**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____

| | |
|---|---|
| ADREA, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| - against - | )   ECF Case |
| | ) |
| BARNES & NOBLE, INC., | )   13-CV-4137 (JSR) |
| BARNESANDNOBLE.COM LLC, and | ) |
| NOOK MEDIA LLC, | )   NON-CONFIDENTIAL |
| | )   (REDACTED) |
| Defendants. | ) |
| | ) |

_____ )

**DEFENDANTS' MEMORANDUM OF LAW**

**IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ............................................................................................1

II.   LEGAL STANDARD.....................................................................................2

III.  ACCUSED PRODUCTS AND THEORIES OF INFRINGEMENT
FOR WHICH ADREA HAS FAILED TO COME FORWARD
WITH EVIDENCE .........................................................................................4

IV.  THERE IS NO LIABILITY WITH RESPECT TO THE '703
PATENT ........................................................................................................5

     A.    The NOOK Devices Do Not Infringe the '703 Patent..............................7

         1.    The NOOK Devices Lack the "wherein the consumer appliance
does not require a user to access a web browser" Limitation of
Claims 1-3 ..........................................................................................7

         2.    The NOOK Devices Lack the "a single user input" Limitation of
Claims 13 and 15 ..............................................................................9

         3.    The NOOK Devices Do Not "initiat[e] retrieval of data by the
consumer appliance from a server based on a predetermined URL
or an identifier associated with the consumer appliance" as
Required by Claims 1-3 or Initiate Access to a Web Page "based
on the identifier" as Required by Claims 13-15........................................11

     B.    The '703 Patent Is Invalid...................................................................12

         1.    Munyan Anticipates or Renders Obvious Claims 1-3 ..............................12

         2.    Bolas Anticipates Or Renders Obvious Claims 13 and 15 ........................16

V.   THERE IS NO LIABILITY WITH RESPECT TO THE '501
PATENT ......................................................................................................20

     A.    The NOOK Devices Do Not Infringe the '501 Patent...........................21

     B.    The '501 Patent Is Invalid...................................................................23

VI.  THERE IS NO LIABILITY WITH RESPECT TO THE '851
PATENT ......................................................................................................27

     A.    The NOOK Devices Do Not Infringe Claims 1, 34, or 35 ....................28

1.      B&N's Encryption System Does Not Perform the Required Steps in the Order Required by Claim 1 ............................................................. 28

2.      Adrea Cannot Rely On the Doctrine of Equivalents to Assert Infringement of Claim 1 ................................................................. 29

3.      Akamai's Use of a Secure Channel to Transmit Encrypted Books Is Not a Basis for Infringement ................................................. 30

4.      B&N Is Not Liable for Induced Infringement of Claim 1 ......................... 31

B.      The NOOK Devices Do Not Infringe Apparatus Claim 96 ................................. 32

1.      The NOOK Devices Do Not "Select a Title" ............................. 32

2.      The NOOK Devices Do Not Meet the Encryption Limitations of Claim 96 ..................................................................................... 35

C.      Claims 1, 34 and 35 of the '851 Patent Are Invalid ....................................... 36

1.      Gifford Anticipates Claims 1, 34 and 35 ................................... 36

2.      The Asserted Claims Have a Priority Date No Earlier Than September 21, 1999 ..................................................................... 40

3.      Claims 1, 34, and 35 Are Invalid Under 35 U.S.C. § 112 ........................ 41

4.      Claims 1, 34, and 35 Are Invalid Under 35 U.S.C. § 101 ........................ 43

VII.      B&N DID NOT WILLFULLY INFRINGE THE PATENTS IN SUIT .................................................................................................................. 45

VIII.      DAMAGES ACCRUE NO EARLIER THAN MARCH 29, 2012 .................................. 46

A.      Even if Direct Infringement Is Shown, Adrea Cannot Recover Damages Prior to March 29, 2012 ..................................................... 46

1.      Adrea Provided Actual Notice Of Alleged Infringement to B&N No Earlier Than March 29, 2012 ................................................. 47

2.      Adrea Did Not Plead Compliance with the Marking Statute ................... 47

3.      Adrea Has Not Complied with the Marking Statute ................................. 47

B.      In the Event Induced Infringement Is Shown, Adrea is Not Entitled to Damages Earlier Than March 29, 2012 .............................. 49

IX.      CONCLUSION .................................................................................................... 50

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Advanced Fiber Techs. Trust v. J&L Fiber Servs., Inc.*, 674 F.3d 1365 (Fed. Cir. 2012)............ 45

*ALZA Corp. v. Andrx Pharms., LLC*, 603 F.3d 935 (Fed. Cir. 2010).......................................... 41

*Am. Med. Sys., Inc. v. Med. Eng'g Corp.*, 6 F.3d 1523 (Fed. Cir. 1993)..................................... 46

*Amazin' Raisins Int'l, Inc. v. Ocean Spray Cranberries, Inc.*, 306 F. App'x 553 (Fed. Cir. 2008) ................................................................................................................................................. 34

*Amsted Indus. Inc. v. Buckeye Steel Castings Co.*, 24 F.3d 178 (Fed. Cir. 1994) ................. 47, 48

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .................................................................. 3

*Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336 (Fed. Cir. 2010) ...................................... 41

*Bai v. L & L Wings, Inc.*, 160 F.3d 1350 (Fed. Cir. 1998)............................................................. 3

*Bancorp Services v. Sun Life*, 687 F.3d 1266 (Fed. Cir. 2012) .................................................... 44

*Bard Peripheral Vascular, Inc. v. W.L. Gore*, 682 F.3d 1003 (Fed. Cir. 2012) ........................... 45

*Bilski v. Kappos*, 130 S. Ct. 3218 (2010)..................................................................................... 44

*Black & Decker, Inc. v. Robert Bosch Tool Corp.*, 260 F. App'x 284 (Fed. Cir. 2008) .............. 45

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................................. 3

*CLS Bank Int'l v. Alice Corp. Pty. Ltd.*, 717 F.3d 1269 (Fed. Cir. 2013).............................. 43, 44

*Cognex, Corp. v. Microscan Sys., Inc.*, 2013 WL 6906221 (S.D.N.Y. Dec. 31, 2013).......... 46, 47

*CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366 (Fed. Cir. 2011) ........................... 44

*DePuy Spine Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314 (Fed. Cir. 2009) .............. 45

*DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005 (Fed. Cir. 2006) ............. 29

*Diamond v. Diehr*, 450 U.S. 175 (1981)...................................................................................... 44

*DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293 (Fed. Cir. 2006).............................................. 32, 49

*Enzo Biochem, Inc. v. Applera Corp.*, 599 F.3d 1325 (Fed. Cir. 2010)......................................... 3

*Festo Corp. v. Shoketsu Kinzoku Kgyo Kabushiki Co.*, 535 U.S. 722 (2002) ...................... *passim*

*Gart v. Logitech, Inc.*, 254 F.3d 1334 (Fed. Cir. 2001) ............................................................... 46

*Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S.Ct. 2060 (2011)................................................ 49

*Hoganas AB v. Dresser Indus., Inc.*, 9 F.3d 948 (Fed. Cir. 1993)................................................ 34

*In re Seagate Tech., LLC*, 497 F.2d 1360 (Fed. Cir. 2007) ........................................................ 45

*In re Vaeck*, 947 F.2d 488 (Fed. Cir. 1991) ................................................................................ 42

*In re Yarn Processing Patent Validity Litig. (No. II)*, 602 F. Supp. 159 (W.D.N.C. 1984) ........ 48

*Int'l Seaway Trading Corp. v. Walgreens Corp.*, 589 F.3d 1233 (Fed. Cir. 2009) ............... 18, 40

*Joy Techs., Inc. v. Flakt, Inc.*, 6 F.3d 770 (Fed. Cir. 1993) ........................................................ 34

*Lantech, Inc. v. Kelp Mach. Co.*, 32 F.3d 542 (Fed. Cir. 1994) .................................................. 32

*Liebel-Flarsheim Co. v. Medrad, Inc.*, 481 F.3d 1371 (Fed. Cir. 2007)................................... 2, 3

*Maxwell v. J. Baker, Inc.*, 86 F.3d 1098 (Fed. Cir. 1996)...................................................... 47, 48

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289 (2012) ......................... 43

*Minks v. Polaris Indus., Inc.*, 546 F.3d 1364 (Fed. Cir. 2008) ................................................... 47

*Mirror Worlds, LLC v. Apple Inc.*, 692 F.3d 1351 (Fed. Cir. 2012)............................................ 29

*Monsanto Co. v. Syngenta Seeds, Inc.*, 503 F.3d 1352 (Fed. Cir. 2007) ...................................... 3

*Nike, Inc. v. Wal-Mart Stores, Inc.*, 138 F.3d 1437 (Fed. Cir. 1998) .......................................... 48

*Parker v. Flook*, 437 U.S. 584 (1978).................................................................................... 43, 44

*Phonometrics, Inc. v. N.Telecom Inc.*, 133 F.3d 1459 (Fed. Cir. 1998) ...................................... 36

*Powell v. Home Depot U.S.A., Inc.*, 663 F.3d 1221 (Fed. Cir. 2011) .......................................... 45

*Process Control Corp. v. HydReclaim Corp.*, 190 F.3d 1350 (Fed. Cir. 1999) .......................... 34

*Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336 (Fed. Cir. 2001)............................................... 36

*Sage Prods., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420 (Fed. Cir. 1997).................................... 29

*Schering Corp. v. Geneva Pharms., Inc.*, 339 F.3d 1373 (Fed. Cir. 2003).................................... 3

*Semiconductor Energy Lab. Co. v. Chi Mei Optoelectronics Corp.*, 531 F. Supp. 2d 1084 (N.D.
   Cal. 2007)................................................................................................................................. 50

*Solvay S.A. v. Honeywell Specialty Materials LLC*, 827 F. Supp. 2d 358 (D. Del. 2011) .......... 46

*Southwall Techs., Inc v. Cardinal IG Co.*, 54 F.3d 1570 (Fed. Cir. 1995) .................................. 32

*Soverain Software LLC v. Newegg Inc.*, 705 F.3d 1333 (Fed. Cir. 2013) .................................... 15

*Spectrum Int'l, Inc. v. Sterilite Corp.*, 164 F.3d 1372 (Fed. Cir. 1998)........................................... 3

*Spine Solutions Inc. v. Medtronic Sofamor Danek USA, Inc*, 620 F.3d 1305 (Fed. Cir. 2010).... 46

*TransCore, LP v. Elec. Transaction Consultants Corp.*, 563 F.3d 1271 (Fed. Cir. 2009).......... 48

*Tyco Healthcare Grp. LP v. Mutual Pharm. Co.*, 642 F.3d 1370 (Fed. Cir. 2011)...................... 3

*Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292 (Fed. Cir. 2011)........................................ 45

*Western Union Co. v. MoneyGram Payment Sys., Inc.*, 626 F.3d 1361 (Fed. Cir. 2010) ........... 15

**STATUTES**

35 U.S.C. § 103(a) ........................................................................................................................ 3

35 U.S.C. § 120............................................................................................................................. 41

35 U.S.C. § 287(a) ........................................................................................................ 2, 46, 47, 48

**RULES**

Fed. R. Civ. P. 56(c) ..................................................................................................................... 3

Defendants and Counterclaim-Plaintiffs Barnes & Noble, Inc., barnesandnoble.com llc, and NOOK Media LLC (collectively, "B&N") respectfully submit this Memorandum of Law in support of their Motion for Summary Judgment of non-infringement and invalidity with respect to the asserted claims of U.S. Patent Nos. 7,620,703 ("the '703 Patent"); 7,299,501 ("the '501 Patent"); and 7,298,851 ("the '851 Patent") (collectively, the "Patents in Suit") owned by Plaintiff Adrea, LLC ("Adrea").

## I.    INTRODUCTION

Adrea is a non-practicing entity formed for the sole purpose of attempting to monetize patents previously owned by others relating to "e-reader" devices.  Defendants are companies related to the world-renowned bookseller, Barnes & Noble.  This action focuses on certain alleged functionalities of B&N's NOOK® e-reader devices, which are accused of infringement. In the case of all three patents, Adrea seeks to sweep in NOOK functionality that the patents do not actually cover.  It also repeatedly takes internally inconsistent and contradictory positions that ultimately serve only to confirm that the asserted claims – particularly if they are interpreted so broadly as to cover the NOOK – are invalid.

First, Adrea alleges that the NOOK device's Shop feature, which can be used to access a B&N storefront to browse books that are available for download and purchase, infringes certain claims of the '703 Patent.  But Barnes & Noble does not infringe for multiple reasons including that the asserted claims specify, among other limitations, a consumer appliance that does not require a user to access a web browser to initiate retrieval of data.  Here, however, the NOOK devices do not infringe because the Shop application *is* a web browser.

Adrea further alleges that B&N's LendMe feature, as implemented on NOOK devices, infringes the asserted claims of the '501 Patent.  B&N's LendMe feature permits one B&N account holder to loan an e-book for which the feature is available to another B&N account holder for a limited period of time.  As construed by the Court, the asserted claims require a lending function that "associat[es] with the electronic book a predetermined amount of time after the electronic book is stored on the viewer."  In the accused LendMe feature, however, the

predetermined amount of time starts when the lend offer is accepted, and it does not depend on when (or whether) a book is stored on a NOOK device.

The last patent asserted by Adrea is the '851 Patent.  Adrea's allegations here focus on the encryption and decryption of e-books downloaded to a NOOK device.  Among other things, the asserted claims specify that the encryption and decryption steps must be performed in a specific order, and that the device must have a receiver that selects an e-book from a transmitted list of titles.  The accused NOOK devices, however, do none of these things.

Additionally, the asserted claims of each of the '703, '501 and '851 Patents are invalid in view of the prior art.  Claim 1 of the '851 Patent is also invalid because the specification does not enable its full scope, and the claim is directed to nothing more than an abstract idea.

Lastly, even if the Court finds that the issues of non-infringement and invalidity raised by B&N are not ripe for summary judgment, B&N cannot be held to have willfully infringed the Patents in Suit, and, due to Adrea's failure to comply with the marking requirements of 35 U.S.C. § 287(a), any damages should accrue no earlier than March 29, 2012.

