**THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

ADREA, LLC,

        *Plaintiff*,

v.

BARNES & NOBLE, INC.,
BARNESANDNOBLE.COM LLC, and
NOOK MEDIA LLC,

        *Defendants*.

Civil Action No. 13-cv-4137 (JSR)

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S
MOTION TO EXCLUDE THE EXPERT TESTIMONY OF
<u>NED BARNES AND B. CLIFFORD NEUMAN</u>**

# <u>TABLE OF CONTENTS</u>

I.      PRELIMINARY STATEMENT ...................................................................................1

II.     SUMMARY OF THE CHALLENGED TESTIMONY .............................................2

     A.      Ned Barnes and His Royalty Opinions ....................................................2

     B.      Clifford Neuman and His Obviousness Opinions ....................................5

III.    LEGAL STANDARDS ..............................................................................................6

     A.      Admissibility of Expert Testimony ..........................................................6

     B.      Damages ....................................................................................................8

     C.      Obviousness ..............................................................................................8

IV.     ARGUMENT ..............................................................................................................9

     A.      The Opinions of B&N's Damages Expert Regarding His Estimated
             Royalty Should Be Excluded ....................................................................9

          1.      Barnes's Opinions Conflict with the Federal Circuit's
                "Longstanding Disapproval of Relying on Settlement Agreements
                to Establish Reasonable Royalty Damages" ...............................10

          2.      The Amazon Settlement Agreement Post-Dates the Hypothetical
                Negotiation by a Full Two Years in a Fast-Changing Financial
                Landscape ....................................................................................12

          3.      Barnes's Projections of Amazon's Sales Are Based on Speculation,
                Guesswork, and Information that Was Not Available to the Parties
                at Time of the Hypothetical Negotiation ....................................15

     B.      The Opinions of B&N's Technical Expert Should Be Excluded to the
             Extent They Relate to Obviousness ..........................................................16

          1.      Neuman's Proposed Testimony Regarding the Ultimate
                Conclusion of Obviousness Should Be Excluded Because His
                Analysis Is Incomplete and Does Not Consider All Relevant
                Factors .........................................................................................16

2.  Neuman's Opinions Regarding the Factual Determinations Underlying Obviousness Should Be Excluded Because They Are Not Based on Sufficient Facts and Would Not Assist the Jury ................18

    a.  Neuman Admits that His Expert Report Does Not Contain an Obviousness Analysis Regarding the Saigh References ...........19

    b.  Neuman's Opinions Regarding the MacPhail Reference Lack Sufficient Support to Render Them Reliable and Admissible ...................................................................................21

    c.  The Court Should Exclude Neuman's Proposed Testimony Regarding the '703 Patent Because He Does Not Provide Any Factual Support for His Opinions ...........................................23

V.  CONCLUSION ................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*,
  807 F. Supp. 2d 544 (E.D. Va. 2011) ...................................................................20

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
  303 F.3d 256 (2d Cir. 2002).................................................................................7

*Apple, Inc. v. Samsung Elec., Ltd.*,
  No. 11-cv-01846, 2013 U.S. Dist. LEXIS 160337 (N.D. Cal. Nov. 7, 2013) .........14

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,
  509 U.S. 209 (1993)............................................................................................16

*Cohesive Techs., Inc. v. Waters Corp.*,
  543 F.3d 1351 (Fed. Cir. 2008)............................................................................20

*Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc.*,
  807 F.2d 955 (Fed. Cir. 1986)..............................................................................17

*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579 (1993).........................................................................................6, 7

*Duro-Last, Inc. v. Custom Seal, Inc.*,
  321 F.3d 1098 (Fed. Cir. 2003)............................................................................20

*Gen. Elec. Co. v. Joiner*,
  522 U.S. 136 (1997).............................................................................................7

*Geo M. Martin Co. v. Alliance Mach. Sys. Int'l*,
  618 F.3d 1294 (Fed. Cir. 2010).............................................................................8

*Georgia-Pacific Corp. v. United States Plywood Corp.*,
  318 F.Supp. 1116 (S.D.N.Y. 1970).....................................................................8, 10

*Graham v. John Deere*,
  383 U.S. 1 (1996).................................................................................................8

*Hanson v. Alpine Ski Area, Inc.*,
  718 F.2d 1075 (Fed. Cir. 1983)..........................................................................8, 10

*Huang v. Marklyn Grp., Inc.*,
  No. 11-cv-01765, 2014 WL 3559367 (D. Colo. Jul. 18, 2014)...............................25

iii

*In re Fosamax Prods. Liab. Litig.*,
    645 F. Supp. 2d 164 (S.D.N.Y. 2009)..............................................................6, 7

*In re Xerox Corp. Sec. Litig.*,
    746 F. Supp. 2d 402 (D. Conn. 2001).................................................................8

*Innogenetics, N.V. v. Abbott Labs.*,
    512 F.3d 1363 (Fed. Cir. 2008)..................................................................18, 23

*InTouch Techs., Inc. v. VGo Communications, Inc.*,
    751 F.3d 1327 (Fed. Cir. 2014)..................................................................17, 18

*Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*,
    688 F.3d 1342 (Fed. Cir. 2012)................................................................8, 9, 18

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999)..........................................................................................7

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
    694 F.3d 51 (Fed. Cir. 2012)....................................................10, 11, 13, 16

*Minkin v. Gibbons, P.C.*,
    680 F.3d 1341 (Fed. Cir. 2012).......................................................................20

*Odetics, Inc. v. Storage Tech. Corp.*,
    185 F.3d 1259 (Fed. Cir. 1999).......................................................................13

*Oxford Gene Tech. Ltd. v. Mergen Ltd.*,
    345 F. Supp. 2d 431 (D. Del. 2004).....................................................21, 22, 23

*ResQNet.com, Inc. v. Lansa, Inc.*,
    594 F.3d 860, (Fed Cir. 2010).........................................................................10

*Rite-Hite Corp. v. Kelley Co.*,
    56 F.3d 1538 (Fed. Cir. 1995) (en banc)...........................................................8

*Sprint Commc'ns Co. L.P. v. Vonage Holdings Corp.*,
    No. 05-cv-02433, 2007 WL 2572417 (D. Kan. Sep. 4, 2007)..............................21

*Transocean Offshore Deepwater Drilling, Inc. v. Maersk Contractors USA, Inc.*,
    617 F.3d 1296 (Fed. Cir. 2010).......................................................................17

*Upjohn Co. v. Mova Pharm. Corp.*,
    225 F.3d 1306 (Fed. Cir. 2000).......................................................................20

**OTHER AUTHORITIES**

FED. R. CIV. P. 26(a)(2)................................................................................................................1

FED. R. EVID. 104........................................................................................................................6

FED. R. EVID. 403........................................................................................................................7

FED. R. EVID. 702...................................................................................................................6, 20

## I.      PRELIMINARY STATEMENT

Defendants Barnes & Noble, Inc., Barnesandnoble.com LLC, and Nook Media LLC (collectively "Defendants" or "B&N") have disclosed expert testimony pursuant to FED. R. CIV. P. 26(a)(2) from two individuals: (i) Ned Barnes, on damages issues; and (ii) B. Clifford Neuman, on liability issues.  Plaintiff ADREA, LLC ("ADREA") hereby moves to exclude, in part, testimony from both individuals.

