**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ADREA, LLC, )<br><br>Plaintiff, )<br><br>- against - )<br><br>BARNES & NOBLE, INC., )<br>BARNESANDNOBLE.COM LLC, and )<br>NOOK MEDIA LLC, )<br><br>Defendants. )<br> )<br> ) | **NON-CONFIDENTIAL (REDACTED) FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER**<br><br>ECF Case<br><br>13-CV-4137 (JSR) |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT**
**OF THEIR MOTION TO EXCLUDE TESTIMONY OF**
**STEPHEN P. MAGEE AND XIN WANG**

NON-CONFIDENTIAL (REDACTED)

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................................ 1

ARGUMENT............................................................................................................................. 2

I.     Legal Standard ............................................................................................................... 2

II.    Magee's Two Proposed Royalty Calculations ................................................................ 5

III.   Professor Magee's Testimony Is Unreliable Because He Proposes One
Royalty Rate, No Matter How Many Patents-in-Suit The Jury May Find
To Have Been Infringed ................................................................................................. 6

     A.     Contrary to Law, Magee's Single Royalty Rate Deliberately Assumes
No Apportionment Should be Made For Each Patented Invention and
Provides No Guidance as to How to Apportion the Royalty in the
Event Any Patent-in-Suit Is Found Not to be Infringed, or Not at Issue
for the Full Time Period ..................................................................................... 6

     B.     Magee Implausibly Assumes That There Would Have Been One
Negotiation for A Single Royalty Amount Even Though Two
Different Companies Owned The Patents............................................................ 11

IV.   Magee's $0.50 Royalty Rate Is Arbitrary, Unsupported, Unreliable, and
Ignores Real World Evidence ....................................................................................... 11

     A.     Magee Relies on Made-Up Royalty Rates That Were Never the
Subject of any License or Real World Valuation .................................................. 12

     B.     Magee Ignores Real World Market-Tested Valuation of the Patents................... 17

           1.     Magee Fails to Take the Amazon License Agreement Into
Account ................................................................................................. 17

           2.     Magee Gives No Credence to Adrea's Own Actual Valuation
of Its Patent Portfolio ........................................................................... 18

           3.     Magee Failed to Investigate Discovery's Prior Attempts to
License Its eReader Patent Portfolio...................................................... 19

V.    Magee's Inflated Lump Sum Payment Is Based on A Speculative Twelve-
Year Projection of Future Sales.................................................................................... 20

VI.   Wang's Opinion on Secondary Considerations of Non-Obviousness
Should Also Be Excluded............................................................................................. 22

CONCLUSION ....................................................................................................................... 25

NON-CONFIDENTIAL (REDACTED)

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Accentra, Inc. v. Staples, Inc.*,
    500 F. App'x. 922 (Fed. Cir. 2013) ...........................................................................................8

*Amorgianos v. Amtrak*,
    303 F.3d 256 (2d Cir. 2002).....................................................................................................3

*Aro Mfg. Co. v. Convertible Top Replacement Co.*,
    377 U.S. 476 (1964)..................................................................................................................7

*Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*,
    650 F. Supp. 2d 314 (S.D.N.Y. 2009) (Rakoff, J.) ..................................................................2

*Cornell Univ. v. Hewlett-Packard Co.*,
    No. 01-cv-1974, 2008 WL 2222189 (N.D.N.Y. May 27, 2008) (Rader, J.)..............................3

*Daubert v. Merrell Dow Pharms.*,
    509 U.S. 579 (1993)..............................................................................................1, 2, 4, 22, 23

*Deere & Co. v. Int'l Harvester Co.*,
    710 F.2d 1551 (Fed. Cir. 1983)..............................................................................................13

*Gallagher v. S. Source Packaging, LLC*,
    568 F. Supp. 2d 624 (E.D.N.C. 2008)..................................................................................4, 20

*General Electric Co. v. Joiner*,
    522 U.S. 136 (1997)..................................................................................................................4

*Geo. M. Martin Co. v. Alliance Mach. Sys. Int'l LLC*,
    618 F.3d 1294 (Fed. Cir. 2010) ..............................................................................................24

*Georgia-Pacific Corp. v. U.S. Plywood Corp.*,
    318 F. Supp. 1116 (S.D.N.Y. 1970)..........................................................................................3

*GPNE Corp. v. Apple, Inc.*,
    No. 12-cv-2885, 2014 WL 1494247 (N.D. Cal. April 16, 2014)............................................10

*In re TMI Litig.*,
    193 F.3d 613 (3d Cir. 1999) ...................................................................................................23

*Inventio AG v. Otis Elevator Co.*,
    497 F. App'x 37 (Fed. Cir. 2012) ...........................................................................................24

*Iron Grip Barbell Co. v. USA Sports, Inc.*,
    392 F.3d 1317 (Fed. Cir. 2004) ........................................................................................23, 25

NON-CONFIDENTIAL (REDACTED)

*J.T. Colby & Co., Inc. v. Apple Inc.*,
   No. 11 Civ. 4060, 2013 WL 1903883 (S.D.N.Y. May 8, 2013)................................................3

*Johnson Elec. N. Am. Inc. v. Mabuchi Motor Am. Corp.*,
   103 F. Supp. 2d 268 (S.D.N.Y. 2000)..........................................................................4

*Leese v. Lockheed Martin Corp.*,
   No. Civ. 11-5091, 2014 WL 1092406 (D.N.J. Mar. 18, 2014)..............................................15

*Lucent Technologies, Inc. v. Microsoft Corp.*,
   No. 07-CV-2000, 2011 WL 7664416 (S.D. Cal. June 16, 2011)............................................10

*Lynch v. Trek Bicycle Corp.*,
   374 F. App'x. 204 (2d Cir. 2010) ...............................................................................3

*Malletier v. Dooney & Bourke, Inc.*,
   525 F. Supp. 2d 558 (S.D.N.Y. 2007)..........................................................................15

*MeadWestVaco Corp. v. Rexam Beauty and Closures, Inc.*,
   731 F.3d 1258 (Fed. Cir. 2013) ................................................................................25

*Medisim Ltd. v. Bestmed LLC*,
   861 F. Supp. 2d 158 (S.D.N.Y. 2012)..........................................................................4

*Minebea Co., Ltd. v. Papst*,
   No. Civ. A. 97-0590, 2005 WL 1459704 (D.D.C. June 21, 2005).......................................4, 8

*Mirror Worlds, LLC v. Apple, Inc.*,
   784 F. Supp. 2d 703 (E.D. Tex. 2011)..........................................................................9

*Monarch Knitting Mach. Corp. v. Sulzer Morat GmbH*,
   139 F.3d 877 (Fed. Cir. 1998) ..................................................................................25

*Monolithic Power Sys. Inc. v. O2 Micro Int'l Ltd.*,
   476 F. Supp. 2d 1143 (N.D. Cal. 2007) ........................................................................4

*Oiness v. Walgreen Co.*,
   88 F.3d 1025 (Fed. Cir. 1996)...................................................................................21

*Pentec, Inc. v. Graphic Controls Corp.*,
   776 F.2d 309 (Fed. Cir. 1985) ..................................................................................24

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
   711 F.3d 1348 (Fed. Cir. 2013)..................................................................................3

*Rambus Inc. v. Hynix Semiconductor Inc.*,
   254 F.R.D. 597 (N.D. Cal. 2008) ...............................................................................24

NON-CONFIDENTIAL (REDACTED)

*R.F.M.A.S., Inc. v. So,*
  748 F. Supp. 2d 244 (S.D.N.Y. 2010)......................................................................22

