EA78ADR1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
    ADREA, LLC,
3
                        Plaintiff,
4
                v.                           13 Cv. 4137 (JSR)
5
    BARNES & NOBLE, INC.,
6   BARNESANDNOBLE.COM LLC, AND
    NOOK MEDIA LLC,
7
                        Defendants.
8   ------------------------------x
                                             October 7, 2014
9                                            10:00 a.m.

10  Before:
                        HON. JED S. RAKOFF
11
                                             District Judge
12
                              APPEARANCES
13
    PROSKAUER ROSE LLP
14       Attorneys for Plaintiff
    BY:  STEVEN M. BAUER
15       COLIN CABRAL
         BRENDAN COX
16
    ARNOLD & PORTER LLP
17       Attorneys for Defendants
    BY:  LOUIS S. EDERER
18       ALI R. SHARIFAHMADIAN
         MICHAEL A. BERTA
19       YUE-HAN CHOW

20

21

22

23

24

25

EA78ADR1

```
 1            (Case called)

 2            THE DEPUTY CLERK:  Will the parties please identify

 3    themselves for the record?

 4            MR. BAUER:  Good morning, your Honor.  Steve Bauer

 5    from Proskauer for plaintiff ADREA.  We have our team here if

 6    you want everybody to identify themselves.

 7            THE COURT:  No, that's all right.  Thank you.

 8            MR. EDERER:  Good morning, your Honor.  Louis Ederer

 9    from Arnold & Porter, and I too have a team.

10            THE COURT:  I am extremely sorry for the delay.

11            First, any witnesses who are present in the courtroom

12    are excluded as of right this moment, including experts.  They

13    should wait in the witness room, and that will continue

14    throughout trial.

15            MR. CABRAL:  Your Honor, our client representative is

16    named on defendants' witness list.

17            THE COURT:  One client representative per side can

18    remain at counsel table.

19            MR. CABRAL:  Thank you, your Honor.

20            THE COURT:  Second, the redactions in the proposed

21    pretrial consent order, which were submitted with the Court's

22    permission, but now that I have seen the redactions I think

23    there is no good reason to redact any of that information.  So

24    the Court will file the unredacted copy in the public record.

25            Third, as you, I believe, already know from my
```

EA78ADR1

1    individual rules and our discussions on the phone, no witness

2    will be called twice.  Of the eleven witnesses listed on

3    plaintiff's list of witnesses, eight are also listed on

4    defendants' list of witnesses.  If for any reason plaintiff

5    doesn't call any of those folks, defendant may, but none of

6    those witnesses will be received by deposition.

7            Next, with respect to the motions in limine, we will

8    begin with the plaintiff's motions.

9            MR. CABRAL:  If I may address the Court.  On two of

10   the plaintiff's motions, the parties have reached agreement

11   that would obviate the need --

12           THE COURT:  When we get to them, tell me which they

13   are.

14           The first motion is to preclude arguments and

15   testimony inconsistent with the Court's claim construction.

16   Both sides of course say they totally are consistent with the

17   Court's claim construction, but they disagree as to what that

18   consistency consists of.  That motion is denied as premature.

19   We will see what happens.  If someone attempts to say something

20   that is in fact inconsistent with the Court's claim

21   construction, an objection can be raised, and I will deal with

22   it then.  If it is in fact inconsistent with the Court's claim

23   construction, the Court will take appropriate action, like

24   telling the jury this is totally inconsistent with the law.

25           Second, the motion to preclude evidence or arguments

EA78ADR1

1    as to when the asserted patents were recorded with the U.S.

2    Patent Office, that has been resolved and is moot.

3            MR. CABRAL:  That's correct.

4            THE COURT:  Third, the motion to preclude expert

5    testimony on matters outside the scope of the expert reports,

6    that motion does not specify any specific evidence that the

7    plaintiff expects will be offered in that regard.  So the

8    motion is denied for now without prejudice to being renewed

9    when in fact some such testimony is offered, if it ever is.

10           Fourth, the motion to preclude use of pejorative,

11   derogatory, or otherwise inflammatory terms to characterize

12   ADREA or its patent, such as patent troll, that motion is

13   granted in the sense of, I don't want to hear a reference to a

14   patent troll, but that doesn't mean that it may not become

15   relevant to describe the structure of plaintiff's business.  We

16   will have to take that up on an item-by-item basis.

17           Fifth, the motion to preclude opinions in Mr. Neuman's

18   supplemental report that relate to questions of law, I will

19   take this up at the *Daubert* hearing on Friday.

20           Sixth, the motion to preclude Neuman from testifying

21   that the Gifford and Sachs prior art references anticipated the

22   asserted claims, I will come back to this one in a minute.

23           Seventh, the motion to exclude evidence of unaccused

24   modes of operation and configurations of the lending process,

25   this again is appropriately taken up at the *Daubert* hearing on

EA78ADR1

1   Friday.

2               Eighth, the motion to preclude the testimony of Vrinda

3   Mushran, this motion is moot.

4               Ninth, the motion to preclude reference to this

5   Court's rulings on summary judgment, that motion I think can't

6   be decided in the abstract.  If someone wants to raise this,

7   they need to approach the sidebar at the appropriate time, and

8   we will deal with it then.  I am inclined, but this is not

9   final, to deny the motion as to the Court's holding that the

10  Nook applications were noninfringing and that the e-content was

11  not infringing, but grant the motion as to any argument that

12  the Court's summary judgment opinions bear on the issue of

13  willful infringement, but I will hear further argument at the

14  sidebar if and when this comes up.  There will be no reference

15  to that in the opening statements.

16              With respect to the defendants' endless motions in

17  limine, with respect to motion 1(a), to preclude the doctrine

18  of equivalents arguments regarding the single-user-input

19  limitation of claim 13 of the '703 patent or the

20  selects-a-title limitation of claim 96 of the '851 patent, my

21  understanding is that motion is moot.

22              With respect to 1(b), to preclude the doctrine of

23  equivalent arguments regarding the associated limitation of

24  claim 7 and 18 of the '501 patent, I will hear argument on that

25  in a few minutes, but I don't really understand that motion

EA78ADR1

because this was under the subheading of expert opinions not

disclosed in discovery, but that opinion was disclosed in

discovery.  I think the objection seems to be rather on grounds

of prosecution history estoppel, but we will discuss that in a

minute.

1(c), to preclude evidence on the reverse engineering

allegedly conducted by Mr. Berg and the source codes allegedly

generated but never provided to Barnes & Noble and alleged

device logs attached to his report on which he never relied,

the motion is moot as to reverse engineering and source code,

the motion is denied as to the device logs.

MR. BERTA:  I don't mean to interrupt.  I just wanted

to let you know we have reached agreement on the second part of

that.

THE COURT:  What is the agreement?

MR. BERTA:  They are not going to introduce the device

logs.

THE COURT:  Very good.  Thank you.

With respect to 1(d), to preclude evidence that prior

art references do not disclose or render obvious any

limitations not addressed by Wang during discovery, this motion

is moot as to any argument or evidence presented to the jury.

If it's still a live issue at summation, counsel may renew its

objection before summations are given.

With respect to 1(e), to preclude ADREA from

EA78ADR1

1    presenting any new patent royalty rate, that motion is moot.

2            With respect to 2(a), to preclude evidence regarding

3    Barnes & Noble's source code production, that motion is

4    granted.

5            With respect to 2(b), to preclude evidence or argument

6    that Barnes & Noble received actual notice of patents-in-suit

7    prior to March 29, 2012, that motion is moot.

8            With respect to 2(c), to preclude evidence or

9    arguments related to willfulness, that evidence or arguments

10   were not identified during discovery, I will hear argument on

11   that in a few minutes.

12           MR. BERTA:  On that one we have reached agreement as

13   well.

14           THE COURT:  Very good.

15           On 2(d), to preclude argument that Barnes & Noble's

16   lack of reliance on opinion of counsel has any relevance to

17   willfulness, that motion is moot as to any argument, except

18   possibly an argument regarding willfulness or enhancement of

19   damages, but we will take that up if and when it arises.  So

20   for now it's denied as premature.

21           With respect to 2(e), to preclude ADREA from relying

22   on Barnes & Noble's technology licenses, that motion is denied.

23           With respect to 2(f), to preclude evidence of Barnes &

24   Noble's e-content and accessory sales, that motion is granted

25   as to revenue from sales made from other than the accused

EA78ADR1

1  devices, but is otherwise denied.

2          With respect to 2(g), to preclude evidence of

3  functions that have not been accused for the purpose of

4  bolstering damages, that motion is granted.

5          With respect to 2(h), to preclude testimony by Talal

6  Shamoon regarding the audio and video codec industry, or

7  alleged similarities of that technology to the technology in

8  this case, that motion is granted.

9          With respect to 2(i), to exclude the 2009 Intertrust

10  analysis, that motion is granted.

11          With respect to 2(j), to preclude ADREA's expert from

12  presenting his "artificially high damage amounts," and from

13  presenting any amount with respect to any patent that he

14  calculated based on unit sales that postdate the patent's

15  expiration, we will take that up at the *Daubert* hearing.

16          With respect to 2(k), to preclude ADREA from calling

17  B&N's attorneys to testify at trial, that motion is moot.

18          With respect to the motion to preclude evidence

19  concerning B&N's revenues, profits and investments, I will take

20  that up at the *Daubert* hearing, although I am leaning towards

21  granting that motion.

22          And, finally, with respect to motion number 3, to

23  preclude Berg's expert reports and exhibits as inadmissible

24  hearsay --

25          MR. CABRAL:  On this one, the parties have also

EA78ADR1

1    reached agreement.

2              THE COURT:  OK.  Very good.

3              MR. CABRAL:  Can we ask one question for

4    clarification?

5              THE COURT:  Yes.

6              MR. CABRAL:  Your ruling with regard to motion in

7    limine 2(i), is it correct that that is limited to Intertrust

8    analysis?

9              THE COURT:  Yes.

10             MR. CABRAL:  Thank you.

11             THE COURT:  All these rulings are subject to the

12   exception that if any party opens the door to something that I

13   have excluded, then of course the matter will have to be

14   reconsidered at that time.

15             MR. BERTA:  On their motion number 6 that you said you

16   may want to hear about, which is Gifford and Sachs?

17             THE COURT:  Pardon?

18             MR. BERTA:  The Gifford and Sachs motion on

19   anticipation, we are not going to rely on Gifford, the Gifford

20   system as anticipatory.  So I think that that should resolve

21   that issue.  And with respect to Sachs, while we think the

22   system as described in both patents is anticipatory, we are

23   going to rely on the patent that is cited in his report.

24             THE COURT:  So that motion is moot too.

25             So I think other than the ones that I reserved on

EA78ADR1

1    either to the *Daubert* hearing or until the matter is raised in

2    some specific question or proffer, I think the only open one

3    then was 1(b), which, as I said, I didn't really understand.

4    It was under the heading of expert opinions not disclosed in

5    discovery, but it was disclosed in discovery.

6              MR. BERTA:  Yes.

7              THE COURT:  So are you still pursuing that argument

8    nevertheless on other grounds?

9              MR. BERTA:  I think it was inartfully worded.

10             THE COURT:  Or, as some might say, wrongfully.

11             MR. BERTA:  Maybe.

12             THE COURT:  Was it disclosed in discovery?

13             MR. BERTA:  It's not whether the DOE argument itself

14   was disclosed.  That was definitely disclosed in discovery.

15   What was not disclosed in discovery is any opinion or other

16   evidence on whether or not they can overcome the presumption of

17   prosecution history estoppel.  They just make an attorney

18   argument about what they think the references say.  It's their

19   burden to overcome prosecution history estoppel because it is

20   an amendment to the actual language.  They have no opinion on

21   that issue or any purpose.  So that's what is missing from the

22   expert report.  So they can't make an argument that they

23   overcome the burden of prosecution history estoppel.

24   Therefore, the DOE argument itself, which was disclosed, should

25   be out.

EA78ADR1

1          THE COURT:  I adhere to what I said a few moments ago.

2     I think it's not that the opinion was not disclosed in

3     discovery; it's that you are arguing that the opinion should be

4     precluded because of a failure to overcome prosecution history

5     estoppel.  But let's not quibble.  Let's hear from your

6     adversary.

7          MR. CABRAL:  This argument was addressed fully in our

8     summary judgment briefing.  This Court denied Barnes & Noble's

9     argument, the motion for summary judgment, on the grounds that

10    there was no prosecution history estoppel.

11         THE COURT:  You are going to need to speak a little

12    louder.

13         MR. CABRAL:  This is essentially rehashed in the

14    summary judgment argument.

15         THE COURT:  I heard that part.  I just didn't hear the

16    very last word you said.

17         MR. CABRAL:  The law is clear that motions in limine

18    are not to be used to reargue the issues that have been

19    resolved by this court.

20         THE COURT:  But just remind me because I haven't gone

21    back and looked at the summary judgment in this respect.  They

22    say that you didn't offer any evidence to overcome prosecution

23    history estoppel.  So was there prosecution history estoppel

24    and you did offer evidence, or are you saying there wasn't

25    prosecution history estoppel?

EA78ADR1

1              MR. CABRAL:  There was not prosecution history

2     estoppel.

3              THE COURT:  Because?

4              MR. CABRAL:  Because the amendment at issue related to

5     a time parameter associated with a Pay-Per-View television

6     program.  So, in other words, if the program were the Nightly

7     News, that parameter would be 6 p.m., because that's when the

8     Nightly News came on.  The claims were then amended to add a

9     predetermined time period.  So to add the lend-in period that

10    is now the element that's in the claims.  That was to overcome

11    prior art.  The prior art related to just any time parameter

12    associated with any program.  So, essentially, the amendment

13    was the introduction of the lending period from the beginning.

14             Now, here, the doctrine of equivalents argument, the

15    equivalent doesn't relate to the lend necessarily; it relates

16    to the precise starting point for the lend period.  In other

17    words, the dispute in this case is over one or two seconds.  If

18    the lending period starts at second one, they say they don't

19    infringe.  If it starts at second two, we say they do.  Because

20    there is no substantial difference in a 14-day lending period

21    based on a one- or two-second difference.  That's essentially

22    the issue in the case.  The equivalency that we are arguing and

23    relying on here has no bearing or relation to the amendment or

24    introduction of the lending period itself.

25             THE COURT:  Let me hear from your adversary.

EA78ADR1

1          MR. BERTA:  The words as they were in the patent --

2          THE COURT:  Remind me because, as I say, I didn't go

3     back.  Was this raised in summary judgment?

4          MR. BERTA:  Yes.

5          THE COURT:  I ruled against you.

6          MR. BERTA:  You ruled on all the rest of the issues

7     that there were questions of fact, that's correct.

8          To respond to that point, the issue of specifically

9     prosecution history estoppel is a question of law for the Court

10    to decide.  The reason we are bringing this forward in an MIL

11    is because, if they were never able to run a DOE argument, it's

12    going to be highly prejudicial for the jury to hear how it

13    doesn't really matter one second or no seconds, an argument

14    that the jury could confuse with the question of literal

15    infringement.  Because they are not going to know that when he

16    says one second, that doesn't mean I can decide it literally

17    infringes.  There is no question that we can't literally

18    infringe.  We believe we can't literally infringe because there

19    is a different time period, one starts earlier than the other.

20         So running DOE at all will be prejudicial in front of

21    the jury if they were not allowed to do it.  I believe we lost

22    on doctrine of equivalents at summary judgment, but the

23    question whether or not they are allowed to run it as an

24    initial matter has to be decided.  So we are trying to figure

25    out how to get that issue teed up, because I do think the

EA78ADR1

1   prejudice here arises from running a DOE argument that they

2   were not able to run infecting the literal infringement

3   argument.

4          THE COURT:  All right.

5          MR. BERTA:  So with respect to the issues, what the

6   claim language said previously was associating a time parameter

7   with the electronic book.  He says there was no time duration,

8   and so the amendment added a time duration, but that's not what

9   the language said.  The language said associating a time

10  parameter.  So there was a time duration associated with the

11  book prior to the amendment.

12         THE COURT:  I understand now the arguments from both

13  sides.  I need to go back and both look at the summary judgment

14  and also to think about the arguments you have just raised.  I

15  assume this is not a matter that is going to come up in opening

16  statement.  So I will resolve it by lunchtime.

17         All right.  I think we are ready to call the jury

18  panel up, unless counsel has anything else they need to raise

19  with the Court at this time.

20         MR. CABRAL:  There are a couple of matters that we

21  talked with the other side about.

22         THE COURT:  OK.

23         MR. BAUER:  Excuse me, your Honor.  I am losing my

24  voice.  Worst thing for a lawyer.

25         We would like to know your views on playing the patent

EA78ADR1

1    video that the Federal Judicial Center puts out.  We would like

2    to play that for the jury; they have opposed.  There are three

3    pieces to this.  We think the jury should know something about

4    patents, whether it's the video.  We have also suggested

5    putting the patents in a notebook so the jury would have the

6    three patents.  They have objected.  And they have objected to

7    a couple of our slides, your Honor, if I could just show you

8    from the opening.

9              Those are the two questions.  It's really your style,

10   but whether you would be open to playing the patent video.

11             THE COURT:  I am open to playing that, but I think we

12   need to get the jury selected, and we can discuss that some

13   more.  But real quickly, what is the objection?

14             MR. EDERER:  We proposed some preliminary instructions

15   to the jury that deal with the issue of patents and how the

16   patent system works and so forth.  That's a 20-minute video,

17   the first 15 or 17 minutes of which are how hard the patent

18   office works to examine the patents.  Then in the last minute

19   or two --

20             THE COURT:  There is some of that.  I am familiar with

21   the video.  I know I asked for it.  Did I receive your

22   preliminary instructions?

23             MR. EDERER:  That was part of the proposed jury

24   charges, your Honor.

25             THE COURT:  There it is.  I will take a look at that.

EA78ADR1

1         We will talk about this a little bit more, but during

2    the break, while we are bringing the jury panel up, I will take

3    a quick look at that video.  Actually, I think defense counsel

4    may be right.  It's not really not more than of passing

5    relevance here, if at all, which is the wonderful work that the

6    patent and trademark office does, which would not be a subject

7    the Court would care to comment about.

8         MR. BERTA:  Very briefly.  We have two issues.  One

9    with respect to the witness order.  There are some changes to

10   which we are objecting and one with respect to the way

11   witnesses are coming in, whether by individual or video.  Do

12   you want to wait until we get the jury here?

13        THE COURT:  Yes.

14        MR. BERTA:  The other issue is Amazon is here with

15   respect to their confidential information as well.

16        THE COURT:  Well, they will just have to wait until we

17   pick the jury too.

18        MR. CABRAL:  One final issue.  With regard to one

19   slide in Barnes & Noble's opening presentation, and I can hand

20   you the slide, it might be easy for discussion purposes.

21        THE COURT:  We are going to get the jury panel up

22   here.  We are going to select the jury, and I am going to then

23   give them about ten minutes to go to the jury room to get

24   familiar with the jury room.  Then we are going to bring them

25   back and hear opening statements.  So during that ten minutes

EA78ADR1

     1    we can take any objections to your adversary's opening

     2    statement in terms of a slide.

     3              After the opening statements, we can then take up all

     4    the other matters, and I am sorry that we can't reach our

     5    friends from Amazon until then, but on the other hand, they

     6    should be thrilled to witness the jury system in action.

     7              We will give you folks a five-minute break now while

     8    we bring up in the panel.

     9              Everyone in the audience needs to move to the back row

    10    because the jury panel is going to be in the front rows.

    11              We will see you in five minutes.

    12              (Recess)

    13              (Prospective jury panel enters courtroom)

    14              (Jury selection commences off the record)

    15              (Continued on next page)

    16

    17

    18

    19

    20

    21

    22

    23

    24

    25

Ea7radr2

1              (A jury of 9 selected and sworn)

2              (Jury not present)

3          THE COURT:  First, I have decided not to play the

4     patent video.  I think this is a pretty straightforward case.

5     I don't think there will be any difficulty with the jurors

6     understanding what it's all about.  I do want to perhaps

7     tomorrow morning give them some preliminary instructions.  Do I

8     have proposed preliminary instructions from both sides?

9          MR. BAUER:  Yes, your Honor.

10          MR. EDERER:  Yes.

11          THE COURT:  Very well.  I will read them later today.

12    Thank you so much.

13          There was an objection to one demonstrative in defense

14    counsel's opening that someone wanted to raise.

15          MR. CABRAL:  That is correct, your Honor.  It is only

16    with respect to the one of the slides in the opening

17    demonstrative.  The slide relates to licensing and investment

18    efforts.  The title of the slide is "ADREA Licensing and

19    Investment Efforts."  There are two columns.  The first column

20    is under a subheading "Possible Target."  The second subheading

21    is "Under License" with a question mark.  The slide lists a

22    series of companies under the heading "Potential Target," and

23    the indication under the license category, there is an X.

24          Among the first two companies listed are Apple and

25    Google.  That is probably not a coincidence given that they are

Ea7radr2

1    very well known.  We are not aware of any direct evidence that

2    ADREA contacted Apple and Google for licensing discussions

3    relating to the patents at issue in this case.

4            THE COURT:  All right.  Let me hear from your

5    adversary.

6            MR. EDERER:  Your Honor, the intention of the slide is

7    to indicate companies that were targeted by ADREA since its

8    formation for licensing or investment efforts.  Apple and

9    Google appeared on that list from day one.  The idea is we are

10   trying to get across to the jury that with respect to all the

11   companies that had been on the list since day one that had been

12   targeted by ADREA, these companies, none of them have actually

13   either vested or taken a license with ADREA.  I don't think

14   there is anything misleading or unfair about it.

15           It is also not entirely clear from the documentation,

16   but there is indication on the target list that Apple and

17   Google were to be contacted.  There was also an email which you

18   will hear about during the case where, after the Amazon

19   litigation was settled by ADREA, Barnes & Noble, Apple, and

20   Google were the obvious primary targets of the company.

21           And it is not just Apple and Google on that list, it

22   is seven or eight names.  The point we are trying to make to

23   the jury is that despite all these companies you have heard of

24   having been targeted or considered as targets by ADREA, none of

25   them have taken a license or invested in the company.  There is

Ea7radr2

1    nothing misleading.

2              THE COURT:  What is the relevance?

3              MR. EDERER:  The relevance has to do with the issue of

4    damages, your Honor.  It goes to the question of whether ADREA

5    was able to make any deals with any of these companies with

6    respect to licensing.  The damages expert for ADREA relies very

7    heavily on the fact that this company had an opportunity to

8    sign up tremendous licensing deals along the way.  I think it

9    goes directly to the issue of damages that none of these

10   licensing deals that they attempted to sign up were actually

11   consummated.

12             It also goes to the issue of secondary --

13             THE COURT:  Your adversary is saying with respect to

14   Apple and Google they didn't even try.  I don't see how it

15   shows what you are saying it shows.

