```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   ADREA, LLC,

 4                      Plaintiff,

 5            v.                          13 Cv. 4137 (JSR)

 6   BARNES & NOBLE, INC.,
     BARNESANDNOBLE.COM LLC, AND
 7   NOOK MEDIA LLC,

 8                      Defendants.

 9   ------------------------------x

10                                        October 10, 2014
                                          2:00 p.m.
11
     Before:
12                      HON. JED S. RAKOFF

13                                        District Judge

14                         APPEARANCES

15   PROSKAUER ROSE LLP
          Attorneys for Plaintiff
16   BY:  STEVEN M. BAUER
          COLIN CABRAL
17        BRENDAN COX

18   ARNOLD & PORTER LLP
          Attorneys for Defendants
19   BY:  LOUIS S. EDERER
          ALI R. SHARIFAHMADIAN
20        MICHAEL A. BERTA
          YUE-HAN CHOW
21        SUSAN BRACKNEY ARNI

22

23

24

25
```

                        (Trial resumed; jury not present)

 1                      THE COURT:  Good afternoon.  We are here for a Daubert

 2   hearing.  Let me first exclude from the courtroom all witnesses

 3   except for the first one who will testify, who is Mr. Barnes.

 4                      We have a lot to do here, but we have a particularly

 5   attentive jury, so I'm sure we will be able to move forward

 6   expeditiously.

 7                      Please get Mr. Barnes here on the stand.

 8    NED BARNES,

 9         called as a witness by the Court,

10          having been duly sworn, testified as follows:

11                      THE CLERK:  State your name and spell it slowly for

12   the record.

13                      MR. EDERER:  My name is Ned Barnes, N-E-D B-A-R-N-E-S.

14                      THE COURT:  Mr. Barnes, very briefly, tell us your

15   background.

16                      THE WITNESS:  My background.  I graduated in 1991 from

17   George Mason University with a degree in accounting.  I

18   practiced as a CPA for approximately six or seven years, at

19   which time I got into financial consulting, including

20   consulting related to dispute resolution and litigation

21   support.  I have been a practicing economic consultant and

22   forensic accountant for approximately 15 to 20 years.

23                      THE COURT:  Were you retained by Barnes & Noble in

24   this case?

```
 1              THE WITNESS:  I was, your Honor.

 2              THE COURT:  What are you charging?

 3              THE WITNESS:  I'm sorry?

 4              THE COURT:  What are you charging?

 5              THE WITNESS:  My firm charges I believe it is 475 an

 6   hour for my time.

 7              THE COURT:  So far, how much billable time has been

 8   run up?

 9              THE WITNESS:  In terms of dollar value, I believe that

10   total invoices for my time and people working at my direction

11   is probably in the neighborhood of 175 to $200,000.

12              THE COURT:  We will begin with counsel for the party

13   challenging Mr. Barnes's testimony, which is plaintiff's

14   counsel.

15              MR. CABRAL:  Thank you, your Honor.

16   EXAMINATION

17   BY MR. CABRAL:

18   Q.  Good afternoon, Mr. Barnes.

19   A.  Good afternoon.

20   Q.  You provided opinions in this case relating to a reasonable

21   royalty for infringement of the patents-in-suit, correct?

22   A.  That is correct.

23   Q.  In your report you rely on a license and settlement

24   agreement between Amazon, Discovery, and ADREA executed in

25   2011, is that right?
```

1   A.  That was one of the pieces of information I considered,

2   yes.

3   Q.  You say in your expert report that the royalty rates

4   associated with the Amazon agreement provide a reliable basis

5   to conservatively analyze the rates that would be given and

6   agreed to in a hypothetical negotiation in this case, is that

7   right?

8   A.  I believe you have accurately reflected my summary

9   conclusions, yes.

10   Q.  Thank you.

11         THE COURT:  What did you conclude, if there was an

12   infringement in this case, was the rate you would assign?

13         THE WITNESS:  For all three of the patents, your

14   Honor, it was 10 cents per unit.  But I provided separate

15   calculations for each of the three patents if less than three

16   are found to be valid and infringed.

17         THE COURT:  You are aware that the plaintiff's expert

18   says it should be 50 cents a unit?

19         THE WITNESS:  I was and I am, yes, your Honor.

20         THE COURT:  So there is this modest difference of 500

21   percent between your estimate and his estimate?

22         THE WITNESS:  That is correct, sir.

23         THE COURT:  Go ahead, counsel.

24   BY MR. CABRAL:

25   Q.  I'll skip ahead and get right to the subject matter we have

1  just talked about.

2          THE COURT:  Always a good idea.

3  Q.  The royalty rate that you have, is it correct that you

4  calculated per-unit rates of 8 cents and 4 cents associated

5  with a license to the Discovery ebook patent portfolio?

6  A.  I'm sorry.  Say that again.  I didn't follow that.  I

7  apologize.

8  Q.  Is it correct that you calculated per-unit rates of 8 cents

9  and 4 cents associated with a license to the Discovery ebook

10 patent portfolio?

11 A.  I calculated 8 cents as the royalty rate for both the '851

12 and the '501 patent, and 4 cents, a maximum of 4 cents, for the

13 '501 patent only.

14 Q.  If we can bring up page 48 of your expert report.  You

15 submitted an expert report in this case, correct?

16 A.  I did.

17 Q.  If we could bring up page 48.  Specifically, in paragraph

18 89, which is towards the bottom half of that page, in the

19 middle, about four lines down, you say, "Based on this

20 analysis, I calculated a per-unit royalty of 8 cents associated

21 with a license to the Discovery ebook patent portfolio."  Do

22 you see that?

23 A.  I do.

24 Q.  That rate is for all of the Discovery patents owned by

25 plaintiff ADREA, correct?

1  A.  You're right, that would be the rate.  I conservatively

2  made the decision not --

3  Q.  That's right --

4          THE COURT:  Wait.  I don't want interruptions.

5          MR. CABRAL:  No problem.

6          THE COURT:  You were saying.

7  A.  I was just saying I made the decision to conservatively not

8  apportion any of that value to any of the other patents that

9  were in the portfolio.  In other words, I attributed all of the

10  value that I had calculated to just the '851 and the '501

11  patent.  Although, as you and I are both aware, there were many

12  other patents that were licensed in connection with that

13  agreement.

14  Q.  The 8 cent royalty that you have here, that's good until

15  December of 2012, is that right?  That applies to sales made

16  before December 2012?

17  A.  You are correct.  That would only apply until the

18  expiration of the '851, which was in December of 2012.

19          THE COURT:  Let me ask you this.  If there was

20  infringement in this case, the infringement would have occurred

21  beginning around 2009, yes?

22          THE WITNESS:  That's correct, your Honor.

23          THE COURT:  So the problem that both you and the other

24  damages expert had was how to calculate what royalty would have

25  been paid in a hypothetical negotiation that occurred in 2009

1    seeking to license these patents, yes?

2              THE WITNESS:  That is correct, your Honor.

3              THE COURT:  Was there any data from the 2009 period

4    that you utilized.

5              THE WITNESS:  Yes, there was.

6              THE COURT:  What was that?

7              THE WITNESS:  I utilized information related to ADREA

8    and its predecessor's attempts to license the technology,

9    license their patent portfolio, unsuccessful, to a number of

10   other parties.  That was economic information that I

11   considered.

12             THE COURT:  Since those didn't result in actual

13   licensing, how did you factor that in?

14             THE WITNESS:  Consistent with my analysis of the

15   Georgia-Pacific factors, that was a source of economic

16   information that I considered that would likely result in a

17   downward pressure on the outcome of the hypothetical

18   negotiation.

19             THE COURT:  Then you still had to come up with a

20   figure, and that doesn't provide the figure itself; it just

21   provides a downward factor, yes?

22             THE WITNESS:  That specific economic information did

23   not provide a specific figure, correct.

24             THE COURT:  What did you primarily rely on?  I had the

25   impression it was the Amazon settlement.

287

1          THE WITNESS:  Yes, I utilized the Amazon agreement and

2    economic information that I believe was embedded in the Amazon

3    agreement as a starting point.

4          THE COURT:  This was a settlement of a lawsuit brought

5    by ADREA against Amazon relating essentially to the same kind

6    of claims, yes?

7          THE WITNESS:  I believe that is generally true, yes,

8    your Honor.

9          THE COURT:  What led you to believe that a settlement

10   negotiation of a lawsuit was a reasonable proxy for an arm's

11   length fair market negotiation?

12         THE WITNESS:  A couple of things, your Honor.  First,

13   while I recognized that there was litigation surrounding the

14   negotiation, as a valuation professional and an empiricist,

15   someone who analyzes these types of issues for a living, the

16   circumstances surrounding that negotiation, while a relevant

17   factor and a relevant consideration, does not, in my view,

18   render the data irrelevant or such that we want to dismiss it.

19         Rather, we would want to investigate that particular

20   issue and other issues which I investigated to determine if

21   there are distinguishing characteristics or factors that we

22   would want to take into account in analyzing or juxtaposing the

23   Amazon agreement and the royalty terms associated with that and

24   what would likely have prevailed at the hypothetical

25   negotiation.

1          THE COURT:  You said in your answer just now, first,

2     that the fact that it is a litigation doesn't mean that it is

3     irrelevant.  Then you say, quote, Rather, we would want to

4     investigate that particular issue and other issues which I

5     investigated to determine if there are distinguishing

6     characteristics or factors that we would want to take into

7     account in analyzing or juxtaposing the Amazon agreement and

8     the royalty terms associated with that and with what would

9     likely have prevailed at the hypothetical negotiation, closed

10    quote.

11         Forgive me, but that doesn't tell me anything.  What

12    you just said was in some ways it is the same and in some ways

13    it's different.  What are the ways it is the same and what are

14    the ways it's different?

15         THE WITNESS:  I apologize, your Honor, if I wasn't

16    clear.  Let me try and state it this way.  I identified four

17    specific factors that I made particular note of in my analysis

18    that I believe would potentially differentiate the royalty

19    terms that might have arisen from the Amazon agreement and what

20    might have been present in the hypothetical negotiations.

21         THE COURT:  What were those factors?

22         THE WITNESS:  The first was the general market

23    conditions associated with the two negotiation periods.

24         THE COURT:  Because you would have to go back to 2009?

25         THE WITNESS:  That's correct, you would have to go

1   back to 2009, and you would have to consider Amazon's position

2   in the market relative to 2011 versus Barnes & Noble's position

3   in the market in 2009.

4         THE COURT:  OK.

5         THE WITNESS:  Would you like me to explain that more,

6   what I did?

7         THE COURT:  Let me hear the four factors first.

8         THE WITNESS:  The second factor is I considered the

9   scope of the two agreements.  The scope of the Amazon agreement

10  with ADREA covered, as counsel has mentioned, the entire

11  portfolio, which included many patents other than the three

12  patents that are at issue here.  It also included worldwide

13  rights to many of those patents, whereas the hypothetical

14  negotiation is only, to my understanding, addressing U.S.

15  patent rights.

16        The third factor was I did take into account what I

17  call the litigation issue or the fact that you've got some

18  external pressure.  Again, as a valuation professional, I don't

19  think that ultimately makes a significant difference.  But it

20  is a factor that, all things being equal, I would consider

21  would push the royalty rate higher in a hypothetical

22  negotiation relevant to a litigation settlement.

23        The fourth factor was present in the Amazon agreement

24  was a cross-license that Amazon provided back to Discovery.

25  That is a consideration that would not have been, as I

1    understand it, present in the hypothetical negotiation.  So I

2    tried to take that into account.

3              THE COURT:  Let's take the third factor, the

4    litigation factor.  How do you put a value on that factor?

5              THE WITNESS:  It's difficult in the abstract to put a

6    specific monetary value on that one factor in this particular

7    case, where we don't have any economic information to try and

8    compare it to, say, a scenario where there wasn't a litigation

9    settlement environment.

10             What I did is I essentially weighted that, as I have

11   indicated previously, as a factor that, all things being equal,

12   would cause the hypothetical negotiation rate to be higher.

13   But that was counterbalanced by my discussion or my

14   consideration of the other factors.

15   Q.  What you are saying is although you thought that that

16   factor would, if anything, have led the Amazon rate to be

17   higher than an arm's length rate, you thought whatever degree

18   that was true is offset by the other factors?

19             THE WITNESS:  Yes, your Honor, I believe that's

20   accurate.

21             THE COURT:  Why do you think it would lead to a higher

22   rate?

23             THE WITNESS:  Why do I think the fact of litigation

24   surrounding the negotiation?

25             THE COURT:  Yes.

Faarad$h1                        Barnes - by Mr. Cabral

1          THE WITNESS:  It potentially can lead to a higher rate

2   if there is a motivation on the parties, in this case

3   particularly Amazon, to pay a royalty not so much for the value

4   of the license in a negotiation that is free from all external

5   litigation threat or presence.  What it really would boil down

6   to is the value proposition for what is being acquired, the

7   license.

8          THE COURT:  What stage was that case at when it

9   settled.

10          THE WITNESS:  I'm not particularly -- I believe it was

11   in the relatively early stages.  I don't believe it had been

12   scheduled for trial.

13          THE COURT:  Was there a claim, if you know, a counter-

14   claim or cross-claim by Amazon to invalidate the patents?

15          THE WITNESS:  I believe that there was, yes, your

16   Honor.

17          THE COURT:  Wasn't the litigation risk potentially as

18   great, if not greater, for the plaintiff than it was for the

19   defendant?

20          THE WITNESS:  Yes, your Honor, that is a fair point.

21   You could argue that whatever risk is embedded in the

22   litigation environment would be potentially equal or greater

23   for the patent holder as it would be for the accused infringer.

24   I approached this and my consideration of this factor more from

25   a conservative positioning where I wanted to identify what the

Eaaradq1                       Barnes - by Mr. Cabral

1    potential inflation factor could be on a hypothetical

2    negotiation.  I was less concerned in my analysis of it going

3    in the other direction.

4                 THE COURT:  Hypothetically, if, after some initial

5    skirmishing, ADREA had begun to fear that it might have its

6    patents invalidated, they might have had a motivation to take

7    whatever was offered even if it wasn't what they would have

8    gotten in an arm's length negotiation before the litigation.

9                 THE WITNESS:  That is equally a fair point.  That is

10   the risk on the side of ADREA entering into that negotiation

11   and choosing to settle as opposed to pursue litigation.

12                THE COURT:  Let me ask you a different question.  You

13   said, I think, the first factor was that you had to look at

14   relative bargaining or market position as of 2009 as opposed to

15   2011.  How did you determine that?

16                THE WITNESS:  I looked at economic information that

17   was available in 2011, in which case Amazon had been in this

18   market, in the market for selling devices that were alleged to

19   utilize the ADREA patents, for approximately three or four

20   years.  They were successful.  They were, I believe, the

21   largest seller of dedicated ereader devices in the market at

22   that time.  They had also just recently introduced a tablet

23   device called the Kindle Fire to a fair amount of fanfare at

24   the time and it was highly touted.

25                I juxtaposed that situation with 2009 in the case of

1   Barnes & Noble being a licensee or the prospective licensee, in

2   which case Barnes & Noble had not yet introduced a product.  So

3   there was certainly a level of risk that both parties would

4   view, but particularly Barnes & Noble, as to whether they would

5   be successful or not in selling the devices that were alleged

6   to infringe.

7        THE COURT:  If I understand what you just said, Amazon

8   is already out there with the Kindle, saying this is the

9   greatest thing ever and Barnes & Noble isn't even into the

10  marketplace in this regard yet.  If Barnes & Noble really

11  wanted to enter this market, why wouldn't that make them, if

12  anything, more anxious to quickly acquire the license for the

13  patented invention so they could enter into this market before

14  it was totally taken over by Amazon?

15       THE WITNESS:  That would be a potentially relevant

16  consideration on the part of Barnes & Noble.  But I also

17  believe that Barnes & Noble would be entering the negotiation

18  and saying we are not out there in the market yet, we don't

19  have a successful product, we don't know if we are going to

20  have a successful product, and that's going to limit our

21  ability to pay a license fee or significant license fee when we

22  don't even know yet if we are going to have a significant

23  presence in the market.

24       It's also slightly different in the context of when

25  you compare it to Amazon because it may present Barnes & Noble

Eaaradgl                    Barnes - by Mr. Cabral

1    with an opportunity to say, rather than take a license to that

2    particular feature or that particular patent, we can just take

3    that out or we can design around that or we can do something

4    different.  They don't have the issue of having an installed

5    base out there where they have already gone about and invested

6    in promoting a product that utilizes, potentially or allegedly

7    utilizes the patents that are at issue.

8            THE COURT:  What I guess I'm getting at is wouldn't

9    either of those approaches be equally reasonable?  It would

10   depend perhaps on the personality of the negotiators, how much

11   Barnes & Noble were guessing that they could make a splash in

12   this market or not, whether, if their company was suffering,

13   they sort of wanted to make a Hail Mary pass, or whether they

14   viewed it as something that was too risky to do more than a

15   modest investment?  Wouldn't all those things be equally

16   plausible?

17           THE WITNESS:  I don't disagree with you that they are

18   not plausible.  But in analyzing the potential economic

19   ramifications of a negotiating position, I generally believe --

20   and this I believe is consistent with the typical Georgia-

21   Pacific analysis, where some of these factors are explicitly

22   set forth -- that a product that is successful, a product that

23   has significant profits, has significant sales, has significant

24   market share, that is, all things being equal, is generally

25   likely to favor the patent holder in terms of negotiating a

Eaarad81                Barnes    by Mr. Cabral

1    royalty versus a product that is not established, not yet

2    commercially available, not commercially successful.

3         I agree with you, we don't know precisely, but we have

4    to try and exercise judgment in analyzing the economic

5    ramifications of that situation.

6         THE COURT:  What was, if you know, Barnes & Noble's

7    overall economic position as of 2009?  Where they in trouble?

8    Were they doing OK at that point?

9         THE WITNESS:  Your Honor, I apologize.  I probably

10   should know that.  I don't have that information at the tip of

11   my fingers right now.  I believe that they were somewhat -- I

12   just don't know.  I don't think they were in significant

13   financial straits at that time, but I could stand to be

14   corrected on that.

15        THE COURT:  Shifting gears again, you made certain

16   projections -- let me make sure I get this right -- as to

17   Amazon sales to arrive at a proxy for what adjusted Barnes &

18   Noble sales would be?

19        THE WITNESS:  That's correct.  What I tried to do was

20   analyze the economics, the economic underpinnings, of the

21   Amazon agreement in order to derive what I believed would be a

22   per-unit rate associated with that agreement.

