```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   ADREA, LLC,

 4                    Plaintiff,

 5           v.                          13 Cv. 4137 (JSR)

 6   BARNES & NOBLE, INC.,
     BARNESANDNOBLE.COM LLC, AND
 7   NOOK MEDIA LLC,

 8                    Defendants.

 9   ------------------------------x

10                                       October 17, 2014
                                         9:20 a.m.
11
     Before:
12                    HON. JED S. RAKOFF

13                                       District Judge

14
                           APPEARANCES
15
     PROSKAUER ROSE LLP
16        Attorneys for Plaintiff
     BY:  STEVEN M. BAUER
17        COLIN CABRAL
          BRENDAN COX
18
     ARNOLD & PORTER LLP
19        Attorneys for Defendants
     BY:  LOUIS S. EDERER
20        ALI R. SHARIFAHMADIAN
          MICHAEL A. BERTA
21        YUE-HAN CHOW
          SARAH BRACKNEY ARNI
22        SUSAN L. SHIN

23

24

25
```

1              (Trial resumed; jury not present)

2              THE COURT:  Let's get the witness on the stand.

3              MS. ARNI:  We have one short issue before we get

4     started.

5              THE COURT:  Unless it relates to Mr. Magee, we will

6     wait till the break.

7              (Jury present)

8              THE COURT:  Not bad.  All right.

9              Ladies and gentlemen, I am going to ask my law clerk

10    to hand out to you a copy of what is called the Georgia-Pacific

11    factors for determining a reasonable royalty.  And counsel also

12    get copies.  We will read them briefly together, but you can

13    keep these for your reference.

14             I want to stress that this is a short version of each

15    of the factors.  They may be elaborated on by various experts

16    who will testify in the case.  But just to put it in context,

17    you will remember, the first thing you have to determine is

18    whether or not there has been infringement.  If there is no

19    infringement, that's the end, but if there is infringement,

20    then you have to determine if the patents that have been

21    infringed are valid.  If they are valid, then you go on to

22    determine damages.  And in determining damages, that is to say

23    the amount of money that the infringer has to pay to the owner

24    of the patent, these are factors that the courts have

25    determined are the relevant factors.

1          Now, there are 15 of them.  Not all of them apply in

2    every case.  I am going to give you the full list of 15 just so

3    you will be learned in the law, but some of them may not be

4    relevant here, and we will see as the various witnesses go

5    through them.  They are as follows:

6          1.  The royalties that the patentee -- the patentee is

7    the owner of the patent -- receives for licensing the patent in

8    suit.

9          2.  The rates the licensee pays for the use of other

10   comparables to the patent in suit.

11         3.  The nature and scope of the license in terms of

12   exclusivity and territory and customer restrictions.

13         4.  The licensor's established policy and marketing

14   program to maintain patent monopoly by not licensing others to

15   use the invention.

16         5.  Commercial relationship between licensor and

17   licensee, such as whether they are competitors or inventor and

18   promoter.

19         6.  The effect of selling the patented specialty in

20   promoting sales of other products of the licensee; the existing

21   value of the invention to the licensor as a generator of sales

22   of his non-patented items; and the extent of such derivative or

23   convoyed sales.  That's a technical term that you can more or

24   less disregard in this case.

25         7.  Duration of patent and term of license.

1          8.  Established profitability of the products made

2    under the patent, its commercial success and its current

3    popularity.

4          9.  Utility and advantages of patent property over old

5    modes of devices.

6          10.  The nature of the patented invention; the

7    character of the commercial embodiment of it as owned and

8    produced by the licensor; and the benefit of those who have

9    used the invention.

10          11.  The extent to which the infringer has made use of

11    the invention and the value of such use.

12          12.  The portion of profit or selling price

13    customarily allowed for the use of the invention.

14          13.  The portion of realizable profit attributable to

15    the invention as distinguished from non-patented elements,

16    significant features/improvements added by the infringer, the

17    manufacturing process or business risks.

18          14.  Opinion testimony of qualified experts.  That's

19    what you are about to hear from one side.  There will be a

20    similar expert from the other side.

21          15.  Outcome from hypothetical arm's length

22    negotiation at the time the infringement began.

23          Now, that's a lot of language.  Don't worry about it.

24    This is just to give you a very broad overview.  When you get

25    my detailed instructions at the end of the case, we will focus

1     in on the factors that are most important for your

2     consideration.  I am sure the witnesses will as well in their

3     testimony.  But since there was so much reference yesterday to

4     the Georgia-Pacific factors, I figured you ought to at least

5     know what they are.  So this is the whole list.

6           Down at the bottom you will see why it's called the

7     Georgia-Pacific factors.  It's from a case called

8     *Georgia-Pacific Corporation v. United States Plywood*

9     *Corporation* that was tried in this very court in 1970.  I, of

10    course, was only two years old at the time.  Another judge

11    tried it.  So that's why they are called the Georgia-Pacific

12    factors, but they have been adopted throughout the United

13    States.  And it's a handy checklist, as you will see.  Some are

14    more relevant to this case than others, but I just wanted to

15    give you a quick heads-up as to what they were.

16          So let's continue with the testimony.

17     STEPHEN MAGEE, resumed.

18    DIRECT EXAMINATION

19    BY MR. COX:

20    Q.  Good morning, sir.

21    A.  Good morning.

22    Q.  Professor Magee, yesterday you told us that you had done

23    your damages analysis and that you determined a royalty rate,

24    multiplied it by a base to get a total royalty, is that right?

25    A.  Yes, sir.

1   Q.  I want to go through each part of that a little bit.  OK?

2   A.  All right, sir.

3   Q.  What was the royalty rate that you determined?

4   A.  50 cents per unit.

5   Q.  Now, can you generally describe how you determined the 50

6   cent rate?

7   A.  The 50 cent rate is basically what you, the jury, will

8   determine, and that rate is the amount, the number of dollars

9   to be paid for each of the Nook e-books that Barnes & Noble

10  sold.  And what I have done is gone through all of the analysis

11  I have studied for the last year to attempt to determine that

12  that 50 cent rate I thought would be the appropriate rate, and

13  there will be a number of things we will go through to try to

14  get to that.

15          THE COURT:  Just answer the question.  I don't want a

16  narrative and I don't want a lecture to the jury.  I want

17  questions and answers and brief, pointed, and in proper form.

18          THE WITNESS:  Yes.  I'm sorry, your Honor.

19  Q.  You mentioned that the rate came out of your analysis over

20  the last year, right?

21  A.  Yes, sir.

22  Q.  Is that the analysis that we are talking about, the

23  Georgia-Pacific analysis you were talking about?

24  A.  Yes, sir.

25  Q.  With regard to your analysis in this case, were there

1    particular factors that were more important than others?

2    A.  Yes, sir.

3    Q.  Which factors were the more important ones to you?

4    A.  Would you like an enumeration of them, sir, the numbers?

5    Q.  Just a summary of the ones that for your rate were more

6    important.

7    A.  OK.  At the summary level, it is Georgia-Pacific factor

8    number 1, number 2, number 4, number 6, number 8, 9, 10, 11 and

9    13.  Then, of course, Georgia-Pacific 15 is the summary of all

10   of the analysis and the hypothetical.

11   Q.  For the rate that you determined, what was the royalty rate

12   that you determined?

13   A.  50 cents per unit.

14   Q.  So just a straight 50 cent per unit?

15   A.  It was 50 cents per unit, with a discount for all sales

16   above 20 million units would be at half that or 25 cents.

17   Q.  That 50 cent number, how do you come up with that 50 cent

18   number, generally?

19   A.  Well, generally, you just look at all the evidence,

20   starting with the hard evidence, the numeric evidence, and then

21   you go to the quantitative evidence to see the reasonableness

22   of it.

23   Q.  In this analysis, did you have any quantitative evidence

24   that guided your assessment that the rate should be 50 cents?

25   A.  Yes, sir.

1    Q.   What were those pieces of information?

2    A.   The hard numbers -- some soft, some hard -- started with

3    the PCT valuation done in August of 2008.

4    Q.   Let me ask you about that one first.

5               MR. EDERER:  Objection, your Honor.

6               THE COURT:  Ground.

7               MR. EDERER:  May I approach?

8               THE COURT:  All right.

9               (Continued on next page)

1            (At the sidebar)

2            MR. EDERER:  I believe this testimony relates to the

3    PCT and Ocean Tomo analyses, which I believe were struck, or at

4    least the slides were struck.

5            THE COURT:  The slides were struck.  I only acted on

6    the slides, but since I haven't had a chance to put my ruling

7    on the record, I am glad you raised this because this is

8    inadmissible hearsay.  An expert can refer to two things.  He

9    can refer to matters that are in evidence or could be admitted

10   into evidence, and it can refer to treatises and other things

11   that are generally regarded in the area.  This doesn't sound

12   like it would be admissible.

13           MR. COX:  May I be heard?

14           THE COURT:  Yes.

15           MR. COX:  I think from ADREA's perspective, with

16   regard specifically to the PCT analysis, in terms of whether

17   it's hearsay or not from ADREA's perspective, we are not

18   offering the PCT information for the truth of the matter

19   asserted.  We are not offering it for the truth that the market

20   was valued --

21           THE COURT:  What are you offering it for?

22           MR. COX:  We are offering it as information that

23   Professor Magee considered.

24           THE COURT:  He considered it for its truth, otherwise

25   it would be irrelevant.

1          MR. COX:  My understanding of his opinion is that he

2     thinks it was not correct.

3          THE COURT:  Oh.  You had just asked him about the

4     evidence that supported his opinion.  So why are we getting

5     into this at all?

6          MR. COX:  I may have used the wrong word there.

7          THE COURT:  If he thinks it's not correct, why are we

8     bothering the jury with it?

9          MR. COX:  I think it's instructive to his analysis in

10    terms of information that was available at the time.  He is

11    going to, I believe, if I understand his opinion correctly, his

12    opinion is that that estimate that existed at the time was too

13    high an estimate.

14          THE COURT:  He is still considering it for its truth.

15    He is just discounting it.  I don't see how it's admissible.

16          You better move on.

17          MR. COX:  Can I just ask for a clarification?

18          THE COURT:  Yes.

19          MR. COX:  In terms of those analyses, without

20    referencing the numbers, is it permissible for him to indicate

21    that he is aware of market analyses that predated the

22    hypothetical negotiation and that he considered those.

23          THE COURT:  If your adversary is foolish enough to

24    say, did you consider any other information, of course the door

25    will be opened and you will get all of this in.  But until that

 1    happens, I don't see the relevance.

 2              MR. COX:  So that I can be clear on how to adjust from

 3    this move, is it acceptable to your Honor for me to, when we

 4    leave the sidebar, start with saying, OK, Professor Magee,

 5    let's talk about the next piece of information that you

 6    considered?  I don't want to lead him too much.

 7              THE COURT:  I will just tell him, for legal reasons

 8    that may not concern the jury, the matters you were about to

 9    refer to are not admissible and move on.  And then you can put

10    your next question.

11              MR. COX:  OK.

12              THE COURT:  You don't want me to do that?  If you want

13    to do something else, don't let me stop it you.

14              MR. COX:  The hesitation, your Honor, was that they

15    are not necessarily inadmissible depending on the cross.

16              THE COURT:  The cross has not happened yet.

17              Let's go.

18              (Continued on next page)

19

20

21

22

23

24

25

 1                (In open court)

 2                THE COURT:  Let me just inform the witness that the

 3     two studies you were about to mention have been ruled earlier

 4     as not admissible.  So you can't refer to them unless they come

 5     up in connection with cross-examination.

 6                Let's move on.

 7     BY MR. COX:

 8     Q.  Professor Magee, what other information guided your

 9     determination of the 50 cent royalty rate with the 25 cent

10     reduction?

11     A.  OK.  The next one, actually chronologically, is the Amazon

12     agreement and Georgia-Pacific factor number 1.

13     Q.  When you say the Amazon agreement with the Georgia-Pacific

14     factor 1, can you describe to the jury what you're talking

15     about in terms of the Amazon agreement?  What does that mean?

16     A.  The Amazon agreement was an agreement entered into by

17     ADREA, the current owner of the patents in this case, and

18     Amazon, which was a company that licensed basically the

19     patents, including all the patents in this case, from ADREA.

20     Q.  What was it about the Amazon agreement that you relied on

21     for determining your 50 cent rate?

22     A.  Well, there's a number of things.  The basic number -- I

23     will just go to the basic number rather than giving the

24     details.  The basic number is, it was a payment of $12.5

25     million for basically three sets of patents.  Discovery

1    patents, Sony patents, and then patents owned by Philips.  Two

2    of those companies would have been at the hypothetical

3    negotiation in 2009.

4    Q.  When we are talking about the Amazon agreement, I want to

5    show you a document that's previously been admitted as JTX 32.

6              MR. COX:  Your Honor, may I approach the bench?

7              THE COURT:  Yes.

8    Q.  Here you go, sir.  JTX 32, there should be a tab in there.

9    A.  Yes.

10   Q.  Do you recognize JTX 32, sir?

11   A.  Yes, sir.  This appears to be the Amazon agreement that we

12   referred to.

13   Q.  You said that Amazon paid $12.5 million, right?

14   A.  That's correct.

15   Q.  Can you describe to the jury how that payment was

16   structured?

17   A.  Yes, sir.

18             MR. EDERER:  Your Honor, I would like to make an

19   objection as to this entire line of questioning.  It's a Rule

20   26 scope issue.

21             THE COURT:  No, I don't think so.  Overruled.

22   Q.  Can you describe to the jury how that $12.5 million payment

23   was structured?

24   A.  Yes, sir.  There was a $10 million payment basically for

25   just the Discovery patents, and then there was an option for a

1    $2.5 million payment that would be for two other sets of

2    patents, one group owned by Sony and the other group owned by

3    Philips.  And that was an option to pay 2.5 any time within the

4    next two years after the date of that agreement.

5    Q.  Have you prepared some slides to assist with the

6    illustration of your testimony on this point?

7    A.  Yes, sir, I have.

8           MR. COX:  Mr. Berk, if we could take a look at PDX

9    310.

10   Q.  Professor Magee, what is this slide?

11          Actually, let me ask you this question.  Is this a

12   slide that you prepared to help illustrate your testimony on

13   this point?

14   A.  Yes, sir.

15   Q.  Professor Magee, can you describe to the jury --

16          THE COURT:  Just so the ladies and gentlemen of the

17   jury understand, the slides you are about to see are not

18   themselves evidence; they are just a visual way of expressing

19   the testimony that the witness is also going to be expressing.

20   So they are to help you follow his testimony, but they are not

21   themselves evidence.

22          Go ahead, counsel.

23   BY MR. COX:

24   Q.  Professor Magee, can you describe the structure of the

25   payment, how you have it illustrated in PDX 310?

1   A.  Yes, sir.  This shows the two parts.  The top half shows

2   Discovery patents.  There are 14 Discovery patents in the

3   United States that were contained in that agreement relevant to

4   this case, including the two patents in this lawsuit.  And you

5   can see the dollar sign going across from Amazon to ADREA.

6   That $10 million was basically for those patents.

7            MR. EDERER:  Objection, your Honor.

8            THE COURT:  Ground?

9            MR. EDERER:  Mischaracterizes the agreement.

10           THE COURT:  I am going to allow it.  You can cross.

11           Go ahead.

12  Q.  Professor Magee, the total Amazon payment you said was 12.5

13  million?

14  A.  Yes, sir.

15  Q.  Was that amount paid all at one time?

16  A.  No, sir.

17  Q.  How was it paid?

18  A.  10 million was paid at the time of the signing of the

19  agreement, late 2011.  And then the 2.5 million, Amazon had an

20  option on taking the Philips and Sony patents any time in the

21  next two years and that payment was not made until something

22  like August of 2013 for 2.5 million for that set of patents.

23  Q.  Professor Magee, did you use the Amazon agreement itself to

24  determine your 50 cent rate?

25  A.  It cannot be used directly but it can be used

1    inferentially.

2    Q.   Describe why you say that.

3    A.   Well, I say that because there was no royalty rate stated

4    in the agreement.  We don't know the royalty rate.  So all we

5    know is the total value of the payments of 12.5 million.

6         Would you like for me to go to the inference?

7    Q.   I would like to ask you a question, actually.

8         When you say there is no royalty rate in the agreement

9    and we don't know the royalty rate, why don't you know the

10   royalty rate?

11   A.   Well, this is called a lump sum agreement and sometimes you

12   know the basis on which lump sums are calculated, the royalty

13   rate times the base, other times you do not.  And this

14   agreement, we do not know the royalty base or the rate that was

15   used.

16   Q.   So why can't you use the Amazon agreement to determine the

17   royalty rate?

18   A.   Well, you can't do it directly, but what I am saying here

19   is, I think I can confirm my 50 cent rate by comparing the 6

20   million in my damage estimate with the 12.5 million here.

21   Q.   Did you compare your rate with the Amazon agreement?

22   A.   Indirectly that way, yes, by comparing 6 million which is

23   based on 50 cents with the 12 and a half million in that

24   agreement for which we don't have a rate.

25   Q.   Can you describe the comparison of your rate to the Amazon

 1    agreement in terms of similarities and differences?

 2              MR. EDERER:  Objection.

 3              THE COURT:  Ground?

 4              MR. EDERER:  Relevance.

 5              THE COURT:  I will allow it.

 6    Q.  Professor Magee, can you describe the comparison of your

 7    rate to the Amazon agreement in terms of similarities and

 8    differences?

 9    A.  Yes.  There's two major similarities and maybe five or six

10    differences.

11    Q.  What are some of the similarities?

12    A.  The similarities are that the patents in that agreement

13    contain the two Discovery patents in this agreement and they

14    also contain the one Philips patent that's at suit in this

15    suit, so all three patents in this suit are included in the

16    patents in the Amazon agreement.

17    Q.  Can you describe to the jury some of the differences

18    between the Amazon agreement and your assessment of the

19    appropriate rate through the hypothetical negotiation analysis?

