```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   ADREA, LLC,

 4                    Plaintiff,

 5          v.                             13 Cv. 4137 (JSR)

 6   BARNES & NOBLE, INC.,
     BARNESANDNOBLE.COM LLC, AND
 7   NOOK MEDIA LLC,

 8                    Defendants.

 9   ------------------------------x

10                                         October 20, 2014
                                           10:05 a.m.
11
     Before:
12                       HON. JED S. RAKOFF

13                                         District Judge

14                            APPEARANCES

15   PROSKAUER ROSE LLP
          Attorneys for Plaintiff
16   BY:  STEVEN M. BAUER
          COLIN CABRAL
17        BRENDAN COX

18   ARNOLD & PORTER LLP
          Attorneys for Defendants
19   BY:  LOUIS S. EDERER
          ALI R. SHARIFAHMADIAN
20        MICHAEL A. BERTA
          SUSAN LEE SHIN
21        YUE-HAN CHOW
          TERI RODRIGUEZ

22

23

24

25
```

1          (Trial resumed; jury not present)

2          THE COURT:  Good morning.  Let me hand to counsel my

3   rulings on the remaining two depositions.  You have my draft

4   charge, my draft verdict form.  We will have a charging

5   conference at 4:30 today.

6          Let's bring in the jury.

7          (Jury present)

8          THE COURT:  Good morning, ladies and gentlemen.  I

9   hope you had a good weekend.  I'm so old I can actually

10  remember when New York football teams were capable of winning a

11  game.  Anyway, we are, as you would expect, right on schedule.

12  We are ready to begin.

13         Counsel.

14         MR. SHARIFAHMADIAN:  The defense calls Dr. Clifford

15  Neuman, your Honor.

16   CLIFFORD NEUMAN,

17      called as a witness by the defendant,

18      having been duly sworn, testified as follows:

19         THE WITNESS:  Clifford Neuman.  C-L-I-F-F-O-R-D,

20  N-E-U-M-A-N.

21         MR. SHARIFAHMADIAN:  Your Honor, may I approach?

22         THE COURT:  Yes.

23  DIRECT EXAMINATION

24  BY MR. SHARIFAHMADIAN:

25  Q.  Good morning, sir.

1    A.   Good morning.

2    Q.   Would you please state your name for the record?

3    A.   Clifford Neuman.

4    Q.   Could you please tell us a little bit about your

5    educational background.

6    A.   Yes.  I have a Bachelor's degree in computer science from

7    MIT, and I have Master's and Ph.D degrees also in computer

8    science from the University of Washington.

9    Q.   Who is your current employer?

10   A.   I currently work for the University of Southern California.

11   Q.   What do you do there?

12   A.   I have several roles there.  I'm a faculty member in the

13   computer scenes department, where I teach several classes.  I

14   am also a researcher in the computer networks division at the

15   Information Sciences Institute, which is a department in the

16   school of engineering at USC.  I am director of USC's Center

17   for Computer System Security.

18   Q.   What is the Center for Computer System Security?

19   A.   The Center for Computer System Security is academic center

20   that brings together faculty and researchers at USC that are

21   conducting work in computer security.  It also plays a role in

22   the development of the computer security curriculum at USC.

23   Q.   What is the Information Sciences Institute?

24   A.   As I just mentioned, the Information Sciences Institute is

25   a department in the school of engineering at USC.  ISI, as it's

1    called in short, in general conducts research in computer

2    science, and in particular the division that I work with at ISI

3    conducts research in computer networks and in computer

4    security.

5    Q.  As a faculty member, in what areas do you teach?

6    A.  I teach primarily in two areas.  One is distributed

7    computer systems.  These are systems for managing and

8    retrieving information on the Internet.  I also teach in the

9    area of computer security.

10   Q.  In what areas do you focus your research?

11   A.  My research is focused in similar areas.  I have done a lot

12   of work in the past on managing information on the Internet,

13   and a lot of my work also is in the areas of computer security

14   and protecting that information.

15   Q.  Have you developed any practical computer products?

16   A.  I have been involved in several practical computer

17   products, one of which was what is known as the Kerberos

18   authentication system.  This is a system that is used to

19   identify the identity of users over the Internet.  In fact, it

20   is part of most Windows systems, it is part of most Apple

21   systems, Linux and UNIX systems, so it is very widely used.

22            I have also developed information retrieval systems as

23   part of my dissertation at the University of Washington.  I

24   developed a system calls Prospero, which is for processing,

25   storing, and managing information over the Internet.  The

1    software that I developed in that instance ended up being used

2    as part of America Online's gateway to the Internet in the

3    early 1990s.

4    Q.  Are you a member of any industry or trade association?

5    A.  Yes, I am.  I am a member of the IEEE.  That is the

6    Institute for Electrical and Electronics Engineers.  I am a

7    senior member in that organization.  I am a member of the

8    Association for Computer Machinery.  I'm a member of the

9    Internet Society and of the USENIX Association.  I also am a

10   member of research organization that is part or of that is

11   managed by the Internet Society called the Internet Engineering

12   Task Force, which is involved in developing the standards for

13   communicating, for managing, and protecting information on the

14   Internet.

15   Q.  Have you authored any papers or books in your time in the

16   field?

17   A.  Yes, many.  I've got over 60 --

18              MR. CABRAL:  Objection, your Honor.

19              THE COURT:  Ground?

20              MR. CABRAL:  It's a yes-or-no question.

21              THE COURT:  Anyway, he has written a lot of stuff.

22   Let's move on.

23   Q.  Have you won any awards related to your work?

24   A.  Yes, I have.

25   Q.  What have you won?

A.  I received an award from the USENIX Association for my

contributions to the Kerberos authentication system that I

already mentioned.  In the early 2000s I was named one of Info

World's top ten technology innovators.  I also received an

award from DARPA, the Defense Advanced Research Projects

Agency, for excellence in academic research.

Q.  What do you understand your role to be in this case, sir?

A.  I understand my role to be providing my independent

opinions of the patents in the accused products.

Q.  On what were you asked to opine?

A.  I was asked to provide an opinion on infringement and on

validity of the -- well, on infringement of the accused

products and validity of the asserted patents.

Q.  Is that with respect to all the asserted patents?

A.  That is with respect to all three of the asserted patents.

Q.  Who retained you?

A.  I was retained by Arnold & Porter on behalf of Barnes &

Noble.

Q.  Are you compensated for your time in this case?

A.  Yes, I am.

Q.  How much?

A.  I am being paid $600 an hour plus reasonable expenses.

Q.  Other than your role in this case, do you have any previous

or current association with Barnes & Noble?

A.  Other than occasionally purchasing a book from them, no, I

1    do not.

2    Q.  Do you have any prior or current association with the

3    plaintiff, ADREA?

4    A.  No, I do not.

5    Q.  What materials did you review to form your opinions in this

6    case, sir?

7    A.  Among other things, I reviewed the asserted patents, I

8    reviewed the accused devices, I reviewed documentation around

9    those devices, I reviewed deposition testimony and other

10   materials that were submitted by the various parties.  I

11   reviewed source code.  I relied on my own experience, the

12   experience that I just went through.

13   Q.  You mentioned source code, sir.  What do you mean by source

14   code?

15   A.  Source code are the human-readable instructions that

16   describe how a program or a system implements a particular

17   function or performs a particular function.

18   Q.  What source code did you review?

19   A.  I reviewed source code for the accused Nook devices.  I

20   also reviewed source code for the server infrastructure into

21   which those devices connect.

22   Q.  Did you review the file histories of the three patents at

23   suit in this case, the '703, '501, and '851 patents?

24   A.  I did review the file histories of those three patents.

25           MR. SHARIFAHMADIAN:  Your Honor, those file histories

Faksadri                          Neuman - direct

1    are JPX-s, and we would like to move them into evidence, JPX-4,

2    5, and 6.

3             THE COURT:  Any objection?  I'm sorry.  You said those

4    are joint exhibits?

5             MR. SHARIFAHMADIAN:  Yes.

6             THE COURT:  Those are received.

7             (Joint Exhibits 4, 5, and 6 received in evidence)

8    Q.  Did you review the Court's claim construction in forming

9    your opinion, sir?

10   A.  Yes, I did review the Court's claim construction.

11   Q.  Can we show the claim construction.  Are these the claim

12   constructions that you reviewed shown on DDX-1005?

13   A.  Yes, these are the claim constructions that I reviewed.

14            THE COURT:  I think this is already clear to the jury,

15   but just so that you are crystal clear on this, each of the

16   patents, the three patent involved in this case, has certain

17   claims.  These are in Joint Exhibits 1, 2, and 3, which you

18   will see some more when you start your deliberations.

19            A claim is the way a patent is expressed.  The

20   inventor says, I claim a device that does X in the following

21   way, I claim a method that does Y in the following way.  What

22   they are claiming, in effect, is that they have something new

23   and it is entitled therefore to patent protection.

24            When you get to deciding whether or not there has been

25   infringement in this case, you won't be looking at the entire

1   patents, because the assertion here by the plaintiff is that

2   particular claims were infringed.  You will be focused on those

3   particular claims, and we will specify all those for you.  What

4   you will do is you will look at the claims and then you will

5   see whether or not the Nook devices do in fact infringe those

6   claims or not.

7          In those claims there will be some words that are just

8   everyday words, but there will be some words that have a

9   specialized meaning.  Where the parties are not in agreement as

10  to what that specialized meaning is, it is my job to figure it

11  out.  I can't tell you how thrilling this is.  What that is

12  called is claim construction, meaning I have decided what is

13  the meaning of those words, and that is binding on you, it is

14  binding on the parties.  It is even binding on my wife and

15  daughters, which very few things are.

16         In any event, that's what claim construction is all

17  about.  Go ahead, counsel.

18         MR. SHARIFAHMADIAN:  Thank you, your Honor.

19  BY MR. SHARIFAHMADIAN:

20  Q.  To close the loop, Dr. Neuman, did you apply the Court's

21  claim construction when formulating your opinions?

22  A.  Yes, I did.

23  Q.  From what perspective did you review and analyze the

24  asserted patents in this case?

25  A.  I reviewed and analyzed the asserted patents from the

perspective of one of ordinary skill in the art at the time

that the patents were filed.

Q.   In your opinion, who is a person of ordinary skill in the

art with respect to these patents?

A.   In my opinion, a person of ordinary skill in the art with

respect to these patents would be an individual, a professional

or an engineer, holding at least a Bachelor's or an advanced

degree in computer science or a related discipline, and they

would further have about two years or more of experience

working in the area of system design or system development.

They would also have an understanding of basic computer

security techniques.

Q.   Did you meet the qualifications of a person of ordinary

skill in the art in 2000?

A.   I did.

Q.   Did you meet the qualifications of a person of ordinary

skill in the art in 1994?

A.   I did.

Q.   What products do you understand ADREA to be accusing of

infringement in this case?

A.   I understand ADREA to be accusing of infringement certain

Nook devices and certain functionality of those devices and of

cloud infrastructure or infrastructure that is supporting these

devices.

Q.   I am going to take this patent by patent.  We will talk

Fakrad21                      Neumann - direct

1    about infringement and validity issues with respect to a

2    patent, and then we will move to the next patent.

3         THE COURT:  Let me interrupt one more time just to

4    finish off on claim construction.  To give you an example, if

5    you look at the screen there, you will see "consumer appliance"

6    is defined as "a device that may send or receive information."

7    In everyday language "consumer appliance" could be lots of

8    other things:  A blender.  But we are talking here in the

9    context of these Nook type devices.  In that context it means a

10   device that may send or receive information.  You see why

11   everyday words will sometimes have a specialized meaning

12   because of the context.

13        OK, counsel.

14   Q.  Let's start with the '703 patent, sir.  Generally speaking,

15   what is the '703 patent directed to?

16   A.  The '703 patent is directed to a method through which

17   consumer appliances or through which appliances are able to

18   initiate access to the Internet in order to retrieve

19   information about their context of usage.  It also talks about

20   how they accomplish this connection through, for example, a

21   home network.

22   Q.  What are some of the examples that are given in the '703

23   patent of this idea?

24   A.  Two examples that are given in the '703 patent.  One is a

25   garbage can and another is a blender.

1  Q.  What do you understand ADREA to be accusing of infringement

2  of the '703 patent?

3  A.  My understanding is that ADREA is accusing the shop

4  application of the Barnes & Noble devices as infringing these

5  claims.

6  Q.  Is the '703 patent directed to pressing a button to perform

7  online shopping?

8  A.  No, it is not.

9  Q.  What is it directed to?

10  A.  It is directed to pressing a button to retrieve information

11  about the context of usage of the particular appliance.

12  Q.  What are some of the examples of context of usage

13  information that is given in the patent?

14  A.  I gave you two examples of devices.  Let's take each of

15  those in turn.  One example I gave you is a garbage can.  An

16  example of context of usage for a garbage can would be garbage

17  pickup schedules in one's community, for example.  The other

18  example I gave was a blender.  An example of context of usage

19  information for the blender would be recipes that one might

20  prepare using the blender.

21  Q.  Do you have an understanding of how the shop application

22  works?

23  A.  I do have an understanding.

24  Q.  How did you gain that understanding?

25  A.  I gained that understanding by using the shop application

1   on Nook devices, by reviewing documentation, among other

2   things.

3   Q.   Did you review source code?

4   A.   I did review source code.

5   Q.   In forming your opinions, did you review a report that Mr.

6   Berg prepared and some analysis that he did in connection with

7   this case?

8   A.   Yes, I did review Mr. Berg's report.

9   Q.   What happens when someone selects the shop icon on a Nook

10  device?

11  A.   When someone selects the shop icon on a Nook device, the

12  first thing that happens is they access the shop application on

13  the Nook.

14  Q.   What happens when the shop application is accessed?

15  A.   When the shop application is accessed, it connects to the

16  Barnes & Noble web, where it retrieves the storefront, a web

17  page for the storefront of the Barnes & Noble shop.

18  Q.   What can users do when that storefront is retrieved?

19  A.   When that storefront is retrieved, users are able to browse

20  through the shop, they are able to press buttons, they are able

21  to search for books that might be available for purchase, they

22  are able to browse through the shop.

23  Q.   Let's take a look at claim 1 of the '703 patent, which is

24  one of the asserted claims here.  Do you have an opinion as to

25  whether the accused Nook devices and the shop functionality

Fakradin1                Neuman          direct

1   meet all elements of claim 1, sir?

2   A.   I do have an opinion.

3   Q.   What is your opinion?

4   A.   My opinion is that the accused shop functionality does not

5   meet all the elements of claim 1 of this patent.

6   Q.   Let's take this step by step.  Let's start with the

7   limitation toward the bottom which says, "wherein the consumer

8   appliance does not require a user to access a web browser or

9   other device in order for the consumer appliance to initiate

10  retrieval of the data."  Do you see that, sir?

11  A.   I do see that.

12  Q.   In your opinion, does the shop application in the accused

13  Nook devices meet this element?

14  A.   In my opinion, the shop application does not meet this

15  element.

16  Q.   Why do you say that?

17  A.   Because this element requires that the user -- more

18  precisely, it requires that the user does not access a web

19  browser or other device in order for the consumer appliance to

20  initiate retrieval of the data.  In my opinion, the shop

21  application is a web browser.

22  Q.   You mentioned that you reviewed some analysis performed by

23  Mr. Berg as part of his work in this case.  Did that include

24  some man-in-the-middle analysis that he performed?

25  A.   Yes.  That included review of the man-in-the-middle

1    analysis that Mr. Berg performed.

2    Q.   Quickly again, what is a man-in-the-middle analysis?

3    A.   A man-in-the-middle analysis, one inserts something into

4    the communicate path between a client device and a server, and

5    one is able to view the information that is being exchanged

6    between those parties.

7    Q.   Did you review the data that Mr. Berg generated as a result

8    of this analysis?

9    A.   I did review the data that he generated.

10   Q.   What did it show regarding whether the Nook devices

11   communicate with the B&N cloud?

12   A.   It shows that the Nook devices were communicating with the

13   B&N cloud.

14   Q.   How did that communicate with the B&N cloud?

15   A.   They communicated using a protocol called HTTP, which means

16   Hypertext Transfer Protocol.

17   Q.   What is it exactly?

18   A.   HTTP is a protocol that was created for the World Wide Web

19   for a browser to communicate with a web server.

20   Q.   What type of information did you observe that the shop

21   application received from the B&N cloud?

22   A.   The shop application was receiving various information.

23   Among that included style sheets.  But most of the content was

24   represented as HTML.

25           MR. CABRAL:  Objection, your Honor:  Scope.

1          THE COURT:  Overruled.

2   Q.  What is HTML?

3   A.  HTML is the HyperText Markup Language, which is the way

4   that you represent content that will be displayed of web pages

5   by a web browser.

6   Q.  What does the shop application do with the HTML it

7   receives?

8   A.  The shop application does what is known as rendering the

9   HTML.  Rendering the HTML is displaying it in a navigable form

10  that we are all used to as the way one navigates web pages.

11  Q.  Once the shop application retrieves and renders this HTML,

12  what can a user do then?

13  A.  Once it's been rendered to the user, the user is able to

14  continue to browse the shop, go from one page to another, enter

15  information in search boxes, perform those things that we do

16  with web browsers.

17  Q.  How do you know that?

18  A.  I know this because I used the shop application and I also

19  reviewed the source code to see what could be done.

20  Q.  Does the shop application identify itself to the servers

21  from which it is getting information?

22  A.  Yes, it does.

23  Q.  How does it do that?

24  A.  It does that by in the HTTP protocol which I just

25  described, the messages it is sending up, there is a field in

1    that that describes the user agent.

2    Q.   What is the user agent here, sir?

3    A.   The user agent is a field that tells the server what it is

4    that is requesting the pages.

5    Q.   Did you observe the user agent field that the shop

6    application was actually sending?

7    A.   Yes, I did observe.

8    Q.   What did it show you?

9    A.   It showed me that it was sending the value Mozilla slash 5

10   point, a bunch of other information.  Also in that string it

11   included Safari.

12   Q.   Let's take a look at in your binder PTX-076-B, which has

13   already been admitted into evidence in this case.  Do you have

14   that, sir?

15   A.   What is the number again, please?  076-B, yes, I have that

16   right here.

17   Q.   Is this a portion of the data that you looked at?

18   A.   Yes, this is a portion of the data that I looked at.

19   Q.   What are we looking at here, sir?  It's very small type.  I

20   apologize.

21   A.   Unfortunately, it is even smaller in here.  What we are

22   looking at is some of the header information that is being sent

23   in the HTTP request.  In particular, we see here in about the

24   middle near the bottom -- you have to scroll up -- scroll down,

25   sorry.  You've got to see further.  That's making it even

1  worse.  If you can blow up on the top box there.  That's

2  perfect.

3         We see the user agent field.  There the user agent

4  says, as I just, said Mozilla 5.0, other information about the

5  operating system, Linux, Android, Nook.  We also see Apple Web

6  Kit, HTML.  That's the information that is in the user agent

7  field.

8  Q.  What does the information like Mozilla --

9  A.  Safari.

10  Q.  -- and Safari mean?

11  A.  That information is how the shop application is identifying

12  itself to the Barnes & Noble server as a web browser.

13  Q.  In your opinion, would a person of ordinary skill in the

14  art consider the shop application to be a web browser?

15  A.  Yes, in my opinion, a person of ordinary skill in the art

16  would consider the shop application to be a web browser.

17  Q.  Why?

18  A.  Because the shop application acts like a web browser.  It

19  does the things that we would expect a web browser to do.  The

20  shop application as we see here identifies itself as a web

21  browser.  And with those, it is clear that the shop

22  application, to me, is a web browser.

23  Q.  Let's put back up claim 1, please, and let's focus on the

24  part of the claim that states, "initiating retrieval of data by

25  the consumer appliance from a server."

1  A.  I see that.

2  Q.  Then it goes on to say, "based on a predetermined URL or an

3  identifier associated with the consumer appliance," do you see

4  that?

5  A.  I see that.

6  Q.  Before we get into the specifics, this says, "a predeter-

7  mined URL or an identifier associated with the consumer

8  appliance."  How do you read that?

9  A.  I read that as you need to meet one of these two things in

10  order to meet the element of this claim, and those two things

11  are a predetermined URL associated with the consumer appliance

12  or, in the alternative, an identifier associated with the

13  consumer appliance.

14  Q.  Let's focus on the predetermined URL associated with the

15  consumer appliance.  You testified that the shop application

16  connected to the B&N cloud and retrieved the shop storefront.

17  Does that mean that the shop is connected to a server?

18  A.  Yes, that means that the shop is connecting to a server.

19  Q.  Is the shop application on each of the accused Nook devices

20  connecting to the same server in the B&N cloud?

21  A.  With the exception of the Nook classic, all the other

22  devices are connecting to the same server.

23  Q.  Let's set aside the Nook classic for a moment.  The server

24  in the B&N cloud to which the accused Nook devices are

25  connecting, does that have a name?

 1   A.  I have heard it referred to as the GPB command server.

 2   Q.  What does GPB stand for?

 3   A.  GPB stands for Google protocol buffer.

 4   Q.  How does the accused application on the accused Nook

 5   devices locate that server?

 6   A.  It locates that server using a URL.

 7   Q.  What is a URL?

 8   A.  A URL is a uniform resource locater which describes the

 9   address at which particular content may retrieved or may be

10   initially contacted.

11   Q.  What is an example of a URL?

12   A.  An example of a URL would be CNN.com, for example.

13   Q.  Other than the Nook classic, do you know what URL the

14   accused Nook devices are using to actually contact the GPB

15   command server?

16   A.  Yes, I do.

17   Q.  What is the URL?

18   A.  It's a URL that starts bncs.barnesandnoble.com and then a

19   slash and some other information at the end.  That's how it

20   starts.

21   Q.  What, if anything, is that URL associated with, sir?

22   A.  That URL is associated with the GPB command server, with

23   the server.

24   Q.  Why do you say that?

25   A.  I say that because what it is referring to is the end point

1    of the connection, where you are actually going to.

2    Q.  Is that the address of the GPB command, sir?

3    A.  That is the GPB command server and the particular interface

4    on that server.

5    Q.  Are the Nook devices the only types of devices that connect

6    to that GPB command server at that URL?

7    A.  No, not only the Nook devices.

8    Q.  What else connects?

9    A.  The Nook applications also connect to the GPB command

10   server at that URL.

11   Q.  This URL for the GPB command server, that is stored on the

12   accused Nook devices, isn't that right?

13   A.  Yes, it is stored on the accused Nook devices.

14   Q.  So, why do you say that it is not associated with the Nook

15   devices?

16   A.  Because --

17            MR. CABRAL:  Objection, your Honor.  Can we approach?

18            THE COURT:  All right.

19            (Continued on next page)

20

21

22

23

24

25

1           (At the side bar)

2           MR. CABRAL:  Your Honor, this relates to our motion in

3    limine number one, which you deferred to the point where it

4    would come up in the trial.  This is that point.  The testimony

5    that he is about to give is that he doesn't believe that the

6    Nook devices infringe because it is not associated with a

7    particular URL.  I think your Honor's claim construction, which

8    I have right here, particularly the construction predetermined

9    URL associated with a consumer appliance, in your order you

10   wrote that Barnes & Noble proposed adding the modifier

11   "particularly."

12           THE COURT:  Let me see that.

13           MR. CABRAL:  Sure.  Your Honor, we think that --

14           THE COURT:  Hold on.  Is he going to give the

15   testimony --

16           MR. SHARIFAHMADIAN:  He is not going to say it is

17   associated with a particular URL.  He is going to say it is the

18   address of the GPB command server and therefore it is

19   associated with the GPB command server.

20           THE COURT:  What's the difference?

21           MR. SHARIFAHMADIAN:  The difference is that the

22   analogy that he is going to give is just because it is stored

23   on a device doesn't mean it is associated with the device.  For

24   example, if you write down somebody's address in your notebook,

25   the address is still associated with the person, it is not

Fakradin1                    Neuman - direct

1   associated with the notebook.  That's what he is going to say.

2           MR. CABRAL:  The argument is, I don't know how he

3   knows what the witness is going to say, first of all --

4           THE COURT:  Come on.  Of course you know how he knows

5   what the witness is going to say.  Did you not prepare your

6   witness?

7           MR. CABRAL:  Well, I didn't exactly what the witness

8   was going to say.  But I agree with you.

9           THE COURT:  If he says something different, I'll deal

10  with it then.  Otherwise, we would never have side bars, which

11  of course would be of great benefit to all concerned.

12          MR. CABRAL:  Absolutely.  I think the thrust of the

13  argument is that the Nook devices do not infringe because not

14  only do the devices have the CRO but also the applications.  By

15  not having a particular association with a particular device,

16  that is essentially a noninfringement defense.

17          MR. SHARIFAHMADIAN:  We are entitled to put on a

18  noninfringement defense, your Honor.  That's what plaintiff's

19  expert did.

20          MR. CABRAL:  As long as it is not inconsistent with

21  your Honor's claim construction.

22          MR. SHARIFAHMADIAN:  It is not inconsistent.  Your

23  Honor did not construe that, and said it is subject to the

24  understanding of a person of ordinary skill in the art, which

25  Dr. Neuman has been established to be.  He is not going to say

1    it is associated with a particular device.  He is going to say

2    it is the address of the GPB command server, it identifies that

3    command server to the world.  Merely storing is not

4    association.

5              THE COURT:  I think it really is a disguised way

6    around my ruling.  Sustained.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1             (In open court)

2  Q.  Let's move on and focus at the next portion of the claim,

3  the identifier associated with the consumer device.

4  A.  OK.

5  Q.  You said you reviewed Mr. Berg's man-in-the-middle

6  analysis.  That was with respect to the Nook HD and HD+,

7  correct?

8  A.  Yes, that was his analysis with respect to the Nook HD and

9  HD+.

10  Q.  Did he do an analysis with respect to any other Nook

11  devices?

12  A.  I did not see an analysis with respect to other devices.

13  Q.  Did that analysis show an identifier being sent from the

14  accused Nook devices or the Nook HD and HD+ to the B&N cloud?

15  A.  Yes, it did.

16  Q.  What did it show?

17  A.  In the header of the message it showed a model number, and

18  in the body of the message it showed a device ID that was being

19  sent.

20  Q.  What did the response of the server show?

21  A.  The response of the server included the device ID.

22  Q.  Did it include the model number?

23  A.  I did not see the model number in the response.

24  Q.  What, if anything, does the man-in-the-middle analysis tell

25  a person regarding how these identifiers are used by the

1    server?

2    A.   It doesn't show how they are used.  It simply shows what is

3    being sent to and retrieved back from the server.

4    Q.   Have you formed an opinion with respect to whether claims 2

5    and 3, which are dependent from claim 1, are met by the accused

6    shop functionality on the Nook devices?

7    A.   Yes, I have opinions.

8    Q.   What are your opinions?

9    A.   My opinion is they do not infringe for the same reasons

10   that I have already described with respect to claim 1.

11   Q.   Why is that exactly?

12   A.   That is because they are dependent claims.  In order to

13   infringe a dependent claim, you have to infringe all of the

14   elements of the claim on which they depend.  I have already

15   performed my analysis that shows that it did not meet all those

16   limitations of the claim on which they depended; therefore, it

17   does not infringe the dependent claim.

18   Q.   Let's turn to claim 13, which is a method claim.  Do you

19   have an opinion as to whether B&N performs all the steps of

20   claim 13, sir?

21   A.   Yes, I have an opinion.

22   Q.   What is your opinion?

23   A.   My opinion is that Barnes & Noble is not performing all the

24   steps of claim 13.

25   Q.   Let's focus on the portion of the claim that says,

1    "enabling the user by a single user input to the consumer

2    appliance to have the consumer appliance initiate sending a

3    request with the identifier representative of a type of the

4    consumer appliance to a server on the Internet through the home

5    network."  Do you see that, sir?

6    A.  I do see that.

7    Q.  In your opinion, does B&N perform this step?

8    A.  In my opinion, Barnes & Noble does not perform this step.

9    Q.  When you buy a book -- excuse me.  When you buy a Nook

10   device, is it required to connect to a home network?

11   A.  No, it is not.

12   Q.  Let's say you went out and bought a Nook device.  What

13   would you have to do to enable it to have the shop application

14   retrieve data from the B&N cloud?

15   A.  I would need to perform initial configuration.  I would

16   need then to associate it with my home network, which would

17   involve selecting the home network, entering a password for the

18   home network if that was needed.  I would need to register it

19   with Barnes & Noble, which would involve entering my username

20   with Barnes & Noble and my password associated with that

21   account.  I would then need to navigate through several screens

22   to get to the one that displayed the icon for the shop

23   application.  And then finally I would access the shop

24   application.

25   Q.  Is it possible for the shop application to initiate sending

Eakradia1                    Neuman    direct

1   your request over a home network without someone having to

2   configure the Nook device to access a wireless network?

3   A.  No, it is not.

4   Q.  If the Nook device is ever configured to connect to a home

5   network, who is it that configures the device to do so?

6           MR. CABRAL:  Objection, your Honor.  This is outside

7   the scope of the expert report.

8           THE COURT:  I'm not sure I understand the question, at

9   least as the reporter has it here.  Maybe it needs to be

10  rephrased.  The question as the reporter has it is, quote, "If

11  the Nook is ever configured to connect to a home network, who

12  is it that configuration the device to do so?"

13          MR. SHARIFAHMADIAN:  It is who is it that configures

14  the device to do so.

15          THE COURT:  I see.

16          MR. SHARIFAHMADIAN:  I have 132, your Honor.  I can

17  hand it up.

18          THE COURT:  Yes, let me see that.

19          MR. CABRAL:  Your Honor, paragraph 132 relates to

20  claim 2.

21          THE COURT:  No, I don't want an argument in front of

22  the jury.

23          MR. SHARIFAHMADIAN:  We can explain, your Honor.

24          THE COURT:  Let me take a look.  Overruled.

25  Q.  Do you need me to repeat the question?

1   A.  Yes, sir, please repeat the question.

2   Q.  If the accused Nook devices are ever configured to connect

3   to a home network, who is that configures the devices to do so?

4   A.  It is the user that is doing so.

5   Q.  Let's focus on the next portion of the claim, which is

6   based on the identifier, "the server initiating access to a web

7   page with content information about a context of using the

8   consumer appliance."  Do you see that, sir?

9   A.  I do see that.

10  Q.  Do you have an opinion as to whether Barnes & Noble

11  performs this step?

12  A.  Yes, I do have an opinion.

13  Q.  What is your opinion, sir?

14  A.  My opinion is that Barnes & Noble is not performing the

15  step.

16  Q.  Does Mr. Berg's analysis that you have reviewed,

17  particularly the man-in-the-middle analysis, show that a server

18  does anything based on an identifier?

19  A.  It does not show that it is doing anything based on the

20  identifier.  It is simply showing what is being communicated

21  between the browser or between the shop application and the

22  Barnes & Noble server.

23  Q.  This claim says that the identifier is representative of a

24  type of a consumer appliance right there.  Do you see that,

25  sir?

1   A.   I do see that.

2   Q.   What is the device ID that you saw being passed from the

3   Nook devices?

4   A.   The device ID that I saw is effectively a serial number for

5   the device.

6   Q.   Would two devices of the same type have the same or

7   different device ID?

