EAL8ADR1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   ADREA, LLC,

4                    Plaintiff,

5            v.                          13 Cv. 4137 (JSR)

6   BARNES & NOBLE, INC.,
    BARNESANDNOBLE.COM LLC, AND
7   NOOK MEDIA LLC,

8                    Defendants.

9   ------------------------------x

10                                      October 21, 2014
                                        10:05 a.m.
11
    Before:
12                     HON. JED S. RAKOFF

13                                      District Judge

14
                         APPEARANCES
15
    PROSKAUER ROSE LLP
16       Attorneys for Plaintiff
    BY:  STEVEN M. BAUER
17       COLIN CABRAL
         BRENDAN COX
18
    ARNOLD & PORTER LLP
19       Attorneys for Defendants
    BY:  LOUIS S. EDERER
20       ALI R. SHARIFAHMADIAN
         MICHAEL A. BERTA
21       YUE-HAN CHOW
         SARAH BRACKNEY ARNI
22       SUSAN L. SHIN

23

24

25

EAL8ADR1

1           (Trial resumed; jury not present)

2           THE COURT:  I will note for the record that I sent

3     counsel this morning the final charge and the final verdict

4     form.  The only -- to be continued.

5           (Jury present)

6     CLIFFORD NEUMAN, resumed.

7           THE COURT:  So, ladies and gentlemen, I apologize

8     profusely.  It was literally beyond my control.  There are

9     matters that unfortunately have to be handled sometimes, but it

10    doesn't make it right for you, and I am really sorry that you

11    had to sit around so far.  But let's continue.

12          MR. CABRAL:  Thank you, your Honor.

13    CROSS-EXAMINATION (Cont'd)

14    BY MR. CABRAL:

15    Q.  Good morning, sir.

16    A.  Good morning.

17    Q.  Yesterday when we finished we were talking about the '501

18    patent.  So if we can bring up claim 7 of the '501 patent.

19          Yesterday we were talking about the "storing an

20    electronic book on a viewer" element, claim 7.  Do you recall

21    that?

22    A.  I do recall that.

23    Q.  And we spoke yesterday about several instances where the

24    Saigh patent stated that the memory was separate from the

25    control unit viewer.  Do you recall that?

1    A.  I do recall referring to that.

2    Q.  I want to talk about a different element of the '501 patent

3    and claim 7 specifically, and that's the next element that

4    appears in the claim, the "associating a predetermined amount

5    of time" element.  Do you see that?

6    A.  I do see that.

7    Q.  You agree that the Court defined this term to mean

8    associating with the electronic book for a predetermined amount

9    of time that begins when the electronic is stored on the

10   viewer.  Do you agree?

11   A.  I do agree.

12   Q.  And your understanding of the Saigh patent is that the

13   reference describes a preset time period that is transcribed

14   into the memory module, is that right?

15   A.  That is correct.

16   Q.  Those memory modules are the Nintendo cartridges we talked

17   about yesterday or the equivalent thereof?

18   A.  They are writable, but yes, they are.

19   Q.  The time period that is discussed in the Saigh patent,

20   that's written into the memory of the memory modules at

21   something called book bank facilities, is that right?

22   A.  That is under one embodiment.  There is a separate

23   embodiment where they are written into the memory on the device

24   through the controller where they are being copied from one of

25   those compact cylinders.

1   Q.  So if we could bring up the Saigh patent, column 7, from

2   line 61 through 65.

3          This is Defense Exhibit 411.  There is a copy in your

4   binder if you would like to look at it as well.

5   A.  I do have that one.  It's actually quite small in print.

6   Q.  Maybe on the screen we can blow it up a little bit.  That

7   will be line 61 through 65.

8          I want to direct your attention to the last four lines

9   in the paragraph beginning with "the preset time."  Do you see

10  that?

11  A.  I do see that.

12  Q.  It says, "The preset time periods before automatic erasure

13  of information programmed in the memory module may be set in

14  the memory module from a book bank facility or from a compact

15  cylinder."  Do you see that?

16  A.  I do see that.

17  Q.  So you agree that the time period in the Saigh patent is

18  written into the memory modules either at the book bank

19  facility or from a compact cylinder, correct?

20  A.  That is what is being stated there, yes.

21  Q.  Now, isn't it your view that the Saigh patent describes a

22  lending period that begins after the information is transcribed

23  in the memory module?

24  A.  Yes, that is what is described.

25  Q.  Before we leave the lending patent, I just have a few more

EAL8ADR1                     Neuman - cross

1  questions, if that's OK.

2              Yesterday we talked about the amount of time it takes

3  for a request sent from the Nook device to reach the Barnes &

4  Noble server after a user accepts a loan offer.  Do you recall

5  that?

6  A.  Well, after the user presses the button that indicates

7  their acceptance.

8  Q.  Exactly.  Do you recall talking about the amount of time it

9  takes for the request from the Nook device to reach a Barnes &

10 Noble server?

11 A.  I do recall.

12 Q.  You mentioned that when the user presses the accept button

13 on the Nook device, you said that request could be received in

14 milliseconds, isn't that right?

15 A.  Yes.  When the user presses that button, that button press

16 can be received within milliseconds, depending on various

17 things, but it should not take very long.

18 Q.  That's true no matter where the user is in the country,

19 right?  The same is true if the user is in California or New

20 York City?

21 A.  It would depend how good their network connection is.

22 Q.  But assuming they had the same quality network connection,

23 the amount of time it took for the Nook device to communicate

24 with the Barnes & Noble server would be approximately the same

25 regardless of the user's location in the country, is that

EAL8ADR1                          Neuman - cross

1   right?

2   A.  Well, we could talk about physics and the speed of light,

3   but that's small amounts of time so it would be similar.

4   Q.  How do you know that?

5   A.  From my understanding of computer networking.

6   Q.  During your analysis in this case, you learned about Barnes

7   & Noble's network of content distribution, is that right?

8   A.  Akamai's content distribution network, yes.

9   Q.  Did you also learn about Barnes & Noble's servers and

10  networks?

11  A.  I did learn about their servers and some of their networks,

12  but not all of them.

13  Q.  And Barnes & Noble has servers located in the United

14  States, is that right?

15  A.  They have some servers in the United States, yes.

16  Q.  And those servers communicate with the Nook devices, is

17  that right?

18  A.  Nook devices do communicate with those servers.

19  Q.  And these would be the same servers that communicate with

20  the Nook devices as part of the lending operation, is that

21  correct?

22  A.  As part of the pressing of the accept button, yes, they

23  would communicate with Barnes & Noble's servers.

24  Q.  These would be the same servers that communicate with the

25  Nook devices via the shop feature that we have discussed

1   throughout this case as well, correct?

2   A.  I need to look if different ones were being used for

3   different functionality, but both those do speak to Barnes &

4   Noble's servers.

5   Q.  Let's move on to the '703 patent.  You discussed during

6   your testimony yesterday a reference called Munyan.  Do you

7   recall that?

8   A.  Yes, I do recall the Munyan reference.

9            MR. CABRAL:  If we can bring up claim 1 of the '703

10  patent.

11  Q.  You provided an opinion in this case that the Munyan

12  reference renders claim 1 of the '703 patent invalid, right?

13  A.  Yes, I did.

14  Q.  I want to direct your attention to the step of claim 1 that

15  refers to "based on a predetermined URL or an identifier

16  associated with the consumer appliance."  Do you see that?

17  A.  I do see that.

18  Q.  And that part of the claim refers back to the initiation of

19  the retrieval of data that precedes in the claim, do you agree?

20  A.  Yes, it does.

21  Q.  Now, the consumer appliance, when we are referring to

22  Munyan, that refers to the electronic book system in your

23  opinion, is that right?

24  A.  Sorry.  Can you repeat that?

25  Q.  The consumer appliance, with reference to the Munyan

1   patent, refers to the electronic book system in your opinion,

2   is that correct?

3   A.  Yes, it is.

4   Q.  And your opinion is that by selecting the bookstore icon in

5   Munyan, that initiates the retrieval of data as required by

6   claim 1, is that correct?

7   A.  Yes, that is correct.

8   Q.  You agree that the electronic book system described in the

9   Munyan reference does not have any predetermined URLs on it,

10  correct?

11  A.  Yes, it does not have predetermined URLs.

12  Q.  So your opinions are based on the identifier as that term

13  is used in claim 1, correct?

14  A.  Yes, it is based on the identifier.

15  Q.  Yesterday you testified that in your opinion the identifier

16  in Munyan was a security identification code, correct?

17  A.  That is correct.

18  Q.  Now, let's turn to the Munyan patent at column 15, line 52.

19  Specifically, lines 52 through 62.

20          Again, this is Defense Exhibit 471.

21  A.  OK.  I am referring to which lines?

22  Q.  This is going to be column 15, line 52.  We will bring it

23  up on the screen.

24          Hold on one second.  I want to make sure we have the

25  right claim on the screen.

1          MR. CABRAL:  We are on Defense Exhibit 471?

2     Q.  Column 14, starting at line 52.  There we go.

3          Starting at line 52, do you see the passage that

4     begins with "the security circuit"?

5     A.  I do see that passage.

6     Q.  This is one very long sentence and I won't read you the

7     whole thing.

8     A.  But please let me read the whole thing.

9     Q.  Go ahead.  Just tell me when you're ready.

10    A.  Yes, I have read through it.

11    Q.  Do you agree that the security identification code, that is

12    the basis of your opinion, with respect to the identifier

13    element, is part of a security circuit in the Munyan reference?

14    A.  Yes, it describes it as such.

15    Q.  And you agree that the purpose of the security circuit and

16    the security identification code is to discourage theft of the

17    consumer appliance and to make sure that products can only be

18    accessed by the consumer appliance that downloaded the

19    information?

20    A.  That is what is described there.

21    Q.  Is it your opinion that in order to initiate retrieval of

22    the data based on an identifier, that identifier must actually

23    be used in initiating the retrieval of data, for example, by

24    customizing the data retrieved by reference to the identifier?

25    A.  The data that is retrieved must be dependent in some manner

1    on that identifier.

2    Q.  And it's your view that the identifier must actually be

3    used in the initiation of the retrieval of that data in order

4    to satisfy the requirements of claim 1, correct?

5    A.  That is correct.

6    Q.  Now, isn't it correct that nothing in the Munyan patent

7    suggests that the device actually uses the security

8    identification code to customize the data returned to the

9    consumer appliance?

10   A.  I disagree.

11   Q.  Isn't it correct that nothing in the Munyan reference

12   suggests that the consumer appliance actually uses the security

13   identification code to return product recommendations to the

14   consumer appliance?

15   A.  I disagree.

16   Q.  What is the basis for your disagreement?

17   A.  Well, we look at the final sentence of the passage that you

18   have right up there:  "The bookstore will terminate

19   communications with a personal electronic book if said user

20   identification code or said security identification code is

21   invalid."

22           So what is happening is that the connection is being

23   established to the bookstore.  The bookstore is now checking

24   what that code is.  If the code is not valid, it is terminating

25   the connection, basically returning nothing.  And that is

1   different than what it returns, that is the list of items that

2   are available for purchase, which occurs in the case that that

3   connection is not terminated.  That decision is made based on

4   what that security identification code is.

5   Q.  So is it clear that the basis for your disagreement is the

6   last sentence of the paragraph starting at line 62 and ending

7   on line 65?

8   A.  That sentence and there were, I believe, similar sentences,

9   but to the same extent elsewhere.

10  Q.  So the security identification code is used to terminate

11  communications with the bookstore if the code is found to be

12  invalid, correct?

13  A.  And the corollary to that is to allow communications with

14  the bookstore when it is valid.

15  Q.  But this doesn't say that the security identification code

16  customizes the data returned to the personal electronic book,

17  does it?

18  A.  This does not explicitly state this.

19  Q.  This doesn't say that the security identification code is

20  specifically used to retrieve product recommendations for the

21  personal electronic book, does it?

22  A.  It is used in establishing the connection with the

23  bookstore from which those product recommendations are

24  retrieved.  It is not able to retrieve those product

25  recommendations if this identifier is incorrect.

EAL8ADR1                    Neuman - cross

1   Q.  This doesn't say that the security identification code is

2   used specifically to retrieve the product recommendations, does

3   it?

4   A.  Well, one of ordinary skill in the art understands that

5   that is inherent in what is disclosed.

6   Q.  But you agree it doesn't expressly say that, correct?

7   A.  I agree it does not expressly say that.

8   Q.  Let's turn to claim 13, if we can bring that up.

9        You provided some opinions yesterday, or some

10  testimony I should say, regarding claim 13 and a reference

11  called Bolas.  Do you recall that?

12  A.  I do recall that.

13  Q.  The Bolas reference discusses -- I should say discusses an

14  Internet radio, is that right?

15  A.  Yes, it discusses an Internet radio.

16  Q.  The Bolas reference doesn't discuss e-books or e-readers,

17  right?

18  A.  It does not discuss e-books or e-readers.

19  Q.  I want to direct your attention to claim 13 and

20  specifically the element "identifier representative of a type

21  of the consumer appliance."

22        That's in the enabling, that middle clause there,

23  three lines from the bottom.

24        Do you see that element in claim 13?

25  A.  I do see that.

1   Q.  Yesterday you testified that the serial number in Bolas was

2   the identifier for the radio device, is that right?

3   A.  I did discuss the serial number as being an identifier,

4   yes.

5   Q.  You testified also that the serial number in Bolas is not

6   representative of a consumer appliance, isn't that right?

7   A.  Yes, I did.

8   Q.  So you would agree that the Bolas reference does not

9   disclose every element of claim 13 of the '703 patent, right?

10  A.  That, I believe, was a "to the extent that" argument, and

11  we discussed that the identifier is used in the same manner

12  that it is in the Nook devices.  But if you did not apply that

13  same understanding, then I was not arguing that this claim

14  element would be met.

15  Q.  So let's look at this issue in isolation without

16  considering the Nook devices, is that fair?

17  A.  It's your call.  I will look at it how you want me to.

18  Q.  You would agree that the Bolas reference does not disclose

19  every element of claim 13 because the serial number is not

20  representative of a consumer appliance, correct?

21  A.  Under the scenario where we are not looking at that the

22  same way that we looked at it for the Nook devices, yes, you

23  are correct.

24  Q.  So you agree that the Bolas reference does not anticipate

25  claim 13 of the '703 patent, is that correct?

1    A.  Again, to the extent that we are not looking at the claim

2    language in the same way that we are for the Nook devices, yes,

3    I would agree with that statement.

4    Q.  Because claim 15 depends from claim 13, your conclusions

5    would then be the same with respect to claim 15 as well,

6    correct?

7    A.  Yes, again with the same limitation.  If we are not looking

8    at the claim the same way or that element the same way that you

9    are looking at it for the Nook device, then that would be so.

10   Q.  You point to, for the content information about a context

11   of using the radio, you point to the audio data and text

12   information received by the device, correct?

13   A.  I pointed to that information, but, in particular, the text

14   information that is describing the audio is one of the things

15   that constitutes that context of usage.

16   Q.  So let's turn back to claim 13.  We don't have to turn back

17   because it's already up on the screen.

18           I want to direct your attention to the last element of

19   claim 13, if we can, beginning with, "Based on the identifier,

20   the server initiating access to a Web page with content

21   information about a context of using the consumer appliance."

22   Do you see that?

23   A.  I do see that.

24   Q.  Now, with that element in mind, I want to turn you back to

25   the Bolas reference that is Defendants' Exhibit 477.

1   Specifically, column 6, line 52.

2                Are you there?

3   A.  I see it on the screen.

4   Q.  It says, "On the net radio station server side" -- and then

5   in parentheses it says "a pseudo code" -- "the system will

6   receive and act upon input from the user's Internet radio box

7   as follows."  Do you see that language.

8   A.  I do see that language.

9   Q.  Then what follows in the Bolas reference is the actual

10  pseudo code referred to in that sentence we just read.  Would

11  you agree?

12  A.  Yes.  It starts on the bottom of column 6 and continues at

13  the top of column 7.

14  Q.  If we can bring that up on the screen here.

15               We are now looking at the pseudo code referred in the

16  Bolas patent.  Do you agree?

17  A.  I do agree.

18  Q.  Would you also agree that the serial number does not appear

19  in this pseudo code which shows how the system receives and

20  acts upon the radio device, does it?

21  A.  You also need to look at the next text that follows that,

22  but this particular piece of the pseudo code does not use that

23  particular parameter.

24               The next paragraph that starts at column 7, line 20,

25  talks about "the net radio station uses the tuning knob and

1  user parameters to index into a list of station URLs."  Those

2  user parameters are the two parameters referred to as user name

3  and the serial number.

4  Q.  So we will get to that next, I promise.  I won't skip over

5  it.  Right now we are looking at the actual pseudo code

6  referenced in the Bolas patent, correct?

7  A.  Yes.

8  Q.  You're not suggesting there is another pseudo code that is

9  not up on the screen, right?

10  A.  This is a piece of code.  The entire code that would be

11  implemented there would be a larger piece of code.  But what is

12  up on the screen, this is the only piece of pseudo code that's

13  on the screen.

14  Q.  This is the only pseudo code that was referenced in the

15  preceding sentence in the Bolas patent that we just read,

16  right?

17  A.  Yes, that is the only piece of pseudo code that is

18  referenced in the preceding sentence.

19  Q.  And this pseudo code does not include a serial number, do

20  you agree?

21  A.  This particular piece of pseudo code does not include the

22  serial number.

23  Q.  Now, let's go back to that sentence we were just looking

24  at, which is at column 6, starting at line 52.  And here it

25  says that the pseudo code that we just looked at shows how the

1    system will receive and act upon input from the user's Internet

2    radio box.  Would you agree?

3    A.  I agree that it states that.

4    Q.  And what we just looked at you agree does not contain a

5    serial number, correct?

6    A.  The particular piece of code that we just looked at did not

7    contain a serial number.

8    Q.  Let's look at what you just pointed out in column 7,

9    starting at line 20.

10          I believe you referred to the first sentence here

11   which reads:  "The net radio station server uses the tuning

12   knob and user parameters to index into a list of station URLs

13   from which the radio audio data will be actually served."

14   That's what you pointed to earlier, correct?

15   A.  That is what I pointed to.

16   Q.  Specifically, you were pointing to the words "user

17   parameters," is that right?

18   A.  I was pointing to the words "user parameters."

19   Q.  In your opinion, you think the user parameters refer to the

20   serial number, is that right?

21   A.  I think it refers to the two parameters, one called user

22   name and one called serial number.

23   Q.  So the user name relates to the actual user, correct?

24   A.  Yes.

25   Q.  The serial number relates to the radio, correct?

1   A.  The serial number relates to the radio, but the two

2   together are part of the registration of the user with the

3   radio.

4   Q.  So your interpretation of this language is that the user

5   parameters includes the serial number based on your review of

6   Bolas, is that right?

7   A.  Based on my review of Bolas.  Based on the fact that it

8   didn't use the specific, quote, user name parameter.  It

9   described two parameters there -- it described more than one

10  parameter there.  And you have one that is labeled user name,

11  another one that is labeled serial number.  And, by the way,

12  the pseudo code that was just referred to did not include the

13  user name one either.

14          MR. CABRAL:  If we can get an instruction to have the

15  witness limit his answer to the question.

16          THE COURT:  Yes.  Just answer the question, please.

17  Q.  The content information about a context of users in Bolas,

18  that refers to audio data and the accompanying text, correct?

19  A.  That is correct, yes.

20  Q.  Is it correct that the only thing you can point me to in

21  the Bolas patent that suggests that the serial number plays a

22  role in initiating retrieval of that data is this sentence that

23  is highlighted on the screen?

24  A.  This sentence or a similar sentence, but effectively this

25  sentence, yes.

1  Q.  I want to talk to you about the '851 patent very briefly.

2       MR. CABRAL:  If we can bring up claim 96.

3  Q.  I want to direct your attention to the (a2) element there:

4  "Selects a title from the transmitted list of titles."  Do you

5  see that?

6  A.  I do see that.

7  Q.  That refers back to the receiver, which is element (a),

8  correct?

9  A.  Yes, that needs to be performed by the receiver.

10 Q.  Yesterday you gave some testimony regarding a combination

11 of something called a Sachs patent and another reference called

12 S-HTTP.  Do you recall that?

13 A.  I do recall that.

14 Q.  And your opinion is the combination of these references

15 renders obvious claim 96 of the '851 patent, is that right?

16 A.  That is correct.

17 Q.  Yesterday you testified that the receiver in the Sachs

18 patent does not actually select the title from a transmitted

19 list of titles, isn't that right?

20 A.  That was a "to the extent that" argument, but yes, that is

21 correct.

22 Q.  You also agree that the Sachs patent doesn't explicitly

23 mention a receiver component at all, does it?

24 A.  It did not explicitly mention that.

25 Q.  S-HTTP is a protocol, is that right?

EAL8ADR1                    Neuman - cross

1   A.  That is correct, S-HTTP is a protocol.

2   Q.  And you agree that S-HTTP doesn't disclose hardware that

3   constitutes receiver, correct?

4   A.  It inherently runs on such hardware, but it does not

5   specifically describe the hardware.

6   Q.  So you agree that neither side of the combination, the

7   Sachs patent or S-HTTP, discloses a receiver that selects a

8   title from a transmitted list of titles, isn't that right?

9   A.  It does not explicitly, but they do inherently disclose it.

10          Actually, let me be more correct.  It inherently

11  discloses a receiver, and as I stated in my direct testimony,

12  it's only to the extent that the arguments are made with

13  respect to the Nook and receiver.  In other words, in those

14  references, just as with the Nook devices, it's not the

15  receiver that is -- sorry.  I'm sorry.  You said receiving a

16  list of titles.

17  Q.  Does your answer still apply?

18  A.  My answer still applies without the caveat that I was

19  describing.

20  Q.  Your inherency reference, that relates to the S-HTTP

21  reference, is that right?

22  A.  That had to do with the selecting.

23  Q.  That's right.

24  A.  Yes.

25          (Continued on next page)

Ealradr2                    Neuman - cross

1   Q.  That's right.

2   A.  Yes.

3   Q.  I want to finish at the place that we started, actually, on

4   the issue of infringement, specifically, infringement with

5   regard to the '851 patent.  I want to go back -- we don't have

6   to go back again.  I should probably look at the screen before

7   I say that.  I want to direct your attention to the same

8   element, "selects a title from a transmitted list of titles,"

9   that we have highlighted there.  OK?

10  A.  OK.

11  Q.  You don't disagree that when a user of a Nook device

12  purchases a book, the Nook devices send a request containing

13  the EAN for the purchased book to the Barnes & Noble cloud,

14  correct?

15  A.  I do not dispute that.

16  Q.  You don't dispute that while the user ultimately chooses

17  which book to purchase, the device selects and communicates the

18  EAN associated with the purchased book to the Barnes & Noble

19  cloud, right?

20  A.  I did not state that it selects.  It is communicating that

21  selection.

22  Q.  You agree that the device communicates the AEN associated

23  with the purchased book to the cloud, correct?

24  A.  Yes, I do agree with that.

25  Q.  You didn't perform any independent analysis to confirm

Ealradr2                         Neuman - cross

1   whether the Nook devices receive a transmitted list of EANs,

2   correct?

3   A.  I did not do any additional or any independent analysis for

4   that.

5   Q.  But you reviewed the results of Mr. Berg's man-in-the-

6   middle analysis to see if you could find any lists of EANs

7   received by the Nook devices, is that right?

8   A.  I did review his analysis with respect to that.

9           MR. CABRAL:  Your Honor, I have a few more questions

10  here.  If I may, I would like to show the witness a document.

11          THE COURT:  All right.

12          MR. CABRAL:  May I approach, your Honor?

13          THE COURT:  Yes.

14  Q.  I handed you a document marked for identification as

15  Plaintiff's Exhibit 73.001.  This is an excerpt of data from a

16  file identified as Plaintiff's Exhibit 73, which is a file that

17  ends in extension CHLS.  My question to you, sir, is do you

18  recognize this document identified as Plaintiff's

19  Exhibit 73.001 as data from Mr. Berg's man-in-the-middle

20  analysis?

21  A.  That is what I believe it to be.

22          MR. CABRAL:  Your Honor, plaintiffs offer Plaintiff's

23  Exhibit 73.001 into evidence.

24          MR. SHARIFAHMADIAN:  No objection.

25          THE COURT:  Received.

Ealradr2                    Neuman - cross

1          (Plaintiff's Exhibit 73.001 received in evidence)

2     Q.  You reviewed Mr. Berg's man-in-the-middle data when forming

3     your opinions regarding whether the Nook devices select an EAN

4     from a list of EANs, correct?

5     A.  Yes, I did.

6     Q.  I would like to direct your attention to page 2 of this

7     document.  That would be at the bottom of PTX-073.002.  Do you

8     see the line what looks like exactly what is here on the screen

9     that begins with a script type?  Do you see that?

10    A.  I do see the script type, yes.

11    Q.  That line ends with the word "datatorender," do you see

12    that?

13    A.  I do see that.

14    Q.  The next line begins "EANs," do you see that?

15    A.  I do see that as well.

16    Q.  What follows in this document is a list of EANs

17    corresponding to books with the next EAN appearing on page 3,

18    lines 4 through 5, do you agree?  Maybe we can bring that up to

19    help you answer that question.

20    A.  I do see a list of EANs.  I had a tool that helped me go

21    through this when I viewed it originally.

22    Q.  The document that we marked or entered into evidence as

23    Plaintiff's Exhibit 73.001, you agree that this document shows

24    a list of EANs, correct?

25    A.  Yes, where you are pointing to it shows a list of EANs.

Ealradr2                        Neuman - cross

1   Q.  This list of EANs would have been communicated between the

2   Nook device and the Barnes & Noble server, correct?

3   A.  I believe this list of EANs would have been communicated

4   from the Barnes & Noble server to the Nook devices.

5   Q.  Now let's talk about, this is the last issue I have here --

6   A.  Or to the Nook device.  Sorry.

7   Q.  Let's talk for one minute about the secure SSL TLS channel

8   that you discussed yesterday.  OK?

9   A.  OK.

10  Q.  Do you agree that during the purchase operation the Nook

11  devices create a secure SSL TLS channel with a Barnes & Noble

12  server, is that right?

13  A.  That is correct.

14  Q.  You agree that during the purchase operation the Nook

15  devices also create a secure SSL TLS channel with the server

16  hosted by Barnes & Noble's content provider, Akamai, correct?

17  A.  Not necessarily during the purchase.  That would be

18  established during the subsequent download of the content.

19  Q.  Fair point.  At some point the Nook device establishes a

20  secure SSL TLS connection with Akamai to download the book to

21  the viewer, correct?

22  A.  That is correct.

23  Q.  You don't dispute that the information sent over the secure

24  SSL TLS channels is encrypted, do you?

25  A.  It is encrypted.

Ealradr2                    Neuman - cross

1   Q.  You don't dispute that secure SSL TLS channels allow for

2   anything sent through those channels to be encrypted, do you?

3   A.  They allow for anything that is sent through them to be

4   encrypted, yes.

5         MR. CABRAL:  Your Honor, with that, I have no further

6   questions.

7         THE COURT:  All right.  Redirect.

8   REDIRECT EXAMINATION

9   BY MR. SHARIFAHMADIAN:

10  Q.  Good morning, Dr. Neuman.

11  A.  Good morning.

12  Q.  I'll start with where counsel left off, the '851 patent,

13  and actually the SSL.  We had the discussion yesterday about

14  different types of encryption that there are?

15  A.  Yes, we have.

16  Q.  Is it your opinion that SSL type encryption is a different

17  type of encryption that happens with the Barnes & Noble books

18  themselves?

19  A.  Yes, it is.

20  Q.  One is transient, the other one is persistent?

21  A.  One is transient and one is persistent, that is correct.

22  Q.  Barnes & Noble's books are encrypted in a persistent manner

23  using ACS4?

24  A.  Yes, Barnes & Noble books are encrypt in a persistent

25  manner.

1    Q.   When are Barnes & Noble's books encrypted?

2    A.   They are encrypted during the ingestion process.

3    Q.   Are they ever encrypted at any other time?

4    A.   They are not encrypted at any other time.  With respect to

5    the discussion that we had before, the encrypted book itself is

6    subsequently later reencrypted through that transient stream,

7    the one that is with the Akamai server; but that is not

8    reencryption of the book, because what is being encrypted on

9    that stream is different, it is the encrypted book.

10   Q.   Counsel asked you if it is your opinion that it is obvious

11   to combine the SoftBook patent with S-HTTP.  Do you recall

12   that?

