```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   ADREA, LLC,

 4                    Plaintiff,

 5           v.                           13 Cv. 4137 (JSR)

 6   BARNES & NOBLE, INC.,
     BARNESANDNOBLE.COM LLC, AND
 7   NOOK MEDIA LLC,

 8                    Defendants.

 9   ------------------------------x

10                                        October 22, 2014
                                          9:40 a.m.
11
     Before:
12                    HON. JED S. RAKOFF

13                                        District Judge

14                         APPEARANCES

15   PROSKAUER ROSE LLP
          Attorneys for Plaintiff
16   BY:  STEVEN M. BAUER
          COLIN CABRAL
17        BRENDAN COX

18   ARNOLD & PORTER LLP
          Attorneys for Defendants
19   BY:  LOUIS S. EDERER
          ALI R. SHARIFAHMADIAN
20        MICHAEL A. BERTA
          SUSAN LEE SHIN
21        YUE-HAN CHOW
          SUSAN BRACKNEY ARNI
22        TERI RODRIGUEZ

23

24

25
```

Eamsad-1

1          (Trial resumed; jury not present)

2          THE COURT:  Good morning.  We have an issue that has

3  arisen.  Would counsel please come to the side bar, just one

4  counsel.

5          (At the side bar)

6          THE COURT:  My courtroom deputy reports that early

7  this morning, when she came in, Juror No. 2 told her that her

8  notes which she had left in the jury room, as all the jurors

9  do, had been ripped out of her notebook and then put back.  Do

10  I that I have that right?

11          THE CLERK:  Yes, but out of order.

12          THE COURT:  Out of order.  There are security tapes

13  that show what is going on in this courtroom, so we are

14  checking the tapes to see if anyone entered the courtroom

15  between 6 o'clock last night and 8:30 this morning, when the

16  courtroom was opened for the jurors.  I think more likely it is

17  something that happened between the jurors.

18          The question is, what would you like me to do?  I

19  think at a minimum we should question Juror No. 2 to find out

20  first-hand exactly what she said and whether it is continuing

21  to bother her or not.  It doesn't sound like it is substantive.

22  Depending on what she says, we could question the other jurors.

23  Or we could do nothing.  I think at a minimum we should

24  question her just to make sure that she is feeling comfortable

25  and can proceed.

1          Let me hear what you folks think.

2          MR. BAUER:  Your Honor, I have never had this issue.

3    I wouldn't know where to begin.  I would defer to your

4    judgment.

5          MR. EDERER:  Same here.  I was wondering if there was

6    any indication that there was any sort of friction between the

7    jurors.

8          THE COURT:  That's a possibility.  If she is not

9    feeling that, then I don't think we have to worry about the

10   other jurors.  Whatever they feel about her, I don't see how it

11   would impact the juror deliberations.

12         What I suggest is that the four of us, namely, the

13   lead lawyers who are here with me at the side bar, my courtroom

14   deputy, the court reporter, and my law clerk, so the five of

15   us -- six of us, whatever.

16         MR. EDERER:  You forgot yourself.

17         THE COURT:  -- go into the robing room, invite Juror

18   No. 2 in and question her briefly.

19         MR. BAUER:  Do you know whether all the jurors are

20   aware of this, or was this a private discussion?

21         THE CLERK:  They are aware of it.  She does think she

22   has all her notes, going by the order of the witnesses.

23         THE COURT:  She can presumably rearrange her notes.

24   Thanks to my promptness or lack thereof, she has had some time.

25         MR. BAUER:  She doesn't think they are missing?

E4msadhr1

```
 1              THE CLERK:  Correct.

 2              (In the robing room)

 3              (Juror No. 2 present)

 4              THE COURT:  Hi, Juror No. 2.  My courtroom deputy

 5    reported you had a little incident.

 6              JUROR NO. 2:  Yes.  I came in this morning and went to

 7    where I had left my book, and it wasn't there.  Somebody

 8    pointed out to me that there were some books on the other side.

 9    I said, that's odd because I didn't leave one there.  I went

10    over there, and it was there.  It was sort of between two other

11    books and it was open and all my notes were out.

12              It was like this.  Some were upside down, some were

13    this way.  They were totally mixed up, the pages.  I was sort

14    of in shock.  Also, where they were torn out, some of the

15    actual writing was torn but it is not even left here.  So that

16    I guess got thrown out.

17              THE COURT:  I can see that, looking at it physically.

18              JUROR NO. 2:  Some was like this, some was like this,

19    just like that.  It upset me.  I don't know who has access.  By

20    the way, I was the last one to leave last night.

21              THE COURT:  And there was no one else there when you

22    came in this morning?

23              JUROR NO. 2:  Yes, I'm sorry, there were three or four

24    jurors there when I got in.

25              THE COURT:  Anything is possible, I suppose.  Let me
```

1  ask my courtroom deputy, do they clean that room at night?

2          THE CLERK:  Yes, they do, when we are lucky.

3          JUROR NO. 2:  It's bad.  I'm sorry.

4          THE CLERK:  The cafeteria does come in just before

5  8:30, sometimes at 8:30.  Today he was a little early, whoever

6  brought the breakfast.

7          JUROR NO. 2:  He was leaving as I came in, actually.

8          THE COURT:  I'm going to guess, but we should probably

9  check, that it may have been one of those people by accident.

10 Maybe the cleaning people thought the case was over or

11 something like that and maybe out of curiosity -- who knows.

12 We will check all that out with our security people.

13         We just want to make sure that you are comfortable now

14 because we are getting close to deliberations.  I want to make

15 sure.

16         JUROR NO. 2:  I'm fine.  I feel a little violated

17 because it is just odd.

18         THE COURT:  Of course.

19         JUROR NO. 2:  The other jurors were saying, what do

20 you mean you lost your notes?  We need your notes.

21         THE COURT:  I can see from this distance that you took

22 copious notes.

23         JUROR NO. 2:  It helps me.

24         THE COURT:  I do want to remind you that if there is

25 anything you don't remember, you can always send us a note, and

1    we will get it for you.

2              JUROR NO. 2:  I understand.

3              THE COURT:  Thank you very much.  That makes us feel

4    much more comfortable.  You can go back to the jury room.

5              JUROR NO. 2:  Thank you.

6              (Juror No. 2 not present)

7              THE COURT:  She seems like a nice woman, she seems

8    comfortable.  Obviously, a very strange happening.  The more I

9    hear about it, the more I'm inclined to think it was some

10   cleaning person something like that who just got all confused

11   and probably didn't know what to do.

12             In any event, I am inclined to leave her on the jury

13   and let things continue, unless anyone disagrees.

14             MR. EDERER:  No, your Honor.

15             MR. BAUER:  No objection.

16             THE COURT:  Very good.  One other thing.  I think we

17   will take maybe a 10-minute break between the two summations.

18   I think that's good for the jury not to have them together.

19             MR. BAUER:  Your Honor, will you be to give me 10

20   minutes' notice or 5 minutes' notice?

21             THE COURT:  Yes, absolutely.

22             (In open court)

23             THE COURT:  Let's bring in the jury.

24             (Jury present)

25             THE COURT:  Good morning, ladies and gentlemen.  I'm

```
 1    looking at my watch.  It says exactly 9 o'clock.  Does anyone

 2    know a good watch repairman?

 3             We are about to hear final arguments from counsel.

 4    Each side has been allotted one hour.  We'll take a very short

 5    break between the two closing arguments.

 6             I want to caution you that nothing that counsel says

 7    is evidence.  The evidence which you have now heard came from

 8    three sources.  There were the witnesses who testified, there

 9    were the documents and other exhibits that were received in

10    evidence, and there were a few things that the parties agreed

11    to, stipulated to.  Those are the three sources of evidence.

12             Now that all the evidence is in, I think it will be

13    very helpful before you start your deliberations to hear what

14    the attorneys think the evidence shows or fails to show.  They

15    are going to, obviously, have very different views.  But it

16    will be, I think, useful to you to hear those competing views

17    before you make up your own mind later today.

18             We will begin with plaintiff's counsel.

19             MR. BAUER:  Thank you, your Honor.  Your Honor, if I

20    could ask for five-minute notice?

21             THE COURT:  Yes.

22             MR. BAUER:  Well, it's been a long time.  You haven't

23    heard a lot from me, but I've been here the whole time, as you

24    know.  Good morning, ladies and gentlemen.  Thank you for your

25    attention.  Thank you for being here.  Thank you for your
```

1   diligence.  When I spoke to you three weeks ago, I told you I

2   hoped that you would find it educational and informative.

3   There has been a lot evidence here.

4          There is no better way to decide who is right than a

5   jury.  There is no better truth-teller than a jury.  Nine

6   people like you together collectively know who is telling the

7   truth better than any lie detector, better than any machine,

8   better than anything.

9          Between the nine of you, you saw all the witnesses.

10  You saw them on cross-examination, that is really the most

11  important thing.  We all know on direct they have been prepared

12  by the lawyers, they know what questions are coming, they know

13  what they are going to be asked.  But cross-examination, that's

14  when the true test begins because that is when they have to

15  stand up and answer for what they have done.

16         You heard three weeks of evidence.  Obviously, at the

17  very beginning, evidence comes from every direction.  There are

18  videotapes, witnesses, and you are hearing all these little

19  snippets of information.  It is a jigsaw puzzle.  Somebody has

20  dumped the box out and you don't have a picture on the cover,

21  you don't know what these pieces are.  That first week for sure

22  you are picking up pieces, and they are white and green and

23  orange.  You don't know are these marbles or a city landscape.

24  I am here to help you put the pieces together so you will

25  understand why you heard that evidence.

1    We have some slides, exhibits largely, and the

2    testimony to try and bring things together to help you remember

3    where we are at.  Remember, this is a patent infringement case.

4    Some of the things I'm going to tell you is what you saw, but

5    some of the things I'm going to tell you are what you didn't

6    hear, remind you of what you didn't hear.

7         These patents went through the patent office.  One

8    thing you didn't hear is any evidence that anything went wrong

9    at the patent office.  Nobody from the other side told you that

10   the Patent Office didn't have the information it was supposed

11   to have, that a patent examiner made a mistake, that somebody

12   told the patent examiner something wrong.

13        All the evidence here is that, as the slide tells you,

14   the patent office reviewed these, the requirements of law were

15   complied with, the patent examiner decided that these were

16   valid patents, that they were inventions here, and the patents

17   were granted.

18        When those patents were granted, that's property.

19   This is real property.  This is real.  As you heard Mr. Barnes

20   talk about it, it's like buying real property.  These patents

21   are property that you can then take, you own.  What do they

22   protect?  They protect ideas.  They protect inventions.

23        Where do these patent come from and what is ADREA?  We

24   have heard a lot of questions, is ADREA just a company that

25   does lawsuits, things like that.

1          MR. BAUER:  ADREA is three of the largest companies

2     that we've heard of, real innovators, people who spend lots and

3     lots of money innovating.  They get patents to protect their

4     investment.  And when you get a patent to protect your

5     investment, there is no obligation that you make that product

6     for the 20 years that the patents last.  The idea of the patent

7     is when you get the patent, when you make the investment and

8     you have identified an invention, you can make it or you can

9     license it; but the real thing is when people use that

10    technology years later.

11          Remember all innovation is standing on the shoulders

12    of the people who came before you.  Every invention you have

13    ever heard of was an improvement on something else.  We hear

14    about airplanes and the Wright brothers, well, that was

15    improvement on a glider.  Thomas Edison's light bulb, he didn't

16    invent the light bulb; he came up with a better filament to

17    make the light bulb last longer.  And all inventions are slight

18    improvements, to some extent, over what was there before.  When

19    you see the prior art that they put in front of you, every one

20    of those, you see what it was like years before and you see

21    that these patents are steps forward.  And that's what we have

22    got patents on, the steps forward, the improvements.

23          Now, it's not just these big technology companies.

24    These are real people.  And you saw the real inventors.  And

25    not only did you see real inventors, Mr. Shteyn, you saw the

1    mind of a real inventor when he was up there.  If you remember,

2    this goes way back the first few witnesses, and the dialogue,

3    the colloquy between him and opposing counsel, Barnes & Noble

4    counsel, you see how an inventor thinks.  When asked what can

5    you do with a garbage can, it was a little bit silly, but

6    that's what an inventor does.  He thinks of different things

7    you can do in different ways.

8         And you have two inventors here, prolific inventors:

9    Mr. Hendricks with 60 issued patents, 90 patent applications,

10   Mr. Shteyn, 29 issued patents and 40-something patent

11   applications.  These are real inventors and real people that

12   did real things 10 and 15 years ago.  14 years ago he did his

13   one-button thing.  And Hendricks, 20 years ago, 1994, the first

14   e-book.

15        And they told you what their inventions were.  And

16   Mr. Hendricks has been incredibly successful, right?  He moved

17   up.  He is retired right now, but he is the founder of

18   Discovery Channel.  And he told you, what did he invent?  The

19   first time being able to deliver content on demand in the form

20   of a full book.

21        And they didn't show you anyone who had that before

22   1994.  The best they showed you was something where you had to

23   go to the bookstore with a cartridge and download the book on

24   to the cartridge and then go home and plug it in.  Well, that

25   might have been cool then, but he, a few years later, went the

1    next step.  It was all integrated.  It was together.  And it

2    wasn't just the cartridges there, but it was the whole system

3    and we will see those patents.

4         What did he say was novel about his application was

5    the first time that someone had invented the process of

6    actually holding a book-type device for the reading of a book

7    for sale.  And the Patent Office granted that patent.

8         What did Mr. Shteyn tell you about his invention?  The

9    idea was really simple.  By the way, simple invention is the

10   best invention.  That's the real invention.  Because ask

11   yourself:  If it was so obvious, why wasn't this stuff being

12   done before?  And when you're looking at real innovative

13   companies like these companies and they come in and tell you

14   anybody could have done this and it was obvious, why hadn't it

15   been done?  The idea was simple, you just press one button.

16   You press a button and get the information.  You press a

17   button.  You initiate the retrieval of information by pressing

18   a button and, boom, you get what you want.

19        Really simple.

20        Now, we talked about the three companies -- Discovery,

21   Sony, Philips -- they put in hundreds of patents into this

22   joint venture.  And they get together and they put their

23   patents in and they say, we need somebody with some real

24   experience in devices.  And they go to Intertrust.  And you

25   heard Dr. Shamoon, our first witness -- barely remember him

 1   that far back.  And he told you ADREA's business plan.  These

 2   companies got together and ADREA's business plan was to license

 3   the patent portfolio and eventually bring in technology

 4   components to help people that are operating in the e-book

 5   market.

 6           That was their business.  They didn't put all things

 7   in just to sue people.  In fact this is the first lawsuit ADREA

 8   has brought.  Remember the first lawsuit, the Amazon suit was

 9   between Discovery and Amazon, a private battle between

10   Discovery and Amazon.  It was only when ADREA was formed and

11   Mr. Shamoon came in that that case, the Amazon case got

12   settled.  And then what do you do after you settle, after you

13   license your technology to the largest person out there?  You

14   talk about licensing it to the next largest person, in fact,

15   the only other large company out there.

16           Remember Intertrust.  What was Mr. Shamoon's

17   experience coming into this?  The company he headed had made

18   over a billion -- and that's not a typo -- a billion dollars

19   from licensing patents over the last 12 or 15 years.  This is a

20   man who knew how to license patents.  And he came in and he

21   settled that Amazon case for $12 and 1/2 million.  How many

22   companies have they ever sued?  Only Barnes & Noble.

23           Now, I know one thing I have to tell you, I don't

24   expect to get back up here again.  I get my hour with you and I

25   sit down.  Barnes & Noble counsel lets the last word,

1   typically.  So I don't know everything he is going to say and I

2   need to anticipate a little bit from the way the evidence has

3   gone in, but one thing we know from the opening, he is going to

4   talk about Barnes & Noble, about ADREA being a company that

5   sues people.  When you go and you discuss licensing with

6   someone and they say no, we are not going to pay you anything,

7   you only have two options, in the U.S. at least.  You have to

8   walk away and say, all right, they don't want to pay me.  Well,

9   that's pretty good negotiating from Barnes & Noble's viewpoint

10  or you have to come to court.  And that's why we are here.

11          You have heard so much about the Amazon agreement.  I

12  am not going to spend that much more time.  Just remember what

13  Mr. Barnes said, and it will come back up when I talk about

14  damages again and we will have his actual testimony.

15  Mr. Barnes' single, best, most reliable measure of what these

16  patents are worth that he saw, $12-1/2 million.

17          Now, we want to talk a little bit about how did we get

18  here and why did we get here because they are going to make big

19  deal about us suing them.  By the way, monetizing is not a bad

20  word.  Monetizing is the word they like.  Maybe they think it

21  means something.  Monetizing is getting paid for what you own.

22  Monetizing, you own an apartment and you rent it, that's

23  monetizing, right?  You rent an apartment.  If you grow food

24  and you sell it, that's monetizing.  This is a different

25  industry.  You make inventions, you patent them, that's your

1   property.  It's as if you own just empty property and you build

2   a house on it.  If it's empty property, it's got a certain

3   value.  You build a house on it and you rent it, it's worth

4   something else.  In technology you make an invention you just

5   sell it, it's worth something.  You patent it, it's worth

6   something else.

7           This is Exhibit DTX 115.

8           I will put up the exhibits as we go through this.

9   There will be the numbers if you want to write the exhibits

10  down.  I think you know, you are going to get all of the

11  exhibits back in the jury room.  And you are going to get a

12  lot, and you haven't gotten to hold them yet or see them, and I

13  encourage you to take them out and look at them and see what is

14  there.

15          But DTX 115 was an e-mail from Mr. Shamoon to

16  Mr. Hendricks after they had settled the Amazon agreement where

17  he writes to Mr. Hendricks and says, "We would not be where we

18  are today without your valuable portfolio.  The win against

19  Amazon is a starting point to what we hope is a healthy and a

20  creative licensing program."

21          Nothing wrong.  That's what the business is.

22          What was the beginning of that healthy licensing

23  program for ADREA, having settled out with Amazon?

24          DX 115 was December 23, 2011, sort of on Christmas

25  Eve.  What was he talking about the licensing program?  This is

EAM8APB2                      Summation - Mr. Bauer

1   PTX 120, an e-mail between Barnes & Noble and ADREA.  They

2   began talking.  This is the problem.  This is what brings us to

3   the court.  What does Barnes & Noble say when these discussions

4   began?

5          I paraphrase.  Sorry, we are busy.  Mr. Snowe, the

6   lawyer is busy.  As general counsel, I don't know what -- it

7   says up at the top he is in legal.  But the person writing

8   this:  As general counsel, so am I.  If you have a proposal and

9   any specific claimed reason why we need to license your

10  patents, include a claim chart, send them to us, and we will

11  review it.  If you don't like that, I guess that's the best we

12  are going to do.

13         All right.  That's OK.  That's fair.  Somebody has

14  knocked on Barnes & Noble's door and said, we have these

15  patents we would like to license.  And ADREA responded.  And

16  this is JTX 21.  And this is from Mr. Ambwani back to Mr. Snowe

17  about three months later and responded:  I hope you're well.

