THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ADREA, LLC,<br><br>    *Plaintiff*,<br><br>v.<br><br>BARNES & NOBLE, INC.,<br>BARNESANDNOBLE.COM LLC, and<br>NOOK MEDIA LLC,<br><br>    *Defendants*. | Civil Action No. 13-cv-4137 (JSR) |

**DECLARATION OF DR. XIN WANG IN RESPONSE TO DEFENDANTS' MOTION
FOR JUDGMENT THAT THE ASSERTED CLAIMS OF THE '501 PATENT
ARE INVALID BECAUSE THEY ARE DIRECTED TO NON-PATENTABLE
SUBJECT MATTER PURSUANT TO 35 U.S.C. § 101**

I, Dr. Xin Wang, declare as follows:

1.	I have been retained as an expert witness by Plaintiff ADREA, LLC ("ADREA") in this litigation. I testified during the trial in this matter on October 21, 2014. My testimony concerned the validity of ADREA's patents.

2.	I submit this declaration in response to arguments raised in Defendants' Motion for Judgment That the Asserted Claims of the '501 Patent are Invalid Because They are Directed to Non-Patentable Subject Matter Pursuant to 35 U.S.C. § 101.

3.	I previously submitted a supplemental expert report in this case addressing factual issues relating to the validity of U.S. Patent No. 7,299,501 ("the '501 patent") under 35 U.S.C. § 101.

### Technological Background and the Inventions of the '501 Patent

4.	The '501 patent recognized that "[n]ot since the introduction of Gutenberg's movable typeset printing has the world stood on the brink of such a revolution in the distribution of text material." (col. 1:18-21) At the time of the invention of the '501 patent (November 7, 1994), the publishing industry faced a significant technological challenge with respect to electronic books—*i.e.*, protecting electronic content against potential illegal distribution and piracy—which effectively halted the development and distribution of electronic books. This is due to the fact that unlike physical books, electronic books can be copied quickly and distributed to many people online at little to no cost.

5.	I personally observed the technological challenges associated with the distribution of electronic content during my career. In the 1990s, while at Xerox Palo Alto Research Center, I worked on a project called "Trusted Printing," which involved updating Xerox's network

printer business model from "print-and-distribute" to "distribute-and-print." The core of the project related to digital rights management (DRM), as the project involved the distribution and protection of digital documents over digital networks in remote (and possibly untrusted) rendering devices (*e.g.*, printers) during the entire life cycle of the documents. Throughout this time, I worked with content providers to address their concerns about the security of their electronic information.

6. The '501 patent addressed the technical problems experienced by publishers by disclosing systems and methods of controlling access to electronic books displayed on a portable electronic book viewer. For example, the '501 patent describes a feature where access to an electronic book is granted for a limited time period:

> The viewer 266 contains a software operating system that allows books to be stored, read and erased and includes the capability to order books and retain them in memory for a predefined period of time determined by the system operator. The software can be configured to allow the book to be read during a period of time (i.e., two weeks) and then automatically erased, read once and erased, or held in memory permanently.

(col. 11:66-12:7)

7. Another example in the '501 patent discusses book stores permitting temporary access to electronic books for a fixed period of time:

> The system shown may also be used at bookstores. The bookstores can rent the public viewer 912 to customers with the text for one or two books loaded onto the viewer 912. The viewer 912 may be provided with an automatic timeout sequence. The timeout sequence would erase the textual data for the books after a certain period of time, for example, two weeks.

(col. 15:19-25)

8.      The '501 patent describes the "viewer" as a "portable book-shaped viewing device . . . for viewing the textual material delivered." (Abstract) The patent also states that the "viewing device is preferably a portable book shaped viewer which stores one or more books for viewing and provides a screen for interacting with the home library unit. A high resolution LCD display is used to both read the books and to interact with the home library software." (*Id.* at col. 2:35-39.)

