```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    ADREA, LLC,

 4                      Plaintiff,

 5            v.                              13 Cv. 4137 (JSR)

 6    BARNES & NOBLE, INC.,
      BARNESANDNOBLE.COM LLC, AND
 7    NOOK MEDIA LLC,

 8                      Defendants.

 9    ------------------------------x

10                                      October 14, 2014
                                        2:00 p.m.
11
      Before:
12                      HON. JED S. RAKOFF

13                                      District Judge

14                          APPEARANCES

15    PROSKAUER ROSE LLP
           Attorneys for Plaintiff
16    BY:  STEVEN M. BAUER
           COLIN CABRAL
17         BRENDAN COX

18    ARNOLD & PORTER LLP
           Attorneys for Defendants
19    BY:  LOUIS S. EDERER
           ALI R. SHARIFAHMADIAN
20         MICHAEL A. BERTA
           YUE-HAN CHOW
21         SUSAN BRACKNEY ARNI

22

23

24

25
```

1          (Trial resumed; jury not present)

2          THE COURT:  We are missing Juror No. 4.  My courtroom

3     deputy just went to see if she is stuck in the security line or

4     something like that.  There are a couple of little things we

5     can take up in the meantime.

6          I sent to counsel yesterday by email some very minor

7     further changes in the preliminary instruction and instructed

8     them that if there were any objections, they needed to be made

9     by email this morning.  No objections were received, so we now

10    have the preliminary instruction in the form that it will go to

11    the jury.  As soon as the jury is here, we will begin by

12    handing it out to them in writing and reading it to them.

13         THE CLERK:  All jurors present.

14         THE COURT:  Let's bring in the jury.  Everything else

15    can wait.  I want to go to 4:30 but with a short break maybe

16    around 3:10 or so.

17         Who is the first witness?

18         MR. EDERER:  Mr. Mulchandani.

19         THE COURT:  Out of turn, so to speak.  Why don't you

20    get him in the courtroom.

21         (Continued on next page)

22

23

24

25

 1            (Jury present)

 2            THE COURT:  Welcome back to the salt mine, ladies and

 3    gentlemen.

 4            I thought it would be useful at this point in time,

 5    before we call our next witness, to give you a very brief

 6    overview of some of the legal issues.  I am going to ask my

 7    courtroom deputy to hand out to each of you a copy of what is

 8    labeled "Preliminary Instruction."

 9            At the end of the case, I'm going to give you detailed

10    instructions.  This is not intended to replace that at all.  It

11    is just a sort of very quick overview of some of the broad

12    legal principles involved that may be of use to you in

13    following the evidence as it comes in.  We will read it

14    together now, but you can also leave this with you in the jury

15    room for further reference.

16            This preliminary instruction is intended to give you a

17    very brief overview of some of the main issues in this case.

18    It is no substitute for the more detailed instructions that I

19    will give you at the close of all the evidence and that will

20    govern your deliberations.

21            The first issue in this case is whether defendant's

22    products, which will be referred to as the "Nook Devices,"

23    infringed any one or more of three of the plaintiff's patents,

24    that is, the '851 patent, the '501 patent, and the '703 patent.

25            A patent protects the owner of a novel invention from

having other people make use of the invention without the

owner's permission.  The part of the patent that describes the

invention consists of a series of claims, each of which is

separately numbered.  If a Nook device includes all the

elements of a given claim of the '851 patent, the '501 patent,

or the '703 patent, or the substantial equivalent of each of

those elements, then infringement of that claim of that patent

has occurred.

        If you find that no infringement has occurred, that is

the end of the story.  But if you find that infringement of one

or more of the claims of a given patent has occurred, you must

then consider whether the patent or patents that have been

infringed are nonetheless invalid either because the inventions

they describe lack novelty or because they were obvious in view

of prior inventions or because they did not clearly and

adequate describe the invention.

        If you find that the defendants infringed one or more

of the plaintiff's patents and that the patent was not invalid,

then you must determine what amount of money must be paid by

defendants to plaintiffs because of the harm brought about by

the patent infringement.  The sum of money is called damages.

        Again let me stress that these are the broadest of

instructions designed simply to focus your attention on some of

the main issues in the case.  Much more detailed instructions

describing all the issues involved will be given to you at the

```
 1   close of all the evidence.

 2            To review it even more briefly, it's a three-step

 3   process.  You first have to decide whether there has been

 4   infringement.  If, and only if, you find there has been

 5   infringement, then you have to decide whether the patent that

 6   was infringed was nevertheless invalid.  If you find that the

 7   infringement has occurred and the patent was not invalid, then

 8   you have to decide on the amount of money damages that has to

 9   be awarded.

10            those are the three steps that you will have to

11   undertake.  I will give you much more detailed instructions on

12   all this, but I thought it would be useful to have a quick

13   overview of what you are going to be asked to do.

14            Please call the next witness.

15            MR. CABRAL:  Your Honor, plaintiffs call Deepak

16   Mulchandani.

17            THE COURT:  Ladies and gentlemen, we are going to go

18   to 4:30.  We will take a very short break around 3:15 or so,

19   though it will have to be limited to about 10 minutes.  We

20   can't go to 5 o'clock, as I had thought, because I have other

21   matters.

22            MR. CABRAL:  Your Honor, pursuant to the parties'

23   agreement, we have agreed to have defense counsel go first.  I

24   don't know if that requires explanation for the jury.

25            THE COURT:  Ladies and gentlemen, just before we swear
```

 1   in the witness, some witnesses are called by one side, some

 2   witnesses are called by the other side, some witnesses are

 3   called by both sides.  For you it doesn't matter who calls

 4   them, it is completely irrelevant.  It has a technical meaning

 5   for me.

 6          This particular witness is a witness who is

 7   essentially more of a defense witness than a plaintiff's

 8   witness, but to accommodate his schedule we are taking him now.

 9   It is really irrelevant who calls him.  It's what he has to say

10   and what you think of what he has to say that is important.

11          Let's swear him in, please.

12   DEEPAK MULCHANDANI,

13        called as a witness by the Court,

14         having been duly sworn, testified as follows:

15          THE CLERK:  Please be seated.  State your name and

16   spell it slowly for the record.

17          THE WITNESS:  Name is Deepak Mulchandani.

18   D-E-E-P-A-K, last name M-U-L-C-H-A-N-D-A-N-I.

19          THE COURT:  Just as you would expect.

20          Go ahead, counsel.

21   DIRECT EXAMINATION

22   BY MR. EDERER:

23   Q.  Good afternoon, Mr. Mulchandani.

24   A.  Good afternoon.

25   Q.  Where are you currently employed?

Feerrakal                    Mulchandani - Direct

1   A.   I'm employed by a company called Cloud Car.

2   Q.   What is Cloud Car?

3   A.   Cloud Car is a small company.  We are developing a car

4   infotainment platform.

5   Q.   What do you do for Cloud Car?

6   A.   I run the engineering organization.

7   Q.   How long have you been at Cloud Car?

8   A.   I have been with Cloud Car since May of this year.

9   Q.   Where you previously employed by Barnes & Noble?

10  A.   Yes, I was.

11  Q.   What business unit or segment of Barnes & Noble were you

12  employed by?

13  A.   I was employed with the Nook Media Division of Barnes &

14  Noble.

15  Q.   When did you first start working for Barnes & Noble?

16  A.   I believe that was in January 2010.

17  Q.   You left Barnes & Noble when, again?

18  A.   May 2014.

19  Q.   You were there for a little over four years, is that right?

20  A.   That seems to be so, yes.

21  Q.   What was your last position at Barnes & Noble?

22  A.   My last position was vice president of software

23  engineering.

24  Q.   Can you explain to the jury, since you are not currently a

25  Barnes & Noble employee, what brings you here today.

 1  A.  I had previously been deposed in this case.  I felt my

 2  ongoing participation would help in some way.

 3  Q.  Are you being paid for your testimony here today?

 4  A.  No.

 5  Q.  Can you briefly tell us your educational background.

 6  A.  I have a Bachelor's degree in computer science.

 7  Q.  From where?

 8  A.  From Purdue University.

 9  Q.  When did you graduate?

10  A.  In 1992.

11  Q.  Can you briefly summarize your work experience just prior

12  to the time you joined Barnes & Noble.

13  A.  Just before joining Barnes & Noble, I was with Hewlett-

14  Packard.  I joined Hewlett-Packard in 2007.  Prior to Hewlett-

15  Packard I was with a company in California called Good

16  Technology, which was acquired by Motorola.

17  Q.  What did you do with Hewlett-Packard?  That was your

18  position immediately prior to Barnes & Noble?

19  A.  That is correct.

20  Q.  What did you do at Hewlett-Packard?

21  A.  At Hewlett-Packard I was responsible for managing a global

22  software team.  We were responsible for developing and

23  commercializing different products that Hewlett-Packard was

24  developing in those years.

25  Q.  Prior to that time you were with Good Technology and

1   Motorola, is that right?

2   A.   That's correct.

3   Q.   What did you do at those companies?

4   A.   At Good Technology, again, I managed a global software

5   team.   In 2007 we were acquired by Motorola, so I took on

6   different product responsibilities at that time but still

7   focused on the same global software leadership and developing

8   products.

9   Q.   What types of products were you involved with at Motorola?

10   A.   It was largely mobile phones, so different markets that

11   Motorola was focused on.

12   Q.   In 2010 I believe you said you joined Barnes & Noble, is

13   that right?

14   A.   That is correct.

15   Q.   Why did you decide to join Barnes & Noble?

16   A.   There were a few different things going through my mind in

17   2009.   There was a lot of positive press with regards to the

18   Nook 1st Edition, which was in development at that time.   To

19   me, after I started some discussions with the leadership team

20   at Barnes & Noble with regards to me potentially coming on

21   board, the powerful aspect for me was that Barnes & Noble --

22   the leadership team, the company, the organization -- seemed

23   really committed to building and developing a cloud-based eco-

24   system, if you will.

25        The ecosystem was really about giving users, in this

Mulchandani - direct

1    case customers, an opportunity to buy digital content from

2    Barnes & Noble and effectively read it anywhere they are,

3    whether it's on a website, a Nook device, or a Nook

4    application.

5           In addition to that, I think I was personally also

6    excited about the team in terms of the energy and the

7    enthusiasm around the company at that time.  These were

8    probably two of the factors that contributed to me coming on

9    board.

10   Q.  What was your first position at Barnes & Noble back in

11   2010?

12   A.  When I joined Barnes & Noble in 2010, I was a director of

13   software.

14   Q.  How big was the software team at that point?

15   A.  For my team, I was the first employee.

16   Q.  What were you charged with doing?

17   A.  It was an exciting time.  Obviously, being the first

18   employee, one of my first responsibilities was building a team,

19   so hiring.  But in parallel I also took on responsibility for

20   starting to lead the software and some of the ongoing updates

21   and enhancements we were making for our Nook's 1st Edition,

22   which was by then already in market.  We also kicked off the

23   development of two new products.  One would be the Nook Color

24   and the other would be the Nook Simple Touch.

25   Q.  How did your responsibilities evolve over time in the four

```
 1   years that you were at Barnes & Noble?

 2   A.  I will say that the organization grew as a whole.  As the

 3   organization grew, my responsibilities and title grew as a

 4   consequence.  I took on perhaps more diverse roles within the

 5   company, took on more opportunity, and obviously my team size

 6   grew.

 7   Q.  By the time you left Barnes & Noble in 2014, how big was

 8   the team?

 9   A.  At the time of my departure, I think my team was over a

10   hundred people.

11   Q.  You were at the head of that team, were you?

12   A.  That is correct.

13   Q.  Did you do software engineering for any particular types of

14   products at Barnes & Noble?

15   A.  In general, in the course of my tenure at Nook, more

16   importantly towards my latter years, I think my team was

17   involved in producing software literally across all the places

18   where customers would want to consume content.  That is

19   specifically the website, the Nook applications, which are what

20   we make available on iPhones, Android, and Windows 8, in

21   addition to the Nook devices that we were producing and making

22   offer for sale.

23   Q.  Over the course of your employment at Barnes & Noble, how

24   many different Nook devices were developed and produced?

25   A.  When I was with the company, we launched eight hardware
```

 1   devices to the market.  We developed some that never quite

 2   launched, but eight actually made it.

 3   Q.  Did your group work together with other groups within the

 4   company on the development of these products?

 5   A.  Yes.  It was definitely a pretty expansive internal

 6   collaborative effort with other organizations.  My team,

 7   myself, we worked very closely with the hardware team,

 8   marketing, product management, sales.  So it was a good

 9   collaborative cross-team effort.

10   Q.  You mentioned that when you first joined Barnes & Noble,

11   there was also a Nook product in market, is that right?

12   A.  That's correct.

13   Q.  What was that product called again?

14   A.  That was referred to as the Nook 1st Edition.

15   Q.  When you joined the company, did you become familiar with

16   that product?

