UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------

ADREA, LLC,

              Plaintiff,

        -v-

BARNES & NOBLE, INC.,
BARNESANDNOBLE.COM LLC, and NOOK
MEDIA LLC,

              Defendants.
------------------------------------



13 Civ. 4137(JSR)

MEMORANDUM ORDER

JED S. RAKOFF, U.S.D.J.

      Plaintiff Adrea, LLC brought this action against defendants Barnes & Noble, Inc., Barnesandnoble.com LLC, and NOOK Media LLC (collectively, "B&N") for infringement of three of its patents: U.S. Patent Nos. 7,298,851 ("the '851 patent"), 7,299,501 (the "'501 patent") and 7,620,703 (the "'703 patent"). See Adrea, LLC v. Barnes & Noble, Inc., No. 13-cv-4137, 2014 WL 3057902, at *1 (S.D.N.Y. July 1, 2014) (describing the patents-in-suit). Following trial, a jury returned a verdict that the '851 patent was not infringed but that the '501 and '703 patents were valid and infringed, and awarded plaintiff $1.33 million in compensatory damages. Currently before the Court are two formal motions, as well as letter briefing on a separate issue. First, defendant B&N moves for judgment as a matter of law under Fed. R. Civ. P. 50 overturning the jury's verdict on infringement and validity with respect to the '703 patent.[1] See Jury's Verdict dated

---

[1] B&N also moves for judgment as a matter of law reversing the jury's verdict with respect to the '501 patent to preserve its positions in

Nov. 4, 2014, ECF No. 145. Second, plaintiff Adrea asks the Court to reconsider its grant of partial summary judgment to B&N dismissing Adrea's claim of induced infringement of Claim 1 of the '851 patent. See Memorandum Order dated July 1, 2014, ECF No. 85. Finally, because the jury did not allocate the $1.33 million award between the '501 and '703 patents and the Court subsequently found that the '501 patent was invalid, see Memorandum Order dated July 24, 2015, ECF No. 182, the parties have submitted letter briefing on how to allocate the damages award and whether a new trial on damages is necessary.

First, the Court denies B&N's motion for judgment as a matter of law under Rule 50 or, alternatively, for a new trial, seeking to overturn the jury's findings of infringement and validity of the '703 patent.[2] For a court to grant judgment under Rule 50, there must be "such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or . . . such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a [contrary] verdict." Stampf v. Long Island R.R. Co., 761 F.3d 192, 197 (2d Cir. 2014) (internal quotation mark omitted). A new trial may be granted under Rule 59 if "the jury has reached a

---

case the Court's ruling on the '501 patent's invalidity (see infra) is overturned on appeal.

[2] As an initial matter, Adrea claims that B&N has waived many of its Rule 50(b) arguments by not raising them in its Rule 50(a) motions. B&N adequately put Adrea on notice that it would be raising arguments against all of Adrea's claims. See Tr. 912:9-13; Tr. 1378:24-1379:1. Regardless, the Court need not reach the waiver issue because it denies B&N's motion on the merits.

seriously erroneous result or [its] verdict is a miscarriage of justice." Nimely v. City of New York, 414 F.3d 381, 392 (2d Cir. 2005) (alteration in original). Overall, "jury verdicts should be disturbed with great infrequency." ING Global v. United Parcel Service Oasis Supply Corp., 757 F.3d 92, 97-98 (2d Cir. 2014).

The '703 patent describes devices and methods for retrieving information related to the usage context of devices and discusses embodiments where the device is configured to retrieve information about the usage context of the device without a web browser. Adrea asserted infringement of five claims of the '703 patent: independent Claim 1, plus dependent Claims 2 and 3, and independent Claim 13, plus dependent Claim 15. The infringing device, the B&N Nook, is an e-reader that allows readers to shop online for books, download them, and read them on a handheld electronic device. The Nook connects to home internet networks, and readers browse the Nook's online bookstore by pressing a "Shop" button on the device which retrieves a bookstore shopfront website from a server.

