# Exhibit D

Page 1

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
ADREA, LLC,

          Plaintiff,

     v.            13 Cv. 4137 (JSR)

BARNES & NOBLE, INC.,
BARNESANDNOBLE.COM LLC, AND
NOOK MEDIA LLC,

          Defendants.
------------------------------x
                        October 7, 2014
                        10:00 a.m.
          Before:
                  HON. JED S. RAKOFF

                                District Judge

                  APPEARANCES

PROSKAUER ROSE LLP
     Attorneys for Plaintiff
BY:  STEVEN M. BAUER
     COLIN CABRAL
     BRENDAN COX

ARNOLD & PORTER LLP
     Attorneys for Defendants
BY:  LOUIS S. EDERER
     ALI R. SHARIFAHMADIAN
     MICHAEL A. BERTA
     YUE-HAN CHOW
```

Page 2

1      (Case called)
2          THE DEPUTY CLERK:  Will the parties please identify
3  themselves for the record?
4          MR. BAUER:  Good morning, your Honor.  Steve Bauer
5  from Proskauer for plaintiff ADREA.  We have our team here if
6  you want everybody to identify themselves.
7          THE COURT:  No, that's all right.  Thank you.
8          MR. EDERER:  Good morning, your Honor.  Louis Ederer
9  from Arnold & Porter, and I too have a team.
10         THE COURT:  I am extremely sorry for the delay.
11         First, any witnesses who are present in the courtroom
12 are excluded as of right this moment, including experts.  They
13 should wait in the witness room, and that will continue
14 throughout trial.
15         MR. CABRAL:  Your Honor, our client representative is
16 named on defendants' witness list.
17         THE COURT:  One client representative per side can
18 remain at counsel table.
19         MR. CABRAL:  Thank you, your Honor.
20         THE COURT:  Second, the redactions in the proposed
21 pretrial consent order, which were submitted with the Court's
22 permission, but now that I have seen the redactions I think
23 there is no good reason to redact any of that information.  So
24 the Court will file the unredacted copy in the public record.
25         Third, as you, I believe, already know from my

Page 3

1  individual rules and our discussions on the phone, no witness
2  will be called twice.  Of the eleven witnesses listed on
3  plaintiff's list of witnesses, eight are also listed on
4  defendants' list of witnesses.  If for any reason plaintiff
5  doesn't call any of those folks, defendant may, but none of
6  those witnesses will be received by deposition.
7          Next, with respect to the motions in limine, we will
8  begin with the plaintiff's motions.
9          MR. CABRAL:  If I may address the Court.  On two of
10 the plaintiff's motions, the parties have reached agreement
11 that would obviate the need --
12         THE COURT:  When we get to them, tell me which they
13 are.
14         The first motion is to preclude arguments and
15 testimony inconsistent with the Court's claim construction.
16 Both sides of course say they totally are consistent with the
17 Court's claim construction, but they disagree as to what that
18 consistency consists of.  That motion is denied as premature.
19 We will see what happens.  If someone attempts to say something
20 that is in fact inconsistent with the Court's claim
21 construction, an objection can be raised, and I will deal with
22 it then.  If it is in fact inconsistent with the Court's claim
23 construction, the Court will take appropriate action, like
24 telling the jury this is totally inconsistent with the law.
25         Second, the motion to preclude evidence or arguments

Page 4

1  as to when the asserted patents were recorded with the U.S.
2  Patent Office, that has been resolved and is moot.
3          MR. CABRAL:  That's correct.
4          THE COURT:  Third, the motion to preclude expert
5  testimony on matters outside the scope of the expert reports,
6  that motion does not specify any specific evidence that the
7  plaintiff expects will be offered in that regard.  So the
8  motion is denied for now without prejudice to being renewed
9  when in fact some such testimony is offered, if it ever is.
10         Fourth, the motion to preclude use of pejorative,
11 derogatory, or otherwise inflammatory terms to characterize
12 ADREA or its patent, such as patent troll, that motion is
13 granted in the sense of, I don't want to hear a reference to a
14 patent troll, but that doesn't mean that it may not become
15 relevant to describe the structure of plaintiff's business.  We
16 will have to take that up on an item-by-item basis.
17         Fifth, the motion to preclude opinions in Mr. Neuman's
18 supplemental report that relate to questions of law, I will
19 take this up at the Daubert hearing on Friday.
20         Sixth, the motion to preclude Neuman from testifying
21 that the Gifford and Sachs prior art references anticipated the
22 asserted claims, I will come back to this one in a minute.
23         Seventh, the motion to exclude evidence of unaccused
24 modes of operation and configurations of the lending process,
25 this again is appropriately taken up at the Daubert hearing on

Page 5

1  Friday.
2        Eighth, the motion to preclude the testimony of Vrinda
3  Mushran, this motion is moot.
4        Ninth, the motion to preclude reference to this
5  Court's rulings on summary judgment, that motion I think can't
6  be decided in the abstract.  If someone wants to raise this,
7  they need to approach the sidebar at the appropriate time, and
8  we will deal with it then.  I am inclined, but this is not
9  final, to deny the motion as to the Court's holding that the
10 Nook applications were noninfringing and that the e-content was
11 not infringing, but grant the motion as to any argument that
12 the Court's summary judgment opinions bear on the issue of
13 willful infringement, but I will hear further argument at the
14 sidebar if and when this comes up.  There will be no reference
15 to that in the opening statements.
16       With respect to the defendants' endless motions in
17 limine, with respect to motion 1(a), to preclude the doctrine
18 of equivalents arguments regarding the single-user-input
19 limitation of claim 13 of the '703 patent or the
20 selects-a-title limitation of claim 96 of the '851 patent, my
21 understanding is that motion is moot.
22       With respect to 1(b), to preclude the doctrine of
23 equivalent arguments regarding the associated limitation of
24 claim 7 and 18 of the '501 patent, I will hear argument on that
25 in a few minutes, but I don't really understand that motion

Page 6

1  because this was under the subheading of expert opinions not
2  disclosed in discovery, but that opinion was disclosed in
3  discovery.  I think the objection seems to be rather on grounds
4  of prosecution history estoppel, but we will discuss that in a
5  minute.
6        1(c), to preclude evidence on the reverse engineering
7  allegedly conducted by Mr. Berg and the source codes allegedly
8  generated but never provided to Barnes & Noble and alleged
9  device logs attached to his report on which he never relied,
10 the motion is moot as to reverse engineering and source code,
11 the motion is denied as to the device logs.
12       MR. BERTA:  I don't mean to interrupt.  I just wanted
13 to let you know we have reached agreement on the second part of
14 that.
15       THE COURT:  What is the agreement?
16       MR. BERTA:  They are not going to introduce the device
17 logs.
18       THE COURT:  Very good.  Thank you.
19       With respect to 1(d), to preclude evidence that prior
20 art references do not disclose or render obvious any
21 limitations not addressed by Wang during discovery, this motion
22 is moot as to any argument or evidence presented to the jury.
23 If it's still a live issue at summation, counsel may renew its
24 objection before summations are given.
25       With respect to 1(e), to preclude ADREA from

Page 7

1  presenting any new patent royalty rate, that motion is moot.
2        With respect to 2(a), to preclude evidence regarding
3  Barnes & Noble's source code production, that motion is
4  granted.
5        With respect to 2(b), to preclude evidence or argument
6  that Barnes & Noble received actual notice of patents-in-suit
7  prior to March 29, 2012, that motion is moot.
8        With respect to 2(c), to preclude evidence or
9  arguments related to willfulness, that evidence or arguments
10 were not identified during discovery, I will hear argument on
11 that in a few minutes.
12       MR. BERTA:  On that one we have reached agreement as
13 well.
14       THE COURT:  Very good.
15       On 2(d), to preclude argument that Barnes & Noble's
16 lack of reliance on opinion of counsel has any relevance to
17 willfulness, that motion is moot as to any argument, except
18 possibly an argument regarding willfulness or enhancement of
19 damages, but we will take that up if and when it arises.  So
20 for now it's denied as premature.
21       With respect to 2(e), to preclude ADREA from relying
22 on Barnes & Noble's technology licenses, that motion is denied.
23       With respect to 2(f), to preclude evidence of Barnes &
24 Noble's e-content and accessory sales, that motion is granted
25 as to revenue from sales made from other than the accused

Page 8

1  devices, but is otherwise denied.
2        With respect to 2(g), to preclude evidence of
3  functions that have not been accused for the purpose of
4  bolstering damages, that motion is granted.
5        With respect to 2(h), to preclude testimony by Talal
6  Shamoon regarding the audio and video codec industry, or
7  alleged similarities of that technology to the technology in
8  this case, that motion is granted.
9        With respect to 2(i), to exclude the 2009 Intertrust
10 analysis, that motion is granted.
11       With respect to 2(j), to preclude ADREA's expert from
12 presenting his "artificially high damage amounts," and from
13 presenting any amount with respect to any patent that he
14 calculated based on unit sales that postdate the patent's
15 expiration, we will take that up at the Daubert hearing.
16       With respect to 2(k), to preclude ADREA from calling
17 B&N's attorneys to testify at trial, that motion is moot.
18       With respect to the motion to preclude evidence
19 concerning B&N's revenues, profits and investments, I will take
20 that up at the Daubert hearing, although I am leaning towards
21 granting that motion.
22       And, finally, with respect to motion number 3, to
23 preclude Berg's expert reports and exhibits as inadmissible
24 hearsay --
25       MR. CABRAL:  On this one, the parties have also

Page 9

1  reached agreement.
2      THE COURT: OK. Very good.
3      MR. CABRAL: Can we ask one question for
4  clarification?
5      THE COURT: Yes.
6      MR. CABRAL: Your ruling with regard to motion in
7  limine 2(i), is it correct that that is limited to Intertrust
8  analysis?
9      THE COURT: Yes.
10     MR. CABRAL: Thank you.
11     THE COURT: All these rulings are subject to the
12 exception that if any party opens the door to something that I
13 have excluded, then of course the matter will have to be
14 reconsidered at that time.
15     MR. BERTA: On their motion number 6 that you said you
16 may want to hear about, which is Gifford and Sachs?
