# EXHIBIT E

"HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY"

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2              SOUTHERN DISTRICT OF NEW YORK
 3                      ---o0o---
 4
 5   ADREA, LLC,
 6                Plaintiff,
 7        vs.                    No. 13-CV-4137 (JSR)
 8   BARNES & NOBLE, INC.,
     BARNESANDNOBLE.COM LLC, and
 9   NOOK MEDIA LLC,
10                Defendants.
11   _____
12
13        "HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY"
14
15         VIDEOTAPED DEPOSITION OF SHAWN AMBWANI
16                San Francisco, California
17                Friday, October 25, 2013
18
19
20
21
22
23   Reported by:
24   DARCY J. BROKAW, RPR, CRR, CLR, CSR No. 12584
25   JOB NO. 67016
```

Page 6

1    the road for you; and then if anything's unclear for
2    you, please ask me and I'll try to clarify it for
3    you.
4            I'm going to ask you a series of
5    questions.  You're under oath today, obviously.
6            The court reporter is going to take
7    everything that's said in this room while we're on
8    the record down.  So for that reason, I would ask
9    that you respond orally to my questions instead of,
10   for example, with gestures or "ums" and things like
11   that.
12           Is that clear?
13       A.  Yes.
14       Q.  Okay.  Great.
15           Is there any reason that you cannot
16   testify completely and truthfully to my questions
17   today?
18       A.  No.
19       Q.  Do you understand -- I guess do you have
20   an understanding of why you're being deposed?
21       A.  No.
22       Q.  Okay.  Do you understand that there is a
23   lawsuit between Adrea and Barnes & Noble and some of
24   its related companies?
25       A.  Yes.

Page 7

1        Q.  Do you understand the nature of that
2    lawsuit?
3        A.  Yes.
4        Q.  What is your understanding?
5        A.  I understand that it's a patent lawsuit
6    where Adrea has asserted a certain number of patents
7    against Barnes & Noble.
8        Q.  Okay.  Now, you're -- well, where are you
9    currently employed?
10       A.  I'm currently employed at Unified Patents.
11       Q.  Okay.  And were you at one time employed
12   at Adrea?
13       A.  No.
14       Q.  Okay.  Were you at one time employed at
15   Intertrust?
16       A.  Yes.
17       Q.  Okay.  And as part of your job
18   responsibilities at Intertrust, were you providing
19   certain services to Adrea?
20       A.  Yes.
21       Q.  Well, actually, let's back up a little
22   bit.  Can you please tell me your educational
23   background since high school.
24       A.  I'm sorry, do you want me to include high
25   school or --

Page 8

1        Q.  Since high school, since you graduated
2    from high school.
3        A.  I graduated from UCLA in 1994 with a
4    Bachelor's of Science in mathematics/applied
5    sciences.  And I proceeded to go to get a J.D. MBA
6    from Boston University, and I graduated in 1997.
7        Q.  Okay.  And can you tell me your employment
8    history since your degree in 1997?
9        A.  Sure.  I graduated in 1998, and to 2001, I
10   worked at a company called France Telecom Research &
11   Development.
12       Q.  That was the name, France Telecom
13   Research & Development?
14       A.  Yes.
15           And then I worked at a company called
16   Envivio.  And then subsequently I worked at a
17   company called NexStreaming.  And then I worked at
18   Intertrust.
19       Q.  Okay.  Well, let's back up.
20           At France Telecom Research & Development,
21   what were your responsibilities there?
22       A.  Business development, technology scouting.
23          (Reporter inquires.)
24           THE WITNESS:  Scouting.
25   ///

Page 9

1    BY MR. SHARIFAHMADIAN:
2        Q.  What does that mean exactly?
3        A.  That means investigating different
4    technologies available to be utilized by France
5    Telecom in the Bay Area.
6        Q.  So to be utilized by France Telecom.
7            Okay.  So what kind of technologies?
8        A.  It could be web-based technologies, it
9    could be -- mostly Internet-based technologies.
10   Voice-over IP.
11       Q.  So were you identifying technologies that
12   France Telecom could license from other entities?
13       A.  Potentially, or they could purchase or
14   they could partner with.
15       Q.  I see.  And what was your title there?
16       A.  My final title was project manager, I
17   believe, business development.
18       Q.  And the next company, you said was
19   Envivio?
20       A.  Yes.
21       Q.  What years were you there?
22       A.  I don't precisely remember, but I believe
23   it was 2001 to -- maybe 2000 to 2003, I apologize.