Prior notable proceedings in this action include the Court's claim construction order, issued on December 2, 2013, as well as the expert disclosures exchanged and expert depositions conducted by the parties.[1]  Based on the Court's construction of the asserted claims and the undisputed testimony of the technical experts, as a matter of law, B&N is entitled to summary judgment of non-infringement and a declaration that the Patents in Suit are invalid.

## II.    LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 481 F.3d 1371, 1377 (Fed. Cir. 2007) (citing

---

[1] The technical experts in this case include:  Mr. Brian Berg ("Mr. Berg"), Adrea's expert on issues related to infringement, Dr. Xin Wang ("Dr. Wang"), Adrea's expert on issues related to validity, and Dr. Clifford Neuman ("Dr. Neuman"), B&N's expert on issues related to non-infringement and invalidity.

Fed. R. Civ. P. 56(c)).  Where the non-moving party bears the burden of proof at trial, the moving party must show initially the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  To defeat summary judgment the non-moving party must show more than a "mere existence of a scintilla of evidence" in support of its position.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  Instead, it must show that "the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Id.* at 247-48.

Because the Court has already construed the disputed patent terms, the infringement analysis requires only a determination of whether the construed claims encompass the accused products, either literally or, where asserted, under the doctrine of equivalents.  *See Bai v. L & L Wings, Inc.*, 160 F.3d 1350, 1353 (Fed. Cir. 1998).  Summary judgment of no literal infringement of an apparatus claim should be granted where there is no genuine dispute that the accused methods or products lack at least one claim limitation.  *See Spectrum Int'l, Inc. v. Sterilite Corp.*, 164 F.3d 1372, 1380 (Fed. Cir. 1998).  Where the alleged literal infringement is of a method claim, "all of the steps of the process must be performed, either as claimed or by an equivalent step."  *Monsanto Co. v. Syngenta Seeds, Inc.*, 503 F.3d 1352, 1359 (Fed. Cir. 2007).

A patent is invalid as anticipated if "a single prior art reference discloses each and every limitation of the claimed invention."  *Schering Corp. v. Geneva Pharms., Inc.*, 339 F.3d 1373, 1377 (Fed. Cir. 2003).  A patent is invalid as obvious "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."  35 U.S.C. § 103(a).  Where there is no genuine issue of material fact, both anticipation and obviousness may be decided on summary judgment.  *Tyco Healthcare Grp. LP v. Mutual Pharm. Co.*, 642 F.3d 1370, 1371 (Fed. Cir. 2011) (affirming grant of summary judgment of obviousness); *Liebel-Flarsheim*, 481 F.3d at 1381 (affirming summary judgment of invalidity based on reference that was cited to the Patent Office during prosecution); *Enzo Biochem, Inc. v. Applera Corp.*, 599 F.3d 1325, 1331 (Fed. Cir. 2010).

III.   **ACCUSED PRODUCTS AND THEORIES OF INFRINGEMENT FOR WHICH ADREA HAS FAILED TO COME FORWARD WITH EVIDENCE**

The accused B&N NOOK® e-reader devices are the NOOK 1st Edition (also referred to as NOOK Classic), NOOK Color, NOOK Tablet, NOOK Simple Touch, NOOK Simple Touch with GlowLight, NOOK HD, NOOK HD+ and NOOK GlowLight (collectively "the accused NOOK devices").  Defendants' Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1 ("Def. 56.1") ¶¶ 21, 23.  B&N also has made NOOK applications, which can be loaded and executed on third party devices not made or sold by B&N, such as iOS-based devices like the iPhone or iPad, Android-based devices such as smart phones and tablets, and PCs running the Windows or Mac operating systems.  Def. 56.1 ¶ 25.  In addition, B&N operates a website (www.barnesandnoble.com), where users may browse and purchase electronic books, and download and view them.  Def. 56.1 ¶ 30.

In its Complaint, Adrea accused B&N of infringing each of the Patents in Suit directly, by inducing infringement, and by contributorily infringing.  Def. 56.1 ¶ 20.  Adrea's Infringement Contentions, served on August 16, 2013, alleged that all the accused NOOK devices, as well as B&N's NOOK applications, infringed the Patents in Suit.  Def. 56.1 ¶¶ 21, 26.[2]  Adrea also accused "the NOOK Bookstore, and/or other Barnes & Noble online services" of infringement, although its contentions did not explain what it meant by those terms.  Def. 56.1 ¶ 23.

Adrea's expert report on infringement issues, however, only provided opinions with respect to the alleged infringement of the accused NOOK devices.  What is more, the report is limited to (i) direct infringement of the asserted claims of the '703 and '501 Patents, (ii) direct infringement of claims 96 and 108 of the '851 Patent, and (iii) inducement of infringement of claims 1, 34, and 35 of the '851 Patent.  Def. 56.1 ¶¶ 33-35.  Thus, Adrea has failed to come forward with evidence or expert opinion with respect to the following accused products or theories of infringement:

---

[2] NOOK GlowLight is only accused of infringing the '703 and '501 Patent.  Def. 56.1 ¶ 24.

- No direct or contributory infringement as to claims 1, 34, and 35 of '851 Patent.
- No indirect infringement as to claims 96 and 108 of the '851 Patent.
- No indirect infringement as to asserted claims of the '703 and '501 Patents.
- No infringement of any kind as to the NOOK applications.
- No infringement of any kind as to the B&N website.

Indeed, Mr. Berg, Adrea's technical expert on infringement issues, confirmed that he is not providing an opinion with respect to any of these issues or products.[3] Def. 56.1 ¶¶ 33-35. As Adrea has failed to come forward with any evidence or expert opinion relating to the above theories of infringement or products, B&N is entitled to summary judgment of no liability on all of them.

## IV.  THERE IS NO LIABILITY WITH RESPECT TO THE '703 PATENT

The '703 Patent, titled "Topical Service Provides Context Information for a Home Network," issued on November 17, 2009 from an application filed on August 10, 2000. Def. 56.1 ¶ 7. The specification describes enabling ordinary, household appliances to retrieve information related to their context of usage from a remote server. Much of the '703 Patent is directed at enabling this retrieval by means of an Internet connection through a home network. A single user input is all that is necessary to initiate retrieval.

The specification of the '703 Patent discloses several embodiments of the alleged invention. For example, the '703 Patent discloses the following:

A user may cause a coffee maker to initiate retrieval of a service web page, by pressing a button on the coffee maker that causes it to send a URL to a kitchen pad with web browser functionality, where the kitchen pad then retrieves from the Internet and displays the web page. Ex.[4] Q at 5:41-6:3, 7:1-23.

A user may cause a DVD player to initiate retrieval of a web page providing information about the most popular DVDs on sale, where the user's action may consist of pressing a button on the DVD player and the web page may be displayed on a connected television. *Id.* at 3:4-11, 6:4-67.

---

[3] In a footnote, Mr. Berg states that he has reviewed a NOOK application for an Android tablet device and a Windows PC and that these devices would likely infringe claim 1 of the '851 Patent. Def. 56.1 ¶ 28. Mr. Berg conceded in his deposition, however, that there is no analysis in his report directed to how these applications allegedly infringe and that he is not planning to provide an opinion at trial that these applications infringe claim 1 of the '851 Patent. *Id.*

[4] All exhibits are exhibits to the Declaration of Yue-Han Chow.

The disclosed embodiments are not directed to taking a computer and reaching a remote destination either by way of URL or IP address without going through a web browser. As named inventor Eugene Shteyn testified, "[t]hat capability existed since, again, probably '68. 1968." Def. 56.1 ¶ 87.

Adrea asserts only claims 1-3, 13, and 15 of the '703 Patent, of which claims 1 and 13 are independent. For ease of reference, claims 1 and 13 are reproduced below:

> 1. A consumer appliance comprising:
> an input component responsive to a user-input for initiating retrieval of data by the consumer appliance from a server based on a predetermined URL or an identifier associated with the consumer appliance, the data representing content information about the context of usage of the consumer appliance, wherein the consumer appliance does not require a user to access a web browser or other device in order for the consumer appliance to initiate retrieval of the data. Ex. Q at 9:46-55.

> 13. A method of enabling a service provider to provide a service via the Internet to a user of a consumer appliance having a predetermined identifier, the identifier being stored on a home network that includes the consumer appliance, the method comprising:
> enabling the user by a single user input to the consumer appliance to have the consumer appliance initiate sending a request with the identifier representative of a type of the consumer appliance to a server on the Internet through the home network; and
> based on the identifier, the server initiating access to a web page with content information about a context of using the consumer appliance. *Id.* at 10:40-52.

Adrea contends that the accused NOOK devices infringe the asserted claims via the Shop feature of those devices. Def. 56.1 ¶ 38. When a user touches the "Shop" icon on an accused NOOK device, the Shop application typically displays a "Shop storefront" or "Shopfront" page that provides information regarding, for example, books that are available for download and purchase. Def. 56.1 ¶¶ 37, 72.[5]

---

[5] Adrea has not presented any expert opinions that the '703 Patent is infringed by features of NOOK devices unrelated to the Shop application.

A.       **The NOOK Devices Do Not Infringe the '703 Patent**

1.       **The NOOK Devices Lack the "wherein the consumer appliance does not require a user to access a web browser" Limitation of Claims 1-3**

Claim 1, and therefore dependent claims 2 and 3, of the '703 Patent each require that "the consumer appliance does not require a user to access a web browser . . . in order for the consumer appliance to initiate retrieval of the data." Ex. Q at Claims 1-3. Because the Shop application *is* a web browser that allows users to retrieve, view, and browse web pages within the store, the accused NOOK devices do not meet this limitation. The main dispute centers on the fact that Shop does not have an address bar that permits users to browse anywhere on the Web. But as with parental controls on a current conventional browser, the fact that *where* Shop permits users to browse may be limited does not change *what* it is.

The record contains ample evidence that the Shop feature on the NOOK devices is a web browser. When a user presses the Shop icon, and the device is powered on, in range, and connected to a network to which the user has secured access, Shop connects to a B&N server on the World Wide Web. Def. 56.1 ¶¶ 37, 50, 72. From this server, the Shop application may retrieve a web page and allow users to browse and navigate. Def. 56.1 ¶¶ 56–58.

Indeed, Adrea's expert conducted tests on the NOOK HD and NOOK HD+ which show that the retrieved data may comprise HTML – the predominant language for creating web pages and other information that can be displayed by a web browser. Def. 56.1 ¶ 57. Mr. Berg's tests confirmed the presence of HTML while recording the interactions between NOOK HD or NOOK HD+ devices and remote servers. Def. 56.1 ¶¶ 57, 61. Once the Shop application retrieves and renders the data, users may browse the Shop storefront by clicking on portions of the page, as is typical with web browsers. Def. 56.1 ¶ 58. Indeed, both parties' expert reports contain screenshots from NOOK devices and user guides urging the user to, for example, "browse THE NOOK STORE" or "Browse the Shop." Def. 56.1 ¶¶ 56, 60.

The behavior of the Shop application satisfies Adrea's proposed definition of the plain and ordinary meaning of "web browser," namely "a client application that enables a user to view

HTML documents on the World Wide Web, another network, or the user's computer; follow the hyperlinks among them; and transfer files." Dkt. 48 at 14. Although B&N does not agree that this is a complete and accurate definition of "web browser," such application is unquestionably an ***example*** of a web browser. And, the Shop feature meets it. As discussed above, the Shop application may "enable[] a user to view HTML documents on the World Wide Web," Def. 56.1 ¶¶ 37, 50, 57, 72, "follow hyperlinks," Def. 56.1 ¶ 58, and "transfer files," Def. 56.1 ¶ 57, 59.

The Shop feature also self-identifies as a web browser. Rendering and displaying a web page often entails the retrieval of files referenced in the HTML, such as images and style sheets. Def. 56.1 ¶ 59. In doing so, the Shop application identifies itself to the web servers hosting these additional files as a "web browser": "***Mozilla***/5.0 (Linux; U; Android 4.0.4; en=us; BNTV400 Build/IMM76L) ***AppleWebKit***/534.30 (KHTML, like Gecko) Version/4.0 ***Safari***/534.30." Def. 56.1 ¶¶ 61-62. (emphasis added).

Adrea's expert has raised only two arguments as to why the Shop application is not a web browser: first, that certain of the accused NOOK devices already have another web browser, (Ex. KK at 70-79), and second, that "users need not enter a web address or specify a URL to access the context-relevant content displayed on the Shopfront or Shop store front in the Shop application," (Ex. KK at 79). Neither is well taken.

As Mr. Berg acknowledged in his deposition, a device can have more than one web browser – the existence of one does not preclude there being another web browser on that same device. Def. 56.1 ¶ 75. Nor must all web browsers contain a visible address bar, permit a user to navigate to a URL of their choosing, or provide unrestricted access to web pages. Def. 56.1 ¶¶ 76-82. In fact, web browsers can omit these features. For example, a kiosk in a mall may include a computer running a web browser in "kiosk mode," in which case mall patrons can navigate the particular web site that the kiosk owner has pre-selected, but cannot see an address bar or enter and navigate to other URLs. Def. 56.1 ¶¶ 81-82. Indeed, Google Chrome (a popular web browser) offers precisely this functionality, but does not cease being a "web browser" when running in kiosk mode. *Id.*

The "ordinary and customary meaning" of "web browser" surely encompasses software for retrieving, viewing, and browsing web pages – particularly when that software refers to itself as a web browser.  As a result, the accused Shop application cannot infringe as a matter of law.[6]

>        **2.      The NOOK Devices Lack the "a single user input" Limitation of Claims 13 and 15**

Claim 13 of the '703 Patent and its asserted dependent claim 15 require "enabling the user by a ***single user input*** to the consumer appliance to have the consumer appliance initiate sending a request . . . to a server."  Ex. Q at Claims 13 & 15.  The undisputed evidence demonstrates, however, that the accused NOOK devices require multiple user inputs to activate the Shop application.

When using a new NOOK device for the first time, a user must turn on the device by holding the Power Button, and generally must configure the device to be associated with the proper location, time zone, and/or Barnes & Noble account.  Def. 56.1 ¶¶ 63-64.  Prior to using the Shop application (which interacts with servers on the Internet), a user must then configure the NOOK device to function on a designated wireless network.  Def. 56.1 ¶¶ 50-51, 66.