The proposed testimony of B&N's damages expert regarding "estimated per-unit rates" and "estimated royalty payments" is not the product of a sound, reliable methodology.  Mr. Barnes's approach is to assume that the terms of a litigation settlement agreement entered into between ADREA and Amazon in November 2011 represent the terms that would have resulted from a hypothetical negotiation between ADREA and B&N in November 2009.  Despite clear warnings from the Federal Circuit, Mr. Barnes treated the settlement agreement as "arms-length, market-based evidence of the value of a license," without making any adjustments to compensate for the fact that the single agreement on which he relies was the product of litigation (involving a cross-complaint alleging infringement of four Amazon patents), or that the Amazon settlement agreement post-dates the hypothetical negotiation by a full two years.  Mr. Barnes then disregarded all other evidence, including relevant market forecasts and sales projections available to the parties when infringement began in 2009, and based his royalty calculations exclusively on the terms of the 2011 Amazon settlement.  His opinions fail to satisfy the requirements for admissible expert testimony and should be excluded.

The testimony of B&N's scientific expert should also be excluded to the extent it relates to the issue of obviousness.  The Federal Circuit has been clear that where, as here, an expert fails to consider objective evidence of non-obviousness (*i.e.*, secondary considerations), the

1

expert cannot testify on the ultimate conclusion of obviousness.  Here, Dr. Neuman failed to consider all factors relevant to the obviousness inquiry, including objective evidence of non-obviousness, rendering his analysis regarding the ultimate question of obviousness incomplete and inadmissible.  Moreover, to the extent Dr. Neuman addressed the factual determinations underlying the obviousness inquiry, he routinely concludes that something (*e.g.*, a claim or element) is obvious, without providing any explanation as to ***how*** or ***why*** it would have been obvious to a person of ordinary skill at the time of the invention.  Dr. Neuman's "take-my-word-for-it" approach is not based on sufficient facts to support admissible expert testimony.  For these reasons, Dr. Neuman's proposed testimony on obviousness should be excluded.

## II.    SUMMARY OF THE CHALLENGED TESTIMONY

### A.    Ned Barnes and His Royalty Opinions

B&N's damages expert has provided two different theories in an attempt to minimize the damages award in this case.  First, he estimated a per-unit royalty derived from a settlement agreement entered into between Amazon, Discovery Communications, LLC ("Discovery"), and ADREA in November 2011 to resolve prior litigation involving one of the three patents-in-suit (U.S. Patent No. 7,298,851).  Second, and in the alternative, Mr. Barnes proposed a "fully paid-up, lump sum alternative valuation" as a basis for potential damages.  This motion relates only to Mr. Barnes's royalty calculations.

In his report, Mr. Barnes states that "the likely outcome of the relevant hypothetical negotiations would have resulted in – at most – royalty rates equivalent to the per-unit rates reflected in the Amazon Agreement, ***based on information that would have been reasonably available to the parties at the time that the Amazon Agreement was negotiated***."  Ex. A, Expert

Report of Ned Barnes ("Barnes Rpt.") at ¶ 85 (emphasis added)[1].  Mr. Barnes has acknowledged that the Amazon settlement agreement was finalized in November 2011 (*see id.* at ¶¶ 29, 74), whereas the relevant date of the hypothetical negotiation was a full two years earlier in "late 2009" or "[g]enerally around November/December 2009."  *See id.* at ¶ 51 ("I have utilized late 2009 as the relevant hypothetical negotiation period."); Ex. B, Deposition of Ned Barnes ("Barnes Tr.") at 75:8-12 ("Q. Mr. Barnes, in calculating a reasonable royalty in this case, what date did you use for the date of the hypothetical negotiation? A. Generally around November/December 2009.  I haven't pinpointed it to a specific day.").  Nonetheless, Mr. Barnes abandoned the date of the hypothetical negotiation and focused his analysis on the November 2011 timeframe.  He summarized his approach as follows:

> My determination of these equivalent per-unit rates is based on my review and consideration of information that would have been available and considered by the parties ***at the time of that comparable [Amazon] agreement***, including estimates of actual and projected sales of Amazon licensed products associated therewith.

Ex. A, Barnes Rpt. at ¶ 6 (emphasis added).

Mr. Barnes purports to calculate a per-unit rate using the settlement amount agreed to by Amazon in 2011 and "estimated future sales" of Amazon's e-reader and tablet products.  *See id.* at ¶ 86 ("[T]hese fully paid-up license values can be converted to per-unit royalty rates based on contemporaneously available data concerning the volume of sales of Amazon licensed products and information that would have been available to the parties concerning estimated future sales of Amazon licensed products.").

---

[1] All exhibits cited herein are attached to the Declaration of Brendan Cox filed on September 5, 2014.

Mr. Barnes estimated Amazon's sales in a series of steps. *First*, for the period from 2008 to 2010, Mr. Barnes relied on actual sales numbers produced by Amazon on an attorneys' eyes only basis in prior litigation. *See* Ex. B, Barnes Tr., at 248:16-21. Neither ADREA, nor B&N would have had access to these Amazon data during the hypothetical negotiation. *Second*, in the absence of post-2010 data, Mr. Barnes relied on an industry source called International Data Corporation (IDC) for a historical estimate of Amazon's 2011 sales—an estimate that is 370% larger than the actual numbers produced by Amazon for the previous year. *See id.* at 248:22-249:17. Without explanation, Mr. Barnes relied only on the IDC data for 2011, and did not discuss available IDC estimates for 2012 and 2013 in his report. *Third*, Mr. Barnes makes up his own projections of Amazon sales for the period from 2012 to 2016, which assume an arbitrary ten percent growth rate projected forward from the 2011 IDC estimate. *See* Ex. A, Barnes Rpt., at ¶ 88 ("I have utilized a conservative growth rate of 10% to estimate expected sales of Amazon licensed products for the period 2012 through 2016."); *id.* at Exhibit 3 (showing "projected" Kindle sales for 2012-2016). *Last*, for the period from 2016 to 2023 (*i.e.*, the last eight years of patent life in this case), Mr. Barnes makes no projections at all because he did not think he "could reliably make any projection out that far." *See* Ex. B, Barnes Tr., at 245:24-246:18.