*ResQNet.com, Inc. v. Lansa, Inc.,*
  594 F.3d 860 (Fed. Cir. 2010)..........................................................................7, 18

*Riles v. Shell Exploration & Produc.Co.,*
  298 F.3d 1302 (Fed. Cir. 2002)...........................................................................3

*Texas Instruments Inc. v. U.S. Int'l. Trade Com'n,*
  988 F.2d 1165 (Fed. Cir. 1993) ...........................................................................25

*TK-7 Corp. v. Estate of Barbouti,*
  993 F.2d 722 (10th Cir. 1993) ...........................................................................16

*U.S. Info. Sys., Inc. v. Int'l Brotherhood of Elec. Workers,*
  313 F. Supp. 2d 213 (S.D.N.Y. 2004)....................................................................4

*United States v. Mejia,*
  545 F.3d 179 (2d Cir. 2008).................................................................................15

*Uniloc USA, Inc. v. Microsoft Corp.,*
  632 F.3d 1292 (Fed. Cir. 2011)...........................................................................3

*United States v. Frazier,*
  387 F.3d 1244 (11th Cir. 2004) ...........................................................................4

*United States v. Glynn,*
  578 F. Supp. 2d 567 (S.D.N.Y. 2008) (JSR) .........................................................22

*Verizon Servs. Corp. v. Vonage Holdings Corp.,*
  503 F.3d 1295 (Fed. Cir. 2007)............................................................................8

*Whiteserve, LLC v. Computer Packages, Inc.,*
  694 F.3d 10 (Fed. Cir. 2012)................................................................................13

**STATUTES AND RULES**

35 U.S.C. § 284.....................................................................................................7

Fed. R. Evid. 403 ..................................................................................................3

Fed. R. Evid. 702 ...........................................................................................1, 2, 3, 4

NON-CONFIDENTIAL (REDACTED)

Defendants Barnes & Noble, Inc., barnesandnoble.com llc, and NOOK Media LLC

(collectively, "B&N"), hereby move *in limine* pursuant to Rule and 702 of the Federal Rules of

Evidence and *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 597 (1993) to preclude

plaintiff Adrea, LLC ("Adrea") from proffering the opinions of Professor Stephen P. Magee

("Magee") on Adrea's alleged damages.  Magee takes the untenable position that the damages

rate should remain the same regardless of whether it compensates for infringement of one, two,

or all three patents-in-suit, and deliberately ignores actual, real world evidence bearing directly

on their value.  His opinions have no basis in reality, are totally unreliable, and should be

precluded.  B&N also moves, for the reasons discussed below, to preclude the opinions of  Dr.

Xin Wang ("Wang") on the secondary considerations of non-obviousness.

### PRELIMINARY STATEMENT

> Q.      Is it your testimony, sir, that all of the patents-in-suit have
> the same value?
>
> **A.      My opinion is that on the eReaders, the royalty rate on
> the eReaders is independent -- of 50 cents, is independent of
> whether one, two or three patents were valid, infringed and
> enforceable.**  Ex. C at 35:24 – 36:6.[1]

At his deposition, rather than attempting to justify his unapportioned, single royalty rate

for all three patents-in-suit, Magee testified that in a hypothetical license negotiation, B&N

would have agreed to pay a running royalty of $0.50 per accused NOOK device, regardless of

whether one, two, or all three patents-in-suit were found to have been infringed.  This is just one

of many examples of the non-commonsensical, foundational errors on which Magee bases his

grossly unsupported damages model.  Another example is that in proposing his $0.50 royalty

rate, which stays constant no matter how many of the patents-in-suit are found to have been

---

[1] All referenced exhibits are attached to the concurrently-filed Declaration of Yue-Han Chow.

NON-CONFIDENTIAL (REDACTED)

infringed, Magee ignores evidence of actual licenses encompassing the patents-in-suit, not to mention Adrea's own patent portfolio valuation to the IRS. He relies instead on speculative "valuations" by parties who are not experts, repeatedly eschewing the record and reality while making results-oriented assumptions to reach conclusions that defy common sense.

In addition to his implausible, unsupported single royalty rate, Magee also proposes a lump sum payment model calculated on a basis that is downright fanciful. Disregarding the trend in actual NOOK sales numbers — which show a steady decline over the last three years, i.e., more than half of the accused product line's lifetime — he instead relies on a speculative *twelve-year* sales projection model that assumes B&N's most recent year of actual sales, which had declined significantly from the previous year, will hold *constant* for the next decade and beyond. This is contrary to sound accounting principles and utterly unreliable.

Alone, any one of these erroneous assumptions is so divorced from logic and law that it should be enough to disqualify Magee. Taken altogether, they render his opinions and conclusions so unreliable, and such a departure from sound economic and factual predicates, that the Court in its gatekeeper role should exclude them in their entirety. The alternative would permit the presentation of unsupported (and unsupportable) damages numbers to the jury, in the hopes that some of them will stick. The case law, however, charges the Court with making sure that this very type of implausible, unreliable testimony is not heard, as it can be misleading and confusing to laypeople, especially coming out of the mouths of so-called experts.

## ARGUMENT

### I.    Legal Standard

"[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola*

NON-CONFIDENTIAL (REDACTED)

*Co.*, 650 F. Supp. 2d 314, 319 (S.D.N.Y. 2009) (Rakoff, J.), citing *Amorgianos v. Amtrak*, 303

F.3d 256, 266 (2d Cir. 2002). Federal Rule of Evidence 702 permits a trial court to admit only

expert testimony that is (1) based upon sufficient facts or data, (2) the product of reliable

principles and methods, and (3) delivered by a witness who has applied the principles and

methods reliably to the facts of the case. *Lynch v. Trek Bicycle Corp.*, 374 F. App'x. 204, 206

(2d Cir. 2010) (citing Fed. R. Evid. 702); *Cornell Univ. v. Hewlett-Packard Co.*, No. 01-cv-1974,

2008 WL 2222189, *1 (N.D.N.Y. 2008) (Rader, J.). The Federal Circuit and district courts in

patent cases exclude damages expert testimony that fails to meet these criteria. *See Uniloc USA,*

*Inc. v. Microsoft Corp.*, 632 F.3d 1292 (Fed. Cir. 2011) (evidence of proposed damages "must be

reliable and tangible, and not conjectural or speculative"); *Cornell*, 2008 WL 2222189, at *4. In

particular, the *Georgia-Pacific* hypothetical negotiation model,[2] used by Magee here, must be

based in "sound economic and factual predicates." *Riles v. Shell Exploration & Produc. Co.*,

298 F.3d 1302, 1311 (Fed. Cir. 2002) (citations omitted).

Expert testimony is also subject to exclusion under Federal Rule of Evidence 403 if it

will confuse the jury or unduly prejudice the opposing party. *J.T. Colby & Co., Inc. v. Apple*

*Inc.*, No. 11 Civ. 4060, 2013 WL 1903883, *19-20 (S.D.N.Y. May 8, 2013) ("In addition to the

requirements of Rule 702, expert testimony is subject to Rule 403, and may be excluded if its

probative value is substantially outweighed by the danger of unfair prejudice, confusion of the

issues, or misleading the jury").[3] Further, as the proponent of the expert, it is the plaintiff's

---

[2]  In determining patent infringement damages, an expert may use the hypothetical negotiation
model to examine "[w]hat a willing licensor and a willing licensee would have agreed upon" as a
reasonable royalty at the time right before the alleged infringement occurred. *Georgia-Pacific
Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116, 1121 (S.D.N.Y. 1970).