16             MR. EDERER:  By the way, there is also a very clearcut

17   email that says that Apple and Google were the subject of claim

18   charts, that the claim charts were developed with respect to

19   them.  I think we should at least be given the opportunity

20   inquire as to what contacts were or were not made.

21             THE COURT:  That may be.  I have to rule on that now.

22   It is just a question of what is permissible in the opening

23   statement.

24             MR. EDERER:  All the opening statement will say is

25   that these companies were targets, targets from day one, and no

Ea7radr2

1    investments or licensing deals were made with any of them.  It

2    is very straightforward and truthful and not misleading.

3             MR. CABRAL:  To be clear, we have two objections.  One

4    is under rule 403 for being confusing and misleading.  That has

5    two parts to it.  One is the Apple and Google piece of it.  The

6    clear indication from the slide, and we have a copy for your

7    Honor if you would like to see it, is that Apple and Google

8    were contacted and there is no license.

9             If there is no direct contact between the companies,

10   the fact that those two companies don't have a license is a

11   pretty straightforward conclusion.  But here it gives the

12   impression to the jurors that those two companies were

13   contacted and specifically chose not to take a license.

14            THE COURT:  As I understand defense counsel, he is

15   going to clarify that.  I take it you will say not all these

16   companies necessarily were contacted but they were all targets.

17            MR. EDERER:  Right.  The column that Mr. Cabral is

18   referring to is headed "Targeted Companies."

19            MR. CABRAL:  The other column says "Licensed" question

20   mark.  We don't have necessarily any issue with the remaining

21   companies on the list.  But Apple and Google are two very, very

22   well-known companies.  The implication that they considered a

23   license to the patents --

24            THE COURT:  That is not the point he is making.  I

25   have some question when this ultimately comes into evidence.  I

Ea7radr2

```
 1      think there will be some interesting evidentiary questions as
 2      to whether it comes in and in what form.  Of course, opening
 3      statements, am I am about to tell the jury, are not evidence.
 4              Unless something is hugely inflammatory or something
 5      like that, the fact that you hope to keep it out later doesn't
 6      preclude it.  With the wording that defense counsel has now
 7      made clear that he is going to use, I don't think there is any
 8      basis for me to preclude it from opening statements, so I will
 9      allow it.
10              MR. CABRAL:  There is only one other issue with
11      respect to 403.  That is the last entry on the list, Amazon,
12      who is a licensee in this case.  There is a window, which has
13      been since been modified somewhat by defense counsel, saying
14      through litigation, the clear implication being that Amazon
15      only took a license by virtue of the fact that it was sued.
16              In 2013 Amazon exercised an option to the portfolios
17      of Sony and Philips which contributed to ADREA, the plaintiff.
18      That license, that option license, was taken independently of
19      any litigation.  Our second challenge under rule 403 would be
20      giving the jury the misleading impression that the complete
21      license taken by Amazon was taken only as a result of
22      litigation.
23              MR. EDERER:  Your Honor, that license, that option was
24      part of a settlement agreement with Amazon.  There was a
25      portion of the Amazon settlement agreement where Amazon took a
```

Ea7radr2

license to the Discovery patents, including some of the
patents-in-suit here.  Then there was a portion of the
litigation settlement agreement where Amazon was given the
option over a period of time to take additional licenses with
respect to patents owned by Sony and by Philips, including one
of the patents-in-suit here.  All of this came straight out of
the litigation settlement agreement.

THE COURT:  Again, I think there is a dispute here
that may have to be resolved by the Court when we get to the
actual evidence.  But given the representation that was just
made, I don't think there is any reason to preclude the
reference in opening statement.

If it turns out that the representation is mistaken or
inadequate in some respect, the other party can ask for some
sort of appropriate instruction from the Court.  You, of
course, are always free to comment on summation about a failure
or mistake that the other side made on opening statement.  But
I think it doesn't go beyond the pale of what is permitted in
opening statements, so I will allow it.

Hearing all this, though, I remind counsel that they
each have a half hour for opening statements, not 31 minutes.
I will cut you off at 30 minutes.

We will take a five-minute break and bring the jury in
to hear opening statements, and then we will take up the matter
that Amazon is here on afterward.

Ea7radr2

1          MR. BAUER:  Your Honor, since I'm going first, do you

2    give five minutes notice or two minutes notice?

3          THE COURT:  Sure, if you would like.  What do you

4    want, five minutes' notice?

5          MR. BAUER:  That would be great, your Honor.

6          THE COURT:  Terrific.

7          (Recess)

8          (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (Jury present)

2        THE COURT:  Please be seated.  Ladies and gentlemen,

3   we are about to hear opening statements of counsel.  I want to

4   advise you at the outset that nothing that either counsel says

5   is evidence.  The evidence will only come from one of three

6   places.  There will be witnesses who testify, there will be

7   exhibits that are introduced in evidence, and every once in a

8   while the parties may enter into what is called a stipulation,

9   where they both agree on a given fact, and you can treat that

10  as evidence.  Those are the only sources of evidence.

11       You may ask, why do we even have opening statements?

12  The answer is that the evidence will come in one little bit at

13  a time.  It may be a while before you begin to get the full

14  picture.  To help you in that regard, both sides are given the

15  opportunity to, in effect, give you a roadmap of what they

16  expect the evidence will show or fail to show, as the case may

17  be.  This is their prediction.  It is not evidence, but it

18  still will help, I think, frame the context for you to evaluate

19  the evidence as it comes in.

20       We will begin with plaintiff's counsel and then with

21  defendant's counsel.  Each side is given 30 minutes.

22       Counsel.

23       MR. BAUER:  Thank you, your Honor.

24       I'm Steve Bauer.  Before I say anything else, I am

25  losing my voice.  This is not what I normally sound like.  The

1    microphone will help, but you all are close enough.

2              Before I get into the evidence, I do want to thank you

3    all.  I know this is the last thing you hoped you would be

4    doing this week.  We know it is a big imposition on you, on

5    your time, you would rather be doing other things.  We really

6    do appreciate it.

7              We believe in the jury system.  You being here is

8    going to be a big help for both of us.  You are going to hear

9    that there is a battle between us and Barnes & Noble, and it is

10   going to take good people, honest people, fair people like you

11   to get to the right answer.  We think it is us, but we do

12   appreciate you being here.

13             As the judge told you, by the end of the week, by the

14   end of the two weeks, we do hope you find this informative,

15   educational.  We are going to try to make it interesting to you

16   all.  It is technology, but, as the judge told you, the

17   technology is not going to be too deep down.

18             What we are accusing here is the Barnes & Noble Nook.

19   It's the Nook that we are charging.  There's a half a dozen

20   different versions.  They come in different sizes and shapes.

21   But what we will be talking about is the Nook and how it

22   operates.

23             I represent ADREA.  There are three patents in this

24   case.  At the beginning the judge told you there was one.

25   There is actually going to be three patents.  There is a little

1  bit of tutorial in the beginning because you all haven't done a

2  patent case before.  The patents have these long numbers.  Both

3  sides will be referring to them by the last three numbers:

4  '501, '851, '703.

5          You will hear those numbers over and over.  You don't

6  have to memorize the numbers.  We also have a short form way to

7  describe them.  The titles are much longer, but we refer to

8  them by these titles:  Ebook lending, secure ebook

9  distribution, and device-specific content.  Let me tell you

10  very briefly what those are.  You will be hearing experts

11  testify.  You will hear from the inventors on all of these

12  patents tell you what they thought they were doing.

13          Ebook lending, that's a patent.  These are valuable

14  patents.  They come from the 1990s, these patents, the ebook

15  lending patent 1994.  What it is is when you own a Nook and you

16  buy a book and you want to loan it to a friend, the Nook lets

17  you loan to it a friend for two weeks.  The friend who has the

18  book can get on it, push a button that says I want to borrow

19  it, and the book is downloaded onto the friend's Nook for two

20  weeks.  That's ebook lending.

21          Back in the 1990s, think about it -- the Nook came out

22  in 2009.  The Kindle, the leading ebook reader, came out in

23  2007.  This was a 1994 invention, the idea of downloading a

24  book so that it disappears or becomes encrypted so that you

25  can't use it after two weeks.

1          The other patent, the '851, secure ebook distribution,

2     gets into copyright protection and encryption and how you

3     download these books from an online bookstore to get here in a

4     secure way.  Back in the 1990s these were big issues.  Today

5     you get your Nook, you download it in a second, you push a

6     button, the book's there.

7          Back in the '90s, when they first were introducing

8     these, book publishers were the big problem.  Book publishers

9     saying, I don't want electronic books out there, because if you

10    download an electronic book to a computer and if it is not

11    encrypted and it is not secure, the person who gets that book

12    can then send it to their friends, and that single book that

13    you buy for $9, hundreds of copies can get around.

14         So the publishers were the big hurdle.  People were

15    trying to figure out how can we make them happy.  One was was

16    this, the book disappears after two weeks if you loan it.  The

17    other was how do you encrypt it and download it in a secure way

18    that protects the copyright.

19         The third patent, which we call device-specific

20    content, that patent is not about ebooks specifically.  That

21    patent is about how do you get content for any device in an

22    easy way.  That patent came out in the year 2000.  One of the

23    things you can do with a Nook, you push a single button that

24    takes you to the Barnes & Noble bookstore, a single button

25    takes you right to the bookstore.

1          Put yourself back to when these inventions were made

2     back in 2000.  I don't know how many of you guys are computer

3     geeks or whatever, but when you wanted to go on line back then,

4     you had to do a dial-up.  You had to dial the telephone.  You

5     had a modem.  Sometimes you put the telephone into the modem.

6     But it went over the telephone lines.

7          Facebook was 2004.  The iPhone was in 2007.  Back in

8     the 1990s we are talking about Tickle Me Elmo.  If you can put

9     yourselves back in time to when these inventors made these

10    ideas, they were novel, valuable at the time.  We are going to

11    show you in this case that those inventions are now in the

12    Nook.

13         You are asking, who is ADREA, I have never heard of

14    these guys, and where do these patents come from?  You were

15    asked if you had heard of Sony, Philips Discovery, and

16    Intertrust.  ADREA is a company that was formed in 2010 by

17    these four companies.  You know these companies, at least some

18    of them.  They are leading innovators.

19         They are companies that spend a lot of money on

20    research and development, develop new technologies:  Sony, the

21    Walkman, the Play Station; Philips largely invented the CDs and

22    DVD players and consumer appliances; discovery Communications,

23    you know their cable network, Discovery, the Learning Channel,

24    Animal Planet.

25         Two of these patents were invented by the founder of

1    Discovery Communications, Mr. Hendricks.  You will see some

2    video from him when he talks about what he was thinking when he

3    got these patents back in the 1990s.

4            The fourth company up there, Intertrust, is not a

5    household name.  You probably haven't heard of Intertrust.

6    Intertrust is a company that has dozens of engineers, hundreds

7    of patents.  Any time you download a movie on the Internet from

8    Netflix or from iTunes, that's being downloaded in part using

9    Intertrust technology.

10           These are all leading, innovative companies, R&D

11   companies.

12           In 2010 they got together and said let's put together

13   a company called ADREA.  ADREA stands for "advanced reading

14   algorithm."  Reading.  What they did is they, these companies,

15   put technology into ADREA.  They said we are going to form a

16   company.  Sony, Philips, and Discovery put technology in.

17           Intertrust is a licensing expert.  They have these

18   patents.  There are technologies out there.  Their field is

19   communications over the Internet, things like movies and

20   whatever.  These companies got together and they asked

21   Intertrust to take the lead in licensing this technology and

22   helping to promulgate the technology out there.

23           Our first witness is Talal Shamoon.  By the way, the

24   witnesses aren't in the room.  The Court doesn't allow any

25   witnesses to come in to hear my opening.  They don't get to

1    hear everybody else's testimony.  It is a way that you can have

2    confidence that when they come in here, they are not being

3    influenced by what we say or by opposing counsel.  That's why I

4    can't point to Mr. Shamoon.  He is sitting out in the lobby.

5    You will hear him this afternoon.

6         Mr. Shamoon -- Ph.D from Cornell University, a

7    research engineer, CEO of Intertrust, that company I was just

8    telling you about with all the engineers and patents -- they

9    asked him to be the president of ADREA and take the lead in

10   getting this technology out there.

11        Let me give you a little bit of a time line to put

12   these in context as the evidence comes in.  These patents we

13   are talking about, two of them came from Discovery:  Ebook

14   lending, Mr. Hendricks 1994, the distribution 1999.  This

15   device-specific content, which I said wasn't ebook specific but

16   was a device, applied consumer stuff, that came from Philips.

17   Philips wasn't specializing in ebooks.  Philips was

18   specializing in getting things into the home.  Those are the

19   three patents.

20        The Kindle doesn't come out until 2007.  The Kindle is

21   the first commercially successful ebook reader.  Then the

22   Barnes & Noble Nook two years after that.

23        I will tell you and Mr. Shamoon will tell you that

24   Amazon has taken a license to these patents, paid a lot of

25   money for that license.  He will tell you that after he took

1    the license, and this is one of the exhibits you will see, they

2    sat down with Barnes & Noble and said, listen, Amazon has taken

3    a license with us, gave them detailed analysis of why Barnes &

4    Noble should take a license to this technology as well, what we

5    call claims charts.

6            They went through the patent claim, compared it to the

7    Barnes & Noble technology, and basically said we are not hiding

8    anything, we want you to see what our technology is and why you

9    should take a license also.  Essentially, Barnes & Noble said

10   sue us.  That's what brings us here today.  That's why we need

11   your help to get this resolved.

12           We're not in the business of suing people.  But when

13   you want to license your technology, the leading company has

14   taken a license and the number two company, Barnes & Noble

15   says, I'm not going to pay you, it brings us to court.  That's

16   what we are here for today.

17           There are three things to keep in mind as we go

18   through this case and as you sit here and listen to the

19   evidence, three points I want you to remember.  First, these

20   patents, look at the dates on these things.  When we talk about

21   patents, they are going to be saying they are obvious and

22   nothing valuable here.

23           You are going to be asked to put yourself back, and

24   our expert who talks about that will come in and tell you

25   you've got to put yourself back -- this is what the law

1    requires -- back in 1994, back in 1999, and know what the

2    engineers were dealing with back then.

3           Hindsight is such an easy thing.  Any of you who own a

4    Nook or a Kindle or iPad or any of those things, it is so easy

5    to look at those things and say of course the book should

6    disappear after 14 days if you lend it, that's obvious.  But

7    how it is done isn't obvious, and that's what these patents

8    describe.  Put yourself back.  That's one point.

9           The second is keep in mind where this technology came

10   from.  This technology came from leading innovative companies,

11   companies that spend a lot of money on R&D.  These aren't

12   people that are just tinkering around.  These are companies

13   that develop, invest in R&D, get patents on that technology in

14   the regular course.

15          Why do they get patents on that technology?  Because

16   the patent gives them the opportunity to recoup some of that

17   R&D cost from people further down.  In technology you stand on

18   the shoulder of the giants before you.  People don't start

19   their technology.  When Nook sat down, Barnes & Noble sat down,

20   they didn't put people into a dark room by themselves and say

21   just imagine.

22          They knew what was out there at the time.  They had

23   seen the Kindle.  They had seen where technology was going.

24   They build upon what people had been doing before.  The fact

25   that these products come out later, they are still building.

Ea7radr2                    Opening - Mr. Bauer

1    You are going to hear how they are using the technology that

2    Discovery and Philips invented.

3            The last point to keep in mind is what would a Kindle

4    be or what would a Nook be without the ability to use these

5    features.  These things are much more than just a tablet with a

6    book on them.  That's one thing.  If you just had a book and

7    you downloaded a book and all you did was read it, that's one

8    thing.  These are more than that.  They let you loan the book.

9            What is the value of a feature that lets you buy a

10   book and loan it to your friends or family and be able to reuse

11   it?  That's what makes these more like a real book.  If you buy

12   a book from Barnes & Noble and you're done, you are able to

13   give it to a friend and say, hey, this is a great book, and you

14   don't have to pay for that.  It wouldn't be right if you

15   downloaded a book and you paid for it and it was only for you,

16   you couldn't use it.  They want these things to feel and act

17   like an electronic version of a book.  That means being able to

18   loan it to somebody.

19           What if you couldn't get it push one button and go

20   right to the Barnes & Noble bookstore to buy it?  What if you

21   had to go to the Internet, into a browser, and type in "Barnes

22   & Noble" every time and do a search or whatever?  It's the

23   ability to go right to the bookstore.  If you have an iPhone,

24   the app, like an iTunes app, if you push the button, it takes

25   you right to iTunes.  That's what makes these things valuable,

1    what makes you want to own them, not if you have to sit there

2    and it looks like a computer every time you have to turn it on.

3              Let me tell you a little bit about these patents now,

4    because this is what the case is all about.  Where does a

5    patent come from?  What I have here is a blow-up.  This is the

6    first page of a patent.  These are the patents, what I'm

7    holding.  They come back from the patent office.  These are the

8    three patents in the case.  I'll flip through it a little bit.

9              This is what happens with a patent.  You go to the

10   patent office.  You tell the patent office you think you have

11   an invention.  That's all you say, I think I have one.  You

12   write it up.  You give a detailed technical description.  You

13   tell them about everything.  If you can see, you give them all

14   your engineering drawings that you can, in this case a lot of

15   drawings.  You get pages and pages of technical description.

16   You tell the patent office what you think your invention is.

17             The examiner looks at it, does his own patent search,

18   goes to see if anybody did this before you, if you might be

19   wrong.  After the investigation and the give-and-take with the

20   examiner, if the examiner, the patent office, thinks you're

21   entitled to a patent, this is what you get.

22             What does it tell you?  The director of the patent

23   office has received an application for a patent, the titles are

24   enclosed, the requirements of law have been complied with, and

25   it has been determined that a patent on the invention shall be

1    granted.

2             What does that patent give you?  Now I have a piece of

3    paper.  That's nice.  Next paragraph.  It gives to the person

4    having title to this patent, the person who owns it -- so it

5    doesn't matter that now the patents are owned by ADREA; even

6    though they started at Discovery, they put them into this

7    company -- it gives to the person who owns this patent the

8    right to stop others from making, using, offering for sale, or

9    selling the invention in the United States.  It gives us the

10   right to stop them.

11            That's not what we are here for.  We are not asking

12   you to stop them.  It is to stop them or pay us.  We want this

13   technology out there.  That's why ADREA was formed, as a

14   company that takes the patents from these different companies

15   and one-stop shopping for these licenses.  A company that needs

16   the technology, rather than have to go to Discovery and go to

17   Sony and go to Philips separately, the patents for ebook

18   readers are in one place, one license, easy to deal with.

19   That's what the patent gives us, subject to the payment of

20   maintenance fees as provided by law.

21            So, this is the patent that we've got, or three of

22   these patents.

23            You are going to hear from two of our inventors on

24   these patents.  First, John Hendricks.  He is not able to be

25   here personally.  He is the founder and CEO of Discovery

1    Communications.  He did this technology in Discovery.  You have

2    some of the logos.  If you don't know Discovery but if you are

3    on cable, he founded Discovery Communications.

4            He was a prolific inventor and technology geek in the

5    1990s.  You are going to hear from a video.  We are going to

6    play a video.  It will be all together.  There is some stuff

7    that we want you to hear, some stuff that they want you to

8    hear.  We put them together.  It is about a one-hour long

9    video.  You will hear from him telling you about his

10   background, what he thought the invention was, and how he came

11   up with the two patents that are his, the ebook lending and the

12   secure book distribution.

13           You are also going to hear live from Eugene Shteyn.

14   He was one of the inventors from Philips.  He was the former

15   principal scientist there.  He now teaches at Stanford

16   University.  He is going to tell you about that technology and

17   what he was thinking and doing in terms of being able to get to

18   the Internet and get you directly to a website with a single

19   push essentially instead of having to search and find, and why

20   that was easy -- not easy -- preferable and something that he

21   thought would be easy for the world to use.

22           Now, what is patent?  A patent, we call it

23   intellectual property.  One way to think about it, it's

24   property.  The typical analogy is to real property.  A patent

25   is just like a deed to real property, with one small

1   difference.  When you have a deed to real property, you

2   describe your property on that deed.  You say I own a hundred

3   feet to the river, I own lot number 38.  We know exactly what

4   your property is.  It's easy.  You record it at the recording

5   office and you know exactly what your piece of property is.

6        How do you do that with an idea?  How do you describe

7   what your idea is?

8        I should say something about infringement.  I'll show

9   you what we do.  We have a claim, a word claim.  In words we

10  describe the invention.  Infringement is when they fall within

11  that scope.  That word description is essentially the fence

12  around our property.  Infringement is when they are inside that

13  fence or fall within that word description.

14        This is a simple example of a claim, one that helps

15  you understand.  What is a claim?  Let's say you invented the

16  soccer ball.  How do you describe what your invention is?  I've

17  got to describe my invention.  The invention is a ball you can

18  kick, made of leather stitched together, filled with compressed

19  air.  You have used those words.  You say my invention is these

20  four things.  That becomes your fence.

21        Notice it doesn't say anything about being a soccer

22  ball or the color of the ball or the size of the ball.  None of

23  that is part of the invention.  The invocation here is a ball

24  you can kick made out of leather.  That claim would cover a

25  football.  It is still a ball you can kick made of leather.  It

1    does not matter if they are small changes.  If your invention

2    is a ball, you get to patent the ball, if that is your

3    invention.

4          So, small improvements, small changes, or in the case

5    of the Nook changes that took place over the last ten years,

6    from our inventions back in the 1990s to today.  It doesn't

7    matter that it looks a little different.  Back in the 1990s you

8    had keypads, you had to push a button.

9          If you think about the old BlackBerry, you have to

10   push keys.  Now they call them keypads, but there is no

11   physical key.  It still looks like a keypad, it acts like a

12   keypad, but it looks a little different.  The claim covers

13   those things because the invention isn't the specific thing you

14   made.  It's the concept, the idea.  That's what you patented.

15         Let's look a little bit at the actual patent that we

16   are talking about just so you can get a sense.  The first

17   patent that I want to talk about, this is the '501 patent, the

18   first page of the patent.  A lot of information on here.  Some

19   of the things you see when you look at the patent, you see the

20   inventor's name, who owned it, who he worked for, in this case

21   Discovery.  There's a bunch of dates and numbers that the

22   patent office uses.

23         The filing date, and everybody will agree, the patent

24   office, the way it works, the date that is important is this

25   case was filed on November 1994.  That's the invention date.

1    Nobody is going to take any issue with that.

2              Then it talks about who the examiner was, the patent

3    examiner.  This is the date the patent was issued, 2007.  That

4    is not important today except for you to see how long it takes

5    to get a patent sometimes.  This case was filed in 1994, issued

6    in 2007.  The patent office is not fast.

7              Then you give an abstract.  You talk about what you

8    think the invention is, in this case an electronic book

9    selection delivery system, a new way to distribute books, and

10   other textual information.  The title is "Electronic Book

11   Selection and Delivery System Having Encryption."  This is the

12   first page of the patent.