23        THE COURT:  For the 2011 sales, you relied on data

24   from something called International Data Corporation?

25        THE WITNESS:  That is correct.  That was a source of

Eaaradrl                     Barnes - by Mr. Cabral

1    information, of data from 2011, because there wasn't actual

2    data in the record for 2011.

3           THE COURT:  As it turned out, the International Data

4    Corporation's estimates were very much larger than what turned

5    out to be the case, yes?

6           THE WITNESS:  No, I don't believe that is accurate.  I

7    still to this day don't have actual data for 2011.  But I did

8    point out that there was information in the record on Amazon's

9    own estimate -- it was partial-year, their own partial-year

10   estimates for 2011 -- and the IDC data for 2011 is reasonably

11   in line with those internal Amazon documents.

12          THE COURT:  The IDC estimates for 2011 were 370

13   percent larger than the actual sales for 2010, right?

14          THE WITNESS:  Compared to 2010, yes, sir, that's

15   correct.

16          THE COURT:  That's a huge increase.  What would be the

17   basis for that estimate?

18          THE WITNESS:  Part of the basis is, as I mentioned

19   earlier, in the last quarter of 2011 Amazon introduced a new

20   product called the Kindle Fire.  The information I reviewed

21   indicated that sales of that product alone were in the

22   neighborhood of 5 or 6 million units for just one quarter, part

23   of one quarter.

24          THE COURT:  You think that would be a reasonable basis

25   for the IDC conclusion that there would be a very large

Faaradrel                    Barnes - by Mr. Cabral

1    increase in sales between 2010 and 2011, yes?

2              THE WITNESS:  I do.

3              THE COURT:  I understand.  Why didn't you choose the

4    IDC estimates for 2012 and 2013?

5              THE WITNESS:  The reason I did not utilize estimates,

6    actual estimates for actual data for 2012 and 2013 is because I

7    was trying to put myself in the position of the parties to that

8    agreement, ADREA and Amazon, in 2011 in analyzing the economic

9    underpinnings that led them to conclude, those two parties to

10   conclude that Amazon were going to pay and ADREA was willing to

11   accept the royalties that came out of that agreement.

12             Information that I reviewed on the part of both

13   available industry data as well as ADREA's own documents

14   indicate that there was a belief, a view, that there was going

15   to be continued growth in those products.  What happened

16   subsequent to that point is not particularly relevant to

17   putting yourself in the mindset of the actual negotiation in

18   2011 that yielded the agreement.

19             THE COURT:  Instead you used, I think, from 2012 on a

20   10 percent growth rate.

21             THE WITNESS:  That's correct.

22             THE COURT:  Where did you get that?

23             THE WITNESS:  I considered a number of available

24   industry services that were available at that time or

25   surrounding that period of time where various analysts,

Faaradre1                    Barnes - by Mr. Cabral

1    industry and market analysts, were making forecasts for the

2    market for ereaders and associated tablet devices that covered

3    the period from 2012 to 2016.

4                THE COURT:  Were they all the same?

5                THE DEFENDANT:  They were roughly in the neighborhood

6    of low 20s to 30 percent or so.  Again, I wanted to be

7    conservative in my estimate, so I dialed that back down to 10

8    percent.

9                THE COURT:  Were they reliable, in your view?

10               THE WITNESS:  I believe they would have been reliable

11   in the sense that this would have been information that would

12   have been available to ADREA, for example, in its discussions

13   with Amazon in it efforts to try and convince Amazon to pay a

14   royalty.

15               THE COURT:  So why dial it down?

16               THE WITNESS:  That was just a judgment call I made to

17   be conservative.  If I had put in 20 or 30 percent, I don't

18   have those exact calculations at the top of my head, but it

19   would have resulted in a somewhat lower royalty rate.

20               THE COURT:  I understand it would have cut even lower.

21   I guess the question I'm asking is, this is part of it is not

22   your calculation.  It is in effect taking what the analysts out

23   there, using whatever information they may or may not have had,

24   seemed to have arrived at a consensus which may or may not have

25   proved to be accurate.  You felt that, nevertheless, under

Faaradz1                    Barnes - by Mr. Cabral

1   these circumstances taking account of that consensus made

2   sense.  If that is true, then I don't see what the basis is for

3   dialing it down.

4           THE WITNESS:  Your Honor, it was just my conservative

5   nature, my conservative judgment that I would rather not

6   utilize the full growth that was reflected in those forecasts

7   or projections, knowing that --

8           THE COURT:  That you were going to be cross-examined

9   on it?

10          THE WITNESS:  Obviously, I know if I had taken a more

11  aggressive approach, it would be subject to maybe a little more

12  strenuous cross-examination.  But I felt that it was the right

13  approach in this case.

14          THE COURT:  All right.  Counsel.

15  BY MR. CABRAL:

16  Q.  If I could follow up with a few questions about the actual

17  IDC data you and your company received.

18  A.  Sure.

19  Q.  We received a native file -- we actually have it here, your

20  Honor, we received it after filing our motion -- the actual IDC

21  historical estimates for Amazon which shows estimates for 2010,

22  2011, 2012, and three quarters of 2013.  We can bring that up

23  on the screen if it is helpful.  I will ask you a few questions

24  about it right now.

25          Are you aware that the IDC historical estimate for

 1  Amazon sales in 2012 dropped from 19.6 million to 14.1 million?

 2  A.  I am familiar with that, yes.

 3  Q.  Then are you also familiar with the fact that the IDC

 4  historical estimate in 2013 dropped from 14.1 million to

 5  8.8 million?

 6  A.  Those numbers, I don't have a recollection of those

 7  numbers.  If you've got them here, I'd be happy to.  That

 8  doesn't ring a bell.

 9  Q.  We can do the math here if it is helpful.  Are you aware of

10  any information regarding IDC historical estimates for 2013?

11  A.  I was aware or I am now aware of the three quarters of

12  information for 2013.

13  Q.  Did those numbers show a growth rate or a decline?

14  A.  Those numbers were lower than two thousand -- they were

15  lower than the three quarter period for 2012.  They did not

16  included the fourth quarter, which is where a significant

17  portion of the sales occur every year in this market.

18  Q.  Is it fair to say that the numbers were considerably lower

19  than the prior year?

20  A.  For the three quarter period?  For the three quarter period

21  I believe they declined from -- I don't have the numbers

22  committed to memory.  They declined by some degree, yes.

23  Q.  Did you know this information when you submitted your

24  expert report?

25  A.  As I was discussing earlier, the information on actual

Eaaradgl                    Barnes - by Mr. Cabral

1   sales of Amazon products or accused products after 2011 were

2   not particularly relevant to me because of reasons that I have

3   already stated, that I was trying to put myself in the position

4   of the parties to that agreement in 2011.  I don't recall

5   seeing that information when I filed my report.

6   Q.  I understand they may not have been relevant to you.  But

7   did you have access to that information when you submitted your

8   expert report in this case?

9   A.  The information was clearly available.  That's not a

10  question.

11  Q.  It was available in the spreadsheet that was provided to

12  you by IDC, correct?

13  A.  I understand that this information, the information that

14  you have described, was included in the spreadsheet.  I did not

15  look at the spreadsheet personally.  I requested information

16  for the 2011 period, and that was provided to me.

17  Q.  Is it fair to say in your expert report you projected a 10

18  percent growth rate for 2012 when the IDC data actually

19  reflected a significant decline in Amazon historical estimates?

20  A.  You are correct that I projected, as I have already

21  discussed, I projected a 10 percent growth rate based on

22  information that I considered would have been known or at least

23  foreseeable by the parties in 2011 notwithstanding what

24  occurred after that date.

25  Q.  Is it also correct to say that you projected another 10

1   percent growth in 2013 despite the IDC data reflecting

2   significant declines in Amazon's historical sales?

3   A.  I did.  Again, for the purpose of my use of that

4   information, it was not relevant to understanding how the

5   parties arrived at the value proposition that they arrived at

6   in 2011.  It was relevant what they would have considered at

7   that time, not what happened subsequently.

8              THE COURT:  I understand that.  But why is 2011 the

9   relevant date?  Isn't 2009 the relevant date?

10             THE WITNESS:  Again, your Honor, what I am trying to

11  utilize here, I am trying to analyze this agreement, which

12  occurred in 2011, and evaluate the economic underpinnings of

13  this agreement to try and derive a value data point, a relevant

14  data point.  Then I took the next step of considering that data

15  point in juxtaposition to what might have occurred in 2009.  It

16  was a two-step process.

17             THE COURT:  Counsel, I'm going to give you five more

18  minutes.

19             MR. CABRAL:  Thank you, your Honor.

20  BY MR. CABRAL:

21  Q.  Did you compare the IDC data that was provided to you in

22  the Tablet Tracker against the actual 2010 numbers produced by

23  Amazon?

24  A.  I don't recall whether I did or I didn't.  My understanding

25  is that there is some variation in those numbers from what was

Faarad21        Barnes - by Mr. Cabral

1    reflected in the Amazon actual records.  Because I had Amazon

2    actual records for 2010, I chose to utilize those instead.  I

3    believe those were a more relevant indication of Amazon's

4    sales.

5    Q.  Are you aware that the IDC estimate for 2010 reflecting

6    Amazon's historical sales overstated the actual numbers by

7    approximately 800,000 units?

8    A.  That number sounds about right.  I think it was 5 million

9    plus or minus in the actual Amazon records and closer to

10   6 million in the IDC data.

11   Q.  Did that inform your opinion as to the accuracy of the IDC

12   data?

13   A.  It's a relevant consideration.  But as I mentioned earlier,

14   again, I only used the IDC data for 2011 and I considered that

15   in comparison to Amazon's own data for estimated 2011 sales.

16   It was generally in line with that data.  So, I wasn't

17   concerned about the accuracy of the IDC data.  In my business I

18   have utilized IDC data on a number of occasions.

19   Q.  Had you used the IDC data for 2010, 2011, 2012, and 2013,

20   that is, all of the IDC data that was available to you when you

21   submitted your expert report, is it fair to say that your

22   per-unit rate using the same methodology you used would be

23   significantly higher than the rate that was reported in your

24   expert report?

25   A.  I don't know exactly what those numbers would work out to

1    be.  I haven't done that calculation.  I don't know.  I know

2    that if you were to take, for example, the -- if we were to

3    utilize -- I don't believe it is appropriate to utilize the

4    actual data, because it is not something that would have been

5    known by the parties when they negotiated that agreement.

6            But if you were to utilize that information and then

7    carry it forward in a manner consistent with, for example, what

8    Professor Magee did, I think you would probably get a somewhat

9    higher royalty rate.  I think I calculated it to be about 15

10   cents instead of 10 cents.

11           THE COURT:  Since Professor Magee, who we will hear

12   from very shortly, came up with a very different rate than you

13   did, you must believe that his methodology was flawed, yes?

14           THE WITNESS:  I do, your Honor.

15           THE COURT:  If you had to describe the one or two

16   largest flaws, what would they have been?

17           THE WITNESS:  The two that I would point to, your

18   Honor, is, one, he applies a 50 cent rate to the entire time

19   period irrespective of which patent might be hypothetically

20   being utilized by Barnes & Noble.

21           THE COURT:  That might be a mistake, but that wouldn't

22   account for the difference between 50 cents versus 10 cents,

23   would it?

24           THE WITNESS:  No, your Honor.  In total it would still

25   be 50 cents versus 10 cents for the period of all three.  That

Faarad01                    Barnes - by Mr. Cabral

1   was just one criticism.

2           The primary criticism that I would argue against the

3   50 cent rate is it is not based on any actual fair market value

4   transaction where any party has actually agreed to take a

5   license and pay any money at that rate.  The only document that

6   I am aware of in this entire case that supports the 50 cent

7   rate that he utilized was a proposal that ADREA made to Barnes

8   & Noble in 2012, I believe, a proposal that was rejected.

9           Again, in my business as a valuation professional, an

10  offer, a proposal that is made by one party, does not provide

11  much economic evidence of fair market value, particularly when

12  that offer was rejected.

13          THE COURT:  In other words, if I understand what you

14  are saying, the Amazon settlement may not be a perfect proxy

15  for the negotiations.  It's a little bit in some respects like

16  comparing apples and oranges.  But at least apples and oranges

17  are both fruit.  He doesn't have any fruit at all is what you

18  are saying?  Not perhaps in those words.

19          THE WITNESS:  That is an interesting characterization,

20  your Honor.  I don't think I would disagree with that.

21          (Continued on next page)

22

23

24

25

 1          THE COURT:  One more question or one more quick line

 2   of questions.

 3          MR. CABRAL:  I will.

 4   BY MR. CABRAL:

 5   Q.  Is it correct that you apportioned the royalty rates in

 6   your expert report on a per patent basis and arrived at one

 7   one-thousandth of a cent of an effective per unit royalty rate

 8   for the '703 patent at issue in this case?

 9   A.  I did a calculation that would evaluate what it would be if

10   you did it on a per patent basis for the whole portfolio.  The

11   opinion that I presented for the '703 patent is it would be two

12   cents per unit.

13   Q.  That's for the entire portfolio, the Philips portfolio,

14   correct?

15   A.  It's also for what I advanced in my calculation for the

16   licensing of the '703 patent.

17          MR. CABRAL:  With your permission, I will just show

18   him one last exhibit and ask one last question.

19          THE COURT:  OK.

20          MR. CABRAL:  If we can put up Supplemental Exhibit 5,

21   which is a summary of reasonable royalties.

22   Q.  This document reflects your per patent apportionment

23   royalty rates for the three patents at issue in this case,

24   correct?

25   A.  This is the calculation that I presented that does it on a

1  per patent basis, but Supplemental Exhibit 4 had the

2  calculations that I have actually advanced as my opinion for

3  the outcome of the hypothetical negotiation.

4  Q.  The calculation that you used, you divided your royalty

5  rate for the portfolio and divided equally amongst the number

6  of patents in the portfolio, isn't that right?

7  A.  Not in connection with the opinion I have advanced as to

8  what the appropriate outcome of the hypothetical negotiation

9  would be.

10  Q.  With regard to this opinion right here in Exhibit 5 showing

11  an effective per unit rate for each of the patents-in-suit in

12  this case that would be correct, right?

13  A.  This is an illustrative example of the calculation if it

14  were done on a per patent basis.

15          MR. CABRAL:  Thank you, your Honor.

16          THE COURT:  I will give plaintiff's counsel a few

17  minutes.  I mean defense counsel.

18  EXAMINATION

19  BY MR. EDERER:

20  Q.  Mr. Barnes, I just want to clarify one thing.  There was

21  some testimony earlier with respect to the question of whether

22  there would be a downward or upward pressure at the time of the

23  hypothetical negotiation with respect to the fact that the

24  Amazon agreement was the settlement of a litigation versus the

25  hypothetical negotiation being not involving litigation.  Do

1  you recall that?

2  A.  I do.

3  Q.  Would you just clarify which way you concluded, whether the

4  pressure would be upward or downward, at the time of the

5  hypothetical negotiation with respect to that issue?

6  A.  Well, with respect to that issue -- again, I believe this

7  was a conservative evaluation of that criteria -- I concluded

8  that it would provide upward pressure in connection with the

9  hypothetical negotiation, although, as his Honor points out,

10 you could actually make that argument either way.

11 Q.  So the question then would be:  When you say upward

12 pressure, you mean that Barnes & Noble would pay more as a

13 result of the fact that this was not a litigation negotiation

14 or less?

15 A.  That they would pay more.

16       MR. EDERER:  I think that, your Honor, when you asked

17 the question to Mr. Barnes, it may have been in reverse.  I

18 just want to make sure the record is clear.

19       THE COURT:  Well, I am just a dumb judge, but now I

20 don't think I understand your analysis at all.

21       I thought your original position, recognizing that

22 this was not a major factor as you analyzed it in any event

23 because you felt it was washed out or contradicted by other

24 factors, was that Amazon would have paid some amount of money,

25 in terms of the licensing agreement that they entered into with

1   the plaintiff, that was reflective not on what they really

2   thought was its fair market value, but because they wanted to

3   get rid of the litigation.  Did I misunderstand that?

4           THE WITNESS:  I don't think you misunderstood it, and

5   I apologize.  I think I was trying to respond to your question,

6   which I thought was asking about why it could influence in the

7   other direction.

8           THE COURT:  And there are factors going both ways,

9   which I think you wound up agreeing with.

10          Just taking that one factor, if Amazon was of the

11  view, we don't want years of litigation in federal court, where

12  there is broad discovery, where the attorneys charge an arm and

13  a leg, so to get rid of these folks, even though we don't think

14  they have got a case, we will pay a little bit more, then, to

15  the extent you can quantify that, that would mean that the

16  arm's-length negotiation that was hypothetically had with

17  Barnes & Noble should be at a lower royalty, yes?

18          THE WITNESS:  That's correct.  Focusing just on that

19  piece, I agree.

20          THE COURT:  I think that's different from what you

21  were just trying to bring out, counsel.

22          MR. EDERER:  I was just trying to clarify based upon

23  what Mr. Barnes actually said in his report.

24          THE COURT:  We went through that.  I understand your

25  point.  That's a good one too.  Anything else?

 1            MR. EDERER:  No, your Honor.  That's it.

 2            THE COURT:  Thank you so much.  You may step down.

 3            (Witness excused)

 4            THE COURT:  Would someone go get Mr. Magee and bring

 5   him here?

 6            MR. EDERER:  Would you like Mr. Barnes to stay in the

 7   building?

 8            THE COURT:  No.  I don't want him in the courtroom

 9   because he is going to be testifying later at trial.  He is

10   more than welcome, of course, to wander through the courthouse

11   observing the beauties of the place, but if he would like to

12   leave, he may leave.

13    STEPHEN PAT MAGEE,

14        called as a witness by the Court,

15        having been duly sworn, testified as follows:

16            THE DEPUTY CLERK:  State your name and spell it slowly

17   for the record.

18            THE WITNESS:  My name is Stephen Pat Magee, Stephen

19   with a P-H, P-A-T, M-A-G-E-E.

20            THE COURT:  Mr. Magee, tell us very briefly about your

21   background.

22            THE WITNESS:  All right.  My background is I grew up

23   in Lubbock, Texas.  I went to Lubbock High School.  I went to

24   Texas Tech as an undergraduate, majored in economics and

25   mathematics.  I have a Ph.D. from MIT in economics.