20    A.  Yes, sir, I can.  I think I have prepared a demonstrative

21    that goes into that.  Sort of at a high level, a big difference

22    is that, that was a settlement.  The Amazon agreement was a

23    settlement that was never tried in court, so the patents were

24    never tested for validity or infringement.  So we don't know

25    whether they were valid or infringed, there was simply a

1    settlement.  Whereas here in this case, when it gets your time

2    to determine the damages, if you have done so, you have

3    determined validity and infringement, therefore, I, as a damage

4    expert, am asked to assume validity and infringement,

5    therefore, that makes the rate in this case quite different

6    from that one.

7              MR. EDERER:  Objection, your Honor.  Move to strike.

8              THE COURT:  Ground?

9              MR. EDERER:  Only one of the patents at issue in this

10    case was at issue in the Amazon case.

11              THE COURT:  I think he already pointed that out in his

12    prelude, if I recall.  So that's another reason why on

13    cross-examination you might claim that this is not the thing

14    that should be looked at, although that's an odd position for

15    you to be taking, to say the least.

16              Overruled.

17    Q.  Professor Magee, I think you said you had a demonstrative

18    to help demonstrate the differences and similarities, is that

19    right?

20    A.  Yes, sir.

21              MR. COX:  Mr. Berk, can we look at PDX 311, please.

22    Q.  Professor Magee, is this the demonstrative that you were

23    talking about?

24    A.  Yes, sir.

25    Q.  What does PDX 311 describe?

1    A.  It describes two columns there, similarities and

2    differences between that $12.5 million agreement and what would

3    be relevant, I think, for consideration here in this case.

4    Q.  You mentioned that it was important that the Amazon

5    agreement was a litigation settlement.  I want to ask you about

6    the second bullet point that you have on PDX 311.

7           What is the importance of infringement and validity

8    being assumed for your analysis?

9    A.  Yes, sir.  In this case, because validity and infringement

10   both have been established, that will give a number.  However,

11   the Amazon agreement I would view because it was not tested for

12   validity and infringement, the parties will typically bargain

13   such that, for example, Amazon will say, we don't think these

14   patents are valid, we don't think they infringe and so we don't

15   want to pay for them.  So eventually they have to be talked

16   into paying for them with a discounted rate, so that would make

17   the Amazon amount and, therefore, the inferred rate when

18   compared to my damages in this case low for Amazon compared to

19   what might come out of this kind of a proceeding, this trial.

20   Q.  You also noted that Amazon took a license for additional

21   patents beyond the patents in suit, is that right?

22   A.  Yes, sir.

23   Q.  What is the importance of that information?

24   A.  Well, there were other patents that were included in that

25   agreement and that would give somewhat added value to that

1  Amazon agreement.  Here we only have three patents, whereas

2  there there would be 50 or 60 or something US patents from all

3  three owners of the patents.  So that would make the Amazon

4  number a little too low for just a straight comparison of this

5  case.

6  Q.  Now, you also note that the Amazon agreement was two years

7  after the hypothetical negotiation date, right?

8  A.  Yes, sir.

9  Q.  What is the importance of that information?

10 A.  That makes it further into time.  That makes the date later

11 in time than this hypothetical agreement.  So there is somewhat

12 more known about the market at that time than there would have

13 been in November of 2009.

14 Q.  Let me ask you, you have on PDX 311, you have on the bottom

15 bullet point on the right-hand side, "does not represent a

16 reasonable royalty" in quotation marks.  Why is that?

17 A.  The parties did not want this to be necessarily used, I

18 presume.  I don't know why they put that term in there but they

19 didn't like it characterized as a reasonable rate.

20         MR. EDERER:  Objection.  It calls for speculation.

21         THE COURT:  We will strike the little parenthetical

22 remark about not knowing why they put that in there.

23 Q.  Professor Magee, I want to look back at the agreement

24 itself for a second which is JTX 32.  Take a look at that

25 exhibit again.  I want to direct your attention specifically to

 1   the page which is page 6 of the exhibit on the bottom

 2   right-hand corner of the page there is a number that ends with

 3   the last four digits 7440.

 4   A.  Yes, sir, I see that page.

 5   Q.  I want to direct your attention to the first full paragraph

 6   on the top of the page that is itemized in Section 4.6.  Do you

 7   see that?

 8   A.  Yes, sir.

 9   Q.  Specifically, I want to ask you a question about the last

10   sentence in that paragraph which reads:  "Accordingly, the

11   parties acknowledge and agree that the payment does not

12   represent a reasonable royalty for the licenses and other

13   rights granted hereunder to Amazon."

14           How is that important to your analysis?

15   A.  Well, I'm not sure exactly what the import of that is.  It

16   just says they don't consider it to be a reasonable royalty.  I

17   don't know if that means they don't want royalty rates inferred

18   from that or amounts or what.  So I don't know exactly what

19   they were meaning by that, therefore, the import would be for

20   this case.

21   Q.  So for you personally, were you able to calculate an actual

22   rate from the Amazon agreement?

23   A.  Only inferentially in just comparing my 50 cent rate and

24   the 6 million in this case with that 12 and a half million in

25   that case.  It's only indirect, you understand.

1   Q.   Professor Magee, what other information was important to

2   you for determining that royalty rate?

3   A.   Everything in this case goes to my royalty rate.  All the

4   Georgia-Pacific factors, all this quantitative evidence that we

5   are going through right now, everything goes into it, as well

6   as what would ultimately at the hypothetical negotiations, what

7   would reasonable people do.  I try to focus on what I would

8   think would be the relevant information to answer that

9   question.

10  Q.   Was there any other information that you had that provided

11  a quantifiable amount for determining the rate?

12  A.   Yes, sir.

13  Q.   What other information did you have to determine a

14  quantifiable amount for the rate?

15  A.   Yes.  The next step in the analysis would be, if we have

16  something that we feel like is a 50 cent royalty rate from the

17  data we have gotten so far, there is the next piece of

18  quantifiable information which was an offer that ADREA made in

19  fact to this party here, Barnes & Noble, in approximately, I

20  think, May or March or April, somewhere in the late spring of

21  2012.

22  Q.   When you talk about an offer, what do you mean by that?

23  A.   It was an offer to license to Barnes & Noble, the party in

24  this case, basically all of the patents that ADREA had under

25  its control, which was the patents owned by Discovery, by Sony

1   and by Philips.  And since Sony is not a major player here, the

2   key thing is, of course, the Discovery patents and the Philips

3   patents.

4   Q.  Now, Professor Magee, I want to direct your attention to

5   another document that should be in your binder.  I want to take

6   a look at JTX 31.

7   A.  OK.

8   Q.  JTX has previously been admitted as an exhibit.  Have you

9   got that?

10  A.  Yes, sir.

11  Q.  Do you recognize JTX 31?

12  A.  Yes, sir.

13  Q.  What is JTX 31?

14  A.  The title of it reads "Preliminary Patent License Term

15  Sheet Between Barnes & Noble and ADREA."

16  Q.  Is this the offer that you were just talking about?

17  A.  Yes, sir.

18  Q.  Now, how does this offer fit in with your Georgia-Pacific

19  analysis, which factors are relevant here?

20  A.  This is relevant because Georgia-Pacific factor number 4

21  talks about either the policy of the patent owner, whether it

22  would be willing or not willing in order to offer a license for

23  its patents, and if so, kind of what would be the scope or

24  nature of a kind of an offer they might make.

25  Q.  How did JTX 31, the ADREA offer to Barnes & Noble, impact

1   your analysis in terms of the rate?

2   A.  In terms of the rate, there is a fee schedule given down at

3   the bottom of the agreement.

4   Q.  When you say fee schedule, are you talking about sort of

5   the third paragraph up from the bottom of the page, is that

6   right?

7   A.  Yes, sir.

8   Q.  The fee schedule reads "50 cent per licensed reader sold or

9   otherwise disposed of by or on behalf of Barnes & Noble."  Is

10  that what you're talking about?

11  A.  Yes, sir.

12  Q.  Professor Magee, can you describe to the jury how you used

13  that information for your analysis?

14  A.  Yes, sir.  That indicates basically a willingness to

15  license on the part of ADREA and it gives a rate that they were

16  willing to offer and it also gives the rate that that offer

17  would be applied to, the kinds of products.

18  Q.  Professor Magee, it says 50 cents per licensed reader,

19  right?

20  A.  Yes, sir.

21  Q.  Isn't that essentially the same thing that you're saying

22  the rate should have been in 2009?

23  A.  Well, yes and no.  Certainly what we are talking about in

24  this case is the licensed readers, the Nook readers that Barnes

25  & Noble has.  The licensed readers are described up in the

1    earlier part of the term sheet.

2                (Continued on next page)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   Q.  Are you talking about the term "Licensed Reader" in the fee

2   schedule is capitalized, right?

3   A.  Yes, sir.

4   Q.  When you say this was discussed earlier in the term sheet,

5   are you talking about the sixth line or sixth entry down under

6   "Definitions"?

7   A.  Yes, sir.

8   Q.  What were the licensed readers in terms of the 2012 ADREA

9   offer that we are talking about?

10  A.  I'm sorry.  I should have made this clear --

11          MR. EDERER:  Objection, your Honor.

12  A.  The licensed readers -- I'm sorry.

13          MR. EDERER:  Objection.

14          THE COURT:  Ground?

15          MR. EDERER:  May I approach, your Honor?

16          THE COURT:  All right.

17          (Continued on next page)

18

19

20

21

22

23

24

25

1                    (At the side bar)

2                    MR. EDERER:  The witness is about to testify that this

3      offer sheet was actually a better deal for Barnes & Noble

4      because there were apps involved in the offer as well as

5      ereader devices.  As you asked me to do when I put questions to

6      my witnesses about the apps portion, I think the jury should

7      understand that apps are not being accused in this case.  You

8      actually ruled that apps are not infringing.  I think it is a

9      question of fairness.

10                    THE COURT:  Why don't you just rephrase the question.

11                    MR. COX:  OK.

12                    (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2    BY MR. COX:

3    Q.  Professor Magee, is the rate that you are suggesting the

4    parties would have agreed to in 2009 the same as the rate that

5    ADREA offered in 2012?

6    A.  Well, it's the same number, but it's very different in

7    terms of the other aspects of an agreement, arm's length

8    agreement, or even an offer out in public versus a number in a

9    patent litigation case like this.

10   Q.  How was the 2012 offer different from your determined 2009

11   hypothetical rate?

12   A.  That rate is 50 cents.  But remember in this case the jury

13   will have determined validity and infringement, so that would

14   be known with certainty.  At the time this offer was made, that

15   was not known, validity was not known, by either party at the

16   time of the offering of this term sheet.

17          The other difference -- I'm sorry I didn't see it on

18   the screen, I didn't realize the jury could see it on the

19   screen -- but this applies to two different things in the term

20   sheet, whereas in the court case here it only applied to one of

21   them.

22   Q.  When you say it applies to two different things in the term

23   sheet, what are you talking about?

24   A.  On the screen I can see it's highlighted.  I didn't know it

25   was.  "Licensed readers" means two things:  Barnes & Noble

 1   reader devices and Barnes & Noble reader software.  This case

 2   applies only to the reader devices.  This offer, however, is

 3   about reader devices as well as software.

 4   Q.  Does your hypothetical rate from 2009 address the reader

 5   software?

 6   A.  No, sir, it does not.

 7   Q.  Does it include the reader software?

 8   A.  No, sir.

 9   Q.  It does not.

10          MR. EDERER:  Your Honor, I continue to object to this

11   line of questioning based upon the side bar.

12          THE COURT:  Yes, I'm waiting for the clarification

13   that plaintiff's counsel agreed to give at the side bar.

14   Q.  Professor Magee, you have indicated that ADREA made a

15   50-cent rate offer in 2012 to Barnes & Noble, right?

16   A.  Yes, sir.

17   Q.  That offer was not accepted, right?

18   A.  That's correct, it was not accepted.

19   Q.  If that's the case, doesn't common sense suggest that if an

20   offer had been made --

21          THE COURT:  No, no.

22          MR. EDERER:  Objection.

23          THE COURT:  Ladies and gentlemen, we are going to take

24   a break at this point for reasons that have nothing to do with

25   you.

 1                  (Jury not present)

 2              THE COURT:  Counsel, if you cannot comply with what

 3      you promised to do at the side bar, then I'm going to take over

 4      the questioning, which you won't like.  The point that was

 5      raised at the side bar is that when Professor Magee is talking

 6      about saying to the jury they now have to assume that there is

 7      infringement in a way that wasn't true at the time of the

 8      settlement, the clarification that was required is that the

 9      infringement is only as to certain of the things that were

10      embraced by the settlement and that a lot of other things are

11      not even accused of infringing or are totally outside of the

12      case.

13              This was the same limitation in questioning that

14      plaintiff demanded of defense counsel and that the Court

15      required defense counsel to give in his questioning of a prior

16      witness.  It could not have been more clear at the side bar,

17      and you said fine.  Yet we now go through, what, five questions

18      or more without that clarification being given.

19              I don't like to intervene.  This is an adversary

20      process.  I don't want to be the questioner.  You should be the

21      questioner.  But if you can't abide by the Court's orders or

22      your own promise to the Court, there's going to be a lot of

23      trouble.  Do you understand?

24              MR. COX:  Yes, your Honor.

25              THE COURT:  Let's bring back the jury.

 1              (Jury present)

 2              THE COURT:  Give you an inch and you take a mile.  We

 3   are ready to proceed.

 4   BY MR. COX:

 5   Q.  Professor Magee, we were talking about JTX-31, correct?

 6   A.  Yes, sir.

 7   Q.  I want to be clear that that offer in 2012 addressed apps.

 8   Apps are not accused in this case, right?

 9   A.  Correct.

10   Q.  The assumptions of infringement validity that you were

11   talking about did not apply per se to the offer in 2012, right?

12   A.  Yes, sir.

13   Q.  Can you summarize for the jury the differences between that

14   2012 offer and your 2009 hypothetical rate.

15   A.  Yes, sir.  The rate is 50 cents in each case.  The rate is

16   applied to two different sets of units in that agreement, but

17   there is only one set of units in that agreement that would

18   apply here, which is the license to ereaders only.

19   Q.  In this case it is the licensed ereaders only, right?

20   A.  Correct.

21   Q.  You said it was two different sets of units for the 2012

22   offer?

23   A.  Yes, sir.  There was additionally the software, which is

24   the second, which is not relevant in this case.

25   Q.  That software is not accused in this case, right?

 1   A.  That's correct.

 2   Q.  In terms of how it influenced your analysis, can you

 3   describe to the jury how the 2012 ADREA offer impacts your

 4   analysis.

 5   A.  My analysis would not look into the $13.5 million, which

 6   would be --

 7          MR. EDERER:  Objection, your Honor.  Objection to the

 8   reference to $13.5 million:  No factual predicate, highly

 9   prejudicial, includes apps.

10          THE COURT:  Sustained as to factual predicate,

11   overruled as to prejudice.  You can establish the factual

12   predicate.

13          Where are you getting that figure from?

14          THE WITNESS:  I'm sorry?

15          THE COURT:  Where did you get that figure?

16          THE WITNESS:  I hadn't gotten to that part of it yet,

17   which would be to discuss the reasons for the rejection.  But

18   we haven't gotten to it, your Honor.  The reasons for the

19   rejection of that agreement was the total dollar amount was

20   much higher.

21          MR. EDERER:  Objection, your Honor:  No foundation.

22          THE COURT:  What is your basis for saying that?  How

23   do you know that?  How do you know the grounds for the

24   rejection?

25          THE WITNESS:  I'm sorry, is this question to me?

 1          THE COURT:  Yes.

 2          THE WITNESS:  I'm sorry.  How do I know the basis?  I

 3   was referring to something which had to do with the 50 cents

 4   and what it is applied to.  We have discussed that it would

 5   apply only to ereaders but not to software.  That is a

 6   difference between that entire term sheet and its implications

 7   for my dollars in this case.  That's what I was trying to get

 8   clear.

 9          THE COURT:  Objection sustained.

10   BY MR. COX:

11   Q.  Professor Magee, based on the terms offered in the 2012

12   ADREA offer, what would the value of that offer be today?

13          MR. EDERER:  Objection, your Honor.

14          THE COURT:  Sustained.

15   Q.  Professor Magee, you said that the 2012 offer applied to

16   software, right?

17   A.  It applies to both software and reader devices, yes, sir.

18   Q.  Again, the software is not accused in this case, right?

19   A.  That's correct, software not accused in this case.

20   Q.  What kind of software was addressed in the 2012 offer?

21   A.  The 2012 is software that is basically stuff like apps and

22   things like that, where people could go onto those apps and

23   basically purchase materials through Barnes & Noble.

24   Q.  Do you know approximately how many software units are

25   Barnes & Noble has --

 1                MR. EDERER:  Objection:  Relevance.

 2                THE COURT:  I didn't hear the end of the question.

 3                MR. EDERER:  Sorry.

 4   Q.  Do you know approximately how many software units or app

 5   units Barnes & Noble has sold?

 6                MR. EDERER:  Objection:  Relevance.

 7                THE COURT:  Overruled.

 8   A.  Roughly, my understanding is through about 2013 there have

 9   been 15,000 units of software that would have been sold by

10   Barnes & Noble.

11   Q.  Did you say 15,000 units of software?

12   A.  Yes, sir.

13   Q.  15,000?

14   A.  Yes, sir.

15                MR. EDERER:  Objection.

16   A.  I'm sorry.  15 million.  My fault.  I'm sorry, I missed the

17   number, your Honor.  Yes, 15 million units of software would

18   have been sold around near the time of this agreement.

19   Q.  Now I want to ask you about the other part of the 2012

20   offer, which dealt with reader devices.  OK?

21   A.  Right.

22   Q.  Approximately how many reader devices have been sold to

23   date?

24   A.  Again, up to about the 2013 time period it would have been

25   12 million units by that point.

1   Q.  I understand you have a slide that addresses this.

2   A.  Yes, sir.

3   Q.  Can we take a look at PDX-314, please.  Professor Magee,

4   can you describe what is illustrated in PDX-314.