8   A.   They would have different device IDs.

9   Q.   For example, two Nook HD+s will have different device IDs?

10  A.   Two Nook HD+s will have different device IDs.

11  Q.   Do you have an opinion as to whether claim 15 of the '703

12  patent is infringed by Barnes & Noble?

13  A.   Yes, I have an opinion.

14  Q.   What is that?

15  A.   It is that claim 15 is not infringed by Barnes & Noble.

16  Q.   Why is that, sir?

17  A.   Because claim 15 is a dependent claim that depends upon

18  claim 13.  I have already explained my reasons why the elements

19  of claim 13 are not met.  For all those same reasons, claim 15

20  is not -- or the elements of claim 15 that are incorporated

21  because it is a dependent claim are not met by Barnes & Noble.

22  Q.   Let's turn to the issues of validity, sir.  I would like to

23  first discuss the state of the art with respect to the '703

24  patent and then move to some specific references.  When were

25  computer networks first used to disseminate information?

1    A.   Computer networks were first being used to disseminate

2    information around the late '60s, early 1970s.

3    Q.   When was the World Wide Web and web browsers?

4    A.   World Wide Web was introduced around 1991 time frame, and

5    web browsers started to become popular shortly after that.

6    Q.   Before the filing of '703 patent, had consumer appliances

7    ever been connected to networks to retrieve information?

8    A.   There were some consumer appliances that had been connected

9    to the Internet.

10   Q.   Do you have any examples?

11   A.   Back around 1982, for example, there was a soda machine at

12   Carnegie-Mellon University that was connected to the network.

13   Also, you get to the 1989-1990 time frames, there was an

14   Internet toaster that was connected for management over the

15   Internet.

16   Q.   Can you please turn in your binder to the document marked

17   for identification as DTX-471.

18   A.   I'm there.

19   Q.   This is U.S. patent number 5,761,485 to Daniel E. Munyan

20   titled Personal Electronic Book System, do you agree?

21   A.   I do agree.

22   Q.   Did you consider this patent when evaluating whether claims

23   1, 2, and 3 of the '703 patent are valid?

24   A.   Yes, I did.

25            MR. SHARIFAHMADIAN:  Your Honor, we move for admission

 1    of Defense Exhibit 471.

 2              THE COURT:  Any objection?

 3              MR. CABRAL:  No, your Honor.

 4              THE COURT:  It will be received.

 5              (Defendant's Exhibit 471 received in evidence)

 6    Q.  Can we agree to refer to this document as the "Munyan

 7    patent"?

 8    A.  Yes, we can refer to this as the "Munyan patent."

 9    Q.  Generally speaking, what is the Munyan patent directed to?

10    A.  The Munyan patent is directed to a handheld electronic book

11    device for retrieving books from a virtual bookstore.

12    Q.  Let's turn to claim 1 of the '703 patent.  In your opinion,

13    does the Munyan patent disclose every element of claim 1 of the

14    '703 patent?

15    A.  Yes, it is my opinion that the Munyan patent discloses

16    every element of claim 1.

17    Q.  In your opinion, does the Munyan patent anticipate claim 1

18    of the '703 patent?

19    A.  Yes, in my opinion the Munyan patent anticipates claim 1 of

20    the '703 patent.

21    Q.  Let's walk through the claim.  We see the cover page of the

22    Munyan patent.  Does the Munyan patent disclose a consumer

23    appliance as that term has been construed by the Court?

24    A.  Yes, it does include a consumer appliance.  We see this in

25    the figure at the bottom of that.  That is the tablet-looking

Eakradirect - Neuman - direct

1    device in the hands of the person.  We also see it sending and

2    receiving data through the antenna that is marked 5 in the

3    arrows that are going back and forth.

4    Q.  Does the Munyan patent disclose an input component

5    responsive to a user input?

6    A.  Yes.  Again, we can look to the figure, see the input

7    component.  We see the button that is being pressed, which is I

8    think is marked 3 on there.  My eyes may be going.  That icon

9    is for the virtual bookstore.

10   Q.  Are those physical buttons or is that a touch-sensitive

11   screen?

12   A.  That is a touch-sensitive screen and those are icons.

13   Q.  Does the Munyan patent disclose that an input component is

14   for initiating retrieval of data by the consumer appliance from

15   a server?

16   A.  Yes.  Again with what I just pointed to, that particular

17   input, when that is accessed, that is initiating communication

18   with the virtual bookstore.

19   Q.  Let's turn to the predetermined URL or an identifier

20   associated with the consumer appliance element.  We already

21   discussed that this is written in the alternative, right?

22   A.  Yes, we did.

23   Q.  In order for the Munyan patent to anticipate this

24   limitation, must it have both a URL and an identifier or just

25   one?

1   A.  It needs to have either a predetermined URL associated with

2   a consumer appliance or an identifier associated with a

3   consumer appliance.  Only one of those is needed.

4   Q.  Which one does Munyan show?

5   A.  Munyan shows the identifier associated with a consumer

6   appliance.

7   Q.  Why do you say that, sir?

8   A.  I say that because there is a security identifier that is

9   associated with the device that is being sent.

10  Q.  Is that the security identification code?

11  A.  Yes, that is the security identification code.

12  Q.  Does the Munyan patent show that the retrieval of data is

13  based on an identifier associated with a consumer appliance?

14  A.  Yes, it does.

15  Q.  How so, sir?

16          MR. CABRAL:  Objection, your Honor.  That is outside

17  the scope of the report.

18          THE COURT:  Page of the report?

19          MR. SHARIFAHMADIAN:  I'll hand up that page.

20          THE COURT:  Just tell me.

21          MR. SHARIFAHMADIAN:  It is a different report, your

22  Honor.  Paragraph 263 and 264.

23          THE COURT:  Overruled.

24  Q.  Do you need the question again?

25  A.  Yes, please repeat the question.

Fakradel                          Neupen - direct

1   Q.  Does the Munyan patent show that retrieval of data is based

2   on an identifier associated with a consumer appliance?

3   A.  Yes, it does.

4   Q.  How does it do that?

5   A.  It shows that depending on this identifier, if the

6   identifier is incorrect, the connection is terminated.  If the

7   security identifier is correct, then the storefront of the

8   virtual bookstore is returned.

9   Q.  Does the Munyan patent show that the data that is retrieved

10  by the electronic book system that is shown there represent

11  content information about the context of usage of the consumer

12  appliance?

13  A.  Yes, it does.

14  Q.  Why do you say that?

15  A.  It says that the data that is returned includes the welcome

16  page for the online bookstore or for the virtual bookstore that

17  contains a listing of the information that can be purchased and

18  displayed on the device.

19  Q.  What kind of list does it describe?

20  A.  This would be lists of books that could be purchased, for

21  example.

22  Q.  Does the Munyan patent disclose that last element, which is

23  kind of a negative element, "wherein the consumer appliance

24  does not require a user to access a web browser or other device

25  in order for the consumer appliance to initiate retrieval of

1     the data"?

2     A.  Yes, it does disclose that.

3     Q.  Why do you say that?

4     A.  As you just said, it was sort of negative.  It discloses

5     this element because it does not disclose a web browser.

6     Q.  Does it mention a web browser?

7     A.  It does not mention a web browser.

8     Q.  How does it connect?

9     A.  It connects directly through the phone system, through the

10    PSTN as it is called in the patent, to the virtual bookstore.

11    Q.  Could it be argued that it inherently discloses a web

12    browser?

13              MR. CABRAL:  Objection, your Honor:  Leading.

14              THE COURT:  No, I think it is appropriate to respond

15    to a likely dispute that may come up on cross.  Overruled.

16              MR. CABRAL:  Thank you.

17    A.  No.  The technology does not inherently disclose a web

18    browser.  In fact, it is a very different technology.  It is

19    the old technology of directly dialing into a system and

20    accessing that, and that is not being performed through a web

21    browser.

22    Q.  I am going to skip over claim 2 for a minute.  We'll come

23    back to it.  I want to jump to claim 3.  Claim 3 says, "the

24    consumer appliance further comprising a memory for storage of

25    the URL or the identifier."  Do you see that, sir?

1    A.  I do see that.

2    Q.  Do you have an opinion as to whether the Munyan patent

3    shows this limitation?

4    A.  Yes, I do.

5    Q.  Why do you say that?

6    A.  I say that because the Munyan patent talks about that

7    security identifier being prestored on the device.  Being

8    prestored implies that it is stored in memory.

9    Q.  Let's go back to claim 2, then.  This claim says, "wherein

10   the consumer appliance configured for use on a home network and

11   having an Internet access functionality through the home

12   network, the predetermined URL or the identifier being stored

13   on the home network."  Do you see that?

14   A.  I do see that.

15   Q.  Certain of those limitations have asterisks, which means

16   that the Court has construed them.  Is that your understanding?

17   A.  That is my understanding.

18   Q.  Have you applied the Court's construction?

19   A.  I have applied the Court's construction.

20   Q.  Does the Munyan patent explicitly disclose this limitation?

21   A.  No, it does not explicitly disclose this limitation.

22   Q.  Does Munyan nevertheless render this claim 2 obvious?

23   A.  I believe that Munyan does render this claim obvious.

24   Q.  Why do you say that?

25   A.  I say that because Munyan was filed in 1995.  By the time

1    we got around to the 1999 time frame, we were starting to see

2    wider deployment of home networks.  One of the things that was

3    happening as we were deploying home networks is a lot of

4    applications and a lot of devices were being modified to use

5    the home networks instead of using that individual dial-up

6    connection or other connections through the phone system.

7    Q.  Why would it be obvious to modify Munyan for it to work on

8    a home network?

9    A.  One of the reasons you might want to do that is so you are

10   not tying up your phone line or not requiring an additional

11   subscription through what is essentially a cell phone, for

12   example.  We saw this kind of changes being made to many other

13   devices in that time frame.

14              (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1  Q.  And would making such a change have been within the skill

2  of a person with ordinary skill in the art?

3  A.  Yes.  It would have been within the skill of one of

4  ordinary skill in the art at that time frame.

5  Q.  What about the requirement of the predetermined URL or the

6  identifier being stored on the home network?

7  A.  I have already established that the identifier is being

8  stored on the device, and if that device were on a home

9  network, then that would be included as well.

10 Q.  In this 1999 time frame, what would you use home networks

11 for?

12 A.  You were using home networks to access Internet services,

13 to access content that you might download, various other

14 purposes.

15 Q.  Let's turn to claim 13 of the '703 patent.

16         Can you please turn in your binder to the document

17 that's marked for identification as Defense Exhibit 477?

18 A.  I'm there.

19 Q.  This is U.S. Patent No. 6,389,463 to Mark T. Bolas.  Do you

20 agree?

21 A.  I do agree.

22 Q.  Did you consider this patent when evaluating whether claim

23 13 and 15 of the 703 patent are valid?

24 A.  Yes, I did.

25         MR. SHARIFAHMADIAN:  We move for admission of Defense

1   Exhibit 477.

2            THE COURT:  Any objection?

3            MR. CABRAL:  No, your Honor.

4            THE COURT:  Received.

5            (Defendant's Exhibit 477 received in evidence)

6   Q.  Can we agree to refer to this document as the Bolas patent?

7   A.  I will refer to it as the Bolas patent.

8   Q.  Speaking generally, what is the Bolas patent directed to?

9   A.  The Bolas patent is directed to a radio device that is

10  capable of searching for and retrieving audio data and textual

11  information about that data from the Internet.

12  Q.  Does the Bolas patent describe a consumer appliance as the

13  Court has construed that term?

14  A.  Yes, it does.

15  Q.  Why do you say that?

16  A.  I say that because if we look at figure 1 -- and actually

17  you see a representation of figure 1 already on the cover page

18  so no need to change pages here -- we see what looks like an

19  appliance, a radio; and, in fact, we also see on the side of

20  the network jack through which input will be sent and received.

21  Q.  Does the Bolas patent disclose a method of enabling a

22  service provider to provide a service via the Internet to a

23  user of the consumer appliance having a predetermined

24  identifier?

25  A.  Yes, it does.

1    Q.  Why do you say that?

2    A.  I say that because the patent also discloses an Internet

3    radio station with the ability to download audio content and

4    text about that content to a radio device that has a user name

5    and a serial number.

6    Q.  You said the user name and a serial number?

7    A.  Yes, I did.

8    Q.  Are those identifiers?

9    A.  The serial number is an identifier.

10   Q.  In your opinion, is that identifier stored on a home

11   network?

12   A.  We have already -- the Internet radio device is on a home

13   network, and that device can be stored within the radio device,

14   so it is also stored on a home network.

15   Q.  Does Bolas disclose enabling the user by a single user

16   input to the consumer appliance to have the consumer appliance

17   initiate sending a request with the identifier?

18   A.  Well, with respect to this limitation, the Bolas Internet

19   radio acts in much the same way as a Nook device does.  That

20   is, it can be configured, and once it has been configured, then

21   a single input pressing a preset button will initiate that

22   process.

23          Now, in understanding the claims, it's important that

24   one apply the same understanding when one looks at both the

25   infringement that was discussed before and the validity.  So to

1   the extent that one were to find that the Nook devices met that

2   claim element regarding the single user input, one would also

3   need to see that this device met that limitation as well.

4   Q.  You mentioned the user name and the serial number and the

5   serial number being an identifier.  Is that representative of a

6   type of a consumer appliance?

7   A.  No, it is not representative of a type of a consumer

8   appliance, but what it is similar to the serial number that we

9   saw on the Nook devices.  So, once again, you have got to apply

10  that claim language in the same way when one is looking at

11  infringement as when one is looking at validity.

12          So to the extent that the device identifier, the

13  serial number on the Nook device, were found to meet that

14  particular limitation, one would also need to find that the

15  serial number met that when looking at the Bolas Internet

16  radio.

17  Q.  To be clear, you're saying that the Nook devices don't meet

18  this enabling limitation, correct?

19  A.  That is correct.  I do not believe that the Nook devices

20  meet that enabling limitation.

21  Q.  But if one were to find that the Nook devices meet this

22  limitation, then Bolas works exactly the same?

23  A.  With respect to this particular limitation, yes, Bolas

24  works exactly the same.

25  Q.  Now, is this request that is sent, is that sent to a server

1    on the Internet through the home network?

2    A.   Sorry.  Can you repeat the question?

3    Q.   The request that is sent by the Internet radio in the

4    Bolas, is that sent to a server on the Internet through the

5    home network?

6    A.   Yes.  That is being sent to the Internet radio station

7    through the home network.

8    Q.   Let's turn to the last element of claim 13, which is:

9    "Based on the identifier, the server initiating access to a Web

10   page with content information about a context of using the

11   consumer appliance."  Do you see that?

12   A.   I do see that element.

13   Q.   Does Bolas disclose that step?

14   A.   Yes.  Bolas does disclose that step.

15   Q.   Why do you say that, sir?

16   A.   I say it discloses that step -- well, we have got to look

17   at a couple of things here first.

18            One part of that step is the "based on the identifier"

19   part of the step.  And there is a disclosure in Bolas that

20   talks about looking at -- that says, based on the user

21   parameters, which includes that device ID, retrieving,

22   basically looking up the content that corresponds to the

23   particular selected now position and returning that to the

24   user.

25            The second thing that you need to look at with respect

1   to this is the content information about the context of using

2   the consumer appliance.  And that part of this is met by the

3   textual information that is downloaded that is about the audio

4   that is being retrieved.

5   Q.  What sort of textual information?

6   A.  It could be a station identifier, it could be the name of a

7   song.  If the audio were a sporting event, for example, it

8   could be the current score.

9   Q.  In your opinion, does the Bolas patent disclose every

10  element of claim 13 of the '703 patent?

11  A.  Well, I have already mentioned some of the issues regarding

12  both the single user input and regarding the identifier.  But

13  to the extent -- because in those respects it acts like the

14  Nook device -- to the extent that one would find the Nook

15  device as having met those limitations, one would also

16  understand that those limitations were met here, and in that

17  case the Bolas radio would anticipate all the elements of claim

18  13.

19  Q.  Let's turn to claim 15.  And this claim says:  "The method

20  of claim 13, further comprising creating a database of URLs or

21  identifiers per user."  Do you see that?

22  A.  I do see that.

23  Q.  Again, identifiers is a construed term.  Do you see that?

24  A.  I do see that.

25  Q.  And you applied the Court's construction?

1   A.  I applied the Court's construction.

2   Q.  Does the Bolas patent disclose this limitation?

3   A.  Yes.

4   Q.  Can you please explain why?

5   A.  In the Bolas patent it talks about using the now position

6   and the user parameters in order to index into a table of URLs,

7   and one understands indexing into a table describes a database.

8   Q.  Thank you.

9        MR. SHARIFAHMADIAN:  Your Honor, I am ready to move on

10  to the next patent, if the Court wanted to take a mid-morning

11  break.

12       THE COURT:  No.  This is going so well, I can't

13  interrupt yet.  We will give you another 10 or 15 minutes

14  before we take our break.

15       MR. SHARIFAHMADIAN:  Thank you.

16  Q.  Let's move to the '851 patent.

17  A.  OK.

18  Q.  Generally speaking, what does the '851 patent direct?

19  A.  The '851 patent is directed to methods for distributing

20  content securely over a network.

21  Q.  The only claim that's at issue in the '851 patent is claim

22  96, is that right?

23  A.  It's my understanding that that is the only claim that is

24  at issue.

25       MR. SHARIFAHMADIAN:  Can we put that up, please?

FAK8APR2                    Neuman - direct

1   Q.  Now, claim 96 is directed to an electronic book viewer for

2   receiving an electronic book from a sending party and for

3   storing and displaying the electronic book.  Do you see that?

4   A.  I do see that.

5   Q.  And it says that the viewer has a receiver.  Do you see

6   that?

7   A.  I do see that.

8   Q.  Do the accused Nook devices have a receiver?

9   A.  Yes.  The accused Nook devices have a receiver.

10  Q.  What is the receiver in the accused Nook devices?

11  A.  The receiver is effectively the WiFi interface, the network

12  hard, the antenna that supports the communication.

13  Q.  Now, claim 96 says that the receiver must do certain

14  things.  Do you see that, sir?

15  A.  I do see that.

16  Q.  One of the things it must do is select a title from the

17  transmitted list of titles.  Do you see that?

18  A.  I do see that.

19  Q.  Now, title is also a term that's been construed by the

20  Court, right?

21  A.  Yes, it is.

22  Q.  And you applied that construction in forming your opinions?

23  A.  I applied that construction in forming my opinions.

24  Q.  In your opinion, does the receiver in the accused Nook

25  devices meet that requirement of selecting a title from the

1    transmitted list of titles?

2    A.  In my opinion the receiver does not meet that claim.

3    Q.  Isn't there a selection being made?

4    A.  There is a selection being made, but it's being made by the

5    user, not by the receiver.

6    Q.  How does the user make a selection?

7    A.  The user is presented with the list of titles and the user

8    presses a button to select one of those.

9    Q.  What happens when the user presses a button to select one

10   of those books?

11   A.  The user's input is noted by the Nook device and that

12   selection is then transmitted back to the Barnes & Noble

13   servers.

14   Q.  Let's break this down a little bit.

15          Specifically, what information associated with the

16   book is being transmitted back to the Barnes & Noble servers?

17   A.  Well, in the case of Barnes & Noble, it is what is known as

18   the EAN.

19   Q.  What is the EAN?

20   A.  It's an identifier for the book that the user has just

21   selected.

22   Q.  In your opinion, when a user is selecting the book in a

23   shop application, does the user select a title from a

24   transmitted list of titles or is it the receiver?

25   A.  It is the user that is doing the selecting.

1   Q.  What does the WiFi subsystem do with the user selection?

2   A.  The WiFi subsystem is simply sending and receiving packets.

3   So it's ultimately transmitting that selection back to the

4   Barnes & Noble servers, but it's not doing the selection.

5   Q.  Is any of what you just described what the WiFi subsystem

6   does, is any of that selecting?

7   A.  What the WiFi subsystem does is not selecting.

8   Q.  Did you review the man-in-the-middle analysis that Mr. Berg

9   did with respect to the functionality issue for the '851

10   patent?

11   A.  Yes, I did review his man-in-the-middle analysis.

12   Q.  How, if in any way, did that data affect your opinion that

13   the user, not the device, is doing the selecting?

14   A.  It does not change my opinion.

15   Q.  Why is that, sir?

16   A.  Well, the man-in-the-middle analysis only showed the

17   communication that was going back and forth between the Nook

18   and the server.  It was not showing what was actually being

19   done on the Nook device or for that matter where on the

20   device -- in this particular case the user -- that selection

21   was actually occurring.

22   Q.  I would like to move on and ask you about encryption.  Are

23   you familiar with the concepts of content encryption and

24   channel encryption?

25   A.  Yes, I am.

1   Q.  Have you prepared demonstratives to illustrate these two

2   concepts to the jury?

3   A.  I have.

4           MR. SHARIFAHMADIAN:  Can we put up DDX 1001?

5   Q.  So which of the two encryptions that we just mentioned is

6   this directed to?

7   A.  We are talking about content encryption in this particular

8   demonstrative.

9   Q.  What do we see here in DDX 1001?

10  A.  We see initial text, for example, a book that exists on a

11  server or that comes from a publisher for example.

12  Q.  What is happening to that book?

13  A.  In content encryption, what we are doing is we are passing

14  it through a process called encryption where we apply an

15  encryption key in order to create new content that is an

16  encrypted object and receive a lock on the book representing

17  that this is locked, and someone that is looking at the object

18  in this form is not able to understand what that is because it

19  is different text.

20  Q.  Is this a persistent kind of encryption or is it transient?

21  A.  When we talk about content encryption, this is persistent.

22  What we have done is we have encrypted the book.  This gives us

23  an output that is an encrypted book and that book may be stored

24  persistently for however long you wish to store it.

25  Q.  What do we see in this next slide?

1    A.  So in this next slide we see the next step of content

2    encryption, which is really decryption.  That is, when someone

3    wants to utilize the electronic book, they need to take that

4    different object, the encrypted electronic book, and they need

5    to apply a new key to decrypt it, and that key that's being

6    applied is the decryption key.  The result of that decryption

7    process is text that is identical to the original book, which

8    they are then able to view or do with as they please.

9    Q.  On this next step of the slide, what do you intend to show

10   with that?

11   A.  Well, this is further demonstrating that that encrypted

12   object is persistent.  And here you might have a second user

13   that is attempting to view that book for example.  They would

14   go back to the same encrypted book object.  They would decrypt

15   it using the same decryption key that had been used by the

16   first user that we saw, and once again, they get as output of

17   that the original text that they are then able to view and do

18   as they please.

19   Q.  Dr. Neuman, what is an example of the type of content

20   encryption that you have been describing?

21   A.  One example is what is called the ACS4 encryption process,

22   which is used during ingestion by Barnes & Noble.

23   Q.  Did you also prepare a demonstrative with respect to

24   channel encryption?

25   A.  Yes, I did prepare a demonstrative with respect to channel

1    encryption.

2              MR. CABRAL:  Your Honor, plaintiff's counsel had an

3    objection to this demonstrative.  I think we can work it out

4    with one clarification, maybe at sidebar.

5              THE COURT:  OK.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At the sidebar)

2          THE COURT:  Your objection, I take it, is that no one

3    except for me is old enough to appreciate the significance of

4    the quick brown Fox jumps over the lazy dog.

5          MR. CABRAL:  That was my first objection.

6          The basis of the objection to this demonstrative is

7    that it was misleading to the extent there is only one form of

8    encryption taking place.  I think as long as counsel when

9    referring to channel encryption makes clear that it is a

10   different form of encryption, I think we are fine, and we will

11   drop the objection to the demonstrative.

12         MR. SHARIFAHMADIAN:  These two demonstratives are just

13   demonstrating his general concepts channel encryption.

14         THE COURT:  Then why don't you make that clear as

15   preclude to your next question.

16         MR. SHARIFAHMADIAN:  Sure.

17         (Continued on next page)

18

19

20

21

22

23

24

25

1    (In open court)

2  BY MR. SHARIFAHMADIAN:

3  Q.  Dr. Neuman, with this demonstrative that you have prepared

4  with respect to channel encryption, are you intending to

5  explain channel encryption in general or a particular form of

6  channel encryption?

7  A.  I am intending to describe it in general.

8  Q.  So what is shown on DDX 1002?

9  A.  Well, we first see message text, which is text that has

10  been prepared for the purpose of being sent to another party

11  over the network.

12  Q.  What is happening to the text now?

13  A.  So when one sends packets or when one sends information to

14  another party over the Internet, the data is usually broken

15  into individual chunks that are referred to as packets.  In

16  this case, we see the message being broken into those chunks.

17  Q.  What is happening now?

18  A.  Those chunks are now being individually encrypted using

19  what is known as a session key, a session encryption key, and

20  those encryption chunks are being sent over the network through

21  a channel, the channel being represented by the pipe.

22    On the other end -- we sort of skipped ahead here, but

23  on the other end, each of those chunks is being decrypted using

24  the decryption session key for that channel, and they are being

25  reassembled into the text of the original message, which can

1    then be viewed or used by the server or application on the

2    other end of the connection.

3    Q.   Is channel encryption a persistent or a transient kind of

4    encryption?

5    A.   Channel encryption is transient.

6    Q.   What about the keys that are used?

7    A.   Once the message has been sent, the channel will drop and

8    the keys that were being used will be forgotten.

9    Q.   What is an example of channel encryption?

10   A.   Well, examples of channel encryption include the SSL

11   protocols and the TLS protocols which are what are typically

12   used within a Web browser today.

13   Q.   So you said ACS4 is an example of content encryption and

14   TLS is an example of channel encryption, correct?

15   A.   That is correct.  TLS is an example of channel encryption;

16   ACS4 is an example of content encryption.

17   Q.   They both have keys?

18   A.   They do both have keys.

19   Q.   Are these similar types of keys, are there any differences

20   between these keys?

21   A.   Well, how the keys are used are different.  So in the

22   content encryption, those keys are persistent, the same key

23   will be used again and again when you are decrypting that same

24   content.  In the case of the keys for TLS or for SSL, those

25   keys change on every different connection that you establish.

1   Q.  Now, have you also prepared a demonstrative to show how

2   these two different types of encryption are used by Barnes &

3   Noble to transmit and deliver books to the accused Nook

4   devices?

5   A.  I have.

6           MR. SHARIFAHMADIAN:  Can we please put up DDX 1003?

7   Q.  Dr. Neuman, what is shown in this first slide?

8   A.  This first slide is really showing the set-up of Barnes &

9   Noble's electronic book delivery system.  We have a publisher

10  from which Barnes & Noble will obtain the text of the books.

11  And here we see the publisher sending the text of the book to

12  Barnes & Noble.  Barnes & Noble now processes that book using

13  what is known as their ingestion process, which is done using

14  ACS4.  And in that process the book is encrypted, and the

15  output of the ACS4 ingestion process is an encrypted electronic

16  book, just like I showed you under content encryption, and a

17  decryption key that will be used in order for the end users to

18  decrypt that book many steps later.

19  Q.  What is shown in this next step?

20  A.  So once the book has gone through the ingestion process,

21  Barnes & Noble sends the encrypted electronic book to Akamai,

22  which is a content distribution network.  It's another party

23  that is going to store that book or store that encrypted

24  electronic book for later retrieval.

25  Q.  Now, just to be clear, is every book that Barnes & Noble

 1  receives encrypted?

 2  A.  No, not every book that Barnes & Noble receives is

 3  encrypted, but those where the publisher requires that the book

 4  be encrypted are encrypted using this process.

 5  Q.  So what is this next step that we see?

 6  A.  So in this next step we see a Nook device which, when it

 7  connects to the Barnes & Noble server, will determine that

 8  there is a new book that it is able to download.  In this

 9  particular case, it will request two things, or it will receive

10  two things from the Barnes & Noble server.  And those are being

11  sent, you see the armored truck, that represents the transient

12  encryption that we talked about before where the two things

13  that are being sent to the Nook device are a URL, that is an

14  identifier of the location where that encrypted electronic book

15  can be obtained, and also being sent to the Nook device, again

16  through that armored car, through that stream encryption, the

17  Nook device is receiving a license file which contains the

18  decryption key that you see there.

19  Q.  What is shown in this next slide?

20  A.  The Nook device now has in its possession the URL that says

21  where that encrypted electronic book exists.  And in this case

22  the Nook device is using that URL, which is pointing off to the

23  Akamai server, and it's identifying the encrypted book on the

24  Akamai server and it is asking that the Akamai server return

25  that encrypted electronic book to the Nook device.

1         In the next slide we see that happening, again through

2    a transient encrypted stream, but this time it is a different

3    stream than the one that we saw with the Barnes & Noble, and it

4    is being done using a different set of keys than we saw in the

5    earlier transient connection there.

6         So at the end of that process, we have the encrypted

7    electronic book on the Nook device.  We also have the license

8    file, which was previously obtained.  And in the next step we

9    see the decryption key from the license file being used to

10   decrypt the book, the way that we saw it in the content

11   encryption before, and that yields the contents of the book

12   that may be viewed on the device.

13   Q.  Let's come back to claim 96.

14        In claim 96, after the receiver, we see the next

15   element, and here it's marked as element (b), you see "a memory

16   coupled to the receiver that stores the encrypted electronic

17   books and the encryption information."  Do you see that?

18   A.  I do see that.

19   Q.  In fact, the term encryption information appears several

20   more times throughout the claim.  Do you see that?

21   A.  I do see that several more times throughout the claim.

22   Q.  Is it your opinion that a person of ordinary skill in the

23   art would understand the term encryption information to refer

24   to the same kind of information throughout the claim?

25   A.  Yes.  One of ordinary skill in the art would understand

1    that to refer to the same kind of information throughout the

2    claim.

3    Q.   Why do you say that?

4             MR. CABRAL:   Objection, your Honor.   This is claim

5    interpretation.

6             MR. SHARIFAHMADIAN:   Your Honor, I would like to

7    explain at sidebar.

8             THE COURT:   All right.

9             (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                   SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

1          (At the sidebar)

2          MR. SHARIFAHMADIAN:  We have an indefiniteness defense

3     with respect to this claim.  It was the subject of supplemental

4     expert briefing that your Honor allowed us to submit after

5     discovery was closed in this case.  I am laying the factual

6     predicate for that decision.  It is an issue of law that your

7     Honor can present to the jury for an advisory opinion.

8          THE COURT:  I am not going to say anything to the jury

9     for an advisory opinion.  Why don't we take our break now and

10    discuss this in open court.

11         (In open court)

12         THE COURT:  So, ladies and gentlemen, you may wonder

13    why we have sidebars.  One good reason would be so I can get a

14    little exercise by standing up.  A second good reason would be

15    so that you could sit around twiddling your thumbs.  But the

16    real reason we have sidebars is so that counsel can forecast to

17    me what the witness is going to say in subsequent testimony on

18    the subject that has been objected to so that I can rule before

19    you hear that testimony.  Because, obviously, if I ruled it out

20    after you had already heard it, it would be sort of a waste of

21    time.  So even though these sidebars are sometimes lengthy,

22    they actually save us a good deal of time.

23         I mention all of that because, as a result of the

24    sidebar we just had, we are going to have to have probably

25    about a ten-minute discussion on law.  So this is probably an

1    excellent time for you to have your mid-morning break so we

2    will give you a 15-minute break at this time.