13   A.   I do recall that.

14   Q.   In your opinion, why is it obvious to combine them?

15   A.   Because S-HTTP was a protocol that was being placed on the

16   standards track, much as SSL was.  There were libraries that

17   were available to do this.  And it was common in that time

18   period that when you had software systems that required

19   encryption, to try to use things that were used across a range

20   of applications rather than reinventing your own purchase.

21   Q.   There was also a discussion regarding the SoftBook patent.

22              MR. CABRAL:  I object, your Honor.  I apologize.  I

23   was distracted.  I move to strike the last answer as outside

24   the scope of the testimony.

25              MR. SHARIFAHMADIAN:  Counsel opened the door, your

Ealradr2                    Neuman - redirect

1     Honor.

2            MR. CABRAL:  Not regarding motivation to buy.  To be

3     clear, your Honor, it is outside the scope of the expert

4     report.

5            THE COURT:  I wish you had raised this before the

6     answer was given.  The first sentence of the answer will stand

7     and the rest will be stricken.  That will be difficult for the

8     jury to follow, but that is your problem.  But that is the

9     ruling of the Court.

10           MR. CABRAL:  Understood, your Honor.  Thank you.

11    BY MR. SHARIFAHMADIAN:

12    Q.  Does the SoftBook patent inherently disclose a receiver?

13    A.  Yes, it does.

14    Q.  Is S-HTTP inherently intended to run on a device with a

15    receiver?

16    A.  Yes, it is.

17    Q.  Did Mr. Berg's man-in-the-middle analysis show anything

18    regarding what actually happens to the list of EANs that

19    counsel pointed to in PTX-073.001?

20    A.  It did not show what occurs on the device.

21    Q.  Now let's turn to the '703 patent and let's start with

22    claim 13.  Can we have that up, please.  Claim 13 is directed

23    to a method of enabling the service provider to provide -- it

24    refers to consumer appliance, do you see that, in the preamble?

25    A.  I do see that.

Ealradr2                    Neuman - redirect

1    Q.  Is claim 13 limited to ebooks and ereaders?

2    A.  No, it is not, in fact.  The patent describes other kinds

3    of devices.

4    Q.  Is Bolas a consumer appliance under the Court's

5    construction?

6    A.  Yes, it is.

7    Q.  Let me be more clear.  Is the Internet radio disclosed in

8    the Bolas patent a consumer appliance under the Court's

9    construction?

10   A.  Yes, it is.

11   Q.  There was a question about let's take the claims in

12   isolation and let's just look at validity.  Do you recall that

13   discussion?

14   A.  I do recall that discussion.

15   Q.  Is it proper to look at claims just in isolation?

16           MR. CABRAL:  Objection, your Honor.

17           THE COURT:  Sustained.

18   Q.  Can we go to the Bolas patent itself.  It's Defense Exhibit

19   477.  Let's go to column 6 at the bottom.  Towards the bottom,

20   please.  That's good.  That last sentence that says "on the net

21   radio station server side, this is pseudocode," this is the

22   first time we are hearing that term.  We have heard "source

23   code," which is what again?

24   A.  Source code is the human-readable form of instructions that

25   describes the steps that are followed by a software/hardware

Ealradr2                      Neuman - redirect

1  system.

2  Q.  It is actually what the processor does, right?

3  A.  It is converted automatically into what the processor

4  actually does.

5  Q.  What source code indicates actually happens?

6  A.  Yes, what source code indicates actually happens.

7  Q.  Pseudocode is called pseudocode because it is not actually

8  source code, right?

9  A.  It's not the actual source code that is used.

10  Q.  Let's turn to claim 1 of the '703 patent.  Yesterday you

11  were asked a series of questions regarding that and you were

12  asked specifically, "Do you agree that the requests sent by the

13  Nook device after the user selects the shop icon results in the

14  retrieval of data that is ultimately rendered and displayed on

15  the Nook device?"  You answered, "I agree with you."  Do you

16  recall that?

17  A.  I do recall that.

18  Q.  When the user selects the shop icon, which application

19  within the Nook device is actually doing the retrieval of data?

20  A.  It is the shop application itself.

21  Q.  Which application is doing the rendering and displaying of

22  the data that is retrieved?

23  A.  It is the shop application.

24  Q.  We were also asked, "You don't dispute that the user

25  initiates the retrieval of the content information about a

1   context of using the Nook devices by selecting the shop icon on

2   the menu bar of the device?"  Do you recall that?

3   A.  I do recall that.

4   Q.  You answered, "I do not dispute that it is initiated by

5   selecting that icon."  Do you recall that answer?

6   A.  I do recall that answer.

7   Q.  When the shop icon is selected, what is it that the user is

8   accessing?

9   A.  The user is accessing the shop application, which is a web

10  browser.

11  Q.  In your opinion, can the initiating of retrieval of data

12  happen without the user accessing the shop application?

13  A.  Not through the shop application.

14  Q.  Let's turn to claim 13 of the '703 patent.  Yesterday there

15  was a series of questions regarding the single-user input

16  limitation in this claim.  Do you recall that?

17  A.  I do recall that.

18  Q.  You testified that there are a series of steps and inputs

19  that must be first performed before the user can press the shop

20  icon and initiate the retrieval of data, is that generally

21  accurate?

22  A.  Yes, that is generally accurate.

23  Q.  You were specifically asked, "If you performed all of the

24  precursor steps and did not press the shop icon, isn't it

25  correct that you wouldn't retrieve content information by a

Ealradr2                    Neuman - redirect

1   context of usage"?  Do you recall that question?

2   A.  I do recall that question.

3   Q.  You answered, "As we understand that claim, you're

4   correct."  Do you recall that?

5   A.  I do recall that.

6   Q.  Let me ask you this.  What if you took a Nook out of the

7   box and you did none of the precursor steps that you had

8   discussed and all you did was press the shop icon.  Could you

9   in that case initiate retrieval of data from a server?

10          MR. CABRAL:  Objection, your Honor.

11          THE COURT:  Ground?

12          MR. CABRAL:  At this point form and foundation.

13          THE COURT:  Overruled.

14          MR. CABRAL:  Thank you, your Honor.

15  A.  First of all, without doing those precursor steps, you

16  would not have been able to reach the shop icon.  But secondly,

17  even if you were able to reach the shop icon and press it,

18  because the device was not configured, you would not have been

19  retrieving the contents of usage.

20  Q.  In fact, pressing the shop icon without the precursor steps

21  doesn't retrieve anything, and performing the precursor steps

22  without pressing the shop icon also doesn't perform anything,

23  isn't that right?

24          THE COURT:  Sustained:  Compound, leading,

25  argumentative, rhetorical.  Shall I go on?

Ealradr2                         Neuman - redirect

1   Q.  Sir, is it your opinion that the precursor steps and the

2   pressing of the shop icon must be considered together when

3   determining whether the single-user input limitation is met?

4   A.  Yes, I must.

5   Q.  Can we turn to the '501 patent, and specifically can we

6   bring up the Saigh publication, which we were discussing

7   yesterday.  That's Defense Exhibit 416.  If I understand you

8   correctly, you have testified that there is an embodiment

9   within Saigh where books that are stored on a cylinder, compact

10  cylinder, are transferred directly to the memory module that is

11  in the control unit, is that right?

12  A.  That is correct.

13  Q.  There is a discussion of that on page 5, if we can bring

14  that up.  Look at lines 19 through 31.  That second sentence

15  says, "By operating the manual controls of the control unit of

16  the personal library apparatus, information encoded on the

17  compact cylinder is transferred either directly to the control

18  unit and displayed as alphanumeric text and graphics on the

19  control unit LCD, or portions of the information encoded object

20  the compact cylinder are transferred to a memory module

21  communicating with the control unit and stored therein."  Do

22  you see that?

23  A.  I do see that.

24  Q.  That is for later retrieval and display by the control

25  unit, right?

Ealradr2                    Neuman - redirect

1  A.  That is correct.

2  Q.  So, information can go from the compact cylinder to the

3  memory module when it is in the control unit?

4            MR. CABRAL:  Objection, your Honor:  Leading.

5            THE COURT:  Not as excessively as previously, but it

6  is leading.  Sustained.

7  Q.  Let's take a look at page 14, please.  Let's blow up lines

8  6 through 25, please.  There was a discussion about this

9  passage on page 14 yesterday, right?

10  A.  That is correct.

11  Q.  Is this the passage you were pointing to with respect to

12  your opinions that Saigh discloses a predetermined amount of

13  time for access to the device?

14  A.  This is the paragraph that I was referring to when I was

15  speaking to those opinions.

16  Q.  This paragraph, the sentence is kind of long, but it says,

17  "Information downloaded from a compact cylinder or from a book

18  bank to a memory module 22 may also include date and time

19  information as to when the data was transcribed into the memory

20  module, as well as information regarding a set time period

21  after which the information transcribed in the memory module

22  will be automatically erased."  Do you see that, sir?

23  A.  I see that, and I pointed to that yesterday.

24  Q.  When you reviewed Saigh, you were reviewing it from the

25  perspective of a person of ordinary skill in the art, is that

1   right?

2         MR. CABRAL:  Objection, your Honor:  Leading.

3   A.  I --

4         THE COURT:  There is an objection.

5         It is, but I think that one is OK.  I'll allow it, to

6   move things along.  You may answer.

7   A.  Yes, I reviewed it from the perspective of one of ordinary

8   skill in the art.

9   Q.  Applying that perspective, sir, does this passage tell you

10  anything about when the time begins?

11  A.  Yes, it does.  In fact, it specifically says, "date and

12  time information as to when the data was transcribed into the

13  memory module."

14  Q.  When it was transcribed into the memory module?

15  A.  Yes, and that is telling you when the period begins.

16  Q.  It doesn't say after?

17        MR. CABRAL:  Objection, your Honor:  Leading.

18        THE COURT:  Sustained.

19  Q.  There was a series of questions yesterday also about the

20  limitation in the '501 patent of associating a predetermined

21  amount of time after the electronic book is stored on the

22  viewer with the electronic book.  Do you recall that?

23  A.  I do recall that.

24  Q.  The Court has actually construed that.  If we can have the

25  construction up, please.  The construction is "associating with

Ealradr2                        Neuman - redirect

1    the electronic book a predetermined amount of time that begins

2    when the electronic book is stored on the viewer."  Do you see

3    that?

4    A.  I do see that.

5    Q.  The claim doesn't refer to 14 days, does it?

6    A.  The claim itself does not refer to 14 days.

7    Q.  It's just a predetermined amount of time?

8    A.  That is correct, it just says a predetermined amount of

9    time.

10   Q.  You were asked whether it is your opinion that a few

11   seconds constitutes a substantial difference of a lending

12   period that lasts 14 days, and you answered, "It does not

13   constitute a substantial difference in the life of the period."

14   Do you recall that, sir?

15   A.  I do recall that.

16   Q.  In your opinion, does that question have any relevance to

17   whether the associating element of claims 7 and 18 as it has

18   been construed by the Court is literally met by the lending

19   feature?

20            MR. CABRAL:  Objection, your Honor.

21            THE COURT:  Sustained.

22   Q.  What, if any, relevance does that question have to your

23   opinion regarding whether the associating limitation of claims

24   7 and 18 is met?

25            MR. CABRAL:  Objection, your Honor.

1       THE COURT:  Sustained.

2  Q.  In your opinion, does the manner in which Lend Me works

3  literally meet the associating limitation of claims 7 and 18?

4  A.  No, it does not literally meet that.

5  Q.  What about whether there is a substantial difference?  Is

6  there a substantial difference?

7       MR. CABRAL:  Objection, your Honor:  Asked and

8  answered.

9       THE COURT:  I'll allow it.

10  A.  There is a significant difference in the way that it is

11  done.

12  Q.  Let me ask you this.  When you are analyzing whether there

13  is a difference, in your opinion what should the person of

14  ordinary skill in the art look to?  Should they look at the

15  difference in the way that an account-based lending system and

16  a device-based lending system work or should they look to the

17  difference between three seconds and 14 days?

18       MR. CABRAL:  Objection, your Honor:  Compound and

19  leading.

20       THE COURT:  The first part of the question was so

21  good, if only you had just stopped there, which was:  When a

22  person skilled in the art is analyzing this, in your opinion

23  what should the person of ordinary skill in the art look to?  I

24  will allow that question.

25       MR. SHARIFAHMADIAN:  As stated by your Honor, it's a

Ealradr2                    Neuman - redirect

1    perfect question.  Thank you.

2    A.  As stated by his Honor, one should look to the actual

3    variables that are being used, the actual meanings of the

4    values.  One should look at whether the time is the time at

5    which the loan acceptance was processed by the server, and that

6    is one thing.  Or one should look at, again, the description of

7    the value, whether it is the time when the book is stored on

8    the viewer.  That's a different thing.

9              One isn't looking at the actual meanings of those --

10   isn't looking at the actual numbers that fill into those

11   values, because those numbers may sometimes be close to one

12   another, they may sometimes be further apart from one another.

13   So it is important to look at what the meanings of the values

14   are that you are looking at.

15   Q.  Thank you.  Yesterday you were asked about the fact that

16   the Saigh patent, not the publication, appears on the cover

17   page of the patent-in-suit, do you recall that?

18   A.  I do recall that.

19   Q.  Did you review the file history of the '501 patent in

20   formulating your opinions?

21   A.  Yes, I did review the file history of the '501 patent.

22   Q.  In your review of the file history of the '501 patent, did

23   you see any indication one way or the other as to whether the

24   patent office actually substantively considered and analyzed

25   the '501 patent -- the Saigh patent?

1          MR. CABRAL:  I object, your Honor.

2          THE COURT:  Ground?

3          MR. CABRAL:  Foundation to the extent the patent

4     office considered the reference.

5          THE COURT:  Overruled.  You may answer.

6     A.  I actually did a search through the file history, and yes,

7     those were big.  I had it in electronic form.  I did an OCR so

8     I could actually search it, looking to see where the Saigh

9     publication, both Saigh as a name as well as the number of the

10    patents, were referenced.  I did see it referenced in the list

11    that was presented.  Well, I did this long before yesterday.  I

12    did see it in that list, but I did not see it discussed at all

13    within the file history beyond being mentioned in that list.

14    Q.  You mentioned a list.  What are you referring to?

15    A.  The list of the publications that the patent office

16    indicated were considered.

17    Q.  Do you have an understanding of who submitted that list, if

18    anybody?

19    A.  My understanding is that near the end of the prosecution of

20    that patent there was a list with about roughly 700 or so

21    publications that was provided to the patent office.  I believe

22    that that is where that list came from.  Actually, more

23    precisely, that that is where the items, some of the items on

24    that list came from.

25    Q.  Thank you.  What was actually mentioned on that list?  Was

Ealradr2                    Neuman - redirect

1  it the Saigh patent or the Saigh publication?

2  A.  It was the Saigh patent.

3  Q.  Not the publication?

4  A.  It was not the publication.

5  Q.  On direct examination yesterday you provided your opinions

6  that the Saigh publication discloses each and every limitation

7  of the asserted claims of the '501 patent.  Do you recall that,

8  sir?

9  A.  I do recall that.

10  Q.  During cross-examination you were asked about whether the

11  memory modules of Saigh are separate, do you recall that?

12  A.  I do recall that.

13  Q.  You were shown a series of quotes from the Saigh patent and

14  asked to confirm that the word "separate" appeared on the page,

15  do you recall that?

16  A.  I do recall that.

17  Q.  To be clear, does it remain your opinion that one of

18  ordinary skill in the art reviewing the Saigh publication would

19  understand it to disclose embodiments in which the memory

20  module is part of the viewer?

21          MR. CABRAL:  Objection, your Honor:  Leading.

22          THE COURT:  I think this is foundational to what is

23  the next question that is going to be put.  If that's correct,

24  I'll allow it.  Otherwise, not.  Are you going to ask him a

25  follow-up question, like why, or are you just leaving it as is?

Ealradr2                    Neuman – redirect

```
 1            MR. SHARIFAHMADIAN:  I'm going to ask why, your Honor.
 2            THE COURT:  Then I will allow the question.
 3   Q.  Why does that remain your opinion, sir?
 4   A.  That remains my opinion because the Saigh publication
 5   actually describes how these components are used together.  In
 6   fact, there is a description that describes the memory module
 7   as an integral component of the controller in one of the ways
 8   that it is used.
 9   Q.  From what perspective did you analyze the Saigh patent?
10   A.  I analyzed the Saigh patent, as with everything else, from
11   the perspective of one of ordinary skill in the art.
12   Q.  Can we put up the Saigh publication, please.  And can we go
13   to page 6 and a description of figure 4.  If we could also put
14   up figure 4 next to it.  Can you blow up the description of
15   figure 4, please.
16            MR. CABRAL:  Your Honor, I would object as outside the
17   scope of the cross-examination, as this figure was not
18   discussed.
19            THE COURT:  No, I'll allow it.  You may have recross
20   on that if you wish.
21            MR. CABRAL:  Thank you, your Honor.
22   Q.  That's a description of figure 4.  Figure 4 is a block
23   diagram showing the interrelationship between functional
24   elements of the control unit of the electronic personal library
25   apparatus.  Do you see that, sir?
```

Ealradr2                    Neuman - redirect

1   A.  I do see that.

2   Q.  Can you describe what you are seeing here on figure 4,

3   please.

4   A.  Figure 4, as just described as being a block diagram, it is

5   showing what those functional elements are.  In this we see the

6   interface.  We see in particular of relevance here the memory

7   module that is being shown as one of the functional elements.

8   You see the keypad, the LCD display.  It is really the

9   inclusion of the memory module as one of the functional

10  elements that I focused on in understanding the Saigh

11  publication to disclose those elements interconnected in such a

12  manner.

13  Q.  Let's turn to page 10 of Saigh, please.  Let's focus on

14  lines 25 through the end.  Did you also review this section of

15  the Saigh publication in forming your opinions?

16  A.  Yes, I did.

17  Q.  It says, "A plug-in interface between the reader control

18  unit 20 and the memory module 22 of the type having plug and

19  jack connections is provided on a side of the control unit

20  housing 36."  Do you see that?

21  A.  I do see that.

22  Q.  Skipping the second sentence, the third sentence says, "The

23  slotted recess enables insertion of the memory modules 22 in to

24  the slot and connection of mating plug connectors of the memory

25  modules with the plug connectors of the control unit, thereby

Ealradr2                    Neuman - redirect

1    connecting the inserted memory module in communication with the

2    microprocessor of the control unit."  Do you see that, sir?

3    A.  I do see that.

4    Q.  How did this passage inform your opinion with respect to

5    whether the Saigh publication discloses a device with memory?

6    A.  This basically told me that the memory modules, actually as

7    I described them yesterday, are inserted into the control unit

8    much as you insert an SD card or, as was described by the other

9    side, a Nintendo module.  This is describing that kind of

10   insertion.

11   Q.  Now let's take a look at page 13, please, lines 25 through

12   33.  This section says, "Information stored in the memory

13   module 22 is retrievable by the control unit 20 for display by

14   the control unit on the LCD screen 48."  Do you see that?

15   A.  I do see that.

16   Q.  It goes on to say that, "The memory module is programmed by

17   insertion of the module into the recessed slot 82 of the

18   control unit."  Do you see that?

19   A.  I do see that.

20   Q.  Then, "By operating the control unit keypad 50 to download

21   information from a compact cylinder inserted in the cylinder

22   reader module 28 to the memory module 22 inserted in the

23   control unit 20."  Do you see that?

24   A.  I do see that.

25   Q.  How did this passage inform your opinion with respect to

Ealradr2                    Neuman - redirect

1   whether Saigh discloses a viewer with a memory on which books

2   can be stored?

3   A.  This was actually the basis for my understanding of the

4   embodiment which I have described earlier, that is, where you

5   are doing the copying from the compact cylinder through the

6   control unit into the memory module, which is part of the

7   apparatus, part of the viewer.

8   Q.  The accused Nook devices have an SD memory slot, correct?

9   A.  At least some of them do, yes.

10  Q.  Some of them do, yes.  Basically, you can insert an SD

11  memory card into it and it's a form of memory, right?

12  A.  That is correct.

13  Q.  Is that similar to the memory that is disclosed in the

14  Saigh reference?

15  A.  Yes, it is.

16  Q.  In reviewing Mr. Berg's infringement analysis that he

17  provided in his report in this case, do you recall whether he

18  addressed the SD memory cards and the SD memory slots in the

19  Nook devices?

20          MR. CABRAL:  Objection, your Honor:  Outside the scope

21  of cross-examination.

22          THE COURT:  I wonder.  Actually, come to the side bar

23  on this.

24          (Continued on next page)

25

Ealradr2                    Neuman - redirect

1           (At the side bar)

2           THE COURT:  This does seem to be going well beyond the

3       scope.

4           MR. SHARIFAHMADIAN:  Your Honor, the suggestion in

5       cross-examination is that removal from memory is not a part of

6       the device and should not be considered as part of the device.

7       That is directly contrary to the position that Mr. Berg took in

8       his expert report.  That's all we want to point out.

9           THE COURT:  I think that is something you can point

10      out on summation.  I don't think that is appropriate for

11      redirect on this witness.  The objection is overruled.

12          How much longer do you have on redirect?

13          MR. SHARIFAHMADIAN:  I will take a look at my notes,

14      but I may be done but no more than a few minutes.

15          MR. CABRAL:  Your Honor, did you say overruled or

16      sustained?

17          THE COURT:  Did I say overruled?  I'm sorry.

18      Sustained.  The objection is sustained.  Sorry.  Thank you very

19      much.  You flip a coin, sometimes it comes up heads and

20      sometimes tails.

21          MR. CABRAL:  Thank you, your Honor.

22          (Continued on next page)

23

24

25

Ealradr2                          Neuman - redirect

1           (In open court)

2           MR. SHARIFAHMADIAN:  Pass the witness.

3           THE COURT:  Anything else?

4           MR. CABRAL:  Your Honor, just a few questions.

5    RECROSS-EXAMINATION

6    BY MR. CABRAL:

7    Q.  Professor Neuman, you were asked by defense counsel about

8    the Saigh patent and its consideration by the patent office, do

9    you recall that?

10   A.  I do recall that.

11   Q.  You referred to a list of materials shown within the

12   prosecution history of the '501 patent, is that right?

13   A.  That is correct.

14          MR. CABRAL:  Your Honor, with your permission, I would

15   like to hand the witness a document.

16          THE COURT:  OK.

17   Q.  Could we actually bring it up on the screen.  It is Joint

18   Exhibit 5, which has been admitted into evidence.  I'm

19   referring specifically to the page on the bottom right corner

20   ending in 58798.  If we could highlight the top block there.

21   There we go.  Do you see under the big letters "Information

22   Disclosure Statement By Applicant" there is reference to

23   examiner initials?  Do you see that?

24   A.  I do see that.

25          MR. SHARIFAHMADIAN:  Objection, your Honor.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Ealradr2          Neuman - recross

```
 1                THE COURT:  Ground?

 2                MR. SHARIFAHMADIAN:  The exhibit is incomplete.

 3                THE COURT:  I'm sorry?

 4                MR. SHARIFAHMADIAN:  The exhibit is incomplete.

 5                MR. CABRAL:  Your Honor, I am trying to avoid the

 6     hand-up of a 500-page --

 7                MR. SHARIFAHMADIAN:  It is a 28-page document, your

 8     Honor.

 9                THE COURT:  The entire exhibit will be received, since

10     it is a joint exhibit and already has been admitted, in fact.

11     If you want to show him some other page, you may.

12                MR. SHARIFAHMADIAN:  Thank you.

13     BY MR. CABRAL:

14     Q.  Is this the list of materials that you were referring to,

15     Professor Neuman?

16     A.  This is part of that list of materials, yes.

17     Q.  Under "examiner initials" do you see the letters TT?

18     A.  I do see that.

19     Q.  If we can go down to the bottom of the page, there is an

20     examiner's signature there and the name Tamara Teslovich.  Do

21     you see that?

22     A.  I do see that.

23     Q.  Do you understand that to be the name of the patent

24     examiner who examined the application leading to the '501

25     patent in this case?
```

1    A.  Yes, I do.

2    Q.  If you look six references up from the bottom of that list,

3    that shows the Saigh patent there, doesn't it?

4    A.  Yes, it does.

5    Q.  If we go to the top, do you see -- you agree that the

6    examiner's initials, scroll down this whole page, has an

7    indication that the examiner considered the references listed

8    on this page, correct?

9    A.  I do see that.

10   Q.  During your redirect you testified that you saw no evidence

11   that the Saigh patent was substantively considered by the

12   patent office during the examination of the '501 patent, right?

13   A.  Yes, that is correct.

14   Q.  Isn't that because the patent office did not issue any

15   rejections during the examination of the '501 patent based on

16   the Saigh patent?

17   A.  It is because I did not see any discussion of the Saigh

18   patent other than its inclusion in a list of publications as

19   you have just shown here.

20   Q.  Is it fair to say that the patent office didn't think that

21   the Saigh patent was relevant enough to have any substantive

22   discussion of that reference during the prosecution of the '501

23   patent?

24   A.  I don't know what their thinking was particularly.

25   Q.  Because you don't know what the patent office thought about

1    the Saigh reference, correct?

2    A.  I only saw what they discussed or did not discuss about the

3    Saigh reference in the file history.

4    Q.  You only know that the patent office considered the Saigh

5    patent during the examination process, though, right?

6    A.  I see that they have listed it as considered, yes.

7    Q.  Just a few more questions about the Saigh reference

8    specifically.  I want to direct your attention, and this is

9    Defense Exhibit 411, to column 3, starting at line 47.

10   Actually, line 44.  Do you see there starting at line 44 it

11   says, "brief description of the drawing figures"?

12   A.  I do see that.

13   Q.  Under that heading it says, "Further objects and features

14   of the present invention are revealed in the following detailed

15   description of the preferred embodiment of the invention and in

16   the drawing figures wherein," and it proceeds down.  Do you see

17   that?

18   A.  I do see that.

19   Q.  Would you agree that all of the descriptions that follow of

20   the drawings and figures relate to the same preferred

21   embodiment referenced here in that sentence?

22   A.  The sentence certainly indicates that they do where it says

23   "of the preferred embodiment," yes.

24   Q.  When you look down to figure 4, do you see the reference to

25   figure 4 there?

Ealradr2             Neuman - recross

1  A.  I do see the reference to figure 4.

2  Q.  The Saigh patent says that figure 4 is a block diagram

3  showing the interrelationship between functional elements of

4  the control unit of the electronic personal library apparatus,

5  right?

6  A.  Yes, I do see that.

7  Q.  You are not suggesting that figure 4 is somehow a separate

8  example other than apart from what is described elsewhere in

9  the Saigh patent, are you?

10  A.  No.  I think that figure 4 is an example of what is

11  described in the Saigh patent.

12  Q.  Using our Nintendo example, OK?, it is not your position

13  that the games stored on the Nintendo cartridge are actually

14  stored on the Nintendo console, is it?

15  A.  First of all, your Nintendo example is not a particularly

16  good one, since it is read-only memory in those particular

17  modules.  But when one looks at a controller that has memory

18  within it, whether it's an SD card, whether it's some other

19  kind of memory card, one still thinks of that device, including

20  that memory, as a device that encompasses all those components.

21  Q.  That hurts.  I thought my Nintendo example was pretty good,

22  actually.  But my point is the same.  Isn't it correct that in

23  the Saigh reference, in the context of the Saigh reference, the

24  book is stored on the memory module and not on the control

25  unit?

1  A.  When the book is stored on the memory module, it is in the

2  control unit in this particular embodiment.

3  Q.  In what particular embodiment?  There is only one preferred

4  embodiment described here.

5  A.  We see the figure where the memory module was an integral

6  component.  We saw the example that we had on the screen

7  otherwise where it was being copied into the memory module.  In

8  those cases the memory module was inserted into the control

9  unit.

10  Q.  Is it your position that when the electronic book is stored

11  on the memory module, it is stored on the control unit viewer?

12  A.  Yes, it is my opinion that when it is stored, at least

13  under that embodiment, it is stored on the viewer.

14          MR. CABRAL:  No further questions.

15          THE COURT:  Anything else?

16          MR. SHARIFAHMADIAN:  Just brief redirect.

17          THE COURT:  Go ahead.

18          MR. SHARIFAHMADIAN:  I have to ask for plaintiff's

19  cooperation to please put back up the JTX-005 that you had on

20  the screen, please.

21          MR. CABRAL:  Your Honor, could we approach very

22  briefly?

23          THE COURT:  All right.

24          (Continued on next page)

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Ealradr2

1           (At the side bar)

2           MR. CABRAL:  I apologize for calling this, your Honor.

3     The issue has been beaten to death.  If the argument is going

4     to be that the patent office somehow was overwhelmed by the

5     amount of material they considered, we consider that to be an

6     irrelevant point and prejudicial for purposes of admitting that

7     kind of evidence in this case.