18  Per your request when we last communicated, we have prepared

19  sample claim illustrations regarding the portfolio and your

20  devices.  I hope these claim maps demonstrate that Barnes &

21  Noble will benefit from taking a license.  Then it talks

22  further down about ADREA having settled the litigation with

23  Amazon.

24         You will see Joint Exhibit 22, and that's the document

25  that was sent, a detailed analysis.  It really lays out the

1    patent infringement claim that you have seen here.  There were

2    no secrets here.  They were told exactly why they infringed in

3    great detail.  And you can see the claim element, the three

4    patents that are in suit here.  They were given this

5    information.

6            And DTX 55, about two months later, May 14, Jeff

7    McDow, another ADREA employee, writes to Bill Baker who is one

8    of Barnes & Noble's lawyers:  "As we have discussed, I've

9    attached a licensing proposal.  As I indicated on the phone, we

10   are open to a variety of licensing modes and can be creative

11   about finding ways to work together, so the attached proposal

12   is simply one way it can be structured."

13           And you saw that proposal, JTX 31.  They offered to

14   license Barnes & Noble 50 cents per licensed reader.

15           Now, what is important about that is we are not in a

16   flea market here where nobody knows the value.  It's not a flea

17   market where somebody starts out saying I want a thousand bucks

18   for this and it's ten cents and you go back and forth, some

19   huge range.  These are business people.

20           Go look at that 50 cents per licensed reader and

21   compare it to what the price was that Amazon had paid.  Amazon

22   had paid $12 million.  You have seen in the record the

23   evidence, the number of units Amazon had sold up until that

24   date.  Do that calculation.  See how much Amazon had paid up

25   until then and see if it's not in the reasonable ballpark of 50

1    cents.

2         Now, I know that they say, oh, but that was the

3    opening offer, 50 cents, you always want less.  Well, that was

4    an opening offer to avoid litigation.  And there is one thing

5    that there is no dispute here, none, and Mr. Barnes told you

6    this yesterday, you take out of play the risk when you decide

7    how much money is on the line.  That hypothetical negotiation,

8    the patents are valid and infringed, there is no risk in that.

9    So that 50 cents offer is a risk avoidance number.  That's the

10   floor here because if the patents were valid and the patents

11   were infringed, there wouldn't be much negotiating, certainly

12   not down from that number.

13        And with that offer on the table -- and this tells us

14   why we are here -- that offer is on the table, Barnes & Noble

15   offered nothing, nothing.

16        Now, you're going to get a whole bunch of jury

17   instructions from the judge when we are both done.  Both

18   counsel, we have seen them.  We know what the judge is going to

19   tell you.  We are allowed to preview it a little bit.  And

20   you're going to see one instruction on willful infringement and

21   it's going to tell you that to prove willful infringement, we

22   must prove by clear and convincing evidence that Barnes &

23   Noble, once they were put on notice of ADREA's patents,

24   recklessly disregarded the fact that their actions constituted

25   an unjustifiably high risk of infringement of that patent.

1          And to determine whether defendants' infringement was

2     willful, you should consider all relevant facts to the extent

3     they are supported by credible evidence including, for

4     example -- and I have just pulled out the one that we think is

5     the primary example -- whether or not defendants made a good

6     faith effort to avoid infringing the asserted claims.

7          And what do we know about the good faith effort Barnes

8     & Noble made?  Mr. Mulchandani testified in deposition as a

9     company representative.  And when he was here, we put in his

10    deposition testimony and it's a corporate admission.  And he

11    was asked on behalf of Barnes & Noble -- so when it's "you," he

12    is answering for Barnes & Noble, not personally:  "Are you

13    aware of any attempts by Barnes & Noble to design around or

14    avoid infringement of the patents that are at issue in this

15    litigation?"

16          Answer:  "No."

17          What is the evidence whether or not defendants made a

18    good faith effort to avoid infringing the asserted claim?

19          I submit, ladies and gentlemen, it's clear and

20    convincing, they didn't.

21          Now, let me go to the merits, the technical merits of

22    the case because that's why we are here.

23          Three patents.

24          Now, I am down to 45 minutes.  I am not even going to

25    take that full time doing this.  I am left with the task of

1  summarizing for you in 30 minutes three weeks of technical

2  testimony that had to sound an awful lot like a Martian --

3  certainly the first couple of days when you were watching those

4  videos and you didn't have any idea why this was going on.  It

5  hadn't gotten to patents yet.  So let me help a little bit to

6  bring all that evidence together.

7        Let me start with this e-book lending patent.  It's

8  Mr. Hendricks' patent.  The 1994 filing date, even though there

9  is some earlier stuff, the parties agree that this patent is

10 entitled to 1994.  What did the abstract tell you about this

11 invention?  This is JTX 2.

12       By the way, these patents, we have seen the original

13 patents.  I don't know if you're going to actually get the

14 originals with the gold seals or not, but you're going to get

15 JTX 1, 2 and 3, the patents.

16       On the first page of that patent, the invention and

17 electronic book selection and delivery system is a new way to

18 distribute books and other textual information to book stores,

19 libraries and consumers.

20       Now, that's not the claim.  In fact this patent, JTX

21 2, is a thick patent.  But the reason I point that out is,

22 patents can have multiple inventions.  So if you look under the

23 that related U.S. application, you will see this one patent

24 application resulted in the '927 patent, the '690 patent and

25 this '501 patent.  So that's why we look at the claims.

1   Different inventions come out of these different patents.

2          But what does the patent describe?  And you saw his

3   testimony I put up a minute ago.  The first complete electronic

4   book, and this is what he was thinking about.  And within the

5   body of that, what does he show and tell you?  In column 11?

6   All the patents you have probably seen by now, they have the

7   numbers on the top which are the column numbers.  11 brings you

8   to the column and then there are line numbers down the middle

9   if you want to see the exact cite.

10         What does it tell you?  He is talking about e-lending.

11  It's one of the inventions in the e-book system, just one of

12  them.  The software can be configured to allow the book to be

13  read during a period of time, i.e., two weeks, and then

14  automatically erased.

15         So he is thinking all the details of e-books, right,

16  not just the book itself?  What can you do with the book?  This

17  is a guy who is sitting there coming up with ideas on what does

18  the world need?  And one of the ideas is e-book lending.

19         Here are two more instructions you are going to get

20  which you need to understand the infringement.

21         To determine whether the Nook device literally

22  infringes, you must compare the Nook device to the elements of

23  the claim.  I think you all understand that.  If the Nook

24  device duplicates every element of the claim, then it literally

25  infringes that claim.  The statement is true even if the Nook

1    device includes other elements.  I emphasize that last sentence

2    because almost all of the arguments that they are making about

3    noninfringement are talking about other things, and we will

4    talk about the claim itself.  But when they talk about how it

5    works on the Web site, it's just not about the claim.  They are

6    distracting you from the claim.  The claim is the only thing

7    here that defines the invention.  It's the claim that defines

8    the invention.

9         And the burden of proof for infringement -- and I flag

10   it right now and I will talk about -- there are two burdens of

11   proof in this case.  There is the burden of proof for

12   infringement which we call the preponderance of the evidence.

13   And there is the burden of proof for invalidity.  I have the

14   burden, ADREA has the burden of proving infringement.

15        We need to prove infringement by a preponderance of

16   the evidence.  And it's defined, preponderance of the evidence,

17   preponderance of the credible evidence; the credible evidence

18   being such testimony, exhibits or other evidence that you find

19   worthy of belief.  To establish a claim by a preponderance of

20   the credible evidence means to prove that claim is more likely

21   than not true.

22        That's our burden in this case.  If you use it as a

23   football analogy, I just have to get the football over the

24   50-yard line one inch.  If it's more on my side than their

25   side, we have proven infringement.  That's distinguished from

1    the burden they have for invalidity, and I will read it when I

2    put it up there, but they have the burden of clear and

3    convincing evidence, a higher standard.  So our burden is to

4    prove infringement by a preponderance of the evidence.

5             Let me talk about the '501.

6             Now, this one was sort of easy for us, I think,

7    because they don't take issue with any of the ones up there,

8    any of those elements that we have the green check mark up

9    here, they don't take issue with here.  In fact Mr. Neuman said

10   that:  "Isn't it correct that the only element of claim 18

11   which you take issue for purpose of infringement is the

12   associating step?"

13            And he answered:  "It is correct that that's the only

14   one which I have taken issue and presented today."

15            So that's the only one I am going to address.  We have

16   put in evidence for every step, and I need to say that because

17   there is a gotcha here.  Even if he tells you he is not taking

18   issue with it, if we didn't put evidence in, they would get up

19   there and say, gotcha, you didn't prove something, because it's

20   my burden to prove.

21            And I hope your notes reflect the testimony and the

22   evidence that every element is in fact there, but I am only

23   going to address the one element that I know that they are

24   going to get up and tell you is not there, the associating

25   step.

1     So that associating step comes with a court claim

2     construction.  The judge is going to tell you, and it will be

3     in the instructions what that term means.  And it means

4     associating with the electronic book a predetermined amount of

5     time that begins when the electronic book is stored on the

6     viewer.

7     So the predetermined amount of time is easy.  We know

8     that that's 14 days.

9     And when does it begin?  Well, first, let me, by the

10    way, point out the top piece here from PTX 19, lending e-books

11    the first sentence there:  "With Lend Me technology from Barnes

12    & Noble, you can now share e-books from Nook to Nook."  Our

13    allegations are about the infringement, the loaning of books

14    Nook to Nook.

15    The next sentence, it doesn't stop there:  "You can

16    lend to and from any device with the Barnes & Noble e-reader,

17    including iPhones, BlackBerrys and most Windows and Mac laptops

18    and desktop computers."  We don't charge those with

19    infringement in this case.

20    I think an awful lot -- I think you will remember, an

21    awful lot of the evidence here, is them talking about Web sites

22    and apps and does it work on a Web site and what happens when

23    you accept on the Web site and it takes time.  Those aren't

24    accused products.  We are only talking about the Nook to Nook.

25    With regard to the Nook to Nook, I think that you will

1       see the only evidence that they are presenting on that are

2       things like what if the computer network crashes, then it might

3       take a little longer.  What if you don't turn it on?  What if

4       you break it?  Then your time period is running.

5               Well, I don't know whether if you break it that counts

6       as an infringement or not.  We are talking about the normal

7       everyday operation of a Nook to Nook device.  And what did we

8       see?  You saw the testimony.  The everyday normal operation,

9       you push accept and when you push accept, the book comes.  When

10      you push accept, it's there.  And when you push accept, the

11      time period is put on it.  And that's what the testimony is.

12              When does the loan period begin?  When the book is

13      downloaded to the viewer.  There is a single operation.  Nook

14      to Nook, single operation.  You push the button and the book

15      shows up.

16              Their expert, Mr. Neuman, it happens automatically.

17              What is the defense here?  Their defense is, because

18      it is computer software and computer software runs

19      sequentially, that they put the time period on it in the cloud

20      before it's actually downloaded.  But it's happening when you

21      download it, when you store it.  Within a second or two or

22      four, when you're ready to download and when it's being

23      downloaded and when it's being stored, the time period begins.

24      And the fact that it takes place one step in the computer code

25      is just not relevant to when it's being stored.

1      And Mr. Berg showed you exactly that.  He gave you an

2   exact demonstration.  The whole process takes on the order of

3   two to four seconds.  That is just a still from his video.  You

4   push the button and in a blink of the eye the book was there

5   and it was stored on the video.  And the time period was

6   affixed, and that time was associated with when you did it.

7      The testimony about how software works, Mr. Berg is

8   talking about computer software runs sequentially.  It might be

9   toward the beginning, the middle, the end, but it has to be

10  series of steps.  It happens when you download, when you store

11  it.  It's all part of the same process when they infringe.

12     Keep this in mind.  Whether it happened first or

13  second within those two seconds isn't part of the invention

14  itself.  That wasn't the invention.  It wasn't that Mr.

15  Hendricks said, my invention is doing it after instead of

16  before.  There is no prior art saying people used to do it this

17  way and your invention is doing it that way.  His invention was

18  getting the book downloaded and putting 14 days on it.  That

19  was what the invention was about, and that's what the claim

20  says.  When you're in software, you don't get around it by

21  tweaking it, and that element is there.

22     But just in case you want to be hyperliteral about

23  that and buy into the software order, there is this doctrine of

24  equivalents.  It's a legal doctrine created for these types of

25  circumstances.

1              And you're going to get this instruction from the

2      Court:  Even if the Nook device do not literally infringe a

3      particular element, even if you think there is something there

4      with their argument, there is still infringement Nook device

5      meets that element under the doctrine of equivalents.  This can

6      happen if the product contains an element that you determine is

7      equivalent to the element of the patent claim, equivalent in

8      the sense that any differences are insubstantial.

9              Well, this one is easy.  Both experts said that.

10             Mr. Berg asked:  Would that interval be a substantial

11     difference from what the claim 7 requires?

12             No, it would not.

13             Then he goes on and says:  You're talking about a

14     couple of seconds, and over that 14-day period, .003 percent.

15             And Mr. Neuman, their expert -- can't get better than

16     having their expert say it:  "Is it your opinion that a few

17     seconds constitutes a substantial difference of the lending

18     period?"

19             His answer:  "It does not constitute a substantial

20     difference in the life of the period."

21             There is no substantial difference by doing the step a

22     few computer steps before or after.

23             That claim is infringed.

24             We have proven more likely than not that it's

25     infringed at least if you're not convinced.

1           Now, there's two claims that we assert in this patent.

2    There is claim 7.  I don't need to spend any time on that.

3    Look at the language in claim 7.  The elements are word for

4    word the same as claim 18.

5           The difference, one of the things patent lawyers do,

6    you try different words to try to capture the invention a few

7    different ways.  One of the things you do, claim 18 is a

8    device.  It's a portable viewer for displaying books.  Claim 7

9    is the method of restricting access to electronic books.  So

10   one is a process, one is a product.  The language is exactly

11   the same.  The only issue they took, Mr. Neuman presented in

12   his direct was that same associating step.  If you find claim

13   18 is infringed, claim 7 is infringed.

14          Now, there was just one thing.  You remember Mr.

15   Neuman -- I am just getting time checks because I have so much

16   to do here -- he took no issue in direct.  I would just move

17   on, but on cross-examination you may remember, he popped up and

18   said, I have a couple of new opinions that I hadn't had in my

19   report and that came up on cross.  I have no idea whether they

20   are going to press those issues now.  They didn't in direct.

21   But just in case, let me just address what was his view.  He

22   said, Barnes & Noble is not doing this, the Nook is doing this.

23   That was his answer, that these steps are not being done by

24   Barnes & Noble, they are being done by the Barnes & Noble Nook.

25   Well, he was off the reservation in that testimony.

1          Mr. Mulchandani testified that the Nook device and the

2     Barnes & Noble cloud -- he was asked do they coordinate with

3     one another?  And his answer was no, the cloud is the sole

4     governing.

5          As I mentioned, the device is effectively a servant in

6     that process.  It's Barnes & Noble that is performing those

7     steps.  He didn't talk about it in his direct.  All the

8     elements are there and there is infringement.

9          Now, patent validity, let me just talk about the

10    instructions on that because they are a little bit different.

11         For the '501, the issue is novelty and there is going

12    to be obviousness for a couple of them.  Those are the two

13    validity defenses that they are presenting, novelty and

14    obviousness.

15         Novelty.  They need to prove to you by clear and

16    convincing evidence that each and every element of the claim

17    was either inherent or expressly disclosed in a single prior

18    art reference.  Single.  They have to look at one patent that

19    they say was done before and show you every element was there.

20         And there is the presumption of validity for validity

21    issues.  The fact that the patents were approved by the U.S.

22    Patent Office makes the asserted claims presumptively valid.

23    But of course they can still prove that the patent office made

24    a mistake by proving that it is highly probable that the claims

25    in question are invalid, and that's standard.  Invalidity by

1    clear and convincing evidence, that is, by proving it is highly

2    probable.  And what is clear and convincing evidence?  The

3    proof that establishes in your mind that the proposition at

4    issue is highly probable.

5         Can they prove with Mr. Neuman's testimony that the

6    Saigh reference has all the elements of the '501 patent?  Well,

7    the testimony was that it doesn't store an electronic book on

8    the viewer and it doesn't associate a predetermined amount of

9    time after the book is stored on the viewer.

10        Now, there was a little dialogue with Mr. Neuman

11   whether the Patent Office had considered Saigh.  He said it was

12   on this long list.  Well, it's more than on a long list.  It's

13   on a list that examiners' initials are on that list.  It's not

14   just something there, examiners' initials.

15        And if you look at the very little -- I don't know how

16   well it blows up.  This is JTX 5, the patent file history.

17   It's a couple thousand pages.  If you're interested the page is

18   58798.  On the bottom what is highlighted there, and I will

19   read it, and this is a note to examiner:  "Examiner, initial if

20   reference considered whether or not citation is in conformance

21   with" -- and then there is a rule, MPEP609 -- "initial if

22   reference is considered."  The examiner initialed it.  It was

23   considered.  And the patent is presumed valid.  They need now

24   to come in and tell you why this has all the elements.

25        What were the differences?  One thing I think they

1    were trying to say is this whole figure is an e-book.  And from

2    a distance when you sit here and you don't read the patent,

3    well, that looks like a book, doesn't it?  Is that an e-book?

4           You know what this is?  The thing on the right is a

5    pad.  This is a portfolio.  There is a zipper around it.  This

6    is like a Day-Timer.  There is a pad.

7               There's headphones, a storage box here in the middle.

8               That is what this is.  It's not an e-book.

9               The controller is the little electronic thing on the

10   top.

11          And the memory, where the book is, are these other

12   boxes separate programmable memory modules, 22, and the

13   cylinder is 24 further down.

14          And this is what invention is.  When was this patent?

15   Saigh was 1991, three years before Hendricks did this, three

16   years before.  It's the closest thing they say to what was out

17   there -- the closest thing, three years before.

18          Hendricks made an invention.  What was there before

19   were separate.  You went to the bookstore.  You downloaded it.

20   When you downloaded it on the memory module, the clock began

21   running.  Then you would go home.  You would plug it in.  You

22   would read.  Not what the claims requires.  The claim requires

23   storing it on the book.  The time begins to run when you store

24   it on the book.

25          Saigh is different.  And you heard the witnesses, even

1   Mr. Neuman said, it's referring to memory module.  That is

2   separate.  They are different.  There is no clear and

3   convincing evidence here that they are the same.

4           This is the verdict form you're going to see.  So

5   you're going to be asked to answer these questions.

6           There is one thing I always remind juries.  The

7   questions are reverse for validity infringement.  So for

8   liability for infringement, have we proven, the answer is yes.

9   For validity have they proven, the answer is no.  So if you're

10  in favor of ADREA, please don't check yes right down the line.

11  You need to say yes for infringement, we have proven it.  Have

12  they proven invalidity?  No.

13          Let me talk about the '851 patent.  This also is

14  another Hendricks patent.  This one, as you know, is more about

15  the encryption side of the e-book as opposed to the lending

16  side.

17          Two general issues that they raised that I will focus

18  on, again, I believe we have proven every element is here, but

19  these are the two:  Selecting a title from the transmitted list

20  and there was some discussion about the type of encryption

21  information.