### The Asserted Claims of the '501 Patent

9.  Claim 7 of the '501 patent reads as follows:

> A method for restricting access to electronic books displayed on a viewer, the method comprising:
>
> storing an electronic book on a viewer;
>
> associating a predetermined amount of time after the electronic book is stored on the viewer with the electronic book;
>
> allowing access to and display of the electronic book for the predetermined amount of time; and
>
> restricting access to the electronic book, for display of the electronic book on the viewer, once the predetermined amount of time has passed.

10.     The invention of claim 7 of the '501 patent is directed to a method for restricting access to "an electronic version of textual or graphical information" displayed on a viewer, which involves storing such information on the viewer, associating a predetermined amount of time with the electronic information that begins when it is stored on the viewer, allowing access to and display of the electronic information for the predetermined amount of time, and restricting access to the electronic information once the predetermined amount of time has passed.

11. Claim 18 is directed generally to a special-purpose "portable viewer" that, among other things, is capable of performing the method of claim 7. Claim 18 reads as follows:

> A portable viewer for displaying electronic books, comprising:
>
> > a memory for storing instructions;
> >
> > a memory for storing electronic books;
> >
> > a display for displaying the electronic books; and
> >
> > a processor that operates under control of the instructions
>
> and is capable of:
>
> > storing an electronic book on the viewer;
> >
> > associating a predetermined amount of time after the electronic book is stored on the viewer with the electronic book;
> >
> > allowing access to and display of the electronic book for the predetermined amount of time; and
> >
> > restricting access to the electronic book, for display of the electronic book on the viewer, once the predetermined amount of time has passed.

12. The asserted dependent claims include additional elements. For example, claim 8 provides, "[t]he method of claim 7, further including deleting the electronic book from the viewer based upon the time parameter." Claim 9 provides further limitations to this method, namely, "[t]he method of claim 8 wherein the deleting step includes automatically erasing the electronic book from the viewer upon expiration of a particular time period." Finally, claim 19 provides, "[t]he portable viewer of claim 18, wherein the processor is further capable of deleting the electronic book from the viewer based upon the time parameter."

**Response to Factual Issues Raised in Defendants' Motion**

13. The asserted claims of the '501 patent are not directed to the abstract idea of providing access to books for a limited period of time. To the contrary, the claims are directed to a practical approach of "restricting access" to "electronic books" on a "viewer" or "portable viewer." Defendants do not account for the practical application of the asserted claims and the critical distinction between electronic books and physical books, including the unique security concerns associated with electronic content (*e.g.*, piracy) and the necessity of a "viewer."

14. In the example of a library lending a physical book, library users are allowed to keep physical books in their possession for a fixed period of time. However, if a borrower keeps a book beyond its "return by" or "due" date, nothing happens to the physical book, except perhaps the borrower receiving reminder messages sent by the library and the accrual of a small fine. The borrower still has access to the physical book even though the lending period has expired. There is no effective technical means to prevent or restrict that from happening.

15. The claims of the '501 patent operate in a fundamentally different way. User access to the electronic book relies on a viewer (*e.g.*, to store and display the book) and is restricted after the expiration of the predetermined time period. Access may be restricted, for example, by deleting the electronic book or keeping the book in an encrypted form. Regardless of how access to the electronic book is restricted, however, the user has no say in the matter and is not permitted to extend the lending period by ignoring the rules or the usage rights granted. Because the claims require allowing and restricting access to electronic books on a viewer, the claims elements cannot be performed by a human alone.

16.     The claims of the '501 patent involve a specific approach to using a viewer to control user access to an electronic book, allowing only temporary access to the electronic book, restricting access to the electronic book on the viewer.

17.     The claims of the '501 patent also provide solutions that addressed the security concerns of the publishing industry by using an approach that was unconventional at the time of the invention.  First, the claims allow *temporary* access to the electronic books for a predetermined amount of time.  Second, the claims restrict access to the electronic books after the expiration of the predetermined time period, for example, by deleting the book.  Last, claims 18 and 19 of the '501 patent are further directed to a special-purpose device used to securely deliver and manage access to the electronic books.  These aspects of the invention each help prevent widespread and unauthorized distribution of the electronic content.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 14, 2014.

_____

Dr. Xin Wang