17   A.  Very much so.

18   Q.  Why is that?

19   A.  Just because I had to take over immediate responsibilities

20   for some of the software that we were producing for that

21   device.

22   Q.  You mentioned earlier that one of the reasons you decided

23   to join Barnes & Noble was because it was committed to

24   developing a software ecosystem, is that right?

25   A.  That is correct.

1    Q.  You mentioned in that context a cloud concept, right?

2    A.  That is correct.

3    Q.  Can you explain a little bit more what the components of

4    the ecosystem are, in particular your reference to a cloud

5    system.

6    A.  Sure.  When you step back and kind of think about Barnes &

7    Noble as how it represents itself to users, if you will, I

8    think our dominant element of creating this cloud layer was

9    really around embodiment of a user account, which is have one

10   centralized system within our company where we could at any

11   point in time manage a user, understand how the user is

12   engaging with us, what types of contents -- books, magazines,

13   newspapers, catalog, games, apps -- they are purchasing from

14   us, and really be able to manage their identity and effectively

15   their experience with Barnes & Noble irregardless of where they

16   are interacting with us, whether it's on a website, whether

17   it's on a Nook application, on a device, or physically in the

18   retail store.  The cloud was really that embodiment of a user,

19   if you will, and it effectively managed and maintained all the

20   data that was relevant to the user.

21   Q.  Can you describe in general terms how the Nook devices work

22   in connection with the cloud system.

23   A.  By design, we wanted to make sure, just to service the use

24   case that I described, where at any given point in time you

25   wanted to have the user always get one consistent view from a

1   Barnes & Noble perspective to them.  We managed the cloud as

2   kind of the master of the system where regardless of where you

3   interacted with us, the data was always there.

4          The devices, the Nook applications, the website were

5   really what we call servants in the sense that they were

6   effectively presenting the data that the cloud was presenting

7   for that user wherever the user happens to be engaging or

8   interacting on the device.

9   Q.  When you left Barnes & Noble in 2014, was it still using

10  the same type of cloud system that you just described?

11  A.  Yes.

12  Q.  The Nook 1st Edition was already in market when you first

13  joined.  What was the first new Nook product that you began to

14  work on in your position as director of software engineering?

15  A.  In 2010, as I mentioned, there were two devices that we

16  kicked off.  One was the Nook Color, which launched in holiday

17  2010.  It was the first 7-inch color product that really

18  brought together a kind of reading-optimized experience.  In

19  parallel we were also developing a product that subsequently

20  launched called the Nook Simple Touch, which was the first time

21  a black and white display product had been paired with a touch

22  screen for users.

23  Q.  How were those products received?

24  A.  We were fortunate in the sense of a lot of our product

25  development and ideation and, more importantly, execution

Mulchandani - direct

1   always allowed us to achieve a set of many firsts in the

2   market, if you will.  As I mentioned, with Nook Color being

3   able to be in market with a 7-inch color product really

4   optimized around reading, being able to offer new types of

5   content, like interactive books, video books, kids interactive

6   books, digital magazines in color, those were kind of new

7   markets that actually Barnes & Noble helped open for the

8   industry as a whole through our device.

9           Simple Touch was the same in the sense of first time

10  we had technologically brought two pieces together, a black and

11  white display with touch, opened up a new interaction paradigm

12  for black and white.

13          In subsequent years we followed that with many other

14  innovations both on the hardware and software side.  Publicly,

15  I would say that we were recognized more in informal ways with

16  regards to either Consumer Reports or other public reviews, if

17  you will.  And I would say that in a few instances we saw some

18  of our products do fairly well in consumer report ratings.  So

19  it would be a public way of getting recognition.

20  Q.  If you would briefly take us through the different products

21  that came out over the course of the time that you were at

22  Barnes & Noble and approximately when each product came out.

23  A.  Sure.

24  Q.  I'm talking about the Nook devices.

25  A.  Understood.  Again, Nook 1st Edition was 2009.  That was

1   before my time.  Nook Color was launched in 2010.  The Nook

2   Simple Touch would have launched somewhere in the middle of

3   2011.  Nook Tablet launched November 2011.  Nook Glowlight

4   launched sometime in 2012.  I forget the exact month but it was

5   sometime that year.  Nook HD and HD+ launched together in fall

6   of 2012.  And we launched our third generation black and white

7   reader in 2013.  That would be the Glowlight 2d Generation.

8   Q.  With respect to any of these devices, were any of them not

9   considered to be dedicated ereader devices?

10  A.  In general, I would say that the product families and the

11  general intent of how we designed our products was to really

12  offer users with a compelling ecosystem experience.  When I say

13  ecosystem in this case, it is obviously cloud-driven.  But it

14  also is about making the widest range of content available for

15  every single device.

16          While our core focus we developed on each product was

17  reading and making sure that reading was a first party

18  experience was very heavily optimized and just presented a

19  great experience, we also offered applications, movies,

20  magazines, catalogs, any type of content that we felt was

21  important.

22          That was mostly driven by the premise that, again, we

23  wanted to have our users purchase digital content from us from

24  the cloud, or through the cloud, and then access it or enjoy it

25  across as many end points, if you will, whether it is a Nook

1    device, a Nook application, or the website, where possible.

2    Q.  Did any of these developments that you just described in

3    connection with Nook products result in any patents or patent

4    applications that you know of?

5            MR. CABRAL:  Objection, your Honor:  Relevance.

6            THE COURT:  I can't tell whether it is relevant until

7    the next question is put.  You can answer the question that has

8    been put with a yes or no.  The question was, did any of these

9    developments that you have just described in connection with

10   the Nook products result in any patents or patent applications

11   that you know of?  Yes or no.

12   A.  Yes.

13           THE COURT:  Put another question.

14   Q.  Did any of those patents involve any of the features, as

15   you understand it, that are involved in this case?

16   A.  Yes.

17   Q.  Which feature are you aware of that Barnes & Noble has

18   filed a patent application with respect to?

19           MR. CABRAL:  Same objection, your Honor:  Relevance.

20           THE COURT:  No, I'll allow it.  I think it is

21   appropriate background.  I agree that it shouldn't be pursued

22   at any length, but I will allow that question to be answered.

23   The question was, which feature are you aware of that Barnes &

24   Noble has filed a patent application with respect to among the

25   ones that are involved in this case?

1   A.  One of the patent applications would be the Lend Me

2   feature.

3        MR. EDERER:  Your Honor, if I could show the witness

4   the documentation?  I believe the patent application is

5   actually on plaintiff's exhibit list.

6        THE COURT:  Go ahead.

7   Q.  Showing you, Mr. Mulchandani, Plaintiff's Exhibit 195 for

8   identification and Defense Exhibit 863, can you identify those

9   documents?

10  A.  From what I can see, this seems to be a patent application

11  and a notice of allowance of patent application.

12       THE COURT:  Which one are you referring to, by number?

13       THE WITNESS:  PTX-195 and --

14       THE COURT:  Is which?

15       THE WITNESS:  Is the U.S. patent application.  The

16  notice of allowance is Defense Exhibit number 863.

17       MR. CABRAL:  Objection.  Defendant's Exhibit 863 is

18  not on the exhibit list.

19       THE COURT:  He hasn't offered it yet.

20       MR. EDERER:  I move the admission.

21       THE COURT:  Let's take them one at a time.  Any

22  objection to 195, Plaintiff's 195?

23       MR. CABRAL:  No, your Honor.

24       THE COURT:  195 is received.

25       (Plaintiff's Exhibit 195 received in evidence)

1        THE COURT:  Now 863, you say it is not on the list of

2  exhibits?

3        MR. CABRAL:  Your Honor, from the face of the

4  document, it appears the document was mailed on October 2nd.

5  That would be after the exchange of exhibits.

6        THE COURT:  My question is, is it on the list of

7  exhibits?  Yes or no.

8        MR. CABRAL:  No, your Honor.

9        MR. EDERER:  Your Honor, this document was not

10  actually received until after the exhibit list was exchanged.

11  It's a notice of allowance that just issued this month.  As

12  soon as we received it, we provided it to counsel.

13        THE COURT:  Did you tell them that you were going to

14  add it to the exhibit list?

15        MR. EDERER:  Yes.

16        THE COURT:  Back to plaintiff's counsel.  You were

17  given notice on this?

18        MR. CABRAL:  Yes, your Honor.  It looks like it was

19  communicated by email.

20        THE COURT:  If that is the only objection, the

21  objection is overruled.  863 is received.

22        (Defendant's Exhibit 863 received in evidence)

23  Q.  Mr. Mulchandani, last week we heard testimony from a

24  gentleman named Sudeep Narain.  Am I saying that right?

25  A.  Yes.

```
 1              THE COURT:  No, that is never a proper question.  I

 2   will not have any witness asked to comment on the testimony of

 3   any other witness, ever.  Put another question.

 4   Q.  Do you know Sudeep Narain?

 5   A.  Yes, I do.

 6   Q.  Who is he?

 7   A.  He used to be a software developer on my team.

 8   Q.  What was his area of responsibility?

 9   A.  He worked on many features of the product, including the

10   Lend Me feature.

11   Q.  Is Mr. Narain one of the named inventors on the patent

12   application that has just been received?

13   A.  Yes, he is.

14   Q.  Mr. Mulchandani, you are aware that in this case the

15   plaintiff, ADREA, is accusing various features of the Nook

16   devices as infringing various patents that are owned by ADREA.

17   Are you aware of that, sir?

18   A.  I am.

19   Q.  What features do you understand are being accused?

20   A.  I believe there is three or four main areas.  I believe one

21   of them is the Lend Me feature, the shop application, the

22   purchase flow, and security.

23   Q.  Are you familiar with how each of those features works from

24   an operational standpoint?

25   A.  Largely, yes.
```

1    Q.  How are you familiar with that?

2    A.  My teams were responsible for developing these features

3    while I was part of the Nook organization.

4    Q.  Let's first talk about the lending feature, the one that is

5    called Lend Me.  Are you familiar with that feature?

6    A.  Yes.

7    Q.  From a consumer's perspective, how does that feature work?

8    A.  In high-level terms, if you are a Nook account holder and I

9    had a Nook account, you would be able to, for titles that the

10   publisher allows, you would be able to offer a book to me for a

11   certain period of time.

12   Q.  How long is that period of time?

13   A.  It's 14 days.

14   Q.  Can you only loan books on Nook devices or can you loan

15   books in other ways?

16            MR. CABRAL:  Objection, your Honor.  Can we approach?

17            THE COURT:  Sure.

18            (Continued on next page)

19

20

21

22

23

24

25

1          (At the side bar)

2          MR. CABRAL:  This testimony relates to motion in

3     limine 7, which was deferred up until this point.  The case

4     involves only the lending feature used on the Nook devices.

5     The question relates to how you can use the lending feature on

6     other platforms that are not accused, for example, the website,

7     the application, etc.  Because this case only relates to

8     lending on the Nook, we move to exclude this evidence as being

9     confusing, because evidence of nonaccused functionality

10    configurations is not relevant to this case, irrelevant to

11    infringement in this case, and we think it is going to be

12    misleading to the jury.

13         MR. EDERER:  The whole point is that the system being

14    accused is an account-based system and operates completely

15    differently from the system covered in the patent.  We need to

16    be able to explain to the jury what that means.  We actually

17    opened on that particular point.  It is an account based system

18    that can be accessed from a number of different end points, as

19    Mr. Mulchandani has already said.

20         I do intend to cover the device-to-device part of it.

21    I also think I should be able to cover and we should be able to

22    explain to the jury that it is an account-based system.  If we

23    can't do that, then they are not going to really fully

24    understand the point we are trying to make, the differences

25    between the two systems.

1                MR. CABRAL:  I think the point they are trying to make

2     is to distract attention away from the Nook infringement.  We

3     made very clear in our summary judgment briefing what we are

4     not accusing, including the website and the shop application.

5                THE COURT:  I think the way to handle this is that as

6     you put a question about a particular aspect, either say

7     whether it is an accused aspect or a nonaccused aspect, so the

8     jury can on the one hand see the broader operation that you

9     want to bring out but also not be confused as to what is

10    accused and what is not accused.

11               MR. EDERER:  That's fine.

12               (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (In open court)

2              MR. EDERER:  There is a pending question, your Honor.

3              THE COURT:  The question was, can you only loan books

4    for Nook devices or can you loan books in other ways?

5              MR. EDERER:  Would you like me to --

6              THE COURT:  Put a new question.  The subject of the

7    side bar didn't relate so much to that as to other issues.

8    BY MR. EDERER:

9    Q.  Mr. Mulchandani, just to be clear, the plaintiff has

10   indicated in this case that they are only accusing the loan

11   feature or the lending feature as it relates to a device-to-

12   device loan.  Do you understand that?

13   A.  Understood.

14   Q.  I am going to ask you some questions about the lending

15   feature not only from a device-to-device standpoint but also

16   from the standpoint of a device to another end point that may

17   be held by a Barnes & Noble account holder.  I will try to

18   indicate, as I ask those questions, which of those

19   circumstances I'm asking you about.