In its instant motion, B&N first argues that no reasonable jury could have found that B&N infringed Claims 1, 2, or 3. Claim 1, the independent claim in this group, reads as follows:

> 1. A consumer appliance, comprising: an input component responsive to a user-input for initiating retrieval of data by the consumer appliance from a server based on a predetermined URL or an identifier associated with the consumer appliance, the data representing content information about the context of usage of the consumer appliance, wherein the consumer appliance does not require a user to access a web browser or other device in order for the consumer appliance to initiate retrieval of the data.

'703 Patent col. 9 l. 46-55. The key limitation of Claim 1 is that a user does not need to access a web browser for the device to retrieve the relevant data. B&N argues that this limitation must be met literally because it was added by amendment to overcome an examiner's rejection. See Declaration of Louis S. Ederer in Support of Defendants' Motion Pursuant to Rule 50 for Judgment as a Matter of Law or in the Alternative for a New Trial Ex. 4 at ADREA0059384, ECF No. 186; Integrated Tech. Corp. v. Rudolph Techs, Inc., 734 F.3d 1352, 1356 (Fed. Cir. 2013). B&N claims that all of the evidence at trial established that the Shop application on the Nook is a web browser. Moreover, the Shop application retrieves the relevant data, the storefront webpage, from the B&N server. Accordingly, in B&N's view, the Nook cannot infringe Claim 1.

While B&N is correct that some evidence from the trial supports its view of the Shop application as a web browser, there is ample evidence cutting the other way on which a jury could base a reasonable verdict. Specifically, although B&N demonstrated that users can follow links in the Shop application to access Twitter, Facebook, and, through Twitter or Facebook, third-party web pages, this was confined to clicking on links to navigate the wider internet, unlike, for instance, a full browser where a URL can be entered. Tr. 463:18-469:14; 525:2-526:6. B&N's own witness described the Shop application as a "special browser" rather than a web browser. Tr. 523:11-13. Adrea also presented evidence that Nooks have a dedicated web browser,

separate from the Shop application, and one witness, Mr. Narain,
stated in videotaped deposition testimony played to the jury that
Nooks lacking a general web browser but including a Shop application
did not include a web browser. Tr. 520:24-521:11; 522:3-523:5;
Declaration of Coli Cabral in Support of Plaintiff's Opposition to
Defendants' Motion Pursuant to Rule 50 for Judgment as a Matter of Law
or in the Alternative for a New Trial Ex. B at 5, ECF No. 194-2.
Adrea's expert, Mr. Berg, testified that web browsers must allow a
user to go anywhere on the internet, whereas the Shop application
"only allows you to see what [B&N] wants you to see." Tr. 683:11-
684:4. On the basis of this evidence, the jury could have reasonably
concluded that the Shop application is not a web browser.

Adrea also points to evidence that pressing the Nook's Shop
button immediately initiates retrieval of data, namely, the storefront
webpage, from the B&N server, and concludes that therefore a user does
not need to do anything with the Shop application after pressing the
Shop button to initiate retrieval of data. Tr. 507:13-16; 788:20-
789:15; 1118:23-1119:2. B&N has a fair argument that attempting to
separate out the launching of the Shop application and the initiation
of data retrieval is impossible, but a reasonable jury could have come
out the other way based on the evidence presented at trial.

Claim 2 of the '703 patent depends on Claim 1 so the foregoing
analysis also applies to Claim 2, but Claim 2 additionally describes
the consumer appliance of Claim 1 "configured for use on a home
network and having an Internet-access functionality through the home

5

network." '703 Patent col. 9 l. 57 – col. 10 l. 2. B&N argues that because the user, and not B&N, connects the Nook to a home network, the Nook does not infringe Claim 2. But Adrea presented evidence that the Nooks are configured for use on a home wi-fi network. Tr. 685:8-17; Tr. 1127:15-19. While it is true that Nooks must be taken out of their boxes and turned on and a home network selected, the user does not need to take any steps beyond this minimal setup process, and a reasonable jury could have concluded that they were accordingly "configured" for home use.