17     THE COURT: Pardon?
18     MR. BERTA: The Gifford and Sachs motion on
19 anticipation, we are not going to rely on Gifford, the Gifford
20 system as anticipatory. So I think that that should resolve
21 that issue. And with respect to Sachs, while we think the
22 system as described in both patents is anticipatory, we are
23 going to rely on the patent that is cited in his report.
24     THE COURT: So that motion is moot too.
25     So I think other than the ones that I reserved on

Page 10

1  either to the Daubert hearing or until the matter is raised in
2  some specific question or proffer, I think the only open one
3  then was 1(b), which, as I said, I didn't really understand.
4  It was under the heading of expert opinions not disclosed in
5  discovery, but it was disclosed in discovery.
6      MR. BERTA: Yes.
7      THE COURT: So are you still pursuing that argument
8  nevertheless on other grounds?
9      MR. BERTA: I think it was inartfully worded.
10     THE COURT: Or, as some might say, wrongfully.
11     MR. BERTA: Maybe.
12     THE COURT: Was it disclosed in discovery?
13     MR. BERTA: It's not whether the DOE argument itself
14 was disclosed. That was definitely disclosed in discovery.
15 What was not disclosed in discovery is any opinion or other
16 evidence on whether or not they can overcome the presumption of
17 prosecution history estoppel. They just make an attorney
18 argument about what they think the references say. It's their
19 burden to overcome prosecution history estoppel because it is
20 an amendment to the actual language. They have no opinion on
21 that issue or any purpose. So that's what is missing from the
22 expert report. So they can't make an argument that they
23 overcome the burden of prosecution history estoppel.
24 Therefore, the DOE argument itself, which was disclosed, should
25 be out.

Page 11

1      THE COURT: I adhere to what I said a few moments ago.
2  I think it's not that the opinion was not disclosed in
3  discovery; it's that you are arguing that the opinion should be
4  precluded because of a failure to overcome prosecution history
5  estoppel. But let's not quibble. Let's hear from your
6  adversary.
7      MR. CABRAL: This argument was addressed fully in our
8  summary judgment briefing. This Court denied Barnes & Noble's
9  argument, the motion for summary judgment, on the grounds that
10 there was no prosecution history estoppel.
11     THE COURT: You are going to need to speak a little
12 louder.
13     MR. CABRAL: This is essentially rehashed in the
14 summary judgment argument.
15     THE COURT: I heard that part. I just didn't hear the
16 very last word you said.
17     MR. CABRAL: The law is clear that motions in limine
18 are not to be used to reargue the issues that have been
19 resolved by this court.
20     THE COURT: But just remind me because I haven't gone
21 back and looked at the summary judgment in this respect. They
22 say that you didn't offer any evidence to overcome prosecution
23 history estoppel. So was there prosecution history estoppel
24 and you did offer evidence, or are you saying there wasn't
25 prosecution history estoppel?

Page 12

1      MR. CABRAL: There was not prosecution history
2  estoppel.
3      THE COURT: Because?
4      MR. CABRAL: Because the amendment at issue related to
5  a time parameter associated with a Pay-Per-View television
6  program. So, in other words, if the program were the Nightly
7  News, that parameter would be 6 p.m., because that's when the
8  Nightly News came on. The claims were then amended to add a
9  predetermined time period. So to add the lend-in period that
10 is now the element that's in the claims. That was to overcome
11 prior art. The prior art related to just any time parameter
12 associated with any program. So, essentially, the amendment
13 was the introduction of the lending period from the beginning.
14     Now, here, the doctrine of equivalents argument, the
15 equivalent doesn't relate to the lend necessarily; it relates
16 to the precise starting point for the lend period. In other
17 words, the dispute in this case is over one or two seconds. If
18 the lending period starts at second one, they say they don't
19 infringe. If it starts at second two, we say they do. Because
20 there is no substantial difference in a 14-day lending period
21 based on a one- or two-second difference. That's essentially
22 the issue in the case. The equivalency that we are arguing and
23 relying on here has no bearing or relation to the amendment or
24 introduction of the lending period itself.
25     THE COURT: Let me hear from your adversary.

Page 97

1        (At the side bar)
2        MR. CABRAL: I would like to show the numbers of the
3    agreement. I also want to comply with your ruling earlier.
4    The Amazon attorney limited his argument to the costs and sales
5    data of Amazon. But he also moved in theory -- included in the
6    motion was the financial terms of this agreement as well.
7    Although it wasn't discussed between you and the Amazon
8    attorney, I don't want to not follow --
9        THE COURT: I will allow that. I asked him for his
10   most, if you will, best case, and that is where he limited it
11   to costs and so forth. Nevertheless, I really think his
12   request in this respect would have been overbroad, so I will
13   allow those questions to be put. Be sure you cut off the
14   witness if he gets into anything that is more narrowly still
15   the subject of the motion.
16       MR. CABRAL: If it is OK, I will just ask him what the
17   amounts paid by Amazon were.
18       THE COURT: Yes, that is permissible.
19       MR. CABRAL: Thank you, your Honor.
20       (Continued on next page)

Page 98

1        (In open court)
2    BY MR. CABRAL:
3    Q. Dr. Shamoon, can you please turn to page 4 of the Amazon
4    agreement.
5    A. The which?
6    Q. Page 4 of the Amazon agreement, which I believe is Joint
7    Exhibit 32. I want to direct your attention to paragraph 3.
8    A. Yes.
9    Q. Do you see the paragraph titled "Settlement Payment"?
10   A. Yes, I do.
11   Q. How much did Amazon pay ADREA for a license to the
12   Discovery portfolio?
13   A. It's there on the screen. It's $10 million.
14   Q. Is this the provision of the Amazon agreement that reflects
15   the terms of that payment?
16   A. Yes.
17   Q. If you could now turn to page 6 of the Joint Exhibit 32,
18   which is the Amazon agreement.
19   A. Yes.
20   Q. I want to direct your attention to paragraph 6.1 on the
21   bottom of page 6 that carries over to the next page. Do you
22   see the section 6.1 under "Option to License"?
23   A. Yes, I see it.
24   Q. Does that provision reflect the terms of Amazon's optional
25   license to the ADREA portfolio?

Page 99

1    A. Yes, it does.
2    Q. How much did Amazon pay ADREA for a license to the optional
3    patents that you see here referred to in paragraph 6.1?
4    A. They paid $2½ million for that option.
5    Q. During the course of your license negotiations with Amazon,
6    were those negotiations reflected -- sorry -- affected by the
7    underlying litigation? If you could limit your answer to your
8    perspective, from ADREA's perspective.
9        MR. EDERER: Objection, your Honor: Vague.
10       MR. CABRAL: No problem. I'll re-ask the question,
11   your Honor.
12   Q. Were your licensing discussions or negotiations with Amazon
13   affected by the underlying litigation between Amazon and
14   Discovery?
15   A. We were in court, and at a relatively early point in the
16   suit we, both us and Amazon, decided to sit down and see if we
17   could sort it out and end what was proving to be a complicated
18   and expensive lawsuit. We sat around a table and negotiated a
19   settlement. We ended the lawsuit as a result.
20   Q. I would like to direct your attention to page 6 of Joint
21   Exhibit 32, specifically section 4.6. The last sentence in
22   that paragraph states that the parties acknowledge and agree
23   that the payment does not represent a reasonable royalty for
24   the licenses and other rights granted hereunder to Amazon. Do
25   you see that?

Page 100

1    A. Yes.
2    Q. What is your understanding of what that language means?
3    A. To me, what that language meant was that since we had
4    settled out of court and there was an exchange of value, this
5    would outline the fact that there were certain discounts and
6    things that were given to Amazon that didn't represent a
7    standard for the market.
8        MR. EDERER: Objection.
9        THE COURT: Sustained, and the jury will disregard the
10   last answer, which is stricken.
11   Q. Did Amazon take a license to ADREA's entire patent
12   portfolio?
13   A. Yes, they did.
14   Q. Why did you agree to license ADREA's entire patent
15   portfolio to Amazon?
16   A. That was part of the settlement agreement. They wanted to
17   license the whole portfolio, and that was built into the deal.
18   Q. I want to talk to you now about Barnes & Noble. Has ADREA
19   ever talked with Barnes & Noble about taking a license to the
20   patents-in-suit?
21   A. Yes, we talked to them many times before we ended up in
22   court.
23   Q. Very briefly, can you summarize those discussions for the
24   jury.
25   A. We approached Barnes & Noble I think starting in the 2010

Page 137

1  A. We tried and we tried and we tried. It's very hard to
2  license patents.
3  Q. By the way, you testified earlier about yourself and Mr.
4  Ambwani providing services to ADREA as part of your duties with
5  Intertrust, correct?
6  A. Yes.
7  Q. You are not an employee of ADREA, are you?
8  A. Well, that's not all that I do but I provide services.
9  ADREA pays me to provide services to it.
10 Q. Does ADREA pay you as an employee to provide services to
11 it?
12 A. ADREA pays a consulting fee to Intertrust to provide skills
13 and services to the company.
14 Q. In fact ADREA has no employees at all, does it?
15 A. It doesn't employ anyone full time.
16 Q. Isn't it true that you only spent about five or ten percent
17 of your time on ADREA business following its formation?
18 A. Yeah.
19 Q. Your main focus was to run Intertrust as CEO, correct?
20 A. I am also on the board of several ventures which I guess is
21 part of running Intertrust, the same way this is a venture that
22 Intertrust owns a piece of. I attend board meetings of other
23 companies and then I manage people at Intertrust.
24 Q. But between ADREA and Intertrust, you spend a lot more time
25 on Intertrust business than you do on ADREA business, correct?

Page 138

1  A. One of the reasons I am having a hard time answering these
2  questions is, the time I spend at ADREA is part of my job at
3  Intertrust as well.
4  Q. Let me ask the question a little differently. In your
5  duties as Intertrust CEO as between the time you spend on
6  Intertrust business that does not involve ADREA and the time
7  you spend on Intertrust business that does involve ADREA, you
8  spend a lot more time on Intertrust business that does not
9  involve ADREA correct?
10 A. Yes, of course.
11 Q. Now, you testified that one of the first things you did
12 after ADREA was formed was that you made efforts to try to
13 settle the Amazon lawsuit, correct?
14 A. Yes.
15 Q. You testified also that the lawsuit was settled for, I
16 think you said, $10 million with respect to the Discovery
17 patents, correct?
18 A. Yes.
19 Q. And an option at $2.5 million to license the Discovery
20 and -- I'm sorry -- the Philips and Sony patents, correct?