24   There was some overlap.
25       Q.  There was overlap?

"HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY"

Page 42

1  BY MR. SHARIFAHMADIAN:
2      Q. Okay. Well, when was Barnes & Noble a
3  potential licensee -- strike that.
4          When was Barnes & Noble identified as a
5  potential licensee by Adrea?
6          MR. CABRAL: Objection to form.
7          THE WITNESS: I don't know.
8  BY MR. SHARIFAHMADIAN:
9      Q. And this document in no way refreshes your
10 recollection as to whether, as of September 20,
11 2010, Barnes & Noble was a potential licensee of
12 Adrea?
13         MR. CABRAL: Objection to form.
14         THE WITNESS: Well, according to this
15 document, Barnes & Noble was a potential licensee as
16 of this date; but you asked me originally, I
17 believe, when they became a licensing target for
18 Adrea, and I don't know that. I don't remember.
19 BY MR. SHARIFAHMADIAN:
20     Q. Do you know what efforts were undertaken
21 to identify Barnes & Noble as a potential licensee
22 of Adrea?
23         MR. CABRAL: Objection to form.
24         THE WITNESS: We discussed internally
25 about the size of the e-book market and looked at

Page 43

1  various aspects of metrics that we could publicly
2  find out.
3  BY MR. SHARIFAHMADIAN:
4      Q. I guess why would you need a license from
5  Adrea just because you made e-book readers?
6          MR. CABRAL: Objection to form, lacks
7  foundation.
8          THE WITNESS: Are you asking my opinion
9  or -- I don't really understand the question.
10 BY MR. SHARIFAHMADIAN:
11     Q. I'm asking for your understanding.
12         MR. CABRAL: Same objections.
13         THE WITNESS: If they don't want a license
14 to Adrea, they don't have to take a license.
15 BY MR. SHARIFAHMADIAN:
16     Q. I understand, but why would Adrea think
17 that they should take a license?
18         MR. CABRAL: Objection to form, calls for
19 speculation.
20         THE WITNESS: I'm not an expert in the
21 patents. So my understanding was that a target list
22 was created. We would approach these targets in
23 order to discuss potential licensing. They would
24 evaluate the patents. If they liked -- or they
25 evaluated these patents and they wanted to take a

Page 44

1  license, they would take a license.
2  BY MR. SHARIFAHMADIAN:
3      Q. What would you tell them about why they
4  would need a license?
5          MR. CABRAL: Objection to form.
6          THE WITNESS: Well, as anyone who takes a
7  license, there's a risk if they don't take a license
8  that there's potential for litigation.
9  BY MR. SHARIFAHMADIAN:
10     Q. I guess that's my point. That's what I'm
11 asking you.
12         Why is there a risk -- there's only a risk
13 of potential litigation if somebody's infringing a
14 patent. What reason was there to believe that they
15 were infringing your patents?
16         MR. CABRAL: Objection to form.
17         THE WITNESS: I'm not an expert in the
18 patents. I presented our, you know -- we'd done a
19 licensing deal at that point. Or I don't actually
20 remember when we did the licensing deal, because I
21 wasn't involved in it.
22         But there was a licensing deal done in the
23 end with Amazon, and my understanding, based on my
24 discussions with the people, with Jeff and Talal,
25 was that these patents would be applicable to other

Page 45

1  companies as well.
2  BY MR. SHARIFAHMADIAN:
3      Q. Okay. What was your understanding as to
4  why these patents would be applicable to other
5  companies?
6      A. Just that they were related to e-books.
7      Q. Okay. Anything more than that? I mean,
8  just because they're related to e-books doesn't mean
9  that somebody is necessarily practicing those
10 patents, does it?
11         MR. CABRAL: Objection to form.
12         THE WITNESS: I don't know. We didn't
13 identify the specific patents, I believe, at this
14 point, I mean, or we didn't even do any of that, as
15 far as I know.
16 BY MR. SHARIFAHMADIAN:
17     Q. So when you approached companies to
18 potentially take a license in Adrea's portfolio, did
19 you even have an understanding as to whether they
20 were infringing any of the patents in the portfolio?
21         MR. CABRAL: Objection to form.
22         THE WITNESS: Well, there's different ways
23 of approaching a company. And in the case of these
24 companies, especially Barnes & Noble, we approached
25 them in different ways, including partnering,

12 (Pages 42 to 45)