Thereafter, depending on the state of the NOOK device and its settings, a user may still be required to enter additional user inputs before accessing the Shop application.  For example, when left alone for a short period of time, NOOK devices go into a "sleep" state from which they must be awakened before they can be used again.  Def. 56.1 ¶ 67.  Accordingly, a user may need to press a button in order to "wake up" the device.  Def. 56.1 ¶ 68.  A NOOK device may also be configured to require that the user enter a passcode in order to "unlock" the device prior to using it following short periods of inactivity.  Def. 56.1 ¶ 69.

Further, even if a NOOK device is powered on, configured, awake, and unlocked, the Shop icon still may not be visible.  Depending on the type of NOOK device and how the device has previously been used, a user may still need to press a button to make the menu or screen that

---

[6] At no time in this litigation has Adrea asserted infringement under the doctrine of equivalents with respect to the "web browser" limitation, and it should not be permitted to raise such an argument at this late date.

contains the Shop icon visible.  Def. 56.1 ¶ 70.  And, even if the proper menu is being displayed, the Shop icon may still not be visible until a user scrolls through the menu options and locates the icon.  Def. 56.1 ¶ 71.

Adrea's response to these multiple user inputs is to ignore all the preliminary inputs and point to the final input – pressing the Shop icon – as a single act.  Ex. KK at 113–38.  That, however, is contrary to the plain meaning of the claim language and the understanding of a person of ordinary skill in the art.

Indeed, Dr. Wang, Adrea's technical expert on issues of validity, agrees that Mr. Berg's focus on the final user input – to the exclusion of all preceding inputs – is not correct.  In his report directed to validity issues, and in the course of opining as to why a certain prior art reference did not disclose the single user input limitation, Dr. Wang admitted that "an initial input step during the configuration process [that occurs prior to the user input that initiates sending a request] . . . does not allow the user to initiate sending a request with a 'single user input' because of the additional input steps that must precede such a request."  Def. 56.1 ¶ 73. Similarly, Dr. Wang opined that requiring a user to navigate a menu-like interface is outside the "single user input" limitation.  Def. 56.1 ¶ 74.  Thus, Adrea admits that the user's entire series of inputs to the consumer appliance must be considered when evaluating whether the "single user input" limitation has been met for purposes of validity.  Adrea should not be permitted to take the opposite view to avoid summary judgment of noninfringement.

The prosecution history of the '703 Patent also demonstrates that Mr. Berg's attempt to ignore the user's entire series of inputs is improper.  When the applicant first filed the application that issued as the '703 Patent, claim 13 required "enabling the user to initiate via the apparatus sending of a request . . . to a server."  Def. 56.1 ¶ 83.  In response to a rejection of claim 13, the applicant amended and narrowed the claim to recite "enabling the user *by a single user input* to the consumer appliance to have the consumer appliance initiate sending a request . . . ."  Def. 56.1 ¶ 85.  Thus, whereas arguably the claim previously permitted multiple inputs to initiate

sending a request, applicants expressly narrowed the claim by adding the "single user input" requirement in response to a prior art rejection.

In short, a user can only click on the Shop icon and activate the Shop application after having engaged in a series of required inputs.  Def. 56.1 ¶¶ 63-72.  As Dr. Wang explained, such a system "does not does not [sic] allow the user to initiate sending a request with a 'single user input' because of the additional input steps that must precede such a request."  Def. 56.1 ¶ 73. Because the NOOK devices require multiple user inputs before launching the Shop application, they do not meet the "single user input" limitation of claim 13.[7]

> ### 3.  The NOOK Devices Do Not "initiat[e] retrieval of data by the consumer appliance from a server based on a predetermined URL or an identifier associated with the consumer appliance" as Required by Claims 1-3 or Initiate Access to a Web Page "based on the identifier" as Required by Claims 13-15

Claims 1-3 of the '703 Patent require the consumer appliance to have "an input component responsive to a user-input *for initiating retrieval of data* by the consumer appliance from a server *based on a predetermined URL or an identifier associated with the consumer appliance*."  Ex. Q at Claim 1 (emphasis added).  Claims 13-15 require that a method "enabl[e] the user . . . to have the consumer appliance *initiate sending a request with the identifier representative of a type of the consumer appliance* to a server . . . [and], *based on the identifier*, the server initiating access to a web page."  Ex. Q at Claim 13 (emphasis added).  In support of its infringement claim, however, Adrea only points to a URL for a general, backend server that is not associated with any accused NOOK device and which is utilized by both NOOK and non-NOOK devices alike.  Def. 56.1 ¶¶ 49–52.  Further, Adrea has not presented any evidence demonstrating that an accused NOOK device initiates retrieval of data from a server "based on" any identifier.

---

[7] Adrea has advanced no argument that the "single user input" limitation is met under the doctrine of equivalents.  In any event, this limitation is not entitled to any range of equivalents, as it was the subject of a narrowing amendment added during prosecution.  *Festo Corp. v. Shoketsu Kinzoku Kgyo Kabushiki Co.*, 535 U.S. 722, 734, 736 (2002).

After a user activates the Shop application on an accused NOOK device (other than the NOOK 1st Edition, a legacy device that has a different back end), the device sends a GPB command to the GPB command server, which server is reached through a URL.  Def. 56.1 ¶ 50. The predetermined URL for the GPB command server (https://bncs.barnesandnoble.com/bncloud/serviceD?version=1) is the same for all NOOK devices that send commands to the GPB command server.  Def. 56.1 ¶ 51.  In fact, this same URL is also used by non-NOOK devices that run NOOK applications and that send commands to the GPB command server, with respect to which Adrea has not presented any expert opinion in support of infringement of the '703 Patent.  Def. 56.1 ¶ 52.  The URL for a general, backend server accessed by a variety of NOOK and non-NOOK devices is not one that is associated with "the consumer appliance."  Def. 56.1 ¶ 53.

With respect to the "based on" limitations relating to an identifier, Adrea only points to evidence regarding a model number and/or device ID that is part of an "Assemble" GPB command sent by the NOOK HD or NOOK HD+ to the GPB command server after activation of the Shop application.  Def. 56.1 ¶ 54.  Adrea has not put forward any evidence, however, demonstrating whether or how the GPB command server utilizes a model number or device ID that it receives from a NOOK HD or NOOK HD+ as part of an "Assemble" GPB command sent after activation of the Shop application, other than including the device ID in a response to the NOOK device.  Accordingly, Adrea cannot maintain that anything occurs "based on" the model number and/or device ID – mere transmission is insufficient to demonstrate that the retrieval of data or access to a web page is initiated "based on" the model number and/or device ID.  Def. 56.1 ¶ 55.

## B.  The '703 Patent Is Invalid

### 1.  Munyan Anticipates or Renders Obvious Claims 1-3

As explained in Dr. Neuman's expert report and summarized in the claim chart attached as Exhibit EEEE, U.S. Patent No. 5,761,485 ("Munyan") anticipates or renders obvious the '703 Patent's claims 1-3.  Ex. EEEE ¶¶ 258–75.  Munyan is directed to a handheld electronic book

device that can download books from an online bookstore.  Munyan at 2:18–54.  A user of this device may press a "bookstore icon" on the touch-sensitive display screen to have the device connect to a remote server.  Def. 56.1 ¶¶ 94-95, 100-01, 102-04, 106-07.  Once the codes are validated, the server will transmit a welcome screen that contains information about, for example, electronic bookstores and electronic libraries from which electronic books may be obtained.  Def. 56.1 ¶¶ 96, 106.  If the codes cannot be validated, the device retrieves nothing and the connection is terminated.  Def. 56.1 ¶¶ 102, 106.  A user can use the handheld electronic book device to purchase and download electronic books, and read those books on the device.  Def. 56.1 ¶ 98.  Figure 1 of the Munyan patent depicts one embodiment of the device:



Def. 56.1 ¶ 90.

In its expert's report, Adrea only disputed whether Munyan discloses or renders obvious the following two limitations from claims 1-3:

- "initiating retrieval of data by the consumer appliance . . . based on a predetermined URL or an identifier associated with the consumer appliance" (claim 1)
- "wherein the consumer appliance configured for use on a home network and having an Internet-access functionality through the home network, the predetermined URL or the identifier being stored on the home network" (claim 2)

But, as set forth below, Munyan fully discloses or renders these limitations obvious.

***an input component responsive to a user-input for initiating retrieval of data by the consumer appliance from a server based on a predetermined URL or an identifier associated with the consumer appliance*** (claim 1)

Munyan discloses "initiating retrieval of data by the consumer appliance."  For example, when a user touches the "bookstore icon" on a touch-sensitive display screen, the Personal Electronic Book may "automatically initiate and establish communications with the remote book store's database library and services."  Def. 56.1 ¶¶ 95, 101.  "The on-line bookstore comprises . . . a processing means . . . such means comprising a server 14 of FIG. 1 . . . or the like."  Def. 56.1 ¶¶ 94, 104.  The Personal Electronic Book may also initiate retrieving data from the server that may include:

> a welcome screen and the various libraries you can access or services available; such as a public domain library, an English language bookstore, a foreign languages bookstore, a multimedia bookstore, and subscription services, or the like.  Upon entering a bookstore or selecting a service, the product selections can be displayed on your Personal Electronic Book in a multitude of formats. . . .  One such display format is to simulate a bookstore arrangement such as by placing periodicals and newspapers in one section of the display screen such as along the sides of the screen, on-sale items or specials in another section such as across the bottom of the screen, and books and/or other products that may be offered by subject, author, title or other classification in yet another section of the screen.

Def. 56.1 ¶ 96; *see* Def. 56.1 ¶ 106 ("transmitting a welcome screen from said bookstore to said Personal Electronic Book").

Munyan further discloses an "identifier associated with the consumer appliance" when it discloses that a user and security identification code are used "to identify a particular Personal Electronic Book unit to the on-line bookstore."  Def. 56.1 ¶ 102; *see* Def. 56.1 ¶ 103.

In addition, Munyan discloses that touching the bookstore icon initiates "retrieval of data by the consumer appliance . . . based on" the user and security identification codes.  In addition to "automatically initiat[ing] and establish[ing] communications with the remote book store's database library and services," Def. 56.1 ¶ 95; *see* Def. 56.1 ¶ 101, pressing the bookstore icon also may cause the Personal Electronic Book to send user-entered or pre-stored user and security identification codes to the remote server for validation, Def. 56.1 ¶¶ 95, 100, 103-04, 106-07.  The "based upon" portion of this limitation is specifically met where Munyan discloses "transmitting a welcome screen from said bookstore to said Personal Electronic Book when said

codes are valid" and "terminating communications if said security [or user] identification code is invalid."  Def. 56.1 ¶ 106; *see* Def. 56.1 ¶ 102.

> ### *wherein the consumer appliance configured for use on a home network and having an Internet-access functionality through the home network, the predetermined URL or the identifier being stored on the home network* (claim 2)

Munyan discloses that the Personal Electronic Book has a modem and communicates with the server through the public switched telephone network (PSTN).  Def. 56.1 ¶¶ 95, 100.  It would have been obvious to a person of ordinary skill in the art at the time of the '703 Patent, filed in 2000, to modify the invention to have the Personal Electronic Book "configured for use on a home network and having an Internet-access functionality through the home network."  Def. 56.1 ¶ 111.  As the Federal Circuit has explained, "applying computer and internet technology to replace older electronics has been commonplace in recent years."  *Western Union Co. v. MoneyGram Payment Sys., Inc.*, 626 F.3d 1361, 1370 (Fed. Cir. 2010).  At the time of the filing of the '703 Patent, it was becoming more common for systems to utilize the Internet via a local area or home network to connect to a remote server.  Def. 56.1 ¶¶ 109-110.  Mr. Shteyn, the named inventor on the '703 Patent, admitted that he did not invent home networks, and the '703 Patent clearly recognizes that home networks were nothing new.  Def. 56.1 ¶ 86; *see* Ex. Q.  Indeed, Dr. Wang also agrees that local area networks existed in homes prior to the filing of the '703 Patent.  Def. 56.1 ¶ 133.

Modifying the Personal Electronic Book device of Munyan to connect to a server through the Internet using a network located in the home amounts to nothing more than a mere substitution of one element for another known in the field to yield a predictable result.  For example, the Federal Circuit has found obvious claims (filed in 1999) that implemented an invention via the Internet, where the prior art implemented it via a fax machine over the PSTN.  *See Western Union*, 626 F.3d at 1364, 1369-70.  Similarly, the Federal Circuit has found obvious certain claims (claiming priority to 1994) that implemented an invention via the Internet, where the prior art implemented it "on a pre-Internet network."  *Soverain Software LLC v. Newegg Inc.*, 705 F.3d 1333, 1340 (Fed. Cir. 2013).

In its claim construction ruling, the Court held that "the home network" does not exclude the consumer appliance itself.  Def. 56.1 ¶ 46.  Accordingly, because it would be obvious to configure the Personal Electronic Book that is the subject of Munyan for use on a home network, Munyan discloses an "identifier stored on the home network" when it discloses that the user and security identification codes may be stored on the Personal Electronic Book.  Def. 56.1 ¶¶ 95, 100, 103-04, 106-07.  For example, Munyan discloses an "alternative embodiment" where the "user identification code [is] encoded into a particular Personal Electronic Book when the unit is procured."  Def. 56.1 ¶ 95.  Similarly, the security identification code may be "embedded in a security circuit" within a Personal Electronic Book.  Def. 56.1 ¶ 103.  And, a Personal Electronic Book may "automatically, without user intervention, . . . identify[] itself by transmitting said unique Personal Electronic Book security identification code and said user identification code."  Def. 56.1 ¶ 107; *see* Def. 56.1 ¶¶ 100, 105-06.  Taken all together, Munyan renders the '703 Patent's claim 2 obvious.

## 2.  Bolas Anticipates Or Renders Obvious Claims 13 and 15

As explained in Dr. Neuman's expert report and summarized in the claim charts attached as Exhibit EEEE.  U.S. Patent No. 6,389,463 ("Bolas") anticipates or renders obvious each limitation of claims 13 and 15 of the '703 Patent.  Ex. EEEE ¶¶ 167-81.  Bolas is directed to a device, similar to a traditional radio, which has the additional capability to locate, retrieve, and play audio from the Internet, and can locate, retrieve, and display text identifying the audio being played.  Def. 56.1 ¶¶ 113, 115, 120, 124, 126.  A user may press a single button or turn a single knob, and thereby cause the internet radio to retrieve both audio data, as well as text identifying the audio.  Def. 56.1 ¶¶ 115-16, 120, 123-25.  In order to retrieve this audio and text, an internet radio may send a unique serial number to a remote server (such as a netradiostation server), which serial number the server may use (in part) to find the Internet address at which the internet radio can retrieve the sought-after audio and text.  Def. 56.1 ¶ 125.