Mr. Barnes either ignores all other relevant information available to the parties at the time of the hypothetical negotiation, or he dismisses the evidence as "not particularly informative." For example, ADREA's investors created a revenue model in November 2009—*i.e.*, the same time as the hypothetical negotiation—which included market forecasts, sales projections, and licensing rate assumptions. Mr. Barnes dismissed this evidence as "not particularly informative." *See id.* at 79:8-20 (stating that the information "is not particularly informative as to the value proposition that would reflect the outcome, the likely outcome of a hypothetical

4

negotiation here.").  Similarly, when presented with e-reader market research from a market-valuation firm called Ocean Tomo, dated March 2007, Mr. Barnes acknowledged that it might have been considered by the parties during the hypothetical negotiation, but he again dismissed the evidence as not "particularly informative."  *See id.* at 78:4-16.  Further, when questioned about an independent market analysis from PCT Capital that related specifically to appropriate royalty rates (exclusive and non-exclusive) for two of the patents-in-suit, Mr. Barnes again dismissed the evidence as not "particularly informative."  *Id.* at 78:17-79:7.

### B.     Clifford Neuman and His Obviousness Opinions

Dr. Neuman's expert report on validity issues provides the same boilerplate language regarding obviousness for each of three patents-in-suit:

> It is also my opinion that the asserted claims are obvious in view of certain combinations of prior art. In particular, it is my opinion that all elements of the asserted claims are in the prior art, and that combination of these known elements in the manner claimed is not inventive. In my opinion, one skilled in the art at the time the patent application was filed would have been motivated to make the combinations I describe because, among other reasons, those combinations involve references directed to the same general technology, and together teach features of a system for distributing encrypted electronic books.
>
> . . .
>
> It is my opinion that to the extent that any element of the asserted claims was not explicitly or inherently described within any one of the prior art references, that element was obvious, standing alone, in light of the knowledge of one of ordinary skill in the art. For some of the invalidity opinions expressed below, I have provided some examples of such limitations.

Ex. C, Expert Report of B. Clifford Neuman ("Neuman Rpt.") at ¶¶ 144-46, 388-90, 523-25 (emphasis added).

Dr. Neuman provided opinions on the ultimate question of obviousness.  *See*, *e.g.*, *id.* at ¶¶ 144, 388, 523 ("It is . . . my opinion that the asserted claims are obvious in view of certain combinations of prior art.").  In addition, Dr. Neuman provided "some examples" of claim

5

limitations that he believes would be obvious in light of "the knowledge of one of ordinary skill in the art."  *See id.* at ¶ 445 (stating that it would have been obvious to redesign the entire distributed system of the MacPhail reference into a single device based on unspecified "known techniques").  In those examples, however, Dr. Neuman merely asserts that certain claim limitations are obvious without explaining ***how*** or ***why*** they would be obvious to a person of ordinary skill, and without citing any evidence regarding the actual knowledge of a person of ordinary skill at the time of the invention.

In one instance, B&N maintains that Dr. Neuman has opinions on obviousness with respect to certain prior art (*e.g.*, the Saigh references) despite Dr. Neuman's admission that his expert report does not contain such opinions.  *See* Ex. D, Deposition of B. Clifford Neuman ("Neuman Tr.") at 74:16-75:2 ("I have not stated in the report the specific words with respect to the Saigh references that it was obvious.").

## III.    LEGAL STANDARDS

### A.    Admissibility of Expert Testimony

Federal Rule of Evidence 702, which governs the admissibility of expert testimony, provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702.  In order for an expert's opinions to be admissible, the witness "must be qualified as an expert, the testimony must be reliable, and the testimony must assist the trier of fact."  *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 172 (S.D.N.Y. 2009).  The

proffered evidence must also be relevant. *See Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 587 (1993); *see also* FED. R. EVID. 104 and 402.

The district courts act as a "gatekeeper" to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert* at 509 U.S. at 597.  In exercising this gatekeeping function, the court must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592-593.

In *Daubert*, the Supreme Court set forth a non-exclusive list of factors that district courts weigh in gauging the reliability of scientific testimony. *Daubert*, 509 U.S. at 593-595.  The district court has broad discretion in determining the relevant factors to be employed in assessing reliability and in determining whether expert testimony is, in fact, reliable. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 153 (1999).  "To warrant admissibility, however, it is critical that an expert's analysis be reliable at every step. . . . [This] means that any step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002).

"The Daubert analysis focuses on the principles and methodology underlying an expert's testimony, not on the expert's conclusions." *In re Fosamax Products Liab. Litig.*, 645 F. Supp. 2d at 173-174 (S.D.N.Y 2009) (*citing Daubert*, 509 U.S. at 595).  "But conclusions and methodology are not entirely distinct from one another." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).  Accordingly, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id.*

Expert testimony may also be excluded under Rule 403 if its "probative value is substantially outweighed by one or more of the following: unfair prejudice, confusing the issues,

misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." FED. R. EVID. 403. "The Second Circuit has noted the uniquely important role that Rule 403 has to play in a district court's scrutiny of expert testimony, given the unique weight such evidence may have in a jury's deliberations." *In re Xerox Corp. Sec. Litig.*, 746 F. Supp. 2d 402, 408 (D. Conn. 2001) (internal quotations omitted).

### B.    Damages

"A patentee is entitled to no less than a reasonable royalty on an infringer's sales for which the patentee has not established entitlement to lost profits." *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1554 (Fed. Cir. 1995) (en banc). "The reasonable royalty may be based upon an established royalty, if there is one, or if not upon a hypothetical royalty resulting from arm's length negotiations between a willing licensor and a willing licensee." *Hanson v. Alpine Ski Area, Inc.*, 718 F.2d 1075, 1078 (Fed. Cir. 1983). "The hypothetical negotiation requires the court to envision the terms of a licensing agreement reached between the patentee and the infringer at the time infringement began." *Rite-Hite*, 56 F.3d at 1554. Pertinent factors for determining a reasonable royalty are set forth in *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F.Supp. 1116, 1120 (S.D.N.Y. 1970).[2]

### C.    Obviousness

"Obviousness is a question of law premised on underlying determinations of fact." *Geo M. Martin Co. v. Alliance Mach. Sys. Int'l*, 618 F.3d 1294, 1300 (Fed. Cir. 2010). These factual determinations require consideration of the following factors: (1) the scope and content of the prior art; (2) differences between the prior art and claimed invention; (3) the level of ordinary skill in the pertinent art; and (4) any objective indicia of nonobviousness. *Graham v. John*

---

[2] *Modified and aff'd sub nom.*, *Georgia-Pacific Corp. v. United States Plywood-Champion Paper*, 446 F.2d 295 (2d Cir. 1971), *cert. denied*, 404 U.S. 870 (1971).