[3]  *See also Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1374
(Fed. Cir. 2013) ("Such unreliable testimony frustrates a primary goal of expert testimony in any
case, which is meant to place experience from professional specialization at the jury disposal not
Footnote continued on next page

NON-CONFIDENTIAL (REDACTED)

"burden to demonstrate the reliability of [the expert's] data." *U.S. Info. Sys., Inc. v. Int'l Brotherhood of Elec. Workers*, 313 F. Supp. 2d 213, 235 (S.D.N.Y. 2004).

Finally, where an expert opinion is based on a series of questionable documents, flawed assumptions, and dubious conclusions, courts will exclude such opinions as cumulatively unreliable and contrary to common sense. "In assessing the reliability of an expert opinion, a resort to common sense is not inappropriate." *Johnson Elec. N. Am. Inc. v. Mabuchi Motor Am. Corp.*, 103 F. Supp. 2d 268, 286 (S.D.N.Y. 2000) (finding that expert's opinion "reaches a result which any average person could readily recognize as preposterous"). Courts have accordingly stricken expert testimony where there are a series of factual and/or methodological flaws that, taken together, undermine the reliability of the expert's opinion. *See, e.g.*, *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146-47 (1997) (holding that the district court did not abuse its discretion in excluding expert testimony because "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered"); *Gallagher v. Southern Source Packaging, LLC*, 568 F. Supp. 2d 624, 634-36 (E.D.N.C. 2008) (holding expert report to be inadmissible as unreliable in part because the report and testimony were "a cornucopia of flawed assumptions"). The same holds true in patent infringement cases.[4] Given the number of glaring "analytical gaps" in Magee's opinions, that is the case here as well.

---

Footnote continued from previous page

muddle the jury's fact-finding with unreliability and speculation"); *United States v. Frazier*, 387 F.3d 1244, 1263 (11th Cir. 2004); *Medisim Ltd. v. Bestmed LLC*, 861 F. Supp. 2d 158, 165-66 (S.D.N.Y. 2012).

[4] *See Monolithic Power Systems, Inc. v. O2 Micro Int'l Ltd.*, 476 F. Supp. 2d 1143, 1156 (N.D. Cal. 2007) (granting *Daubert* motion where defendants "point[ed] to flaws in [the damages expert's] report that, when combined, are serious enough to render it unreliable and inadmissible"); *Minebea Co., Ltd. v. Papst*, No. Civ. A. 97-0590, 2005 WL 1459704, *3 (D.D.C. June 21, 2005) (holding that the number of problems with the damages expert's proposed testimony made it "too speculative to satisfy the reliability threshold of Rule 702 since such testimony would invite conjecture and confusion rather than assist the jury in determining a reasonable royalty rate").

NON-CONFIDENTIAL (REDACTED)

## II.    Magee's Two Proposed Royalty Calculations

Professor Magee opines that the parties would have either negotiated a running royalty or

a lump sum payment in their hypothetical negotiation, which, he opines, would have taken place

in late 2009, just prior to B&N's first sales of the accused NOOK devices. Ex. F at 21, ¶ 47.  He

concludes that B&N would have agreed to pay an unapportioned running royalty of $0.50 per

NOOK device, regardless of whether it was negotiating a license for one, two or all three of the

patents-in-suit, even while admitting that B&N would have negotiated these licenses with the

two separate then-owners of these patents, Discovery Communications, Inc. ("Discovery") and

Koninklijke Philips N.V. ("Philips").[5]  Based on B&N's actual sales through June 2014, Magee's

running royalty damages amount to                                         .

Magee's lump sum calculation applies the same $0.50 per device running royalty to

actual NOOK device sales for the period of December 2009 through June 2014,[6] projects flat

future sales for the twelve-year period from 2014 to 2026 (even though one asserted patent

expired in 2012, the second expires in 2015, and B&N's actual sales in 2012-2014 have been

steadily declining), and then discounts the sum of the running royalty to its present value in

November 2009.  Ex. C at 69:13-25.  Magee's proposed lump sum royalty amount is

                            .[7]

---

[5]  At the time of the hypothetical negotiation, Adrea had not yet been formed.  Ex. A at 77:20-22 (Adrea formed in August 2010).  Discovery and Philips, who owned the patents-in-suit in 2009, had not even begun to discuss forming a joint venture at this time.  Ex. A at 79:5-22; Ex. L.

[6]  Magee lowers the running royalty to $0.25 per NOOK device after B&N has sold over 20 million devices.  Ex. F at 5, ¶ 3.  He speculates that this will not occur until sometime in                                         , after two of the three patents will have expired, but makes only a volume-based reduction, and no reduction to account for the fact that only one of three patents could possibly be at issue after expiration of the '501 patent in December 2015.

[7]  Because the lump sum calculation applies the same $0.50 per device rate, all of Magee's errors and unsupported assumptions with respect to his running royalty calculation apply equally to his lump sum model.

NON-CONFIDENTIAL (REDACTED)

III.     **Professor Magee's Testimony Is Unreliable Because He Proposes One Royalty Rate, No Matter How Many Patents-in-Suit the Jury May Find to Have Been Infringed**

Of all the opinions expressed by Magee, perhaps the most implausible is his conclusion that in a hypothetical negotiation, B&N would have agreed to pay a running royalty rate of \$0.50 per NOOK device for all three of the patents-in-suit, two of them, or any one of them. Magee does not merely fail to apportion, or provide the jury with any basis to apportion his royalty rate among the three patents, as is required in a multi-patent situation; rather, he actually takes the position, contrary to logic, law, and the evidence in the record, that the damages rate of \$0.50 per device will remain the same regardless of whether the jury is awarding damages for infringement of one, two, or three patents. Ex. C at 35:24 – 36:6. This conclusion cannot properly be allowed past the gate for at least the following reasons.

*First*, Magee's opinion that the damages rate is the same regardless of whether it compensates for infringement of one or more patents is contrary to the patent law, which requires damages to be determined on a per-patent basis. Indeed. Magee's uniform royalty rate would allow Adrea to recover for non-infringing or expired patents, which, under governing law, is alone enough to require the exclusion of his royalty model. Nor is there any sound basis for concluding, as Magee does, that B&N would have negotiated a single royalty rate for the three patents-in-suit, when the claimed inventions relate to different properties and functionalities, and accordingly have different relative values. *Second,* there is no evidence that B&N would or could have entered into one hypothetical negotiation for a single license at a single rate for the three patents-in-suit, since at that time, the three patents were owned by two different parties.

A.     **Contrary to Law, Magee's Single Royalty Rate Deliberately Assumes No Apportionment Should Be Made for Each Patented Invention and Provides No Guidance as to How to Apportion the Royalty**

Magee's opinion is that no matter how many patents the jury may find to have been

NON-CONFIDENTIAL (REDACTED)

infringed, it should apply the same royalty rate.  Ex. C at 25:22 – 26:9, 34:8 – 35:3, 35:9-15.

Thus, according to Magee, even if only one of the three patents is found to have been infringed, the jury should still award damages at the rate of $0.50 per NOOK device.  This is contrary to governing law, which requires damages to be based on the value of each patented invention.  By refusing to provide any basis for apportioning the royalty patent-by-patent — indeed, insisting that the jury should not undertake an individualized per-patent assessment or damages award — Magee is attempting to present a damages model that epitomizes unreliability.  If allowed, it will undoubtedly confuse and mislead the jury and invite reversible error.