13             There are references cited.  This tells us what the

14   examiner looked at.  In this case on the first page there is

15   just one thing.  That is because, if you can see, these pages,

16   all these numbers, every one of these is a patent, somebody

17   else's patent.  The examiner, when he does his search and finds

18   things --

19             You also have to tell the patent examiner what you

20   think is relevant.  You don't just say, I have an invention.

21   You have to say, I think other people did things close.

22   Remember, all invention is building on something, all

23   invention.  Nobody ever invented anything from scratch.  The

24   lightbulb wasn't invented from scratch; it was the best

25   lightbulb.

1          This is all the stuff the patent examiner looked at in

2     coming up with this.

3          This is just a graphic for now, but this is all

4     exhibits.  This is the patent file.  This is what comes back

5     from the patent office.  Everything that goes on in the patent

6     office is public record.  What the examiner thinks, he writes

7     to you.  What you think, you tell him.  You each explain what

8     you think the invention is.  You tell him what the property is.

9          When he is done with all that and he gives you the

10    patent, this is the claim.  This is going to be the focus of

11    the case.  There are a couple from each patent.  I was telling

12    you that there are these word claims that you describe your

13    invention.  There are a lot of claims in these patents.  You

14    describe them with different words because you are trying to

15    describe your invention with words.

16         You will see there is a claim 96 from one of the

17    patents.  We are only talking about one or two claims from

18    every patent.  You don't have to go through them all.  We have

19    picked one or two that we think are representative.  In this

20    case claim 7 is the one that we are talking about.

21         You can see what he claimed as his invention:  A

22    method for restricting access to books, storing a book on a

23    viewer, associating a time after the book is stored, allowing

24    access to the book for that predetermined amount of time, and

25    then restricting access to the book once the determined time

1   has passed.  You can see that 14-day loaning period.

2            We are going to have our expert get up here and go

3   through every element here element by element.  Our expert is

4   Brian Berg.  He started his career at NASA working on software

5   for rockets.  He now has a software design business.  He is an

6   expert in consumer electronics and how they work.  He did a

7   forensic study.  He is our expert.  He had to prove

8   infringement.

9            As you can imagine, what goes on in the Nook isn't

10  always public.  But in this case, the way the system works,

11  they had to turn over their computer code, their engineering

12  diagrams, part of the legal system.  He had access to that.  He

13  took products apart, he did testing.  He is going to go through

14  the detail and explain how he went through it and take each one

15  of these things step by step, go through it and show you that

16  this is exactly what the Nook does.

17           Remember when I said the technology is not so tough?

18  What goes on inside the Nook is in detail, and he is going to

19  tell you what he saw.  But at the end of the day you will see

20  that what the Nook does is you store the book on a viewer and

21  14 days later it turns off.

22           I have an asterisk here.  There are some terms in

23  these claims that the parties dispute, find ambiguous, because

24  this was written a long time ago.  When we have a disagreement

25  about what the terms mean, we came to court.  There is a

1    process in the system.

2            We asked the judge to interpret that.  There are a

3    couple of terms, "electronic books" and this term "associated,"

4    where we asked the judge to interpret and help us along.  He

5    does that.  As we go through this case, when you have these

6    claims, those terms that are asterisked, the judge will tell

7    you you need to use his definition.

8            What is sort of interesting is there are some words

9    that are ordinary words to you or me that you or I would always

10   think, I know what this is.  But because they were described

11   one way in the patent by the inventor, they may have a

12   different meaning.  We will ask you to step aside.  The judge

13   is going to tell you these are the right definitions.  This

14   isn't me playing games.

15           For example, "title," we all know what a title is of a

16   book, right?  It's the name of a book.  But in the context of

17   this technology, "title" has a different word.  You are going

18   to hear them talk about titles.  You have to always stop and

19   say, are they using the ordinary word that you or I would use

20   or are they using the judge's word?

21           They are supposed to be, when talking about the

22   patent, using the judge's word.  It may be get confusing.  They

23   will say the title of this book is X, and that's right.  But

24   when we talk about the ebook, a title is not just a title, it

25   is any other designation including a graphical symbol.  That is

Ea7radr2                    Opening – Mr. Bauer

1    going to be important because the computer, the ebook, the

2    processor, it doesn't read English titles.  It's reading

3    computer code and special numbers.

4            THE COURT:  Counsel, forgive me for interrupting you.

5    You asked me to tell you when you have about five minutes.

6            MR. BAUER:  Thank you, your Honor.

7            Let me move along quickly.  That is one patent.  Let

8    me skip and give you a hint as to what the other two patents

9    are going to be about.

10           This is the second patent, the secure ebook

11   distribution.  I don't need to go through it in a lot of

12   detail.  This is the one claim we are going to be talking about

13   here.  It is with respect to this that you are going to hear

14   "title" because this is talking about transmitting a book

15   electronically with encryption.

16           You will see it talks about the receiver selecting a

17   title from a list of books.  They are going to tell you they

18   don't infringe, because the receiver doesn't pick the title.

19   They are going to say you choose the title, the user chooses

20   the title.  Of course an ebook reader doesn't pick the title;

21   you tell them what you want.

22           That's why we need that special definition.  When they

23   say you are picking the title, you are saying I want this book,

24   yes, you are picking that.  But the computer doesn't know that.

25   What we are going to show you and Mr. Berg is going to show you

Ea7radr2                    Opening – Mr. Bauer

1   is when it talks about selecting a title here, it is that

2   special definition.  It is not picking the title of the book

3   itself.  What it's doing is it's picking that bar code, that

4   special number.  So, when you say, I want The Da Vinci Code, it

5   is going to give you that special number.  That is the title.

6   That is the definition.

7           I want to touch base on this one.  This is talking

8   about downloading the book that we are talking about.  The

9   definition for that begins when the book is stored.  The 14

10  days begins when the book is stored.  They are going to tell

11  you because of security, they are going to tell you that when

12  is essentially simultaneous.

13          There is a one-second gap because of the way computers

14  work.  You are going to say, I want that book.  You push a

15  button.  It processes it.  That's a second or two.  Then the

16  book is downloaded.  They are going to say it's not starting

17  when the book is downloaded because of the one second.  But

18  computers do things sequentially.  There is nothing exactly

19  simultaneous.  It is not when.  You get that book for 14 days,

20  to midnight 14 days later.  When you say, I want it, they are

21  going to say, well, but it's not when it is downloaded, the

22  clock started a second or two seconds before.

23          This is the kind of defense they are going to be

24  raising and putting in front of you when they say, we are not

25  using your technology, we don't owe you any money.  Because of

Ea7radr2                        Opening - Mr. Bauer

1    one second out of 14 days, they say they don't owe us, and

2    things like that.

3         The last patent that we will talk about is the

4    consumer appliance.  This is the idea that you can go -- well,

5    we are not going to go into this.  I'm out of time.  Basically,

6    here is what the idea is.  It is the shop application.  You

7    push a button and up comes the Barnes & Noble bookstore.

8    That's all you do, push the shop button, and up it comes.

9    That's what this invention is about.

10        They are going to try to misdirect you.  They are

11   going to say the patent talks about not using a web browser.

12   They are going to say the bookstore is a web browser.  You know

13   what a web browser is.  It's Internet Explorer, it's Safari, it

14   is how you search the whole Internet.

15        If I told you that in the jury room you had a computer

16   with access to a web browser and you went back there and the

17   only thing it gave you was a Barnes & Noble bookstore, you

18   would be pretty angry.  That's not a web browser.  A web

19   browser lets you do the whole Internet.  In fact, they have a

20   web browser.  There is something called a web button right next

21   to it that takes you to Google Chrome.

22        This is the type of infringement defenses they are

23   going to be telling you about as we get here.

24        Very briefly, we are going to have our damages expert

25   after we tell you about infringement.  He is going to tell you

Ea7radr2                    Opening - Mr. Bauer

1   how he calculated the royalties in this case.  He is going to

2   tell you that the royalty is about 50 cents per unit, there are

3   about 12 million units of sales.  He is going to tell you how

4   to get to the lump sum final number based on present value when

5   the negotiation had taken place.

6         We have to go back to 2009 to figure out what it was

7   worth in 2009.  Don't let them tell you the Barnes & Noble

8   product is failing today, it is not doing well today.  It

9   doesn't matter.  The question is what would they have agreed,

10  this is the law, what would they have agreed in 2009 when they

11  introduced their product and thought it was going to be as

12  successful as the Kindle.

13        Then, we sit down and they get to come in after I'm

14  done.  They are going to come and tell you that, hey, we are

15  not using any of this technology.

16        THE COURT:  Counsel, I'm sorry.  When you said you are

17  going to sit down, you were right.

18        MR. BAUER:  All right.  Thank you, your Honor.

19        Ladies and gentlemen, the judge has a very strict 30

20  minutes.  I apologize I can't finish everything today.  But I

21  will get to it.  We will be here and you will see our case and

22  our evidence, and we look forward to convincing you.  Thank

23  you.

24        THE COURT:  Thank you very much.

25        (Continued on next page)

1              THE COURT:  All right.  We will now hear from defense

2     counsel.

3              MR. EDERER:  One moment, your Honor.

4              THE COURT:  Yes.

5              MR. EDERER:  I was going to say good morning, ladies

6     and gentlemen, but I guess it's good afternoon at this point.

7              My name is Louis Ederer, and I am the lead trial

8     counsel for Barnes & Noble in this case.

9              Joining me at counsel table are several of my

10    colleagues, and you will be hearing from them.  They will be

11    participating in this case as well.  Also at counsel table is

12    Elizabeth Brannen.  She is a member of the Barnes & Noble's

13    legal department, and Liz will be with us, hopefully, for the

14    duration of the trial as well.

15             Now, as you have already heard, our clients in this

16    case are three affiliated companies that make up Barnes &

17    Noble.  And many of you know and are familiar with Barnes &

18    Noble.  It's a well-respected, well-known retail bookstore

19    chain with roots right here in New York.  In fact, Barnes &

20    Noble started right here in New York City and has been part of

21    the New York community for 50 years.  The flagship store has

22    been on Fifth Avenue in Manhattan for many years.  And the

23    company's original owner started his book-selling career when

24    he was a student at NYU in the 1960s.  And over the past 50

25    years Barnes & Noble has opened bookstores all over the country

1    and has become part of the fabric of not only our New York

2    community, but the nation's communities.  And I imagine some of

3    you have spent some time in Barnes & Noble bookstores over the

4    years.

5            But the part of Barnes & Noble's business that is

6    involved in this case, as you have heard, is the Nook.  Some of

7    you may be familiar with the Nook.  Some of you jury members

8    had said you may own a Nook or your wife uses it.  It's a

9    device that Barnes & Noble came out with back in late 2009 that

10   lets you read electronic books.  And at the time the Nook was

11   introduced, the Amazon Kindle and other similar devices were

12   already out in the market.

13           This case is about whether three things that the Nook

14   does infringed three patents owned by the plaintiff ADREA.  Of

15   course, ADREA says, yes, they do infringe, and we say, no, they

16   don't infringe.  And I am a little biased, but I think that

17   after you hear all the evidence in this case, you will get it,

18   you will apply your common sense and you will say no as well,

19   for a whole variety of reasons which we will explain to you as

20   clearly and as directly as we can to you.

21           So let me tell you a little bit about the evidence

22   that Barnes & Noble intends to present to you in this case.

23           First, where does ADREA come from?  You heard a lot

24   about how ADREA is a joint venture of some companies you

25   know -- Sony, Discovery and Philips -- and that's true.  And of

1    course it all sounds very impressive.  But ADREA is a company

2    you have never heard, and there is a reason for that.  ADREA

3    doesn't make anything.  It makes no products.  In fact, as the

4    evidence will show, it exists for only one reason:  To try to

5    monetize patents by trying to get companies to take licenses.

6          So it's important to remember who ADREA is.  They are

7    what is called in the patent field a nonpracticing entity.

8    They don't compete in the electronic reader industry.  Instead,

9    their purpose is to try to make money off of patents which they

10   had nothing to do with inventing, much less using themselves.

11         Now, how did ADREA even come to own these patents?

12   For years, Discovery Communications had a bunch of patents that

13   related to electronic reader devices.  But don't misunderstand,

14   Discovery didn't invent eReaders only.  As the evidence in this

15   case will show, the concept of electronic readers and

16   electronic books existed long before Discovery started applying

17   for patents.  What Discovery and Sony and Philips owned were

18   some patents that related to some very specific functions of

19   electronic readers, not the whole concept of electronic books

20   or using devices to access, download, or share those books.

21         By the way, you will not hear any evidence that Barnes

22   & Noble knew anything about these patents when it was

23   developing the Nook back in 2009, because it didn't.

24         Here is another important piece of evidence that you

25   will hear.  For many years, try as it might, Discovery, which

1   also had never made an e-reader device, couldn't get a single

2   company in the e-reader business to pay for a license for these

3   patents; not Amazon, not anyone.  The fact is you will hear

4   Discovery tried to get Sony to take a license for some of these

5   patents back in 2008 and 2009 when Sony had an e-reader device

6   out in the market, but Sony wasn't having any of it.

7        Now, you heard Mr. Bauer refer to Amazon having taken

8   a license.  In 2009, Discovery decided to sue Amazon -- that's

9   the part he didn't tell you about -- for patent infringement on

10   the Kindle.  But after a couple of years, Discovery decided it

11   didn't want to spend any more money fighting with Amazon.  So

12   while that lawsuit was going on back in 2010, Discovery, Sony

13   and Philips all decided to throw in their e-reader patents with

14   this company called Intertrust, and they formed a new company,

15   ADREA.

16        They create this holding company to try to license a

17   bunch of patents, more than 300 patents, that no one had ever

18   been interested in licensing.  The first thing ADREA does is it

19   goes out and settles the Amazon case.  And then it tries to get

20   other companies in the e-reader industry to take licenses for

21   this whole portfolio of patents, the same patents Discovery

22   could never license for years and years.

23        As the evidence will show, now, after four years of

24   trying, ADREA has been completely unsuccessful, outside of

25   litigation, in getting anyone to take a license for these

1    patents.  As you will hear, they targeted Samsung, HTC, Intel,

2    Apple and Google and many others.  Now, not all these companies

3    were contacted, but several of them were.  Not one of them

4    signed up for a single license.  And so the only way ADREA has

5    ever made any money off of these patents was to settle the

6    Amazon case.  And that case ended up settling for a lot less

7    money than ADREA had been asking for.

8            So who was next for ADREA?  As you will hear, they

9    told Barnes & Noble they were thinking about suing Apple and

10   Google, but I guess they had second thoughts about that.  So

11   instead they sued Barnes & Noble.  Maybe they thought we would

12   be an easier mark.  And that's how we got here today.  But as

13   you will see and hear, the difference between Barnes & Noble

14   and Amazon is we didn't do what Amazon did, what ADREA was

15   hoping we would do, just write them a check after they sued us.

16   We are taking this case to you, the jury --

17           THE COURT:  Counsel, the purpose of an opening

18   statement is to describe what you believe the evidence will

19   show or not show, not to make arguments, and I think you're

20   getting a little too carried away.

21           MR. EDERER:  Thank you.

22           Now, as Mr. Bauer told you, in this country you have a

23   patent system that exists to protect truly new inventions, and

24   patent rights are to be respected, and as you will hear, Barnes

25   & Noble doesn't take them lightly.  In fact, Barnes & Noble is

1   an innovator itself.  Many of its Nook devices were the first

2   of their kind in the e-reader industry.

3           At the end of the case, the Court will instruct you on

4   how to decide these claims of patent infringement.  But for now

5   it's important for you to remember that the words of the last

6   part of the patent, what we call the claims, are extremely

7   important.  Patent owners only own what the words of the claim

8   say they own, not the general concept of the invention, any

9   which way it can be accomplished.  So as you hear the evidence,

10  think about whether the Nook function that ADREA is complaining

11  about falls directly within those words or accomplishes the

12  function in a different way.

13          It's also important to remember that just because a

14  patent has issued out of the patent office, it's not

15  automatically valid.  The patent office may not have had all

16  the information it needed to determine whether the patent

17  should have been issued.  And we have the right to demonstrate

18  to you that the patent was invalid, in other words, that it

19  never should have issued in the first place.

20          So we intend to show you that we win this case two

21  ways.

22          First, we don't infringe.  Our products don't do what

23  the patent claim said.  We don't do what they actually have the

24  patent for here.  Mr. Bauer talked to you about the soccer ball

25  example and he said, well, you can also say that you invented a

1    football if you invented a soccer ball.  Well, that's what they

2    are trying to do here.  The claims in this case are very

3    specific and very limited, and we don't fall within them.

4            Second, we have the right to show you that these

5    patents are invalid, and we are going to do that two ways:

6    One, we can show you that the invention already existed at the

7    time that the patent was applied for.  That's called

8    anticipation.  Second, we can show you that the invention was

9    obvious from the technology that already existed.  And what

10   that means is that someone familiar with the technology could

11   have figured it out for themselves.

12           We will show you that on one of those two bases -- the

13   anticipation basis or the obviousness basis -- that all three

14   of these patents are invalid.  So they weren't infringed and

15   are all three invalid.

16           Now, I would like to introduce you to some of the

17   witnesses who will be testifying on behalf of Barnes & Noble.

18   This is your introduction to the evidence too because these

19   witnesses will explain to you what the Nook devices are, how

20   they work, why you should find that they don't infringe ADREA's

21   patents, and why you should find ADREA's patents to be invalid.

22   So who will you be hearing from?

23           First, you're going to hear from Jim Hilt.  Mr. Hilt

24   was a senior marketing executive involved with Barnes & Noble's

25   Nook business for many years.  He is going to explain to you

1    how Barnes & Noble got into the Nook business, how it decided

2    to market the Nook and to whom.  And he will discuss some of

3    the business challenges that Barnes & Noble faced, including

4    strong competition from Amazon, whose Kindle was the dominant

5    product in the market then and now.

6            He will also tell you about the company's marketing

7    strategy and the extent to which the Nook features that are

8    involved in this case were emphasized as part of that strategy.

9    I think you will find Mr. Hilt's testimony to be very helpful,

10   because unlike the ADREA witnesses you will be hearing from, he

11   actually knows something about the electronic book industry; he

12   has lived it for many years.

13           Second, you will be hearing from Deepak Mulchandani,

14   who was a senior technical person at Barnes & Noble.  Mr.

15   Mulchandani was very involved in developing the various

16   versions of the Nook products that are accused in this case.

17   He knows intimately how they work.  He will provide testimony

18   that will help you understand why the accused functions of the

19   Nook devices do not infringe the ADREA patents.

20           Now, you will also hear from Barnes & Noble's expert

21   witness, Dr. Clifford Neuman, who will testify on some of the

22   technical issues in this case.  Dr. Neuman is a professor at

23   the University of Southern California.  He has got a Ph.D in

24   computer science and over 25 years of professional, academic

25   and research experience in the field of computer networking and

1    the Internet.  He will explain to you how the Nooks work and

2    what technology was already in existence before Discovery and

3    Philips applied for the patents that are involved in this case.

4            Finally, you will hear from Ned Barnes.  And his last

5    name is pure coincidence by the way.  Mr. Barnes is Barnes &

6    Noble's expert witness on damages.  He will explain why the

7    damages amounts that are proposed to you by ADREA's damages

8    expert, Stephen Magee, are unreliable, based on speculation,

9    and make no economic sense.  And I will talk a little bit more

10   about the issue of damages later on in my opening.

11           I ask you to listen carefully to all of these

12   witnesses on direct and cross-examination.  Their credibility

13   is important, and we think if you do that, you will find the

14   testimony of the Barnes & Noble witnesses to be very credible.

15           Now, let's take a look at the three patents involved

16   in this case and talk a little bit about the evidence that you

17   will hear, that we think will show you, if you apply your

18   common sense, that Barnes & Noble hasn't infringed them, and

19   also that they are invalid; they never should have issued out

20   of the patent office in the first place.

21           I am not going to highlight every issue for you, but I

22   want to alert you to one common theme.  These patents, if they

23   cover anything, they cover old technology, and the new

24   technology has passed them by.  As you will hear, these patents

25   are all directed to technology contained in physical devices.

1   The Nook works differently.  The Nook uses server- and

2   cloud-based processes, and these processes are simply not

3   covered by these much older patents.

4          Let's talk first about the '703 patent.  As you will

5   hear, this patent covers consumer appliances, like blenders and

6   garbage cans, where you can press a button on the appliance and

7   it takes you to a dedicated Web site on the Internet.  And when

8   you get there, you can see information about the appliance.  If

9   it's a blender, it takes you to a site where you get a list of

10  smoothie recipes.  If it's a garbage can, you get a list of

11  collection dates for your neighborhood.  And claim 1 of this

12  patent requires that you do all of this without ever accessing

13  a Web browser.

14         Now, ADREA says that this patent is being infringed by

15  the Nook shop feature.  But as you will hear from the Barnes &

16  Noble witnesses, the shop feature allows you to shop for books

17  to download to your Nook.  When you activate the shop

18  application, it takes you to a Barnes & Noble bookstore on the

19  Internet, and then you can browse the bookstore and buy books.

20  So the shop application is just a convenient way to get to a

21  Barnes & Noble bookstore without having to type www.bn.com into

22  your browser.

23         After you hear how shop works, you will see for

24  yourself that the shop application is completely different from

25  the requirement of their patent that the user not access a Web

1   browser, because the shop application is itself a dedicated Web

2   browser that is set up to take you to a location on the

3   Internet so that then you can do your browsing.  And that's

4   simply not what the patent covers.

5          Now, with regard to the issue of the '703 patent's

6   validity, even if ADREA is right that their patent somehow

7   covers pushing a button on an e-reader to take you to a

8   location on the Internet where you can purchase books and other

9   content, that invention already existed when the '703 patent

10  was applied for.  And what this means is that the claim that

11  ADREA is asserting against Barnes & Noble is invalid.

12         For example, you will hear about a patent issued to a

13  guy named Munyan.  The Munyan patent discloses exactly what is

14  covered by the '703 patent, and it was filed long before the

15  '703 patent.  Munyan shows a handheld electronic book reader,

16  that when the user selects a bookstore icon, it connects to a

17  server, identifies itself to the server, and retrieves

18  information, such as lists of libraries and other services, and

19  it does all of this without accessing the Web browser.  If that

20  sounds to you like what they say the '703 patent covers, you're

21  right.  So after you hear the evidence about the Munyan patent,

22  it will be clear to you that the invention covered in the '703

23  patent is not new.