1         I went on and taught at the University of California

2    at Berkeley for two years, the University of Chicago for five

3    years, the University of Texas about 38 years, and in the

4    interim I did three one-year visits at the University of

5    Chicago in the 1990s.

6         THE COURT:  And you were employed in connection with

7    this litigation by the plaintiff ADREA, yes?

8         THE WITNESS:  Yes.

9         THE COURT:  How much are you charging?

10        THE WITNESS:  I am charging $600 an hour.

11        THE COURT:  So far, approximately how much have you

12   run up in terms of billable time for you and any persons

13   working with you?

14        THE WITNESS:  This is just a guess, your Honor.  I

15   would guess around 150,000 or more.  I'm not sure.

16        THE COURT:  Go ahead, counsel.

17   EXAMINATION

18   BY MR. EDERER:

19   Q.  Professor Magee, you have opined that the per device

20   royalty rate that the parties for this litigation would have

21   negotiated hypothetically in 2009 was 50 cents per Nook device,

22   correct?

23   A.  That's correct.

24   Q.  Is it true, sir, that you have not broken that 50 cent rate

25   down patent by patent?

1    A.  The rate, no.

2    Q.  In fact, you have opined that no matter how many patents

3    are in the picture, it's still 50 cents per device, correct?

4    A.  Yes.

5    Q.  So if, for example, if only the '703 patent were in the

6    picture, the rate would still be 50 cents, correct?

7    A.  Correct.

8    Q.  How much would it be for the '851 patent alone?

9    A.  It would also be 50 cents.

10   Q.  How much for the '703 patent alone?

11   A.  It would be 50 cents.

12   Q.  So it's your position that Barnes & Noble would have agreed

13   to pay a 50 cent royalty even if it was licensing only one or

14   two of these three patents, is that correct?

15   A.  Yes.  The rate would be constant; the amounts paid would be

16   different.

17            THE COURT:  Why would the rate be constant?

18            THE WITNESS:  The rate would be constant because this

19   is typically how patent license agreements are done.  If you

20   look at all of the agreements in the GP-2 frequently, most of

21   those agreements in there are either lump sum or reasonable

22   royalty once the rate has been determined, and patents come and

23   go, but they are still all paying the same royalty rate per

24   unit.

25            THE COURT:  How did you arrive at the 50 cents?

 1          THE WITNESS:  The 50 cents, there are three or four

 2    hard metrics that I looked at that I think point to 50 cents.

 3    There was the PCT capital evaluation back in May of 2008 that

 4    gave a value.  There was an Intertrust value that was given in

 5    2009, right about the month of the hypothetical.  There was an

 6    offer that ADREA made in approximately June or something 2012.

 7    All three of those numbers -- the last one, the offer was 50

 8    cents.  All of the other numbers were substantially above,

 9    anywhere from a dollar to five dollars.

10          THE COURT:  Let's take the last number.

11          So they make an offer of 50 cents and the offer is

12    rejected?

13          THE WITNESS:  Yes, sir, it was.

14          THE COURT:  So why wouldn't the common sense of that

15    be that if there is a negotiation that then goes on, it's going

16    to wind up at something less than 50 cents?

17          THE WITNESS:  Your Honor, the thing that was rejected

18    was not the 50 cents.  It was the combination of the 50 cents

19    and the number of units involved.  So that offer was basically

20    $12-1/2 million.  There was another offer of $15 million.  It's

21    the amount, I believe, in my opinion the amount was rejected.

22          What I am asking for here would be 50 cents for all

23    running royalty damages up to the time of trial of $6 million,

24    not 12-1/2 or 15.  And I think it's reasonable that the parties

25    would pay, Barnes & Noble would pay 7.7 million for the entire

1    life of all the patents.  So what changed was the total

2    package.  My number is about half or so of the total package.

3            More importantly, as you know, your Honor, what

4    happens in negotiations is there is an argument between the

5    parties over whether these patents are valid and infringed or

6    not.  It's typically the defendant's position that these

7    patents are not valid, they are not infringed, and so we don't

8    want to pay for it.  That would have been true around the time

9    of the offer.  I don't know what the reasons were why they

10   rejected the offer, but they rejected it.  And those kind of

11   arguments would be there.

12           That is not true here in court today.  What is true

13   here in court today is damage experts like myself and

14   Mr. Barnes are asked to assume that the patents are valid,

15   infringed and enforceable, and that eliminates all of the

16   uncertainty that goes on in private negotiations.  So that

17   eliminates a major element of risk, and I think that's the

18   important part.

19           THE COURT:  Am I right that there was no actual

20   contract entered into with anyone regarding these patents, so

21   you have to infer indirectly what the result would have been

22   because you can't look at any actual arm's-length negotiation

23   that went on, say, with another purchaser?

24           THE WITNESS:  That's not quite true.  I didn't mention

25   the Amazon agreement.  I think the Amazon is very relevant

1     here.  The Amazon agreement is an actual agreement, and that

2     actual agreement gave a $10 million value to just 14 of the

3     patents that were the Discovery patents.  So that gives a

4     measure, a metric.  And then there is another 2-1/2 million,

5     basically, for the Sony and Philips patents.  That gives an

6     arm's-length measure that doesn't help us on the royalty rate

7     directly, but it goes to insight into the value of the life of

8     the patent for its life.

9          So I do use that as a calibrator to check the

10    reasonableness of my $7.7 million lump sum royalty.  I think

11    that's the value in that license.

12         THE COURT:  Why isn't that also then at least

13    inferentially relevant to determining the rate?

14         THE WITNESS:  It is, your Honor.  My 50 cent rate for

15    the life of these patents, present value back to November 2009,

16    gives you a number of 7.7 million.  I can show you, if you want

17    me to, the link where I see, because of validity and

18    infringement not being present -- there was no clarity about

19    that in that negotiated rate so the rate would be much higher

20    than the 10 million if you adjust for validity and

21    infringement.

22         THE COURT:  I hear what you're saying, but there were

23    factors going both ways, were there not?

24         You're saying right now, for your purposes, you are

25    required to calculate what would have been the negotiated rate

 1   as of 2009 if it was acknowledged that there was infringement,

 2   or acknowledged that ADREA's patents had to be used to produce

 3   the Nook.  And you're saying in the Amazon situation, there

 4   were other factors that would have cut down the rate because

 5   there Amazon was saying, we don't owe you a cent, but we are

 6   willing to negotiate a license anyway.  Do I have that right so

 7   far?

 8          THE WITNESS:  That's right.  The way I would

 9   characterize it more is the $10 million is low because if you

10   adjusted that for validity and infringement, you know these

11   multiples that go into validity and infringement, sometimes

12   they are 50 percent, those are in academic articles.  And then

13   you have on top of this, they got a discount for being the

14   first party to be a license, and that I have seen numbers there

15   quite large.  So maybe that agreement could have been, in my

16   mind, maybe 20 million.  Then you compare that with my 7.7

17   million, and I think that gives some basis for comfort both

18   with the lump sum I calculated, which is like Amazon to the

19   lack of the patents, and to my 50 cent rate.

20          THE COURT:  I guess I am having a little trouble in

21   figuring it out.  If you were to translate or make an analogy

22   between the Amazon settlement and the fair market negotiation

23   with Barnes & Noble that you have to hypothesize here, what

24   factors would you seek to eliminate and which way would they

25   cut?

1              THE WITNESS:  All right.  There's a couple.  I

2       mentioned one or two.

3              In order to compare the Amazon with my lump sum, we

4       need to do the one I already mentioned about validity

5       infringement and a first licensee discount.

6              In addition, there is additional value --

7              THE COURT:  Let me stop you on that one.

8              You're saying that Amazon would have been paying more

9       or less because it was taking the position that the patents

10      were in fact not infringed?

11             THE WITNESS:  They took the position that

12      they -- there is uncertainty as to whether those patents are

13      valid or infringed.  So that uncertainty would cut the number

14      down.  If in court they were found to have infringed and the

15      patents were valid, that would give you a bigger number.

16             THE COURT:  You're saying Amazon is paying less than

17      they would otherwise have paid if they knew the patents were

18      infringed.  They are paying less because they recognize that

19      ADREA has to take into account the fact that they may not be

20      able to prove infringement?

21             THE WITNESS:  Yes, sir, they may not be able to prove

22      infringement.  They don't think the patents are valid, they

23      don't think they are infringed, and so there is a discount

24      there.  If they think they are not valid or infringed at all,

25      they don't have to pay anything.  If ADREA says, no, we are 100

 1   percent sure it is valid and infringed, they are saying it's

 2   100 percent sure.  So one party says zero, one says 100

 3   percent, let's just take the average.  There's a 50/50 chance

 4   these patents are not infringed.  That gets you from 20 million

 5   down to 10 million.

 6            THE COURT:  Why isn't that offset by Amazon's

 7   recognizing that they have to face maybe years of expensive

 8   litigation and they should be willing to pay something?

 9            THE WITNESS:  You're right, your Honor.  The expected

10   cost of litigation is a factor that goes the other way that

11   would lower that $10 million number for the reason you just

12   stated.

13            On the other hand, there is one other thing, and that

14   is, in the agreement Amazon agreed to give a number of their

15   patents over to ADREA.  So that has value.  And so I don't know

16   how these nets balance out, these contrary forces, but they are

17   in opposite directions.

18            THE COURT:  Go ahead, counsel.

19   BY MR. EDERER:

20   Q.  Professor Magee, just to be clear, if the parties had sat

21   down in November 2009 to negotiate a license with respect to

22   the '851 patent alone, you're saying that they would have

23   agreed to a 50 cent royalty rate, is that correct?

24   A.  Yes, sir, but only for the units that were sold, yes.

25   Q.  I am just talking about the royalty rate.

1    A.  Yes.

2    Q.  If they sat down and negotiated a license for the '703 and

3    the '851, you're saying that the rate would still have been 50

4    cents?

5    A.  Yes, sir.

6    Q.  If they sat down and negotiated a license for all three

7    patents, you're saying the rate would still be 50 cents?

8    A.  Yes.

9    Q.  So if the jury finds in this case that one or more of the

10   patents that are at issue are either not infringed or invalid,

11   you're saying the rate is still 50 cents?

12   A.  The rate is 50 cents, but if you're down to one or two

13   patents left, then the amounts all drop because of the royalty

14   base.

15   Q.  Are you saying that each of these patents has equal value?

16   A.  In my opinion, yes, based on all the evidence in the case,

17   each one of these three patents individually contributes more

18   in my opinion than 50 cents per unit to Barnes & Noble.

19   Q.  Each one by itself.  So then in that case, the royalty rate

20   should have been $1.50?

21   A.  Yes, sir, could have been.  The way patents are licensed,

22   you typically give one rate in order to license the whole

23   package.  It's kind of like the analogy of all-you-can-eat

24   restaurants.  This is a deal where it doesn't matter.  There's

25   a lot of businesses, Disney World, all-you-can-eat restaurants

EAA8APP2                    Magee - by Mr. Ederer

1    are like this.

2            THE COURT:  You have got to remember that

3    all-you-can-eat restaurants are more common in Texas.

4            THE WITNESS:  Maybe the jury won't understand that

5    one.  Hopefully, you know something about it.

6    Q.  Professor Magee, each of these patents has a different

7    expiration date, correct?

8    A.  Yes, sir.

9    Q.  So back in 2009, when the parties were hypothetically

10   negotiating, the '851 had three years to go, right?

11   A.  Yes, sir.

12   Q.  And the '501 had six years to go, it's expiring in 2015,

13   right?

14   A.  Correct.

15   Q.  The '703 patent was set to expire in 2026 so it had 17

16   years left to go?

17   A.  Yes.

18   Q.  So are you saying that there is no difference from the

19   standpoint of what the value of the license would be from a

20   royalty rate standpoint as far as the expiration dates are

21   concerned?

22   A.  That's not correct.  What the value of the license is is

23   the product of the royalty rate and the royalty base.  So with

24   that one correction, I am staying at 50 cents.

25            Now, you have to understand there is a 25 percent

E4A8APR2        Magee - by Mr. Federer

1    discount that goes down to 25 cents per unit after about 2017

2    or 2018 because of the 20 million.  Over 20 million units,

3    there is a discount on the 50 cent rate down to 25 cents.

4    Q.  Now, each of these patents covers a different function for

5    the Nook, correct?

6    A.  Yes.

7    Q.  One relates to encryption, right?

8    A.  It's security.  I think it's broader than just encryption.

9    Q.  That's pretty important, right?

10   A.  Very important, yes.

11   Q.  One of them is a lending feature, correct?

12   A.  Correct.

13   Q.  You could have a device without a lending feature, right?

14   A.  You could have one, yes, sir.

15   Q.  But you couldn't have a device without security, correct?

16   A.  That's correct.

17   Q.  One of them is a shopping feature, correct?

18   A.  Correct.

19   Q.  That shopping feature takes you to the Barnes & Noble

20   bookstore?

21   A.  Yes, sir.

22   Q.  But you could also go to the Barnes & Noble bookstore other

23   ways, right?

24   A.  You could get to the online bookstore in other ways.

25   Q.  As far as you're concerned, all of these features have

1   equal value?

2   A.  Per unit.  I quantified roughly, yes, per unit.  In my

3   opinion, they are all worth more than 50 cents.  So, therefore,

4   Barnes & Noble would be getting a deal to get all three of them

5   for 50 cents.

6   Q.  How is it that if the parties had sat down to negotiate a

7   royalty with respect to one of the three patents, they would

8   come out with the same number that they came out with for all

9   three patents?

10  A.  Be careful.  The same number --

11  Q.  The same royalty rate.

12  A.  What would come out of the agreement would be the same

13  royalty rate, counselor, that's correct.  But the amounts that

14  the parties would know would be different.

15  Q.  Now, you testified earlier about an offer sheet that you

16  relied on that was provided by ADREA to Barnes & Noble back in

17  2012?

18  A.  Correct.

19  Q.  That offer sheet related to not just these three patents,

20  right?

21  A.  That's right.

22  Q.  It related to about 300 patents, correct?

23  A.  Well, it related to about 50 U.S. patents, but 250 maybe is

24  worldwide.

25  Q.  That was an offer for a license to Barnes & Noble for

 1    somewhere in the nature of 300 patents on a worldwide basis,

 2    correct?

 3    A.   Correct.

 4    Q.   And we are talking here about a license for three or less

 5    patents on a U.S. only basis, and you're talking about the same

 6    royalty rate, correct?

 7    A.   Correct.

 8    Q.   I want to ask you this:  At the time of the hypothetical

 9    negotiation in 2009, these patents were owned by two different

10    parties, correct?

11    A.   Yes, sir.

12    Q.   Two of them were owned at the time by Discovery?

13    A.   Yes, sir.

14    Q.   One of them was owned by Philips, is that right?

15    A.   Yes, sir.

16    Q.   They weren't transferred to ADREA until somewhere close to

17    a year later, correct?

18    A.   Correct.

19    Q.   Now, you assume, for purposes of your calculation, your

20    royalty calculation, that there was one negotiation going on

21    here, right?

22             THE COURT:  Before you pursue further questions on

23    that, because I have a legal question, counsel, which is:

24    Isn't that what he has to do?  This is a hypothetical.  He has

25    to hypothesize, if ADREA owned these in 2009, what would have

1   been the hypothetical royalty rate, etc. arrived at and

2   negotiated with Barnes & Noble?  The fact that they were owned

3   by what later became ADREA, two components at the time, I am

4   not sure legally how that impacts what he is being asked to do.

5            MR. EDERER:  What we are trying to do is recreate the

6   situation at the time in 2009, which is a situation where the

7   patents were owned by two different parties.  I can't cite to

8   you the case law as I stand here right now.

9            THE COURT:  I can't either.

10            MR. EDERER:  I am happy to do that because I believe

11   what you're trying to do is recreate the situation that existed

12   at the time.

13            THE COURT:  OK.  You may be right.  I am just not

14   sure.  Go ahead with your questions.

15   BY MR. EDERER:

16   Q.  So for purposes of your royalty calculation, you assumed

17   that there was one negotiation going on, correct?

18   A.  Correct.

19   Q.  But at the time, the two Discovery patents, the '851 and

20   '501, were owned by Discovery, and the Philips patent was the

21   '703, correct?

22   A.  Correct.

23   Q.  Was Philips even involved in the negotiations that were

24   going on with respect to the formation of ADREA at that time?

25   A.  They were with respect to the formation of ADREA.  I

1   understand there were discussions in late 2009 between all

2   three parties about the formation of ADREA.  I think Discovery

3   and Sony were further along, but Philips was in on the

4   discussions before the end of 2009 so they would have been part

5   of the discussions.  I don't know how far along they were.

6   Q.  Are you aware that there has been testimony at this trial,

7   sir, that Philips was not introduced as a party to the

8   negotiations until after 2009?

9   A.  I don't know that.  I'm sorry.  I don't know that, sir.

10  Q.  Isn't it the case, Professor Magee, that you testified at

11  your deposition in this action that if you were talking about

12  two negotiations, it would have been a different story?  Do you

13  recall that?

14  A.  I remember you asking me those questions, and I remember

15  not having knowledge of how this would work either legally or

16  practically, whether it would be a single negotiation or two

17  separate ones.  And so if I remember, I sort of punted on that.

18  I didn't know the answer.

19  Q.  If there were two separate negotiations and the total rate

20  would be 50 cents, then somehow there would have to be a

21  division of that 50 cents between the one negotiation and the

22  other negotiation, right?

23  A.  If it were -- I don't know.  Now we are off into, I think,

24  a hypothetical that I don't know the answer to either legally

25  or practically.

 1   Q.   It's not hypothetical.  I think what you did was

 2   hypothetical.  What was true at the time was that these patents

 3   were owned by two separate parties, right?

 4   A.   That's right.  They were owned by two separate parties.

 5   Q.   Let me ask you this.  If you're right and in fact what we

 6   had here was one negotiation, there were still two parties who

 7   owned these patents, right?

 8   A.   Yes, sir.

 9   Q.   So if a payment had been made, 50 cent per device payment

10   had been made to these parties pursuant to the rate that you

11   calculated, how would they have divided up that number?

12   A.   You asked me that at the deposition and I had no idea.

13   That would be speculation for me to say how they divided up.  I

14   don't know how they would divide it up.

15   Q.   But you would agree that under the scenario that I just

16   mentioned, that number would have to be divided up somehow

17   because we are talking about two different parties, right?