5   A.  Yes, sir.  Again, this goes to the offer itself, and the

6   offer itself applied to the two parts here on the slide, which

7   is 50 cents per Nook ereader and as well 50 cent per Barnes &

8   Noble app, and that is the 15 million units I just referred to,

9   the second part.

10  Q.  To date how much would that offer have been in total dollar

11  value?

12              MR. EDERER:  Objection.

13              THE COURT:  Sustained.

14  Q.  Professor Magee, are there differences between your

15  analysis for the result of the hypothetical negotiation and the

16  2012 ADREA offer?

17  A.  Yes, sir.

18  Q.  Can you describe what the differences are.

19  A.  Yes, sir.  The case today relevant to the hypothetical

20  negotiation in November 2009 would apply only to the first line

21  here, the 50 cents per Nook ereader times the number of Nook

22  eReaders that are relevant in this case.

23  Q.  Do you have a slide that illustrates those differences,

24  right?

25  A.  Yes, sir.

1   Q.  Can we look at PDX-315, please.  Professor Magee, can you

2   describe how this slide illustrates the differences.

3   A.  Yes, sir.  This slide shows that in comparing the ADREA

4   offer in May 2012, the first column there, the two check marks

5   there, and then the hypothetical negotiation only has one green

6   checkmark, and that shows the difference between that offer and

7   the hypothetical negotiation.  The similarity is both deal with

8   the ereaders but the royalty on the apps was in that offer in

9   2012, but the royalty on the apps is not included.

10  Q.  Your hypothetical rate included a volume-based discount.

11  Does the ADREA offer address that issue?

12  A.  No, sir, it didn't.  Mine has a discount and that offer did

13  not.  It was a 25 cent discount in this case for the

14  hypothetical.

15  Q.  Ultimately, how did your analysis of the 2012 ADREA offer

16  affect your analysis for damages in this case?

17  A.  It does not affect the rate, with the one exception I

18  noted.  But the size of that offer -- the size of that asking

19  amount in May of 2012 was about 7 million, 7½ million more.

20          MR. EDERER:  Objection.

21          THE COURT:  I guess we need a side bar here as well

22  just to make sure we are on the same wavelength.

23          (Continued on next page)

24

25

1            (At the side bar)

2            THE COURT:  This may be admissible or it may not.  It

3    depends on the purpose.  I sustained the objections to certain

4    slides dealing with dollar figures for, what is the term they

5    use in Georgia-Pacific, convoyed --

6            MR. EDERER:  Derivatives.

7            THE COURT:  Yes.  -- because I thought it was too

8    remote.  That was the objection that was made.  So, those

9    figures should not come in.  The figures he is about to discuss

10   may be relevant for other purposes, I just can't tell.  Tell me

11   where you are going, then let me hear what the objection is.

12           MR. COX:  What I expect him to say, frankly, is that

13   the total monetary dollar value of the 2012 offer was

14   approximately 13½ million when you consider the 50-cent rate

15   times what is now known as the sales of the apps plus the 50

16   cent value times what is now known as the base for the devices.

17   That's different from what his opinion is because he doesn't

18   include the apps and he also includes the volume-based

19   discount.  That's what I expect him to say.

20           THE COURT:  What I'm getting at is what is the

21   relevance of the 13 million figure to his opinion?  I

22   understand that he is saying, and there is no problem with

23   this, that he had to factor out, so to speak, the fact that the

24   offer was for two things, one of which is infringed and one of

25   which is not infringed.  But I'm not quite sure I see what the

1    top figure has to do with anything in that analysis.

2              MR. COX:  I'm not a hundred percent sure he will say

3    it, but what I expect him to say is that the 2012 offer is also

4    sort of a reasonableness check on what his assessment of the

5    appropriate rate is.

6              THE COURT:  Because?

7              MR. COX:  Because it was a 2012 offer and his

8    assessment of what would have happened in 2009 relative to that

9    is reasonable.

10             THE COURT:  I don't understand what that means.

11             MR. EDERER:  Your Honor, what is going on here is we

12   are trying to put big numbers in front of the jury and then

13   say, I compared my 6 million to these bigger numbers as a check

14   and therefore my 6 million is reasonable.  That's what he said

15   about Amazon and that's what he is planning to say about the

16   13.5 million.

17             Since the 7.5 million in app sales are not part of

18   this case, it is irrelevant as a check or for any other reason

19   what that total number is.  He can say whatever he wants to say

20   about the 50 cents for the devices and compare the offer that

21   was made in 2012 with the hypothetical negotiation figure that

22   he is coming up with.  But to say that the offer relates to

23   both devices and another 7.5 million in products that are not

24   accused and then I used that as a check and it all sounds

25   reasonable to me is highly prejudicial to me.  That is the

 1   Unilog case that we cited to your Honor last night.

 2          THE COURT:  It really goes to one of the things that

 3   made the whole issue of his testimony problematic, as I

 4   indicated in my Daubert ruling.  I don't see why that is a

 5   check on the rate.  Part of his methodology seems to be

 6   arriving at a figure, not a rate, just an abstract figure that

 7   is a figure for apples and oranges, saying if that's what they

 8   were willing to pay for apples and oranges total, then it's

 9   reasonable that they would pay half of that for apples and from

10   that I derive a rate of 50 cents.  It's not really a check.  It

11   seems to me it's, what can I say, a bootstrap type argument.

12          For now I think you should tell him "without referring

13   to the figures."  I also think there is the 403 problem that

14   counsel has raised.  We'll see how it goes.

15          MR. COX:  Just so I'm clear, I can say:  Without

16   referring to the figures, how does the licensing offer impact

17   your analysis?

18          THE COURT:  Yes.  I'm not sure that's going to get

19   very far, because the way he did it was really based on the

20   figures.  It's a related ground, but it is not the same ground

21   on which I struck the slides.  The slides were struck because

22   of the remoteness of the figures there.

23          Let me try the questioning myself.  We will see how it

24   goes.

25          (In open court)

 1           THE COURT:  Professor, without referring, at least for

 2     the moment, to any dollar figures, just explain, if you would,

 3     when you were using this offer, even though the offer was not

 4     accepted, you felt it still provided information that was

 5     relevant to your analysis, do I have that right?

 6           THE WITNESS:  Yes, sir.

 7           THE COURT:  What was your line of reasoning in that

 8     regard?

 9           THE WITNESS:  It's relevant because it's part of

10     Georgia-Pacific factor number 4.  It's indicative of a

11     willingness to license, and it's also indicative of a

12     willingness to license at a specific rate, and it mentions a

13     rate of 50 cents.  I think that is the relevance.  I'm sorry if

14     I went earlier, your Honor, into too much.  I think that's

15     relevant.

16           THE COURT:  Now I understand it.  Then the point was

17     being made that, well, it is an offer for 50 cents but it also

18     includes some noninfringing apps that have never been accused

19     and aren't part of this case.  What was your response to that?

20           THE WITNESS:  Yes, sir.  It is not part of this case.

21     Therefore, the 50 cents would only apply to the accused items

22     in this case, which would be the ereaders.

23           THE COURT:  If you remove the apps that was part of

24     this offer, why would the rate still stay the same?

25           THE WITNESS:  The rate would still stay the same

1   because this was an asking price back then.  The rate would

2   stay the same, in my judgment, because of all the rest of the

3   analysis in the case that I have done to test 50 cents relative

4   to the alternatives.  The only other alternatives --

5           THE COURT:  So it is not a factor of this, it is a

6   factor of other information?

7           THE WITNESS:  Yes, sir.  Everything else goes to the

8   50 cents.

9           THE COURT:  Let's go on.

10  BY MR. COX:

11  Q.  Professor Magee, I want to shift gears a little bit.  I

12  want to ask you a couple of questions about a different

13  development of your analysis, specifically with regard to

14  Georgia-Pacific factor 2.

15  A.  All right, sir.

16  Q.  Briefly, what is Georgia-Pacific factor 2?

17  A.  Georgia-Pacific factor number 2 is information about

18  licenses that the defendant in this case, Barnes & Noble, would

19  have entered into in which they were paying money to somebody

20  else for either software or patents or any other kind of thing

21  that might be relevant in any way to this lawsuit.

22  Q.  You considered that factor for your analysis, right?

23  A.  Yes, sir.

24  Q.  What did you do to consider that factor for your analysis?

25  A.  I asked the attorneys to gather as much as they could on

1   information from Barnes & Noble about all the licenses they had

2   entered into that might be relevant to this case.

3   Q.  I want to ask you to take a look at another document in

4   your binder, which would be PTX-200.

5   A.  OK, sir.

6   Q.  I want you to take a look at that first, and then I'm going

7   to ask you if you recognize it.

8   A.  I'm sorry.  What was the last, 200?

9   Q.  Yes.  It should be the last document in your binder there,

10  the very last one.

11  A.  Just a moment.  Yes, sir, thank you, I have it.

12  Q.  Do you recognize that document?

13  A.  Yes, sir.

14  Q.  Did you use this document as part of your analysis for

15  Georgia-Pacific factor 2?

16  A.  Yes, sir, I did.

17  Q.  How did you use this information for your analysis?

18  A.  This exhibit here shows licenses that were produced in

19  response to an interrogatory with respect to any licensing or

20  royalty agreements related to the accused product, accused

21  service between the defendant and another person, and so forth.

22  Q.  How did you use the information for your analysis?

23  A.  The information from this document and I think the

24  information I am relying on for Georgia-Pacific factor number 2

25  does not go to the royalty rate itself in terms of dollar

1    numbers.  It goes rather to the structure of the type of

2    agreements that Hewlett-Packard entered into, and that goes

3    into the structure both with respect to the kind of payment,

4    like dollars per unit, and it goes to whether they are -- I'm

5    sorry.  Let me look at the document here.

6    Q.  Professor, let me ask you a question about what you just

7    said.  I think you said it goes to the structure and type of

8    agreements that Hewlett-Packard entered into.

9    A.  I'm sorry, I slipped on that.  It goes to the structure

10   that Barnes & Noble, the defendant in this case, had entered

11   into, the kind of agreements they have, what is the structure

12   of them, both in terms of payments and in terms of whether

13   there are quantity discounts or not, those two important

14   structural features.

15   Q.  Can you describe with a little more specificity what the

16   two key structural pieces are that you analyzed with regard to

17   this information.

18   A.  Yes, sir.  The two pieces analyzed were do these royalty

19   agreements typically, for the running royalty agreements are

20   they typically payment of dollars per unit?  The answer is yes

21   to many of these which were provided.  Second, do they

22   typically have quantity discount or not?

23   Q.  I'm going to ask, Mr. Berk, if we could take a look at

24   PTX-200.  On the fourth page -- fifth page of the document.

25   Professor Magee, can you describe generally what this

 1  information is.

 2  A.  Yes, sir.  You're talking about the page that we can see on

 3  the screen there?

 4  Q.  This page and the next two pages, yes.

 5  A.  Yes, sir.  The entire document, but specifically these

 6  pages here starting with Bates number ending 7361, has the

 7  first column, which is the payee name, vendor and payee name.

 8          THE COURT:  I'm sorry.  Is this in evidence?

 9          MR. CABRAL:  Yes, your Honor.  This is the

10  interrogatory response that was addressed yesterday at the end

11  of the session.

12          THE COURT:  Very good.

13          MR. CABRAL:  Thank you, your Honor.

14  A.  Now would you like me to continue?

15          THE COURT:  Yes.

16  A.  Yes, sir.  This shows basically the description in the

17  middle column there and then the payment terms in the last

18  column.

19  Q.  You said you used that information to assess some parts of

20  the structure of the hypothetical rate, right?

21  A.  That's correct.  I tried to pattern the royalty rate and

22  the structure of quantity discounts in the hypothetical

23  negotiation that I think would emerge from the agreement with

24  this same pattern in Georgia-Pacific factor number 2.

25  Q.  I understand you have a slide that you created that

1   illustrates this information.

2   A.  Yes, sir.

3   Q.  Mr. Berk, could we take a look at PDX-312, please.

4   Professor Magee, could you describe to the jury what you have

5   summarized here in PDX-312.

6   A.  Yes, sir.  This shows a number of the licensors, which is

7   the parties that were providing technology.  The middle column

8   shows whether the agreements that we are referring to here were

9   royalty rates per unit, and the last column asks are there

10  volume discounts or not.

11  Q.  The information summarized here is information you got from

12  PTX-200, is that right?

13  A.  Yes, sir.

14  Q.  When you have "Per Unit Rate" and it says "Yes," what does

15  that mean?

16  A.  That means that these shown here basically have dollars per

17  unit as the method of payment either for a patent agreement or

18  for a technology license.

19  Q.  In the right-hand column where it says "Volume Discount,"

20  what does that mean?

21  A.  Yes, sir.  That means were these agreements, did they give

22  quantity discounts, meaning that the more products that were

23  being licensed, at some point was there a discount given on the

24  royalty rate.  That is true for all but one of them shown on

25  the screen here.

Febrad22              Magee2 direct

1    Q.  How did that information ultimately impact your analysis?

2    A.  It impacted my analysis because I adopted this same format

3    for damages in this case, which is a per-unit royalty rate, as

4    well as I provided a quantity discount in the offer.  My

5    royalty rate goes from 50 cents down to 25 cents when more than

6    20 million units have been sold.

7    Q.  Yesterday, when you were talking about your total damages

8    amount, it was the rate times the units sold equals the total

9    amount, right?

10   A.  Correct.

11   Q.  In terms of the number of units sold, I want to ask you a

12   couple of questions about that.  What did you say the total

13   units of accused ereader devices was?

14   A.  In this case?

15   Q.  In this case.

16   A.  Yes, sir.  Through June of 2014, which is the last date

17   available over the entire infringing period, it is just a

18   little less than 12 million units.  I think it is 11.95 million

19   units have been told that are accused of infringement.

20   Q.  I want to ask you to take a look at another document,

21   JTX-20, which may not be in your binder.

22            MR. COX:  Your Honor, may I approach?

23            THE COURT:  Yes.

24   Q.  Professor Magee, would you take a look at JTX-20.  Do you

25   recognize that?

1    A.  Yes, sir.

2    Q.  What is it?

3    A.  This is a set of data from Barnes & Noble on the sales of

4    the accused infringing units in terms of net device units.

5    Q.  Did you rely on that document for determining the number of

6    units sold in this particular case?

7    A.  Yes, sir, I did.

8    Q.  I show you another document here.

9        MR. COX:  Your Honor, may I approach, please?

10       THE COURT:  Yes.

11   Q.  Professor Magee, I'm showing you what you have there as

12   JTX-34.  It's marked for identification.  Do you recognize

13   that?

14   A.  Yes, sir.

15   Q.  What is that?

16   A.  This basically is a chronological arrangement by period of

17   the number of units of Nook devices sold within the United

18   States for various periods.

19       MR. COX:  Your Honor, I would offer JTX-34 and JTX-20.

20       THE COURT:  Yes, all joint exhibits are automatically

21   received.

22       (Joint Exhibits 20 and 34 received in evidence)

23   Q.  Professor Magee, with regard to your analysis, and I

24   specifically want to reference Georgia-Pacific factor 11, how

25   did the number of units impact your analysis?

1   A.  Yes, sir.  The number of units that are discussed and shown

2   in G-P factor 11 basically are these accused units for the

3   three patents:  For the '851, for the '501, and for the '703

4   patent.  It's the number of accused units arranged under --

5   each of the patents that have been accused in this suit, units

6   that are accused under each of the patents.

7   Q.  You have a slide, I believe, that summarizes that, is that

8   correct?

9   A.  Yes, sir.

10  Q.  Mr. Berk, can we take a look at PTX-325, please.  Professor

11  Magee, can you describe what you have illustrated here, please.

12  A.  Yes, sir.  Basically, these are just the alleged infringing

13  units arranged by patent, and there is clear overlaps for the

14  bottom two, the '501 patent and the '703 patent, over the

15  alleged infringing period November 2009 through the latest date

16  available, June 30th of 2014.  For each of those patents, these

17  are all the same units.  There were 11,952,463 units that are

18  accused of infringing each of those patents.

19          With respect to the top part, the '851 has a shorter

20  time period over which the alleged infringement occurred, and

21  that is March 29, 2012 through December 9, 2012.  There were

22  2,280,192 units of the alleged infringing units also alleged to

23  have infringed the '851 patent.

24  Q.  I want to make clear, these are independent numbers.  You

25  are not adding up these numbers for total units, right?

1   A.   No.   These are all the same units.   It's just that the

2   units for the '851 is a different subset of the units below.

3   But you can't add any of this stuff up.   The bottom two are all

4   the same units, and the top group up there of 2.28 million

5   units are a subset or part of those units listed below.

6             MR. COX:   May I have a moment, your Honor?

7             THE COURT:   Yes.

8             MR. COX:   Professor Magee, at this point I don't have

9   any further questions for you right now.

10            THE COURT:   Cross-examination.

11            MR. EDERER:   Your Honor, may I approach the side bar?

12            THE COURT:   Yes.

13            (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1            (At the side bar)

2            MR. EDERER:  Your Honor, I wanted to raise the

3    possibility that we might move to strike this witness's

4    testimony on a Daubert basis now just based upon what he has

5    done so far.

6            THE COURT:  No, I want to hear cross-examination.

7            (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1           (In open court)

 2    CROSS-EXAMINATION

 3    BY MR. EDERER:

 4    Q.   Good morning, Professor Magee.

 5    A.   Good morning, Mr. Ederer.

 6    Q.   You presented a running royalty rate of 50 cents per device

 7    for all three patents-in-suit, correct?

 8    A.   Yes, sir.

 9    Q.   You're saying that this is the royalty rate that Barnes &

10    Noble would have agreed to pay in a hypothetical negotiation

11    that would have taken place in November 2009, before Barnes &

12    Noble selling the Nook product, correct?

13    A.   Yes, sir.

14    Q.   The royalty rate it would have had to pay to license all

15    three of these patent was 50 cents per device, right?

16    A.   Yes, a maximum of 50 cents, yes, sir.

17    Q.   Starting in November 2009 it would have been 50 cents,

18    right?

19    A.   Correct.

20    Q.   According to you, until 20 million units were sold, it

21    still would have been 50 cents, right?