3              THE WITNESS:  May I take a break also, your Honor?

4              THE COURT:  Yes.

5              (Jury exits courtroom)

6              THE COURT:  Does someone have in front of them to put

7    up on the screen the claim construction that defense counsel

8    feels is indefinite?

9              MR. SHARIFAHMADIAN:  It's the encryption information,

10   your Honor, referred to in elements (c) and (d).

11             THE COURT:  What about my claim construction do you

12   think is indefinite?

13             MR. SHARIFAHMADIAN:  I don't believe that you have

14   actually construed this limitation, your Honor.  Our position

15   is that the limitation should be read consistently throughout

16   the claim.  Otherwise it would be indefinite to a person of

17   ordinary skill in the art.

18             THE COURT:  I misunderstood your argument.

19             Let me hear from plaintiff's counsel.

20             MR. CABRAL:  Your Honor, plaintiff's position is that

21   this is in fact an issue that should have been raised during

22   claim construction.  It is indefiniteness.  It is a question of

23   law.  And your Honor's order earlier in the week made clear

24   that experts would not be testifying on questions of law.

25             So with regard to the indefiniteness issue here, you

1    will see there are multiple instances of encryption information

2    here in this claim.  The first one appears in (a)4 I believe.

3    Then you have the encryption information in (b) referring back

4    to the previous encryption information in (a)4.  You also have

5    in step (c) the encryption information, again referring back to

6    the previous encryption information in (a)4.  And then when you

7    get to step (d), you lose that antecedent basis.  It says a

8    transmitter coupled to the processor that sends encryption

9    information to the sending party, wherein the encryption

10   information -- again, referring back to the prior reference in

11   step (b), at least that's plaintiff's position -- is completely

12   consistent not only in this case, but with other cases where

13   the same term has been used in the same claim under the same

14   circumstances.

15        THE COURT:  I am glad because I hadn't really

16   remembered having defined in claim construction encryption

17   information.  I am delighted to learn that I did not.

18        Is it defendants' position that that means X in some

19   context and Y in some other context and that's wrong?  Or that

20   it has to be, whatever it means, it has to be read consistently

21   throughout, or what?  I am still not clear on what your

22   position is.

23        MR. SHARIFAHMADIAN:  Defense's position is that the

24   term encryption information needs to be read consistently.

25   It's not defined anywhere else in the patent.

1       THE COURT:  So what follows from the fact that it has

2   to be read consistently.

3       MR. SHARIFAHMADIAN:  For example, here, the

4   infringement theory is that in one context, in (a)4 and (c) I

5   believe, plaintiff is pointing to the persistent kind of

6   encryption, the content encryption that Dr. Neuman testified

7   about.  And when it comes to element (b), they are pointing to

8   the transient, the TLS-type encryption.

9       Our position, and the factual predicate that we want

10  to set for this issue, is the encryption information needs to

11  be read consistently throughout the claim.  Actually, although

12  it's not mentioned anywhere in the specification of the

13  patent --

14      THE COURT:  What do you think encryption information

15  means?

16      MR. SHARIFAHMADIAN:  It's actually defined in the

17  claim, your Honor.  I says, "Wherein the encryption

18  information" -- it's the very last instance that's highlighted.

19  "Wherein the encryption information includes information that

20  allows encryption and decryption of the electronic book and

21  encryption and decryption of encryption and decryption keys."

22      THE COURT:  The word "includes" is not necessarily

23  exclusive.  We have that all the time.  Does include mean for

24  example or does include mean that this is the sole limits?  So

25  I don't know that that solves anything.

1              MR. SHARIFAHMADIAN:  At a minimum, it must include

2     those.

3              THE COURT:  I agree.  At a minimum, it must include

4     those.  So what follows from the fact at a minimum it must

5     include those?

6              MR. SHARIFAHMADIAN:  It means that everyplace you see

7     encryption information, they need to be pointing to the type of

8     information that meets at least those requirements.

9              THE COURT:  I am not sure what that follows.

10             In other words, if you have a word that could have

11    different meanings depending upon the context, like colorful,

12    which could mean one thing when you're describing the paint on

13    a house and another thing when you're describing someone's

14    style of writing, but it's the same word, you would need to see

15    the context to know which of those two meanings is being

16    referred to.

17             If this is a question of law, it should have been

18    raised before.  If it's not a question of law, then it's a

19    question I guess for the jury to decide.

20             So you're saying or your witness is saying that,

21    because encryption information in (d) includes information that

22    allows encryption and decryption of the electronic book and

23    encryption and decryption of encryption and decryption keys,

24    that, therefore, every time the word encryption information is

25    used throughout the claim it must have that same meaning.  I

1    don't think that follows.  I don't see why that follows.

2         MR. SHARIFAHMADIAN:  Your Honor, it is a general

3    principle of claim drafting opinions that the same word should

4    be given the same meaning.

5         THE COURT:  Yes.  The point is what you don't know --

6    and I am just looking at this, so to speak, issue for the first

7    time -- what you don't know is whether the use of encryption

8    information in subparagraph (d) is intended to isolate one

9    particular meaning for that particular subparagraph's use

10   without prejudice to its having a different meaning in the

11   other places where it's not used with that modifier.  I think

12   you can argue it both ways, and I am not sure why it's not a

13   question of law.

14        MR. SHARIFAHMADIAN:  Indefiniteness is a question of

15   law.

16        THE COURT:  I am not sure it is a question of

17   indefiniteness.  Take my example, which I just dreamed up, but

18   what the heck, of colorful.  If I say that house is painted in

19   a colorful manner and then I say, and the style of the author

20   describing the house is itself colorful, there is no ambiguity,

21   there is no indefiniteness.  Everyone knows exactly what I mean

22   in both those instances.  It's just that it's being used, the

23   same word, in two different sentences, which the context makes

24   clear.

25        MR. SHARIFAHMADIAN:  That is why we want to lay the

1    factual predicate for that.  That for a person of ordinary

2    skill in the art, this is not a situation where the claim would

3    be understandable if it's read differently.

4         THE COURT:  So now we have gone through all of that.

5    What is wrong with his expert explaining why it would not be

6    understandable to a person skilled in the art, etc. based on

7    the various ways it may be used?

8         MR. CABRAL:  Your Honor, I think you're right that

9    this necessarily isn't an indefiniteness argument; it is really

10   one of claim construction.  What it is is defense counsel's

11   expert saying, this is how I think a person of ordinary skill

12   would interpret this claim.  That's extrinsic evidence for the

13   purpose of claim construction.

14        THE COURT:  No.  What he is saying is, to use my not

15   very good analogy, I see in this paragraph, or given the way

16   patents work in this one endless sentence, the same term being

17   used in a variety of ways, and I don't think someone skilled in

18   the art would have a basis for understanding how to make any

19   sense of that, or something along those lines.

20        MR. SHARIFAHMADIAN:  Something along those lines.

21        MR. CABRAL:  Our position would be, first of all, if

22   it is an indefiniteness issue, and let's assume that it is, it

23   should have been raised during claim construction.

24        THE COURT:  I don't understand it to be an

25   indefiniteness argument, even though I agree that term has come

EAK8ADR2                    Newmann - direct

1    up.  I think it is an argument about, given the different ways

2    the term appears to be used in different paragraphs,

3    subparagraphs, that the person reasonably skilled in the art

4    would not know how to go about understanding this sentence.

5           All right.  I have the arguments.  Let me think about

6    it one more time, and I will give you my ruling when we return

7    in about five minutes.

8           (Recess)

9           (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    THE COURT:  I adhere to my prior comments.  The term

2    "encryption information" is one that both sides felt was

3    sufficiently clear to anyone skilled in the art that they did

4    not seek a claim construction on it.  What the witness is going

5    to be testifying about, as I understand it, is how seeing that

6    term in its various inclusions in this claim leaves a person

7    skilled in the art with some difficulties in understanding and

8    making use of the alleged invention.  I think that is not a

9    question of law, I think that is perfectly appropriate, and I

10   think that falls within his reports.  So, the objection is

11   overruled.

12          Let's bring in the jury and let's get the witness back

13   on the stand.

14          (Jury present, witness resumed)

15          THE COURT:  Counsel.

16   BY MR. SHARIFAHMADIAN:

17   Q.  Dr. Neuman, before the break we were taking a look at claim

18   96 and discussing the fact that the term "encryption

19   information" appears in multiple different places in the claim.

20   Do you recall that?

21   A.  I do recall that.

22   Q.  Do you have an opinion as to whether a person of ordinary

23   skill in the art would understand the term "encryption

24   information" to refer to the same kind of information

25   throughout the claim?

1    A.  Yes.  One of ordinary skill in the art would understand it

2    to refer to the same kind of information throughout the claim.

3    Q.  Why do you say that, sir?

4    A.  Because the meaning of the term "encryption information,"

5    it is not a term of art, it could mean many different things,

6    and it is not described elsewhere in the specification of the

7    patent.  Therefore, one would turn to a definition that is

8    provided at the end of this claim, the "wherein, the encryption

9    information includes information that allows encryption and

10   decryption of the electronic book and encryption and decryption

11   of encryption and decryption keys."  I know that is a mouthful.

12   One would turn there in order to understand what that term

13   meant in the context of the claim.

14   Q.  Would the person of ordinary skill in the art be able to

15   understand the scope of the claim if the term "encryption

16   information" is construed to not refer to the same kind of

17   information throughout the claim?

18   A.  It would be hard to understand the scope of that term as

19   it's used elsewhere in the claim.

20   Q.  When Mr. Berg performed his infringement analysis, did he

21   read the term "encryption information" to refer to the same

22   type of information?

23   A.  It did not appear to me that he did.

24   Q.  Let's turn back to the memory limitation of claim 96.  It

25   says, "a memory coupled to the receiver that stores the

1   encrypted electronic books and the encryption information."  Do

2   you see that, sir?

3   A.  I do see that.

4   Q.  What did Mr. Berg point to in his report and analysis as

5   meeting the encryption information requirement of this element?

6   A.  In his analysis he referred to the license file, which

7   contained the key to decrypt the electronic book, and the CC

8   hash, which is used to decrypt that license file.

9   Q.  You did a demonstration of how the Barnes & Noble system

10  delivers books, and you didn't mention CC hash there.  What is

11  the CC hash, sir?

12  A.  The CC hash is an extra level of encryption that was

13  applied to the license file, and that occurs based on a --

14  well, it's a hash of the customer's credit card number, but it

15  is used to protect the key needed to decrypt the books so that

16  that file can only be read by a particular Nook device.

17  Q.  In your opinion, sir, the license file and the CC hash that

18  Mr. Berg pointed to as meeting this encryption information

19  limitation in the memory element, in your opinion do those two

20  things meet that limitation?

21  A.  No, they do not.

22  Q.  Why do you say that?

23  A.  Because among the information that we see, "wherein

24  encryption information includes information that allows," there

25  are a lot of things here, but among the things it needs to

 1    allow is to allow encryption of the electronic book.  In this

 2    particular case, the encryption of the electronic book occurred

 3    long before.  There is no encryption of the electronic book

 4    that is occurring on the Nook device.

 5    Q.  If I understand you correctly, are the CC hash and the

 6    license file ever used on a Nook device to encrypt an

 7    electronic book?

 8    A.  No, the CC hash and the license file are not used to

 9    encrypt an electronic book on the Nook device.

10    Q.  What are they used for when they are used on a Nook device?

11    A.  They are used to decrypt the book in order to allow one to

12    view the contents.  They are used to decrypt the book rather

13    than to encrypt.

14    Q.  Where are books encrypted in the Nook system -- excuse

15    me -- in the Barnes & Noble system?

16    A.  In the Barnes & Noble system, books are being encrypted in

17    the ingestion process that I showed in the slides earlier, and

18    that occurs on a Barnes & Noble server.

19    Q.  Are they ever encrypted anywhere else?

20    A.  They are not encrypted elsewhere.

21    Q.  Let's go to the transmitter elements of claim 96, which is

22    (d) here.  Do you see that, sir?

23    A.  I do see the transmitter element, yes.

24    Q.  It says, "a transmitter coupled to the processor that sends

25    encryption information to the sending party, wherein the

1   encryption information includes information that allows

2   encryption and decryption of the electronic book and encryption

3   and decryption of encryption and decryption keys."  Do you see

4   that, sir?

5   A.  I do see that.

6   Q.  In his report and analysis, what did Mr. Berg point to as

7   the encryption information that is sent from the Nook devices?

8   A.  He referred to information that was being used to establish

9   the transient SSL connection or the transient TLS connection on

10  that device, and he was referring to what is known as the

11  premaster key in that exchange.

12  Q.  Let me take one step back, because I think I skipped this.

13  This element requires that encryption information be

14  transmitted from the Nook device to a sending party, is that

15  right?

16  A.  That is correct.  It requires that the encryption

17  information is sent to the sending party.

18  Q.  This transient encryption information that you said Mr.

19  Berg pointed to, what was that exactly?

20  A.  In SSL and TLS it's called the premaster secret.

21  Q.  Is this premaster secret the same thing as the CC hash and

22  the license file?

23  A.  No, it is not.

24  Q.  Does the premaster secret, in your opinion, meet the

25  requirements of encryption information that are listed in this

1   transmitter element?

2   A.  No, it does not.

3   Q.  Why do you say that, sir?

4   A.  Once again we have the "wherein the encryption information

5   includes information that allows," as I indicated before,

6   encryption of the electronic book.  The encryption of the

7   electronic book in the system occurs on the Barnes & Noble

8   servers using a completely different and unrelated set of keys.

9   Q.  Having said this, do you have an opinion as to whether the

10  accused Nook devices meet the transmitter element of claim 96?

11  A.  I have such an opinion.

12  Q.  What is it?

13  A.  The opinion is that the Nook devices do not meet this

14  element of the claim 96.

15  Q.  Is it your opinion that the Nook devices, the accused Nook

16  devices, do not infringe claim 96?

17  A.  It is my opinion that the accused Nook devices do not

18  infringe claim 96.

19  Q.  Let's turn to the validity issues with respect to the '851

20  patent.  Again I would like to briefly discuss the state of the

21  prior art with you, what was known at the time that the patent

22  was filed.  When were electronic devices for receiving and

23  viewing digital text files introduced?

24  A.  We started to see some electronic devices of that matter

25  introduced in the mid 1980s.  For example, there was a system

1    called the Gifford Community Information System that allowed

2    one to access newspaper and other kinds of contents on their

3    device.

4    Q.  How about encryption of digital content, when was that?

5    A.  We saw a lot of work in encryption going on -- encryption

6    itself is ancient, but we saw the use of encryption in computer

7    systems to become fairly dominant in the mid 1970s with the

8    introduction of the data encryption standard sometimes referred

9    to as DES, also public key cryptography, RSA.

10        When we get into the '80s, we start to see the

11   application of the encryption technologies in the protection of

12   content.  Again, that Gifford Community Information System is

13   one example of a system that did use encryption to protect that

14   kind of content.

15   Q.  Can you please turn in your binder to the document that has

16   been marked for identification as Defense Exhibit 394.

17   A.  I'm there.

18   Q.  This is U.S. patent number 6,331,865, to James Sachs,

19   titled Method and Apparatus for Electronically Distributing and

20   Viewing Digital Content.  Do you agree?

21   A.  I do agree.

22   Q.  Did you consider this patent when evaluating whether claim

23   96 of the '851 patent is valid?

24   A.  Yes, I did.

25        MR. SHARIFAHMADIAN:  Your Honor, we would move the

 1   admission of Defense Exhibit 394.

 2               THE COURT:  Any objection?

 3               MR. CABRAL:  No, your Honor.

 4               THE COURT:  Received.

 5               (Defendant's Exhibit 594 received in evidence)

 6   Q.  We have it up there.  Can you also turn in your binder to

 7   the document marked for identification as Defense Exhibit 569.

 8   A.  I'm there.

 9               MR. SHARIFAHMADIAN:  I'm sorry.  I apologize, your

10   Honor.

11   Q.  Let's take a look at this patent.  Who is the assignee of

12   this patent, Defense Exhibit 594?

13   A.  The assignee of this exhibit or of this patent is SoftBook

14   Press, Inc.

15   Q.  Can we agree to refer to this patent as the "SoftBook

16   patent"?

17   A.  I will refer to it as the SoftBook patent.

18   Q.  Can you also turn in your binder to a document marked for

19   identification as Defense Exhibit 569.

20   A.  I am at that exhibit.

21   Q.  This is the February 1996 Internet draft of the Secure

22   Hypertext Transfer Protocol, is that right?

23   A.  That is correct.

24   Q.  Did you consider this document when evaluating whether

25   claim 96 of the '851 patent is valid?

1    A.  I did consider this document.

2              MR. SHARIFAHMADIAN:  Your Honor, we move to admit

3    Defense Exhibit 569.

4              MR. CABRAL:  No objection.

5              THE COURT:  Received.

6              (Defendant's Exhibit 569 received in evidence)

7    Q.  Can we agree to refer to this document as "S-HTTP"?

8    A.  Yes, we can.

9    Q.  Dr. Neuman, in forming your opinions as to whether claim 96

10   of the '851 patent is very old, did you apply the Court's

11   construction?

12   A.  Yes, I did.

13   Q.  Let's turn to the SoftBook patent first.

14             MR. CABRAL:  Your opinion, may we approach?

15             THE COURT:  All right.

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

1          (At the side bar)

2          MR. CABRAL:  We have a pretty serious scope objection

3    to this line and this obviousness combination, in particular

4    between the Sachs patent and the S-HTTP.  This is Mr. Neuman's

5    expert report.  With regard to claim 96, you see that he takes

6    the first half of the claim and just has the one paragraph here

7    for the 719.  What he essentially says --

8          THE COURT:  Hold on.  Paragraph 719?

9          MR. CABRAL:  719.

10         THE COURT:  Got it.

11         MR. CABRAL:  What I think he is saying is, everything

12   I said in claim 1 is applicable to the first half of this claim

13   of obviousness.  The problem with that is that claim 1 is a

14   method claim.  It does not have any of the components or

15   elements that you see here in claim 96.  So you are really

16   comparing apples and oranges.  When you go back to claim 1,

17   which the text is actually provided right here, your Honor,

18   this is claim 1, you will see it is entirely different than

19   claim 96.  In our view, it appears to be a hand wave.

20         THE COURT:  What about that?

21         MR. SHARIFAHMADIAN:  Your Honor, this is basically the

22   same thing.  Claim 1 is a method claim.  It says you receive

23   certain things, you process it, certain things are transmitted.

24   Claim 96 is directed to a device that does those same things.

25   There is nothing special about this patent in terms of --

1          THE COURT:  When he was deposed, was he asked about

2     this?

3          MR. SHARIFAHMADIAN:  He wasn't asked a single question

4     about this combination, your Honor.

5          MR. CABRAL:  Your Honor, this expert report is I think

6     320 pages long.  Defendants have recently withdrawn all of

7     their validity defenses and all of their prior art defenses

8     except for this particular combination.  In the grand scheme of

9     things, this was one of a dozen obviousness combinations that

10    they had of '851 alone.  Now to mention the other prior art

11    things they asserted with respect to the other patent -- there

12    wasn't time to address every single validity argument.

13         MR. SHARIFAHMADIAN:  They had two days, your Honor.

14    This is invalidity defense we put on in this case.  Counsel was

15    more than on notice about this.  In fact, he communicated with

16    us yesterday or the day before, asking us what is the

17    combination we intend to apply.  We informed him of that

18    combination.  He never said, I intend to object based on the

19    scope.  The is fact that he chose not to ask about this

20    combination in the deposition and tried to use that at this

21    point to argue that we should be precluded from putting on our

22    invalidity defense.

23         MR. CABRAL:  The only other point I make is that from

24    a legal standpoint there is also no stated reason to combine

25    these references in the report as well, which is also another

1    argument we think is why this is a deficient argument on its

2    face.

3             MR. SHARIFAHMADIAN:  There is more than that.  We seek

4    to combine the references, your Honor.  Sachs' software patent

5    says that the books are encrypted and S-HTTP is a method of

6    encryption that one skilled in the art would have more than a

7    sufficient motivation.  There are reasons to combine provided

8    for other obviousness combinations, just not this one in

9    particular.

10            Your Honor, I will just point out that claim 1 doesn't

11   have the receiver component or the hardware component for

12   memory or any of the other hardware components we see here in

13   96.

14            MR. SHARIFAHMADIAN:  Claim 1 says transmitting the

15   listed title, selecting the title, communicating the selected

16   title.  That's what a server does.  To say that claim 1 doesn't

17   have a receiver -- claim 1 is a method that is implemented

18   using the device of claim 96, your Honor.

19            THE COURT:  I have now looked at the relevant

20   paragraphs, which begin around 705 and continue through for

21   these purposes 719.  While I think it would have been more

22   artful to have explained why the same disclosures that the

23   expert sees in the S-HTTP system covers both of these

24   situations, the method situation and the processor situation,

25   nevertheless, I think a reasonable reader would be on more than

1    fair notice that the same arguments were being applied to both

2    in a way that is comprehensible.  So the objection is

3    overruled.

4             I am delighted that for convenience we are referring

5    to the prior system here as the S-HTTP system, which just goes

6    tripping off the mouth.

7             (Continued on next page)

1        (In open court)

2   Q.  Dr. Neuman, did you prepare a demonstrative slide to

3   provide an overview of the SoftBook patent?

4   A.  I did have one slide.

5   Q.  Can we put up DDX-1004, please.  At a high level, can you

6   explain what the SoftBook patent describes.

7   A.  The SoftBook patent describes an electronic book device,

8   the "SoftBook devices" it is referred to, that is able to

9   connect to an online bookstore, an Internet bookstore, and

10  allows a user to select books to download and can download

11  those books.  It also describes encryption that is being used

12  to protect that content.

13  Q.  What is the device that you are referring to that is

14  described in the software?

15  A.  The device that I am referring to is what we see in figure

16  2 on the demonstrative.

17  Q.  How did the users of the SoftBook device get electronic

18  books?

19  A.  They were able to get electronic books initially by

20  pressing icons and buttons that are on the display.  The book

21  connects to an online bookstore, and they were able to select

22  books and to have those books downloaded.

23  Q.  Does the SoftBook patent describe using encryption to

24  protect the electronic books that are obtained from the

25  bookstore?

1  A.  Yes, it does describe using encryption.  In the

2  demonstrative you see it in the text block near the bottom, for

3  example, the resulting encrypted content key is sent along with

4  the digital content, which is downloadable.  It is described

5  elsewhere in there also.  But that describes the use of

6  encryption.

7  Q.  Can we put up claim 96 side by side with the SoftBook

8  patent.  What is your opinion on whether the electronic book

9  reader that is disclosed in the SoftBook patent is an

10  electronic book viewer as recited in claim 96?

11  A.  It is an electronic book viewer as recited in claim 96, or

12  that is my opinion.

13  Q.  Is it your opinion that the electronic book reader

14  disclosed in the SoftBook patent receives, stores, and displays

15  electronic books?

16  A.  Yes.  We see the patent describing it as being a reader for

17  displaying electronic books, and it describes the ability to

18  store the books on the device, and those books are received

19  from a sending party.

20  Q.  Let's turn to the receiver element.  In your opinion, does

21  the electronic reader in the SoftBook patent have a receiver?

22  A.  Yes.  The receiver is disclosed from the fact that it is

23  able to receive the content from the bookstore on the Internet.

24  Q.  Does the receiver in the SoftBook patent receive a created

25  transmitted list of titles of available electronic books

1   wherein an electronic book is available if text associated with

2   the electronic book is available for transmission?

3   A.  Yes.  The SoftBook patent describes the ability to go to a

4   bookstore to retrieve a list of books that are available and

5   then download that list.

6   Q.  In your opinion, does the receiver of the electronic reader

7   in the SoftBook patent select a title from the transmitted list

8   of titles?

9   A.  In this respect the receiver in the SoftBook is very

10  similar to the receiver that we talked about in the accused

11  Nook devices.  It is not the receiver that is doing the

12  selection, it is the user that is doing the selection.  But, as

13  I said several times before, you need to understand these

14  claims in the same way when one is looking at infringement as

15  when one is looking at validity.  Therefore, to the extent that

16  this element were to be found present in the Nook devices, one

17  would apply the same standard and one would find this was also

18  present in the SoftBook device.

19  Q.  Do you have an opinion as to whether the receiver of the

20  electronic SoftBook disclosed in the SoftBook patent

21  communicates the selected title?

22  A.  Yes, it is communicating the selected title once the user

23  has selected the title.  That title is communicated back to the

24  bookstore, which is used as a basis of determining which book

25  is going to be downloaded.

Q.  In your opinion, does the receiver disclosed in the

electronic SoftBook patent receive transmitted text associated

with the selected title as encrypted electronic books and

encryption information?

A.  Yes, it does.  In fact, on the demonstrative that we saw on

the previous page, we actually saw the text that was describing

where that occurred.  There was a content key and there was an

inscription of the electronic book.

Q.  So, the books can be encrypted in the SoftBook patent,

correct?

A.  That is correct, they can be encrypted and they are

encrypted in the SoftBook patent.

Q.  What does it receive?  Does it receive anything with the

encrypted books?

A.  When the encrypted book is returned to the SoftBook reader,

the book is accompanied with the content key, the encryption

key, that was used to encrypt the encrypted electronic book.

Q.  Is that key itself encrypted?

A.  That key is itself encrypted.

Q.  Does the device disclosed in the SoftBook patent store the

encrypted book and the encrypted decryption key?

A.  Yes.  In fact, what is happening in that case is the

SoftBook is actually first decrypting the encryption key.  It

is then reencrypting the encryption key using its own device

key and storing that together with the encrypted book.

1   Q.   What is your opinion of whether the electronic book reader

2   that is disclosed in the SoftBook patent has a processor that

3   performs encryption and decryption?

4   A.   The encryption and decryption that is described is

5   occurring on the device.   That occurs necessarily -- and

6   actually there is a processor that is disclosed for the device

7   that performs those operations.

8   Q.   Do you have an opinion as to whether the electronic book

9   reader that is disclosed in the SoftBook patent has a

10  transmitter?   Can we put up the second half of the claim.

11  A.   Yes.   The SoftBook device has a transmitter, and that

12  transmitter is used, among other things -- we saw it used

13  before to communicate the selection.   So it does have a

14  transmitter.

15  Q.   What information, if any, does the SoftBook device send

16  that is related to encryption?

17  A.   There's quite a bit of information that is sent related to

18  encryption.   Among other things, the means or the method that

19  is being used to authenticate the book actually involves

20  accepting an encrypted session key, which is then relayed and

21  sent out to the sending party, to the bookstore.   So, we have

22  encryption keys that are being sent to the bookstore as well as

23  other information about the request.

24  Q.   Is this concept shown anywhere in the figures?

25  A.   Yes.   In fact, there is a figure that we have on page --

1    actually, it is on the figure on page 1.  There is a blow-up on

2    page 3 which is figure 1.

3    Q.  Can we show that, please.  Can you show where the concept

4    you were describing is shown in this.

5    A.  The concept where the encryption key is being sent to the

6    bookstore is, if you see the arrows with the cross-hatches --

7              MR. SHARIFAHMADIAN:  I apologize.  Your Honor, may I

8    give a pointer to the witness?

9              THE COURT:  Yes.

10             MR. SHARIFAHMADIAN:  Thank you.

11   A.  If we see this sort of crossed-hatched arrow, that is where

12   information is being sent from the SoftBook itself to the

13   bookstore.  Included in here is an encrypted session key which

14   is being relayed.  It had come from the authentication server

15   down to the SoftBook server, and then that is being relayed to

16   the primary virtual bookstore, and that includes an encrypted

17   session.

18   Q.  How is that session key used?

19   A.  I'm sorry?

20   Q.  How is the session key used?

21   A.  The session key will be used in the response that is

22   coming -- actually, the response is coming from the bookstore

23   along this path, but essentially the same two end points, to

24   protect the communication channel over which the encrypted

25   electronic book is sent and over which the book key, the

1    content encryption key, is being sent.

2    Q.  You said earlier that you also considered the S-HTTP

3    document, right?

4    A.  Yes.  I know it is hard to pronounce.  The S-HTTP document,

5    I did consider that.

6    Q.  Can we put that up.  Can you explain how S-HTTP is relevant

7    to claim 96.

8    A.  S-HTTP was another standard that was being developed in the

9    early '90s for encryption of data between devices.  In

10   particular, it was intended for use on web browsers

11   communicating with a web server.  S-HTTP is similar to SSL in

12   terms of where it was intended to be applied, but it actually

13   uses an additional form of encryption.  It actually uses a

14   blend of both content encryption that I described and the

15   stream or transient encryption that I described.

16         As a standard that was being introduced, there were

17   libraries that were produced for which this was available.

18   Developers, others of skill in the art around that time frame

19   would use these libraries much as they would use the initial

20   SSL libraries, to integrate encryption into the products that

21   they were developing.

22   Q.  What is your opinion of whether S-HTTP discloses a receiver

23   that receives a list of titles?

24   A.  S-HTTP by itself is a protocol.  It doesn't have the

25   hardware that constitutes the receiver.  But if you look at the

specification and what it was intended to be used in, it is

described as being used for a web browser.  A web browser is

software.  Software runs on a computer.  It makes little sense

to use a web browser if you don't have access to the Internet.

That is where the receiver comes in.  What is being displayed

is content that is being received by the computer through a

receiver into the browser, and that's what S-HTTP is

describing.

Q.  What is your opinion of whether S-HTTP discloses a receiver

that communicates selected titles?

A.  S-HTTP is a mechanism that is based on the communication of

HTML.  I already described what that was, HyperText Markup

Language.  That is how one represent web pages.  Web pages at

that time had links to documents that you retrieved by clicking

on those web pages.  Those links constituted a list of titles.

        In the S-HTTP specification, we actually see an

example at the end that includes HTML that includes, at least

within the example, a list of one title.

Q.  What is your opinion on whether S-HTTP discloses a key

generator that generates encryption and decryption keys?

A.  The S-HTTP specification repeatedly discusses the need to

generate new, fresh keys that will be used for only a

particular communication or only a particular item.  In

disclosing the generation of those new random keys, it is

disclosing a key generator.

1    Q.  What is your opinion on whether S-HTTP discloses

2    transmitting encryption information?

3    A.  The S-HTTP protocol clearly discloses the transmitting of

4    encryption information when it describes the particular keys

5    that are being sent as part of the protocol messages and the

6    multiple layers of encryption that are being provided to

7    encrypt those keys themselves.  In fact, if you look at what is

8    described specifically in the text and if you look at what is

9    described specifically in just even that example at the end of

10   the text, you see each of those elements that are encompassed

11   in encryption information being described.

12   Q.  In this respect of transmitting encryption information, how

13   is S-HTTP different than SSL?

14   A.  S-HTTP is different from SSL in that there is a lot more

15   use of keys that are being provided.  In particular, I just

16   indicated each of those that were specified is described in

17   there.  S-HTTP also explicitly contemplates the use of content

18   encryption.  That is, where there will be content that has

19   been, they use the term "preenhanced," but where that data

20   remains encrypted on disk, the same data is retrieved by

21   multiple users and the same key is used to decrypt that content

22   for each user that is accessing that content.