8           THE COURT:  I don't know what he is going to ask.  I

9     was amazed that when you asked the witness about what's gone on

10    in the patent office, there was no objection on the grounds of

11    hearsay, which it clearly blatantly is, as well as speculation.

12    But since there was no objection, you sort of opened that door.

13    We'll see what the questions are.  I think that door was

14    opened.

15          MR. CABRAL:  Thank you, your Honor.

16          (Continued on next page)

17

18

19

20

21

22

23

24

25

Ealradr2

```
 1              (In open court)

 2     FURTHER REDIRECT EXAMINATION

 3     BY MR. SHARIFAHMADIAN:

 4     Q.  Can we blow up the top left corner.  Thank you.  Counsel

 5     handed you this sheet of paper and asked about the Saigh

 6     reference mentioned on there.  Do you recall that?

 7     A.  Yes, I recall that.

 8     Q.  Do you see at the top left there it says sheet 9 of 28?

 9     A.  Yes, I do see it says sheet 9 of 28.

10     Q.  I am going to hand you a different portion of the JTX-005

11     and ask that that be blown up.  It is actually in your binder

12     at JTX-005 excerpt.

13     A.  I have it here.

14     Q.  Can we see the top left again.  That says sheet 1 of 28,

15     right?

16     A.  Yes.

17     Q.  Do you have all 28 pages there, sir?

18     A.  Yes, I have all 28 pages.

19     Q.  That was what was submitted to the patent office, right?

20     A.  That was my understanding.

21              MR. CABRAL:  Objection, your Honor:  Foundation.

22              THE COURT:  Overruled.

23     Q.  Did you actually take the time to -- are you aware of how

24     many references are listed in this document that were submitted

25     at one time?
```

Ealradr2                    Neuman - redirect

1    A.   My understanding is it's approximately 700.

2              MR. SHARIFAHMADIAN:   Thank you.

3              THE COURT:   Anything else?

4              MR. CABRAL:   No, your Honor.

5              THE COURT:   Thank you very much.   You may step down.

6              (Witness excused)

7              THE COURT:   Ladies and gentlemen, we will give you a

8    15-minute break at this time.

9              (Jury not present)

10             THE COURT:   Counsel, I am going to take a short other

11   matter now.

12             (Recess)

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (Jury not present)

 2              THE COURT:  Who is the next witness?

 3              MS. ARNI:  The next witness is Shawn Ambwani by a

 4    video deposition.

 5              THE COURT:  Who is the next live witness?

 6              MR. EDERER:  We have Mr. Barnes.

 7              THE COURT:  Why don't we get him on the stand now.

 8              MR. EDERER:  Before the jury comes in, may I raise one

 9    issue?

10              THE COURT:  Yes.

11              MR. EDERER:  One of the things that we may be asking

12    Mr. Barnes about is the calculation that he did with respect to

13    the later starting dates.  Yesterday we had a discussion in

14    connection with the jury instructions about whether or not you

15    were going to instruct the jury on this issue of marking and

16    when the starting date was.

17              THE COURT:  As you can see from my draft, I am not

18    convinced there is anything in here that warrants anything

19    about marking, but that's why I want to hear from Mr. Barnes.

20    If he has some evidentiary support for anything having to do

21    with marking, then I may adjust my instruction.  If he doesn't,

22    he doesn't.

23              MR. EDERER:  He was going to present a calculation

24    from a different starting point.