22          Selecting a title.  Remember what we are talking about

23  here.  We are talking about -- it's in the preamble -- an

24  electronic book viewer.  These are the steps that an electronic

25  book viewer is meant to perform, not the steps you, the user,

1    performs.

2            Counsel for both sides are talking at cross-purposes.

3    What title?  They are talking about the titles on the book, the

4    name of the book.  We are talking about the code in the device.

5            The Court's construction is:  Is the actual title a

6    sign or any other designation or icon indicating a particular

7    group?

8            The EAN is a title when you're talking about the

9    machine.  And it's the receiver that picks that EAN out of that

10   list after the user says what book is it I want.

11           Now, they have some other places.  They say, well,

12   sometimes we have a button and there is only one EAN there.

13   But we are talking about the ordinary usage of this, not

14   sometimes, the normal usage.

15           And they don't dispute that -- this is Mr. Neuman --

16   don't disagree that when a user purchases a book, the devices

17   send a request containing the EAN.  That element is there.  The

18   book has to pick it from the title.

19           By the way, keep it in context for the claim.  The

20   receiver receives a transmitted list of titles -- this is just

21   normal English as you read it -- it receives the list, it

22   selects the title from the transmitted list, it communicates

23   that title back and then the book shows up.  That's what we are

24   talking about, not what the person does at home.

25           The last element, the transmitter.  They took issue on

1    the transmitter about how do you read encryption.  And Mr.

2    Neuman said that an engineer wouldn't understand what

3    encryption meant or wouldn't read it the same way.

4         You will get an instruction from the judge, the claims

5    contain ordinary English words and specialized terms.  One of

6    my jobs is to determine the meaning of specialized terms, and

7    the judge has.  The terms he has interpreted, ordinary English

8    terms.

9         How do you read this claim?  Encryption of information

10   shows up in (a4).  It talks about the receiver receives

11   encryption information.  The memory receives the encryption

12   information.  The processor coupled to the memory processes the

13   encryption information.  Those are referring to the (a4)

14   encryption.

15        (d)  A transmitter coupled with a processor that sends

16   encryption.  Different encryption.  When you talk about the one

17   before, you use the word "the."  (d) says "encryption."  Then

18   it says:  "Wherein the encryption information of (d) includes

19   other information."  It's plain ordinary English.

20        Mr. Berg told you what the two different types of

21   encryption information are.  In one the encryption information

22   is the pre-master secret.  And in the other, that's part of the

23   license that gets received.  Different types, plain language of

24   the claim.  That claim is infringed.  The patent is not

25   invalid.

1            Obviousness.  This is the first time you will see

2     obviousness.  They agree that the prior art references -- well,

3     by doing obviousness, it means the prior art references don't

4     have everything.  So they are telling you here, they don't have

5     a prior art reference that includes all the steps.  Now they

6     have to get you to say, it would have been obvious.

7            What does it mean that a person skilled in the

8     relevant field would have thought it was obvious?

9            Well, what is out there is different.  It works

10    different.  That's why they are trying to prove it's obvious.

11    It works differently.  They want to combine it with an

12    encryption standard.  Nobody explained why it would be obvious.

13    I think the witness basically just said, I don't think it was

14    obvious.  Did he convince you clearly and convincingly that

15    this would have been obvious to a person of ordinary skill at

16    the time?

17            Let me move on to the '703 patent.  This is the one

18    that came from Philips and Mr. Shteyn.  A consumer apparatus,

19    as he described it in his abstract, is made an intuitive

20    component of user interface to a topical server.

21            The idea is, it's simple.  You want to make the

22    interface of the device as simple for people to use.  And he

23    compares it to the Web browser.  And he says, mine is simpler,

24    you just push the button, basically was his testimony.

25            And his patent taught because he was thinking about

1    things at home.  Remember, the e-book reader is a consumer

2    appliance within these definitions, right?  I know there was

3    some examples of blenders and garbage cans and other things,

4    but we are not equating a garbage can to an e-book reader, but

5    this patent is broader than just garbage cans.  He actually had

6    a discussion.  He was actually even thinking about a bookcase

7    with a URL associated with books, books in quotes.  He was

8    talking about e-books.  He told you.

9         What is the one element they tell you is missing on

10   this one or the one element I think they focused on, on this

11   one?  Again, when the consumer appliances does not require user

12   to access a Web browser or other device in order for the

13   appliance to initiate retrieval.

14        Every time they talk about whether the shop is a Web

15   browser, it's misdirection.  It doesn't matter whether the shop

16   application is a Web browser.  It is not and it doesn't matter.

17   Because what does the claim -- let me just put the claim in

18   context.  It is a input component responsive to a user input

19   for initiating retrieval.  That's the first element, right?  An

20   input component responsive to user input.

21        The element says, where the consumer appliance does

22   not require a user to access a Web browser or other device in

23   order for the consumer appliance to initiate retrieval.  You

24   can initiate retrieval without having to go to a Web browser or

25   other device.  And with the Nook, you initiate retrieval before

1   you get to the shop application.  This is the button to get you

2   to the shop application.

3          And the witnesses told you that.  This is Mr. Neuman,

4   their expert:  Pressing the shop button does initiate that

5   process in the context of claim 1.  It's pressing the button

6   that initiates the process.

7          And Mr. Berg:  All you do is press the button and the

8   information is retrieved.

9          That's what the claim requires, initiating retrieval

10  without going to the shop application or the Web browser first.

11         This claim is literally infringed.

12         Now, they spend so much time on the Web browser and I

13  don't get to come up again.  I just have to make one point.

14         A Web browser is software.  It's the thing that allows

15  you to browse the Web.  It's the thing that you put your

16  address in and allows you to go anywhere.  That's your Web

17  browser.  Google Chrome, Internet Explorer -- that's a Web

18  browser.  Their argument about what a Web browser is, they are

19  using the word browse as in read.  The guy says, well, when I

20  am at the shop, I am browsing the page.  They are talking about

21  what the person does.  That's what they said.  When I am on

22  that shop page, I'm browsing.  Well, that's what the human

23  does.  We are talking about software.  Web browser is what

24  takes you through.

25         How do we know, by the way, that that shop isn't a Web

1    browser?  This is one of those things when Mr. Narain was on

2    the video, you just wouldn't have heard.  It was an hour

3    videotape.  Do you know what he said during that videotape?

4          "Is it correct that the Nook Simple Touch with

5    GlowLight does not have a Web browser?"

6          And his answer is "yes."

7          And we show you the Nook Simple Touch GlowLight.  It

8    doesn't have a Web browser, but it has the shop.  He is their

9    engineer.  He knows there is no Web browser there.  It doesn't

10   matter.  Every time you talk about the Web browser, it doesn't

11   matter in the claim.

12         Shteyn tells you a Web browser is the thing with the

13   address.

14         Claim 13 is similar.  The focus is enabling the user

15   by a single user input.  Remember we said we write claims to be

16   a little different.  This one doesn't talk about the Web

17   browser at all, claim 13.  This simply says, all you have to

18   have is the single user input.  It doesn't even mention Web

19   browser.  That element is there.

20         You know what their argument was?  I got to turn the

21   box on, the thing on.  I have to push a power button.

22         Well, that's not what this claim is about.  Method of

23   enabling a service provider to provide service to the Internet,

24   it's not:  Gee, I have to turn it on, that's my first step and

25   then I push the button.  Or they talk about the registration

1    process.  That's the thing you do the day you buy it and you

2    take it out of the box.  That's their argument.  I take it out

3    of the box, I have to plug in, I have to do a punch of stuff on

4    Day 1.  That's not what we are talking about.  We are talking

5    about normal usage of a machine that is on, not a machine that

6    is off.  A machine that is on, you push the button and you go

7    to the shop application.

8           Let me just move on.

9           The validity issue, they talk about Munyan, not

10   obvious.

11          What is the difference with these, by the way?  Munyan

12   is talking about a security code.  Remember the claim talked

13   about a code that is associated with the device, right, an

14   identifier associated with the consumer appliance?

15          Munyan is not a code associated -- it's a security

16   code.  It's something that doesn't help bring information back.

17   It gets you in, but we are talking about a code that gets the

18   right contextual information downloaded, not what gets you in.

19          I am told that my time is running out.

20          THE COURT:  You asked for five minutes.  Actually, you

21   have a full seven minutes left.

22          MR. BAUER:  Thank you, your Honor.

23          Mr. Cabral is giving me my two-minute notice of your

24   five minutes.

25          Let me just mention on Bolas, Bolas is a radio.  It's

 1    not downloading information about a radio.  It's downloading

 2    music.  This claim is about bringing in information about the

 3    device, not for the device.  Again, there's differences.  You

 4    have heard the experts.

 5         This is what I wanted to spend my last seven minutes

 6    about.

 7         This is why we are here.  We own these patents.  There

 8    is infringement.  They are valid.  ADREA is entitled to fair

 9    compensation.

10         And this is the instruction:  "In order to reasonably

11    compensate plaintiff for its losses.  Damages.  The amount of

12    money that defendants hypothetically would have paid ADREA as a

13    fee or royalty for using the patented invention."

14         Going back to 2009, if we had had this discussion,

15    what would it have resulted in, because that's our damage.  If

16    they had paid us when they should have, when they introduced

17    this in 2009, how much would that negotiation have resulted in?

18         Remember, what are the facts in 2009?  Kindle has been

19    on the market for two years.  These are the facts.  Amazon is

20    taking book sales from Barnes & Noble, which is a bookseller.

21    Barnes & Noble has hired engineers.  They are developing a new

22    product to take on Amazon.  And this is all ten years after

23    these patents, ten years after the invention.

24         Nobody told you Barnes & Noble hired engineers and put

25    them into a locked room and said, do this on your own.  The

1    evidence is, they needed to get there.  And in fact this was

2    Mr. Hilt's testimony:  "We were in the book business.  People

3    were moving into digital books.  We needed, as a bookseller, to

4    offer that option to our customers, and we were going to do it

5    any way we could."  And they needed to do it quickly.

6             What did Mr. Barnes tell you would have been known

7    back then?  Well, he agreed that they would have known that

8    they needed to do this.  Remember, he told you about the book

9    of wisdom, that they know what is going on.  The parties would

10   have been aware of the ongoing competition.  They would have

11   known that if they didn't enter into the agreement they can't

12   use the technology.

13            Remember, it's a negotiation when they walk in saying,

14   your patents are valid and infringed -- very, very different

15   than that Amazon discussion.

16            (Continued on next page)

17

18

19

20

21

22

23

24

25

1     Amazon said, your patents aren't infringing, we don't

2     think they are valid, we are in litigation.  Then they settled,

3     they compromised.

4          At this negotiation, Barnes & Noble walks in and says,

5     I know your patents are valid and infringed, I know I need this

6     technology.  They didn't offer, you heard nothing about how

7     they could have worked around this.  They could have told you

8     these were small changes, this was accidental, I could just

9     make a small change, I could have been out of this if I needed

10    the patent, who needed it.

11         You haven't heard one word of evidence, not one word,

12    of how they could have avoided using this technology.  That's

13    what makes these patents valuable.  Right?  No one has told you

14    there was an alternative to using this technology.  No one has

15    told you that.  He tells you the parties would have known about

16    the agreement that Amazon entered.

17         How do you price this?  What we know is that Barnes &

18    Noble was successful against Amazon.  How much did you hear

19    them talk about Barnes & Noble's a startup company, no product?

20    Barnes & Noble is a billion-dollar company.  This is no startup

21    with no money.  And they were successful.  They got to grow

22    almost half the size of Amazon.

23         MR. EDERER:  Objection, your Honor.

24         THE COURT:  Overruled.

25         MR. BAUER:  In the year 2010 Barnes & Noble was about

1    40 percent the size of Amazon.  That's the testimony.

2    2 million units in less than -- in about a year.  All right?

3    They are successful.

4         What does he come in to do?  What does Mr. Barnes tell

5    you would be the right amount?  He tells you 8 cents a unit.

6    How does he get there?  He goes to the Amazon agreement and he

7    wants to divide that Amazon agreement by as big a number as he

8    can to turn it into a royalty rate.

9         Rather than look at how many Amazon had sold up till

10   then and divide it by that number, which was the numbers he has

11   up there -- using his numbers it's about 25 million units,

12   something like that -- rather than dividing what Amazon paid by

13   that and telling you what it was, he projects out for six

14   years.

15        Where did he get those projections?  He made them up.

16   He multiplied numbers by 10 percent when we know that the

17   facts, the facts were that they were going down.  He was coming

18   up with a big number so he can drive the royalty rate down.

19        What we got here, these are the sales numbers he told

20   you were actual.  He knew this when he did that chart.  He

21   says, I don't care what really happened.  That's what he said,

22   I don't care what really happened.  He said, I'm putting in

23   there what I, Mr. Barnes, think the Amazon people were

24   projecting at the time, with no real evidence showing that they

25   were projecting.  For 2011 he put in the number 19 million when

1    he told you they were projecting 18 million.

2         He knows that it's going down.  We don't know the last

3    three years, but we know that it's going down, you know that

4    it's going down.  Do the numbers.  If those things had gone

5    down, if the number was half, that royalty rate would double,

6    to 16 that he is proposing.  If the sales had dropped two-

7    thirds, that number would triple to 24.  That's why he's

8    putting in big numbers.

9         MR. EDERER:  Objection, your Honor.  There is no

10   foundation for those numbers in this case.

11        THE COURT:  Overruled.  Counsel, your time really is

12   up.  I will give you a couple of more minutes.  That's it.

13        MR. BAUER:  I'm on my last couple of slides.  Thank

14   you, your Honor.  I appreciate that.

15        The question you are asked is when you look at the

16   number that they propose, you test it against the Amazon

17   number.  That's what you do.  What would they have negotiated

18   in 2009?  Who knows.  We are trying to figure that out.  We are

19   asking you to figure that out, what would they have negotiated

20   in 2009, what would have been fair, what would have been

21   reasonable?  We ask you to do that.

22        What we know for a fact is two years later Amazon paid

23   $12 million.  That's your testing point.  That's the test.

24   Think of it this way.  Mr. Barnes said think about property,

25   housing.  You buy a house or somebody tells you your house is

1  worth less than a million dollars in 2009 and that's what they

2  tell you and you do that deal.  Two years later the house next

3  door that's just a little bit bigger than yours, more than

4  twice your size, sells for 12½ million.  Do you think you got

5  the fair price?  Was that the right number?  That's what we are

6  asking, what would be the right number knowing that Amazon paid

7  2 million years later and compensatory damages.

8         One last thing.  How valuable is this technology?  Let

9  me talk about that Lend Me feature, and then I'm done.  Mr.

10 Hilt said 4 percent of the people –- this was PTX-183, Nook At

11 A Glance, you will see that exhibit, Nook At A Glance -– 4

12 percent said it was one of the top three reasons people buy it.

13 He says its a minimal number, 4 percent, minimal, pooh-pooh, 4

14 percent.

15        Well, in 2010 they had 2 million units.  Take 4

16 percent of 2 million units.  That's about 80,000 units.

17 Multiply it by he told you the average selling price in the

18 $300 range.  80,000 times 300.  That's 24 million bucks of

19 extra sales for the feature that has minimal value.  And that's

20 just 2010.  Small number, big dollars.  These patents are

21 valuable.

22        What is a reasonable royalty?  There's 5 million units

23 in dispute here.  We know that ADREA would have taken 50 cents

24 a unit back in 2012, before this litigation, with the risk of

25 litigation.  There is your verdict form.  We ask you to put in

1   a number that is reasonable as the judge defines reasonable for

2   damages, and that you find that there is willful infringement.

3          Thank you very much.  I don't get a chance to come

4   back up here again.  I really do thank you for your time.

5   ADREA really thanks you for your time.  This has been a long

6   week.  We appreciate it.

7          Thank you, your Honor.

8          THE COURT:  Thank you very much.

9          Ladies and gentlemen, we are going to give you a

10   ten-minute break at this time and then we will hear from

11   defense counsel.

12          (Recess)

13          THE COURT:  Now we will hear from defense counsel, who

14   I will give an hour and 3 minutes to, being equal time.

15          MR. EDERER:  I won't need the extra three minutes,

16   your Honor.

17          Good morning, ladies and gentlemen.  On behalf of

18   Barnes & Noble, we wish to thank you for your service and the

19   incredibly close attention that you have been paying to the

20   evidence in this case.  We know it's been a long few weeks, but

21   this is an extremely important matter to Barnes & Noble.  Based

22   on everything we have seen, we are confident you will give the

23   evidence the careful consideration that it deserves, and when

24   you apply the law which the judge will instruct you with, you

25   will come out the right way, the only way we believe you

E9cwsad23          Summation - Mr. Federer

should, and you will reach the only conclusion that the

evidence clearly points to:  That there has been no patent

infringement here on the part of Barnes & Noble.

          I am going to take some time to review with you the

evidence you have heard over the course of the trial.  I am

also going to ask you to think back, if you can, to my opening

statement and some of the things I told you Barnes & Noble

intended to prove to you.

          I want you to think about whether the evidence has

shown what we said it will show, which is that plainly and

simply the facts do not bear out that there has been any

infringement of the patents at issue in this case and that in

any event, and you only need to get to this issue if you find

infringement on any of these patents, which we strongly believe

you won't, but in the unlikely event that you find that any of

these patents has been infringed, that in any case the evidence

will show that each and every one of these patents is invalid.

          They are simply not new, they are not inventive, and

they are completely anticipated or obvious.  While the

inventors named on these patents may have thought they did

something new, if the invention existed before or was obvious

based upon what others had done previously, then, even if the

patent office did not realize it, you can't have a valid U.S.

patent on it.  This issue of invalidity is also something to

keep in mind, and I will address it as well in my closing.

1            Before I get to the patents, however, as I did in my

2     opening statement, I want to remind you who the parties are in

3     this case and what we are doing here.  I think that all of the

4     evidence, and especially the testimony of the witnesses and

5     their credibility, should be examined in that light.

6            On the one hand, you have Barnes & Noble, a long-

7     standing member of New York community and an important part of

8     the nation's fabric, who for 70 years has been a leader and an

9     innovator in the area of book selling.  You heard from Mr. Hilt

10    that Barnes & Noble sold the Rocket eBook reader in the early

11    2000s, before the market was even ready for it.

12           As electronic reader technology began to improve in

13    the mid 2000s, Barnes & Noble, who, as you have heard, had

14    already been a pioneer in offering electronic books and other

15    content on the Internet, made a decision to expand its product

16    offerings.  In particular, as Mr. Mulchandani and Mr. Hilt

17    explained to you, the idea was to make books and content

18    available to Barnes & Noble account holders across as many

19    electronic platforms as possible.

20           That would mean making them available not only on the

21    Internet but on electronic devices and through other means that

22    would allow the user to read and access content wherever they

23    might find themselves -- at home, on the road, anywhere --

24    using only their Barnes & Noble account credentials to gain

25    access to these books through the Barnes & Noble cloud.

 1           As you have heard, as part of this initiative, the

 2    Nook was born in 2009.  Barnes & Noble expended substantial

 3    resources in an effort to become a leader and an innovator once

 4    again in a highly competitive market, coming out with many

 5    firsts in the area of electronic reader devices and also

 6    introducing various features designed to enhance the user's

 7    experience, including the Lend Me and shop features that are

 8    the subject of this case.