20             My first question has to do, just broadly speaking,

21   with the manner in which the lending feature works and whether

22   it can be used across various Nook or Barnes & Noble end

23   points, as you explained them before, with the understanding

24   that not all of those end points are being accused.

25             MR. CABRAL:  Objection, your Honor.  Under 403 it is

1   confusing.

2           THE COURT:  No, I'm going to allow it.  I think it is

3   useful to put it in context to the jury.

4           MR. EDERER:  Thank you, your Honor.

5           THE COURT:  As counsel just pointed out, not all these

6   aspects are aspects that are accused of violating or infringing

7   the patent.  Counsel will point out which ones are and which

8   ones are not.  What he is trying to elicit from this witness is

9   sort of how the whole thing works together so you can get the

10  overall context.

11          Go ahead, counsel.

12  BY MR. EDERER:

13  Q.  Can you explain, Mr. Mulchandani, in general terms whether

14  the lending feature is available across different end points,

15  not just device-to-device but other end points within the

16  Barnes & Noble system.

17  A.  Sure.  As I mentioned earlier, our approach towards our

18  features was, again to use the cloud as kind of the centerpiece

19  of the system.  Lend Me was offered as a feature for customers

20  who came to our website and had accounts.  It was offered as a

21  feature for Nook device holders and was also made available for

22  users who downloaded our Nook application on their phones or

23  tablets.

24  Q.  Is it also available for customers who only access their

25  Barnes & Noble account on the Barnes & Noble website?

1    A.   Yes.

2    Q.   Now let's start out with a device-to-device example.  Let's

3    say that both you and I have Barnes & Noble accounts and we

4    both own Nook devices and that I would like to lend you an

5    electronic book that I purchased.  OK?  That will be what we

6    just characterized here as the accused situation.  What is the

7    first thing that I would do in order to start that process?

8    A.   The process would in this case have to be entirely

9    initiated by you.  You would have to use your Nook device,

10   access your library of purchased content, and discover a title

11   that offers or is available as a lendable title.  From the

12   screen, on the device there is usually an instruction or a

13   badge that is provided to the user to say that it is lendable,

14   so it is visually presented.

15   Q.   If I could stop you right there.  Are all books within

16   Barnes & Noble's system lendable?

17   A.   No.  That was based on publishers.  They would define which

18   ones were or were not lendable.

19   Q.   Let's say now I found a lendable book and I want to make a

20   loan offer to you.  What is the first step that I have to

21   engage in?

22   A.   Skipping some of the front-end steps, let's assume you are

23   on a book that is lendable.  From that screen you would tap a

24   button which says "Lend Me."  You will tap that button, and

25   that would bring up a second screen, which would allow you to

1    initiate the loan process.

2    Q.   If I tapped that second screen, operationally what happens

3    next?

4    A.   On the second screen I believe you would be asked to enter

5    either the email or some identifier of the person you wished to

6    loan your book to.  You would enter those credentials and

7    effectively initiate the loan or the lend request.

8    Q.   What happens to the lend request at that point?

9    A.   The lend request is sent to the cloud.  The cloud

10   effectively processes the request to confirm that a lend offer

11   has been initiated by you.  One of the first steps is that it

12   effectively removes your rights to access that book from your

13   account so that you are no longer able to access or open that

14   book on any end point.

15   Q.   At this point in time is my device talking to your device

16   directly?

17   A.   At no point is your device ever talking directly to my

18   device.

19   Q.   How are we talking to each other?

20   A.   It's always through the cloud.

21   Q.   Now that the loan request has been sent to the cloud, what

22   happens next?

23   A.   Again, once the cloud has confirmed the request that it

24   received from the device and it has removed your rights to

25   access that book from, as we call it, your locker, then I will

1    receive a notice from the Nook cloud effectively indicating to

2    me that you have made a book available to me under a loan

3    window.

4    Q.  How does that manifest itself on your device, if at all?

5    A.  In the device-only case, I will receive a notification,

6    it's a Y promptly on the device, that would intimate to me that

7    a message has come in.  When I click on that, I will

8    effectively be presented with a screen that would tell me the

9    details of what you have loaned to me.  At that time I can take

10   some action.

11   Q.  What action can you take?

12   A.  After reviewing the contents of the loan request, I can

13   choose to accept or I can also choose to reject your offer.

14   Q.  Let's say you like the book that I'm offering to loan to

15   you and you wish to accept.  What happens then?

16   A.  If I like the book you are offering, then I would likely go

17   ahead and accept the offer.  As a consequence of me accepting

18   the loan offer, then the device sends a message to the cloud

19   confirming that I have accepted the offer.

20   Q.  What does the cloud do with that information at that point?

21   A.  One of the first steps it takes is it starts a clock.  It

22   effectively initiates this 14-day window I spoke of earlier.

23   As I mentioned earlier, once the clock has been started on the

24   cloud, then the cloud takes a second step of effectively

25   entitling, as they call it, or adding the book that you have

1   loaned to me to my account.  It is effectively an official

2   transfer into my account as a second step.

3   Q.  At this point in time where the clock is starting on the

4   cloud, has your Nook device downloaded or stored the electronic

5   book?

6   A.  No.

7   Q.  That doesn't happen until later?

8   A.  That is correct.

9   Q.  What would the cloud do next, after it starts the clock?

10  A.  Once my account has been updated with the rights to gain

11  access to that book, then the cloud will send a notification to

12  the device with a few different pieces of information.  One is

13  the cloud will effectively tell the device that now it has the

14  rights to access this piece of information.  It conveys a

15  license file, which is effectively a decryption key which the

16  device will need downstream to open the book.

17       Cloud also informs the device of a specific URL or

18  location on the Internet from where the device can separately

19  fetch the book, if you will, or the encrypted book.  That is

20  effectively what the cloud is messaging to the device, and in

21  that step basically the device is trying to make sure that that

22  information is received.

23  Q.  When you say that the cloud is sending that information to

24  the device, that is to your device, correct?

25  A.  That is correct.

1   Q.   As the acceptor of the loan offer?

2   A.   That's correct.

3   Q.   At this point in time has your device downloaded or stored

4   the book?

5   A.   Not at this time.

6   Q.   Is the clock running?

7   A.   Yes.

8   Q.   Once your device receives the information that you just

9   described, what happens next?

10  A.   Once the device has successfully received the license key

11  as well as the URL or the location that I mentioned where the

12  encrypted book is located, the device effectively creates a

13  session to download the encrypted book from this location it

14  was given from the cloud.

15  Q.   What happens when that download takes place?

16  A.   First, the device has to make a connection to this location

17  that I mentioned, and the device will attempt to download the

18  entirety of the book and will attempt to basically effectively

19  get the entire set of bytes down to the device.

20  Q.   What is the location that you mentioned where the device

21  sends a URL or interacts with a URL in order to try to download

22  the book?  What is this location?

23  A.   We use a third party called Akamai, A-K-A-M-A-I.  It's the

24  equivalent of -- we used it for file storage for books.

25  Q.   Is it the case that your device sends a message of some

1   kind to Akamai in order to get the download process started?

2   A.   It wouldn't necessarily send a message.  I would say it

3   already has the specific location it needs to access on Akamai.

4   Effectively, what the device would be trying to do is access

5   that specific location and pull down the contents of the file

6   that's stored at that specific location.

7   Q.   When the device is interacting with Akamai as you just

8   described, is the book yet downloaded or stored to the device?

9   A.   Until the last byte has been downloaded, I would say that

10  the bytes of the book are being downloaded, but the entire book

11  is not available until the final byte has been transmitted and

12  received on the device.

13  Q.   During this period of time that you just described, is the

14  clock still running?

15  A.   The clock on the cloud continues to run.

16  Q.   Am I correct that all of these steps have to occur after

17  you hit the accept button and before your Nook actually stores

18  the loaned book?

19  A.   That is correct.

20  Q.   When in relation to all of these steps does the lending

21  period start to run?

22  A.   Again, the lending period started when the user pressed

23  "accept."

24  Q.   Before many of these steps actually occurred, correct?

25  A.   That's correct.

1   Q.  Once all of these steps are performed and the book is

2   actually downloaded and stored to your device, how long at that

3   point would you have access to the stored book on your device?

4   A.  It's whatever time is left on your server with regards to

5   the 14-day window.

6   Q.  14 days minus whatever time has elapsed?

7   A.  Absolutely.

8   Q.  Do you have to open the book in order for the lending

9   period to run?

10  A.  No.  The clock on the server continues to run irrespective

11  of what user action is performed.

12  Q.  What happens to the lending period if you never open the

13  book?

14  A.  The cloud continues to run the clock.  If the user never

15  opens the book and the 14-day window expires on the cloud, the

16  user loses the right to the book.

17  Q.  How quickly will your Nook device download the book after

18  the loan is first accepted, in ordinary circumstances?

19  A.  It's hard to put an exact time on it, but I would say that

20  we obviously strive to make sure that these independent set of

21  steps that I walked through were performed in the most

22  expedient manner.  From the user perspective, you can easily

23  see that some of these steps could take place at times in a few

24  seconds.  It could be longer.  There really is no guaranteed

25  window that is offered to the customer.

1   Q.   If a download doesn't take place right away, how does that

2   impact the lending period?

3   A.   It doesn't impact the lending period, because, again, the

4   clock continues to run on the cloud.

5   Q.   Under what circumstances could there be an interim period

6   between the time that the download is requested and it actually

7   is completed?

8              MR. CABRAL:   Objection:   Leading.

9              THE COURT:   It is leading.   I will allow it in this

10  instance, but be careful of that in future questions.   You may

11  answer.

12  A.   Would you mind repeating the question?   Sorry.

13  Q.   Sure.   You testified about the circumstances under which

14  the download may take place very promptly, within a matter of a

15  few seconds.   Are there also situations where the download

16  would take place over a longer period of time?

17  A.   Yes.

18  Q.   What would be the circumstances under which that might

19  happen?

20  A.   The case that I mentioned, for example, in the few seconds

21  what we call internally as the happy path, where things go

22  swimmingly well and all these steps that I mentioned just

23  happen to be completed in a desirable amount of time from a

24  user perspective.

25              There were situations where on the device you could

 1   have instances where you don't have a great wi-fi connection so

 2   the download couldn't take place or it has trouble downloading

 3   the contents of the book.  You could also have situations

 4   where, in the event that I'm the person trying to download, my

 5   device is out of storage so I don't have sufficient storage to

 6   even store the contents of the book.  There are instances like

 7   that that would impact the ability to complete the transaction,

 8   and it could conceivably take longer.

 9   Q.  Does the time that it takes to complete the transaction as

10   you just described have any impact on the lending period?

11   A.  Again, it's unrelated.  The clock on the server, once the

12   user has hit "accept," starts and continues to run irregardless

13   of what issues I may or may not have in terms of downloading or

14   securing access to that loaned book.

15   Q.  The cloud is keeping track of the clock, is that right?

16   A.  That is correct.

17   Q.  Does the cloud keep track of the point in time when the

18   book is actually stored or downloaded on the device?

19   A.  No, they are completely unrelated.  The cloud clock is

20   something that runs entirely on its own accord, and it doesn't

21   take into account anything that is happening on the device.

22   Q.  From a technical standpoint, can you explain what happens

23   at the end of the lending period.

24   A.  It would be almost a reversal of some of the steps I

25   described.  Again going back to the happy path where everything

442

Faeraedp1                      Mulqbandapi - direct

1   is running extremely well, the server determines that the loan

2   window has ended, if you will.  At the time the server

3   determines that, or the cloud, the cloud will revoke my rights

4   to the book that had been previously loaned to me.  At the same

5   time, the book rights would transfer to your account as it was

6   originally prior to the lend offer being extended.

7   Q.  To be clear, does the time expire on the cloud or on the

8   device?

9   A.  The time expires on the cloud.

10  Q.  Would that happen regardless of whether or not the device

11  is powered on?

12  A.  That is correct.

13  Q.  Let's assume that the device is powered off at the time

14  that the clock expires.  What happens when you next power on

15  your device?

16  A.  Conceivably, you would see two different things.  One is

17  that when the cloud expires the clock, your access rights to

18  that piece of content would effectively be removed, which means

19  that as a user, if you went to the website or Nook apps or

20  anywhere else, you would not see that book available to you to

21  be read.

22          On the specific device where I might have downloaded

23  that book, the loaned book, and assuming I'm in good

24  connectivity with wi-fi, I would immediately lose my rights to

25  read that back, which means that either the book would be

1    replaced with the user experience letting you know that you no

2    longer have rights to this book, or in another event the device

3    would delete the book from my device so I wouldn't actually

4    have physical access to it anymore.

5    Q.  You testified about a situation where a loan offer was sent

6    from a device and accepted on a device.  OK?

7    A.  Yes.

8    Q.  Are there circumstances under which a loan offer can be

9    sent from a device and accepted in another manner?