B&N states in a heading that no reasonable jury could find that it infringed on Claim 3 of the '703 patent. However, it does not present any specific argument on Claim 3. Because Claim 3 depends on Claim 1, the foregoing analysis applies, and B&N's implied arguments against infringement of Claim 3 fail. Accordingly, a reasonable jury could have found that the Nook infringed Claims 1, 2, and 3 of the '703 patent.

B&N next argues that no reasonable jury could have found that B&N infringed Claims 13 or 15. Claim 13, the independent claim, reads as follows:

> 13. A method of enabling a service provider to provide a service via the Internet to a user of a consumer appliance having a predetermined identifier, the identifier being stored on a home network that includes the consumer appliance, the method comprising: enabling the user by a single user input to the consumer appliance to have the consumer appliance initiate sending a request with the identifier representative of a type of the consumer appliance to a server on the Internet through the home network; and based on the identifier, the server initiating access to a web page with content information about a context of using the consumer appliance.

6

'703 Patent col. 10 l. 40-52. Claim 15 describes "[t]he method of claim 13, further comprising creating a data base of URLs or identifiers per user." Id. col. 10 l. 55-56.

B&N first focuses on the "enabling step" of Claim 13, arguing that the Nook requires more than a "single user input" to intiate a request to a remote server. In particular, B&N points to trial testimony that Nooks must be turned on and connected to a home network before pushing the Shop button loads the Nook storefront. Tr. 734:19-735:6. Adrea responds that all electronic devices must be turned on to do anything and cites testimony from trial, including from B&N's own witnesses, that pressing the Nook's Shop button initiates retrieval of information from a server. See, e.g., Tr. 507:13-16; Tr. 788:20-789:15. On the basis of this evidence, a reasonable jury could have concluded that pushing the Nook's Shop button is a "single user input" that initiates a request to a remote serve.

B&N next focuses on Claim 13's language requiring that the device send "a request with the identifier representative of a type of the consumer appliance to a server on the Internet" and that, "based on the identifier, the server initiat[e] access to a web page." '703 Patent col. 10 l. 47-48, l. 50-51. Adrea claimed that when a user pressed the Shop button, the Nook would transmit a model number to B&N's servers that would initiate access to the Nook storefront webpage. The only witness to testify on this point, Mr. Mulchandani, testified that the model number sent by the NOOK is only used for

7

"logging and analytics purposes" and not to determine what information to send to the Nook. Tr. 455:17-457:1; Tr. 512:9-513:1. However, Adrea impeached Mr. Mulchandani with his deposition testimony as a 30(b)(6) witness, which contained the following exchange: "Q: And how does the server determine what data is appropriate for the device? A: "The model number for the device will help the server have some insight into the type of device it's talking to and the device might send some information on its own." Tr. 513:15-19. Based on this testimony, which was received for all purposes, a reasonable jury could have concluded that the storefront webpage the server transmitted to the Nook after receiving the model number was "based on the model number."

The foregoing analysis also applies to Claim 15 because Claim 15 depends on Claim 13. However, B&N also argues with respect to Claim 15 that there was no evidence presented at trial that the Nook "creat[es] a data base of URLs or identifiers per user." '703 Patent col. 10 l. 55-56. However, Adrea cites trial testimony that Nooks do perform this function. See Tr. 690:13-691:12; 1131:2-12. Accordingly, a reasonable jury could have concluded that the Nook infringed Claims 13 and 15 of the '703 patent.