21 A. Yes. They exercised that.
22 Q. Wasn't it also the case that for the entire option period
23 from the time that the Amazon settlement agreement was entered
24 into until the option period ended which was, I believe, a two-
25 or a two-and-a-half-year option period for Amazon to decide

Page 139

1  whether or not it wanted to take a license to the Sony and
2  Philips patents, correct? Is that about two and a half years?
3  A. Something like that, yeah.
4  Q. For that period of time, didn't the agreement also provide
5  that ADREA would not sue Amazon over any of those patents?
6  A. I don't remember that term.
7  Q. Let's take a look again at Joint Exhibit 32 which I believe
8  is in your binder also, although you may have it from your
9  direct examination.
10 A. It's in the binder you gave me?
11 Q. Yes.
12 A. 32?
13 Q. No. It's Joint Exhibit 32 but tab number 17.
14 A. So 17 in your book?
15 Q. Yes.
16 A. OK.
17 Q. If you look at paragraph 6.4 on page 7?
18 A. I am just waiting for it to come up on the screen.
19 Q. So you see it now, right?
20 A. Right.
21 Q. So this paragraph provides that during the period in which
22 Amazon had the right to take a license for the Sony and Philips
23 patents that ADREA would not sue Sony or Philips -- I'm
24 sorry -- would not sue Amazon for infringing the Sony and
25 Philips patents, correct?

Page 140

1  A. That's what it looks like.
2  Q. It's called a covenant not to sue, you have heard that
3  term?
4  A. Yes.
5  Q. Back in 2010 when you first got involved in discussions
6  relating to the settlement of the Amazon case, ADREA had
7  actually asked Amazon for up to $50 million to settle that
8  case, right?
9  A. There was some back and forth.
10     MR. CABRAL: Objection, your Honor.
11     THE COURT: Sustained.
12 Q. Let me point you to a document, tab 9 in your book, which
13 is Defense Exhibit 69.
14     MR. CABRAL: Your Honor, I object on relevancy grounds
15 and hearsay -- I apologize -- Rule 408 as well.
16     THE COURT: That's the right one.
17     MR. CABRAL: Thank you. Third time is the charm.
18     THE COURT: Sustained.
19 Q. Do you recall any discussions, Mr. Shamoon, about dollar
20 figures that ADREA was seeking in settlement of the Amazon
21 agreement?
22     MR. CABRAL: Same objection.
23     THE COURT: Sustained.
24 Q. Now, the plan after settling the Amazon litigation was to
25 get a licensing program started, correct?

Page 141

1  A. There were several plans. When I hear the word "licensing
2  program," it could mean many different things. I don't want to
3  tell you what you mean.
4  Q. Why don't I refer you to a document. Do you recall sending
5  an e-mail to Mr. Hendricks at or about the time that you
6  settled the Amazon agreement?
7  A. I sent Mr. Hendricks a bunch of e-mails over the time
8  that --
9  Q. Yes. Take a look at tab 18 in your binder.
10 A. Got it.
11 Q. We are talking about Defense Exhibit 115.
12    Do you have that document, Mr. Shamoon?
13 A. Yes, sir, I do.
14 Q. Do you recognize the lower e-mail on the first page of tab
15 18?
16 A. "Dear John, I am writing to wish you all the best"?
17 Q. Yes.
18 A. Yes.
19 Q. That was an e-mail that you sent to Mr. Hendricks on
20 December 23, 2011, two days before Christmas?
21 A. Yes.
22    MR. EDERER: I move the admission of Defense Exhibit
23 115, your Honor.
24    MR. CABRAL: No objection.
25    THE COURT: Received.

Page 142

1     (Defendant's Exhibit 115 received in evidence)
2  Q. So in this e-mail that you wrote to Mr. Hendricks on
3  December 23, 2011, you talk about the fact that the Amazon
4  agreement has now been signed, correct?
5  A. Yes.
6  Q. And then you go on to say: "2012 brings new goals for
7  ADREA. We are looking forward to continuing the charge on
8  patent licensing. Barnes & Noble, Apple and Google are obvious
9  next targets." Do you see that?
10 A. It's before I learned to spell "Barnes & Noble."
11 Q. Then if you drop down another paragraph it says: "We would
12 not be where we are today without your valuable portfolio. The
13 win against Amazon is a starting point for what we hope is a
14 healthy and accretive licensing program." Do you see that?
15 A. Yes.
16 Q. So that was one of your one objectives at or about that
17 time, was it not, to establish a healthy and accretive
18 licensing program, correct?
19 A. Yes. But there were different ways we were looking into
20 doing that. You can license patents by licensing software.
21 You can license patents directly, depending on who you're
22 talking to and what the products of the company are and who you
23 are partnering with.
24 Q. Was it or was it not your objective at or about that time
25 to establish a healthy and accretive licensing program?

Page 143

1     MR. CABRAL: Objection, your Honor. Asked and
2  answered.
3     MR. EDERER: I don't think I got an answer to that
4  question, your Honor.
5     THE COURT: No, I think you did. The answer is yes.
6  He then added some stuff, but he said yes.
7     Sustained. Asked and answered.
8  Q. I think you testified earlier that one of the reasons why
9  you wanted to settle the Amazon agreement is because a lot of
10 lawyers' fees were being incurred, correct?
11 A. That was one of the reasons but the other reason was we
12 didn't like being in court.
13 Q. Do you recall discussing with anyone from Discovery the
14 reason why you wanted to settle the Amazon litigation in order
15 to avoid paying additional lawyers' fees?
16 A. That's one of the reasons we don't like being in court. We
17 also don't like being in court because we see it as a
18 distraction from building the business.
19 Q. Let me ask you this. It's now 2014 and you knew back in
20 2012 that Barnes & Noble was not interested in taking a
21 license, correct?
22 A. I'm sorry. Could you ask me the question again?
23 Q. Isn't it a fact that you knew back in 2012 that Barnes &
24 Noble was not interested in licensing any of the patents that
25 we are talking about?

Page 144

1  A. Well, just generally people say no until they take a
2  license, so just because somebody says no several times, it
3  doesn't mean you can't think of something really creative or
4  maybe they change their mind or maybe they don't want to go to
5  court, so it's part of the process.
6  Q. Was there anything that prevented you, sir, at any point in
7  time after you sent that e-mail to Mr. Hendricks in late 2011
8  in which you said something about establishing a healthy and
9  accretive licensing program, was there anything that prevented
10 you from licensing these patents to other people besides Barnes
11 & Noble?
12 A. No.
13 Q. That e-mail suggested that obvious targets were Apple and
14 Google, in addition to Barnes & Noble, correct?
15 A. Yes.
16 Q. Have you licensed the patents to Apple and Google?
17 A. No, we haven't.
18 Q. Have you talked to Apple and Google?
19 A. Not about this.
20 Q. Not about what?
21 A. Not about licensing these patents.
22 Q. They were obvious targets back at the end of 2011. It's
23 now getting towards the end of 2014. Are you saying you didn't
24 contact any of those obvious targets in the last three years?
25 A. Well, we ranked the different people in the field. Amazon

Page 826

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
ADREA, LLC,
        Plaintiff,
           v.                13 Cv. 4137 (JSR)
BARNES & NOBLE, INC.,
BARNESANDNOBLE.COM LLC, AND
NOOK MEDIA LLC,
        Defendants.
------------------------------x
                    October 17, 2014
                    9:20 a.m.

Before:
            HON. JED S. RAKOFF
                    District Judge

                    APPEARANCES

PROSKAUER ROSE LLP
    Attorneys for Plaintiff
BY:  STEVEN M. BAUER
     COLIN CABRAL
     BRENDAN COX

ARNOLD & PORTER LLP
    Attorneys for Defendants
BY:  LOUIS S. EDERER
     ALI R. SHARIFAHMADIAN
     MICHAEL A. BERTA
     YUE-HAN CHOW
     SARAH BRACKNEY ARNI
     SUSAN L. SHIN

Page 827

1    (Trial resumed; jury not present)
2        THE COURT:  Let's get the witness on the stand.
3        MS. ARNI:  We have one short issue before we get
4    started.
5        THE COURT:  Unless it relates to Mr. Magee, we will
6    wait till the break.
7        (Jury present)
8        THE COURT:  Not bad.  All right.
9        Ladies and gentlemen, I am going to ask my law clerk
10   to hand out to you a copy of what is called the Georgia-Pacific
11   factors for determining a reasonable royalty.  And counsel also
12   get copies.  We will read them briefly together, but you can
13   keep these for your reference.
14       I want to stress that this is a short version of each
15   of the factors.  They may be elaborated on by various experts
16   who will testify in the case.  But just to put it in context,
17   you will remember, the first thing you have to determine is
18   whether or not there has been infringement.  If there is no
19   infringement, that's the end, but if there is infringement,
20   then you have to determine if the patents that have been
21   infringed are valid.  If they are valid, then you go on to
22   determine damages.  And in determining damages, that is to say
23   the amount of money that the infringer has to pay to the owner
24   of the patent, these are factors that the courts have
25   determined are the relevant factors.

Page 828

1        Now, there are 15 of them.  Not all of them apply in
2    every case.  I am going to give you the full list of 15 just so
3    you will be learned in the law, but some of them may not be
4    relevant here, and we will see as the various witnesses go
5    through them.  They are as follows:
6        1. The royalties that the patentee -- the patentee is
7    the owner of the patent -- receives for licensing the patent in
8    suit.
9        2. The rates the licensee pays for the use of other
10   comparables to the patent in suit.
11       3. The nature and scope of the license in terms of
12   exclusivity and territory and customer restrictions.
13       4. The licensor's established policy and marketing
14   program to maintain patent monopoly by not licensing others to
15   use the invention.
16       5. Commercial relationship between licensor and
17   licensee, such as whether they are competitors or inventor and
18   promoter.
19       6. The effect of selling the patented specialty in
20   promoting sales of other products of the licensee; the existing
21   value of the invention to the licensor as a generator of sales
22   of his non-patented items; and the extent of such derivative or
23   convoyed sales.  That's a technical term that you can more or
24   less disregard in this case.
25       7. Duration of patent and term of license.

Page 829

1        8. Established profitability of the products made
2    under the patent, its commercial success and its current
3    popularity.