In its expert's report, Adrea only disputed whether Bolas discloses or renders obvious certain limitations in claims 13 and 15:

- "a consumer appliance having a predetermined identifier . . . representative of a type of the consumer appliance" (claim 13)
- "enabling the user by a single user input to the consumer appliance to have the consumer appliance initiate sending a request" (claim 13)
- "the identifier being stored on a home network that includes the consumer appliance" (claim 13)
- "initiate sending a request . . . to a server on the Internet through the home network" (claim 13)
- "based on the identifier, the server initiating access to a web page with content information about a context of using the consumer appliance" (claim 13)
- "further comprising creating a data base of URLs or identifiers per user" (claim 15)

As set forth below, however, Bolas fully discloses or renders these limitations obvious.

### *a consumer appliance having a predetermined identifier . . . representative of a type of the consumer appliance* **(claim 13)**

Bolas anticipates this limitation when it discloses that a remote netradiostation server recognizes a request that includes the serial number as coming from an internet radio and responding appropriately.  Def. 56.1 ¶ 125.  Indeed, Dr. Wang agrees that the serial number is associated with the internet radio.  Def. 56.1 ¶ 134.  If the serial number is associated with the internet radio and a netradiostation is able to recognize the serial number as associated with an internet radio, then that serial number also represents "a type of the consumer appliance" – namely, an internet radio having a predetermined identifier.  Ex. DDDD ¶ 177.

### *enabling the user by a single user input to the consumer appliance to have the consumer appliance initiate sending a request* **(claim 13)**

As explained above, this limitation requires consideration of all user inputs, not just the final input in a series.  Bolas arguably discloses a single user input inasmuch as the user can press a preset button that is located on the housing of the radio and directly physically accessible to the user, Def. 56.1 ¶ 123, which is very much akin to the blender and coffee maker embodiments disclosed in the '703 Patent.  Bolas at Fig. 1.  Contrary to its infringement position, however, when it comes to validity, Adrea disputes that Bolas discloses this limitation, because, according to Dr. Wang, it "describes an initial input step during the configuration process, as well as additional input by the user to create pushbutton preset switches, prior to the radio device

sending a request for data." Def. 56.1 ¶ 73.  Adrea cannot have it both ways – claims must be given the same scope for validity and infringement.  *See Int'l Seaway Trading Corp. v. Walgreens Corp.*, 589 F.3d 1233, 1239 (Fed. Cir. 2009).  According to Dr. Wang's view of the claim, B&N cannot infringe this claim because of the multiple user inputs required before the user can access the Shop button.  To the extent that the Court agrees with Dr. Berg's view that only the last in a series of inputs need be considered, however, then Bolas anticipates this limitation when it discloses a user turning a single knob or pressing a single button, thereby causing the internet radio to initiate sending a request to a netradiostation server on the Internet. Def. 56.1 ¶¶ 123, 125.

### *the identifier being stored on a home network that includes the consumer appliance* (claim 13)

Bolas discloses a "home network" when it focuses on simplifying internet radio for "home user[s]," Def. 56.1 ¶ 114, discloses that the internet radio can be configured to "match any . . . pre-existing home audio/home theater systems," Def. 56.1 ¶ 117, and discloses that the internet radio can connect to a local area network, contain a network interface card, and connect to the Internet via that card, Def. 56.1 ¶¶ 115, 118.  Indeed, Dr. Wang does not dispute that the internet radio that is the subject of Bolas could be used in a home and connect to a network, or that local area networks in the home existed before the '703 application was filed.  Def. 56.1 ¶¶ 133, 135-36.

Thus, Bolas inherently discloses a "home network that includes the consumer appliance" that stores the identifier, when it discloses that the internet radio sends the serial number to the netradiostation server.  Def. 56.1 ¶ 125.  If the internet radio is able to send the serial number, then it must store it at least temporarily.

Even if not inherently disclosed, it would have been obvious to store the serial number on the internet radio.  Dr. Wang agreed that "if an object of the design is to store, it is obvious." Def. 56.1 ¶ 140.  Nor has Adrea presented any expert testimony that Bolas teaches away from storing the serial number on the radio.  Def. 56.1 ¶ 139.

**initiate sending a request . . . to a server on the Internet through the home network (claim 13)**

As discussed above, Bolas discloses the user turning a knob or pressing a preset button to have the internet radio initiate sending a request to a server on the Internet. *See supra* at 17-18. As further discussed above, Bolas also discloses connecting to the Internet through a home network. *See supra* at 18.

**based on the identifier, the server initiating access to a web page with content information about a context of using the consumer appliance (claim 13)**

Bolas meets this limitation, in that it discloses that the internet radio device transmits its serial number to a netradiostation server, which in turn uses the serial number (along with a user name and data about the user input) to determine the URL of the radio station from which to retrieve data. Def. 56.1 ¶ 125. The internet radio may then receive, from the station's web page, "audio data" that is "transmitted to the audio card[] for eventual transmission to the speakers" and "identifying text data to be sent to the display." Def. 56.1 ¶ 124; *see* Def. 56.1 ¶ 120 (radio receives "audio content from an audio source" and "other data, such as an identification of the audio source or website"). Accordingly, at a minimum, Bolas discloses "a web page with content information about a context of using the consumer appliance" when it discloses the radio station's web page providing the internet radio with other data, including textual data identifying the audio source. Def. 56.1 ¶ 124; *see* Def. 56.1 ¶ 120.

**further comprising creating a data base of URLs or identifiers per user (claim 15)**

Finally, Bolas discloses the internet radio sending its serial number and user name (*i.e.*, user parameters) to a netradiostation server, which the server uses to "index into a list of station URLs from which the radio audio data will be actually served." Def. 56.1 ¶¶ 124-25. A person of ordinary skill in the art would know that a database of URLs per user could be used to implement indexing into a list of station URLs by user parameters. Def. 56.1 ¶ 137. Thus, Bolas renders this limitation obvious. *Id.* Notably, Dr. Wang does not dispute that this limitation would be obvious to a person of ordinary skill in the art. Ex. NN ¶¶ 228-29.

## V.      THERE IS NO LIABILITY WITH RESPECT TO THE '501 PATENT

The '501 Patent, titled "Electronic Book Selection and Delivery System Having

Encryption and Security Features," issued on November 20, 2007 from an application filed on

September 28, 2001.  Def. 56.1 ¶ 12.  The specification discusses bookstores or libraries renting

electronic books by physically renting e-readers to customers.  Ex. P at 5:12-15 (discussing

libraries checking out viewer devices and bookstores renting such devices).  Customers visit a

library or bookstore to retrieve a viewer device containing one or two electronic books.  Ex. P at

15:19-33.  The viewer device has a time out sequence that erases the books after a certain period

of time.  Ex. P at 15:19-33, 11:66-12:7.

Adrea asserts only claims 7-9 and 18-19 of the '501 Patent, of which claims 7 and 18 are

independent.  For ease of reference, claims 7 and 18 are reproduced below:

> 7.      A method for restricting access to electronic books displayed on a viewer,
> the method comprising:
> storing an electronic book on a viewer;
> associating a predetermined amount of time after the electronic book is
> stored on the viewer with the electronic book;
> allowing access to and display of the electronic book for the
> predetermined amount of time; and
> restricting access to the electronic book, for display of the electronic book
> on the viewer, once the predetermined amount of time has passed.

> 18.     A portable viewer for displaying electronic books, comprising:
> a memory for storing instructions;
> a memory for storing electronic books;
> a display for displaying the electronic books; and
> a processor that operated under control of the instructions and is capable
> of:
> > storing an electronic book on the viewer;
> > associating a predetermined amount of time after the electronic
> > book is stored on the viewer with the electronic book;
> > allowing access to and display of the electronic book for the
> > predetermined amount of time; and
> > restricting access to the electronic boo, for display of the electronic
> > book on the viewer, once the predetermined amount of time has
> > passed.

Adrea argues that B&N's LendMe feature, as implemented on the accused NOOK

devices, infringes the '501 Patent.  Def. 56.1 ¶¶ 21, 24, 39-40.  B&N's LendMe feature permits

one B&N account holder to loan certain electronic books for which the feature is available to

another B&N account holder for a limited period of time.[8]  Def. 56.1 ¶ 39.  The recipient of the lend offer has seven days after the date the offer was sent to accept the offer, which he can do in several ways.  Def. 56.1 ¶ 141.  For example, the recipient can accept the lend offer by logging onto his B&N account on B&N's website, or his NOOK device if the device is associated with the account to which the lend offer was made, or using a NOOK application running on, for example, an Android device.  Def. 56.1 ¶ 142.  The recipient has fourteen days after the date the lend offer *is accepted* during which he may access and read the book.  Def. 56.1 ¶ 143.  The fourteen day time period begins to run from acceptance of the loan offer regardless of how the recipient accepted it – and regardless of whether his NOOK device has downloaded the e-book, or whether he even owns a NOOK device.  Def. 56.1 ¶¶ 144; Ex. MM.

Thus, the LendMe feature permits a user to loan an eligible e-book from one B&N account to another – it is not tied to any particular device the way the '501 Patent describes.  By beginning the lending period when the lend offer is accepted, B&N permits loan recipients to accept and access a borrowed book on multiple devices that may access the recipient's B&N account, including, but not limited to, accused NOOK devices, as well as unaccused personal computers, smart phones, and/or tablets.  Further, access to the e-book on all such devices is subject to a single, uniform lending period that runs from the moment that the recipient first accepts the loan.  A loan recipient could not artificially extend a lending period by switching devices and need not even have a NOOK device to use the LendMe feature.

### A.     The NOOK Devices Do Not Infringe the '501 Patent

Under this Court's claim construction ruling, both asserted independent claims in the '501 Patent (claims 7 and 18) require "associating with the electronic book a predetermined amount of time *that begins when the electronic book is stored on the viewer*."  Def. 56.1 ¶ 47.  But the undisputed evidence establishes – and Adrea acknowledges – that the lending period of B&N's LendMe feature begins when the lend offer is accepted, and not when the borrowed e-

---

[8] Adrea has not presented any expert opinions that the '501 Patent is infringed by any feature of NOOK devices unrelated to B&N's LendMe feature.

book is stored on a NOOK device.  Def. 56.1 ¶¶ 144-48.  Once the recipient accepts a lend offer—which can be done with or without a NOOK—B&N's servers (not a processor on the NOOK device) calculate the expiration date of the lending period.  Def. 56.1 ¶ 148.  Only after that lending period has been calculated does the server "note within the Barnes & Noble infrastructure" that the lend offer has been accepted.[9]  In other words, the server determines the lending period and it begins begins upon loan acceptance; the book may (or may not) be stored on a NOOK device at some indefinite time thereafter.

Adrea concedes that "[t]he 14-day loan window begins upon acceptance of the loan offer."  Def. 56.1 ¶ 145.  Adrea also concedes the undisputed fact that there is always at least a "short time in between acceptance of the loan offer and the *complete* download of the loaned content on the recipient's device."  Def. 56.1 ¶ 147 (emphasis in original); *see also* Ex. MM (discussing user scenarios that demonstrate the 14 day period commences on the server upon loan acceptance and is unrelated to storage of the book on a NOOK device).

Accordingly, because the LendMe feature does not meet the '501 Patent's most basic limitation, *i.e.*, "associating with the electronic book a predetermined amount of time that begins when the electronic book is stored on the viewer," Adrea cannot demonstrate literal infringement of the asserted claims as a matter of law.

Further, prosecution history estoppel precludes Adrea from relying on the doctrine of equivalents to overcome the failure to meet this limitation literally.  The original claim language of what eventually became claims 7 and 18 included the following limitation: "associating a time parameter with the electronic book."  Def. 56.1 ¶ 150.  However, in response to an obviousness rejection, the applicant narrowed the claims by replacing that limitation with the final limitation: "associating a predetermined amount of time after the electronic book is stored on the viewer

---

[9] Thus, as Dr. Neuman testified, "at some point following that, at the time of the next sync of the user's device – depending upon a number of factors, such as space available and other things but – at some point following that, upon such synchronization occurring, the book might be downloaded."  Def. 56.1 ¶ 149.

with the electronic book."[10]  Def. 56.1 ¶¶ 151-52.  By so narrowing the claim language, the applicant presumptively "surrendered all subject matter between the broader and the narrower language," and Adrea is now barred from relying on the doctrine of equivalents.[11]  *Festo Corp.*, 535 U.S. at 740.

Accordingly, the Court should grant summary judgment of non-infringement of the '501 Patent on claims 7 and 18, as well as their dependent claims (claims 8, 9, and 19).

### B.  The '501 Patent Is Invalid

As explained in Dr. Neuman's expert report and summarized in the claim chart attached as Exhibit FFFF.  PCT Publication No. WO1993/09490 ("Saigh") invalidates asserted claims 7-9 and 18-19.  Saigh is directed, in part, to a portable electronic personal library apparatus for retrieving and displaying electronic books.  Def. 56.1 ¶¶ 156, 158-61, 163.  When storing these electronic books, the apparatus may also store a predetermined amount of time after which the books will be automatically erased.  Def. 56.1 ¶¶ 158, 164, 167-68.

The only dispute about whether Saigh invalidates the asserted claims rests on whether it discloses or renders obvious the following specific limitations:

- "storing an electronic book on a viewer" (claim 7)
- "associating a predetermined amount of time after the electronic book is stored on the viewer with the electronic book" (claim 7)
- "a portable viewer for displaying electronic books comprising . . . a memory for storing instructions" (claim 18)
- "a portable viewer for displaying electronic books comprising . . . a memory for storing electronic books" (claim 18)

---

[10] In making this amendment, the applicant distinguished the examiner's cited prior art references by arguing that they "do not disclose or suggest a predetermined amount of time after an electronic book is stored in the viewer that is associated with the electronic book."  Def. 56.1 ¶ 153.  In response to these amendments and arguments, the examiner issued a Notice of Allowability.  Def. 56.1 ¶ 154.