*Deere*, 383 U.S. 1, 17-18 (1996).  "[T]he obviousness inquiry requires examination of all four *Graham* factors."  *Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1360 (Fed. Cir. 2012).  Moreover, "[a]t all times, the burden is on the defendant to establish by clear and convincing evidence that the patent is obvious."  *Id.*

## IV.   ARGUMENT

### A.   The Opinions of B&N's Damages Expert Regarding His Estimated Royalty Should Be Excluded

Mr. Barnes's methodology is unreliable and should be excluded for several reasons.

*First*, Mr. Barnes relies on the Amazon settlement agreement without accounting for the many coercive forces at work in settlement negotiations that are not present in the *Georgia-Pacific* framework, which assumes a voluntary agreement between a willing licensor and a willing licensee, where validity and infringement are not disputed.  Mr. Barnes has ignored the warnings of the Federal Circuit and failed to consider the Amazon settlement in the proper context of the hypothetical negotiation to ensure that his estimated royalties reflect the true economic demand for the claimed technology.

*Second*, Mr. Barnes's single-minded focus on the Amazon settlement caused him to abandon the date of the hypothetical negotiation (November 2009) and overlook relevant evidence, while he based his analysis on the 2011 timeframe.

*Last*, Mr. Barnes's projections of Amazon's sales are deeply flawed in that: (i) Mr. Barnes relies on confidential Amazon data that would not have been available to any party during the hypothetical negotiation; (ii) he relies on a historical estimate of Amazon's sales in 2011 while ignoring the 2012 and 2013 estimates from the same organization (IDC); and (iii) he artificially inflates his sales projections by projecting forward from the 2011 IDC estimate of Amazon's sales and assuming an arbitrary growth rate of 10%, without ever testing the accuracy

9

of IDC's information, for example, by comparing the 2010 IDC estimate against the actual sales figures produced by Amazon for the same year.

      1.     **Barnes's Opinions Conflict with the Federal Circuit's "Longstanding Disapproval of Relying on Settlement Agreements to Establish Reasonable Royalty Damages"**

"The propriety of using prior settlement agreements to prove the amount of a reasonable royalty is questionable." *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 77 (Fed. Cir. 2012). The Federal Circuit has observed that "license fees negotiated in the face of a threat of high litigation costs may be strongly influenced by a desire to avoid full litigation" and "should not be considered evidence of an established royalty." *Hanson v. Alpine Ski Area, Inc.*, 718 F.2d 1075, 1079 (Fed. Cir. 1983). Indeed, "[t]he notion that license fees that are tainted by the coercive environment of patent litigation are unsuitable to prove a reasonable royalty is a logical extension of *Georgia-Pacific*, the premise of which assumes a voluntary agreement will be reached between a willing licensor and a willing licensee, with validity and infringement of the patent not being disputed." *LaserDynamics*, 694 F.3d at 77.

Despite the "longstanding disapproval of relying on settlement agreements to establish reasonable royalty damages," the Federal Circuit has allowed reliance on litigation settlement agreements under "certain limited circumstances." *Id.* In *ResQNet.com, Inc. v. Lansa, Inc.*, the Federal Circuit permitted consideration of a settlement agreement on remand, where the agreement was the "most reliable license in [the] record" and other "licenses with no relationship to the claimed invention [were used] to drive the royalty rate up to unjustified double-digit levels." 594 F.3d 860, 870-872 (Fed. Cir. 2010). But even that case acknowledged that "litigation can skew the results of the hypothetical negotiation" (*id.* at 872), and the Federal Circuit cautioned the district court to "consider the license in its proper context within the

10

hypothetical negotiation framework to ensure that the reasonable royalty rate reflects 'the economic demand for the claimed technology.'" *LaserDynamics*, 694 F.3d at 77 (quoting *ResQNet*, 594 F.3d at 872-73).

Here, Mr. Barnes makes no effort to adjust his reasonable royalty calculations to account for the Amazon settlement agreement in the proper context of the hypothetical negotiation. In his report, Mr. Barnes attempts to justify his approach by stating that "as an economic matter, 'settlement-related licenses and the negotiations that produced them can provide useful economic information related to the amount of a reasonable royalty.'" Ex. A, Barnes Rpt, at 33 n. 161. For support, Mr. Barnes quotes from a book titled <u>Assets and Finances: Calculating Intellectual Property Damages</u>. *Id.* He fails to point out, however, that the ***same section*** of the ***same book*** cautions that where, as here, the differences between settling litigation and "regular course license negotiation" are ignored, the inferences drawn from settlement-driven licenses may be unreliable:

> [I]f settlement-related licenses are to be used in determining a reasonable royalty, they must be used carefully. There are many forces at work in negotiations to settle litigation that are not present in a regular course license negotiation. If these factors are ignored, the inferences drawn from the licenses may be unreliable.

Ex. E, <u>Assets and Finances: Calculating Intellectual Property Damages</u>, § 5:28 at 327.

Mere consideration of the Amazon settlement agreement does not render Mr. Barnes's opinions inadmissible.[3] But Mr. Barnes went off the rails when he decided to make the Amazon

---

[3] In fact, Plaintiff's damages expert, Prof. Magee, discussed the Amazon settlement agreement in his expert report. In stark contrast to Mr. Barnes, however, Prof. Magee observed that "[the] settlement was not based on the patents being assumed to be valid, infringement, and enforceable, as is required at the hypothetical negotiation." Ex. F, Expert Report of Prof. Stephen Magee ("Magee Rpt.") at ¶ 4. Prof. Magee also noted that "[t]he agreement was in settlement of cross-litigation between the parties related to patents owned by ADREA and Amazon, and was entered into specifically to avoid the expense and uncertainty of those

settlement the sole focus of his analysis and he failed to account for the critical differences

between settlement negotiations in the context of litigation and the *Georgia-Pacific* framework.[4]

By seeking a wholesale substitution of the terms of the Amazon settlement agreement in place of

the hypothetical negotiation, Mr. Barnes's opinions fall outside the bounds of binding Federal

Circuit authority and are inadmissible.

<div style="margin-left:2em">

**2.     The Amazon Settlement Agreement Post-Dates the Hypothetical Negotiation by a Full Two Years in a Fast-Changing Financial Landscape**

</div>

Mr. Barnes's proposed testimony does not account for the full two years in between the

date of the hypothetical negotiation and the Amazon settlement agreement.   The parties agree

that the date of the hypothetical negotiation for purposes of calculating potential damages is in

November 2009.   *See*, *e.g.*, Ex. B, Barnes Tr., at 75:8-12.   The Amazon settlement agreement

was executed two years later in November 2011.   Rather than explain how, if at all, this two-year

gap affects his opinions, Mr. Barnes abandons the date of the hypothetical negotiation altogether:

> [T]he likely outcome of the relevant hypothetical negotiations would have resulted in – at most – royalty rates equivalent to the per-unit rates reflected in the Amazon Agreement, ***based on information that would have been reasonably available to the parties at the time that the Amazon Agreement was negotiated***.