Patent owners are only entitled to recover damages "adequate to compensate for *the infringement*" itself.  35 U.S.C. § 284 (emphasis added).  In the case of a reasonable royalty, the award must be "for the use made *of the invention* by the infringer."  *Id.* (emphasis added).  "At all times, the damages inquiry must concentrate on compensation for the economic harm cause by infringement *of the claimed invention*."  *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010) (emphasis added) (citing *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 507 (1964) ("[T]he present statutory rule is that only 'damages' may be recovered.")).  The Federal Circuit has further cautioned that "the trial court must carefully tie proof of damages to the *claimed invention's* footprint in the marketplace," and that "[a]ny evidence unrelated to the claimed invention does not support compensation for infringement but punishes beyond the reach of the statute."  *Id.* (emphasis added).

Here, the three asserted patents implicate different properties and certain functionalities of the accused NOOK devices, and the devices also have far greater functionality than merely what is accused.  As discussed below, there is no sound economic basis to conclude that any of the accused features alone is worth $0.50 per device, but it defies logic to say, as Magee opines,

7

NON-CONFIDENTIAL (REDACTED)

that each of the three accused functionalities is worth $0.50 both individually and together.  It

also defies the law.  *See, e.g.*, *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295,

1309-10 (Fed. Cir. 2007) (vacating jury award and remanding for new damages trial where there

was no framework to allow apportionment of jury's damages verdict on per-patent basis and new

trial was required on infringement of one of three patents); *Accentra, Inc. v. Staples, Inc.*, 500 F.

App'x. 922, 931 (Fed. Cir. 2013) (vacating damages award after vacating infringement judgment

as to two of the three patents because jury's verdict was based on expert testimony assuming all

three patents to be valid and infringed); *see also Minebea Co.*, 2005 WL 1459704 at *3

(excluding expert damages testimony because, among other problems, "he did not do a detailed

per patent analysis for each license agreement he considered").

Magee's refusal to apportion or provide any basis for apportioning his royalty rate on a

per-patent basis deliberately ignores the relative value of the patents-in-suit and the separate

accused functionalities, upon which the law requires a damages award to be based.  Indeed, at his

deposition and in his report, Magee acknowledged that the three patents-in-suit have different

functions and expiration dates:  the '851 patent (which allegedly covers encryption and

decryption of eBooks) expired on December 9, 2012; the '501 patent (which allegedly covers the

lending of eBooks) expires on December 1, 2015; and the '703 patent (which allegedly covers

the NOOK's Shop function) expires on March 18, 2026. Ex. F at 38, Table 9 & at 49, ¶¶ 127-

129;  Ex. C at 210:2 – 211:10.  Thus, at the time of the hypothetical negotiation in 2009, one

Discovery patent would have expired in three years, another in six years, and the Philips patent

in fifteen years.  In addition, Magee acknowledged that these respective accused functions may

NON-CONFIDENTIAL (REDACTED)

be of varying degrees of importance to the NOOK and B&N.[8]  Thus, there is simply no reliable

basis for Magee to have concluded that B&N would have agreed to pay the same royalty rate no

matter how many patents it was hypothetically licensing in November 2009, or to refuse to

apportion the royalty among them.

Where, as here, a damages expert not only fails to give the jury the tools to do its job of

apportioning damages by patent, but tells they jury it need not bother to do so, the law requires

the exclusion of that testimony.  To illustrate the point, even in cases where an expert has simply

failed (but not refused, as Magee does) to provide the jury with any reasonable basis for

apportioning a royalty on a per-patent basis, and one or more of the patents are found to have

been invalid or not infringed, courts do not allow the damages model to stand.  Thus, in *Mirror

Worlds, LLC v. Apple, Inc.*, 784 F. Supp. 2d 703, 720-22, 725-26 (E.D. Tex. 2011), *aff'd*, 692

F.3d 1351 (Fed. Cir. 2012), the court granted Apple's request for Judgment as a Matter of Law to

vacate the jury's damages award in part where the patentee's damages expert had failed to

apportion his proposed single royalty payment for the three patents-in-suit on a per-patent basis,

instead providing one single damages number for all the patents-in-suit.  *Id.* at 722.  As a result,

the court found that there was no reliable basis to determine the patentee's damages for the

infringement of only one of the patents-in-suit.  *Id.* at 725-26.

Here, the situation is worse.  Instead of simply not giving the jury the tools to do its job,

Magee would have it that the jury is not required to do its job of evaluating and awarding

damages to compensate for use of each of the particular patented inventions.  Magee's failure to

modify his damages calculation in the wake of this Court's summary judgment decision, which

limits the damages period for the '851 patent, illustrates the problem.  Originally, Adrea claimed

---

[8]  For example, at one point in his deposition, Magee places great emphasis on the '851
encryption patent, saying that "it's an absolutely necessary feature."  Ex. C at 211:4-10.

NON-CONFIDENTIAL (REDACTED)

damages on the '851 patent from December 2009 to December 2012, but the Court's decision limited the period of available damages to March 2012 through December 2012. According to Magee, however, this two-year difference has ***no effect whatsoever*** on the royalty rate for the period December 2009 to February 2012. In other words, even if, for the sake of argument, Adrea were to prevail on all three patents, the Court's summary judgment ruling means that there is a period (i.e., December 2009 to February 2012) for which Adrea is entitled to damages only with respect to two of the three patents in suit. Magee's opinion, however, is that the jury should effectively ignore the Court's ruling and apply the same royalty rate to the period December 2009 to February 2012 as it does to the period March 2012 to December 2012.[9]

In the face of all this, and even after conceding that each patent-in-suit has its own separate relative value, Magee nevertheless refused to apportion his $0.50 royalty among the three patents, instead maintaining that B&N would have paid a $0.50 royalty no matter how many of the three patents were involved in the hypothetical negotiation. Ex. C at 45:25 – 46:18. Courts have excluded damages experts for doing exactly that, i.e., not only failing to provide any reliable basis for the proposed royalty, but refusing to apportion between what infringes and what doesn't. *See, e.g.*, *GPNE Corp. v. Apple, Inc.*, No. 12-cv-2885, 2014 WL 1494247, at *5 (N.D. Cal. April 16, 2014); *see also Lucent Technologies, Inc. v. Microsoft Corp.*, No. 07-CV-2000, 2011 WL 7664416, at *10 (S.D. Cal. June 16, 2011) (patentee must apportion "between the patented and unpatented features as tied to the facts of this case and economic realities").[10]

---

[9]  The same problem arises after December 2012. The '851 patent expired in December 2012, the '501 patent will expire in December 2015, and the '703 patent expires in March 2026. Yet, Magee's opinion is that the jury should award apply the same royalty rate for periods during which no more than two or one of the patents-in-suit could possibly be found to infringe.

[10] While these cases are directed to the expert's failure to correctly determine the base to which a royalty rate should be applied, the principle is the same — experts are not permitted to refuse to differentiate between what infringes and what does not when opining on alleged damages.

10

NON-CONFIDENTIAL (REDACTED)

This principle applies equally here, since Magee's approach invites the jury to award damages for patents found not to have been infringed, or for periods beyond their undisputed expiration dates. That is too far afield of what the law allows.