24         Now, let's talk about the '501 patent.  On the '501

25  patent, ADREA accuses the Nook's book lending feature of

1    infringement.  This feature, which Barnes & Noble calls "Lend

2    Me," allows one Barnes & Noble account holder to loan an

3    electronic book to another Barnes & Noble account holder for 14

4    days.  And it's important to note that this feature only works

5    on an account-holder-to-account-holder basis.  Anyone can

6    create a Barnes & Noble account with an e-mail and a password

7    and access that account from a variety of computing devices,

8    not just the Nook.  So what this means is you can offer to loan

9    a book to another Barnes & Noble account holder, regardless of

10   whether they own a Nook device, or they just have a Nook app on

11   their iPad, or even if they just have an online Barnes & Noble

12   account on their personal computer.  It's not something that

13   works on a device-to-device basis only.

14          This is important to understanding why Barnes &

15   Noble's Nook does not infringe the '501 patent.  As you will

16   hear, the way the lending period works on the Nook, the 14-day

17   period begins to run when the server processes the acceptance

18   of the loan by the person you're offering it to.  The loan is

19   accepted through the cloud, through Barnes & Noble's system of

20   servers, and the cloud is what tracks the lending period.  And

21   that's the key here because the patented lending feature works

22   differently.

23          As you will hear, the '501 patent requires the lending

24   period to begin when the electronic book is stored on the

25   device, but the Lend Me feature is different.  Barnes & Noble

1    starts counting its lending period from the time the server

2    processes the acceptance of the loan by the person who is

3    borrowing the book.  Two completely different approaches to

4    lending electronic books.  Cloud based versus device based.

5    New technology versus old technology.  So if you apply your

6    common sense, we think you will get this.

7              Let's think of an analogous example.  It's like

8    borrowing a physical book from a library.  Let's say there are

9    two libraries in town that allow you to reserve books online

10   before you come to pick them up.  One library gives you 14 days

11   from the time you reserve the book online.  The other library

12   gives you 14 days from the time you come in and pick it up.  So

13   the loan period could be nearly the same.  Let's say you

14   reserved the book online on your Smartphone while you were

15   walking to the library and you were a block away.  But we are

16   still talking about two completely different concepts here, and

17   it's the same thing in this case.

18             This patent also has an invalidity problem.  It was

19   completely anticipated by what is called the prior art, the

20   technology that was already in existence.

21             Now, here is what we call the Saigh reference.  Once

22   you see the evidence, you will see for yourself that the Saigh

23   reference works exactly the same way as the claims of the '501

24   patent, and therefore these claims should never have been

25   allowed by the patent office.

1          Let me just give you a quick preview.  The Saigh

2    reference is directed to an electronic book reader, and it

3    explicitly discloses an electronic personal library device that

4    can be used to read books.  And it also discloses, when the

5    books are downloaded to the device, there can be a set time

6    period after which the book that's stored in the memory module

7    will be automatically erased.  If that sounds like the '501

8    patent, it's because it is.  And we will show you and explain

9    it works exactly the same way and it predates the '501 patent

10   by five years.

11         Finally, there is the '851 patent.  This patent covers

12   a certain way that an electronic reader encrypts and obtains

13   books.  As Mr. Bauer mentioned, in order for an electronic book

14   to be available only to the people who select the book and pay

15   for it, the book has to be protected somehow.  Otherwise it

16   could be copied by anyone who wants to read it.  To prevent

17   this from happening, you use what is called encryption and

18   decryption.  Once again, the evidence will show you that the

19   Nook devices work differently.

20         Now, you will hear that the claim at issue in the '851

21   patent is what is called claim 96.  So claim 96 is supposed to

22   cover a device that selects the books to be downloaded from a

23   list.  It's the device that selects the book, not the user.

24   The problem for ADREA, as you will hear from the Barnes & Noble

25   witnesses, is that the Nook device itself makes no selection.

1    In the case of the Nook, it's the user who makes the selection

2    of the book.  That's not what the patent says.  The patent says

3    it's the device that makes the selection.  And ADREA can argue

4    this point all it wants, but that's the fact.  So if you decide

5    that the user selects what books to buy, then we don't infringe

6    claim 96 of the '851 patent.

7            As you will also hear, claim 96 of the '851 patent

8    requires that the device send and receive encryption keys for

9    encrypting a book.

10           Well, it turns out Barnes & Noble doesn't do that

11   either.  Barnes & Noble pre-encrypts all of its books on its

12   own servers as soon as it gets them from the publisher, whether

13   the books are ever sent to the device or not.  The encryption

14   doesn't come from the device; it's on the server.  Once again,

15   it's not what we do and it's not covered by the patent.

16           We also believe you will understand after you hear the

17   evidence that this '851 patent is also invalid because it

18   covers an encryption process that was not new at the time that

19   the patent was filed.

20           You are going to here a story about how this patent

21   was put together.  Mr. Hendricks and his coinventors took the

22   idea for an electronic book, an idea which was around for a

23   long time before that, and then they read some books on

24   encryption and copied them into the patent application.  That's

25   not an invention.  Because the idea of encrypted e-books was

1  already around, copying someone else's encryption textbooks to

2  get a patent doesn't work.

3           Now, here is the Sachs patent. Just one of many

4  examples of the preexisting idea of sending around electronic

5  books with encryption that was generated by the device itself;

6  not the server, the device. We don't do that. But the Sachs

7  patent from 1998 did do that. And as the evidence will show,

8  the '851 encryption scheme was far from new and the inventors

9  didn't invent anything. So we say this patent is also invalid.

10          Now, let's talk briefly about the topic of damages,

11 and I want to preface my remarks by saying I don't want you to

12 misunderstand Barnes & Noble's position here. We don't think

13 there is any infringement in this case. In any case, we think

14 the patents are invalid, so we don't think you will have to get

15 to the point where you will even have to consider whether to

16 award ADREA any damages. So we are only talking about damages

17 here because we have to, since in cases like this you, the

18 jury, will be hearing all the evidence at one time. There is

19 no separate trial for liability and then damages. But just

20 because we are talking about damages doesn't mean that we think

21 you will ever get to the point of awarding any damages against

22 Barnes & Noble. We don't think you will.

23          Now, in calculating damages in a patent case, Mr.

24 Bauer briefly alluded to this, you're supposed to try to figure

25 out what was the amount Barnes & Noble would have agreed to pay

1    to get a license for these patents before it started to make

2    the products.  That's called a hypothetical negotiation to

3    determine a reasonable royalty.

4           Now let's talk about what their expert Magee's

5    calculation does and all the things you will hear about it that

6    are wrong.  Mr. Bauer mentioned something about 50 cents per

7    device being the royalty amount that Mr. Magee is going to put

8    in front of you.

9           I will only touch on a few things about Magee because

10   there are so many things wrong with what Magee did and our

11   damages expert will tell you about them.  I can't get to them

12   all now, but you will hear about them as we go through the

13   case.

14          Now, Mr. Magee is going to put some big numbers in

15   front of you, 50 cents times 12 million or whatever Mr. Bauer

16   said.  And he is going to hope that some of those numbers stick

17   with you.  Here is what the evidence will show.

18          First, Magee says Barnes & Noble would have agreed to

19   pay the same royalty rate of 50 cents per Nook device no matter

20   how many patents were infringed.  It's 50 cents no matter what.

21   So ADREA is saying, even if you only find one of these three

22   patents to be infringed, it doesn't matter, it's still 50 cents

23   per device.  Does this make any sense to you?  How would you

24   react if you were at the corner deli and you wanted to buy a

25   bag of chips, a soda and some gum and the cashier tells you

1    it's five bucks?  Then you say no, I will just take the gum and

2    the soda, and cashier says, OK, five bucks.  Then you say,

3    forget it, I will just take the gum.  And the cashier says, OK,

4    five bucks.  Does that make any sense?  Well, that's what

5    Professor Magee is going to be putting in front of you.  That's

6    exactly how he comes up with his 50 cents number.

7         By the way, all three of these patents involve

8    different functions -- encryption, lending, shopping, and they

9    all have different expiration dates.  What does that mean?

10        The judge mentioned earlier that patents are only for

11   a limited period and then it expires.  Well, one of these

12   patents has already expired.  The '851 patent, the encryption

13   patent, expired in 2012.  The lending period patent expires

14   next year in 2015.  And the consumer appliance patent, the one

15   that refers to blenders and garbage cans, that one expires in

16   2026.

17        What they want you to do is award damages all the way

18   through to 2026, no matter what.  And it's 50 cents no matter

19   what, no matter how many patents you find to be infringed.

20        Second, where does Magee get this 50 cent number?

21   Well, as you will hear, he uses data that has no relation to

22   what this hypothetical negotiation would have looked like.

23   Instead, he uses ADREA's opening licensing offer to Barnes &

24   Noble in 2012 which was not coincidentally, guess what, 50

25   cents per device, and Barnes & Noble rejected that offer.

1     Think about it.  When you want to come to a negotiated number,

2     you start out with a much higher number, right, and then after

3     you negotiate for a while, the number comes down.  But here the

4     royalty number that ADREA's expert is going to be putting in

5     front of you is the same as their opening offer to Barnes &

6     Noble.  By the way, that 50 cents offer was for a lot more than

7     just the three patents involved in this case.  It involved,

8     according to ADREA, 300 patents all together.  Yet somehow that

9     same 50 cents should now apply to three, two or one patents, if

10    you even find any of them to be infringed or invalid.

11         As I said, those are just a few of the things that

12    Magee did that we think are wrong in this case in coming up

13    with this big damages award.  You will hear many more as we go

14    through the case.

15         By the way, speaking about big damages numbers, Mr.

16    Bauer mentioned that Amazon paid a lot of money to get a

17    license in this case.  Well, first of all, don't forget that

18    they were sued and they ended up settling that case for a lot

19    less money than ADREA was originally asking for.

20         But don't be fooled by the amount of money that Amazon

21    paid to settle its litigation with ADREA.  As you will hear

22    from the Barnes & Noble witnesses, Amazon is much, much larger

23    than Barnes & Noble in terms of sales of the Kindle and, also,

24    that settlement gave Amazon a license to ADREA's entire

25    portfolio of 300 patents whereas here we are talking about a

maximum of three patents.  So any attempt by ADREA to use the

amount of the settlement in Amazon to try to get a big number

from you, the jury, is just wrong.

        As I said before, for all these things that we say

Professor Magee did wrong, we will present to you our damages

expert Ned Barnes and he will explain all of this very clearly

to you and if you use your common sense, we think you will

believe Barnes.

        THE COURT:  Counsel, you have about three minutes.

        MR. EDERER:  I just want to wind up.

        THE COURT:  That's fine.

        MR. EDERER:  I just want to very briefly address the

issue of willfulness.  ADREA is trying to convince you that not

only did Barnes & Noble infringe its patents but it did so

deliberately.  The judge will instruct you later on what

willfulness means.  But you will hear absolutely no evidence of

willfulness in this case.  ADREA first contacted Barnes & Noble

in 2010.  By then Barnes & Noble had already developed and put

out several Nook devices, and when it did that, it didn't even

know that these patents existed then and it had no reason to

know that.

        Now, Mr. Bauer showed you the infringement letter that

was sent to Barnes & Noble in 2012 with these claim charts.

Even ADREA agrees that before that date, March 29, 2012, Barnes

& Noble couldn't possibly have been deliberately doing

anything.  And, also, that March 2012 claim chart lists six

patents that Barnes & Noble was supposedly infringing but we

are here today talking about only three.  So how were we even

supposed to know which patents they were serious about?

In any case, Barnes & Noble believes it has good,

viable defenses to these claims and we will be presenting these

defenses to you.  And we believe you will find that these are

good faith, legitimate defenses to the claims of patent

infringement and if you listen closely to the evidence, we

don't think you should find willfulness.

Just to wind up now, this case is an important case

for Barnes & Noble.  We thank you, ladies and gentlemen, for

your service.  We invite you to pay close attention to all the

witnesses for both sides and see whose testimony you think is

being consistent and whose is being contradictory.

We will try to present things to you as clearly as

possible and, as I said before, the idea is for you to use your

good old-fashioned common sense to resolve the key issues.  And

if you do that, we think you're going to find in Barnes &

Noble's favor.

Thank you.

THE COURT:  Thank you very much.

Ladies and gentlemen, we are going to give you your

lunch break at this time.  We are only going to go to 4:00

today so if you would be back in the jury room promptly at 2:00

EA78ADR3

1   we will start promptly then and go to 4.  You're excused until

2   then.

3              (Jury exits courtroom)

4              THE COURT:  Now, would counsel for Amazon please come

5   forward?

6              MR. KREMER:  Good morning, your Honor.

7              THE COURT:  Would you identify yourself for the

8   record.

9              MR. KREMER:  Paul Kremer, K-R-E-M-E-R, Gibson, Dunn &

10  Crutcher for Amazon.

11             THE COURT:  Thank you for being here and for your

12  papers that were submitted.

13             There has been a motion to hold in confidence in one

14  of a variety of ways a number of other items that counsel have

15  expected will come up during the damages phase of the

16  proceeding.  My tentative view, which I expressed to the

17  parties here in a telephone conference last week, was to limit

18  that to a narrow range of information.  And then when I saw

19  some examples of it in the redacted pretrial consent order, I

20  didn't even see a good reason for keeping that confidential.  I

21  haven't ruled finally on their application.  But what is it

22  about the information that you want to keep confidential and,

23  admittedly, you're in a better position than they are because

24  you're not a party in the case and had no reason to expect that

25  this problem might arise?  What is the reason you want to keep

1    this confidential?

2            MR. KREMER:  Briefly, your Honor, it's information

3    that includes cost factor costs and some profit margin data and

4    some original documents that relate to the Kindle.

5            THE COURT:  Their information, not all of it but a lot

6    of it -- just taking, for example, the stuff that was in the

7    pretrial consent order, was information that, essentially, was

8    a subset of information that would normally have been filed

9    with the SEC, things about in common revenues and stuff like

10    that.  Are we talking about that in your case?

11            MR. KREMER:  Not in our case.  We are talking about

12    data that includes a level of granularity that Amazon keeps

13    very close to their vest and wouldn't ordinarily be --

14            THE COURT:  What is the harm?  Take maybe what you

15    think is your best example -- maybe hand it up since we don't

16    want to resolve the issue by having you reveal it in open court

17    right now -- and then tell me what terrible competitive

18    disadvantage Amazon, which has no market power to speak of, I

19    am sure, would suffer from this.

20            I am looking at the exhibit that you just handed me.

21    Now point me to the line that you're concerned with.

22            MR. KREMER:  Your Honor, if you look towards the

23    bottom third of the page there is a heading line of "Total

24    Operating Expenses" and there are some breakouts under that.

25            THE COURT:  So I am there.

EA78ADR3

1          MR. KREMER:  That's an example of documents that are

2     not open to the press and general public and something that

3     Amazon -- if that information were to become available,

4     Amazon's competitors and its partners can use that information

5     not previously available to negotiate different factor cost

6     prices, etc.

7          THE COURT:  I have been troubled by this in a

8     conversation I had with the counsel for the parties.  The

9     suggestion seems to be that if a company had to negotiate price

10    with someone who actually knew the facts, they would be in a

11    less competitive situation from someone who was in total

12    ignorance.  I am sure that's true.  If you're negotiating with

13    someone who is in ignorance, you can do better at negotiating a

14    deal than if they know the facts, but I am a little unclear why

15    that is a legitimate concern for a court.

16         MR. KREMER:  I think there is a deep question there,

17    your Honor, and I am loath to opine on the philosophy that

18    underpins private actors negotiating based on somewhat

19    asymmetrical information.  I can say that Amazon's business

20    partners, to our knowledge, would make similar motions if it

21    was their information that it would be presented --

22         THE COURT:  I understand it's like you're playing

23    poker, no one wants to show their hand, but I am not sure

24    that's the kind of game we are involved in, in a public trial.

25         Let me ask you this.  One possibility that I was

1    exploring with counsel was that, because the jury may need to

2    see the information, that we would put it up on the screen so

3    that they could see it on their screens but we would not put it

4    on the public screen that's right over there or the one right

5    up here, and to the extent it was marked as an exhibit, it

6    could be redacted for all purposes except for the jury's view.

7    They could get it when they are deliberating and, if they

8    wanted to, they could get an unredacted copy.  So would that

9    solve your problem?

10             MR. KREMER:  Absolutely.

11             THE COURT:  All right.  I am not sure whether this is

12   going to even come up.

13             Let me ask the parties.  Are the exhibits that Amazon

14   is concerned with ones that in fact are likely to come into

15   evidence?

16             MR. SHARIFAHMADIAN:  Your Honor, we are open to

17   preparing summaries based on the underlying documents so that

18   the extent of the information is also reviewed, some of the

19   cost factors.

20             THE COURT:  Why don't we do this.  I don't want to

21   deprive you of your lunch either.  Why don't you over the next

22   day or two see if the two sides can work out a summary that

23   they would be comfortable with and if that's agreeable to

24   Amazon.  If you don't have an agreement, then I will notify

25   Amazon's counsel -- I will ask the parties to notify me at

1    least 24 hours before any such evidence is going to be offered

2    and then I will notify counsel so that you can come in

3    beforehand, if I don't go the route that I am thinking of

4    going.  So I suspect you should probably give your name and

5    phone number to my law clerk, although I have heard of Gibson

6    Dunn -- I think it's a small but lovable firm here in New York

7    and elsewhere.

8              Anything else we can take up?

9              MR. BAUER:  One small thing.  Juror number 2 seems to

10   have a pad and has been taking extensive notes.

11             THE COURT:  Yes.  That's fine with me.

12             MR. BAUER:  We had asked if we could give the jurors

13   notebooks and no one else has one.

14             THE COURT:  I hadn't noticed that, but I will have my

15   courtroom deputy, when they come back in the jury room say,

16   anyone who wants to take notes is free to do so.  And then I

17   will give them an instruction about it's perfectly fine to take

18   notes, although it's perfectly fine not to take notes.

19             MR. BAUER:  That's fine.  It was just that she was the

20   only one taking notes.

21             THE COURT:  I can't understand it because it was just

22   mesmerizing, both opening statements.  Actually, I don't mean

23   to be snarky; they were fine opening statements, and I much

24   appreciate both of them.

25             All right.  We will see everyone at 2:00.
               (Luncheon recess)

AFTERNOON SESSION

2:00 p.m.

(Jury not present)

THE COURT:  Let's bring in the jury.  We have the
schedule for next week, which we will give to them.  Is the
first witness in the courtroom?  We'll call you up in just one
minute.

(Jury present)

THE COURT:  Please be seated.  Ladies and gentlemen, a
couple of things.  First, as you are all now aware, it is
perfectly permissible to take notes.  On the other hand, it is
also perfectly permissible not to take notes.  When this case
is given to you for your deliberations, if you have any
question about precisely what was said by a particular witness,
don't rely on your notes.  Send us a note, and we will get you
the actual transcript of what that person said.

The notes you are taking now may be very useful to you
for evaluating the case or remembering the issues generally.  I
just want to be sure you understand that if there is something
very specific -- let's say you're in the jury room and one of
you says, my notes says that he said X and the other person
says no, my note says he said Y -- you don't have to debate
about it.  All you have to do is send us a note, and we will
send you the actual transcript of what he said.

Yes, sir?

Ea7radr4

          A JUROR:  Do we need to take down who is speaking and

on what day or times to clarify for you?

          THE COURT:  If you want.  On your notes you can write

down anything you want.  You can write down, gee, the judge's

jokes are really bad, or anything you want.  It's up to you.

          Secondly, in terms of our schedule, because I think

you need to know that, we will sit tomorrow from 9:00 to 4:00

again.  We will end at 4:00.  We will not sit on Thursday or

Friday.  Just so you know that counsel are very hard-working, I

will be conducting a hearing on some legal issues on Friday,

but they don't concern you.  It is not like we are taking

Friday off or anything like that.

          Monday is a court holiday, Columbus Day.  We will sit

on Tuesday but beginning at 2 o'clock.  We will sit in the

afternoon.  We will go all the way to 5 o'clock.  So it will be

a half day.  That is totally my fault.  I have to give a speech

at Fordham Law School in the morning.  So we will sit from 2:00

to 5:00 on Tuesday.

          We will sit all day Wednesday, 9:00 to 5:00.  We will

sit on Thursday 10:00 to 4:00 because of other matters I have

to take up, 10:00 to 4:00 on Thursday.  And, depending how

things are going, we might have to sit Friday morning.  We will

not sit Friday afternoon in any event.  We might have to sit

Friday morning.  If things are moving swiftly, we may not have

to do that.

Ea7radr4

1          If we go into the following week, we would sit on

2    Monday from 9:00 to 5:00, we would sit on Tuesday from 9:00 to

3    5:00, and we would sit on Wednesday from 9:00 to 5:00.  I am

4    very, very confident that by October 22nd this case will be

5    completed.

6          The one thing I can't control is how long it takes you

7    to deliberate.  That is totally within your power.  But in

8    terms of everything else, I'm sure we will be finished with the

9    evidence long before October 22nd.  I want to allow some time

10   for your deliberations, but I can't totally control that.

11         That is the schedule on the case.

12         Time to call our first witness.

13         MR. CABRAL:  Your Honor, the plaintiff will call Talal

14   Shamoon as our first witness.

15         THE COURT:  I need to mention to plaintiff's counsel,

16   I am shocked that you are a lawyer because you have a very soft

17   and pleasing voice.  But you need to speak louder so that

18   everyone in this courtroom can hear you.

19         MR. CABRAL:  Yes, your Honor.

20    TALAL SHAMOON,

21        called as a witness by the plaintiff,

22        having been duly sworn, testified as follows:

23         THE CLERK:  Please be seated.  State your name and

24   spell it slowly for the record.

25         THE WITNESS:  My name is Talal Shamoon.  T-A-L-A-L

Ea7radr4

S-H-A-M-O-O-N.

        MR. CABRAL:  Your Honor, we have a witness binder for

the witness.  With your permission, I would like to hand it to

the witness so I don't have to walk back and forth.

        THE COURT:  Yes, absolutely.

        MR. CABRAL:  Thank you, your Honor.

DIRECT EXAMINATION

BY MR. CABRAL:

Q.  Good afternoon, sir.

A.  Hello.

Q.  Can you please introduce yourself to the jury.

A.  I'm Talal Shamoon.  I'm the president of ADREA.  I'm also

the CEO of Intertrust Technologies Corporation, which is one of

the shareholders in ADREA and also the company that manages

ADREA on a daily basis.

Q.  Let's talk first about Intertrust.  Can you tell the jury a

bit about the company.

A.  Intertrust is a company that's been around for a while, at

least by Silicon Valley standards.  It was founded in 1990 by

this brilliant man called Victor Shear, who realized that as

people like us use computers more and more to exchange

information, buy music, read books, the way computers were

built wasn't really set up for people to conduct commerce.  The

likelihood people would take personal information and money and

cheat each other and stuff was very high.  The way people used

Ea7radr4                              Shamoon – direct

1    to protect computers was lock them in a room and try to protect

2    access.

3                THE COURT:  Counsel, I'm very sorry, but I need to

4    have counsel approach the side bar.

5                (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                  (At the side bar)

2                  THE COURT:  First, by and large I will not intervene

3     without an objection from an adversary, because this is

4     ultimately an adversary process.  On the other hand, we might

5     as well not get things off on the wrong foot.