18           THE COURT:  Pardon me, counsel, but I am still failing

19   to see the relevance of this line of questioning.  If it were a

20   fair market negotiation, the fact that 20 people own a product

21   or one person owns the product, it does not, it seems to me,

22   enable the owners to get a higher rate.

23           MR. EDERER:  That's not what I was suggesting.

24           THE COURT:  Then I am missing your point.

25   Q.   We are not talking about a single product.  We are talking

1    about three patents, two of which were owned by one party and a

2    third by another party so, in effect, we are talking about

3    three products.

4              THE COURT:  This goes to your question about his

5    failure to break it down.

6              MR. EDERER:  That's correct.

7              THE COURT:  Now I understand.

8    Q.  Now, is it true, sir, that in your report, you did not do

9    any arithmetical calculation to get to your 50 cent royalty

10   number?

11             THE WITNESS:  May I go back to the previous question,

12   your Honor?

13             THE COURT:  Yes.

14             THE WITNESS:  The follow-up is, I was under the

15   understanding that there was some communication at least, maybe

16   not anything formal, but some communication between Philips and

17   Discovery such that, I think, for that reason I made the

18   assumption that they would be basically having that

19   hypothetical negotiation like any hypothetical would be.

20   That's the assumption behind my work.

21             I'm sorry.  Proceed.

22   Q.  Now, you referred to the opening offer that was made by

23   Barnes & Noble.  What were the other factors that you said you

24   took into account in arriving at a 50 cent rate?

25   A.  Well, there are a number of indicators in the record that

1  point to a 50 cent rate.  I think I mentioned them already.

2  It's PCT at about $5.70.  There is the Intertrust valuation

3  that was approximately 90 cents.  And then there was the offer,

4  of course, of 50 cents.  And then there was the Amazon.

5  Amazon, I think, goes more to lump sum and validating the 50

6  cents indirectly.  So those other two are numeric, but the

7  whole -- as a damage analyst, what I have to do is, in

8  economics, the relevant thing is the price times the quantity.

9  It's what the total price is going to have to be for a product.

10  Price times quantity.  So I went through and tried to examine

11  the reasonableness using various GP factors.  GP2 is an

12  important one, the Barnes & Noble licenses.  The convoyed sales

13  is a big one.  GP6 was just south of a billion dollars of

14  convoyed sales that were done.  I go through all of those

15  numbers, numerics to show the reasonableness of the price times

16  the quantity which is what goes on in the hypothetical.

17          THE COURT:  For our hypothetical jury, GP is a

18  reference to the Georgia Pacific case that was mentioned

19  earlier.

20          Go ahead.

21          THE WITNESS:  I'm sorry, your Honor.  I have had

22  students saying, isn't that a lumber company?  What does that

23  have to do with patents?

24          THE COURT:  These are students from Columbia Law

25  School who have nothing better to do this afternoon.

1        THE WITNESS:  It's Friday afternoon, your Honor.

2  Q.  Professor Magee, did you consider the fact when you were

3  coming up with your 50 cent royalty rate number for one, two or

4  three patents, did you consider the fact that Discovery had not

5  previously been able to license for any royalty, any of the

6  patents in its portfolio including the two patents involved in

7  this case?

8  A.  Yes, sir.  I believe that's true.  I think they considered

9  selling them, as you know, in late 2008 or early 2009 and then

10  they decided to license them.  So they were trying to decide

11  what to do with them to go on with their core business in

12  another way.

13  Q.  Are you saying, sir, that you're not aware of any effort or

14  attempt on the part of Discovery to try to license those

15  patents at any previous time?

16  A.  I think they were having discussions about what to do with

17  the patents and they had these discussions with Sony.  They had

18  a dispute with Sony, I think, and eventually came together and

19  settled with a cross license to each other's patents and said,

20  hey, we have a whole bunch of patents here, what are we doing

21  with these things.  So I think there were other things in play

22  that may have prevented them from doing that.

23        Then Discovery eventually said OK in 2010, I believe

24  it was, they decided to finally sue the biggest company in the

25  business for e-books which was Amazon and that was before the

1    formal ratification of the ADREA creation and formation.

2    Q.  You mentioned that there was some communication between

3    Sony and Discovery back in 2009 with respect to a possible

4    license, correct?

5    A.  I don't recall the history of it but somehow they were

6    going back and forth.  I don't recall if it was litigation or

7    just discussions.

8    Q.  Did you review any documents with respect to those

9    communications between Sony and Discovery?

10   A.  I don't recall.  I may have seen them.  I don't recall as I

11   sit here right now, no.

12   Q.  Were you aware of the fact that Discovery made a proposal

13   to Sony with respect to a royalty rate to be paid by Sony for a

14   license for the Discovery patents?

15   A.  I don't recall.

16   Q.  Do you know what the royalty rate was?

17   A.  I don't recall, sir.

18   Q.  Did you inquire of anyone with respect to what royalty rate

19   was proposed by Discovery to Sony in the year 2009, the very

20   same year that the hypothetical negotiation in this case would

21   have taken place?

22   A.  No, sir, I don't recall.

23   Q.  Any reason why not?

24   A.  If it's in my report, I just don't recall, sir.  I don't

25   recall why I don't know.

1    Q.  You just testified that you were aware that there were

2    discussions going on between Sony and Discovery that initially

3    involved proposals to license the Discovery patents and

4    ultimately they agreed to a cross license, correct?

5    A.  That's the extent of my memory, yes, sir.  I don't remember

6    a rate.

7    Q.  So you don't know prior to the time that they entered that

8    cross license what Discovery proposed to Sony in terms of a

9    royalty rate for a license for the Discovery patent?

10   A.  As I sit here right now, I can't recall.

11   Q.  Did you ever know?

12   A.  I don't recall.  I don't remember whether -- I don't

13   remember seeing it but it's possible that I did.

14   Q.  Is there anything in your report about that?

15   A.  I would have to look through it to see.  I don't recall.

16   Q.  You mentioned some valuations that were done with respect

17   to the patent portfolios that are at issue in this case,

18   correct?

19   A.  Yes, sir.

20   Q.  I believe you said there was a valuation in 2009 that you

21   referred to?

22   A.  There is an Intertrust valuation, yes, sir.

23   Q.  Are you aware, sir, that that document has been excluded

24   from evidence in this case?

25   A.  I understand that that's the case so I won't speak to it

1      then.

2      Q.  Now that you learned that that document has been excluded,

3      does that change in any way the royalty calculation that you

4      did?

5      A.  No, sir.  There is a lot of other evidence that I looked at

6      including PCT which is a much higher number.

7      Q.  So it's still 50 cents no matter whether it's one, two or

8      three patents, correct?

9      A.  Yes, sir.

10            THE COURT:  Counsel, I am going to give you just five

11     more minutes.

12     Q.  I would like to talk about your lump sum calculation,

13     Professor?

14     A.  OK.

15     Q.  Now, you mentioned that the lump sum projects out sales to

16     the last expiration date of the three patents at issue,

17     correct?

18     A.  Yes, sir.

19     Q.  That's 2026?

20     A.  Yes, sir.

21     Q.  That's the '703 patent, right?

22     A.  Correct.

23     Q.  So what gets you to your $7.7 million number is the '703

24     patent, right?

25     A.  That's the one that gets you -- well, there is some coming

1   in from the '501 up to the end of 2015 and then there is the

2   '703, that's correct.

3   Q.  Just to be clear, the '851 patent has already expired,

4   right?

5   A.  Correct.

6   Q.  So you're not projecting anything with respect to the '851

7   patent because that expiration date was two years ago, right?

8   A.  It was the end of 2012, yes.

9   Q.  You just referred to the '501 patent which I believe you

10  said expires in 2015 which is next year, right?

11  A.  Yes, sir.

12  Q.  So you don't have to do much projection or present

13  valuation in order to get a number for your lump sum with

14  respect to the '501 patent, do you?

15  A.  Correct.

16  Q.  So what gets you to your $7.7 million dollar number and

17  your projection of sales is the '703 patent, right?

18  A.  Yes, sir.

19  Q.  And that's projecting sales for 12 years from 2014, right?

20  A.  Correct.

21  Q.  Which is what you did, right?

22  A.  Yes, sir.

23  Q.  And you have held sales flat from 2014 through 2026 with

24  respect to your projection of sales that go to the expiration

25  date of the '703 patent, right?

1    A.   That's correct.

2    Q.   You did that even though you are well aware that Barnes &

3    Noble was suffering severe downward trends in their sales of

4    the Nook for the last three years, correct?

5    A.   Since the end of 2012, yes, sir, there is a downward trend.

6    Q.   In fact you held sales flat from 2013 to 2026 when you only

7    had the Barnes & Noble sales figures through that date, right?

8    A.   Yes, sir.

9    Q.   Then when you found out that there was another 30 percent

10   drop in Barnes & Noble sales in 2014, you lowered your number

11   because you used actual numbers for 2014, right?

12   A.   Correct.

13   Q.   But you didn't change your projection, you still projected

14   another 12 years of flat sales, right?

15   A.   We couldn't change the link because I am required to value

16   it to the end of the patent and the end of the patent didn't

17   change, it was still 2026.

18   Q.   But you could have changed your projection in terms of

19   whether sales were going to go up, down or stay flat, right?

20   A.   Correct.

21   Q.   You didn't make a change with respect to that, did you?

22   A.   That's correct.

23            THE COURT:   Why not?

24            THE WITNESS:   Well, it's real simple, your Honor.   I

25   have a supplemental report that counsel has.   And what happened

1    was, from the end of 2012 on, Barnes & Noble stopped bringing

2    out any new products or anything associated with the old Nooks.

3    They were basically phasing that one out and they were moving

4    to a new Nook and they had just brought out a new Galaxy Nook

5    with Samsung which the expectation, it's going to be enormously

6    successful.

7          Samsung has $216 billion in annual sales.  They are

8    one of the most successful consumer electronics firms in the

9    world and there are expectations that that's going to help the

10   Nook.  So that projection would give you a big increase.  The

11   trend, as counsel correctly points out, is down for the last

12   two years, so I thought it was fair to go flat.

13   Q.  What Samsung projection are you talking about?

14   A.  The discussions about optimism, I think, around Barnes &

15   Noble about the new product is quite optimistic.  It was

16   released last month so there is a lot of publicity and fanfare

17   in the press about the new Galaxy Nook.

18   Q.  Let me ask you another question about that $7.7 million

19   lump sum number.  And you have already indicated how you get

20   there is by extending out sales through 2026 which is the

21   expiration date of the '703 patent, right?

22   A.  Yes, sir.

23   Q.  Now, if the '703 patent is found to be not infringed or

24   invalid in this case, that lump sum number comes way down,

25   right?

1    A.  Yes, sir.

2    Q.  You know the terms of the Amazon agreement, of course,

3    right?

4    A.  Most of them, I think.  We will see.

5    Q.  You know there is a $10 million payment with respect to the

6    ability to use the Discovery patents, correct?

7    A.  Correct.

8    Q.  Including the two Discovery patents that are at issue in

9    this case, right?

10   A.  Correct.

11   Q.  Then this $2.5 million number that relates to the Philips

12   and Sony portfolios, right?

13   A.  Everything is correct except the '851 is here as well.  The

14   other patent is not exactly the same one that Amazon and the

15   one in the hypothetical are slightly different.  The '501 is a

16   related patent by divisional patent.  That was the '691.

17   Q.  The fact of the matter is that the license in the Amazon

18   case was for the full portfolio of patents?

19   A.  Ultimately, it was, but the two patents that sort of

20   brought the parties to the table for a settlement and they

21   would have gone to trial had they not settled were just these

22   two patents.

23   Q.  The two patents that are at issue in this case that were

24   Discovery patents at one time were licensed as part of the

25   Amazon agreement, correct?

 1    A.   Correct.

 2    Q.   In fact, that's the only revenue generating agreement in

 3    history that included a license with respect to any of the

 4    patents in suit in this case, right?

 5    A.   That's correct.

 6    Q.   With respect to the $2.5 million payment that was made with

 7    respect to the Philips and the Sony portfolios, those

 8    portfolios included the '703 patent which was then a Philips

 9    patent, correct?

10    A.   Correct.

11    Q.   So $2.5 million is the most that you could possibly

12    calculate from the Amazon agreement in terms of the value of

13    the '703 patent, correct?

14    A.   OK.  Well, that's what was paid for there.  The question is

15    what is the value to Barnes & Noble of that patent which can be

16    quite different from what is the value to Amazon of that

17    patent.

18    Q.   Are you saying Amazon is not practicing that patent?

19    A.   No.  I am saying, I haven't evaluated the value that Amazon

20    gets from the patent, the value that Barnes & Noble would get

21    is quite considerable.

22    Q.   You're saying that Barnes & Noble would have a value for

23    the '703 patent that's three times the maximum value that

24    Amazon could have gotten for the '703 patent, correct?  7.7

25    million is the value you ascribed to that patent for Barnes &

1   Noble and 2.5 million is the most that that patent could have

2   been worth to Amazon, right?

3   A.  I am not following your math.  I understand you're trying

4   to somehow compare the two and a half with the ten and then

5   arbitrage somehow the '703 relative to the other two.

6   Q.  I am comparing the two and a half to the 7.7.  You

7   testified earlier that what gets you to $7.7 million from your

8   lump sum payment is the '703 patent because that's the only

9   thing that gets you from 2015 to 2026, right?

10  A.  Correct.

11  Q.  So it's 7.7 million is what that patent is worth to Barnes

12  & Noble.  And the most that it could have been worth to Amazon

13  was 2.5 million, right?

14  A.  I would have to look at that.  On your arbitrage argument I

15  would have to think through it.

16          THE COURT:  Counsel, I am going to have to cut you

17  off.

18          MR. EDERER:  Thank you, your Honor.

19          THE COURT:  We will give plaintiff's counsel five

20  minutes if you want.

21  EXAMINATION

22  BY MR. COX:

23  Q.  Hello, Professor Magee.  How are you doing?

24  A.  Fine.

25  Q.  I want to ask you a question about the Amazon agreement.

 1   A.  OK, sir.

 2   Q.  The Amazon litigation that the Amazon agreement ended was

 3   started by Discovery, correct?

 4   A.  Correct.

 5   Q.  Not started by ADREA?

 6   A.  That's my understanding.

 7   Q.  During the course of the litigation the patents were

 8   transferred to ADREA, correct?

 9   A.  Correct.

10   Q.  You mentioned earlier that the Amazon agreement involves a

11   cross license from Amazon, correct?

12   A.  Correct.

13   Q.  And the party that that cross license goes to is actually

14   Discovery, correct?

15   A.  That would be correct.  I am not clear because ADREA

16   settled it, but I am not sure whether they settled it for

17   Discovery or whether they got some part of it.  I have no idea.

18   Let me think.  Since there were Philips patents there, and Sony

19   patents and Discovery patents there, in the agreement, I can't

20   say specifically, counselor.  Maybe you can help me with that.

21   Q.  I will come back to it in just a second.

22          While we do that, the other thing I wanted to ask you

23   about was the 2012 offer that you were talking about?

24   A.  Yes.

25   Q.  From ADREA to Barnes & Noble?

1   A.   Yes, sir.

2   Q.   That offer, there is some talk about there was a offer for

3   50 cents, a 50 cent royalty rate, is that correct?

4   A.   Correct.

5   Q.   That offer was a 50 cent royalty rate per e-reader device,

6   correct?

7   A.   Correct.

8   Q.   But it also included an additional 50 cent royalty rate,

9   correct?

10   A.   Are you talking about for the apps?

11   Q.   For the software?

12   A.   For the software and apps, yes, sir.

13   Q.   Specifically, it included a 50 cent royalty rate for the

14   Barnes & Noble branded software, correct?

15   A.   Correct.

16   Q.   That's different from your 50 cent with the volume based

17   discount of 25 percent estimated rate for the hypothetical

18   negotiation, correct?

19   A.   Right, just for the e-readers.

20   Q.   The 2012 ADREA offer also involved a worldwide nonexclusive

21   license to the ADREA patents, correct?

22   A.   That's correct.

23   Q.   Does the hypothetical negotiation result in a worldwide

24   license?

25   A.   No, sir.  It would be US only.

1   Q.  That's different?

2   A.  Yes.

3   Q.  I want to ask you a question about the growth rate for your

4   lump sum analysis.

5   A.  Yes, sir.

6   Q.  You applied zero percent growth rate going forward,

7   correct?

8   A.  Yes.

9   Q.  Can you just describe to the judge some of the reasons that

10  you use a zero percent growth rate?

11  A.  I think --

12          THE COURT:  I thought he already did.  It was the

13  balancing of the declining actual sales versus the impetus

14  provided by the Samsung investment and new product, yes?

15          THE WITNESS:  Yes, sir.

16          MR. COX:  Thank you, your Honor.

17          THE COURT:  Very good.  You may step down.  Thank you

18  so much.

19          (Witness excused)

20          THE COURT:  All right.  Here is where we are going to

21  go for the next few hours.  I am going to spend about 15

22  minutes with my class.  They are going to tell me who was the

23  cutest lawyer, things like that, so I am going to ask everyone

24  in the courtroom to step outside except the class so I can talk

25  with them.

1              Before you do, I then have two short matters which

2     combined will take another 15 minutes.  So you're excused for a

3     half hour.  Then come on back and we will go through the other

4     two witnesses.

5              I will also ask anyone in the courtroom to step

6     outside as well but you can come back in 15 minutes.

7              (Recess)

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1            THE COURT:  I'm sorry that took a little bit longer

 2   than I thought.  Let us continue.  I think the next expert that

 3   I would like to hear from is Mr. Wang.

 4            MR. CABRAL:  Your Honor, we were able to discuss with

 5   the other side, and copying is no longer an issue.  The

 6   plaintiff has agreed not to introduce evidence of copying.

 7   That is one less factor to talk about.

 8            THE COURT:  Great.

 9    XIN WANG,

10        called as a witness by the Court,

11         having been duly sworn, testified as follows:

12            THE CLERK:  State your name and spell it slowly for

13   the record.

14            MR. EDERER:  Xin Wang, X-I-N W-A-N-G.

15            THE COURT:  Mr. Wang, tell us briefly about your

16   background.

17            THE WITNESS:  I have a Ph.D in applied mathematics.  I

18   was adjunct faculty at USC for about 15 years.  I also joined

19   Xerox to work on digital rights management, technologies, which

20   is related to protecting electronic books relevant to this

21   case.  Now I'm with Huawei USA, the biggest telecom

22   manufacturing company in the world.