22    A.   Yes, sir.

23    Q.   It is true, sir, that you have not broken down that rate

24    patent by patent?  Have you?

25    A.   Yes and no.  I think the damages in the case will be not

1   the rate, it will be the rate times the number of infringing

2   units.  So, the rate 50 cents, in my judgment, would apply to

3   each of the patents separately.  You multiply 50 cents times

4   the units for the '501; that reflects a value.  There would be

5   50 cents times the units of the '703; that would give you an

6   equivalent value, just under $6 million.  Then there would be

7   the 50 cents times the 2.2 million units for the '851 patent,

8   and that gives you a number around a million.  But you never

9   pay, as I said in my report, more than 6 million total in the

10  case.

11  Q.  That wasn't my question.  My question, sir, is what if the

12  jury were to find that only two of the three patents were

13  infringed and not invalid.  You're still saying it's 50 cents

14  per device, right?

15  A.  Yes, sir.

16  Q.  If the jury were to find only one of the three patents were

17  infringed and not invalid, you are still saying it's 50 cents

18  per device, right?

19  A.  Correct, times the appropriate base.

20  Q.  You are not saying these patents don't have independent

21  value, are you?

22  A.  I'm saying that they demonstrate, the record demonstrates,

23  they each independently have value of over $6 million each,

24  yes, sir.

25  Q.  If I own three patents and I wanted to license each patent

1   separately, we would have to come up with a royalty rate for

2   each patent in order to strike a deal, wouldn't we?

3   A.  It depends on the structure of the agreement.  As you know,

4   the agreement is not exactly that, sir.

5   Q.  But it is your opinion that one patent alone is 50 cents

6   and all three patents are 50 cents, right?

7   A.  Yes, sir.

8           MR. CABRAL:  Objection:  Asked and answered.

9           THE COURT:  Overruled.

10  Q.  Let's say you and I negotiate a license for the three

11  patents-in-suit and I agree to pay you 50 cents per device,

12  right?

13  A.  Yes, sir.

14  Q.  Then you say, you know what, I only need a license for two

15  of those patents, how much is it now, and you say, sorry, it's

16  still 50 cents, right?

17  A.  Per unit, yes, but not the total package.

18  Q.  For the '703 and the '501, the total package you just had

19  up on the screen was the same, wasn't it?

20  A.  The total number of units are the same.  But, as I

21  indicated, have indicated to you in my deposition and my

22  report, the maximum payment would be 6 million no matter which

23  patents are infringed, the maximum.

24  Q.  If I came back to you and said, you know what, I just

25  thought maybe I'd only want to license one of the three

 1   patents, how much is it going to be now, your answer would be

 2   still 50 cent per device?

 3   A.   The rate would be the same, yes, sir.

 4   Q.   You agree, don't you, that each of those patents has a

 5   different expiration date, right?

 6   A.   Yes, sir.

 7   Q.   The '851 already expired in December of 2012, correct?

 8   A.   Yes, sir.

 9   Q.   In a hypothetical negotiation back in 2009, that patent

10   would have had three years to go, approximately, right?

11   A.   Three years until the nine months or so of the period of

12   infringement, yes, sir.

13   Q.   Three years until the nine months of the period of

14   infringement.  In other words, you are saying it would have

15   been some period less than three years until the damages

16   actually started accruing, right?

17   A.   Yes, sir.

18   Q.   The '501 patent is set to expire in December of 2015,

19   right?

20   A.   Correct.

21   Q.   In 2009 that patent would have had six years left to go,

22   approximately, right?

23   A.   Correct.

24   Q.   The '703 patent is set to expire in March 2026, right?

25   A.   Yes, sir.

1  Q.  That's 12 years from now, a little less than 12 years,

2  right?

3  A.  Yes, sir.

4  Q.  In 2009 that patent would have had 17 years left, correct?

5  A.  That's correct.

6  Q.  The expiration date is something you would expect the

7  prospective licensor to take into account in deciding how much

8  to pay for a license, wouldn't you?

9  A.  Certainly in a lump sum it would, yes, sir.

10  Q.  In fact, it is one of the Georgia-Pacific factors, isn't

11  it, factor number 7?

12  A.  Yes, sir.

13  Q.  Let me understand this.  You are saying that your rate is

14  50 cents for all three patents through 2012, right?

15  A.  Yes, sir.

16  Q.  Then one patent expires, the '851, and it's still 50 cents

17  for the remaining two patents through 2015, right?

18  A.  Per unit, yes, sir.

19  Q.  The second patent expires, and it is still 50 cents, at

20  least until we get somewhere in the future to your volume

21  discount, it's still 50 cents for the next 11 years, right?

22  A.  11 years from 2009?

23  Q.  Actually, it's 17 years from 2009, isn't it?

24  A.  Yes, sir, but remember --

25  Q.  It's 11 years from 2015 is what I'm saying.

 1   A.  Yes, sir, but remember there's no payments after this

 2   trial.  I calculated running royalty damages only up through

 3   June of 2014.

 4   Q.  Are you saying that in the hypothetical negotiation the

 5   parties wouldn't have negotiated a license through the

 6   expiration date of each patent?

 7   A.  Not a running royalty, no, sir.  Running royalties only

 8   apply, as you know, in court cases, just up to the date of

 9   trial.  I did calculate -- I do not testify here to a lump sum

10   all the way to the end of the patent.

11   Q.  Each of those patents-in-suit covers a different function

12   of the Nook product, correct?

13   A.  Yes, sir.

14   Q.  One involves encryption, correct?

15   A.  Yes, sir.

16   Q.  Another involves lending?

17   A.  Yes, sir.

18   Q.  And another involves shopping, right?

19   A.  That's correct.

20   Q.  You would agree, would you not, that each of those features

21   may have different degrees of value to Barnes & Noble, right?

22   A.  Yes, sir, it does.

23   Q.  You haven't attempted to put a value on each patent, have

24   you?

25   A.  Yes, sir, I have, and my report goes to that.

1   Q.  Your report goes to?  I'm sorry, what did you say?

2   A.  The determination basically of what the relative values

3   would be for each of the patents.

4   Q.  Your determination goes to the relative values of each of

5   the patents?

6   A.  Yes, sir.

7   Q.  But you are not proposing a separate royalty rate for each

8   of the patents, are you?

9   A.  Not a separate royalty rate.

10  Q.  So, how did you get to 50 cents for all three patents?  If

11  you're saying that each patent has its own separate value, then

12  there must be some way that you built up to the 50-cent number

13  patent by patent, correct?

14          MR. CABRAL:  Objection to the form of the question,

15  your Honor.  There are two questions there.

16          THE COURT:  Overruled.

17  A.  Yes, sir.  The value of the patent, you understand, for

18  each of these patents is not just the royalty rate.  More

19  importantly, it's the royalty rate times the base.  The

20  question is, does the record justify the $6 million?  I have

21  independently placed each on the '501 and the '703.  That's

22  what I address in my report.

23  Q.  Sir, your opinion is not $6 million.  Your opinion in this

24  case is that there should be a rate of 50 cents per device,

25  correct?

1    A.   Correct.

2    Q.   When you originally opined in this case, the total number

3    that you gave us, 50 cents times whatever the number of units,

4    was based upon the units that had been sold at that point in

5    time, right?

6    A.   Yes, sir.

7    Q.   Then that number got updated at some point because more

8    sales were recorded, correct?

9    A.   That's correct.

10   Q.   But your opinion has nothing to do with the number of sales

11   and the total number, does it?  Your opinion has to do with the

12   royalty rate, correct?

13   A.   No, sir, that's not correct.  It goes to both the rate and

14   the total dollar numbers because the dollar numbers I would

15   think in most business deals is a relevant thing.

16   Q.   Let me see if I understand what you are saying.  In the

17   hypothetical negotiation in 2009, are you saying that the

18   parties would have known that -- what is today's date?  Let's

19   use the June 30th date that you showed us early, June 30, 2014.

20   A.   Yes, sir.

21   Q.   Are you saying that the parties in November 2009 would have

22   known that on June 30, 2014, the total number would have been

23   $6 million and therefore this is all very reasonable?  Is that

24   your testimony?

25   A.   No, sir, that's not my testimony.  Remember --

1   Q.  Sir, I didn't ask you -- I asked you whether that was your

2   testimony.

3   A.  Yes, sir.

4   Q.  All your opinion says in this case is that in November 2009

5   the parties would have sat down and figured out what a

6   reasonable royalty rate would have been, correct?

7   A.  Correct.

8   Q.  That was 50 cents, right?

9   A.  Correct.

10  Q.  That was regardless of whether one Nook was sold or 100

11  Nooks were sold or 100,000 Nooks were sold, right?

12  A.  Yes.  But recall it's based on an expectation at that date

13  of both the rate and the number of units.  That's the relevant

14  thing.

15  Q.  You haven't testified here today about any expectation,

16  have you?

17  A.  I gave you a number, yes.  Well, there were expectations

18  that were at the time, yes.  I've studied, and I know the

19  expectations were very optimistic at the time because of two

20  years of successful sales by the Amazon Kindle product, a

21  competitor product.

22  Q.  Now let me ask you this.  Let's talk about the hypothetical

23  negotiation a little bit.  Your testimony is that there were

24  two parties that owned the patent at that point in time,

25  Discovery and Philips, correct?

1    A.   That's correct.

2    Q.   Discovery owned two of the patents-in-suit and Philips

3    owned one, right?

4    A.   Yes, sir.

5    Q.   The date of the hypothetical negotiation is important,

6    Professor Magee, correct?  You're trying to best recreate the

7    circumstances of that negotiation, right?

8    A.   That's correct, sir.

9    Q.   Your assumption in this case was that Discovery and Philips

10   sat down together at a table across from Barnes & Noble and

11   negotiated a single royalty rate for all three patents,

12   correct?

13   A.   Correct.

14   Q.   But at the point in time, November of 2009, those two

15   parties weren't in business together with respect to these

16   patents, were they?

17   A.   No, sir, not yet.

18   Q.   Isn't it the case, sir, that there should have been two

19   separate hypothetical negotiations going on here, one with

20   Discovery for the '501 and the '851 patents and one with

21   Philips for the '703?

22   A.   OK, sir.

23   Q.   Is that right?

24   A.   I'll accept that hypothetical, yes, sir.

25   Q.   In that hypothetical situation --

1          MR. CABRAL:  Can we approach?

2          THE COURT:  No.

3          MR. CABRAL:  Thank you, your Honor.

4          THE COURT:  You're welcome.

5   Q.  In that hypothetical situation, sir, there would have been

6   an agreed royalty rate between Barnes & Noble and Discovery on

7   the one hand and an agreed royalty rate between Barnes & Noble

8   and Philips on the other hand, right?

9   A.  Correct.

10  Q.  What, in your opinion, would that have agreed royalty been

11  between Barnes & Noble and Discovery?

12  A.  OK.  The agreed royalty rate would have been basically a

13  50-cent royalty rate applied to all of the Discovery units, and

14  then there would be a 50-cent royalty rate that would be

15  applied to all of the Philips units.  And then you realize that

16  when those rates would be applied in this case separately or to

17  those two unit separately, each one would then be paying

18  $6 million instead of just one $6 million number figure.  If we

19  go with your hypothetical, it's going to cost your client

20  $12 million, not $6 million.

21  Q.  Let me see if I can understand what you just said.  You're

22  saying that Discovery, when they were negotiating with Barnes &

23  Noble for two of the patents-in-suit, would have agreed to 50

24  cents per unit?  Is that what you are saying?

25  A.  Yes, sir.

 1   Q.  And Philips, who separately negotiated with Barnes & Noble,

 2   would have agreed to 50 cents per unit, is that your testimony?

 3   A.  Separately, yes, sir.

 4   Q.  Do you recall having testified at a deposition in this

 5   case, sir?  Strike that.  Let me go on.  Let's go with what you

 6   say happened in this case, which is where the two parties sat

 7   across the table together from Barnes & Noble.  OK?

 8   A.  Yes, sir.

 9   Q.  In that case it would have cost the two parties only 50

10   cents and not a buck, right?

11   A.  Right.

12   Q.  So you're giving them a break.  What you are saying is

13   you're giving the parties in this case a break by assuming that

14   they sat at the hypothetical negotiation table together, is

15   that your testimony?

16   A.  That's not quite characterizing my testimony, because the

17   one-dollar rate I didn't think would be reasonable.  In light,

18   for example, of the Amazon agreement, one dollar for all of

19   these units would give twice the amount.  That would give a

20   $12 million number figure, which I think would be unreasonable.

21   It would be right next to the Amazon amount.  The Amazon is a

22   bigger firm, so it wouldn't be appropriate.  That's why I'm

23   doing 50 cents.  If you license one patent, you basically get a

24   second one for free.  It's like buy two for the price of one,

25   very common in business.

1          MR. EDERER:  Your Honor, I move to strike that

2    testimony based on rule 26 as outside the scope.

3          THE COURT:  I'm a little unclear, Professor.  You're

4    saying that if the owners of the patents at the time, since the

5    patents had different ownership, had separately sat down with

6    Barnes & Noble, they would have been able to negotiate a rate

7    that would foreseeably have cost Barnes & Noble $12 million,

8    correct?  You're saying that?

9          THE WITNESS:  I'm sorry.  Are you asking me?

10          THE COURT:  Yes.

11          THE WITNESS:  I thought you were asking him.  Sure,

12    that's correct.

13          THE COURT:  All right.  But you're saying if instead

14    at the same moment Barnes & Noble had sat down with the two of

15    them together, Barnes & Noble would then have been able to

16    negotiate a rate of a total of 6 million rather than a total of

17    12 million?

18          THE WITNESS:  Yes, sir.  This goes, though, to my --

19          THE COURT:  No, just answer my question.

20          THE WITNESS:  Yes, sir, that's correct, there would be

21    a discount on the second and third patents.

22          THE COURT:  You're saying that a reasonable licensee

23    in the position of Barnes & Noble would be reasonably willing

24    to pay twice as much based on the circumstance of whether the

25    two patent owners sat down at the same table or sat down at

 1    separate tables, is that what you are saying?

 2            THE WITNESS:  That doesn't quite go to the heart of

 3    it, your Honor.  Yes, it does.  My opinion is 50 cents a unit

 4    times the number of infringing units.  If they separately

 5    negotiate at 50 cents a unit, the mathematics is inevitable

 6    that they each would have to pay -- Barnes & Noble would have

 7    to pay 6 million to each of the two.

 8            Whereas, my report goes to why a quantity discount

 9    would be valid on the second and third patent so that it would

10    conform to a number that would be reasonable in light of the

11    only Georgia-Pacific factor number 1 evidence we have, which is

12    the $12½ million Amazon agreement.

13            I think 6 million is a total that should be paid to

14    Barnes & Noble any way you cut it, whether it is one, two, or

15    three patents.  The maximum would be 6.  I have independent

16    evidence of how each of the '501 and the '703 demonstrates

17    value to Barnes & Noble far in excess of $6 million for each

18    patent separately, but I can't double charge, because then it

19    would be 12 million, and the whole Amazon agreement is 12.5,

20    and Amazon is quite a bit bigger than Barnes & Noble.

21            It's a reasonableness thing for the structure of the

22    agreement using two or three -- the second or third patent free

23    once you pay for one large one.

24            (Continued on next page)

25

```
 1              THE COURT:  So all you're really calculating is the

 2    total amount, which you say should be 6 million; the rate is

 3    really secondary to your analysis?

 4              THE WITNESS:  The rate is secondary.

 5              THE COURT:  On your analysis it would be 6 million,

 6    and if that worked out to a rate of 2 cents, 50 cents, 90

 7    cents, it doesn't matter, right?

 8              THE WITNESS:  Correct.  It's a maximum --

 9              THE COURT:  That's what I thought.

10              THE WITNESS:  That's with them negotiating together.

11              THE COURT:  Ladies and gentlemen, we are going to give

12    you your mid-morning break at this time.

13              (Jury exits courtroom)

14              THE COURT:  Professor Magee, can you go outside.  I

15    have to discuss some things with counsel.

16              THE WITNESS:  Thank you your Honor.

17              (witness exits courtroom)

18              THE COURT:  I am leaning very strongly towards

19    striking Professor Magee's testimony based on the answers he

20    just gave first to counsel and then to me.  In the Daubert

21    hearing some of these same issues came up, but I was willing to

22    give him the benefit of the doubt after I looked at his expert

23    report, and also because I had not yet at the point made a

24    determination about certain of the surveys other than the

25    Intertrust surveys.  But now what I am hearing it seems to be
```

1    crystal clear that he has no reliable valid methodology for

2    calculating a 50 cent rate.  In fact, the 50 cent rate is

3    irrelevant to him.  But that's what his opinion is, is that

4    it's a 50 cent rate.

5             In fact, though, what is clear is that what he thinks

6    would have happened was there would have been a $6 million

7    deal, which only would have occurred if they had sat down

8    jointly, for which he had zero basis for believing that would

9    have occurred because they were separate owners at that time.

10   And, by the way, if they had sat down separately, the allegedly

11   reasonable Barnes & Noble would have paid double of what he

12   says they reasonably would have paid when they sat down

13   jointly.  I guess it's always good to have another chair at the

14   table.  And in this, more or less, totally unsupported

15   scenario, the royalty rate itself would have been a complete

16   irrelevancy because he says, without any support whatsoever,

17   that this is the way these deals are negotiated.

18             Let me hear before I make a final determination from

19   plaintiff's counsel.

20             MR. CABRAL:  So there are a couple of different issues

21   here.  The reason I requested a sidebar initially was to get --

22             THE COURT:  The reason I denied your sidebar, the one

23   and only time I ever denied a sidebar in this trial to any

24   counsel, was because defense counsel was right in the midst of

25   a strenuous cross-examination.  It seemed to be unfair to him

1    to interrupt it at that time.

2        MR. CABRAL:  I completely understand.  The issue I

3    wanted to raise with you is the hypothetical raised by Mr.