23   Q.  If I understand you correctly, in S-HTTP there are keys

24   that are transmitted, is that right?

25   A.  Yes, there are keys that are transmitted.

1   Q.  Are there keys that are transmitted in SSL?

2   A.  In SSL the keys are not actually transmitted.  There is

3   this premaster secret that is transmitted from which keys are

4   derived.

5   Q.  What is your opinion of whether the keys transmitted in

6   S-HTTP allow encryption of encryption and decryption keys?

7   A.  The S-HTTP specification and even the example provided at

8   the end point to cases where you are encrypting and decrypting

9   encryption and decryption keys.

10  Q.  What is your opinion of whether the keys transmitted in

11  S-HTTP allow decryption of encryption and decryption keys?

12  A.  The keys transmitted in S-HTTP also allow decryption of the

13  encryption and decryption keys.

14  Q.  In your opinion, would it be obvious to combine the

15  disclosure of S-HTTP with the device that is disclosed in the

16  SoftBook patent that we discussed earlier?

17  A.  Yes, it would be obvious to do so.

18  Q.  Why do you say that, sir?

19  A.  Once again, I described S-HTTP as an emerging --

20          MR. CABRAL:  Objection, your Honor:  Outside the scope

21  of the expert report.

22          THE COURT:  Paragraph?

23          MR. SHARIFAHMADIAN:  Your Honor, the same sections

24  that we discussed earlier.

25          MR. CABRAL:  Your Honor, to be specific, the objection

Eeksad23            Newmann - direct

1    relates to the motivation of the buyer.

2              THE COURT:  Sustained as to the motivation of the

3    buyer.

4    Q.  Let's move on to the '703 patent.

5    A.  I'm sorry?

6    Q.  I'm sorry.  The '501 patent.  Typo.  I apologize.

7    Generally speaking, what is the relevant portion of the '501

8    patent directed to?

9    A.  The relevant portion of the '501 patent is directed to

10   techniques that are being used to facilitate the storage of an

11   electronic book on a viewer for a predetermined amount of time.

12   Q.  With respect to the '501 patent, do you know what ADREA is

13   accusing of infringement?

14   A.  Yes.  My understanding is that ADREA is accusing the Lend

15   Me functionality at Barnes & Noble of infringing.

16   Q.  Do you have an understanding of how Barnes & Noble's Lend

17   Me functionality works?

18   A.  Yes, I have an understanding.

19   Q.  How did you gain that understanding?

20   A.  I gained that understanding by reading about the Lend Me

21   functionality, by using the functionality on several devices,

22   by running some experiments as well to determine how the

23   particular time periods are determined and how they relate to

24   the time at which the books are stored on the viewer.

25   Q.  Did you review source code related to this functionality?

1    A.  Yes, I did review source code related to this

2    functionality.

3    Q.  You mentioned performing some experiments.  At a high

4    level, can you please explain the purpose of doing those

5    experiments.

6    A.  Yes.  The purpose of those experiments was to determine how

7    the time at which the lending period was set, the start of the

8    lending period, was related to the time at which an electronic

9    book would be stored on a Nook device.

10   Q.  We'll go through that in a little bit more detail in a

11   little bit.  Based on the evidence that you have reviewed, can

12   you please explain, what is B&N's Lend Me feature?

13   A.  Barnes & Noble's Lend Me feature is a feature that allows

14   users of Barnes & Noble to loan a book from one Barnes & Noble

15   account to another Barnes & Noble account for a specific period

16   of time.

17   Q.  Can you explain how a Barnes & Noble account holder, how

18   one person would go about lending a book to another account

19   holder.

20   A.  First, the person who was going to loan the book would have

21   to have a book that was available to loan.  If they had that

22   book, they would click on a link on the Barnes & Noble website

23   or on a Barnes & Noble Nook device which would allow them to

24   offer that book to loan.  They would enter the email address or

25   another identifier of the intended recipient of the loan.

1   Q.   For clarity's sake, is every book that is purchasable on

2   Barnes & Noble also lendable?

3   A.   No, not every book is lendable.

4   Q.   Who determines whether a book is lendable?

5   A.   I believe it is the book publisher.

6   Q.   Can you please explain how a person would accept an offer

7   to lend a book via the Barnes & Noble Lend Me feature.

8   A.   A user with a Barnes & Noble account that has been offered

9   a book for loan would, when they logged in to the Barnes &

10  Noble website or when they accessed a Nook device that was

11  associated with that account, would see a message indicating

12  that their friend had offered them a book for loan.  At that

13  point they would press a button indicating their acceptance of

14  the loan, and that button would result in a message being sent

15  to the Barnes & Noble servers, which would then initiate the

16  loan and note what the start of the lending period is.

17  Q.   What is actually the lending period in the Barnes & Noble

18  Lend Me feature?

19  A.   Within Barnes & Noble, the Lend Me period is roughly 14

20  days.

21  Q.   When does this lending period begin to run?

22  A.   The lending period begins to run when the loan offer is

23  accepted by the user.

24  Q.   What do you mean by that, when the loan offer is accepted

25  by the user?

1  A.  The loan offer is accepted by the user at the time that the

2  Barnes & Noble website accepts that input from the user and

3  records the start of the loan period.

4  Q.  How does the Barnes & Noble server record the acceptance

5  and start the time period?

6  A.  Barnes & Noble records the acceptance and starts the time

7  period by noting an entry associated with the book on the

8  Barnes & Noble website associated with the customer's account.

9  Q.  Who is it that is setting the expiration time?

10  A.  It is being set by the Barnes & Noble servers.

11  Q.  When is the expiration time starting?

12  A.  It is starting when the user accepts the loan.

13  Q.  What happens when the user accepts the loan?

14  A.  When the user accepts the loan, the time of the acceptance

15  of the loan is when the Barnes & Noble server records the start

16  of that lending period and does other things to now associate

17  that book with the new account rather than with the old

18  account.

19  Q.  At the time that the loan period starts on the Barnes &

20  Noble server, has a book been downloaded to the Nook device

21  yet?

22  A.  No, the book has not been downloaded to the Nook device at

23  that time.

24  Q.  When does the book get downloaded to the Nook device?

25  A.  The book is downloaded to the Nook device at some time

1    after the loan period is begun.  It could be shortly there-

2    after, it could be several days thereafter.

3    Q.  Does the loan period begin when the book is stored on the

4    Nook?

5    A.  No.  As I already indicated, the book is stored on the Nook

6    much after, many steps after, and sometimes significant time

7    after the loan was accepted.

8    Q.  Does the start of the loan period depend on when the book

9    is downloaded to the device?

10    A.  No, it does not.  In fact, that is one of the things that I

11    determined through the experiments that I ran.

12    Q.  Are the steps of processing the loan acceptance by the

13    server and downloading the book to the Nook device part of the

14    same operation?

15    A.  No, they are not part of a single operation.

16    Q.  What is their relationship?

17    A.  One, the downloading to the Nook and then the storing on

18    the Nook occurs necessarily after the loan was accepted.  The

19    experiments that I performed also demonstrate the separation of

20    these two things in two distinct operations.

21    Q.  We will get to that in a second.  What would happen with

22    the lending period if the book is never downloaded to the Nook

23    after it is accepted?

24    A.  If the book is never downloaded to the Nook, the lending

25    period continues to run, and at the end of 14 days the lending

1    period will be over even though the book was never downloaded.

2    Q.  Now let's turn to the experiment that you said that you

3    did.  Again, what was the purpose of the experiment?

4    A.  The purpose of the experiment was to determine the

5    relationship between the point at which the loan offer is

6    accepted and when the book is downloaded to and stored on the

7    Nook device.

8    Q.  By acceptance here you are referring to the processing of

9    that acceptance of the server?

10   A.  By acceptance I am referring to the processing of that

11   acceptance on the server.

12   Q.  Did you prepare a demonstrative to show this concept or

13   show this experiment to the --

14   A.  Yes, I did provide several slides to that experiment.

15   Q.  Can we please put up DDX-950.  Before we get started with

16   the slides, what did you do to perform this experiment.

17   A.  To perform this experiment, I created multiple Barnes &

18   Noble accounts, I purchased a book with one of those accounts,

19   one of the books that was available for loan.  I then --

20   actually, that's what I did.  The other steps we will get into.

21   Q.  You said you created a second account?

22   A.  Yes, I created a second Barnes & Noble account.  This is

23   the account to which I was going to loan the book.  In these

24   experiments, you are loaning the book from one Barnes & Noble

25   account to another Barnes & Noble account, so it was necessary

1   to create two accounts to run this experiment.

2   Q.  Did you associate the second account with any particular

3   device?

4   A.  Yes.  The second account, the one to which I was initiating

5   the loan, I associated with a Nook HD+ device.

6   Q.  What do you mean by associating it with a Nook HD device?

7   A.  As we talked about in some of the other patents, when I

8   turned on the Nook HD device, I configured the device, I

9   associated it with my wireless network.  Then I logged in to

10  that second Barnes & Noble account, entering the username or

11  really the email address associated with that account, and the

12  password associated with that account.  At that point it became

13  associated with that Barnes & Noble account.

14  Q.  Could we show the next slide, please, DDX-916.  Can you

15  please explain what is shown here.

16  A.  What is shown here is my offering to lend the book 100

17  Classic Hikes in Southern California to the Barnes & Noble

18  account that here is bn@bcneuman.com.

19  Q.  So bn@bcneuman.com is the second account, right?

20  A.  That is the second account.  Unfortunately, this is a

21  little blurry here.  I may refer to the . . .

22  Q.  Let's go to the next slide, the DDX-917.  Can you please

23  explain what is shown here.

24  A.  By the way, in both of these cases what you see is myself

25  logged in to the Barnes & Noble website.  In the first line I

1    was logged in to the account from which I was making the loan.

2    I logged out, and now I logged in to the Barnes & Noble website

3    using the account to which the loan was offered.  When I log in

4    to the Barnes & Noble website, I see that I have a lend offer

5    that is available.  You see the book, it says "lent to you,"

6    and it gives me some choices of what I may do.

7    Q.  At the time that you logged in to the Barnes & Noble

8    website with your second account, what was going on with the

9    Nook HD+?

10   A.  After I had associated the Nook with my account, I actually

11   turned it off.  At the point that I am logging in here, the

12   Nook device itself is turned off.  I did that specifically so

13   that the Nook device would not download the book at that time.

14   Q.  Was the Nook device also off when you actually made the

15   offer from your first account?

16   A.  Yes, it was off when I made the offer.

17   Q.  Can we go to the next slide.  This is DDX-918.  Can you

18   please explain what is shown in this slide.

19   A.  From the previous slide, I then accepted the loan offer

20   while I was logged in to the Barnes & Noble website.  Here we

21   see the view after I accepted that offer, where we see the book

22   now showing it is not lent to you but it is borrowed,

23   indicating that I have this in my account as a borrowed book

24   and that I have 14 days remaining in the loan period.

25   Q.  What did you do after this?

1    A.  After this, I actually went on vacation for a little while

2    and I didn't do anything until two days -- until a few days

3    later.

4    Q.  Can we show the next slide, DDX-919.  What is shown here,

5    sir?

6    A.  This is a few days later, when I turned on the Nook device

7    that had been associated with the account for which I had

8    previously accepted the loan.  Here we see that now that I have

9    turned on the Nook device, the book downloads to the device and

10   is eventually stored on the device.  But you also see here that

11   the loan period at this point is 12 days.  It's already two

12   days shorter than when I had originally accepted the loan.

13   Q.  What did you conclude from this?

14   A.  From this I concluded that the loan period is not dependent

15   upon when the book is downloaded to the Nook device.

16   Q.  What does it depend on?

17   A.  It depends on when the loan offer was accepted.

18   Q.  And?

19   A.  And the loan offer was accepted at the time that the user's

20   acceptance of that was recorded on the Barnes & Noble servers.

21   Q.  Did you conduct similar experiments using other Nook

22   devices?

23   A.  I did.

24   Q.  Which other devices?

25   A.  The Nook Simple Touch, various others as well.

1   Q.  What were your conclusions with those experiments?

2   A.  The conclusions were the same with those experiments for

3   the same reasons.

4   Q.  Dr. Neuman, do you even need a Nook device to use B&N's

5   Lend Me system?

6   A.  No, you do not need a Nook device to use that.  In fact,

7   until this line came up, you saw it being used in a way that

8   could be performed without a Nook device.

9   Q.  In B&N's Lend Me system, when does the loan period start?

10  A.  The loan period starts --

11          MR. CABRAL:  Objection, your Honor:  Asked and

12  answered.

13          THE COURT:  Sustained.

14  Q.  Let's turn to claim 7, which is a method claim.  Dr.

15  Neuman, have you formed an opinion as to whether B&N performs

16  all of the elements of claim 7?

17  A.  I have.

18  Q.  Before we discuss the individual elements of this

19  limitation, does claim 7 require any special kind of hardware

20  to perform the steps?

21  A.  No, it doesn't require any special hardware.

22  Q.  What is your opinion regarding whether claim 7 is infringed

23  by Barnes & Noble?

24  A.  My opinion is that claim 7 is not infringed by Barnes &

25  Noble.

Q.  Let's focus on the element that says, "associating a
predetermined amount of time after the electronic book is
stored on the viewer with the electronic book."  Do you see
that?

A.  I do see that.

Q.  Is it your understanding that the Court construed that
limitation?

A.  Yes, the Court has construed that limitation.

Q.  Can we put up the construction, please.  We see it there.
Can you please read the Court's construction.

A.  "Associating with the electronic book a predetermined
amount of time that begins when the electronic book is stored
on the viewer."

Q.  With that construction in mind, is it your opinion that
Barnes & Noble performs this associating step?

A.  It is my opinion that Barnes & Noble does not perform this
associating step.  Can we get the claim?

Q.  Sure.  Let's put the claim up.  Can you please explain why.

A.  Because under that construction and under this term the
predetermined amount of time that needs to be stored is after
the electronic book has been stored on the viewer.  As we just
demonstrated in the example that I presented, the predetermined
amount of time is being stored or, sorry, is being associated
with the electronic book at the time that the loan offer is
accepted, and that is before the book is actually being stored

1    on the viewer.

2    Q.  I believe the limitation begins "when stored on the

3    viewer," the construction says that.

4    A.  The construction begins when it is stored on the viewer.

5    Q.  Does your opinion remain the same with that clarification

6    in mind?

7    A.  Yes, my opinion remains the same.  Again, the experiment

8    demonstrated when the book was stored on the viewer, and it

9    demonstrated that the loan period began long before that.

10   Q.  Thank you.  Dr. Neuman, do you agree that the time between

11   when the loan period starts and the book can be downloaded to

12   the device, that time period can sometimes be quite short?

13   A.  That time period can sometimes be quite short.

14   Q.  Isn't that just an insubstantial difference?

15   A.  No, it is not insubstantial at all.

16   Q.  Why do you say that, sir?

17   A.  Because it really gets to the core of how things are

18   operating.  First of all, the time that is being stored is a

19   different time.  It is the time at which the loan was sent, and

20   that we have already demonstrated is a distinct time.  It could

21   be removed by several days from the time at which the book is

22   stored on the Nook itself.

23        It is actually being done for a purpose, a different

24   purpose as well.  In the Barnes & Noble system you are looking

25   at loaning books from one account to another account.  In fact,

1  it is possible to loan a book to someone's account where they

2  are able to view that book on multiple viewers that they might

3  have associated with that account.

4      If what you are to do instead was to associate that

5  period with when it was stored on the book, they'd be able to

6  artificially extend that loan period by moving it from book to

7  book, and each time they loaded it on a different book, they

8  would get a new 14 days, for example.

9      So we've got a different purpose.  We see a different

10  result as well.  My experiment demonstrated that the loan

11  period at the time that it was downloaded and stored on the

12  book 12 days, whereas the result -- and that's the result that

13  you got in the Barnes & Noble system.  The result that you

14  would have gotten if you applied these claim terms is it would

15  have been 14 days at that point, and that's a different result.

16  Q.  Now, is it your understanding that claims 8 and 9 are also

17  being asserted?

18      THE COURT:  Counsel, bear in mind that we are going to

19  break for lunch in two minutes.

20      MR. SHARIFAHMADIAN:  All right, your Honor.  This

21  would be a good place to stop.

22      THE COURT:  I thought it might be a good place.

23      MR. SHARIFAHMADIAN:  I apologize, your Honor.  If I

24  could just finish 8 and 9.

25      THE COURT:  Go ahead.

1  Q.  Is it your understanding that claims 8 and 9 are also being

2  asserted?

3  A.  Yes, it is my understanding.

4  Q.  Do you have an opinion as to whether those claims are

5  infringed by Barnes & Noble?

6  A.  It is my opinion that those claims are not infringed by

7  Barnes & Noble.

8  Q.  Are those dependent from claim 7?

9  A.  Yes, those are dependent from claim 7.

10 Q.  Why do you say they are not infringed?

11 A.  Because in order to infringe a dependent claim, you need to

12 infringe the independent claim from which it is derived.  I

13 have already given you all of my reasons that Barnes & Noble

14 does not infringe the independent claim; therefore, the

15 dependent claims are not infringed.

16          MR. SHARIFAHMADIAN:  Thank you.

17          THE COURT:  Ladies and gentlemen, we will take our

18 lunch break at this time and we will reconvene at 2 o'clock.

19          (Continued on next page)

20

21

22

23

24

25

1     (Jury not present)

2     THE COURT:  You may step down.  We'll see you at 2

3     o'clock.

4     (Witness not present)

5     THE COURT:  How much longer do you have on direct?

6     MR. SHARIFAHMADIAN:  It shouldn't be more than half an

7     hour, and probably less.

8     THE COURT:  That's fine.  We'll see you at 2 o'clock.

9     (Luncheon recess)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1                        AFTERNOON SESSION

 2                           2:00 p.m.

 3            (Jury not present)

 4            THE COURT:  Let's get the witness on the stand and

 5   bring the jury in.

 6            (Jury present)

 7   CLIFFORD NEUMAN, resumed.

 8            THE COURT:  All right.  Counsel.

 9   BY MR. SHARIFAHMADIAN:

10   Q.  Good afternoon, Dr. Neuman.  Welcome back.

11   A.  Thank you.

12   Q.  Before the lunch break we were discussing the

13   noninfringement of the '501 patent, and we finished going

14   through claims 7, 8 and 9.  And with respect to claim 7, we

15   were discussing the associating limitation.  Do you recall

16   that?

17   A.  I do recall that.

18   Q.  Let's turn to claim 18 of the '501 patent.

19            That's directed to a portable viewer for displaying

20   electronic books.  Do you see that?

21   A.  I do see that.

22   Q.  It says "comprising" and lists a number of elements?

23   A.  I see those elements.

24   Q.  Have you formed an opinion regarding whether the accused

25   Nook devices meet every element of claim 18 of the '501 patent?

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

FAK8ADR4                    Neuman - direct

1   A.  I have.

2   Q.  What is your opinion?

3   A.  My opinion is the accused Nook devices do not meet all of

4   the elements of claim 18 of the '501 patent.

5   Q.  Let's turn to the element that says "a processor that

6   operates under the control of the instructions and is capable

7   of."  Do you see that, sir?

8   A.  I do see that.

9   Q.  The processor must be capable of doing certain things, is

10  that right?

11  A.  That is correct.

12  Q.  One of the things it must be capable of doing is

13  associating a predetermined amount of time after the electronic

14  book is stored on the viewer with the electronic book.  Do you

15  see that?

16  A.  I do see that.

17  Q.  That's the same associating limitation that appeared in

18  claim 7, is that right?

19  A.  Yes.  That is the same associating limitation that appeared

20  in claim 7.

21  Q.  Then the Court's construction of that language also applies

22  to claim 18, correct?

23  A.  That is correct.  The Court's construction applies to claim

24  18 as well.

25  Q.  The construction is associating with the electronic book a

1  predetermined amount of time that begins when the electronic

2  book is stored on the viewer, right?

3  A.  That is correct.

4  Q.  That's the construction you applied in formulating your

5  opinions?

6  A.  That is the construction I applied.

7  Q.  In your opinion, do the Nook devices, the accused Nook

8  devices, have a processor that operates under the control of

9  the instructions and is capable of associating the

10 predetermined amount of time after the electronic book is

11 stored on the viewer with the electronic book?

12 A.  I have formed an opinion.

13 Q.  What is your opinion?

14 A.  My opinion is that the Nook devices do not.

15 Q.  Why is that, sir?

16 A.  That is because it is necessary for the Nook devices to,

17 under the control of instructions, meet that particular element

18 of the claim as well, associating the predetermined amount of

19 time after the electronic book is stored on the viewer, as

20 understood within the Court's construction.  And, as I have

21 described with claim 7, that is not what is actually occurring.

22 Q.  What is actually occurring?

23 A.  What is occurring with the Nook devices is that the time is

24 being associated with when the loan offer is accepted on the

25 Web server.

Neuman - direct

1   Q.  Does your opinion remain the same that this difference of

2   the loan starting when processed on the server versus when

3   stored on the Nook device is a substantial difference?

4   A.  Yes, my opinion remains that it is a significant

5   difference.

6   Q.  Is it for the same reasons as you explained with respect to

7   claim 7?

8   A.  Yes, for exactly the same reasons I explained there.

9   Q.  Finally, claim 19 is the final asserted claim and that

10  depends from claim 18.  Do you have an opinion as to whether

11  claim 19 is infringed?

12  A.  Yes, I do.

13  Q.  What is your opinion?

14  A.  My opinion is that claim 19 is not infringed for the same

15  reasons that claim 18 was not infringed.  Claim 19 is a

16  dependent claim; to infringe it you would also need to infringe

17  claim 18.

18  Q.  Let's turn to the issues of validity with respect to the

19  '501 patent.  I would like to ask you a few questions about

20  what was known at the time the '501 patent was filed.

21          Are computers able to store and view electronic books,

22  sir?

23  A.  Yes.  Computers are able to store and view electronic

24  books.

25  Q.  Since when have they been able to do that?

1    A.   Well, storing of textual information of electronic books

2    has been occurring since the late 60s, early 70s.  In fact, a

3    lot of the early Internet publications were being distributed

4    through computers and computer networks.

5    Q.   When did dedicated electronic book readers come into

6    existence?

7    A.   You started to see some of the dedicated electronic book

8    readers coming into existence in the 80s.

9    Q.   With respect to computers disseminating information, in

10   fact, with respect to one of the earlier patents, you said that

11   has been going on since the late 1960s.  Were electronic books

12   among the information disseminated at or around that time?

13   A.   At or around which time?

14   Q.   1960s.

15   A.   1960s, electronic books, as the Court has construed the

16   term, were being distributed.

17   Q.   Were electronic book readers ever connected to computer

18   networks?

19   A.   Electronic book readers have been connected to networks for

20   many years.

21   Q.   Since at least the mid to late 1990s?

22   A.   Since at least the mid to late 1990s.

23   Q.   In the 1980s and 1990s, was it possible to disseminate

24   information over a computer network on a temporary basis, in

25   other words, without giving people permanent copies?

1   A.  It was possible to disseminate information over networks

2   where, if it was viewed on a screen, for example, and not

3   stored, that would be a temporary copy.

4   Q.  What about if it was just time limited?

5   A.  If it was to be time limited, there was art to disclose

6   that as well.

7   Q.  Can you please turn in your binder to the document marked

8   for identification as DTX 416.

9   A.  I am at DTX 416.

10  Q.  This is PCT publication number WO1993/09490, and it names

11  Michael M. Saigh as an inventor.  Do you see that, sir?

12  A.  I do see that.

13  Q.  Did you consider this publication when evaluating whether

14  the asserted claims of the '501 patent are valid?

15  A.  Yes, I did consider this publication.

16          MR. SHARIFAHMADIAN:  We offer Defense Exhibit 416 into

17  evidence.

18          THE COURT:  Any objection?

19          MR. CABRAL:  No, your Honor.

20          THE COURT:  416 is received.

21          (Defendant's Exhibit 416 received in evidence)

22  Q.  Can we agree to refer to this document as the Saigh

23  publication?

24  A.  I will refer to it as the Saigh publication.

25  Q.  Speaking generally, what is the Saigh publication directed

FAK8ADR4                    Neuman - direct

1    to?

2    A.  The Saigh publication is directed to an apparatus for

3    displaying and storing electronic books.

4    Q.  Can you please tell us a little bit more about how the

5    Saigh publication discloses electronic books and distribution?

6    A.  The Saigh publication describes an apparatus that includes

7    a display, it includes a processor, it includes input devices

8    through which -- and it includes also memory cards that are

9    associated with those devices.  And it explains how contents in

10   electronic books may be stored on the viewer and how

11   information about the time for which those should be stored on

12   the viewer is to be recorded so that the content may be deleted

13   and erased at the end of that period.

14   Q.  In your opinion, does the Saigh publication disclose every

15   element of claim 7?

16   A.  Can you please put up claim 7?

17            Yes.  It is my opinion that the Saigh publication

18   discloses all of the elements of claim 7 of the '501 patent.

19   Q.  Have you formed an opinion regarding whether the Saigh

20   publication anticipates claim 7 of the '501 patent?

21   A.  I have.

22   Q.  What is your opinion?

23   A.  My opinion is that the Saigh publication does anticipate

24   claim 7 of the '501 patent.

25   Q.  Does the Saigh publication disclose electronic books?

FAK8ADR4                         Neuman - direct

1  A.  Yes.  It does disclose electronic books where it talks

2  about the data that may be stored on the apparatus.

3  Q.  Does it say that books and magazines and other periodicals

4  can be stored on the apparatus?

5  A.  Yes.  It does describe that books and magazines may be

6  stored.

7  Q.  I want to focus on the viewer element next, which is in the

8  claim.  Does the Saigh publication disclose a viewer?

9  A.  Yes.  The Saigh publication does disclose a viewer.

10  Q.  Why do you say that, sir?

11  A.  Because the Saigh publication discloses the apparatus that

12  can display the electronic books, and in this figure we see a

13  display as item 48, an LCD display.

14  Q.  So the Saigh publication discloses an electronic personal

15  library apparatus, correct?

16  A.  It is describing an electronic library apparatus.

17  Q.  That's what we see in figure 1 in total?

18  A.  That is what is up there in figure 1 is the total

19  apparatus.

20  Q.  Does it also disclose a control unit?

21  A.  Yes.  It discloses a control unit, which you see up there

22  as the small fold-out device labeled 20 on that figure.

23  Q.  Is the apparatus that is disclosed in Saigh portable?

24  A.  Yes.  Saigh explicitly discloses it as being portable.

25  That particular case that you see is maybe a little cumbersome,

 1   but it is still described as something that can be ported.  And

 2   you also have the control unit of the device, the small piece

 3   that you see up at the top, that is also portable.

 4   Q.  Do you have an opinion as to whether it's the personal

 5   library apparatus as a whole or the control unit that is the

 6   viewer that corresponds to what is in the claim?

 7   A.  Yes, I do.

 8   Q.  What is it?

 9   A.  My opinion is that both of them can independently be shown

10   to be that viewer.  So you can look at it both ways, and

11   whether you look at it as the entire apparatus or whether you

12   look at it as just the control unit piece, it would still meet

13   the requirements of viewer as described in the claim.

14   Q.  Does the Saigh publication disclose the method for

15   restricting access to electronic books displayed on the viewer?

16   A.  Yes.  It does disclose a method for restricting access to

17   electronic books displayed on the viewer.

18   Q.  How does it do that, sir?

19   A.  The way that it does that is by describing the electronic

20   books that are stored on the viewer may be erased at the

21   completion of a predetermined time.  In fact, we see some of

22   that on page 14 of the publication.

23   Q.  We will get to that in a moment.

24          So the books that are mentioned in Saigh, they are

25   capable of being stored, or Saigh is capable of storing an

1    electronic book on a viewer, sir?

2    A.  Yes.  The books that are described in Saigh may be stored

3    on a viewer.  In particular, what ends up happening is that the

4    books are copied to the memory cards that are part of the

5    viewer.

6    Q.  How are the books transferred to the memory cards of the

7    control unit?

8    A.  Well, actually, it's in one embodiment.  The books can be

9    copied by commands by the user using the control apparatus from

10   a compact cylinder, which is something similar to a compact

11   disk; they can be copied into the memory that is part of the

12   viewer.

13   Q.  So is that something analogous to taking a CD in your

14   computer, putting it in a CD-ROM and transferring it to the

15   memory?

16   A.  It is very analogous to taking a CD and copying it into

17   memory or on to a memory card in your computer or your cell

18   phone or something like that.

19   Q.  So you mentioned Saigh has memory modules, right?

20   A.  I have mentioned that it has memory modules.

21   Q.  What does it say about these memory modules?

22   A.  Saigh discloses that these memory modules are separable,

23   but that they are a part of the -- they are an integral part of

24   the control unit of the apparatus as well.

25   Q.  Can you give an analogy of what a separable memory module

FAK8ADR4          Neuman - direct

 1  might be like?

 2  A.  A separable memory module might be like an SD card you

 3  might plug into your cell phone in order to provide it with

 4  additional memory.  It is also similar to an SD card that one

 5  could plug into a Nook device.

 6  Q.  Does the Saigh publication disclose associating a

 7  predetermined amount of time after the electronic book is

 8  stored on the viewer with the electronic book?

 9  A.  Yes.  The Saigh publication does disclose associating a

10  predetermined amount of time after the electronic book is

11  stored on the viewer with the electronic book.

12  Q.  Is that page 14 you were referring to?

13  A.  That's what I was referring to earlier when I said page 14,

14  which discusses quite a number of things, this is one of the

15  things.

16  Q.  Where on page 14 should we look, sir?

17  A.  You should start at the paragraph that is starting at line

18  6.  It starts, "The control unit 20."  And if you'd like, I

19  could read this.

20  Q.  Sure.  Where are you pointing to?

21  A.  You have got it here.  It starts on line 6:  "The control

22  unit 20 of the apparatus is provided with a real time clock as

23  part of the microprocessor unit.  Information downloaded from a

24  compact cylinder" -- that's the CD I was referring to before --

25  "or from a book bank to a memory module 22" -- the memory

EAK8ADR4                     Neuman - direct

1   module I was referring -- "may also include date and time

2   information as to when the data was transcribed into the memory

3   module, as well as information regarding a set time period

4   after which the information transcribed in the memory module

5   will be automatically erased."

6   Q.  What is the next sentence after that?

7   A.  The next sentence reads:  "The programmed set time period

8   is compared to the control unit's real time clock, and if the

9   set time period has elapsed, the control unit will

10  automatically cause the data downloaded to the memory module to

11  be effectively erased."  And that's the process of where you

12  are actually controlling the access to the memory.

13  Q.  It says that the electronic books can be transferred to the

14  memory module in two ways, is that right?

15  A.  Yes, it does describe two ways.

16  Q.  One is from the compact disk or compact cylinders?

17  A.  One is from the compact cylinders, and that is what I just

18  described.

19  Q.  Is that the embodiment that you're referring to?

20  A.  Yes.

21  Q.  So the next limitation is allowing access to and display of

22  the electronic book for the predetermined amount of time.

23  A.  Yes.

24  Q.  Is that limitation met in your opinion?

25  A.  That limitation is also met in my opinion.

1   Q.   What do you base that on?

2   A.   There is similar text in here, and if we look through

3   here --

4              MR. SHARIFAHMADIAN:  Let's put back up page 14,

5   please.