25              THE COURT:  It seems to me, and I do not want to spend
```

EAL8ADR4

1    more than two minutes discussing this now because, through no

2    fault of your own, we are running late today, but -- I will

3    give you an opportunity to discuss it later -- I don't recall,

4    counsel can correct me if I am wrong, any evidence in this case

5    yet about devices being marked.  Is there any such evidence?

6              MR. CABRAL:  There is none, your Honor.  And there is

7    also no evidence that 287 applies in this case.

8              THE COURT:  If there is no evidence of anything being

9    marked, then an expert can't be talking about something not in

10   evidence, unless it fits under 703, and I don't think this

11   does.  So then we are down to the pure question of whether the

12   damages in this case, with respect to the two patents that the

13   parties disagree as to when the damages go from, date from the

14   date of infringement back several years or from the date of

15   notice.  And that's the one question I wanted to hear counsel

16   talk about, but I think marking is not part of this case.

17             MR. EDERER:  We can address the issue later.

18             THE COURT:  Very good.  Let's bring in the jury.

19             (Continued on next page)

20

21

22

23

24

25

EAL8ADR4

1          (Jury present)

2                THE COURT:  Please call your next witness.

3                MR. EDERER:  Defendants call Ned Barnes, your Honor.

4      NED BARNES,

5           called as a witness by the defendants,

6           having been duly sworn, testified as follows:

7                THE DEPUTY CLERK:  State your name and spell your last

8      name slowly for the record.

9                THE WITNESS:  My name is Ned Barnes, B-A-R-N-E-S.

10     DIRECT EXAMINATION

11     BY MR. EDERER:

12     Q.  Mr. Barnes, would you please briefly describe your

13     educational background?

14     A.  Yes.  I received a degree in accounting from George Mason

15     University in 1991.  I have been a licensed certified public

16     accountant since 1993.  I am also a certified fraud examiner.

17     And I have been practicing professionally as a forensic

18     accountant and economic consultant for approximately the last

19     18 years.

20     Q.  Where are you currently employed?

21     A.  I am currently employed with the Berkeley Research Group.

22     We go by the acronym BRG.

23     Q.  What is the Berkeley Research Group?

24     A.  BRG is an economic and financial consulting firm.

25     Q.  What do you do at the Berkeley Research Group?

EAL8ADR4                    Barnes - direct

1   A.  I provide consulting services to clients on a variety of

2   issues, but a significant portion of my practice is devoted to

3   the valuation of intellectual property and related issues.

4   Q.  Does this include assessing damages for alleged patent

5   infringement?

6   A.  Yes, it does, on many occasions.

7   Q.  Have you also analyzed issues relating to patent valuation

8   outside of litigation?

9   A.  Oh, yes.  On many occasions I have been retained to perform

10  a valuation of patents or patent portfolios outside of the

11  context of litigation.  I have also been retained on occasion

12  to play a consulting role in connection with ongoing or

13  prospective licensing activities.

14  Q.  Have you ever been qualified as a damages expert in any

15  litigation?

16  A.  Yes, I have.

17  Q.  In patents litigations?

18  A.  Yes, I have.

19  Q.  Were you retained by Barnes & Noble to provide assistance

20  in this litigation?

21  A.  I was.

22  Q.  What were you asked to do?

23  A.  I was asked to analyze the appropriate -- the royalty rates

24  that would be appropriate in this matter for the three ADREA

25  patents, assuming that the jury were to conclude that any one

1  of the three or all three were found to be valid and infringed

2  by Barnes & Noble.

3  Q.  Were you able to make any assessment as to whether Barnes &

4  Noble actually infringed any of the patents at issue in this

5  case?

6  A.  No, I was not.  That's outside the scope of my work.

7  Q.  So you're not offering any opinions on infringement or

8  validity, are you?

9  A.  That's correct.  I'm not.

10 Q.  If the jury finds that there is no infringement, would

11 there be any damages?

12 A.  No, there would not be.

13 Q.  So what were your conclusions regarding the royalty rate

14 that you calculated?

15 A.  I concluded that an appropriate royalty rate for the '851

16 patent and the '501 patent together would be eight cents per

17 unit; for the '501 patent alone, four cents per unit; and for

18 the '703 patent, two cents per unit.

19 Q.  Now, why did you do a calculation for each of the three

20 patents separately?

21 A.  Several reasons.  First of all, each of the three patents

22 correspond, as I understand it, to different functionality.  So

23 that would be a factor in having a separate royalty for each of

24 the three patents.  But it's also important to recognize that

25 the three patents at issue have significantly disparate

1   expiration dates.  So the hypothetical license that would be in

2   effect for any of the patents is going to vary patent by

3   patent.

4   Q.  Did you prepare a report reflecting your conclusions?

5   A.  I did.

6   Q.  When was that report prepared?

7   A.  My initial report was prepared at the end of last year,

8   late December 2013.

9   Q.  Did you ever revise or supplement your report?

10  A.  Yes.  I provided a supplementation, a supplemental report,

11  in August of this year.

12  Q.  Why did you do that?

13  A.  A couple of reasons.  There was a need to update some of my

14  calculations for the passage of time, and I also accounted for

15  a limitation to the damages period for the '851 patent.

16  Q.  What do you mean by a limitation for the damages period for

17  the '851 patent?

18  A.  It is my understanding the damages are only available for

19  the '851 patent for the eight-and-a-half month period, March

20  29, 2012, through December 9, 2012.

21  Q.  And what is the December 9, 2012 date, what is the

22  significance of that date?

23  A.  That's the date that the '851 patent expired.

24  Q.  Now, can you explain how you went about your damages

25  analysis in your report?

1   A.   Sure.  I began with a consideration of the Georgia-Pacific

2   factors, which provides a framework for investigating and

3   analyzing issues that would be relevant to determining the

4   outcome of a hypothetical negotiation.

5   Q.   What is the purpose of using the Georgia-Pacific factors

6   for an analysis like the one you conducted?

7   A.   Well, again, it provides sort of a checklist for various

8   economic and factual considerations that can be useful in

9   conducting this type of analysis.

10  Q.   Did you look at all of the Georgia-Pacific factors?

11  A.   Well, I certainly considered them all.  There's 15 of them,

12  and they are not all going to be equally relevant or

13  appropriate in every situation, but I considered them all.  I

14  focused on the factors that I believe were most relevant to the

15  analysis here.

16  Q.   What were the factors that you considered to be the most

17  relevant here?

18  A.   I think we have got a slide.  There are five or six.

19              MR. EDERER:  Your Honor, we have a few slides for

20  Mr. Barnes.

21  Q.   What are we looking at here, Mr. Barnes?

22  A.   This is a slide that -- these are not specifically the

23  factors; these correspond to several of the factors.

24              So, for example, the first one:  Were the patents ever

25  licensed?  That was the first factor that I believe was

1   particularly relevant here.

2   Q.  We will go through each of these considerations in a

3   minute, but I first wanted to ask you a few questions about the

4   hypothetical negotiation that you referred to earlier.

5           Now, who is that hypothetical negotiation between?

6   A.  The hypothetical negotiation is going to be between Barnes

7   & Noble as the licensee and as the licensor Discovery with

8   respect to the '851 patent and the '501 patent and Philips with

9   respect to the '703 patent.

10  Q.  What time period did you use for this hypothetical

11  negotiation?

12  A.  November 2009, late 2009.

13  Q.  Why did you choose that date?

14  A.  Well, the hypothetical negotiation, it's designed to occur

15  in the time leading up to when the alleged first infringement

16  began.  The alleged first infringement began in this case when

17  Barnes & Noble introduced its first Nook product, which was I

18  believe December of 2009.  So I used the month before that as

19  the time period for the hypothetical negotiation.

20  Q.  You mentioned that the hypothetical negotiation would have

21  been between Barnes & Noble and Discovery, on the one hand, for

22  the '851 and '501 patents, and between Barnes & Noble and

23  Philips, on the other hand, with respect to the '703 patent,

24  correct?

25  A.  That is correct.

1   Q.  Why didn't you use ADREA in the hypothetical negotiation?

2   A.  Well, in 2009 ADREA didn't exist, ADREA hadn't been formed

3   yet, and the patents were actually owned at that time

4   separately by Discovery and Philips.

5   Q.  So in your analysis did you consider this to be two

6   separate negotiations?

7   A.  There would, in effect, be two separate negotiations

8   because you have two independent owners of the patent assets at

9   issue.

10  Q.  What is the scope of the license that would result from the

11  hypothetical negotiation that you analyzed?

12  A.  I believe the scope would have been a nonexclusive license.

13  Q.  Why is that?

14  A.  Well, the evidence that I reviewed indicates that both

15  Discovery and Philips were interested in broadly licensing

16  their patent portfolios.  I am not aware of any information to

17  suggest that either one of those parties was ever interested in

18  identifying one single potential licensee to whom they would

19  grant an exclusive license.  And that's consistent with what

20  ADREA did once they were formed and acquired the patent assets.

21  Q.  What effect would a nonexclusive license have upon a

22  royalty rate that you're calculating for the hypothetical

23  negotiation?

24  A.  Well, on a comparative basis, nonexclusive versus

25  exclusive, a nonexclusive license is going to have a lower

EAL8ADR4                         Barnes - direct

1    royalty rate because it is going to provide lower value.

2    Q.  What about the geographical scope of the hypothetical

3    license?  What did you look at there?

4    A.  My understanding is the geographic scope of the license

5    from the hypothetical would be a U.S. only license, that's the

6    only rights that are be conveyed in the hypothetical

7    negotiation.

8    Q.  What effect would a geographical scope that covers only the

9    U.S. have on a hypothetical royalty rate that you're analyzing?

10   A.  Again, as compared to a worldwide license, a U.S. only

11   license is going to tend to have a downward influence on the

12   rates.

13            MR. EDERER:  Can you put the relevant consideration

14   slide back up, please?

15   Q.  Now, Mr. Barnes, going back to your list of your most

16   relevant economic considerations, the first consideration you

17   list up here is whether the patents have ever been licensed.

18   Do you see that?

19   A.  I do.

20   Q.  What did you conclude with respect to that?

21   A.  Yes.  There was a license, and it was one royalty bearing

22   license that had been entered into that included a license to

23   these patents, and that was the license agreement that ADREA

24   entered into with Amazon.

25   Q.  Now, how did the Amazon license figure into --

 1           THE COURT:  When was that?

 2           THE WITNESS:  That was in 2011.

 3   Q.  How did the Amazon license figure into your analysis of the

 4   hypothetical negotiation?

 5   A.  Well, as an empiricist and a valuation professional, the

 6   best definition, the best information of fair market value is

 7   the amount that unrelated parties agreed to in an arm's-length

 8   exchange, which is what the Amazon license with ADREA was.

 9           So I believe that the Amazon agreement -- that the

10   economic turns of the Amazon agreement provide strong evidence

11   as to the valuation of a license that would likely result from

12   a hypothetical negotiation, and I use that as a starting point

13   in my analysis, subject to further investigation.

14   Q.  What do you mean by starting point?

15   A.  Well, I went on from -- after analyzing the Amazon

16   agreement, I investigated a number of other factors that might

17   influence my consideration of the Amazon agreement either up or

18   down.

19   Q.  Is the Amazon agreement comparable to the agreement coming

20   from the hypothetical negotiations that you analyzed?

21   A.  Well, I believe in many respects it is.  For example,

22   Amazon and Barnes & Noble as licensees are direct competitors,

23   at least with respect to the accused products, e-readers and

24   tablets that can function as e-readers, although it's important

25   to recognize that Amazon is a much, much bigger market

participant in this arena.  And a second factor is that the way

that the patents are allegedly utilized in the accused products

is similar between Amazon and its e-reader products and Barnes

& Noble.

Q.  Now, would you consider the Amazon agreement to be a

perfect match with the hypothetical license that you analyzed

between Barnes & Noble and Discovery and Barnes & Noble and

Philips?

A.  No, it's not a perfect match.  There are some key

distinguishing factors and characteristics that I think it is

important to investigate and analyze.

Q.  Now, you calculated a per unit royalty rate from the Amazon

agreement, correct?

A.  I did.

Q.  Did you just use that rate that you calculated from the

Amazon license to stick it into your hypothetical license

negotiation?

A.  No, I wouldn't agree with that.  I considered a number of

economic and factual considerations that I investigated in

arriving at the rate that I believe would be the product of a

hypothetical negotiation.

Q.  You just responded to the judge's question about when the

Amazon license was entered into and you said 2011, correct?

A.  I did.

Q.  Do you remember approximately when in 2011 that license was

1   entered into?

2   A.  It was right near the end, I want to say November 2011.

3   Q.  How does a license agreement negotiated in late 2011 tell

4   us about the value of a license that would have been negotiated

5   late in 2009?

6   A.  Well, Mr. Ederer, if you think about it, let me give you an

7   analogy.  If I asked you to investigate or try and estimate the

8   value of a house five years ago, I say go look back and figure

9   out what the house was worth five years ago.  And you go out

10  and you dig up all the public records and you find out there

11  was an actual transaction involving this house, it was actually

12  sold three years ago.  Well, the information concerning the

13  purchase price that was agreed to between a willing buyer and a

14  willing seller is going to be an important data point for you

15  to consider in evaluating what the house might have been worth

16  five years ago.

17          Now, you're not going to stop there.  You're going to

18  want to do further investigation and determine, for example,

19  were there major changes in the real estate market in that

20  time, were there significant changes in the neighborhood where

21  the house was.  There are things that you want to investigate,

22  but you're not going to discard the data point simply

23  because --

24          THE COURT:  What did you do in this case?

25          THE WITNESS:  What I did in this case is I identified

EAL8ADR4                        Barnes - direct

1    a number of factors that I thought might distinguish the Amazon

2    agreement from the hypothetical negotiation, and I investigated

3    each of them.

4              THE COURT:  What was the royalty rate in the Amazon

5    agreement?

6              THE WITNESS:  It was in the form of a lump sum.  So

7    the first thing I did was convert it to a per unit rate.

8              THE COURT:  What was the rate you converted it to?

9              THE WITNESS:  Eight cents per unit for the '851 patent

10   and the '501 patent together, four cents for the '501 patent by

11   itself, and two cents for the '703 patent.

12             THE COURT:  OK.  What did you do next?

13             THE WITNESS:  So the first issue that I considered was

14   the market conditions surrounding the Amazon agreement versus

15   what the market conditions would have been at the hypothetical

16   negotiation.

17             THE COURT:  Let me ask you, leaping ahead for a

18   moment, what was the final rate you came up with?

19             THE WITNESS:  Well, I ultimately concluded that it was

20   conservative to not make an adjustment.  The evidence I

21   reviewed I believe convinced me, if anything, the rates coming

22   out of the hypothetical negotiation would have been lower than

23   the rates from the Amazon agreement.  So to be conservative I

24   did not make a downward adjustment.

25             THE COURT:  So you wound up using the same rates?

 1              THE WITNESS:  I did, your Honor.

 2              THE COURT:  Go ahead, counsel.

 3   BY MR. EDERER:

 4   Q.  How did you go from the lump sum payments that were made in

 5   the Amazon agreement to a per unit royalty rate as you just

 6   described?

 7   A.  I had to convert them to a per unit by taking into account

 8   actual and estimated sales that I believe ADREA and Amazon

 9   would have considered when they entered into that agreement.

10   Q.  Why did you convert these payments to a per unit rate?

11   A.  Well, I believe it's the best way really to account for the

12   significant size difference between Amazon and Barnes & Noble

13   and the fact that Amazon sales of licensed products were much,

14   much greater than Barnes & Noble sales of licensed products.

15   Q.  So what is the relevance of the actual amount of money paid

16   by Amazon to ADREA?

17   A.  I think it's only relevant in the context of the number of

18   sales, actual and expected sales.

19   Q.  Now, what years of Amazon sales did you look at?

20   A.  I looked at historical sales that covered the period 2008

21   through 2011.

22   Q.  What data did you use to determine Amazon sales for the

23   years 2008 to 2011?

24   A.  I utilized actual Amazon -- actual sales data from Amazon's

25   own business records.

EAL8ADR4                    Barnes - direct

1   Q.  For what period of time?

2   A.  For 2008, 2009, and 2010.  And then there were partial year

3   estimates for 2011.

4   Q.  Did you use anything else in connection with your analysis

5   of data of Amazon sales for the year 2011?

6   A.  Yes.  In order to get a better handle on 2011 full year

7   sales, I collected information or I obtained information from a

8   market research firm called IDC, which is in the business of

9   analyzing various markets and putting that type of data

10  together.  So I obtained that information for 2011.

11          MR. EDERER:  Can we put up DDX 1008, please?

12  Q.  Now, we have a slide, Mr. Barnes.  What are we looking at

13  here?

14  A.  Well, this is the sales data that we were just discussing

15  for 2008, which is when Amazon first introduced its Kindle

16  products, through 2011.

17  Q.  According to this table, the estimated actual sales for

18  2011 that you used reflected a pretty big jump over the

19  previous year.  Do you see that?

20  A.  I do.

21  Q.  Did you do anything to test the reliability of the IDC data

22  that you used as estimated actual sales for 2011?

23  A.  Yes, I did.  As I mentioned previously, I did have from

24  Amazon's own records estimates.

25          MR. BAUER:  Objection.  Outside the scope.

EAL8ADR4                      Barnes - direct

 1              THE COURT:  I need a copy of his report.  Reports I
 2     should say.
 3              MR. BAUER:  Your Honor, I am going to withdraw the
 4     objection, not because it's not outside the scope, but we will
 5     deal with it later.
 6              THE COURT:  You may answer the question.
 7     A.  Yes, I did.  As I mentioned earlier, there was information
 8     in the Amazon records that I reviewed that had estimates for
 9     partial year 2011.  And those estimates, I believe they were in
10     the range of 18 to 24 million units for 2011.  So that led me
11     to conclude that the actual data, the estimated actual data
12     that I obtained from IDC was reasonably accurate.
13     Q.  Did you have any understanding as to what accounted for
14     this jump in sales?
15     A.  Yes.  In addition to just the trend, the Kindle devices
16     became more and more popular and successful over the time
17     period, at the end of 2011 Amazon introduced a new product
18     called the Kindle Fire tablet.  And that product was very
19     heavily promoted and it was very well received in the market.
20     And although it was introduced near the end of 2011, there were
21     substantial sales of that product in just the last quarter of
22     2011, which accounted for a significant portion of that
23     increase.
24     Q.  Now, you said that your per unit royalty calculation for
25     the Amazon agreement also covered projected sales for the years

1  2012 to 2016, correct?

2  A.  It did include projections, yes.

3  Q.  What did you do to account for those sales?

4  A.  Well, what I did is I wanted to put myself in the position

5  of Amazon and ADREA when they entered into this license.  So I

6  tried to ascertain or obtain information that would have been

7  relevant to those parties when they entered into the

8  negotiation.  I wanted to put myself in their shoes so to

9  speak.

10 Q.  So how did you determine the projected Amazon sales that

11 ADREA and Amazon would have considered back in 2011?

12 A.  Well, I did some research, and I collected information on

13 market forecasts from around that time, around the end of 2011

14 and the beginning of 2012, that would reflect I believe market

15 data or market intelligence that would have been available to

16 the parties when they entered into this agreement.

17 Q.  What forecasts are you referring to?

18 A.  These would have come from articles, industry magazines,

19 other types of forecasts that would have been generally

20 available in the public domain.

21 Q.  These are forecasts that would have been available to ADREA

22 and Amazon at the end of 2011, is that right?

23 A.  Reasonably so, yes.

24 Q.  How do you know ADREA and Amazon would have considered this

25 information in 2011?

1          MR. BAUER:  Objection.  Foundation.

2          THE COURT:  Overruled.

3          You may answer.

4     A.  As a valuation matter, it really just makes sense that the

5     parties would have considered contemporaneous information that

6     would have been available at the time.  I don't think there is

7     any reason to not expect that they would have done that.  But

8     more directly, I found information in ADREA's own files, which

9     indicate that this is the very type of analysis that ADREA

10    itself was doing in connection with its license negotiations

11    with Amazon; this is precisely what ADREA was doing.

12    Q.  What information did you review in ADREA's own files?

13    A.  I reviewed information where they had compiled projections

14    of Amazon sales going out from 2012 to 2016.  I didn't have

15    access to the details of those projections, they were not

16    provided to me, but I did have information to confirm that they

17    in fact did make the projections.

18    Q.  Why did you just go to 2016?

19    A.  Well, several reasons.  One is when I did my own

20    investigation, the market research that I was able to find from

21    that time period generally included forecasts or market

22    projections that went out to 2016.  So that's what the market

23    was doing so to speak.  But, in addition, that's also

24    consistent with the information that I identified in ADREA's

25    records as to how far out they were taking their projections.

1  Q.  What projections did you actually use for the period 2012

2  to 2016, what did you conclude with respect to that?

3  A.  The information that I found supported a growth rate, a

4  year-by-year growth rate of in the neighborhood of 20 to 30

5  percent.  But I chose to dial that back a little bit, and I

6  utilized a growth rate of 10 percent per year.

7  Q.  Why did you do that?

8  A.  Just to be conservative.

9  Q.  When you did your analysis at the end of 2013 for this

10  case, wouldn't there have been data available for actual Amazon

11  sales for 2012 and at least part of 2013?

12  A.  Oh, sure.  That information would have been available years

13  later, but that's not information that would have been

14  available to the parties when they enter into this agreement,

15  and that's really what I am trying to focus on, is I am trying

16  to understand the economic substance of the parties when they

17  enter into this agreement, what were they thinking at the time.

18  Q.  Do you know how Amazon's actual sales for 2012 and 2013

19  compared to the projections for those years that you used?

20  A.  Yes.  The actual data was -- the actual sales were quite a

21  bit lower.

22  Q.  Now, we have discussed how you have calculated Amazon

23  sales.  Can you explain again why you're even doing this

24  calculation?

25  A.  Well, again, I want to come up with a per unit rate from

1  the Amazon agreement, it being the only arm's-length fair

2  market value license that involves these patents, and I want to

3  use that as a starting point to conduct further analysis to

4  determine if an adjustment is warranted in evaluating the

5  outcome of the hypothetical negotiation.

6  Q.  How did you calculate that per unit royalty rate?

7  A.  Well, effectively, what I did is I took the payments that

8  were prescribed in the Amazon agreement, the lump sum payments,

9  and I divided them or I apportioned them out over all of the

10 Amazon sales, both actual through 2011 and what I forecasted

11 through 2016.

12      There is one additional wrinkle there, and that had to

13 do with any time you're dealing with projections you have to

14 account for a discount factor.  A discount factor, when you're

15 dealing with projections, is a way that we account for

16 essentially two things.  The first is whenever you're dealing

17 with projections you have uncertainty and you have risk.

18 Projections are not actuals.  They can vary to some degree and

19 you want to account for that.  So you incorporate a discount

20 rate.

21      The other reason why we have a discount rate is to

22 simply account for the time value of money.  Generally, as a

23 economic matter, a dollar today is worth more than a dollar a

24 year from now.  You have got inflation.  You have got time

25 value of money issues.  So we want to take into account those

1    two factors by applying a discount rate to the projections.

2               So accounting for that, what I did was I apportioned

3    the lump sum payments in the Amazon agreement to the units that

4    I had compiled for both actual and forecasted Amazon units.

5    Q.  How did you spread out the actual payments that were made

6    in Amazon among the patents in suit?

7    A.  Well, when I did the -- so let's talk about the Discovery

8    portfolio first.  I calculated that the payments that Amazon

9    made for access to the Discovery portfolio would have been

10   equated to approximately eight cents per unit.  That eight

11   cents per unit covers all of the Discovery portfolio, not just

12   the two patents at issue here.  And I understand there were, I

13   think, a dozen more U.S. patents, not to mention patent

14   applications and foreign patents and so forth.  But, again, to

15   be conservative, I applied 100 percent of that value, of that

16   eight cent per unit, to the two Discovery patents at issue

17   here, the '851 and '501.

18   Q.  What did you conclude with respect to those two patents?

19   A.  Again, eight cents per unit.

20   Q.  Did you also calculate a separate royalty rate for the '501

21   patent alone?

22   A.  Yes.  Four cents per unit.

23   Q.  How did you determine that?

24   A.  In the same manner.

25   Q.  Did you also calculate a per unit royalty rate for the '703

EAL8ADR4                      Barnes - direct

1    patent?

2    A.  I did.

3    Q.  What was that?

4    A.  That was two cents per unit.

5    Q.  Did you similarly ascribe the entire value of the payment

6    to that particular patent?

7    A.  Yes.  The '703 patent was part of the Philips portfolio.

8    And when I did the analysis for the payment that Amazon made

9    for the Philips and Sony portfolios combined, there were I

10   believe over 40 patents, 40 U.S. patents, plus patent

11   applications and foreign patent assets.  And that would

12   really -- those were the rights that would be associated with

13   the two cents per unit.  But what I did, again, to be

14   conservative, is I assigned all of that value to just the '703

15   patent.

16   Q.  Why is that being conservative?

17   A.  Because I am not giving any credit, any value at least, for

18   any of the other patents that were included in the Amazon

19   agreement, but that are not related to the hypothetical

20   negotiation here.

21   Q.  So did you think that these per unit royalty rates that you

22   calculated were fair?

23   A.  Yes, I believe they are fair.

24   Q.  Once you calculated a per unit royalty rate from the Amazon

25   agreement, did you have everything you needed to know what the

1    rate would have been two years earlier at the hypothetical

2    negotiations?

3    A.  No.  As I mentioned, that was my starting point.  I got my

4    starting point, my per unit rate, and now I want to undertake

5    additional analysis, additional investigation to determine if

6    there are any adjustments that need to be made to those rates.

7    Q.  Did you make such an analysis?

8    A.  I did.

9    Q.  How did your consideration of these differences or

10   adjustments affect your analysis?

11   A.  Well, I identified four considerations, in particular, some

12   of them would tend to cause me to believe that the rates of the

13   hypothetical would be lower, some would cause me to believe

14   that the rates of the hypothetical would be slightly higher.

15   Q.  We have a slide here, which is DDX 1011.  Do you see that?

16   A.  I do.

17   Q.  Did you prepare this slide?

18   A.  It was prepared at my direction, yes.

19   Q.  What are we seeing here on this slide?

20   A.  Well, these are really the four, what I call the

21   considerations, the distinguishing considerations between the

22   Amazon agreement, where I got my starting point, and the

23   circumstances surrounding the hypothetical negotiation.  So

24   this is what I am trying to investigate to determine if an

25   adjustment is warranted.

1  Q.  Would you take us through the slide and explain what the

2  differences were and how they affected your analysis?

3  A.  OK.  So starting at the top, the first one is market

4  conditions.  We talked earlier about the house example, things

5  could be different three years ago than five years ago.

6         So when I look at market conditions, I focus first on

7  what were the conditions surrounding the Amazon negotiation, or

8  the Amazon license.  And at that time, Amazon was the market

9  leader in e-readers.  They had a market share of over 50

10  percent in that market.  They had very successful e-reader

11  products.  The Kindle was a very successful product.  They had

12  just released, as I mentioned earlier, a new tablet product

13  that was very well received in the market.  So the economic

14  consideration surrounding the Amazon agreement was very

15  favorable.

16         So I contrasted that with, OK, what about in 2009 at

17  the hypothetical negotiation where it's with Barnes & Noble?

18  And in 2009, at the end of the 2009, Barnes & Noble had not yet

19  introduced a product yet.  They were introducing the Nook for

20  the first time.  So there is a significant degree of risk

21  associated with whether or not these products are going to be

22  successful.  That, I believe, is a very significant

23  distinguishing factor between the market conditions of the two

24  negotiations that I believe would have had a significant

25  downward effect on the royalty rate going from the Amazon

EAL8ADR4                    Barnes - direct

1    agreement to the hypothetical negotiation.

2    Q.  What was the next difference that you identify?

3    A.  The next difference has to do with the scope of the

4    agreements.  We have talked about this a little bit already.

5          The Amazon agreement, the Amazon license, included

6    access to 14 patents in the Discovery portfolio, and I believe

7    over 40 patents in the Sony and Philips portfolio, as well as a

8    whole host of pending patents and foreign patent assets.

9    That's quite different than the scope of the agreement at the

10   hypothetical negotiation, which is a nonexclusive license to

11   these three patents for U.S. rights only.

12         So, again, I believe that that would apply downward

13   pressure to the rates going from the Amazon agreement to the

14   hypothetical negotiation.

15   Q.  The next difference you list here is legal considerations.

16   Can you explain that?

17   A.  Yes.  In the context of the Amazon agreement, any agreement

18   that is not part of a hypothetical negotiation, it's not

19   uncommon for the party that's taking the license to, in effect,

20   challenge whether or not they really need a license.  They

21   might challenge that the patents aren't valid or that the

22   patents aren't infringed by their products.  In fact, that's

23   what Amazon did.  In the negotiations with ADREA, Amazon took

24   that position.

25         Now, Amazon ultimately agreed to pay a significant

EAL8ADR4                      Barnes - direct

1    amount of money to obtain a license, so it kind of offset in

2    some ways, but that's a consideration that does not apply in

3    the hypothetical negotiation.  In the hypothetical negotiation,

4    we have to assume -- it's kind of the rules -- we have to

5    assume that both parties agree that the patents are valid and

6    the patents are infringed.  That's the assumption I make.

7    Obviously, other people are going to argue about that, but

8    that's the assumption I have to make.

9           And so when I am evaluating the difference between the

10   Amazon agreement and the hypothetical negotiation, that causes

11   some upward pressure on the rates that would come from the

12   hypothetical negotiation.

13              (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

Ealradr4                    Barnes - direct

1    Q.  The last difference you identify is a cross-license.  Can

2    you explain that.

3    A.  Yes.  Again, this is not unusual to see in some license

4    agreements in the real world where, in connection with the

5    negotiations for the Amazon license, Amazon actually provided

6    what we call a grant-back or a license of their own patents to

7    Discovery.  Not to ADREA, to Discovery.  That's not a

8    consideration or a factor that would be relevant in the hypo-

9    thetical negotiation.  There is no consideration of a grant-

10   back.  So, all things being equal, that would tend to influence

11   the rates slightly upward in the hypothetical negotiation as

12   compared to the Amazon agreement.

13   Q.  Overall, what is your opinion about the applicability of

14   the Amazon agreement as it relates to the Barnes & Noble

15   hypothetical negotiation license?

16   A.  Again, I believe that it's very informative of the rates

17   and the value proposition that would be considered and analyzed

18   in the context of the hypothetical negotiation, particularly

19   since it is the only actual agreement that we have that

20   included these three patents.

21   Q.  Did you adjust the Barnes & Noble rate in the hypothetical

22   negotiation, the per-unit royalty rate, to reflect the overall

23   upward or downward push on the Amazon rate?

24   A.  No.  I ultimately concluded, as I said earlier, that I

25   believe the balance of these factors, the balance of these

Ealradr4                          Barnes - direct

1    factors informs me or tells me that the hypothetically

2    negotiated rates would be somewhat lower than the Amazon

3    agreement, than the rates in the Amazon agreement.  But to be

4    conservative, I did not make that adjustment, I just held the

5    rates the same.  I feel that is the conservative position.

6    Q.  If we could go back and look at the relevant considerations

7    slide again.  I believe it's DDX-1007.  Do you have that, Mr.

8    Barnes?

9    A.  I do.

10   Q.  We have been talking so far about the first relevant

11   consideration on this list, which is were the patents ever

12   licensed.

13   A.  Yes.

14   Q.  Did you take into account these other four considerations

15   that appear on the slide?

16   A.  Yes, I did.  Those were considerations that I also

17   analyzed.

18   Q.  Do these considerations correspond in one way or another

19   with any of the Georgia-Pacific factors?

20   A.  They do.  Some apply to more than one of the Georgia-

21   Pacific factors, but they certainly all stem from or relate to

22   the Georgia-Pacific factors.

23   Q.  Let's take the second consideration on your list, "Other

24   attempts made to license the patents."  Can you explain that,

25   please.

Ealradr4                    Barnes - direct

1   A.  Yes.  One thing that I investigated was the extent to which

2   there was an effort made by Discovery and Philips and then

3   later ADREA to license these patents to any other parties.  My

4   conclusion on that was that yes, there were.  Both Discovery

5   and Philips prior to the formation of ADREA, and ADREA

6   subsequently, undertook significant efforts to license these

7   patents or at least license their patent portfolios which

8   included these patents.

9        They were not successful in those efforts.  They were

10  unsuccessful in finding any other market participants who were

11  willing to take a license and pay royalties for access to these

12  patents.

13  Q.  How did that affect your analysis of the per-unit royalty

14  rate that you calculated?

15  A.  That's going to have a downward influence on the rates

16  because that is telling you that the market reality is that

17  although ADREA, and Philips and Discovery before them, are out

18  there trying to extend a license to these patents, no one is

19  willing to take one, no one's interested in taking one.

20  Q.  The next factor that we see up here is "Do the patent

21  owners practice the patent?"  Do you see that?

22  A.  Yes.

23  Q.  Can you explain your consideration of that factor.

24  A.  Yes.  This gets into an issue we often refer to as the

25  commercial relationship of the parties.  What I mean by that is

Ealradr4                         Barnes - direct

1    if you're in a situation where the licensor is in direct

2    competition with the company that they are licensing the

3    patents to, they are going to have a disincentive to grant that

4    license because they are essentially going to be allowing a

5    competitor to compete with them using their own technology.

6           Generally, what you see in those situations is the

7    rates are higher.  If I'm competing with you and we sell the

8    same product, if I'm going to give you access to my technology,

9    I'm going to command a premium on that license.  That's quite

10   different than if I have patents but I don't make products.

11          You make products, so I'm going to license to you the

12   right to use my technology in your products.  In that

13   situation, all things being equal, it is going to have a

14   downward influence in the rates because licensing my patents is

15   the only way that I can obtain any return on them.  I can't

16   earn a return on them by making products myself; my only avenue

17   is to license them.

18   Q.  The next factor that is listed on the slide is "What would

19   be the duration of the licenses?"  Did you consider that

20   factor?

21   A.  I did.

22   Q.  How did that factor impact your analysis?

23   A.  Again, we talked about this earlier.  Each of these three

24   patents have different expiration dates.  The '851 patent, as

25   we mentioned, expired in 2012.  The '501 patent expires next

1  year, in 2015.  And the '703 patent going on, I believe, until

2  2026.  So, the hypothetical license, the rights that are going

3  to be provided by the hypothetical license, is going to vary

4  quite a bit patent to patent.

5          As we talked about earlier, that's why I believe it is

6  important to have a royalty rate that is tailored to each of

7  the three patents, to take into account the significant

8  differentiating factor in the duration of the three licenses.

9  Q.  Did your royalty rate calculation do that?

10 A.  Yes, it did.

11 Q.  In what way?

12 A.  As we talked about, I provided a specific rate for each of

13 the three patents.

14 Q.  The last relevant consideration on your slide is

15 "Profitability of the products."  Do you see that?

16 A.  I do.

17 Q.  We are talking about what products now?

18 A.  Now we are talking about the products that would utilize

19 the patents.  These would be the Barnes & Noble accused Nook

20 devices.

21 Q.  Did you conduct any analysis with respect to that?

22 A.  I did.

23 Q.  What did you conclude?

24 A.  First of all, at the time of the hypothetical

25 negotiation --

1              MR. BAUER:  Objection, your Honor.  This is outside

2     the scope, and relevance.

3              THE COURT:  Let me see the reports and the relevant

4     paragraphs.

5              MR. EDERER:  Paragraphs 76 through 78, your Honor.

6              MR. BAUER:  Your Honor --

7              THE COURT:  Hang on a minute.  Yes?

8              MR. EDERER:  Your Honor, I would also mention

9     paragraphs 39 through 41, which go to commercial success.

10             MR. BAUER:  Your Honor, they are talking about the

11    business unit, not the product.

12             THE COURT:  Hang on a second.  Overruled.

13    Q.  Can you go ahead now, Mr. Barnes, and tell us your analysis

14    of the profitability of the products and what you concluded.

15    A.  Sure.  As I mentioned earlier, in 2009, at the hypothetical

16    negotiation, there are no products, they haven't released them

17    yet, so there is no information on the profitability of the

18    products at that time.  However, subsequent to the hypothetical

19    negotiation, we do have information on how Barnes & Noble's

20    Nook business has performed.  It has not been profitable.

21    Since 2010 I believe Barnes & Noble's --

22             MR. BAUER:  Your Honor, I will object and move to

23    strike.  The question was about products.  He is talking about

24    the business unit.

25             THE COURT:  I understand that.  You may cross-examine

1    about that.  But that was the force of your objection, and the

2    issue I whether the profitability of this expect of the Nook

3    business is relevant in assessing the profitability of the

4    product.  The Court finds that that meets the modest threshold

5    of relevance and was within the scope of the report.

6    Overruled.

7    A.  Since 2010 the available data to me indicate that Barnes &

8    Noble's Nook business has suffered operating losses in excess

9    of a billion dollars.

10   Q.  Did you conduct any analysis with respect to the sales of

11   the Nook products themselves?

12   A.  Yes.  The sales themselves of the Nook products

13   individually, although Barnes & Noble does not maintain a

14   separate profitability line on those products, but sales

15   themselves have declined quite significantly since I think

16   2010.

17   Q.  What information did you review in connection with the

18   analysis that you just testified to?

19   A.  The sales data, the unit sales data for Barnes & Noble came

20   from Barnes & Noble sales records.  My analysis of the

21   profitability of the Nook business unit would have come from

22   Barnes & Noble's annual reports, 10-Ks, that they filed with

23   the Securities and Exchange Commission.

24   Q.  If I can show you Defense Exhibit 339 for identification.

25   Can you identify Defense Exhibit 339?

Ealradr4                    Barnes - direct

1    A.  Yes.  This is Barnes & Noble's annual form 10-K.  It's

2    required to be filed with the Securities and Exchange

3    Commission.  This particular one corresponds to the period that

4    ends at the end of April 2013.  That's the fiscal year end date

5    for Barnes & Noble's business.

6    Q.  Is this one of the 10-Ks that you reviewed in connection

7    with your analysis of the profitability issue?

8    A.  This is.

9          MR. EDERER:  Your Honor, I move the admission of

10   Defense Exhibit 339.

11         MR. BAUER:  Objection.

12         THE COURT:  Sustained.  403.

13   Q.  In connection with your analysis of the profitability of

14   the products, Mr. Barnes, what effect did this have on your

15   royalty rate calculation?

16   A.  Again, this is another consideration that I believe would

17   have had a downward influence on the rates, the fact that in

18   2009 the products hadn't been introduced.  But even

19   subsequently declining sales, significant operating losses,

20   those are going to be factors and considerations that are going

21   to push down the rates.

22   Q.  Looking at all the relevant considerations that appear on

23   this chart, how did these all impact your royalty rate

24   calculation in this case?

25   A.  Again, these were all factors that I believe would have a

Ealradr4                    Barnes - direct

1    downward pressure on the rates.  By not making a downward

2    adjustment in the rates that I derived from the Amazon

3    agreement, I believe my calculations have been very

4    conservative.

5    Q.  Let's talk about the damages calculations themselves, or

6    the royalty rate calculations, if you will.  Could you briefly

7    explain how you actually came to those 8-cent, 4-cent, and

8    2-cent numbers before we go through this slide.

9    A.  Sure.  I think I already did that when I explained how I

10   took the unit sales, both historical and projected, and I

11   divided those into the total payments that were made under the

12   Amazon agreement, accounting for the discount factor that I

13   discussed earlier.  Once I did that, I came up with the 8 cents

14   for the Discovery portfolio, which again I attributed 100

15   percent to the '851 and the '501.  When you multiply that 8

16   cents to the unit sales that were made by Barnes & Noble

17   through June 30, 2014, you get a total damages figure of

18   569,306.

19   Q.  That's for the '851 and '501 together, right?

20   A.  That is.

21   Q.  The starting point for this calculation is December 1,

22   2009, is that right?

23   A.  It is.  But remember the '851 is only -- the damages period

24   for the '851 is only that 8½-month period from March 29, 2012,

25   to December 9, 2012.  All other periods in that date range at

Ealradr4                        Barnes - direct

1   the top there, the rate is only 4 cents.  For those other

2   periods, only the '501 would be included in the calculation.

3   Q.  You did a calculation for the '501 only at 4 cents for the

4   period indicated at the header of the slide, correct?

5   A.  That's correct.  For the entire period '501 only at 4

6   cents, it's $478,099.

7   Q.  Then if you take the '501-only number and subtract it from

8   the '851-'501 together number, what does that come out to?

9   A.  The difference is approximately $91,000 for the '851 by

10  itself.

11  Q.  We see also some dates in parentheses next to the words

12  "'851 only."  Can you explain the significance of those dates.

13  A.  Yes.  Those are the same dates that I have been discussing

14  earlier, March 29, 2012, to December 9, 2012.  That's the

15  8½-month period for which damages may apply if the '851 patent

16  is found to be valid and infringed.

17  Q.  Then there is a number at the bottom of that slide for the

18  '703 patent only.  Do you see that?

19  A.  Yes.

20  Q.  Can you explain how you calculated that number.

21  A.  That is for the entire date range at the top.  That is all

22  the units that were sold during that time period multiplied by

23  the 2-cent royalty for the '703 patent.

24  Q.  In your analysis, Mr. Barnes, are these the maximum amounts

25  of damages that would be awardable for these three patents for

1    the period that you calculated them?

2    A.  Yes.  You would not want to add them all together, because

3    there is some overlap between a couple of them, but yes.

4    Q.  Explain that overlap.

5    A.  If we took all three patents, for example, said all three

6    are valid and infringed, then you would take the top line and

7    the bottom line.

8    Q.  The 569 and the 239?

9    A.  Right.  I think that is roughly $808,000.

10   Q.  If you did the same thing with each patent by itself, the

11   478, the 91, and the 239, you would come out with that same

12   $808,000 number?

13   A.  That's correct.

14            MR. EDERER:  No further questions, your Honor.

15            THE COURT:  Cross-examination.

16            MR. BAUER:  Thank you, your Honor.

17   CROSS-EXAMINATION

18   BY MR. BAUER:

19   Q.  Hello, Mr. Barnes.

20   A.  Hello.

21   Q.  You spoke a lot about economics.  You don't have any degree

22   in economics, do you?

23   A.  My degree is in accounting.

24   Q.  Before you were retained here, you had no particular

25   experience in the ereader space, correct?

1277

1    A.  I would not agree with that, no.  I have analyzed other

2    issues in the ereader space.

3    Q.  For Amazon?

4    A.  In a variety of contexts.

5    Q.  For Amazon?

6    A.  I have not ever specifically worked for Amazon, no.

7    Q.  You have never actually negotiated a patent license with

8    another party, have you?

9    A.  I'm not a lawyer.  I don't get involved in --

10            THE COURT:  Just answer the question.

11   A.  I haven't actually done a licensing transaction itself.  I

12   have consulted in that role.

13   Q.  You have been paid how much so far for your work in this

14   case?

15   A.  My firm bills for my work in this case, and I believe total

16   billings that my firm has invoiced to date are in the

17   neighborhood of 175 to $200,000.

18   Q.  This hypothetical negotiation would have taken place in

19   late 2009, right?

20   A.  That's correct.

21   Q.  You said November 2009, right?

22   A.  I think so, yes.

23   Q.  That's when the Nook was first introduced?

24   A.  Right around that time period.  I don't have a precise

25   date.  I think it was late November-December.

Eakradr4                    Barnes - cross

1   Q.  The Amazon Kindle had been on the market for two years by

2   then, correct?

3   A.  The Amazon Kindle had been on the market since 2008.

4          MR. BAUER:  If I can get the ELMO working here,

5   please.

6   Q.  Let's capture some of these events so it will help us keep

7   things in mind.  The hypothetical negotiation would be late

8   2009, which is when the Nook was introduced.  We can say the

9   Nook introduced about here, right?  (Indicating)

10  A.  That would appear to be towards the end of December, but it

11  looks close enough.

12         MR. EDERER:  Your Honor, objection.  This is

13  misleading.  We are at the beginning of 2009.

14  Q.  We both made that mistake.  I have an extra page.  Late

15  2009 would be about here, right?  (Indicating)

16  A.  That looks more accurate.

17  Q.  The Amazon Kindle came on the market in late 2008, correct?

18  A.  I don't recall the specific time period in 2008.  I want to

19  say it might have been --

20  Q.  Late 2007, I'm sorry.  It was about two years earlier?

21  A.  I don't have a specific date in mind.  I know there were

22  sales, significant sales, in 2008.  I don't remember sales

23  being reported in 2007.

24  Q.  The negotiation would have taken place between Philips and

25  Discovery on the one hand and Barnes & Noble on the other?

Eakradr4                         Barnes - cross

1   A.   The hypothetical negotiation, yes.

2   Q.   That's because Philips and Discovery owned the patents at

3   issue here back in late 2009?

4   A.   That is correct.

5   Q.   In your view, whether Philips and Discovery were in the

6   room together or negotiating separately would not have had any

7   impact on the total amount negotiated, correct?

8   A.   I think that the particular layout of the hypothetical

9   conference room that the negotiation is taking place in is not

10  something that went into my analysis.  I believe there would

11  have been two separate licenses coming from the hypothetical

12  negotiation.

13  Q.   But it wouldn't matter whether they were talking to each

14  other or not at the time?

15  A.   I don't think I made an assumption on that one way or the

16  other.

17  Q.   This hypothetical negotiation, it is at the same time as

18  the Nook was introduced, right?

19  A.   Right around the same time period, yes.

20  Q.   Both parties are assumed to know all relevant business

21  facts at that negotiation?

22  A.   They are assumed to have equal access to information, yes.

23  Q.   For that negotiation you considered historic information

24  known to both parties, information that took place before 2009,

25  right?

Eakradr4                        Barnes - cross

1    A.  That would have been information that would have been known

2    to both parties historically, yes.

3    Q.  This is a strange thing, this hypothetical negotiation,

4    which is a creature of law.  It also allows you to consider

5    post-2009 information, right?

6    A.  It is a strange creature of law, I would agree with you on

7    that.  It does.

8    Q.  But that is the law, that we need to look at what took

9    place after as well, we don't disregard facts, correct?

10            MR. EDERER:  Objection.

11            THE COURT:  Sustained.

12   Q.  As you understand your job, you look at facts that took

13   place after 2009 and put them into this hypothetical, correct?

14   A.  That is true.

15   Q.  This is what is called in the field the "book of wisdom"?

16   A.  I've heard that term used to describe it, yes.

17   Q.  In fact, you use that term, don't you?

18   A.  It wouldn't surprise me.

19   Q.  What the book of wisdom tells us is that as an economic

20   analysis, you don't limit yourselves or put blinders on and you

21   look to see what actually took place in the future, right?

22   A.  I think that's fair.

23   Q.  Let's see what the parties to this negotiation would have

24   known.  They would have known Amazon had been on the market for

25   two years already with its Kindle, right?

Eakradr4                          Barnes - cross

1    A.   They would have known that, yes.

2    Q.   The Kindle, you don't know if it was in late 2007, but it

3    is somewhere around 2008 that the Kindle comes up, beginning of

4    2008, right?  You know that?

5    A.   My recollection is the early part of 2008.  I apologize, I

6    don't have a specific date.

7    Q.   I'm not putting the exact date.  We are just trying to get

8    the order correct here.  The parties would have known that

9    Amazon was taking physical book sales away from Barnes & Noble

10   bookstores over those two years?

11   A.   The parties would be aware of the ongoing competition

12   between Amazon and Barnes & Noble in I believe both physical

13   books and electronic books.

14   Q.   Barnes & Noble would have known that people were moving

15   into reading digital books and that Barnes & Noble needed, as a

16   book seller, to offer an option to their customers, right?

17              MR. EDERER:  Objection.

18              THE COURT:  Ground?

19              MR. EDERER:  Compound.

20              THE COURT:  It is, but I think it is a simple enough

21   question.  Overruled.  Counsel, do keep in mind we are going to

22   take our lunch break in about three minutes.

23              MR. BAUER:  Any time that works for the Court, your

24   Honor.

25              THE COURT:  The time that works for the Court is 1

Eakradr4                    Barnes - cross

1    o'clock, three minutes.

2    A.  I apologize.  Would you repeat the question.

3    Q.  At the time of the negotiation, the hypothetical

4    negotiation, Barnes & Noble would have known that its customers

5    were moving into reading digital books, correct?

6    A.  I think the general environment in the market at that time

7    would have been a consideration that would have been known by

8    the parties, yes.

9    Q.  And the parties would have known that Barnes & Noble

10   needed, as a book seller, to offer an option to their customers

11   so they could retain them as they moved to digital books?

12   A.  That sounds reasonable.  I'm not sure what you are

13   referencing, but that doesn't sound unreasonable to me.

14   Q.  Barnes & Noble would have already invested many tens of

15   millions of dollars in the development of the product by the

16   time the Nook had been introduced?

17   A.  I don't have that information at my fingertips.  I don't

18   know one way or the other.

19   Q.  You talked about the profitability of the business unit.

20   You didn't look to see how profitable it was or how much they

21   had spent to get the product on the market?

22   A.  I don't recall at this point reviewing that information.

23   It may have been something that was included that I considered.

24   I don't recall right now.

25   Q.  You must know that they spent tens of millions of dollars.

Eakradr4                    Barnes - cross

1  Not the exact amount, but to get this product on the market you

2  don't think they spent tens of millions of dollars?

3  A.  I just don't have that information handy.  If you want to

4  show me something, I'd be happy to look at it.  I just don't

5  recall right now.

6  Q.  You testified about how much money they lost.  I'm trying

7  to understand what your basis is.  Barnes & Noble enters this

8  discussion in 2009 knowing that if they don't get a license,

9  they cannot use that technology, right?

10  A.  They enter the negotiation knowing that they want to take a

11  license to these three patents.  I'm not sure what you are

12  referring to when you say "that technology."

13  Q.  They enter into the negotiation on the assumption that they

14  are infringing the three patents in this case, right?

15  A.  That they would infringe with the sales of the accused Nook

16  products, that's correct.

17  Q.  You need to assume that the patents are valid going into

18  that meeting, right?

19  A.  That is correct, I make an assumption of validity.

20  Q.  Going into that meeting, these Barnes & Noble people would

21  know that if they couldn't get a license, they can't use the

22  technology, because it is infringing valid patents, right?

23  A.  The assumption is valid, infringed patents, and that both

24  parties are willing and desire to enter into an agreement.

25  Q.  And if they don't enter into that agreement, they can't use

Eakradr4                    Barnes - cross

1   the technology?

2   A.  I don't think in the hypothetical negotiation that is an

3   option.

4   Q.  They have to take a license?

5   A.  Both parties want a license in the hypothetical.

6   Q.  All right.  What we do know --

7           THE COURT:  Let me ask you this.  Is it not relevant

8   for your analysis how badly someone wants a license?

9           THE WITNESS:  I could see where that could be a

10  relevant consideration.  Depending on how significant a

11  particular feature or component of the accused product might

12  be, there might be a degree of magnitude there.  That wouldn't

13  be something that would -- that would be something that would

14  be worth considering.

15  Q.  You did no analysis in this case as to the value of any of

16  the features, the patented features, correct?

17  A.  I don't agree that that is true.  I'm not a technical

18  person, but I did review certain information on certainly the

19  Lend Me feature, for example, which is accused of infringing

20  the '501 patent, and the shop app, which is accused of

21  infringing the '703 patent.

22  Q.  We will get to that after lunch.

23          THE COURT:  Actually, you hit the nail on the head.

24  We are going to take our lunch break now and we will resume at

25  2 o'clock.

Eakradr4                        Barnes - cross

1           MR. BAUER:  Thank you, your Honor.

2           (Jury not present)

3           THE COURT:  Mr. Barnes, you can step down.  During

4    your cross you should not discuss the case with anyone.

5           THE WITNESS:  Yes, your Honor.

6           (Witness not present)

7           THE COURT:  With respect to the charge, let me ask

8    plaintiffs first, are you going to be calling Mr. Wang or not?

9           MR. CABRAL:  We do plan on calling Mr. Wang, your

10   Honor.

11          THE COURT:  Really?  Why?

12          MR. CABRAL:  Just for a brief rebuttal to some of the

13   validity opinions.

14          THE COURT:  Brief rebuttal to?

15          MR. CABRAL:  To some of the validity opinions that

16   were rendered by Dr. Neuman.

17          THE COURT:  The only typo I found was on page 14.

18   I'll fix it.  It was "some meaning."  It should have been "same

19   meaning."

20          With respect to the one and only issue that I am going

21   to hear argument on, the one and only issue I'm going to hear

22   argument on, which is the last paragraph of instruction number

23   12 on compensatory damages and the related issue of marking,

24   I'll start with the marking part.  I still have not heard any

25   evidence on the issue of marking.  Unless someone from the

1    defense can tell me there is such evidence, we are not going to

2    say one word in these instructions about marking.

3              MR. EDERER:  Your Honor, are you asking me?

4              THE COURT:  You're the defense last time I checked.

5              MR. EDERER:  I'm sorry.  I didn't hear you.  The issue

6    here, your Honor, is with respect to the issuance of the

7    license, such as the Amazon license in this case.  There was

8    also a license issued to Sony.  The issue is did the plaintiff

9    demonstrate that there was marking and/or that if there was no

10   need to mark because the product did not practice the patent.

11             The case law is clear that at this point in time if

12   there is a license, such as the Amazon license, the burden goes

13   to the plaintiff to demonstrate either that the product was

14   marked or, if it wasn't marked, that the products did not

15   practice the patent.  That was the premise of the summary

16   judgment motion in this case.  That is the reason why your

17   Honor ruled in favor of Barnes & Noble with respect to the '851

18   patent.  You found that --

19             THE COURT:  Excuse me.  If you're right about that,

20   then there is still no instruction on the issue of marking.  My

21   question to you was, was there any evidence of marking?  With

22   respect to marking, any evidence about that issue at all?  The

23   answer is there was none.

24             If you're right about the burden, then the instruction

25   in the present way it reads follows.  If you're wrong about the

Eakradr4                    Barnes - cross

1    burden, then we have to put a different date on.  But neither

2    way do we have to have any of this gobbledygook about marking.

3            MR. EDERER:  Understood, your Honor.

4            THE COURT:  Let me hear now from plaintiffs.  What I

5    understand defendant to be arguing is that because Amazon,

6    after the settlement, had a license to utilize these patents

7    and the marking section, what is it again --

8            MR. CABRAL:  287, your Honor.

9            THE COURT:  Thank you.  -- kicked in so that your

10   damages, if there was no marking, would be from the time of

11   actual notice, which was March 29, 2012.  If they are wrong

12   about that kicking in, then it is from the date of

13   infringement, which is December 1, 2009 or two-thousand --

14           MR. CABRAL:  2009, your Honor.

15           THE COURT:  2009, yes.  The only question now, we are

16   down to one little issue, which is on the very last line of

17   this:  Should the date be March 29, 2012 or December 1, 2009?

18   What is your argument as to why the statute did not kick in?

19           MR. CABRAL:  Your Honor, what we are talking about

20   here is a short window between November 2011, which is the

21   execution of the Amazon license, and March 2012, which is the

22   date of actual notice.  You're talking about a four-month

23   window here.

24           The litigation that Mr. Ederer referenced, that

25   related to the '851 patent.  Your Honor decided that issue on

Eakradr4                    Barnes - cross

1   summary judgment because the Amazon Kindle products were

2   accused of infringing the '851 patent.  So we couldn't very

3   well argue that they were not patented articles in the sense as

4   that term is used in section 287.

5          The lending patent, the '501 patent, is not accused in

6   that case.  The Kindle products were never accused of

7   infringing the '501 patent.  Our point of view, your Honor, and

8   we cited some case law to this effect, is that there is no

9   doubt that the plaintiff, the patent holder, has the ultimate

10  burden of proving compliance with 287.  But the defendant also

11  bears some burden of identifying products that would be covered

12  under the patents that would trigger the implication of 287.

13         THE COURT:  OK, I understand that argument.  Let me

14  hear from defense.

15         MR. EDERER:  Your Honor, I think it becomes a burden

16  issue once again.  At this point when there is a license, the

17  burden is upon the plaintiff.

18         THE COURT:  They are saying the license doesn't relate

19  to these two other patents.

20         MR. EDERER:  It certainly does.  The license encom-

21  passes these two other patents.  The license encompasses the

22  entire portfolio of patents, which includes these other

23  patents.  And there has been testimony in this case --

24         THE COURT:  If I understand what plaintiff is saying,

25  the litigation against Amazon only accused them of violating --

Eakradr4                         Barnes - cross

1            MR. EDERER:  The '851.

2            THE COURT:  Yes, thank you.

3            MR. CABRAL:  Yes, your Honor, the '851 and an

4    unrelated patent as well.

5            THE COURT:  They say that although as part of a

6    settlement they got this agreement, a reasonable person in

7    their position would not have believed that the '501 or '703

8    patents had been the subject of any accusation of infringement

9    and therefore the marking section doesn't kick in, if I

10   understand it.  That is the argument, I think.

11           MR. EDERER:  Right.  That is not dispositive, your

12   Honor.  In fact, you denied summary judgment with respect to

13   those other two patents because of the question whether Amazon

14   and/or Sony, but let's focus on Amazon, was actually practicing

15   those two patents and therefore needed those licenses

16   notwithstanding the question of whether those licenses --

17           THE COURT:  I understand the issue.  I will decide it

18   and let you know at 2 o'clock.  Yes, you wanted to say

19   something?

20           MR. CABRAL:  Yes, your Honor.  The only thing I would

21   add is that the issue here is illustrated by the fact that had

22   defendants identified any particular products that were covered

23   by these patent during Discovery, which they did not do, we

24   then could have come forward and shown why the patents or at

25   least established why the patents didn't apply to those

Eakradr4                        Barnes - cross

1   products.  The best example I can give your Honor --

2              THE COURT:  We are cutting into your lunchtime as well

3   as mine.  I understand what you are saying.

4              MR. CABRAL:  Thank you, your Honor.

5              THE COURT:  How much longer do you have on cross?

6              MR. BAUER:  Not more than an hour, your Honor.

7              THE COURT:  How long are those two videotapes?

8              MR. EDERER:  38 minutes, I believe, total.

9              THE COURT:  Together?

10             MS. ARNI:  Yes.

11             THE COURT:  Mr. Wang?

12             MR. BAUER:  Not more than 45 minutes, your Honor.  I

13   would venture 30, but . . .

14             THE COURT:  On the one hand, I'm thinking of letting

15   the jury stay to 5:00.  On the other hand, I'm not going to ask

16   them to stay beyond 5:00.  I don't like the situation, but you

17   may collectively create the situation where we have someone's

18   summation interrupted overnight and continue it next morning.

19             I don't blame counsel for the hour delay this morning.

20   That was totally my fault.  I was concerned by the I thought

21   more than expected length of the redirect and recross, and so

22   forth, of Mr. Neuman, but there it is.  I don't say any of it

23   was improper, it wasn't.  Let's see how it goes this afternoon.

24   We'll see you at 2 o'clock.

25             (Luncheon recess)

EAL8ADR5

                              AFTERNOON SESSION

                                 2:00 p.m.

 3          (Jury not present)

 4          THE COURT:  So I adhere to the instructions in the

 5     fashion that I gave it to you, essentially adopting defendants'

 6     view of the issue.  So I will ask my law clerk to hand each

 7     side the final instructions.

 8          Let's bring in the jury.

 9          MR. EDERER:  May I raise one issue in light of your

10     ruling?

11          THE COURT:  Yes.  You feel mortified that I ruled in

12     your favor and you want to seek reargument?

13          MR. EDERER:  No objection.

14          We were awaiting the results of the ruling.  We did do

15     a calculation from the date March 29 forward for all three

16     patents, which we didn't present because we were awaiting the

17     results of your ruling.  So we would like to be able to conduct

18     redirect with Barnes to ask him to provide that calculation.

19          THE COURT:  All right.  Let me hear from plaintiff.

20          MR. BAUER:  My cross is based on the numbers that he

21     has just done.  What we would ask, because this is an issue of

22     law, is that we just let the jury do it with the numbers they

23     have, and you can correct it in posttrial briefing.

24          THE COURT:  I think it would be aiding the jury to

25     have this calculation.  Here is what I think does make sense.

1   Assuming we are going to do all the things you folks told me

2   about, I do not think it would be fair to plaintiff having to

3   give a summation today, or even part of a summation today.  I

4   don't think that is fair.  So we will have summations first

5   thing tomorrow followed by the charge, and as a result of that,

6   if you want to take a little bit more time or have a more

7   lengthy recross after that comes out, I will certainly permit

8   that.  I am still going to hold the videotape to 38 minutes,

9   but I think it would be not fair to, as I thought about it, the

10  way it was probably going to work out, given everyone's timing,

11  that plaintiff would sum up today and defendant would sum up

12  tomorrow.  I don't think that's really fair to the plaintiff,

13  unless you want to do that.  I can exclude that possibility if

14  you want it, but it seems to me it wouldn't be equal treatment.

15          MR. BAUER:  We were just going to ask your Honor what

16  time we needed to finish.  We didn't want to split the closing

17  either, and I was going to ask your Honor what time I needed to

18  be finished if you wanted to get the closing in today.  But I

19  am just not sure, if it's a 5:00 hard break --

20          THE COURT:  I think where we are winding up, and I

21  will apologize to the jury because it is totally my fault, is

22  we will finish the evidence today.  We will hear any motions

23  anyone wants to make outside the presence of the jury.  We will

24  have summations at 9:00 tomorrow morning, followed immediately

25  by the charge.  They still will have the case by late morning

EAL8ADR5

1    tomorrow.

2              OK.  Let's bring in the jury.

3              Before defense counsel starts your redirect, I will

4    explain to the jury that there is one portion of this that had

5    to await a ruling by the Court so that both sides will know

6    what is coming in.

7              (Jury present)

8    NED BARNES, resumed.

9              THE COURT:  Counsel.

10             MR. BAUER:  Thank you, your Honor.

11   BY MR. BAUER:

12   Q.  All right, Mr. Barnes.  We were talking about what the

13   parties would know under this book of wisdom.

14             So they are doing the negotiation in late 2009.  But

15   as you said, we are not limited to the information they would

16   have had in 2009, correct?

17   A.  That is correct.  We don't put blinders on it in a

18   hypothetical negotiation.

19   Q.  So in this respect, the parties would know that Amazon

20   entered into an agreement with ADREA on November 10, 2011,

21   right?

22   A.  I think that the information concerning the agreement would

23   certainly have been a relevant consideration.

24   Q.  Let's just put that on here, November 10, 2011.  That's the

25   Amazon/ADREA agreement, and it's 11/10/11, right?

EAL8ADR5

1    A.   That looks close to right, yes.

2    Q.   You agree that the Amazon agreement is the only comparable

3    royalty bearing agreement that included a license to the

4    patents?

5    A.   Yes.

6    Q.   You agree that the Amazon agreement is the most reliable

7    evidence of the value of a license under the patents in this

8    case, right?

9    A.   I think properly considered, yes, it provides relevant

10   information.

11   Q.   In fact, I think you testified on direct it's the best

12   information of a fair market value out there, right?

13   A.   As a starting point to a complete analysis, I believe it is

14   informative as to the fair market value of a license that would

15   result from a hypothetical negotiation.

16   Q.   That Amazon agreement was a lump sum agreement, right?

17   A.   The form of the payment in that agreement was lump sum,

18   yes.

19   Q.   $12.5 million, right?

20   A.   It was 10 million for the Discovery portfolio and the

21   option, which was subsequently exercised, two-and-a-half

22   million for the Philips and Sony portfolios.

23   Q.   So Amazon paid 12.5 million for access to the Sony, Philips

24   and Discovery patents, right?

25   A.   Ultimately that's what they paid for access to the entire

1    portfolios, yes.

2    Q.  And lump sum agreements are fairly typical, particularly as

3    a way to settle litigation?

4    A.  They are certainly not unheard of.  I don't know what you

5    mean by fairly typical.

6    Q.  As a way to settle litigation, you know, you do this for a

7    living, most litigations settle with a lump sum payment, don't

8    they, that you have seen?

9    A.  I don't know that I would agree with that.  It's a

10   case-by-case analysis.  You would need to -- I couldn't make a

11   generalization about that.

12   Q.  I am not asking about the whole industry.  Of the cases you

13   have seen, where you have analyzed settlement agreements, lump

14   sums are fairly typical, right?

15   A.  I said it's not uncommon, but I have seen agreements that

16   included a per unit.

17   Q.  You have seen the Barnes & Noble agreements, the ones that

18   they have produced in this case, right?

19   A.  I have reviewed some Barnes & Noble agreements, yes.

20   Q.  All the cases that they have settled relating to patents

21   were lump sum payments, correct?

22   A.  I recall some lump sum agreements.  I don't recall every

23   one of them, but I do recall some lump sum agreements.

24   Q.  And a lump sum agreement, just so we have the right

25   definition, is one in which the royalty is a single payment

EAL8ADR5

1    that would cover essentially unlimited use of technology

2    irrespective of volume, correct?

3    A.   It would not be limited to a specific volume.  It would

4    account for -- any number of volume would be licensed under a

5    lump sum arrangement.

6    Q.   I will ask again.  It's a single payment that would cover

7    essentially unlimited use of technology irrespective of the

8    volume of sales, correct?

9    A.   I don't think I disagree with that.

10   Q.   Now, there are advantages to the parties to enter into a

11   lump sum payment, correct?

12   A.   There are strategic differences that can be advantageous,

13   disadvantageous.  It would depend on specific facts.

14   Q.   Typically the person taking the license, who takes a lump

15   sum, typically prefers it because it caps its liability in case

16   the product becomes more successful than anticipated, is that

17   correct?

18   A.   That's one potential advantage from a licensee standpoint.

19   Q.   One potential advantage from the licensor's standpoint is a

20   lump sum agreement gives them cash up front without risk of the

21   marketplace tanking, correct?

22   A.   That is one advantage from the perspective of a licensor,

23   yes.

24   Q.   Now, going back to the Amazon/ADREA agreement, that was a

25   $12.5 million lump sum agreement, right?

EAL8ADR5

1    A.   Again, just to clarify, it was a $10 million payment for

2    the Discovery portfolio and two and a half for the option for

3    Philips and Sony.

4    Q.   You agreed earlier they paid $12.5 million for the licenses

5    they got, right?

6    A.   Ultimately they did pay the full amount, they paid the full

7    12-1/2 million, but it was two separate payments.

8    Q.   You have that $12.5 million payment to ADREA.  You tried to

9    convert that to a per unit royalty for your work in this case,

10   right?

11   A.   That is part of what I did, yes.

12   Q.   To do that, to convert it, you needed to figure out the

13   number of units to divide into that $12.5 million, right?

14   A.   I had to figure out a number of units that I believe would

15   have been considered, potentially considered by the parties at

16   the time they entered into the agreement, yes.

17   Q.   Now, in fact, between ADREA and Amazon, nobody exchanged

18   any such unit calculations, right?

19   A.   I don't know that to be the case.

20   Q.   You haven't seen any evidence that either of them shared

21   their expectations with the others about the future of the

22   product?

23   A.   I don't know that I could agree with that, no.

24   Q.   You haven't seen any evidence that there was a negotiation

25   between them on a per unit royalty basis?

EAL8ADR5

1    A.   Yes, I believe I have.

2    Q.   What evidence did you see that they were negotiating a per

3    unit royalty?

4    A.   Well, a royalty on a per unit basis associated with a

5    percentage of revenue.

6    Q.   A percentage not per unit, right?

7    A.   But it's per unit -- dollars per unit and percentage of

8    revenue are both, in my vocabulary those would both be per

9    unit.

10   Q.   In this regard, from your calculations here, you were given

11   actual sales data for Amazon for 2008, 2009 and 2010, right?

12   A.   That is correct.  And part-year estimates for 2011.

13   Q.   Well, let's look at the data that you had to try to

14   calculate the number of units to divide into that 12.5 million.

15        We can go to your source, but this was your document

16   DDX 1008?

17   A.   This is a slide that was prepared, yes.

18   Q.   And under licensed units, that's the number of actual

19   Amazon sales for those three years, 2008, 9 and 10?

20   A.   Those two years are there, plus 2011, yes.

21   Q.   I said 2008, 2009, 2010, that's three years.

22   A.   I am just referring to the exhibit.  But yes, the three

23   years you referred to are on this exhibit, yes.

24   Q.   Let's just see what the Amazon sales were.

25        For 2008, let's just do actual Amazon.  For 2008,

EAL8ADR5

1   actual sales are 366K, right?

2   A.   That's right.

3   Q.   For 2009, actual sales are 1.82 million, right?

4   A.   That is correct.

5   Q.   For 2010, actual sales are 5.3 million, right?

6   A.   That's correct.

7   Q.   And those are actual numbers?

8   A.   Those were actual numbers.

9   Q.   Right now I am just focusing on the actuals before we get

10  into your projections and how you tried to figure things in the

11  future.  Let's just get accurate actuals.

12          You also had actual Barnes & Noble sales from 2009 to

13  date, right?

14  A.   I did have access to Barnes & Noble actual sales.

15  Q.   Let's just look at Barnes & Noble's actual sales

16  between -- the product was introduced in late 2009.  There is

17  just a residual number in 2009, a very small number of sales in

18  2009?

19  A.   I don't recall what that number is.  We would have to get

20  it out.

21  Q.   Let's pull up from your expert report Exhibit 4A.  It's the

22  top half of that.

23          MR. BAUER:  Take it down for a minute.  Your Honor,

24  this hasn't been admitted in evidence.

25  Q.   Sir, you submitted an expert report in this case?

EAL8ADR5

1              MR. BAUER:  Do we have the book to give him with his

2     expert report?

3              THE COURT:  Allow me to hand you your expert report.

4              THE WITNESS:  Thank you, your Honor.

5     Q.  That is your expert report, right?

6              THE COURT:  You just want to get those figures from

7     that one thing?

8              MR. BAUER:  That's right.

9              THE COURT:  Unless there is any objection from

10    defendants, why don't we just have him read off those relevant

11    figures.

12             MR. EDERER:  That's fine, your Honor, although I do

13    object to any attempt to admit or read from the expert report.

14             THE COURT:  That's why I am doing it this way.

15             MR. EDERER:  There is also an exhibit in the record

16    that has those figures.

17             THE COURT:  That's another reason why you have no

18    objection.

19             MR. EDERER:  Correct.

20             MR. BAUER:  So Exhibit 4A, can we just blow up the top

21    half?

22    BY MR. BAUER:

23    Q.  This is a chart that you generated based on actual Barnes &

24    Noble sales, right?

25    A.  That's part of what is reflected here, yes, sir.

1          MR. BAUER:  Mr. Berk, if you can just blow up just the

2    2010 numbers, all the way down through 2010.

3    Q.  So that just shows us there were some sales in December

4    2009 and then we get into 2010, right?

5    A.  That's correct.

6    Q.  I have done the calculation.  Tell me if this is right or

7    you want to verify it.  But does it sound right that the 2010

8    actual Barnes & Noble numbers are 2,098,713?

9    A.  I can take your representation.  It will take me a little

10   while to do that.

11   Q.  Is it in the right ballpark?  I am happy to add it up.  You

12   have looked at annual sales.  You have got the numbers.

13         THE COURT:  Come on.  This is not the way to proceed.

14         So looking at it quickly, it appears to be

15   approximately 2 million.  Is that the figure you want to use?

16         MR. BAUER:  That's correct, your Honor.

17         THE COURT:  Does that appear to you to be about 2

18   million?

19         THE WITNESS:  It looks like that would be a rough

20   approximation.

21         MR. BAUER:  Thank you.

22   Q.  This is 2010.  This is the 2010 actual.  I will give it a

23   little line to show it's an estimate.  OK?

24   A.  OK.

25   Q.  You understand that line means estimate, right?

EAL8ADR5

1   A.  Approximate, yes.

2   Q.  And this is actual Barnes & Noble.

3         Then I just want to get the actual Barnes & Noble

4   numbers through the time of the Amazon agreement.

5         To the time of the Amazon agreement, are the actual

6   numbers approximately 4 million units?

7   A.  What period of time are you asking me to look at?  That

8   doesn't look like 4 million to me.

9   Q.  Let me leave it at 2010.

10        In 2010, in the first year Barnes & Noble was on the

11  marketplace, they had about 40 percent, they gained about 40

12  percent -- not gained -- they grew to be about 40 percent the

13  size of Barnes & Noble, right?

14        MR. EDERER:  Objection.  Foundation.

15  A.  I'm sorry.  You said grew to 40 percent of Barnes & Noble.

16  That didn't make sense.

17  Q.  Let me ask the question again.

18        We have actual Amazon sales 5.3 million, right?

19  A.  Yes.

20  Q.  In 2010, actual Barnes & Noble sales are about 2 million,

21  right?

22  A.  Correct.

23  Q.  In the year 2010, Barnes & Noble was about 40 percent the

24  size of Amazon?

25  A.  2 million is a little bit less than 40 percent of 5.3, yes.

EAL8ADR5

1    Q.  So about 40 percent?

2    A.  A little bit less, but yes.

3    Q.  And that percentage continued up until the day of the

4    Amazon agreement, right?  Do you know that?

5    A.  What percentage?

6    Q.  For 2011, up until November 2011, so January 2011 to

7    November 2011, Barnes & Noble continued to be about 40 percent

8    of the size of Amazon?

9    A.  I don't believe that's accurate, no.

10   Q.  Let me show you, please, DTX 787.

11          Do you have a book of exhibits in front of you?

12          We haven't given you the exhibits yet.

13          MR. BAUER:  Your Honor, I have a book for you.

14   Q.  Do you have DTX 787?

15          MR. EDERER:  Objection, your Honor.  Hearsay.

16   Foundation.

17          THE COURT:  I don't hear him offering it yet.

18   A.  I see that exhibit.

19   Q.  DTX 787 is a document you cited in your report, correct?

20   A.  As I sit here right now, I don't have a specific

21   recollection, but it's possible.

22   Q.  Do you want to take a look at your footnote 164 of your

23   report?

24   A.  This appears to be a document that I considered in

25   connection with my report.

1  Q.  Not just considered, cited for the accuracy of the numbers.

2  You relied on the numbers in this document, correct?

3  A.  I don't recall what I relied on it for.  I would have to

4  look at it again.

5  Q.  Look at paragraph 58 of your report.

6       In your report you stated, "Amazon was an established

7  leader in the e-reader market with a reported market share of

8  more than 50 percent," right?

9  A.  Right.  I cite to a different document and then I also cite

10  to this document.

11  Q.  That's right.

12       MR. BAUER:  Your Honor, I offer Defendants' Exhibit

13  787.  It comes off their list.  I think they waive any

14  objection to it.

15       MR. EDERER:  Objection, your Honor.  Hearsay.

16       THE COURT:  Let me see your report.

17       What was the page again?

18       MR. BAUER:  Page 34, your Honor, paragraph 158.

19       We can get you your own copy of the report.  Right in

20  the middle of the report there is 164 as a footnote.

21       THE COURT:  I see it.

22       MR. BAUER:  I have an extra copy.  I can give it to

23  the witness.

24       THE COURT:  Yes, please.

25       Sustained.

EAL8ADR5

BY MR. BAUER:

Q.  Sir, you relied on this document in forming your opinions, right?

A.  As we just discussed, I cited this document in connection with a particular statement in my report.

Q.  And the statement you cited it for was that the Kindle's market share was 51.7 percent, right?

A.  I think --

         THE COURT:  The actual statement in his report, give me that page again.

         MR. BAUER:  I was reading the sentence from the document that he used to generate it.

         THE COURT:  I'm sorry.

         Go ahead then.

         MR. EDERER:  Objection.  Hearsay.

         THE COURT:  Give me again the page of the report.

         MR. BAUER:  Page 34.

         THE COURT:  The relevant sentence of the report, which itself is hearsay but hearsay that's been waived, reads:  "The market conditions surrounding the Amazon agreement were significantly different than comparative market information that was available at the time of the hypothetical negotiation. For example, at the time of the Amazon agreement, Amazon's Kindle e-readers had been on the market for over four years and Amazon was an established leader in the e-reader market with a

EAL8ADR5

1    reported market share of more than 50 percent."  And the

2    footnote then cites to several sources, articles.

3            So the objection is sustained.

4    BY MR. BAUER:

5    Q.  The document you relied on was a Web site?

6    A.  Are you talking about this document?  It's an article.

7    Q.  It was an article that you found on the Web?

8    A.  It's very likely that it was found on the Internet.

9    Q.  I don't need to deal with what the articles are.  We are

10   lucky.  We have the exact sales figures.  Let's get the exact

11   sales figures for the first three quarters of 2011 for Barnes &

12   Noble.  I thought that would be the easier way to do it, but we

13   will just get it quickly.

14           Going to your Barnes Exhibit 4A, and right in the

15   middle, from January 2011, let's take it through September

16   2011.  Those are the first three quarters, right?

17   A.  OK.

18   Q.  Just ballpark for me what you think those sales are for the

19   first three quarters, actual sales for Barnes & Noble.

20           MR. EDERER:  Objection, your Honor.

21           May we approach?

22           THE COURT:  You may approach, but I don't see anything

23   objectionable in the question just put.  If there is some other

24   issue you can approach.

25           MR. EDERER:  There is some other issue.

EAL8ADR5

 1          THE COURT:  Come up.

 2          (At the sidebar)

 3          THE COURT:  Before we get to your issue, just to

 4   elaborate on the last ruling.  The mere fact that the defense

 5   lists an exhibit doesn't mean that they waive all objections to

 6   it if used for some other purpose or offer it for some other

 7   purpose after they haven't offered it by the defense.

 8          In the case of this particular article, the expert was

 9   citing it for the fact that Amazon had been reported -- and the

10   newspaper article itself indicates it wasn't reported like in

11   an SEC filing or anything like that, it was reported from

12   another hearsay nongovernmental source -- to have more than 50

13   percent of the market.  That doesn't remotely open the door to

14   plaintiffs relying on that article to show that what the

15   article -- again, in total double hearsay form -- reports about

16   Nook sales for that same period is something that this expert

17   is vouching for, let alone that it's admissible in evidence.

18   So that was the reason I sustained the objection.

19          Now, what is the new problem?

20          MR. EDERER:  I would like to take this one step

21   further, your Honor.  Because what is going on here now is that

22   Mr. Bauer is attempting to create for the jury in a prejudicial

23   way the false inference that they should take the $12.5 million

24   that was paid by Amazon, which related to a 300 patent

25   portfolio, and they should simply take the difference between

EAL8ADR5

1   whatever the percentage of the market Amazon had and whatever

2   percentage of the market Barnes & Noble had, do a quick math

3   calculation, and $6 million.  This is going back to what

4   Professor Magee was exactly doing and why he was excluded.

5   This is where this is all leading.

6           THE COURT:  I don't think so.  At least he hasn't done

7   that yet.  I think he is, at a minimum, attempting to show that

8   some of the assumptions that underlay the witness's treatment

9   of the Amazon settlement were arguably misplaced.  So, for

10   example, he showed right before the lunch break that Barnes &

11   Noble would have had very different motivations or a greater

12   degree of motivation than Amazon would to have entered into

13   that agreement.  That was maybe right, maybe wrong, but that

14   was a fair argument to bring to the jury's attention.  And now

15   I think he is on the way to bring to their attention another

16   possibility.

17           So I am going to allow this.  This is without

18   prejudice to any objections you want to make about his

19   summation, if he is going to say what you think he is going to

20   say, but I don't know that yet.

21           MR. BAUER:  Your Honor, the witness has said that the

22   Amazon agreement is the single best market value.  I am going

23   to ask him that if Barnes & Noble had 40 percent of the market

24   on that day, why wouldn't he have valued the agreement at $5

25   million?

EAL8ADR5

1            THE COURT:  I think that is a fair argument as

2    impeaching his methodology.  That doesn't mean that you should

3    be able to argue to the jury on summation that that's what it

4    should be.  Those are two different issues.

5            MR. BAUER:  OK.  Thank you.

6            (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EAL8ADR5