 9           With each of those features, Barnes & Noble did it

10    their own way, creating something new and different that works

11    on an account basis across many different kinds of devices, not

12    just Nook devices.  In the case of Lend Me, Barnes & Noble

13    created a lending function that, as you have heard, has become

14    the subject of its own allowed U.S. patent.  In the case of

15    shop, Barnes & Noble designed a special purpose web browser,

16    through which a user can have his or her own personalized

17    shopping experience while browsing for books and content on the

18    Barnes & Noble website and can also share that shopping

19    experience on the World Wide Web, including on Twitter and

20    Facebook.

21           In contrast, on the other side of this case, we have

22    "AY-dree-a" or "ay-DREE-a", I'm not sure which it is.  As you

23    have now heard, ADREA is a company that does nothing.  The

24    company has no employees, no product, not even a written

25    business plan.  It was set up exclusively to attempt to

1    monetize some ereader patents dating back to the 1990s that no

2    one ever had any interest in.

3           As you have heard, over the course of its five-year

4    existence, despite whatever efforts it's made, ADREA has failed

5    to place a single license for any of these patents outside of

6    its settlement in the Amazon litigation.  None of the companies

7    they targeted -- not Samsung, not Kobo, not Kno, not anyone --

8    no company involved in the electronic book industry had shown

9    the remotest interest in these patents, even back in 2011,

10   after Mr. Shamoon wrote to Mr. Hendricks.

11          You saw this email on Mr. Bauer's closing.  Mr.

12   Shamoon wrote to Mr. Hendricks of Discovery that now that the

13   Amazon case has been settled, he was looking forward to

14   developing a healthy and a creative licensing program for the

15   Discovery patents.  That program is more unhealthy than it's

16   ever been.  In fact, in its five-year existence, ADREA has only

17   done two things:  It settled the litigation with Amazon that it

18   inherited from Discovery, and then it sued Barnes & Noble.

19          When they decided to sue Barnes & Noble, maybe they

20   thought they had an easy mark, that we would write them a check

21   to avoid the pain of expensive litigation, like Amazon did.

22   Well, guess what.  That's not what Barnes & Noble is about.

23   Barnes & Noble has always striven to be an innovator, a

24   business and technology leader.  When Barnes & Noble gets sued

25   for something it didn't do, it doesn't just roll over, it

1    defends itself.

2            That's why we are here today, and that's why we are

3    asking you, the jury, to send a message to ADREA that its

4    monetizing model is a failure.  We didn't infringe their

5    patent, we didn't do anything wrong, and we believe we have

6    proven that to you during the course of this case.

7            Before I start talking about the substantive issue in

8    the case, I want to briefly review with you some of the witness

9    you have seen and heard.  As you know, the credibility of the

10   witness, what you believe about what they have said and what

11   you don't believe, is very important.

12           Who did you hear from?  Let's take the Barnes & Noble

13   witnesses first.  First you heard from Mr. Mulchandani, the

14   head of software development for Nook products for years,

15   someone who was intimately involved in the product development

16   process.  He told you exactly how the Nook works, on an

17   account-by-account basis across all platforms.  Not one ADREA

18   witness contradicted anything Mr. Mulchandani said about how

19   the Nook works.  They just tried to put their own spin on it.

20           But you saw him.  He was knowledgeable, he was

21   credible, he was forthcoming, and he was clear.  As we showed

22   you and as all of ADREA's witnesses have conceded, Mr.

23   Mulchandani's testimony was completely corroborated by how the

24   Nook actually works.

25           You also heard from Mr. Hilt.  Mr. Hilt explained to

1   you everything you need to know about how and why the Nook was

2   launched and marketed.  The uncertainty of how the Nook would

3   be received by consumers, how it would compete, all the risks

4   and the difficulties Barnes & Noble had in penetrating the

5   market given the complete domination by Amazon, and how the

6   Nook features that are being accused in this case were actually

7   used and their relative lack of importance to Nook customers

8   and sales.

9        He told you that shop was not important in driving

10  sales of the Nook, even though he did say it allows you to

11  search and browse for books.  He also told you that while Lend

12  Me sounded like a good idea, as it turned out, the major

13  publishers did not make their books available to loan using

14  Lend Me and people didn't use it very much.

15       In fact, in the study Mr. Bauer mentioned when he told

16  you to do that division exercise when he was talking about

17  damages, about the top three features of the Nook, Lend Me

18  being one of those, only 18 people responded, 18 people

19  responded and said that Lend Me was one of the top three

20  features that caused them to buy the book.  Mr. Hilt was

21  another credible and knowledgeable Barnes & Noble witness.

22       Finally, we had Dr. Clifford Neuman.  Yesterday Dr.

23  Neuman methodically took you through all the reasons why, in

24  his opinion, the patents in this case are not infringed and are

25  invalid.  His testimony was direct and straightforward and as

clear as could be given the technical nature of what he was
talking about.  I suggest to you that his testimony was in
sharp contrast to the testimony of ADREA's technical experts,
who I will come to into second.

So, if you have any questions in your mind about
infringement or invalidity, consider the testimony of Dr.
Neuman, and you will have the answers.  What he did, unlike any
other witness in this case, is he took the infringement and
invalidity claims head-on and he showed you step by step why
the patents are not infringed and why they are invalid, and it
was so clear and so believable.

Now let's contrast all of this with ADREA's witnesses.
We think if you compare the ADREA witnesses with their Barnes &
Noble counterparts, they all come up well short on the
credibility spectrum.

First, there was Mr. Shamoon, the CEO but not employee
of ADREA, who admitted spends about 5 percent of his time on
ADREA business.  He was trying to tell you what an enterprising
young company ADREA is and all the great things that it is
doing to build a business in the ereader space.

But by the end of his cross-examination, he had
basically conceded that his company has done virtually nothing
in five years to develop its business and is literally doing
nothing right now.  It's doing no market research, placing no
licenses, developing no products, nothing.  That's because it's

1    a nonpracticing entity whose only purpose is to try to make

2    money off patents.  That's the take-away you should have for

3    Mr. Shamoon when you think about the parties to this lawsuit

4    and where they fall on the credibility spectrum.

5            You also heard the testimony of Mr. Ambwani, ADREA's

6    director of licensing, you watched the videotape yesterday, who

7    couldn't remember much about what he did to try and place

8    licenses for ADREA over four years.  But the one thing he could

9    remember was that ADREA was all about trying to make money off

10   patents.

11           Next was Mr. Shteyn.  What can I say about Mr. Shteyn,

12   who was license listed as an inventor of what we have been

13   calling the garbage can patent?  On his cross-examination he

14   wouldn't answer a single question, and he started to give some

15   very flip answers about his invention.

16           You remember he kept saying, well, garbage cans and

17   blenders can be used for anything, like for playing the drums

18   or for use as weapons against intruders.  Indeed, by the end of

19   his testimony it seemed like Mr. Shteyn was saying he invented

20   just about anything having to do with connecting to the

21   Internet.  I suggest to you that his testimony was not

22   credible.

23           We also heard from three inventors on the '851 patent:

24   Mr. Hendricks, Mr. McCoskey, and Mr. Asmussen.  You heard what

25   they said very clearly.  Incredibly, none of them could

1    remember exactly what it was they invented.  I want to come

2    back to them in a few minutes because I want to remind you

3    about the story we promised you you would hear about, about how

4    they pieced their patent application together by copying

5    material from much older encryption textbooks.

6          Now let's talk about Mr. Berg, ADREA's technical

7    expert, who along with his colleagues has been paid almost

8    $500,000 for this case, the man-in-the-middle guy who hacked

9    into the Nook devices but didn't even bother to test all of the

10   products he was accusing.

11         You heard Mr. Berg.  All he did here in court was

12   agree with the words his attorney was putting in his mouth

13   about his infringement opinions and then falling back on

14   unspecified deposition testimony of Mr. Mulchandani and Mr.

15   Narain.  I'll come back to Mr. Narain in a little bit.

16         One thing that Mr. Berg didn't do.  He did not once

17   contest with any specific evidence any of the factual state-

18   ments made by any of Barnes & Noble's witnesses as to how the

19   Nook actually works and how it interacts with the Barnes &

20   Noble cloud.  In fact, he agreed wholeheartedly with Barnes &

21   Noble's witnesses on this.

22         At the end of the day, in order to get around how the

23   Nook actually works and the fact that it doesn't do what these

24   patents cover, all Mr. Berg could do with you was play word

25   games.  Remember when we were talking about when the lending

1    period starts for the Lend Me feature?

2           On the one hand, as far as Mr. Berg was concerned,

3    even though the clock starts before download of the book, that

4    was the same as the clock starting after the download of the

5    book.  But then, when he was talking about the selection

6    requirement of the '851 patent, when it comes to purchasing

7    books on the Barnes & Noble website, somehow the word "select"

8    is different from the word "choose."

9           You may remember that when Mr. Berta was questioning

10   him, Mr. Berg kept admitting that it was in fact the user, not

11   the device, who was selecting the book, but instead of using

12   the word "selecting" he kept using the word "choosing," as if

13   that somehow meant something different from "selecting."  At

14   the end of the day, you should find that Mr. Berg's testimony

15   also fails the credibility test.

16          Finally, we have Dr. Wang, the rebuttal expert who you

17   heard for 15 minutes yesterday.  While his testimony was brief,

18   it was notable mostly because in discussing invalidity, his

19   view of the patent claims was different from Mr. Berg's.  For

20   Dr. Wang, memory cards make prior art different, even though

21   for Mr. Berg memory cards in the Nook support infringement.

22   For Dr. Wang, if the time period for an electronic book starts

23   before it gets to the reader, that makes the patent valid, but

24   for Mr. Berg that was infringement when it came to the Nook.

25          The most important thing you can take away from Dr.

1    Wang is that he contradicted the positions of his own

2    counterpart Mr. Berg, and he never even bothered to review Mr.

3    Berg's expert report.  It is also worth noting that Dr. Wang

4    respects our technical expert Dr. Neuman and holds him in high

5    regard.

6            Now let's talk about the patent claims in this case

7    and what the evidence has and has not shown with respect to the

8    issues of infringement and invalidity.  First, on the issue of

9    infringement, as Judge Rakoff will instruct you, the burden of

10   proving patent infringement is on ADREA.  It is not Barnes &

11   Noble's burden to disprove infringement.

12           It is ADREA's obligation to show, based on the

13   preponderance of the evidence that the Barnes & Noble feature

14   being accused of infringement meets each and every single

15   element of the patent claims that the feature is accused of

16   infringing.  If we do not meet every single element, we do not

17   literally infringe that patent.

18           Before I get into any of the individual features of

19   the Nook that have been accused and the patent claims

20   themselves, I want to remind you of something I alerted you to

21   in my opening statement and which you have heard a great deal

22   about from the Barnes & Noble witnesses who have testified at

23   this trial.  That is that in this case we are basically dealing

24   with a bunch of old patented technology that is in sharp

25   contrast with the new technology being used by Barnes & Noble.

1   After hearing the evidence, we believe you should have no doubt

2   that what I told you would be the case is in fact the case.

3           These patents all cover old technology that is tied to

4   physical devices.  All of them have to do with how technology

5   works on a device, an electronic reader, a consumer appliance,

6   like a blender or a garbage can.  But none of these patent has

7   anything to do with what Barnes & Noble is doing on the Nook,

8   all of which, as Barnes & Noble witnesses have clearly

9   explained, has to do with account-based server technology that

10  works across many different platforms, devices, apps on the

11  iPhone, your iPad, Android devices, and the World Wide Web, you

12  name it.  The technology that Barnes & Noble is using has

13  everything to do with what's happening in the cloud, that one

14  little word that you have heard so many times in this case.

15          So, we are truly talking about apples and oranges

16  here, device-based technology versus cloud-based technology.  I

17  want you to think about this and remember this as we go through

18  the patent claims and when you sit down to deliberate on the

19  issue of infringement.

20          You may also need to decide whether these patents are

21  valid or invalid.  As you will be instructed, in that case the

22  burden does shift over to Barnes & Noble to show, based on the

23  property and the technology in existence at the time the patent

24  application was filed, that either the invention already

25  existed, in which case it's what we call anticipated, or that

1    the invention was obvious, that is, whether someone familiar

2    with the prior art could have figured it out for themselves.

3         Although we don't think you will have to get there,

4    since we don't believe that you should find that any of these

5    patents have been infringed, if you do get to invalidity, we

6    think the evidence clearly and convincingly shows that these

7    so-called inventions were either already in existence or were

8    obvious to someone familiar with the technology.

9         In my closing today, I am only going to focus on

10   certain aspects of the patent claims, in the interest of time,

11   even though I do have an extra three minutes.  But I want you

12   to remember that in order to infringe, the accused product or

13   feature has to meet all the elements of the patent claim.

14        Dr. Neuman took you through every single element the

15   day before yesterday, every step of the methodology, so I'm

16   leaving that with him.  If I don't happen to highlight for you

17   every single one of these elements, please forgive me.  Or

18   maybe you will thank me, I'm not sure.  I just want to make

19   sure you understand that by not mentioning a particular claim

20   element, I am not conceding that any of these elements have

21   been met.  But in the interest of time, in discussing these

22   patents I'm going to focus in my closing on some of the key

23   claim elements.

24        The '703 patent.  Let's talk about that patent, which

25   Barnes & Noble's shop feature is accused of infringing.  As you

recall, the '703 patent is not specifically directed to ereaders.  Rather, it generally covers consumer appliances. The idea is that without having to do anything else, you go over to the appliance and you press what's called a single-user input, for example, a button on the appliance.  Then, without accessing a web browser -- and that's the key -- it takes you to a dedicated website on the Internet for information about the context of usage where that particular appliance can be found.

You remember that the inventor Mr. Shteyn came in here and tried to broaden the scope of his patent to cover the Barnes & Noble shop application by saying that context of usage can mean just about anything, not only garbage collection information for your neighborhood, but if you use garbage cans to play the drums, the context of usage information can relate to that as well.  As I said before, I'll let you assess the credibility of Mr. Shteyn as a witness.

In any case, there are a few important points to keep in mind here about the '703 patent.  The '703 patent has two sets of claims.  First, there is claim 1, which we call an independent claim, and some other claims that depend on claim 1, all of which ADREA says are infringed by the Nook device itself because of the shop feature.

Then there is claim 13 and another claim that depends on it.  Claim 13 is what's known as a method claim.  For this

1    method claim, ADREA is saying that Barnes & Noble, not the

2    user, takes all of the steps laid out in the claim also because

3    of the shop feature.

4           As I said, claims 1 and 13 are independent claims.  I

5    want to focus on the specific reasons that we don't meet these

6    two independent claims.

7           First, for claim 1, as the evidence clearly shows,

8    claim 1 requires that shop not be a web browser.  As you have

9    heard, there are different kinds of web browsers.  There can be

10   those that are for special purposes and those that are for

11   general purposes, but they are all still web browsers.  The

12   fact is, as we have shown, shop is a special-purpose web

13   browser.  It's as simple as that.

14          We showed you many times what shop does.  It browses,

15   it searches, it displays web pages, all of which even ADREA's

16   witness admit to be true.  Don't forget our little

17   demonstration that we did for you here in the courtroom where

18   we browsed through Twitter all the way to the full MTA website

19   on the Internet.  We also showed you that shop even identifies

20   itself as a web browser.  Remember when Dr. Neuman pointed out

21   that it identifies itself as Mozilla or Safari?

22          You also heard Mr. Mulchandani testify that shop was

23   deliberately built from the same Android web engine used to

24   build a general purpose web browser found on some Nook devices

25   and to have web browsing capabilities just like a general

1   purpose web browser, but instead it was designed to have a

2   special purpose, which was to allow the user to browse and

3   search for content on the Barnes & Noble website, which is the

4   reason why shop does not have an address bar that you can type

5   a web address into.

6         That's because, as Mr. Mulchandani explained, it's

7   like a bookmark to your favorites website on a general purpose

8   web browser.  But it is still a web browser.  You don't need an

9   address bar to browse the Internet and you don't need an

10  address bar to be a web browser.

11        What is ADREA's position?  ADREA says shop is not a

12  web browser, because you can't use it to go anywhere on the

13  Web.  What evidence does ADREA claim to have of this?  Well,

14  they say shop doesn't have an address bar that you can type the

15  address into.  Then ADREA falls back to its position that when

16  in doubt, let's refer to Mr. Narain's deposition testimony and

17  claim that Mr. Narain said something he didn't say.

18        What Mr. Narain testified at his deposition is that

19  the Nook Simple Touch doesn't have a web browser.  The focus on

20  this one question and answer that you saw in Mr. Bauer's

21  closing is just so misleading in the context of his entire

22  testimony.  Anyway, at this one single point in his deposition

23  where he was asked this very isolated question, Mr. Narain was

24  clearly being asked and clearly understood he was being asked

25  about a general purpose web browser, and that's how he

responded.

In fact, later on, when he was asked the same question
again, and this is the part of his testimony that you didn't
see go up on the screen during Mr. Bauer's closing, Mr. Narain
testified that the device doesn't expose web browsing
capability, meaning you don't see a general web icon on the
device.  But clearly what he meant was that the device did have
web browsing capability.

Of course, plaintiff's counsel never bothered to ask
Mr. Narain if shop was a web browser.  That question was never
asked at his deposition.  Or to ask him the follow-up question,
which would have been something like, And what do you mean by
not exposing web browsing capability?  Because he knew what Mr.
Narain would have said that just because the device does not
have a separate general purpose browser doesn't mean that shop
isn't a web browser, too.

Also, for claim 1 of the '703 Barnes & Noble doesn't
need the additional requirement that the device have a
predetermined URL or identifier that is associated with it.  If
you agree with Barnes & Noble that shop is a web browser, you
don't even need to consider this point or you can start with
this one.  This is an independent second reason why Barnes &
Noble doesn't infringe claim 1 of the '703 patent.

Also, for claim 1 of the '703, Barnes & Noble doesn't
need the additional requirement that the device have a

1   predetermined URL or identifier that is associated with it.  If

2   you agree with Barnes & Noble that shop is a web browser, you

3   don't even need to consider this point, or you can start with

4   this one.  This is an independent, second reason why Barnes &

5   Noble doesn't infringe claim 1 of the '703 patent.

6          Now, on the URL issue, as you heard from Dr. Neuman

7   yesterday, all of the Nooks except the Nook 1st Edition go to

8   the same URL in the Barnes & Noble cloud.  The key point here

9   is that this URL isn't associated with the Nook, it's

10  associated with the cloud.  The reason we know that, as you

11  heard from Mr. Mulchandani, is that this is the same URL used

12  by all Nook devices except the first device, and also all Nook

13  software applications running on non-Nook devices, including

14  ones that are used on things like Windows and Android phones.

15         So, unlike the patent, where there is a URL for the

16  type blender and a URL for the type garbage can, there is no

17  URL for the Nook devices.  So we just don't meet this claim

18  even if it does cover intruder-repelling garbage cans, as Mr.