10   A.  Yes.

11   Q.  To be clear, as we understand it for purposes of today's

12   questioning, I'm asking about a situation that plaintiff is

13   saying is not accused in this case.  Can you describe a

14   situation where a loan offer comes from my device and you

15   accept it somewhere else besides on your device.  Let's say you

16   don't even have a device.

17   A.  A good example of that would be the website case where you

18   initiate a loan request on your device.  I could conceivably

19   log into my account on the Barnes & Noble website and receive a

20   notification from you about your loan offer, where I can again

21   go through the same accept-or-reject process and either gain

22   access to the content or not.

23   Q.  In terms of how the loan offer is operationally

24   transmitted, is it any different from what you described

25   earlier with respect to the device situation?

1    A.   Again, we use the same cloud infrastructure to manage all

2    these different end points.  I would say that how the clock is

3    managed and the user has access to the content is exactly the

4    same.

5    Q.   In this particular situation that I just described, when

6    does the clock start?

7    A.   Again, very similarly, if I was at the website and I

8    reviewed your lend offer and I accepted it, at the time that

9    our cloud registered my acceptance, the clock would start.

10   Q.   Then what happens?

11   A.   Then a similar set of steps occur.  The rights to open that

12   specific book would be added to my account.  On the website

13   either the page would refresh or I would get some notification

14   that the book is now available for me to read.  More often, I

15   think it was read instantly or there was a button that we made

16   available to the user which they could depress and open up the

17   book right on the website.

18   Q.   To be clear, in this situation you could actually, if you

19   wanted to, open up and read the book on the website, correct?

20   A.   That is correct.

21   Q.   After you log in with your account information, and so

22   forth?

23   A.   That is correct.

24   Q.   Is the lending period that you just described, the clock

25   has already started, is that in any way impacted by the point

1  in time you actually access or read the book on your online on

2  your account?

3  A.   It is again unrelated.  The server clock is running on its

4  own accord, and that is driven by the time of acceptance of the

5  offer.

6  Q.   What is it that grant the account the right to access the

7  book on your online account?

8  A.   It was the cloud.

9  Q.   What would happen if 14 days passed and you never even

10 accessed or opened the book?

11 A.   Again, the cloud would continue to monitor the clock.  Even

12 if I never as a user received your lend offer or never opened

13 the book, if you will, after 14 days my rights to that book

14 would be revoked and it would be returned to you.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

 1   Q.  Just briefly, one more, what we are calling here today,

 2   unaccused situation.  Is there a situation where a loan offer

 3   can be made where a device is not even involved at either end,

 4   offer or acceptance?

 5   A.  Yes.  I think just extending the previous example that we

 6   just covered, I would say that one of the use cases that we

 7   support is a Web site to Web site, if you will, where a URL

 8   user or a customer on our Web site with a Barnes & Noble

 9   account, a Barnes & Noble account holder on our Web site,

10   through the Web site you can initiate a loan offer and loan a

11   book to me directly through the Web site, and we can

12   effectively engage in the same experience.

13             MR. CABRAL:  Your Honor, if we can just be clear that

14   the functionality he was just talking about is not an issue in

15   this case.

16   Q.  Operationally, Mr. Mulchandani, from the standpoint of the

17   technical aspects, does the operation of the loan offer and the

18   acceptance thereof, and the expiration of the loan offer, the

19   clock, does it work any differently than you have already

20   described?

21   A.  That was one of the advantages of our cloud-based system,

22   is that the system behaves consistently across all these

23   different use cases.

24   Q.  Just to be clear, when does the lending period begin no

25   matter what form of access you would have to the loan offer?

 1              MR. CABRAL:  Objection.  Asked and answered.

 2              THE COURT:  I'm sorry?

 3              MR. CABRAL:  Objection.  Asked and answered.

 4              THE COURT:  Well, it was.  I will allow it, but I do

 5     think we need to move this along.

 6              You may answer that question.

 7     A.  I would ask that the question be repeated.

 8     Q.  I believe the question was, when does the lending period

 9     begin in any of these scenarios that we have just laid out?

10     A.  It begins on acceptance of the offer when the cloud

11     registers the acceptance and starts the clock.

12     Q.  So let's talk about the shop feature or shop application.

13     You mentioned earlier that you understood that this is one of

14     the accused features in this case, correct?

15     A.  Yes.

16     Q.  From a consumer's perspective, what is the shop

17     application?

18     A.  The shop application I would say was a purposeful

19     experience where we wanted to bring a great mobile friendly

20     experience for users to browse, purchase, and search for

21     content that we made available, whether it's books, magazines,

22     videos, catalogues, newspapers.

23     Q.  Is the shop application the only way that a Barnes & Noble

24     account holder can browse your catalogue of books and make

25     purchases?

 1   A.  Well, as I mentioned, we wanted to offer and we did our

 2   shopping experience on Nook applications in addition to our

 3   Nook devices.  So that would be Windows 8 and Android.

 4   Q.  In the course of your employment at Barnes & Noble, did you

 5   or your team work on the development of the shop application?

 6   A.  Yes.  My teams were responsible for developing the shop

 7   application.

 8   Q.  Now, in order to use the shop application, do you need to

 9   be connected to a wireless network?

10   A.  Yes.

11   Q.  Are the Nook devices pre-configured to connect to a home

12   network?

13   A.  No.

14   Q.  So what does a user have to do to connect a Nook device to

15   a home network when it first purchases it?

16   A.  Well, when you buy a brand-new device, it largely comes

17   from the factory in a powered out state.  So I would say that

18   you first power it on.  Then there is what we called an

19   out-of-book experience, where the user would first have to

20   connect the device to WiFi just to establish connectivity.

21   That would be their home WiFi in this case.

22           The second step would be the creation, or they would

23   enter in their Barnes & Noble credentials.  So if they are an

24   existing customer, they can just enter their log-in password

25   right on the screen or they can create an account directly from

1    the device.

2            Then we have a few other screens to get them through

3    the device set-up, after which the device would be ready for

4    general use.

5    Q.  Let's say that I went out and bought a new Nook device

6    today, would I need to do any of that before I could access the

7    shop application?

8    A.  Yes, you would.

9    Q.  Once I did those things, what would I then do to access the

10   shop application?

11   A.  Well, assuming you have completed those steps, and the

12   device is obviously in working order and charged, you would be

13   presented with either a button or icon that would allow you to

14   launch the shop application.

15   Q.  What if I already had a Nook device and it was already

16   configured to my home network, but it's been sitting on my

17   couch for about an hour.  Would I need to do anything before I

18   can access the shop application at that point?

19   A.  I would say for an hour in that case, it's likely that we

20   would suspend the device, which is just for battery

21   conservation we would power off the device and just put the

22   device to sleep.  So it is not inconceivable that you would

23   have to hit the power button just to wake it up, unlock the

24   screen to get to the screen saver, press N to get to the home

25   screen, and then launch the shop application.

 1  Q.  How would I launch the shop application?

 2  A.  Again, we often made available directly for the user on the

 3  home screen some sort of visual either button or tile, if you

 4  will, that they can launch the shop application.

 5  Q.  Did you say tile?

 6  A.  Yes.

 7  Q.  Is that like an icon?

 8  A.  Yes.

 9  Q.  Assuming everything is running smoothly and I depress the

10  shop icon on my Nook device, what would I see on the screen

11  after doing that?

12  A.  Well, once you launch the shop application, what you would

13  see is the device in this case would attempt to paint the

14  storefront.

15  Q.  You used the term paint.  Can you explain what you mean by

16  paint in that context?

17  A.  Paint would be equivalent of just draw or in this case just

18  show.

19  Q.  What is the shop storefront?  What would I actually see in

20  front of me?

21  A.  Well, visually as a user what you would see is a painted or

22  a set of icons, which is books, magazines, catalogues, videos,

23  effectively an organized page of content.

24  Q.  What can I do on that storefront once I see all of those

25  things?

1   A.  Well, once the storefront is loaded, then the user can

2   effectively engage in free-form discovery.  So they can click

3   on products that are shown in the shop.  They can search.  They

4   can browse different categories of content that we make

5   available.  They are basically are now free to discover any

6   content they may be interested in from the storefront.

7   Q.  Is the shop storefront maintained on the Nook device

8   itself?

9   A.  No.  As I mentioned earlier, the way we designed our shop

10  application was it really levers this master and servant

11  content that I covered earlier, where the cloud in this case

12  would be where we stored a lot of the data in the course of the

13  shop experience.  And when the user actually attempted to

14  launch the shop on the device, the device would attempt to load

15  the storefront thundercloud and then present it to the user.

16  Q.  Other than on a device, and again, I am not quite sure what

17  is accused or not accused with respect to the shop application,

18  but I am pointing out to you that I am asking you a question

19  now about a different way you might access the shop application

20  other than through a device.  Is that possible?

21  A.  Yes.  We would have Nook applications that would allow for

22  a similar experience.

23  Q.  What do you mean by Nook applications?

24  A.  So it would be the user would have an Android phone or an

25  Android tablet, a third-party product that was designed by

 1    someone else, like Samsung or Google in this case, an IOS or

 2    iPad device or iPhone, if you will, produced by Apple, or a

 3    Windows 8 device that was produced by Microsoft or another

 4    Windows 8 product.

 5    Q.  Can I access the shop storefront through those

 6    applications?

 7          MR. CABRAL:  Objection.  Relevance in the sense that

 8    the application is not at issue in this case.

 9          THE COURT:  I think defense counsel is not clear on

10    that.  On making that objection, which is perfectly proper, you

11    have alerted the jury correctly that that is not one of the

12    points in this case.

13    Q.  The question was, can I access the shop storefront through

14    one of those Nook applications?

15    A.  Yes, you can.

16    Q.  Now, let's go back to the device scenario where you are

17    pressing that icon on your device and you're calling up the

18    shop storefront.  From an operational standpoint, what has

19    actually happened, what is the first thing that the shop

20    application does in order to find its way onto your device?

21    A.  From an implementation perspective, our cloud was just like

22    any other Internet address that's popular on the Web.  So

23    similar to Yahoo or Google, the Barnes & Noble's cloud also had

24    a specific address, if you will, that we knew to connect to in

25    order to download the storefront.  So when the user depresses

 1    the shop button on their device, we effectively connect to that

 2    URL or Internet destination and then download the content that

 3    is appropriate for that device or user.

 4    Q.  What is a URL?

 5    A.  URL, it's a technical term that's used to describe

 6    destinations on the Web.  So wwwyahoo.com is a URL,

 7    www.google.com is a URL.  It's effectively referring to that

 8    specific construct.

 9    Q.  Does every Nook device that connects to the cloud in

10    connection with the shop feature, do they use a different URL

11    to reach the cloud or is it the same URL?

12    A.  They use the same URL.

13    Q.  What if I am trying to access the shop feature through my

14    Android device, do I also use the same URL?

15    A.  On Android we use the same URL.

16    Q.  Why is that, that the Nook devices, the applications and

17    other N points, why is it that they use the same URL to reach

18    the cloud in connection with shop?

19    A.  Well, the design intent around how we wanted to develop

20    shop, and again, going back to some of what I mentioned

21    earlier, the aspiration, in terms of how we wanted customers to

22    shop and browse our content, was that we wanted to use our

23    cloud to capture all the essence of a user.  So in the case

24    that a user is buying a book from us on a Web site or on an

25    iPhone or on a Nook device, our cloud maintains all that

1   information within itself, as you know, kind of a single user

2   account.

3        So by maintaining one common URL to where all the

4   devices or Nook applications are connected to, it actually

5   allowed us to provide a better personalized and more

6   appropriate shop on an individual basis.  So we basically by

7   design choice felt that it was better for us to use the cloud

8   as a more -- have the cloud have more involvement in the

9   overall process of our shop experience.

10  Q.  Now, you testified that when I depress shop button on my

11  device that the shop application then sends a demand or a

12  request to the cloud, correct?

13  A.  That is correct.

14  Q.  Is there a name for this?

15  A.  Well, we often refer to it as a GPB command.

16  Q.  What does GPB stand for?

17  A.  GPB stands for Google Protocol Buffer.  It's basically an

18  efficient way of transmitting data between a device and cloud.

19  Q.  So what is a GPB command?

20  A.  It's basically an instruction where the device is informing

21  the cloud that someone has requested to load the storefront for

22  a particular user.

23  Q.  Once the cloud receives this GPB command, is there any way

24  that the cloud can identify which device sent that command?

25  A.  Well, usually as part of the GPB command, the device in

1   question, for example, if it was my device, my device along

2   with the GPB command would include what we called a device

3   identifier.

4   Q.   Is there any particular way or procedure in which this GPB

5   command is transmitted to the cloud?

6   A.   Well, again, because our shopping experience was

7   effectively levering a fair amount of browser technology, we

8   did transmit, along with the request, we transmitted the GPB

9   command using what is called HTTP.  Again, in general Web

10  terms, it's the header that you use when addressing specific

11  URLs, like Yahoo.com or Google, and in this case it would be

12  the Barnes & Noble cloud.  But we used HTTP to transmit the GPB

13  command from the device to the cloud.