B&N makes one final argument on the finding of infringement – that "the evidence was overwhelming that the Nook devices were not the invention contemplated by the '703 patent." Defendants' Memorandum of Law in Support of their Motion Pursuant to Rule 50 for Judgment as a Matter of Law or in the Alternative for a New Trial ("D. Mem.") at 14, ECF No. 184. The import of this argument is not entirely clear. To the

8

extent B&N means to argue that the Nook is not a consumer appliance within the meaning of the '703 patent, see id. at 15 n.8, the Court specifically construed the term "consumer appliance" to mean "a device that may send or receive information." Order at 7, ECF No. 60. B&N's own expert witness testified that the Nook falls under this construction, Tr. 1116:11-14, and a reasonable jury could conclude that the Nook is a "consumer appliance." Accordingly, the Court denies B&N's motion for judgment as a matter of law on infringement of the '703 patent.

B&N also moves for judgment as a matter of law on the validity of the '703 patent. The burden to establish invalidity of a patent on a motion for JMOL is "doubly high" because the movant must show that "no reasonable jury could have failed to conclude that [invalidity] had been established by clear and convincing evidence." Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp., 320 F.3d 1339, 1353 (Fed. Cir. 2003). B&N first argues that the '703 patent was obvious. A patent is invalid as obvious "if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art." 35 U.S.C. § 103. Except for a brief comment by Dr. Neuman, see Tr. 993:22-995:4, B&N's witnesses testified about anticipation, not obviousness. See Duro-Last, Inc. v. Custom Seal, Inc., 321 F.3d 1098, 1107 (Fed. Cir. 2003) ("Obviousness and anticipation are related, but legally distinct and separate challenges

to a patent's validity."). In the absence of substantial testimony from its own witnesses, B&N relies on the testimony of the inventor of the '703 patent, Mr. Shteyn, Adrea's witness. See D. Mem. at 16-17 (citing Tr. 209:14-23, 224:12-15, 225:18-23, 227:17-20, 228:11-13, 228:20-22). However, as Adrea correctly points out, Mr. Shteyn's testimony did not address in any real depth the elements of an obviousness inquiry, including "the scope and content of the prior art," "differences between the prior art and the claims at issue," and "the level of ordinary skill in the pertinent art." KSR Intern. Co. v. Teleflex Inc., 550 U.S. 398, 406 (2007). Nor were secondary considerations such as "commercial success, long felt but unsolved needs, [or the] failure of others" discussed. Id. Accordingly, B&N has not met the "high burden" of demonstrating that no reasonable jury could not have found obviousness.

B&N raises two separate arguments that the '703 patent was invalid because it was anticipated by earlier patents. "To show that a patent is invalid as anticipated, the accused infringer must show by clear and convincing evidence that a single prior art reference discloses each and every element of a claimed invention." Krippelz v. Ford Motor Co., 667 F.3d 1261, 1265 (Fed. Cir. 2012). "Moreover, a prior art reference may anticipate without disclosing a feature of the claimed invention if that missing characteristic is necessarily present, or inherent, in the single anticipating reference." Schering Corp. v. Geneva Pharm., 339 F.3d 1373, 1377 (Fed. Cir. 2003). B&N argues that the elements of Claims 1, 2, and 3 were disclosed or

inherent in the Munyan reference, U.S. Patent No. 5,761,485 (the "Munyan patent"), and that Claims 13 and 15 were disclosed in the Bolas reference, U.S. Patent No. 6,389,463 (the "Bolas patent").

The Munyan patent describes a "Personal Electronic Book System" which allows users to read e-books and other electronic media on a handheld device that downloads such materials from a server. See Munyan patent. B&N argues that Dr. Neuman testified that Claim 1 of the '703 patent is present in the Munyan patent. Tr. 987:16-995:14. In response, Adrea points out that Claim 1 of the '703 patent requires "retrieval of data by the consumer appliance from a server based on a predetermined URL or an identifier associated with the consumer appliance, the data representing content information about the context of usage of the consumer appliance." '703 Patent col. 9 l. 48-52. On cross-examination, Dr. Neuman stated that the Munyan patent does not include any predetermined URLS and does not expressly say that the security identification code, its closest thing to an identifier, is used to retrieve product recommendations. Tr. 1193:8-17; 1196:15-1197:7 Dr. Neuman did testify that one of ordinary skill in the art would understand that it was inherent in the Munyan patent that the security identification code would be used to retrieve product recommendations. Tr. 1195:6-1197:7. Dr. Neuman based this conclusion of inherent anticipation on the fact that, if the server does not recognize the security identification code sent by the Munyan device, it terminates the connection with the device. Id. If it accepts the code, it will send a list of items that are available. Id. A