4        9. Utility and advantages of patent property over old
5    modes of devices.
6        10. The nature of the patented invention; the
7    character of the commercial embodiment of it as owned and
8    produced by the licensor; and the benefit of those who have
9    used the invention.
10       11. The extent to which the infringer has made use of
11   the invention and the value of such use.
12       12. The portion of profit or selling price
13   customarily allowed for the use of the invention.
14       13. The portion of realizable profit attributable to
15   the invention as distinguished from non-patented elements,
16   significant features/improvements added by the infringer, the
17   manufacturing process or business risks.
18       14. Opinion testimony of qualified experts.  That's
19   what you are about to hear from one side.  There will be a
20   similar expert from the other side.
21       15. Outcome from hypothetical arm's length
22   negotiation at the time the infringement began.
23       Now, that's a lot of language.  Don't worry about it.
24   This is just to give you a very broad overview.  When you get
25   my detailed instructions at the end of the case, we will focus

Page 830

1    in on the factors that are most important for your
2    consideration. I am sure the witnesses will as well in their
3    testimony. But since there was so much reference yesterday to
4    the Georgia-Pacific factors, I figured you ought to at least
5    know what they are. So this is the whole list.
6         Down at the bottom you will see why it's called the
7    Georgia-Pacific factors. It's from a case called
8    Georgia-Pacific Corporation v. United States Plywood
9    Corporation that was tried in this very court in 1970. I, of
10   course, was only two years old at the time. Another judge
11   tried it. So that's why they are called the Georgia-Pacific
12   factors, but they have been adopted throughout the United
13   States. And it's a handy checklist, as you will see. Some are
14   more relevant to this case than others, but I just wanted to
15   give you a quick heads-up as to what they were.
16        So let's continue with the testimony.
17    STEPHEN MAGEE, resumed.
18   DIRECT EXAMINATION
19   BY MR. COX:
20   Q. Good morning, sir.
21   A. Good morning.
22   Q. Professor Magee, yesterday you told us that you had done
23   your damages analysis and that you determined a royalty rate,
24   multiplied it by a base to get a total royalty, is that right?
25   A. Yes, sir.

Page 831

1    Q. I want to go through each part of that a little bit. OK?
2    A. All right, sir.
3    Q. What was the royalty rate that you determined?
4    A. 50 cents per unit.
5    Q. Now, can you generally describe how you determined the 50
6    cent rate?
7    A. The 50 cent rate is basically what you, the jury, will
8    determine, and that rate is the amount, the number of dollars
9    to be paid for each of the Nook e-books that Barnes & Noble
10   sold. And what I have done is gone through all of the analysis
11   I have studied for the last year to attempt to determine that
12   that 50 cent rate I thought would be the appropriate rate, and
13   there will be a number of things we will go through to try to
14   get to that.
15        THE COURT: Just answer the question. I don't want a
16   narrative and I don't want a lecture to the jury. I want
17   questions and answers and brief, pointed, and in proper form.
18        THE WITNESS: Yes. I'm sorry, your Honor.
19   Q. You mentioned that the rate came out of your analysis over
20   the last year, right?
21   A. Yes, sir.
22   Q. Is that the analysis that we are talking about, the
23   Georgia-Pacific analysis you were talking about?
24   A. Yes, sir.
25   Q. With regard to your analysis in this case, were there

Page 832

1    particular factors that were more important than others?
2    A. Yes, sir.
3    Q. Which factors were the more important ones to you?
4    A. Would you like an enumeration of them, sir, the numbers?
5    Q. Just a summary of the ones that for your rate were more
6    important.
7    A. OK. At the summary level, it is Georgia-Pacific factor
8    number 1, number 2, number 4, number 6, number 8, 9, 10, 11 and
9    13. Then, of course, Georgia-Pacific 15 is the summary of all
10   of the analysis and the hypothetical.
11   Q. For the rate that you determined, what was the royalty rate
12   that you determined?
13   A. 50 cents per unit.
14   Q. So just a straight 50 cent per unit?
15   A. It was 50 cents per unit, with a discount for all sales
16   above 20 million units would be at half that or 25 cents.
17   Q. That 50 cent number, how do you come up with that 50 cent
18   number, generally?
19   A. Well, generally, you just look at all the evidence,
20   starting with the hard evidence, the numeric evidence, and then
21   you go to the quantitative evidence to see the reasonableness
22   of it.
23   Q. In this analysis, did you have any quantitative evidence
24   that guided your assessment that the rate should be 50 cents?
25   A. Yes, sir.

Page 833

1    Q. What were those pieces of information?
2    A. The hard numbers -- some soft, some hard -- started with
3    the PCT valuation done in August of 2008.
4    Q. Let me ask you about that one first.
5         MR. EDERER: Objection, your Honor.
6         THE COURT: Ground.
7         MR. EDERER: May I approach?
8         THE COURT: All right.
9         (Continued on next page)

Page 834

1    (At the sidebar)
2    MR. EDERER: I believe this testimony relates to the
3 PCT and Ocean Tomo analyses, which I believe were struck, or at
4 least the slides were struck.
5    THE COURT: The slides were struck. I only acted on
6 the slides, but since I haven't had a chance to put my ruling
7 on the record, I am glad you raised this because this is
8 inadmissible hearsay. An expert can refer to two things. He
9 can refer to matters that are in evidence or could be admitted
10 into evidence, and it can refer to treatises and other things
11 that are generally regarded in the area. This doesn't sound
12 like it would be admissible.
13    MR. COX: May I be heard?
14    THE COURT: Yes.
15    MR. COX: I think from ADREA's perspective, with
16 regard specifically to the PCT analysis, in terms of whether
17 it's hearsay or not from ADREA's perspective, we are not
18 offering the PCT information for the truth of the matter
19 asserted. We are not offering it for the truth that the market
20 was valued --
21    THE COURT: What are you offering it for?
22    MR. COX: We are offering it as information that
23 Professor Magee considered.
24    THE COURT: He considered it for its truth, otherwise
25 it would be irrelevant.

Page 835

1    MR. COX: My understanding of his opinion is that he
2 thinks it was not correct.
3    THE COURT: Oh. You had just asked him about the
4 evidence that supported his opinion. So why are we getting
5 into this at all?
6    MR. COX: I may have used the wrong word there.
7    THE COURT: If he thinks it's not correct, why are we
8 bothering the jury with it?
9    MR. COX: I think it's instructive to his analysis in
10 terms of information that was available at the time. He is
11 going to, I believe, if I understand his opinion correctly, his
12 opinion is that that estimate that existed at the time was too
13 high an estimate.
14    THE COURT: He is still considering it for its truth.
15 He is just discounting it. I don't see how it's admissible.
16    You better move on.
17    MR. COX: Can I just ask for a clarification?
18    THE COURT: Yes.
19    MR. COX: In terms of those analyses, without
20 referencing the numbers, is it permissible for him to indicate
21 that he is aware of market analyses that predated the
22 hypothetical negotiation and that he considered those.
23    THE COURT: If your adversary is foolish enough to
24 say, did you consider any other information, of course the door
25 will be opened and you will get all of this in. But until that

Page 836

1 happens, I don't see the relevance.
2    MR. COX: So that I can be clear on how to adjust from
3 this move, is it acceptable to your Honor for me to, when we
4 leave the sidebar, start with saying, OK, Professor Magee,
5 let's talk about the next piece of information that you
6 considered? I don't want to lead him too much.
7    THE COURT: I will just tell him, for legal reasons
8 that may not concern the jury, the matters you were about to
9 refer to are not admissible and move on. And then you can put
10 your next question.
11    MR. COX: OK.
12    THE COURT: You don't want me to do that? If you want
13 to do something else, don't let me stop it you.
14    MR. COX: The hesitation, your Honor, was that they
15 are not necessarily inadmissible depending on the cross.
16    THE COURT: The cross has not happened yet.
17    Let's go.
18    (Continued on next page)

Page 837

1    (In open court)
2    THE COURT: Let me just inform the witness that the
3 two studies you were about to mention have been ruled earlier
4 as not admissible. So you can't refer to them unless they come
5 up in connection with cross-examination.
6    Let's move on.
7 BY MR. COX:
8 Q. Professor Magee, what other information guided your
9 determination of the 50 cent royalty rate with the 25 cent
10 reduction?
11 A. OK. The next one, actually chronologically, is the Amazon
12 agreement and Georgia-Pacific factor number 1.
13 Q. When you say the Amazon agreement with the Georgia-Pacific
14 factor 1, can you describe to the jury what you're talking
15 about in terms of the Amazon agreement? What does that mean?
16 A. The Amazon agreement was an agreement entered into by
17 ADREA, the current owner of the patents in this case, and
18 Amazon, which was a company that licensed basically the
19 patents, including all the patents in this case, from ADREA.
20 Q. What was it about the Amazon agreement that you relied on
21 for determining your 50 cent rate?
22 A. Well, there's a number of things. The basic number -- I
23 will just go to the basic number rather than giving the
24 details. The basic number is, it was a payment of $12.5
25 million for basically three sets of patents. Discovery

Page 858

1           THE COURT:  Yes.
2           THE WITNESS:  I'm sorry.  How do I know the basis?  I
3  was referring to something which had to do with the 50 cents
4  and what it is applied to.  We have discussed that it would
5  apply only to ereaders but not to software.  That is a
6  difference between that entire term sheet and its implications
7  for my dollars in this case.  That's what I was trying to get
8  clear.
9           THE COURT:  Objection sustained.
10  BY MR. COX:
11  Q.  Professor Magee, based on the terms offered in the 2012
12  ADREA offer, what would the value of that offer be today?
13           MR. EDERER:  Objection, your Honor.
14           THE COURT:  Sustained.
15  Q.  Professor Magee, you said that the 2012 offer applied to
16  software, right?
17  A.  It applies to both software and reader devices, yes, sir.
18  Q.  Again, the software is not accused in this case, right?
19  A.  That's correct, software not accused in this case.
20  Q.  What kind of software was addressed in the 2012 offer?
21  A.  The 2012 is software that is basically stuff like apps and
22  things like that, where people could go onto those apps and
23  basically purchase materials through Barnes & Noble.
24  Q.  Do you know approximately how many software units are
25  Barnes & Noble has --

Page 859

1           MR. EDERER:  Objection:  Relevance.
2           THE COURT:  I didn't hear the end of the question.
3           MR. EDERER:  Sorry.
4  Q.  Do you know approximately how many software units or app
5  units Barnes & Noble has sold?