[11] Even if the doctrine of equivalents were available, it would not apply because there are substantial differences between the claim limitation and the manner in which the LendMe feature operates.  The '501 Patent ties the associated period of time to a specific device on which the electronic book is stored.  The LendMe feature, on the other hand, permits one B&N account holder to loan certain books to another B&N account holder without being tied to any particular device, such as an accused NOOK device.

- "a processor that operates under control of the instructions and is capable of . . . storing an electronic book on the viewer" (claim 18)
- "a processor that operates under control of the instructions and is capable of . . . associating a predetermined amount of time after the electronic book is stored on the viewer with the electronic book" (claim 18)

As set forth below, Saigh fully discloses or renders obvious these contested limitations.

### *storing an electronic book on a viewer* (claim 7)

Saigh anticipates a "viewer" by disclosing, among other embodiments, an "electronic personal library apparatus . . . contained in a portable binder dimensioned to be hand held by a user of the apparatus."  Def. 56.1 ¶ 157.  Among other components, this apparatus "comprises a control unit [and] programmable memory modules."  Def. 56.1 ¶ 156.  The control unit can display information stored on the memory modules.  Def. 56.1 ¶ 158.[12]

Saigh also discloses "storing an electronic book" on memory modules.  As Saigh explains:

> When downloading information from a compact cylinder to a memory module, the control unit 20 effectively erases any data currently stored on the memory module and inputs new data corresponding to the particular data selected from the compact cylinder 22 by the operator of the control unit.  In this manner, the same ***memory module 22 may be loaded and/or reprogrammed several times with the text of several different books if so desired***.

Def. 56.1 ¶ 163; *see also*  Def. 56.1 ¶ 158.

Lastly, Saigh discloses that the memory modules are a part of the control unit, which is a component of the electronic personal library apparatus.  Def. 56.1 ¶¶ 159-161.  Figure 4 of Saigh describes "a block diagram showing the interrelationship between functional elements of the control unit of the electronic personal library apparatus."  Def. 56.1 ¶ 125.  That figure, which appears below, includes a block containing the words "MEMORY MODULE" and which is labeled "22":

---

[12] In his report, Dr. Wang opines that only the control unit qualifies as the viewer.  Def. 56.1 ¶ 174; Ex. NN 473-74.  For the reasons explained here and in Dr. Neuman's report, however, one of ordinary skill in the art would consider the entire electronic personal library apparatus to be a viewer.  Ex. EEEE ¶ 397.  Nevertheless, the Saigh publication invalidates the '501 Patent even under Dr. Wang's view of what constitutes a "viewer."



FIG. 4

Def. 56.1 ¶ 160.  Saigh explains that, in Figure 4, "a memory module 22 [is] inserted in the recess 82 of the control unit."  Def. 56.1 ¶ 161.  Accordingly, Saigh discloses storage on a memory module, which also discloses storage on the apparatus.

> ### *associating a predetermined amount of time after the electronic book is stored on the viewer with the electronic book* (**claim 7**)

The Court construed this limitation to mean "associating with the electronic book a predetermined amount of time that begins when the electronic book is stored on the viewer."

Def. 56.1 ¶ 47.  Saigh anticipates this limitation by disclosing that:

> [i]nformation downloaded from a compact cylinder or from a book bank to a memory module 22 may also include *date and time information as to when the data was transcribed into the memory module*, as well as information regarding a *set time period after which the information transcribed in the memory module will be automatically erased*.  The programmed set time period is compared to the control units real time clock and if the set time period has elapsed, the control unit will automatically cause the data downloaded to the memory module to be effectively erased.

Def. 56.1 ¶ 164; *see also* Def. 56.1 ¶¶ 167-68.

> ### *a portable viewer for displaying electronic books comprising . . . a memory for storing instructions* (**claim 18**)

As for Claim 18, Saigh anticipates this limitation when it discloses the microprocessor control system of the control unit having a memory for storing a system operating program.  Def.

56.1 ¶ 166.  Indeed, Dr. Wang once again conceded that Saigh discloses a memory for storing instructions.  Def. 56.1 ¶ 177.  And, to the extent that Saigh does not disclose these limitations, Dr. Wang agreed that having "a memory for storing instructions" would "be obvious to somebody of ordinary skill in the art to have a memory in the control unit of Saigh for storing instructions."  Def. 56.1 ¶ 176.

### *a portable viewer for displaying electronic books comprising . . . a memory for storing electronic books* (claim 18)

As discussed above, Saigh discloses that its electronic personal library apparatus (and the control unit therefore) have memory modules for storing electronic books.  *See supra* at 24-25.

### *a processor that operates under control of the instructions and is capable of . . . storing an electronic book on the viewer* (claim 18)

Saigh anticipates "a processor" when it discloses the control unit having a microprocessor.  Def. 56.1 ¶ 162.  By disclosing this microprocessor, Saigh inherently discloses that it "operates under control of the instructions."  Def. 56.1 ¶ 172.  Once again Dr. Wang concedes that Saigh discloses a microprocessor and that "the microprocessor inherently operates under the control of instructions."  Def. 56.1 ¶ 177.

Lastly, Saigh anticipates that its microprocessor "is capable of . . . storing an electronic book on the viewer" when it discloses that the "microprocessor unit" performs "[a]ll of the functions performed by the electronic personal library apparatus."  Def. 56.1 ¶ 165.  Indeed, Dr. Wang agrees that the microprocessor and the software executing on the microprocessor "makes the system work."  Def. 56.1 ¶ 173.

### *a processor that operates under control of the instructions and is capable of . . . associating a predetermined amount of time after the electronic book is stored on the viewer with the electronic book* (claim 18)

As discussed above, Saigh discloses "associating a predetermined amount of time after the electronic book is stored on the viewer with the electronic book."  *See supra* at 25.  As also discussed above, Saigh discloses "a processor that operates under control of the instructions and is capable of" all the functions of the electronic personal library apparatus.  *See supra* at 26.  Specifically, Saigh discloses that:

[i]nformation downloaded from a compact cylinder or from a book bank to a memory module 22 may also include ***date and time information as to when the data was transcribed into the memory module***, as well as information regarding a ***set time period after which the information transcribed in the memory module will be automatically erased***. The programmed set time period is compared to the control units real time clock and if the set time period has elapsed, the control unit will automatically cause the data downloaded to the memory module to be effectively erased.

Def. 56.1 ¶ 164; *see also* Def. 56.1 ¶¶ 167-68.[13]

## VI.    THERE IS NO LIABILITY WITH RESPECT TO THE '851 PATENT

The '851 Patent, titled "Electronic Book Security and Copyright Protection System," issued on November 20, 2007 from an application filed on September 21, 1999. The '851 Patent purports to provide for the secure transmission of electronic books. John Hendricks, a named inventor of the '851 Patent, acknowledged that electronic books and e-readers were already in the market when the '851 Patent application was filed. Def. 56.1 ¶ 180. Mr. Hendricks further acknowledged that neither he nor his co-inventors invented any new encryption methods for securing electronic books. Def. 56.1 ¶ 181. Rather, he and his colleagues simply applied existing technologies in a specific order:



*Id.* Because the inventors were only claiming a purportedly novel way of applying existing art, the Patent Office required them to amend and narrow their claims during prosecution to avoid prior art. Ultimately, to secure issuance of the patent, and consistent with Mr. Hendrick's testimony, they added limitations that require the steps to be performed in a specific order.

Adrea asserts only claims 1, 34, 35, 96, and 108 of the '851 Patent, of which claims 1 and 96 are independent. Adrea contends that B&N's system for providing electronic books, as implemented by the accused NOOK devices, infringes those claims. That system does not

---

[13] To the extent Adrea argues that the electronic personal library apparatus does not disclose these limitations because the time period is initially determined remotely (Ex. NN ¶ 493), the accused NOOK devices also do not violate these limitations, as the lending period is initially determined on a remote server. Def. 56.1 ¶ 148.

infringe, however, because it does not follow the order required by the claims.  Any

interpretation of the claims that covers B&N's system as implemented by the accused NOOK

devices would render the '851 Patent invalid in view of the prior art and for failure to provide an

adequate written description.  Additionally, recent decisions by the U.S. Supreme Court and the

Federal Circuit show that claim 1 of the '851 Patent is fundamentally flawed because it claims

unpatentable abstract ideas.

### A.     The NOOK Devices Do Not Infringe Claims 1, 34, or 35

#### 1.     B&N's Encryption System Does Not Perform the Required Steps in the Order Required by Claim 1

The purchase of electronic books through NOOK devices does not infringe claim 1 of the

'851 Patent because B&N encrypts books *before* they are selected, while claim 1 requires they

be encrypted *after* being selected.  The Court's claim construction order states "[t]here is an

order required in [claim 1] arranging and construing the claim terms 'selecting a title from the

transmitted list of titles' and 'encrypting the selected electronic book using the encryption key':

'Selecting' must be performed before 'encrypting.'"  Def. 56.1 ¶ 48.  The undisputed evidence,

however, shows that B&N's system does not operate in the required order.

When publishers provide electronic books to B&N for sale, the publishers determine

whether or not the provided book should be encrypted.  Def. 56.1 ¶ 41.  For any such books,

B&N uses Adobe ACS4 technology to encrypt the book using an encryption key, leaving B&N

with an encrypted book and a decryption key for that book.  Def. 56.1 ¶ 42.  This process occurs

before the book is made available for selection by any NOOK device.  B&N stores the

decryption key in its servers and provides a copy of the pre-encrypted book to Akamai.  Def.

56.1 ¶ 43.  Akamai provides B&N with a URL link to the location of the encrypted book.  *Id.*

The book is then made available for purchase through a variety of mechanisms, including B&N's

website, applications running on smart phones, and also through NOOK devices.[14]  Def. 56.1

---

[14] Adrea has not asserted that sales of electronic books by B&N infringe claim 1 (or its
dependents) through any other mechanism than by a purchase of an encrypted book through a
NOOK device.  Ex. II at 40–52.

¶ 44.  After a user selects and purchases a book from B&N, the NOOK device retrieves the book from Akamai's servers, rather than B&N's servers.  Def. 56.1 ¶ 45.  The "encrypting" step is thus performed before the "selecting" step, and there is no infringement.

> ## 2.     Adrea Cannot Rely On the Doctrine of Equivalents to Assert Infringement of Claim 1

Adrea tacitly acknowledges that B&N's system does not meet the order requirement of claim 1 when it attempts to rely on the doctrine of equivalents.  Adrea asserts in bare, conclusory language that a process that pre-encrypts books prior to selection should be considered equivalent to the "books-on-demand" method set forth in claim 1.  Ex. II at 54, 60, 69.[15] Conclusory statements regarding equivalence, however, are insufficient to survive summary judgment.  *Mirror Worlds, LLC v. Apple Inc.*, 692 F.3d 1351, 1358 (Fed. Cir. 2012) ("Dr. Levy's conclusory statement is thus insufficient to allow a reasonable juror to find that Mirror Worlds has met its burden of proof in showing that Cover Flow has the equivalent of a cursor or pointer.").  Nor can the doctrine of equivalents be used to vitiate a required claim element.  *See DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005, 1017 (Fed. Cir. 2006).  Here, the Court expressly confirmed that claim 1 requires an order of steps. Adrea cannot use the doctrine of equivalents to reconstrue the claim to eliminate that requirement.  *Sage Prods., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1429 (Fed. Cir. 1997) (rejecting doctrine of equivalents argument where its application "would effectively remove an express functional requirement of the claims").

Further, as noted above, prosecution history estoppel bars Adrea from using the doctrine of equivalents to re-claim coverage it forfeited during prosecution.  *See Festo*, 344 F.3d at 1367.

---

[15]  Adrea's expert states that "[t]o the extent this step is performed before steps (C)-(D), this step is met under the Doctrine of Equivalents.  Encrypting electronic books during ingestion, rather than encrypting the electronic books at the time they are purchased by a user, is performing substantially the same function by encrypting the electronic books that will be provided in response to a user request to protect the electronic book from unauthorized access.  Encryption is performed in substantially the same way by applying encryption to the electronic book that will be made available.  Further, encrypting the electronic book at the time of ingestion obtains the same result by producing an encrypted electronic book that can be distributed on demand." Ex. II at 54, 69.

Here, the applicants amended claim 1 to specifically require that a user make a selection from a

list of available content *before* encryption of the selected content:

> 1. A method for encrypting, sending and receiving electronic books <u>upon demand</u>, comprising:
> <u>creating a list of titles of available electronic books;</u>
> <u>transmitting the list of titles of available electronic books;</u>
> <u>selecting a title from the transmitted list of titles;</u>
> <u>communicating the selected title to an electronic book source;</u>
> supplying [an] <u>a selected</u> electronic book <u>corresponding to the selected title</u> to be encrypted;
> supplying an encryption key;
> encrypting the <u>selected</u> electronic book using the encryption key;
> supplying the <u>encrypted</u> selected electronic book;
> supplying a decryption key; and
> decrypting the encrypted <u>selected</u> electronic book using the decryption key.

Def. 56.1 ¶ 182.[16]  Having amended its claims to include the concept of selection from a list

*prior* to encryption, Adrea is presumed to have forfeited a different ordering of the steps, and

Adrea has produced no evidence to rebut that presumption.  *Festo*, 344 F.3d at 1367.

### 3.   Akamai's Use of a Secure Channel to Transmit Encrypted Books Is Not a Basis for Infringement

Nor can Adrea rely on Akamai's transmission of encrypted books to satisfy the missing

claim element.  Ex. II at 56-59.  Akamai uses a form of channel encryption known as TLS to

encrypt all information that it sends to a NOOK device.  Ex. II at 56.  The TLS process, however,

does not involve the steps of "supplying an encryption key," "supplying a decryption key," or

"decrypting the encrypted selected electronic book using the decryption key," all of which are

required by claim 1.[17]  Def. 56.1 ¶ 189, 191-92.

Adrea suggests that the step of "supplying an encryption key" is met when, in the process

of sending a pre-encrypted book to a NOOK device, an Akamai server generates an encryption

---

[16] The underlined language was added to overcome a PTO rejection.