Ex. A, Barnes Rpt. at ¶ 85 (emphasis added); *id*. at ¶ 6 (stating that his determination of the per-

unit rates is based on his "review and consideration of information that would have been

---

lawsuits."  *Id.* at ¶ 58.  Further, Prof. Magee also pointed out that the parties to the settlement
agreement "acknowledged and agreed that the payment under the license was not representative
of a reasonable royalty for the licenses and other rights granted to Amazon."  *Id.* at ¶ 63.

[4] Notably, Mr. Barnes admits that "[t]o the extent the royalty amounts associated with the
Amazon Agreement reflected this risk [of infringement or invalidity] by one or more parties*,
these considerations would indicate lower royalty rates in the Amazon Agreement, on a
comparative basis, relative to the hypothetically negotiated licenses to B&N*."  Ex. A, Barnes
Rpt., at ¶ 60 (emphasis added).  Despite this admission, however, Mr. Barnes presents no
analysis of the prior Amazon litigation and does not adjust his calculations to reflect the true
economic demand of the claimed inventions.

available and considered by the parties **at the time of that comparable [Amazon] agreement** . . . .") (emphasis added).

By Mr. Barnes's own account, the market for e-readers was a fast-changing financial landscape between November 2009 and November 2011.  Mr. Barnes wrote in his report that "significant price competition in the market for eReader and tablet devices" resulted in "significant price reductions" for the Nook devices between late 2009 and September 2011.  *See* Ex. A, Barnes Rpt. at ¶ 42 (summarizing price reductions of the accused Nook devices between late 2009 and September 2011).  He then concluded that "in less than two years, the retail price of the original Nook eReader was reduced by more than 65%."  *Id.*

Against such a fast-changing financial landscape, the two full years between the date of the hypothetical negotiation and the Amazon settlement significantly reduces the probative value of the settlement agreement for purposes of determining a reasonable royalty.   In *LaserDynamics*, the Federal Circuit found that a district court abused its discretion by admitting a settlement agreement into evidence.  694 F.3d at 78.  In that case, the Federal Circuit reasoned that "in light of the changing technological and financial landscape . . . the [litigation] settlement, entered into a full three years after the hypothetical negotiation date, is in many ways not relevant to the hypothetical negotiation analysis."  *Id.*  Similarly, in *Odetics, Inc. v. Storage Tech. Corp.*, the Federal Circuit agreed with the district court that, for two licenses entered into four and five years after the date of first infringement, "the age of the license agreements, in the context of the changing technology and 'financial landscape' at issue, made those agreements irrelevant for the hypothetical negotiation analysis."  185 F.3d 1259, 1276-77 (Fed. Cir. 1999).[5]

---

[5] While the Federal Circuit "does not require the exclusion of post-infringement evidence, it certainly does not require its entry."  *Odetics*, 185 F.3d at 1276-77.

Given the full two years between the date of the hypothetical negotiation and Amazon settlement agreement, the Court is well within its discretion to exclude the agreement for purposes of determining a reasonable royalty.[6]   Moreover, assuming the agreement is relevant to the hypothetical negotiation analysis, the Court is also within its discretion to exclude the settlement agreement on the ground that its probative value is outweighed by the risk of confusing the issues and misleading the jury.  *See*, *e.g.*, *Apple, Inc. v. Samsung Elec., Ltd.*, No. 11-cv-01846, 2013 U.S. Dist. LEXIS 160337, **50-54 (N.D. Cal. Nov. 7, 2013) (excluding a settlement agreement on the grounds that its probative value is "substantially outweighed by the danger of confusing the issues, wasting time, and misleading the jury") (citing *LaserDynamics*, 694 F.3d at 78).

But setting aside the admissibility of the Amazon agreement, the fundamental problem with Mr. Barnes's proposed testimony is that despite the significant questions raised above regarding the probative value of the Amazon settlement in the hypothetical negotiation analysis, Mr. Barnes relies on this agreement alone to calculate his reasonable royalty and disregards all other relevant evidence, including timely sales projections and market forecasts that he concedes "might have been considered by the parties."   *See*, *e.g.*, Ex. B, Barnes Tr., at 78:4-79:20 (dismissing evidence as "not particularly informative"); Ex. F, Magee Rpt. at ¶ 4 (discussing relevant evidence).   This single-minded focus on "questionable" evidence is not a reliable methodology for determining potential damages and should be excluded.

---

[6] ADREA is not moving at this time to exclude the Amazon agreement as evidence for purposes of determining a reasonable royalty.  Notably, even if the Amazon agreement were excluded on that basis, the agreement would have relevance to other disputed issues in this case, including, for example, objective indicia of non-obviousness (*e.g.*, licensing).

    **3.**     **Barnes's Projections of Amazon's Sales Are Based on Speculation, Guesswork, and Information that Was Not Available to the Parties at Time of the Hypothetical Negotiation**

Mr. Barnes's projections of Amazon's sales are based, in part, on actual 2008-2010 sales figures produced by Amazon in prior litigation. Amazon produced the information on an "Attorneys' Eyes Only" basis, meaning that only outside counsel (and other individuals authorized to view highly confidential information under the Court's Protective Order, such as expert witnesses) can view the data relied on by Mr. Barnes. The parties to the hypothetical negotiation would not have had access to this information at the time of first infringement in November 2009. Nor do they have access to the information today, due to the confidentiality restrictions in place under the Protective Order. There is simply no support for Mr. Barnes's assertion that Amazon's confidential data "would have been reasonably available to the parties at the time that the Amazon Agreement was negotiated" (Ex. A, Barnes Rpt. at ¶ 85), even if that were the correct timeframe for determining damages in this case.

Mr. Barnes also relies improperly on a historical estimate provided by IDC for Amazon's 2011 sales. This is problematic for several reasons. First, Mr. Barnes accepts the IDC estimate for Amazon's 2011 sales without question, despite the fact that the estimate is 370% larger than the actual sales figures produced by Amazon for the previous year (2010). Second, Mr. Barnes relies on the 2011 IDC estimate, while at the same time, and without explanation, ignoring IDC's estimates of Amazon's sales for 2012 and 2013. *See* Ex. A, Barnes Rpt. at ¶¶ 87-88; *id.* at Exhs. 3, 6. Last, Mr. Barnes never tests the general accuracy of IDC's data, for example, by comparing IDC's 2010 estimate against the actual 2010 sales data produced by Amazon.

Rather than use the available IDC data, Mr. Barnes creates projections of Amazon's sales from 2012 to 2016 by applying an arbitrary 10% growth rate to the 2011 IDC estimate. Mr.

Barnes provides no support for selecting this growth rate, apart from his claim that it is "conservative" and "considerably lower than the forecasted growth rates for the tablet and eReader markets around the time of the Amazon Agreement." *Id.* at ¶ 88. Yet, Mr. Barnes does not explain why he places value on market forecasts in 2011, when he dismissed the market forecasts and sales projections in existence on the date of the hypothetical negotiation (November 2009) as "not particularly informative." *See* Ex. B, Barnes Tr., at 78:4-79:7.