### B.    Magee Implausibly Assumes That There Would Have Been One Negotiation for a Single Royalty Amount

In proposing one royalty rate for all three patents-in-suit, Magee not only ignores governing law, but also the fact that in the real world there would had to have been some sort of apportionment would necessarily have happened, since B&N would have been negotiating with two different, unrelated and independent patentees at the time of the hypothetical negotiation. Ex. C at 153:8 – 154:9, 154:20 – 155:22. Indeed, Magee implausibly assumes that Discovery and Philips, two large multinational companies who had nothing to do with one another at the time of the hypothetical negotiation, would have somehow banded together to negotiate one license for all three patents-in-suit.   Ex. C at 28:7 – 29:7. Further, when asked how Discovery and Philips would have divided up the royalties among them if they had succeeded in negotiating such a license, Magee conceded that would have divided them up, but he does "not have an opinion on how Discovery and Philips would divide those patent damages between them."   Ex. C at 25:7 – 26:9. The reason for this, of course, is that if he had such an opinion, this would undermine his whole royalty model — that no matter how many patents or patentees were involved in the hypothetical negotiation, B&N still would have agreed to pay a royalty of $0.50 per device. There is simply no evidence, not to mention any rational basis, to support this facially unreliable theory.

### IV.    Magee's $0.50 Royalty Rate Is Arbitrary, Unsupported, Unreliable, and Ignores Real World Evidence

Magee also offers no reliable basis for selecting $0.50 as the appropriate running royalty rate. Ignoring real world data and actual valuations of Adrea's patent portfolio, he plainly

NON-CONFIDENTIAL (REDACTED)

selected the number he wishes to present to the jury and then backed into it.  Indeed, when asked

at his deposition how he arrived at the $0.50 royalty rate, Magee could not provide any

calculations, because he never performed a single one.  Instead, he principally pointed to two

documents that purportedly make his $0.50 rate look reasonable:  1) Adrea's opening offer to

B&N for a license ███████████████████████████████████████████████████ and

which B&N rejected) and 2) an alleged "valuation" by Adrea's affiliate Intertrust, which was

trying to drum up business from the then-owners of the patents-in-suit, and was authored by

someone who is not and has never been qualified as an expert.   Ex. C at 78:21 – 82:18.  As

Magee offers no economic basis for his conclusion (or that of any other putative expert) that the

parties would have negotiated a $0.50 running royalty rate, his opinion should be excluded.

### A.   Magee Relies on Made-Up Royalty Rates That Were Never the Subject of Any License or Real World Valuation

Magee's proposed $0.50 running royalty rate not only ignores real world valuations of

the patents-in-suit, but defies common sense.  *First*, ███████████████████████████████

████████████████████████████████████████████████████████████████████████████████an

offer B&N *rejected* nearly a year before Adrea filed suit.  Ex. K;  Ex. C at 76:18 – 77:9; *see also*

Ex. F at 33-34, ¶ 86; at 67, ¶ 93;  Ex. C at 82:19 – 83:9.  Common sense dictates that in a real (or

even hypothetical) negotiation, the opening offer is usually inflated, with the expectation that it

will be bargained down.[11]  Here, that is demonstrably the case, because ████████████████

████████████████████████████████████████████████████████████████████

████████████████ the license the parties would have negotiated in the hypothetical

---

[11]   Indeed, Magee conceded that Adrea's licensing offer is just "a starting point in the
negotiation."   Ex. C at 203:13 – 204:14.

NON-CONFIDENTIAL (REDACTED)

negotiation.[12]  Nevertheless, even though Magee's proposed running royalty model would work

out to a much higher per-patent royalty, he still opines that the result of a hypothetical

negotiation would be that B&N would have gladly agreed to pay $0.50 per device for a U.S.-

only license to one, two, or three patents, and that Adrea's opening offer of $0.50 per device for

hundreds more patents on a worldwide basis somehow supports this, even though in reality B&N

flatly rejected it.[13]

Actual proposals to license may have some value "in certain situations" in determining

the amount a licensor might have paid in a hypothetical negotiation, but "their evidentiary value

is limited by, *inter alia*, the fact that patentees could artificially inflate the royalty rate by making

outrageous offers." *Whiteserve, LLC v. Computer Packages, Inc.*, 694 F.3d 10, 29-30 (Fed. Cir.

2012).  Courts have accordingly rejected an expert's reliance on such offers, especially where

they are "for a license under an untested patent of indeterminate value." *Deere & Co. v. Int'l

Harvester Co.*, 710 F.2d 1551, 1557 (Fed. Cir. 1983).[14]  Here, as discussed below, even though

---

[12]  ████████████████████████████████████████████████████████████
████████████████████████████████████████
            Ex. J at ADREA0007451 – ADREA0007459.

[13]  Adrea's offer to B&N in 2012 proposed ████████████████████████████
████████████████████████████████████████████████████████████
████████████████  Magee, in attempting to defend his arbitrary selection of the $0.50 rate, now
takes the position that ████████████████████████████████████████████
████████████  Ex. C at 203:19 - 204:14.  This is, of course,
another example of implausible, unreliable reasoning that defies common sense.

[14]  Indeed, in addition to the fact that Magee cannot explain how he got to his $0.50 number,
there is no evidence as to how Adrea arrived at its ████████████  when it made its
offer to B&N.  When questioned about this, the CEO of Adrea testified vaguely that he believed
it was a fair offer based on conversations with two other Adrea employees.  Ex. A at 316:4 –
319:9.  Likewise, there is no basis for Magee to rely on Adrea's supposed offer to B&N to
license i████████████████████████████████████.  Ex. F at 34, ¶ 87.  The
Adrea employee who "made" this offer was not authorized to do so.  Ex. A at 326:21 – 327:11.
It also exceeds by ████████████████████████████████████████████
████████████████████████████  these patents.

13

NON-CONFIDENTIAL (REDACTED)

the patents were actually valued in the real world, Magee chose to ignore this data and rely on an inflated, unaccepted offer to license in support of his arbitrary royalty number.

*Second*, in another attempt to justify his implausible running royalty rate of $0.50 per accused device, Magee says that he found certain "valuations" of the Discovery and/or Sony patent portfolios to be "informative." Ex. F at 62-66. There is no evidence, however, that the parties who performed these so-called valuations were experts, or that any of the valuations ever resulted in any real world transactions or actual licenses.

The principal "valuation" document on which Magee relies is one prepared in November 2009 by Michael Manente ("Manente") of Intertrust, Adrea's part-owner and affiliate.[15] In this document, Manente predicts that even though they had never successfully licensed any of these patents, if Discovery and Sony would only allow Intertrust to "monetize" their eReader patent portfolios, ████████████████████████████████████████████████████████████

████████████████████████████████. Ex. N at ADREA0141112-13; Ex. F at 63, ¶ 135. While Magee admits that ███████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████ (Ex. F at 63, ¶ 135), he nevertheless points to Manente's royalty rate as support for the notion that his own rate is somehow reasonable. There is no evidence in the record, however, that Manente (or Intertrust) had any previous experience with the eReader industry, much less the expertise to prepare such a valuation.[16] Rather, as is evident from a cursory review of the document, this so-called "valuation" was created solely for the purpose of

---

[15] While Magee states that he found the Intertrust document "informative," at his deposition, he testified that it was one of the "primary" pieces of information he considered and relied upon in concluding that the royalty rate should be $0.50 per device. Ex. C at 78:21 – 81:22.

[16] The only evidence in the record is that Manente is a business analyst with Intertrust, a company not involved in the eBook business, where he is Vice President of Intellectual Property and Corporate Development. Ex. A at 106:20 – 106:24, 107:8 – 107:15.

NON-CONFIDENTIAL (REDACTED)

convincing Discovery and Sony, and later Philips, to pitch their tents with Intertrust and form a new company (which would share Intertrust's management and executives) in order to "monetize" patents that had never successfully been licensed.   Ex. C at 298:23 – 300:8.