6                  The history of the founder of this company is of zero

7     relevance to any issue in this case.  Even the history of the

8     company is of only modest relevance.  Although, of course, the

9     more you go into that, the more you open the door to some of

10    the stuff that your adversary is undoubtedly going to want to

11    get into about patent trolls, not in those words, of course,

12    but which I otherwise would have some doubts about how much he

13    could get into.

14                 Moreover, aside from the irrelevancy, we can't have

15    these kinds of narratives that just go on for minutes and

16    minutes or we will never finish this case.  I just told the

17    jury when we are going to finish it, and we are going to finish

18    it in that time frame.

19                 So, I think you need to make your questions a little

20    more pointed, not leading but pointed.  Secondly, if your

21    witness does launch into a narrative, I expect counsel to

22    object.

23                 MR. EDERER:  I was about to stand up, your Honor.

24                 THE COURT:  Very good.

25                 MR. CABRAL:  Your Honor, one additional point, if it's

Ea7radr4                        Shamoon - direct

1    OK, so as not to have another side bar.  There was an issue

2    with regard to one of the motions in limine on the 2009

3    Intertrust agreement.  My understanding and my reading of the

4    motion was to exclude a document from evidence.  We don't plan

5    to introduce the document into evidence, and we actually never

6    did.  But I would like to ask the witness a few basic questions

7    factually about any market assessment that was done prior to

8    Intertrust's investment in ADREA, if that's OK with the Court.

9              THE COURT:  What is the relevance?

10             MR. CABRAL:  The relevance is that it relates to

11   information relied on by our expert.  This was the subject of

12   one of the Daubert motions, actually.

13             THE COURT:  If I agree to allow your expert to get

14   into it, I will allow your expert, through hearsay, which is

15   permissible with experts, to get into all the background.  I

16   don't think we need to get into it here.

17             MR. CABRAL:  One of the issues is whether the person

18   who developed it is a qualified expert.  This would be an

19   opportunity for me to establish who that person was who created

20   the presentation and whether he was qualified.

21             THE COURT:  Wait a minute.  This is a question in the

22   Daubert area?

23             MR. CABRAL:  Yes.

24             THE COURT:  If your expert doesn't know the answer to

25   that, it is irrelevant that this guy knows it.

Ea7radr4                    Shamoon – direct

1          MR. CABRAL:  I think our expert does know the answer

2     to it.  That is what is being challenged by Barnes & Noble.

3          THE COURT:  If that becomes a matter of great moment,

4     this guy is obviously available.  We can recall him or I can

5     hear him outside the presence of the jury during a telephone

6     interview during the Daubert hearing if that is necessary.  I

7     don't think you need to get into it here.

8          I don't really understand, please explain to me, what

9     the history of any of these companies -- if we go into the

10    history, we will be here for two weeks just on that -- has to

11    do with anything.

12         MR. CABRAL:  The question I asked him was just tell me

13    a bit about the company, and he went into it.

14         THE COURT:  All right.  Why don't you ask him to talk

15    a bit about ADREA.  That would be permissible.

16         MR. CABRAL:  Very well, your Honor.  Thank you.

17              (Continued on next page)

18

19

20

21

22

23

24

25

Ea7radr4                        Shamoon - direct

1          (In open court)

2          MR. CABRAL:  We will pick up where we left off, your

3  Honor, if that's OK?

4          THE COURT:  Why don't you put a new question.

5  Q.  How long have you been CEO of Intertrust?

6  A.  I became CEO of Intertrust in early 2003.

7  Q.  What are your job responsibilities at Intertrust, briefly,

8  if you could?

9  A.  I manage the company of about 150 people.  It does research

10  and development, technology development, licensing of various

11  technologies, and we have a small venture capital fund.  We

12  invest in startups and foreign little companies.

13  Q.  Does Intertrust employ any engineers?

14  A.  Intertrust employs a large number of --

15          MR. EDERER:  Objection, your Honor:  Relevance.

16          MR. CABRAL:  Your Honor, I'd be happy to address the

17  objection.

18          THE COURT:  But I wouldn't be happy to have you do

19  that.  Sustained.

20  Q.  When did you join Intertrust?

21  A.  I joined Intertrust in July of 1997.

22  Q.  What were you doing before you joined Intertrust?

23  A.  I was a research scientist --

24          THE COURT:  Are you employed by the plaintiff in this

25  case, ADREA?  I'm asking the witness.

                Ea7radr4                    Shamoon – direct

 1          THE WITNESS:  ADREA pays Intertrust for services.

 2   Part of my pay comes from a payment from ADREA.

 3   Q.  What is your title with Intertrust?

 4   A.  I'm the chief executive officer of Intertrust.

 5   Q.  Do you have a title with a address?

 6   A.  I use the title of president at ADREA.  I'm in charge of it

 7   and I run it and I manage it.

 8          MR. CABRAL:  Your Honor, I will get into the history

 9   of ADREA in one moment.

10          THE COURT:  OK.

11   Q.  Can you tell the jury a bit about your educational

12   background.

13   A.  I have three degrees from Cornell University:  A

14   Bachelor's, a Master's, and a Ph.D in electrical engineering.

15   Q.  Let's talk about ADREA.  What is ADREA?

16   A.  ADREA is a company that is owned by four shareholders:  My

17   company Intertrust, Sony, Philips, and Discovery Networks.  It

18   is a company that was put together by a group of partners to

19   try to facilitate licensing and technology development and what

20   we call interoperability in the electronic book space.

21   Q.  Who are the shareholders in ADREA?

22   A.  I'll repeat what I just said.  It's Sony, Philips,

23   Discovery Networks, and Intertrust.

24   Q.  Does each member have an equal share in the company?

25   A.  Yes.  We each own 25 percent.

Ea7radr4                          Shamoon – direct

```
 1   Q.  You mentioned that Intertrust provides certain services to
 2   ADREA.  What kind of services are those?
 3   A.  We manage the company, we conduct sales, business
 4   development, we do strategic planning, and we do licensing, and
 5   obviously accounting and everything else that is required to
 6   run a company.
 7   Q.  Is Intertrust in the licensing business?
 8   A.  Intertrust is in the licensing business.  We conduct
 9   licensing, both software and patents, and we run what we call
10   trust services, which is we license keys that go into things
11   like phones and TVs that allow them to buy content and other
12   things.
13   Q.  Very briefly, if you could tell the jury a bit about
14   Intertrust's experience with licensing patents.
15               MR. EDERER:  Objection, your Honor.  This isn't about
16   Intertrust.
17               THE COURT:  I think that the defendant's opening
18   waived the otherwise valid objection that is now being made to
19   this particular question.  Overruled.
20   Q.  Let me repeat the question.  Very briefly, if you could
21   tell the jury about Intertrust's experience with licensing
22   patents.
23   A.  Intertrust has a long history of licensing patents.  I
24   think it is public that we have made over a billion dollars
25   from licensing patents over the last 12 or 15 years.
```

Ea7radr4                          Shamoon - direct

1    Q.  Were you involved in the creation of ADREA?

2    A.  Yes, I was.

3    Q.  When was ADREA ultimately informed?

4    A.  ADREA was formed I believe in 2010.

5    Q.  Again briefly, if you could please tell the jury how you

6    came up with the idea to form the company.

7    A.  I don't want to take too much time.  There was a guy at

8    Discovery Networks called Jay Rosenstock, who still works

9    there, who used to work at Sony.  He is an old friend of mine.

10   He called me in the summer of 2009, right after he had moved

11   from Sony to Discovery.  His job at Discovery was to handle

12   business strategy and what they call corporate development.

13          One of his jobs was to deal with this patent case that

14   Discovery had filed against Amazon that was using the patents

15   of the founder of Discovery Networks, guy called John

16   Hendricks, that were on ebooks that John had filed in the mid

17   '90s.  Discovery is a content company.  They make shark

18   documentaries and things like.  Jay had been asked by his boss

19   to see if there was a way to use this patent portfolio that he

20   had invented strategically.

21          Jay knew that I knew a lot about patents, and he knew

22   that I worked with people at Sony and Philips spending a lot of

23   time on research.  Sony had an ebook reader in the market at

24   that time.  He called me up and said, hey, look --

25          MR. EDERER:  Objection, your Honor.

Ea7radr4                          Shamoon - direct

1          THE COURT:  Sustained.

2     A.  He called me and said, do you have any idea --

3          THE COURT:  No, no.

4     Q.  I will ask you another question.

5          THE COURT:  Yes.

6     Q.  What was the plan, what was your plan, for ADREA's business

7     when you formed the company?

8     A.  I was presented with the opportunity to gather inventions

9     from three companies that were active in the space.  Philips

10    had a research labs, one of the great research labs of the 20th

11    century.  Sony had obviously done a lot of technology in this

12    area.

13         MR. EDERER:  Objection.

14         THE COURT:  I need to maybe make the witness aware of

15    the rules of evidence.  This is not like an everyday

16    conversation.  Your opinions, your views of what Philips'

17    history was, your views of what the founder of your company was

18    like, none of that comes into evidence.  What you need to

19    report is simply facts that you either saw or heard or

20    participated in, very simple facts.  That's all we need.

21         It's not easy.  Everyday conversation isn't like that.

22    But this is the way we work it here because we are engaged in a

23    very important matter, a lawsuit, not an everyday conversation.

24    See what you can do to keep it within those confines.

25         THE WITNESS:  I'll do my best.  Sorry.

Ea7radr4                        Shamoon - direct

 1          THE COURT:  No problem.

 2     BY MR. CABRAL:

 3     Q.  I'll try to get at the same subject matter in a more direct

 4     way.  Can you please list for the jury what your plans were for

 5     the company.

 6     A.  My plan for the company was to create an entity that helped

 7     people trying to distribute electronic books and make devices

 8     or apps that read electronic books work better, and also to

 9     make it, at least over time, make it so that consumers wouldn't

10     be gate-kept by one company selling books in what I call the

11     silo, where you have a bookstore and a device made by the same

12     person and you're locked into that bookstore, kind of like what

13     you have with the Kindle and the Amazon bookstore or the iPad

14     and the Apple bookstore.

15     Q.  When did you first have discussions about forming ADREA?

16     A.  In the summer of 2009.

17     Q.  Did any other companies or individuals become involved in

18     that conversation regarding the formation of ADREA?

19     A.  Over the course of the summer and the fall of 2009, we

20     approached Sony, and they became interested.  Then we

21     approached Philips, and they became interested.

22          MR. CABRAL:  Your Honor, with your permission, I would

23     like to show the witness what's been marked for identification

24     as Exhibit JTX-009, which is a joint exhibit on the parties'

25     joint exhibit list.

Ea7radr4                      Shamoon - direct

```
 1              THE COURT:  Go ahead.

 2              MR. CABRAL:  Your Honor, I don't know if you prefer

 3     courtesy copies.  I have extra copies here if you would like to

 4     see them.

 5              THE COURT:  Sure.

 6              MR. CABRAL:  With your permission, may I approach?

 7              THE COURT:  Yes.  If it is a joint exhibit, it will,

 8     upon presentation to a witness, be deemed to have been received

 9     in evidence, so we don't have to go through offering and any

10     objection, because this is a joint exhibit.  So Joint Exhibit 9

11     is received.

12              (Joint Exhibit 9 received in evidence)

13              MR. CABRAL:  Thank you, your Honor.

14     Q.  Have you seen this document before, sir?

15     A.  Yes, I have.

16     Q.  What is it?

17     A.  It's the agreement between the four companies I mentioned

18     earlier to form this company ADREA.

19     Q.  Can you please tell the jury the purpose of this agreement.

20     A.  When we formed the company, obviously, we had to agree on

21     certain principles about how we would run the company, what the

22     company's mission would be, how we would fund it, and then deal

23     with whatever money it made if it made any money.

24     Q.  I now want to direct your attention to an exhibit that's

25     been marked for identification as Exhibit JTX-010.
```

 1              THE COURT:  JTX010, by that I take it you mean Joint

 2     Exhibit 10?

 3              MR. CABRAL:  Joint Exhibit 10, your Honor, yes.  I'll

 4     change my terminology.  Your Honor, with your permission, can I

 5     approach?

 6              THE COURT:  Yes.  Joint Exhibit 10 is received.

 7              (Joint Exhibit 10 received in evidence)

 8     Q.  Sir, my first question to you is, have you seen this

 9     document before?

10     A.  Yes, I have.

11     Q.  What is it?

12     A.  It's a follow-on agreement from the one you just showed me.

13     Q.  We have no page numbers on this document, unfortunately.

14     If you could please turn to the page marked at the bottom with

15     ADREA 19363.

16     A.  You said 19363?

17     Q.  That's correct.

18     A.  I guess it's on my screen.

19     Q.  Are you there?

20     A.  Yes.

21     Q.  On this page do you see the heading of section 5.1 that

22     says "Contribution of the Members"?  Do you see that?

23     A.  Yes, I do.

24     Q.  Can you please tell the jury very briefly in general terms

25     what is being discussed here in section 5.1.

1    A.  Yes.

2              MR. EDERER:  Objection, your Honor.  The document

3    speaks for itself.

4              THE COURT:  While of course that is true, it speaks in

5    this case endlessly, so I will allow the witness to answer.

6    A.  This is what I sort of call myself the splits-the-bill

7    section.  This says that we value the company at a certain

8    amount of money, we just agreed that each party put $5 million

9    down on the table to get the engine running.  Intertrust put

10   5 million in cash in, and the other parties put $5 million of

11   value in terms of patent contribution.

12   Q.  Can you please explain to the jury how the investors

13   arrived at that $5 million amount.

14   A.  We had no way of really telling sort of how to really value

15   the company beyond just figuring out how much money we

16   thought -- how much cash we needed to run the company until the

17   engine started and it could fund itself.  My team determined it

18   would cost around $5 million.  We said, look, we need

19   $5 million in cash, and if we each want to own this four ways,

20   then everybody else put in $5 million of value, and we will go

21   from there.

22   Q.  If you could turn to Exhibit A.  This is actually Exhibit A

23   of Joint Exhibit 10.  It is kind of confusing.  It is towards

24   the end of the document.

25   A.  OK.

                Ea7radr4                    Shamoon - direct

 1   Q.  I believe it begins on the page marked at the bottom ADREA

 2   19397.  Do you see that?

 3   A.  I've got it here, yes.

 4   Q.  Very briefly, could you tell the jury what is shown here in

 5   Exhibit A.

 6   A.  It's just what I said.  It just says that we are going to

 7   each share the company four ways equally and we are each going

 8   to own 25 percent.

 9   Q.  If you could briefly take a look at Exhibits B, C, and D of

10   Joint Exhibit 10.  I won't make you go through each page here.

11   My question for you is, what is being shown here in Exhibits B,

12   C, and D?

13   A.  I'm looking at B.

14   Q.  Why don't we start with Exhibit B.

15   A.  These are lists of patents that were contributed.  B is the

16   list of Discovery patents that were contributed.

17   Q.  What is shown on Exhibit C?

18   A.  Exhibit C is the list of Philips patents being contributed.

19   Q.  What is shown in Exhibit D of Joint Exhibit 10?

20   A.  The one that is on the screen the same, but it is the Sony

21   patents that are being contributed.

22   Q.  Now I would like to show you several documents that have

23   been marked as Joint Exhibit 1, Joint Exhibit 2, and Joint

24   Exhibit 3.

25              THE COURT:  Those are received.

 1                (Joint Exhibits 1, 2, and 3 received in evidence)

 2   Q.  Dr. Shamoon, do you recognize these documents?

 3   A.  These are the actual patents that are in the suit.

 4   Q.  Let's take a look at the documents marked as Joint Exhibit

 5   1 and Joint Exhibit 2.  That is the '851 and '501 patents

 6   respectively.  Can you tell the jury briefly what you know, if

 7   anything, about these patents.

 8   A.  I recognize these to be -- at least 1 is one of the

 9   Hendricks patents from Discovery and 2 is another Hendricks

10   patent from Discovery.

11   Q.  If you can turn your attention briefly to Joint Exhibit 3,

12   can you please tell the jury a bit about what you know about

13   this patent.

14   A.  This is one of the patents in the suit.  It is one of the

15   patents that Philips contributed from Mr. Shteyn.

16   Q.  Are these patents owned by ADREA?

17   A.  These patents are owned by ADREA.

18   Q.  If we can talk a bit about ADREA's business.  Can you

19   briefly explain for the jury about the market for ebooks and

20   ebook viewers in 2009.

21   A.  The market for ebooks and ebook viewers in 2009 was --

22                MR. EDERER:  Objection, your Honor:  No foundation.

23                THE COURT:  Sustained.

24   Q.  Dr. Shamoon, are you familiar with the market for ebooks

25   and ebook viewers in 2009, when you began discussions about

Ea7radr4                          Shamoon - direct

1   forming ADREA?

2   A.  Yes.

3   Q.  Can you please tell the jury a bit about what you know

4   about the market at that time.

5            MR. EDERER:  Same objection.

6            THE COURT:  Same ruling.

7   BY MR. CABRAL:

8   Q.  Just one moment, sir.  Do you know who competes in the

9   market for electronic books and electronic book viewers in

10  today's market?

11  A.  Yes.

12  Q.  Who competes in the market?

13  A.  The main players are Amazon, Barnes & Noble, and, depending

14  on the geography, I guess the third most dominant party is a

15  company called Kobo.  That was a Canadian company that was

16  bought by a large Japanese company called Rakuten that has a

17  lot of stores around the world and some electronic commerce

18  activities as well.

19  Q.  Do any of the companies you just mentioned have a license

20  to ADREA's patents?

21  A.  Amazon does.  But if I could go back.  There is also

22  other -- I don't know how much you guys want me to talk about

23  the market.

24           THE COURT:  The answer to that is, since there was an

25  objection raised and I sustained the objection, the amount you

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Ea7radr4                          Shamoon – direct

1   can discuss the market currently under the present questions

2   that have been permitted is not at all.

3           THE WITNESS:  OK.

4   BY MR. CABRAL:

5   Q.  I would like to hand you a document that has been

6   identified as Joint Exhibit 32.

7           MR. CABRAL:  Your Honor, with your permission, may I

8   approach?

9           THE COURT:  Yes.  32 is received.

10          (Joint Exhibit 32 received in evidence)

11          MR. CABRAL:  This is Joint Exhibit 32, your Honor.

12  Q.  My question to you, Dr. Shamoon, is do you recognize this

13  document?

14  A.  Yes, I do.

15  Q.  What is it?

16  A.  It's the license agreement we have with Amazon.

17  Q.  Were you involved in the negotiation of this agreement?

18  A.  Yes, I was.

19  Q.  Can you very briefly summarize for the jury the purpose of

20  this document.

21  A.  This is a document that is a contract between Amazon and

22  ADREA that provides them with a license to all of the patents

23  in the ADREA portfolio.  When we formed ADREA there was a

24  lawsuit going on, this document also settled that lawsuit with

25  Amazon.  So it halted all litigation.

Ea7radr4                          Shamoon - direct

1   Q.   Did ADREA sue Amazon?

2   A.   Actually, Discovery sued Amazon.  We took over the suit

3   against Amazon because we basically bought those patents into

4   ADREA.

5   Q.   Can you briefly explain for the jury how ADREA ended up in

6   the lawsuit between Discovery and Amazon.

7   A.   As I said, Discovery had sued Amazon, and when we formed

8   ADREA, we took over the patents.  There were more patents than

9   there were in the Amazon suit, but we took on responsibility

10  for that case.

11  Q.   Do you know if Amazon also sued Discovery?

12  A.   Yes, Amazon had sued Discovery back when Discovery had sued

13  them.

14  Q.   What, if anything, do you know about that lawsuit?

15  A.   We knew it was there.  We didn't take responsibility for

16  it.  Discovery continued to defend themselves.  Again, I think

17  Amazon had some patents on some website that Discovery had, and

18  they sued them back.

19  Q.   Without going into actual numbers, can you give the jury a

20  brief description of the terms of the Amazon license.

21  A.   Amazon paid us a certain amount of money for a license for

22  all the patents we had.  The way they did it was they --

23  remember, there were three patent portfolios in ADREA.  One was

24  from Discovery, one was from Sony, one was from Philips.  What

25  they said was since we have been sued with Discovery patents,

                Ea7radr4                    Shamoon - direct

1   we would like a license to the whole Discovery patent

2   portfolio, we will pay you a certain amount of money for that.

3   Then they said, look, we would like some more time to think

4   about whether we need a patent license --

5           MR. EDERER:  Objection, your Honor, as to what Amazon

6   was saying.

7           THE COURT:  Sustained.

8   Q.  Without getting into any discussions between you and Amazon

9   during the negotiations, could you briefly summarize the terms

10  of the final deal between ADREA and Amazon.

11  A.  They took a license to Discovery patents, and then they had

12  an option to take a license to the rest of the portfolio.

13  There were two payments.  The second one was optional.  They

14  exercised both.  They took a license to the entire ADREA

15  portfolio, all of the patents in it, eventually.

16  Q.  When did Amazon exercise its option to the license that you

17  referred to?

18  A.  Last fall.

19          MR. CABRAL:  Your Honor, could we approach side bar?

20          THE COURT:  Yes.

21          (Continued on next page)

22

23

24

25

Ea7radr4                          Shamoon - direct

1           (At the side bar)

2           MR. CABRAL:  I would like to show the numbers of the

3     agreement.  I also want to comply with your ruling earlier.

4     The Amazon attorney limited his argument to the costs and sales

5     data of Amazon.  But he also moved in theory -- included in the

6     motion was the financial terms of this agreement as well.

7     Although it wasn't discussed between you and the Amazon

8     attorney, I don't want to not follow --

9           THE COURT:  I will allow that.  I asked him for his

10    most, if you will, best case, and that is where he limited it

11    to costs and so forth.  Nevertheless, I really think his

12    request in this respect would have been overbroad, so I will

13    allow those questions to be put.  Be sure you cut off the

14    witness if he gets into anything that is more narrowly still

15    the subject of the motion.

16          MR. CABRAL:  If it is OK, I will just ask him what the

17    amounts paid by Amazon were.

18          THE COURT:  Yes, that is permissible.

19          MR. CABRAL:  Thank you, your Honor.

20          (Continued on next page)

21

22

23

24

25

                    Ea7radr4                    Shamoon - direct

1                  (In open court)

2       BY MR. CABRAL:

3       Q.  Dr. Shamoon, can you please turn to page 4 of the Amazon

4       agreement.

5       A.  The which?

6       Q.  Page 4 of the Amazon agreement, which I believe is Joint

7       Exhibit 32.  I want to direct your attention to paragraph 3.

8       A.  Yes.

9       Q.  Do you see the paragraph titled "Settlement Payment"?

10      A.  Yes, I do.

11      Q.  How much did Amazon pay ADREA for a license to the

12      Discovery portfolio?

13      A.  It's there on the screen.  It's $10 million.

14      Q.  Is this the provision of the Amazon agreement that reflects

15      the terms of that payment?