23            THE COURT:  Were you retained by ADREA to be an expert

24   in this case?

25            THE WITNESS:  Yes.

```
 1              THE COURT:  How much do you charge?

 2              THE WITNESS:  Hourly I charge 375.

 3              THE COURT:  Approximately, to date, roughly how much

 4    of a bill have you run up?

 5              THE WITNESS:  I don't know exactly the number, but

 6    probably about 30K.

 7              THE COURT:  All right, counsel.

 8    BY MR. SHARIFAHMADIAN:

 9    Q.  Good afternoon, Dr. Wang.  As the judge said to you, you

10    provided an opinion with respect to the validity issues in this

11    case, correct?

12    A.  Yes.

13    Q.  As part of that, you considered issues of obviousness?

14    A.  Yes.

15    Q.  Part of what you considered are called secondary factors of

16    nonobviousness?

17    A.  Yes.

18    Q.  You went through a number of factors, and we will take them

19    one by one.  Before we do, you understand that in order for

20    these factors to be relevant to the obviousness analysis, there

21    must be a nexus between the factor you are considering and the

22    claimed invention, right?

23    A.  Yes.

24    Q.  The first one you have in your report is commercial

25    success, correct?
```

 1   A.  That's right.

 2   Q.  What you say in your report is, "I understand that

 3   Professor Stephen Magee has prepared an expert report on the

 4   issue of commercial success," right?

 5   A.  Yes.

 6   Q.  You yourself didn't prepare a report on that issue?

 7   A.  No.

 8   Q.  You haven't provided an opinion on that issue?

 9   A.  I don't have an opinion.

10   Q.  You also haven't seen Professor Magee's opinion on this

11   issue, correct?

12   A.  I did not.

13   Q.  So you don't know what factors --

14   A.  No, I did not see his report.

15   Q.  That's right, you did not see his report.  It goes to say

16   that you haven't seen what factors he considered in reaching

17   that conclusion?

18   A.  No, I did not see it.  I simply considered his conclusion

19   as my overall nonobviousness analysis.

20   Q.  What do you understand that conclusion to be?

21   A.  The conclusion is the commercial success of Nook product

22   and also Amazon Kindle's product were partially due to their

23   use of the patent technology.

24   Q.  By necessity, for Professor Magee to have reached that

25   conclusion, he must have also concluded that the Amazon Kindle

1   practices the patents-in-suit in this case, correct?

2   A.  Could you say that again?

3   Q.  Professor Magee, in order to have provided an opinion of

4   commercial success, he must have necessarily concluded that the

5   Amazon Kindle practices all of the patents-in-suit in this

6   case, correct?

7   A.  I assume that's the case.

8   Q.  You yourself haven't analyzed whether the Amazon Kindle

9   practices the patents-in-suit?

10  A.  Personally, I did not.

11  Q.  You haven't analyzed whether the Nook practices the

12  patents-in-suit?

13  A.  My purpose on this case was to just respond to the issues

14  raised by Dr. Neuman on the validity aspects of those patents.

15  Q.  You have no basis to evaluate whether Professor Magee's

16  opinion is correct or not?

17  A.  I don't have opinion on that.  I just basically considered

18  his conclusion as a part of the evidence.

19  Q.  What expert analysis are you providing with respect to

20  Professor Magee's conclusion of commercial success?

21  A.  I considered he is an economics professor.  This is

22  evidence I'm aware of.  I considered his conclusion.

23          THE COURT:  Let me ask a broader question.  What

24  expertise are you bringing to bear on any issue as opposed to

25  simply reciting what may or may not have been shown by other

1   experts or facts in this case?  Where is your expertise being

2   utilized?

3          THE WITNESS:  My expertise is on the security and the

4   protection of distributing digital document contents, and

5   especially in the digital rights management area.  I have been

6   working on that for over 16 years.

7          THE COURT:  Your opinion on that is what?

8          THE WITNESS:  Your Honor, on what?  I'm not clear.

9          THE COURT:  In the area where you are utilizing your

10  expertise as in this case, you said it was on the security

11  part, right?

12         THE WITNESS:  Yes.

13         THE COURT:  What is your opinion with respect to that

14  in this case?

15         THE WITNESS:  Not clear with respect to security.

16         THE COURT:  What did you conclude about that issue?

17         THE WITNESS:  Your Honor, I guess I'm not clear of the

18  issue you are talking about.

19         THE COURT:  If you are not clear on it, I don't know

20  that --

21         THE WITNESS:  Are you talking about the commercial

22  success issue?

23         THE COURT:  No.  I'm talking about any issue.  That's

24  why I said I'm broadening this.

25         THE WITNESS:  Oh.  My conclusion on this case is the

1    three patents in my opinion are valid.

2              THE COURT:  Because?

3              THE WITNESS:  Because I just looked at the prior art

4    they raised in Neuman's report, I did the validity analysis, I

5    went through a number of aspects.

6              THE COURT:  The only aspect where you were bringing

7    your expertise to bear, I thought you just said, was with

8    reference to security.

9              THE WITNESS:  Security and the protection of

10   distributing content.

11             THE COURT:  Does that apply to all three patents?

12             THE WITNESS:  I think yes.  For the '851 it's really

13   about secure delivery of content.  For '501 it's about the

14   controlled access to the ebook.  And the '701 is also about

15   retrieving some of the context information which is related to

16   distributing of the content and how to use it.

17             THE COURT:  How does that latter one relate to

18   security?

19             THE WITNESS:  My area is security and digital rights

20   management.

21             THE COURT:  And, I'm sorry, what?

22             THE WITNESS:  Digital rights management.

23             THE COURT:  What does that mean?

24             THE WITNESS:  It means that you manage the

25   distribution and the use of the digital content in its entire

1   life cycle.  It is really about the creation, how to protect it

2   and distribute it, how to protect it in storage, how to control

3   how people access it, and what kind of rights that people have

4   over the digital content in terms of further distributing,

5   lending, selling, also aggregating.  All those possible rights

6   that people can have over the digital content.  It involves

7   distribution from end to end, from creation to the end

8   consumption.

9            THE COURT:  All right, counsel, go ahead.

10  BY MR. SHARIFAHMADIAN:

11  Q.  You also provided an opinion with respect to alleged

12  industry praise, industry praise, correct?

13  A.  Yes.

14  Q.  To be clear, your opinions such as they are with respect to

15  industry praise do not apply to the '703 patent, correct?

16  A.  In that report, in my report, I didn't talk about '703.

17  Q.  You have no opinion with respect to industry praise of the

18  '703 patent, correct?

19  A.  In that report, yes.

20  Q.  You mentioned in your report the fact that John Hendricks,

21  one of the named inventors on the '851 and the sole inventor on

22  the '501 patent -- excuse me -- the '851 patent, was awarded

23  the Edison Achievement Award, correct?

24  A.  Yes.

25  Q.  You rely on that fact?

 1   A.  Right.

 2   Q.  You don't in your report explain what the Edison

 3   Achievement Award is, though, is that right?

 4   A.  I know it is for his contribution to the world of

 5   innovation.

 6   Q.  But in your report do you explain what the Edison

 7   achievement award is?

 8   A.  No.

 9   Q.  Do you explain why he received it?

10   A.  I didn't in the report.

11   Q.  Do you explain what the criteria are for receiving this

12   award?

13   A.  I did not explain.

14   Q.  Do you explain that he received this award because of the

15   incremental contributions that are claimed in the '851 patent

16   or the '501 patent?

17   A.  I'm aware that he made a lot of contributions, a lot of

18   innovative contributions to the TV industry as well as to the

19   ebook industry.  I think the award is for his entire

20   contribution.

21   Q.  That's right.  He has made contributions to the TV

22   industry, correct?

23   A.  Yes.

24   Q.  Those contributions are apart from the ebook-related

25   patents that are at issue in this case, correct?

1   A.  Correct.

2   Q.  Do you understand that industry praise needs to be the

3   industry praise relating to the claimed invention in order to

4   be properly considered as a secondary factor?

5   A.  I think the award is about his contribution to all his

6   innovation.  I think it includes his innovation in ebooks.

7   Q.  What is your basis for that, sir?  Excuse me.  Let me

8   rephrase that.  What is the basis that you provide for that

9   conclusion in your report?

10  A.  The basis I have is the award is for his contribution to

11  the work of innovation.  He has innovation in both TV and

12  ebooks.  I think that includes his contribution in ebooks.

13  Q.  If the award was for his innovation in the TV industry, it

14  wouldn't be relevant to the secondary factors, correct?

15  A.  I'm not aware that that's the case.

16  Q.  You're --

17  A.  I'm not aware that that award is purely for his

18  contribution, his innovation in TV.

19  Q.  You are also not aware that it isn't?

20  A.  I'm aware that it's for his contribution to the award of

21  innovation.  I think that includes both.

22  Q.  Do you have any specific evidence or do you discuss any

23  specific evidence in your report that he received that award

24  specifically for his contributions or the claimed work in the

25  '851 patent and the '501 patent?

Case 1:13-cv-04137-JSR  Document 150  Filed 11/05/14  Page 73 of 128

1   A.  Again, in my report I did not consider that.  He received

2   the award for his contribution, the award of innovation.  I

3   will consider that evidence, objective evidence of

4   nonobviousness in this case.

5   Q.  You also referred to praise that Barnes & Noble's Lend Me

6   feature received in the press, correct?

7   A.  Yes.

8           THE COURT:  I'm sorry.  Does someone have a copy of

9   Dr. Wang's report?

10          MR. CABRAL:  Yes, your Honor.

11          THE COURT:  Would you put it in front of him, please.

12          I'm looking at my copy of your report, which is 234

13  pages, dated December 30, 2013.  Did you write this report?

14          THE WITNESS:  I wrote this report with the assistance

15  of attorneys.

16          THE COURT:  Who were the attorneys who assisted you in

17  writing this report?

18          THE WITNESS:  Colin and Michael.

19          THE COURT:  I'm sorry?

20          THE WITNESS:  Colin and Michael.

21          MR. BAUER:  Your Honor, he is referring to Mr. Cabral

22  and Michael Miller.

23          THE WITNESS:  Michael Miller.  Sorry.

24          THE COURT:  Who prepared the first draft of this

25  report?

Case 1:13-cv-04137-JSR   Document 150   Filed 11/05/14   Page 74 of 128

1             THE WITNESS:  I think I looked at Neuman's report.  I

2     have some opinions on them, I communicate my opinions with

3     them, and then come up with --

4             (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1          THE COURT:  Dr. Wang, I will be blunt and I want you

 2   to answer this, of course, totally truthfully.

 3          This report has all the earmarks to me of something

 4   that was primarily written by a lawyer.

 5          THE WITNESS:  Yes.

 6          THE COURT:  Is that true?

 7          THE WITNESS:  Yes.  A lot of legal languages.

 8          THE COURT:  So let me ask plaintiff's counsel, should

 9   I strike this report or strike his testimony because it's

10   really counsel's report?

11          He seems to have, from his own testimony here today,

12   very limited expertise.  Most of what he is presenting both in

13   his testimony and in his report is a regurgitation of what was

14   concluded here by others or by counsel.  And it has, to my,

15   perhaps, totally unfair eye, all the earmarks of counsel trying

16   to pretend to be experts and placing his signature on their

17   product.

18          MR. CABRAL:  Short of becoming a witness here --

19          THE COURT:  You can become a witness for these

20   purposes and you better.

21          MR. CABRAL:  Dr. Wang was substantively involved in

22   drafting this report.  With regard to the distinction I see

23   between the secondary considerations piece which is the focus

24   of today's hearing and the remainder of the opinions which

25   relate to the technical analysis of prior art relating to

 1    computer software and DRM technologies which Dr. Wang is one of

 2    the most qualified people in the world to deal with those

 3    issues.

 4         Now, when you're talking about the Hendricks patents

 5    themselves, those relate to digital rights management issues,

 6    distribution of electronic content e-books and Dr. Wang has

 7    extensive experience in that.

 8         THE COURT:  I am not questioning his experience on

 9    that although, of course, that is not being challenged.  He

10    seems to have, from what I have heard so far, essentially zilch

11    experience on the things that are being challenged, but even

12    that is not what I am asking about right now.  What I am asking

13    about is, you can be Einstein but that doesn't mean that if you

14    signed the name Einstein to a report that is really prepared by

15    someone else, that that can be foisted off on the Court.

16         MR. CABRAL:  I think the reality here is that it was a

17    substantial undertaking given the amount of the art, so we did

18    assist Dr. Wang with preparing his draft but he was

19    substantively involved -- and I can show the Court -- in

20    exchanging drafts, comments, revisions.  We met several times

21    prior to the exchange of the report.  We exchanged numerous

22    drafts.  We discussed it at length before it was submitted.  I

23    can represent that to the Court.

24         I think with regard to the secondary considerations

25    aspect of the opinion, I think it was evidence considered --

 1              THE COURT:  What you are telling me, it sounds like --

 2     and, again, you correct me if I am wrong -- you, counsel,

 3     prepared the report, showed it to him and he made some comments

 4     and you adjusted it to reflect his comments, but it was still

 5     essentially your product.  Am I wrong on that?

 6              MR. CABRAL:  No, your Honor.  What you're missing is,

 7     I think, is the critical opening step which is being able to

 8     discuss the prior art in the first place, getting his opinions

 9     and trying to put that down on paper.  Like I said, this was a

10     substantial undertaking given the length of Dr. Wang's report,

11     but I think the critical aspect was meeting and getting his

12     opinions, understanding what those were and then trying to put

13     them down on a paper format that was appropriate to submit

14     under Rule 26.

15              THE COURT:  So when you got to the point, for example,

16     there is a whole section here that goes from page 7 to page 15,

17     and then actually entitled "Applicable Law."  Then there is a

18     section that goes from page 15 through 18 on rules of claim

19     construction.  And then there is a little section on page 18

20     about what is meant by a person of ordinary skill in the art.

21     That was all you, right?

22              MR. CABRAL:  The legal section, certainly.

23              THE COURT:  So you don't expect that I would allow him

24     to testify to any of that, do you?

25              MR. CABRAL:  Regarding the actual state of the law,

```
 1    no, your Honor.

 2              THE COURT:  Or regarding anything as contained in the

 3    portion of the report where he contributed nothing?

 4              MR. CABRAL:  There are certain aspects of the law,

 5    including your Honor's claim constructions.

 6              THE COURT:  That are necessary background.  That's a

 7    different subject that may have to be presented by the Court to

 8    the jury or some other fashion.

 9              Then leaping ahead to the portion of the report that

10    is, I guess, pages 228 through 233, commercial success, etc.,

11    does any of that involve any of his expertise?

12              MR. CABRAL:  Your Honor, I think it depends on how you

13    look at this issue.  If the Court is of the opinion that

14    secondary considerations must be considered to form an opinion

15    on obviousness, then I think that information is essential as

16    part of the analysis and to be included in the report.

17    However, you are right, in a sense that, as you get into issues

18    of commercial success, for example --

19              THE COURT:  I don't understand what you just said.

20    Forgive me.  If a witness knows about one aspect of something

21    that's necessary for the jury to draw a conclusion about

22    obviousness, but doesn't know about some other aspect, and he

23    is testifying as an expert, he can testify about what he knows

24    and brings his expertise to bear, someone else can testify

25    about or it can be documentary evidence or lay evidence that
```

1   relates to the other part and the jury can then be instructed

2   that if they want to find obviousness they have to find both or

3   if they want to find nonobviousness in this case they have to

4   consider both.  I don't see what would allow an expert to get

5   up on the stand and say, I'm going to offer an opinion about

6   obviousness, although I only know about one part of it.

7           MR. CABRAL:  One way to potentially resolve this, your

8   Honor, is a lot of this evidence will go into the record

9   anyway.

10          THE COURT:  I agree with that totally.  That, I think,

11  is the point I am making.

12          MR. CABRAL:  So long as Dr. Wang is able to testify

13  substantively on the issue of obviousness and address that

14  issue --

15          THE COURT:  He can testify on the aspects that relate

16  to obviousness or nonobviousness that he has expertise on.

17          MR. CABRAL:  In that case, I think we would be happy

18  to just submit the evidence into the record as it comes in, in

19  the ordinary course and then make argument in closing

20  statement --

21          THE COURT:  And it could be part of the jury

22  instruction of the things they have to consider.

23          MR. CABRAL:  Absolutely.

24          THE COURT:  Is there any reason to detain him further

25  here today with that limitation?

```
 1           MR. CABRAL:  I see no other reason.

 2           THE COURT:  Anything else you want to raise?

 3           MR. SHARIFAHMADIAN:  The only thing I would add, your

 4  Honor, we do still maintain that there is no nexus between the

 5  proposed evidence that plaintiff's counsel suggests they will

 6  introduce into evidence and the --

 7           THE COURT:  If that's true they are not going to get

 8  to the jury on that issue and that would be something we would

 9  discuss when we have your motions at the conclusion of the

10  evidence.

11           MR. SHARIFAHMADIAN:  Right.  We would just request and

12  reserve the right to object at the time of the introduction of

13  the evidence.

14           THE COURT:  As each item comes in, you will raise your

15  objection and I will receive it or not receive it as the case

16  may be and, believe me, I have been very fully educated on

17  that.

18           MR. CABRAL:  Your Honor, a lot of the prior art

19  references, prior art reasons have been dropped from the case,

20  so the report has gotten a lot shorter.

21           THE COURT:  Thank you so much, Doctor.  You may step

22  down.

23           (Witness excused)

24           THE COURT:  Let's call the remaining witness.

25           MR. BAUER:  While we are waiting for him to come in,
```

 1   as Mr. Cabral just indicated, at 2:00 today they told us that

 2   they are dropping a number of the prior art references that

 3   were the subject of this motion as prior art.  They reserve the

 4   right to talk about them as background, the technologies are

 5   the technology, but that they have agreed that they will not be

 6   charting them or arguing that those references are prior art

 7   and --

 8           THE COURT:  We can put that on the record later

 9   because we have the witness here now.

10    CLIFFORD NEUMAN,

11        called as a witness by the Court,

12        having been duly sworn, testified as follows:

13           THE DEPUTY CLERK:  State your name and spell it slowly

14   for the record.

15           THE WITNESS:  Clifford Neuman, C-L-I-F-F-O-R-D,

16   N-E-U-M-A-N.

17           THE COURT:  Mr. Neuman, do you want to just briefly

18   tell us your background.