4    Ederer as to whether there would be more than one hypothetical

5    negotiation, which even Barnes & Noble's expert concedes

6    everybody is at the same table for one negotiation.  So it's

7    actually outside of the scope of the opinions given by

8    Professor Magee.

9        The evidence in this case, and this relates partly to

10   the motion to exclude Professor Magee, all shows that Philips,

11   Discovery were all talking to each other with Sony about

12   entering into a joint venture with --

13       THE COURT:  But they hadn't.

14       MR. CABRAL:  They had.

15       THE COURT:  Not at the moment where he says that the

16   hypothetical negotiation should take place.

17       My understanding is that every day I open the New York

18   Law Journal and I see that firm X is thinking about merging

19   with firm Y.  Sometimes it happens, sometimes it doesn't.  At

20   this point in time in 2009, it hadn't happened yet.

21       MR. CABRAL:  Sony and Discovery and Intertrust, they

22   had discussions going back months before the date of the

23   hypothetical negotiation.  Philips comes into the picture in

24   early December of 2009, which is pretty much the date of the

25   hypo.  You get to March of 2009 -- and all of this evidence is

1    cited in the opposition to the motion to exclude where this

2    argument is made by defense counsel.  In 2009 they enter into a

3    common interest agreement that states that the parties'

4    communications regarding forming the joint venture that

5    eventually became ADREA go back all the way to September of

6    2009, again, several months before the hypothetical

7    negotiation.

8         THE COURT:  I am not sure I see the significance in

9    that.  They enter into what is probably, as you described it,

10   an unenforceable back-looking agreement.  But you're saying

11   they must have gotten a bit more serious because now they say

12   we are at the point that we are going to after the fact keep

13   secret what we hadn't agreed to keep secret before.  Is that

14   the agreement?

15        MR. CABRAL:  The agreement relates to communications

16   regardless of its enforceability.  What it does demonstrate is

17   that communications were going back at least to the date of the

18   hypothetical negotiation and in fact before that.

19        Now, ADREA was formed only a few months later, so less

20   than a year, maybe eight months after the hypothetical

21   negotiation, in August.  So we are not talking about a huge

22   amount of time here.  The point being that all the parties in

23   this case agree that there is only one hypothetical negotiation

24   going on.

25        THE COURT:  Why would a reasonable owner of a patent,

 1    who is talking to but not yet having reached an agreement with

 2    another hypothetical owner of a patent, who now has a willing

 3    buyer who is willing to pay him $6 million on Professor Magee's

 4    analysis for his patent alone, say to his future partner, you

 5    know what, it doesn't make sense for us to negotiate separately

 6    because then we will get $12 million.  So in breach of our

 7    fiduciary duty to our shareholders, and in breach of common

 8    sense, and in breach of any known economic motive, let's

 9    negotiate jointly because we will get less that way.  I will

10    get 3 million, you will get 3 million, instead of the 6 million

11    apiece we can get by negotiating separately.  Why would they do

12    that?

13         MR. CABRAL:  I think that goes to the heart of this.

14    Because a critical assumption in the opinions given by

15    Professor Magee is that there are two sides of the table.

16    There is Philips and Discovery on one side and there is Barnes

17    & Noble on the other.  That's the same assumption that Barnes &

18    Noble's expert made.  So we are talking about a situation, if

19    you get into a scenario where you break those parties up to

20    negotiate separately, we are going outside the bounds of what

21    Professor Magee stated.

22         THE COURT:  I am questioning, just based upon what has

23    been shown to me in cross-examination and the previous Daubert

24    hearing, whether the hypothetical negotiation he posits makes

25    any sense.  If you think their expert made the same mistake, we

1  will get to that with their expert.  As I indicated, that's

2  just one of the grounds I just referred to.  I know you want to

3  get to the other grounds as well.  But it is undisputed, is it

4  not, that at the time that both sides agree the hypothetical

5  negotiation should have occurred the patents were owned

6  separately, yes?

7      MR. CABRAL:  The patents were owned separately as of

8  December 2009.  That is correct, your Honor.

9      THE COURT:  And no one disputes that's the right date.

10     MR. CABRAL:  Nobody disputes that's the right date

11  either, you're right.

12         If I can elaborate.

13         THE COURT:  Please.

14     MR. CABRAL:  The basic framework of the joint venture,

15  the basic agreement, the discussions, and the motivation behind

16  forming the joint venture were all in place.  And that

17  ultimately led to the formation of the company, which takes

18  time to formulate a deal of that complexity.

19     THE COURT:  That may be, but I still don't see, if

20  there weren't one company, why would they have any economic

21  motivation?  They can deal with what they feel is one company

22  when they become one company.  But at this point in time, on

23  his analysis, which I already indicated strikes me as absurd in

24  other respects, but on his analysis, they would have a strong

25  motivation not to act as one company because he thinks, he

 1    asserts, in what frankly strikes me as totally

 2    counterintuitive, they could have done twice as well if they

 3    had negotiated separately.

 4         MR. CABRAL:  Your Honor, again, I think this gets away

 5    from the centerpiece of his opinion.

 6         THE COURT:  Under Rule 702, which is the relevant

 7    rule, I have to look at whether he has a sound methodology,

 8    soundly applied to adequate data.  The data here is rather

 9    biased.  He is asserting, by the way, all sorts of things about

10    package deals and stuff like that, for which I don't recall

11    seeing any data, even though it's quite central to his opinion.

12    And his methodology, based on what are undisputed facts,

13    namely, who owned the patents at the relevant date, his

14    methodology asserts that they would have acted in a way totally

15    contrary to their economic interests.

16         MR. CABRAL:  I think that again goes to the assumption

17    of whether there are two sides of negotiation, one with Philips

18    and Discovery on the one end and Barnes & Noble on the other.

19    If you split them up, I think you're getting away from his

20    actual methodology.

21         THE COURT:  But if you don't split them up, then

22    you're getting to a false fact because they were split up at

23    the relevant date.

24         MR. CABRAL:  This goes to the case law, and I think

25    something you actually mentioned in the Daubert hearing, as to

1    whether ADREA would participate in a hypothetical negotiation.

2    And this is not an entirely clear area of the law in terms of

3    the book of wisdom and how far you can look out and so forth.

4         The basic parameters of the joint venture were in

5    place.  That led to the formation of the company after enough

6    time had gone by to form the joint venture.  From a practical

7    standpoint, the evidence supports that Philips and Discovery

8    were operating together.

9         THE COURT:  Even if that were true, just so we can

10   move on -- I understand your point; I am not sure I am

11   persuaded by it, but I understand your point -- but his answers

12   to what would have occurred, based on his methodology, if they

13   had been separate, seems to me so revealing about the flaws in

14   his methodologies.  Because it's like someone saying, I have

15   come up with a formula for determining a particular result, and

16   my formula says that under certain circumstances two plus two

17   equals eight.  Now, my opinion was that under the circumstances

18   that I took, applying my methodology, two plus two equals four,

19   but I agree with defense counsel that if in fact you would

20   apply my formula to the facts that defense counsel posited,

21   then two plus two equals eight.  That shows what is wrong with

22   the formula, what is the wrong with the approach.  It is

23   completely methodologically unsound.

24        Another respect, and you may want to address this, he

25   basically says, assuming now a joint negotiation or a

1    negotiation by the hypothetical ADREA, he says the only thing

2    they care about is the total package amount.  The royalty rate

3    could be one cent, it could be 50 cents, it could be 99 cents,

4    that doesn't matter, even though my bottom line opinion is they

5    would have come up with a 50 cent royalty rate.  That seems to

6    me to again expose the methodological flaws of his approach.

7             MR. CABRAL:  This gets to the second issue.  If I can

8    address briefly the first issue.

9             THE COURT:  Yes.

10            MR. CABRAL:  I think you are right, in the sense that

11   what my argument is is that if both Discovery and Philips are

12   negotiating together, based on the premise of the joint

13   venture, which is what we believe was the case, even back on

14   the date of the hypothetical negotiation, it certainly was the

15   fact several months later, then I think your problems with the

16   methodology in that sense go away, because they were

17   negotiating together and you didn't have to enter into the

18   second negotiation, which I think you have a problem with.  So

19   I think that is the basis of that issue.

20            To get to your second issue, in terms of the

21   questioning that you just had with Professor Magee, candidly, I

22   don't know if he was intimidated by your Honor or what.

23            THE COURT:  He is an experienced witness.  He makes a

24   lot more than I do.  He is clearly a guy who has testified many

25   times.  I didn't see any even hint of intimidation.

 1                MR. CABRAL:  Regardless of the intimidation, your

 2   Honor --

 3                THE COURT:  By the way, it wouldn't be relevant

 4   anyway.  He said what he said under oath.

 5                MR. CABRAL:  He did, your Honor.  Respectfully,

 6   candidly, I think what he said on the stand is inconsistent

 7   with what is in his report.

 8                In your Honor's order, you identified the fact that

 9   there is limited evidence in this case, and in a situation

10   where you have limited evidence you would allow more

11   speculation than you otherwise would.  In an effort to comply

12   with that order, we removed the lump sum part of his analysis,

13   which shows growth rates going out to 2016, and removed a lot

14   of that uncertainty, focusing in on the running royalty aspect

15   of his opinion.

16                When you focus in on the running royalty, you really

17   only focus on the 50 cents.  And I think when you were asking

18   questions -- they were leading questions, but they are from

19   your Honor so your Honor is obviously permitted to do that -- I

20   think he was answering yes in an effort to comply.  But his

21   answers were not consistent with his opinions in his expert

22   report, which determined the running rate, the per unit rate,

23   in the best way he can based on the evidence available to him.

24                Now, you heard him explain why the Amazon agreement

25   was not a suitable mechanism to determine a per unit rate

1    because it just gives you the lump sum.  So informally it

2    guides you in terms of the overall amount that should be paid

3    in terms of reasonableness, but you can't arrive at a per unit

4    rate using that Amazon agreement for the reasons Professor

5    Magee stated.

6         You also heard him testify about using the Barnes &

7    Noble licensing history to determine the structure of the

8    agreement, which again ties into the record.  So again you have

9    per unit rates.  That's all Barnes & Noble pays for the Nook

10   devices.  And that informed his opinion to the fact that you

11   can't use the Amazon agreement to convert it to a lump sum

12   because that's not what Barnes & Noble does with the technology

13   on its Nook devices.

14        You also heard him testify about Georgia-Pacific

15   number 4, in terms of the settlement offer, in terms of

16   arriving at the 50 cents and making whatever modifications you

17   need to adjust for the fact that 15 million software

18   applications are not included in this particular case.

19        Now, when you take out the Intertrust agreement, the

20   PCT analysis, and the Ocean Tomo analysis --

21        THE COURT:  I am not sure, even before my questions,

22   that what he said follows what you're suggesting.  For example,

23   on the Amazon, although he wasn't permitted to use the 13.5,

24   although I think it crept in later in some of his testimony

25   anyway, but he had gone into this in the Daubert hearing, but

his basic point was the Amazon deal should be cut in half

because it includes the patents here and includes other stuff.

          So he is not looking at the royalty rate.  He is

looking the lump sum again.  It was a check.  He is saying, I

am thinking this should be a $6 million deal.  Amazon was

13-1/2, but that makes sense because they are getting twice as

much.  I am oversimplifying it.  That was the gist of it.  That

again is not focusing on the royalty rate at all.

          MR. CABRAL:  I think that is not reflective of what

his running royalty payment is.  Again, I think he uses the

Amazon agreement.  I think he was clear about this early in his

testimony in terms of how he uses it in his running royalty

analysis, per unit rate analysis.

          There are a lot of reasons why you can't use the

Amazon agreement to arrive at a per unit rate.  A lot of that

is incomplete information regarding Amazon's unit sales.  So

that gets into speculation from the parties' perspective at the

time of the hypothetical negotiation.

          I think you are correct, your Honor, in the sense of

how he used the Amazon agreement as a check.  I think Mr.

Ederer asked him, What if the per unit rate were two dollars

per unit?  Then you are getting into a situation which is

unreasonable because you're getting well beyond the rate that

the much larger company paid.  I think that goes to the heart

of it.  He is using the Amazon agreement the only way he can,

 1    not to determine per unit rate, but as a check on his  overall.

 2         THE COURT:  I will hear briefly from defense counsel,

 3    and then I will take a five-minute break to reflect on all of

 4    this, and then I will rule.

 5         MR. CABRAL:  The only other way to do this, I think,

 6    is if the Amazon agreement was the only way your Honor views to

 7    determine a reasonable royalty in this case, then you have to

 8    do it in terms of a lump sum.  And if you do it with the lump

 9    sum, based on the parties' expectations at the time of the

10    hypothetical negotiation, when you look at the actual data from

11    2010 and 2011, you have Barnes & Noble entering the market at

12    40 percent of what Amazon sells.

13         THE COURT:  That is not his opinion.  You can't have

14    it both ways.  His opinion is couched as a royalty rate, not as

15    a lump sum.

16         MR. CABRAL:  That's right.  I would only ask, if you

17    were to strike his opinion because you didn't think there was

18    enough adequate information to determine a per unit rate, that

19    we would be given the opportunity to present evidence, if not

20    through Professor Magee, but at least through Mr. Barnes,

21    because Mr. Barnes certainly thinks you're capable of

22    determining a lump sum from the evidence in this case.

23         THE COURT:  I will consider that.

24         I wanted to make one other point clear.  Rule 703 of

25    the Federal Rules of Evidence -- this relates to the two other

1    surveys, Ocean Tomo and the other one.

2            MR. CABRAL:  Ocean Tomo and PCT capital.

3            THE COURT:  Rule 703 reads:  "An expert may base an

4    opinion on facts or data in the case that the expert has been

5    made aware of or personally observed."  So he was aware of it.

6            "If experts in the particular field would reasonably

7    rely on those kinds of facts or data in forming an opinion on

8    the subject, they need not be admissible for the opinion to be

9    admitted."  This does not, I think, fit within that category.

10    That's more like things like treatises and stuff like that, and

11    certainly not a study commissioned by counsel for one party,

12    which was what these were.

13            Then the rule goes on:  "But if the facts or data

14    would otherwise be inadmissible, the proponent of the opinion

15    may disclose them to the jury only if their probative value in

16    helping the jury evaluate the opinion substantially outweighs

17    their prejudicial effect."

18            The commentary of the advisory committee notes make

19    clear that the point is that since this is otherwise

20    inadmissible hearsay, it is by its very nature prejudicial and

21    difficult to evaluate because the jury doesn't know anything

22    about the underlying survey.  So it would only be that they

23    wanted to give an escape hatch for the rare situation where,

24    even though it was inadmissible hearsay and difficult to

25    evaluate and so forth, the probative value was so great that it

 1    substantially outweighs the prejudicial effect.  That clearly,

 2    in the Court's view, applied to these two surveys.  So that's

 3    why I did not let him testify about that.

 4             By way of contrast, there were some questions the

 5    other day from plaintiff's counsel, objected to by defense

 6    counsel, and I overruled the objections, where plaintiff's

 7    counsel was eliciting some statements -- this was I guess on

 8    Mr. Berg's testimony -- that referenced Mr. Narain's

 9    statements.  Mr. Narain's statements would have been admissible

10    because they were statements from a party adversary since he

11    was employed at Barnes & Noble in 2009.  So that's why 703 did

12    not bar those questions from plaintiff, but did bar the stuff

13    that they wanted to ask Magee about.

14             All right.  Let me hear from defense counsel.

15             MR. CABRAL:  Your Honor, if I can just ask one point

16    of clarification.  You said a study commissioned by a party,

17    counsel for a party?

18             THE COURT:  Aaron Fox is my recollection.

19             MR. CABRAL:  You're referring to the PCT analysis

20    specifically?

21             THE COURT:  The one I have right in front of me is

22    Ocean Tomo.

23             MR. CABRAL:  So setting aside the Ocean Tomo

24    analysis --

25             THE COURT:  Intertrust is already out.

1          MR. CABRAL:  That leaves the PCT agreement as well.

2          It looks as if that was commissioned by Aaron Fox.

3          THE COURT:  Yes.  Very good.

4          Yes, sir.

5          MR. EDERER:  Very briefly, your Honor.  First of all,

6    just addressing the issue of Philips and its involvement in all

7    of this.

8          First of all, the stipulated fact is that the

9    hypothetical negotiation took place in November 2009.

10   Mr. Shamoon testified that Philips didn't get involved in any

11   of the discussions until after December 25, 2009.  He gave

12   sworn testimony in this case to that effect.  And the NDA that

13   Mr. Cabral was referring to that Philips signed was signed at

14   the end of the January 2010.  So there is no question

15   whatsoever that Philips was not involved in any of these

16   discussions back in November 2009 when the hypothetical

17   negotiation would have taken place.

18         THE COURT:  Let me add to this.  I know the case law

19   is not totally consistent on this point, but I am going to give

20   my view of it so if there is an appeal, this case can be

21   assessed.

22         I do not think the hypothetical can be by someone who

23   is not an owner of the patent at the time of the hypothetical

24   date.  I think the whole point is to try to figure out what

25   would have happened if there had been an arm's-length

1    negotiation at the relevant date between a licensor and a

2    licensee, in this case several licensors.  The fact that later

3    on someone buys up those patents, and therefore is the person

4    who gets the damages, that's no different from any passage of

5    title of any property.  That happens all the time.  I do know

6    there is case law both ways on that, but that's where I come

7    out.

8             Go ahead.

9             MR. EDERER:  I just wish to follow up on what you

10   already said succinctly.  You have heard absolutely no basis

11   either at the Daubert hearing or here today for how Professor

12   Magee arrived at that 50 cent number.  What is going on here is

13   he is looking at the end number, which happens to be a number

14   that no party to the hypothetical negotiation could possibly

15   have known back in November 2009.  It happens to be, according

16   to him, $6 million today, and he is looking to check that

17   number against other numbers that are involved.  Some of the

18   numbers that you have already struck and he wasn't allowed to

19   check against those, the Amazon agreement.  And even with

20   respect to the offer sheet, before your Honor shut it down, he

21   was trying to come out with a number of 13,500,000, if you put

22   all the offer sheet numbers together, and then check against

23   that.  This is all about a $6 million number, and he told you

24   right on the stand that the 50 cents is irrelevant to the

25   equation.  What is important is the total number and measuring

1      that against other numbers that may have bearing.