6   Q.   Does that discussion support your opinion?

7   A.   Yes.  It does support my opinion, and I am looking for the

8   particular reference in here.

9              So where it talks about "the material programmed into

10  memory module is loaned for a predetermined period of time.

11  The preset time periods before automatic erasure of information

12  programmed in the module may be set."

13  Q.   So the book is available until the time period has elapsed?

14  A.   That's right.  So the book is available and you are

15  allowing access until the time that the time period has

16  elapsed.  And then within the previous claim, you are

17  restricting -- or actually the next one -- you are restricting

18  the access --

19  Q.   The next limitation actually --

20  A.   I will wait till you get there.

21  Q.   -- is restricting access to the electronic book for display

22  of the electronic book on the viewer once the predetermined

23  amount of time has passed.

24             In your opinion, is that limitation also shown in

25  Saigh?

1   A.  Yes.  That limitation is shown in Saigh, and I just

2   described where that was.  In other words, the erasure of the

3   document once that predetermined amount of time has passed is

4   what constitutes the restricting of the access.

5           MR. SHARIFAHMADIAN:  Can we put claim 8 on the left

6   and keep up what is on the right, please?

7   Q.  So claim 8 requires:  "The method of claim 7, further

8   including deleting the electronic book from the viewer based

9   upon the time parameter."  Do you see that, sir?

10  A.  I do see that.

11  Q.  In your opinion, does Saigh disclose that limitation?

12  A.  Yes.  Saigh discloses that limitation when it talks about

13  the automatic erasure of the information based on that time

14  parameter.  And erasure is a more secure form of deletion.  So

15  when it says erasing, it also is informing us that that data is

16  being deleted.

17  Q.  Claim 9 of the '501 patent says:  "Wherein the deleting

18  step includes automatically erasing the electronic book from

19  the viewer upon expiration of a particular time period."  Do

20  you see that, sir?

21  A.  I do see that.

22  Q.  Does Saigh disclose that limitation?

23  A.  Yes.  Saigh discloses that directly, as I just pointed to

24  in the explanation.

25  Q.  You are pointing to page 14?

1    A.  Yes, I am pointing to page 14.

2    Q.  Let's turn to claim 18 of the '501 patent.

3         Claim 18 is directed to a portable viewer for

4    displaying electronic books.  Do you see that?

5    A.  I do see that.

6    Q.  In your opinion, does the Saigh publication disclose every

7    element of this claim?

8    A.  Yes.  In my opinion, the Saigh publication discloses every

9    element of this claim.

10   Q.  In your opinion, does the Saigh publication anticipate

11   claim 18 of the '501 patent?

12   A.  Yes.  In my opinion, the Saigh publication anticipates

13   claim 18.

14   Q.  Let's walk through claim 18.  We already covered that Saigh

15   discloses electronic books, right?

16   A.  Please repeat it.

17   Q.  We already covered that Saigh discloses electronic books,

18   right?

19   A.  Yes, we have covered that it discloses electronic books.

20   Q.  We covered that Saigh discloses a portable viewer?

21   A.  And we have disclosed that it covers a portable viewer.

22   Q.  So the first element in claim 18 is a memory for storing

23   instructions.  Do you see that?

24   A.  I do see that.

25   Q.  Now, does that claim require any special kind of memory?

Neuman - direct

 1    A.   No, it does not require any special kind of memory, other

 2    than it be for storing instructions?

 3    Q.   Does the '501 patent discuss having made an improvement in

 4    memory technology?

 5    A.   I do not recall it mentioning having made any improvement

 6    to memory technology.

 7    Q.   Does the Saigh publication disclose a memory for storing

 8    instructions?

 9    A.   Yes.  The Saigh publication does disclose a memory for

10    storing instructions in that.  And, again, in that reference

11    that we saw at 14, we had the control unit of the apparatus is

12    provided with a real time clock as part of the microprocessor

13    unit.  And microprocessors necessarily operate under the

14    control of instructions.  And those instructions are stored in

15    memories.

16    Q.   Now, the next element is a memory for storing electronic

17    books.  Do you see that?

18    A.   I do see that.

19    Q.   Now, does that memory require any special sort of memory?

20    A.   That memory doesn't need to be special in any way either.

21    Q.   Does the '501 patent discuss having made any improvements

22    in memory technology for storing electronic books?

23    A.   I did not see any argument that it had disclosed any

24    special advancements to memory.

25    Q.   Does the Saigh publication disclose that the portable

1  viewer has a memory for storing electronic books?

2  A.  Yes.  As I have discussed before, the Saigh publication

3  discloses its memory as the memory modules that are an integral

4  part of the control unit.

5  Q.  The next element is a display for displaying the electronic

6  book.  Do you see that?

7  A.  I do see that.

8  Q.  Does that claim require any special kind of display?

9  A.  It does not require any special kind of display beyond what

10  is in normal computer systems.

11  Q.  Does the '501 patent discuss having made an improvement in

12  the display technology?

13  A.  It does not disclose having made an improvement in display

14  technology.

15  Q.  Does the Saigh publication, in your opinion, disclose that

16  the portable viewer has a display for displaying the electronic

17  books?

18  A.  Yes.  Once again, on the figure we see item 48, which is

19  the LCD display for the control unit.

20  Q.  You're referring to figure 1?

21  A.  I am referring to figure 1, yes.

22  Q.  The claim then states:  "A processor that operates under

23  the control of the instructions and is capable of."  Do you see

24  that?

25  A.  I do see that.

FAK8ADR4                        Neuman - direct

1   Q.   Does the claim require any special kind of processor?

2   A.   No.

3   Q.   Does the '501 patent discuss having made an improvement to

4   processor technology?

5   A.   I did not see it discuss having made an improvement to the

6   processor technology.

7   Q.   Does the Saigh publication disclose that the portable

8   viewer has a processor?

9   A.   The Saigh publication discloses, again, in that excerpt

10   from paragraph 14, where it indicated as part of the

11   microprocessor unit 86.

12   Q.   So the processor is in the control unit?

13   A.   The processor is in the control unit, yes.

14   Q.   Is that processor operating under control of instructions?

15   A.   All processors operate under the control of instructions,

16   so it is, yes.

17   Q.   The claim says that the processor under the control of

18   instructions is capable of doing four things.  Do you see that?

19   A.   I do see that.

20   Q.   Those four things are:  Storing an electronic book on the

21   viewer; associating a predetermined amount of time after the

22   electronic book is stored on the viewer with the electronic

23   book; allowing access to and display of the electronic book for

24   the predetermined amount of time; and restricting access to the

25   electronic book for display of the electronic on the viewer,

 1  once the predetermined amount of time has passed.  Do you see
 2  those four things?
 3  A.  I do see those four things.
 4  Q.  Those are the same four things that we saw in claim 7, is
 5  that right?
 6  A.  Yes.  They are the same as in claim 7.
 7  Q.  Does Saigh disclose a microprocessor that operates under
 8  the control of instruction that is capable of performing those
 9  four elements?
10  A.  Yes, it does.  It has disclosed the microprocessor, and it
11  says that the operations that are described within Saigh are
12  performed under the control of that microprocessor.  Therefore,
13  these actions, which we have already said are being performed
14  by the apparatus, are being performed under the control of that
15  microprocessor.
16  Q.  And we already discussed that Saigh discloses performing
17  all those four things with respect to claim 7, correct?
18  A.  Yes.  In claim 7 that's the discussion we had.
19  Q.  Let's turn to claim 19.
20        Claim 19 says:  "The portable viewer of claim 18,
21  wherein the processor is further capable of deleting the
22  electronic book from the viewer based upon the time parameter."
23  Do you see that, sir?
24  A.  I do see that.
25  Q.  In your opinion, does the Saigh publication disclose this

1    limitation?

2    A.   Yes.  In my opinion the Saigh publication does disclose

3    this limitation.

4    Q.   What is that opinion based on?

5    A.   It's based on the same argument that I provided with an

6    earlier claim, and that is that the Saigh publication discloses

7    erasing the electronic book and erasing is a more secure form

8    of deletion so erasing actually is deletion and it is disclosed

9    that as being performed under the control of the processor.

10            MR. SHARIFAHMADIAN:  I have nothing further.

11            THE COURT:  Cross-examination.

12            MR. CABRAL:  Your Honor, may I approach?

13            THE COURT:  Yes.

14   CROSS-EXAMINATION

15   BY MR. CABRAL:

16   Q.   Good afternoon, sir.

17   A.   Good afternoon.

18   Q.   You are employed as a research associate professor in the

19   department of computer science in USC, is that right?

20   A.   That is correct.

21   Q.   That is a full-time research position with some teaching

22   responsibilities, correct?

23   A.   That is a full-time research position with some teaching

24   responsibilities.

25   Q.   You didn't teach any classes last semester, right?

1    A.  In the spring semester I did not teach any classes.

2    Q.  Your position is in the computer science department of USC,

3    right?

4    A.  It is in the -- well, my faculty appointment is in computer

5    science.  I also have an appointment in Information Sciences

6    Institute which is where I conduct my research.

7    Q.  All of your degrees are in computer science, is that

8    correct?

9    A.  All of my degrees are in computer science or computer

10   science and engineering.

11   Q.  You are familiar with the term "distributed computer

12   systems," is that right?

13   A.  Yes, I am familiar with that term.

14   Q.  Generally speaking, that refers to how computer systems

15   talk to one another across the network, is that accurate?

16   A.  It involves computers talking to one another over a network

17   and the things that they perform using those interconnections.

18   Q.  Your field of expertise is in the areas of distributed

19   computer systems and computer security, correct?

20   A.  Those are the areas where I am currently conducting my

21   work, yes.

22   Q.  You don't claim to be an expert in hardware design of

23   consumer electronic devices, correct?

24   A.  I am not an expert in hardware design.  Consumer electronic

25   devices, well, we have the Court's construction of these

1    devices.

2    Q.  I am speaking more generally, not with reference to any

3    claim terms that may have been defined in this case, OK.

4           MR. SHARIFAHMADIAN:  Objection.  Vague.

5    A.  We have computer systems --

6           MR. CABRAL:  There is no question pending, but feel

7    free to object.

8           THE COURT:  Put a question.

9           MR. SHARIFAHMADIAN:  If counsel has withdrawn the

10   question, there is no objection.

11          THE COURT:  Before we have a lengthy colloquy which

12   will ultimately demand a sidebar as to whether or not he has

13   uttered a question or not, why don't you just put a new

14   question.

15          MR. CABRAL:  Thank you, your Honor.

16   Q.  Your work and research experience with consumer devices

17   used in or around the home is limited to personal computers,

18   isn't that right?

19   A.  Personal computers and similar kinds of devices.

20   Q.  You don't claim to be an expert in the hardware design of

21   e-reader devices, do you?

22   A.  I have not claimed to be an expert in the hardware design.

23   Q.  Aside from your work on this case and your experience with

24   computer systems generally, you had no work or research

25   experience with portable e-reader devices like the Nook or the

1    Kindle, is that right?

2    A.   Can you please repeat?

3    Q.   Sure.  Aside from your work on this case and your

4    experience with computer systems generally, you had no work or

5    research experience with portable e-reader devices like the

6    Nook or the Kindle, correct?

7    A.   With the Nook or the Kindle, no, I do not.

8    Q.   Or e-reader devices like the Nook or the Kindle, correct?

9    A.   I did research that involved some distribution of content

10   over the Internet.

11   Q.   But that did not involve any work or research involving

12   portable e-reader devices, is that right?

13   A.   It did not involve things involving things that were

14   dedicated e-reader devices.

15   Q.   Your involvement in this case began in July or August of

16   2013, is that right?

17   A.   That seems to be about right.  I don't recall the exact

18   date.

19   Q.   You were contacted by attorneys representing Barnes & Noble

20   from the Arnold & Porter law firm, correct?

21   A.   That is correct.

22   Q.   You're being paid $600 per hour plus expenses for your time

23   working on this case, is that right?

24   A.   That is correct.

25   Q.   And your bills so far amounts to about $100,000, is that

1    right?

2    A.  My bills so far have amounted to a little more than

3    $100,000.

4    Q.  I would like to turn first to the patent you just spoke

5    about last, OK?

6    A.  OK.

7    Q.  I want to talk about the lending patent in this case which

8    is the '501 patent.

9    A.  OK.

10   Q.  That's Joint Exhibit 2.  I want to start with claim 18 of

11   that patent.  Hopefully, we can bring that up.

12          All right.  I want to start with the first element

13   there right next to the number 18 where it says "a portable

14   viewer for displaying electronic books."  Do you see that?

15   A.  I do see that.

16   Q.  You don't dispute that the Nook devices are portable

17   viewers for displaying electronic books, correct?

18   A.  In the general terms, so when we don't add the comprising

19   in here, I don't dispute that the Nook device is a portable

20   viewer for displaying electronic books.

21   Q.  So you don't dispute that the Nook devices meet this part

22   of claim 18, right?

23   A.  I am not disputing that it meets this preamble of claim 18.

24   Q.  There is a word comprising, and after that it says "a

25   memory for storing instructions."  Do you see that?

EAK8ADR4      Neuman - cross

1   A.  I do see that.

2   Q.  You don't dispute that the Nook devices have a memory for

3   storing instructions, do you?

4   A.  I have not disputed that the Nook devices have a memory for

5   storing instructions.

6   Q.  The next step of claim 18 is a memory for storing

7   electronic books, do you see that?

8   A.  I do see that.

9   Q.  You don't dispute that the Nook devices have a memory for

10  storing electronic books, do you?

11  A.  No, I do not.

12  Q.  The next element is a display for displaying the electronic

13  books, do you see that?

14  A.  I do see that.

15  Q.  You don't dispute that the Nook devices have a display for

16  displaying the electronic books, do you?

17  A.  I do not.

18  Q.  Next element is a processor that operates under the control

19  of the instructions.  Do you see that?

20  A.  I do see that.

21  Q.  You don't dispute that the Nook devices had a processor

22  that operates under the control of instructions, do you?

23  A.  As long as you leave off the "and is capable" part, no, I

24  do not dispute that.

25  Q.  Allow me to get there.

1    The next part of that element refers to capabilities

2    of the processor and is followed by four steps.  Do you see

3    that?

4    A.  I do see that.

5    Q.  I want to focus on the capabilities of the processor to

6    store electronic book on the viewer.  Do you see that?

7    A.  I do see that.

8    Q.  You don't dispute that the Nook devices have a processor

9    capable of storing electronic book on the viewer, do you?

10   A.  I have not disputed that.

11   Q.  I want to focus on the third capability under the

12   processor, "allowing access to and display of the electronic

13   books for the predetermined amount of time."  Do you see that?

14   A.  I do see that.

15   Q.  You don't dispute that the Nook devices have a processor

16   capable of allowing access to and display of the electronic

17   book for the predetermined amount of time, do you?

18   A.  Well, I haven't provided an opinion with respect to that.

19   But it would be necessary to understand what that for the

20   predetermined amount of time was in order to form an opinion

21   with respect to that particular element.

22   Q.  So you provided opinions in this case regarding why in your

23   view the Nook devices do not infringe claim 18 of the '501

24   patent, correct?

25   A.  I have.

EAK8ADR4                    Noum158      proceedings

1  Q.  You have provided no such opinion with respect to this

2  allowing access element that I just pointed to, is that right?

3  A.  I did not present an opinion of that here.

4  Q.  The fourth capability under processor element, you don't

5  dispute that the Nook devices have a processor capable of

6  restricting access to the electronic book for display of the

7  electronic book on the viewer once the predetermined amount of

8  time has passed, do you?

9  A.  I have not offered such an opinion to dispute that today.

10 Q.  So you have no opinion that the Nook devices do not

11 infringe claim 18 based on that restricting access element of

12 the claim, is that right?

13 A.  I have not said that I don't have such an opinion.  I said

14 I have not discussed an opinion with respect to that claim

15 here.

16 Q.  You have not discussed an opinion in your expert report,

17 right?

18 A.  I would need to go back and look specifically; however,

19 there is the issue of the predetermined amount of time.  I

20 would need to see how that applied in various instances.

21 Q.  Isn't it correct that the only element of claim 18 with

22 which you take issue for purposes of infringement is the

23 associating step under the processor element shown in claim 18?

24 A.  It is correct that that is the only one with which I have

25 taken issue and presented today.

1  Q.  Taken today or at all in this case, isn't that right?

2  A.  I don't recall if I might have analyzed some of these other

3  things.  There are a lot of things that were here, but it is

4  only necessary to show that one of these things is absent.  So

5  today and what I have been focusing on recently has been on

6  that element.

7  Q.  You wrote an expert report in this case, right?

8  A.  I did write an expert report in this case.

9  Q.  You provided certain opinions regarding why in your view

10  the Nook devices do not infringe claim 18, is that right?

11  A.  I have provided many opinions.

12  Q.  You don't recall whether you provided any other opinions

13  regarding why the Nook devices do not infringe other than this

14  associating stuff?

15  A.  I know in my report I provided many opinions of many

16  different elements, some of which in the interest of time we

17  didn't present today.  I would need to go back and look at

18  those many opinions that support the noninfringement in order

19  to specifically answer your question of whether I provided an

20  opinion with respect to that.

21  Q.  But today we will focus on today, OK.  The only element in

22  claim 18 that you have taken issue with is this associating

23  step, is that right?

24  A.  Today, the only element with which I have expressed an

25  issue with is this associating element.

EAK8ADR4                        Neumann - cross

1    Q.  Let's focus on that element of the claim, OK.

2         You testified regarding an experiment you did where

3    you accepted a loan offer from the Barnes & Noble Web site.  Do

4    you recall that?

5    A.  I do recall that.

6    Q.  You understand this case is about the use of Barnes &

7    Noble's lending functionality on the Nook devices and not the

8    Barnes & Noble Web site, right?

9    A.  I do understand that.

10   Q.  I want to focus your attention on the use of Barnes &

11   Noble's lending feature on the Nook device.  Do you understand?

12   A.  I understand.

13   Q.  Your opinion is that the loan period begins when the user

14   accepts a loan offer, is that right?

15   A.  My opinion is the loan period begins when the user's

16   acceptance is processed on the Barnes & Noble server.

17   Q.  That's what I am getting at.  When the user accepts the

18   loan offer, some time elapses before the lending request is

19   actually processed in the Barnes & Noble cloud, right?

20   A.  When the user presses an accepted button, usually a small

21   amount of time, but some time will elapse.  The actual

22   acceptance of the offer is at the time when that choice has

23   been recorded and processed on the Barnes & Noble server.

24   Q.  So I thought I recall your testimony and correct me if I am

25   wrong, did you testify that the lending period began when the

1   user accepted an offer on the Nook device?

2   A.   I explained that the lending period begins when the user

3   accepts an offer.   I think in some points it may have been on

4   the device, in other cases, it may have been on the server but

5   effectively, yes, when the user accepts the offer.

6   Q.   But you would agree that if you want to be precise, the

7   actual calculation of the loan expiration that occurs in the

8   Barnes & Noble cloud occurs a couple of seconds after the user

9   presses accept on the Nook device, isn't that accurate?

10  A.   Yes.   But those are two different points.   You said when

11  the user accepts and I understand when the user accepts to be

12  when that button press is processed.   That's a distinct time.

13  You just said from when the button is actually pressed.

14  Q.   So you don't view it that the user accepts the lending

15  offer when he or she actually presses the accept button, is

16  that right?

17  A.   No.   The lend offer is accepted when that button press is

18  recorded and stored on the Barnes & Noble servers.

19  Q.   That's a couple of seconds after the user presses the

20  actual accept button on the device, correct?

21  A.   Hopefully, a couple of milliseconds but, yes, a period of

22  time after that.

23  Q.   You agree then that the calculation of the lending window

24  does not happen precisely when the user accepts the loan offer,

25  does it?

1   A.  It, again, gets to your definition of when the user

2   accepts.  I consider the acceptance to have occurred when that

3   is recorded on the Barnes & Noble server.

4   Q.  Let me try it a different way.  You would agree that the

5   calculation of lending window does not happen precisely when

6   the user presses accept on the Nook device, correct?

7   A.  I do agree with that, yes.

8   Q.  So when the user hits accept on the Nook device, the device

9   has to send a signal to the Barnes & Noble cloud to let it know

10  what the user has done, would you agree?

11  A.  If the user presses the accept button on the Barnes & Noble

12  device, yes, a message needs to be sent to the cloud to let it

13  know all that stuff.

14  Q.  That communication takes a couple of seconds, would you

15  agree?

16  A.  Again, it should take a couple of milliseconds but it does

17  take some time.

18  Q.  Did you do any testing or analysis to figure out how long

19  it took?

20  A.  No, I did not.

21  Q.  Do you agree that the time between the acceptance of the

22  loan offer and the storage of the loaned book on the receiving

23  device may be relatively short, correct?

24  A.  It may also be relatively short.

25  Q.  Have you used the Lend Me feature on the Nook device?

1   A.  I have used the lending feature on the Nook device.

2   Q.  How many times?

3   A.  Probably about six or seven times.

4   Q.  Six or seven times throughout the course of the case?

5   A.  Six or seven times throughout the course of the case.

6   Q.  Would you agree that the time from acceptance of a loan to

7   the download of a loaned book only takes approximately two to

8   four seconds?

9   A.  It depends on a number of factors, among those, whether the

10  Nook device was on.  If we are talking about the acceptance

11  occurring when the user is on a Nook device, then it typically,

12  unless something goes wrong, would only take a few seconds.

13  Q.  Did you say it depends on whether the Nook device is on?

14  Is that what you said?

15  A.  For a moment there I was not focusing specifically on your

16  example.  But in your example where the user is accepting from

17  the Nook device, yes, the Nook device would be on in that case.

18  In that instance, unless something else goes wrong, it

19  typically will only be a few seconds.

20  Q.  Exactly.  The device would have to be on if the user was

21  accepting a loan offer from the device?

22  A.  Yes, I agree with you on that.

23  Q.  If the system is operating as it should, you agree that the

24  time it takes from acceptance of the loan offer to the download

25  of the loaned book on recipient's device only takes a couple of

EAK8ADR4                    Neuman - cross

1   seconds?

2   A.  Depending upon the size of the book, depending upon the

3   network connectivity, if it's a large book, if you have a slow

4   network connection, it could take longer than that but it is

5   not a significant amount of time.

6   Q.  You don't take issue with the fact that the Nook devices

7   associate and track the predetermined 14-day time period with

8   the loaned electronic book, is that right?

9   A.  Can you please repeat that?

10  Q.  You don't take issue with the fact that the Nook devices

11  associate and track the predetermined 14-day time period with

12  the loaned electronic book, right?

13  A.  I actually do not believe that the Nook devices are doing

14  that.

15  Q.  In providing your opinions in this case, you reviewed the

16  testimony, the deposition testimony specifically, of a

17  gentleman named Mr. Narain, is that right?

18  A.  Yes, I did.

19  Q.  You commented on his testimony in your expert report, is

20  that right?

21  A.  I believe I did.

22  Q.  Did you rely on his testimony when forming your opinions?

23  A.  I took his testimony into consideration when forming my

24  opinions.

25          MR. CABRAL:  Your Honor, with your permission, I would

FAK8ADR4                    Neuman - cross

1   like to play a small section of Mr. Narain's testimony on the

2   big screen.

3           THE COURT:  All right.

4           MR. CABRAL:  The testimony I am referring to is on

5   page 48, lines 10 through 15.

6           MR. SHARIFAHMADIAN:  A)  Has this been played at the

7   trial and did Dr. Neuman indicate he relied on this testimony?

8           MR. CABRAL:  I am happy to respond.

9           THE COURT:  All I heard was a colloquy among counsel.

10  Anytime you would like to raise an objection with the Court, I

11  am here just waiting.

12          MR. SHARIFAHMADIAN:  Objection.  It's not clear that

13  the testimony:  A) is of record in this case; and B) whether

14  Dr. Neuman has relied on this specific testimony that is about

15  to be played.

16          THE COURT:  Come to sidebar.

17          (Continued on next page)

18

19

20

21

22

23

24

25

```
 1                  (At the sidebar)

 2            THE COURT:  Is this his testimony?

 3            MR. CABRAL:  This is Mr. Narain's testimony.

 4            THE COURT:  I totally misunderstood.

 5            Absolutely not.  That's just having one witness

 6   comment on the testimony of the other which I told you

 7   repeatedly I wouldn't allow.

 8            MR. CABRAL:  I was following your instruction to

 9   Mr. Berg a couple of days ago in which you said that one of the

10   exceptions was allowing a witness to comment on testimony of

11   another if that expert actually relied or commented on that

12   testimony in forming his opinions in the case.

13            THE COURT:  So that's the question that your adversary

14   put to you.  Where did you rely on this?

15            MR. CABRAL:  Paragraph 249 of his expert report, he

16   cited to pages 47 and 48 of Mr. Narain's deposition transcript.

17   I am quoting from page 48.

18            THE COURT:  Let me see.  Which of his two reports?

19            MR. CABRAL:  This is his noninfringement report so the

20   smaller of the two.

21            THE COURT:  "Smaller" is a relative term.

22            Page or paragraph?

23            MR. CABRAL:  Paragraph 249.  I don't have a page

24   number here.

25            THE COURT:  249 is fine.
```

1    All he says is "a loan recipient has 14 days after the

2    date the lend offer is accepted during which he may access the

3    book with his B&N account."  Then he cites numerous portions of

4    Mr. Narain's testimony and Mr. Mulchandani's testimony.

5    Are you disputing that statement that "a loan

6    recipient has 14 days after the date the lend offer is accepted

7    during which he may access the book with his B&N account"?

8    MR. CABRAL:  I am not disputing that statement.

9    THE COURT:  That's the only thing he quotes so far.

10    MR. SHARIFAHMADIAN:  He has already testified to that.

11    THE COURT:  So the fact that Mr. Narain may have said

12    something else on those pages is neither here nor there.

13    MR. CABRAL:  So am I correct to understand, your

14    Honor, that the only time the exception would apply for

15    allowing an expert to comment on testimony is if he commented

16    specifically on the portion of the testimony or cited

17    specifically that testimony in his report?

18    THE COURT:  Yes.

19    MR. CABRAL:  Thank you, your Honor.  I appreciate the

20    clarification.

21    (Continued on next page)

22

23

24

25

FAK8ADR4                     Neumann - cross

1                    (In open court)

2    BY MR. CABRAL:

3    Q.  OK, sir.  Do you agree that the Nook devices keep track of

4    lending periods?

5    A.  The Nook devices keep track of a time that the book expires

6    and is no longer available.

7    Q.  So the Nook devices do keep track of the lending period

8    that's being enforced as part of the lending process, correct?

9    A.  The Nook devices keep track of the end of the lending

10   period.

11   Q.  When the Barnes & Noble cloud calculates the expiration of

12   the lending period, it's in the form of an expiration date, is

13   it not?

14   A.  It is in the form of an expiration date.

15   Q.  And that's the time value that the Nook devices keep track

16   of, isn't it?

17   A.  The Nook devices, once a book has been downloaded, do keep

18   track of that expiration.

19   Q.  And you agree that the Nook devices receive that time value

20   from the Barnes & Noble cloud, correct?

21   A.  They receive that time value from Barnes & Noble.  That is

22   the expiration time, yes.

23   Q.  And that's the expiration time, to be clear, of the 14-day

24   lending window, right?

25   A.  That is the expiration of the lending window.

1   Q.  Your opinion is that the Nook devices does not infringe

2   claim 18 because the lending period does not begin when the

3   loaned book is stored on the viewer, correct?

4   A.  Yes.  My opinion is that it is not because the -- it does

5   not begin when the electronic book is stored on the viewer.

6   Q.  Do you agree that accepting a lend offer on a Nook device

7   initiates the download of the loaned electronic book on the

8   recipient's device?

9   A.  It doesn't directly initiate.  What it does is it

10  communicates to the server that the loan has been accepted.

11  The server notes the acceptance of the loan, that is beginning

12  of the lending period.  It also notes in the account to which

13  that Nook is associated that there is a book that is available

14  for download.  Usually that will be noticed fairly quickly by

15  the Nook and it will begin to download the book, but it doesn't

16  have to and it is not a process of actually initiating that

17  download.

18          MR. CABRAL:  Your Honor, respectfully, I would request

19  that the witness limit his answer to the question posed.

20          THE COURT:  Yes.

21  A.  Please repeat it.

22  Q.  You don't dispute that the download of the loaned content

23  is automatic when a user accepts a loan offer from a Nook

24  device, do you?

25  A.  It does happen automatically.

1    Q.  So you don't dispute that?

2    A.  I don't dispute that.

3    Q.  Isn't it accurate to say that you have no opinion regarding

4    whether the user must take any further action for the loan

5    electronic content to be stored on recipient's device after

6    accepting a loan offer, isn't that right?

7    A.  I have not offered an opinion that there is -- that there

8    is further action that is needed.

9    Q.  Is it your opinion that a few seconds constitutes a

10   substantial difference of a lending period that lasts 14 days?

11   A.  It does not constitute a substantial difference in the life

12   of the period.

13   Q.  Let's take a look at claim 19.

14            Just bear with me one moment, sir.

15            Do you see claim 19 on the bottom of the screen?

16   A.  I do see that.

17   Q.  Claim 19 reads, "the portable viewer of claim 18.  Do you

18   see that?

19   A.  I do see that.

20   Q.  And following that language, it says, "wherein the

21   processor is further capable of deleting the electronic book

22   from the viewer based upon the time parameter."  Do you see

23   that?

24   A.  I do see that.

25   Q.  And you don't dispute that the Nook devices have a

1   processor further capable of deleting the electronic book from

2   the viewer based upon the time parameter, correct?

3   A.   I have not offered an opinion here that disputes that.

4            (Continued on next page)

1  Q.  The time parameter we are referring to here in claim 19,

2  that would be the lending period for the Lend Me feature on the

3  Nook devices, correct?

4  A.  It was based on the expiration, sort of the end date of

5  that period.

6  Q.  At the end of the 14 days, right?

7  A.  The period that is the end of the 14 days.

8  Q.  Let's turn to claim 7.  I want to start from the top, "a

9  method for restricting access to electronic books displayed on

10  a viewer."  Do you see that language?

11  A.  I do see that language.

12  Q.  You don't dispute that Barnes & Noble performs a method for

13  restricting access to electronic books displayed on a viewer,

14  correct?

15  A.  I have not disputed that today.

16  Q.  Following that language, it reads, "a method comprising,"

17  and then there are four different steps.  Do you see those?

18  A.  I see those steps.

19  Q.  You don't dispute that Barnes & Noble stores an electronic

20  book on a viewer, is that correct?

21  A.  Actually, it is the Nook device itself that is storing the

22  electronic book on the viewer.

23  Q.  So you do dispute that Barnes & Noble stores an electronic

24  book on a viewer?

25  A.  Yes, I am disputing that Barnes & Noble is storing the

1  electronic book on a viewer.

2        MR. CABRAL:  Your Honor, with your permission, I would

3  like to identify a section of --

4  Q.  Is it Professor Neuman or Dr. Neuman?

5  A.  Either/or.

6        MR. CABRAL:  -- of Professor Neuman's deposition

7  testimony, if that's OK.  I will hand you up a copy of both

8  sessions, if the Court allows.