```
 1              (In open court)
 2    BY MR. BAUER:
 3    Q.  Mr. Barnes, I have a calculator.  I can put it on the elmo
 4    and we can add them up.  I am just trying to get ballpark
 5    numbers.  Can you give me your best estimate eyeballing what
 6    the Barnes & Noble actual sales were through the third quarter
 7    of 2011?
 8    A.  Just ballparking, it looks like it's maybe slightly under 2
 9    million on sales.
10    Q.  That's through Q3?
11    A.  That's through, according to this table, January through
12    September of 2011.
13    Q.  2 million.  All right.  About 2 million.
14              And of course after Q3, Christmas, that's when most
15    sales -- can we go back to that?
16              I just want to look at those sales just so we can see
17    what happens at Christmas.  Sales really spike in November and
18    December.  And that's typical in the industry in everything you
19    have seen, right?
20    A.  That is correct.
21    Q.  The sales, on the average, they look 100, 200,000 a month.
22    Then all of a sudden November people start buying Christmas
23    presents?
24    A.  The fourth quarter in this market is typically by far and
25    away where the bulk of the sales are made.
```

EAL8ADR5

1    Q.  In fact, it's Thanksgiving, it's Black Friday, right, it's

2    the second half of November?

3    A.  I don't have it nailed down to that point, but you might be

4    right.

5    Q.  So through the third quarter gets us right on the eve of

6    the Amazon/ADREA settlement agreement, right?

7    A.  At the end of September we are, I guess, a month and a half

8    before the settlement agreement between ADREA and Amazon.

9    Q.  You had actual Amazon numbers -- Amazon now, go back to my

10   chart -- actual Amazon numbers for the first three quarters,

11   right?

12   A.  I had them for the whole year.

13   Q.  Actual Amazon numbers for the whole year of 2011?  You

14   didn't use those, did you?

15              THE COURT:  There are two questions.

16              MR. BAUER:  Sorry.

17   A.  From Amazon's own records I had part-year estimates for the

18   year.  And then I had from a third party market research

19   company, I had estimates for the full year.

20   Q.  So estimates.  You had estimates from Amazon for 2011, not

21   actual numbers?

22              MR. EDERER:  Objection.  It mischaracterizes the

23   testimony.

24   A.  They are estimated actuals.

25   Q.  Sir, the document you're referring to is a document from

EAL8ADR5

1    January 2011 that was predicting the 2011 sales?

2    A.  I'm not familiar with what document you're talking about.

3    Q.  What document are you talking about?

4    A.  I was talking about two different documents.

5    Q.  Right.

6            THE COURT:  We really need to move this along.

7            The first document you were referring to, what was

8    that?

9            THE WITNESS:  There were actual Amazon records that

10   had estimated sales for 2011 that ranged between 18 million and

11   24 million units.

12           THE COURT:  These were actual sales or just actual

13   Amazon records that estimated sales.

14           THE WITNESS:  It was part-year data that estimated for

15   the full year.  It was what they called their operating plan.

16           THE COURT:  Did it show actual sales for the first

17   part of the year?

18           THE WITNESS:  It may have, your Honor.  I don't recall

19   that.

20   BY MR. BAUER:

21   Q.  Sir, can you look at Defense Exhibit 296?

22   A.  OK.

23   Q.  Is that the document you're referring to?

24   A.  Yes.  This is the document I was just speaking of.

25   Q.  Look at the date on it, sir, at the bottom.  Is that

1    January 25, 2011?

2    A.   There is a date there of January 25, 2011.  I don't know

3    what that date represents.

4    Q.   So you don't know what the date is on this document?

5         You're looking at a column that talks about

6    predictions, right?

7    A.   There's two columns.  One that is operating plan one, and

8    it says operating plan one final.  And then operating plan two,

9    and then operating plan two 2011 actuals.

10        MR. EDERER:  Objection.  This document is not in

11   evidence.

12        THE COURT:  Sustained.

13   Q.   Sir, the document that you say gave you actuals is dated

14   January 25, 2011, correct?

15        MR. EDERER:  Objection.  It's not what he testified.

16        THE COURT:  It's a question.

17        Let me see the document.

18        I am glad this is not in evidence because only with

19   the aid of a magnifying glass can I actually read it.

20        MR. BAUER:  If I can, every page has that date.  The

21   first page is the smallest.  If you turn to page 2.

22        THE COURT:  This is the document that you relied on

23   that you were just referring to in your answers to counsel in

24   the last few minutes, yes?

25        THE WITNESS:  It's one of two documents.

EAL8ADR5

1          THE COURT:  Then we focused in on this one, right?

2          THE WITNESS:  Yes, your Honor.

3          THE COURT:  Do you have any reason to believe that the

4    date that appears at the bottom is anything other than the date

5    that this document was created?

6          THE WITNESS:  The only reason why that would surprise

7    me is there are, I think, three different operating plan

8    estimates for 2011.  It would strike me as odd that in 25 days

9    of a year they would have gone through three different

10   iterations.  But other than that, I don't have any reason one

11   way or the other to ascribe what the meaning of that date is.

12         THE COURT:  All right.  Go ahead, counsel.

13         MR. BAUER:  Thank you.

14   BY MR. BAUER:

15   Q.  Now, did you look to see Amazon's relative market share

16   after three quarters compared to Barnes & Noble in 2011?

17   A.  I wasn't trying to slice it quite that thin.  I looked at

18   the overall sales.

19   Q.  Sir, you're trying to value the Amazon/ADREA agreement and

20   apply it to Barnes & Noble, right?

21   A.  Part of the process that I went through is studying the

22   economic terms of the Amazon/ADREA agreement.

23   Q.  And you had quarterly numbers for Amazon and Barnes & Noble

24   through the third quarter of 2011, right?

25   A.  That would have been data that would have been available

EAL8ADR5

1    for Amazon, yes.

2    Q.  Now, sir, you could have, as part of your methodology,

3    assuming it was still 40 percent in that third quarter -- we

4    saw it was 40 percent in 2010.  Assuming it was 40 percent in

5    the third quarter, you could have just taken that $12 million

6    number and taken 40 percent of it, which is $5 million, and

7    figured that to be the fair market value for Barnes & Noble as

8    of that date, correct?

9             MR. EDERER:  Objection, your Honor.

10            THE COURT:  Overruled.

11   A.  No, I would not do that.  I would disagree with that.

12   Q.  You don't think it would be fair -- we are talking about

13   the book of wisdom -- -that the day Amazon and ADREA signed

14   that agreement, that Barnes & Noble couldn't have walked in and

15   gotten a deal for 40 percent of the Amazon agreement?

16            MR. EDERER:  Same objection.

17            THE COURT:  Same ruling.

18   A.  I don't know why either party would have approached it that

19   way.  That doesn't make any sense to me.

20            THE COURT:  And the Court will ask then:  Why is that?

21            THE WITNESS:  Well, again, if we are -- the Amazon

22   agreement, certain economic terms went into the agreement

23   pre-Amazon/ADREA.  There were certain expectations.  That's

24   clear.  I looked at ADREA's own files as to how they were

25   negotiating that license with Amazon.  They were clearly

1    expecting significant growth in Amazon sales, and that was part

2    of their argument to Amazon for why Amazon should pay that

3    royalty, that license.  And I think you have to -- this idea of

4    cutting something off at the third quarter of 2011, ignoring

5    what the parties expected or anticipate at that time, I don't

6    believe that's appropriate.  That's not appropriate from a

7    valuation perspective.

8    Q.  What I am trying to understand, sir, is if this is the best

9    agreement, and can you convert it to Barnes & Noble, what was

10   different between Barnes & Noble on the day that ADREA and

11   Amazon signed the agreement?

12            That's going to be the question, but it's not a

13   question.

14            MR. EDERER:  Objection.  Just speeches being made.

15   It's argumentative.

16            THE COURT:  I agree.  Sustained.

17   Q.  By the way, the Kindle Fire came out after the Amazon

18   agreement, correct, was released after?

19   A.  I am not sure specifically when it was released.  I know

20   that it was being heavily promoted and it had made significant

21   inroads in the press.

22   Q.  Sir, you're talking about expectations.  You didn't look to

23   see how successful the Kindle Fire had been at the time of the

24   ADREA agreement?

25   A.  I was looking at the expectations.  The expectations were

1   that it was going to be a significant new product.

2   Q.  And at the same time, within the same week, Barnes & Noble

3   was introducing a new product and there were similar

4   expectations for it?

5            MR. EDERER:  Objection.  No foundation.

6   A.  There were --

7            THE COURT:  Hold on.

8            Sustained.

9   Q.  Sir, do you know whether at the same time that Amazon was

10  introducing the Kindle, and that you believe there were

11  significant expectations, do you believe that there were also

12  significant expectations for the Barnes & Noble Nook?

13  A.  At that time, I believe sales had already begun to

14  significantly drop off for the Nook.

15  Q.  Did you not look to see whether Barnes & Noble was

16  introducing a new product?

17  A.  Barnes & Noble introduced a number of new products over the

18  years.  I don't recall the specific -- I don't recall the

19  specific dates of those introductions.

20  Q.  Sir, is it your suggestion -- strike that.

21            As part of your project here, you went out and you

22  searched the Web and looked for news releases and public press

23  and things like that to see what people were saying about the

24  Amazon product, right, to figure out expectations?

25  A.  It depends on what you're referring to, but one of the