19  Shteyn testified.

20         Now, on the identifier requirement, this applies to

21  both claim 1 and claim 13.  Barnes & Noble doesn't meet it,

22  either.  The requirement is that initiating access to a web

23  page and retrieval of information must be based on an

24  identifier that is associated with the device.  That is just

25  not the way the Nook works.  We just don't use the identifier

1   that is required by this claim.

2          As you heard, yes, there is a model number and a

3   device ID that is sent to the cloud when the shop feature is

4   activated.  But these identifiers are not the basis for the

5   information the cloud sends back down to the device.  In fact,

6   as Mr. Mulchandani testified, the model number is essentially

7   thrown away, and neither the model number nor the device ID is

8   used to gather any information to be sent back.  Rather, the

9   cloud uses a different identifier, what is called a product

10  device ID, as well as customer information in order to

11  personalize shop for the customer.

12         By the way, you heard Dr. Neuman say that Mr. Berg's

13  man-in-the-middle analysis on this issue was useless because it

14  could not see what was actually happening with these

15  identifiers on the Barnes & Noble cloud.

16         One more note on the identifier issue.  For claim 13

17  it is required to be an identifier representative of a type of

18  consumer appliance.  That just doesn't happen, either.  Again,

19  it is undisputed that the model number is not used for this and

20  the device ID is an identifier for the actual Nook device

21  itself, not a type of Nook device.

22         Last thing on the '703 patent on the issue of

23  infringement.  On claim 13, as I said before, this is a method

24  claim.  It requires what is called a single-user input that is

25  provided by Barnes & Noble to initiate retrieval of the

E9cspad23          Summation Mr. Ederer

1    information.  But, as you heard, Barnes & Noble doesn't

2    configure your Nooks for you when you take them out of the box,

3    and Nooks simply can't function at all unless the user sets

4    them up.  As Mr. Mulchandani explained, the Nook can never be

5    connected to a home network unless the customer configures it.

6          You also heard Mr. Berg, their technical expert, admit

7    that he had to set up the Nooks he was testing on his own home

8    network by himself in order to be able to hack into them.  And

9    even after the user sets them up, a Nook device needs to be

10   powered on and unlocked before you can launch the shop.  It is

11   not about going over to your garbage can or blender and pushing

12   a button.  There are all these steps that have to be taken

13   first.

14         The key here on claim 13 is that it is not Barnes &

15   Noble that connects the Nook to the home network, it is the

16   user who does that, and it is only when that happens that the

17   device can even interact with the cloud.  The key here is that

18   since it's the user and not Barnes & Noble who is taking these

19   required steps, Barnes & Noble cannot be infringing this method

20   claim.  You heard Dr. Neuman take you through all of the claims

21   very methodically.  He showed you why there is no infringement

22   of the '703.

23         Now let's talk about the validity of the '703 patent.

24   As I said, we don't think you will even have to get here.  But

25   if you do get to invalidity, we think it is clear that the

E4O9ADR3                Summation - Mr. Federer

1  claims ADREA accuses Barnes & Noble of infringing were nothing

2  new or at least were obvious to someone familiar with the

3  technology.  We believe you should find the '703 patent to be

4  invalid.

5       In my opening I told you about a patent issued to a

6  guy named Munyan.  As you have now seen, the Munyan patent

7  covers exactly what is covered by claims 1, 2, and 3 of the

8  '703 patent.  It was filed long before the '703 patent.  Munyan

9  is a patent that shows a handheld electronic book reader with a

10  touch screen.  This book reader has an identification code

11  stored in its memory which when he can be used to identify

12  itself to an online bookstore.

13       That's what happens when the user depresses the

14  bookstore icon on the touch screen.  The reader connects to a

15  remote server and identifies itself.  Then, if the server

16  recognizes the reader, it sends back information, such as lists

17  of libraries and other services.  The reader does all of this

18  without accessing a web browser.  As Dr. Neuman explained, this

19  is exactly what the '703 patent covers in claims 1 and 3.

20       When it comes to claim 2 of the '703 patent, which

21  basically only adds the element of connecting to the Internet

22  through a home network, Dr. Neuman explained how it would have

23  been obvious to modify Munyan to do that.  As Dr. Neuman told

24  you, by the late 1990s, before the '703 patent was filed, it

25  was common for devices to connect to the Internet over a home

 1    network.  This old Munyan patent completely invalidates claims

 2    1, 2, and 3 of the '703 patent specifically for electronic book

 3    readers.

 4            You also heard about a patent issued to this fellow

 5    Mark Bolas, who invented an Internet radio.  With Bolas, all

 6    you have to do is press a button or turn a knob, and the radio

 7    will automatically reach out to the Internet and find the

 8    Internet radio station you want to hear.  How does it do that?

 9    Just like in the '703 patent, the radio identifies itself to an

10    Internet radio server, which uses what the radio sends to find

11    the station's web page and point the radio to the music.

12            The radio doesn't just get music.  It also gets

13    information that describes the channel the listener is

14    listening to, in other words, just like the context of usage

15    requirement of the '703 patent.  As Dr. Neuman explained, all

16    of this is exactly what claims 13 and 15 of the '703 patent

17    supposedly cover, but Bolas did it first.

18            What does ADREA say in response?  Music for a garbage

19    can is context of usage information when it comes to infringe-

20    ment, but music for a home Internet radio all of a sudden isn't

21    context of usage information.  So, any way you look at it,

22    whether it is Munyan or Bolas or both, unfortunately for Mr.

23    Shteyn, his patent should never have issued and it is invalid.

24    Dr. Neuman went through this with you step by step and he

25    showed you why.

 1           Now let's talk about the '501 patent.  That's the one

 2     that ADREA is claiming that Barnes & Noble infringes with its

 3     Lend Me book lending feature.  The claims we are focused on

 4     here are claims 7 and 18, which are the two independent claims

 5     of the patent that are at issue.  Both of these require that

 6     the lending periods start when the book is stored on the device

 7     and the time is then tracked on the device.

 8           You heard the testimony of Mr. Mulchandani and Dr.

 9     Neuman on this one.  Lend Me is completely different.  Lend Me

10     is a cloud-based feature that works across all Barnes & Noble

11     platforms, not just the Nook device.  That is the key point

12     here.  The way our lending feature works, including when it

13     starts and how it tracks the lending period, is the key to this

14     whole discussion.

15           Everything happens in the cloud, not on the device.

16     The lending time is tracked in a completely different way from

17     what is described in the patent.  It is all on the cloud.  And

18     the time begins to run on the cloud's clock before any book or

19     any other content is downloaded or stored on the device.  There

20     is no dispute about this.  That's how it works.  It's a

21     completely different concept.  Mr. Mulchandani and Dr. Neuman

22     explained this to you in detail and show you exactly how the

23     clock works, when it starts and where it's kept.

24           It starts when the cloud processes the loan

25     acceptance.  Then there are a bunch of other steps that have to

1    happen before the book is downloaded to the device.  As Mr.

2    Mulchandani told you, the clock is already running when all of

3    those steps are taking place, and the clock continues to run no

4    matter what happens to the book or when it get downloaded to

5    the device.  In the patent, on the other hand, the clock begins

6    to run only when the book is stored on the device; the clock is

7    kept on the device.

8         Whenever the download happens on the Nook, whether

9    it's three seconds, the happy path that Mr. Mulchandani told

10   you about, or three hours, the not so happy path if there are

11   connectivity problems or whatever, it does not matter.  It's

12   not about how long the download takes, it's about how and when

13   and where the clock starts, how the time is kept.

14        It is undisputed that the clock starts on acceptance

15   of the loan, not upon storage of the book on the device.  The

16   evidence is clear that the clock starts running before anything

17   is ever downloaded to the device no matter when or how fast

18   that happens.

19        Dr. Neuman took you through this very carefully step

20   by step and showed you with his demonstration slides what

21   happens when the Nook is turned off.  Remember his vacation

22   experiment where he didn't download the book but the clock was

23   still running for three full days.  Two distinct operations:

24   Acceptance, download.

25        Let me remind you of the library analogy I gave you in

F3Crad23        Summation - Mr. Federer

1    my opening statement.  Here is an example of two different ways

2    to track time that could be very close to one another in time

3    but which are completely different in concept.

4         There are two libraries in town that allow you to

5    reserve the books online before you come pick them up.  One

6    library gives you 14 days from the time you reserve the book

7    online, and the other library gives you 14 days from the time

8    you come in and pick it up.  The loan period could be nearly

9    the same, say, if you reserved your book on your smart phone

10   while you're half a block away from the library and it takes

11   you another minute or two to get over there, but we are still

12   talking about two completely different concepts.  It is the

13   same thing here.

14        By the way, a marathon is 26 miles 385 yards.  You can

15   run the first 26 miles, but if you don't run the last 385

16   yards, you haven't run a marathon.

17        ADREA says, OK, members of the jury, disregard all of

18   this, none of that matters; what matters, even though there are

19   several steps in between acceptance and download, is that the

20   download happens automatically and usually takes only a few

21   seconds.  I guess the argument is that even if this is not

22   literal infringement since no one, not even Mr. Berg, could

23   bring himself to say that the clock is not already running on

24   the cloud when the download happens, I guess the argument is

25   that Barnes & Noble's cloud-based system for tracking the

E Fensad23          Summation - Mr. Federer

1  lending period still infringes under the doctrine of

2  equivalents.

3         Mr. Bauer put up on the screen the Court's instruction

4  with respect to doctrine of equivalents, but he cut it off

5  right in the middle, after the word "insubstantial." The way

6  to evaluate whether the accused feature is under the doctrine

7  of equivalents is whether it does substantially the same thing

8  in substantially the same way to achieve substantially the same

9  result.  That will be in the instruction that you receive.

10        What does ADREA say about that?  They say it doesn't

11  matter when and where and how the clock begins to run, it all

12  happens really fast no matter what.  But that doesn't mean the

13  Nook works substantially the same way.  No video of really fast

14  downloads can show that a cloud-based time management system,

15  like Lend Me, works in substantially the same way as a

16  device-based time management system.  How could it?

17        As Dr. Neuman explained, the time is being kept for a

18  different purpose and it achieves a substantially different

19  result, since Lend Me keeps track of loaned books for its

20  customers across all of their touch points, whether it's on the

21  device or on a Nook app or on the Barnes & Noble website.  That

22  is the purpose of a cloud-based system.  A device-based system

23  from 1994 doesn't work that way and can't do that.

24        As Dr. Neuman explained to you, Barnes & Noble doesn't

25  infringe the '501 patent.

1    This patent also has a serious invalidity problem

2    because it also is completely anticipated by the prior art.  In

3    my opening I told you about the Saigh reference.  Now you have

4    seen the Saigh reference.  You saw it in Mr. Bauer's opening.

5    I think you know what I'm talking about.

6          Clearly, the lending feature for electronic books that

7    Mr. Saigh invented works exactly the same way as the lending

8    feature in the '501 patent, but the Saigh reference did it

9    first.  So, these claims from the '501 patent should have never

10   been allowed.

11         The Saigh invention covers an electronic personal

12   library apparatus which has a control unit that can be used to

13   store and read electronic books.  You can copy electronic books

14   from a compact cylinder, kind of like a Compact Disc, directly

15   to the control unit's memory.  When books are copied to that

16   memory, there can be a set time period after which the book

17   will be automatically erased from memory.  This one is pretty

18   cut and dry.  As Dr. Neuman explained, the Saigh invention

19   explains exactly what the '501 patent covers, but Saigh came

20   first by three years.

21         By the way, on this issue of the patent office having

22   considered Saigh, you saw all those documents that were put on

23   the screen and they circled the reference, just remember this.

24   Saigh was part of a list of over 700 references.  The examiner

25   supposedly examined them all in a very short period of time.

1   The patent office must have missed this one.  It happens.  The

2   examiner is only human.  When he or she are examining 700

3   patents, sometimes they miss one.  But that doesn't mean that

4   the patent is not invalid.  We believe you should find that the

5   '501 patent is invalid, too.

6          Finally, there is the '851 patent relating to

7   encryption.  Before we get into the patent claim, I thought I

8   might remind you that in my opening I mentioned to you that you

9   were going to hear an interesting story about the '851 patent,

10  which really goes both to infringement and invalidity.  That

11  was, what exactly is this invention, and is there anything new

12  about it?  After all, everyone has admitted, even ADREA's

13  experts, that there was nothing new about encryption at the

14  time this patent was applied for.  The concept of encryption

15  had existed for decades, and electronic reader devices also

16  existed at the time.

17         Remember you heard about the SoftBook and the Rocket

18  eBook?  What exactly was the '851 invention?  You saw and heard

19  the depositions of Mr. Hendricks, Mr. McCoskey, and Mr.

20  Asmussen.  The same question was put to all three of them:

21  What exactly did you invent?  Incredibly, not one of them could

22  answer that question.  They had no idea.

23         They all admitted that the technology described in the

24  patent existed well before this patent application was filed.

25  Mr. Asmussen even admitted that his contribution to the patent

1    was to read a book about encryption and then, without telling

2    the patent office, literally copy portions of that book and

3    drop them into his patent application.

4         Putting aside for the moment the question of infringe-

5    ment, which requires a review of the patent claims and which

6    you will see in a minute Barnes & Noble doesn't come close to

7    infringing, what are we talking about here?  Basically, we are

8    talking about taking old technologies that already existed,

9    ereaders and encryption, and putting them together in a way

10   that even ADREA's own expert Mr. Berg conceded was already in

11   existence at the time.

12        We ask you that in considering the issues relating to

13   the '851 patent, you keep in mind this remarkable testimony of

14   the three named inventors, none of whom had any earthly idea

15   what it was they'd invented.

16        On the issue of infringement of the '851 patent, we

17   are talking about claim 96 of the patent.  There are basically

18   two issues, first the encryption issue, and then there is the

19   selection issue.  I will address the first issue, what sounds

20   like the more technical issue, which is encryption.

21        When it comes right down to it, the reasons Barnes &

22   Noble doesn't infringe the encryption portion of the '851

23   patent are pretty straightforward.  How would you know this?

24   As you heard, there are two things that Barnes & Noble does

25   that are undisputed in this case which completely avoid the

1    elements of this claim.

2            First, the claim requires that certain encryption

3    steps, including encrypting the electronic books, take place

4    through the device.  As you heard, Barnes & Noble encripts all

5    of its books upon receipt of the books into its cloud system at

6    the ingestion phase -- remember that term "ingestion" -- long

7    before there is any Nook device in the picture at all.  They

8    use Adobe's ACS4 encryption technology to do that.

9            Very simply, encryption happens before the book is

10   purchased or sent down to any device and not in connection with

11   any storage to any device.

12           Second, as Mr. Berg admitted, their expert, in order

13   to even try to get this claim to work for them, ADREA has to

14   mix and match that new Adobe technology with what he admitted

15   was at least 20-year-old data security functionality called

16   SSL.  What does that mean?  I don't know if you or I exactly

17   remember what these acronyms stand for, I know I don't, but Mr.

18   Berg admitted that the Nook device does not store any of this

19   channel security information and does not transmit any

20   encryption keys or any ACS4 information.

21           Once again, this is a cloud-based system, not a

22   device-based system.  Mr. Berg testified that the term

23   "encryption information," which appears in multiple places in

24   claim 96, could mean whatever it was convenient for him to mean

25   at different points throughout the claim in order to come up

1    with some sort of infringement theory.  But this, too, doesn't

2    work.  As Dr. Neuman explained, "encryption information" means

3    the same thing throughout the claim, and that makes perfect

4    sense.

5            On this last element of claim 96, which requires that

6    the device transmit encryption information, which includes

7    information that allows encryption and decryption of the

8    electronic book and encryption and decryption keys, this just

9    doesn't happen, because the books were already encrypted.  As

10   Mr. Mulchandani testified and as Dr. Neuman explained, the Nook

11   device transmits no keys or anything else in the course of that

12   process, and the device never encripts anything.

13           So, very simply, there is no infringement of the

14   elements of this encryption scheme, which everyone agrees,

15   including the inventors themselves, was not even invented by

16   them.  Barnes & Noble just doesn't do what this encryption

17   claim covers.

18           The second issue you will be looking at on claim 96 is

19   the selection issue.  That is even easier to figure out.  It's

20   really simple.  When the book is purchased, does the receiver

21   on the device select the book from a list of titles or does the

22   user?  Use your common sense here.

23           The testimony of the Barnes & Noble witnesses was

24   clear.  It's the user who selects the title, not the device.

25   The purchase button that you push when you want to buy an

 1   electronic book is preloaded with an EAN number that identifies

 2   that book.

 3           In fact, if you remember, we showed you the metadata

 4   for the book right on the Nook device.  We demonstrated this to

 5   you right here in this courtroom.  You saw the EAN number for

 6   yourselves.  So, there is no selection of the device from a

 7   list of titles.

 8           In any case, the device doesn't select anything, it is

 9   the user who is selecting the book.  To the extent that

10   software on the device is somehow involved, there is no

11   evidence or expert opinion by any party to suggest that the

12   receiver on this device selects anything.

13           What does ADREA have to say about this?  You also

14   heard the testimony of Mr. Berg.  He had some convoluted theory

15   about software on the device doing the selecting, software that

16   he never showed you, or even the right to identify with

17   specificity.  But that's when he started to parse words with

18   you again.

19           When Mr. Berta was questioning him, he started to say,

20   well, yes, it's true that the user is doing the work here, not

21   the device.  But then he was careful to say that what the user

22   is really doing is choosing the book, not selecting it, and so

23   it is really the device that is doing the selecting.

24           Come on.  Use your common sense.  If the user selects

25   the book on the Nook, the user is also selecting the EAN

1   number.  The device doesn't do the selecting, it's the user who

2   does that.

3         By the way, look at what Mr. Berg says carefully here.

4   He says that the Nook device does the selecting but the claim

5   requires that the receiver do the selecting.  We know that is

6   not true, because Mr. Berg clearly and unequivocally admitted,

7   regardless of the rest of his theory, that the receiver itself

8   does not do the selecting.  So, even ADREA's witnesses admitted

9   that Barnes & Noble does not meet the selection requirement of

10  claim 96.

11        Now let's talk about the validity of the '851 patent.

12  As I said, the patent claim must describe something that is

13  actually new and something that would not have been obvious

14  when it was filed.  Remember, there is no dispute that ebooks

15  were not new when the '851 patent was filed.  You heard the

16  testimony of Hendricks, Asmussen, and McCoskey, three so-called

17  inventors of the '851 patent, each of whom admitted that

18  portable electronic book readers were already out there and

19  available to the market.

20        In fact, they didn't just know that ereaders were

21  already available.  They bought them, they studied them, and

22  they talked about them, and they wrote memos about them.  They

23  were basically taking these existing ideas and trying to paste

24  them into their own patent application.  They hired a whole

25  team of people to do this.

1  Remember the memo from Mr. McCoskey that listed the

2  various ereaders on the market in 1998, a year before the '851

3  patent was filed?  One of those was the SoftBook ereader.  You

4  heard Dr. Neuman testify that the SoftBook patent, or what we

5  call the Sachs patent in this case, covers the SoftBook ereader

6  described virtually everything about ereaders and purchasing

7  electronic books, including the use of encryption.  You also

8  heard Dr. Neuman testify that various kinds of encryption were

9  very well known at the time.  Once again, this patent claim is

10  completely obvious based on the SoftBook patent and encryption

11  references that he showed.