14  Q.   This is all in connection with the shop application,

15  correct?

16  A.   Correct.

17  Q.   You mentioned something about a device ID being included

18  within the GPB command, right?

19  A.   Yes.

20  Q.   What is the device ID?

21  A.   The device ID was, if you recall the case we went through

22  of setting up a brand-new device, our cloud needs some way of

23  identifying every single device within the ecosystem.  So the

24  cloud actually, during the process of device registration,

25  issues a device ID, and the device ID is effectively a token of

1   uniqueness for that specific device in the Barnes & Noble

2   ecosystem.

3   Q.  You also mentioned an HTTP request, and that's the way the

4   GPB command is transmitted to the cloud, right?

5   A.  That is correct.

6   Q.  So what information is contained within that HTTP request?

7   A.  The HTTP is an open, actually, spec that's governed by kind

8   of the industry.  HTTP generally mandates that you include

9   certain parts, some Android fields you have to include.  We

10  send up some information, such as model number.  At times we

11  also have to include information so the device could be

12  identified, like a user agent string.  So we included that as

13  part of the HTTP request to the cloud.

14  Q.  Once the cloud receives this HTTP request, what does it do

15  with the model number that you just mentioned?

16  A.  Well, the model number, as I mentioned, was mostly for,

17  again, for compliance with the HTTP standard and what the cloud

18  needed to get to support that standard.  So the cloud would

19  effectively just receive the HTTP request, acknowledge it.  It

20  would take the model number information, use it for some

21  logging and analytics purposes just to confirm that a specific

22  type of device is connected with the cloud, and then throw that

23  information away.

24  Q.  Does the cloud use this model number to decide what

25  information to send to the Nook device?

1   A.  No.

2   Q.  You mentioned earlier a couple of steps ago something

3   called a device ID, the unique identifier in the device is sent

4   to the cloud in connection with the activation of the shop

5   feature.  Why did the Nook devices send their device ID to the

6   cloud?

7   A.  Well, again, as I mentioned, I think maintaining a great

8   user experience for our users was really important to us.  So

9   one of the design paradigms in our shop application was

10  personalizing as much as possible the storefront for that

11  individual user.  So the device ID was informing the -- again,

12  one of the front-end tokens.  It was leveraged by the cloud to

13  translate the type of product that the user is coming from into

14  a different identifier, which would ultimately be used to

15  effectively paint the storefront.

16  Q.  What is this different identifier called?

17  A.  Well, internally, once we received the device ID from the

18  device -- I am talking more from what is happening at the

19  cloud -- the cloud would convert the device ID received into

20  what we call the product device ID.  So that was an internal to

21  the cloud two digit code to where the device would be mapped,

22  and that is what would be used, along with other data, to

23  effectively respond to the device request.

24  Q.  The device request in connection with the shop application,

25  correct?

1   A.   That is correct.

2   Q.   So at this point in time has anything been transmitted to

3   the device yet in connection with the shop application?

4   A.   Not at this time.

5   Q.   So what does the cloud do with this information, this

6   product device ID that you just mentioned?

7   A.   Well, the product device ID, as I mentioned two digit code,

8   it effectively allows the cloud -- it's one of the many data

9   points we use, but it effectively allows the cloud to have some

10  recognition of the type of device it's speaking to.  Because at

11  times it could be a color product, a black and white display.

12  Having some awareness of the type of device it's speaking to

13  could help it paint a more relevant or appropriate storefront

14  for that user.

15  Q.   Again, when you say paint, what do you mean?

16  A.   Draw.

17  Q.   What you actually visually see?

18  A.   What you visually see on the screen.

19  Q.   So at some point is information concerning the shop

20  storefront returned to the device after all of these steps you

21  just mentioned?

22  A.   Yes.  Eventually the cloud will effectively on its side

23  curate all the content that it feels is relevant to draw the

24  storefront, and it would respond to the device request with a

25  GPB response.

1   Q.   In what form is the information then returned to the

2   device?

3   A.   Well, the GPB response would again include different

4   bookkeeping information.  So it would include what we call

5   product details.  It would actually in some cases have specific

6   books, magazines, or other types of content that the cloud

7   feels is relevant to show to the user as part of drawing this

8   storefront.  It could also include a Web page if needed to

9   paint the storefront.

10  Q.   Once the cloud has sent all of that information back to the

11  device, what happens next?

12  A.   Once the -- let's assume the device has received a response

13  and everything checks out, then the device will attempt to

14  interpret what it received from the cloud and effectively paint

15  or show the storefront to the user.

16  Q.   What can the user do at that point once the painting takes

17  place?

18  A.   Once the painting takes place, then you pretty much, from a

19  user perspective, have access to the full Barnes & Noble

20  digital catalogue, which means from that point on you can start

21  browsing all the links that we make available to you.  You have

22  a search bar available to use so you can search for any string

23  or any content that you like.  We also try to make sure that we

24  give users some hints or cues.  So we would offer like New York

25  Times bestsellers or certain things we felt they would be

 1   interested in.

 2   Q.  I believe you testified earlier that your software team

 3   helped develop and build the shop application, correct?

 4   A.  That is correct.

 5   Q.  What did you do to develop the shop application as things

 6   evolved and you went along?

 7           MR. CABRAL:  Objection, your Honor.  The testimony is

 8   his team developed it, not the actual witness.

 9           THE COURT:  I think that was implicit in the question,

10   but I sustain the objection.  Rephrase.

11   Q.  What did your team do to develop the shop application with

12   respect to Nook devices?

13   A.  Well, I would say, as I mentioned, our objective within

14   Barnes & Noble was to build a great reading experience for our

15   users, and obviously allowing them to discover and engage with

16   more content new types of content was really important to us in

17   the entire time I was with the company.  So as part of that, I

18   think we felt that the way to achieve that was to really build

19   and develop -- and this is from my early days with the

20   company -- a dynamic storefront that attempted to basically be

21   as personalized as possible to that user.  Because that way it

22   allows them to engage, discover content that's relevant to

23   them, broader than being presented to them that they may not be

24   interested in.

25   Q.  So what did you actually use as the foundation for building

1    the shop application?

2    A.   Well, to support the use case I described, in terms of the

3    highly personal dynamic site or storefront in this case, we

4    knew when we canvassed different technologies that were

5    available, one of the aspects, just given the fact that our

6    Nook devices were leveraging Android as its operating system,

7    one of the capabilities that Android offers is something called

8    WebView.  WebView is effectively a browser engine that gives

9    you all the support you need to effectively build either a full

10   Web browser, where you have a navigable bar where you type in

11   addresses and browse on the Web, or build special purpose

12   browsers, if you will, for a more curated experience.

13           So we developed shop as a special browser, if you

14   will, where all we tried to do was give the user the same

15   flexibility of being able to browse and navigate links, run

16   searches, but, at the same time, not burdening them with the

17   logistics or the minutia of having to type URLs to go to

18   different destinations.  We tried to build shop in a way that

19   would be the equivalent of bookmarking a page in your browser,

20   where if you go to Yahoo you just bookmark it.  So we developed

21   shop as a special browser to effectively mimic that behavior,

22   where we took you to the storefront the minute you launched the

23   app.

24   Q.   Did you use WebView in that context?

25   A.   Yes, we did.

1   Q.  You mentioned that the user in connection with shop doesn't

2   have to type in a URL to use that application, is that correct?

3   A.  That is correct.

4   Q.  Does it still have browsing functionality?

5          MR. CABRAL:  Objection.  Leading.

6          THE COURT:  Overruled.

7   A.  Yes, it does.

8   Q.  You mentioned that the shop application has various links

9   that you can use and you can click on, correct?

10  A.  That is correct.

11  Q.  What do you use those links for?

12  A.  You basically use those links to navigate within shop.  So

13  you can have a book that you're interested in reading.  You can

14  click on a link that's associated with it or tap on the book

15  cover itself.  It will take you to a more detailed page for

16  that book.  So it may give you more enhanced information --

17  reviews, recommendations, ratings -- so you can read about what

18  other people have said about the book, how many star ratings it

19  has.  Then you can navigate back and forth between pages of

20  content and browse different links and search.

21  Q.  Can any of those links lead the user out of the shop

22  storefront and onto the Internet?

23  A.  As I mentioned, our primary objective for shop was to build

24  a special browser where we try to keep the user -- and more as

25  a convenience -- navigating links and browsing effectively

1    within the Barnes & Noble digital catalogue.  In the course of

2    developing that feature, we were aware that some of the

3    capabilities of our shop application, specifically, the rate

4    and recommend features, put a lot of users to navigate outside

5    of shop to other designations or Internet addresses.

6    Q.  You said something about the rate or recommend feature.

7    What is that?

8    A.  On all book products, or effectively all digital products,

9    I think the social aspect of purchase is a pretty powerful one,

10   where users want to read about other people's experiences with

11   a specific piece of content, what they like, dislike, in making

12   their own purchasing decisions.  So one of the features we

13   offered on a book, regardless of whether the user bought it or

14   not, was a rate and recommend where they can actually, through

15   Facebook or Twitter, actually post a recommendation or post

16   some comment or feedback about a specific book or digital

17   product, if you will.

18   Q.  So I would like to have you perhaps walk me through a

19   situation where you can click on one of the links in the shop

20   application and it takes me outside to the Internet.

21          MR. EDERER:  And I have here in my hands Defendants'

22   Exhibit 754 for identification, which I would like to show the

23   witness, your Honor.

24   Q.  Mr. Mulchandani, can you identify Defendants' Exhibit 754?

25          THE COURT:  While he is doing that, how much longer do

 1    you have on direct?

 2            MR. EDERER:  15, 20 minutes.

 3            THE COURT:  I think we are going to give the jury a

 4    ten-minute break at this time.  We have to keep it very short

 5    because we are only going to 4:30, but I think it would be

 6    useful to have a break.  We will have a ten-minute break and

 7    call you right back.

 8            (Jury exits courtroom)

 9            THE COURT:  We will resume in exactly ten minutes.

10            (Recess)

11            (Jury present)

12    DEEPAK MULCHANDANI, resumed.

13    BY MR. EDERER:

14    Q.  Mr. Mulchandani, before the break I was asking you about

15    and you testified about some of the links on the shop

16    application that the user can click on in order to get

17    information about content for example.  Do you recall that?

18    A.  Yes, I do.

19    Q.  Can any of those links lead the user outside of the shop

20    storefront and onto the Internet?

21    A.  Well, as I mentioned, there were times where the shop

22    application was, as I mentioned, a special browser optimized

23    for shopping and discovery.  But by virtue of, one of the

24    features I mentioned was the rate and recommend feature, which

25    allowed the user or anyone to effectively post a review for

1   some content, or any product we offered for sale digitally, a

2   review about that product on either Facebook or Twitter.  So

3   through those integrations, we became aware that users were

4   able to browse sites outside of our shopping experience.  We

5   didn't discourage it, but it wasn't something that we deemed

6   was core to the shop experience.

7          MR. EDERER:  Your Honor, I would like to show the

8   witness what has been marked as Defendants' Exhibit 754 for

9   identification and ask if he can identify it.

10         THE COURT:  Yes.

11  Q.  Can you identify the exhibit?

12  A.  This is a Nook HD+ device.

13  Q.  Is that one of the devices that you helped develop while

14  you were at Barnes & Noble?

15  A.  Yes, I was very much involved in the development of this

16  device.

17         MR. EDERER:  I move the admission of Defendants'

18  Exhibit 754.

19         MR. CABRAL:  No objection, your Honor.

20         THE COURT:  Received.

21         (Defendants' Exhibit 754 received in evidence)

22  Q.  Mr. Mulchandani, I am not all that tech savvy, but I am

23  going to ask whether you can help walk me through an example of

24  what you just talked about, in terms of clicking on a link,

25  using the rate and recommend feature and taking the user out of

1   the shop page and onto the public Internet.  Can you just walk

2   me through what you just testified about?

3   A.   Sure.  I assume the device is pared to WiFi and connected.

4   Q.   I certainly hope so.

5   A.   Please tap on the power button, which would be on the right

6   of the device.  Press the N button, which is the home.

7          So you see that green fruit in that circle.  If you

8   can touch that, tap it and bring it towards the lock, that will

9   unlock the device.  It seems like you're reading *Pride &*

10  *Prejudice*.  So you may have to end that for now and press the N

11  button to exit out.

12  Q.   The N button being what?

13  A.   We used to call it the equivalent of a home button so it

14  always takes you back to the home screen.

15  Q.   "N" stands for Nook?

16  A.   Yes.

17  Q.   Am I now on the homepage?

18  A.   Yes.  As I mentioned, you have some links.  Specifically,

19  if you look at the button right, you will see an icon called

20  "shop" with a little shopping bag.  If you tap on that.

21  Q.   Press that icon?

22  A.   Yes, please.

23         So it goes to the storefront which, as I mentioned,

24  effectively presenting you with different books and different

25  types of content that we have available for sale, or Nook makes

1    available for sale.