11

reasonable jury could have heard Dr. Neuman's testimony, particularly about whether any recommendations are "based on" a security code, and concluded that the Munyan reference does not necessarily contain all the elements of Claim 1. In particular, a jury could have concluded that the security identification code in the Munyan reference merely terminates or sustains the connection between the device and the server and is not involved with transmitting any recommendations or "content information about the context of usage of the consumer appliance." '703 Patent col. 9, l. 51-52. Accordingly, B&N has not demonstrated that no reasonable jury could fail to find anticipation of Claim 1 or, by extension, dependent Claims 2 and 3.

B&N also argues that Claims 13 and 15 were anticipated by the Bolas patent. The Bolas patent described an internet radio that displays information about the song and station the user is listening to. See Bolas patent. B&N relies on the testimony of Dr. Neuman to argue that Bolas discloses the elements of Claims 13 and 15. Tr. 995:15-1001:7, 1212:21-1214:9. However, Adrea's expert, Dr. Wang, addressed the sufficiency of the Bolas patent's disclosures with respect to three of Claim 13's limitations. This testimony was not "conclusory," as B&N characterizes it. Instead, Dr. Wang explained why the Bolas patent does not disclose specific elements. See, e.g., Tr. 1359:1-15-1361:7. Moreover, Dr. Neuman testified on direct examination that Bolas does not disclose certain elements of Claim 13, namely, an "identifier representative of a type of the consumer appliance." '703

patent col. 10, l. 47-48; see Tr. 998:4-9.[3] Further, Dr. Neuman

admitted on cross-examination that the pseudo-code disclosed in the

Bolas patent does not use a serial number to initiate a retrieval of

data as described in the '703 patent. Tr. 1200:9-1202:7; see also Tr.

1360:5-13 (Wang testifying that "the serial number is not used at

all"). In sum, there was ample testimony on which a reasonable jury

could find that the Bolas patent did not anticipate Claim 13 or 15 of

the '703 patent. For the foregoing reasons, B&N's motion for JMOL or,

alternatively, a new trial, is denied in full.

Second, the Court denies Adrea's motion for reconsideration of

the Court's grant of summary judgment dismissing Adrea's claim of

induced infringement of Claim 1 of the '851 Patent. The standard for

granting a motion for reconsideration "is strict, and reconsideration

will generally be denied unless the moving party can point to

controlling decisions or data that the court overlooked – matters, in

other words, that might reasonably be expected to alter the conclusion

reached by the court." Shrader v. CSX Transp. Inc., 70 F.3d 255, 257

(2d Cir. 1995).

The Court's summary judgment decision on induced infringement

rested on two grounds. See Memorandum Order dated July 1, 2014, at 7-

---

[3] B&N tries to dismiss this point by arguing that Adrea is
contradicting itself by claiming that the Bolas serial number is not a
representative identifier when discussing validity, but that the
Nook's serial number is representative when discussing infringement.
Leaving aside that the Bolas and Nook serial numbers are not
necessarily the same thing, B&N appears to have misstated Adrea's
argument, which is that the Nook's model number, not its serial
number, infringes the representative identifier element of Claim 13.
Dr. Neuman's testimony does not contradict this point.