6           MR. EDERER:  Objection:  Relevance.
7           THE COURT:  Overruled.
8  A.  Roughly, my understanding is through about 2013 there have
9  been 15,000 units of software that would have been sold by
10  Barnes & Noble.
11  Q.  Did you say 15,000 units of software?
12  A.  Yes, sir.
13  Q.  15,000?
14  A.  Yes, sir.
15           MR. EDERER:  Objection.
16  A.  I'm sorry.  15 million.  My fault.  I'm sorry, I missed the
17  number, your Honor.  Yes, 15 million units of software would
18  have been sold around near the time of this agreement.
19  Q.  Now I want to ask you about the other part of the 2012
20  offer, which dealt with reader devices.  OK?
21  A.  Right.
22  Q.  Approximately how many reader devices have been sold to
23  date?
24  A.  Again, up to about the 2013 time period it would have been
25  12 million units by that point.

Page 860

1  Q.  I understand you have a slide that addresses this.
2  A.  Yes, sir.
3  Q.  Can we take a look at PDX-314, please.  Professor Magee,
4  can you describe what is illustrated in PDX-314.
5  A.  Yes, sir.  Again, this goes to the offer itself, and the
6  offer itself applied to the two parts here on the slide, which
7  is 50 cents per Nook ereader and as well 50 cent per Barnes &
8  Noble app, and that is the 15 million units I just referred to,
9  the second part.
10  Q.  To date how much would that offer have been in total dollar
11  value?
12           MR. EDERER:  Objection.
13           THE COURT:  Sustained.
14  Q.  Professor Magee, are there differences between your
15  analysis for the result of the hypothetical negotiation and the
16  2012 ADREA offer?
17  A.  Yes, sir.
18  Q.  Can you describe what the differences are.
19  A.  Yes, sir.  The case today relevant to the hypothetical
20  negotiation in November 2009 would apply only to the first line
21  here, the 50 cents per Nook ereader times the number of Nook
22  eReaders that are relevant in this case.
23  Q.  Do you have a slide that illustrates those differences,
24  right?
25  A.  Yes, sir.

Page 861

1  Q.  Can we look at PDX-315, please.  Professor Magee, can you
2  describe how this slide illustrates the differences.
3  A.  Yes, sir.  This slide shows that in comparing the ADREA
4  offer in May 2012, the first column there, the two check marks
5  there, and then the hypothetical negotiation only has one green
6  checkmark, and that shows the difference between that offer and
7  the hypothetical negotiation.  The similarity is both deal with
8  the ereaders but the royalty on the apps was in that offer in
9  2012, but the royalty on the apps is not included.
10  Q.  Your hypothetical rate included a volume-based discount.
11  Does the ADREA offer address that issue?
12  A.  No, sir, it didn't.  Mine has a discount and that offer did
13  not.  It was a 25 cent discount in this case for the
14  hypothetical.
15  Q.  Ultimately, how did your analysis of the 2012 ADREA offer
16  affect your analysis for damages in this case?
17  A.  It does not affect the rate, with the one exception I
18  noted.  But the size of that offer -- the size of that asking
19  amount in May of 2012 was about 7 million, 7½ million more.
20           MR. EDERER:  Objection.
21           THE COURT:  I guess we need a side bar here as well
22  just to make sure we are on the same wavelength.
23           (Continued on next page)
24
25

Page 862

1          (At the side bar)
2          THE COURT: This may be admissible or it may not. It
3    depends on the purpose. I sustained the objections to certain
4    slides dealing with dollar figures for, what is the term they
5    use in Georgia-Pacific, convoyed --
6          MR. EDERER: Derivatives.
7          THE COURT: Yes. -- because I thought it was too
8    remote. That was the objection that was made. So, those
9    figures should not come in. The figures he is about to discuss
10   may be relevant for other purposes, I just can't tell. Tell me
11   where you are going, then let me hear what the objection is.
12         MR. COX: What I expect him to say, frankly, is that
13   the total monetary dollar value of the 2012 offer was
14   approximately 13½ million when you consider the 50-cent rate
15   times what is now known as the sales of the apps plus the 50
16   cent value times what is now known as the base for the devices.
17   That's different from what his opinion is because he doesn't
18   include the apps and he also includes the volume-based
19   discount. That's what I expect him to say.
20         THE COURT: What I'm getting at is what is the
21   relevance of the 13 million figure to his opinion? I
22   understand that he is saying, and there is no problem with
23   this, that he had to factor out, so to speak, the fact that the
24   offer was for two things, one of which is infringed and one of
25   which is not infringed. But I'm not quite sure I see what the

Page 863

1    top figure has to do with anything in that analysis.
2          MR. COX: I'm not a hundred percent sure he will say
3    it, but what I expect him to say is that the 2012 offer is also
4    sort of a reasonableness check on what his assessment of the
5    appropriate rate is.
6          THE COURT: Because?
7          MR. COX: Because it was a 2012 offer and his
8    assessment of what would have happened in 2009 relative to that
9    is reasonable.
10         THE COURT: I don't understand what that means.
11         MR. EDERER: Your Honor, what is going on here is we
12   are trying to put big numbers in front of the jury and then
13   say, I compared my 6 million to these bigger numbers as a check
14   and therefore my 6 million is reasonable. That's what he said
15   about Amazon and that's what he is planning to say about the
16   13.5 million.
17         Since the 7.5 million in app sales are not part of
18   this case, it is irrelevant as a check or for any other reason
19   what that total number is. He can say whatever he wants to say
20   about the 50 cents for the devices and compare the offer that
21   was made in 2012 with the hypothetical negotiation figure that
22   he is coming up with. But to say that the offer relates to
23   both devices and another 7.5 million in products that are not
24   accused and then I used that as a check and it all sounds
25   reasonable to me is highly prejudicial to me. That is the

Page 864

1    Unilog case that we cited to your Honor last night.
2          THE COURT: It really goes to one of the things that
3    made the whole issue of his testimony problematic, as I
4    indicated in my Daubert ruling. I don't see why that is a
5    check on the rate. Part of his methodology seems to be
6    arriving at a figure, not a rate, just an abstract figure that
7    is a figure for apples and oranges, saying if that's what they
8    were willing to pay for apples and oranges total, then it's
9    reasonable that they would pay half of that for apples and from
10   that I derive a rate of 50 cents. It's not really a check. It
11   seems to me it's, what can I say, a bootstrap type argument.
12         For now I think you should tell him "without referring
13   to the figures." I also think there is the 403 problem that
14   counsel has raised. We'll see how it goes.
15         MR. COX: Just so I'm clear, I can say: Without
16   referring to the figures, how does the licensing offer impact
17   your analysis?
18         THE COURT: Yes. I'm not sure that's going to get
19   very far, because the way he did it was really based on the
20   figures. It's a related ground, but it is not the same ground
21   on which I struck the slides. The slides were struck because
22   of the remoteness of the figures there.
23         Let me try the questioning myself. We will see how it
24   goes.
25         (In open court)

Page 865

1          THE COURT: Professor, without referring, at least for
2    the moment, to any dollar figures, just explain, if you would,
3    when you were using this offer, even though the offer was not
4    accepted, you felt it still provided information that was
5    relevant to your analysis, do I have that right?
6          THE WITNESS: Yes, sir.
7          THE COURT: What was your line of reasoning in that
8    regard?
9          THE WITNESS: It's relevant because it's part of
10   Georgia-Pacific factor number 4. It's indicative of a
11   willingness to license, and it's also indicative of a
12   willingness to license at a specific rate, and it mentions a
13   rate of 50 cents. I think that is the relevance. I'm sorry if
14   I went earlier, your Honor, into too much. I think that's
15   relevant.
16         THE COURT: Now I understand it. Then the point was
17   being made that, well, it is an offer for 50 cents but it also
18   includes some noninfringing apps that have never been accused
19   and aren't part of this case. What was your response to that?
20         THE WITNESS: Yes, sir. It is not part of this case.
21   Therefore, the 50 cents would only apply to the accused items
22   in this case, which would be the ereaders.
23         THE COURT: If you remove the apps that was part of
24   this offer, why would the rate still stay the same?
25         THE WITNESS: The rate would still stay the same

Page 886

1       MR. CABRAL:  Can we approach?
2       THE COURT:  No.
3       MR. CABRAL:  Thank you, your Honor.
4       THE COURT:  You're welcome.
5  Q.  In that hypothetical situation, sir, there would have been
6  an agreed royalty rate between Barnes & Noble and Discovery on
7  the one hand and an agreed royalty rate between Barnes & Noble
8  and Philips on the other hand, right?
9  A.  Correct.
10 Q.  What, in your opinion, would that have agreed royalty been
11 between Barnes & Noble and Discovery?
12 A.  OK.  The agreed royalty rate would have been basically a
13 50-cent royalty rate applied to all of the Discovery units, and
14 then there would be a 50-cent royalty rate that would be
15 applied to all of the Philips units.  And then you realize that
16 when those rates would be applied in this case separately or to
17 those two unit separately, each one would then be paying
18 $6 million instead of just one $6 million number figure.  If we
19 go with your hypothetical, it's going to cost your client
20 $12 million, not $6 million.
21 Q.  Let me see if I can understand what you just said.  You're
22 saying that Discovery, when they were negotiating with Barnes &
23 Noble for two of the patents-in-suit, would have agreed to 50
24 cents per unit?  Is that what you are saying?
25 A.  Yes, sir.

Page 887

1  Q.  And Philips, who separately negotiated with Barnes & Noble,
2  would have agreed to 50 cents per unit, is that your testimony?
3  A.  Separately, yes, sir.
4  Q.  Do you recall having testified at a deposition in this
5  case, sir?  Strike that.  Let me go on.  Let's go with what you
6  say happened in this case, which is where the two parties sat
7  across the table together from Barnes & Noble.  OK?
8  A.  Yes, sir.
9  Q.  In that case it would have cost the two parties only 50
10 cents and not a buck, right?
11 A.  Right.
12 Q.  So you're giving them a break.  What you are saying is
13 you're giving the parties in this case a break by assuming that
14 they sat at the hypothetical negotiation table together, is
15 that your testimony?