[17] TLS operates between two ends of a communication stream by exchanging certain information between the recipient and the sender of the communication.  Def. 56.1 ¶ 184.  The sender generates its own encryption key and uses that key to encrypt all of the information being sent to the recipient in a set of small packages.  *Id.*  The receiver, on the other hand, generates its own decryption key and uses that key to decrypt the stream of packages being received, as they are received.  *Id.*  Because TLS does not result in the encryption of content, but instead provides for the encryption of packets of information only during transmission, TLS is often referred to as channel encryption, rather than content encryption.  *Id.*

key used in a TLS session.  Def. 56.1 ¶ 188.  As Mr. Berg conceded at his deposition, however, the Akamai TLS process generates and uses an encryption key *on the Akamai server*, it is not supplied by anyone to the server, nor is it supplied by the server to anyone else.  Def. 56.1¶ 189.  Simply put, the Akamai server is not "supplying an encryption key" (as required by claim 1), but rather "generating" one for its own use, and the '851 Patent makes clear that those processes are not the same.  In claim 3, which Adrea has not asserted and which depends from claim 1, the patentee added the step of "further comprising *generating* the symmetric key."  Ex. O at 67:57-58 (emphasis added).  Claim 3 would make no sense if "generating" and "supplying" were the same thing.  Accordingly, Akamai's use of TLS cannot meet the "supplying an encryption key" requirement of claim 1, because the generated key is not supplied to anyone and is only used on the Akamai server.

Adrea's argument regarding Akamai's use of TLS also fails because that process does not perform the step of "decrypting the encrypted selected electronic book using the decryption key."  As discussed above, and conceded by Mr. Berg, at the end of the TLS channel encryption process, the NOOK device is left with an *encrypted* version of an electronic book.  Def. 56.1 ¶ 191.  That book can only be *decrypted* on the device if B&N separately provides the decryption key obtained through the Adobe ACS4 encryption process.  This makes sense, because TLS is not a content encryption scheme, but a channel encryption scheme.  Def. 56.1 ¶ 184–85.  Because claim 1 is directed to a system that ends with the selected encrypted book content being "decrypt[ed]", and because the TLS channel encryption process does not result in a decrypted book, Adrea's alternate theory of infringement fails to match the method of claim 1.

### 4.      B&N Is Not Liable for Induced Infringement of Claim 1

Adrea's TLS infringement theory also fails because Akamai, not B&N, performs the purportedly infringing step; thus, B&N cannot be liable for direct infringement.  Adrea nonetheless alleges generally that, to the extent B&N does not perform the steps of claim 1, it induces others – presumably Akamai or the end user – to do so.  These allegations of induced infringement necessarily fail.  Inducement requires specific intent to induce infringement, *DSU*

*Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006) (*en banc*), and there is no evidence that B&N intended to induce any third party to infringe.[18]  In fact, the presence of objectively reasonable defenses to infringement – as presented here – negates the requisite intent for inducement.  *See infra* Section VII.  Additionally, inducement requires knowledge of the patent. *DSU Med.*, 471 F.3d at 1305.  It is undisputed that B&N did not know about the patent until March 29, 2012.  Thus, there could be no earlier indirect infringement.

**B.     The NOOK Devices Do Not Infringe Apparatus Claim 96**

**1.     The NOOK Devices Do Not "Select a Title"**

NOOK devices do not literally infringe asserted claim 96 of the '851 Patent.  That claim describes an "electronic book viewer" having several different components, including a "receiver" that performs four functions, including selection of a book title from a list:

> wherein the receiver:
>
> receives a created, transmitted list of titles of available electronic books, wherein an electronic book is available if text associated with the electronic book is available for transmission;
>
> ***selects a title from the transmitted list of titles;***
>
> communicates the selected title; and
>
> receives transmitted text associated with the selected title as encrypted electronic books and encryption information. Ex. O at 74:42-55.[19]

To infringe, the accused NOOK devices must include each and every limitation of this claim.[20]

Specifically, the NOOK must have a "receiver" that "selects a title from the transmitted list of titles."  Because the NOOK devices have no "receiver" – or any other component – that "selects a title from a transmitted list of titles," the accused devices cannot literally infringe this claim.

---

[18] Indeed, Adrea has not even identified any third party or attempted to adduce evidence sufficient to establish that B&N should be held liable for a third party's actions.

[19] The language regarding the receiver functionality was added to claim 96, along with similar language in claim 1, to overcome a rejection at the Patent Office.  Def. 56.1 ¶ 194.

[20] *See Southwall Techs., Inc v. Cardinal IG Co.*, 54 F.3d 1570, 1575 (Fed. Cir. 1995) ("To establish literal infringement, every limitation set forth in a claim must be found in an accused product, exactly."); *Lantech, Inc. v. Kelp Mach. Co.*, 32 F.3d 542, 547 (Fed. Cir. 1994) ("For literal infringement, each limitation of the claim must be met by the accused device exactly, any deviation from the claim precluding a finding of infringement.").

Adrea alleges that various WiFi Radios and 3G Antennae in the NOOK devices "include a receiver" for purposes of claim 96.  Def. 56.1 ¶ 196.  However, Adrea identifies no evidence that any specific hardware or software element in a NOOK device performs the required act of "selecting a title from a transmitted list of titles" in the NOOK device.  Def. 56.1 ¶ 197..  This is because, as a matter of undisputed fact, no such function exists in NOOK devices.  Indeed, Adrea tacitly admits as much in its expert reports by ducking the issue of "selection."  With respect to the next element required of the "receiver" in claim 96 (namely, that it "communicates the selected title"), Adrea states that in the process of purchasing a specific book, that book's EAN number is transmitted from the NOOK device to a B&N server.  Def. 56.1 ¶ 198.  Adrea's infringement contentions, however, provide no evidence as to how such book's EAN is selected.

The reason Adrea cannot provide any evidence that a receiver in the NOOK device performs the required function of selecting from a list is because, quite simply, NOOK devices are not capable of making such a selection.  Indeed, the NOOK device has no idea what book a user may want to select and purchase until *the user* makes the selection.  Def. 56.1 ¶ 199. Adrea's own infringement expert concedes that the receiver does not perform the selection:

> Q:  So the selecting a title from the transmitted list of titles, when that is performed, it's not interacting directly with the receiver at that point, that's your opinion?
>
> \*       \*       \*
>
> THE WITNESS:  It's preparing to do that, **but it's not at that point.**

Def. 56.1 ¶ 200 (emphasis added); *see also* Def. 56.1 ¶ 201.[21]

Then, only after *the user* selects a book, is the NOOK device provided with an identification number corresponding to that particular book, which is then transmitted to B&N's servers.  Adrea's analysis with respect to the next claim element ("communicat[ing] the selected

---

[21] As explained by Dr. Neuman, a device could exist that would literally meet the express requirement of claim 96 that the device make a selection from a list.  For example, a device could receive a list of news content from a remote server and download recent entries from that list to the device itself.  Def. 56.1 ¶ 204.  In that example, the device would be making a selection from the list – the selection of recent news items.  Adrea's expert makes no contention that the NOOK device performs this function.

title") confirms that purchase requests sent from a NOOK device contain the EAN for a specific book, not any information corresponding to a list that the user may or may not have been interacting with prior to selecting a book for purchase.  Ex. II at 151–53.

Nor can Adrea assert that claim 96 does not require the "receiver" itself to perform the selection from a list.  That is because the language of claim 96 plainly states otherwise, as Mr. Berg admitted.  Def. 56.1 ¶ 202.  It is black letter law that, with respect to literal infringement, unambiguous patent claims are to be read literally, so that they "particularly point[] out and distinctly claim[] the subject matter which the inventor or a joint inventor regards as the invention."  35 U.S.C. § 112(b).  A patentee cannot simply rewrite an unambiguous claim limitation.  *See Amazin' Raisins Int'l, Inc. v. Ocean Spray Cranberries, Inc.*, 306 F. App'x 553, 559-60 (Fed. Cir. 2008) ("The claim requires that the acidulant 'substantially remove' the natural flavor from the dried fruit – not that it 'mask,' 'cover,' or 'conceal' it.  '[W]e have repeatedly declined to rewrite unambiguous patent claim language' and will decline to do so here." (citation omitted)).[22]  Because the NOOK devices do not meet this unambiguous element of claim 96, there can be no literal infringement of claim 96 (or its dependent asserted claims) by any NOOK device.[23]

---

[22] *See also Process Control Corp. v. HydReclaim Corp.*, 190 F.3d 1350, 1357 (Fed. Cir. 1999) ("Where, as here, the claim is susceptible to only one reasonable construction, the canons of claim construction cited by [defendant] are inapposite, and we must construe the claim based on the patentee's version of the claim as he himself drafted it."); *Hoganas AB v. Dresser Indus., Inc.*, 9 F.3d 948, 951 (Fed. Cir. 1993) ("It would not be appropriate for us now to interpret the claim differently just to cure a drafting error . . . .  That would unduly interfere with the function of claims in putting competitors on notice of the scope of the claimed invention.").

[23] Adrea has not alleged indirect infringement, and thus may not do so at this late date.  Nor could it.  Claim 96 is an apparatus claim, not a method claim.  To establish infringement, Adrea would still have to show that a device exists that meets each element of the claim.  *See Joy Techs., Inc. v. Flakt, Inc.*, 6 F.3d 770, 773-74 (Fed. Cir. 1993).  Adrea cannot make this showing for any of the accused NOOK devices.

Adrea is also foreclosed from asserting infringement of this element of claim 96 through the doctrine of equivalents.  *First*, Mr. Berg specifically and solely relies on a claim of literal infringement in the case of claim 96, offering no evidence or opinion on the issue of whether a device that allows a *user* to make a selection from a list can be considered equivalent to a *device* selecting the book from a list (as is literally and expressly required by claim 96).  Def. 56.1 ¶ 203.  *Second*, the "[selection from a list]" language was specifically added to claim 96 in response to a rejection by the Examiner of the original claim.  Def. 56.1 ¶ 194.  Because this

### 2.   The NOOK Devices Do Not Meet the Encryption Limitations of Claim 96

NOOK devices also do not meet the encryption elements of claim 96, which require that the device have a "memory coupled to the receiver that stores the encrypted electronic books and ***the encryption information***."  Claim 96 defines the stored encryption information in clear and unambiguous language: "***the encryption information*** includes information that allows encryption and decryption of the electronic book and encryption and decryption of encryption and decryption keys."  Thus, the encryption information is really four sets of information: information to (a) encrypt the electronic book, (b) decrypt the electronic book, (c) encrypt the encryption key, and (d) decrypt the encryption key.  In the accused system, information (a) is only used by B&N's servers when the electronic book is first encrypted.  It is undisputed that the NOOK device does not encrypt the electronic book; thus, it has no need for information (a) and does not receive it, much less store it.  Def. 56.1 ¶ 206.

Claim 96 also requires that the device have a transmitter that can transmit "the encryption information" ***from*** the device ***to*** the sending party:

> [the device includes] a transmitter coupled to the processor that sends encryption information to the sending party, wherein the encryption information includes information that allows encryption and decryption of the electronic book and encryption and decryption of encryption and decryption keys.

As explained above, NOOK devices do not have any information to encrypt the electronic book. Thus, they do not have a transmitter that can ***transmit*** the required encryption information.

Adrea tries to step around these limitations of claim 96 by again resorting to its backup theory regarding TLS channel encryption.  Adrea asserts that, because the NOOK device uses TLS as a channel encryption scheme to transmit information between the NOOK device and B&N's servers, the NOOK device is transmitting some form of "encryption information."  For this theory to satisfy claim 96, however, the TLS information would have to be stored in the memory of the device.  The experts all agree, however, that TLS encryption-related information

---

language was added to overcome a rejection, it cannot be infringed under the doctrine of equivalents.  *See Festo Corp.*, 535 U.S. at 740.

is used for channel encryption, not for content encryption.  Def. 56.1 ¶ 207.  As such, it is transitory and deleted as soon as the channel communication is completed.  *Id.*  Dr. Wang further opined that temporary storage while in use is not the same as "stored" in memory.  Def. 56.1 ¶ 208.  And Mr. Berg admitted that the only information related to encryption stored on the NOOK device is decryption keys.  Ex. II at 182.

To obscure the clear facts that establish non-infringement, Adrea asserts that "the encryption information" means two completely separate things in two different places in claim 96.  Adrea first states that it means ACS4-related information in the "memory" element, but later states that it means TLS-related information in the "transmitter" element.  Def. 56.1 ¶ 209.  Both the memory element and the transmitter element, however, refer to the same "the encryption information" and are to be construed consistently.[24]  This is particularly true because the TLS-related information cannot be "the encryption information" claimed.  As explained above, TLS information is incapable of decrypting a book that has been encrypted using ACS4 technology.  Def. 56.1 ¶¶ 191-92.  Thus, no TLS encryption information will result in the "decryption of the electronic book" as required by "the encryption information" in claim 96.  For these additional reasons, NOOK devices cannot infringe claim 96.

## C.    Claims 1, 34 and 35 of the '851 Patent Are Invalid

### 1.    Gifford Anticipates Claims 1, 34 and 35

As explained in Dr. Neuman's expert report and summarized in the claim chart attached as Exhibit GGGG, the Gifford Community Information System (CIS), as disclosed in U.S. Patent No. 4,845,658 to David K. Gifford ("Gifford '658"), which was filed Dec. 1, 1986 and issued Jul. 4, 1989, discloses each limitation of claim 1.  Def. 56.1 ¶¶ 210, 241.  Gifford '658 also incorporates by reference the publication "An Architecture for Large Scale Information

---

[24] *See Phonometrics, Inc. v. N.Telecom Inc.*, 133 F.3d 1459, 1465 (Fed. Cir. 1998) ("A word or phrase used consistently throughout a claim should be interpreted consistently."); *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001) ("Furthermore, a claim term should be construed consistently with its appearance in other places in the same claim or in other claims of the same patent.").

Systems" authored by David K. Gifford, Robert W. Baldwin, Stephen T. Berlin, and John M. Lucassen ("Gifford ACM"), published by the Association for Computing Machinery in December 1985.  Def. 56.1 ¶211.