Mr. Barnes's royalty calculations should be excluded to the extent they are based on his dubious projections of Amazon's sales. Such speculation and guesswork is unreliable and should not be allowed into evidence. *See LaserDynamics*, 694 F.3d at 75-76 (ordering a new trial on damages because the expert's royalty rate was "arbitrary and speculative"); *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993) ("When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict.").

### B.   The Opinions of B&N's Technical Expert Should Be Excluded to the Extent They Relate to Obviousness

#### 1.   Neuman's Proposed Testimony Regarding the Ultimate Conclusion of Obviousness Should Be Excluded Because His Analysis Is Incomplete and Does Not Consider All Relevant Factors

Dr. Neuman's opinions on the ultimate conclusion of obviousness are incomplete because he has failed to consider the fourth *Graham* factor in his analysis—that is, objective indicia (*i.e.* secondary considerations) of non-obviousness.[7] In fact, Dr. Neuman testified at his deposition

---

[7] ADREA has provided objective evidence of non-obviousness related to the patents-in-suit, including evidence of commercial success, copying, industry praise, licensing, and long-felt but unsolved need. This evidence has not been rebutted by B&N or its expert, Dr. Neuman.

that he did not recall whether he considered secondary considerations of non-obviousness prior to submitting his expert report:

> Q.    Did you look for any of those, of secondary considerations of nonobviousness, prior to submitting your expert report on validity issues in this case?
>
> THE WITNESS: There may have been thoughts about such things.
>
> …
>
> Q.    You said certain things may have been considered.  Is it [a] fact that secondary considerations of nonobviousness were considered by you prior to submitting your expert report on validity in this case, or is that not accurate?
>
> A.    I don't recall.

Ex. D, Neuman Tr., at 279:18-25; 280:15-22 (objections omitted).

By failing to consider objective indicia of non-obviousness, Dr. Neuman has overlooked an essential element of the obviousness inquiry.  *See Transocean Offshore Deepwater Drilling, Inc. v. Maersk Contractors USA, Inc.*, 617 F.3d 1296, 1305 (Fed. Cir. 2010) ("To be clear, a district court must ***always*** consider any objective evidence of nonobviousness presented in a case.") (emphasis in original); *Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc.*, 807 F.2d 955, 960 (Fed. Cir. 1986) ("When present, such objective evidence must be considered."). Because Dr. Neuman's analysis is incomplete, it is insufficient as a matter of law and his proposed testimony on the ultimate conclusion of obviousness should be excluded.

In *InTouch Techs., Inc. v. VGo Communications, Inc.*, the Federal Circuit reversed a district court's findings of invalidity based on obviousness, where the defendant's expert failed to account for objective evidence of non-obviousness.  751 F.3d 1327, 1452-53 (Fed. Cir. 2014). The Court reasoned that "[b]y failing to account for objective evidence of nonobviousness, [the

expert]'s analysis was incomplete, and ultimately insufficient to establish obviousness by clear and convincing evidence." *Id.* The Federal Circuit also provided valuable guidance:

> We do not imply that a defendant must proffer an expert on objective indicia of nonobviousness before the trier of fact may reject such evidence. Indeed, technical experts may testify to matters like the level of skill in the art at the time of the invention and what a skilled artisan might find obvious in light of the prior art without addressing objective indicia of non-obviousness. ***But, where, as here, an expert purports to testify, not just to certain factual components underlying the obviousness inquiry, but to the ultimate question of obviousness, the expert must consider all factors relevant to that ultimate question.***

*Id.* at n.8 (emphasis added); *see also Kinetic Concepts*, 688 F.3d at 1367-70 (warning "against the dangers of ignoring objective indicia of nonobviousness" and noting the "particularly important role" of objective indicia in cases like this one, "where there is a battle of scientific experts regarding the obviousness of the invention").

Dr. Neuman's opinions on the ultimate question of obviousness should be excluded because he performed an incomplete analysis and failed to consider all factors underlying the obviousness inquiry, as the Federal Circuit mandates.

### 2. Neuman's Opinions Regarding the Factual Determinations Underlying Obviousness Should Be Excluded Because They Are Not Based on Sufficient Facts and Would Not Assist the Jury

Dr. Neuman's proposed testimony on obviousness should also be excluded on the ground that Dr. Neuman does not provide the required factual basis to support his opinions. *See Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363, 1373 (Fed. Cir. 2008) ("[T]here must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness.").

18

### a.   Neuman Admits that His Expert Report Does Not Contain an Obviousness Analysis Regarding the Saigh References

Dr. Neuman has offered opinions regarding prior art identified as PCT Publication No. WO1993/09490 (the "Saigh Publication") and U.S. Patent No. 5,734,891 (the "Saigh Patent") (collectively, the "Saigh references"). The entirety of his expert report regarding the Saigh references relates to the issue of anticipation, not obviousness. *See generally* Ex. C, Neuman Rpt., at ¶¶ 391-437. In fact, Dr. Neuman admitted during his deposition that his report does not include an obviousness analysis relating to the Saigh references:

> Q.   Can you point to me any statement in your discussion of the Saigh references, spanning from pages 101 through 109 of your expert report, where you conclude that the asserted claims of the 501 Patent are invalid as obvious in light of the Saigh references?
>
> [A.]   So I have not made an explicit statement that the asserted claims are rendered obvious, so I have not explicitly stated that in those words with respect to the Saigh references.
>
> …
>
> Q.   And is it correct that you would agree that in your expert report, you never state an opinion that it would have been obvious to one of ordinary skill in the art to perform the invention of the asserted claims of the 501 Patent in view of the Saigh references?
>
> [A.]   I have not stated in the report the specific words with respect to the Saigh references that it was obvious.

Ex. D, Neuman Tr., at 68:4-20; 74:16-75:2 (objections omitted).

B&N admits that Dr. Neuman "focused his analysis on anticipation," but it maintains that anticipation "was not the entirety of [Dr. Neuman's] opinions." Dkt. No. 70 (Defs.' Opp. to Pl.'s Partial MSJ) at 27. B&N's only support for this assertion is the following generic statement from Dr. Neuman's report: "[T]o the extent that any element of the asserted claims was not

explicitly or inherently described within any one of the prior art references, that element was obvious, standing alone, in light of the knowledge of one of ordinary skill in the art."  *See id.*; *see also* Ex. C, Neuman Rpt., at ¶ 390.