Magee's attempt to pass off this document, a self-serving opinion of a party who only stood to gain business from it, as a reliable, neutral valuation, is improper on multiple grounds. *First*, an expert may not simply "parrot" the ideas of others, even if they are truly experts. *Second*, where the other person was never qualified as an expert, then his/her opinion cannot be considered anything on which a testifying expert can rely.   *Leese v. Lockheed Martin Corp.*, No. Civ. 11-5091, 2014 WL 1092406, *6-7 (D.N.J. Mar. 18, 2014).   *Third,* an expert's opinion should be excluded if there is no evidence that he supervised the underlying work, or that reliance on the work would be standard practice in the field.   *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 664-66 (S.D.N.Y. 2007).

Here, Magee "parrots" Manente's ████████████████████, and adopt his purported valuations, even though there is no evidence that Manente is an expert.   As such, Magee's use of this non-qualified expert's dubious valuations to justify his own should be stricken.   *United States v. Mejia*, 545 F.3d 179, 197 (2d Cir. 2008) (an expert "must form his own opinions by applying his extensive experience and a reliable methodology to the inadmissible materials. . . . Otherwise, the expert is simply repeating hearsay evidence without applying any expertise whatsoever, a practice that allows the [party offering the expert testimony] to circumvent the rules prohibiting hearsay.").

Further, Magee's reliance on the Manente document cannot possibly be standard practice in his field.   On its face, the document is nothing more than a business pitch, not a real patent valuation; indeed, the document itself states that ██████████████████████████

NON-CONFIDENTIAL (REDACTED)

███████████████████████████████████████████████████████████████

████████████████████████ Ex. N at ADREA00141111.[17]  Thus, as Magee

well knew, the Manente presentation is hardly evidence of the royalty rate a willing licensee

would pay a willing licensor for three patents in a hypothetical negotiation; rather, it is only what

a prospective business partner hoped to convince ████████████████ they would be able to

charge prospective licensees if the owners would only give them a chance.

In addition, there is also no evidence that Magee had anything to do with putting this

document together, or can speak to how Intertrust arrived at its proposed royalty.[18]  Nor does

Magee claim that that he made any attempt to examine the underlying data to determine

independently that Manente's valuation was reasonable.  *See TK-7 Corp. v. Estate of Barbouti*,

993 F.2d 722, 732-33 (10th Cir. 1993) (holding that testifying expert could not rely on study by

another where testifying expert had no familiarity with the methods or reasoning used).

However, he was more than satisfied to tout Intertrust as a reliable patent valuation firm, when

there is no evidence that this was ever the case.   Ex. C at 85:20 – 86:25, 289:10 – 290:20.

Indeed, if Magee had examined the Manente document more closely, he would have seen

that it is not, on its face, what he says it is.  Indeed, four months later, Manente stated that ███

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████ Ex. I at ADREA0065432.  Apparently that ███

---

[17]  Indeed, according to the evidence, Intertrust was well aware at this time that Discovery had
never successfully licensed its eReader patents since their issuance, despite many past efforts.
Ex.  B at 9:3 – 9:18 (Discovery trying monetize since 2007 or 2008); Ex. A at 40:8 – 42:2; Ex. Q
at ADREA0046007 – ADREA046010.  Thus, the whole point of the document was to convince
Discovery and Sony that Intertrust was a ██████████████████ that could provide
services to a venture to be formed. Ex. L at ADREA015561- ADREA015562.

[18]  Notably, at his deposition, Magee testified that he had discussed this presentation document
with Manente, but could not provide details of their conversation.  Ex. C at 83:10 – 84:15.

NON-CONFIDENTIAL (REDACTED)

was great, because as of today, five years later, Adrea has never been able to convince a single party to license any of these patents, outside the litigation context.  As such, there is no basis for concluding that other experts in this field would ever have relied on such an analysis for purposes of forming an opinion as to a royalty rate, and Magee's having done so renders his opinions all the less reliable.[19]

> **B.      Magee Ignores Real World Market-Tested Valuation of the Patents**
>
> **1.      Magee Fails to Take the Amazon License Agreement into Account**

Despite having had numerous opportunities to do so, Magee repeatedly failed to consider actual negotiations and valuations of the patents-in-suit in constructing his hypothetical negotiation damages model, as damages experts are expected to do if they would like their opinions to pass the reliability test.  Instead, Magee prefers to rely on untested "valuations" that have no relation to the real world or any actual negotiations or transactions.  The most egregious example of this is his disregard for the license agreement between Adrea and Amazon, which resulted from the settlement of Adrea's litigation with Amazon, and is the only evidence in the entire record of what a licensee would have actually paid for a license ██████████████████.

Unlike the "valuations" relied on by Magee, the Amazon Agreement is the only document in existence that actually contains ████████████████████████████
████████████████████████████. Ex. F at 22-27; Ex. C at 141:9 – 141:21.
Accordingly, although Magee does not care to perform this calculation, a per unit/per patent

---

[19] ████████████████████████████████

NON-CONFIDENTIAL (REDACTED)

royalty rate (which is far lower than Magee's proposed $0.50 rate) can actually be calculated.

Ex. D at 6-7; Ex. E. ████████████████████████████████████████

████████████████████████████ Yet Magee virtually ignores this Agreement, testifying at

his deposition that he found it merely to be "informative," without plausibly explaining how or

why he did (or did not) take it into account.   Ex. C at 142:6-9.[20]   Indeed, when asked what he did

consider in determining his $0.50 royalty rate, Magee does not even mention the Amazon

Agreement (Ex. C at 78:21 – 82:18), deliberately ignoring the only real world evidence of the

royalty an actual licensee agreed to pay for any of the patents-in-suit. *See, e.g.*, *ResQNet.com*,

594 F.3d at 870-73 (vacating jury award and remanding because it was based on damages expert

who relied on non-litigation licenses that were not shown to relate to the technology of the

patents in suit and noting that, in contrast, "the most reliable license in this record arose out of

litigation").  Together with all the other "analytical gaps" in Magee's conclusions, his opinions

are unreliable as a matter of law.

        **2.**      **Magee Gives No Credence to Adrea's Own Actual Valuation of Its Patent Portfolio**

Another inexplicable analytical gap in Magee's analysis is that he ignores Adrea's own

financial statements which, from the company's inception, value its patents far below any

valuation numbers Magee chooses to rely on.  In fact, to this day, Adrea's financial statements

value each patent portfolio contributed by Discovery, Philips, and Sony, ███████████.  Ex.

---

[20]  Magee's only "explanation" as to how he took the Amazon Agreement into account is that (a)

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████ Ex. C at 38:22 – 39:4, 176:21 – 177:11; Ex. F at 67,

¶ 93.

NON-CONFIDENTIAL (REDACTED)

O at ADREA0149185. Magee's excuse for why he did not take Adrea's own patent valuation into account is that he was told ██████████████████████████████████████████

██████ Ex. C at 114:21 – 115:12. Had he bothered to inquire, however, Magee would have learned that these are the same valuations Adrea has been reporting to the IRS on its tax returns since its formation in 2010. *See* Ex. U.[21]

Indeed, when confronted with this fact, Magee testified that he nevertheless believed Manente's ██████████valuation was more informative, because "these are sophisticated people who are trying to put together . . . a joint venture . . . ." Ex. C at 128:13 – 130:5. Apparently it means nothing to Magee that these very same "sophisticated people" were the ones reporting the ██████████valuations to the IRS. Magee's failure to take these real world facts into account once again demonstrates the unreliability of his opinions as a damages expert.[22]

### 3. Magee Failed to Investigate Discovery's Prior Attempts to License Its eReader Patent Portfolio

Finally, contrary to reliability or common sense, while perfectly happy to rely on Adrea's unaccepted opening offer to B&N for a license, Magee has never bothered to investigate, much less take into account, the results of Discovery's own past efforts to license its eReader patent portfolio. Indeed, he testified at his deposition that he was completely unaware of the fact that Discovery had made numerous unsuccessful efforts, over many years, to license its eReader

---

[21] Magee also ignores the fact that in an accounting treatment paper, Philips stated that it ██████████████████████████████████████████████████████████████████ Ex. M at ADREA0138046, ADREA0138051.