16      A.  Yes.

17      Q.  If you could now turn to page 6 of the Joint Exhibit 32,

18      which is the Amazon agreement.

19      A.  Yes.

20      Q.  I want to direct your attention to paragraph 6.1 on the

21      bottom of page 6 that carries over to the next page.  Do you

22      see the section 6.1 under "Option to License"?

23      A.  Yes, I see it.

24      Q.  Does that provision reflect the terms of Amazon's optional

25      license to the ADREA portfolio?

                 Ea7radr4                    Shamoon – direct

1    A.  Yes, it does.

2    Q.  How much did Amazon pay ADREA for a license to the optional

3    patents that you see here referred to in paragraph 6.1?

4    A.  They paid $2½ million for that option.

5    Q.  During the course of your license negotiations with Amazon,

6    were those negotiations reflected -- sorry -- affected by the

7    underlying litigation?  If you could limit your answer to your

8    perspective, from ADREA's perspective.

9             MR. EDERER:  Objection, your Honor:  Vague.

10            MR. CABRAL:  No problem.  I'll re-ask the question,

11   your Honor.

12   Q.  Were your licensing discussions or negotiations with Amazon

13   affected by the underlying litigation between Amazon and

14   Discovery?

15   A.  We were in court, and at a relatively early point in the

16   suit we, both us and Amazon, decided to sit down and see if we

17   could sort it out and end what was proving to be a complicated

18   and expensive lawsuit.  We sat around a table and negotiated a

19   settlement.  We ended the lawsuit as a result.

20   Q.  I would like to direct your attention to page 6 of Joint

21   Exhibit 32, specifically section 4.6.  The last sentence in

22   that paragraph states that the parties acknowledge and agree

23   that the payment does not represent a reasonable royalty for

24   the licenses and other rights granted hereunder to Amazon.  Do

25   you see that?

Ea7radr4                        Shamoon - direct

1    A.   Yes.

2    Q.   What is your understanding of what that language means?

3    A.   To me, what that language meant was that since we had

4    settled out of court and there was an exchange of value, this

5    would outline the fact that there were certain discounts and

6    things that were given to Amazon that didn't represent a

7    standard for the market.

8              MR. EDERER:   Objection.

9              THE COURT:   Sustained, and the jury will disregard the

10   last answer, which is stricken.

11   Q.   Did Amazon take a license to ADREA's entire patent

12   portfolio?

13   A.   Yes, they did.

14   Q.   Why did you agree to license ADREA's entire patent

15   portfolio to Amazon?

16   A.   That was part of the settlement agreement.  They wanted to

17   license the whole portfolio, and that was built into the deal.

18   Q.   I want to talk to you now about Barnes & Noble.  Has ADREA

19   ever talked with Barnes & Noble about taking a license to the

20   patents-in-suit?

21   A.   Yes, we talked to them many times before we ended up in

22   court.

23   Q.   Very briefly, can you summarize those discussions for the

24   jury.

25   A.   We approached Barnes & Noble I think starting in the 2010

Ea7radr4                          Shamoon - direct

```
 1   time frame.  I could be fuzzy about the dates.  We made
 2   repeated attempts to try to license Barnes & Noble without
 3   having to go to court.  We explained to them what our business
 4   model was.  We made a series of proposals.  It was difficult to
 5   get meetings, but we did, and we talked back and forth.  After
 6   a long time, we realized that they weren't willing to take a
 7   license through an out-of-court negotiation, and we had no
 8   choice but to take legal action, which is why we are here
 9   today.
10   Q.  I am going to hand you two documents that have been
11   identified as Joint Exhibits 21 and 22.
12            MR. CABRAL:  Your Honor, with your permission, may I
13   approach?
14            THE COURT:  Yes.  21 and 22 Joint Exhibits are
15   received.
16            (Joint Exhibits 21 and 22 received in evidence)
17   Q.  Let's start with Joint Exhibit 21, if we can.  Dr. Shamoon,
18   have you seen this document before?
19   A.  Yes, I have.
20   Q.  What is it?
21   A.  An email from a gentleman called Shawn Ambwani, who used to
22   work for us in licensing.  It's an email from him to a
23   gentleman called Mr. Snowe, who used to be the person in charge
24   of intellectual property at Barnes & Noble.  It's one of the
25   communications we had with them offering them a license and
```

Ea7radr4                         Shamoon – direct

1   asking them to take a license to the patents.

2   Q.  You may have touched on this briefly, but who is Shawn

3   Ambwani?

4   A.  Shawn Ambwani was an executive both at Intertrust and he

5   supported ADREA as well.  His job was to conduct licensing

6   activities for the company.  He was our salesperson.

7   Q.  How long have you known Mr. Ambwani?

8   A.  I've known Mr. Ambwani since around 2000.

9   Q.  Does Mr. Ambwani have a technical background?

10  A.  I think he has an undergraduate degree in mathematics.

11          MR. EDERER:  Objection, your Honor.

12          THE COURT:  Sustained.

13  Q.  Was Mr. Ambwani employed by ADREA?

14  A.  He was employed by ADREA the same way I'm employed by

15  ADREA.  We were paid a services agreement to support ADREA's

16  business functions.  He wore an ADREA hat and he worked for

17  ADREA.

18  Q.  Did he have a title with ADREA?

19  A.  I think the title is, I think he used the title of VP of

20  licensing.  Yes, that's what's on the bottom of this email, if

21  you scroll down.

22  Q.  Did you ever ask Mr. Ambwani to determine the value of

23  ADREA's patent portfolio or any of its individual patents?

24  A.  I did not.  He wasn't qualified to do that, in my opinion.

25          MR. EDERER:  Objection.

1           THE COURT:  Sustained.

2   Q.  If you could limit your answer to yes or no.  Did you ever

3   ask Mr. Ambwani to determine the value of ADREA's patent

4   portfolio or any of its individual patents?

5   A.  No.

6   Q.  Without going into your characterization of Mr. Ambwani's

7   qualifications or lack thereof, can you tell the jury why you

8   didn't ask him to do that.

9   A.  His job was to really handle sales.  We had other experts

10  to do that.

11  Q.  Directing your attention to Joint Exhibit 21, do you

12  recognize any of the names of the recipient on this March 29,

13  2012 email?

14  A.  I recognize Mr. Feuer, who is currently general counsel of

15  Barnes & Noble.  I think Mr. DeFelice was the general counsel

16  at Barnes & Noble.  I know he was a legal executive there.

17  Q.  Do you know if the recipients of this email were employees

18  of Barnes & Noble?

19  A.  I know that Mr. Snowe and Mr. DeFelice were.

20  Q.  I'm going to show you -- if you can direct your attention,

21  rather, to Joint Exhibit 22.

22  A.  OK.

23  Q.  Have you seen this document before?

24  A.  Yes.

25  Q.  What is it?

Ea7radr4                        Shamoon – direct

1    A.  It's a presentation, a PowerPoint or some kind of document

2    that shows the ADREA patents and how they map, what we say map

3    against Barnes & Noble products.  That is fairly conventional

4    way of showing someone you would like to take a license to a

5    patent portfolio why the patent enables their product.

6    Q.  I want to direct your attention to page 3 of this document,

7    Joint Exhibit 22.

8    A.  Page 3?

9    Q.  Right.

10   A.  OK.

11   Q.  I'm not going to ask you a question about every page on

12   this, but if you could briefly take a look at pages 3 through

13   10 and tell the jury what is shown in that section of this

14   document.

15            MR. EDERER:  Objection, your Honor:  No foundation as

16   to this witness's knowledge of this document or what he had to

17   do with preparing it.

18            THE COURT:  If you can establish a foundation, I'll

19   permit the question.  But on the present showing, the objection

20   is sustained.

21   Q.  Dr. Shamoon, do you know what this document is?

22   A.  Yes.

23   Q.  Are you familiar with this document?

24   A.  Yes.

25   Q.  When did you first become familiar with this document?

Ea7radr4                           Shamoon - direct

1   A.  I reviewed it after it was prepared, before it was sent to

2   Barnes & Noble.

3   Q.  So you did have a chance to review this document before it

4   was provided to Barnes & Noble?

5   A.  Yes, I think I did.

6   Q.  Going back to my original question on what is shown on

7   pages 3 through 10 of this document, could you please tell the

8   jury briefly what is shown on these pages.

9           MR. EDERER:  Same objection, your Honor.

10          THE COURT:  Overruled.

11  Q.  You may answer.

12  A.  Can I answer?

13  Q.  Yes.

14  A.  As I said, it takes the language from the patent and shows

15  the product and it maps the patent onto the product.

16  Q.  What patent are you referring to specifically?

17  A.  There are different patents here.  These go on about the

18  '851.  You asked me to look at pages 3 through 6, right?

19  Q.  3 through 10, please?

20  A.  3 through what?

21  Q.  Through 10.

22  A.  10.  Yes, they call the '851 patent.  Yes.

23  Q.  If you could direct your attention to page 17 of the same

24  document.  That is Joint Exhibit 22.  I'll ask you a similar

25  question.  Can you briefly tell the jury what is being shown on

Ea7radr4                        Shamoon – direct

1    pages 17 through 24 of Joint Exhibit 22.

2    A.  Page 17 through 24?

3    Q.  That's right.

4    A.  Yes, it is the same thing.  It's a map from another patent,

5    what they call the '501 patent, onto some Barnes & Noble

6    products.  Again, it shows the correspondence between what is

7    invented and what Barnes & Noble sells.

8    Q.  Finally, if you could direct your attention to page 25 of

9    the same document.

10   A.  OK.

11   Q.  What patent is being discuss discussed on pages 25 through

12   30 of Joint Exhibit 22?

13   A.  It's the same concept, maps between what is called the '703

14   patent and Barnes & Noble products and how the patent

15   corresponds as to what was invented.

16   Q.  With respect to the three patents we just discussed -- the

17   '851 patent, the '501 patent, and the '703 patent, is it your

18   understanding that those are the patents at issue in this case

19   here today?

20   A.  It is my understanding that that is the case.

21   Q.  You may have addressed this earlier in your testimony, but

22   did ADREA ever provide Barnes & Noble with a copy of these

23   claim illustrations?

24   A.  Yes, I believe we did.

25   Q.  Were those claim illustrations provided to Barnes & Noble

Ea7radr4                    Shamoon - direct

1    as an attachment to Mr. Ambwani's March 29, 2012, email that we

2    just viewed as Joint Exhibit 21?

3    A.  I believe it was.

4    Q.  Did you ever participate in any in-person discussions with

5    Barnes & Noble regarding the license of the patents in suit?

6    A.  I did towards the end of 2012.  We had delegated this to

7    Mr. Ambwani for most of 2012.

8    Q.  Who was at that meeting?

9    A.  At the meeting I attended?

10   Q.  Right.

11   A.  I was there.  I was there with Mr. McDow, who was our chief

12   patent counsel, Mr. Ambwani.  From the Barnes & Noble side, Ms.

13   Brannen was there, who at the time was and still is their

14   director of intellectual property.  And an attorney from

15   another law firm.

16   Q.  Do you recall specifically when that meeting took place?

17   A.  I don't, but I think it was August through September 2012.

18   It was in that time frame.

19   Q.  Can you briefly, very briefly, explain to the jury what

20   happened during that meeting.

21   A.  We had a conversation about ADREA, our vision.  We told

22   Barnes & Noble that we were interested in exploring a peaceful

23   settlement, that we would work with them on crafting a deal

24   that was a positive exchange of value for both ADREA and Barnes

25   & Noble.  We were told by --

Ea7radr4                              Shamoon - direct

1              MR. EDERER:  Objection, your Honor, as to what they

2    were told.

3              THE COURT:  Sustained.

4    Q.  Did you ever make a licensing proposal to Barnes & Noble?

5    A.  We did make a licensing proposal.

6    Q.  Do you recall what that proposal was?

7    A.  I believe was sent them a proposal that asked them to pay

8    50 cents per unit that they sold.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EA78ADR5                    Shamoon - direct

1    Q.  I am going to direct your attention to Joint Exhibit 31 in

2    your binder.

3              MR. CABRAL:  Your Honor, with permission, may I

4    approach?

5              THE COURT:  Yes.  31 is received.

6              (Joint Exhibit 31 received in evidence)

7    Q.  Dr. Shamoon, do you recognize this document?

8    A.  Yes.  This is what is called a term sheet outlining the

9    proposal we were making to Barnes & Noble.

10   Q.  Is this the same proposal you referenced in your previous

11   testimony?

12   A.  Yes, it is.

13   Q.  I want to direct your attention to the bottom of the page,

14   the bottom third.  There is a reference to fees.  Do you see

15   that?

16   A.  Yes, I do.

17   Q.  And that sentence that follows the word fees refers to 50

18   cents.  Do you see that?

19   A.  Yes.

20   Q.  What is your understanding of what that 50 cents referred

21   to?

22   A.  That 50 cents refers to a payment per book reader that they

23   sold that would give them a license to the patents that we had.

24   Q.  Next to the 50 cents, do you see the word licensed reader?

25   A.  Yes.

1   Q.  When you made this offer to Barnes & Noble, was that offer

2   limited to e-book viewers?

3   A.  I am not a lawyer, but one thing I learned is when things

4   are capitalized, you sort of look up for a definition.  So if

5   you look up at the bottom of the definition section, it says

6   licensed readers, means Barnes & Noble reader devices and

7   Barnes & Noble reader software.  People can read it for

8   themselves, but the idea was that people bought books from the

9   Barnes & Noble bookstore on either a hardware device called the

10  Nook or on an app that ran on an iPhone or an Android phone.

11  And rather than try to charge for the books that were being

12  sold, we just said, Listen, why don't we just say 50 cents per

13  reader, whether it's a device or whether it's an app, and then

14  we won't charge for the books.  At least that's what I think

15  this said.

16  Q.  So without reference to the document itself, did your offer

17  to Barnes & Noble for licensing include 50 cents per e-book

18  viewer, per app, or for both?

19  A.  I think it's for both.  If you look at licensed reader, it

20  says reader devices, which I think is the actual Nook device,

21  or reader software, which is an app that runs on somebody

22  else's device, like an iPhone or Android phone.

23  Q.  When you made the offer to Barnes & Noble, did you have any

24  idea of the volume of apps that would fall within this offer?

25  A.  We had.  We were using publicly available information, but

1    we had different marketing surveys that we could get.

2    Q.  Why was your offer not limited to e-book readers

3    themselves?

4    A.  By e-book, you mean the actual hardware?

5    Q.  Correct.

6    A.  Because some people used a Barnes & Noble piece of software

7    to buy books as well.  If you had an iPhone, you just get the

8    app from Barnes & Noble and just read the book on your iPhone

9    or iPad.  You wouldn't need to buy a second device.

10   Q.  Why did you offer 50 cents?

11   A.  There's industry standards for these types of patents.

12          MR. EDERER:  Objection, your Honor.  There is no

13   foundation for what he knows.

14          THE COURT:  If the objection is to foundation, see if

15   you can lay a foundation, counsel.

16   Q.  Are you aware of any industry standards for licensing of

17   similar technology to what you were offering Barnes & Noble

18   with this Joint Exhibit 31?

19   A.  Yes, I am.

20   Q.  What is your understanding of those industry standards?

21          THE COURT:  Maybe there is a misunderstanding about

22   what is meant by foundation.

23          Without telling us what those standards are, how did

24   you become aware of those standards?

25   Q.  You can answer it.

1   A.  Well, as I said, I have been at Intertrust since 2003.  We

2   have been very active in what is called standards-based

3   licensing.

4          MR. EDERER:  Objection.  That has nothing to do with

5   the e-book industry.

6          THE COURT:  I am going to hear a little bit more.

7          When you talk about standards, are you talking about

8   some official standard or just custom and practice?

9          THE WITNESS:  Sir, I am talking about both.  One of

10  the things about Internet-based devices, in the old days people

11  used to write formal standards and then there would be patent

12  polls that would price the patents associated with those formal

13  standards.  Because companies like Google and Apple started to

14  arise in the market and write their own technology, people

15  still conducted licensing but the pricing was done differently

16  because there wasn't an open recipe you can map patents onto.

17         If I can continue --

18         THE COURT:  No.

19         So, defense counsel may, if he wish, have a brief voir

20  dire on whether there is a sufficient foundation or not.  If

21  not, I will allow the original question to be answered.

22         MR. EDERER:  Should I do so from here.

23  VOIR DIRE EXAMINATION

24  BY MR. EDERER:

25  Q.  So, Mr. Shamoon, when you're talking about industry

1    standards with respect to the licensing of e-reader devices,

2    are you talking about information that you had with respect to

3    prior licensing deals relating to the licensing of e-reader

4    devices or are you talking about something else?

5    A.   Maybe I should have used the word industry norms for

6    licensing, but I was talking about what people who make devices

7    pay for component technologies that go into things like

8    e-readers, and a lot of e-readers have audio players and video

9    players and they license that technology as well.

10            THE COURT:  That's enough.

11            Now, going back to plaintiff's counsel, given that

12   answer, I think the objection needs to be sustained, unless you

13   have any further questions you want to put to the witness by

14   way of foundation.

15   BY MR. CABRAL:

16   Q.   Without a reference to any particular standards or issued

17   norms, are you able to tell the jury how you arrived at that 50

18   cent number?

19   A.   It seemed like a fair thing to ask for.

20   Q.   Did ADREA ever make an offer to Barnes & Noble to license

21   ADREA's patents for a lump sum number?

22   A.   I believe there was a subsequent offer made by Mr. Ambwani

23   to Ms. Brennan for $15 million.

24   Q.   In response to either the $15 million offer or 50 cent per

25   viewer and app offer, has Barnes & Noble ever offered to pay

EA78ADR5                          Shamoon - direct

1   ADREA anything for a license of the patents in issue in this

2   case?

3   A.  No.

4   Q.  We are almost done here.

5            Did you make the decision to file suit against Barnes

6   & Noble?

7   A.  Yes, I did.

8   Q.  Did you want to sue Barnes & Noble?

9   A.  I did not.  I don't like to sue people.

10  Q.  Can you explain your answer, please?

11  A.  I am a technical guy.  I invent stuff.  I generally believe

12  inventions I am associated with have value.  I like to form

13  partnerships.  In general, in my experience, I have been able

14  to form partnerships in the majority of the cases involving

15  this type of technology.

16  Q.  So why did you ultimately file suit?

17  A.  We really felt that they needed a license for these

18  patents, and they were just refusing to take a license.  They

19  were refusing to work with us.  They literally told us that

20  they had no interest in working with us and rebuffed all of our

21  offers.  We had no choice.  A lot of money went into creating

22  these inventions, and we have a business to run.

23            MR. CABRAL:  I offer the witness.

24            THE COURT:  Cross-examination.

25            MR. EDERER:  Your Honor, we have a cross-examination

1    binder with some exhibits.  May I approach?

2            Would you like one as well?

3            THE COURT:  Just introduce individual exhibits.

4    CROSS-EXAMINATION

5    BY MR. EDERER:

6    Q.  Good afternoon, Mr. Shamoon.

7    A.  Hello.

8    Q.  Now, you testified that ADREA -- is it an ADREA or ADREA?

9    A.  I use both.  It stands for advanced reading algorithms.

10   Q.  You testified that ADREA is a joint venture, correct?

11   A.  Yes, sir.

12   Q.  That's between Discovery, Philips, Sony and Intertrust, is

13   that right?

14   A.  Yes.

15   Q.  And the reason ADREA was formed was to help Discovery

16   monetize their electronic book packets, correct?

17   A.  Not just Discovery.  ADREA was formed to bring together

18   inventions from three major research companies.

19   Q.  When you were originally approached, you mentioned you were

20   approached by Mr. Rosenstock of Discovery back in the summer of

21   2009, is that correct?

22   A.  Yes, that's what I said.

23   Q.  Did you understand at the time that Discovery was looking

24   to monetize e-reader patents that it had previously been unable

25   to license?

EA78ADR5                          Shamoon - cross

1    A.   I think they were trying to build a business around the

2    patents.   Monetizing to me means make money, so I guess they

3    were trying to make some money for these patents.

4    Q.   Were you aware at the time of whether Discovery had ever

5    succeeded in obtaining patent licenses for any of its e-reader

6    or e-book patents?

7    A.   I was not aware that they had.

8    Q.   You had no idea about that?

9    A.   No.

10   Q.   Whether they were successful or unsuccessful in monetizing

11   or licensing their patents in the e-reader space?

12   A.   When Jay Rosenstock called me, I didn't.

13   Q.   Do you recall testifying in a deposition in this case,

14   Mr. Shamoon?

15   A.   Yes.

16            THE COURT:   Counsel, just so you know my procedure as

17   to depositions, you will first read the page and line numbers

18   that you want to put before the jury, and then pause for a few

19   seconds in case there is any objection.   If there is no

20   objection, then you can go ahead and read the relevant

21   deposition portion.   If there is an objection, I will rule on

22   it at that time.

23            MR. EDERER:   May I approach the witness with a copy of

24   the transcript?

25            THE COURT:   If you need to.   It's not necessary for

1    him to see it if you don't want to.

2    Q.  I am reading, Mr. Shamoon, page 47 of Mr. Shamoon's

3    deposition, which took place on October 22, 2013, line 8

4    through line 11.  That's the question.

5             THE COURT:  Any objection?

6             MR. CABRAL:  No objection, your Honor.

7             THE COURT:  Go ahead.

8    "Q.  Well, you had -- so as you sit here today, you have never

9    been told one way or the other whether Discovery had ever

10   succeeded in obtaining patent licenses for any of John's

11   patents?"

12            MR. EDERER:  That was the question.

13            The answer is from line 15 to 17.

14            MR. CABRAL:  Then I would object because the answer

15   goes on for some time.

16            THE COURT:  Gentlemen, the question is irrelevant

17   without the answer.  I assumed it was the answer that was being

18   offered.

19            Let me see a copy of the deposition.

20            MR. CABRAL:  To be clear, I would just ask that the

21   full answer be read.

22            THE COURT:  Let me see a copy of the deposition.

23            Page?

24            MR. EDERER:  Page 47.  The answer starts on line 15.

25            THE COURT:  So counsel may read lines 15 through 17.

1   Under the rule of completeness, the rest does not have to be

2   read now.  Of course, it can be inquired into on redirect, but

3   it's not going to be read now.

4          MR. CABRAL:  Thank you, your Honor.

5          THE COURT:  Just to move this along, do you remember

6   giving a deposition?

7          THE WITNESS:  Yes, sir, I do.

8          THE COURT:  And you understand -- and this is really

9   just for the jury's benefit -- that a deposition is where the

10  lawyers in a lawsuit, before the case goes to trial, can take

11  the testimony of various witnesses so that they can prepare for

12  trial.  You understand that, yes?

13         THE WITNESS:  Yes, I do, of course.

14         THE COURT:  The witnesses, and in this case you, were

15  under oath, correct?