19           THE WITNESS:  Yes, your Honor.

20           I am a professor at the University of Southern

21   California.

22           THE COURT:  So you're here because you prefer the

23   weather here?

24           THE WITNESS:  Actually, it has been pretty hot out in

25   California recently.

 1           I hold a Ph.D. in computer science from the University

 2   of Washington, a master's also in computer science from the

 3   University of Washington, and a bachelor's degree in computer

 4   science from MIT.

 5           I have been a researcher in distributed systems and

 6   computer security since about 1985.  And I have done quite a

 7   bit of research in computer security, electronic commerce and

 8   distributed systems.

 9           THE COURT:  You have been retained by Barnes & Noble

10   in connection with this case?

11           THE WITNESS:  I have, your Honor.

12           THE COURT:  How much are you charging?

13           THE WITNESS:  I am being paid $600 an hour, plus

14   reasonable expenses.

15           THE COURT:  Roughly, how much of a bill have you run

16   up so far?

17           THE WITNESS:  I haven't tallied but I believe it is

18   perhaps close to, maybe a little bit more, maybe a little bit

19   less than $100,000.

20           THE COURT:  Go ahead, counsel.

21           MR. BAUER:  Your Honor, I will submit, there is JUST

22   one issue that I am going to skip now.  We had asked that he

23   not be allowed to talk on the ultimate conclusion of

24   obviousness because of secondary considerations.  I just spoke

25   to Mr. Berta, the same issue that was with Dr. Wang, so we can

1    pass on that.

2            THE COURT:  Very good.

3            MR. BAUER:  He will talk about the technology

4    primarily at trial, but not those things -- the references

5    removed -- Kraftsow, Morgan, Nachinson, and Crisp, so I won't

6    be addressing those today.

7    EXAMINATION

8    BY MR. BAUER:

9    Q.  Mr. Neuman, in your report you provided an opinion on the

10   Saigh reference, by Saigh, I think we have all agreed that

11   S-A-I-G-H we are pronouncing Saigh here?

12   A.  That is my understanding of how to pronounce it and, yes, I

13   did provide an opinion on that reference.

14   Q.  You provided an opinion that the Saigh reference

15   anticipated the asserted claims, correct?

16   A.  Yes, I did.

17   Q.  If you could look at your expert report, your expert

18   report, you discuss legal principles beginning at page 6 of

19   paragraph 22?

20   A.  Yes, I do see that section starting at 6.

21   Q.  Then it goes on for page after page -- page 6, page 7, page

22   8, page 9, page 10 -- a lot of discussion about the law.  Who

23   wrote that?

24   A.  That section on the law was written primarily by the

25   attorneys.

1    Q.  Your understanding about the law of anticipation and

2    obviousness are understandings that counsel gave to you,

3    correct?

4    A.  My understanding is based on what has been built up over

5    several cases not just with this counsel, but in particular

6    what is recited here is based on what I was told by counsel.

7    Q.  Let's take a look at your discussion on Saigh and that

8    begins on page 101, paragraph 391.

9           THE COURT:  On the theory that after a hundred pages

10   of other stuff, one had to breathe a "Saigh" of relief.

11   A.  I am at paragraph 390.

12   Q.  Paragraph 391, the heading on that section is "The Saigh

13   Publication Anticipates the Asserted Claims," right?

14   A.  That is the heading, that is correct.

15   Q.  In fact, there's two Saigh references to the patent

16   application and an issue patent, correct?

17   A.  That is correct.

18   Q.  You discuss both in your report but in separate sections?

19   A.  I believe that I discussed them both in my report here and

20   relying on the publication.

21   Q.  In fact, other than the claims, those two disclosures were

22   identical?

23   A.  My understanding is that they are substantially similar and

24   that the claims are where the primary differences exist.

25          THE COURT:  I guess the question that I had with

1    respect to the Saigh portion of your report, the heading itself

2    says "The Saigh Publication Anticipates the Asserted Claims of

3    the '501 patent," but that is a different issue from

4    obviousness, right?  One can anticipate something without being

5    obvious, that the invention of the wheel anticipates the

6    invention of the cart but it's not obvious that because

7    everyone knew how to make a wheel, they also knew how to make a

8    cart.  So I am wondering whether this is really about

9    obviousness?

10            THE WITNESS:  My understanding is that anticipation

11   requires that you meet all the elements.  The example you gave

12   with the cart and the wheel, I'm not sure that I completely

13   understand.  I do agree with you that the wheel does not

14   anticipate --

15            THE COURT:  Maybe I am putting the cart before the

16   wheel.

17            Go ahead.

18            THE WITNESS:  I am trying to understand precisely what

19   your question is.  I think I understand where you're going, but

20   if a particular item is anticipated, that would be an argument

21   that in light of that particular anticipatory reference it is

22   obvious, but I believe they are different analyses that you

23   perform.

24            THE COURT:  That's really my point.

25            So I guess my question is -- well, maybe I will leave

1    it to counsel.

2            Go ahead, counsel.

3            MR. BAUER:  Your Honor, you are right.

4    Q.  The only discussion in your report is on the issue of

5    anticipation with respect to Saigh, correct?

6    A.  And my report only discusses anticipation, that is

7    correct -- or the only opinion I have presented is that of

8    anticipation.

9            MR. BAUER:  Your Honor, that's what brings us here

10   today.  We have been told he intends to testify on the issue of

11   obviousness at trial.

12           THE COURT:  I think what I hear him saying is that

13   from anticipation a reasonable juror could, with respect to

14   this particular element, draw an inference of obviousness.  The

15   fact that he is not testifying about obviousness on this

16   particular reference doesn't mean that he is then supplying

17   expertise that would enable a jury as part of their obviousness

18   analysis to draw an inference of obviousness.

19           That's what I sense was what you were saying.

20           THE WITNESS:  That's precisely what I meant, your

21   Honor.

22           MR. BAUER:  Our understanding was that he was going to

23   take the stand and say that there are elements missing and that

24   it would have been obvious to include those elements.

25           THE COURT:  He is not saying that, at least I am not

1    seeing him say that in his report about Saigh.  Let's go on.  I

2    see your point.  We can argue more about this after we have

3    heard from the witness.

4             Maybe we should talk about the MacPhail reference.

5             Let me ask the witness:  What is it that you say

6    renders the '501 patent obvious from the MacPhail reference?

7             THE WITNESS:  So with respect to the MacPhail

8    reference, the main issue that we are looking at in '501 has to

9    do with the time months, the setting of the times and the like.

10            If we look at the MacPhail reference, it talks about

11   the setting of times.  Now, it has a couple of different times

12   that are set there but in fact --

13            THE COURT:  That's in the background section?

14            THE WITNESS:  In the background section of my report

15   on MacPhail.

16            THE COURT:  Background section of the patent?

17            THE WITNESS:  The background section of MacPhail is

18   addressing the kinds of systems on which there was a need to

19   use these kinds of techniques.  So when we are talking about

20   the background section, we are looking at the use of or the

21   need to do this on, for example, a personal computer as well as

22   distributed systems and other kinds of things to which this can

23   be applied.  So the part that comes from the background section

24   is the motivation to utilize this on a single computer system,

25   which is implementing the viewer, rather than implementing the

1    components on different pieces.

2            THE COURT:  Is there anything in the MacPhail patent

3    that you're relying on for your conclusion of obviousness with

4    respect to the '501 patent other than maybe a passing statement

5    or two in the background section?

6            THE WITNESS:  There is that component with respect to

7    one element.  There is with respect to another element having

8    to do with different embodiments, there is the suggestion that

9    the two different times that are maintained will normally be

10   the same.  And that's another item that comes into that

11   obviousness argument.

12           THE COURT:  All right.

13   BY MR. BAUER:

14   Q.  Let's focus on the exact paragraph we are talking about,

15   paragraph 445.

16           Sir, you just told the judge about the motivation to

17   combine that background with what is shown in MacPhail.  You

18   don't describe that motivation to combine anywhere in your

19   report, do you?

20   A.  I don't recall if I specifically used those words.  But I

21   do in my report talk about things external to the MacPhail

22   patent but what one of ordinary skill in the art understands in

23   terms of the ability to run multiple servers or multiple

24   components on a single computer system.

25   Q.  Let's look at 445.  You say it would have been obvious to a

1  person of skill to implement the method of managing the

2  retention and deletion of documents disclosed in MacPhail on a

3  single computer?

4  A.   Yes.

5  Q.   That method is not described in MacPhail itself, correct,

6  you need to bring this other technology in?

7  A.   Well, it's not so much other technology.  You need to bring

8  this particular way of implementing it in.  That is, it doesn't

9  state that they run on a single computer, but one of ordinary

10  skill in the art understands, when you look at servers in that

11  time of the writing of this and other computer systems, that

12  that could be done.

13  Q.   None of that is in this paragraph either, is it?

14  A.   That may not be in this paragraph, it may be in some other

15  paragraphs.

16  Q.   You prepared to come in here today, right, you knew this

17  was going to be the heart of the issue?

18  A.   I did prepare to come in here, yes.

19  Q.   Paragraph 445 is your entire opinion on the issue of

20  obviousness with respect to this element not being in MacPhail,

21  isn't that correct?

22  A.   I will need to look specifically at this particular

23  section.  In fact, what you quoted to me from that one

24  paragraph was only part of that one paragraph.  Even with this

25  I have the discussion:  Combining the functionalities of

1    storing and viewing electronic documents, which in the

2    embodiment disclosed in the MacPhail patent is distributed into

3    one device, would entail no more than application of known

4    techniques by a person of ordinary skill in the art to obtain

5    predictable results.

6    Q.   Other than that one conclusory statement, you provide no

7    evidence to support that statement, correct?

8    A.   I also state in this paragraph immediately following that,

9    in fact, it would have been easier for the developer of the

10   system disclosed in the MacPhail patent to implement or access

11   restriction technique on a single device had she not been

12   trying to solve a broader problem of managing information in a

13   distributed system.

14   Q.   You provided, other than those conclusory statements, you

15   provided no evidence to support it.  You didn't point to any

16   prior art that would have done it, or to support your

17   contention that these were known techniques providing

18   predictable results, did you?

19   A.   Within the body of the report, I do not believe that I

20   pointed to additional references.

21   Q.   In fact, when you talk about "she would have been able to

22   do it had she not been trying to solve a broader problem," in

23   fact, she wasn't trying to solve this problem in MacPhail, was

24   she?

25   A.   She wasn't trying to solve?

1   Q.  The problem that you're saying anybody could have easily

2   done.  She was looking at a different problem.

3   A.  She was looking at solving a particular problem and

4   described the solution in the context of a distributed system.

5   The problem that she was solving is the same problem that

6   exists also on an individual system.

7   Q.  She didn't say that in her patent.  This is not in your

8   report, right?  This is what you're adding now to fill it out?

9   A.  No, sir.  In the introductory material in the patent, and

10  we see this cited here at 1-15-20, and that is a citation that

11  is in this paragraph, it talks about the state of the systems

12  including a simple personal computer where this kind of problem

13  existed.  The particular embodiment that she described in this

14  did speak about a more complex environment, but that doesn't

15  get to the point that the core concepts that were the

16  contributions of the MacPhail patent couldn't be implemented in

17  these other environments that she had indicated were

18  preexisting environments.  And I provide the support here that

19  one of ordinary skill in the art, and we went through those

20  cites.

21          MR. BAUER:  Your Honor, our contentions are that the

22  expert report was nothing more than his conclusion.

23          THE COURT:  I understand.  He is making his argument

24  to give a broader reading of this paragraph than you are, which

25  I may or may not agree, but both sides are in total agreement

1   of course that to the extent he is permitted to testify, he is

2   bound by the four corners of the report, he can't go beyond the

3   report.  But that's not the question before me.  The question

4   before me is whether he can testify about this particular

5   aspect based on MacPhail, etc.  So maybe we can move on.

6            MR. BAUER:  That's right.

7   BY MR. BAUER:

8   Q.  The last ones that I just want to talk about are Munyan and

9   Bolas with respect to the '703 patent.

10           At paragraph 277, you discuss the Munyan patent, at

11  page 71 of your report.

12  A.  I am reading that now.

13           MR. BAUER:  I understand they are not going to do

14  Munyan and Bolas in the same claims.

15  Q.  With respect to claim 13 of the '703 patent, you talk about

16  the Munyan reference, the Munyan patent with respect to the

17  preamble.  You see how you did the report?  You took it step by

18  step.  So paragraphs 276 to 281 relate to the preamble, and

19  then 282 relates to the first element enabling?

20  A.  Yes, that's how I did that.

21  Q.  With respect to the Munyan patent, paragraph 277, you say

22  it renders obvious the method.  You're talking about the

23  preamble, right?

24           MR. BAUER:  One second, your Honor.

25  Q.  So what I have been told is what we are talking about with

EAASADR4       Neumann - FDV - Mr. Bauer

1  you with Munyan is with respect to claims 1, 2, and 3.  That's

2  at page 75, paragraphs 292 and 293.

3  A.  I am on that page.

4  Q.  The one paragraph you have in here about what is missing,

5  paragraph 293, it says:  To the extent that it might be

6  determined, that claim 1 is not anticipated for failing to

7  disclose the consumer appliance element, that claim 2 is not

8  anticipated for failing to disclose the consumer appliance

9  element, and claim 13 is not anticipated for failing to

10 disclose service via the Internet and server initiating access.

11        You then have the conclusion:  "Those of ordinary

12 skill in the art would have found it obvious to modify the

13 electronic book described in the Munyan patent so that these

14 limitations were included."

15 A.  And that is what I state.

16        MR. BAUER:  I was only going to talk about the one

17 claim that I had.  Now I have been switched around.

18        I am not going to take up the Court's time.  I think

19 the arguments have been made.

20        THE COURT:  I think they are set out in your papers.

21        Any questions from defense counsel?

22        MR. BERTA:  Your Honor, very briefly.  I just want to

23 address two and a half issues.

24        We do have an issue with respect to Saigh and

25 obviousness.  So if we could lay the foundation for that.

 1          THE COURT:  Go ahead.

 2   EXAMINATION

 3   BY MR. BERTA:

 4   Q.  So it's correct that you looked at the Saigh reference in

 5   your report.  As counsel noted, and as the judge also noted,

 6   you offered an opinion that Saigh anticipates the asserted

 7   claims, right?

 8   A.  That is correct.

 9   Q.  Anticipation, in your view, means that each element listed

10   in that patent claim can also be found expressly or inherently

11   in that reference, is that right?

12   A.  Yes, that is also correct.

13   Q.  When you offered that opinion -- is that your opinion

14   still?

15   A.  That is still my opinion.

16   Q.  Good.  When you offered that opinion, you received a

17   response, is that correct, from Dr. Wang?

18   A.  Yes.  I have read Dr. Wang's report.

19   Q.  Did he agree with you as to whether each of the individual

20   elements in the asserted claims were also reflected in the

21   Saigh reference?

22   A.  He certainly disagreed with me on that.

23   Q.  In response to seeing his distinctions between what you

24   believe were in Saigh that were also in the patent, did you

25   have a reaction to the distinctions he was drawing between what

1   you said was a disclosure in Saigh and what he thought maybe

2   wasn't actually disclosed in Saigh?

3   A.   My reaction in some of the cases were that I outright

4   disagreed with him.  For example, he indicated that certain

5   things might not be there.  For example, he said that the

6   storing of, as he quoted and as he cited, information, he

7   didn't see where that was a book.  But elsewhere, within a

8   paragraph or so, there was information that would lead one to

9   believe that that was a book.  So that was one example, and

10  there were various other examples, where he tried to draw

11  distinctions that I believed were insignificant and in fact

12  would not hold merit in terms of his argument that they didn't

13  anticipate.

14  Q.   I think what you said was you were of the opinion that

15  Saigh in fact discloses an element that an electronic book is

16  stored to a device.  Is it correct that Dr. Wang concluded that

17  actually, with respect to the element at issue, what was stored

18  to the device, what was literally contained within the words of

19  Saigh was that what was stored to the device for the relevant

20  element was information, not books, in that particular

21  situation.  Is that roughly correct?

22  A.   That is my understanding of that particular element.

23  Q.   So to the point, if someone were to decide that storing

24  information to the device was somehow distinct from storing a

25  book to the device such that, literally speaking, it wasn't

1    anticipated -- first, let me ask you, is it your view that that

2    still is anticipation?

3    A.  It is still my view it is anticipation.

4    Q.  If someone were to decide that information in a book were

5    distinct enough that it wouldn't be found literally within the

6    four corners of Saigh, do you have an opinion as to whether or

7    not information and books are different enough from one another

8    to render Saigh no longer now just obvious, if not anticipated?

9    A.  I believe it would be obvious because one understands that

10   what one is interested in with books is the information, and

11   that if we are describing information can be stored, that

12   information can certainly be information from books.  I believe

13   it actually was, but to the extent that someone else might not

14   believe it, it would be obvious to use that information from

15   books.

16   Q.  In the four corners of your discussion of Saigh --

17             THE COURT:  So you don't really understand books.

18   These days books are not used for information at all.  You put

19   them up on your bookshelf to impress easily impressionable

20   young people, which is what I think is their sole function.

21   Q.  Just to put the point to the Court as to what I think the

22   decision would have to be is, with respect to these

23   distinctions that Wang raised, did you review Wang's report

24   after you received it?

25   A.  I did review Wang's report.

 1   Q.  Did you develop responsive thoughts with respect to this

 2   issue of where he was drawing a distinction with something that

 3   you thought was disclosed in Saigh?

 4   A.  I first developed thoughts which actually disagreed with

 5   him.  And I also developed thoughts that, to the extent that

 6   someone might accept his arguments, that it still would have

 7   been obvious to what was needed to meet those.

 8   Q.  You obviously were deposed in this case?

 9   A.  I was deposed.

10   Q.  Were you able to when asked to offer those further thoughts

11   that came to you upon seeing what distinctions he was drawing

12   with respect to the --

13        THE COURT:  This is an interesting example of leading

14   questions, but what is the point?

15        MR. BERTA:  The point being we agree that what was in

16   that report is anticipation by Saigh.  We can't control that

17   Dr. Wang says, well, electronic information and electronic

18   books are somehow different things, but that's going to go to

19   the jury, perhaps, with respect to his opinion.  And if the

20   jury thinks a book is not the same word --

21        THE COURT:  I understand all of that.  I understand

22   totally your argument.  I am just wondering why you feel the

23   need to put it through this witness.  It's really what one

24   might say an obvious argument.