2          Now, his opinions with respect to the 6 million and

3      the 50 cent rate being irrelevant were not limited to the

4      scenario of two negotiations.  He sat up there on the witness

5      stand and told you, whether it was 6 million or 12 million,

6      it's still the $6 million number that's the most important.

7      And your Honor picked up on this at the Daubert hearing, and we

8      heard nothing different today.  Of course they dropped the lump

9      sum number portion because that made the situation even worse

10     for them because that is a higher number, and then they were

11     trying to back that number down.  So now they are trying to

12     come in here today and say, well, it's more reasonable because

13     now we are throwing out a lower number.  But the most important

14     thing is that that number was not a number that any party to

15     that hypothetical negotiation could possibly have known.

16         So the hypothetical that I just posed to the witness

17     just exposed all of that, but it didn't change anything.  And

18     if you're looking for evidence as to what went into the

19     calculation of the 50 cent number, you can look through the

20     entire record in this case and you will find nothing, zero.

21     The only thing you will find is that offer sheet, which even

22     Professor Magee admits is just an offer that was never

23     accepted.  We have case law that we have cited to your Honor

24     that says offer sheets like that in hypothetical negotiations

25     are of limited if any relevance to the outcome of that

1   hypothetical negotiation.

2           So I think your Honor is right on target with this.

3   You suspected it last week.  You gave them the opportunity to

4   put this witness up on the stand today and explain it better to

5   you.  Not only did he not explain it better, he conceded to

6   your Honor that he was not interested in the 50 cent number.

7   He is interested in the total number and how it compares to

8   other numbers that are involved in this case.  His testimony

9   should be stricken.

10          MR. CABRAL:  Your Honor, may I?

11          THE COURT:  Yes.

12          MR. CABRAL:  This is a "be careful of what you wish

13   for" kind of thing.  The $6 million ultimate conclusion for the

14   50 cent per unit rate is a conservative number in the end.  The

15   statute is very clear that plaintiff, having proved

16   infringement, is entitled to a reasonable royalty.  And, your

17   Honor, there is case law from Judge Rader, in fact, sitting by

18   designation in New York, where this exact situation happened.

19          THE COURT:  Former Judge Rader.

20          MR. CABRAL:  Former Chief Judge Rader, exactly.

21          What happened was he interrupted a trial to conduct a

22   Daubert hearing and ended up striking that expert's testimony

23   and allowed the plaintiff to then come back and offer testimony

24   to support the reasonable royalty.  Here, we think that can be

25   done with Mr. Barnes frankly.

```
 1              THE COURT:  I will think about that separately.  I
 2    said that we are not leaving you guys in suspense.  I am going
 3    to grant the motion.  I will strike the testimony.  I will tell
 4    the jury it's stricken and they are not to worry about it one
 5    way or the other.  It's a technical legal determination that
 6    should not bother them, but they have to exclude from their
 7    consideration his testimony.
 8              Let's take five minutes, no more, and we will bring
 9    back the jury, and I will then take up later today your issue.
10              MR. BAUER:  I understand your ruling to strike his
11    opinion testimony.  Exhibits went in, facts went in, the sales
12    figures went in, the Amazon agreement, the discussions, the
13    background discussions.  The facts, we ask that that not be
14    stricken, and perhaps just ask that you strike his opinion on
15    the royalty and leave it at that.
16              THE COURT:  The exhibits, I think most of them were
17    joint exhibits in any event.  They certainly come in.  I agree
18    with you on that.  I will also inform the jury.
19              In terms of his testimony, if you and your adversary
20    can work out an agreement in this five minutes as to what
21    should come in and should not.  I will give you an example.
22    The Amazon agreement, on the one hand, as from him is hearsay.
23    On the other hand, it is going to be coming in from their
24    expert.  They didn't object to it on hearsay grounds so maybe
25    it's in.
```

1          MR. BAUER:  It's already been admitted.

2          THE COURT:  Separately admitted?

3          MR. BAUER:  Yes.

4          THE COURT:  So then that's not an issue.

5          The exhibits, it's easy to say to the jury all the

6    exhibits remain in.  In terms of testimony, if it's already in

7    through other witnesses, I don't have to say anything, but why

8    don't you discuss it with your adversary.

9          MR. BAUER:  What I am asking to do is an instruction

10   that they should ignore his opinion as to royalty rate and

11   leave it at that.

12         THE COURT:  I am going to say, I am striking his

13   testimony as to any and all opinions given.  I would do that

14   perhaps.

15         MR. BAUER:  That would be better.

16         THE COURT:  Any objection?

17         MR. EDERER:  No objection, your Honor.

18         THE COURT:  Very good.  Five minutes.

19         (Recess)

20         THE COURT:  Who is the next witness?

21         MR. CABRAL:  For plaintiff, your Honor, Professor

22   Magee was the last witness.  But your Honor, I think that

23   depends on your ruling here.  If you are inclined to strike

24   Professor Magee, we would ask that Mr. Barnes be required to

25   testify.  If that is not the case, then we would like the

1    opportunity to make an adjustment to call perhaps one other

2    witness.

3            THE COURT:  It's the latter that I thought was what

4    you were asking subject, obviously, to hearing what he is going

5    to say and so forth, I think that's reasonable under the

6    circumstances.

7            The plaintiff will rest subject to that proviso, and I

8    am not one of those people that thinks the plaintiff has to

9    rest in front of the jury or anything like that.  I just want

10   to make sure that we have a record that, other than this

11   hypothetical other witness that you may or may not be able to

12   call, you have completed your case.

13           MR. CABRAL:  That's right, your Honor, pending your

14   Honor's ruling regarding whether Mr. Barnes has to testify.

15           THE COURT:  I thought defense counsel was calling him.

16           MR. CABRAL:  That's right, your Honor.  He is.

17           THE COURT:  What is it you're asking for with regard

18   to him?

19           MR. CABRAL:  In order to prove a reasonable royalty

20   which the statute requires we do here, we have to tie that to

21   the record.

22           THE COURT:  You are going to be calling Mr. Barnes,

23   yes?

24           MR. EDERER:  I believe so, yes, your Honor.

25           THE COURT:  If you don't call him, they can.

1          MR. CABRAL:  That's essentially what I was asking.

2          THE COURT:  I'm sorry.  I misunderstood.

3          MR. CABRAL:  The only other witness that we would

4     potentially call here, and we would like just a few minutes to

5     think about it, would be Mr. Rainey, but that would be Monday

6     anyway.

7          THE COURT:  We will worry about that one later.

8          So who is the first defense witness?

9          MR. EDERER:  First of all, we thought it would be

10    appropriate at this time to move for a judgment.

11         THE COURT:  You're making a hundred motions which I

12    will allow you to make and they are all reserved till the end

13    of the case.

14         Congratulations.

15         MR. EDERER:  Your Honor, in anticipation of our

16    technical expert testifying, we had two deposition transcripts

17    that we wanted to read which relate to the technical or the

18    patent aspects of the case.

19         THE COURT:  That's fine.  I have given you rulings on

20    everything but one, so it's not that one.

21         MR. EDERER:  It's Asmussen and McCoskey.

22         THE COURT:  So let's see if we can do that now.

23         MS. ARNI:  On that issue, your Honor, as the parties

24    were reviewing your order on Mr. Rosenstock's transcripts we

25    realized we had inadvertently given you a copy where the green

1    objection boxes had not printed out, so the parties together

2    would like to resubmit that for your ruling on plaintiff's

3    objections.

4            THE COURT:  I'm sorry?  You gave me the wrong copy,

5    but the objections were still there.

6            MS. ARNI:  Only the one defense objection.  The green

7    boxes, the plaintiff's objections didn't print.

8            THE COURT:  I'm sorry.  Oh, that was sneaky.

9            MS. ARNI:  It was not sneaky, I promise, your Honor.

10    It resulted from perhaps a lack of sleep.

11            THE COURT:  So hand that back up.  We have something

12    to play now, right?

13            MS. ARNI:  Yes, your Honor, to read, not to play.

14            MR. EDERER:  Unfortunately, your Honor, these

15    depositions were not videotaped so they are going to be read.

16            THE COURT:  It's all right.  The jury will bear up

17    since it's only till 1:00.

18            MR. CABRAL:  We are happy to defer to your preference

19    in terms of the order.  I know a couple of days ago Mr. Ederer

20    said that Mr. Neuman would go first.  If this is your

21    preference, we are totally fine with that.  Mr. Neuman,

22    however, is going to be quite lengthy, my understanding is.  If

23    Mr. Neuman is not going to take the stand until Monday, my

24    understanding is defense counsel expects five hours with him.

25    That would take us to Tuesday or Wednesday or Thursday.

1           MR. SHARIFAHMADIAN:  Your Honor, he is opining both on

2      issues of infringement and validity, so he is essentially two

3      experts.

4           THE COURT:  Even if we gave the same length that we

5      gave for their experts, then it would still only be four hours.

6      But given the Court's ruling on Magee, I can't imagine that you

7      need four hours.

8           MR. SHARIFAHMADIAN:  We do, your Honor.

9           THE COURT:  Well, you're not going to get it.  If you

10     want to hondel, we can hondel.

11          MR. EDERER:  This is not Barnes.  This is the

12     technical expert.

13          THE COURT:  I think you should think about three hours

14     and we will talk more about it.  What we can do, of course, is

15     you can go for five hours and then every question that I think

16     is either repetitive or that I think is not properly phrased,

17     regardless of whether there is an objection or that I think

18     calls for a narrative or that I think is cumulative, I will sua

19     sponte interrupt and move things along.  That's one

20     possibility.  But another possibility is for you to cut it

21     down.

22          MR. SHARIFAHMADIAN:  We will certainly try and cut it

23     down as much as possible, your Honor, and we will try to get it

24     in in three hours, but we do ask for your indulgence, it is

25     quite a bit of material.

1          THE COURT:  Yes, I hear you.  I don't mean to be flip

2     about this.  I understand it's a very important witness.  I

3     understand he is serving two purposes, but I also know that we

4     have got to move things along.  The jury has been very patient.

5     They have now waited almost an hour for reasons that you should

6     be delighted about but, nevertheless, they have had to wait an

7     hour and I don't want to let them feel that we are not moving

8     swiftly.

9          As far as they know, the only guarantee they have had

10    is the case will be over, P.S., subject to the length of their

11    deliberations, on Wednesday.  I don't believe this case will

12    take more than a day on deliberations, so I can conceive rather

13    than having the summations Tuesday morning, worst case, it

14    could be Tuesday afternoon but I cannot perceive of it being

15    later than that.  So everyone should take note of that.

16          Let's bring in the jury.

17          (Continued on next page)

18

19

20

21

22

23

24

25

1                    (Jury present)

2              THE COURT:  So, ladies and gentlemen, we had a lengthy

3     discussion about very important but highly technical, legal

4     issues which is why it took so long.  The net result of all

5     that is, I am going to strike all the opinions offered by Mr.

6     Magee.  So you are not to consider any opinions he offered.

7     They are no longer a part of the evidence in this case.  You

8     should not speculate why that is.  It has to do with technical,

9     legal concerns.  That is my province, not yours.

10             Still in evidence are the documents that came in

11    during his testimony and any facts that he testified to.  And

12    during your deliberations if for some reason you think there is

13    something he said that you're not sure whether it was opinion

14    or fact, just send us a note and we will tell you whether it is

15    so.  You don't have to sort that out.

16             I want to mention in that regard as well, all the

17    exhibits will be sent in to you automatically when you begin

18    your deliberations.  Any testimony you want will be furnished

19    to you upon request in a transcript form.  So let's take Mr.

20    Magee as an example.  If you were to ask, we would like to see

21    the testimony of Mr. Magee, we would erase from that testimony

22    all the opinions so all you would see is what remains.  So you

23    don't have to worry about sorting it all out, but I do want you

24    to know that you must disregard and not consider at all in your

25    deliberations any opinions he stated because they have now been

1    ruled out of evidence.

2         We have an hour left to go before the weekend, and I

3    have been told it is going to be incredibly exciting.  It is

4    going to be the reading of a deposition.  We don't even have a

5    videotape of this one.  So we are going to put one counsel at

6    the podium and one counsel up here at the witness box, and the

7    counsel at the podium will be the person who is propounding the

8    questions at the deposition and the person in the witness box

9    will be playing the role of the witness.

10        MR. BAUER:  Your Honor, if you just want to advise the

11   jury these are witnesses being called by the defense.

12        THE COURT:  As I told you, it doesn't really matter;

13   what matters is what you determine are the facts.

14        Go ahead.

15        MR. EDERER:  Your Honor, the defense calls Mr. John

16   McCoskey.

17        To be clear, this is not Mr. McCoskey.

18        THE COURT:  This is an imposter.

19        Go ahead.

20   BY MR. EDERER:

21   "Q. Good morning, Mr. McCoskey.

22   "A. Good morning.

23   "Q. Did you review any documents in preparation for today's

24   deposition?

25   "A. I briefly looked at the patent in Mr. Hung's office.

1    "Q. Did reviewing the '851 patent refresh your recollection

2    regarding what you are here to testify about today?

3    "A. It refreshed my memory a little bit about the patent.  I'm

4    not sure what I am here to testify about here today."

5            MR. EDERER:  If I could just ask Mr. McCoskey to speak

6    up because I am having trouble hearing.

7    "Q. In what way did it refresh your memory about the patent?

8    "A. I hadn't seen the patent or really looked at it since it

9    issued, so it just reminded me of what it was about.

10   "Q. How long were you at Discovery Communications?

11   "A. I was at Discovery Communications as an employee until

12   somewhere in 1997 when we spun off Your Choice TV as a separate

13   company.

14   "Q. What was your title at Your Choice TV after it spun off?

15   "A. Senior vice president of operations.

16   "Q. We will obviously want to come back to talk about your time

17   at Discovery and at Your Choice TV but let me just close out

18   what you have been doing since.  So how long were you at Your

19   Choice TV?

20   "A. I was at Your Choice TV until we closed the company which

21   was sometime in late 1998.

22   "Q. And then what did you do then?

23   "A. Then I took some time off and then began working as a

24   consultant to Discovery.

25   "Q. Do you know when that was?

1    "A. I don't recall the exact date.  It would have been early

2    1999 and I continued in that role until late 2001."

3              (Continued on next page)

1  "Q. And what was the nature of that role?

2  "A. It was really working as a consultant to continue work on

3  the patent portfolio.

4  "Q. Anything else?  Any other role?

5  "A. No.

6  "Q. So not really the same strategic role that you had

7  described earlier where you were working with Mr. Hendricks; it

8  was more focused on patents, is that right?

9  "A. I would say, if anything, it was probably a more strategic

10 role.  It was a full-time focus on the patent portfolio and

11 working on strategy and development of that portfolio.

12 "Q. And what would you discuss with Mr. Hendricks?

13 "A. A broad range of things.  It was always about the patent

14 portfolio, the directions that I was taking it, where we wanted

15 to invest, the speed of investment in different areas, areas

16 that we wanted to increase our speed, areas we wanted to

17 decrease our speed.  Again, really maximizing the potential for

18 return on investment.

19 "Q. When you say decrease the speed of investment, especially

20 as you were describing the strategy for many years with respect

21 to the ebook part of the portfolio, what do you mean by slowing

22 down the speed of investment?

23 "A. What I mean is I had a limited pool of dollars that I could

24 spend on prosecution of the Discovery portfolio, and so for me,

25 I had to make decisions about which applications we wanted to

 1    put extra resources on versus which applications we wanted to

 2    let follow the process and not basically go as -- follow the

 3    process and let the process define the speed and my rate of

 4    spend.

 5    "Q. What do you mean by follow the process?

 6    "A. Not accelerate our activities both in terms of prosecution

 7    and filing.

 8    "Q. Did you discuss with Mr. Hendricks the strategy of slowing

 9    down the prosecution process with respect to electronic books?

10    "A. Yes.

11    "Q. And what did you talk about with Mr. Hendricks?

12    "A. I don't recall whether this was in conversation or whether

13    this was in my written communications to him, but I certainly

14    remember at some point having a strategy of what I would call,

15    you know, slow rolling or decelerating the electronic book

16    portion of our portfolio.

17    "Q. Now, what about the industry?  We talked about the

18    electronic book industry.  What was it about the electronic

19    book industry that made you think that slowing down the

20    prosecution of Discovery's electronic book patents was a good

21    strategy?

22    "A. I didn't see the underlying reader technology advancing

23    very quickly, particularly in the areas of display and battery.

24    "Q. What underlying reader technology are you referring to?

25    "A. This would be the readers that were becoming available

1  commercially during that period.

2  "Q. When you say during that period, what are you referring to?

3  Can you be as specific as possible.

4  "A. If I recall correctly, it was the late '80s, before readers

5  really started becoming available on the market for purchase by

6  consumers.  So it was looking at the reader technology as that

7  was beginning to happen.

8  "Q. Are you thinking of particular readers in particular?

9  "A. I'm sorry.  I meant the late '90s, not late '80s.

10  "Q. And are you thinking of particular electronic book readers?

11  "A. I'm not.  I don't recall the specific brands, but there

12  were a few brands that were becoming commercially available in

13  the late '90s.

14  "Q. Do you recall any of those brands?

15  "A. Specifically, there was a book called the Rocket eBook.

16  There was another one called the SoftBook.  Those are the two

17  that I remember.

18  "Q. Did Discovery do any research and development to offer a

19  viable ebook reader?

20  "A. Not that I'm aware of.

21  "Q. Or to distribute electronic book content?

22  "A. Not that I'm aware of outside of one example.

23  "Q. So let me understand.  So you're saying that the sole

24  purpose for the Everybook was for this trademark purpose?

25  "A. Yes.

1    "Q. Did it work?

2    "A. I believe Discovery still or at that time had got the

3    trademark approval.  But I'm not a trademark attorney, so I

4    don't know.

5    "Q. I don't mean did the trademark strategy work.  I mean did

6    the device actually function?