9        THE COURT:  All right.  I need to know, in advance, of

10  course, which pages and lines so counsel can object if he

11  wishes to.

12        MR. CABRAL:  Sorry for the break there.  The section I

13  want to identify for the Court is on page 394, which should be

14  in volume 2, starting at line 8, through line 24.  Actually, I

15  apologize to the Court.  Maybe I identified the wrong section.

16  It is actually page 417.  I apologize.  The last cite was to a

17  different element.  Page 417 starting at line 7, lines 17

18  through 18, your Honor.  Apologies for the mix-up.

19        THE COURT:  417?

20        MR. CABRAL:  Correct, lines 17 through 18.

21        THE COURT:  Any objection?

22        MR. SHARIFAHMADIAN:  It is not impeachment, your

23  Honor.

24        THE COURT:  Sustained.

25  Q.  Isn't it true that you have no opinion regarding the role

1  Barnes & Noble plays in the act of storing an electronic book

2  on the viewer?

3  A.  I do have an opinion.  Well, I have an opinion that Barnes

4  & Noble is not storing the electronic book on the viewer.

5  Q.  Isn't it accurate that you have no opinion or you haven't

6  formed any opinion with regard to the role that Barnes & Noble

7  plays in the act of storing?

8        MR. SHARIFAHMADIAN:  Objection:  Asked and answered.

9        THE COURT:  Overruled.

10  A.  I have formed opinions about what is involved in the act of

11  storing.  Whether Barnes & Noble is among those is in some

12  sense an opinion as to the role they play or, I guess, the role

13  they don't play.

14  Q.  Have you formed any opinion in this case with respect to

15  whether Barnes & Noble plays any role in the act of storing an

16  electronic book on the Nook device as part of the lending

17  feature?

18  A.  I have.

19        MR. CABRAL:  Your Honor, I would offer the same

20  testimony for impeachment purposes.

21        THE COURT:  Yes.  You may now read it.

22  Q.  "Q.  With regard to Barnes & Noble's lending feature, is it

23  your opinion that Barnes & Noble plays no role in the act of

24  storing an electronic book on the viewer?

25  "A.  I have not formed an opinion with respect to the role that

1   they have played.  My opinions simply argue that it is the Nook

2   device that is storing the electronic book on the Nook device,

3   that that occurs at the -- based on actions by the user."

4           That was your testimony at your deposition, correct

5   A.  I believe it was.

6   Q.  Is it accurate that at the time of your deposition you had

7   not formed any opinions with respect to the role Barnes & Noble

8   plays in the act of storing an electronic book on the viewer?

9   A.  That is what I stated there.

10  Q.  Isn't it accurate that you never considered whether the

11  storing step of claim 7 is performed by anyone?  Isn't that

12  right?

13  A.  I have considered whether the storing step is performed by

14  anyone.  Yes, I have formed such an opinion.

15  Q.  Is it your testimony that you performed an analysis as to

16  whether the storing step of claim 7 is performed by someone or

17  something?

18  A.  I have formed an opinion that it is performed by something.

19  Q.  Have you performed any analysis to form that opinion?

20  A.  It depends on how you define "analysis."

21  Q.  Earlier today during your testimony, did you dispute that

22  Barnes & Noble stores an electronic book on a viewer as part of

23  claim 7?

24  A.  I do not recall if I disputed that earlier.

25  Q.  But you are disputing it now?

1    A.  I am disputing that Barnes & Noble is storing the

2    electronic book on the viewer, yes.

3    Q.  You don't dispute that Barnes & Noble performs the allowing

4    access step in claim 7 of the '501, do you?

5    A.  As I described that particular step, it is the Nook device

6    that does that.

7    Q.  Is it correct that you are also disputing that this element

8    is performed?

9    A.  I need to do further analysis to see if there is some other

10   role.  I believe allowing access to probably is performed by

11   Barnes & Noble, but I would need to look at this further to

12   understand the specific aspects that you are referring to.

13   Q.  Sitting here today, in your testimony you can't identify

14   whether you have an opinion regarding whether Barnes & Noble

15   allows access to and display of the electronic book for the

16   predetermined amount of time as that term appears in claim 7?

17           MR. SHARIFAHMADIAN:  Objection:  Argumentative.

18           THE COURT:  Overruled.

19   A.  I believe that Barnes & Noble does allow access to and

20   display of the electronic book for a predetermined amount of

21   time in some embodiments.

22   Q.  So you agree that Barnes & Noble performs the allowing

23   access step in claim 7, correct?

24           MR. SHARIFAHMADIAN:  Objection:  Mischaracterizes his

25   testimony.

1    THE COURT:  That's the question.  Overruled.

2   A.  What are we limited to now?  Are we limited to the on the

3   Nook devices?

4   Q.  Yes, sir.  Claim 7 is a method for restricting access to

5   electronic books displayed on a viewer.  Do you see that?

6   A.  I do see that.

7   Q.  I'm talking about methods performed with respect to

8   electronic books displayed on the viewer.  In that context I'm

9   referring to the Nook devices.

10  A.  You are referring to the book devices.  I would argue at

11  this point that it is the Nook devices and not Barnes & Noble

12  that is allowing the access to.

13  Q.  Is it correct that you are now disputing that Barnes &

14  Noble allows access to and display of the electronic book for

15  the predetermined amount of time?

16  A.  In the context of this question, yes.

17  Q.  Let's turn to the last element here, "restricting access to

18  the electronic book for the display of the electronic book on

19  the viewer once the predetermined amount of time has passed."

20  Are you disputing this element, that Barnes & Noble performs

21  that element?

22  A.  Again, in the context that you have just set, I am

23  disputing that it is Barnes & Noble.

24  Q.  Let's go back to the allowing access step for a second, OK?

25  I think your testimony is clear that you now dispute that

1  Barnes & Noble performs that allowing access step, is that

2  right?

3  A.  In the context of on the Nook device, yes, it is not the

4  Nook -- sorry -- it is not Barnes & Noble that is allowing that

5  access.

6          MR. CABRAL:  Your Honor, I would like to identify a

7  portion of Professor Neuman's testimony starting on page

8  396:line 14 going through page 397:line 3.  Again, that would

9  be in volume 2.

10          THE COURT:  Tell me the line it begins on 396 again.

11          MR. CABRAL:  Line 14, your Honor.

12          MR. SHARIFAHMADIAN:  May I be heard, your Honor?

13          THE COURT:  Yes.

14          MR. SHARIFAHMADIAN:  It is not impeachment, your

15  Honor.  The context about which counsel is asking --

16          THE COURT:  Sustained.

17  Q.  Have you formed an opinion as to whether Barnes & Noble

18  performs the allowing access step shown in claim 7 for the '501

19  patent?

20  A.  In the context that we are currently discussing, it is not

21  Barnes & Noble that is performing the allowing access.

22  Q.  Is it accurate that you have formed an opinion regarding

23  whether Barnes & Noble performs the allowing access step of

24  claim 7?

25  A.  I have formed an opinion that it is not Barnes & Noble.  So

 1    yes, I have formed an opinion.

 2           MR. CABRAL:  Your Honor, I offer the same testimony

 3    for impeachment purposes.

 4           THE COURT:  Yes.

 5           MR. SHARIFAHMADIAN:  Objection.

 6           THE COURT:  Overruled.

 7    Q.  "Q.  Do you dispute that Barnes & Noble performs the

 8    allowing step, the allowing access step in claim 7 of the '501

 9    patent?

10    "A. I haven't formed a particular opinion there, but some of

11    the things that would be necessary would include the fact that,

12    for example, there is a predetermined amount of time, and we

13    would need to understand what that is with respect to the other

14    elements where I actually have offered opinions.  So, to the

15    extent there may be arguments made with respect to other

16    opinions that I have expressed, I reserve the right to perform

17    further analysis of this element."

18           That was your testimony at your deposition, correct

19    A.  That sounds like it was my testimony at my deposition.  I

20    haven't committed all of it to memory, but I will take your

21    word for that.

22    Q.  Isn't it fair to say that at the time of your deposition,

23    you hadn't formed a particular opinion regarding whether Barnes

24    & Noble performs the allowing access step here shown in the

25    claim of the '501 patent?

1  A.  Based on what I said then at the time of my deposition, I

2  had indicated that I had not formed that particular opinion,

3  correct.

4  Q.  Going back to the last, restricting access step here, is it

5  your testimony that you have formed an opinion regarding

6  whether Barnes & Noble performs the restricting access step of

7  claim 7?

8  A.  With respect to the context we are talking about now, I

9  have formed an opinion.

10         MR. CABRAL:  Your Honor, I can offer page 398 of

11 Professor Neuman's deposition transcript, starting at line 5,

12 through line 15.

13         THE COURT:  I think the test is whether any reasonable

14 juror could arguably regard it as impeachment.  They of course

15 will determine whether it is or is not, but I think it falls

16 within the permissive scope of what is permitted.  So I will

17 allow it.  Go ahead.

18 Q.  "Q.  Do you dispute that Barnes & Noble performs the

19 restricting access step of claim 7 of the '501 patent based on

20 your review of the evidence in this case?

21 "A. I have not formed an opinion on that at this time, but

22 there are a number of things that I do discuss, actually in the

23 discussion not only in this patent but in the discussion of

24 other patents, that might be relevant in terms of understanding

25 it."

1    That was your testimony at the deposition, correct

2    A.   I believe that was my testimony at the deposition.

3    Q.   Is it fair to say that at the time of your deposition you

4    did not form an opinion regarding whether Barnes & Noble

5    performs the restricting access step of claim 7 of the '501

6    patent?

7    A.   It is fair to say that at the time of my deposition I had

8    not formed such an opinion.

9    Q.   Your deposition took place after you submitted your expert

10   report in this case, correct?

11   A.   Yes, it did.

12   Q.   Did you ever supplement your expert report to contain or

13   include noninfringement opinions that you formed after your

14   deposition?

15       MR. SHARIFAHMADIAN:   Objection:   Relevance.

16       THE COURT:   Overruled.

17   A.   Please repeat it.

18   Q.   Did you ever supplement your expert report to contain or

19   include noninfringement opinions that you formed after your

20   deposition?

21   A.   I did not.

22   Q.   Your opinions regarding the associating step here, which is

23   the second step of the method of claim 7, your opinions

24   regarding the associating step in claim 7 are the same with

25   regard to the same element that appears in claim 18, correct?

1   A.  The opinions are the same, yes, they are.

2   Q.  Your opinion is that you do not believe Barnes & Noble,

3   infringes because there is a few-second difference?  I will

4   withdraw that question.  Let's look at claim 8.  Do you see

5   claim 8 at the top of the page?

6   A.  I do see claim 8.

7   Q.  "The method of claim 7, further including deleting the

8   electronic book from the viewer based upon the time parameter,"

9   do you see that?

10  A.  I do see that.

11  Q.  Do you dispute whether Barnes & Noble deletes the

12  electronic book from the viewer based on the time parameter?

13  A.  Again, it is the Nook device that does, so yes, I do

14  dispute.  I do dispute that.

15  Q.  You do dispute that Barnes & Noble deletes the electronic

16  book from the viewer based on the time parameter?

17  A.  I do dispute that Barnes & Noble deletes the electronic

18  book from the viewer.

19  Q.  Do you disagree that Barnes & Noble physically deletes the

20  loaned book bytes from the recipient's Nook device?

21  A.  Physically -- can you please repeat?

22  Q.  Do you disagree that Barnes & Noble physically deletes the

23  loaned book bytes from the recipient's device at the expiration

24  of the lending window?

25  A.  I don't understand what you mean by physically delete in

         1   the context of electronic information.

         2   Q.  Do you disagree that Barnes & Noble deletes the loaned book

         3   bytes from the recipient's Nook device at the expiration of the

         4   lending window?

         5   A.  There is a word -- "the loaned book," and you're using a

         6   word.

         7   Q.  I'm sorry.  I'm using a word?

         8   A.  Say that again slowly.  Do I dispute that Barnes & Noble

         9   deletes the loaned book -- what is the next word?

        10   Q.  Do you disagree that Barnes & Noble deletes the loaned book

        11   bytes --

        12   A.  Oh, book bytes.

        13   Q.  -- from the recipient's Nook device at the expiration of

        14   the lending window?

        15   A.  Yes, I do dispute that Barnes & Noble is the one doing that

        16   deletion.

        17   Q.  Let's move on to the '703 patent.

        18           THE COURT:  I think now we will give the jury a brief

        19   mid-afternoon break.  We will take about a 10-minute break at

        20   this time.

        21           (Continued on next page)

        22

        23

        24

        25

```
 1                    (Jury not present)

 2             THE COURT:  Defense counsel, I'm pleased to say, took

 3    only three hours on direct, and I'm certainly going to allow

 4    full time for cross.  I just want to get a feel if plaintiff's

 5    counsel knows about how much longer he is going to be with this

 6    witness.

 7             MR. CABRAL:  That was about 50 minutes, your Honor.

 8             THE COURT:  OK.

 9             MR. CABRAL:  I would say my best estimate is about an

10    hour and a half.

11             THE COURT:  OK.  What I'm trying to figure out is our

12    schedule for tomorrow.  Based on that estimate, you will

13    probably have about a half hour more tomorrow and there will be

14    some redirect.  Let's assume, worst case, that this witness

15    will take another hour tomorrow.  Who else do we have from the

16    defense?

17             MR. EDERER:  Your Honor, we have two short videotape

18    depositions to play, totaling I wouldn't say more than 35

19    minutes altogether, about 40 minutes altogether.

20             MR. CABRAL:  Your Honor, there is an issue I believe

21    with one of them.

22             THE COURT:  We will take up issues later.

23             MR. CABRAL:  It may increase the length of the video

24    somewhat, but not by a lot.

25             MR. EDERER:  Then we have our damages expert, Mr.
```

Barnes.

    THE COURT:  How long will he be on direct?

    MR. EDERER:  I hate to say it, your Honor, but I'll

give you my best estimate, which is an hour and 15 minutes or

an hour and a half tops.

    THE COURT:  After that?

    MR. EDERER:  That would be our final witness.

    THE COURT:  Is the plaintiff still planning on calling

Mr. Wong?

    MR. CABRAL:  Yes, your Honor.

    THE COURT:  How long will he be on direct?

    MR. CABRAL:  No more than 35 minutes.

    THE COURT:  I think we will probably finish the

testimony by lunch based on those estimates.  Regardless, we

will start summations right after the testimony.  If the

testimony ends before lunch, you will have an hour break before

summations.  If the testimony ends, say, a half hour after

lunch, you will have five minutes before the start of

summations.  I want to make sure everyone understands we are

going to have summations tomorrow.

    MR. BAUER:  Your Honor, one question, just about your

preference.  Who goes first?

    THE COURT:  If you look at my rules, you see you go

first.

    MR. BAUER:  Thank you.

1      THE COURT:  Anything else that we need to take up now?

2   Very good.  See you in five minutes.

3      (Recess)

4      (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (Jury present, witness resumed)

 2   BY MR. CABRAL:

 3   Q.  We are about to shift gears to the '703 patent.  That is

 4   the Philips patent where the inventor is Eugene Shteyn, do you

 5   agree?

 6   A.  I'm sorry.  Which?

 7   Q.  The '703 patent.

 8   A.  Yes.

 9   Q.  With the inventor Eugene Shteyn?

10   A.  Yes, I believe that to be the case.

11   Q.  Let's take a look at claim 1, if we could bring that up.  I

12   want to take a look at the first step here.  You don't dispute

13   that the Nook devices are consumer appliances, correct?

14   A.  I do not dispute that, you are correct.

15   Q.  As the Court has defined that term, of course, right?

16   A.  Of course, yes.

17   Q.  You don't dispute that the Nook devices have an input

18   component responsive to a user input, correct?

19   A.  I do not dispute that the Nook devices have an input

20   component responsive to a user input.

21   Q.  You don't dispute that the user initiates the retrieval of

22   content information about a context of using the Nook devices

23   by selecting the shop icon on the menu bar, isn't that right?