```
 1   analyses that I did was to investigate what information, what
 2   expectations might have been available that would have informed
 3   ADREA and Amazon when they entered into that agreement as to
 4   expectations for sales of Amazon products.
 5   Q.  Are you telling us that you didn't go to look at the same
 6   type of information regarding Barnes & Noble and expectations
 7   for it at the same time in November 2011?
 8   A.  With respect to Barnes & Noble, I was focused on looking at
 9   what the expectations were when they introduced the first Nook
10   product at the end of 2009.
11   Q.  You didn't look at 2011.
12              Let me ask, sir --
13              MR. EDERER:  Objection.
14   Q.  Is it your belief --
15              MR. EDERER:  Objection.
16              THE COURT:  Objection to what?  He hasn't finished the
17   question.
18   Q.  Let me look at the Georgia-Pacific factors.  Let's see
19   where there are differences between Barnes & Noble and Amazon
20   in November 2011, because you have said that's the starting
21   agreement.
22              MR. EDERER:  Objection.  Your Honor.  That's not what
23   he testified to.
24              THE COURT:  I think what counsel needs to do is just
25   limit himself to questions and not make statements as part of
```

EAL8ADR5

1    the question.  So rephrase the question.

2              MR. BAUER:  Yes, your Honor.

3    Q.  We have the Georgia-Pacific factors.  This is from your

4    exhibit, right?

5    A.  This looks like the second half of the Georgia-Pacific

6    factors.  I don't recall whether this is my exhibit or not.

7    Q.  You don't know whether Barnes & Noble's lawyers gave it to

8    us and told us you were going to testify to this?

9              MR. EDERER:  Objection, your Honor.

10             THE COURT:  Sustained.

11   Q.  Sir, did you participate in preparing this document?

12   A.  I didn't prepare the document.  It appears to be the second

13   half of the Georgia-Pacific factors.  I'm not quarreling with

14   you on that.

15   Q.  You didn't seem to recognize it and I am surprised.

16             THE COURT:  Counsel.

17             MR. BAUER:  I'm sorry, your Honor.  I withdraw that.

18   Q.  Let's look at these factors.

19             MR. EDERER:  May we approach one more time, please?

20   Sorry.

21             THE COURT:  All right.

22             (Continued on next page)

23

24

25

EAL8ADR5

1                  (At the sidebar)

2            MR. BAUER:  I apologize, your Honor.

3            MR. EDERER:  He is asking the witness to conduct a

4    Georgia-Pacific analysis in 2011 when the Amazon agreement was

5    signed.  The witness has clearly testified that he conducted a

6    Georgia-Pacific analysis in 2009 using the Amazon agreement as

7    a starting point.  This whole line of questioning is

8    prejudicial and irrelevant because the hypothetical negotiation

9    he is talking about is two years later.

10           THE COURT:  So you seemed to agree earlier or did not

11   seem to be arguing with his starting point, that in determining

12   what the parties would have hypothetically agreed to in 2009

13   you can look at what occurred thereafter.

14           I think the law in that area is much more narrow than

15   you're both apparently in agreement that it is, but maybe you

16   can point me to some case law.  My understanding, and I haven't

17   looked at this for about a year I guess or more, is that while

18   what happened later can serve as a kind of a check or a kind of

19   corroboration as to what you hypothesize would have been the

20   agreement, that it is not proper to assume that the parties in

21   2009 actually knew in a Nostradamus fashion what was going to

22   happen in 2011.

23           MR. EDERER:  That's not what the witness testified.

24   He said he was using it as data point, the house analogy that

25   he gave before.  It's the only document that shows a fair

EAL8ADR5

market valuation for the license for those.  What he did was

took that information and he applied back in 2009.  He is not

saying the parties in 2009 knew anything about it or should

have taken it into account.  Now we are moving the whole

process forward two years.

          THE COURT:  Until we got to this point, everything I

thought defense counsel was doing --

          MR. BAUER:  Plaintiff's counsel.

          THE COURT:  Plaintiff's counsel -- was well within the

scope of permissible cross-examination.  And I can't tell yet

where he is going with this part, in part, I have to say,

because plaintiff's counsel, whose cross-examination up to now

was a model of clear, crisp questioning, seems to have lost

that in the last few minutes.  But I am going to let him go a

little bit more on this and then we will see if we have to

strike it or not.

          (Continued on next page)

1          (In open court)

2     BY MR. BAUER:

3     Q.  All right, Mr. Barnes.  What I am trying to get at is the

4     differences that existed in 2011 between Barnes & Noble and

5     Amazon, which would lead you to believe that it wouldn't have

6     been a fair starting point to value the Amazon agreement pro

7     rata to the Barnes & Noble market share.  OK?

8          MR. EDERER:  Objection, your Honor.  This is what we

9     talked about earlier.

10         MR. BAUER:  May I ask a question?

11         THE COURT:  Let's erase all the statements.  Just put

12    a question.

13    Q.  Sir, factor 15, the outcome of the negotiations.  We will

14    come back to that.

15         14, opinion testimony of experts.  We will skip that.

16         So the first one is 13, the portion of realizable

17    profit.  That element, it's your view that both companies were

18    in relatively -- Barnes & Noble and Amazon were in relatively

19    similar positions at that time, correct?

20         MR. EDERER:  Objection, your Honor.  This reads to the

21    Georgia-Pacific factor.

22         MR. BAUER:  I will withdraw the question, your Honor,

23    and ask it a different way.

24    Q.  You provided an opinion regarding that factor and its

25    impact on the Amazon and Barnes & Noble -- its impact on your

EAL8ADR5

1   hypothetical negotiation, right?

2   A.  I believe this factor was discussed in my report, yes.

3   Q.  In your report, your view was that that factor was not

4   significantly different between Barnes & Noble and Amazon for

5   purposes of your analysis, right?

6   A.  I believe that what I said in my report is that, in

7   analyzing the conditions and circumstances surrounding Amazon

8   at the time of the hypothetical negotiation -- I'm sorry,

9   Amazon, at the time of the Amazon agreement, as compared to the

10  hypothetical negotiation in 2009 that would have been between

11  Barnes & Noble and Philips on the one hand and Discovery on the

12  other, that there was not a meaningful distinction there.  I

13  think that's a little bit different than what you articulated.

14  Q.  Factor 12, a portion of profit or selling price customarily

15  allowed for the use of the invention."

16       It's your view that there is little difference between

17  Barnes & Noble and Amazon with respect to that factor in doing

18  your analysis, correct?

19       MR. EDERER:  Objection, your Honor.  No foundation.

20       THE COURT:  Overruled.

21  A.  Again, my analysis of that factor, which I describe in my

22  report, would have been an analysis of the circumstances

23  surrounding the Amazon agreement in 2011 versus what would have

24  been associated with the hypothetical negotiation.  I believe

25  with respect to that factor, I believe that my conclusions -- I

1324

EAL8ADR5

1    concluded that the Amazon agreement itself took into account

2    what information there was on how much of the portion of the

3    profit or selling price might be allowed for the use of the

4    invention.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Ealradr6                          Barnes - cross

1   Q.  You found no meaningful distinction between Amazon and

2   Barnes & Noble on that factor?

3   A.  For purposes of carrying the associated royalty terms back

4   to 2009, I believe that's correct.

5   Q.  Factor 11, "The extent to which the infringer has made use

6   of the invention and the value of such use."  With respect to

7   that, you made no adjustments between Amazon and Barnes &

8   Noble, correct?

9   A.  I don't believe I made any adjustments.  I think I

10  discussed this factor in my report.  There's a significant

11  distinction between Amazon in 2011 versus Barnes & Noble in

12  2009.

13  Q.  What about between Amazon and Barnes & Noble in 2011?

14          MR. EDERER:  Objection, your Honor, same objection.

15  A.  I don't believe that's a relevant -- I'm sorry.

16          THE COURT:  Overruled.

17  A.  I don't believe that's a relevant comparison.  That's not

18  the comparison I did.

19  Q.  Number 10, "The nature of the patented inventions,

20  character of the commercial embodiment, etc.," as you wrote

21  here.  Any differences between Barnes & Noble in 2011 and

22  Amazon in 2011 with respect to that?

23          MR. EDERER:  Same objection.

24          THE COURT:  You will have a continuing objection to

25  this, so you don't need to stand up.  I'm overruling it.  We

Ealradr6                        Barnes - cross

1   can discuss it further at the break.  I am, though, going to

2   limit.  How much more do you have on cross?

3              MR. BAUER:  Half an hour, your Honor.

4              THE COURT:  All right.  Then, counsel, come to the

5   side bar.

6              (At the side bar)

7              THE COURT:  You told me before lunch, when we broke

8   for lunch, you had an hour more.  You have already gone an

9   hour.  I probably should not have told you that I wasn't going

10  to ask you to sum up today, because otherwise you would have

11  been -- we have to finish the evidence today.  We must complete

12  the evidence today.

13             MR. BAUER:  Yes, your Honor.

14             THE COURT:  We know we have 38 minutes of the

15  videotape.  That won't change.  If we go much further on this,

16  forget about any rebuttal from Mr. Wang.

17             MR. BAUER:  Your Honor, what time will we be breaking

18  today for the break?

19             THE COURT:  Why don't you see if you can do it in 15

20  minutes.

21             MR. BAUER:  I will move to my last module, your Honor.

22             THE COURT:  Very good.

23             (Continued on next page)

24

25

Ealradr6                    Barnes - cross

1          (In open court)

2          MR. BAUER:  We will perhaps come back to that.  But

3    let's look at how you calculated -- how you converted this

4    agreement rather than applying a lump sum prorated share.  OK?

5    What you did, sir, first, is you used estimated sales.  What

6    you wanted to do was get Amazon sales for six years out, right?

7    A.  I wanted to get what I believed to have been the reasonable

8    expectations of the parties for Amazon's sales when they

9    entered into that agreement.

10   Q.  You didn't ask counsel to get you the actual Amazon sales

11   for 2011, right?  You just estimated?

12          MR. EDERER:  Objection.

13          THE COURT:  There are two questions there.

14   Q.  Sir, for 2011 you estimated Amazon sales?

15   A.  I didn't personally estimate them.  I obtained estimates of

16   actual sales from a third-party market research firm and I

17   compared those to internal Amazon estimates.

18   Q.  So you decided to use third-party data rather than Amazon's

19   data for 2011?

20   A.  I considered both.

21   Q.  But you chose to use third-party data?

22          MR. EDERER:  Objection, your Honor.  He hadn't

23   completed his answer.

24          THE COURT:  No, I think he was not being responsive.

25   Put the question again.

Ealradr6                      Barnes - cross

1  Q.  For 2011 you chose third-party data rather than Amazon data

2  for your analysis?

3  A.  The point estimate I used was based on third-party data

4  that I confirmed with Amazon's estimates.

5  Q.  It was greater than Amazon's estimates, right?

6  A.  No, that's not true.

7  Q.  The estimates you say were between 18 and 24 million?

8  A.  Correct.

9  Q.  You didn't choose the 18 million number Amazon was

10  estimating?

11  A.  I utilized the 19 million, which came from the IDC report.

12  Q.  In fact, the document you say you got the number from shows

13  an estimate going from 24 million to 18 million, right?

14  A.  There was a range of between 18 million and 24 million.

15  Q.  Sir, did you read the deposition that that exhibit was

16  attached to?

17  A.  I might have.  I don't recall right now.

18  Q.  You know that that exhibit was attached to an Amazon

19  deposition, don't you?

20  A.  I believe it was a deposition exhibit.  I don't recall

21  whose deposition it was.

22  Q.  You don't recall whether you read that deposition to

23  understand what those documents were showing?

24  A.  I just don't have a specific recollection as I sit here

25  today.

Ealradr6                        Barnes - cross

1   Q.  So you don't know as you sit here today that that wasn't

2   showing that Amazon already was predicting a drop from 24

3   million to 18 million units?

4   A.  I don't have a specific recollection of that, no.

5   Q.  What you did take is you went to this place called IDC,

6   right, and you got their estimate?

7   A.  I obtained the information from IDC.  I didn't go to

8   anyplace.

9   Q.  IDC, you put in a number 19.6 million, that was your

10  estimate?

11  A.  That's correct.

12  Q.  Did you test that estimate from IDC?  Strike that.  IDC is

13  a third-market company that doesn't ask Amazon for the numbers.

14  It goes and asks customers and stores so that they can try to

15  get the information independently, right?

16          MR. EDERER:  Objection.

17          THE COURT:  Overruled.

18  A.  IDC is a market research firm.  They have their sources and

19  they do their research and they put out their estimates.

20  Q.  Did you test the IDC estimate against actual Amazon sales

21  to see if it was accurate or not?  Not Amazon predictions but

22  actual Amazon sales.

23  A.  I didn't have actual Amazon sales for 2011.

24  Q.  You had the IDC data for 2010, correct?

25  A.  I had actual Amazon sales for 2010.  I didn't need the IDC

Ealradr6                    Barnes - cross

1   data for 2010.

2   Q.  You also had the IDC data for 2010, correct?

3   A.  I believe I had access to the IDC data for 2010.  It wasn't

4   relevant to my -- it wasn't needed, because I had actual Amazon

5   data.

6   Q.  Sir, you said you had actual Amazon 2011 data also, right?

7          MR. EDERER:  Objection, your Honor.

8          THE COURT:  Overruled.

9   A.  What I said is I had estimates that Amazon had prepared

10  partial year, and that's what I used to confirm the

11  reasonableness of the estimates from IDC.

12  Q.  Let's look at the IDC estimates you had for 2010.  That's

13  in Exhibit PTX-224.

14         MR. EDERER:  Objection, your Honor.  This document has

15  not been entered into evidence.  Actually, this document is not

16  even on plaintiff's exhibit list.

17         MR. BAUER:  Your Honor, it was --

18         THE COURT:  Excuse me.  Number one, for cross-

19  examination it doesn't have to be on anyone's interest list.

20  Number to, it hasn't been offered yet.  I think the objection

21  is premature.  Put a question.  You have five minutes left.

22  Q.  Sir, look at PTX-224.

23  A.  I'm there.

24  Q.  That comes from the same database that you had and that you

25  took the 2011 numbers from, correct?

Ealradr6                    Barnes - cross

1   A.  I believe that is correct.

2   Q.  The 2010 IDC numbers show how many sales for Amazon --

3            THE COURT:  Now you are referring to a document not in

4   evidence.  Now the objection kicks in.

5   Q.  Sir, this is the database you used to generate the 2011

6   numbers, correct?

7   A.  I didn't use 2010 from IDC.

8   Q.  This is the database you used to create the 2011 numbers,

9   correct?

10           THE COURT:  I think that can be answered yes or no.

11  A.  The data source, I believe the data source, IDC, contains

12  this information for 2010 as well.

13  Q.  Right.  You didn't look at that 2010 data to test the 2011

14  data?

15  A.  No, I did not.

16  Q.  You could have compared the IDC data to the 2010 actual to

17  see if it was greater or less, right?

18  A.  That comparison could have been made.

19  Q.  If the IDC data was 15 percent greater, then you would have

20  some reason to believe that the 2011 data might also have been

21  15 percent greater, correct?

22  A.  I don't think I would reach that conclusion based on just

23  that comparison.  I had other information to consider for 2011.

24  Q.  Let's look at what you actually did.  That same database

25  gave you 2012 data, right?

Ealradr6                     Barnes - cross

1    A.  I believe 2012 data was included as well.

2    Q.  You didn't use that in your projections for 2012, did you?

3    A.  I did not, because that would have not been available to

4    the parties when they entered into that agreement.

5    Q.  Sir, let's look at what you did put in.  For the next few

6    years, you put in for 2012 -- sir, let me show you what's been

7    marked PTX-401?

8            MR. EDERER:  Objection, your Honor.

9    Q.  Sir, this is DX-1014.  This is your projections for the

10   future, right?

11   A.  This table has information for actual and then the

12   projections as well.

13   Q.  Right.  You put in 21 million for the first year,

14   23 million, 26 million, 28 million, 31 million, right?

15   A.  Those look to be the right numbers, yes.

16   Q.  The projections that you put in at the time you did that,

17   you had the IDC actual data for 2012, right?

18   A.  That information was available.  But, as I discussed on

19   direct, it wasn't relevant to my analysis.

20   Q.  Sir, what was the IDC report for 2012 for the data sales

21   that year?

22           MR. EDERER:  Objection.

23           THE COURT:  Ground?

24           MR. EDERER:  He is trying to get the information that

25   is in the document in through question and answer.

Ealradr6                    Barnes - cross

1              THE COURT:  I understand that.

2              Did you consider that or not?

3              THE WITNESS:  I did not, sir, your Honor.

4              THE COURT:  Why not?

5              THE WITNESS:  Because what actually occurred in 2012

6    was not relevant to my consideration of what the parties would

7    have anticipated in 2011 when they entered into that agreement.

8    What I was focused on was trying to put myself in the position

9    of Amazon and ADREA in 2011 when they actually entered into

10   that agreement, and I had information as to what the

11   expectations of the parties were at that time and what

12   information would have been available to them at that time.

13             THE COURT:  All right.

14   Q.  What was the total number of sales that you estimated until

15   2016 for Amazon?  158 million?

16   A.  That includes --

17             MR. EDERER:  Objection.

18             THE COURT:  Ground?

19             MR. EDERER:  That is not estimating.  That includes

20   actuals.

21             MR. BAUER:  I'm sorry.

22   Q.  What did you estimate for the next five years?  20, 40, 60,

23   80, about 120 million, something like that?

24   A.  It looks like roughly 120 million, yes.

25   Q.  Do you have any idea what Amazon's actual sales have been

1    over that same period of time or up till now?

2              MR. EDERER:  Same objection, your Honor.

3              THE COURT:  I think that is a permissible question.

4    Overruled.

5    A.  I believe, yes, I answered that question on direct.  I

6    understand that at least for 2012 and 2013 the sales are

7    quite -- lower than the expectations.

8    Q.  What numbers do you believe those are when you say quite

9    below?

10   A.  I don't have them committed to memory.

11   Q.  We are not asking exact.  You said quite below.  What do

12   you consider quite below?

13   A.  I think the reported information for 2012 was in the

14   neighborhood of 15 million.

15   Q.  How about for 2013?

16   A.  My recollection is it was around 11 million.

17   Q.  How about so far for 2014?

18   A.  I'm not aware of that information.

19   Q.  Still going down, though, you know that, right?

20   A.  I don't know that.

21   Q.  Sir, you're talking about expectations in November 2011.

22   It is your view that the Amazon management was so far off that

23   they thought that sales were going to keep going up 10 percent

24   or 20 percent a year when the very next month they dropped?

25             MR. EDERER:  Objection:  No foundation.

1        THE COURT:  The objection is sustained on the grounds

2   of argumentative.  I have a feeling that was probably the last

3   question.

4        MR. BAUER:  Yes, your Honor.

5        THE COURT:  Redirect.

6   REDIRECT EXAMINATION

7   BY MR. EDERER:

8   Q.  Mr. Barnes, on your direct examination I asked you some

9   questions about the per-unit royalty calculation that you had

10  performed and the dollar amount of royalties that you had

11  calculated with respect to the three patents-in-suit coming out

12  of the hypothetical negotiation.  Do you recall that?

13  A.  I do.

14  Q.  Could we put up the previous slide, please.  This was the

15  slide we looked at at that time, correct?

16  A.  I believe you are correct, yes.

17  Q.  I believe you testified that this calculation covers the

18  period December 1, 2009 to June 30, 2014, right?

19  A.  That's correct with the caveat that we discussed about the

20  '851 patent.

21  Q.  Did you do any other calculation with respect to the

22  anticipated royalties that would be paid by Barnes & Noble in

23  the hypothetical negotiation for a different period of time?

24        MR. CABRAL:  Objection, your Honor.  Could we

25  approach?

1             THE COURT:  No.  And there is going to be no more side

2     bars.  This redirect is going to be finished in the next ten

3     minutes.  And we are going to finish the evidence in this case

4     today.  That is not a projection.  That is an order.

5             MR. CABRAL:  Thank you, your Honor.

6             THE COURT:  Sit down.  Ten minutes, counsel.

7             MR. EDERER:  Thank you, your Honor.

8     A.  Yes, I did another calculation similar to this that would

9     have the damages period beginning March 29, 2012.

10    Q.  Is this the calculation that you did, Mr. Barnes?

11    A.  Yes, sir, it is.

12    Q.  This is the second calculation, right?

13    A.  Yes, sir.

14    Q.  Can you explain what we are looking at here.

15    A.  Yes.  These are all the rates that we discussed earlier.

16    None of that has changed.  All I have done here is I have

17    applied the rates to only those sales beginning with March 29,

18    2012.  I understand that for legal reasons.  But this is the

19    calculation that would reflect the total damages if damages

20    began on March 29, 2012, and go through June 30, 2014.

21    Q.  That is broken down between the three different patents,

22    right?

23    A.  Yes, it is, the '851 and '501 together and then the '3

24    individually.

25    Q.  The number for the '851 hasn't changed from the previous

Ealradr6                    Barnes - redirect

1    calculation, right?

2    A.   That's right, because the '851, even under the previous

3    calculation, the damage period for the '851 was limited to

4    March 29, 2012, to December 9, 2012, the same 8½-month period.

5    Q.   This calculation was done using the same royalty rates that

6    you had applied to your other calculation, right?

7    A.   The exact same royalty rates.

8    Q.   What is the total amount for the three different patents

9    based upon this calculation starting from March 29, 2012, for

10   the three of them?

11   A.   It's approximately $405,000.

12   Q.   Is it your opinion, sir, that that is the maximum amount of

13   damages that ADREA would be entitled to should it demonstrate

14   that all three patents-in-suit have been infringed and are

15   valid using March 29, 2012, as a starting point?

16   A.   That is correct.

17   Q.   Mr. Barnes, you were asked some questions on direct

18   examination about the potential for Barnes & Noble to be, I

19   think the word that was used was desperate going into the

20   hypothetical negotiation because they had spent lots of money

21   leading up to that point and would really, really need that

22   license.  Do you recall that?

23   A.   I recall the questions, yes.

24   Q.   Isn't it the case that the rules under Georgia-Pacific

25   involve a willing licensor and a willing licensee?

Ealradr6                          Barnes - redirect

A.  That is correct, that is the presumption.  Both parties are

approaching the hypothetical negotiation, both parties desire a

license.

Q.  If you applied that reasoning to every negotiation -- you

have to assume that the patents are valid and infringed in that

hypothetical negotiation, right?

A.  That is true.

Q.  If you went into negotiation assuming that the prospective

licensee is desperate to get that license, wouldn't that skew

the negotiation?

A.  It could have an impact.

Q.  Isn't there another Georgia-Pacific factor that accounts

for the possibility that the prospective licensee needs the

license more so than it might need the license for something

else?

A.  The Georgia-Pacific factors cover a wide range of economic

circumstances and facts.  You would have to be a little more

specific.

Q.  Georgia-Pacific factor number 9 --

          MR. BAUER:  I will object to leading.

          THE COURT:  And I have some question as to whether,

although there was no objection, whether the previous set of

questions really accurately stated the law.  Put a new

question.

Q.  Are you familiar with Georgia-Pacific factor 9, Mr. Barnes,

1    the utility and advantages of the patented property over old

2    modes and devices, if any, that have been used for working on

3    similar results?

4    A.  Yes, I am familiar with that Georgia-Pacific factor.

5    Q.  Why, to your understanding, is that factor important?

6    A.  Because one of the considerations at the hypothetical

7    negotiation is what is the benefit that is going to be provided

8    by the use of the patent, patent or patents, over other

9    available alternatives that might have already been used or

10   that might also be available to the party that is taking a

11   license.

12   Q.  If there was another available alternative, perhaps the

13   prospective licensee wouldn't be so desperate for a license,

14   right?

15   A.  That is certainly one consideration if there are ways to

16   avoid using the patent or if there are other opportunities to

17   achieve the same results.

18   Q.  Mr. Bauer asked you some questions about the lump sum

19   calculation that was done or the lump sum payment that was made

20   in the Amazon agreement versus the reasonable royalty

21   calculation that you derived from that.  Do you recall that?

22   A.  I do recall that.

23   Q.  In a hypothetical negotiation in 2009, before Barnes &

24   Noble had ever sold a single Nook, do you have an opinion as to

25   whether it would have been more likely for Barnes & Noble to be

1  looking for a running royalty or for a lump sum?

2  A.  My opinion is that they would have been far more likely to

3  desire a per-unit royalty than a lump sum royalty.

4  Q.  Why is that?

5  A.  Because, again, when you are looking at a company like

6  Barnes & Noble in 2009 that's never sold a product, they don't

7  have any -- they are getting ready to introduce a product -- I

8  don't mean any product -- this particular product, the Nook,

9  they don't know how successful they are going to be.  They

10  don't know what type of revenues or profits they might earn.

11  So, they are going to be more likely to desire a royalty

12  arrangement where they can basically pay based on how many they

13  sell as opposed to paying a large amount up front.

14  Q.  Mr. Bauer asked you some questions about comparisons that

15  were drawn between the Amazon agreement in 2011 and what Barnes

16  & Noble would have known in 2011 in a hypothetical negotiation.

17  Do you recall that?

18  A.  I do recall those questions.

19  Q.  Did you conduct a hypothetical negotiation analysis with

20  respect to Barnes & Noble's prospective licensing of the

21  patents-in-suit as of 2011?

22  A.  No.  That is not the relevant hypothetical negotiation

23  date.

24  Q.  What is the relevant hypothetical negotiation date?

25  A.  It's late 2009, November 2009.

1    Q.  In November 2009 would Barnes & Noble have had any idea

2    what its market share would have been in 2011?

3    A.  They certainly wouldn't have had specific information on

4    what occurred several years later.

5    Q.  You were asked some questions about your use of Amazon

6    sales numbers.  I just want to get this straight.  Did you or

7    did you not have actual Amazon sales numbers for 2011?

8    A.  I'm sorry.  Repeat the question.

9    Q.  Forget about IDC.  Did you or did you not have actual

10   Amazon sales numbers for 2011?

11   A.  Not for the entire year, no.

12   Q.  Isn't it the case that that's why you went and got actual

13   and estimated numbers from IDC?

14   A.  That is correct.

15   Q.  Indicate one more time for the record, if you will, why it

16   is that you didn't use actual or estimated actual sales numbers

17   for 2012 and 2013?

18            MR. BAUER:  Objection.

19            THE COURT:  Sustained.

20   Q.  Was it relevant to your analysis what the actual Amazon

21   sales numbers were for 2012, 2013, and beyond?

22            MR. BAUER:  Objection.

23            THE COURT:  Asked and answered, and that concludes the

24   redirect.  Thank you very much.  You may step down.

25            THE WITNESS:  Thank you, your Honor.

 1          (Witness excused)

 2          THE COURT:  Ladies and gentlemen, we will take a

 3   10-minute break at this time.  I am going to try to hold it to

 4   10 minutes.  As you can see, we are running behind.  We are not

 5   going to have summations until first thing tomorrow morning,

 6   but we are going to finish the evidence today, I guarantee you

 7   that.  See you in ten minutes.

 8          (Jury not present)

 9          THE COURT:  It is 3:29.  At 3:39 we will bring in the

10   jury and begin the tape.  It had better be 38 minutes, because

11   if it's 39 the jury will not hear the last minute because we

12   will cut it off.

13          MR. EDERER:  Your Honor, we are prepared to cut one of

14   the two depositions.

15          THE COURT:  That's good.

16          MR. CABRAL:  Your Honor, we may be able to tell you

17   after the break if we intend to call Dr. Wang as well.

18          THE COURT:  All right.

19          MR. BAUER:  We are all tired, your Honor.

20          THE COURT:  That's all fine.  Sounds good to me.

21   There anything I can do to make you more tired?  We'll see you

22   in ten minutes.

23          (Recess)

24          THE COURT:  What did the defense decide about the

25   depositions?

Ealradr6