12  Now let's talk a little bit about damages.  ADREA has

13  to prove damages.  Even if you find infringement, it's their

14  burden to prove damages.  They have completely failed to prove

15  anything.

16  I want to remind you, ladies and gentlemen, as I told

17  you in my opening and as the judge has indicated to you several

18  times, I'm only talking about damages now because I have to,

19  not because I think you will ever need to get there.  As you

20  know, if you find no infringement or if you find invalidity,

21  you never even get to damages.  We firmly believe that that

22  will be the case here.

23  For all the reasons I've said, there's no

24  infringement, and in any case these patents are invalid, so the

25  issue of damages should never even come up in your

deliberations.  I even debated whether I should bother to

address the issue in my closing.  Anyway, since it's my only

chance, I will.  And since you are probably tired of hearing

from me, I am going to try and keep my remarks very brief on

this subject.

On damages we have a situation here, as you know,

where the opinions of ADREA's damages expert have been

stricken.  The Court has and will instruct you on this and what

that means.  As a practical matter, what that means is that the

only expert opinion on damages that's in the record in this

case is that of Mr. Barnes, Barnes & Noble's damages expert.

You heard Mr. Barnes.  He was credible, truthful, and

straightforward, and he methodically took you through the

manner in which he calculated a running royalty for damages.

What he did was he applied the Georgia-Pacific factors, which

the Court has already instructed you on.

Under Georgia-Pacific factor number 1, which is

whether any royalties have been received for these patents, Mr.

Barnes took the Amazon settlement agreement, the only agreement

in existence that involves the payment of anything for a

license to these patents -- don't forget, for all the years

leading up to 2009, Discovery was never able to place a single

license for any of these patents, and for all the years since

then neither has ADREA.  So only one license arising only out

of litigation over a period of 15 years.

Case 1:13-cv-04137-JSR   Document 162   Filed 11/05/14   Page 82 of 130

1          MR. EDERER:  Mr. Barnes took the Amazon settlement

2     agreement, and he analyzed it carefully, and he showed you how

3     to come up with a per unit royalty rate from that agreement

4     that makes complete sense.  And the numbers came out to four

5     cents for the '851, and four cents for the '501, and two cents

6     for the '703.  Very straightforward, very commonsensical,

7     exactly what a seasoned damages expert should be doing.

8          But that wasn't the only thing that Mr. Barnes did.

9     He used that as a starting point.  And after he did his per

10    unit calculation based on the Amazon agreement, he took those

11    per unit royalty numbers back two years, to the time of the

12    hypothetical negotiation with Barnes & Noble back in November

13    2009.  Then he considered all of the similarities and all of

14    the differences between the circumstances surrounding the

15    negotiations that took place in 2011 between Amazon and ADREA

16    and the circumstances surrounding the hypothetical negotiation

17    between Barnes & Noble and Discovery and between Barnes & Noble

18    and Philips in 2009.  Then he applied all of the other

19    Georgia-Pacific factors, and he found that some of the factors

20    would indicate a higher royalty number and some would indicate

21    a lower royalty number.  And in the end, he concluded that the

22    numbers he derived from the Amazon agreement were fair and

23    reasonable estimates of the royalties Barnes & Noble would have

24    agreed to pay at the hypothetical negotiation back in 2009.

25         If anything, the royalty rates Barnes & Noble would

1    have agreed to pay were lower, but he kept the rates the same

2    to be conservative, and actually favored ADREA.

3            It's also important to emphasize again that there are

4    no other expert opinions in this record that you can consider

5    that would point to any other approach or any other calculation

6    of a reasonable royalty that Barnes & Noble would have agreed

7    to pay in the hypothetical negotiation.  As you recall, Mr.

8    Magee's opinions were stricken, and so Mr. Barnes' testimony is

9    the only expert testimony you have.

10           And, remember, it is ADREA's burden to prove damages

11   in this case.  And ADREA has proved nothing about damages.  And

12   has absolutely failed to meet its burden.  So if you ever get

13   to damages, which for all of the reasons I have already said

14   you shouldn't, but if you ever get there, you should go with

15   Mr. Barnes' conservative numbers as the maximum damages you

16   should award in this case.

17           And as the Court will instruct you, the starting point

18   for any damages award against Barnes & Noble is March 29, 2012,

19   not November 2009 when Barnes & Noble first started selling the

20   Nooks.  March 29, 2012.  So you can only calculate damages from

21   that date forward.

22           So using Mr. Barnes' royalty rates at four cents for

23   the '851, four cents for the '501, and two cents for the '703,

24   and multiplying that rate by the number of units sold in the

25   relevant periods after March 29, 2012, here are the maximum

1    damages numbers that you should use if you ever get to damages:

2              For the '851, which has an end date for damages of

3    December 9, 2012, since the patent expired on that date -- so

4    we are talking about March 29, 2012 to December 9, 2012 -- the

5    total is $91,207; for the '501, a total of $209,281; and for

6    the '703, a total of $104,640.  All together, about $400,000 or

7    so.

8              This is the ceiling on what you should ever possibly

9    consider awarding for each of these patents if, and only if,

10   you find infringement on any of them, and again we don't think

11   you will.

12             And whatever else Mr. Bauer just told you about

13   damages, ADREA couldn't even find a qualified expert to say any

14   of those things.  And the number that Mr. Bauer was pointing

15   you to, these were made-up numbers.  So ask yourself:  Why is

16   that?

17             Anyway, enough about damages.  If you find no

18   infringement or invalidity on these three patents, which we

19   believe you should, then you can forget about everything I have

20   just said, about damages that is.  And you don't need to do any

21   damages calculation at all.  And for all the reasons we have

22   been discussing, we don't think you will ever even get there.

23             Now, I want to close the loop on one more point.

24             THE COURT:  I just want to alert you you have five

25   minutes.

1          MR. EDERER:  Thank you, your Honor.

2          I want to close the loop on one more point, since I

3     did mention it in my opening and you will be asked to decide

4     this, and that is the issue of willfulness.

5          Ladies and gentlemen, you have sat through eight days

6     of testimony now and I want you to ask yourselves -- and once

7     again, this issue comes up only if you find infringement, which

8     you shouldn't, but I want you to ask yourselves:  Have I heard

9     one shred of evidence in this case that suggests that for one

10    second Barnes & Noble was acting willfully in any way, shape or

11    form?  And the answer is no.  Barnes & Noble didn't know about

12    these patents when it designed the Nook.  It didn't copy them.

13    And there is no question that we have presented you with strong

14    defenses that show that we reasonably believed we didn't

15    infringe.  So if you ever reach the point of finding

16    infringement on any of the patents, which we don't think you

17    will, I have two words for you:  No willfulness.

18         So finally I come to the end of what I hope was a not

19    too long-winded summary of the evidence that has been

20    presented.  Once again, I want to thank you for your service

21    and your undivided attention to this extremely important

22    matter.  And we recognize it's not what you do every day, but

23    it's an important service to our judicial system, and we really

24    do appreciate it.

25         I will now remind you one last time of the underlying

1    theme of my opening, which is very simply use your common

2    sense.

3           Ladies and gentlemen, I know there are some very

4    technical issues presented in this case, but at the end of the

5    day these issues, even the technical ones, are pretty

6    straightforward.  And we believe that if you use your common

7    sense, consider all the evidence, and apply the law to the

8    evidence as the judge will instruct you, the decision is very

9    clear-cut.

10          No infringement on the '851 patent, a patent which the

11   inventors didn't even know what they invented.  And the books

12   are encrypted before they ever get loaded to the device.  And

13   the user selects the book, not the device.

14          No infringement on '703 patent.

15          Sorry, guys, I mixed you up there.

16          Remember, the shop page is a Web browser.  There is no

17   single user input.  And there is no URL associated with the

18   Nook device.  And no evidence that the model number or device

19   ID is used to retrieve information.

20          And no infringement on the '501 patent.  Remember, the

21   lending period starts upon acceptance of the loan in the cloud,

22   before the download of the book, and is trapped in the cloud,

23   not on the device.

24          So my final words to you are:  Use your common sense

25   and you will find no infringement on the '851, no infringement

1    on the '703, no infringement on the '501.  And make sure you

2    check the right boxes on your jury verdict form.  Do you find

3    infringement?  No, no and no.

4              Thank you very much.

5              THE COURT:  Thank you very much.

6              All right, ladies and gentlemen, we are going to take

7    a 15-minute break at this time and then I will give you my

8    instructions of the law.  And then two things will immediately

9    occur after that.  One is your deliberations and the other is

10   your lunch.  But we will take a 15-minute break now.

11             (Jury exits courtroom)

12             THE COURT:  All right.

13             MR. BAUER:  We have two exceptions to the closing that

14   they just made that we would like to address with you.

15             THE COURT:  I am happy to do that, but I have to take

16   a conference call from 12:15 to 12:25.  So when we come back I

17   will hear you on that.

18             In the meantime, while we are taking this break,

19   counsel for both sides need to put together in a cart that my

20   courtroom deputy will provide to you all of the original

21   exhibits.  Make sure you both check it.  And if there are any

22   disputes as to what is in evidence, I will resolve it when I

23   come back.

24             (Recess)

25

```
 1              (Jury not present)
 2         THE COURT:  Before we bring in the jury, plaintiff's
 3    counsel had two matters he wanted to raise.
 4         MR. CABRAL:  Yes, your Honor.  There is one matter I
 5    will address, and I will defer to Mr. Bauer for the second.
 6         THE COURT:  It has to be quick.  If you want to make a
 7    lengthy statement, we will wait until after.
 8         MR. BAUER:  Very quick, your Honor.
 9         MR. CABRAL:  Your Honor, on Thursday your Honor
10    sustained an objection that was raised by plaintiff on motion
11    in limine number 1 regarding the predetermined URL issue, and
12    the grounds for that was that it was inconsistent with your
13    Markman order.  I have the transcript here if you would like to
14    review it, your Honor.  During the closing defense counsel made
15    that argument at length.  We would ask for a corrective
16    instruction.
17         THE COURT:  Why didn't you object then?
18         MR. CABRAL:  We didn't want to object during the
19    closing, your Honor.
20         THE COURT:  Why not?  That is the time to make a
21    correction.
22         MR. CABRAL:  Your Honor, out of respect for the
23    process, we decided to raise it at the end.
24         THE COURT:  That is not respect for the jury.  The
25    time to correct something that is inaccurate, and I want to
```

1   hear from defense counsel, assuming it is inaccurate, is, as

2   you saw defense counsel do.  I didn't sustain his objections,

3   he knew that the time to make the objection was when the

4   plaintiff's counsel stated something that he thought was

5   inaccurate.  That's the time to do it.

6           MR. CABRAL:  Your Honor, the grounds for the objection

7   that we are raising now, the exception we are raising now is

8   not inaccuracy necessarily.  It is that this evidence was

9   specifically excluded by your Honor.

10          THE COURT:  That's the same point.  Let me hear from

11  defense counsel.

12          MR. EDERER:  Mr. Sharifahmadian will argue this.

13          MR. SHARIFAHMADIAN:  The objection had been waived,

14  your Honor.

15          THE COURT:  No.  I may or may not decide that.  If

16  that's the best you have, you are not in good shape.

17          MR. SHARIFAHMADIAN:  Mr. Ederer's closing referred to

18  what is in the patent.  The patent does refer to URL's of the

19  type blender or the URL of the type coffee maker.  It is a

20  factual statement about what is stated in the patent.  It is no

21  way contrary to anything that your Honor ruled with respect to

22  claim construction in this case.  In fact, what is a URL

23  associated with was not construed.

24          THE COURT:  I will deal with this after I charge the

25  jury.  I don't think it can be dealt with in one second.  Let

1        me hear the other objection.

2               MR. BAUER:  The other one, your Honor, our objection

3        is to keep the evidence out.  This was after he made the

4        statement that ADREA couldn't find a qualified expert.  That is

5        just inappropriate and wrong.

6               THE COURT:  I noticed you were on the verge of

7        objecting then.

8               MR. BAUER:  It had come out already.

9               THE COURT:  Again, that would have been the time to do

10       it.  But I would have overruled that objection.  While perhaps

11       not as ideally phrased as it might have been, I think what the

12       jury understood was it was an argument by defense counsel

13       commenting, fairly I think, on the deficiency of the expert who

14       was offered.  I think that is totally fair comment.  That

15       objection is overruled.

16              We will deal with the other objection after we charge

17       the jury.  Let's bring in the jury.

18              (Jury present)

19              THE COURT:  Ladies and gentlemen, you each now have a

20       copy of my instructions of law.  We are going to read them

21       together now.  You have them in writing so you will be able to

22       take them with you into the jury room and use them during your

23       deliberations.

24              I will mention right at the outset, at the very back

25       of the instructions, in what is called an appendix, are the

actual claims that are involved in this case.  While you also

have them in Joint Exhibits 1, 2, and 3, which are the entire

patents, we have separated out here the specific claims that

are the disputed claims, the asserted claims of infringement in

this case.  That will be there for your convenience.

        Also, if you look at the table of contents, you will

see it is in four parts.  First, there are general

instructions.  These are instructions that apply not just to

this case but to all civil cases pretty much.

        Then there is a section called "Liability."  That's

where you undertake the first two steps of your analysis.  The

first step is deciding whether or not there is infringement.

If there is no infringement, you don't have to go any further.

If there is infringement, then you have to decide the issue of

validity, whether the infringed claims are nevertheless invalid

for the reasons defense argues or are valid instead.  If you

find that there is infringement, if you find that there is no

invalidity, then you would go on to the issue of damages.

        The third section in my table of contents is the

instructions on damages.  "Damages," you will recall, is the

legal term for money.  The legal profession prefers, of course,

not to use a simple word when we can use a more obscure one, so

we call them damages.

        Finally, there are some concluding instructions about

how you fill out your verdict form and things like that.

1        Let's turn to page 1, the beginning of the

2   instructions.

3        We are now approaching the most important part of this

4   case, your deliberations.  You have heard all of the evidence

5   in the case as well as the final arguments of the lawyers for

6   the parties.  Before you retire to deliberate, it is my duty to

7   instruct you as to the law that will govern your deliberations.

8   These are the final and binding instructions, which entirely

9   replace the preliminary instructions I gave you earlier.

10       As I told you at the start of this case and as you

11  agree, it is your duty to accept my instructions of law and

12  apply them to the facts as you determine them.  Regardless of

13  any opinion that you may have as to what the law may be or

14  ought to be, it is your sworn duty to follow the law as I give

15  it to you.  Also, if any attorney or other person has stated a

16  legal principle different from any that I state to you in my

17  instructions, it is my instructions that you must follow.

18       Because my instructions cover many points, I have

19  provided each of you with a copy of them not only so that you

20  can follow them as I read them to you, but also so that you can

21  have them with you for reference throughout your deliberations.

22       In listening to them now and reviewing them later, you

23  should not single out any particular instruction as alone

24  stating the law, but you should instead consider my instruction

25  as a whole.

1      Your duty is to decide the fact issues in the case and

2   arrive, if you can, at a verdict.  You, the members of the

3   jury, are the sole and exclusive judges of the facts.  You pass

4   upon the weight of the evidence, you determine the credibility

5   of the witnesses, you resolve such conflicts as there may be in

6   the testimony, and you draw whatever reasonable inferences you

7   decide to draw from the facts as you determine them.

8      In determining the facts, you must rely upon your own

9   recollection of the evidence.  To aid your recollection, we

10  will send you all the exhibits at the start of your

11  deliberations.  If you need to review particular items of

12  testimony, we can also arrange to provide them to you in

13  transcript or read-back form.

14      Please remember that none of what the lawyers have

15  said in their opening statements and their closing arguments

16  and their objections or in their questions is evidence, nor is

17  anything I may have said evidence.  The evidence before you

18  consists of just three things:  The testimony given by

19  witnesses that was received in evidence, the exhibits that were

20  received in evidence, and any stipulations of the parties that

21  were received in evidence.

22      Testimony consists of the answers that were given by

23  the witnesses to the questions that were permitted either here

24  in court or in the deposition excerpts that were placed in

25  evidence.

1        Please remember that questions, although they may

2   provide the context for answers, are not themselves evidence,

3   only answers are evidence, and you should therefore disregard

4   any question to which I sustained an objection.  Also, you may

5   not consider any answer that I directed you to disregard or

6   that I directed be stricken from the record.  Likewise, you may

7   not consider anything you heard about the content of any

8   exhibit that was not received nerve.

9        It is the duty of the attorney for each side of the

10  case to object when the other side offers testimony or other

11  evidence that the attorney believes is not properly admissible.

12  Counsel also have the duty to ask the Court to make rulings of

13  law and to request conferences at the side bar out of the

14  hearing of the jury.  All of questions of law must be decided

15  be me.

16       You should not show any prejudice against any attorney

17  or party because the attorney objected to the admissibility of

18  evidence or asked for a conference out of the hearing of the

19  jury or asked me for a ruling on the law.

20       Finally, I also ask you to draw no inference from my

21  rulings or from the fact that upon occasion I asked questions

22  of certain witnesses.  My rulings were no more than

23  applications of the law, and my questions were only intended

24  for clarification or to expedite matters.  You are expressly to

25  understand that I have no opinion as to the verdict you should

1    render in this case.

2         You are to perform your duty of finding the facts

3    without bias or prejudice or sympathy as to any party, for all

4    parties are equal under the law.  You are to perform your final

5    duty in an attitude of complete fairness and impartiality.  You

6    are not to be swayed by rhetoric or emotional appeals.

7         It must be clear to you that if you were to let

8    prejudice or bias or sympathy interfere with your thinking,

9    there would be a risk that you would not arrive at a true and

10   just verdict.  So, do not be guided by anything except clear

11   thinking and calm analysis of the evidence.

12        As you know, this is a civil case.  In order to

13   prevail in a civil case, a party who is making a claim against

14   another party has what we call the burden, which is the burden

15   of proof of establishing each of the essential elements of the

16   claim.  There will be two burden of proof standards by which

17   you must weigh the evidence in this case:  Preponderance of the

18   evidence and clear and convincing evidence.

19        Plaintiff here is ADREA LLC.  The defendants here are

20   three related companies:  Barnes & Noble, Inc.,

21   BarnesandNoble.com LLC, and Nook Media LLC.  However, for all

22   of your purposes, these parties can be treated as one entity

23   and are therefore referred to here simply as "B&N" or

24   "defendants."

25        ADREA claims that the defendants infringed one or more

1    of ADREA's patents.  To prevail on this claim, ADREA must prove

2    such infringement by a preponderance of the credible evidence.

3    The credible evidence means such testimony, exhibits, or other

4    evidence that you find worthy of belief.

5           To establish a claim by a preponderance of the

6    credible evidence means to prove that that claim is more likely

7    true than not true.  It does not mean the greater number of

8    witnesses or how much time either side employs in the trial.

9    The phrase refers to the quality of the evidence, its

10   persuasiveness in convincing you of its truth.

11          If you find that ADREA has proved that defendants

12   infringed one or more of ADREA's patents, then you must also

13   consider whether nonetheless the defendants are not liable

14   because they approved by clear and convincing evidence that the

15   relevant patent is invalid.