2           So to show the rate and recommends, if you see the

3    book behind the Oscar, the second row of books, click on the

4    left most one with the white cover just as an example.

5    Q.  *Born on the Fourth of July*?

6    A.  Yes.  So as you see on this screen, we just navigated a

7    link or followed the link to a more detailed page about the

8    book.  Below the full cover of the book you see the stars,

9    which is really where we post a kind of aggregate rating for

10   the book.  And right below that is a tile of three icons.  If

11   you can click on the middle icon please.

12   Q.  Like so?

13   A.  Yes.  You will see that the second option in the middle is

14   rate and review.  So if you can please click on that.

15          As I mentioned earlier, the motivation here was really

16   around engaging a social concept around the feature.  So we

17   allowed users to post reviews to Facebook, Twitter or both.

18          So if you don't mind clicking into the Twitter link

19   there.  Now, since you don't have your Twitter account

20   connected already to your Nook device, it will ask you to log

21   in with your Twitter log-in or Twitter password.

22   Q.  Now I am giving up my personal information here, but I will

23   go ahead and do that anyway.

24   A.  Go ahead.  It seems like there is an account already there

25   that you can use.

 1   Q.   If I did that right, it will be a miracle.

 2   A.   There you go.  You just need one more confirmation step.

 3   Go to the Twitter link on the page, if you can click that

 4   please.  Yes.

 5   Q.   So now where am I going?

 6   A.   So now you're connected to Twitter, which basically means

 7   that what the shop application has done is load the Twitter

 8   homepage within the application.  So it has effectively browsed

 9   to the Twitter homepage and pulled down the content over the

10   Internet into the experience of the shop application.

11        So as you can see, I think if you just move your

12   finger up and down, you can scroll through the Twitter

13   homepage.  And maybe just to follow a link, I am not familiar

14   with some of these, but I see New York Yankees are there.

15   Click on the MTA clink.

16   Q.   Which stands for Metropolitan Transit Authority for you

17   nonworkers.

18   A.   It seems to be.  Again, if you want to just follow, you can

19   obviously read about the MTA page.  This is the Internet page.

20   If you don't use the device, you can find this.  Also, I think

21   somewhere there you can go to the full homepage of Twitter, if

22   you want to go external to this page.  Now you can load the

23   entire MTA page.  So you're literally browsing within shop,

24   within the experience, but you're connected to a third-party

25   page.

 1  Q.  So this is the same MTA homepage that I would be able to

 2  browse to if I was on a more traditional browser, if you will?

 3  A.  If you are on your desktop and you went to the MTA

 4  homepage, you would probably see this page.

 5  Q.  If I pushed the Yankees icon, I would be able to go to the

 6  Yankees homepage, correct?

 7  A.  Depending on what navigation the Yankee page allows, it's

 8  possible that you could go to the Yankee homepage.

 9  Q.  Now, Mr. Mulchandani, finally, as we discussed earlier, one

10  of the patents involved in this case --

11         THE COURT:  I don't think you can really hit on the

12  Yankees Web page because the Yankees don't do any hits anymore.

13         MR. EDERER:  At least we learned that Joe Girardi just

14  turned 50.

15  Q.  As we discussed earlier, Mr. Mulchandani, one of the

16  patents involved in this case is being asserted against a

17  system that Barnes & Noble uses to provide security to books

18  that are going to be purchased by consumers; is that your

19  understanding?

20  A.  Yes.

21  Q.  Are you familiar with that system?

22  A.  Yes.

23  Q.  Did you work on that system when you were at Barnes &

24  Noble?

25  A.  Myself and my team were responsible for developing that

 1    system.

 2    Q.   What is that system called?

 3    A.   Well, the system is effectively the cloud, is what we

 4    developed, and it uses aspects to secure the content.

 5    Q.   Is there a term that Barnes & Noble uses in connection with

 6    the intake of books into its system?

 7    A.   Yes.  One of our systems as part of our cloud was a system

 8    that we called ingestion.  So ingestion was really a front step

 9    in terms of how we made books available for sale in our

10    ecosystem, in the sense of when we signed a publisher deal to

11    offer their books for sale in our visual storefront, ingestion

12    would be the equivalent of bringing their content into our

13    system, so we physically receive files or in this case actual

14    files or bytes into our systems.  And at that time we would

15    process those files into our Nook cloud.

16    Q.   What is involved in processing those files into your Nook

17    cloud?

18    A.   Well, the ingestion step would effectively do a certain set

19    of steps.  Number one, just to honor our obligations to the

20    publisher, where appropriate, we encrypted the books.  Once the

21    books were encrypted, we signed a unique identifier we called

22    the EAN to those, and those were specifically to identify that

23    unique book within our cloud, if you will.

24         In parallel to the encryption process, we would

25    generate some security keys, and the security keys would be

 1   used later in the process when a user attempts to buy the book.

 2   At the ingestion phase, all we are doing is generating some

 3   decryption keys.

 4        Once that process is completed, the decryption keys

 5   are stored securely in our cloud.  The book bytes that are

 6   encrypted that we receive from the publisher, in the case that

 7   it was appropriate, we would then transmit those encrypted

 8   books to our Akamai server.

 9   Q.  Just to be clear, at what point in this process does Barnes

10   & Noble encrypt the books that it has agreed to protect or

11   secure with its publishers?

12   A.  It's right as the book is going through the ingestion

13   process.

14   Q.  Essentially the first step of the ingestion process once

15   the book is received?

16   A.  Yes.  It would be one of the initial steps.

17   Q.  At what point does the book become available for purchase

18   in the Barnes & Noble catalogue?

19   A.  Once the book has completed the ingestion process, in the

20   sense the bytes of the book in encrypted form are available on

21   Akamai and the decryption keys have been stored away, the EAN

22   has been generated, and a few other housekeeping items have

23   been completed, then the book can be made available for sale.

24   Q.  Do the Nook devices play any role in the encryption of the

25   books?

 1    A.   The Nook devices don't play any role in the encryption of

 2    the books.   That's entirely handled by ingestion.

 3    Q.   Remind us again, what is Akamai?

 4    A.   Akamai is a third-party company.   We used them for the

 5    storage of our books and other content.

 6    Q.   When the encrypted book is stored on Akamai, does anything

 7    else happen that is related to that book's encryption?

 8    A.   No.   The books remain unchanged while they are stored on

 9    Akamai.

10    Q.   Other than this ingestion process that you have just

11    described, is there any other point in time when books are

12    encrypted within Barnes & Noble's system?

13    A.   No.   The ingestion process was the only process we used to

14    encrypt the books.

15    Q.   So after the book has been stored on Akamai and made

16    available for purchase, what happens when a user decides to

17    purchase a book on a Nook device for example?

18    A.   Well, when the user, for example, wants to purchase a book,

19    they obviously go to their device, in the case that they are

20    using a device, and they click on the buy button for that

21    appropriate title.   That buy transaction effectively

22    immediately transmits the user intent to the cloud where the

23    purchased transaction is registered.

24    Q.   Then what happens after that?

25    A.   Once the cloud receives the purchased transaction, in the

 1 case that nothing goes wrong, so just again conceivably the

 2 happy path here, the cloud will respond to the device with a

 3 few pieces of information.  One will be the decryption key that

 4 I previously mentioned was generated during ingestion.  The

 5 second piece of information the device will receive -- and all

 6 this is being done securely so that no one can tamper or

 7 effectively change the contents of this message.  So the

 8 decryption key.  And then the second piece of information the

 9 cloud sends to the device is a URL or a location identifier of

10 that specific encrypted book on Akamai.

11 Q.  You mentioned that these two pieces of information, the key

12 and the URL, are sent to the device in a secure manner,

13 correct?

14 A.  That is correct.

15 Q.  Is there a name for that process whereby these pieces of

16 information are transmitted to the device?

17 A.  So earlier I spoke of HTTP as being used to transmit data

18 back and forth between the device and cloud just to use common

19 Web parlance.  We used SSL, secure sockets layer, which again

20 is what is traditionally used in Web applications for securely

21 transmitting data.

22 Q.  So, therefore, the decryption key and the URL, the location

23 URL, are therefore transmitted to the device through SSL, is

24 that correct?

25 A.  That is correct.

1    Q.  And what happens next after the Nook device has received

2    the decryption key and the URL?

3    A.  So once the device has successfully received both pieces of

4    information from the cloud, then it effectively keeps the

5    decryption key aside, and what it attempts to do is initiate a

6    download request to Akamai.  So it takes the information that

7    the cloud provided in terms of the URL, where the specific book

8    bytes are located, and it effectively engages in a download

9    request to the Akamai server.

10   Q.  When the book is downloaded from Akamai, what format is it

11   in?

12   A.  At the time of ingestion, so just talking about standard

13   copyrighted books, we often brought it in in a format called

14   EPUB2, which is a format that usually the publisher sends us

15   these books in.  At the time we receive them from Akamai, they

16   are still EPUB2 books, it's just that they are encrypted.  So

17   the underlying conscribe doesn't change of the book, it's just

18   that the additional protection is just encryption.

19   Q.  When the book is received from the device from Akamai, what

20   happens at that point?

21   A.  The device will effectively pull down the entire book to

22   the device.  Once that request has been completed and the book

23   is successfully downloaded, then the device is available to be

24   read by the user.

25   Q.  Does the device transmit any keys in this entire process?

 1  A.  No.  The device in this case is purely just acting as a

 2  servant of the cloud, where it's only receiving but never

 3  sending.

 4  Q.  Does the device ever encrypt anything?

 5  A.  No.

 6  Q.  Now, after the book is ingested, received and stored, it

 7  can then be purchased, correct?

 8  A.  Yes.

 9  Q.  How does the process of purchasing a book occur on a Nook

10  device?

11  A.  So again, from an N user perspective, I would navigate to

12  the shop storefront, find the appropriate book or content that

13  I am interested in purchasing, and I would depress the buy

14  button that's associated with that piece of content.

15  Q.  So if you look up on the screen, we were looking at *Born on*

16  *the Fourth of July* before.  Do you see that?

17  A.  I do.

18  Q.  You just mentioned a purchase button.  Can you point out to

19  us where that resides on the screen?

20  A.  It's the button that says buy, dollars --

21  Q.  Buy in this case $10.49?

22  A.  Sorry.  My eyes are bad.

23  Q.  I don't think they are.  I have a better look at it than

24  you do.

25  A.  That button is effectively the purchase button.  So if you

1    depress that button, it should lead to a book being purchased.

2    Q.  If the user wants to buy the book, is there any information

3    about the book that is included in that purchase button?

4    A.  Yes.  So because you want to offer the user with as

5    immediate of a purchase experience as possible, we preloaded

6    that button with all the information that the cloud would need

7    to complete that transaction.

8    Q.  What would that include?

9    A.  Well, the button included information like the EAN, what

10   the product identifier is, the unique one that I talked about

11   earlier that's assigned during ingestion; product details with

12   regard to the title, the synopsis, any metadata that would help

13   the cloud in completing that transaction.  So that's already

14   available to the device at the time this page is painted.

15   Q.  So if I depress that buy button, what happens next?

16   A.  So if you depress that button, a transaction is immediately

17   sent up to the cloud.  The device doesn't need to do any more

18   look-ups or steps.  Once you have confirmed it, it will send

19   the transaction request to the cloud and purchase that book for

20   you.

21   Q.  Who is actually selecting the book for purchase?

22   A.  The user.

23   Q.  Does the device have to do anything in terms of looking up

24   any information about the book in order to execute the purchase

25   transaction?

 1    A.   At the time the transaction is being executed, all the

 2    information the device and the cloud needs is already contained

 3    within that button.

 4    Q.   What is the device's involvement in selecting a book to

 5    purchase?

 6    A.   There is none.  It's purely the user's.

 7              MR. EDERER:  No further questions, your Honor.

 8              THE COURT:  Cross-examination.

 9              MR. CABRAL:  With your permission, I would like to

10    bring some documents up to the witness.

11              THE COURT:  All right.

12              MR. CABRAL:  With your permission, I would like to

13    give you the documents as well.

14              THE COURT:  That's fine.

15              (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1    CROSS-EXAMINATION

2    BY MR. CABRAL:

3    Q.  Good afternoon, sir.

4    A.  Good afternoon.

5    Q.  You left Barnes & Noble earlier this year, correct?

6    A.  That is correct.

7    Q.  Before we get into your employment history and your titles

8    at Barnes & Noble, I want to ask you a couple of questions

9    about some of the documents you just spoke about with Mr.

10   Ederer.  Is that all right?

11   A.  OK.

12   Q.  If you could look at Plaintiff's Exhibit 195.  Do you have

13   that in front of you?  That's the patent application.

14   A.  I do.

15   Q.  This patent application was filed in October 2010, is that

16   right?  Maybe I can help you out a little bit there.  If you

17   look on the left-hand side, do you see the left-hand column of

18   that document?