8, ECF No. 85. First, according to Limelight Networks, Inc. v. Akamai Technologies, 134 S. Ct. 2111 (2014)("Akamai II"), induced infringement liability under § 271(b) cannot not exist where no direct infringement under § 271(a) has occurred. Second, induced infringement liability requires evidence of specific intent to induce another's infringement. See DSU Med Corp. v. JMS Co., Ltd., 471 F.3d 1293, 1306 (Fed. Cir. 2006). Adrea has failed to show that either of these two grounds has materially changed since the Court rendered its decision. Akamai II remains in full force, and Akamai Technologies, Inc. v. Limelight Technologies, Inc., 797 F.3d 1020 (Fed. Cir. 2015)(en banc)(per curiam)("Akamai III"), concerned § 271(a) claims of direct infringement, not § 271(b) claims of induced infringement. Adrea argues that Akamai III did affect § 271(b) claims because it expanded § 271(a) liability and Akamai II held that § 271(b) liability depends on the existence of underlying direct infringement. This argument is premature. Although the Supreme Court did invite the Federal Circuit to reconsider the scope of § 271(a) liability, it did not discuss how any expansion of § 271(a) would change its decision regarding § 271(b). Akamai III does not mention § 271(b).

In addition, Adrea has not raised any new questions of fact regarding B&N's specific intent to induce Akamai's infringement. DSU Med Corp. remains good law and specific intent is still required for a § 271(b) claim. The continued absence of evidence in the record of B&N's specific intent to induce infringement is independently sufficient to sustain the Court's earlier summary judgment decision.

14

Accordingly, the Court will not disturb its earlier summary judgment decision.

Although Adrea now also seeks permission to assert § 271(a) claims, this request was previously waived. Specifically, in a letter to the Court dated June 11, 2014, Adrea sought "to withdraw the inducement theory under § 271(b) and allege direct infringement under § 271(a)." See Declaration of Louis S. Ederer in Support of Defendants' Opposition to Plaintiff's Motion for Reconsideration of and to Revise the Court's Non-Final Order Regarding Claim 1 of U.S. Patent No. 7,298,851 Ex. 2, ECF No. 192. Adrea made this request after the Supreme Court issued Akamai II, but then did not renew or follow up on it after this Court issued its summary judgment decision. If Adrea had wished to pursue a § 271(a) theory of its case, it should not have abandoned such a theory at that time. Moreover, regardless of its June 2014 letter, Adrea should not have waited until after trial to raise a theory of § 271(a) liability. If Adrea believed that it could prevail under § 271(a), it should have presented such claims from the outset of the case and preserved them for appeal if it disagreed with this Court's application of the law. This would have been a long-shot strategy, although, in light of Akamai II and Akamai III, one that might have paid off. In any litigation, strategic tradeoffs are made between possibility and efficiency. Adrea made its choices – which, to be clear, the Court considers entirely reasonable

- and now must live with the consequences. Accordingly, Adrea's motion for reconsideration is denied in full.[4]

Third, the Court considers whether a limited new trial is necessary in light of the fact that the jury awarded $1.33 million in damages but did not allocate these damages between the '501 and '703 patents, one of which the Court subsequently held invalid. "In a situation . . . where the jury rendered a single verdict on damages, without breaking down the damages attributable to each patent, the normal rule would require a new trial as to damages." Verizon Services Corp. v. Vonage Holdings Corp., 503 F.3d 1295, 1310 (Fed. Cir. 2007) (citing Memphis Cmty. Sch. Dist. v. Stachura, 477 U.S. 299, 312 (1986)). The parties, who submitted letter briefing on this issue, have not provided any significant reasons to deviate from the normal rule. Accordingly, a limited new trial will be held to determine damages on the remaining claims as to which liability remains established. The parties are directed to jointly call chambers no later than February 29, 2016, to schedule the new trial.

The Clerk of Court is directed to close documents numbered 184 and 189 on the docket of this case.

SO ORDERED.

Dated:    New York, NY
          February 24, 2016                    JED S. RAKOFF, U.S.D.J.

---

[4] In its opposition briefing to Adrea's motion, B&N also attacked the patent-eligibility of Claim 1. The Court agrees with Adrea that this issue is not properly before the Court on Adrea's motion.