16 A.  That's not quite characterizing my testimony, because the
17 one-dollar rate I didn't think would be reasonable.  In light,
18 for example, of the Amazon agreement, one dollar for all of
19 these units would give twice the amount.  That would give a
20 $12 million number figure, which I think would be unreasonable.
21 It would be right next to the Amazon amount.  The Amazon is a
22 bigger firm, so it wouldn't be appropriate.  That's why I'm
23 doing 50 cents.  If you license one patent, you basically get a
24 second one for free.  It's like buy two for the price of one,
25 very common in business.

Page 888

1       MR. EDERER:  Your Honor, I move to strike that
2  testimony based on rule 26 as outside the scope.
3       THE COURT:  I'm a little unclear, Professor.  You're
4  saying that if the owners of the patents at the time, since the
5  patents had different ownership, had separately sat down with
6  Barnes & Noble, they would have been able to negotiate a rate
7  that would foreseeably have cost Barnes & Noble $12 million,
8  correct?  You're saying that?
9       THE WITNESS:  I'm sorry.  Are you asking me?
10      THE COURT:  Yes.
11      THE WITNESS:  I thought you were asking him.  Sure,
12 that's correct.
13      THE COURT:  All right.  But you're saying if instead
14 at the same moment Barnes & Noble had sat down with the two of
15 them together, Barnes & Noble would then have been able to
16 negotiate a rate of a total of 6 million rather than a total of
17 12 million?
18      THE WITNESS:  Yes, sir.  This goes, though, to my --
19      THE COURT:  No, just answer my question.
20      THE WITNESS:  Yes, sir, that's correct, there would be
21 a discount on the second and third patents.
22      THE COURT:  You're saying that a reasonable licensee
23 in the position of Barnes & Noble would be reasonably willing
24 to pay twice as much based on the circumstance of whether the
25 two patent owners sat down at the same table or sat down at

Page 889

1  separate tables, is that what you are saying?
2       THE WITNESS:  That doesn't quite go to the heart of
3  it, your Honor.  Yes, it does.  My opinion is 50 cents a unit
4  times the number of infringing units.  If they separately
5  negotiate at 50 cents a unit, the mathematics is inevitable
6  that they each would have to pay -- Barnes & Noble would have
7  to pay 6 million to each of the two.
8       Whereas, my report goes to why a quantity discount
9  would be valid on the second and third patent so that it would
10 conform to a number that would be reasonable in light of the
11 only Georgia-Pacific factor number 1 evidence we have, which is
12 the $12½ million Amazon agreement.
13      I think 6 million is a total that should be paid to
14 Barnes & Noble any way you cut it, whether it is one, two, or
15 three patents.  The maximum would be 6.  I have independent
16 evidence of how each of the '501 and the '703 demonstrates
17 value to Barnes & Noble far in excess of $6 million for each
18 patent separately, but I can't double charge, because then it
19 would be 12 million, and the whole Amazon agreement is 12.5,
20 and Amazon is quite a bit bigger than Barnes & Noble.
21      It's a reasonableness thing for the structure of the
22 agreement using two or three -- the second or third patent free
23 once you pay for one large one.
24      (Continued on next page)
25

Page 890

1    THE COURT: So all you're really calculating is the
2 total amount, which you say should be 6 million; the rate is
3 really secondary to your analysis?
4    THE WITNESS: The rate is secondary.
5    THE COURT: On your analysis it would be 6 million,
6 and if that worked out to a rate of 2 cents, 50 cents, 90
7 cents, it doesn't matter, right?
8    THE WITNESS: Correct. It's a maximum --
9    THE COURT: That's what I thought.
10    THE WITNESS: That's with them negotiating together.
11    THE COURT: Ladies and gentlemen, we are going to give
12 you your mid-morning break at this time.
13    (Jury exits courtroom)
14    THE COURT: Professor Magee, can you go outside. I
15 have to discuss some things with counsel.
16    THE WITNESS: Thank you your Honor.
17    (witness exits courtroom)
18    THE COURT: I am leaning very strongly towards
19 striking Professor Magee's testimony based on the answers he
20 just gave first to counsel and then to me. In the Daubert
21 hearing some of these same issues came up, but I was willing to
22 give him the benefit of the doubt after I looked at his expert
23 report, and also because I had not yet at the point made a
24 determination about certain of the surveys other than the
25 Intertrust surveys. But now what I am hearing it seems to be

Page 891

1 crystal clear that he has no reliable valid methodology for
2 calculating a 50 cent rate. In fact, the 50 cent rate is
3 irrelevant to him. But that's what his opinion is, is that
4 it's a 50 cent rate.
5    In fact, though, what is clear is that what he thinks
6 would have happened was there would have been a $6 million
7 deal, which only would have occurred if they had sat down
8 jointly, for which he had zero basis for believing that would
9 have occurred because they were separate owners at that time.
10 And, by the way, if they had sat down separately, the allegedly
11 reasonable Barnes & Noble would have paid double of what he
12 says they reasonably would have paid when they sat down
13 jointly. I guess it's always good to have another chair at the
14 table. And in this, more or less, totally unsupported
15 scenario, the royalty rate itself would have been a complete
16 irrelevancy because he says, without any support whatsoever,
17 that this is the way these deals are negotiated.
18    Let me hear before I make a final determination from
19 plaintiff's counsel.
20    MR. CABRAL: So there are a couple of different issues
21 here. The reason I requested a sidebar initially was to get --
22    THE COURT: The reason I denied your sidebar, the one
23 and only time I ever denied a sidebar in this trial to any
24 counsel, was because defense counsel was right in the midst of
25 a strenuous cross-examination. It seemed to be unfair to him

Page 892

1 to interrupt it at that time.
2    MR. CABRAL: I completely understand. The issue I
3 wanted to raise with you is the hypothetical raised by Mr.
4 Ederer as to whether there would be more than one hypothetical
5 negotiation, which even Barnes & Noble's expert concedes
6 everybody is at the same table for one negotiation. So it's
7 actually outside of the scope of the opinions given by
8 Professor Magee.
9    The evidence in this case, and this relates partly to
10 the motion to exclude Professor Magee, all shows that Philips,
11 Discovery were all talking to each other with Sony about
12 entering into a joint venture with --
13    THE COURT: But they hadn't.
14    MR. CABRAL: They had.
15    THE COURT: Not at the moment where he says that the
16 hypothetical negotiation should take place.
17    My understanding is that every day I open the New York
18 Law Journal and I see that firm X is thinking about merging
19 with firm Y. Sometimes it happens, sometimes it doesn't. At
20 this point in time in 2009, it hadn't happened yet.
21    MR. CABRAL: Sony and Discovery and Intertrust, they
22 had discussions going back months before the date of the
23 hypothetical negotiation. Philips comes into the picture in
24 early December of 2009, which is pretty much the date of the
25 hypo. You get to March of 2009 -- and all of this evidence is

Page 893

1 cited in the opposition to the motion to exclude where this
2 argument is made by defense counsel. In 2009 they enter into a
3 common interest agreement that states that the parties'
4 communications regarding forming the joint venture that
5 eventually became ADREA go back all the way to September of
6 2009, again, several months before the hypothetical
7 negotiation.
8    THE COURT: I am not sure I see the significance in
9 that. They enter into what is probably, as you described it,
10 an unenforceable back-looking agreement. But you're saying
11 they must have gotten a bit more serious because now they say
12 we are at the point that we are going to after the fact keep
13 secret what we hadn't agreed to keep secret before. Is that
14 the agreement?
15    MR. CABRAL: The agreement relates to communications
16 regardless of its enforceability. What it does demonstrate is
17 that communications were going back at least to the date of the
18 hypothetical negotiation and in fact before that.
19    Now, ADREA was formed only a few months later, so less
20 than a year, maybe eight months after the hypothetical
21 negotiation, in August. So we are not talking about a huge
22 amount of time here. The point being that all the parties in
23 this case agree that there is only one hypothetical negotiation
24 going on.
25    THE COURT: Why would a reasonable owner of a patent,

Page 894

1  who is talking to but not yet having reached an agreement with
2  another hypothetical owner of a patent, who now has a willing
3  buyer who is willing to pay him $6 million on Professor Magee's
4  analysis for his patent alone, say to his future partner, you
5  know what, it doesn't make sense for us to negotiate separately
6  because then we will get $12 million. So in breach of our
7  fiduciary duty to our shareholders, and in breach of common
8  sense, and in breach of any known economic motive, let's
9  negotiate jointly because we will get less that way. I will
10 get 3 million, you will get 3 million, instead of the 6 million
11 apiece we can get by negotiating separately. Why would they do
12 that?
13         MR. CABRAL: I think that goes to the heart of this.
14 Because a critical assumption in the opinions given by
15 Professor Magee is that there are two sides of the table.
16 There is Philips and Discovery on one side and there is Barnes
17 & Noble on the other. That's the same assumption that Barnes &
18 Noble's expert made. So we are talking about a situation, if
19 you get into a scenario where you break those parties up to
20 negotiate separately, we are going outside the bounds of what
21 Professor Magee stated.
22         THE COURT: I am questioning, just based upon what has
23 been shown to me in cross-examination and the previous Daubert
24 hearing, whether the hypothetical negotiation he posits makes
25 any sense. If you think their expert made the same mistake, we

Page 895

1  will get to that with their expert. As I indicated, that's
2  just one of the grounds I just referred to. I know you want to
3  get to the other grounds as well. But it is undisputed, is it
4  not, that at the time that both sides agree the hypothetical
5  negotiation should have occurred the patents were owned
6  separately, yes?
7          MR. CABRAL: The patents were owned separately as of
8  December 2009. That is correct, your Honor.
9          THE COURT: And no one disputes that's the right date.
10         MR. CABRAL: Nobody disputes that's the right date
11 either, you're right.
12         If I can elaborate.
13         THE COURT: Please.
14         MR. CABRAL: The basic framework of the joint venture,
15 the basic agreement, the discussions, and the motivation behind
16 forming the joint venture were all in place. And that
17 ultimately led to the formation of the company, which takes
18 time to formulate a deal of that complexity.
19         THE COURT: That may be, but I still don't see, if
20 there weren't one company, why would they have any economic
21 motivation? They can deal with what they feel is one company
22 when they become one company. But at this point in time, on
23 his analysis, which I already indicated strikes me as absurd in
24 other respects, but on his analysis, they would have a strong
25 motivation not to act as one company because he thinks, he

Page 896

1  asserts, in what frankly strikes me as totally
2  counterintuitive, they could have done twice as well if they
3  had negotiated separately.