The Gifford CIS was an early system for distributing electronic content, including articles and other textual data, to remote users.  Def. 56.1 ¶¶ 212, 218, 219, 235.  Users were able to select the content they would like to view from a list of available content.  Def. 56.1 ¶ 214.  If the content was not already stored locally, the user terminal would initiate a request to a remote server.  *Id.*  The remote server would then deliver the selected content to the local user terminal. *Id.*  The delivered content would be encrypted at time of delivery to prevent unauthorized access and to protect content.  Def. 56.1 ¶ 210.  The local user terminal was provided with a decryption key, which enabled the local terminal to decrypt and view the selected content delivered by the remote server.  Def. 56.1 ¶ 222.  The content provided by the Gifford CIS was intended to be "an electronic version of textual or graphical information," just as this Court has construed the term "electronic book."  Def. 56.1 ¶ 219.

Adrea's dispute as to whether Gifford anticipates claim 1 is limited to conclusory statements that four discrete elements are missing: (i) "selecting a title from the transmitted list of titles," (ii) "communicating the selected title to an electronic book source," (iii) "selecting" a title prior to "supplying" the selected title and before "encrypting" the selected electronic book", and (iv) "supplying a selected electronic book corresponding to the selected title to be encrypted."  Def. 56.1 ¶ 240.  Adrea does not offer any additional argument disputing that Gifford discloses the limitations in dependent claims 34 and 35.  As set forth below, the Gifford CIS clearly discloses each of these elements and thus anticipates claim 1 and the asserted dependent claims.

*selecting a title from the transmitted list of titles*

The Gifford ACM explicitly discloses "selecting a title from the transmitted list of titles."

The Gifford ACM discloses presenting the user with an index of specific available content, such

as news articles, and then presenting for display a particular article after it is selected by the user.

Figures 3 and 4 of the Gifford ACM illustrate these presentations.



| 5 matching articles found. | lines 1:16 of 16 |
| --- | --- |

1 sep 19, 18:48 (121 lines) regular (Financial)
   NEW YORK -- After a record year, the market for public stock
   offerings by private companies has gone into a slump, forcing many of
   these companies to bypass the new-issue market and seek capital --
   often through creative deals -- elsewhere.
2 sep 18, 22:37 (60 lines) regular (Financial)
   NEW YORK -- Technology stocks took a beating Tuesday, for two
   unrelated reasons, and helped to keep the market on the downside.
3 sep 18, 21:18 (82 lines) urgent (Financial)
   A digest of business and financial news for Wednesday, Sept. 19.
   1984.
4 sep 18, 18:22 (70 lines) urgent (Financial)
   NEW YORK -- Stock prices dropped Tuesday in accelerated trading, with
   some of the technology and large capitalization issues registering
   the biggest declines.
5 sep 18, 7:41 (113 lines) deferred (Financial)
   London -- the American lawyer would have been rubbing his hands,
   except that he was jogging in Hyde Park, so he was swinging his arms.

technology & (category: financial);

**Typical Article Summary Display**
**Figure 3**

| Article N40B1B7.727: | lines 1:23 of 80 |
| --- | --- |

type: New York Times general news copy
priority: regular
date: 09-18-84 2237edt
category: Financial
subject: MARKETPLACE
title: (BizDay)
author: DANIEL F. CUFF
source: (c)1984 N.Y. Times News Service
text:
   NEW YORK - Technology stocks took a beating Tuesday, for two
unrelated reasons, and helped to keep the market on the downside.
   First, worry over problems with a disk drive hurt Control Data and
Burroughs. Second, the semiconductor issues were battered by a
bearish brokerage house report on Motorola.
   Burroughs opened down 2 3/8 Tuesday morning after an order imbalance.
The drop in Burroughs, which closed the day at 53, off 3 5/8, followed
Control Data's slide. On Monday, Control Data dropped 2 1/8, and it lost
an additional 3/8 Tuesday, to close at 28 1/8.
   Control Data, according to analysts, encountered problems with a
thin coating on the disk. "If that chemical compound is not
virtually perfect, trouble ensues," said Ulric Weil, an analyst at
Morgan Stanley & Co. "We are talking about tolerances the thickness
of a human hair."

technology & (category: financial):2

**Typical Article Display**
**Figure 4**

Def. 56.1 ¶¶ 231, 235-236.  The Gifford ACM explains that "Figure 3 and 4 illustrate how

information from the database is presented to the user.  Figure 3 shows *a set of article*

*summaries* results from the processing of a query; Figure 4 shows *an article that has been*

*selected* *for display*."  Def. 56.1 ¶ 229.

The Gifford CIS was specifically designed to retrieve selected content from one of the

displayed records from a remote server.  Def. 56.1¶ 231 ("Database Requests: The server

interface is designed to permit query processing at server to occur concurrently with other client

processing . . . .").

FetchSummaries is used to return summaries of specified records, while FetchRecord is
used to obtain specific lines from a specific record.

*communicating the selected title to an electronic book source*

The Gifford CIS also discloses "communicating the selected title to an electronic book

source."  The Gifford CIS explains that "[i]t is important to note that the 'query' can also be a

request, for example, a request to place an order, etc., at a remote site." Def. 56.1 ¶ 224. The Gifford ACM sets forth specific protocols for making such a request. Def. 56.1 ¶ 231. ("FetchRecord is used to obtain specified lines from a specific record."); *see also* Ex. GGGG ('851 claim chart). Because the Gifford CIS enables communication of a specific selected title to a remote content server, the Gifford CIS expressly discloses the element of "communicating the selected title to an electronic book source."

> ### selecting" a title prior to "supplying" the selected title and before "encrypting" the selected electronic book

Adrea also challenges whether the Gifford CIS discloses the order of operation as set forth in claim 1 (and as confirmed by this Court's claim construction); however, it does. Specifically, the Gifford CIS discloses that records that are to be transmitted are provided to a "broadcast scheduler 76" along with "the encryption key with which the record should be encrypted (for security purposes) prior to transmission." Def. 56.1 ¶ 218.

Dr. Wang asserts that this language suggests that records are all encrypted prior to any selection. Def. 56.1 ¶ 240. He is wrong. The disclosed "broadcast scheduler 76" is depicted in Figure 3 of the Gifford '658:



*FIG. 3*

The Gifford '658 is clear that the actions of the broadcast scheduler (circled above) are the last actions to be taken on a record prior to being transmitted.  Def. 56.1 ¶ 218.  Also shown in Figure 3 is "query routing" (boxed above), which must occur *prior* to sending responsive content to the broadcast scheduler for processing, including the disclosed encryption.  *See also* Ex. GGGG ('851 Claim Chart).  Thus, it is incorrect to say that content in the Gifford CIS is encrypted prior to selection by a user.  Just as in the '851 Patent, the Gifford CIS encryption is "on demand."

If the Gifford CIS did pre-encrypt content (which it does not) Adrea's infringement argument would fail.  Adrea cannot argue that order of encryption and selection renders the Gifford CIS different from the '851 Patent for the purposes of invalidity, and then at the same time argue that the order is irrelevant for purposes of infringement, as it does in its doctrine of equivalents assertions discussed above.  *See Int'l Seaway*, 589 F.3d at 1239.

> ### *supplying a selected electronic book corresponding to the selected title to be encrypted*

As discussed above, the Gifford CIS discloses selecting specific content from a list, supplying that content to the broadcast scheduler, and encrypting that selected content just prior to transmission.  Because the Gifford CIS discloses each of these steps, it also discloses the step of "supplying a selected electronic book corresponding to the selected title to be encrypted."  *See* Ex. GGGG ('851 Claim Chart).  Accordingly, the Gifford CIS anticipates claims 1, 34, and 35.

### 2.    The Asserted Claims Have a Priority Date No Earlier Than September 21, 1999

Although not pertinent to Gifford, which was first disclosed in the 1980s, there is other prior art B&N may rely on as a basis for invalidating the '851 Patent, should this case proceed to trial, that predates the correct priority date (September 21, 1999), but not Adrea's asserted priority date (November 7, 1994).  By law, the asserted claims of the '851 Patent cannot claim a priority date earlier than September 21, 1999, because the applicants first disclosed the concepts of "supplying an encryption key" and "supplying a decryption key" then.  Ex. DDDD ¶ 508.

Adrea argues that claim 1 of the '851 Patent is entitled to a priority date of November 7, 1994, the filing date of the '690 Patent from which the '851 derived ("the 1994 priority date"). Def. 56.1 ¶ 237.  However, for a patent claim to be entitled to a priority date based on an earlier application, the earlier application must satisfy the requirements of 35 U.S.C. § 112 with respect to the claimed subject matter.  35 U.S.C. § 120.  To satisfy § 112, it is not enough that the written description enables a person of ordinary skill in the art to make and use the invention.  *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1344 (Fed. Cir. 2010)*.*  Rather, it must also demonstrate to the ordinarily skilled artisan that the inventor had possession of the claimed invention.  *Id.* at 1351.  Here, the '690 Patent contains no written description relating to "supplying an encryption key."  Adrea's own expert admitted that while one skilled in the art would ***know*** how to supply an encryption key, the '690 Patent itself does not ***describe*** "supplying an encryption key."  Def. 56.1 ¶ 238-239.  Nor can Adrea rely on the '690 Patent's description of encrypting an electronic book, because "encrypting the selected electronic book" is separate from the step of "supplying an encryption key" in claim 1 of the '851 Patent.  Thus, Adrea is not entitled to the priority date of the '690 Patent.

Adrea has not asserted any other priority date for claim 1, and it has refused to take any position with respect to the priority of the asserted claims.  Accordingly, the earliest date to which any of the claims of the '851 Patent are entitled is September 21, 1999.

### 3.      Claims 1, 34, and 35 Are Invalid Under 35 U.S.C. § 112

Adrea's infringement theories, in addition to being unsound, render claims 1, 34, and 35 invalid for lacking full scope enablement under § 112.  The specification of any patent must have enough information so that a person skilled in the art can "make and use the full scope of the claimed invention without 'undue experimentation.'"  *ALZA Corp. v. Andrx Pharms., LLC*, 603 F.3d 935, 940 (Fed. Cir. 2010) (citations omitted).  Adrea's alternative theory of infringement, however, expands the scope of claim 1 well beyond what the specification enables.

As explained above, B&N's ACS4 encryption process does not meet the order requirements of claim 1.  Thus, Adrea asserts an alternate theory centered around Akamai's use

of a secure communications channel when transmitting previously encrypted books to a NOOK device in response to a user's selection.

If Adrea's position were an acceptable theory of infringement (which it is not), then the patent would need to enable a method whereby an ***already encrypted*** book is selected, and then temporarily ***further encrypted*** during transmission via a secure communication channel, and then decrypted such that a still encrypted electronic book is supplied – all ***without transmission of any encryption or decryption keys*** for the second encryption process – because this is how the Akamai TLS process actually works.[25]  There is no embodiment in the '851 Patent that describes or suggests using TLS to deliver a book which has already been encrypted prior to TLS transmission.  Rather, in two separate embodiments, the specification describes using SSL over the Internet to encrypt and transmit an electronic book; there is no encryption of the book other than that provided by SSL.  Ex. O at 36:33-37:49; 46:29-47:48.

Further, the SSL process described in the '851 Patent specifically contemplates the transmission of an encryption key from one side to the other.  *Id.*.  However, the TLS process as used by Akamai does not transmit an encryption key.  Rather, the TLS process involves the transmission of a shared secret, from which an encryption key is independently generated on one side of the channel and a decryption key is independently generated on the other side of the channel, all without any transmission of an encryption or decryption key.  Def. 56.1 ¶ 184.  Thus, there is no teaching in the '851 Patent for using TLS, much less TLS on an already encrypted book, as is the case with the transmission from Akamai to a NOOK device.  For this reason, if claim 1 can be stretched so far as to cover a system that transmits already-encrypted electronic books over a secure channel, it is invalid under the doctrine of full-scope enablement.

---

[25] *See In re Vaeck*, 947 F.2d 488, 496 (Fed. Cir. 1991) ("[T]here must be sufficient disclosure, either through illustrative examples or terminology, to teach those of ordinary skill how to make and how to use the invention as broadly as it is claimed.").

### 4.      Claims 1, 34, and 35 Are Invalid Under 35 U.S.C. § 101

Claims 1, 34, and 35 also are invalid for failing to claim patent eligible subject matter under § 101.  Those claims cover the abstract idea of using encryption to provide electronic information.  However, for a claim to be patent eligible under § 101, it must cover "significantly more" than an abstract idea.  *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1293-94 (2012); *Parker v. Flook*, 437 U.S. 584, 593-94 (1978).  In other words, a claim that merely recites a "trivial" implementation of an abstract idea is not enough to satisfy § 101.  *CLS Bank Int'l v. Alice Corp. Pty. Ltd.*, 717 F.3d 1269, 1283–84 (Fed. Cir. 2013).  Claims 1, 34, and 35 of the '851 Patent are invalid under § 101 because they add nothing more than trivial steps to the abstract idea of using encryption to provide electronic information.

With regard to claim 1, the first four steps merely describe the abstract idea of selecting content from a list.[26]  These steps are not limited in any material way, for example, to particular devices, actors, or users.  Rather, the claim uses broad, indeterminate language: "creating a list," "transmitting the list," "selecting a title," and "communicating the selected title."  Even to the extent claim 1 is limited to "electronic books," this is nothing more than a trivial field-of-use limitation, which is not sufficient to render patent eligible an otherwise abstract idea.  *CLS Bank*, 717 F.3d at 1283–84 ("Finally, bare field-of-use limitations cannot rescue a claim from patent ineligibility where the claim as written still effectively preempts all uses of a fundamental concept within the stated field."), *cert. granted*, 134 S. Ct. 734 (2013).

The remaining steps of claim 1 cover nothing more than the abstract idea of encrypting content.[27]  Like the first four steps, these steps are not limited in any material way.  These steps also use broad, abstract language not limited to particular actors or actions (e.g., "supplying" the

---

[26] The first four steps of claim 1 are "(a) creating a list of titles of available electronic books; (b) transmitting the list of titles of available electronic books; (c) selecting a title from the transmitted list of titles; (d) communicating the selected title to an electronic book source."