Dr. Neuman's "catch-all" opinion is not admissible evidence under FED. R. EVID. 702. Obviousness is not a fallback argument to anticipation; it is a separate defense based on distinct legal concepts.[8]  *See, e.g.*, *Minkin v. Gibbons, P.C.*, 680 F.3d 1341, 1351-52 (Fed. Cir. 2012) ("We have held . . . that anticipation and obviousness are separate conditions of patentability, requiring different tests and different elements of proof"); *Cohesive Techs., Inc. v. Waters Corp.*, 543 F.3d 1351, 1364 (Fed. Cir. 2008) ("The tests for anticipation and obviousness are different") (citing *Duro-Last, Inc. v. Custom Seal, Inc.*, 321 F.3d 1098, 1107-08 (Fed. Cir. 2003)).

Put another way, Dr. Neuman's opinions regarding anticipation do not dispose of or limit his obligation to analyze the required factual issues underlying the obviousness inquiry.  *See ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 807 F. Supp. 2d 544, 562 (E.D. Va. 2011) ("At this critical point in the determination of obviousness, there must be factual support for an expert's conclusory opinion") (citing *Upjohn Co. v. Mova Pharm. Corp.*, 225 F.3d 1306, 1311 (Fed. Cir. 2000)).  Dr. Neuman does not satisfy this obligation.  Indeed, Dr. Neuman neither identifies nor discusses: (i) what element(s) of the asserted claims the Saigh references allegedly render obvious; or (ii) what "knowledge of one of ordinary skill in the art" he would consider relevant to such an obviousness analysis.

Because such conclusory opinions require blind acceptance of Dr. Neuman's testimony, they will be neither helpful to the jury, nor sufficient to enable effective cross-examination.  *See*

---

[8] Dr. Neuman has acknowledged that anticipation and obviousness are separate defenses. Ex. D, Neuman Tr., at 51:7-8 ("I understand that they [anticipation and obviousness] are separate, though not necessarily exclusive defenses.").

20

*Sprint Commc'ns Co. L.P. v. Vonage Holdings Corp.*, No. 05-cv-02433, 2007 WL 2572417, *2 (D. Kan. Sep. 4, 2007) (excluding expert testimony on obviousness on the grounds that "[p]resenting a summary of a proffered expert's testimony in the form of a conclusory statement devoid of factual or analytical support is insufficient to lay the proper foundation for the admission of that testimony"); *Oxford Gene Tech. Ltd. v. Mergen Ltd.*, 345 F. Supp. 2d 431, 438 (D. Del. 2004) (excluding expert opinion on obviousness on the ground that "[Plaintiff] cannot be expected to cross-examine Dr. Purdue regarding the methodology he used to reach such a conclusion when he could not or would not disclose the factual evidence upon which he relies").

Accordingly, Dr. Neuman's opinions and proposed testimony regarding obviousness of the '501 Patent in view of the Saigh references should be excluded.

> **b.    Neuman's Opinions Regarding the MacPhail Reference Lack Sufficient Support to Render Them Reliable and Admissible**

Dr. Neuman relies on the "MacPhail reference"[9] to assert that the '501 Patent is obvious. Dr. Neuman has acknowledged that the MacPhail reference describes a system for managing document retention in a distributed system.[10]   Despite this acknowledgement, however, Dr. Neuman concludes that it would have been obvious to one skilled in the art to redesign the entire MacPhail system first to a single computer, and then to an individual portable device.  Ex. C, Neuman Rpt., at ¶ 463.

The problem with Dr. Neuman's proposed testimony is that it is utterly devoid of any factual basis or analysis.  In this respect, Dr. Neuman's opinions are based on the following two statements:

---

[9] U.S. Patent No. 4,899,299 ("MacPhail").

[10] *See* Ex. D, Neuman Tr., at 159:10-11 ("The MacPhail patent does describe document retention in a distributed system.").

21

- "[T]he background section of the MacPhail patent acknowledges that an interactive information handling systems [sic] may be implemented on a "simple personal computer.""

- "[P]rior to the earliest priority date to which the asserted claims of the '501 Patent are entitled [date omitted], portable computers were common place [sic]."

*Id.* at ¶¶ 463-64.

These statements do not provide a sufficient factual basis to clear the threshold for admissibility.  First, the phrase "simple personal computer" is used in the MacPhail reference to describe the prior art, not to describe the invention, as Dr. Neuman suggests.[11]  Second, whether portable computers were "commonplace" at the time of invention is irrelevant to the obviousness inquiry.  Even if that were true, Dr. Neuman does not explain how or why this fact would have made it obvious for a person of ordinary skill in the art to redesign the MacPhail reference into a single, portable device (or that such person would even have the ability to do so).

All that remains in Dr. Neuman's report is the unsupported conclusion that redesigning the MacPhail system into a single, portable device would require "no more than application of known techniques."  *See* Ex. C, Neuman Rpt., at ¶ 445.  Importantly, however, Dr. Neuman neither identifies these "techniques," nor explains how or why they were "known" by those of ordinary skill in the art at the time of invention.

Courts have excluded such conclusory opinions relating to obviousness under similar circumstances.  In *Oxford Gene*, for example, the district court excluded expert testimony on obviousness because the expert failed to disclose the factual basis for his opinion in the expert report.  345 F.Supp.2d at 438-39.  The court noted that the expert "did not provide any basis for

---

[11] *See* Ex. G, MacPhail Patent, at col. 1:15-22 ("The prior art has disclosed various interactive information handling systems which store electronic documents. These systems vary in complexity and sophistication from the very simple personal computer employed in the home for writing letters to the very large main frame data processing systems . . . .")).

his conclusion that it would be obvious to one of ordinary skill in the art to use an impermeable support such as glass." *Id.* at 438.   The court reasoned that the "opinion of what a person of ordinary skill in the art would know or find obvious still lacks sufficient support to make it reliable under *Daubert* or admissible under Rule 26(a)(2)(B)." *Id.*  Because the expert failed to disclose the factual basis for his opinions, the district court did not allow the opinion to be presented to the jury. *Id.* at 437-38.  The same reasoning applies here.

Absent factual evidence to support Dr. Neuman's opinions, his testimony regarding the MacPhail patent will not assist the jury to avoid the pitfalls of hindsight. *See Innogenetics*, 512 F.3d at 1373-74 ("Such vague testimony would not have been helpful to a lay jury in avoiding the pitfalls of hindsight that belie a determination of obviousness").   To the contrary, every indication is that Dr. Neuman relied on hindsight when he wrote in his report that "it would have been easier for the developer of the system disclosed in the MacPhail patent to implement her access restriction technique on a single device ***had she not been trying to solve a broader problem of managing information in a distributed system***."   Ex. C, Neuman Rpt., at ¶ 463 (emphasis added).   In other words, Dr. Neuman is saying that the MacPhail inventor would have had an easier time implementing the claimed invention had she not been focused on solving ***an entirely different type of problem***.   This and the remainder of Dr. Neuman's opinions regarding the MacPhail reference should be excluded on the grounds that they are unreliable and devoid of factual support.