[22] Once again turning a blind eye when it suits him, Magee also failed to investigate the circumstances behind Adrea's ██████████████████valuation. He testified that he was not sure he had ever seen Adrea's 12/31/10 financial statement that lists fair market value to be ██████████████████ (Ex. C at 117:19 – 118:23), and did not know, and never even bothered to ask, whether that valuation had ever changed. Ex. C at 119:25 – 121:7; 121:25 – 122:22. Notably, Adrea's most recent financial statement (July 31, 2014) still values the patent portfolios of Discovery, Philips, and Sony at ██████████, not the ██ ██████value Magee relies on. Ex. O at ADREA0149185.

NON-CONFIDENTIAL (REDACTED)

patents.  Ex. C at 108:10 – 111:13, Ex. Q at ADREA0046007 - 10.[23]  Magee's deliberate refusal

to pursue critical information about Discovery's failed licensing efforts, which any fair and

impartial damages expert would insist on taking into account, is another analytical gap in his

opinions, and further illustrates just how unreliable his proposed single royalty rate really is.

Taken together, all of the analytical gaps in Magee's opinions are so wide that they

constitute a "cornucopia of flawed assumptions," *Gallagher*, 568 F. Supp. 2d at 635, and require

the exclusion of his testimony for total lack of reliability.  Magee's choices in relying on alleged

valuations that have never been market-tested while neglecting to consider actual evidence of

real-world licensing of the patents-in-suit and what the licensee, B&N, would be willing to pay

for a patent license, render Magee's arbitrary $0.50 royalty rate unreliable.

**V.     Magee's Inflated Lump Sum Payment Is Based on a Speculative Twelve-Year**
**Projection of Future Sales**

Magee's proposed lump sum calculation of ██████████ is just as unreliable as his

unsupported running royalty calculation, and should also be excluded.  Indeed, this calculation,

which is based on a completely speculative projection of twelve years' worth of NOOK sales,

defies reality and common sense, and appears to be nothing more than an attempt on Magee's

part to present the biggest number he can to the jury.  The reason, of course, that Magee projects

NOOK sales out for twelve years is that the '703 patent expires in 2026, fourteen and eleven

years, respectively, after the other patents-in-suit.  Once again, as was the case with his running

royalty calculation, Magee assumes that B&N would have agreed to make a lump sum payment

covering 17 years' worth of sales, *even if the last expiring patent is found not to have been*

---

[23]  In particular, Magee did not remember asking any questions about a written licensing
proposal Discovery made to ████ in 2009, right around the time of the hypothetical negotiation.
Ex. C at 98:17 – 101:11; 102:20 – 103:9.  In fact, despite numerous requests by B&N, this
licensing proposal has mysteriously vanished.  Ex. B at 36:9 – 38:8.

NON-CONFIDENTIAL (REDACTED)

*infringed*.  This plainly should not be allowed.[24]

The history of Magee's ever-changing future NOOK sales projections bears review here.
Magee first included in his lump sum calculation a projection that sales would increase from
2013 through 2026.  Ex. G.  When B&N's expert pointed out the flaw in Magee's econometric
model (Ex. D at 70-71), Magee changed his future sales projection to be a flat number year after
year (Ex. C at 71:14 – 72:6), even though sales had been declining year on year, using sales for
B&N's 2013 fiscal year (May 2012 through April 2013) as a baseline.  Ex. C at 72:2 – 73:5.  He
then revised them again after B&N produced sales data for its 2014 fiscal year, which actually
reflected a ▮▮▮ reduction in device sales over the prior year.  Magee's only revision here was to
hold B&N projected sales constant for the next twelve years using 2014 sales as a baseline.[25]
Ex. H at 3, ¶ 4.

Magee's decision to hold sales flat for twelve years makes no sense, especially in the face
of several years' worth of sharp actual sales declines.  In fact, because B&N NOOK sales had
been sharply declining up until that point, Ex. G; Ex. D at 71, ¶ 129, there was never any reliable

---

[24] *See, e.g.*, *Oiness v. Walgreen Co.*, 88 F.3d 1025, 1031-32 (Fed. Cir. 1996) (reversing the jury award of projected lost profits because of the expert's unreliable sales projections).

[25] Left with nothing but evidence of B&N's declining sales, Magee attempts to justify his completely speculative projections of twelve years of flat future sales by relying first on reports of *one good month* of NOOK sales around the time of the hypothetical negotiation.  Ex. F at 39, ¶ 107.  One month's sales, however, do not enable a fair and impartial damages expert to ignore all the declining sales that followed.  More recently, to explain his continued insistence on holding sales flat for twelve years in the face of another year's sharp decline, Magee points to recent B&N partnerships with Samsung and Google as possibly "result[ing] in substantial sales of new products in the near future."  Ex. H at 5, ¶ 6.  Once again, however, this amounts to total speculation on Magee's part, as he points to nothing about either the Samsung or Google relationships that would in any way indicate a reversal of the sharp downward trend in NOOK device sales.  Ex. S at 6-8.  This is hardly a basis for holding future device sales constant for the next twelve years, when all real world results would point any reliable damages expert in the other direction.

NON-CONFIDENTIAL (REDACTED)

basis for Magee to use the 2013 fiscal year sales figures as the starting point for thirteen more

years of flat sales.  But there is certainly no basis in economic reality for him to do so in light of

B&N's actual downward sales for the 2014 fiscal year (i.e., May 2013 through April 2014).

Once again, in order to get to the number he wants to put up in front of the jury, Magee must rely

on mere speculation, while ignoring the real world data.

Finally, Magee relies on B&N's own patent licenses insofar as, according to him, they

demonstrate that B&N ████████████████████████████████████████████████████

████████    Ex. C at 43:11 – 45:3.  However, he conveniently ignores the fact that the majority of

B&N's patent licenses are ████████████████████████████████████████

████████████████████████████████████████.  Ex. P.  To get to his proposed lump

sum amount of ██████████, once again Magee ignores real world evidence of what B&N has

historically paid for its patent licenses.

In its role as gatekeeper, this Court should reject Magee's attempt to put up unsupported,

unreliable damages numbers in front of the jury.  As courts recognize, at some point the

prejudice of allowing the jury to hear such total speculation outweighs any argument that it can

simply be dealt with on cross-examination.  *United States v. Glynn*, 578 F. Supp. 2d 567, 574

(S.D.N.Y. 2008) (JSR) ("the explicit premise of *Daubert* and *Kumho Tire* is that, when it comes

to expert testimony, cross-examination is inherently handicapped by the jury's own lack of

background knowledge, so that the Court must play a greater role, not only in excluding

unreliable testimony, but also in alerting the jury to the limitations of what is presented."); *see

also R.F.M.A.S., Inc. v. So*, 748 F. Supp. 2d 244, 252 (S.D.N.Y. 2010).  That is the case here.

**VI.    Wang's Opinion on Secondary Considerations Should Be Excluded**

The Court should also preclude Dr. Xin Wang, Adrea's validity expert, from opining

about evidence of secondary considerations of non-obviousness.  As to each relevant factor,

NON-CONFIDENTIAL (REDACTED)

Wang has failed to show any nexus between his cited evidence and the asserted claims.  This failure renders his opinions unreliable as contrary to established law.