16         THE WITNESS:  Yes, sir.

17         THE COURT:  You were asked the question:

18  "Q.  So as you sit here today, you have never been told one way

19  or the other whether Discovery had ever succeeded in obtaining

20  patent licenses for any of John's patents?"

21         And you answered:

22  "A.  I know from like the venture formation, the due diligence,

23  that John's patents have not been licensed to anyone."

24         So that was your initial answer, correct?

25         THE WITNESS:  Yes, sir.

1            THE COURT:  So, ladies and gentlemen, just so you

2    understand about depositions, this is testimony, as you just

3    heard, that's given before a case goes to trial.  There is no

4    judge present.  It's taken in the lawyers' offices, but the

5    witnesses are under oath, and therefore obliged to tell the

6    truth.

7            If a witness here in court gives an answer that is

8    arguably different from an answer that he or she gave at the

9    deposition, then counsel can raise that different answer with

10   you, as we just did.  And then you have to decide whether it

11   really is different or not.  If it's not different, it doesn't

12   matter.  If it is inconsistent, as we say, then you have to

13   decide whether that is important or unimportant, and you can

14   assess the whole thing as you see fit, and you can decide

15   either that the original testimony was the more accurate

16   testimony, or the later testimony was the more accurate, or any

17   other possibility, just like evidence given here in court, and

18   you may consider it as such when it's read into evidence, as it

19   was here.

20           I note purely as a technical matter, and not for the

21   jury's concern, it would also be admissible as an admission by

22   a party adversary.

23           Go ahead, counsel.

24   BY MR. EDERER:

25   Q.  Just to be clear, Mr. Shamoon, the reference to John and

1   John's patents in that question and answer that was just read

2   was to Mr. Hendricks, correct?

3   A.  Yes.

4   Q.  And two of Mr. Hendricks' patents are involved in this

5   case, correct?

6   A.  Yes.

7   Q.  So up through 2009, summer of 2009, as far as you knew,

8   Discovery had never made any money licensing John's e-reader

9   patents, is that right?

10  A.  Could you tell me the date again, please?

11  Q.  You testified earlier that the initial discussions that you

12  had regarding this venture were in the summer of 2009 I

13  believe?

14  A.  Yes.

15  Q.  So as of that date, was it your understanding that

16  Discovery had never made any money licensing its e-reader

17  patents?

18  A.  If I could just clarify, based on having my deposition

19  testimony, I think I said during the venture formation and due

20  diligence, which came after when Jay Rosenstock called me

21  initially.  When Jay called me in the summer of 2009, the only

22  thing I knew about was that Discovery had sued Amazon with

23  those patents because that was in the newspaper.

24  Q.  Let's talk about through the formation of ADREA.  You said

25  that occurred in the summer of 2010, correct?

1   A.   The actual formation occurred in 2010.   It look a long time

2   to get everybody together, negotiate these agreements, do our

3   homework of where the patents came from, the quality of the

4   inventions, find different partners who wanted to be involved,

5   figure out how much it would cost, figure out whether we had

6   the time and resources to do a good job running it, at least

7   come up with an initial business plan for the company and so

8   on.   These things take a long time.   It feels like yesterday,

9   but 2009 is a long time ago.

10          MR. EDERER:   Move to strike the response.   The

11   question was:   Was ADREA formed in 2010, I believe, or

12   something along those lines?

13          THE COURT:   I am not going to strike it, but I do want

14   to caution the witness.   Particularly when you're on

15   cross-examination, you need to confine your answers quite

16   narrowly to just answering the question put.   Your counsel,

17   when he gets up on redirect, can ask any follow-up questions

18   that are permissible at that time.   But I will leave it as is.

19          Put another question.

20          THE WITNESS:   Sorry.

21   BY MR. EDERER:

22   Q.   So was it your understanding in 2009, when you were first

23   approached by Mr. Rosenstock, that Sony and Discovery were

24   having some discussions about licensing of John's patents?

25   A.   In the summer of 2009, when Mr. Rosenstock called me, I

EA78ADR5                    Shamoon - cross

1    knew they were in court with Amazon.  Mr. Rosenstock had worked

2    at Sony.  He may have talked to me, may not have, but it was

3    not an element of focus in that conversation.

4    Q.  So the answer to my question is, no, you did not understand

5    that Sony and Discovery were having discussions about possible

6    licensing of John's patents in 2009?

7    A.  I knew that Sony and Discovery talked about things, but I

8    wasn't very clear on the details.  They may have talked about

9    this.  I wasn't really that focused on it.

10   Q.  Isn't it true, sir, that Sony suggested to Discovery that

11   you and your company become involved in a potential joint

12   venture as a monetization partner?

13   A.  That came after the conversations I had with Mr. Rosenstock

14   in summer of 2009.

15   Q.  So the answer to my question is, yes, sometime later on in

16   2009 you understood that Sony had suggested to Discovery that

17   your company become involved as a monetization partner to

18   attempt to monetize John's patents?

19   A.  I am hazy on whether Sony suggested it or whether I called

20   Sony and said, why don't we work with Discovery, and with what

21   you guys have done in e-reader space, to see if there are other

22   people who want to join.  But eventually Sony thought it was a

23   good idea, and they must have endorsed it.

24   Q.  Why don't you take a look at tab 4 in the book that I just

25   gave you, which is Defendants' Exhibit 50.

1              MR. EDERER:  Your Honor, should I bring up the paper

2    copy of the exhibit?

3              THE COURT:  Yes.

4    Q.  So, Mr. Shamoon, do you have Defendants' Exhibit 50 in

5    front of you?

6    A.  Yes, I do.

7    Q.  This is an e-mail chain that starts, if you look at the

8    bottom of page 2.

9    A.  You're talking about the e-mail from Jay Rosenstock?

10   Q.  It's an e-mail from Jay Rosenstock to a Mr. Mitomo.  Do you

11   know who Mr. Mitomo is?

12   A.  He is the head of patent licensing standards at Sony.  He

13   is also a board member of Intertrust.

14   Q.  That was on November 30, 2009, right?

15   A.  That's the time stamp on the e-mail.

16   Q.  If you look at the bottom of page 2, Mr. Rosenstock writes

17   to Tosh --

18             THE COURT:  No.  A joint exhibit is automatically in

19   evidence, but not an individual party's exhibit.  Do you want

20   to offer this exhibit?

21             MR. EDERER:  I do want to offer it.

22             THE COURT:  Any objection?

23             MR. CABRAL:  I object on relevancy grounds.

24             THE COURT:  Let me take a look.

25             No.  I think it is arguably relevant sufficient to

EA78ADR5                        Shamoon – cross

1    pass the very minimal test of Rule 401.  It's received.

2              (Defendant's Exhibit 50 received in evidence)

3    Q.  So focusing on that e-mail that begins at the bottom of

4    page 2, Mr. Shamoon, you are not copied on that e-mail,

5    correct?

6    A.  Tosh and I both sign our e-mails with the first letter of

7    our first name.  So I am not copied on the original e-mail, but

8    as the thread evolves I get added.

9    Q.  So, in fact, on that same day, if you look on page 1 of

10   this e-mail, on that same day, the thread was forwarded to you,

11   correct?

12   A.  Yes.

13   Q.  If you look at that original e-mail, it's an e-mail from

14   Mr. Rosenstock to Mr. Mitomo of Sony and a Mark Khalil,

15   correct?

16   A.  Yes.

17   Q.  He is also with Sony?

18   A.  Yes.

19   Q.  Mr. Rosenstock says to Mr. Mitomo and Mr. Khalil:  "After

20   further discussion with Discovery management, in the spirit of

21   getting our JV established on the right footing with commonly

22   aligned objectives, we are prepared to move on the Sony license

23   fee issue."  Do you see that?

24   A.  Yes.

25   Q.  Was that an indication to you or did you understand from

1   that that there were licensing discussions going on between

2   Sony and Discovery at that point in time?

3           MR. CABRAL:  Objection.  Dr. Shamoon is not copied on

4   this e-mail.

5           THE COURT:  Sustained.

6           MR. EDERER:  As I pointed out, that e-mail was

7   forwarded to Mr. Shamoon on the same day.

8           THE COURT:  I don't know that his understanding would

9   be relevant.  It's really whether he had an understanding or

10  not.  The e-mail will either stand on its own or not, which is

11  in evidence.  Sustained.

12  Q.  Shortly after this time period, November 2009, Mr. Shamoon,

13  you wrote to Mr. Rosenstock and told him that you were excited

14  about the opportunity to help monetize these patents, correct?

15  A.  I don't see any e-mail, but it sounds like something I

16  would have said.

17  Q.  Why don't you take a look at tab 5, which is Defendants'

18  Exhibit 286.  The top e-mail is an e-mail from you to Mr.

19  Rosenstock, dated December 25, 2009.  Do you see that?

20  A.  Yes.  Christmas Day.

21          MR. EDERER:  I offer Defendants' Exhibit 286.

22          THE COURT:  Any objection?

23          MR. CABRAL:  Again, we object on relevancy grounds.

24          THE COURT:  Overruled.  Received.

25          (Defendant's Exhibit 286 received in evidence)

1    Q.  So, Mr. Shamoon, just looking at the top e-mail of Exhibit

2    286, you were writing to Mr. Rosenstock on Christmas Day 2009,

3    correct?

4    A.  Yes.

5    Q.  In the third paragraph you say, "I am also quite excited by

6    this project.  A bunch of us have been waiting for years to

7    monetize the e-book area and this venture is an excellent

8    launch pad and vehicle for doing so."  Do you see that?

9    A.  Yes, that's what I wrote.

10   Q.  By monetize, you meant the act of making money by creating

11   a business in the e-book area, correct?

12   A.  Yes.  I meant creating a business in the e-book area.

13   Q.  You meant the act of making money by creating a business in

14   the e-book area, correct?

15   A.  I meant we wanted to create a venture, which is a business,

16   to help make money in the e-book area.

17   Q.  And this business of monetizing patents in the e-book

18   industry had never been done before by anybody to your

19   knowledge, correct?

20   A.  Making money in the e-book industry?

21   Q.  By licensing patents relating to e-books and e-readers.

22   A.  Patents were an important part of this business but, you

23   know, as we have discussed, I don't think anything here can be

24   taken to mean just by licensing patents.

25   Q.  Well, it says here, "A bunch of us have been waiting for

1    years to monetize the e-book area," correct?

2    A.  Right.

3    Q.  So did you know of anybody who prior to that time, December

4    25, 2009, had successfully monetized the e-book area?

5    A.  A lot of people monetized the e-book area by that time.  I

6    wrote the e-mail, and I will tell you what I meant.  What I

7    meant was we saw an opportunity here and wanted to create a

8    business to make money from it.

9    Q.  At one point after that Philips was introduced as a

10   potential partner, I believe you testified, correct?

11   A.  Correct.

12   Q.  So you were going to try to monetize their e-reader and

13   e-book patents as well?

14   A.  We invited them to join the business as a partner by a

15   share in the company.  They did the same thing as you heard

16   earlier.  They bought their share in the company by

17   contributing to some patents.  Patents are basically legal

18   documents that define an invention, and we were going to use

19   those as starters to start a business to make money in the

20   e-book space.

21   Q.  Isn't it true, sir, that the purpose of the joint venture

22   was to monetize the e-reader and e-book patents that were being

23   contributed by these various companies, is that true?

24   A.  Patents were a very important part of this business.  I

25   don't want to hang on the meaning of the word monetize, but a

1    person monetizes patents and technology in all sorts of

2    different ways.  I don't think anyone said that they would

3    exclusively just license patents out of this business.  We had

4    different ideas we were going to experiment with.  But as you

5    know, and as everybody here knows, the business was formed by

6    taking patents and putting them in there, putting some money

7    in, bringing some people in who knew how to build businesses on

8    top of inventions, in a market that was just beginning to

9    evolve in this time period.

10   Q.  Can you take a look at tab 47 in your binder, please?  It's

11   the last exhibit in the binder.  Sorry about that.

12   A.  No problem.

13   Q.  Do you have that?

14   A.  Yes, sir, I do.

15   Q.  This document is headed, "Proposed JV terms, subject to tax

16   and accounting review," is that right?

17   A.  Yes.

18   Q.  Is this document a proposal or a term sheet that was put

19   together by ADREA in connection with the establishment of the

20   ADREA joint venture?

21   A.  I don't actually remember who put this document together.

22           Well, it's in advance of the formation of ADREA.  And

23   it doesn't have Philips on it.  If you look at the ownership

24   section, it says Discovery 33, Sony 33, Intertrust 33.  As I

25   said, I don't know who put this together, whether it was people

1    from Intertrust or people from Sony or people from a law firm

2    for Discovery.  Do you know?

3    Q.  I am asking you, sir, if you know.

4    A.  I said I don't know who wrote this document.  It's

5    definitely a document that was circulated at the time.  As I

6    said --

7                MR. CABRAL:  Objection.  Lack of foundation.

8                MR. EDERER:  May I ask this question, your Honor?

9    Q.  Is this document a document that was prepared by at least

10   one of the proposed joint venturers -- Discovery, Sony and

11   Intertrust -- prior to the time that the joint venture was

12   formed?

13               MR. CABRAL:  Objection.  Calls for speculation.

14   Q.  Or one of their representatives?

15               THE COURT:  Sustained.

16   Q.  Mr. Shamoon, this document didn't just appear on your desk.

17   This document related to the discussions you were having about

18   forming a joint venture, correct?

19               MR. CABRAL:  Objection.

20               THE COURT:  Forgetting about the first sentence of

21   that question, the second sentence is permissible.

22               So you may answer the question.

23   A.  Could you ask it again, please?

24   Q.  The question was, was it your understanding that this

25   document was prepared by one of the prospective joint venturers

1   listed on the document:  Discovery, Sony or Intertrust?

2   A.  It would appear to have been prepared by someone.  It

3   doesn't look like a document Intertrust wrote, but it may have

4   been.  Or it may have been prepared by one of the attorneys

5   working for one of the three companies.

6               MR. CABRAL:  Objection.  Asked and answered.  It was

7   the same question he previously asked.

8               MR. EDERER:  I would like to offer this document in

9   evidence.

10               THE COURT:  Let me see the document.

11               Let me ask the witness.  Did you receive this

12   document?

13               THE WITNESS:  Sir, I honestly don't remember whether

14   it was e-mailed to me or sent to me or whether it was presented

15   in one of these round-table meetings we had.

16               THE COURT:  I don't care how it got to you.  Do you

17   remember whether or not you received this document?  Yes or no

18   or I don't recall.

19               THE WITNESS:  I don't recall.  I'm sorry.

20               THE COURT:  The objection is sustained.

21               MR. EDERER:  I point out that this was a document that

22   was produced by ADREA in this litigation.

23               THE COURT:  I don't care if it was produced by the man

24   in the moon in this litigation.  I am dealing with the

25   objection to the admissibility of this document with this

EA78ADR5                         Shamoon - cross

1   witness, and the foundation for the admissibility of it in this

2   case regarding the question of this witness has not been

3   established.  Sustained.

4   BY MR. EDERER:

5   Q.  You mentioned earlier, Mr. Shamoon, it took a while to get

6   the joint venture formed, correct?

7   A.  Yes, sir.

8   Q.  Discussions were initially had in the fall and then into

9   the winter of 2009, correct?

10  A.  Yes, sir.

11  Q.  And the venture was not formed until the summer of 2010,

12  correct?

13  A.  Yes.  By the way, the discussions continued through the

14  winter and spring of 2010, as I recall.

15           THE COURT:  That may be, but I need to tell the

16  witness once again.  You're not here to tell us the history of

17  the world.  You're here right now to answer questions of

18  counsel and only questions of counsel.  So don't add things,

19  don't volunteer things.  Just answer the questions.

20  Understood?

21           THE WITNESS:  Yes, sir.

22           THE COURT:  Good.

23  Q.  By June 2010, the parties had still not formed a joint

24  venture, correct?

25  A.  By June.

1    Q.  By June of 2010.

2    A.  That sounds right.

3    Q.  Did there come a point in time where you understood that

4    Discovery felt as though the potential joint venturers were

5    dragging their feet in the negotiations?

6            MR. CABRAL:  Objection.  It calls for speculation.

7            THE COURT:  How does that call for speculation?  He

8    was asking for his understanding.

9            Overruled.

10   A.  This was a complicated negotiation where people got

11   frustrated at different times.

12   Q.  Can I direct your attention to tab number 7 in your book,

13   please?

14           Do you recognize tab number 7, which is Defense

15   Exhibit 282?

16   A.  Right.

17           THE COURT:  You want to provide the Court with a copy?

18           MR. EDERER:  Yes.

19           THE COURT:  Go ahead.

20   Q.  Do you recognize Defense Exhibit 282, Mr. Shamoon?

21   A.  Yes.

22           MR. EDERER:  I offer 282 into evidence, your Honor.

23           MR. CABRAL:  No objection, your Honor.

24           THE COURT:  Received.

25           (Defendants' Exhibit 282 received in evidence)

1    Q.  I would also like you to take a look at tab number 6,

2    Mr. Shamoon.

3          So tab number 6 is Defense Exhibit 650.  Do you see

4    that exhibit?

5    A.  Yes.

6    Q.  Do you recall receiving a copy of that document?

7    A.  Yes.

8          MR. EDERER:  I move the admission of Defense Exhibit

9    650.

10          MR. CABRAL:  No objection.

11          THE COURT:  Received.

12          (Defendant's Exhibit 650 received in evidence)

13    Q.  Starting with that document, Exhibit 650, the lower e-mail

14    is an e-mail from Mr. Rosenstock of Discovery to Mr. Mitomo of

15    Sony, correct?

16    A.  Yes.

17    Q.  Mr. Rosenstock is indicating, among other things, that his

18    management, Discovery management is highly frustrated with the

19    pace of the negotiations with the parties.  They were

20    originally hoping to have a deal by the end of 2009, correct?

21    A.  Yes.  That's what it says.

22    Q.  That e-mail was forwarded to you by Mr. Rosenstock, JFYI,

23    meaning just for your information, right?

24    A.  Yes.

25    Q.  Then if you look at tab 7 which is Defense Exhibit 282, the

EA78ADR5                        Shamoon - cross

1    lower e-mail is an e-mail from Mr. Rosenstock to Mr. Mitomo on

2    June 22, 2010, about three months later, right?

3    A.  Yes.

4    Q.  He says to Mr. Mitomo, this market is really going to take

5    off, right?

6    A.  Yes.

7    Q.  Mr. Mitomo responds, "then sign the agreement and let Talal

8    fix your problem before it becomes a real problem, do you see

9    that?

10   A.  Yes.

11   Q.  Mr. Mitomo forwarded that e-mail to you and you responded

12   with a smiley face, right?

13   A.  Yes.

14   Q.  Did you understand that the problem that Mr. Mitomo was

15   suggesting to Mr. Rosenstock that you fix was the inability of

16   Discovery to monetize its patents for many years?

17   A.  I don't think so.  With the understanding that everybody on

18   this e-mail thread are old friends, I think this is just a way

19   of people trying to push each other to move faster on getting a

20   deal done.

21   Q.  So this is just Mr. Mitomo's way of saying hurry up?

22   A.  Yeah.

23   Q.  It had nothing to do with you fixing a monetization

24   problem, right?

25   A.  Mr. Mitomo is a second language speaker of English.  He is

1    a Japanese person and he uses English in an odd way.  You got

2    to know him to really hear this but, again, you see this in the

3    earlier email.  People were getting frustrated about how long

4    things were taking and then they are just baiting each other,

5    the way friends do.

6    Q.  You testified earlier on direct examination that these

7    companies then all agreed to contribute various e-book and

8    e-reader related patents to the venture, correct?

9    A.  Yes, sir.

10   Q.  ADREA was formed, I think you said, on August 25, 2010,

11   that was the formation document that we looked at?

12   A.  That sounds correct.

13   Q.  Before that date these patents were separately owned,

14   correct?

15   A.  Yes, sir.

16   Q.  So two of the patents that are involved in this case, the

17   '851 patent and '501 patent were owned by Discovery, right?

18   A.  Yes, sir.

19   Q.  The '703 patent was owned by Philips, correct?

20   A.  I think so.

21   Q.  It wasn't until after ADREA was formed that any of those

22   patents were transferred or assigned to ADREA, correct?

23   A.  Yes.

24   Q.  Now, when you entered into the joint venture, you believed

25   the joint venture had the potential to generate revenue from

1   licensing of these patents, correct?

2   A.  That was one of the business models, yes.

3   Q.  Since that time, how many licenses has ADREA signed up

4   outside of its litigation with Amazon?

5   A.  We have signed a deal with Amazon -- I'm sorry, just with

6   Amazon.

7   Q.  My question was, how many licenses has ADREA signed up

8   outside of its litigation with Amazon?

9   A.  None.

10  Q.  How much revenue has ADREA realized outside of whatever

11  revenue it may have realized from the Amazon settlement

12  agreement?

13  A.  None.

14  Q.  Were you expecting that within four years you would have

15  zero licenses in place outside of the one license you entered

16  into when you settled a lawsuit?

17  A.  It's a difficult question because the e-book market when we

18  formed the venture we started talking about it, it s really in

19  the early stages and I had been doing licensing for a long

20  time.  Sometimes this stuff goes fast, sometimes it doesn't.

21  So I guess in hindsight I am not surprised, but you always go

22  into these things with optimistic expectations.

23  Q.  Well, it wasn't for lack of trying, was it?  You did try to

24  get other companies interested in taking a license to some of

25  these patents, didn't you?

1    A.  We tried and we tried and we tried.  It's very hard to

2    license patents.

3    Q.  By the way, you testified earlier about yourself and Mr.

4    Ambwani providing services to ADREA as part of your duties with

5    Intertrust, correct?

6    A.  Yes.

7    Q.  You are not an employee of ADREA, are you?

8    A.  Well, that's not all that I do but I provide services.

9    ADREA pays me to provide services to it.

10   Q.  Does ADREA pay you as an employee to provide services to

11   it?

12   A.  ADREA pays a consulting fee to Intertrust to provide skills

13   and services to the company.

14   Q.  In fact ADREA has no employees at all, does it?

15   A.  It doesn't employ anyone full time.

16   Q.  Isn't it true that you only spent about five or ten percent

17   of your time on ADREA business following its formation?

18   A.  Yeah.

19   Q.  Your main focus was to run Intertrust as CEO, correct?

20   A.  I am also on the board of several ventures which I guess is

21   part of running Intertrust, the same way this is a venture that

22   Intertrust owns a piece of.  I attend board meetings of other

23   companies and then I manage people at Intertrust.

24   Q.  But between ADREA and Intertrust, you spend a lot more time

25   on Intertrust business than you do on ADREA business, correct?

1    A.  One of the reasons I am having a hard time answering these

2    questions is, the time I spend at ADREA is part of my job at

3    Intertrust as well.

4    Q.  Let me ask the question a little differently.  In your

5    duties as Intertrust CEO as between the time you spend on

6    Intertrust business that does not involve ADREA and the time

7    you spend on Intertrust business that does involve ADREA, you

8    spend a lot more time on Intertrust business that does not

9    involve ADREA correct?