25        MR. BERTA:  I agree with you, but he does bring

1   expertise to bear -- this is just on example -- on why a whole

2   network, for example, is the same thing as a modem.

3              THE COURT:  All right.

4   BY MR. BERTA:

5   Q.  The last issue with respect to MacPhail -- and this might

6   have been me -- to clarify, is it correct that with respect to

7   MacPhail, besides the two elements that you identified when you

8   were speaking with his Honor, that you believe all the rest of

9   it is disclosed in MacPhail?

10  A.  I do believe that the rest of it is disclosed.

11  Q.  So there were two elements that you thought arguably were

12  not --

13             THE COURT:  I understand your point.

14             MR. BAUER:  Just two questions.

15             THE COURT:  Go ahead.

16  BY MR. BAUER:

17  Q.  Mr. Neuman, you say you didn't form the obviousness

18  opinions until after you saw Dr. Wang's report?

19  A.  That is correct.

20             Actually, I believed that they anticipated and thus

21  would have been obvious.  But the obviousness opinions, in

22  light of potentially missing elements that Dr. Wang claimed

23  were there, are opinions I didn't form.

24  Q.  Just so the record is clear, when you say anticipation,

25  it's your view that if it anticipates, then obvious is really

 1   just a subset of it at that point?

 2   A.  I believe we are in agreement there.

 3   Q.  If it doesn't anticipate, then you need to go one more step

 4   to show why the missing element would have been obvious?

 5   A.  That is correct.

 6   Q.  When you formed the opinions on obviousness after Dr. Wang

 7   showed it to you, you submitted a supplemental report in this

 8   case, didn't you?

 9   A.  There was a supplemental report that was submitted, but

10   that was two particular issues.

11   Q.  You didn't mention any of these obviousness supplemental

12   issues in your supplemental report which was submitted after

13   Dr. Wang's report?

14   A.  In that supplemental report, no, I did not mention these

15   issues.

16   Q.  In fact, until today, this is the first time we have heard

17   your obviousness arguments?

18   A.  I don't know what you have heard, but this is the first

19   time I have specifically presented them to you.

20   Q.  The last thing.  If we can look at your expert report, page

21   9.  This is paragraph 35.

22   A.  Yes, I see paragraph 35, which I think starts on page 8.

23   Q.  You did understand when you rendered this report that you

24   needed to provide some rationale to support your finding of

25   obviousness, and you listed at least seven different ways to do

1    it?

2    A.  I do see, "I understand that at least the following

3    rationales may support a finding of obviousness," and I listed

4    those rationales.

5    Q.  And you haven't listed any of those in any expert report

6    you submitted in this case with respect to Saigh?

7    A.  I'm sorry.  The question?

8    Q.  You haven't discussed any of those rationale regarding the

9    obviousness argument you make about Saigh?

10   A.  Use of known techniques to improve similar -- applying a

11   known technique to a known device.

12   Q.  I am not asking you today what your opinion is.  I am

13   asking you to confirm, you have never provided us a written

14   opinion or an expert report correlating any of those factors to

15   the missing elements in Saigh?

16   A.  I have not provided any supplemental reports that

17   specifically did that for Saigh.

18              MR. BAUER:  Thank you.

19              THE COURT:  OK.  Thank you so much.  You may step

20   down.

21              (Witness excused)

22              THE COURT:  So we have two more things to handle.  I

23   want to hear oral argument in a minute, and then I also want to

24   go over the preliminary jury charge.  I e-mailed that to you

25   about noon, but let me hand you a copy as well.

1          I think there may have been some misunderstanding on

2    your part.  When we discussed this on the phone, I indicated

3    that what I had in mind in the way of a preliminary charge was

4    something like one or two pages.  What you each provided me in

5    your submissions, along with your regular requests to charge,

6    was something like 15 or 20 pages.  A simple error in order of

7    magnitude, but what I want is one or two pages.  So I have

8    given you a proposed preliminary instruction that is one page.

9    It actually, to be totally fair, was one and a quarter pages,

10   but I cut the font down slightly.  So we will talk about that

11   before we leave today, but you can take a look at it.

12         Now, in terms of oral argument, I am happy to hear

13   argument about anyone and everyone, but I will tell you where

14   my head is at at the moment.

15         I am inclined to admit Mr. Barnes' testimony.

16         I am inclined to admit Mr. Neuman's testimony with

17   some narrowing, but not much.

18         I am inclined to admit Dr. Wang's testimony with

19   considerable narrowing along the lines that I think pretty much

20   there is now consensus on.

21         Where I am having the greatest difficulty is with

22   respect to Dr. Magee.  It sounded to me like what he basically

23   did was say, if this had been a negotiation, they would have

24   come up with a lump sum of about seven million bucks, and then

25   from that I derived what the royalty rate would be.  And I am

1   wondering whether that's an appropriate methodology consistent

2   with Georgia Pacific case law generally.  Now, maybe I am

3   misunderstanding his testimony.

4           So while I am happy to hear argument on anything and

5   everything, I particularly want to hear argument with respect

6   to Magee.

7           So why don't we hear first, therefore, from

8   plaintiff's counsel because it's you who have got to defend the

9   case, so to speak, and then we will hear from defense counsel,

10  and then we will come back to plaintiff's counsel by way of

11  rebuttal.  I know that defense counsel is the moving party

12  here, but given what I just said, I think it makes more sense

13  to hear from plaintiff's counsel.

14          MR. CABRAL:  Your Honor, I think the Fed Circuit has

15  come down pretty recently in the *Apple v. Motorola* case and

16  said that estimating a reasonable royalty is not an exact

17  science.  There can be more than one way to do it.

18          THE COURT:  I appreciate that in some ways this is an

19  unusually difficult situation of people estimating the

20  reasonable royalty because there are so few participants in the

21  market, there's so little history, any negotiations.  I

22  appreciate all of that, but that doesn't mean anything goes

23  either.

24          MR. CABRAL:  I think that this is one of those cases

25  where there is no sort of method to come up with a number.

1     What you have here is evidence that's out there in the record,

2     limited evidence frankly.  You don't have a free arm's-length

3     negotiation outside of the context of litigation.  All we have

4     is really a couple of surveys and analyses done on the relevant

5     portfolios.  You also have the Amazon settlement agreement,

6     which is really the only license I believe to the patent.

7          So it all depends on how you treat the Amazon

8     agreement, and I think the two experts in this case have

9     treated them differently.  The Amazon agreement was the focal

10    point of Mr. Barnes' testimony, as you probably are well aware

11    by now, and the issue with that is the Fed Circuit has been

12    very clear that there is a long-standing disapproval of relying

13    on litigation settlement agreements.

14          THE COURT:  As the master of cliches, let me throw out

15    one.  In the land of the blind, the one-eyed man is king.  That

16    was the only licensing agreement we have to work from.  So it

17    has to be looked at with great care and caution.  I am sure the

18    jury will hear lots of reservations about that.  But there is a

19    certain common sense in saying, well, that's the one license

20    out there that is at all in this ballpark, and that's not how

21    Magee goes.

22          MR. CABRAL:  He considers the Amazon agreement at

23    length.

24          THE COURT:  It corroborates his view not on the

25    royalty rate, but on the lump sum.

1            MR. CABRAL:  Yes, if I heard him correctly, he said it

2      was on the lump sum.  I think the reason that he gave, at least

3      if I heard him correctly, is that -- this is true independently

4      of what he said today -- the available evidence regarding

5      Amazon's unit sales, in order to convert those opinions or that

6      agreement from a lump sum amount, which is what the Amazon

7      license is, into a per-unit rate, which is what Mr. Barnes

8      does, you have to rely on several things.

9            You have to rely on attorneys' eyes only confidential

10     information that was produced by Amazon litigation that would

11     not have been available to the parties as of the date of the

12     hypothetical negotiation.  You have to rely, as Mr. Barnes did,

13     on data from the IDC, which came in 2011.  We have issues with

14     how he used that data, obviously, because there was data from

15     2010 and 2012 and 2013, and even 2014 now.  But all of that

16     came after the date of the hypothetical negotiation as well.

17           So, in order to use the Amazon agreement, you have to

18     focus on an agreement that came two years after the agreed-upon

19     date of the hypothetical negotiation in a fast-moving market,

20     which I think everybody agrees on.  That time difference plus

21     all of the other factors that distinguish the Amazon agreement

22     from the hypothetical negotiation -- assumptions of validity

23     and infringement, the cross-license which involved 6 Amazon

24     patents that were at issue in two different litigations, in

25     Washington and in Delaware -- Mr. Barnes attributes no value to

1     that, but that is another distinguishing factor between the

2     Amazon license and the hypothetical negotiation.

3          You also have the coercive forces that are involved in

4     litigation when you are talking about litigation fees, costs,

5     and risks associated with that, and so forth.  So, the Amazon

6     agreement is not a perfect starting point.

7          THE COURT:  I totally agree with that.  But I come

8     back to the fact that that at least is some guidance, arguably,

9     and you can have competing arguments, as opposed to sort of

10    pulling it out of either thin air or, that's not quite fair,

11    offers that were not accepted, things like that.  How can an

12    offer that is not accepted be a basis?

13         MR. CABRAL:  Your Honor, the offer was 50 cents per

14    unit.  It depends on how you define unit.  In that particular

15    term, which has now been admitted into evidence, "unit" was

16    defined as an ereader device and an application, a Nook app.

17    Nook apps, the data shows, they give away for free.  It's like

18    15, 20 million units, whatever it is.  I don't know what it is.

19         What he said, what Professor Magee said at a high

20    level was that when you take apps into account, the real offer

21    wasn't just 50 cents per unit.  The real value of the offer was

22    in the 13 to $15 million range.  That's what they rejected, not

23    the 50 cents.  When you take the apps out of the equation --

24         THE COURT:  Which he doesn't know.  He speculates.

25         MR. CABRAL:  He bases that on information in his

1      report.  We do have data available to how many apps were

2      released by Barnes & Noble within that relevant time period.

3                THE COURT:  Go ahead.

4                MR. CABRAL:  He does have data about how many apps

5      would have been there so he can evaluate what that true offer

6      was.  You're right in the sense that ADREA didn't know how many

7      apps had been released, because that was Barnes & Noble

8      information.  But certainly Barnes & Noble knew what that would

9      cost them at that point.  That's what they rejected, the 13 to

10     $15 million offer, which is really what was put on the table.

11               What you have here is Professor Magee coming back and

12     proposing it is not 50 cents, it is 50 cents with a volume-

13     based discount down to 25.  That is also consistent with Barnes

14     & Noble's licensing history, where they do license technology

15     for the Nook device specifically on a per-unit basis, and it is

16     adjusted based on volume.  It is consistent with their

17     licensing history.  He comes up with a number.

18               Up to date using the 50 cent royalty, the vast

19     majority of the damage, we are at $6 million if you do 50 cents

20     up to now.  That's on a running royalty basis.  If you have

21     problems with a lump sum, maybe that is independent of the

22     reasonable royalty opinion, but today that would take us to

23     $6 million for a 50 cent rate.  Once you hit the 20 million

24     units, it would go down to 25, according to Professor Magee's

25     opinion.

1          THE COURT:  Let me hear from defense counsel.

2          MR. EDERER:  Your Honor, we have two problems with the

3    50 cent number.  One is set out in detail in our briefing, and

4    that is the fact that the number is not broken down among the

5    various patents.  I can address that issue as well.

6          With respect to the issue that you were just talking

7    about, it is absolutely true, and Mr. Magee admitted this on

8    the stand, he performed no mathematical calculation whatsoever

9    to get to his 50 cent number.  He provides no guidance as to

10   how that number was arrived at.  All he says is, I looked at a

11   bunch of different things, and that number seemed fair and

12   reasonable to me.

13         What he said was he based it first on the opening

14   offer to Barnes & Noble, which is not, coincidentally, 50

15   cents.  By the way, we have heard now a couple of times about

16   why Barnes & Noble rejected that offer.  There is absolutely no

17   evidence in this record, and you will hear none in this

18   litigation, as to why Barnes & Noble rejected that offer.  That

19   is total conjecture on the part of Professor Magee, number one.

20         Number two, we keep hearing about these apps.  The

21   apps were originally accused in addition in this case, and your

22   Honor dismissed the claim with respect to the apps because it

23   wasn't actually being pursued by the plaintiffs.  So the apps

24   are not accused and they are not involved in this case anymore.

25         The other part of it is that -- we wanted this out

1    when I was examining Professor Magee -- if you look at it

2    another way, there's 300 patents covered in that offer to

3    license versus 3 in this case.  The offer was for a worldwide

4    license versus a U.S.-only license in this case.  There is no

5    correlation whatsoever between that offer and Professor Magee's

6    royalty rate number other than the fact that they both were 50

7    cents.  He does not actually do any calculation or tie it back.

8         The other document that he refers to and which he

9    relied on very heavily is a document that your Honor has

10    excluded from this case as highly prejudicial.  There is a fair

11    amount of argument about that document in our Daubert motion.

12    But Professor Magee conceded today that he is not going to be

13    able to rely on that document.

14         I think when you put that together, the two things

15    that he relied on principally are the offer document and what

16    he called the valuation document, which we I think have

17    demonstrated was not a valuation document at all.

18         Then, with respect to what he failed to take into

19    account, he says he did take into account the Amazon agreement.

20    You heard him talking about that today.  But he conceded on the

21    stand today that he didn't use it to come to a number.  He just

22    said, well, those numbers were really big, so my number sounds

23    reasonable in relation to the big numbers in the Amazon

24    agreement.  That's really all that he is talking about.

25         If you look at his report, he says that he found the

1    Amazon agreement informative but not with respect to the 50

2    cent number or any total lump sum number that he may arrive at.

3    He just says that it supports the notion that you can do a lump

4    sum calculation in a situation like this and that ADREA would

5    have been open to either a running royalty rate or a lump sum,

6    and also that it involves the licensing of all three patents

7    for one single rate.

8          We also heard a little bit about a report called PCT,

9    although he hasn't really described in any detail how that

10   influenced his calculation or lack thereof.  The PCT document

11   is a document that well predated the date of the hypothetical

12   negotiation and relates back to agreements and other data that

13   goes back to the beginning of the 2000s and the late 1990s.

14         So, there is just absolutely nothing that Dr. Magee or

15   Professor Magee has presented in his report or in court here

16   today that in any way whatsoever demonstrates or would demon-

17   strate to a jury why or how he got to his 50 cent number.

18   Therefore, we think it would be highly prejudicial to allow him

19   to present that number in that context.

20         Also, by the way, there are other things that we

21   mentioned, we didn't get to today, the things that he fails to

22   take into account.  One of them is the $5 million valuation in

23   ADREA's own financial statements, which we had some testimony

24   on in court here on Wednesday.  The fact that these valuations

25   are being reported to the IRS, he didn't take that into

1    account.  In fact, he dismissed that in favor of what he called

2    the valuation in the Intertrust document, which has now been

3    excluded.

4           Piecing it all together, there is just no way that he

5    can present to a jury any rational basis for coming to that 50

6    cent number, not to mention that we have a big problem that we

7    address in detail in our motion, the fact that the 50 cent

8    number doesn't change if the jury may find one or two of the

9    patents-in-suit to be not infringed or invalid.  Your Honor may

10   recall my soda, gum, and -- what was it? -- chips example.

11          THE COURT:  I recall it, but apparently you don't.

12          MR. EDERER:  The last thing I will mention is that his

13   reliance on the Amazon agreement, to the extent he was relying

14   on it, got tripped up when he was here today and we pointed out

15   to him that what gets him to that $7.7 million lump sum number,

16   putting aside all the other problems with his lump sum number,

17   the fact that he is projecting out for 12 years based upon flat

18   sales when the 3 actual years' worth of data that he is relying

19   upon show a sharp drop in sales every single year.

20          As to his reasoning as to the Samsung agreement that

21   Barnes & Noble just entered into as a basis for keeping sales

22   flat, well, before the 2014 numbers were reported by Barnes &

23   Noble, Magee was relying on the 2013 numbers, which was long

24   before the Samsung agreement was announced, and he held sales

25   flat then, too.  The only change he made when the 2014 numbers

1    came out is he lowered his number and held sales flat from that

2    point.

3              THE COURT:  Before plaintiff's counsel gets up, that

4    was something I meant to ask plaintiff's counsel about a minute

5    ago in addition to various other things.  I was surprised, and

6    I asked him twice about this, whether the reason he held sales

7    flat despite the decline in actual sales was the Samsung thing,

8    and he said yes, that was his reasoning.

9              But what evidence is there of any knowledge of that at

10   the time he issued his report?  He said it's now just been put

11   on the market a month ago, but his report predates that.  He

12   talked about it's been put on with a big splash and all like

13   that, but none of that could have been the basis for his

14   report.

15             Anyway, we will hear from plaintiff's counsel in a

16   minute.

17             MR. EDERER:  The point on that, your Honor, is that

18   that information appears only in his supplemental report.  He

19   updated his numbers based upon --

20             THE COURT:  Even before his supplemental report, your

21   point is he had come to the same conclusion.

22             MR. EDERER:  Come to the same conclusion.  He was just

23   starting from a higher base and holding sales flat for 12

24   years, and I guess it was 13 years at that point.  When the

25   numbers came out from Barnes & Noble for 2014, he realized if

1    he was going to hold sales flat, he was going to have to hold

2    it flat from a lower number.  That is the first and only time

3    that we have heard anything about the Samsung agreement.  His

4    entire discussion of the Samsung agreement:  There was a lot of

5    excitement about it, it was just announced.

6         THE COURT:  But you are reminding me he did refer to

7    it as in his supplemental report.

8         MR. EDERER:  In his supplemental report he did.

9         THE COURT:  OK.

10        MR. EDERER:  I was about to also mention the fact that

11   the Amazon agreement got turned around on Professor Magee a

12   little bit when I questioned him about what gets him to that

13   $7.7 million lump sum number is the fact that the '703 patent

14   is the only one that goes beyond 2013 in terms of an expiration

15   date.  If the '703 patent is found to be not infringed or

16   invalid, there goes the $7.7 million number.

17        On top of that, the most that you could possibly

18   attribute to the '703 patent from the Amazon agreement is

19   2.5 million because it is within that Philips/Sony portion of

20   the license as opposed to the Discovery portion of the license,

21   which was for $10 million.  What he is trying to do is put the

22   biggest number he can in front of the jury, the $7.7 million

23   number, which he only gets to by reference to the '703 patent.