7    "A. Well, the device was a Palm Pilot with a memory card, so it

8    absolutely functioned.  We private labeled that device with an

9    Everybook label.

10   "Q. What do you mean by a Palm Pilot with a memory card?

11   "A. It was a Palm Pilot that had a CompactFlash memory card

12   slot in it.

13   "Q. And what did you do with that memory card?

14   "A. We didn't do anything with it.  I mean, somebody could put

15   content on that and use that with the Palm Pilot.

16   "Q. So let me just understand this.  You literally took an off-

17   the-shelf Palm Pilot that had a memory card, you didn't make

18   any technological changes to it, and you rebranded it as an

19   Everybook?

20   "A. That's correct.

21   "Q. With respect to the '851 patent, can you think of any

22   particular engineering project that was ongoing prior to the

23   work on the '851 patent that led to the '851 patent?

24   "A. None that I was leading.

25   "Q. Any that you were involved in?

1  "A. Not that specifically tied to just the '851 patent.  In

2  general, again, all of the things we were doing kind of fit

3  into the portfolio overall.

4  "Q. Right.  And I guess what I'm asking is if you can think of

5  a particular engineering project that you were working on that

6  predated the work on the '851 patent that went into the '851

7  patent.

8  "A. No.

9  "Q. Was there a particular shortcoming in the then-current

10 state of the art that you were trying to address with the '851

11 patent?

12 "A. I'm not sure.  Could you restate the question?

13 "Q. Sure.  Let me explain a little more.

14 "A. OK.

15 "Q. So, oftentimes when we talk about patents or when inventors

16 talk about patents, they're talking about an improvement on

17 something that was already existing or some novel change to

18 something or trying to solve some problem that existed in the

19 then-current.  So what I'm trying to understand is what, if

20 anything, were you trying to solve or address with the '851

21 patent?

22 "A. I have a hard time because I'm not that familiar with the

23 '851 patent.  So, for example, I don't recall specifically what

24 it teaches.  I mean, I've seen the title, I've seen, you know,

25 just a cursory review of it on Friday.  But specifically I

1    don't recall what's even in that patent.

2    "Q. Is it your understanding that the '851 patent is directed

3    to electronic books?

4    "A. I believe it is.  Again, I haven't reviewed the patent in

5    detail.

6    "Q. Is it your understanding that the '851 patent is related to

7    electronic book readers?

8    "A. I don't recall specifically whether it talks about readers

9    or not.

10   "Q. Is it your understanding that the '851 patent is directed

11   to content protection for the delivery of electronic books?

12   "A. Yes.  That was my recollection after reading the title and

13   looking briefly at it.

14   "Q. Right.  But you also said that your work on the '851 patent

15   was to expand upon content protection and encryption.  Why was

16   there a need to do so?

17   "A. I think there was new ideas there, a new invention.

18   "Q. What were those new ideas?

19   "A. I don't remember specifically.

20   "Q. What was the new invention?

21   "A. It was around content protection.

22   "Q. Do you recall a moment when you were meeting with Mr.

23   Hendricks, either at that initial meeting or otherwise, where

24   the two of you came up with a particular invention of the '851

25   patent?

1   "A. No, not specifically.

2   "Q. Do you recall yourself ever having a moment where you

3   remember coming up with the invention or inventions of the '851

4   patent?

5   "A. Not specifically.  And I remember this was 10 to 15 years

6   ago.  I don't recall that level of detail.

7   "Q. Do you recall ever being in a meeting about the '851 patent

8   with both Mr. Hendricks and Mr. Asmussen?

9   "A. No, I don't believe such a meeting ever took place.

10  "Q. Do you recall ever having a conversation with Mr. Asmussen

11  during which there was a moment of realization that you had an

12  invention that went into the '851 patent?

13  "A. Specifically for the '851 patent, no.  But, again, I'll

14  restate, Mr. Asmussen and I were working on a whole portfolio

15  of patents, and the number of applications was very large.  We

16  had many, many discussions about lots of different patents, and

17  this one specifically I don't recall.

18  "Q. So you're a named inventor on the '851 patent, obviously.

19  That's why you're here today.  What do you think you

20  contributed to the invention of the '851 patent?

21  "A. I don't recall specifically how the three of us provided

22  this.  I can tell you it was a collaboration.  We started with

23  John and his early disclosures.  I had conversations with John.

24  Mike and I then had conversations.  As I said, Mike would never

25  have talked to John; that wasn't the way Mr. Hendricks would

1    have operated.  But specifically who had which piece of it, I

2    can't remember.

3    "Q. Now, you said it was a collaboration, but you also

4    testified that you do not recall a specific conversation with

5    either Mr. Hendricks or Mr. Asmussen about the '851 patent, is

6    that correct?

7    "A. Right.  I said specifically a specific conversation.  I

8    don't recall those.  I remember many general conversations

9    about the patent portfolio and many patents.

10   "Q. And you don't recall a specific meeting with either of them

11   or both of them about the '851 patent, correct?

12   "A. That's correct.

13   "Q. So, I asked you what you contributed to the invention or

14   inventions, and your testimony was you are not sure, is that

15   correct?

16   "A. I think my testimony is I don't recall specifically which

17   things I contributed to.

18   "Q. And so let me ask you with respect to Mr. Hendricks and Mr.

19   Asmussen, what is your understanding of what Mr. Hendricks

20   contributed to the '851 patent?

21   "A. Again, I don't recall specifically which of the three of us

22   contributed different things, and I don't recall, frankly, what

23   are the specific claims of the patent.

24   "Q. So you don't recall what -- you don't have an understanding

25   sitting here today of what Mr. Hendricks contributed to the

1    '851 patent?

2    "A. Specifically, no.  I would say in general kind of the

3    foundation for this.

4    "Q. And I'm interested in specifics.  So specifically, no,

5    correct?

6    "A. That's correct.

7    "Q. And as for Mr. Asmussen, do you recall what Mr. Asmussen's

8    contribution was to the '851 patent?

9    "A. No, not specifically, no.

10   "Q. Is it correct that you do not recall either having a

11   conversation or a meeting with either Mr. Hendricks or Mr.

12   Asmussen specifically about the '851 patent?

13   "A. It was too long ago.  I just don't recall.

14   "Q. What specific engineering projects, if any, led to the '851

15   patent?

16   "A. I don't recall a specific engineering project for that

17   patent.

18   "Q. And what specific engineering projects led to the

19   electronic book patent at Discovery?

20   "A. I would say, as I said previously, our engineering efforts

21   around Your Choice TV and other distribution projects informed

22   all of the patent portfolio.

23   "Q. But how?  How did that happen?  What do you mean by that?

24   "A. We were doing technology development and exploration.

25   "Q. What kind of technology development?

1  "A. Looking at content and media distribution, media

2  management.

3  "Q. And how did that relate to electronic books?  How, if at

4  all, did it relate to electronic books?

5  "A. Part of an electronic book system, in my view, is the

6  distribution mechanisms for distributing content to electronic

7  book readers and libraries.  And much of what we did as

8  engineering projects for Your Choice TV were those kinds of

9  systems.

10  "Q. And what work on content protection, what engineering

11  projects on content protection in particular went into the

12  electronic book patents?

13  "A. We didn't have a specific electronic book engineering -- I

14  didn't have a specific electronic book engineering project

15  going.

16  "Q. But what content protection projects did you have going

17  that went into the electronic book patents?

18  "A. Just the work on actually working on the patents

19  themselves.

20  "Q. So, we've talked about the Rocket eBook and the SoftBook.

21  Do you recall that?

22  "A. Yes.

23  "Q. Do you recall if they were available prior to the filing of

24  the '851 patent?

25  "A. I don't recall the time frame.

1   "Q. Do you recall -- I think you had testified that you had a

2   Rocket eBook and had at least seen a SoftBook.  Do you recall

3   if you had the Rocket eBook prior to the filing of the '851

4   patent?

5   "A. I don't recall the chronology of when I had those books.

6   "Q. Are you aware of why the Rocket eBook was not disclosed to

7   the Patent and Trademark Office during the prosecution of the

8   '851 patent?

9   "A. No, I'm not.

10  "Q. Do you recall why the SoftBook was not disclosed to the

11  Patent and Trademark Office during the prosecution of the '851

12  patent?

13  "A. No, I don't.

14  "Q. Were you personally following the market for electronic

15  book readers during the time that the '851 patent application

16  was being prosecuted?

17  "A. I believe that -- well, certainly I was, yes.

18  "Q. And were you following the market for electronic book

19  readers prior to the time that you actually filed the '851

20  patent application but subsequent to the time that you started

21  working on Discovery's electronic book patents?

22  "A. Yes.

23  "Q. Were you watching -- were you following the electronic book

24  reader market in order to help guide strategy decisions for

25  prosecuting the electronic book patents?

Fahead14                  "McCoskey"

1   "A. Yes.

2   "Q. And that would be both prior to and after the '851 patent

3   was filed, correct?

4   "A. Yes.

5   "Q. Mr. McCoskey, I'm going to hand you an unredacted version

6   of a document we've marked Exhibit 4.  Would you please take a

7   moment to review that document."

8        Just for the record, this Exhibit Is DTX-219; which we

9   move to admit

10       THE COURT:  Yes, 219 is received.

11       (Defendant's Exhibit 219 received in evidence)

12       MR. EDERER:  I don't know if the witness needs to see

13   it or not, but I'll give it to him.

14   "Q. Do you recognize this document?

15   "A. I don't recognize it specifically, but I see it's something

16   I wrote to Mr. Hendricks in 1999.

17   "Q. I'd like you to turn with me to page 2, please, and

18   specifically the paragraph that's entitled 'Electronic Book

19   Portfolio.'  Do you see that?

20   "A. Yes.

21   "Q. Could you please read the first two sentences into the

22   record of that paragraph after the title 'Electronic Book

23   Portfolio.'

24   "A. 'I received consumer versions of the Rocket eBook and the

25   Millennium Reader products along with sample content titles for

each.  Those are the first two commercially available books,

and they're being used to evaluate features and functions of

the market and our own technology disclosures.'

"Q. And does this refresh your recollection as to the time

period during which you had and reviewed the Rocket eBook

product that we discussed earlier?

"A. To the extent that it appears to have happened on or before

May of 1999, yes.

"Q. Is that your understanding now, that you did in fact review

it, the product, prior to May 18, 1999?

"A. Based on my note here, that's what it appears.

"Q. Do you have any reason to believe that that would not have

been true?

"A. No.

"Q. Turning back to DTX-219, could you please read into the

record the next sentence, the third sentence in the paragraph

concerning electronic book portfolio.

"A. The one that starts with 'This market'?

"Q. Correct.

"A. 'This market has rapidly matured, and with the correct

retail positions and content deals, electronic book technology

is likely to become quite popular.'

"Q. Do you have an understanding of what you mean -- what you

meant by this market has rapidly matured?

"A. I don't recall specifically what I was thinking.  I can

1   interpret from rereading this that I was saying that the ebook

2   reader technology was maturing, that the distribution

3   technology was maturing, and that the elements were coming into

4   play to make this a commercially viable service.

5   "Q. Were you talking about advancements that Discovery was

6   making or that other companies in the industry were making?

7   "A. I would say both.

8   "Q. And so what kinds of advancements that Discovery was making

9   do you think you were referring to?

10  "A. Specifically, I think that the things Discovery had talked

11  about in terms of distribution and content protection.

12  "Q. And can you tell me in your own words what you think the

13  '851 patent invention was directed to?

14  "A. It was directed to protecting content associated with

15  electronic books.

16  "Q. And what's the basis of your understanding of that?

17  "A. My brief review of the patent on Friday.

18  "Q. And can you tell me in your own words what it is that you

19  think that you invented that went into the '851 patent?

20  "A. Specifically, I cannot.

21  "Q. I'd like for you to turn with me, if you would, to claim

22  96, which is at column 74.  And if you wouldn't mind taking a

23  moment to read this claim as well.  You don't have to read it

24  out loud, just to yourself.

25  "A. OK."

1          MR. EDERER:  Just for the record, in this case this is

2    Joint Exhibit 1.  This is the '851 patent.

3    "Q. Do you have an understanding of what claim 96 covers?

4    "A. I believe so.

5    "Q. And what is your understanding?

6    "A. I believe it covers the method and process for a viewer

7    actually receiving and decrypting and displaying content.

8    "Q. Do you see a reference at line 61 to a key generator?

9    "A. Yes.

10   "Q. Do you have any understanding of what a key generator is?

11   "A. I do from a general standpoint.  A key generator is a

12   mechanism that generates a specific key.

13   "Q. Is it your understanding that this claim covers a device

14   that contains a key generator on the receiving or client

15   device?

16   "A. I'm not sure.  It appears that it does.

17   "Q. Do you recall any particular design consideration that

18   would have suggested that a key generator should be included on

19   a receiving device?

20   "A. I don't remember any of the specifics.

21   "Q. Do you feel that you invented encryption?

22   "A. No, I don't.

23   "Q. Do you feel that Mr. Hendricks invented encryption?

24   "A. No, I don't.

25   "Q. Do you feel that encryption was invented by the '851

1   patent?

2   "A. Encryption as a process by itself?

3   "Q. Right.

4   "A. No, I do not.

5   "Q. Do you feel that you or any of the inventors of the '851

6   patent invented the use of encryption keys?

7   "A. For this specific purpose and in this specific system,

8   absolutely.

9   "Q. What about apart from this specific system?

10  "A. No.

11  "Q. And when you say for this specific purpose, what are you

12  talking about?

13  "A. For purposes that are laid out in these claims of

14  encrypting, distributing, decrypting, store, all of the things

15  that are discussed about electronic books.

16  "Q. Do you think that encrypting -- so you're talking about

17  specifically in the context of electronic books?

18  "A. Yes.  And I guess what I'm saying is that if you look at

19  individual elements here, there are individual elements that

20  are not the invention.  It's the combination of those elements

21  together that are the invention.

22  "Q. Do you feel that you invented SSL?

23  "A. As part of this patent, no.

24  "Q. Do you recall who made the decision to file the '851

25  patent?

1    "A. I don't recall specifically, but it would have been me.   I

2    mean, that's where the decisions were coming from.

3    "Q. Do you think you reviewed the '851 patent application

4    before it was filed?

5    "A. Yes.

6    "Q. Do you recall ever personally identifying prior art

7    relevant to the '851 patent to be forwarded on to the Patent

8    and Trademark Office?

9    "A. No, I don't recall.

10   "Q. Is it your belief -- sorry.   Strike that.   Do you believe

11   that you ever identified prior art relevant to the '851 patent

12   to be forwarded on to the PTO?

13   "A. I don't recall.

14   "Q. Now, what about with respect to '851 patent?   Do you recall

15   what, if any, involvement you had with responding to office

16   actions that were received from the Patent and Trademark Office

17   during the prosecution of the '851 patent?

18   "A. I don't recall.

19   "Q. I am going to hand you a document we've marked Exhibit 5."

20            MR. EDERER:   For the record in this case, that's

21   DTX-596.

22   "Q. And if you could take a moment to review this document,

23   please."

24            MR. EDERER:   Your Honor, for the record, I believe

25   this has had been admitted in this case already.

1          THE COURT:  As?

2          MR. EDERER:  As DTX-596, Defense Exhibit 596.

3   "A. OK.

4   "Q. Do you recognize that document?

5   "A. I recognize this document.  I don't recall who the audience

6   was for this.

7   "Q. Directing your attention to page 7, do you see in the

8   middle it says 'four significant product players now'?  Do you

9   see that?

10  "A. Yes.

11  "Q. And then it looks like it's listing four companies:

12  Everybook, Inc., SoftBook, Inc., and Librius, Inc., and

13  Nuvomedia, Inc.  Do you see that?

14  "A. Yes.

15  "Q. And are you familiar with the identified companies?

16  "A. I do recall them now, yes.

17  "Q. OK.  And I think we've talked about SoftBook, and it looks

18  like SoftBook press, Inc. was the company that had the

19  SoftBook.  Is that your recollection?

20  "A. Only from what it says here, I believe.

21  "Q. And does this refresh your recollection as to what company

22  was selling the Rocket eBook?

23  "A. Yes.

24  "Q. And what was that?

25  "A. Nuvomedia.

1   "Q. And then does this refresh your recollection as to what the

2   Millennium Reader was?

3   "A. Not really, no.  I really don't remember that one.

4   "Q. OK.  And do you see at the top where it says 'Everybook,

5   Inc.'?

6   "A. Yes.

7   "Q. That was a different Everybook than what we were talking

8   about before that Discovery had, is that correct, or am I

9   incorrect?

10   "A. No, that's correct.

11   "Q. And do you know what that book was?

12   "A. I don't recall specifically what it was, no.

13   "Q. So, is it safe to say that you were aware of these products

14   at or around the time that you created this presentation?

15   "A. I was certainly aware of their -- the existence of the

16   companies, and it looks like I was targeting the availability

17   of their products.

18   "Q. Do you have any idea why none of these products were cited

19   to the Patent and Trademark Office during prosecution of the

20   '851 patent?

21   "A. No, I don't.

22   "Q. I'm going to hand you a document marked Exhibit 13."

23           MR. EDERER:  For the record, in this case that's

24   DTX-218.

25   "Q. And would you please take a moment to review this document.

1   "A. OK."

2          MR. EDERER:  This is in evidence, your Honor, as

3   DTX-218.

4          THE COURT:  Right.

5   "Q. Do you recognize this document?

6   "A. I don't recognize it, but I see it as a document that I had

7   written in April of 1999.

8   "Q. Do you know what document -- what purpose this document was

9   prepared for?

10  "A. I believe it was to update Mr. Hendricks and Mr. Durig on

11  the status of my work.

12  "Q. Do you see on the first page under the redacted section

13  where it says, 'I have ordered consumer versions of the Rocket

14  eBook and the Millennium Reader products.  These are the two

15  first commercially available electronic books and will be used

16  to evaluate features and functions of the market and our own

17  technology disclosures'?  Do you see that?

18  "A. Yes, I do."

19         MR. EDERER:  I believe that ends our scintillating

20  presentation, your Honor.

21         THE COURT:  You're not off the hook yet, because we

22  still have another half hour.  You've got another one to go, do

23  you not?