24   A.  As we have been understanding the term "context of usage,"

25   I do not dispute that.
```

1    Q.  The term content "information about context of usage," that

2    refers to product recommendations, like recommended books, is

3    that right?

4    A.  It's my understanding that that is what your side has

5    claimed, and I have accepted that definition for my analysis.

6    Q.  You agree that upon selecting a shop application, the Nook

7    devices pull that type of content information about a context

8    of usage, namely, product recommendations or book

9    recommendations?

10   A.  With several steps in between, yes, upon selecting the

11   icon, that does eventually get pulled down.

12   Q.  Do you agree that the request sent by the Nook device to

13   the Barnes & Noble server after the user selects the shop

14   application -- sorry -- selects the shop icon I should say,

15   results in the retrieval of data that is ultimately rendered

16   and displayed on a Nook device?

17   A.  Sorry.  That was long.  Can you say that a little slower?

18   Q.  Sure.  Do you agree that the request sent by the Nook

19   device after the user selects the shop icon results in the

20   retrieval of data that is ultimately rendered and displayed on

21   the Nook device?

22   A.  I agree with you.

23   Q.  You don't dispute that the user initiates the retrieval of

24   that content information about a context of using the Nook

25   devices by selecting the shop icon on the menu bar of the

1    device, right?

2    A.  I do not dispute that it is initiated by selecting that

3    icon.

4    Q.  And you agree with plaintiff's position that selecting a

5    shop icon is all the user needs to do to initiate the retrieval

6    of that data, right?

7    A.  I have disagreed with that in my opinion.

8    Q.  You are suggesting there are other actions the user must

9    take in order for the Nook device to initiate retrieval of the

10    data?

11    A.  Yes, there is.

12    Q.  What is your position?

13    A.  My position, as I stated earlier, is that there are many

14    precursor steps that are necessary.  The device must have been

15    registered or must have been configured, you must have

16    connected to a network, you must have registered your device

17    with Barnes & Noble all before you are able to access that shop

18    icon.

19    Q.  You are referring to the single-user input limitation that

20    appears in the '703 patent?

21    A.  I'm just answering your particular question as to whether

22    that was all that was required.

23    Q.  In the context of claim 1 of the '703 patent, you agree

24    that pressing the shop button initiates the retrieval of data

25    in this context, correct?

1  A.  Pressing the shop button does initiate that process in the

2  context of claim 1.

3  Q.  Let's talk a bit about "based on a predetermined URL or an

4  identifier associated with the consumer appliance element" that

5  appears in between the two highlighted portions that we have

6  here.  Do you see that?

7  A.  I do see that.

8  Q.  First, do you agree, and I think you testified, that the

9  claim is an either/or situation; you only need the

10 predetermined URL or an identifier associated with the

11 compliance, correct?

12 A.  As I parsed that, it was a predetermined URL associated

13 with the consumer appliance or an identifier associated with

14 the consumer appliance.

15 Q.  But you don't need both, right?

16 A.  You do not need both.

17 Q.  Is it correct that the Nook devices would infringe this

18 element if they had either a predetermined URL or an identifier

19 that otherwise satisfied this element?

20 A.  If they had a predetermined URL that was associated with

21 the consumer appliance or if they had an identifier associated

22 with the consumer appliance, then they would meet this

23 particular element.

24 Q.  You have reviewed the opinions of plaintiff's infringement

25 expert, Brian Berg, correct?

1   A.   I have reviewed his opinions.

2   Q.   You are aware that he pointed to evidence of both a

3   predetermined URL and an identifier stored in the Nook devices,

4   correct?

5   A.   I understand that he pointed to what he claimed were

6   predetermined URLs and identifiers, each associated with the

7   consumer appliance.

8   Q.   Let's start with the URL.  You agree that as part of the

9   registration process, all Nook devices except for the first

10  one, the Nook classic, received the URLs that B&N wants the

11  devices to talk to?

12  A.   Yes, I do understand, do agree with that statement.

13  Q.   You don't dispute that during the registration process the

14  Nook devices received the URL from what B&N calls its GPB

15  server?

16  A.   I have already stated that they do receive that URL.

17  Q.   That's during the registration process, correct?

18  A.   That is during the registration process.

19  Q.   By they, you are referring to the Nook devices receiving

20  that URL, right?

21  A.   The Nook devices, except for the classics, are receiving

22  the URL that refers to what we talked of as the GPB command

23  server.

24  Q.   They received that URL from Barnes & Noble, correct?

25  A.   They receive that URL from Barnes & Noble.

1   Q.  You agree that the GPB server is a Barnes & Noble server,

2   right?

3   A.  My understanding is the GPB server is a Barnes & Noble

4   server.

5   Q.  The GPB server is in fact the Barnes & Noble server that

6   returns data in response to a user selecting the shop icon on

7   the Nook device, correct?

8   A.  That is my understanding.

9   Q.  For the Nook classic, the URL is written directly into the

10  source code for the device, correct?

11  A.  That is my understanding, yes.

12  Q.  The URL that is written into the source code for the Nook

13  classic directs the communications between the Nook classic and

14  the Barnes & Noble server, correct?

15  A.  Yes, it does.

16  Q.  Now let's talk about the identifier part of this claim

17  element, OK?  You are aware that Mr. Berg identified two types

18  of identifiers, a device ID and a model number, correct?

19  A.  That is correct.

20  Q.  You would agree that the Nook devices send the device ID

21  and the model number to the Barnes & Noble server when a user

22  selects the shop icon on the Nook devices?

23  A.  That is correct.  They send the model number in the header

24  and they send the device ID in the body of the request.

25  Q.  You are familiar with what the model number is on the Nook

1   device, correct?

2   A.  I have seen them.  I haven't committed the model number

3   specifically to memory, though.

4   Q.  You would agree that the model number is representative of

5   a type of Nook device, right?

6   A.  A model number is, in my view, representative of the type

7   of a device, yes.

8   Q.  By type of Nook device, we are referring to the Nook

9   classic, for example?

10  A.  Talking about whether it is the classic, or let's deal with

11  the ones that were in his analysis, the Nook HD or the Nook

12  HD+, for example.

13  Q.  So, each type of Nook would have a different model number,

14  right?

15  A.  Different kinds of Nooks would have different model

16  numbers.

17  Q.  You also gave some testimony about the shop application and

18  whether it was a web browser, do you recall that?

19  A.  I do recall that testimony.

20  Q.  Your opinion is that the shop application is a web browser,

21  right?

22  A.  Yes, I believe the shop application to be a web browser.

23  Q.  Isn't it correct that you did not try to use the shop

24  application to access web pages other than those related to

25  Barnes & Noble in this case?

1  A.   I did not try to use it to access pages other than Barnes &

2  Noble.

3  Q.   Isn't it correct that you did not form an opinion in this

4  case regarding whether a user could access a website or

5  information on the Web unrelated to Barnes & Noble while using

6  the shop application?

7  A.   At the time of our deposition, I had not formed such an

8  opinion.

9  Q.   Isn't it correct that based on your review of the evidence

10  in this case, you were not able to find a portal in the shop

11  application that one might use to browse all publicly available

12  information on the World Wide Web?

13  A.   At the time of my deposition, I had not tried to find such

14  a portal.

15  Q.   Isn't it true that you don't think it is necessary for a

16  web browser to be able to reach anything at all on the World

17  Wide Web?

18  A.   I had indicated that it was not necessary for a web browser

19  to be able to reach everything that was on the World Wide Web.

20  Q.   Isn't it true that you don't think it is necessary for a

21  web browser to be able to reach anything on the World Wide Web?

22  A.   That depends on how you define World Wide Web.  I think

23  that it needs to be able to reach something, whether it is a

24  local server, a boxed-in server, or other things that are out

25  there.

1     MR. CABRAL:  Your Honor, I would offer Professor

2  Neuman's deposition testimony on page 385, starting at line 21,

3  going through page 386, line 4.

4     THE COURT:  Any objection?

5     MR. SHARIFAHMADIAN:  It's a partial answer, your

6  Honor.  If the question and answer can be read, then it should

7  be read to line 15.

8     THE COURT:  I agree, 16.

9     MR. CABRAL:  Apologies, your Honor.  I may have

10 truncated the testimony there.

11    THE COURT:  We will read from page 385, line 21, to

12 page 386, line 16.

13    MR. CABRAL:  I have that here in front of me.

14 Q.  "Q.  Can you tell me definitively whether the shop

15 application on the accused Nook devices can be used to browse

16 the entire World Wide Web based on your review of the evidence

17 in this case?

18 "A. First of all, it is not necessary for a browser to be able

19 to reach anything on the World Wide Web."

20     It is not really a question, but it is a statement.

21 "I understand that opinion."

22     The answer continues, "Additionally, of course,

23 actually I -- the question actually is a little bit misinformed

24 because, of course, there is content on the World Wide Web that

25 one is not able to access because the providers of the content

1   didn't want it accessed.  So, if you want me to answer your

2   specific question, I can say, well, no, there are places on the

3   World Wide Web that cannot be accessed because there are places

4   on the World Wide Web that using your browser on your laptop

5   you can't access."  That is the end of it.

6            That was your testimony, correct?

7   A.  That was my testimony.

8   Q.  You testified at your deposition that it was not necessary

9   for a web browser to access anything on the World Wide Web and

10  yet it could still be a web browser, is that fair?

11  A.  That was my testimony there.

12  Q.  Let's talk about claim 2 of the '703 patent.  Before we do

13  that and before we leave the web browser issue, you are aware

14  of the Nook Simple Touch, is that right?

15  A.  I am aware of the Nook Simple Touch.

16  Q.  The Nook Simple Touch is sort of a black-and-white ereader

17  device, would you agree?

18  A.  Yes, it is.

19  Q.  The Nook Simple Touch has a shop icon or shop button to

20  reach the shop application, correct?

21  A.  Yes, it does.

22  Q.  The Nook Simple Touch does not have a button on the menu

23  bar to access the web browser feature on the Nook devices,

24  correct?

25  A.  I don't recall at this time.

1    Q.  Is it your opinion that the Nook Simple Touch offers web

2    browser functionality?

3    A.  It is my opinion that the Nook Simple Touch does have a web

4    browser.

5    Q.  That's the shop application?

6    A.  At least the shop application.

7    Q.  What else would be a web browser on the Nook Simple Touch?

8    A.  I would need to look at it to see if it had an additional

9    web browser on there.  I don't recall offhand.  There were

10   quite a number of devices, and I would need to refresh my

11   memory to answer that.

12   Q.  Is that analysis you performed in forming your opinions in

13   this case?

14   A.  I had formed an opinion that certain devices did have a

15   separate web browser in addition to the shop application.  I do

16   not recall if that analysis was done with respect to the Simple

17   Touch or another Nook device.

18   Q.  Now we can turn to claim 2.  You agree here that the claim

19   requires the consumer appliance to be configured for use on a

20   home network?  Would you agree?

21   A.  Consumer appliance of claim 1 wherein the consumer

22   appliance is configured, yes, I would agree.

23   Q.  It is your opinion that the Nook devices are not configured

24   for use on a home network, is that right?

25   A.  My opinion was that the Nook devices are not configured by

1    Barnes & Noble for use on a home network.

2    Q.  Your opinion is that the Nook devices are configured for

3    use on a home network by the user, is that right?

4    A.  When the Nook device is to be used on a home network, it is

5    configured for that by the user.

6    Q.  Isn't it correct that you haven't specifically formed an

7    opinion as to whether the Nook devices are designed by Barnes &

8    Noble for use on a home network?

9    A.  I believe I may have said, but I don't recall specifically,

10   that they were intended to be used in a home network.  And I

11   believe that we had a discussion at deposition as to whether

12   that intent constituted -- I'm sorry -- whether that meant

13   designed for or other things.  I remember a long discussion to

14   that effect.

15   Q.  Regardless of what you may or may not have said previously,

16   you would agree that the Nook devices are intended for use on a

17   home network, correct?

18   A.  I do believe the Nook devices are intended to be used on a

19   home network.

20   Q.  But your opinion is that the devices are not configured for

21   use on a home network by Barnes & Noble as they are sold in the

22   box, for example?

23   A.  That is my position, yes.

24   Q.  Isn't it fair to say that under your interpretation of this

25   language, no consumer electronic devices would be configured

1    for use on a home network as they are sold in the box?

2    A.  Nowadays you have technology such as DHCP and other things,

3    but I haven't opined on other devices specifically.  I would

4    need to perform further analysis with respect to them.

5    Q.  Let's talk briefly about claim 3.  Claim 3 refers to the

6    consumer appliance of claim 1.  Do you see that?

7    A.  I do see that.

8    Q.  It further comprises a memory for storage of the URL or

9    identifier.  Do you see that?

10   A.  I do see that.

11   Q.  You don't dispute that the Nook devices comprise a memory

12   for storing the URL or identifier, correct?

13   A.  Well, I would need to see what the URL is.  If we look at

14   the, as it says, the URL.  It doesn't say a URL or identifier,

15   which means I would need to look at claim 1 to see what the

16   limitations are on the URL.

17   Q.  You are not familiar with the limitations on the URL in

18   claim 1?

19   A.  If I recall correctly, the URL and the identifier both

20   needed to be associated with the consumer device, so it

21   required that associated with limitation.

22   Q.  Would you agree that the Nook devices comprise a memory for

23   storing a URL or identifier?

24   A.  The Nook devices do comprise a memory for storing a URL or

25   an identifier.

1    Q.  I want to direct your attention to "enabling the user by a

2    single user input to the consumer appliance to have the

3    consumer appliance initiate sending a request."  I am going to

4    stop there.

5           Do you see that language there?

6    A.  I do see that language.

7    Q.  Is it your opinion that there is no single user input in

8    the context of this claim because the user must make several

9    inputs to the Nook devices before being able to press shop

10   icon?

11   A.  Yes, that is my position.

12   Q.  And those inputs include turning the power on, unlocking

13   the device, and pressing the home button?

14   A.  Depending on the particular device, what those precursor

15   steps are are slightly different on the different devices, and

16   it included other things such as configuring for use on the

17   network, associating with the Barnes & Noble servers,

18   navigating through screens in some cases to reach that

19   particular icon.

20   Q.  So the registration process and the configuration process

21   to set the device up on a home network, those would be included

22   as inputs in your view?

23   A.  In my view they should be considered inputs.

24   Q.  Now, claim 13 is talking about the retrieval of content

25   information by a context of using.  Do you agree?

1  A.  I would agree.

2  Q.  Would you also agree that the inputs that we just spoke

3  about have nothing to do with actually retrieving the content

4  information that is the subject of claim 13?

5  A.  They are precursor steps so I am not quite sure what you

6  mean by have nothing to do with.

7  Q.  So turning the device on, that doesn't return content

8  information by a context of using, does it?

9  A.  No, it does not.

10  Q.  Registering the device, that doesn't initiate the retrieval

11  of content information by a context of using?

12  A.  Not as we are using that term.

13  Q.  Isn't it true that the only input that actually initiates

14  the retrieval of content information by a context of using is

15  pressing the shop button on the Nook devices?

16  A.  In fact, it is pressing the shop icon after performing all

17  these other precursor steps.  So that's not a single input.

18  What you are doing is you are ignoring all the precursor steps.

19  Q.  If you performed all of the precursor steps and did not

20  press the shop icon, isn't it correct that you wouldn't

21  retrieve content information by a context of using?

22  A.  As we understand that claim, you are correct.

23  Q.  Let's turn to claim 15.

24          Claim 15 requires "creating a database of URLs or

25  identifiers per user."  Do you see that?

1    A.  I do see that.

2    Q.  Do you dispute that Barnes & Noble creates a database of

3    URLs or identifiers per user?

4    A.  I did not dispute that Barnes & Noble was creating such a

5    database.

6    Q.  Is that because Barnes & Noble does in fact create a

7    database of URLs on the Nook devices?

8    A.  I would need to do some further analysis, but I did not

9    offer an opinion that they did not.

10   Q.  So you don't know whether Barnes & Noble creates a database

11   of URLs on Nook devices?

12   A.  I haven't looked specifically to that particular issue.

13   Q.  I want to turn briefly to the '851 patent.  I want to turn

14   to claim 96 of the '851 patent.

15          This is the secure delivery patent that involves

16   encryption.  Would you agree?

17   A.  Yes, I would agree.

18   Q.  Claim 96 requires certain components, including a receiver,

19   memory, a processor and a transmitter.  Would you agree?

20   A.  I do agree.

21   Q.  When forming your opinions in this case regarding the '851

22   patent, you did not take apart any of the Nook devices to

23   analyze their component parts, did you?

24   A.  No, I did not disassemble any of the devices.

25   Q.  You don't dispute that the Nook devices have a receiver, a

1   memory, a processor, and a transmitter, do you?

2   A.  I do not dispute that the Nook devices have a receiver, and

3   we will ignore the wherein part; I do not dispute that they

4   have a memory; I do not dispute that they have a processor; and

5   I do not dispute that they have a transmitter.

6   Q.  Isn't it correct that you did not do anything to

7   independently analyze the communications between the Nook

8   devices and the server hosted by Barnes & Noble or Barnes &

9   Noble's content provider?

10  A.  I did not do anything independent to view that.

11  Q.  Isn't it correct you relied on Mr. Berg's analysis to

12  evaluate the communications between the Nook devices and the

13  Barnes & Noble server?

14  A.  I relied on the data collected in Mr. Berg's

15  man-in-the-middle analysis.

16  Q.  You don't take any technical issue with the results of that

17  man-in-the-middle analysis, do you?

18  A.  I don't take any issue with the data that was generated by

19  the man-in-the-middle analysis.  I do with the opinions that

20  were formed by Mr. Berg regarding that data.

21  Q.  But you don't dispute the accuracy of the data generated by

22  the analysis, do you?

23  A.  I have not disputed the accuracy of the data from that

24  analysis.

25  Q.  I am going to set aside some of the questions there and go

1    back.  Before we end today, I want to talk about the validity

2    issues regarding the '501 lending patent.  OK?

3    A.  OK.

4    Q.  I will set these questions aside because I don't want to

5    lose them.

6         You testified that a reference called Saigh renders

7    the claim of the '501 patent invalid, correct?

8    A.  I have.

9    Q.  And you point to two Saigh references in your expert

10   report, a Saigh patent and a Saigh publication, correct?

11   A.  That is correct.

12   Q.  And those two references are substantially identical in

13   terms of the descriptions and their figures.  Would you agree?

14   A.  I do agree.

15   Q.  Your opinions regarding the validity of the '501 patent are

16   the same for both of those Saigh references?

17   A.  My opinions were the same regarding both of those

18   references.

19   Q.  In your binder, there should be a Joint Exhibit 2, which is

20   the '501 patent.

21        MR. CABRAL:  If we can bring up the first page of the

22   '501 patent?

23   A.  I am at Joint Exhibit 2, and I see what you have on the

24   screen.

25   Q.  In top right corner shows the date November 20, 2007.  Do

1  you see that?

2  A.  Yes, I see that date.

3  Q.  That's your understanding of when the '501 patent issued?

4  A.  That is my understanding of the issue date of the '501

5  patent.

6  Q.  Do you understand that the '501 patent claims priority to a

7  patent application that was filed way back in November of 1994?

8  A.  Yes, I am aware of that.

9  Q.  You would agree that the patent office examined the

10  applications that led to the '501 patent for about 13 years?

11  A.  At least parts of that, yes.

12  Q.  You don't dispute that the patent office actually

13  considered the Saigh patent during the examination of the '501

14  patent, correct?

15  A.  I am not disputing that they at least indicated they had

16  considered it.

17  Q.  Now, if you look on page 2 of Joint Exhibit 2, starting on

18  page 2 and going through page 5, do you understand this list of

19  materials here to show U.S. patents and other materials

20  considered by the patent office during the application process

21  for the '501 patent?

22  A.  Yes, I do.

23  Q.  If we can turn to page 4 of the '501 patent.  I am looking

24  at the top right corner.

25          You see that first reference on the top right corner

1   there?

2   A.  I do see that first reference.

3   Q.  It says Saigh, correct?

4   A.  It says Saigh.

5   Q.  The number next to that is 5,734,891.  Do you see that?

6   A.  I do see that.

7   Q.  Do you understand that to be the number for the Saigh

8   patent on which you base your invalidity opinions?

9   A.  I understand that to be a reference to the Saigh patent and

10  that is one of the items, together with the Saigh publication,

11  on which I base my opinions.

12  Q.  So you would agree then that the Saigh patent on which you

13  base your opinions is listed on the face of the '501 patent

14  under a list of materials considered, correct?

15  A.  Yes, I do agree that the Saigh patent is listed on the face

16  on page whatever as one of the patents that they claim to have

17  considered.

18  Q.  Is it your opinion that the patent office made a mistake by

19  allowing the '501 patent to issue over the Saigh patent?

20  A.  It is my opinion that the patent office made a mistake in

21  allowing at least the claims that we have been considering

22  today with respect to the '501 patent to issue over the Saigh

23  patent.

24  Q.  Let's talk about the Saigh reference or patent or whatever

25  you want to call it.

 1                MR. CABRAL:  I want to bring up Defense Exhibit 411.

 2                If we can zoom in on the top here.

 3                Before we do that and ask any questions, your Honor,

 4    the Saigh publication has been entered into evidence by defense

 5    counsel.  This is Defense Exhibit 411, which is the

 6    corresponding patent.  Plaintiff would move to enter this

 7    document into evidence as well.

 8                MR. SHARIFAHMADIAN:  No objection.

 9                THE COURT:  Received.

10                (Defendant's Exhibit 411 received in evidence)

11    Q.  Look at the top right corner.  5,734,891, that's the patent

12    number on the top right.  Do you see that?

13    A.  I do see that.

14    Q.  On the left-hand side it says Saigh?

15    A.  That is correct.

16    Q.  This is the Saigh patent on which you base your invalidity

17    opinions with respect to the '501 patent?

18    A.  It is the Saigh patent on which -- it's one of the

19    references on which I base my opinions in my report.  My

20    testimony here is with respect to the publication.

21    Q.  But the two are --

22    A.  The two are substantially similar.

23    Q.  The only difference between the two doesn't affect your

24    opinions one way or the other, right?

25    A.  That is correct.

1   Q.  Now, I would like to look at column 2 of the Saigh patent

2   under the heading, "Summary of the Invention."

3        I want to look in that summary of the invention

4   section, but on column 3, lines 8 through 14.

5        You see here it says:  "At the separate book bank

6   facilities the information encoded on the laser disks is

7   purchased by the consumers and is transferred to the compact

8   cylinder or memory module of a consumer's personal library

9   apparatus, with several of the books, periodicals, magazines,

10  etc. encoded on the laser disks being transferable to and

11  stored on each compact cylinder of a consumer's personal

12  library apparatus."  Do you see that?

13  A.  I see that.

14  Q.  Do you agree that the Saigh invention construes the

15  purchased information from book banks, which is then

16  transferred to compact cylinders or memory modules?

17  A.  That is what is being described here, that they are

18  purchasing it from book banks that is being transferred to

19  memory modules or compact cylinders, yes.

20  Q.  So you agree that's what the Saigh patent says?

21  A.  That is what it is referring to here.

22  Q.  A compact cylinder, I believe you testified, is essentially

23  like a compact disk or a CD?

24  A.  It's essentially a CD.

25  Q.  Memory modules are like mini-random-access memory devices

1    that can hold about three books, is that right?

2    A.  In the time of Saigh, what a memory module would store

3    would be approximately three books, yes.

4    Q.  In fact, Saigh says that the memory modules can store as

5    many as three separate books, right?

6    A.  Yes, that's what it says.

7    Q.  So as far as analogies go, and we made one earlier, are

8    memory modules like small cartridges, like the old video game

9    cartridges for Nintendo?

10   A.  Yes.  They are like those cartridges, except they have

11   writable memory, where the video game cartridges usually were

12   just readable memory.

13   Q.  That brings back some good memories.

14        The compact cylinders in the memory modules are the

15   data storage medium discussed in Saigh, right?

16   A.  Sorry.  Repeat that.

17   Q.  The compact cylinders and the memory modules, those are the

18   data storage medium discussed in the Saigh patent, correct?

19   A.  Those are storage media that are discussed in Saigh.

20   Q.  Your view is that the Saigh patent or Saigh publication

21   anticipates the claims of the '501 patent by disclosing each

22   and every element of the '501 patent?

23   A.  Yes, that is my position.

24   Q.  So let's talk about some of those elements.

25        You agree that in order to anticipate the claims of

1    the '501 patent, the Saigh reference must disclose "storing

2    electronic book on a viewer"?

3    A.  Yes, it must.

4    Q.  And this element with the word "a" changed to "the" appears

5    in both claim 7 and claim 18 of the '501 patent.  Do you agree?

6    A.  I would agree.

7    Q.  In the context of the Saigh patent, you agree that a person

8    of ordinary skill would understand the control unit labeled 20

9    to be the viewer for purposes of your invalidity analysis?

10   A.  In the invalidity analysis that I presented here, yes, it

11   would be the control unit that is the viewer.

12   Q.  You agree that the only component part of the library

13   apparatus described in Saigh that is able to display an

14   electronic book is the control unit, right?

15   A.  To display it, it would be the control unit, and more

16   precisely the LCD screen within the control unit.

17   Q.  And you agree that the control unit is removable or

18   separable from the overall library apparatus, correct?

19   A.  Saigh describes that the control unit is separable.

20   Q.  You don't consider a compact cylinder to be a viewer,

21   right?

22   A.  I do not consider a compact cylinder to be a viewer.

23   Q.  You don't consider memory modules to be a viewer?

24   A.  I do not consider the memory module by itself to be a

25   viewer.

1  Q.  Compact cylinders and memory modules are storage medium,

2  correct?

3  A.  They are storage medium.

4  Q.  Do you agree that the Saigh patent refers to the data

5  storage medium as separate from the entire library apparatus?

6  A.  It describes it as being separable from the apparatus.

7  Q.  But you don't agree that the Saigh patent describes the

8  data storage medium as separate from the library apparatus?

9  A.  There may be some context within here where it does

10  describe it as separate.

11  Q.  Let's look at column 2, starting on line 4.

12          That begins:  "It is an object of the present

13  invention to provide an electronic personal library apparatus

14  that is capable of reading data stored by a separate data

15  storage medium."  Do you see that?

16  A.  I do see that.

17  Q.  Do you agree this section of the Saigh patent refers to the

18  data storage medium as being separate from the personal library

19  apparatus?

20  A.  Yes, it does.

21  Q.  And by data storage medium here, it's referring to the

22  memory modules and compact cylinders, correct?

23  A.  I believe it is referring to those, yes, correct.

24  Q.  If we can stay in column 2, going down to line 20.

25          Line 20 of column 2 of the Saigh patent reads:  "It is

1   also an object of the present invention to provide an

2   electronic personal library apparatus that is capable of

3   displaying data read from a separate data storage medium

4   accessed by the library apparatus."  Do you see that?

5   A.  I do see that.

6   Q.  You agree here again the Saigh patent is referring to a

7   separate data storage medium with relation to the personal

8   library apparatus?

9   A.  In the context of this paragraph, yes, it is.

10  Q.  Again, the data storage medium here refers to the memory

11  modules and compact cylinders?

12  A.  I believe that is what it is referring to.

13  Q.  If we can look further down column 2, starting on line 27.

14         Here it reads:  "It is also an object of the present

15  invention to provide an electronic personal library apparatus

16  where the separate data storage medium of the apparatus

17  interfaces with an electronic book bank and receives and stores

18  information from the book bank, and where the information

19  received and stored by the separate data storage medium is read

20  from the medium and visually displayed by the electronic

21  personal library apparatus."  Do you see that?

22  A.  I do see that.

23  Q.  Do you agree that this paragraph of the Saigh patent refers

24  two times to the separate data storage medium?

25  A.  It refers to separate storage medium in a particular

1    environment, yes.

2    Q.   That's separate from the personal library apparatus,

3    correct?

4    A.   In the particular case where it is described here in this

5    embodiment it is separate from the library apparatus.

6    Q.   You're referring to a particular embodiment.  I want to

7    direct your attention to the first line in that paragraph where

8    it says:  "It is an object of the present invention."  Do you

9    see that?

10   A.   I do see that.

11   Q.   That language isn't limited to a particular embodiment, is

12   it?

13   A.   But it says "it is an object of the present invention."  It

14   doesn't say it is the only object of the present invention.

15   Q.   But it is referring to the present invention and not a

16   specific embodiment, correct?

17   A.   But the object of the present invention is a particular

18   embodiment of it.

19   Q.   I want to direct your attention to column 4, starting at

20   line 62, and this goes over to column 5, line 1.

21        Starting here, the Saigh patent says:  "In the

22   embodiment of the invention showed in figure 1, the control

23   unit 20 is designed as a hand-held device removable from the

24   enclosure 12, that is capable of reading information from a

25   separate programmable memory module and visually displaying the

1  read in data as alphanumeric characters, graphs and/or drawing

2  figures on a display screen."

3       Would you agree that this language of the Saigh patent

4  refers to the memory module as a separate programmable memory

5  module, correct?

6  A.  It is referring to it using those words:  A separate

7  programmable memory.

8  Q.  In this context, it is separate from the control unit label

9  20, would you agree?

10  A.  It is saying that it is a distinct element.  What is meant

11  by separate there has to do with really the listing of this.

12  But it's my understanding that when it is capable of reading

13  the information, that it is actually inserted into that control

14  unit.

15  Q.  So is it your opinion or your interpretation of this that

16  the programmable memory module could be referred to as separate

17  from the enclosure or something different?

18  A.  I believe that they are referring to it as separate,

19  meaning that it can be taken out of or placed into, but that

20  actually how it is being used in the context of this, it is

21  actually inserted into, much the same way that you insert an SD

22  card into a digital camera or into a cell phone or something

23  along those lines.

24  Q.  If we can look at column 5, lines 1 through 6.

25       You see here, starting with the first line, it says

1    "the reader control unit."  That's what you view as the actual

2    viewer here, correct?

3    A.  20 is the reader control unit which is what, in the

4    embodiment I spoke about, we are referring to as the viewer.

5    Q.  Here it says:  "That's generally comprised of a housing

6    divided into first and second parts with a LCD screen, several

7    manual controls, an input for the separate memory module."  Do

8    you see that?

9    A.  I do see that.

10   Q.  And here again, the Saigh patent is referring to a memory

11   module that is separate from the control unit.  Would you

12   agree?

13   A.  I would agree it is referring to it as such.

14   Q.  The last one I am going to show you is column 11, line 5.

15          This might be the clearest one.  "The electronic

16   personal library apparatus 10 and the separate memory modules

17   22 and compact cylinders 24 are integral parts of an electronic

18   network interfacing book publishers directly with book retail

19   stores and their customers."

20          Do you see that reference again to the separate memory

21   modules there on the second line, line 6 of column 11 of the

22   Saigh patent?

23   A.  I do see that.

24   Q.  Here it's referring to separate memory modules from --

25   separate from that is electronic personal library apparatus.

1    Would you agree?

2    A.  I do see it as describing it as such.

3    Q.  We just saw numerous instances of the Saigh patent

4    referring to the memory modules as separate from both the

5    library apparatus and the control unit reading device.  Would

6    you agree?

7    A.  I do agree that is how it is referred to there.

8    Q.  But you still believe that the Saigh patent discloses

9    storage of electronic books on the viewer itself, don't you?

10   A.  Yes, I still do believe that.

11              MR. CABRAL:  I can transition now or we can --

12              THE COURT:  This is fine.

13              Ladies and gentlemen, here is our schedule for

14   tomorrow, which is going to be a full day.  We will start at

15   9:00.  My expectation is that the evidence in this case will be

16   completed by lunch.  It's possible to go slightly over lunch,

17   but I am hoping it will be completed by lunch.  We will then

18   have the closing arguments of counsel.  Each side has asked for

19   and given permission to spend one hour on summation.  If we

20   haven't reached 4:30 by that time, I will give you my

21   instructions of the law, which take about a half hour.  If for

22   any reason we are at 4:30, we will excuse you and I will give

23   you my instructions of law first thing Wednesday morning.  But

24   in any event, as you can see, your deliberations will begin

25   Wednesday morning.  So we are essentially on schedule.

1    I want to remind you one last time please do not

2  discuss the case among yourselves or with anyone else until it

3  is given to you for your deliberations on Wednesday.  So have a

4  good evening, and we will see you at 9:00.

5    (Jury exits courtroom)

6    THE COURT:  Let me explain to you that while you're on

7  cross, you should not discuss the case with anyone.

8    THE WITNESS:  I understand that.  Can I have other

9  insubstantial discussions not relating to case, like dinner?

10    THE COURT:  You can discuss with your counsel a good

11  place for dinner.  Of course, the list in New York is only

12  about 5,000, but with a good computer you can probably narrow

13  it down, a good computer program.  Undoubtedly, you will want

14  to then go to one of the enumerable fleshpots available.  So we

15  will see you tomorrow at 9:00.

16    (Witness exits courtroom)

17    THE COURT:  Let's turn to draft charge.

18    With respect to my general instructions 1 through 7,

19  any additions, corrections, objections or whatever with respect

20  to 1 through 7, starting with plaintiff?

21    MR. CABRAL:  Your Honor, the only point that we have

22  would be on instruction number 7, which is specialized

23  testimony.

24    THE COURT:  Let me turn to that.

25    Yes.

1              MR. CABRAL:  Starting at line 4, in parentheses it

2    refers to the testimony of Stephen Magee that was stricken and

3    may not be considered in any respect, at least the opinions it

4    says here.  The only point we would ask for is an instruction

5    in line with what you actually said to the jury.

6              THE COURT:  Although the facts that came out during

7    his testimony can be considered.

8              MR. CABRAL:  That's right.

9              THE COURT:  I will add that.

10             Anything from defense counsel?

11             MR. EDERER:  Yes, your Honor.

12             With respect to instruction number 4, burden of proof,

13   we had a modification or proposed modification at the end of

14   the last paragraph.

15             THE COURT:  Go ahead.  Read it if it is short.  If

16   not, hand it up.

17             MR. EDERER:  Instead of ending with the word

18   "defendant," we would say comma, "but I will decide any

19   increased damages.  You may only award a reasonable royalty,

20   which must be supported by the evidence, and can only be meant

21   to compensate ADREA and not punish Barnes & Noble."

22             THE COURT:  I am not going to give all of that.

23             Let's see.  How about this for the last sentence:  If

24   ADREA shows, again, by clear and convincing evidence, that

25   B&N's infringement was willful, then ADREA may be entitled to

1  increased damages from defendants, but the amount will be

2  determined by me and should not concern you in any respect.

3  OK?

4           MR. EDERER:  Yes.

5           THE COURT:  Very good.

6           MR. EDERER:  One more with respect to instruction

7  number 7, specialized testimony.

8           THE COURT:  Go ahead.

9           MR. EDERER:  This goes to the question of how your

10  Honor will be making reference to Magee, the excluded witness.

11  You had mentioned, I believe to the jury, that they could

12  consider not his opinions, but any facts that may have been put

13  in through him.  We went pretty exhaustively through his

14  testimony last night, and we don't think, other than the

15  exhibits that were entered through him --

16           THE COURT:  Why don't we say this, because your

17  adversary was raising a similar issue, although from their

18  point of view.

19           So the sentence would now read:  Stephen Magee also

20  testified, but the opinions he offered were subsequently

21  stricken and may not be considered by you in any respect,

22  although the exhibits that were received during his testimony

23  and any non-opinion facts he testified to may be considered.

24           MR. EDERER:  Right.

25           THE COURT:  I am not going to go through his whole

 1    testimony and determine whether there are such.

 2         MR. EDERER:  Understood.

 3         One other issue with respect to what you just said.

 4    There was one exhibit that was entered through him that,

 5    because he was excluded before I was able to cross-examine him,

 6    I didn't get a chance to cross-examine him on it.  That's the

 7    interrogatory answer that lists all the different agreements,

 8    license agreements and technology agreements, at Barnes &

 9    Noble.  We would ask that that document not be included as part

10    of the exhibits in this case because I did not get a chance to

11    cross-examine him on that.

12         MR. CABRAL:  The document was entered into evidence

13    before he took the stand.

14         THE COURT:  It is a binding admission.  It has nothing

15    to do with Magee.  It is a response to an interrogatory by a

16    party adversary.  So I don't see any ground to exclude it.

17         You could have cross-examined him until you were blue

18    and it's still in evidence.

19         MR. EDERER:  True, your Honor.

20         THE COURT:  Your point is you would have attempted to

21    show why it was of no relevance.

22         MR. EDERER:  Correct.

23         THE COURT:  Remind me what the interrogatories show.

24         MR. EDERER:  It was a list of Barnes & Noble

25    agreements that plaintiff is claiming under the Georgia-Pacific

1   factors are comparable to the patent license at issue or to the

2   hypothetical license negotiation at issue.  And it lists

3   various rates and other terms.

4           THE COURT:  And it was introduced by whom?

5           MR. EDERER:  It was introduced by plaintiff, in

6   anticipation of presenting it to Magee.

7           THE COURT:  I see.  So it's not a statement of a party

8   adversary because it's their witness, yes?

9           MR. CABRAL:  It is Barnes & Noble's interrogatory

10  response.

11          THE COURT:  Because I don't have a pinpoint memory of

12  it, do you have it?

13          MR. CABRAL:  We can put it up, your Honor.  It's PTX

14  200.

15          It may be a moot point because we are going to use it

16  with Mr. Barnes anyway, but we will do our best to get it up as

17  soon as we can.

18          THE COURT:  If you're going to use it with Mr. Barnes,

19  then there will be a full opportunity to cross-examine him

20  about it.

21          In any event, we are stopping at 5:30 no matter what.

22  If you want to continue spending time on this as opposed to

23  when it comes up with Mr. Barnes' testimony you may, but I

24  suggest we move on.  This does not relate to the charge itself,

25  because if it's ruled out as an exhibit, it will be ruled out

1     as an exhibit.  All the charge relates to is the exhibits.

2              MR. EDERER:  Understood.

3              THE COURT:  With respect to charge 8, patent

4     infringement, any objections, additions, corrections, etc. from

5     plaintiff?

6              Any objections?

7              MR. CABRAL:  No, your Honor.

8              THE COURT:  Thank you.

9              Anything else from defense counsel?

10             MR. EDERER:  Just a few, your Honor.

11             Just prior to the last sentence of the first full

12    paragraph, we propose adding the following sentence:  The Nook

13    GlowLight is only alleged to have infringed the '501 and '703

14    patents.

15             THE COURT:  That may be true.  You really think it's

16    worth making that point as part of the charge?  You think the

17    jury is going to get hung up on that?

18             MR. EDERER:  No.

19             THE COURT:  If you want me to give that, I will give

20    it.  I am just wondering whether you really want me to give it.

21    It adds a tiny element of complexity to something that I think

22    it's extremely unlikely will detain the jury.  They are going

23    to consider the Nook devices as a whole.  But if you want to, I

24    will give it.

25             MR. EDERER:  Just for the sake of accuracy.

1   THE COURT:  Accuracy is a wonderful thing.

2        Let us suppose, hypothetically, that they were to find

3   all the Nook devices violated some other patent, but didn't

4   violate those two claims that this particular device, or the

5   ones you just read.  Which ones are they?

6        MR. EDERER:  It was the Nook GlowLight.

7        THE COURT:  Yes.

8        MR. EDERER:  '501 and '703.

9        THE COURT:  But not the other one?

10       MR. EDERER:  Correct.

11       THE COURT:  Of course, we can always give them a few

12  paragraphs of instruction when we get to that about how they

13  should separate out the GlowLight from that particular

14  consideration.  And then they come in and they find the other

15  two patents have been infringed, but the one that applies to

16  all the other devices except the GlowLight has not been

17  infringed.  What is it that they are then going to do

18  differently in their verdict form?

19       MR. EDERER:  It could affect the number of units.

20       THE COURT:  By how much?

21       MR. EDERER:  I don't have those figures.

22       THE COURT:  You don't have that figure, and they are

23  not in evidence.  They are coming in tomorrow through your

24  wonderful damages expert?

25       MR. EDERER:  The sales figures.

1        THE COURT:  The sales figures.  So they will find it

2   in the massive exhibits that they will be looking through with

3   great care.

4        I ask you again, and I will be bound by your decision

5   on which you need to make now.  Do you really want that in this

6   charge?

7        MR. EDERER:  No, your Honor.

8        THE COURT:  Thank OK.

9        Let's go on to the next one.

10        MR. EDERER:  I have a couple of more on this one.

11        On the second page of the instruction, the paragraph

12   that begins "for the '703 patent."

13        THE COURT:  Yes.

14        MR. EDERER:  The word is "consumer" rather than

15   "computer."

16        THE COURT:  Oh, yes.  Thank you very much.

17        MR. EDERER:  We have two others.

18        The next paragraph beginning with the words, "As you

19   look at the claims themselves," we propose adding the sentence

20   as follows:  "You must interpret and give the claims the same

21   meaning for purposes of both validity and infringement

22   analyses."

23        THE COURT:  OK.  I doubt they would think otherwise,

24   but I don't mind that.  Give me that language again.

25        MR. EDERER:  You must interpret and give the claims

EAK8ADR8

1    the same meaning for purposes of both validity and infringement

2    analyses.

3            One more, your Honor.  In the next paragraph, after

4    the first sentence we propose the following:  "For a claim that

5    covers a method, ADREA must prove that Barnes & Noble performed

6    all of the steps of the method in the United States."

7            THE COURT:  Yes.  And you want that after the word

8    "claim" and before the word "there"?

9            MR. EDERER:  Correct.

10           THE COURT:  Give me that language again.

11           For a claim that covers a method, ADREA must prove

12   that Barnes & Noble performed all of the steps --

13           I will tell you what.  You have it there in writing.

14   Just give it to my law clerk, but I will insert that.

15           MR. EDERER:  That's it for number 8.

16           THE COURT:  Let's go on to instruction number 9.

17           Now, let me ask a question.  Maybe I missed it.  On

18   the direct of Dr. Neuman's testimony, did he cover adequate

19   written description?

20           MR. SHARIFAHMADIAN:  No, your Honor, he didn't.

21           THE COURT:  I don't think he did either.  So I don't

22   think that's in the case.  So we should take it out.

23           MR. CABRAL:  I believe the same is true of enablement,

24   which is instruction 13.

25           THE COURT:  Thank you very much.

1    So that first sentence in the second paragraph in

2    instruction number 9 will now read:  "To be valid, a claimed

3    invention must satisfy certain conditions of patentability, of

4    which the two here relevant are (1) novelty and (2)

5    non-obviousness.  Here, defendants contend that all of the

6    asserted claims are invalid because they lack novelty and are

7    obvious," striking the rest of that sentence.  "If the

8    defendants establish one or more of these contentions of

9    invalidity as to a given claim, that claim is invalid."

10    Anything else on 9?

11    Anything on 10?

12    MR. SHARIFAHMADIAN:  Yes, your Honor.

13    THE COURT:  Go ahead.

14    MR. SHARIFAHMADIAN:  We have two changes.

15    In the first paragraph, currently the last sentence

16    where it says "product offered for sale, anywhere in the world,

17    more than a year before September 21, 1999."

18    THE COURT:  Yes.

19    MR. SHARIFAHMADIAN:  We propose that the words "more

20    than a year" should be stricken.

21    MR. CABRAL:  There is no on-sale bar here so our

22    position would be that the entire sentence should come out.

23    THE COURT:  You're saying the whole issue is

24    irrelevant.

25    MR. CABRAL:  Exactly, your Honor.

1        MR. SHARIFAHMADIAN:  This is standard prior art.

2        THE COURT:  Hold on.  Let me look at it.

3        Let's take it from the start.  "Let's first consider

4   the issue of novelty.  To qualify for a patent, an invention

5   must be new or novel.  Defendants argue that all the asserted

6   claims are invalid for lack of novelty because they were

7   anticipated by prior art.  Prior art is the term for any

8   patents, publicly known publications, or products offered for

9   sale that disclosed the claimed invention either before ADREA's

10  invention was made or more than one year before the effective

11  filing date of the patent application.  In this case, the

12  parties are agreed that the effective filing date of the patent

13  application was," etc.

14        Just stopping there, any objections to that language?

15        MR. CABRAL:  No, your Honor.

16        MR. SHARIFAHMADIAN:  No, your Honor.

17        THE COURT:  So then we have:  "Thus, ADREA's patent is

18  invalid if it was already patented, described in a publicly

19  known publication, or contained in a product offered for sale,

20  anywhere in the world --"

21        You know what, I think that sentence is confusing now

22  that I look at the last sentence.  I don't think we need it at

23  all.  I think everything that needs to be said is said before

24  that sentence, yes?  Any disagreement with that?

25        MR. CABRAL:  No, your Honor.

1        MR. SHARIFAHMADIAN:  We can take that sentence out,

2   your Honor.  We do have one additional sentence.

3        THE COURT:  I will hear that in a minute.  I am taking

4   out that sentence.

5        Go ahead.

6        MR. SHARIFAHMADIAN:  We propose adding, "Additionally,

7   ADREA's patent is invalid if it was described in another patent

8   that was filed before these respective dates for the '851

9   patent, the '501 patent, and the '703 patent."  And that is

10  directed to 102(e).

11       THE COURT:  We have already determined prior art as

12  the term for any "patents, publicly known publications, or

13  products offered for sale that disclosed the claimed

14  invention."

15       MR. SHARIFAHMADIAN:  The difference is between the

16  publication date or the issue date of the patent, which is what

17  the first sentence covers, versus a filing of an earlier patent

18  that didn't issue until after one of the patents in suit.

19       MR. CABRAL:  We are not challenging any of the prior

20  art that's been asserted.

21       THE COURT:  I understand.

22       I am trying to think of it in a way that would make it

23  simpler for the jury.

24       How about, going back to the previous sentence, Prior

25  art is the term for any patents or patent applications,

FAK8ADR6

 1  publicly known publications, etc.  Does that satisfy your

 2  problem?

 3          MR. SHARIFAHMADIAN:  Not quite, your Honor.

 4          THE COURT:  Why not?

 5          MR. SHARIFAHMADIAN:  Because that still refers to the

 6  publication date of a patent application and not the filing

 7  date of the patent application.

 8          THE COURT:  What is the difference?

 9          MR. SHARIFAHMADIAN:  The difference is between 102(a),

10  102(b) and 102(e).

11          THE COURT:  I understand that.  What is the difference

12  in this case?

13          MR. SHARIFAHMADIAN:  I believe we had a 102(e) art

14  that has been asserted, Mr. Sachs' patent.  It was filed before

15  the filing date of the '851 patent, effective filing date, but

16  it issued after.  So the Sachs patent is 102(e) art.

17          THE COURT:  So how about, prior art is the term for

18  any filed patents, is that what you want?

19          MR. SHARIFAHMADIAN:  For any patents filed before.

20          THE COURT:  Prior art is the term for any filed

21  patents, publicly known publications, or products offered for

22  sale that disclosed the claimed invention either before ADREA's

23  invention was made or more than one year before the effective

24  filing date of the patent applications here involved.

25          I am not going to take your sentence, counsel.  Do you

1       want that sentence or not?

2                   MR. SHARIFAHMADIAN:  Why don't we have --

3                   THE COURT:  You have to tell me.  Forgive me.  You

4       haven't told me exactly what it is in this case, I am waiting

5       to hear in your summation, how you describe to the jury the

6       issue that you now think I need to add a whole sentence about.

7                   MR. SHARIFAHMADIAN:  I will try to be succinct, your

8       Honor.  If we have an instruction that all of the art that has

9       been presented to them qualifies as prior art, I think that may

10      solve the issue.

11                  THE COURT:  I am not going to give that instruction.

12                  MR. SHARIFAHMADIAN:  I am not sure that the

13      instruction --

14                  THE COURT:  Why doesn't the word "filed" before the

15      word "application" solve your problem?

16                  MR. SHARIFAHMADIAN:  Because it then goes on to say

17      that it has to be disclosed, and it wasn't publicly disclosed

18      before the '851 patent was filed.

19                  THE COURT:  How about described?

20                  Why is that not what you're saying, counsel?  You can

21      put up your hands and rub your forehead and do all the gestures

22      you're in the process of doing, but I would like an

23      articulation of why the word "describe" does not solve your

24      point.

25                  MR. SHARIFAHMADIAN:  Your Honor, I am just trying to

1   be faithful to the language of the statute.

2          THE COURT:  I am trying to be faithful to my duty to

3   the jury.  If we want to read them the statutes, we are

4   guaranteeing that they will be confused beyond all get out,

5   because if there is one thing Congress isn't capable of doing

6   is writing a statute about patents in everyday normal English.

7          I am asking you substantively, given what the statutes

8   say, which you are correct on, why is that not fully covered by

9   changing the word "disclose" to "describe," which is a better

10  English word anyway?

11         MR. SHARIFAHMADIAN:  Your Honor, because I think it

12  needs to say describe and filed previous to.

13         THE COURT:  I hear you, and I am going to do the

14  following:  Prior art is the term for any filed patents,

15  publicly known publications, or products offered for sale that

16  describe the claimed invention either before ADREA's invention

17  was made or that were filed or published more than one year

18  before the effective date of the patent applications here at

19  issue.

20         Do you have any objection to that?

21         MR. SHARIFAHMADIAN:  I understand the Court has --

22         THE COURT:  Do you have any objections?  Preserve it

23  for appeal.  I can't wait for the Court of Appeals to take this

24  up.

25         MR. SHARIFAHMADIAN:  I stated my position, your Honor.

1      THE COURT:  So you do object.

2      MR. SHARIFAHMADIAN:  I do object.

3      THE COURT:  Your objection is overruled.  OK.

4      You shouldn't let me intimidate you, counsel.  If you

5  have an objection, state it for the world to hear.

6      Anything else on number 10?

7      Anything on 11?

8      MR. EDERER:  Yes, your Honor.  I think maybe you will

9  agree with us on this one.

10      THE COURT:  I agreed with him on the last one.  He

11  just didn't like my wording.

12      MR. EDERER:  In the second paragraph, first line, at

13  the end of the line, after the word "as" the word "of" is

14  missing.

15      THE COURT:  Which sentence?

16      MR. EDERER:  First line of the second paragraph.  "In

17  order to determine whether a claim was obvious, you need to ask

18  yourself, as of September."

19      THE COURT:  Oh, yes.  Oh, my God.  You're really

20  pushing it, but OK.

21      (Continued on next page)

22

23

24

25

1          MR. EDERER:  No, your Honor.

2          MR. CABRAL:  Your Honor, the only change we would have

3    to instruction 11 is have the word "in addition" with regard to

4    objective evidence of nonobviousness.

5          THE COURT:  Yes.

6          MR. CABRAL:  We would change the word "should" to

7    "must also consider," which we believe is a little more

8    consistent with case law regarding secondary considerations.

9          THE COURT:  That's fine, but what is the evidence that

10   supports that?

11         MR. CABRAL:  That is a separate question, your Honor.

12   There was some testimony, for example, from Mr. Hendricks

13   related to secondary considerations, regarding long-felt need,

14   etc.

15         THE COURT:  I have no problem with that.

16         Instruction 12 is now out.

17         Instruction 13 is now out.  We will revise the other

18   numbers accordingly.

19         With respect to what was until those changes

20   instruction number 14 on compensatory damages, anything from

21   plaintiffs?

22         MR. CABRAL:  No, your Honor.

23         THE COURT:  Anything from defendants?

24         MR. EDERER:  Yes, we have a few things, your Honor.

25   Please bear with me for one second.  We are suggesting adding

1      two sentences at the end of the first paragraph.

2              THE COURT:  Go ahead.

3              MR. EDERER:  Maybe it's three.  "Damages are not meant

4      to punish the infringer.  It is important to understand that by

5      instructing you on damages, I am not suggesting that Barnes &

6      Noble has committed patent infringement or that any of the

7      patents are valid.  That is for you to decide, and only for you

8      to decide that, should consider that on the issue of damages."

9              THE COURT:  No, I'm not going to do any of that.  When

10     we get to willfulness, I might consider the first of those

11     sentences, but not here on compensatory damages.  I frankly,

12     though this is your call, not mine, wonder whether saying to

13     the jury repeatedly, now, whatever you do, don't punish the

14     defendants, don't you dare punish the defendants, some might

15     say you're putting thoughts in their mind that otherwise would

16     not be there.

17             MR. EDERER:  The next point is with respect to the

18     Georgia-Pacific factors, we note that a number the number of

19     them has been cut down.

20             THE COURT:  Yes.  For example, factor 15 is really

21     just a repeat of what I say they should do overall.

22             MR. EDERER:  Of course.  I don't have a list of the

23     other ones that are out.  We were just going to suggest that we

24     were perfectly fine with the --

25             THE COURT:  I wasn't fine with the wording.  As I read

1    them to the jury, I thought some of the words there were not

2    simple English, as I think the words here are.  That is really

3    why I changed them and took out the few that I thought were

4    irrelevant.

5            MR. EDERER:  One or two other points on this issue.

6            THE COURT:  Yes.

7            MR. EDERER:  First of all, we have been referring to

8    the factors as factor number so-and-so, factor number

9    so-and-so.

10           THE COURT:  All right.  I can fix that.  We can do

11   this A, B, C, D, and E.

12           MR. EDERER:  Or just putting them in the order that we

13   have been referring to them or calling them by their name.

14           THE COURT:  If you have the suggested order.  I'm not

15   going to go back and do that.  If you want to renumber them,

16   I'm willing to hear you on that.  What would you like to

17   change?  Which ones would you like to change numbers?

18           MR. EDERER:  I'll have to look that up and get back to

19   you.

20           THE COURT:  OK.

21           MR. EDERER:  One other quick point on what you have

22   now as number 6.  This is an issue that came up earlier.  Where

23   it says, "The effect of selling a patented device on the sales

24   of other products," and so forth, the word in the factor is

25   "specialty," and it has a different meaning than "device."  It

1  has to do with the feature as opposed to the device itself.  We

2  had this discussion earlier.

3          THE COURT:  Yes.  I agree with that.  What language do

4  you want there?

5          MR. EDERER:  Just use the word "specialty."

6          THE COURT:  "Specialty," which will mean nothing to

7  the jury?

8          MR. EDERER:  I think it is a patent feature and is

9  what it should be from the standpoint of the jury under-

10  standing.

11          THE COURT:  I have no problem.  Let me hear from

12  plaintiff in a minute.  I'm not going to give a word they don't

13  understand.

14          MR. EDERER:  "Feature" would be great.

15          MR. CABRAL:  We are fine with "feature," your Honor.

16          THE COURT:  "Feature," good.

17          MR. EDERER:  We will come back to you in a moment with

18  any suggested order.  There is one more point on this section,

19  your Honor.

20          THE COURT:  Yes.

21          MR. EDERER:  You struck what was formerly instruction

22  number 15, date of commencement of damages.  I don't know if I

23  have the numbers right.  The whole issue really goes to the

24  issue of marking, and so forth.  I'll come back to that in a

25  second.  If you are not going to give that instruction, we

1    think at least --

2              THE COURT:  Which instruction?

3              MR. EDERER:  There was a proposed instruction that we

4    made called date of commencement of damages.  It has to do with

5    what date damages start.  Also, we have an instruction that

6    related to the marking issue.

7              THE COURT:  First of all, any instructions that either

8    side submitted that I'm not giving I have, in effect, either

9    rejected or felt that my instructions convey the sense of them.

10   There is no sense going back to your previous instruction.

11   Just tell me what language you want here that you think is not

12   here.

13             MR. EDERER:  I think at the very least the jury should

14   be told that for the '851 patent, the Court has already

15   determined that damages cannot be awarded before March 29,

16   2012.

17             THE COURT:  Where would you put that?

18             MR. EDERER:  That should go at least at the end of the

19   damages instruction, which is currently 14 but which you are

20   going to renumber.

21             THE COURT:  Doesn't it come earlier?  I'm looking at

22   the second paragraph.  "Specifically, compensatory damages are

23   the amount of money that defendants hypothetically would have

24   paid ADREA as a fee or royalty for" -- maybe the second

25   sentence.  "The first step in calculating the fee is to

1   determine what rate as a percentage of a fixed amount," etc.,

2   "the parties would have reasonably agreed to in a hypothetical

3   negotiation taking place" -- when?

4            MR. EDERER:  I believe the parties have agreed on that

5   issue as November 2009.

6            THE COURT:  Yes.  -- "taking place in November 2009."

7   Then you want to say?

8            MR. EDERER:  "For the '851 patent the Court has

9   already determined that damages cannot be awarded before March

10  29, 2012."

11           THE COURT:  OK.

12           MR. CABRAL:  Your Honor, I think our only issue with

13  that would be we don't see the need to say the Court has

14  already determined.  I think we can say the damages period for

15  the '851 patent begins on March 29, 2012, and if you want to

16  put an end on it, we can do that as well.

17           MR. EDERER:  I think there should be an end on it,

18  too, because that patent has expired.

19           MR. CABRAL:  It is a set time period.

20           THE COURT:  I come back to what is the language you

21  want for that purpose?

22           MR. EDERER:  We had suggested "the Court has already

23  determined."  "Putting that aside, for the '851 patent the

24  Court has already determined that damages cannot be awarded

25  before March 29, 2012.  Also, because the '851 patent has

1   expired, damages may only be awarded for the period March 2,

2   2012, through December 9, 2012."

3            THE COURT:  OK.  I have no problem with adding that

4   language.  I think it should go at the end of that instruction,

5   now that I look at it.  Do you have an objection?

6            MR. CABRAL:  We would prefer it be simpler, your

7   Honor, and say the damages period for the '851 patent or

8   damages should be awarded to the extent they are for the '851

9   patent from March 29, 2012, to December 9, 2012.

10           THE COURT:  If we are going to do that, we should do

11   it for all three.

12           MR. CABRAL:  There is no end period on the other

13   patents, as they have not expired yet, your Honor.

14           MR. EDERER:  But there is an end period because it is

15   the date today or tomorrow.  It would be November 2009 through

16   to date.

17           THE COURT:  I don't mind your wording as long as it

18   covers all three.  Why don't you jointly get me that wording by

19   certainly no later than 7:30 tonight.  I'll add something to

20   that effect at the bottom of the compensatory damages

21   instruction.

22           MR. EDERER:  Your Honor, if I may, we had also

23   proposed an instruction, which you didn't accept, with respect

24   to the start date for the other two patents.  We had a marking

25   issue which was raised on summary judgment.  You granted with

1    respect to the '851 but not with respect to the '501 and '703

2    because you said there were issues of fact.  It has to do with

3    the question of marking and whether or not the patents are

4    being practiced and whether there was marking.

5            There was no dispute that there was no marking.  The

6    dispute is whether or not the patents were being practiced.  If

7    we are right about that and the jury finds that the patents

8    were being practiced, then we are entitled to push forward the

9    start date for those two patents as well to March 29, 2012,

10   because that is the date --

11           THE COURT:  What is the instruction you want?

12           MR. EDERER:  The instruction we are asking for is an

13   instruction which asks the jury to determine --

14           THE COURT:  No, I want the words.

15           MR. EDERER:  It's a fairly lengthy charge.

16           THE COURT:  Yes, it was.  That's why I wasn't going to

17   give it.

18           MR. EDERER:  We can cut it down.  But I think we are

19   entitled to that.

20           MR. CABRAL:  Your Honor, on this issue defendants did

21   not identify any articles they thought were covered by the '501

22   or '703 patents during discovery.  They never identified any

23   patent articles that we would then have to go back and

24   establish were not covered by the patents.  They waived any

25   argument regarding marking.

1   On this issue, your Honor, we wrote a letter to

2   defense counsel on October 4th laying out our position very

3   clearly and the case law supporting our position, which has not

4   been responded to.  I am happy to provide your Honor with a

5   copy of that letter.

6         THE COURT:  I don't know about that.  I'm certainly

7   not going to give the lengthy instruction.  If by 7:30 tonight

8   you want to propose a short instruction that can be added to

9   this general instruction on compensatory damages, I will

10  consider it, keeping in mind the objections just stated.  If

11  you want to submit something right after you receive it as to

12  further objections or anything like that, I will look at that

13  as well.  But I need to have it by 7:30 tonight because we have

14  to put this to bed tonight.

15        I shouldn't say we are putting it to bed tonight with

16  one exception that anything in motions made at the close of all

17  the evidence that affects the charge, obviously that will be

18  taken account of.

19        Turning to instruction number 15, any objections or

20  additions, etc., from plaintiff's counsel?

21        MR. CABRAL:  Your Honor, one moment.  I seem to have

22  lost it in the pile of paper here.

23        No problem, your Honor.

24        THE COURT:  From defense counsel?

25        MR. EDERER:  Which one, your Honor?

1        THE COURT:  The willful infringement.

2        MR. EDERER:  You mentioned earlier, and I don't

3   remember exactly --

4        THE COURT:  Here is where I will put it if you want

5   it.  Look at the second sentence on the first paragraph, "The

6   determination of whether B&N's infringement was willful."  I'm

7   going to change that to "defendant's infringement was willful

8   will not affect the specific amount of compensatory damages you

9   will assess."  Then I would add, if you want me to, "which are

10  not intended to punish defendants but simply to compensate

11  plaintiffs, but it will aid the Court," etc., "in determining

12  whether any additional damages must be assessed."  If you want

13  that, I'll put that in there.

14       MR. EDERER:  Yes, your Honor.

15       THE COURT:  Let me write that down.

16       MR. BAUER:  Your Honor, I'm going to suggest that the

17  word "and" be put in front of that clause.  The way you have

18  read it, it might come out a little clearer.

19       THE COURT:  Hold on.  Just one second and I'll hear

20  you.  Here is the way I now have it.  "The determination of

21  whether defendant's infringement was willful will not affect

22  the specific amount of compensatory damages that you will

23  assess, which are not intended to punish defendants but simply

24  to compensate plaintiffs; but it will aid the Court in

25  determining whether any additional damages must be assessed."

1           What is the objection there?

2           MR. BAUER:  There was no objection, your Honor.  I was

3   just suggesting the word "and" be put after your comma and in

4   front of the clause, as I hear it said.

5           THE COURT:  No, I don't grammatically agree with that.

6   But thank you anyway.  Anything else on 15?

7           MR. EDERER:  I'm a little confused about the numbers.

8           THE COURT:  On willful infringement.

9           MR. EDERER:  There is one other suggestion we had,

10  which is in the second paragraph, little (i), after the words

11  "intentionally copied the product of plaintiff." " As opposed

12  to having independently developed the Nook devices," we propose

13  to add those words.

14          THE COURT:  Is there a product by the plaintiffs?

15          MR. CABRAL:  There is not, your Honor.

16          THE COURT:  Maybe we should just strike (i)

17  altogether.

18          MR. EDERER:  Yes.

19          MR. CABRAL:  I have no problem with that.

20          THE COURT:  Then we will read the others.

21          MR. EDERER:  The independently developed is think is a

22  concept which we think should be in there.

23          MR. CABRAL:  Your Honor, I think the independent

24  development would occur before the period of willful

25  infringement.