```
1              MR. EDERER:  We are going to play one deposition, your
2    Honor.
3              THE COURT:  Which one?
4              MR. EDERER:  Shawn Ambwani.
5              MS. ARNI:  Before we begin the video, we move the
6    admission of five documents:  Defense Exhibit 644, Defense
7    Exhibit 646, Plaintiff's Exhibit 120, Defense Exhibit 55, and
8    Defense Exhibit 272.
9              THE COURT:  Any objection?
10             MR. BAUER:  We don't know what those are, your Honor.
11             THE COURT:  They were the ones referenced in the
12   deposition that both sides --
13             MR. BAUER:  Then there is no objection.
14             THE COURT:  Give me those numbers again.
15             MS. ARNI:  Certainly, your Honor.  Defense 644,
16   defense 646, plaintiff 120, defense 55, and defense 272.
17             THE COURT:  Those are all received.
18             (Plaintiff's Exhibit 120 received in evidence)
19             (Defendant's Exhibits 55, 272, 644, and 646 received
20   in evidence)
21             MR. BAUER:  As for that Amazon document, the January
22   11, 2011, document they objected to, we have a stipulation from
23   them.  "The parties accept representation that the two Amazon
24   documents are business records of Amazon created and maintained
25   in the ordinary course of business and accordingly agree not to
```

Ealradr6

1    raise an objection as to the admissibility of the two Amazon

2    documents on hearsay grounds."  It's a written stipulation.

3              THE COURT:  What about that?

4              MR. EDERER:  Your Honor, I believe that stipulation

5    has to do with confidentiality issues.

6              THE COURT:  What?  That's not what was just read.  Can

7    I see the stipulation?

8              MR. BAUER:  We are getting it printed out, your Honor.

9    I have it on the laptop here.

10             THE COURT:  Let's bring in the jury.  You can look for

11   it while we are playing the deposition.

12             MR. BAUER:  Thank you.

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

Ealradr6

1            (Jury present)

2            MR. BAUER:  Your Honor, I have that document.

3            THE COURT:  While I am considering this, you wanted to

4      play the deposition, counsel for the defense?

5            MS. ARNI:  Yes, your Honor.  We are calling Shawn

6      Ambwani by video deposition.

7            THE COURT:  Spell his name for the record.

8            MS. ARNI:  Shawn, S-H-A-W-N, last name Ambwani,

9      A-M-B-W-A-N-I.

10            THE COURT:  Go ahead.

11            (Video deposition of Shawn Ambwani shown)

12            MS. ARNI:  Your Honor, the last the document that was

13      referred to in the video is Defendant's 203.  We would like to

14      move that for admission.

15            THE COURT:  Yes, received.

16            (Defendant's Exhibit 203 received in evidence)

17            THE COURT:  First, is there anything further from the

18      defense?

19            MR. EDERER:  No, your Honor.

20            THE COURT:  Anything further from the plaintiff other

21      than the relating to the stipulation that we will take up at

22      the side bar?

23            MR. CABRAL:  Regarding witnesses, your Honor, we are

24      prepared to call Dr. Wang.

25            THE COURT:  Are you calling him or not?

Ealradr6

1          MR. CABRAL:  We are, your Honor.

2          THE COURT:  Bring him in.

3          MR. CABRAL:  Your Honor, your intention is to

4    release --

5          THE COURT:  My intention is to go until we finish.  I

6    guaranteed the jury it is going to be before 5 o'clock.  You

7    told me this was going to be a very short witness.  I'll give

8    you 15 minutes on direct.

9          MR. CABRAL:  That was all I was going to ask for, your

10   Honor.  Thank you.

11         THE COURT:  Counsel, come to the side bar.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

Ealradr6

```
 1              ((at the side bar)

 2              THE COURT:  The plaintiff's counsel has furnished me

 3     with a stipulation signed by both sides dated October 3, 2014,

 4     that in relevant part states in paragraph 4, "The parties

 5     accept Amazon's representation that the two Amazon documents

 6     are business records of Amazon, created and maintained in the

 7     ordinary course of business activities of Amazon, and

 8     accordingly agrees," spelled here A-G-R-E-E-S, showing that the

 9     parties don't understand grammar, "and accordingly agrees not

10     to raise an objection as to the admissibility of the two Amazon

11     documents on hearsay grounds, nor will it object to the

12     admissibility of the summary documents on hearsay grounds with

13     respect to the Amazon data from the two Amazon documents."

14              In light of all that, what are the documents that were

15     objected to on hearsay grounds that you wish to put in?

16              MR. BAUER:  It was Defense Exhibit 296, your Honor,

17     just the one.

18              THE COURT:  Any objection?

19              MS. SHIN:  We have no objection to the plaintiff

20     moving these documents into evidence.  We had represented to

21     Amazon, who was very concerned about these documents coming

22     into evidence, that we would not be the ones to introduce them.