16          Clear and convincing evidence is a more exacting

17   standard than proof by a preponderance of the evidence.  Clear

18   and convincing evidence is proof that establishes in your mind

19   that the proposition at issue is highly probable.

20          Finally, if you find that the defendants have

21   infringed one or more of ADREA's patents and that the patent is

22   not invalid, you must decide whether the infringement by

23   defendants was willful, which, as I will explain later, means

24   intentional or reckless.  If ADREA shows, again by clear and

25   convincing evidence, that B&N's infringement was willful, then

1   ADREA may be entitled to increased damages from defendants, but

2   the amount will be determined by me and should not concern you

3   in any respect.

4           In deciding whether a party meets its burden of proof,

5   you may consider both direct evidence and circumstantial

6   evidence.  Direct evidence is evidence that proves a fact

7   directly, for example, where a witness testifies as to what he

8   or she saw, heard or observed.  That is called direct evidence.

9           Circumstantial evidence is evidence that tends to

10  prove a fact by proof of other facts.  To give a simple

11  example, suppose that when you came into the courthouse today,

12  the sun was shining and it is a nice day but the courtroom

13  blinds were drawn and you could not look outside.  Then later,

14  as you were sitting here, someone walked in with a dripping

15  well umbrella and soon after somebody else walked in with a

16  dripping-wet raincoat.

17          On our assumed facts, you cannot look outside the

18  courtroom and you cannot see whether or not it is raining, so

19  you have no direct evidence of that fact.  But on the

20  combination of the facts about the umbrella and the raincoat,

21  it would be reasonable for you to infer that it had begun

22  raining.

23          That is all there is to circumstantial evidence.

24  Using your reason, experience, you will infer from establish

25  facts the existence or nonexistence of some other fact.  Please

1    note, however, it is not a matter of speculation or guess; it

2    is a matter of logical inference.

3            The law makes no distinction between direct and

4    circumstantial evidence.  Circumstantial evidence is of no less

5    value than direct evidence, and you may consider either or both

6    and may give them such weight as you conclude is warranted.

7            It must be clear to you by now that counsel for the

8    opposing parties are asking you to draw very different

9    conclusions from various factual issues in the case.  An

10   important part of that decision will involve making judgments

11   about the testimony of the witnesses you have listened to and

12   observed.  In making these judgments, you should carefully

13   scrutinize all the testimony of each witness, the circumstances

14   under which each witness testified, and any other matter in

15   evidence that may help you to decide the truth and the

16   importance of each witness's testimony.

17           Your decision whether or not to believe a witness may

18   depend on how that witness impressed you.  How did the witness

19   appear to you?  Was the witness candid, frank, and forthright,

20   or did the witness seem to be evasive or suspect in some way?

21   How did the way the witness testified on direct examination

22   compare with how the witness testified on cross-examination?

23           Was the witness consistent or contradictory?  Did the

24   witness appear to know what he or she was talking about?  Did

25   the witness strike you as someone who was trying to report his

1    or her knowledge accurately?  These are the examples of the

2    kind of common-sense questions you should ask yourselves in

3    deciding whether a witness is or is not truthful.

4            How much you choose to believe a witness may also be

5    influenced by the witness's bias.  Does the witness have a

6    relationship with any of the parties that may affect how he or

7    she testified?  Does the witness have some interest, incentive,

8    loyalty, or motive that might cause him or her to shade the

9    truth?  Does the witness have some bias, prejudice, or

10   hostility that may cause the witness to give you something

11   other than a completely accurate account of the facts he or she

12   testified to?

13           You should also consider whether the witness had an

14   opportunity to observe facts he or she testified about and

15   whether the witness's recollection of the fact stands up in

16   light of the other evidence in the case.  In other words, what

17   you must try to do in deciding credibility is to size up a

18   person just as you would in any important matter where you are

19   trying to decide if a person is truthful, straightforward, and

20   accurate in his or her recollection.

21           The law permits parties to offer testimony from

22   witnesses who were not involved in the underlying events in the

23   case but who, by education or experience, profess to expertise

24   in a specialized area of knowledge.  In this case Ned Barnes,

25   Brian Berg, Clifford Neuman, and Xin Wang were offered as such

1    witnesses.

2         Stephen Magee also testified, but the opinions he

3    offered were subsequently stricken and may not be considered by

4    you in any respect, although the exhibits that were received

5    during his testimony and any nonopinion facts he testified to

6    may be considered.

7         Specialized testimony is presented to you on the

8    theory that someone who is learned in the field may be able to

9    assist you in understanding specialized aspects of the

10   evidence.  However, your role in judging credibility and

11   assessing weight applies just as much to these witness as to

12   other witness.  When you consider the specialized opinions that

13   were received in evidence in this case, you may give them as

14   much or as little weight as you think they deserved.

15        For example, a specialized witness necessarily bases

16   his or her opinions in part or in whole on what that witness

17   learned from others, and you may conclude that the witness's

18   opinions may be affected by how accurate or a inaccurate that

19   underlying information is.

20        More generally, if you find that the opinions of a

21   specialized witness were not based on sufficient data,

22   education, or experience, or if you should conclude that the

23   trustworthiness or credibility of such a witness is credible,

24   or if the opinion of the witness is outweighed in your judgment

25   by other evidence in the case, then you may, if you wish,

1    disregard the opinions of that witness either entirely or in

2    part.

3              On the other hand, if you find that the specialized

4    witness is credible and that the witness's opinions are based

5    on sufficient data, education, and experience, and that the

6    other evidence does not give you reason to doubt the witness's

7    conclusions, you may, if you wish, rely on that witness's

8    opinions and give them whatever weight you deem appropriate.

9              With these preliminary instructions in mind, we now

10   turn to the specific charges in this case.  Plaintiff asserts

11   that defendants have infringed certain claims of three of

12   plaintiff's patents:  U.S. patent number 7,298,851, referred to

13   as the '851 patent, which is Joint Exhibit 1 in evidence; U.S.

14   patent number 7,299,501, referred to as the '501 patent, which

15   is Joint Exhibit 2 in evidence; and U.S. patent number

16   7,620,703, referred to as the '703 patent, which is Joint

17   Exhibit 3 admissible evidence.

18             Plaintiff asserts that such infringement extended to

19   eight devices sold by defendants:  The Nook classic, also

20   referred to as the Nook 1st Edition, Nook Color, Nook Tablet,

21   Nook Simple Touch, Nook Simple Touch with Glowlight, Nook HD,

22   Nook HD+, and Nook Glowlight.  Together these devices will be

23   referred to as the "Nook devices."

24             In order to encourage useful inventions, the laws of

25   the United States give an inventor a temporary monopoly over

1   his or her invention.  This is called a patent.  Once it is

2   issued, anyone who during the period of the patent's protection

3   makes uses or sells the patent's invention without the

4   permission of the owner of patent is said to have infringed the

5   patent.

6           Here ADREA claims that the Nook devices that are made,

7   used, and sold by defendants infringe claim 96 of the '851

8   patent; claims 7, 8, 9, 18, and 19 of the '501 patent; and

9   claims 1, 2, 3, 13, and 15 of the '703 patent.  These claims

10  will be referred to collectively as the "asserted claims."

11          To make your job easier, I am attaching as an appendix

12  to the written copies of this set of instructions a copy of

13  each of these asserted claims.  As you will see, the asserted

14  claims contain both ordinary English words and specialized

15  terms.  One of my jobs is to determine before trial the meaning

16  of the specialized terms.

17          In particular, the Court has already determined the

18  meanings of the following terms.  For the '851 patent, the term

19  "electronic book" means an electronic version of textual or

20  graphical information.  The term "title" means the actual title

21  assigned by an author to a book or any other designation,

22  including any graphical symbol or icon indicating a particular

23  group, portion, or category of textual information.

24          For the '501 patent, the term "associating a

25  predetermined amount of time after the electronic book is

stored on the viewer with the electronic book" means

associating with the electronic book a predetermined amount of

time that begins when the electronic book is stored on the

viewer.

For the '703 patent, the term "consumer appliance"

means a device that may send or receive information.  The term

"identifier" means a sequence of bits or characters that

identifies a program, device, or system to another program,

device, or system.  The term "home network" means a collection

of interconnected apparatus in and around the home.

As you look at the claims themselves, these

definitions will become clearer.  Also, please bear in mind

that you must be consistent in the meaning you give to the

terms of any given claim for purposes of your analysis of both

infringement issues and validity issues.

To prove that defendants have infringed a given claim,

ADREA must prove by a preponderance of the evidence that the

Nook devices made use of each of the elements of that claim.

For a claim that covers the so-called method, ADREA must prove

that defendants performed all of the steps of that method.

There are two types of infringement relevant to this

case, literal infringement and infringement under the doctrine

of equivalents.  In order to determine whether a Nook device

literally infringed any of the claims, you must compare the

Nook device to the elements of the claim you are considering.

1    This means not just looking at the preferred embodiment of that

2    claim but at the language of the claim itself, since every

3    embodiment of a claim is protected.

4            If the Nook device duplicates every element of a

5    claim, then it literally infringes that claim.  This statement

6    is true even if the Nook device includes other elements.  If,

7    however, the Nook device fails to duplicate every element of a

8    claim, then it does it not infringe that claim.

9            Even if the Nook devices do not literally infringe a

10   particular element of a claim you are considering, there can

11   still be infringement if the Nook device meets the element

12   under the doctrine of equivalents.  This can happen if the

13   product contains an element that you determine is equivalent to

14   the element of a patent claim in the sense that any differences

15   are insubstantial.

16           ADREA asserts a doctrine of equivalents argument only

17   with respect to the associating element of claims 7, 8, 9, 18,

18   and 19 of the '501 patent.

19           One way to decide whether the associating element of

20   any of these claims and the allegedly corresponding part of the

21   Nook devices are equivalent is to consider whether the

22   corresponding part of the Nook devices performs substantially

23   the same function in substantially the same way to achieve

24   substantially the same result as the requirement of the claim.

25           If you find that plaintiff has failed to prove that

1    the Nook devices infringed any of the asserted claims, you must

2    find the defendants not liable, and your work is over.  But if

3    you find the plaintiff has proved that the defendants infringed

4    one or more of the asserted claims, then you must turn to the

5    issue of validity.

6          Even if the Nook devices infringed one or more of the

7    asserted claims, the defendant would still not be liable if

8    those claims were invalid.  The fact that the patents were

9    approved by the U.S. patent office makes the asserted claims

10   presumptively valid, but the defendants may still prove that

11   those claims are invalid if they can establish such invalidity

12   by clear and convincing evidence, that is, by proving that it

13   is highly probable that the claims in question are invalid.

14         To be valid, a claimed invention must satisfy certain

15   conditions of patentability, of which the two here relevant are

16   novelty and nonobviousness.  Specifically, defendants contend

17   that all the asserted claims are invalid because they lack

18   novelty and/or are obvious.  If defendants establish one or

19   more of these contentions of invalidity as to a given claim,

20   that claim is invalid.

21         Let's first consider the issue of lack of novelty.  To

22   qualify for a patent, an invention must be new or novel.

23   Defendants argue this all the asserted claims are invalid for

24   lack of novelty because they were anticipated by prior art.

25   "Prior art" is the term for any previously filed patents,

1    publicly known publications, or products offered for sale that

2    describe the claimed intervention and were filed or published

3    more than one year before the effective filing date of the

4    patent applications here at issue.

5            In this case the parties are agreed that the effective

6    filing date of the patent applications here at issue was

7    September 21, 1999, for the '851 patent; November 7, 1994, for

8    the '501 patent; and August 10, 2000, for the '703 patent.

9            The prior patent, product, or publication need not use

10   the same words as any of the asserted claims.  However, to find

11   that the assert claim was not novel, you must find that each

12   and every element of that claim was either inherent or

13   expressly disclosed in a single prior invention or in a single

14   prior art reference.  You may not combine two or more items of

15   prior art to make out an anticipation.

16           Let's next discuss the issue of obviousness.  Even if

17   an invention is novel in the sense that no one has previously

18   made it, a patent claim is invalid if the invention was

19   obvious, that is, would have been obvious to a person skilled

20   in the relevant field at the time the invention was made.

21   Defendants contend that all the asserted claims were obvious in

22   this sense.

23           In order to determine whether a claim was obvious, you

24   need to ask yourself:  As of September 21, 1999, for the '851

25   patent; November 7, 1994, for the '501 patent; and August 10,

1   2000, for the '703 patent:

2        First, what was the prior art respecting that claim,

3   that is, what patents, printed publications, and/or products

4   were publicly available prior to the effective filing date that

5   bore on the subject matter of the claim?

6        Second, what were the differences between the claim

7   you are considering and the prior art?

8        Third, given the foregoing, would someone reasonably

9   familiar with the prior art and reasonably skilled in the

10  relevant field have considered the invention embodied in the

11  claim you are considering obvious in view of the prior art?

12       In addition, you must also consider, in evaluating

13  obviousness, objective considerations to the extent they have

14  been the subject of credible evidence that may indicate that

15  the invention was not obvious, such as commercial success,

16  long-felt need, failure of others to make the invention,

17  copying of the invention by others, unexpected results achieved

18  by the invention, and praise of the invention by others in the

19  field.

20       If you find that defendants have infringed one or more

21  valid claims, you must then determine how much money defendants

22  should pay plaintiff in order to reasonably compensate

23  plaintiff for its losses attributable to such infringement.

24  These are called compensatory damages, and plaintiff bears the

25  burden of proving the amount of such damages by a preponderance

1    of the credible evidence.

2              Specifically, compensatory damages are the amount of

3    money that the defendants hypothetically would have paid ADREA

4    as a fee or royalty for using ADREA's patent invention in the

5    Nook devices.  The first step in calculating the fee is to

6    determine what rate as a percentage or fixed amount per unit of

7    Nook devices sold the parties would have reasonably agreed to

8    in a hypothetical negotiation taking place in November 2009.

9              In determining the reasonable royalty, you should

10   consider such factors as:

11             1.  Whether the patent holder had an established

12   royalty for the particular invention;

13             2.  The rates paid by defendants for the use of other

14   patents comparable to ADREA's patent;

15             3.  The nature, scope, and term of the license;

16             4.  ADREA's established policy, if any, to maintain

17   its patent monopoly by not licensing others;

18             5.  The commercial relationship between plaintiff and

19   defendants, if any;

20             6.  The effect of selling the patented device on the

21   sales of the products of other defendants;

22             7.  The duration of the patent;

23             8.  The established profitability of the patent made

24   under the patent, its commercial success, and its current

25   popularity;

1         9.   The utility and advantages that the patent

2    features over prior methods and devices;

3         10.  The nature of the patent invention, the character

4    of the commercial embodiment of it as owned and produced by the

5    licensor and the benefit to those who have used the invention;

6         11.  The extent to which the defendant used the

7    invention and any evidence probative of the value of that use;

8         12.  The portion of the realized profit that should be

9    credited to the invention as distinguished from nonpatented

10   elements, the manufacturing process, business risk, or

11   sufficient features or improvement added by the infringer.

12        You have previously heard these and a few other

13   factors referred to as the Georgia-Pacific factors, but the

14   list I have just given you replaces the earlier list you

15   received.  No one factor is dispositive.  However, you may also

16   consider any other factor that in your mind would have

17   increased or decreased the royalty the parties would have

18   agreed to acting as normally prudent businesses.

19        Once you have considered these factors, you then

20   multiply the royalty rate by the corresponding figure in

21   evidence for the number of Nook devices sold during the

22   relevant periods.  The result is the reasonable royalty or the

23   amount of compensatory damages ADREA is entitled to.

24        The relevant periods for purposes of those

25   calculations varies according to the patent you are

1500

1    considering.  For the '851 patent, damages may only be awarded

2    for the period of March 29, 2012, through December 9, 2012.

3    For the '501 and '703 patents, however, damages should run from

4    March 29, 2012, through the date of your verdict.

5          If you find defendants liable for infringement, there

6    is one last thing you need to determine bearing on damages,

7    which is whether the infringement by defendants was willful.

8    The determination of whether defendants' infringement was

9    willful will not affect the specific amount of compensatory

10   damages that you will assess, which are not intended to punish

11   defendants but simply to compensate plaintiff, but it will aid

12   the Court in determining whether any additional damages must be

13   assessed.

14         To prove willful infringement, plaintiff must prove by

15   clear and convincing evidence that defendants either actually

16   knew they were infringing plaintiff's patents or, once they

17   were put on notice of plaintiff's patents, recklessly

18   disregarded the fact that their actions constituted an

19   unjustifiably high risk of infringement of that patent.

20         To determine whether defendants' infringement was

21   willful, you should consider all relevant facts to the extent

22   they are supported by credible evidence, including, for

23   example:

24         1.  Whether or not defendants intentionally copied a

25   product of plaintiff;

         2.   Whether or not defendants acted in accordance with
the standards of commerce or its industry;

         3.   Whether or not defendants made a good-faith effort
to avoid infringing the asserted claims;

         4.   Whether or not there was a reasonable claim to
believe that defendants did not infringe or had a reasonable
defense to infringement; and

         5.   Whether or not defendants tried to cover up any
infringement.

         You will shortly retire to the jury room to begin your
deliberations.  As soon as you get to the jury room, please
select one of your number as the foreperson to preside over
your deliberations and to serve as your spokesperson if you
need to communicate with the Court.  You will be bringing with
you into the jury room a copy of my instructions of law and a
verdict form on which to record your verdict.  In addition, we
will send into the jury room all of the exhibits that were
committed into evidence.

         Let me pause for a minute, ladies and gentlemen and
show you the verdict form.  It is a simple two-page document.
The first section is about liability.  For each patent you have
to say whether or not there has been infringement, and if the
answer to that is yes, then you have to say whether or not
nevertheless the patent was invalid.  You will answer in that
first section for each patent both the infringement question

1    and the validity question.

2        If you find that any patent was infringed and that the

3    patent was not shown to be invalid, then you go on to the

4    second section, which is damages, and you will compute the

5    total of damages and fill that in next to the dollar sign.

6    Then you will also indicate whether or not the infringement was

7    willful or not willful.

8        Remember, the dollar sign is for compensatory damages.

9    Willfulness is simply so that I can then determine, if there is

10   any finding of damages, whether additional damages should be

11   added.  But that is not for you.  You just determine whether it

12   is willful or not.  Your damage amount is purely compensatory

13   damages, not additional damages.

14       After you have reached a verdict and filled out the

15   form, your foreperson will sign it, fold it, seal it in this

16   envelope very cleverly marked "Verdict," and that will be

17   brought to me.  But I will not open it until you are all back

18   here in the jury room.  Then I will open it, and I will ask

19   each one of you is that your verdict after we have read it out.

20   The reason we go through all those technicalities is to be

21   absolutely sure we have your verdict as you have decided it.

22       Let's go back to the instructions.

23       If you want any of the testimony, that can be provided

24   either in transcript or read-back form.  Please remember that

25   it is not always easy to locate what you might want, so be as

 1   specific as you possibly can be in requesting portions of

 2   testimony.