19   A.  Yes, I do.

20   Q.  Under the title "Related U.S. Application Data," do you see

21   that?

22   A.  I do.

23   Q.  It refers to a continuation of an application and it states

24   an application number.  Do you see that?

25   A.  I do.

1   Q.  It says that application was filed on October 19, 2010, do

2   you see that?

3   A.  Yes.

4   Q.  Is that your understanding of when this application was

5   filed?

6   A.  I was generally aware that the application was filed during

7   my tenure with the company.  I don't recall the specific dates

8   as to when.

9   Q.  Do you have any reason to doubt that this application was

10  not filed on October 18, 2010?

11  A.  No.

12  Q.  Are you aware that one of the patents in this case that was

13  developed by Discovery also relates to ebook lending?

14  A.  I'm not familiar with the specific patents in question, but

15  I believe that lending is a specific use case.

16  Q.  You never read the Discovery lending patent at issue in

17  this particular litigation, is that right?

18  A.  That is correct.

19  Q.  Are you aware that that Discovery patent issued three years

20  earlier, in 2007?

21  A.  I was not.

22  Q.  You have never compared the Discovery lending patent to the

23  patent application that we are viewing here as Plaintiff's

24  Exhibit 195, is that right?

25  A.  No, I have not.

1   Q.  I would like to direct your attention to Defense Exhibit

2   863, which is the notice of allowance.  Do you see that?

3   A.  I do.

4   Q.  If you can turn to page 3.  I apologize.  There are

5   actually a couple of page 3s on this one.  After you get to the

6   notice of allowability, there is another page 3 on there.  At

7   the top of the page it says, "Please amend the claims as

8   follows."  Do you see that?  It's right up on the screen right

9   now.

10  A.  I will quickly navigate there.  I see it.

11  Q.  Are you familiar with the invention that actually became

12  the issued claims in this notice of allowance here?

13  A.  No, I'm not familiar with it.

14  Q.  If you look down to the second step of this particular

15  claim 1 here, do you see the line at the paragraph that begins

16  with the word "Generating"?

17  A.  OK.

18  Q.  It talks about generating a lending notice, do you see

19  that?

20  A.  Yes, I see it.

21  Q.  Then it talks about in the next line wherein the lending

22  notice comprises an email, do you see that?

23  A.  I do.

24  Q.  The next paragraph begins with the word "transmitting."  Do

25  you see that word?

1    A.  I do.

2    Q.  That line refers to transmitting an email to the lendee, do

3    you see that?

4    A.  Yes, preventing access to the lender, I see that.

5    Q.  Is it your understanding that the claims at issue in this

6    notice of issuance that we are looking at here in Defense

7    Exhibit 863 involved the generating and transmitting of email?

8    A.  Again, I have not read this document in its entirety, so I

9    wouldn't be able, without a more thorough review, be able to

10   comment.

11   Q.  Do you know if generating and sending email has any

12   relevance to the Discovery lending patent at issue in this

13   case?

14   A.  I believe that email is used as a mechanism to communicate

15   some aspects of the loan request.

16   Q.  I'm not referring to the Barnes & Noble patent application.

17   I'm referring to the Discovery patent, the ebook lending patent

18   that you said you never reviewed.  Is it your understanding

19   that email, sending email, has anything to do with that patent,

20   or do you know?

21   A.  I wouldn't be able to comment.

22   Q.  I want to talk about your time at Barnes & Noble now, if I

23   could.  OK?

24   A.  OK.

25   Q.  Prior to your departure, you were the vice president of

1   software engineering at Barnes & Noble, is that right?

2   A.  That is correct.

3   Q.  You held that vice president position in the Nook Media

4   Division of Barnes & Noble, right?

5   A.  That is correct.

6   Q.  In your role I believe you testified you had over a hundred

7   people reporting to you, is that correct?

8   A.  That is correct.

9   Q.  One of those individuals was a gentleman named Sudeep

10  Narain, is that right?

11  A.  That is correct.

12  Q.  He was a software developer on your team, correct?

13  A.  That is correct.

14  Q.  His title was principal architect, is that right?

15  A.  I believe so.

16  Q.  Were you Mr. Narain's boss?

17  A.  I was.

18  Q.  Do you remember being deposed in this case?

19  A.  Yes, I do.

20  Q.  It was last year, right?

21  A.  I don't remember the exact date, but yes.

22  Q.  In fact, I took your deposition --

23  A.  Sometime last year.  Yes, that's where I met you.

24  Q.  Prior to your deposition, you spoke to Mr. Narain, is that

25  right?

1   A.   That's correct, yes.

2   Q.   You reached out to Mr. Narain to refresh your recollection

3   about certain functional capabilities of the Nook products, is

4   that right?

5   A.   I just wanted to firm my understanding of some of the

6   features.

7   Q.   One of the things you talked about with Mr. Narain was how

8   the Nook devices communicate with the Barnes & Noble cloud as

9   that relates to the lending feature, is that right?

10   A.   I believe that was one of the topics we covered.

11   Q.   We are talking about the word "cloud" here.  We are talking

12   about a bunch of networked computer servers used for some sort

13   of a centralized storage, is that accurate?

14   A.   It's probably not centralized storage.  It's more the user

15   accounts, the information, the data, all that would be the

16   cloud.

17   Q.   Of your team of over a hundred people, you chose to speak

18   specifically with Mr. Narain, riot?

19   A.   That is correct.

20   Q.   To prepare you for the deposition, that is?

21   A.   That is correct.

22   Q.   The reason you spoke with him or chose to speak with him is

23   because he was the most up to date regarding how the lending

24   feature worked, is that right?

25   A.   That was my understanding at the time.

1   Q.  Of all the people on your team, correct?

2   A.  That's correct.

3   Q.  You thought that because of the type of work he's done in

4   the past, right?

5   A.  That is correct.

6   Q.  Specifically, the type of work he's done with the lending

7   feature used on the Nook devices, correct?

8   A.  That is correct.

9   Q.  Is it fair to say that Mr. Narain knows more information

10  about the lending feature on the Nook devices than you or any

11  of the other members on your former team?  I'll tell you what,

12  let's make the question a little easier so you don't have to go

13  through a hundred people in your head.  Is it fair to say that

14  Mr. Narain knows more about the lending functionality on the

15  Nook devices than you do?

16  A.  I would say he may have a little bit more specific

17  knowledge with the specific code.

18  Q.  I want to talk a little bit about the actual functionality,

19  if we can.  The lending feature that is offered on a Nook

20  device, that is called Lend Me, is that right?

21  A.  That's correct.

22  Q.  That's L-E-N-D capital M-E?

23  A.  Yes.

24  Q.  The lending feature was available or has been available on

25  the Nook devices since the release of the Nook 1st Edition in

Eaoaadr2                    Mulchandani

1   2009, correct?

2   A.  Correct.

3   Q.  You started at Barnes & Noble in January 2010, right?

4   A.  That is correct.

5   Q.  You started after Barnes & Noble had already begun selling

6   devices with the lending functionality, correct?

7   A.  That is correct.

8   Q.  I take it you were not involved in the development of the

9   lending functionality, is that right?

10  A.  It's probably better to say that I wasn't involved in the

11  initial development of the feature.  But obviously, subsequent

12  to me coming on board with Barnes & Noble, by virtue of the

13  fact that the software engineering team reported to me, that

14  for future products I was involved in any ongoing development

15  and enablement of this feature.

16  Q.  I'll ask the question slightly differently, then.  Is it

17  fair to say you were not involved in the initial development of

18  the lending feature?

19  A.  Yes.  That was before my time with Nook.

20  Q.  In your binder I want to turn your attention to several

21  exhibits.  That's that big binder right in front of you there.

22  What I want to direct your attention to is Exhibits 19, 21, 24,

23  26, 28, 29, 31, and 33.  It might be easier to look at the

24  table of contents there.  Then you can flip to the actual

25  documents if you need a moment to take a look.  OK?

1   A.  OK.  To clarify, you mentioned 19 through 33?

2   Q.  It was 19, 21, 24, 26, 28, 29, 31, and 33.

3   A.  Got it.

4   Q.  That would be tabs 5 through 12 in your binder.

5   A.  I see it.

6   Q.  Do you recognize these documents as the user guides for the

7   Nook devices sold by Barnes & Noble?

8   A.  They seem to be.

9   Q.  Is it correct that you learned about the Lend Me feature by

10  reading these user guides?

11  A.  It's true my initial understanding of these features came

12  from the user guides.

13  Q.  Isn't it the case that most of your functional

14  understanding of the lending feature came from these user

15  guides?

16  A.  I would say that from a user perspective it was very

17  important for me to understand how in the general case we were

18  expressing our features to end customers.  But internally,

19  obviously, where the need arose, I basically did dive into the

20  specific design or implementation of the features where

21  necessary.  So, I did familiarize myself with this feature over

22  the course of my tenure with Nook and, where needed, got into

23  specifics with my engineering team as appropriate.

24  Q.  We talked about your deposition a few moments ago, do you

25  recall that?

1    A.   Yes.

2    Q.   You testified under oath at that deposition, correct?

3    A.   That is correct.

4          MR. CABRAL:   If I can, I would like to identify for

5    the Court several lines from Mr. Mulchandani's deposition.

6          THE COURT:   It won't do me any good if you don't give

7    me a copy of the deposition.   OK, go ahead.

8    Q.   I would like to direct your attention to page 75 of the

9    deposition transcript, lines 14 through 21.

10   A.   Is that something --

11         THE COURT:   Hold on.   You want to read those?

12         MR. CABRAL:   Yes, your Honor.

13         THE COURT:   Any objection?

14         MR. EDERER:   Same objection that appears in the

15   document.

16         MR. CABRAL:   Your Honor, may I proceed?

17         THE COURT:   That objection was to the question.   The

18   portion of the answer that he is relying on here is

19   independent, has independent evidentiary value regardless of

20   the wording of the question.   The objection is overruled.   Go

21   ahead.

22         MR. CABRAL:   Thank you, your Honor.

23   Q.   I am going to read you a portion of your deposition

24   transcript, if that's OK.

25   A.   Please.

488

Q.  "Q.  Are you aware of any documents describing the

operation of the Lend Me feature?

"A.  Again, I wouldn't be able to qualify whether such

documents, you know, what exists, but I would say that most of

my functional understanding of the feature has come from a user

guide."

          That was your testimony at your deposition, do you

agree with that?

A.  Seems to be.

Q.  I'll ask you the same question I asked you just a few

moments ago.  Is it fair to say that most of your functional

understanding of the lending feature came from reviewing the

user guides for the Nook devices?

A.  As I qualified, I think the way that I have come to

appreciate the feature from a user perspective is definitely

the user guide.  Again, the user guide is not an embodiment of

how we design or architect or implement the feature.

Q.  You are not aware of any other technical documents relating

to the design or development of the Lend Me feature other than

these user guides that we put in front of you, is that right?

A.  To the best of my knowledge, I just used the user guide.  I

wasn't aware of any other documents.

Q.  These user guides were created by individuals at Barnes &

Noble with knowledge regarding how the Nook devices worked, is

that right?

1   A.  I believe so.

2   Q.  The user guides were created and kept in the regular course

3   of Barnes & Noble's usual business activities, is that right?

4   A.  I believe so.

5   Q.  Barnes & Noble makes these user guides available to their

6   customers, correct?

7   A.  They do.

8   Q.  Barnes & Noble generally strives to provide accurate

9   information regarding the features of the Nook devices in its

10  user guides, is that right?

11  A.  We make best efforts to make sure the information in them

12  was accurate.

13          MR. CABRAL:  Your Honor, I would like to move and

14  enter into evidence Plaintiff's Exhibits 19, 21, 24, 26, 28,

15  39, 31, and 33, which are the user guides for the accused Nook

16  devices.

17          THE COURT:  Any objection?

18          MR. CABRAL:  I apologize, your Honor.  I believe I

19  said 39.  I meant to say 29.  I apologize for that.

20          THE COURT:  OK.

21          MR. EDERER:  No objection, your Honor.

22          THE COURT:  Received.

23          (Plaintiff's Exhibits 19, 21, 24, 26, 28, 29, 31, and

24  33 received in evidence)

25  Q.  I would like to direct your attention to Plaintiff's

1    Exhibit 19, which should be tab 5 in your binder.

2    A.   Got it.

3    Q.   Do you recognize this document as the user guide for the

4    Nook 1st Edition?

5    A.   I do.

6    Q.   Could you turn to page 131 of that document.

7    A.   Sure.

8    Q.   I would like to direct your attention to the top of the

9    page under the heading "Lending ebooks."  Do you see that?

10   A.   I do.

11   Q.   Under the heading "Lending eBooks" the manual states, "With

12   Lend Me technology from Barnes & Noble, you can share ebooks

13   from Nook to Nook."  Do you see that?

14   A.   I do.

15   Q.   That's what I want to talk to you about right now, the

16   lending of ebooks using the actual Nook devices.  OK?