4          MR. CABRAL: Your Honor, again, I think this gets away
5  from the centerpiece of his opinion.
6          THE COURT: Under Rule 702, which is the relevant
7  rule, I have to look at whether he has a sound methodology,
8  soundly applied to adequate data. The data here is rather
9  biased. He is asserting, by the way, all sorts of things about
10 package deals and stuff like that, for which I don't recall
11 seeing any data, even though it's quite central to his opinion.
12 And his methodology, based on what are undisputed facts,
13 namely, who owned the patents at the relevant date, his
14 methodology asserts that they would have acted in a way totally
15 contrary to their economic interests.
16         MR. CABRAL: I think that again goes to the assumption
17 of whether there are two sides of negotiation, one with Philips
18 and Discovery on the one end and Barnes & Noble on the other.
19 If you split them up, I think you're getting away from his
20 actual methodology.
21         THE COURT: But if you don't split them up, then
22 you're getting to a false fact because they were split up at
23 the relevant date.
24         MR. CABRAL: This goes to the case law, and I think
25 something you actually mentioned in the Daubert hearing, as to

Page 897

1  whether ADREA would participate in a hypothetical negotiation.
2  And this is not an entirely clear area of the law in terms of
3  the book of wisdom and how far you can look out and so forth.
4          The basic parameters of the joint venture were in
5  place. That led to the formation of the company after enough
6  time had gone by to form the joint venture. From a practical
7  standpoint, the evidence supports that Philips and Discovery
8  were operating together.
9          THE COURT: Even if that were true, just so we can
10 move on -- I understand your point; I am not sure I am
11 persuaded by it, but I understand your point -- but his answers
12 to what would have occurred, based on his methodology, if they
13 had been separate, seems to me so revealing about the flaws in
14 his methodologies. Because it's like someone saying, I have
15 come up with a formula for determining a particular result, and
16 my formula says that under certain circumstances two plus two
17 equals eight. Now, my opinion was that under the circumstances
18 that I took, applying my methodology, two plus two equals four,
19 but I agree with defense counsel that if in fact you would
20 apply my formula to the facts that defense counsel posited,
21 then two plus two equals eight. That shows what is wrong with
22 the formula, what is the wrong with the approach. It is
23 completely methodologically unsound.
24         Another respect, and you may want to address this, he
25 basically says, assuming now a joint negotiation or a

Page 898

1  negotiation by the hypothetical ADREA, he says the only thing
2  they care about is the total package amount. The royalty rate
3  could be one cent, it could be 50 cents, it could be 99 cents,
4  that doesn't matter, even though my bottom line opinion is they
5  would have come up with a 50 cent royalty rate. That seems to
6  me to again expose the methodological flaws of his approach.
7       MR. CABRAL: This gets to the second issue. If I can
8  address briefly the first issue.
9       THE COURT: Yes.
10      MR. CABRAL: I think you are right, in the sense that
11 what my argument is is that if both Discovery and Philips are
12 negotiating together, based on the premise of the joint
13 venture, which is what we believe was the case, even back on
14 the date of the hypothetical negotiation, it certainly was the
15 fact several months later, then I think your problems with the
16 methodology in that sense go away, because they were
17 negotiating together and you didn't have to enter into the
18 second negotiation, which I think you have a problem with. So
19 I think that is the basis of that issue.
20      To get to your second issue, in terms of the
21 questioning that you just had with Professor Magee, candidly, I
22 don't know if he was intimidated by your Honor or what.
23      THE COURT: He is an experienced witness. He makes a
24 lot more than I do. He is clearly a guy who has testified many
25 times. I didn't see any even hint of intimidation.

Page 899

1       MR. CABRAL: Regardless of the intimidation, your
2  Honor --
3       THE COURT: By the way, it wouldn't be relevant
4  anyway. He said what he said under oath.
5       MR. CABRAL: He did, your Honor. Respectfully,
6  candidly, I think what he said on the stand is inconsistent
7  with what is in his report.
8       In your Honor's order, you identified the fact that
9  there is limited evidence in this case, and in a situation
10 where you have limited evidence you would allow more
11 speculation than you otherwise would. In an effort to comply
12 with that order, we removed the lump sum part of his analysis,
13 which shows growth rates going out to 2016, and removed a lot
14 of that uncertainty, focusing in on the running royalty aspect
15 of his opinion.
16      When you focus in on the running royalty, you really
17 only focus on the 50 cents. And I think when you were asking
18 questions -- they were leading questions, but they are from
19 your Honor so your Honor is obviously permitted to do that -- I
20 think he was answering yes in an effort to comply. But his
21 answers were not consistent with his opinions in his expert
22 report, which determined the running rate, the per unit rate,
23 in the best way he can based on the evidence available to him.
24      Now, you heard him explain why the Amazon agreement
25 was not a suitable mechanism to determine a per unit rate

Page 900

1  because it just gives you the lump sum. So informally it
2  guides you in terms of the overall amount that should be paid
3  in terms of reasonableness, but you can't arrive at a per unit
4  rate using that Amazon agreement for the reasons Professor
5  Magee stated.
6       You also heard him testify about using the Barnes &
7  Noble licensing history to determine the structure of the
8  agreement, which again ties into the record. So again you have
9  per unit rates. That's all Barnes & Noble pays for the Nook
10 devices. And that informed his opinion to the fact that you
11 can't use the Amazon agreement to convert it to a lump sum
12 because that's not what Barnes & Noble does with the technology
13 on its Nook devices.
14      You also heard him testify about Georgia-Pacific
15 number 4, in terms of the settlement offer, in terms of
16 arriving at the 50 cents and making whatever modifications you
17 need to adjust for the fact that 15 million software
18 applications are not included in this particular case.
19      Now, when you take out the Intertrust agreement, the
20 PCT analysis, and the Ocean Tomo analysis --
21      THE COURT: I am not sure, even before my questions,
22 that what he said follows what you're suggesting. For example,
23 on the Amazon, although he wasn't permitted to use the 13.5,
24 although I think it crept in later in some of his testimony
25 anyway, but he had gone into this in the Daubert hearing, but

Page 901

1  his basic point was the Amazon deal should be cut in half
2  because it includes the patents here and includes other stuff.
3       So he is not looking at the royalty rate. He is
4  looking the lump sum again. It was a check. He is saying, I
5  am thinking this should be a $6 million deal. Amazon was
6  13-1/2, but that makes sense because they are getting twice as
7  much. I am oversimplifying it. That was the gist of it. That
8  again is not focusing on the royalty rate at all.
9       MR. CABRAL: I think that is not reflective of what
10 his running royalty payment is. Again, I think he uses the
11 Amazon agreement. I think he was clear about this early in his
12 testimony in terms of how he uses it in his running royalty
13 analysis, per unit rate analysis.
14      There are a lot of reasons why you can't use the
15 Amazon agreement to arrive at a per unit rate. A lot of that
16 is incomplete information regarding Amazon's unit sales. So
17 that gets into speculation from the parties' perspective at the
18 time of the hypothetical negotiation.
19      I think you are correct, your Honor, in the sense of
20 how he used the Amazon agreement as a check. I think Mr.
21 Ederer asked him, What if the per unit rate were two dollars
22 per unit? Then you are getting into a situation which is
23 unreasonable because you're getting well beyond the rate that
24 the much larger company paid. I think that goes to the heart
25 of it. He is using the Amazon agreement the only way he can,

Page 902

1    not to determine per unit rate, but as a check on his overall.
2        THE COURT:  I will hear briefly from defense counsel,
3    and then I will take a five-minute break to reflect on all of
4    this, and then I will rule.
5        MR. CABRAL:  The only other way to do this, I think,
6    is if the Amazon agreement was the only way your Honor views to
7    determine a reasonable royalty in this case, then you have to
8    do it in terms of a lump sum.  And if you do it with the lump
9    sum, based on the parties' expectations at the time of the
10   hypothetical negotiation, when you look at the actual data from
11   2010 and 2011, you have Barnes & Noble entering the market at
12   40 percent of what Amazon sells.
13       THE COURT:  That is not his opinion.  You can't have
14   it both ways.  His opinion is couched as a royalty rate, not as
15   a lump sum.
16       MR. CABRAL:  That's right.  I would only ask, if you
17   were to strike his opinion because you didn't think there was
18   enough adequate information to determine a per unit rate, that
19   we would be given the opportunity to present evidence, if not
20   through Professor Magee, but at least through Mr. Barnes,
21   because Mr. Barnes certainly thinks you're capable of
22   determining a lump sum from the evidence in this case.
23       THE COURT:  I will consider that.
24       I wanted to make one other point clear.  Rule 703 of
25   the Federal Rules of Evidence -- this relates to the two other

Page 903

1    surveys, Ocean Tomo and the other one.
2        MR. CABRAL:  Ocean Tomo and PCT capital.
3        THE COURT:  Rule 703 reads:  "An expert may base an
4    opinion on facts or data in the case that the expert has been
5    made aware of or personally observed."  So he was aware of it.
6        "If experts in the particular field would reasonably
7    rely on those kinds of facts or data in forming an opinion on
8    the subject, they need not be admissible for the opinion to be
9    admitted."  This does not, I think, fit within that category.
10   That's more like things like treatises and stuff like that, and
11   certainly not a study commissioned by counsel for one party,
12   which was what these were.
13       Then the rule goes on:  "But if the facts or data
14   would otherwise be inadmissible, the proponent of the opinion
15   may disclose them to the jury only if their probative value in
16   helping the jury evaluate the opinion substantially outweighs
17   their prejudicial effect."
18       The commentary of the advisory committee notes make
19   clear that the point is that since this is otherwise
20   inadmissible hearsay, it is by its very nature prejudicial and
21   difficult to evaluate because the jury doesn't know anything
22   about the underlying survey.  So it would only be that they
23   wanted to give an escape hatch for the rare situation where,
24   even though it was inadmissible hearsay and difficult to
25   evaluate and so forth, the probative value was so great that it

Page 904

1    substantially outweighs the prejudicial effect.  That clearly,
2    in the Court's view, applied to these two surveys.  So that's
3    why I did not let him testify about that.