[27] The remaining steps of claim 1 are "(e) supplying a selected electronic book corresponding to the selected title to be encrypted; (f) supplying an encryption key; (g) encrypting the selected electronic book using the encryption key; (h) supplying the encrypted selected electronic book; (i) supplying a decryption key; and (j) decrypting the encrypted selected electronic book using the decryption key."

encrypted book, "supplying" an encryption key, and "supplying" a decryption key). Even Adrea's expert conceded that these "supplying" steps are obvious and trivial. Def. 56.1 ¶ 238. Merely breaking the abstract idea of encrypting information into separate, trivial steps does not render claim 1 patent eligible.[28]

None of steps (a) through (c), (f), or (i) are limited – explicitly or intrinsically – to an electronic medium, and could be performed using pen, paper, and the U.S. Postal Service. Alone, these steps do not create a patent eligible process. *See CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1372 (Fed. Cir. 2011) ("All of claim 3's method steps can be performed in the human mind, or by a human using a pen and paper."). The remaining steps require a computer only because the information recited is an "electronic book." Nevertheless, the "prohibition against patenting abstract ideas 'cannot be circumvented by attempting to limit the use of the formula to a particular technological environment.'" *Bilski v. Kappos*, 130 S. Ct. 3218, 3230 (2010) (quoting *Diamond v. Diehr*, 450 U.S. 175, 191-92 (1981)); *see also Flook*, 437 U.S. at 590 ("A competent draftsman could attach some form of post-solution activity to almost any mathematical formula . . . ."). This is particularly true where the computer is used for only its most basic function – performing calculations on electronic information. *Bancorp Services v. Sun Life*, 687 F.3d 1266, 1278 (Fed. Cir. 2012) (using a computer "for no more than its most basic function – making calculations or computations – fails to circumvent the prohibition against patenting abstract ideas and mental processes"). Simply applying the abstract concept of using encryption to provide information to an "electronic book" does not make it patent eligible.

The foregoing arguments apply equally to claims 34 and 35, which add the steps of "providing the decryption key with the encrypted electronic book" and "encrypting the decryption key." These steps again can be implemented by a human using pen and paper and the

---

[28] *CLS Bank*, 717 F.3d at 1284 ("Analyzing patent eligibility, in contrast, considers whether steps combined with a natural law or abstract idea are so insignificant, conventional, or routine as to yield a claim that effectively covers the natural law or abstract idea itself.").

Post Office, and they do not add any meaningful patentable limitations to claim 1.  Accordingly, claims 1, 34, and 35 of the '851 Patent are not patentable under § 101.

## VII.   B&N DID NOT WILLFULLY INFRINGE THE PATENTS IN SUIT

Particularly in view of B&N's non-infringement and invalidity positions set forth above, Adrea's allegations of willful infringement are untenable.  The test for establishing willful infringement has two prongs.  *In re Seagate Tech., LLC*, 497 F.2d 1360 (Fed. Cir. 2007).  The 'objective' first prong requires the patentee to show "by clear and convincing evidence that the infringer acted despite an objectively high likelihood that its actions constituted infringement of a valid patent."  *Id.* at 1371.  The 'subjective' second prong requires the patentee to show "that this objectively-defined risk (determined by the record developed in the infringement proceeding) was either known or so obvious that it should have been known to the accused infringer."  *Id.*

The plaintiff must prove existence of the first objective prong "by clear and convincing evidence as a ***predicate*** to the jury's consideration of the subjective prong."  *Powell v. Home Depot U.S.A., Inc.*, 663 F.3d 1221, 1236 (Fed. Cir. 2011) (emphasis added).  If reliance on a defense was not objectively reckless, the Court "cannot send the question of willfulness to the jury."  *Id.* (citing *DePuy Spine Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1335-37 (Fed. Cir. 2009)).  Summary judgment of no willfulness infringement is warranted where, as here, "both legitimate defenses to infringement claims and credible invalidity arguments demonstrate the lack of an objectively high likelihood that a party took actions constituting infringement of a valid patent."  *Black & Decker, Inc. v. Robert Bosch Tool Corp.*, 260 F. App'x 284, 291 (Fed. Cir. 2008); *see also Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1310 (Fed. Cir. 2011).  Thus, the question for the Court is whether the asserted defenses, including questions of infringement and validity, were objectively reasonable.  *Bard Peripheral Vascular, Inc. v. W.L. Gore*, 682 F.3d 1003, 1005 (Fed. Cir. 2012).[29]

---

[29] *See also Advanced Fiber Techs. Trust v. J&L Fiber Servs., Inc.*, 674 F.3d 1365, 1377-78 (Fed. Cir. 2012) ("Taken together, these facts show that J&L's assertions of invalidity and

B&N's motion on liability issues should prevail, but even if it does not, the positions B&N advances are credible and reasonable on their face, and the Court should grant summary judgment of no willful infringement for each of the patents and dismiss any claim of willfulness.

## VIII.   DAMAGES ACCRUE NO EARLIER THAN MARCH 29, 2012

### A.   Even if Direct Infringement Is Shown, Adrea Cannot Recover Damages Prior to March 29, 2012

The Patent Act requires patentees to give notice to the public by marking the patented article or packaging with the patent number.  35 U.S.C. § 287(a).  "In the event of failure so to mark, no damages shall be recovered by the patentee in any action for infringement, except on proof that the infringer was notified of the infringement and continued to infringe thereafter, in which event damages may be recovered only for infringement occurring after such notice."  *Id.* "When a patent owner or licensee makes or sells a product that embodies at least one claim of a patent but does not mark that product as required by Section 287(a), damages are limited to the period beginning when the patentee provides actual notice of infringement."  *Cognex, Corp. v. Microscan Sys., Inc.*, 2013 WL 6906221, at *6 (S.D.N.Y. Dec. 31, 2013) (Rakoff, J.) (citing *Gart v. Logitech, Inc.*, 254 F.3d 1334, 1345 (Fed. Cir. 2001)).  For each of the Patents in Suit, Adrea has asserted both apparatus and method claims, and its licensees produced devices capable of being marked, thus implicating the marking requirements.  *See Am. Med. Sys., Inc. v. Med. Eng'g Corp.*, 6 F.3d 1523, 1539 (Fed. Cir. 1993).  As a matter of law, Adrea may not recover damages prior to March 29, 2012, when it first provided actual notice of alleged infringement to B&N.

---

noninfringement were, at a minimum, objectively reasonable defenses to AFT's charge of infringement."); *Spine Solutions Inc. v. Medtronic Sofamor Danek USA, Inc*, 620 F.3d 1305, 1319 (Fed. Cir. 2010) ("Medtronic raised a substantial question as to the obviousness of the '071 patent. . . .  Medtronic was not objectively reckless in relying on this defense."); *Solvay S.A. v. Honeywell Specialty Materials LLC*, 827 F. Supp. 2d 358, 366 (D. Del. 2011) ("Honeywell's invalidity contentions are 'substantial, reasonable, and far from the sort of easily-dismissed claims that an objectively reckless infringer would be forced to rely upon.'").

### 1.   Adrea Provided Actual Notice Of Alleged Infringement to B&N No Earlier Than March 29, 2012

There is no dispute that Adrea provided actual notice of alleged infringement to B&N no earlier than March 29, 2012.[30]   That is when Adrea first sent claim charts to B&N outlining Adrea's allegations of infringement.   Def. 56.1 ¶ 258-59.   "For purposes of section 287(a), notice must be of 'the infringement,' not merely notice of the patent's existence or ownership.   Actual notice requires the affirmative communication of a specific charge of infringement by a specific accused product or device."   *Amsted Indus. Inc. v. Buckeye Steel Castings Co.*, 24 F.3d 178, 187 (Fed. Cir. 1994); *see also Minks v. Polaris Indus., Inc.*, 546 F.3d 1364, 1376 (Fed. Cir. 2008) ("[G]eneral letters referring to the patent and including an admonishment not to infringe do not constitute actual notice.").   Adrea's communications with B&N prior to March 29, 2012, were generalized in nature, did not identify specific patents let alone allege infringement of a specific product, and did not meet the strict standard for actual notice.   Def. 56.1 ¶ 260.

### 2.   Adrea Did Not Plead Compliance with the Marking Statute

The first reason Adrea is precluded from recovering damages prior to March 29, 2012 is that it failed to even plead compliance with the marking statute.   As the patentee in a patent infringement case, Adrea bears that burden.   *Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1111 (Fed. Cir. 1996) (patentee has "the burden of pleading and proving at trial that [it] complied with the statutory requirements").   This Adrea did not do, instead only asserting the date on which it allegedly provided actual notice to B&N.   Dkt. 1 ¶¶ 19, 26, 33.   Because Adrea did not plead compliance with the marking statute, it is not permitted to recover damages for conduct prior to March 29, 2012, when it first provided actual notice.   *See Cognex*, 2013 WL 6906221, at *7 (granting summary judgment and denying leave to replead).

### 3.   Adrea Has Not Complied with the Marking Statute

Even if Adrea's pleading on the marking issue were sufficient, Adrea cannot prove that it has complied with the marking statute.   Adrea bears the burden of showing compliance with the

---

[30] Adrea alleges in its Complaint that B&N received actual notice "at least as early as March 29, 2012."   There is no evidence, however, that Adrea provided actual notice prior to this date.

marking statute by a preponderance of the evidence.  *Nike, Inc. v. Wal-Mart Stores, Inc.*, 138

F.3d 1437, 1447 (Fed. Cir. 1998); *see also Maxwell*, 86 F.3d at 1111.

 Adrea has licensed the Patents in Suit to others who have produced e-readers

incorporating them.  "A licensee who makes or sells a patented article does so 'for or under' the

patentee."  *Amsted*, 24 F.3d at 185; *Maxwell*, 86 F.3d at 1111 (stating that licensees and other

authorized parties must also comply with marking requirements).  Accordingly, Adrea, as the

patent owner, must ensure that its licensees comply with the marking statute.  *Maxwell*, 86 F.3d

at 1111-12.  It has not done so.



---

31

32 *See TransCore, LP v. Elec. Transaction Consultants Corp.*, 563 F.3d 1271, 1275 (Fed. Cir.
2009) ("[T]his court and its predecessors have on numerous occasions explained that a non-
exclusive patent license is equivalent to a covenant not to sue."); *In re Yarn Processing Patent
Validity Litig. (No. II)*, 602 F. Supp. 159, 169 (W.D.N.C. 1984) ("Section 287 applies . . .
regardless of the particular form these authorizations may take and regardless of whether the
authorizations are 'settlement agreements,' 'covenants not to sue' or 'licenses.'), *cited with
approval by Amsted*, 24 F.3d at 185 n.2.

33



Because Adrea's licensees did not mark their e-readers in compliance with the marking statute, Adrea cannot recover damages prior to giving actual notice to B&N for the first time on March 29, 2012.

### B.    In the Event Induced Infringement Is Shown, Adrea is Not Entitled to Damages Earlier Than March 29, 2012

Adrea's allegations of infringement with respect to claims 1, 34, and 35 of the '851 Patent are limited to inducement of infringement.  Def. 56.1 ¶ 261.  Inducement requires both knowledge of the existence of the patent and specific intent to induce infringement.  *DSU Med.*, 471 F.3d at 1306 ("[I]nducement requires that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement.") (internal quotations omitted); *see also Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S.Ct. 2060, 2068 (2011).  As explained above, Adrea provided actual notice to B&N no earlier than March 29, 2012.[35]  Additionally, Adrea has presented no evidence that B&N had knowledge of any of the Patents in Suit any earlier than March 29, 2012.  Accordingly, Adrea cannot collect damages for inducement of infringement for any conduct before then.  *See Semiconductor Energy Lab. Co. v.*

---

[34] ██████████████████████████████████████████████████████████████

[35] B&N is not waiving any argument that it had no specific intent to induce infringement. B&N's lack of knowledge regarding the '851 Patent, however, is sufficient to entitle it to summary judgment relating to damages prior to March 29, 2012.

*Chi Mei Optoelectronics Corp.*, 531 F. Supp. 2d 1084, 1114 (N.D. Cal. 2007) (granting defendant summary judgment of no damages for induced infringement prior to actual notice, because plaintiff had produced no evidence of actual knowledge of the patent before that date).

## IX.      CONCLUSION

For the foregoing reasons, the Court should grant B&N's motion for summary judgment that (i) B&N does not infringe the asserted claims of the '703, '501, and '851 Patents; (ii) those claims are invalid; and, in the event liability is proven, (iii) B&N has not willfully infringed the Patents in Suit, and (iv) Adrea is not entitled to damages any earlier than March 29, 2012.

Dated:  January 31, 2014                          **Arnold & Porter LLP**

*/s/ Ali R. Sharifahmadian*
Louis S. Ederer
Susan Shin
Yue-Han Chow
Maxwell Preston
399 Park Avenue
New York, NY 10022-4690
Telephone:  (212) 715-1000
Facsimile:  (212) 715-1399
louis.ederer@aporter.com
susan.shin@aporter.com
yue-han.chow@aporter.com
maxwell.preston@aporter.com

Ali R. Sharifahmadian  (*pro hac vice*)
Sarah Brackney Arni (*pro hac vice*)
555 Twelfth Street, NW
Washington, DC  20004-1206
Telephone:  (202) 942-5000
Facsimile:  (202) 942-5999
ali.sharifahmadian@aporter.com
sarah.arni@aporter.com

Michael Berta (*pro hac vice*)
Willow Noonan (*pro hac vice*)
Three Embarcadero Center
10th Floor
San Francisco, CA 94111-4024
Telephone: (415) 471-3100
Facsimile: (415) 471-3400
michael.berta@aporter.com
willow.noonan@aporter.com

*Attorneys for Defendants Barnes & Noble, Inc.,*
*barnesandnoble.com llc, and Nook Media LLC*

<u>**CERTIFICATE OF SERVICE**</u>

I, hereby certify that on January 31, 2014, copies of the foregoing were caused to be served upon the following via ECF:

Kenneth Rubenstein, Esq.
Baldassare Vinti, Esq.
PROSKAUER ROSE LLP
11 Times Square
New York, NY 10036


Steven Michael Bauer, Esq.
Kimberly A. Mottley, Esq.
Micah W. Miller, Esq.
Patrick Niedermeier, Esq.
Erin Staab, Esq.
PROSKAUER ROSE LLP
One International Place
Boston, MA 02110


Colin Cabral, Esq.
PROSKAUER ROSE LLP
2049 Century Park East
Los Angeles, CA 90067


_____/s/ Yue-Han Chow_____
Yue-Han Chow