### c.      The Court Should Exclude Neuman's Proposed Testimony Regarding the '703 Patent Because He Does Not Provide Any Factual Support for His Opinions

Dr. Neuman's opinions and proposed testimony regarding obviousness of the '703 Patent should also be excluded on the ground that Dr. Neuman fails to provide any factual evidence to

support his opinions.   For example, Dr. Neuman opines as follows regarding the alleged

obviousness of the '703 Patent:

- _With respect to the "Kraftsow" reference_:   "[I]t would have been obvious to connect to the Internet through a home network in light of the likelihood that a user would find this invention useful in their home and the fact that a local area network can be essentially the same as a home network, but located outside of the home."  Ex. C, Neuman Rpt., at ¶ 364.

- _With respect to the "Morgan" reference_:   "[I]t would be obvious to a person of ordinary skill in the art at the time of the '703 Patent to configure the computer system for use on a home network.   Such networks were increasingly common methods of connecting to the Internet at that time."  _Id_. at ¶ 238.

- _With respect to the "Bolas" reference_:   "[I]t would have been obvious to one of skill in the art to use memory 22 of the internet radio device to store the serial number and user name as to avoid a user having to entering [sic] that information manually every time. Storing information in the memory would have been a trivial modification that is well within the ability of a person with ordinary skill in the art."  _Id_. at ¶ 158; _id_. at ¶¶ 306-07 (finding same in regard to the "Crisp" reference); _id_. at ¶ 347 (finding same in regard to the "Kraftsow" reference).

- _With respect to the "Nachinson" reference_:   "The Nachinson Patent already discloses that the configuration process may download software from a server on the Internet.  (Citation omitted)  And the Nachinson Patent discloses that actuating a single switch on a mouse pad would result in the retrieval of a web page (citation omitted), where the computer system may first send a request to a network server storing the switch objects that associate the predetermined signals with URLs (citation omitted).  Accordingly, it would have been obvious to a person of ordinary skill in the art to have the computer system send a request to a server on the Internet, which would store the switch objects and redirect the computer system to the correct URL."  _Id_. at ¶ 212.

- _With respect to the "Munyan" reference_:   "[I]t would be obvious to a person of ordinary skill in the art to modify the Munyan Patent to connect to the online bookstore on the Internet through a home network in light of the increased usage of such networks rather than the PSTN.  Accordingly, it would be obvious to a person of ordinary

skill in the art for the online bookstore providing an Internet-based bookstore to the user of an electronic book system. *Id*. at ¶ 277.

- *With respect to the "Crisp" reference*: "One of ordinary skill in the art would know that one method of identifying the user and customizing the data returned would be to base the initiation of retrieval of data on the unit identification. Thus, the Crisp Patent's disclosure of returning different information depending on the user renders obvious the limitation 'initiating retrieval of data by the consumer appliance from a server based on … an identifier.'" *Id*. at ¶ 304.

The fundamental problem with Dr. Neuman's methodology is that he fails to address or discuss the underlying factual issues of ***how*** or ***why*** a person of ordinary skill in the art would have found the asserted claims obvious in view of the identified prior art.  Dr. Neuman merely asserts that the claim elements are obvious and goes no further.  Because Dr. Neuman provides no articulated reasoning supported by some rational underpinning, his opinions and proposed testimony concerning the alleged obviousness of the '703 Patent should be excluded. *See Huang v. Marklyn Grp., Inc*., No. 11-cv-01765, 2014 WL 3559367, *5 (D. Colo. Jul. 18, 2014) (excluding expert opinion on obviousness where the expert's "report merely lists the alleged prior art references and concludes, without explanation, that each demonstrates that the idea of mounting LED lights on a flexible attachment strip was not a new design concept in 2010").

## V.   CONCLUSION

For the foregoing reasons, Plaintiff ADREA respectfully requests that the Court exclude the opinions and proposed trial testimony of B&N's damages expert, Mr. Barnes, relating to a reasonable royalty, and the opinions of B&N's technical expert, Dr. Neuman, relating to the issue of obviousness.

Dated: September 5, 2014                    Respectfully submitted,


*/s/ Steven M. Bauer*
Steven M. Bauer
Kimberly A. Mottley (*pro hac vice*)
Patrick J. Niedermeier (*pro hac vice*)
Micah Miller (*pro hac vice*)
Brendan Cox (*pro hac vice*)
Erin Staab (*pro hac vice*)
PROSKAUER ROSE LLP
One International Place
Boston, Massachusetts 02110
(617) 526-9600 (telephone)
(617) 526-9800 (facsimile)
sbauer@proskauer.com
kmottley@proskauer.com
pniedermeier@proskauer.com
mmiller@proskauer.com
estaab@proskauer.com

Colin Cabral
PROSKAUER ROSE LLP
2049 Century Park East, Suite 3200
Los Angeles, CA 90067
(310) 284-5611 (telephone)
(310) 557-2193 (facsimile)
ccabral@proskauer.com

Kenneth Rubenstein
Baldassare Vinti
PROSKAUER ROSE LLP
11 Times Square
New York, NY 10036
(212) 969-3000 (telephone)
(212) 969-2900 (facsimile)
krubenstein@proskauer.com
bvinti@proskauer.com

*Attorneys for Plaintiff ADREA, LLC*

## CERTIFICATE OF SERVICE

I certify that on September 5, 2014, I caused a copy of the forgoing document to be served upon counsel of record for Barnes & Noble, Inc., barnesandnoble.com llc, and Nook Media LLC by electronic mail.


Louis S. Ederer
Susan Lee Shin
Yue-Han Chow
Maxwell Charles Preston
ARNOLD & PORTER LLP
399 Park Avenue
New York, NY 10022-4690
Telephone:  (212) 715-1000
Facsimile:  (212) 715-1399
louis.ederer@aporter.com
susan.shin@aporter.com
yue-han.chow@aporter.com
maxwell.preston@aporter.com

Ali R. Sharifahmadian  (*pro hac vice*)
Sarah Brackney Arni (*pro hac vice*)
ARNOLD & PORTER LLP
555 Twelfth Street, NW
Washington, DC  20004-1206
Telephone:  (202) 942-5000
Facsimile:  (202) 942-5999
ali.sharifahmadian@aporter.com
sarah.arni@aporter.com

Michael A. Berta, Jr. (*pro hac vice*)
Willow W. Noonan (*pro hac vice*)
ARNOLD & PORTER LLP
Three Embarcadero Center, 10th Floor
San Francisco, CA 94111-4024
Telephone: (415) 471-3100
Facsimile: (415)-471-3400
michael.berta@aporter.com
willow.noonan@aporter.com

*Attorneys for Defendants Barnes & Noble, Inc.,*
*barnesandnoble.com llc, and Nook Media LLC*

                              */s/ Steven M. Bauer*
                              Steven M. Bauer

27