**Commercial Success:**  Wang asserts that he has considered a report by Magee that the NOOK and Kindle devices (made by Amazon) have been commercially successful; yet he admits that he actually never read or reviewed Magee's report.  Ex. R at 228 – 29.  The law does not permit such blind reliance.  *See In re TMI Litig.*, 193 F.3d 613, 716 (3d Cir. 1999) ("Crawford–Brown's failure to assess the validity of the opinions of the experts he relied upon together with his unblinking reliance on those experts' opinions, demonstrates that the methodology he used to formulate his opinion was flawed under *Daubert* as it was not calculated to produce reliable results.").  Wang also fails to address whether any alleged commercial success of these products was due to the claimed features rather than unrelated factors such as price, advertising, market strength, etc.  *Iron Grip Barbell Co. v. USA Sports, Inc.*, 392 F.3d 1317, 1324 (Fed. Cir. 2004) ("Our cases make clear that a 'nexus must be established between the merits of the claimed invention and evidence of commercial success before that evidence may become relevant to the issue of obviousness.'").

**Copying:**  Wang relies on the alleged similarity between the '501 patent and a patent application filed by Barnes & Noble.  Ex. R at 229-30.  Evidence of a similar patent application, however, is not evidence of copying for purposes of secondary considerations.  "Rather, copying requires the replication of a specific product," as demonstrated, for example, "through internal documents; direct evidence such as disassembling a patented prototype, photographing its features, and using the photograph as a blueprint to build a virtually identical replica; or access to, and substantial similarity to, the patented product (as opposed to the patent)."  *Iron Grip*, 392 F.3d at 1325 (internal citations omitted).  Wang readily admits that he is not aware of any

NON-CONFIDENTIAL (REDACTED)

evidence that B&N even knew about the '501 patent at the time.  Ex. T at 285 – 86 ("Q: Just to be clear, but you have no evidence that they actually did know about the patent? A: I have no evidence."); *see Rambus Inc. v. Hynix Semiconductor Inc.*, 254 F.R.D. 597, 609 (N.D. Cal. 2008) (excluding expert's opinion on copying).  Indeed, this Court has already determined that the notice date post-dated development of the accused products.  Dckt. 85 at 3-5.

    **Industry Praise:**  Wang relies on an "innovation" award given to John Hendricks, a named inventor on both the '501 and '851 Patents, Ex. R at 231-32, but there is no evidence the award was due to the subject matter at issue.  *Geo. M. Martin Co. v. Alliance Mach. Sys. Int'l LLC*, 618 F.3d 1294, 1305 (Fed. Cir. 2010) ("Industry praise must also be linked to the patented invention.").  Wang also opines that four media references to LendMe are sufficient industry praise to suggest non-obviousness of the '501 Patent.  Wang, however, performs no analysis of how this "praise" is directed to the merits of the putative invention relative to alternative approaches.  *See Inventio AG v. Otis Elevator Co.*, 497 F. App'x 37, 42 (Fed. Cir. 2012) (rejecting evidence where patentee "failed to establish a nexus between the patented invention and . . . industry praise"); *Geo. M. Martin Co.*, 618 F.3d at 1305 (declining to give weight to generalized praise).

    **Licensing:**  Wang points to a single license between Adrea and Amazon.  Ex. R at 232-33.  One litigation settlement, however, is insufficient evidence of a successful licensing practice or industry-wide respect for the patents-in-suit to suggest non-obviousness.  *Pentec, Inc. v. Graphic Controls Corp.*, 776 F.2d 309, 316 (Fed. Cir. 1985) (finding "a lack of record evidence that those who refrained from infringement and who sought licenses did so out of respect for the strength of the patent and not out of a desire to avoid the costs of litigation.").

NON-CONFIDENTIAL (REDACTED)

**Long-felt but Unsolved Need:**  Wang relies on testimony from ███████████

████████████████████████████████████████████████████████████████

████████████████████████████  and on general statements from an isolated study

suggesting that security for electronic books would be important.  Ex. R at 233 – 34.  Wang fails

to analyze, however, whether there is any nexus between the supposed "need" identified by

███████  and the specific merits of the claimed invention.  *See MeadWestVaco Corp. v. Rexam*

*Beauty and Closures, Inc.*, 731 F.3d 1258, 1264-65 (Fed. Cir. 2013) ("[O]bjective evidence of

non-obviousness must be commensurate in scope with the claims which the evidence is offered

to support."); *Iron Grip*, 392 F.3d at 1324–25 (finding insufficient evidence of long-felt need

where patentee failed to prove nexus).  Nor does Wang point to any evidence that shows how the

alleged "need" was unsolved.  *See Monarch Knitting Mach. Corp. v. Sulzer Morat GmbH*, 139

F.3d 877, 884 (Fed. Cir. 1998) ("The relevant secondary consideration is 'long-felt *but unsolved*

*need*,' not long-felt need in isolation."); *Texas Instruments Inc. v. U.S. Int'l Trade Com'n*, 988

F.2d 1165, 1178 (Fed. Cir. 1993) ("[L]ong-felt need is analyzed as of the date of an articulated

identified problem *and evidence of efforts to solve that problem*.") (emphasis added).

## CONCLUSION

For the foregoing reasons, the Court should grant B&N's motion to exclude the testimony

of Professor Stephen Magee in its entirety, and the testimony of Dr. Xin Wang regarding

secondary considerations of non-obviousness.

NON-CONFIDENTIAL (REDACTED)

Dated:  September 5, 2014                    Arnold & Porter LLP

_____

Louis S. Ederer
Susan Shin
Yue-Han Chow
Maxwell Preston
399 Park Avenue
New York, NY 10022-4690
Telephone:  (212) 715-1000
Facsimile:  (212) 715-1399
louis.ederer@aporter.com
susan.shin@aporter.com
yue-han.chow@aporter.com
maxwell.preston@aporter.com

Ali R. Sharifahmadian  (*pro hac vice*)
Sarah Brackney Arni (*pro hac vice*)
555 Twelfth Street, NW
Washington, DC  20004-1206
Telephone:  (202) 942-5000
Facsimile:  (202) 942-5999
ali.sharifahmadian@aporter.com
sarah.arni@aporter.com

Michael Berta (*pro hac vice*)
Maulik Shah (*pro hac vice*)
Willow Noonan (*pro hac vice*)
Three Embarcadero Center
10th Floor
San Francisco, CA 94111-4024
Telephone: (415) 471-3100
Facsimile: (415) 471-3400
michael.berta@aporter.com
maulik.shah@aporter.com
willow.noonan@aporter.com

*Attorneys for Defendants Barnes & Noble, Inc.,
barnesandnoble.com llc, and Nook Media LLC*

26

## CERTIFICATE OF SERVICE

I, hereby certify that on September 5, 2014, copies of the Memorandum of Law in

Support of Defendants' Motion to Exclude Testimony of Stephen P. Magee and Xin Wang with

exhibits were caused to be served upon the following via email and FTP:

Kenneth Rubenstein, Esq.
Baldassare Vinti, Esq.
PROSKAUER ROSE LLP
11 Times Square
New York, NY 10036

Steven Michael Bauer, Esq.
Kimberly A. Mottley, Esq.
Micah W. Miller, Esq.
Brendan Cox, Esq.
Patrick Niedermeier, Esq.
Erin Staab, Esq.
PROSKAUER ROSE LLP
One International Place
Boston, MA 02110

Colin Cabral, Esq.
PROSKAUER ROSE LLP
2049 Century Park East
Los Angeles, CA 90067

Yue-Han Chow