10   A.  Yes, of course.

11   Q.  Now, you testified that one of the first things you did

12   after ADREA was formed was that you made efforts to try to

13   settle the Amazon lawsuit, correct?

14   A.  Yes.

15   Q.  You testified also that the lawsuit was settled for, I

16   think you said, $10 million with respect to the Discovery

17   patents, correct?

18   A.  Yes.

19   Q.  And an option at $2.5 million to license the Discovery

20   and -- I'm sorry -- the Philips and Sony patents, correct?

21   A.  Yes.  They exercised that.

22   Q.  Wasn't it also the case that for the entire option period

23   from the time that the Amazon settlement agreement was entered

24   into until the option period ended which was, I believe, a two-

25   or a two-and-a-half-year option period for Amazon to decide

1   whether or not it wanted to take a license to the Sony and

2   Philips patents, correct?  Is that about two and a half years?

3   A.  Something like that, yeah.

4   Q.  For that period of time, didn't the agreement also provide

5   that ADREA would not sue Amazon over any of those patents?

6   A.  I don't remember that term.

7   Q.  Let's take a look again at Joint Exhibit 32 which I believe

8   is in your binder also, although you may have it from your

9   direct examination.

10  A.  It's in the binder you gave me?

11  Q.  Yes.

12  A.  32?

13  Q.  No.  It's Joint Exhibit 32 but tab number 17.

14  A.  So 17 in your book?

15  Q.  Yes.

16  A.  OK.

17  Q.  If you look at paragraph 6.4 on page 7?

18  A.  I am just waiting for it to come up on the screen.

19  Q.  So you see it now, right?

20  A.  Right.

21  Q.  So this paragraph provides that during the period in which

22  Amazon had the right to take a license for the Sony and Philips

23  patents that ADREA would not sue Sony or Philips -- I'm

24  sorry -- would not sue Amazon for infringing the Sony and

25  Philips patents, correct?

1    A.   That's what it looks like.

2    Q.   It's called a covenant not to sue, you have heard that

3    term?

4    A.   Yes.

5    Q.   Back in 2010 when you first got involved in discussions

6    relating to the settlement of the Amazon case, ADREA had

7    actually asked Amazon for up to $50 million to settle that

8    case, right?

9    A.   There was some back and forth.

10            MR. CABRAL:   Objection, your Honor.

11            THE COURT:   Sustained.

12   Q.   Let me point you to a document, tab 9 in your book, which

13   is Defense Exhibit 69.

14            MR. CABRAL:   Your Honor, I object on relevancy grounds

15   and hearsay -- I apologize -- Rule 408 as well.

16            THE COURT:   That's the right one.

17            MR. CABRAL:   Thank you.   Third time is the charm.

18            THE COURT:   Sustained.

19   Q.   Do you recall any discussions, Mr. Shamoon, about dollar

20   figures that ADREA was seeking in settlement of the Amazon

21   agreement?

22            MR. CABRAL:   Same objection.

23            THE COURT:   Sustained.

24   Q.   Now, the plan after settling the Amazon litigation was to

25   get a licensing program started, correct?

1    A.  There were several plans.  When I hear the word "licensing

2    program," it could mean many different things.  I don't want to

3    tell you what you mean.

4    Q.  Why don't I refer you to a document.  Do you recall sending

5    an e-mail to Mr. Hendricks at or about the time that you

6    settled the Amazon agreement?

7    A.  I sent Mr. Hendricks a bunch of e-mails over the time

8    that --

9    Q.  Yes.  Take a look at tab 18 in your binder.

10   A.  Got it.

11   Q.  We are talking about Defense Exhibit 115.

12           Do you have that document, Mr. Shamoon?

13   A.  Yes, sir, I do.

14   Q.  Do you recognize the lower e-mail on the first page of tab

15   18?

16   A.  "Dear John, I am writing to wish you all the best"?

17   Q.  Yes.

18   A.  Yes.

19   Q.  That was an e-mail that you sent to Mr. Hendricks on

20   December 23, 2011, two days before Christmas?

21   A.  Yes.

22           MR. EDERER:  I move the admission of Defense Exhibit

23   115, your Honor.

24           MR. CABRAL:  No objection.

25           THE COURT:  Received.

1          (Defendant's Exhibit 115 received in evidence)

2     Q.  So in this e-mail that you wrote to Mr. Hendricks on

3     December 23, 2011, you talk about the fact that the Amazon

4     agreement has now been signed, correct?

5     A.  Yes.

6     Q.  And then you go on to say:  "2012 brings new goals for

7     ADREA.  We are looking forward to continuing the charge on

8     patent licensing.  Barnes & Noble, Apple and Google are obvious

9     next targets."  Do you see that?

10    A.  It's before I learned to spell "Barnes & Noble."

11    Q.  Then if you drop down another paragraph it says:  "We would

12    not be where we are today without your valuable portfolio.  The

13    win against Amazon is a starting point for what we hope is a

14    healthy and accretive licensing program."  Do you see that?

15    A.  Yes.

16    Q.  So that was one of your one objectives at or about that

17    time, was it not, to establish a healthy and accretive

18    licensing program, correct?

19    A.  Yes.  But there were different ways we were looking into

20    doing that.  You can license patents by licensing software.

21    You can license patents directly, depending on who you're

22    talking to and what the products of the company are and who you

23    are partnering with.

24    Q.  Was it or was it not your objective at or about that time

25    to establish a healthy and accretive licensing program?

1          MR. CABRAL:  Objection, your Honor.  Asked and

2    answered.

3          MR. EDERER:  I don't think I got an answer to that

4    question, your Honor.

5          THE COURT:  No, I think you did.  The answer is yes.

6    He then added some stuff, but he said yes.

7          Sustained.  Asked and answered.

8    Q.  I think you testified earlier that one of the reasons why

9    you wanted to settle the Amazon agreement is because a lot of

10   lawyers' fees were being incurred, correct?

11   A.  That was one of the reasons but the other reason was we

12   didn't like being in court.

13   Q.  Do you recall discussing with anyone from Discovery the

14   reason why you wanted to settle the Amazon litigation in order

15   to avoid paying additional lawyers' fees?

16   A.  That's one of the reasons we don't like being in court.  We

17   also don't like being in court because we see it as a

18   distraction from building the business.

19   Q.  Let me ask you this.  It's now 2014 and you knew back in

20   2012 that Barnes & Noble was not interested in taking a

21   license, correct?

22   A.  I'm sorry.  Could you ask me the question again?

23   Q.  Isn't it a fact that you knew back in 2012 that Barnes &

24   Noble was not interested in licensing any of the patents that

25   we are talking about?

1    A.  Well, just generally people say no until they take a

2    license, so just because somebody says no several times, it

3    doesn't mean you can't think of something really creative or

4    maybe they change their mind or maybe they don't want to go to

5    court, so it's part of the process.

6    Q.  Was there anything that prevented you, sir, at any point in

7    time after you sent that e-mail to Mr. Hendricks in late 2011

8    in which you said something about establishing a healthy and

9    accretive licensing program, was there anything that prevented

10   you from licensing these patents to other people besides Barnes

11   & Noble?

12   A.  No.

13   Q.  That e-mail suggested that obvious targets were Apple and

14   Google, in addition to Barnes & Noble, correct?

15   A.  Yes.

16   Q.  Have you licensed the patents to Apple and Google?

17   A.  No, we haven't.

18   Q.  Have you talked to Apple and Google?

19   A.  Not about this.

20   Q.  Not about what?

21   A.  Not about licensing these patents.

22   Q.  They were obvious targets back at the end of 2011.  It's

23   now getting towards the end of 2014.  Are you saying you didn't

24   contact any of those obvious targets in the last three years?

25   A.  Well, we ranked the different people in the field.  Amazon

1    was the biggest player.  We licensed Amazon.  Barnes & Noble

2    was doing a very good job.  They were the second, in my

3    opinion, most important player in the market.  We were just

4    going down the list.  As you know, we spoke to Kobo.  I think

5    at the time they were still owned by a Canadian group, it was

6    before the Japanese had bought them, before they had really

7    moved into the American market.

8              I don't want to give my opinions about Apple and

9    Google and the market based on what was discussed earlier,

10   unless people want to hear it, but it was a question of

11   priorities.

12   Q.  So the fact of the matter is that at no time since the end

13   of 2011 has anyone on behalf of ADREA made contact with anyone

14   from Apple and Google about getting involved in licensing any

15   of the patents in your portfolio?

16   A.  Not that I am aware of.

17   Q.  What did you mean when you said that Apple and Google were

18   obvious targets back in late 2011?

19   A.  They had bookstores for the iPad and this thing called

20   Google Play, which is the app store, or whatever it's called.

21   I don't know what it is.

22   Q.  Isn't it a fact, sir, that you also attempted to engage in

23   licensing deals with respect to one or more of these patents in

24   your portfolio with Samsung?

25   A.  We approached Samsung to see if they wanted to become a

1   shareholder in the company.  There was a discussion that went

2   back and forth but we didn't approach them just to take our

3   license.

4   Q.  How did that work out?

5   A.  They looked at the patents.  They asked us a bunch of

6   questions.  They thought about it and they decided they had

7   other priorities and didn't buy a share in the company.

8   Q.  If you take a look at tab 20 in your book, Defense Exhibit

9   82?

10          THE COURT:  Counsel, keep in mind that we are going to

11   let the jury go in about three minutes.

12          MR. EDERER:  I will just ask a few questions about

13   this document.

14          THE COURT:  All right.

15   Q.  So this is Defense Exhibit 82.  Do you recognize Defense

16   Exhibit 82, Mr. Shamoon?

17   A.  82 is the one entitled "ADREA Responds to Samsung's

18   Questions"?

19   Q.  Correct.

20   A.  Yes, I do.

21          MR. CABRAL:  Objection on relevancy grounds.

22          THE COURT:  I can't tell yet.  It hasn't yet been

23   offered.  He is about to put a question.

24   Q.  Did you prepare this document, Mr. Shamoon?

25   A.  This document was prepared by several people.  I made input

1    into it.

2    Q.  Did you review it before it was sent to Samsung?

3    A.  Yes, I did.

4    Q.  In fact you sent it to Samsung, did you not?

5    A.  I guess I did.  That would make sense for me to do it.  It

6    was either me or Mr. Ambwani.

7    Q.  If you look at tab 19, Defense Exhibit 81, tab 19 is your

8    e-mail to a gentleman named Pilsu, P-I-L-S-U, of Samsung on

9    November 8, 2011, correct?

10   A.  Yeah.  I'm not sure Mr. or Ms. Wu is a gentleman, but yes,

11   I sent this e-mail.

12   Q.  Attached to this e-mail was Defense Exhibit 82?

13   A.  So I sent it.

14           MR. EDERER:  So I move the admission of 81 and 82,

15   your Honor.

16           MR. CABRAL:  Objection on relevancy.

17           THE COURT:  Pardon?

18           MR. CABRAL:  Objection on 402, 403.  Relevancy.

19           THE COURT:  You mean 401 and 403 but, in any event, I

20   think we should discuss that.  I am going to let the jury go

21   and we will take it up outside of their hearing.

22           So, ladies and gentlemen, we made good progress in our

23   first day but as they sometimes say, past results are no

24   guarantee of future performance so we need to make sure that we

25   get going early tomorrow.  It will be our one really full day

1    this week because we won't be sitting on Thursday and Friday.

2    So please be in the jury room a couple of minutes before 9:00

3    and we will start at 9:00.  Have a very good evening and we

4    will see you tomorrow.

5              (Jury exits courtroom)

6              THE COURT:  You can leave your notebooks in the jury

7    room.  Don't leave them here in open court and don't take them

8    home with you.

9              (Jury exits courtroom)

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Ea7radr6

1          (Jury not present)

2          THE COURT:  What is the relevance of Exhibit 82?

3          MR. EDERER:  Your Honor, this has to do with an

4     attempt on ADREA's part --

5          THE COURT:  Maybe we should let the witness go so we

6     can discuss it outside his presence.

7          We will see you tomorrow at 9 o'clock.

8          MR. BAUER:  Before he leaves, what is your ruling in

9     terms of who he can talk to this evening?

10         THE COURT:  Yes.  I'm sorry.  While the witness is on

11    cross-examination, you cannot have any contact with your

12    counsel, plaintiff's counsel.  Tonight you will be forced not

13    to talk to lawyers.  I know it is a hardship, but bear with it

14    as best you can.

15         MR. BAUER:  But with other companies it is OK?

16         THE COURT:  He really shouldn't be discussing his

17    examination at all, but specifically not with lawyers.

18    Basically, my understanding there are a lot of good baseball

19    games on tonight.  Just forget about this case.

20         (Witness not present)

21         MR. EDERER:  Two things at least, your Honor.  One is

22    I believe this goes directly to the issue of damages in the

23    hypothetical negotiation.

24         THE COURT:  I think that is the only grounds most of

25    the stuff is coming in on, relating to damages, the fact that

Ea7radr6

they didn't have licenses with anyone else, and so forth.  I am

concerned about how widely that door should be opened.  I was

surprised you didn't stop your cross-examination about a half

hour ago, when you asked him did you have licenses with anyone

else, answer no, did you get income from anyone else, answer

no.  That's what the jury presumably needs to know for your

purposes on this issue.

I'm a little concerned that we are now getting into

potentially confusing -- if not prejudicial, certainly

confusing -- minutia that detracts from their focus.  It is

really a 403 issue as far as I'm concerned, not a 401 issue.

I come back to what is 403.  I have to balance the

relevance against the prejudicial or confusing aspects.  What

is there in this that hasn't already been covered?

MR. EDERER:  The other point, your Honor, is that this

document, in particular Defense Exhibit 82, and the responses

to the questions deals with an issue of valuation that was also

raised on direct examination.

THE COURT:  Where is that?

MR. EDERER:  Question and answer number 7 on the

second page of the exhibit.

THE COURT:  Hang on a minute.  First of all, it is not

even the final deal.  Putting aside that, I'm not quite sure

what the relevance is.  You need to spell it out for me a

little more clearly.

Ea7radr6

1          MR. EDERER:  The valuation of the patents was

2    something that their damages expert also took into account in

3    his damages report.  There is an inconsistency between the

4    numbers that appear in the financial statements of the company

5    and the numbers that appear here.

6          THE COURT:  This is dealing with the valuation of the

7    company.

8          MR. EDERER:  Yes.

9          THE COURT:  As a whole, right?

10         MR. EDERER:  Yes.

11         THE COURT:  Your expert or their expert or both

12   experts are only concerned with the valuation of the particular

13   patents and claims here involved, right?

14         MR. EDERER:  Yes.

15         THE COURT:  I think this is somewhat of apples and

16   oranges.

17         MR. EDERER:  Fair enough, your Honor.

18         THE COURT:  Very good.  How much more do you have

19   roughly on cross?

20         MR. EDERER:  Half an hour.

21         THE COURT:  I think that would be appropriate.  I

22   think any more would be overkill.  Who is the second witness?

23         MR. CABRAL:  Your Honor, that is an issue we wanted to

24   address with you.  The second live witness available is Eugene

25   Shteyn, who appears third on the list.  The second on our

Ea7radr6

witness list is John Hendricks, who is not available to testify

live.  The parties have agreed to show the videotape of his

deposition subject to the Court's rulings on limited

objections.

THE COURT:  When I said no deposition, what I meant is

that if either party had been able to call a witness live, then

he would be called live, because live testimony is always

preferable to deposition testimony.  Why is he not available,

other than technically?  Why is he not available?  I thought he

was associated with the plaintiff.

MR. CABRAL:  He is an inventor, a retired chairman of

Discovery Communications.  I don't have specific information

regarding his unavailability.  I know he is outside of our

ability to bring him to court.

THE COURT:  I understand the technical objection.

Discovery is a one-quarter owner of ADREA, right?

MR. CABRAL:  That's correct.

THE COURT:  He was the former honcho of Discovery, is

that correct?

MR. CABRAL:  My understanding is he is no longer

associated with Discovery.

THE COURT:  When did he retire?

MR. CABRAL:  That's a good question.  I don't have a

specific date for your Honor.

THE COURT:  Has anyone asked him if he would come

Ea7radr6

1   testify?

2            MR. CABRAL:  We did inquire of that, your Honor.

3            THE COURT:  Of whom?  Of him personally?

4            MR. CABRAL:  Of attorneys representing his interest,

5   your Honor.

6            THE COURT:  Attorneys representing?

7            MR. CABRAL:  Representing his interest, your Honor.

8            THE COURT:  Representing his interest?

9            MR. CABRAL:  That's right, and that of Discovery as

10  well.

11           THE COURT:  Interest, shminterest, as they would say.

12  Do you have a phone number for him?

13           MR. CABRAL:  I do not, your Honor.  I believe we have

14  reached out to him personally as well.

15           THE COURT:  I don't know what representing his

16  interest means.  Unless he is represented personally by

17  counsel, someone ought to call him up and say that it would be

18  much more helpful to the jury to hear from him in person than

19  by deposition.

20           MR. BAUER:  Your Honor, the company's representative,

21  Mr. Rainey, knows the personal details.  He can address that.

22           THE COURT:  All right.

23           MR. RAINEY:  We reached out to Mr. Hendricks.  Not

24  only did he say that he was unavailable, out of the country,

25  but also his personal attorney made the same representation

Ea7radr6

 1    when we tried once again to get him.

 2                THE COURT:  Who is his personal attorney?

 3                MR. RAINEY:  It was a woman, and I don't remember her

 4    name.

 5                THE COURT:  I want to speak with him by phone

 6    tomorrow.  Get me the name and phone number by 9 o'clock

 7    tomorrow.  All right?

 8                MR. RAINEY:  Yes.

 9                THE COURT:  Assuming he is not available, you want to

10    play that deposition.

11                MR. CABRAL:  That's correct, your Honor.

12                THE COURT:  How long will that take?

13                MR. CABRAL:  Right now the video with both parties'

14    designations is approximately one hour.  If your Honor were to

15    rule on the objections, it would be shorter than that.

16                THE COURT:  I'm sorry, I didn't know that was one of

17    the ones that was before me for rulings.  I will have my law

18    clerk pull it out.  I don't think I can get you those rulings

19    until tomorrow morning, because I teach at Columbia tonight.

20    We will put that off till later in the day.  You should have

21    witness number three available to testify right after this

22    witness.  Then I'll try to get you those rulings by certainly

23    no later than the beginning of the lunch hour so you can adjust

24    the video accordingly.

25                MR. CABRAL:  That should be fine, your Honor.  One

Ea7radr6

1    other issue, just to give the Court notice.  The only other

2    issue regarding unavailability of a witness is Sudeep Narain,

3    who also appears relatively early on the witness list.  He is a

4    former Barnes & Noble employee who is not going to be able to

5    testify live.

6                THE COURT:  Also outside the jurisdiction?

7                MR. CABRAL:  Yes, your Honor.

8                THE COURT:  What is his reason?

9                MR. CABRAL:  For that you would have to ask Barnes &

10   Noble.

11               THE COURT:  I am asking Barnes & Noble.

12               MR. SHARIFAHMADIAN:  Your Honor, he is no longer

13   employed by Barnes & Noble.

14               THE COURT:  So what?  I understand you don't control

15   him.  How long was he an employee?

16               MR. SHARIFAHMADIAN:  How long was he?

17               THE COURT:  How long was he an employee, yes.

18               MR. SHARIFAHMADIAN:  I believe he was an employee for

19   a couple of years.

20               THE COURT:  Just a couple of years?

21               MR. SHARIFAHMADIAN:  Yes.

22               THE COURT:  What is he doing now?

23               MR. SHARIFAHMADIAN:  He is in another venture.  I

24   don't know the name of it.

25               THE COURT:  Do you know where it is?

Ea7radr6

1              MR. SHARIFAHMADIAN:  He is in California.

2              THE COURT:  Did anyone ask him whether he would be

3       willing to testify -- I'm not sure I want to do this -- by

4       video conference?

5              MR. SHARIFAHMADIAN:  We did not put the video

6       conference out to him, your Honor.

7              THE COURT:  Did you contact him personally?

8              MR. SHARIFAHMADIAN:  I did not personally speak to

9       him, no.

10             THE COURT:  Who spoke to him personally?

11             MR. SHARIFAHMADIAN:  I believe representatives of

12      Barnes & Noble.

13             THE COURT:  Why don't you talk to him personally and

14      tell him that of course you would be thrilled, as I know you

15      would, to pay his expenses and how can he pass up coming to a

16      city that has rain.  Explain to him more seriously that the

17      jury system functions much better when we have live testimony

18      rather than videotape deposition testimony.

19             I don't have the power to force anyone and I'm not

20      going to try to twist their arms, but my experience has been

21      that, believe it or not, there are a lot of good citizens out

22      there who are quite responsive to the suggestion that they will

23      be doing a public service to a jury of peers if they will

24      appear in person, at some modest inconvenience to them but with

25      every attempt to moderate that inconvenience so that the jury

Ea7radr6

1    could have a chance to hear and see them first-hand and not

2    have to rely on something indirect.

3          Not everyone is responsive to that.  I can well

4    imagine that some -- what was he, CEO of Discovery?

5          MR. CABRAL:  He was the former chairman.

6          THE COURT:  Corporate chairman.  Now he is off and no

7    longer in the country, is that the information?

8          MR. CABRAL:  Your Honor, unfortunately, I don't know

9    his personal circumstances.

10          THE COURT:  How can I possibly expect someone like

11    that to respond to a request in the interests of justice and

12    public service?  But maybe he will.

13          MR. CABRAL:  The extent of my knowledge is that he is

14    out of the country, your Honor.

15          THE COURT:  Maybe your former employee would as well.

16    Let's give it a try, gentlemen.

17          See you tomorrow at 9 o'clock.

18          MR. BERTA:  Your Honor, there has been an issue with

19    respect to witness ORDER.

20          THE COURT:  We will take that up tomorrow.  I have

21    another matter that is 15 minutes late right now.

22          (Adjourned to 9:00 a.m., October 8, 2014)

23

24

25

1                          INDEX OF EXAMINATION

2       Examination of:                              Page

3       TALAL SHAMOON

4       Direct By Mr. Cabral . . . . . . . . . . . . .77

5       Cross By Mr. Ederer  . . . . . . . . . . . . 115

6                          DEFENDANT EXHIBITS

7       Exhibit No.                              Received

8        50    . . . . . . . . . . . . . . . . . . 124

9        286   . . . . . . . . . . . . . . . . . . 125

10       282   . . . . . . . . . . . . . . . . . . 132

11       650   . . . . . . . . . . . . . . . . . . 133

12       115   . . . . . . . . . . . . . . . . . . 142

13                           JOINT EXHIBITS

14      Exhibit No.                              Received

15       9                                        88

16       10                                       89

17       32                                       94

18      31   . . . . . . . . . . 109

19

20

21

22

23

24

25