24        The Amazon agreement suggests that at most the value

25   of that particular patent, which is only one of many patents

1    that is being licensed in the Amazon agreement, could possibly

2    be $2.5 million, yet he is trying to put a number that is three

3    times that amount in front of the jury.  We think that would be

4    highly prejudicial along with everything else.

5         THE COURT:  Thank you very much.  Let me here hear

6    from plaintiff.

7         MR. CABRAL:  Your Honor, a lot of what I heard just

8    now was arguments from cross-examination and the weight of the

9    evidence, so I want to address all of those.  There are certain

10   issues that were brought up that do actually relate to

11   admissibility.  Not all of them, obviously, not even many of

12   them, but there are some.

13        There is no rule that requires a per-unit royalty.

14   There is no rule that requires a lump-sum royalty.  That is

15   rule that requires a reasonable royalty.  There is no

16   requirement that a particular mathematical calculation be done.

17   If it was an easy thing where you could just point to an

18   agreement or a number and break out a calculator, then we

19   wouldn't need expert testimony in this situation.  The case law

20   is clear on this.  Sometimes there is no magic formula to come

21   up with a number.  In situations like this, where your starting

22   point is very imperfect, you have a lot of gray area here.

23        THE COURT:  What do you make of the fact, which both

24   in their papers and here today defense counsel have repeatedly

25   emphasized, that the lump sum would change substantially if

1    some patents were found valid and others were found invalid,

2    and yet he maintains that the royalty rate should remain the

3    same even though it appears he derived the royalty rate from

4    saying this was all a package deal and therefore the lump sum

5    is really the best way to look at it and the royalty rate is

6    only derivative?

7        MR. CABRAL:  That question related solely to the lump

8    sum analysis, not the running rate analysis, which is slightly

9    different.  On the lump sum piece of it, you are right, if you

10   did take the '703 patent, which has a long life span, out of

11   the equation, it would change the overall analysis.

12       Part of the problem with this argument is that in

13   order to calculate damages, your job is to assume validity and

14   infringement of all of the asserted patents.

15       THE COURT:  But nothing precludes you from saying, and

16   here is my analysis if only this one is found valid and only

17   that one is found valid.  You are quite correct that the law

18   here is not all that specific.  By the same token, it doesn't

19   exclude your doing that.

20       I'm wondering, what is the jury supposed to do if he

21   gives essentially the testimony he gave today or in his report

22   and they conclude that the '703 patent was not infringed?

23       MR. CABRAL:  The significance I don't think is as

24   dramatic as we are being led to believe, because there is a

25   volume-based discount in the projections.  When you take that

1   out of the equation at the tail end of the lump sum, you are

2   talking about a much, much lower rate, half the rate actually.

3          I think Professor Magee is prepared, and I think he

4   would have been prepared today had he been asked the questions,

5   to give the actual amounts in the event one of the patents is

6   not infringed or found invalid.  He can do that certainly on

7   the running royalty part of his calculation easy enough.

8          THE COURT:  The royalty part is just an arithmetic

9   calculation.

10         MR. CABRAL:  That's right.

11         THE COURT:  Which the jury could do, too, in that

12  situation.

13         MR. CABRAL:  Absolutely.

14         THE COURT:  I don't know that he can be allowed to

15  testify to something that is not in his report.  You made your

16  choice, rightly or wrongly, in that regard.  Was there anything

17  else you wanted to say?

18         MR. CABRAL:  No.  I think you had asked a question

19  about flat growth.  That was the only other point.  I will

20  address that point if you would like.

21         THE COURT:  Go ahead.

22         MR. CABRAL:  The issue here is again this relates

23  solely to the lump-sum analysis here.  The issue again is that

24  damages opinions are not adjusted in real time.  The goal here

25  is to conduct the focus of the analysis at the time of the

1    hypothetical negotiation.

2         In 2009 the outlook on the ebook market was incredibly

3    optimistic and positive.  That continued all the way up to

4    2012.  If you look at projections even in 2012, the market was

5    still rosy and great.  After that, there was a decline in the

6    market and the device sales dropped.  You saw that from Amazon,

7    and from Barnes & Noble, frankly.

8         I think what Barnes & Noble's counsel would like you

9    to do or would like the experts do is just project downward

10   growth now in real time because in 2014 the Nook sales are

11   dropping.  What I think Professor Magee is saying, and I'm not

12   an economist and I haven't been doing this for 40 years, but

13   what I think he is saying is you can't adjust in it 2012 saying

14   the number is going to go crazy high, and in 2014 saying the

15   number is going down so I'm going to adjust it here.

16        What I think he is saying is I'm going to use a flat

17   growth rate based on the evidence available to me and some of

18   the evidence, not counting the Samsung Nook, we did know

19   about --

20        THE COURT:  To put it differently, I think the null

21   hypothesis is flat growth is really what he is saying.

22        MR. CABRAL:  Yes.

23        THE COURT:  Let me think about that.

24        MR. CABRAL:  I do think the evidence regarding the

25   pulling of the marketing and all of that information was

1   available prior to the supplemental report.  We did have some

2   advance notice of this new Samsung product being released, and

3   that does account in large part for the decline of the sales,

4   and I think he was right about that.

5              THE COURT:  Thank you very much.

6              Now, with respect to any and all other experts, I'm

7   happy to hear anything anyone wants to say, but I don't need to

8   hear anything unless you are dying to say it.  If there is any

9   point any wants to make with respect to the other experts, now

10  is your opportunity.

11             MR. BAUER:  Your Honor, in our dialogue we probably

12  have all reached a conclusion.  There was the MIL, and it sort

13  of links to this.  I don't know if I should address that now.

14             THE COURT:  Sure, go ahead.

15             MR. BAUER:  The question really is, what does the

16  expert get to say on legal stuff?  By the way, every expert

17  report, we have to give them the explanation of the law.

18  That's just the way it is.  They all say, I understand.

19             THE COURT:  We sort of discussed this a little bit on

20  the phone the other day.  To the extent that an expert gets up

21  and says, I was informed by the lawyers or I took it as a given

22  that the legal test was X, Y, and Z, and then applying that

23  test I have concluded such and such, I have no problem with

24  that as long as he is right about X, Y, and Z.  If he is wrong

25  about X, Y, and Z, if he misstates the law, I will sua sponte

1   interrupt him.  But if you keep to fairly broad stuff, usually

2   there is no dispute and he can state the law.

3        That is to be distinguished from him saying the law is

4   such and such.  He cannot say that.  He can say, I have taken

5   as my assumption that the law is such and such.  It may even be

6   that if both counsel are in agreement that what he just stated

7   is right, we can tell the jury that by stipulation or something

8   like that, or I can say he got it right.  But I will not have

9   any witness ever testifying as an expert on the law.  That is

10  the distinction.

11       It came up in a different way.  I was concerned, when

12  I saw Dr. Wang's command of the English language, that a lot

13  more of his report than just the legal part may have been the

14  product of counsel.  But as we narrowed his testimony, I'm

15  content with where we are now.

16       MR. BAUER:  No question, we controlled the draft.  I

17  think everybody should be thankful for that perhaps.

18       Your Honor, the question on the legal then is really

19  whether the expert can say, in my opinion this claim is

20  obvious.  That is the ultimate legal question.  That we don't

21  think they should be able to say.

22       THE COURT:  In the Federal Rules of Evidence it

23  expressly says that an expert can testify on the ultimate

24  question.  Let's take a look at rule 704.  "Except as provided

25  in subdivision (b)," which refers to mental state in a criminal

1   case, which near as I can tell is not yet part of this case,

2   "Except as provided in subdivision (b), testimony in the form

3   of an opinion or inference otherwise admissible is not

4   objectionable, because it embraces an ultimate issue to be

5   decided by the trier of fact."

6           Isn't that the end of it?

7           MR. BAUER:  I have learned the Federal Circuit here,

8   your Honor, and it is not.  I am going to ask your Honor, when

9   you take the break, there is one very recent Federal Circuit

10  case, In-Touch Technology v. VGO Communications, May 9, 2014,

11  very recent, 751 F.3d 1327.  The Federal Circuit says, and I'm

12  reading from footnote 8, "The ultimate question of

13  obviousness," the ultimate question of obviousness, "the expert

14  must consider all factors relevant to that ultimate question."

15          That is why we had the debate about the secondary

16  considerations

17          THE COURT:  No, no, no.  This is the point we were

18  talking about with Dr. Wang.  If an expert is only an expert on

19  one aspect of obviousness, he is not in a position to give an

20  opinion as to obviousness as a whole.  He gives his opinion on

21  element X of obviousness, and you get, either through another

22  expert or through other evidence, you get in the other, and

23  then you make the argument to the jury that the conclusion is

24  nonobvious or obvious, whichever side you are on.

25          If he is an expert on all the elements of obviousness,

1   which Dr. Wang clearly is not, but if some expert were, and I

2   see nothing in what you just read me that contradicts, then he

3   can give an opinion on obviousness.

4          MR. BAUER:  Your Honor, it is just that was the basis

5   of our motion regarding Mr. Neuman.  It should be the same.

6   Neither of the experts should be able to say in their opinion

7   the claims are obvious.  They can both talk about the

8   technology.  They can both say what is missing.  They can even

9   say that the thing that is missing might have been obvious to

10  people of ordinary skill, the element that is missing, the

11  technology that is missing.

12         But they cannot say, and neither of us gets a sound

13  bite from an expert saying "in my opinion the claim," the

14  claim, the claimed invention -- that is the ultimate legal

15  conclusion -- is obvious, because neither of them is

16  considering the secondary considerations and all that other

17  stuff.  That's the distinction we have here.

18         THE COURT:  All right.  I will think about that with

19  respect to Neuman.

20         MR. BAUER:  With respect to the MILs, Mr. Neuman's

21  supplemental report has him talking about section 101 and 112.

22  Those are both purely legal issues for your Honor, and we don't

23  think there should be any testimony from him talking about

24  whether the claim is definite or indefinite.  We did that in

25  the claim construction with your Honor.  Nor should they be

1    talking about whether these claims were invalid under Alice and

2    the Supreme Court case.  That is what the supplemental report

3    is and that is what the MIL is directed to.

4              THE COURT:  All right.  Go ahead.

5              MR. BERTA:  I appreciate it, your Honor.  Let me

6    quickly work through the things I would like to say.

7              First, there was the suggestion that Dr. Neuman's

8    views with respect to obviousness, which is one of the issues

9    that we primarily talked about here today, the representation

10   that was made today, is the first day that we are learning

11   about it.

12             What actually happened was at his deposition, which we

13   can submit if you want, from pages 47 through 74 were about

14   a million questions on whether what was in the report was or

15   wasn't in anticipation of obviousness.  They asked a hundred

16   ways from Sunday, didn't you use the word "anticipation" here

17   and there and everywhere.  He said yes, but the predicate basis

18   for my obviousness view in light of Wang's response also, the

19   factual predicate for that is laid out in my report.

20             They never asked him what his response to Wang was.

21   We spent 47 to 74 talking about whether it was in the body of

22   his report.  So, there was absolutely fair notice that he had a

23   view in response to Wang.  They just chose not to ask so that

24   they could say today we haven't heard it.  On the issue of

25   whether there is fairness or there is ambush going here, that

1    is not true.  We were ready to go.

2         Secondly, there is a little bit of a distinction here

3    on the issue of secondary considerations between Dr. Neuman and

4    Dr. Wang.  They have the burden of production if they are going

5    to rely on secondary considerations when an expert proffers a

6    prima facie case of obviousness.  That's what happened.  We say

7    obvious because we had the opening burden on the report.  They

8    say, we disagree and also here are the secondary

9    considerations.

10        THE COURT:  That's a good point.  You're saying you

11   don't need to have an expert give an opinion on obviousness,

12   you don't have to have your expert assess the secondary

13   considerations to give that ultimate decision, because your

14   burden doesn't include consideration of the secondary

15   considerations?

16        MR. BERTA:  To be perfectly honest, I want to agree

17   with you except that I that if they do proffer secondary

18   considerations, I think our expert probably should respond to

19   whether he believes that is or isn't secondary considerations.

20   Let me boil it to a specific example.  I think we have the

21   Hendricks video and I think he might have said, I got an award,

22   I don't remember, I don't know, but I think that is probably

23   come in that he got an award.

24        He also talked about a long-felt need for books with

25   encryption.  They say, Wang says, well, there was a long-felt

1    need for books encryption and the '851 patent satisfies it.

2    They are going to argue that there is evidence of a long-felt

3    need because Hendricks said there was.

4            The response to that for us is you only get to have

5    long-felt need as a factor as a secondary consideration if you

6    show that what you purport to be the long-felt need was not in

7    the prior art.  It is undisputed in this case with respect to,

8    for example, the Sachs reference that patents existed on books

9    plus encryption.  That couldn't have been the long-felt need

10   satisfied.

11           Dr. Neuman, who is familiar with the prior art because

12   he was around at the time and has now looked at it, certainly

13   has the opinion that the scope and content of the prior art

14   means that the long-felt need could not have been encrypted

15   books with security.

16           We should be able to have a way to respond to that

17   evidence with a person of skill in the art at the time who knew

18   at the time that actually books plus encryption couldn't have

19   been a need that existed.  That's where we are.  Having them

20   having identified the secondary considerations through Wang to

21   the extent they are valid, we should be able to criticize them,

22   and some of the criticism does involve the knowledge of a

23   person of skill in the art at the time, which he is.

24           THE COURT:  Let me mull on all that.

25           Go ahead, counsel.

1          MR. BERTA:  Actually, I have one last issue.

2          THE COURT:  Go ahead.  The evening is young.

3          MR. BERTA:  I completely agree that the decision is

4     yours, it is yours, with respect to indefiniteness and with

5     respect to 101.  The question isn't whose decision it is.  It's

6     whether there are facts that an expert can bring to the table

7     that may assist this Court in its determination.

8          I'm not certain I'm of the view that we should do a

9     101 presentation to the jury.  It could be confusing, or an

10    indefiniteness presentation to the jury, unless you want an

11    advisory opinion.  However, if we are having a trial on

12    invalidity, that evidence has to come in somehow to the extent

13    the Court were to find it helpful.  I think our expert has

14    views as to why a person of skill in the art, him being one --

15         THE COURT:  I'm not interested in an advisory opinion.

16    But that actually makes me think of something else, which we

17    should probably discuss next week rather than tonight, which is

18    to the extent the defense here is asking for declaratory

19    relief, that is for the Court, not the jury.  It may follow

20    like night follows day from the jury's verdict, but

21    nevertheless I point out that that will be a decision that the

22    Court will have to make.

23         Yes?

24         MR. BAUER:  Very short, your Honor.  I welcome your

25    Honor to read the six or seven pages he just talked about in

Page 125

```
1           the deposition transcript.  If I can give it to your Honor?

2                   THE COURT:  Yes.

3                   MR. BAUER:  The yellow highlight is just where it

4           begins.

5                   Your Honor, what you will notice is that about every

6           third question is objected to.  Wait until you read those ten

7           pages and see what Mr. Cabral went through trying to get to the

8           obviousness argument after the witness said, I have nothing in

9           here about obviousness.

10                  THE COURT:  OK.

11                  MR. BAUER:  The last thing is on that issue about

12          secondary, you're right, it's rebuttal, but they have to give

13          us the report.  The issue of secondary considerations and

14          obviousness, maybe he didn't have it in his first opinion when

15          he saw when we were doing.  There's got to be a supplemental

16          report.  You don't get it here and you don't get it through

17          that transcript.

18                  THE COURT:  All right.

19                  MR. BAUER:  Thank you.

20                  MR. BERTA:  I don't know what pages he handed your

21          Honor.

22                  THE COURT:  He handed me 48 through 77.

23                  MR. BERTA:  Thank you.  Those are the ones I said.

24                  MR. BAUER:  I'm an honest guy, your Honor.  Thank you.

25                  THE COURT:  Last thing.  First, I will get you these
```

 1   rulings in a bottom line sense -- let me ask plaintiff's

 2   counsel, who is the first witness on Tuesday?

 3          MR. BAUER:  Mr. Mulchandani, who is their witness.

 4   They are going to take him first, out of order.

 5          THE COURT:  After that?

 6          MR. BAUER:  Then it is our expert, Mr. Berk, the

 7   infringement expert.

 8          THE COURT:  Who is not being --

 9          MR. BAUER:  Who is not challenged.

10          THE COURT:  Right.  I was going to say I'll get you

11   the rulings on Monday, but I'll get it to you when we convene

12   on Tuesday, give it to you right then.

13          MR. BAUER:  While we were doing this, we marked up

14   your preliminary instruction.  I think there is only one place

15   where there is a disagreement.

16          THE COURT:  Hand it up to my law clerk.

17          MR. BAUER:  The blue was my ink.  I had crossed out

18   one line where they wrote the word "stet."  I think the rest of

19   these were really meant to get it a little more clear.  I'm

20   glad to see that they have agreed with most of my suggestions.

21   The "stet" one, that really goes to the issue of the MIL,

22   whether the experts can testify to that.

23          THE COURT:  I have no problem with these changes.  Are

24   these agreeable to both sides?

25          MR. BERTA:  The thing that is written out actually is

1    a different issue than the MILs.

2            THE COURT:  We don't have to worry about that.

3            MR. BAUER:  For the preliminary, it doesn't matter.

4            THE COURT:  For the preliminary instruction, the only

5    changes are in the sentence that begins in the middle of the

6    second paragraph "If an element."  It now reads, "If the Nook

7    Devices include all of the elements of a claim of the various

8    patents, then infringement has occurred."  The second sentence,

9    right after that, "In addition, if an element of the Nook

10   device is substantially equivalent to an element of any one or

11   more of the claims."

12           The only other changes are in the next paragraph, at

13   the end:  "either because the inventions they described lacked

14   novelty or because they were obvious in view of the prior

15   inventions or because they did not clearly and adequately

16   describe the invention."

17           Then there are a couple of other trivial usage

18   changes.

19           Any problem with any of those changes?

20           MR. BERTA:  No, your Honor.

21           MR. BAUER:  No, your Honor.

22           THE COURT:  Very good.  I'll get this in final.  I am

23   going to distribute it to the jury and read it to them first

24   thing on Tuesday.

25           I would love to have you stick around, but if you want

1    to leave, you are more than welcome to.  I thank you very much

2    for all your help tonight.  Thanks a lot.

3              (Adjourned to 2:00 p.m., October 14, 2014)