24         MR. EDERER:  Another one where this came from.

25         THE COURT:  Very good.

1              MR. EDERER:  Now you are going to change your name,

2    Mr. Witness, to Michael Asmussen.

3              By the way, your Honor, for the record, the deposition

4    that we just read from was taken on December 6, 2010, in

5    another matter.

6              THE COURT:  Very good.

7              I must say, you look just like Mr. McCoskey.

8              A VOICE:  Thank you, your Honor.

9              MR. EDERER:  This is the deposition of Mr. Asmussen

10   taken on November 16, 2010.

11             Michael Asmussen was called for examination by counsel

12   for Amazon.com and, after having been duly sworn by the notary

13   public, was examined and testified as follows.

14   "Q. Good morning, Mr. Asmussen?

15   "A. Good morning.

16   "Q. We have already been introduced off the record, but again,

17   my name is Ernie Shin.  I represent Amazon.com in this

18   litigation.  Do you understand that?

19   "A. Yes.

20   "Q. Sure.  You said that Skjei Telecom was tasked by Dorsey &

21   Whitney to apply for certain patents, is that right?

22   "A. Skjei Telecom was tasked to provide engineering support in

23   the area of a number of technologies, which ultimately -- and

24   contributed to a number of inventions that were ultimately

25   included in some patents that were filed by Dorsey & Whitney on

behalf of Discovery.

"Q. And was Skjei Telecom paid by Dorsey & Whitney for that work?

"A. Yes.

"Q. And did that work include the work that went into the '851 patent?

"A. Yes.

"Q. So is it your recollection that you were adding something to something that already existed?

"A. For the '851 patent?

"Q. Yes.  OK.  Can you recall, and I'm not asking for the substance of communications between you and the Dorsey & Whitney lawyers, but can you recall if your involvement in the '851 patent application was added on to something that was already there, in other words, that your contribution was on top of work that was already being done?

"A. My best recollection is that there were both clarifications to previous patents as well as new ideas that were part of the '851 patent.

"Q. New ideas that you came up with, is that your recollection?

"A. New ideas that we as a group may have come up with.  I don't recall specifically which ones I came up with.

"Q. Now, earlier, when we first mentioned the '851 patent, I think you'd mentioned that you had contributed encryption.  Is it your understanding that that was your contribution to what

1    ended up becoming the '851 patent application?

2    "A. As the patent title was focused on encryption, the

3    contributions were -- my contributions were, as I recall,

4    related to encryption and their application in ebook

5    technology.

6    "Q. Had you done any encryption work outside of the context of

7    working on these patent applications?

8    "A. Not related to this, no.

9    "Q. Well, related to that?

10   "A. With the security and encryption embedded in all

11   communications systems or many communications systems

12   throughout the course of working on other clients, I was

13   exposed to their systems, and they may have had an encryption

14   conditional access type technology.  That wasn't my area of

15   focus.  But being a system engineer, encryption may have been

16   one of the subsystems.

17   "Q. And as far as what the '851 patent actually invented, what

18   is your understanding of that?

19   "A. Having not reviewed the patent in over 10 or 11 years other

20   than just generally offering that it's the application of

21   encryption technology to the ebook arena, I really can't

22   comment on the specifics.

23   "Q. Are you aware of any electronic book readers that were

24   available prior to around the time they were working on the

25   '851 patent application?

1   "A. Repeat the question.

2   "Q. Do you recall any other electronic book readers, putting

3   aside anything that you or Discovery may have been working on,

4   that was available prior to or around the time of your work on

5   the '851 patent application?

6   "A. I was aware of the device called the Rocket eBook, but I

7   don't recall what time frame that was.

8   "Q. What was the Rocket eBook?

9   "A. It was an electronic book reader device that provided the

10  ability to read electronic versions of text.

11  "Q. What is the basis for your understanding of what the Rocket

12  eBook was?  Did you actually own one?

13  "A. I did not.

14  "Q. Do you recall what your basis is for understanding what it

15  is?

16  "A. I saw one once, handled one once.

17  "Q. And in what context?

18  "A. At one point one was given to me to play with.

19  "Q. Do you believe that you invented in the '851 patent

20  electronic book readers?

21  "A. I don't believe so.

22  "Q. Do you believe that you invented in the '851 patent the

23  transmission of electronic books?

24  "A. Without a more thorough review of this patent, since I

25  haven't seen it in 10 years, 11 years, I really can't answer

1    that question.

2    "Q. Do you believe that you invented with the '851 patent

3    encryption?

4    "A. I don't feel as if I invented encryption.

5    "Q. Do you feel that you invented with the '851 patent

6    encryption of electronic content or do you feel that was around

7    already?

8    "A. I don't feel that I invented it in the '851 patent.

9    "Q. Do you feel that you invented the use of encryption keys in

10   the '851 patent?

11   "A. Without thorough review of the '851 patent and the other

12   patents that led up to it, I don't feel like I can answer that

13   question.

14   "Q. So let me summarize the questions I think you did answer.

15   You did not invent electronic books, you did not invent

16   electronic book readers, you did not invent encryption, is that

17   correct?

18   "A. Yes, that's my testimony.

19   "Q. So what I'm trying to understand is this.  If electronic

20   book readers you did not invent and they were already known,

21   what was different about what you invented?  What is it that

22   the '851 patent actually invented?

23   "A. Again, without a much more thorough review of it and

24   comparing the other predecessor patents, I really don't feel

25   like I can specifically say that.

1   "Q. Are you familiar with something called a secure socket

2   layer?

3   "A. Only peripherally.  I know that there is an acronym for it.

4   "Q. What's the acronym?

5   "A. SSL.

6   "Q. Do you have an understanding of what that is?

7   "A. At this point in time, no.

8   "Q. You don't know what it's used for?

9   "A. I understand it's used for providing secure communications.

10  "Q. Between what and what?

11  "A. To the best of my knowledge, systems that are

12  communicating.

13  "Q. Communicating electronic data?

14  "A. To the best of my knowledge, I would say electronic data.

15  "Q. One more question about what you did or did not invent.  Do

16  you believe that you invented in the '851 patent selecting a

17  particular electronic file from a list of available electronic

18  files?

19  "A. Having not reviewed the document in 10 years, I don't

20  recall if that's one of the inventions in it or not.

21  "Q. Do you think that concept was around before you filed the

22  '851 patent?

23  "A. Repeat the previous.

24  "Q. Do you think the concept of selecting one electronic file

25  from a list of electronic files was around and known before

1    1999?

2    "A. I assume it was, but I don't know for sure.

3    "Q. Do you know if selecting something from a menu of options

4    was known and around before the filing of the '851 patent?

5    "A. I would have to say -- I would have to say yes.

6    "Q. You don't recall the gist of what was the purpose of their

7    hiring you?

8    "A. I recall the gist of it was to support evolving the

9    Discovery patent portfolio.

10   "Q. What do you mean by evolving?

11   "A. Increasing the scope of Discovery's patent portfolio.

12   "Q. Of their existing patent portfolio, is that correct?

13   "A. I don't know that it was limited to the existing patent

14   portfolio.

15   "Q. And to support in what particular way?

16   "A. To provide contributions to new patent filings and support

17   other activities related to understanding the technology

18   related to the patent portfolio.

19   "Q. What kind of contributions?

20   "A. Additional inventions related to some of the core areas

21   that Discovery had applications pending or in existence.

22   "Q. Dorsey & Whitney hired you to provide inventive content

23   regarding the '851 patent, correct?

24   "A. I don't remember the specific terms of the contract, but

25   certainly one of the activities I was involved in was providing

947

"Asmussen"

1    inventive content.

2    "Q. For the '851 patent?

3    "A. The '851 patent was one of the patents that I was involved

4    in.

5    "Q. Have you ever heard of a book called Applied Cryptography

6    written by Bruce Schneier?

7    "A. Yes, I have.

8    "Q. Are you familiar with that book?

9    "A. I've used it in the past.

10   "Q. For what purpose?

11   "A. For understanding technologies related to encryption.

12   "Q. Did you use that book in connection with your work on the

13   '851 patent?

14   "A. Yes, I did.

15   "Q. How did you use it?

16   "A. Without a more thorough review of this document, I have no

17   recollection of how I used it specifically.

18   "Q. What about generally?

19   "A. Generally, I used it to provide myself with more knowledge

20   in encryption.

21   "Q. Do you recall if you incorporated any aspects of that book

22   into the '851 patent?

23   "A. I recall incorporating aspects into the patent from that

24   book, but I don't recall the specific areas."

25            Your Honor, I believe that concludes the reading from

948

1    this deposition

2            THE COURT:  Do we have a third short one?  I think

3    there was one that was fairly short.  We don't have that?

4            MR. EDERER:  No.  Sorry, your Honor.

5            THE COURT:  That's all right.

6            You may step down, Mr. Witness, Mr. Witnesses.

7            Ladies and gentlemen, we are basically on schedule.  I

8    can't predict this for sure, but I think we are liable to

9    finish the evidence in this case and hear summations, closing

10   arguments, from counsel by sometime on Tuesday, and then the

11   case will be yours to deliberate.

12           On Monday I know there are things I'm going to have to

13   take up with counsel.  Why don't you come in at 9:30.  I think

14   we should be done by then, maybe.  9:30.  On Monday to we are

15   going to go to 4:30, but there may be a long lunch.  I'm going

16   to work this out over the weekend.  There is a half-hour matter

17   that I may have to take at 2 o'clock.  You may have from 1:00

18   to 2:30 for lunch.  Anyway, for your purpose we will start at

19   9:30 and go to 4:30 on Monday.

20           Have a very good weekend.  Don't think a bit about

21   this case.  When you are watching your favorite sporting event,

22   don't think, does this fit the 15 characteristics of

23   Georgia-Pacific?  That would be just ruinous.

24           Anyway, have a good weekend.  See you Monday.  Be sure

25   to leave your notes in the jury room.  We'll lock the jury

room.

                    (Jury not present)

          THE COURT:  On Monday we will have Mr. Neuman, who by

then I'm sure will be, what, 20 minutes.  Who do we have after

Mr. Neuman?

          MR. EDERER:  We have two other depositions, your

Honor, Ambwani and Rosenstock, and then our last witness would

be Mr. Barnes.

          THE COURT:  If for any reason you don't call Mr.

Barnes, then the plaintiffs can.  I wonder, if Mr. Wong is

still someone plaintiffs want to call or not?

          MR. CABRAL:  He is, your Honor, although we can agree

to limit his testimony.

          THE COURT:  Given that Mr. Neuman will be quite long,

and I appreciate that he may be very long and you won't mind if

I bring a pillow, it sounds like we won't finish the evidence

until some point maybe Tuesday morning.  We will still have

summations on Tuesday.  For example, if we finish at noon, we

will do summations at 2 o'clock, right after lunch.

          I will get you a proposed jury charge sometime.  I'll

probably email it to you on Sunday, late Sunday.  We'll have a

charging conference on Monday evening, so you will have plenty

of time to look at it.  I will get the remaining deposition

rulings by first thing Monday morning, so you will have them

then.

 1                    Anything else we need to take up?

 2            MR. CABRAL:  Your Honor, there is one issue regarding

 3     not all the slides for Dr. Neuman's testimony but only some of

 4     them.  This relates to a motion in limine that has been pending

 5     and discussed throughout the case actually relating to certain

 6     experiments that he did regarding the use of the Barnes & Noble

 7     website to show the lending period and how it's different from

 8     when you use the lending period on the Nook device, which is

 9     really what is at issue in this case.  There is quite a lengthy

10     number of slides here, which may shorten his testimony if it is

11     excluded.  We believe this relates to noninfringing modes of

12     operation and is completely irrelevant to the issue of

13     infringement.

14            MR. SHARIFAHMADIAN:  Regarding the number of slides,

15     we will be cutting that down considerably.  But the issue in

16     this case, and there has been a lot of testimony on this but

17     Mr. Berg basically disputes it, is whether the acceptance of

18     the loan, the setting and starting of the time, and then the

19     storing of the book on the device is one operation, atomic as

20     you would say or as one would say, or whether there are

21     distinct operations.

22            Dr. Neuman has performed several experiments, we won't

23     be showing all of them, that actually clarifies that these are

24     distinct operations.  This goes to (a) literal infringement as

25     to whether it's one operation and when the beginning of the

 1    time starts or the running of the time starts as compared to

 2    storage on the device, and, second, your Honor has ruled that

 3    the doctrine of equivalents is an issue in this case.  It

 4    certainly goes to that and whether the manner in which our Lend

 5    Me system works is substantially different.

 6            THE COURT:  I haven't said it is precluded by

 7    prosecution history or whatever.  Whether there is still enough

 8    to make it an issue is a separate question, of course.

 9            MR. SHARIFAHMADIAN:  Certainly, if we were to have our

10    other witness today, we would have argued substantial

11    difference.  But Mr. Berg did offer an opinion regarding

12    whether the differences are substantial or not, and we believe

13    we are entitled to rebut that.

14            THE COURT:  Yes.  What about that?

15            MR. CABRAL:  Your Honor, that's fine.  The issue is

16    for purposes of infringement the only thing that we have

17    accused in this case is accepting a loan offer on a Nook

18    device.  In the summary judgment briefing we made abundantly

19    clear -- they moved for summary judgment regarding the website

20    and the app.  In response to that, we said are not accusing

21    those products in this case.  You granted summary judgment of

22    noninfringement regarding the website and the app.

23            These experiments relate to accepting a loan offer

24    through the website and through the application.  The issues

25    are not relevant to infringement using the lending feature on

1    the Nook device, and that's all this case is about.  Under

2    that, we think it's prejudicial.  Under rule 403 we think it is

3    a waste of time, which is not my language, that is actually out

4    of the rule, and we think it is confusing to the jury.

5          MR. SHARIFAHMADIAN:  Your Honor, it is not confusing

6    to the jury.  The central point here is, is this one operation

7    or are these distinct operations?  While I can understand why

8    ADREA may want to exclude this evidence, it directly goes to

9    that point and it shows that these are two different

10   operations.  That's what it goes to.  It also goes to the

11   substantiality of the difference between the manner in which

12   our Lend Me system works and the manner in which the patent

13   claims are stated.

14         MR. CABRAL:  To be clear, your Honor, the doctrine of

15   equivalents issue relates to how long it takes when you accept

16   the loan offer on the Nook for it to be downloaded automatic-

17   ally to the Nook and whether that 2- to 4-second difference is

18   a substantial difference.  That is the doctrine of equivalents

19   issue.  That does not relate to the operation of the Lend Me

20   feature by accepting loan on a website or some Windows 8

21   application or other things that are not at issue in the case.

22         MR. SHARIFAHMADIAN:  Certainly, counsel had a

23   mischaracterization of what the doctrine of equivalents issue

24   is.  But the issue here is our system is fundamentally

25   different.  It performs a different function, gets a different

1    result in a different way than what the claims require.  The

2    claims are tied to storage on the device, and the running is

3    based off of that.

4         Our system is fundamentally different.  It is not

5    based on storage on the device.  As a result of that, it allows

6    you to have a single time limit across multiple platforms.  It

7    works fundamentally differently.  While counsel may want to

8    focus on the 3-second difference, the issue here is that in our

9    system the time is completely unrelated to when the book is

10   stored on the device, and this is what the testimony will

11   demonstrate.

12        MR. CABRAL:  That is the issue, your Honor.  The claim

13   element at issue here is when the book is stored on the viewer.

14   Accepting a lending offer from a website has nothing to do with

15   accepting a lend offer on the viewer.  It is not my

16   characterization of the doctrine of equivalents argument.

17        That is what Mr. Berg testified to.  That's the

18   evidence in the record relating to the doctrine of equivalents.

19   That's what we are talking about, that 2- to 4-second

20   difference between accepting on the device and having the

21   download come down to the device, not with the website, not

22   with an application or anything along those lines, which would

23   be nonaccused modes of operation.

24        The case law is pretty clear that you can't rely and

25   use that as a distraction to direct the jury's attention away

 1     from what really matters in this case, which is the accused

 2     devices, the Nook devices.

 3          MR. SHARIFAHMADIAN:  Your Honor, the experiments also

 4     demonstrate exactly how the Nook devices work.  The experiments

 5     demonstrate that the time does not begin and it is not tied to

 6     when the book is stored on the device.  It will be directly

 7     relevant to that issue, which is what ADREA says the issue is

 8     here.  The experiments will demonstrate that the start of the

 9     time is completely unrelated to when the book is stored on the

10     device, which is the heart of the claim according to ADREA.

11          MR. CABRAL:  Your Honor, finally, there are 24 slides

12     here with four different experiments.  This is clearly an

13     attempt to distract attention away from an otherwise non-

14     existent noninfringement defense for the Lend Me feature as it

15     exists and as it operates on the Nook devices themselves, which

16     again is the only issue relevant to infringement in this case.

17          THE COURT:  Let me see the slides.  I'm not sure it

18     will add anything, but let me see them anyway.

19          MR. SHARIFAHMADIAN:  Your Honor, in the interest of

20     full disclosure, we have given them more slides than we plan to

21     use.  Frankly, given the time constraints in this case, it will

22     probably only be experiment one that will be demonstrated.

23          THE COURT:  That's very helpful.  I will reflect on

24     this and email you my ruling by sometime this evening so you

25     will know it well in advance of when Mr. Neuman takes the

1    stand.

2         MR. CABRAL:  Again, your Honor, the case law I have

3    referenced is cited in our motion in limine papers.

4         THE COURT:  I'll go back and take a look at that.

5         MR. CABRAL:  Thank you.

6         THE COURT:  Thanks very much.  Have a good weekend.

7         (Adjourned to 9:00 a.m., October 18, 2014)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                    Page

STEPHEN MAGEE

    Direct By Mr. Cox . . . . . . . . . . . . 830
    Cross By Mr. Ederer . . . . . . . . . . . 876


DEFENDANT EXHIBITS

Exhibit No.                              Received

219   . . . . . . . . . . . . . . . . . . . 931


JOINT EXHIBITS

Exhibit No.                              Received

20 and 34 . . . . . . . . . . . . . . . .  872