```
1            THE COURT:  What language do you want?  I can't use

2    the language that I have there now, because there is no such

3    product.

4            MR. EDERER:  You could simply say "whether or not

5    defendants independently developed the Nook devices."

6            THE COURT:  "Whether or not defendants independently

7    developed the Nook devices," that's fine.

8            MR. CABRAL:  Your Honor, we would object to that

9    language.

10           THE COURT:  Because?

11           MR. CABRAL:  Because the development of the Nook

12   devices took place in 2009.  The issue for purposes of

13   willfulness here in this case is after they were given notice

14   of the patents in 2012, whether they did anything to avoid

15   infringement of those patents.  The independent development of

16   Nook device is not relevant to infringement in this case.

17           THE COURT:  If that is the only thing you are saying

18   is the evidence of willfulness, we should forget about all

19   these factors and just talk about that.  "Whether or not, after

20   being given sufficient notice of infringement, defendants

21   continued to infringe" or something like that.

22           MR. CABRAL:  Your Honor, you may recall this was one

23   issue where there was an admission by Barnes & Noble, and I

24   believe you read it into the record as an admission, regarding

25   Barnes & Noble taking no efforts to avoid infringement of the
```

Faheed13   Change Conference05A

 1   patents.  But you are right in the sense that the issue for

 2   purposes of willfulness --

 3            THE COURT:  I just want to be clear.  Is that all that

 4   you are going to be arguing with respect to willfulness?

 5            MR. CABRAL:  Yes, I think that's right, your Honor.

 6            THE COURT:  Then I think we should reword everything

 7   in the second paragraph after the first sentence and substitute

 8   some statement along the lines of what you are arguing and what

 9   they are saying in response on that issue.  Their response

10   essentially is they didn't infringe, so they didn't have to do

11   anything.

12            Let me ask defense counsel, assuming you were found to

13   have infringed, assuming you were on notice that your adversary

14   claimed you were infringing by filing this lawsuit, what is

15   your defense to the claim that any continued production of the

16   product after that time was not willful?  Isn't it that you had

17   a good-faith belief that you were not infringing even if that

18   proved in the end to be erroneous?

19            MR. EDERER:  Yes, and/or that we had a reasonable

20   defense.  Same thing.

21            THE COURT:  OK.  I think that's right, those are the

22   two points that should be made.  I will let you submit jointly

23   or severally by --

24            MR. EDERER:  I'm sorry, your Honor.  Are we going to

25   limit that entire paragraph to just those two points?

1          THE COURT:  Yes.

2          MR. EDERER:  I think these other points are

3     appropriate under the law.

4          THE COURT:  Why?  They are saying in their sentence

5     it's going to read, in effect, plaintiffs claim willful

6     infringement only for the period beginning after the filing of

7     this lawsuit, on whatever date that was, which plaintiffs

8     contend unequivocally placed defendants on notice that they

9     were infringing.

10         Then you will add, defendants argue that notwith-

11    standing the filing of the lawsuit, they had a good-faith

12    belief that they did not infringe, which, even if it arguably

13    proved to be erroneous, was still held in good faith, or

14    something like that.  This is not the language you will give

15    me, but aren't those the two points?  Just one argument by the

16    plaintiff and one response by the defendant.

17         MR. CABRAL:  Your Honor, the only point of

18    clarification from the plaintiff's side is the complaint is not

19    the notice for willfulness in this case.  I don't think that

20    affects --

21         THE COURT:  Whatever you want to say in that regard,

22    yes.

23         MR. EDERER:  I would just say I think all of these

24    factors are well recognized as bases for nonwillfulness.

25         THE COURT:  Yes, but they don't address the one and

1    only argument that is here.  Either you had a good-faith

2    belief -- if you want me to say good-faith belief based on the

3    entire background or something like that, that's fine, or based

4    on all the evidence.

5          MR. EDERER:  Your Honor, I think the standard is

6    actually objective recklessness, it is not good-faith belief.

7          THE COURT:  That's fine, that may be true, which we

8    need to define.  But that is the point.  I think this is two

9    sentences.

10         MR. EDERER:  We would urge the Court to include these

11   various elements.  To the extent that you do not wish to do so,

12   we register a mild objection.

13         THE COURT:  I'm not sure you are right, by the way.

14   In my list, you are saying that number 3 is not correct?

15         MR. EDERER:  Number 3 or number 4?

16         THE COURT:  3, whether or not defendants made a

17   good-faith effort to avoid infringing the asserted claims.  You

18   say the test is not good faith?

19         MR. EDERER:  No.  I'm saying that with respect to

20   number 4, you said good-faith basis to believe that we did not

21   infringe.  We are saying that it is not just a good faith or

22   reasonable basis, that objective recklessness is the standard.

23         THE COURT:  Tell you what.  I'm willing to consider

24   adding other factors.  But now what you need to get me by

25   7:30 -- that gives you ample time, two hours -- is your

 1    respective charges for the portion of what is presently

 2    instruction number 15 on willful infringement following the

 3    first sentence of the second paragraph.

 4            MR. EDERER:  Understood.

 5            THE COURT:  16 and 17, any objections from plaintiff?

 6            MR. CABRAL:  No, your Honor.

 7            THE COURT:  Any objections from defense counsel?

 8            MR. EDERER:  No, your Honor.

 9            THE COURT:  Jury verdict, any objections from

10    plaintiff?

11            MR. CABRAL:  Your Honor, I think in general we are OK

12    with the approach taken on the jury verdict.

13            THE COURT:  Any objections from defendant?

14            MR. EDERER:  Yes, your Honor, a few points.  First of

15    all, we are suggesting that with respect to liability, the jury

16    be asked to determine whether we have infringed each claim

17    separately of the respective patents, as opposed to just the

18    patents.

19            THE COURT:  I don't think that makes sense.  That just

20    risks confusion because some are independent and some are

21    dependent.  I understand there is an incredibly unlikely

22    theoretical possibility that it could affect something in the

23    overall scenario.  But my object, once again, to repeat, is to

24    make this as simple and straightforward and easy to comprehend

25    by the jury as I can consistent with the law.  That objection

Fake3d17                  Change Conference

1  is overruled.

2       MR. EDERER:  Your Honor, the second thing we are

3  proposing is that the damages be divided up patent by patent,

4  which is consistent with the way --

5       THE COURT:  They are going to get that instruction

6  that we just discussed about the date and all like that.  I

7  appreciate the Court of Appeals, to argue your position for a

8  moment, always says give us a verdict with 47 special

9  interrogatories so that we can make sure that every single

10 issue is decided permanently here and we don't have to send it

11 back for a new trial, their theory being that they are somehow

12 saving the district court or maybe a future Court of Appeals

13 panel some problem.  What I think is lacking from that analysis

14 is the fact that in every case, but certainly in a patent case,

15 to complicate the verdict form in the way that that kind of

16 approach entails is actually to just create a recipe for

17 confusion rather than clarity.

18      If the jury carries out the Court's instructions of

19 law as to how to calculate damages, they will be able to arrive

20 at damages -- if, for example, they find there is infringement

21 on one patent but not on two others -- that will reflect that

22 fact.

23      Will the Court of Appeals necessarily know that fact,

24 and therefore, if they find that there is a reason for over-

25 turning one of those infringement determinations or something

 1  like that, will they know how to reserve at damages?  No, they

 2  won't, and that is a shame.  But that problem is more than

 3  offset by the need to make sure that the jury is not placed in

 4  a position of endless difficulty, confusion, and angst.  So,

 5  that request is denied.

 6          MR. EDERER:  You have our position on that.

 7          This one I think you may actually agree with us on,

 8  your Honor.

 9          THE COURT:  I have agreed with you on so much.  It is

10  hard to believe what an agreeable person I am.  Go ahead.

11          MR. EDERER:  What you have now as paragraph 3(b) in

12  your verdict form, it should have a "yes" and a "no" box

13  underneath it.

14          THE COURT:  Yes, you are right.  Of course, if this

15  were an SEC case, we could put yes, no, or neither admit nor

16  deny.

17          Anything else?

18          MR. BAUER:  Just a couple of procedural issues

19  regarding tomorrow, your Honor.  The jury has not touched the

20  patents yet.  They won't even know where to find the claims in

21  the back.

22          THE COURT:  I asked that you prepare an appendix.  I

23  think my law clerk sent you an email to this effect.  In the

24  instructions under infringement, I specifically say attached to

25  this set of instructions is an appendix with all the claims.

1    Let me ask my law clerk, was that included in the email?  Yes.

2    My law clerk sent you an email which you recklessly

3    disregarded, both objectively and subjectively apparently, that

4    said jointly prepare a list of claims which we can attach to

5    each and every one of the instructions so they will have them

6    right there.

7                MR. BAUER:  That's it.

8                THE COURT:  That one I'll give you to 8 o'clock to do.

9                MR. EDERER:  The original email had said by 11 p.m.

10               THE COURT:  Yes, but now that you have so little to

11   do, we will make it 8:30.

12               MR. BAUER:  The last question, your Honor, because I

13   haven't tried in front of you, do you have any objection to us

14   showing the jury the verdict form during the closing?

15               THE COURT:  No, nor do I have any problem with you

16   showing them any portion of the instructions of law.

17               MR. BAUER:  Thank you, your Honor.

18               THE COURT:  I know there is an old-line view that that

19   is not proper.  I have never understood that.  You can do that

20   to your heart's content.  In fact, that is much better than

21   trying to summarize it.  "Here is what the judge is going to

22   say."

23               Yes?

24               MS. SHIN:  Your Honor, may I ask one clarification, it

25   wasn't very clear when we were discussing number 7, as to

1    specialized testimony?  The edit that I believe I heard you

2    propose to make was except as to exhibits and factual.

3              THE COURT:  I'll read it to you again.

4              MS. SHIN:  We would not object to any exhibits that

5    came in --

6              THE COURT:  I'll read it to you again as edited.

7    "(Stephen Magee also testified, but the opinions he offered

8    were subsequently stricken and may not be considered by you in

9    any respect, although the exhibits that were received during

10    his testimony, and any nonopinion facts he testified to, may be

11    considered.)"  Any objection?

12              MS. SHIN:  Yes.  The objection is that we believe the

13    entirety of his testimony was opinion testimony.

14              THE COURT:  The entirety of his testimony?

15              MS. SHIN:  Was opinion testimony.

16              THE COURT:  You said that.  You said that repeatedly.

17    Excuse me.  Your colleague said it.  And I said to him I'm not

18    going to go back and parse through the entire transcript and

19    have a big argument over whether any statement was fact or

20    opinion, but I'm going to give it in the language I just gave,

21    which I thought he accepted.  The record will reflect whether

22    he did or not, but I'm pretty sure that was one of the few

23    defense agreements that I received.  In any event, that's the

24    way it's going to be.

25              MS. SHIN:  Note our objection, please.

```
1          THE COURT:  I note the objection that I believe has

2   previously been waived, but I note the objection.

3          MR. CABRAL:  Your Honor, one quick question.

4          THE COURT:  Which in any event I find to be frivolous

5   on its face.

6          MR. CABRAL:  As far as exhibits for the jury, I just

7   got a note asking whether you would like us to provide them or

8   if you have them, whether you would like us to provide the

9   copies of the exhibits that have been admitted into evidence

10  for the jury.

11         THE COURT:  Thank you for raising that.  At the close

12  of my instructions -- really, you will have to put this

13  together at the close of the summations; my guess is we'll

14  finish summations, but we probably won't get to the

15  instructions until Wednesday morning, so you will have plenty

16  of time Tuesday night to do this -- you will need to put

17  together, in a cart that my courtroom deputy will supply to

18  you, the originals of any and all exhibits that were received

19  in evidence.

20         Each side has to show the other side what they are

21  putting in that cart.  If there is any disagreement as to what

22  should be going in the cart, namely, any disagreement over

23  whether a particular exhibit has been received, you can bring

24  that to my attention and I'll resolve it.  But that is the way

25  we do it.  That cart is wheeled in right at the beginning of
```

 1    their deliberations.

 2              MR. CABRAL:  Thank you, your Honor.

 3              THE COURT:  Anything else?

 4              MR. EDERER:  Your Honor, I believe you may have asked

 5    for copies of some of the language that we were reading.

 6              THE COURT:  Yes.  Bring that up to my courtroom

 7    deputy.  I will get you by no later than tomorrow morning,

 8    which is why I need to have the stuff by 7:30 and 8:30

 9    respectively, the final charge so you can refer to it on your

10    summations tomorrow.  I think that's everything.  Anything else

11    that anyone need to raise?

12              MR. CABRAL:  The only issue, your Honor, I know you

13    have a hard stop here --

14              THE COURT:  I have to give a program in 15 minutes in

15    this very court how that is entitled How Judges Think.  I think

16    it is going be extraordinarily short program given that title.

17    In any event, go ahead.

18              MR. CABRAL:  There is just one issue regarding one of

19    the designations that defendants plan to show tomorrow.  This

20    relates to the deposition, I believe, of Mr. Rosenstock.

21    Yesterday we received an email that defendants were removing a

22    lot of the designations that they had previously had.  They

23    also struck our designations from the video.  I believe your

24    Honor has ruled on the designations that were submitted and the

25    objections that were provided in that designation.  We would

Faksad17                    Change Conference

 1    ask that your Honor's rulings with the designations that were

 2    submitted to the Court be shown in the video as you ruled on

 3    them.

 4            MS. SHIN:  Your Honor, in the interest of reducing the

 5    number of deposition designations and time, we did cut back on

 6    some of our designations.  This is a witness that was never on

 7    plaintiff's exhibit list, never listed as a witness, and they

 8    didn't actually even bother to play the testimony that they had

 9    designated.  In our pretrial submissions we actually lodged an

10    objection with respect to their affirmative designations.

11            To the extent that we kept our own designations, we

12    kept the corresponding counterdesignations.  The designations

13    they pointed out last night were affirmative designations which

14    at this point --

15            THE COURT:  I agree.  It can be cut down in that way.

16            MS. SHIN:  Thank you, your Honor.

17            THE COURT:  Very good.  Thanks very much.

18            (Adjourned to 9:00 a.m., October 21, 2014)

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                    Page

CLIFFORD NEUMAN

Direct By Mr. Sharifahmadian . . . . . . . . . 958

Cross By Mr. Cabral  . . . . . . . . . . . .1080

DEFENDANT EXHIBITS

Exhibit No.                              Received

471  . . . . . . . . . . . . . . . . . . . 988

477  . . . . . . . . . . . . . . . . . . . 996

594  . . . . . . . . . . . . . . . . . . .1030

569  . . . . . . . . . . . . . . . . . . .1031

416  . . . . . . . . . . . . . . . . . . .1066

411  . . . . . . . . . . . . . . . . . . .1136