23     They made the representation to us that ADREA should not have

24     produced these documents to us in the first place under some

25     confidentiality agreement that they had in another litigation.
```

Ealradr6

1          THE COURT:  I don't care about any of that.

2          MS. SHIN:  We have no objection.  If ADREA would like

3    to move them in, we have no objection.

4          THE COURT:  They were previously attempted to be moved

5    in, this particular document, and there was a hearsay

6    objection, which I sustained.  Now, based on the stipulation, I

7    reverse myself and that will be received.  296?

8          MR. BAUER:  Yes, your Honor.  Just for the record, it

9    is a highly confidential Amazon document which we had spoken

10   about, so it can go to the jury but it would be somehow kept

11   from the public record.

12         MS. SHIN:  That was the purpose of this exercise.

13         THE COURT:  Just so everyone understands, at the close

14   of the case the originals of all exhibits go into the custody

15   of the parties who offered them in evidence.  This one is funny

16   because it is marked as a defense document, it is going to

17   called a defense document, but plaintiff is offering it.  I

18   don't care one whit about that.

19         What I care about is that when the jury returns their

20   verdict, both sides will send someone down to the courthouse

21   within 24 hours who will be given their original documents, the

22   exhibits, and they maintain them in custody forever after.

23         Given that, there is no basis for believing that

24   anyone will ever see this, though if there is ever an

25   application for these documents by anyone, the Court will of

Ealradr6

course consider it de novo at that time and give them an

opportunity to be heard.  So, we don't even have the problem we

were talking about earlier of things being up on certain

screens and not on other screens, and so forth.

     296 is received.  Even though it is offered by

plaintiff, it is marked as Defendant's 296, so we will call it

Defendant's 296.

     MS. SHIN:  As long as the record is clear that it is

the plaintiff that introduced the document.

     THE COURT:  Yes.  As far as I'm concerned, the

stipulation would have enabled both sides to have offered it

regardless of whatever private deals you may have with Amazon,

which are of no business of the Court.

     (Continued on next page)

Ealradr6

1          (In open court)

2          (Defendant's Exhibit 296 received in evidence)

3    XIN WANG,

4        called as a witness by the plaintiff,

5        having been duly sworn, testified as follows:

6          THE CLERK:  State your name and spell it slowly for

7    the record.

8          THE WITNESS:  My name is Xin Wang, X-I-N, W-A-N-G.

9    DIRECT EXAMINATION

10   BY MR. CABRAL:

11   Q.  Good afternoon, Dr. Wang.  What is your educational

12   background?

13   A.  I have a Ph.D in applied mathematics from the University of

14   Southern California at Los Angeles.  I also have Master and

15   Bachelor degrees in computer science from Tsinghua University

16   in Beijing.

17   Q.  What do you do for a living?

18   A.  I'm currently the head of micromedia systems of copper

19   research of Huawei, which is currently the largest manufacturer

20   of telecommunications equipment in the world.

21   Q.  What are you are job responsibilities currently?

22   A.  I'm responsible for companywide strategy and solutions of

23   digital rights management and micromedia content distribution

24   for a number of product lines.

25   Q.  We are going to be very quick today, so I'm only going to

                 Ealradr6                        Wang – direct

 1   ask you a few more questions about your background and then one

 2   or two more questions about specific documents.  OK?

 3   A.  OK.

 4   Q.  Do you have any experience with electronic books?

 5   A.  Yes.  I participated standard development for electronic

 6   books.

 7   Q.  Specifically, what was your participation in the

 8   development of standards for electronic books?

 9   A.  I wrote the portions of the standard:  Encryption, rights

10   management, and digital signatures.

11   Q.  That's for what standard?

12   A.  That is the standard for EPUB format that is currently used

13   by a lot of ebooks.

14   Q.  What time frame was this?

15   A.  That was year thousand?  Year 2000, I'm sorry.

16   Q.  That would have been a long time ago.

17   A.  Yes.

18   Q.  My last question, last two questions on background.  Are

19   you the inventor on any patents?

20   A.  Yes.  I'm an inventor of --

21           MR. BERTA:  Objection:  Relevance.

22           THE COURT:  I will allow it.

23   Q.  Go ahead.

24   A.  I'm an inventor of over 50 U.S. patents.

25   Q.  What do those patents relate to?

                    Ealradr6                    Wang - direct

1  A.  Most of them relate to digital rights management for

2  digital content, distribution, and protection.

3  Q.  That's it for the background.  We are going to jump to a

4  few basic questions about your role in this case, and THEN we

5  are going to get into the substance.  OK?

6  A.  OK.

7  Q.  You provided some opinions in this case, is that right?

8  A.  Yes.

9  Q.  Your opinions specifically are in response to Dr. Neuman,

10 is that right?

11 A.  Yes.

12 Q.  Is it correct that your opinions relate to the issue of

13 validity of the patents at issue in this case?

14 A.  Yes.

15 Q.  Can you tell the jury what type of analysis you did with

16 respect to the validity issues.

17 A.  I looked at an analysis of the three patents in this case

18 and their file histories.  I looked at all the references cited

19 by in Dr. Neuman's report, and also I reviewed Dr. Neuman's

20 report and his deposition testimony.

21 Q.  I want to talk about one of the documents referenced in Dr.

22 Neuman's report.  OK?

23 A.  OK.

24 Q.  This document is Defendant's Exhibit 411, which has been

25 previously admitted.

                         Ealradr6                    Wang - direct

 1           MR. CABRAL:  Your Honor, we are going to put it on the

 2    screen.  If you like, we have a binder here.  But it should be

 3    pretty straightforward.

 4           THE COURT:  The screen is fine.  Go ahead.

 5           MR. CABRAL:  Thank you.

 6    Q.  As part of your analysis, you considered this document

 7    marked as Defendant's Exhibit 411, is that right?

 8    A.  Let me change my glasses.

 9           MR. BERTA:  Objection, your Honor.  Move to preclude

10    testimony on anything other than the '851 patent with respect

11    to security and encryption pursuant the hearing we had last

12    week.

13           THE COURT:  I hate to do this, but I think we need a

14    side bar, because I really don't understand your objection.

15                  (Continued on next page)

16

17

18

19

20

21

22

23

24

25

Ealradr6                          Wang – direct

1                (At the side bar)

2                MR. BERTA:  I apologize, your Honor.  You asked the

3      question, and the question was asked three times at the Daubert

4      hearing, what is his expertise.  His expertise is in the

5      security and protection of distributing digital content.  The

6      only patent related to that is the '851 patent, not the '501,

7      which has to do with the lending period, and certainly not the

8      '703, which has to do with --

9                THE COURT:  Did he opine on these in his report?

10               MR. BERTA:  He did.

11               MR. CABRAL:  There has been no challenge to his

12     qualifications to this point, your Honor, to opine on the '501

13     patent.

14               MR. BERTA:  He admitted three times in --

15               THE COURT:  Let me see.

16               MR. BERTA:  This is the transcript of the hearing.

17               THE COURT:  This was in response to a question of what

18     expertise he was adding.  This was in the context of his

19     reliance on Professor Magee and the meshing of their two areas

20     of expertise.  It was not with respect to what's being asked

21     now.

22               MR. BERTA:  Thank you, your Honor.

23               (Continued on next page)

24

25

Ealradr6                              Wang - direct

1                (In open court)

2    Q.  You have considered this document as part of your analysis

3    in this case, correct?

4    A.  Yes.

5    Q.  Have you formed opinions as to whether this document marked

6    as Defendant's Exhibit 411, also known as the Saigh patent,

7    discloses each element of claims 7, 8, 9, 18, and 19 of the

8    '501 patent?

9    A.  Yes, I have.

10   Q.  What are your opinions?

11   A.  My opinion is this patent does not describe each and every

12   element of the '501 patent.

13              MR. CABRAL:  Can we bring up claim 7 of the '501

14   patent.

15   Q.  I want to direct your attention to storing an electronic

16   book on a viewer and highlight that element, if we can.  Dr.

17   Wang, did you form an opinion as to whether the Saigh patent

18   discloses storing an electronic book on a viewer?

19   A.  Yes.

20   Q.  What is your opinion?

21   A.  The Saigh patent does not describe storing electronic book

22   on a viewer.

23   Q.  What is the basis for that opinion?

24   A.  Because the Saigh patent describes storing electronic books

25   on separate memory modules or separate compact cylinders.

Ealradr6                           Wang - direct

1   Q.  What is a compact cylinder?

2   A.  A compact cylinder is a storage media, like a CD.

3   Q.  What is a memory module?

4   A.  A memory module is another type of storage media, like a

5   cartridge.

6   Q.  You mentioned that the memory modules and compact cylinders

7   were separate.  What did you mean by that?

8   A.  Saigh describes many times in his patent those two are

9   separate from the control unit and also separate from the

10  entire apparatus.

11  Q.  What do you mean by control unit?

12  A.  The control unit is the one that reads information from the

13  memory module or compact cylinder that displays the

14  information.

15  Q.  That's where you view the electronic books?

16  A.  Yes.

17  Q.  I want to direct your attention to the next element here,

18  "associating a predetermined amount of time after the

19  electronic book is stored on the viewer with the electronic

20  book."  Did you form any opinion as to whether the Saigh patent

21  discloses that element?

22  A.  Yes.

23  Q.  What is that opinion?

24  A.  The Saigh patent does not describe this element.

25  Q.  What is the basis for that opinion?

Ealradr6                              Wang - direct

1    A.   Because Saigh patent only describes two types of

2    information, two pieces of types of information.  One is the

3    time at which the electronic book is read into the separate

4    memory module.  Another piece of information is a set time

5    period after which the information on the separate memory

6    module would be erased.  Those two pieces of information are

7    related to storage of the books on the memory module, are not

8    related to storage of the book on the viewer.

9    Q.   One last question about this before we move on to the last

10   document we will talk about today.  Where in Saigh, in the

11   Saigh patent, is the predetermined amount of time associated,

12   if at all?

13   A.   It is associated to the book when the book is written to

14   the separate module at a book bank facility.

15   Q.   What is a book bank facility?

16   A.   A book bank facility is geographically located somewhere

17   else that can be used to distribute books.

18   Q.   The last document I'll talk to you about -- I just have a

19   few questions, and we will try to wrap up within three or four

20   minutes -- is the Bolas patent marked Defense Exhibit 477.  You

21   reviewed the Bolas patent as part of your analysis in this

22   case, correct?

23   A.   Yes.

24   Q.   Did you form any opinions as to whether the Bolas patent

25   renders claim 13 of the '703 patent invalid?

Ealradr6                          Wang – direct

1    A.   Yes.

2    Q.   What is your opinion?

3    A.   The Bolas patent does not teach the claim 13 of the '701

4    patent.

5              MR. CABRAL:   Can we bring up claim 13.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   Q.  I want to direct your attention in the middle clause

2   beginning with "enabling," there is the phrase "initiate

3   sending a request with the identifier representative of a type

4   of the consumer appliance."

5           Are you familiar with Dr. Neuman's opinions on this

6   element?

7   A.  Yes.

8   Q.  What does he point to to, in his view, meet this element?

9   A.  He thinks the serial number that he used for the device is

10  the identifier.

11  Q.  Do you agree with that opinion?

12  A.  No.

13  Q.  Why not?

14  A.  Because the serial number is not a representative of a type

15  of consumer appliance.

16          MR. CABRAL:  If you can zoom out a little bit, I just

17  want to focus on the last issue here before I sit down.

18  Q.  The element beginning "based on the identifier."  Do you

19  see that?

20  A.  Yes.

21  Q.  It reads:  "Based on the identifier the server initiating

22  access to a Web page with content information about a context

23  of using the consumer appliance."  Do you see that?

24  A.  Yes.

25  Q.  Are you familiar with Dr. Neuman's opinions on this

1  element?

2  A.  Yes.

3  Q.  Do you agree with Dr. Neuman's opinions?

4  A.  No.

5  Q.  What is your opinion as to whether the Bolas patent

6  discloses initiating access to a Web page with content

7  information based on the identifier?

8  A.  The Bolas patent has a description on how the Bolas system

9  works.  In the description, Bolas has a pseudo code that

10  describes how the system server receives the input from a

11  request and then direct the input to radio station.  So in that

12  pseudo code it clearly shows that the serial number is not used

13  at all; it does not appear in that pseudo code at all.

14  Q.  The last line of questions I am going to ask you about is

15  the phrase "content information about a context of using the

16  consumer appliance."  Do you see that?

17  A.  Yes.

18  Q.  In the context of the Bolas patent, which relates to a

19  radio device, what is your understanding of what Dr. Neuman

20  points to for that element?

21  A.  He points to the returned radio station data.

22  Q.  Do you agree with his opinion that that returned radio

23  station data constitutes content information about a context of

24  using the consumer appliance?

25  A.  No.

1    Q.  Why not?

2    A.  Because that's the data for usage of the radio.  It's not

3    the information for the context of the usage of the radio.

4    Q.  What would be information about the context of using a

5    radio in your opinion?

6    A.  It could be some recommended station of the radio station

7    that the user can turn to.

8             MR. CABRAL:  No further questions, your Honor.

9             THE COURT:  Cross-examination.

10   CROSS-EXAMINATION

11   BY MR. BERTA:

12   Q.  Dr. Wang.

13   A.  Yes.

14   Q.  We are on a schedule.

15            I think you mentioned earlier that you had done some

16   work with e-books in the 2000s, is that right?

17   A.  Yes.

18   Q.  And a little bit before that you may have mentioned you did

19   a little bit of work related to encryption and DRM when you

20   were at Xerox or IBM?

21   A.  Xerox.

22   Q.  It's true, though, prior to being hired by ADREA in this

23   case, you never heard of these patents at all, is that true?

24   A.  That's right.

25   Q.  But you did know Dr. Neuman prior to this case?

1   A.  Yes.

2   Q.  It's fair to say that you hold him in high regard

3   professionally?

4           MR. CABRAL:  Objection, your Honor.

5           THE COURT:  Ground.

6           MR. CABRAL:  Relevance.

7           THE COURT:  Overruled.

8   A.  Yes.  He is a professor, researcher.

9   Q.  In preparing your reports in this case, did you speak to

10  anyone else other than the attorneys for ADREA?

11  A.  No.

12  Q.  Did you talk to Mr. Berg?

13  A.  No.

14  Q.  You don't have an opinion here, obviously, with respect to

15  whether or not the Nook devices infringe, is that correct?

16  A.  That's correct.

17  Q.  You didn't review the Nook devices, is that correct?

18  A.  That's correct.

19  Q.  And you have never actually had any experience with any

20  Nook devices, is that correct?

21  A.  I don't know what devices are involved.

22  Q.  But you do agree that with respect to invalidity on the one

23  hand and infringement on the other hand you have to apply the

24  claims in the same manner in both analyses, is that true?

25          MR. CABRAL:  Objection, your Honor.  Relevance.

1           THE COURT:  I agree it's irrelevant.  It's also a

2     question of law, but is there any disagreement on that

3     proposition?

4           MR. CABRAL:  No, your Honor.

5           THE COURT:  OK.  So the jury now knows, when you're

6     doing your work tomorrow and you're looking at particular words

7     of a claim, they don't change their meaning if you're looking

8     at it for one purpose and then looking at it for another

9     purpose, their meaning is constant throughout, whatever meaning

10    you tend to ascribe to it.

11          Put another question.

12    BY MR. BERTA:

13    Q.  My question is, in preparing your report in this matter,

14    did you take any action to review Mr. Berg's work to determine

15    whether or not you and he were applying the claims consistently

16    in either of your opinions?

17    A.  No, I didn't.

18    Q.  Is it correct that you're not actually offering an opinion

19    of validity of the patents, correct?

20    A.  I'm offering my opinion on validity of those three patents

21    in response to the issues or opinions that were raised by Dr.

22    Neuman in his report.

23    Q.  So is it fair to say that you're basically responding to

24    what you understood Dr. Neuman's opinions to be?

25    A.  My opinions are limited to responding to his opinions.

1    Q.  A couple of questions.  One of the patents that you looked

2    at here is the '851 patent, is that right?

3    A.  Yes.

4    Q.  I know you didn't talk about it in your direct, but I did

5    have a couple of questions for you.

6            You provided an opinion regarding the Sachs' Softbook

7    of the '851 patent?

8    A.  Yes.

9    Q.  You agree that the Sachs' Softbook patent is prior art in

10   claim 96 at least of the '851 patent?

11   A.  Just looking at the filing date it appears so.

12   Q.  Now, you also looked at the S-HTTP specification for

13   purposes of this case, is that right?

14   A.  Yes.

15   Q.  The Secure Hypertext Transfer Protocol specification?

16   A.  Yes.

17   Q.  Can I call it secure HTTP, is that OK?

18   A.  That's OK.

19   Q.  You don't dispute that secure HTTP is prior art to claim 96

20   of the '851 patent?

21   A.  Just look at the publication dates, yes.

22   Q.  Do you have an opinion as to whether or not someone who had

23   knowledge of the Softbook patent, the Sachs patent, would have

24   had a motivation to combine that invention with secure HTTP?

25           MR. CABRAL:  Objection, your Honor.  Defense counsel's

1    expert did not address this issue.

2              THE COURT:  Sustained.

3    Q.  One of the things that you talked about here was Saigh, is

4    that right, today?

5    A.  That's for a different patent.

6    Q.  I know.  We did cover Saigh on direct, correct?

7    A.  Yes.

8    Q.  You offered two opinions.  You offered the opinion as to

9    whether or not Saigh discloses the element --

10             MR. BERTA:  Can I have claim 7?

11   Q.  You had two opinions.  One, a response to Dr. Neuman on

12   whether or not storing an electronic book on a viewer, whether

13   or not Saigh discloses that, is that right?

14   A.  Right.

15   Q.  Let's take that one first.

16             Now, you at least agree that the control unit of Saigh

17   is a viewer, is that right?

18   A.  It could be a viewer, but not the viewer in the sense of

19   the patent.

20             MR. BERTA:  Can I have his deposition, please?

21             THE COURT:  Counsel, bear in mind your examination is

22   going to end in ten minutes.

23             MR. BERTA:  I am aware, your Honor.

24             Can I hand this up to you?

25             Your Honor, page 240, lines 21 to 25.

1          THE COURT:  240, what lines?

2          MR. BERTA:  Lines 21 to 25, hopefully.

3          THE COURT:  Any objection?

4          MR. CABRAL:  No, your Honor.

5          THE COURT:  OK.

6     BY MR. BERTA:

7     "Q.  So the control unit is what is labeled 20, correct?

8     "A.  That's right.

9     "Q.  And in your opinion that is a viewer?

10    "A.  That's right."

11         MR. BERTA:  Can I have the picture out of Saigh that

12    is on the front page?

13    Q.  So 20, that's that little guy up in the left, is that

14    right?

15    A.  Yes.

16    Q.  You do agree with me that if the entire picture that I have

17    just shown you right there can be considered a viewer, then you

18    agree it definitely stores electronic books, correct?

19         MR. CABRAL:  Objection, your Honor.  Foundation.

20         THE COURT:  Overruled.

21    A.  No, I don't think the entire thing is considered to be a

22    viewer.

23    Q.  Which is not my question.  My question is, if the entire

24    thing can be considered a viewer, you definitely agree that

25    within that picture there are stored electronic books, correct?

 1              MR. CABRAL:  Objection.  Lack of foundation.

 2              THE COURT:  Sustained.

 3   Q.  You agree within that picture there are stored electronic

 4   books, correct?

 5   A.  The books are stored in those separate modules and the

 6   separate compact cylinders labeled as 22 and 24.

 7   Q.  So you agree that number 22, they can hold electronic

 8   books, correct?

 9   A.  Yes.  That's a separate memory module.

10   Q.  If we can go to -- well, let me just ask you the question.

11              You're aware that there is a disclosure in Saigh that

12   the memory cards 22 can be inserted into what you say is the

13   viewer, number 20, correct?

14   A.  Yes.

15   Q.  When the cards are inserted into the viewer, you agree that

16   then the viewer has electronic books on the card in the viewer

17   at least, correct?

18   A.  Yes.  It is connected to the control unit, but it still

19   does not describe it stores the e-books on the viewer.

20   Q.  So take a camera and take an SD card.  An SD card inside a

21   camera, you would contend that whatever is on that SD card is

22   not in that camera, is that correct?

23   A.  Right.

24   Q.  And that is the basis for your opinion that it is not

25   stored on the device, that even though it's in a piece of

1  memory that is intended to and inserted into that device, that

2  does not mean that it is in fact stored on the device, correct?

3  A.  That's one of the reasons.

4  Q.  But you do agree that it would be obvious to have memory on

5  board number 20 in which to store electronic books, correct?

6          MR. CABRAL:  Objection.  Defense counsel's expert did

7  not render an opinion on obviousness.

8          THE COURT:  Sustained.

9  Q.  The other distinction between Saigh and claim 7 in the '501

10  patent is on this step of associating a predetermined amount of

11  time after the electronic book is stored on the viewer with the

12  electronic book, correct?

13  A.  Yes.

14  Q.  As you know, the Court has instructed that this means a

15  step of associating with the electronic book for a

16  predetermined amount of time that begins when the electronic

17  book is stored on the viewer, correct?

18  A.  That's right.

19  Q.  Now, in your opinion -- well, there is a section of Saigh

20  that both you and Dr. Neuman point to that has language

21  regarding the time period that is set for the borrower of the

22  electronic books, correct?

23  A.  Yes.

24  Q.  You agree that Saigh says, "Information downloaded from a

25  compact cylinder or from a book bank to a memory module 22,"

1  and that's the little card, right?

2  A.  Yes.

3  Q.  "May also include date and time information as to when the

4  data was transcribed into the memory module as well as

5  information regarding a set time period after which the

6  information transcribed in the memory module will be

7  automatically erased."  Correct?

8  A.  Yes.

9  Q.  Now, one of your opinions with respect to this disclosure

10 is that this sentence does not state that the preset time

11 period begins when an electronic book is stored on the viewer,

12 right?

13 A.  That's right.

14 Q.  So to be clear, you believe that if the preset time began

15 before the book was downloaded to the memory module and then

16 stored in the viewer, that is different than claim 7 under the

17 Court's construction, correct?

18 A.  Could you repeat that question?

19 Q.  Possibly.  To be clear -- well, let me start over.

20        It's true that your problem with this disclosure is

21 that it doesn't say that, the preset time period begins when

22 the electronic book is stored on the viewer?

23 A.  A little bit more than that.  It does not say a

24 predetermined amount of the time that begins.

25        MR. BERTA:  Paragraph 481, the second sentence.

1           THE COURT:  Paragraph?

2           MR. BERTA:  481.

3           THE COURT:  But who's counting.

4           So you want to read that?

5           MR. BERTA:  The second sentence.

6           THE COURT:  Any objection?

7           MR. CABRAL:  It doesn't appear to be impeachment.

8           THE COURT:  Sustained.

9   Q.  So let me ask you the question differently.

10          You agree that one of the differences between Saigh

11  and claim 7 is that Saigh does not state that the preset time

12  period begins when an electronic book is stored on the viewer,

13  correct?

14  A.  Saigh does not describe a predetermined amount of the time

15  that begins, which is construed by the Court.

16  Q.  Which includes a predetermined amount of time when the

17  electronic book is stored on the viewer, correct?

18  A.  Yes.

19  Q.  So to be clear, it is your opinion that if the preset time

20  period began before the book was downloaded to the memory

21  module, which is what would happen if the book was downloaded

22  to the memory module from the book bank, that's different than

23  claim 7 under the Court's construction, correct?

24          MR. CABRAL:  Objection, your Honor.  Foundation.

25          THE COURT:  Well, also compound, assumes facts not in

1    evidence, and states the opinion of counsel.  Sustained on all

2    of those grounds.

3    Q.  You mentioned a book bank in your direct, is that correct?

4    A.  I'm sorry.  Are you asking me a question?

5    Q.  I am.  I would not ask the judge a question.

6    A.  Sorry.

7    Q.  You mentioned a book bank in your direct?

8    A.  Yes.

9    Q.  And the book bank is where the book bank can put a book on

10   the little card 22, correct?

11   A.  That's right.

12   Q.  And associate a predetermined time with that card, is that

13   correct?

14   A.  Yes.

15   Q.  But your opinion is because the card is not yet in the

16   viewer, that can't meet claim 7, correct?

17   A.  That's part of it, yes.

18   Q.  So that if the time period was set before the card got into

19   the viewer, you believe that that does not fall within the

20   scope of claim 7 by the Court's construction, is that correct?

21   A.  It's not associated with the book stored on the viewer.

22   It's only associated with the book is stored on the separate

23   memory module.

24   Q.  The card hasn't made its way to the viewer yet, correct?

25   A.  That's correct.

1        THE COURT:  Counsel, your time is up, but because I am

2   well-known for my generous forgiving ways, I will give you two

3   more minutes if you have one last thing you want to cover.

4        MR. BERTA:  Thank you, your Honor.

5   Q.  We talked a little bit about Bolas?

6   A.  Yes.

7   Q.  Bolas is a little Internet radio, correct?

8   A.  That's right.

9   Q.  And Bolas has -- I think we agree what it sends to a URL is

10  the user identification information?

11  A.  Yes.

12  Q.  Then it also sends a serial number for the particular

13  device, is that correct?

14  A.  That's correct.

15  Q.  So just to be clear, is it your opinion that if the only

16  thing the device sends is user information and the particular

17  serial number of the particular device itself, that that does

18  not meet the claim elements of the identifier that is

19  associated with the type of appliance?

20       MR. CABRAL:  Objection, your Honor.  Foundation.

21  Assumes facts not in evidence.  That opinion was not in defense

22  counsel's expert.

23       THE COURT:  Sustained.

24       MR. BERTA:  I have no further questions.

25       THE COURT:  Any redirect?

 1              MR. CABRAL:  No, your Honor.

 2              THE COURT:  Thank you very much.  You may step down.

 3              THE WITNESS:  Thank you, your Honor.

 4              (Witness excused)

 5              THE COURT:  Anything else from plaintiff?

 6              MR. BAUER:  I just ask that you let the jury know

 7    about Exhibit DX 296.

 8              THE COURT:  Yes, 296 was received.

 9              MR. BAUER:  Thank you.

10              THE COURT:  But all of the exhibits will be given to

11    you when you start your deliberations.

12              So it's been a full day.  Let me just quickly remind

13    you of a few things.  When the case is given to you tomorrow,

14    which it will be given after the closing arguments of counsel

15    and my instructions, you will basically have to consider up to

16    three things.

17              The first thing you will need to consider is whether

18    there has been an infringement of any of the claims in any of

19    the patents.  If there is no infringement, that's the end of

20    that.  If there is an infringement, the next thing you will

21    have to consider is whether as to any claim that you found that

22    was infringed, that claim is nevertheless invalid either

23    because it didn't describe something new or because what it

24    described would have been obvious to anyone skilled in the art.

25              If you find that any given claim is invalid, that's

EAL8ADR7

1    the end of that.  If, however, you find any claim was infringed

2    and that the claim is valid, then you will go on to determine

3    damages, the amount of money that needs to be awarded.  And

4    that requires you to determine what a reasonable licensor in

5    the position of the plaintiff would have negotiated in November

6    2009 with a reasonable seller, reasonable licensee.

7              You heard some testimony today and even before today

8    about things that occurred after 2009.  Those things can be

9    relevant by sort of backward reasoning.  You can say, well, if

10   Joe agreed to buy a widget from Tom in 2010 for ten bucks, that

11   reasonably he might have paid him ten bucks in 2009, or you

12   might disagree, that conditions have changed totally by 2010.

13   You can't backward reason.  All of that is for you to decide.

14             I do want to make clear that ultimately what you have

15   to decide is what someone in 2009 would have decided was the

16   fair royalty, the fair price for licensing any patent that you

17   find was infringed, not what someone decided later on; you

18   can't substitute the later stuff for the earlier, but you can

19   use it to reason backwards to determine what you think the

20   conditions would have been.

21             So those are the possible jobs that you will have to

22   undertake tomorrow.  I will give you very full instructions on

23   all of this.

24             Now, tomorrow plaintiff's counsel goes first.  They

25   get an hour.  Defense counsel goes second.  They get an hour.

EAL8ADR7

1    I go last.  I only get a half an hour but it's enough.

2            So we will start at 9.  You say, boy, this is the guy

3    who cried wolf.  My gosh, I am going to make every effort to

4    start at 9 tomorrow.  So if we start at 9, we will go directly

5    through those two hours of summation, take a 15-minute break

6    and then give my half hour of instructions.  So I am guessing

7    about 11:45 the case will be yours to start deliberation.

8            You can take as long or as little as you want for

9    deliberations, but on the assumption that it might take you

10   more than an hour, we are going to arrange for lunch to be

11   brought in to you at around 1:00 and we will give you a menu

12   during that mid morning break so you can order your lunch.

13           So I think that's everything.  I am glad to say it's

14   still only two minutes before 5, but I think it's time for you

15   to go home.

16           Thank you so much.

17           We will see you tomorrow at 9:00.

18           (Jury exits courtroom)

19

20           (Continued on next page)

21

22

23

24

25

EAL8ADR7

1            THE COURT:  Any motions that anyone wants to make?

2            MR. CABRAL:  Yes, your Honor.

3            Plaintiff would move for a judgment as a matter of law

4    of no anticipation by the Bolas reference in light of Dr.

5    Neuman's concession that there was in fact no anticipation of

6    that reference.

7            I am happy to move on if you like.

8            THE COURT:  Keep going.

9            MR. CABRAL:  We would also like to move for judgment

10   as a matter of law of no obviousness for claim 96 of the '851

11   patent in light of the combination of the Sachs and HTTP

12   references, given that Dr. Neuman did not provide a reason to

13   combine the two references and Dr. Neuman conceded that neither

14   reference included receivers that selects the title in the

15   transmitted list of titles.

16           With regard to the Saigh reference, plaintiff would

17   also move for judgment as a matter of law of no anticipation

18   which is the only defense raised with respect to that

19   reference.  In light of Dr. Neuman's concession that the

20   predetermined time period begins after the book is written on

21   the alleged viewer, and in light of the evidence indicating

22   that the memory module is separate from the viewer itself.

23           Finally, your Honor, plaintiff would move for judgment

24   as a matter of law of no invalidity in light of the Munyan

25   reference, in light of the fact that Dr. Neuman is relying on

EAL8ADR7

1    security information that does not initiate retrieval of

2    content information to the device itself.

3           THE COURT:  All right.

4           MR. CABRAL:  As a procedural matter, plaintiff would

5    move for judgment as a matter of law with respect to all the

6    defense issues, but we would like to focus on those.

7           THE COURT:  Your general motion which you were right

8    to raise at this point for technical reasons is denied, but now

9    with respect to your more specific motions, let me hear from

10   defense counsel.

11          MR. SHARIFAHMADIAN:  Regarding the Bolas, your Honor,

12   there was no concession that Bolas does not anticipate.  Dr.

13   Neuman testified that the claims must be read consistently.

14   And if they are read in the manner that plaintiff is suggesting

15   for purposes of infringement, then there is more than

16   sufficient evidence for a reasonable jury to find that Bolas

17   anticipates those claims and, therefore, judgment as a matter

18   of law is not appropriate.

19          Regarding the combination of S-HTTP and the software

20   patent with respect to claim 96 of the '851 patent, there is

21   more than sufficient evidence in the record to allow a

22   reasonable jury to conclude that a combination of S-HTTP and

23   SoftBook would have been obvious to a person of ordinary skill

24   in the art.

25          Saigh, which is the reference that was asserted

1   against the '501 patent, Dr. Neuman did not concede that the

2   time begins after the book is stored on the viewer.  In fact on

3   redirect he clarified his testimony that the time begins when

4   the book is stored on the memory module.  And he testified that

5   the memory module is part of the viewer in one embodiment, is

6   part of the viewer at the time that the book is transferred

7   from the compact cylinder to the memory module.  So there is

8   more than sufficient evidence for a jury to find that Saigh

9   anticipates.

10          With respect to Munyan, Dr. Neuman testified that the

11   security identification code is used to initiate retrieval and

12   that retrieval information is based on that code because the

13   bookstore will not return information if that code is not

14   validated, and that is more than sufficient evidence for a jury

15   to find that Munyan anticipates.

16          I believe I may be missing one, your Honor.  I am

17   sorry.

18          THE COURT:  Is there one he hasn't responded to yet of

19   the points you just raised?

20          MR. CABRAL:  I believe he addressed them all.

21          THE COURT:  I agree with defense counsel that there

22   are jury issues here so the motions are denied.

23          Now let me hear any motions from defense counsel.

24          MR. SHARIFAHMADIAN:  Your Honor, we have a motion with

25   respect to all of the claims.

EAL8ADR7

1      THE COURT:  Yes, that motion is denied.

2      MR. SHARIFAHMADIAN:  I will focus on several issues.

3      One is with respect to claim 13 of the '703 patent.

4  There is no evidence or no legally sufficient evidentiary basis

5  for a jury to conclude that claim 13 is infringed by Barnes &

6  Noble.  That is a method claim.  And the only evidence that

7  Mr. Berg or anybody else put into the record here is that the

8  users -- Mr. Berg pointed to the actions of users of Nook

9  devices and what a Nook device does to say that the enabling

10  limitation of claim 13 is met.

11      However, the law is very clear that a method claim

12  cannot be infringed by selling your product; it is the actions

13  that need to be looked at, not the fact that a product is

14  capable of being used to infringe a method.

15      There is no evidence of direction and control in this

16  case.

17      There is no allegation of inducement of

18  infringement -- that your Honor already granted summary

19  judgment with respect to.

20      The only claim here is direct infringement and he has

21  not pointed to any actions performed by Barnes & Noble.  All he

22  pointed to is what a user does and what a Nook device is

23  capable of doing when it is owned and being operated by a user

24  of that device.

25      Also, with respect to the based on an identifier

EAL8ADR7

 1    limitation of claim 13, all that Mr. Berg pointed to and all

 2    that this evidence shows in the record is that identifiers are

 3    sent and identifiers may be returned, but nothing in terms of

 4    what happens to those identifiers.

 5          And claim 13 specifically says that the identifier is

 6    representative of type.  Mr. Mulchandani testified, unrebutted,

 7    that the identifier that is representative of type and model

 8    number is in the HTTP header and is actually not used to return

 9    any information; it is used for logging and statistical

10    purposes but not to return any information.  For that reason,

11    there is no evidence supporting a judgment of direct

12    infringement with respect to method claim 13.

13          THE COURT:  Anything else?

14          MR. SHARIFAHMADIAN:  Yes, your Honor.

15          With respect to claim 1 of the '703 patent, Mr. Berg

16    admits that pressing the shop icon is accessing the shop

17    application.  That testimony is further corroborated by Mr.

18    Mulchandani and Dr. Neuman's testimony.  So the user is

19    accessing the shop application when pressing the button

20    happens.

21          The evidence in this case is that shop is a Web

22    browser.  The evidence shows that it receives and displays

23    HTML.  It identifies itself as a browser.  It was built using

24    Android Web browser libraries.  It can be used to browse and

25    search the shop storefront.  You can use it to follow links to

EAL8ADR7

the general worldwide web.  That was demonstrated in open

court.  And it uses the HTTP protocol which is a protocol that

transmits over the worldwide web.

     This evidence is unrebutted in the record.  There is

no other evidence for a jury to conclude that shop is not a Web

browser, and for that reason we move for a judgment as a matter

of law with respect to claim 1 of noninfringement of the '703

patent.

     THE COURT:  I would like to get the full panoply.

     MR. SHARIFAHMADIAN:  And I will try and move as fast

as I can.

     With respect to the '501 patent and claim 7, again,

this is a method claim.  So selling a product capable of

performing the method is not direct infringement.  That's *Joy*

*Technologies*.  That's federal circuit law.

     Here, storing the book on the device, the unrebutted

evidence is that that is something that the Nook device does;

it's not something that Barnes & Noble is performing.

Therefore, there cannot be direct infringement for that reason

with respect to claims 7 and 8.

     Additionally, with respect to both claims 7 and 18,

there is no associating predetermined amount of time that

begins when the electronic book is stored on the viewer.  The

unrebutted evidence is that the time begins prior to when the

book is stored on the viewer.  Mr. Berg admits that.  Mr.

EAL8ADR7

Mulchandani testified as to that.  Mr. Neuman testified as to

that.  The time admittedly sometimes can be short, but

nevertheless there is no literal infringement.  And there is

more than sufficient testimony in the record for a reasonable

jury to find that this difference is substantial.  Dr. Neuman

testified as to that.

Additionally, your Honor, we renew our motion with

respect to the fact that doctrine of equivalents is not even

applicable here because of the prosecution history.

Finally with respect to claim 96, there is no evidence

to allow a jury to find that the receiver in the accused Nook

devices is doing the selection of titles.  The evidence in the

record by Mr. Mulchandani and Dr. Neuman is that it is the user

who is the doing the selecting.  There was no evidence in the

record at this trial to rebut that.  All Mr. Berg said is that

I saw a bunch of lists being sent to the device and I saw

something being returned.  He had no evidence or opinion

regarding what actually happens in the Nook device with that.

Mr. Mulchandani testified that there is no selection of the

list by the device, much less the transmitter or the receiver.

Therefore, we move for noninfringement on that basis, your

Honor.

I think that covers it, your Honor.

THE COURT:  Let me hear from plaintiff's counsel.

MR. CABRAL:  With respect to claim 13, claim 13 is a

method claim.  This is claim 13 of the '703 patent.  It is a

method claim that requires a method of enabling a service

provider to provide a service via the Internet.

          Mr. Berg testified at length regarding how each step

of that claim is performed and Mr. Berg's testimony is evidence

in this case.  Now, with respect to other aspects of the actual

claim that were challenged by plaintiff, he takes issue with

whether or not data is retrieved using the identifier claim in

claim 13.  That identifier is representative of a type of

device.  This came up, your Honor, earlier in the proceedings.

There is an admission by Barnes & Noble's 30(b)(6) witness and

I asked him at his deposition, how does the server decide what

data to provide to the device?  And that 30(b)(6) witness

admitted, the model number.  That evidence by itself, your

Honor, is sufficient to defeat this judgment as a matter of

law.

          With respect to claim 1 of the '703 patent, the

challenge there -- I apologize, your Honor -- I forget the

actual basis for the challenge.

          Again, Mr. Berg gave very detailed testimony on an

element-by-element basis with respect to claim 1.  The issue

here that is challenged by defendants is with respect to the

initiation of retrieval of data and whether a user has to

access a Web browser in order to do that.  The testimony of

Mr. Berg was clear that pressing the button sends the request.

EAL8ADR7

```
 1    Mr. Mulchandani also admitted that.  Mr. Narain also admitted
 2    that as part of his testimony, although it was played by video
 3    as part of the designations of law, your Honor.
 4         The issue of the Web browser in our view is a
 5    distraction from the issue as to whether the user has to access
 6    anything in order to initiate retrieval of data.  And on that
 7    issue, Mr. Berg provided very clear testimony that the user
 8    does not have to access anything.
 9         That takes me to claim 7 of the '501 patent, your
10    Honor.  The issue here, as I understand it, is that defense
11    counsel is now arguing that Barnes & Noble performs the storage
12    element of that claim.
13         I will start with Mr. Berg's testimony which, again,
14    is evidence in the case.  He addressed every element of claim 7
15    and how every step of the method is performed.
16         You had Mr. Mulchandani's testimony also that the
17    device operates as a slave to the Barnes & Noble cloud which
18    dictates all of the actions that are going on in and around the
19    device which is also evidence in this case to defeat
20    defendants' motion.
21         With respect to the time period, Mr. Berg testified
22    that in his opinion the time period begins when the book is
23    stored on the viewer.  That evidence is sufficient by itself to
24    defeat the motion.
25         In addition, there is a doctrine of equivalents
```

EAL8ADR7

1    argument that your Honor has already allowed plaintiff to make.

2    On this very issue, defense counsel's own expert admitted that

3    a two-to-four-second difference is not substantial.  And that,

4    your Honor, is pretty damning evidence, we think, to even get

5    beyond this judgment as a matter of law and to reach the

6    ultimate conclusion in this case.

7             Finally, your Honor, with respect to claim 96, there

8    is this receiver issue.  On this, again, we went through every

9    element here with Mr. Berg.  He provided testimony which is

10   evidence in this case regarding how the Nook devices meet that

11   element.  He gave testimony specifically that the EAN is the

12   title that is selected by the device.  Defense counsel's

13   defense is that the user selects the title -- that's a

14   different subject matter here.  And that testimony was

15   corroborated by the testimony of Dr. Neuman earlier this

16   morning regarding the section of the selection of the EAN from

17   a list of EANs as transmitted by the devices.

18             THE COURT:  All right.  Once again, I think there are

19   jury questions with respect to each and every one of the points

20   raised by defense counsel so the motions are denied.

21             Now, in terms of tomorrow, you know the schedule and I

22   really am going to try very hard to get things going promptly

23   at 9:00.

24             Is there anything else we need to take up this

25   evening?

EAL8ADR7

1              MR. CABRAL:  We have one issue, your Honor.

2              THE COURT:  Yes.

3              MR. CABRAL:  It relates to the sentence we discussed

4    earlier that was the subject of your Honor's ruling regarding

5    patent marking.  And not to reconsider your judge's ruling, but

6    to reconsider the accuracy of that language in light of your

7    Honor's ruling on the marking issue.

8              THE COURT:  Go ahead.

9              MR. CABRAL:  Plaintiff believes the law allows it to

10   recover damages prior to the point in time when 271 was

11   triggered which is the subject of your Honor's ruling.  So the

12   law is pretty clear and we have three cases and secondary

13   source available here that says that plaintiffs or patent

14   holders are allowed to recover damages prior to the point in

15   time in which 287 is triggered and there is a marking

16   obligation.  So, your Honor, prior to the obligation to mark,

17   plaintiff is entitled to damages under the law and after the

18   date of actual notice plaintiff is also allowed to recover

19   damages under the law.

20              The only issue in this case, in light of your Honor's

21   ruling that there was an obligation to mark products under the

22   '703 and '501 patents, the only period that that affects is

23   that four-month window in between the Amazon license and the

24   date of actual notice in March of 2012.

25              THE COURT:  Let me hear from defense counsel.

1          MR. SHARIFAHMADIAN:  Your Honor, this is an issue of

2     the plaintiff having waived this issue.  They have not raised

3     it at any time during this case.

4          THE COURT:  Oh, no, no.  The very argument he just

5     made, he has made before.  I can remember him making that

6     argument.

7          MR. SHARIFAHMADIAN:  Yesterday for the first time,

8     after your Honor said that anything not raised in jury

9     instructions sent on Friday would be waived and would not be

10    part of the jury instructions.

11         THE COURT:  Last night I got from both sides all sorts

12    of untimely unsolicited communications which of course I was

13    thrilled to receive but I did consider it.

14         So on the merits, do you have any answer to the point

15    just made?

16         MR. SHARIFAHMADIAN:  If I may have one second?

17         THE COURT:  Yes.

18         MR. SHARIFAHMADIAN:  Our position would be that there

19    is nothing in the language of 287 itself that requires parsing

20    of the time period in this matter.  There was an obligation to

21    mark.  Your Honor has ruled that it has come into effect and

22    therefore --

23         THE COURT:  I must say, I think 287 is a strange

24    statute.

25         MR. CABRAL:  Plaintiff will offer the cases in the

EAL8ADR7

1    secondary source if it is helpful.

2            THE COURT:  Here is what I am going to do on this

3    because I am running out of time.  I teach at Columbia tonight

4    and I have to hear this other matter.

5            So you would have it read what?

6            MR. CABRAL:  I will bring up the exact language, your

7    Honor.

8            It relates to the last sentence, your Honor.

9            THE COURT:  You would say for the '501 and '703

10   patents, however, damages should run from December 2009 through

11   the date of your verdict except for -- and then we would

12   specify that four-month period?

13           MR. CABRAL:  It would be November 10th of --

14           THE COURT:  How can they even apply that, given the

15   evidence in this case?  They don't have the data to separate

16   out that four months.

17           MR. BAUER:  We have no objection to giving them those

18   four months or resubmitting the numbers.

19           THE COURT:  I don't have time.  I want both sides to

20   submit by 7:30 tonight -- and I really mean 7:30, not the fake

21   times that I got after 7:30 last night -- to my law clerk what

22   you say that last sentence should say, what case law supports

23   your respective positions -- actually, I take it back, I think

24   it should be the plaintiff who should do this by 7:30 and the

25   defense by 8:00 because the defense has their position stated

EAL8ADR7

```
 1    in the instruction -- and what evidence would then be added to
 2    the record before the jury hears summations tomorrow.  So that
 3    from plaintiffs by 7:30, response by defendants by 8:00.
 4            My class ends at 8:15 so my law clerk will get that
 5    stuff to me and I will give you my ruling by sometime this
 6    evening.
 7            Anything else?
 8            MR. CABRAL:  No, your Honor.
 9            MR. SHARIFAHMADIAN:  No, your Honor.
10            THE COURT:  Very good.
11            (Adjourned to October 22, 2014, at 9:00 a.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

INDEX OF EXAMINATION

Examination of:                                    Page

CLIFFORD NEUMAN

Cross By Mr. Cabral . . . . . . . . . . .1187

Redirect By Mr. Sharifahmadian . . . . . . .1210

Recross By Mr. Cabral . . . . . . . . . .1230

Redirect By Mr. Sharifahmadian . . . . . . .1237

NED BARNES

Direct By Mr. Ederer . . . . . . . . . . . .1241

Cross By Mr. Bauer . . . . . . . . . . . .1276

Redirect By Mr. Ederer . . . . . . . . . . .1335

XIN WANG

Direct By Mr. Cabral . . . . . . . . . . . .1350

Cross By Mr. Berta . . . . . . . . . . . .1361

                    PLAINTIFF EXHIBITS

Exhibit No.                                    Received

 73.001   . . . . . . . . . . . . . . . . .1208

 120   . . . . . . . . . . . . . . . . . . .1343

                    DEFENDANT EXHIBITS

Exhibit No.                                    Received

 55, 272, 644, and 646   . . . . . . . . . .1343

 203   . . . . . . . . . . . . . . . . . . .1345

 296   . . . . . . . . . . . . . . . . . . .1350