 3          Any of your requests, in fact any communication with

 4   the Court, should be made to me in writing signed by your

 5   foreperson and given to the marshal, who will be available

 6   outside the jury room throughout you are deliberations.  After

 7   consulting with counsel, I will respond to any question or

 8   request you have as promptly as possible, either in writing or

 9   by having you return to the courtroom so that I can speak with

10   you in person.

11          You should not, however, tell me or anyone else how

12   the jury stands on any issue until you have reach your verdict

13   and recorded it on your verdict form.

14          Each of you must decide the case for yourself after

15   consideration with your fellow jurors of the evidence in the

16   case, and your verdict must be unanimous.  In deliberating,

17   bear in mind that while each juror is entitled to his or her

18   opinion, he should exchange views with his or her fellow

19   jurors.  That is the very purpose of jury deliberations, to

20   discuss and consider the evidence, to listen to the arguments

21   of fellow jurors, to present your individual views, to consult

22   with one another, and to reach a verdict based solely and

23   wholly on the evidence.

24          If, after carefully considering all the evidence and

25   the arguments of your fellow jurors, you entertain a

1 conscientious view that differs from the others', you are not

2 to yield your view simply because you are outnumbered?  On the

3 other hand, you should not hesitate to change or modify an

4 earlier opinion which, after discussion with your fellow

5 jurors, now appears to you erroneous.  In short, your verdict

6 must reflect your individual views and it must also be

7 unanimous.

8    This completes my instructions of law.

9    Now a couple of other things.  First, I will note for

10 the record that all previous objections to the charge are

11 deemed renewed at this time and the Court's rulings remain as

12 they were.

13    Second, there is one little item, ladies and

14 gentlemen, I am going to take up with counsel that conceivably

15 might lead to a short additional instruction.  I'm not sure

16 whether that will happen or not.  If it does, we will send that

17 in in a few minutes.  If you don't receive anything further,

18 then that's fine, too.

19    Third, after we do that, I'm going to excuse counsel

20 for 45 minutes so they can have their lunch.  Any note you send

21 us between now and 2 o'clock we won't respond to until after 2

22 o'clock.

23    Fourth, you can take as little or as long for your

24 deliberations.  That is entirely up to you.  If, however, you

25 want to sit beyond 5 clock, and there is no need for you to sit

1    beyond 5 clock, but if you want to for any reason, we can make

2    provision for you to sit later.  But you have to let us know by

3    4 o'clock.  So, if for any reason you wanted to sit late, 7

4    o'clock or something like, that just let us know.  Otherwise,

5    when you get to 5 o'clock, if you haven't reached a verdict

6    yet, just go home.

7           Come back tomorrow at 9 o'clock.  You will be on time,

8    unlike some people I know.  Whoever is your foreperson needs to

9    make sure that you don't start your deliberations again until

10   all nine of you are back.

11          Unless counsel has anything else, we will swear in the

12   marshal and excuse the jury.

13          MR. BAUER:  Plaintiff has nothing, your Honor.

14          MR. EDERER:  Nothing else, your Honor.

15          THE COURT:  Very good.

16          (Marshal sworn)

17          THE CLERK:  Jurors, please follow the marshal.

18          (1:15 p.m., the jury commenced deliberations.)

19          (Jury not present)

20          THE COURT:  I will note for the record that I have

21   marked one copy of my instructions as Court Exhibit 1, and that

22   will be docketed.  Now let's back to the issue that was raised,

23   belatedly, by plaintiff.  Yes, sir.

24          MR. SHARIFAHMADIAN:  Your Honor, the term "URL

25   associated with" has not been construed by this Court.  The

Page 115

1  other day your Honor made a ruling that an expert witness on

2  the stand could not testify that in his opinion "URL

3  associated" means that it has to be of a type.  Nevertheless,

4  there has never been a request, much less an order, that B&N is

5  not entitled to put forward a defense with respect to this

6  limitation.

7        Mr. Ederer's closing pointed out the fact that the

8  patent does make references to URL for a particular type of

9  consumer appliance, for example, URL of the type blender.  That

10  is a factual statement.  Moreover, it is something that the

11  jury can consider and rely on when reaching its own decision in

12  terms of what the common and ordinary meaning of "associated

13  with" is.  For that reason, there is nothing improper about

14  making a factual statement about what is in the patent.

15        That's what Mr. Ederer said, the patent makes these

16  types of references.  He didn't say that's what the claim

17  means.  For that reason we don't believe that there is any need

18  for a special instruction.  And any such instruction at this

19  point would be essentially new claim construction when your

20  Honor refused during the claim construction process to construe

21  these terms and said that the jury is entitled to apply the

22  common and ordinary meaning.

23        THE COURT:  Counsel.

24        MR. CABRAL:  Thank you, your Honor.  On Thursday you

25  sustained the objection to exclude evidence on this issue.

1  What you said was, "I think this is really a disguised way

2  around my ruling."  What your ruling says is, "B&N proposes

3  adding the modifier 'particular' before 'a consumer appliance,'

4  but that would inappropriately rewrite the claim language."

5         That's exactly what this issue is.  They are trying to

6  say they don't infringe this particular claim element because

7  the URL is not associated with a particular device, which is

8  why you saw on that slide references to iPads and all these

9  other things, laptop computers.  That is the basis of the

10  defense.

11        In our view, that is inconsistent with the Court's

12  ruling.  And you precluded their expert from testifying on this

13  exact issue for the same exact reason.  That is why we ask that

14  it be excluded.

15        With regard to Mr. Sharifahmadian's point, the motion

16  in limine number 1 sought to exclude evidence and arguments on

17  this issue.  We have already excluded the evidence.  Now we are

18  trying to exclude the arguments.

19        THE COURT:  I'm troubled by this.  Here is what I

20  want.  First, I want, with the help of the court reporter, to

21  see exactly what defense counsel said about this on summation.

22  After we break in a minute, counsel should work with him to

23  print out that and get me one copy of that, which you can then

24  give to my courtroom deputy, who will bring it down to me.

25        Secondly, plaintiff's counsel should then, assuming I

1    agree with their theory arguendo, draft an instruction that I

2    would give to the jury on this point.  That instruction has to

3    be short.  I think it has to be short for three different

4    reasons.

5           First, because all good instructions are short.

6           Second, because -- and here is where I don't think it

7    is a question of waiver but not irrelevant that no objection

8    was made at the time -- if an objection had been made at the

9    time, I could have dealt with this right then and there and it

10   either would have been corrected quickly in front of the jury

11   or not, as the case may be, depending on how I ruled.  Now it

12   takes on an arguable significance that is out of proportion to

13   what would have been the case if there had been objection right

14   at the time.  The best way to balance these competing

15   interests, therefore, is to keep the instruction short.

16          Thirdly, to be frank, on my view of the evidence, the

17   jury is not going to spend one minute on this issue in any

18   event.  My apologies to defense counsel for thinking this is

19   not his winning argument.  I think this will not prove to be

20   material when all is said.  But that is just a guess.  I don't

21   know what goes on in the jury's mind, and therefore we have to

22   make sure they know what the proper arguments are.

23          You can do that in handwriting, by the way.  You don't

24   need to go find, although you may have something here,

25   something to print it out.  Show it to your adversary.  Defense

Page 115

1    counsel, I have your arguments, but if you have specific

2    objections to the wording of the proposed instructions, take a

3    copy of it and mark it up.  My courtroom deputy can photocopy

4    whatever they put together.  Mark it up.

5         I'm coming back to the courtroom at 2 o'clock to hear

6    that other Barnes & Noble case with different counsel.  My

7    gosh, I was surprised I didn't hear this in defense counsel's

8    summation, that Barnes & Noble's real reason for fighting this

9    and every other case is because of their well-known belief that

10   the legal community is underemployed and needs a stimulus,

11   which it is clearly getting.  In any event, when I come back at

12   2 o'clock, I'll make a ruling after having reviewed these

13   materials.

14        Yes?

15        MR. SHARIFAHMADIAN:  Very shortly, your Honor, and

16   just in the interests of it not getting lost in the shuffle, we

17   want to note that Barnes & Noble still has a 101 defense with

18   respect to the '501 patent and a 112 defense with respect to

19   the '851 patent.  Those are issues for your Honor that can be

20   addressed at the appropriate time.  We just wanted to put that

21   on the record.

22        THE COURT:  Yes, that's right.  There is the

23   declaratory judgment claims.  Of course, I am looking forward

24   to them.  Do you think, what, two months of hearing on that

25   should be sufficient?  I'll see what the schedule is.

1           We will see you at 2 o'clock.  My courtroom deputy is

2    available.  If she is not here in the courtroom, just knock

3    loudly on the door.

4           (Luncheon recess)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

FAM8ADRC

1                        AFTERNOON SESSION

2                             2:20 p.m.

3              (Jury not present)

4              THE COURT:  So, first of all, I forgot to mention this

5    morning, and let me note for the record, that last night I

6    received excellent submissions from both sides on the somewhat

7    close question of the duration of damages.  I decided in favor

8    of defendants' position, but I do want to acknowledge that it's

9    a close call.  If it becomes not mooted by the jury's verdict,

10   I will write a short opinion setting forth the reasons for my

11   determination so that any reviewing court will have the benefit

12   of a more elaborate discussion.

13             Secondly, with respect to the issue that was raised by

14   plaintiff's counsel after summations, I don't think any further

15   instruction is necessary, and I don't think what defense

16   counsel said violated any previous ruling.

17             Let's go back to the original source of all this,

18   which is the ruling from this Court in the Markman hearing.  As

19   I said in my Markman opinion at page 8, "The terms 'a

20   predetermined URL associated with a consumer appliance' and 'an

21   identifier associated with a consumer appliance' require no

22   further construction.  B&N proposes adding the modifier

23   'particular' before 'consumer appliance,' but that would

24   inappropriately rewrite the claim language."

25             Now, I mention this because there was no ruling

1    relating to a particular URL, which was the point that

2    plaintiff's counsel was referring to at the various sidebars we

3    had, for example, during Mr. Neuman's testimony.  But even

4    aside from all that, the exact language of defense counsel's

5    summation that's in dispute here, and now I am reading from the

6    excerpt from the summation provided by our court reporter is,

7    "So, unlike the patent, where there is a URL for type blender

8    and a URL for the type garbage can, there is no URL for the

9    Nook devices."

10        So the argument wasn't anything about that there has

11   to be a particular predetermined URL associated with the Nook

12   device; it was that here there was no URL, and therefore there

13   was no infringement.  I think that's a different argument, not

14   one precluded by any of my prior rulings, and so I think no

15   further instruction is necessary.

16        All right.  So here is the drill in terms of while the

17   jury is out.  I want at least one attorney authorized to

18   respond to any note from the jury present on this floor at all

19   times.  You can be in the courtroom, you can be outside the

20   hallway, but not on any other floor and not otherwise.  Because

21   when a note comes in, I want to be able to immediately respond

22   to it and not to go searching or waiting for counsel to appear.

23   But we don't need all lawyers; we just need one authorized

24   lawyer from each side.

25        At 5:00, unless the jury asks to sit later, you can

1    all just automatically go home.  You should be back here at 9

2    a.m. and I will be back in as timely fashion as always.

3          Now, I haven't told this to the jury, but at 1:00

4    tomorrow, or maybe about 1:30, I have to leave to go to Detroit

5    to appear at a program before Wayne State Law School.  I of

6    course scheduled this when I was quite sure that Detroit was

7    going to be in the World Series and little did I know.

8          Assuming the jury has not reached a verdict by that

9    time, I can deal with any and all notes by e-mail or by

10   telephone.  Even when I am up in the air, these days you can

11   get Internet access.  And I will arrange with one of my fellow

12   judges to take the verdict if I am still away when the verdict

13   comes in.  Frankly, I am modestly confidently that we will have

14   a verdict before I leave, but I don't know that, obviously, and

15   I did not want to put any pressure on the jury by telling them

16   I would be leaving so they would have as much time as they

17   needed.

18         So, if you folks will go to the back, I need to hear

19   argument on another case.

20         (Recess pending verdict)

21         (Jury not present; time noted:  3:40 p.m.)

22         THE COURT:  We have a note, which I will have my

23   deputy mark as Court Exhibit 2 since number 1 was the charge,

24   and it reads as follows:

25         "If one claim is infringed, is that sufficient for the

1  patent to be considered infringed?  EG, if we find that claim 7

2  of '501 is infringed, do we need to consider claim 18 also, or

3  can we not consider claim 18 at all once we find infringement

4  for claim number 7?"  And it's signed by the foreperson, but I

5  can't read his or her name, so it will remain a mystery, at

6  least for the moment as to who the foreperson is.  You guys can

7  figure it out.

8          I should note for the record both counsel have

9  received copies of the note.

10         Let me hear from counsel as to what you propose we

11  respond?

12         I am told the foreperson is James Hoffnagle, Juror No.

13  8.

14         So plaintiff.

15         MR. CABRAL:  Our position would be that one claim is

16  sufficient for infringement.

17         THE COURT:  So the answer to the question would be

18  yes.

19         MR. CABRAL:  I believe so, your Honor.

20         THE COURT:  Defense counsel?

21         MR. BERTA:  Your Honor, our position would be that in

22  order to have a record for appeal, because claim 7 and claim

23  18, one is a method and the other one is a device, it would be

24  important to have a finding on each claim.

25         THE COURT:  You have indicated previously at the time

1  of the verdict form that that was your preference, and I

2  indicated why I was not inclined to go that route, and as

3  always, this is a good example.  I understand for appellate

4  purposes, and plaintiffs take their chances since they haven't

5  asked for that, but the other side of it is that it makes the

6  jury able to proceed in an efficient manner.

7        So on the merits, putting aside your request for a

8  more particularized verdict, do you agree that the right answer

9  to the question is yes?

10        MR. BERTA:  Yes.  Setting aside the objection to the

11  verdict form, I believe that the answer has to be yes because

12  that's consistent with the verdict form.

13        THE COURT:  I agree.  So let me write something here.

14        (Pause)

15        THE COURT:  My law clerk points out that there is one

16  exception.  So let me read this to you and see if there is any

17  objection to the following note.

18        To the jury:  In answer to your question, the answer

19  is yes.  If one claim is infringed, that is sufficient for the

20  patent to be infringed.

21        However, if the claim that you found infringed you

22  later determine to be invalid, you would then have to go back

23  and determine whether any other claim of that patent was

24  infringed.

25        Yes?

```
 1              MR. BERTA:  Yes, your Honor.

 2              THE COURT:  Very good.

 3              So I will have my courtroom deputy make a copy of this

 4    note and mark the copy as Court Exhibit 3, and we will send the

 5    original in to the jury room.

 6              Very good.  Stay tuned.

 7              (Recess pending verdict)

 8              (Jury not present; time noted:  4:55 p.m.)

 9              THE COURT:  We have received another note.

10              I will give the previous note to my courtroom deputy

11    to mark as Court Exhibit 2.  My response to that was Court

12    Exhibit 3.  So this will be Court Exhibit 4 received at 4:45

13    p.m.  You all have copies of it.

14              "Can we get the following:  Testimony on from Narain

15    on '501 patent plus slides.  Testimony from Neuman on '501

16    patent and slides.  Testimony from Berg on '501 patent plus

17    slides."

18              So I think the clear answer is they can get the

19    testimony, not the slides; the slides were not evidence.

20              Anyone disagree?

21              MR. BERTA:  No, your Honor.

22              MR. CABRAL:  No, your Honor.

23              THE COURT:  They are about to leave, so rather than

24    try to write them a note I will just bring them in, and I will

25    excuse them for the day and tell them that we will get them the
```

1    testimony overnight, and they will have it first thing in the

2    morning.

3              (Jury present; time noted:  4:56 p.m.)

4              THE COURT:  So, ladies and gentlemen, thank you for

5    your latest note.  I wanted to let you know, not only for this

6    note but also for any future reference, that we will get you

7    the testimony, in fact, it will be ready for you for when you

8    come back tomorrow morning, but we can't give you the slides

9    because they were never in evidence.  They were presented as an

10   aid in following the testimony that was given, but under the

11   law, when you're deliberating, we can only send in evidence, we

12   can't send in something that was not evidence.

13             So I know it breaks your heart to end your

14   deliberations today five minutes early but, nevertheless, you

15   are excused.  Please be back in the jury room at 9 a.m. and you

16   should just start deliberating once your foreperson has made

17   sure that all nine persons are here.

18             We will see you tomorrow morning.

19             (Jury exits courtroom)

20             THE COURT:  So here is the story in preparing the

21   testimony.

22             Counsel, I think you all had daily copy, yes?  Check

23   with the court reporter to make sure there is nothing that has

24   been changed, typographical errors or anything like that.

25   Assuming you have the final, then agree among yourselves as to

1    what testimony should go in.  If there is any disagreement, and

2    I really hope there isn't, but if there is any disagreement,

3    send me, so my law clerk, an e-mail this evening no later than

4    8 p.m.  I teach at Columbia, but my class is finished at about

5    8:15 and I will take a look at it then and resolve it by e-mail

6    either tonight or early tomorrow well before 9 a.m.

7            Assuming you're in agreement, make nine copies of it

8    tonight.  If you're in disagreement, you will have to make

9    those copies early tomorrow morning.  The way I usually do

10   this, if a note like this comes during the day, is we send in

11   one copy immediately and then make the eight other copies so we

12   don't delay things, but since we have overnight we might as

13   well make the nine copies if we can.

14           So, assuming there is agreement, then just give the

15   nine copies, at or before 9 a.m., to my courtroom deputy, who

16   will bring them into the jury room or give them to the marshal

17   to take into the jury room.  If there is disagreement, as I

18   say, I will resolve that by e-mail early tomorrow morning at

19   latest.  Then make the nine copies, and again, then just give

20   them to my courtroom deputy who will take them in.

21           Yes, sir.

22           MR. SHARIFAHMADIAN:  Mr. Narain's testimony was read

23   in or was on video, and I don't believe it was transcribed by

24   the court reporters.  Would you like the video?

25           THE COURT:  Unless counsel disagree, I think it would

FAM8ADR6

1    be not prudent to bring them back here to just look at it.  I

2    think they want to study it.  So if you have a transcript, just

3    make the transcript in accordance with what was played in court

4    and that will be fine.

5         By the way, it is not necessary, and it will save you

6    a lot of time because it is not necessary, to take out

7    objections and all like that.  The jury has been fully informed

8    to disregard any testimony to which an objection was sustained,

9    etc., etc.  If you want to spend the time doing that, I am not

10   going to stop you, but it's certainly not necessary.  That

11   applies also to the depositions where, as I noticed when I was

12   going through them, every third question was objected to.

13        MR. BERTA:  May I ask one question?

14        THE COURT:  Yes.

15        MR. BERTA:  I think it's implicit from the note that

16   this is with respect to infringement and the Nook device, but

17   it's not expressed.

18        THE COURT:  Anything that relates to the '501 patent

19   we are going to have to send them.

20        MR. BERTA:  That would include invalidity?

21        THE COURT:  If you have disagreements on that, but I

22   think it includes everything.  That's invalidity, infringement,

23   you name it, anything that deals with the '501 patent.  My

24   general rule is to err on the side of inclusion; better they

25   should have more than less.  If they ask a very, very specific

1    question, that's a different story.

2              Anything else?  We will see you tomorrow morning.

3              (Adjourned to October 23, 2014, at 9:00 a.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25