17   A.   OK.

18   Q.   I am not interested in the website or the shop application

19   or the other ways of lending that Mr. Ederer talked to you

20   about.  OK?

21   A.   Understood.

22   Q.   There is an arrow under the heading "Rules" on the same

23   page, do you see that?

24   A.   I see it.

25   Q.   Right under the arrow there is a bullet point.  Do you see

1    that first bullet point under the arrow?

2    A.   The one that starts with "A loan is for 14 calendar days"?

3    Q.   That's exactly right.

4    A.   OK.

5    Q.   Right there the document states, "A loan is for 14 calendar

6    days, counting the day on which the lending offer is received.

7    A lent ebook is automatically returned at the beginning of the

8    15th calendar day."  In parentheses it states, "if the borrower

9    has not returned it more quickly."  Do you see that?

10   A.   I see it.

11   Q.   Do you agree that the lending window for the lending

12   feature is approximately 14 days?

13   A.   Again, as I stated earlier, as governed by our cloud, we

14   strive to give the user 14 days to enjoy a loaned book.

15   Q.   So the answer to the question is yes, the lending period is

16   14 days?

17   A.   Yes.

18   Q.   During the 14-day lending window, is it accurate that the

19   loan recipient is allowed to open and access the loan content?

20   A.   During the lending phases, they have gone through all the

21   steps I previously covered.  If they are within that window

22   agreed upon by the cloud, then yes, they can open and read the

23   content.

24   Q.   So the answer to the question is yes, the loan recipient

25   has access --

```
 1              MR. EDERER:  Objection, your Honor.  That misstates
 2   his testimony.
 3              THE COURT:  I don't think he finished his question.
 4   Why don't you rephrase it.
 5              MR. CABRAL:  Thank you, your Honor.
 6   Q.  Is it accurate that during the 14-day lending window the
 7   loan recipient has access to the loaned electronic book?
 8   A.  If they have accepted the offer and, again, as I stated
 9   earlier, all the steps are successfully completed, then the
10   user would have access to the book.
11   Q.  Is it also accurate that during the 14-day lending window
12   the loan recipient can display the loaned electronic book on
13   his or her Nook device?
14   A.  If you mean just gain access to it and see it as part of
15   your library -- is that what you mean?
16   Q.  That's exactly what I mean, yes.
17   A.  Then yes, you would see that book as part of your library.
18   Q.  After the 14-day lending window expires, the loan recipient
19   ceases to have access to the loaned content, is that right?
20   A.  That's generally true, yes.
21   Q.  After the 14-day lending window expires, the loaned book is
22   physically deleted from the loan recipient's Nook device, isn't
23   that true?
24   A.  Yes.  We effectively disallow any further reading of that
25   content, and subsequently the book is deleted from the user's
```

1    device.

2    Q.  So the loaned electronic book is deleted from the loan

3    recipient's device, correct?

4    A.  At some point, yes.

5    Q.  After the 14-day window expires, I guess?

6    A.  Yes.

7    Q.  Is it accurate to state that the Barnes & Noble cloud keeps

8    track of how much time is left for a loan?  Is that right?

9    A.  That is correct.

10   Q.  But you agree that the Nook device and the Barnes & Noble

11   cloud coordinate with one another to enforce the lending

12   window, right?

13   A.  No.  The cloud is the sole governor.  As I mentioned, the

14   device is effectively a servant in that process.  The cloud

15   continues to count down irregardless of what's happening on the

16   device.  If the cloud instructs that the lending window has

17   finished, the device has to oblige and does not allow access

18   anymore.

19        MR. CABRAL:  I would like to identify for the Court a

20   portion of Mr. Mulchandani's deposition testimony beginning on

21   page 104,line 24 and proceeding to page 105, line 7.

22        THE COURT:  Any objection?

23        MR. EDERER:  I'm sorry.  What was the ending?

24        MR. CABRAL:  Line 7.

25        MR. EDERER:  I have no objection to the question and

 1   answer, your Honor.  It is incomplete.

 2            THE COURT:  Excuse me?

 3            MR. EDERER:  We can deal with the issue of

 4   incompleteness later.  I don't have any objection to that

 5   question and that answer.

 6            THE COURT:  All right, you may read it.

 7   Q.  "Q.  Now, you said that the device and the cloud work

 8   together in some way for the enforcement of the lending window,

 9   is that fair?

10   "A. As I understand it, in general terms, they -- yes, the

11   device and cloud do coordinate with each other."

12            Was that your testimony

13   A.  Seems to be.

14   Q.  Are you saying today that they do not in fact coordinate

15   with each other, that is, the device and the cloud, to enforce

16   the lending window?

17   A.  The specific question you asked me is the governance of the

18   lending window specifically, which, as I mentioned, was

19   governed by the cloud solely.  If you are asking the question

20   as to whether the cloud and server -- sorry -- the device and

21   cloud coordinate in terms of user access to a specific piece of

22   content, they clearly have to.  Obviously, the device has to

23   delete the content, make it unavailable for reading.  So it

24   just depends on the nature of the question.

25   Q.  If you wanted to know for sure if the cloud and the Nook

 1   devices coordinated with each other to enforce the lending

 2   window, would Mr. Narain be a good person to ask?

 3   A.  I'm able to confirm that as well.  I'm sure Sudeep would

 4   confirm that, too.

 5   Q.  If you could turn to page 136 of the user manual for the

 6   Nook 1st Edition.  I want to direct your attention toward the

 7   bottom third of the page under the heading "Delivery and

 8   Download."  Do you see that?

 9   A.  I do.

10   Q.  Under that heading the user guide reads, "When you accept a

11   lending offer, the ebook is delivered to your online digital

12   library and automatically downloaded to your Nook."  Do you see

13   that?

14   A.  I do.

15   Q.  You don't dispute that the download of the loaned

16   electronic book is automatic when a user accepts a loan offer

17   from a Nook device, do you?

18   A.  I think the language that's presented here is, again, being

19   presented more as how we explain it to a user.  It's a very

20   different sequence of steps, which I think I already walked

21   through in terms of how the actual physical lending process is

22   exercised from a systems point of view between our cloud and

23   device.

24   Q.  With respect, sir, I'm not sure that you answered the

25   question I asked.  Do you dispute that the download of the

1   loaned electronic book is automatic when a user accepts the

2   loan offer from a Nook device?

3   A.  I would say that if I were answering this as a user, which

4   is whether they have to participate in the download of the

5   book, and again in the happy path case, the device would, upon

6   receipt of the appropriate information from the cloud, as I

7   mentioned, the URL and the keys, it would automatically

8   initiate the download from Akamai to pull down the book.

9   Q.  From the user's perspective, the download happens

10  automatically upon accepting a loan offer on the Nook device,

11  correct?

12  A.  Not exactly.  As I mentioned, the user accepts, the cloud

13  transaction occurs to start the clock, the keys that download

14  URL come down, the keys are stored, the book is downloaded

15  separately from the cloud, and then the transaction is

16  completed.  It's just that it's not one atomic operation in

17  that these things are all one operation.  They are a series of

18  independent steps.

19  Q.  My question was directed to the user's perspective.  The

20  user doesn't see any of what you just said actually happen,

21  does he?

22  A.  That is correct.  But in terms of the user case, I'm just

23  trying to highlight the fact that the download step is kind of

24  an independent step in the process.

25  Q.  From the user's perspective, the user hits accept of a loan

1    request on the device, and the loaned electronic book is

2    automatically downloaded to the Nook device, isn't that right?

3    A.  That is correct.  From a user perspective, that is.

4    Q.  You testified earlier, if I recall, the length of time it

5    takes from the acceptance of the loan offer on the Nook device

6    to the time a download begins.  Do you recall that?

7    A.  Yes.

8    Q.  You said in a happy path scenario that could take as little

9    as a few seconds, right?

10   A.  Possibly.  Again, the happy path is the important piece

11   here, which is everything has to go swimmingly well.

12   Q.  By happy path scenario, you are referring to a normal

13   course of events without any problems associated with the wi-fi

14   connection or storage or anything like that, right?

15   A.  Generally, yes.

16   Q.  I would like to shift gears a bit and talk about the shop

17   feature, if that's OK.

18   A.  Sure.

19          THE COURT:  If you are about to shift gears, since we

20   are going to end in about four minutes, maybe this would be a

21   good time to end and we will pick up in the morning.

22          MR. CABRAL:  It would be a perfect time, your Honor.

23   Thank you.

24          THE COURT:  Ladies and gentlemen, tomorrow the bad

25   news is we will start promptly at 9:00 a.m.  The good news is

1   you will end, not me unfortunately, at 3:30 because of another

2   matter that came up over the weekend and I have to handle it at

3   3:30 tomorrow.  So be in the jury room at 9:00 a.m., and we

4   will start promptly, and we will continue through 3:30 but no

5   later tomorrow.  Have a good evening.  We will see you tomorrow

6   morning.

7              (Jury not present)

8              THE COURT:  How much longer do you have on cross for

9   this witness?

10             MR. CABRAL:  Not a tremendous amount of time, your

11  Honor.  I would estimate about 20 minutes.

12             THE COURT:  You may step down.  We will see you

13  tomorrow at 9 o'clock.

14             MR. CABRAL:  Your Honor, if we can get an instruction

15  to the witness?

16             THE COURT:  Yes.  Basically, don't discuss the case

17  with anyone.  I know that is a terrible hardship, but bear with

18  it as best you can.

19             THE WITNESS:  I will.  Thank you, your Honor.

20             THE COURT:  Who is the next witness?

21             MR. CABRAL:  The next witness is our infringement

22  expert, Brian Berk, your Honor.

23             THE COURT:  Very good.  I will note for the record, I

24  meant to mention this earlier, that I also sent to counsel over

25  the weekend my rulings on the Daubert challenges.  Those are

Esagacr3

1    completed.

2            Unless counsel tells me otherwise, I think there are

3    no open matters for me.  I think we have dealt with all open

4    matters.  Is that right?  Are there any motions hanging out

5    there somewhere that still need to be resolved?

6            MR. EDERER:  Your Honor, I would note that I believe

7    there are two motions in limine that you indicated you were

8    going to push off.

9            THE COURT:  Remind me which ones they were.

10           MR. EDERER:  L and J.  One deals with preclusion of

11   evidence relating to revenues, profits, and investments.  The

12   other relates to the presentation of artificially high damages

13   amounts.

14           THE COURT:  I needed something to keep me up tonight,

15   and now I have something.  We will deal with that tomorrow.

16   See you tomorrow.

17           MR. SHARIFAHMADIAN:  Your Honor, if we may, is it

18   possible to get clarification on whether there will be a court

19   session on Friday or not?

20           THE COURT:  Yes, I think we are going to need to have

21   a court session on Friday.  Just Friday morning, not Friday

22   afternoon.

23           MR. SHARIFAHMADIAN:  Thank you.  We have a couple of

24   depositions for which we do not have videos.  Does your Honor

25   prefer that we bring somebody to read the deposition?

```
 1              THE COURT:  You don't have to bring them.  You have a
 2    cast of thousands here.  Just have one of them read the
 3    questions and one of them read the answers.
 4              MR. SHARIFAHMADIAN:  That's what we will do.
 5              THE COURT:  Very good.  Are there any of those that I
 6    need to rule on?
 7              MS. ARNI:  There are some objections.
 8              MR. SHARIFAHMADIAN:  There may be some objections.
 9              THE COURT:  When we break right now, have your
10    colleague tell my law clerk which those are so I can --
11              MR. SHARIFAHMADIAN:  That is still several days off.
12              THE COURT:  Very good.  Anything else?
13              MR. EDERER:  Yes, your Honor.  I think this is
14    something we may be able to work out with counsel.  We
15    understood that they were calling one of our witnesses after
16    Mr. Mulchandani, I'm not sure in quite what order, a fellow
17    named Jim Hilt, who has traveled here.  He is also a former
18    Barnes & Noble employee who lives in Ohio.  He is expected to
19    be called tomorrow.  Now I'm not entirely clear whether he is
20    going to be called at all or when.  I just want to get some
21    clarification.
22              THE COURT:  I agree with you.  Take it up with
23    adversary counsel.  If there is still a problem, let me know.
24              Very good.  Thanks very much.
25              (Adjourned to 9:00 a.m., October 15, 2014)
```

```
1                              INDEX OF EXAMINATION

2    Examination of:                              Page

3    DEEPAK MULCHANDANI

4    Direct By Mr. Ederer . . . . . . . . . . . . 413

5    Cross By Mr. Cabral  . . . . . . . . . . . . 478

6                          PLAINTIFF EXHIBITS

7    Exhibit No.                                Received

8     195  . . . . . . . . . . . . . . . . . . . 425

9     19, 21, 24, 26, 28, 29, 31, and 33  . . . . . 489

10                         DEFENDANT EXHIBITS

11   Exhibit No.                                Received

12    863  . . . . . . . . . . . . . . . . . . . 426

13    754  . . . . . . . . . . . . . . . . . . . 465
```