4        By way of contrast, there were some questions the
5    other day from plaintiff's counsel, objected to by defense
6    counsel, and I overruled the objections, where plaintiff's
7    counsel was eliciting some statements -- this was I guess on
8    Mr. Berg's testimony -- that referenced Mr. Narain's
9    statements.  Mr. Narain's statements would have been admissible
10   because they were statements from a party adversary since he
11   was employed at Barnes & Noble in 2009.  So that's why 703 did
12   not bar those questions from plaintiff, but did bar the stuff
13   that they wanted to ask Magee about.
14       All right.  Let me hear from defense counsel.
15       MR. CABRAL:  Your Honor, if I can just ask one point
16   of clarification.  You said a study commissioned by a party,
17   counsel for a party?
18       THE COURT:  Aaron Fox is my recollection.
19       MR. CABRAL:  You're referring to the PCT analysis
20   specifically?
21       THE COURT:  The one I have right in front of me is
22   Ocean Tomo.
23       MR. CABRAL:  So setting aside the Ocean Tomo
24   analysis --
25       THE COURT:  Intertrust is already out.

Page 905

1        MR. CABRAL:  That leaves the PCT agreement as well.
2    It looks as if that was commissioned by Aaron Fox.
3        THE COURT:  Yes.  Very good.
4        Yes, sir.
5        MR. EDERER:  Very briefly, your Honor.  First of all,
6    just addressing the issue of Philips and its involvement in all
7    of this.
8        First of all, the stipulated fact is that the
9    hypothetical negotiation took place in November 2009.
10   Mr. Shamoon testified that Philips didn't get involved in any
11   of the discussions until after December 25, 2009.  He gave
12   sworn testimony in this case to that effect.  And the NDA that
13   Mr. Cabral was referring to that Philips signed was signed at
14   the end of the January 2010.  So there is no question
15   whatsoever that Philips was not involved in any of these
16   discussions back in November 2009 when the hypothetical
17   negotiation would have taken place.
18       THE COURT:  Let me add to this.  I know the case law
19   is not totally consistent on this point, but I am going to give
20   my view of it so if there is an appeal, this case can be
21   assessed.
22       I do not think the hypothetical can be by someone who
23   is not an owner of the patent at the time of the hypothetical
24   date.  I think the whole point is to try to figure out what
25   would have happened if there had been an arm's-length

Page 1186

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
ADREA, LLC,
      Plaintiff,
    v.         13 Cv. 4137 (JSR)
BARNES & NOBLE, INC.,
BARNESANDNOBLE.COM LLC, AND
NOOK MEDIA LLC,
      Defendants.
------------------------------x
           October 21, 2014
           10:05 a.m.

Before:
       HON. JED S. RAKOFF
         District Judge

      APPEARANCES

PROSKAUER ROSE LLP
    Attorneys for Plaintiff
BY: STEVEN M. BAUER
    COLIN CABRAL
    BRENDAN COX

ARNOLD & PORTER LLP
    Attorneys for Defendants
BY: LOUIS S. EDERER
    ALI R. SHARIFAHMADIAN
    MICHAEL A. BERTA
    YUE-HAN CHOW
    SARAH BRACKNEY ARNI
    SUSAN L. SHIN

Page 1187

1  (Trial resumed; jury not present)
2  THE COURT: I will note for the record that I sent
3  counsel this morning the final charge and the final verdict
4  form. The only -- to be continued.
5  (Jury present)
6  CLIFFORD NEUMAN, resumed.
7  THE COURT: So, ladies and gentlemen, I apologize
8  profusely. It was literally beyond my control. There are
9  matters that unfortunately have to be handled sometimes, but it
10 doesn't make it right for you, and I am really sorry that you
11 had to sit around so far. But let's continue.
12 MR. CABRAL: Thank you, your Honor.
13 CROSS-EXAMINATION (Cont'd)
14 BY MR. CABRAL:
15 Q. Good morning, sir.
16 A. Good morning.
17 Q. Yesterday when we finished we were talking about the '501
18 patent. So if we can bring up claim 7 of the '501 patent.
19 Yesterday we were talking about the "storing an
20 electronic book on a viewer" element, claim 7. Do you recall
21 that?
22 A. I do recall that.
23 Q. And we spoke yesterday about several instances where the
24 Saigh patent stated that the memory was separate from the
25 control unit viewer. Do you recall that?

Page 1188

1  A. I do recall referring to that.
2  Q. I want to talk about a different element of the '501 patent
3  and claim 7 specifically, and that's the next element that
4  appears in the claim, the "associating a predetermined amount
5  of time" element. Do you see that?
6  A. I do see that.
7  Q. You agree that the Court defined this term to mean
8  associating with the electronic book for a predetermined amount
9  of time that begins when the electronic is stored on the
10 viewer. Do you agree?
11 A. I do agree.
12 Q. And your understanding of the Saigh patent is that the
13 reference describes a preset time period that is transcribed
14 into the memory module, is that right?
15 A. That is correct.
16 Q. Those memory modules are the Nintendo cartridges we talked
17 about yesterday or the equivalent thereof?
18 A. They are writable, but yes, they are.
19 Q. The time period that is discussed in the Saigh patent,
20 that's written into the memory of the memory modules at
21 something called book bank facilities, is that right?
22 A. That is under one embodiment. There is a separate
23 embodiment where they are written into the memory on the device
24 through the controller where they are being copied from one of
25 those compact cylinders.

Page 1189

1  Q. So if we could bring up the Saigh patent, column 7, from
2  line 61 through 65.
3  This is Defense Exhibit 411. There is a copy in your
4  binder if you would like to look at it as well.
5  A. I do have that one. It's actually quite small in print.
6  Q. Maybe on the screen we can blow it up a little bit. That
7  will be line 61 through 65.
8  I want to direct your attention to the last four lines
9  in the paragraph beginning with "the preset time." Do you see
10 that?
11 A. I do see that.
12 Q. It says, "The preset time periods before automatic erasure
13 of information programmed in the memory module may be set in
14 the memory module from a book bank facility or from a compact
15 cylinder." Do you see that?
16 A. I do see that.
17 Q. So you agree that the time period in the Saigh patent is
18 written into the memory modules either at the book bank
19 facility or from a compact cylinder, correct?
20 A. That is what is being stated there, yes.
21 Q. Now, isn't it your view that the Saigh patent describes a
22 lending period that begins after the information is transcribed
23 in the memory module?
24 A. Yes, that is what is described.
25 Q. Before we leave the lending patent, I just have a few more

Page 1306

1  reported market share of more than 50 percent." And the
2  footnote then cites to several sources, articles.
3      So the objection is sustained.
4  BY MR. BAUER:
5  Q. The document you relied on was a Web site?
6  A. Are you talking about this document?  It's an article.
7  Q. It was an article that you found on the Web?
8  A. It's very likely that it was found on the Internet.
9  Q. I don't need to deal with what the articles are.  We are
10 lucky.  We have the exact sales figures.  Let's get the exact
11 sales figures for the first three quarters of 2011 for Barnes &
12 Noble.  I thought that would be the easier way to do it, but we
13 will just get it quickly.
14     Going to your Barnes Exhibit 4A, and right in the
15 middle, from January 2011, let's take it through September
16 2011.  Those are the first three quarters, right?
17 A. OK.
18 Q. Just ballpark for me what you think those sales are for the
19 first three quarters, actual sales for Barnes & Noble.
20     MR. EDERER:  Objection, your Honor.
21     May we approach?
22     THE COURT:  You may approach, but I don't see anything
23 objectionable in the question just put.  If there is some other
24 issue you can approach.
25     MR. EDERER:  There is some other issue.

Page 1307

1      THE COURT:  Come up.
2      (At the sidebar)
3      THE COURT:  Before we get to your issue, just to
4  elaborate on the last ruling.  The mere fact that the defense
5  lists an exhibit doesn't mean that they waive all objections to
6  it if used for some other purpose or offer it for some other
7  purpose after they haven't offered it by the defense.
8      In the case of this particular article, the expert was
9  citing it for the fact that Amazon had been reported -- and the
10 newspaper article itself indicates it wasn't reported like in
11 an SEC filing or anything like that, it was reported from
12 another hearsay nongovernmental source -- to have more than 50
13 percent of the market.  That doesn't remotely open the door to
14 plaintiffs relying on that article to show that what the
15 article -- again, in total double hearsay form -- reports about
16 Nook sales for that same period is something that this expert
17 is vouching for, let alone that it's admissible in evidence.
18 So that was the reason I sustained the objection.
19     Now, what is the new problem?
20     MR. EDERER:  I would like to take this one step
21 further, your Honor.  Because what is going on here now is that
22 Mr. Bauer is attempting to create for the jury in a prejudicial
23 way the false inference that they should take the $12.5 million
24 that was paid by Amazon, which related to a 300 patent
25 portfolio, and they should simply take the difference between

Page 1308

1  whatever the percentage of the market Amazon had and whatever
2  percentage of the market Barnes & Noble had, do a quick math
3  calculation, and $6 million.  This is going back to what
4  Professor Magee was exactly doing and why he was excluded.
5  This is where this is all leading.
6      THE COURT:  I don't think so.  At least he hasn't done
7  that yet.  I think he is, at a minimum, attempting to show that
8  some of the assumptions that underlay the witness's treatment
9  of the Amazon settlement were arguably misplaced.  So, for
10 example, he showed right before the lunch break that Barnes &
11 Noble would have had very different motivations or a greater
12 degree of motivation than Amazon would to have entered into
13 that agreement.  That was maybe right, maybe wrong, but that
14 was a fair argument to bring to the jury's attention.  And now
15 I think he is on the way to bring to their attention another
16 possibility.
17     So I am going to allow this.  This is without
18 prejudice to any objections you want to make about his
19 summation, if he is going to say what you think he is going to
20 say, but I don't know that yet.
21     MR. BAUER:  Your Honor, the witness has said that the
22 Amazon agreement is the single best market value.  I am going
23 to ask him that if Barnes & Noble had 40 percent of the market
24 on that day, why wouldn't he have valued the agreement at $5
25 million?

Page 1309

1      THE COURT:  I think that is a fair argument as
2  impeaching his methodology.  That doesn't mean that you should
3  be able to argue to the jury on summation that that's what it
4  should be.  Those are two different issues.
5      MR. BAUER:  OK.  Thank you.
6      (Continued on next page)