G6nWadr1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   ADREA, LLC,

 4                  Plaintiff,

 5           v.                          13 Civ. 4137 (JSR)

 6

 7   BARNES & NOBLE, INC.,
     BARNESANDNOBLE.COM LLC, and
     NOOK MEDIA LLC,

 8                                       Trial

 9           Defendants.

10   ------------------------------x
                                         New York, N.Y.
11                                       June 23, 2016
                                         10:20 a.m.
12
     Before:
13
                         HON. JED S. RAKOFF,
14
                                         District Judge
15

16                           APPEARANCES

17   PROSKAUER ROSE LLP
          Attorneys for Plaintiff
18   BY:  COLIN G. CABRAL
          BRENDAN S. COX
19

20   ARNOLD & PORTER LLP
          Attorneys for Defendants
21   BY:  LOUIS S. EDERER
          SUSAN L. SHIN
22        JULIE A. SIMEONE
          MAXWELL PRESTON
23

24

25
```

1          (Case called)

2          MR. CABRAL:  Colin Cabral, for the plaintiff, from

3    Proskauer Rose.  With me is Brendan Cox from Proskauer as well.

4          MR. EDERER:  Good morning, your Honor.  Louis Ederer

5    from Arnold & Porter, representing the Barnes & Noble

6    defendants.  With me is my partner Susan Shin and others from

7    my office.

8          THE COURT:  Who are the other folks at plaintiff's

9    table?

10          MR. CABRAL:  At the plaintiff's table, we have

11   Mr. Berk, who is our technical consultant, and a paralegal.

12          THE COURT:  All right.  Any witnesses other than one

13   corporate representative for each side are excluded from the

14   courtroom, beginning right now.  So if there's anyone in the

15   courtroom that is a witness, they need to go to the witness

16   room.

17          All the motions *in limine* -- there were ten, quite

18   excessive, from the plaintiff, and two, somewhat more colorful,

19   from the defense -- are denied as moot.  Since this is a bench

20   trial, I don't need to decide the motions *in limine* in advance.

21   Both sides were given the option, but they're not required, to

22   make opening statements.  If plaintiff wants to make an opening

23   statement, now is your opportunity.

24          MR. CABRAL:  Thank you, your Honor.  Your Honor, we

25   have hard copies of the presentation.  May I approach?

1           THE COURT:  Yes.

2           MR. CABRAL:  Thank you, your Honor.  Whenever you're

3    ready.

4           THE COURT:  Go ahead.

5           MR. CABRAL:  Your Honor, we now know that Barnes &

6    Noble infringes the '703 patent.  Liability has been

7    established, so we're here to determine the proper measure of

8    compensatory damages for Barnes & Noble's infringement.  But

9    before turning straight to the damages analysis, I think it's

10   important to briefly revisit the patent technology and how

11   Barnes & Noble uses that technology on the infringing devices.

12          The '703 patent at its core is a patent about content.

13   The inventor of the patent, Mr. Shteyn, testified that his

14   invention provides content relating to the use of electronic

15   devices.  In particular, it's about providing content that

16   improves the consumer's use of that electronic device.  In this

17   particular case, Barnes & Noble provides content in the form of

18   specific product recommendations, or e-books recommended for

19   purchase, to users of those devices.  The implementation of the

20   patented technology on the Nook device is found in a shop

21   feature on the Nook.  The home screen of the Nook device

22   includes a menu bar with a button for the shop application.

23   When pressed, that button sends a request to Barnes & Noble,

24   who using identifiers associated with the device, return

25   product recommendations in the form of e-books for the user.

G6nWadr1                         Opening - Mr. Cabral

1              Now, this recommended content can come in several

2     different forms.  As we see here, the top line of this blowup

3     screen shows recommended products that Barnes & Noble happens

4     to include as part of its big fall sale.  You also have more

5     popular products that could be associated with New York Times

6     best seller list, for example, and at the bottom of the screen

7     is yet another example of a particular genre of a particular

8     product that the user may want to purchase.

9              Now, users may find this particular invention useful

10    in the sense that they may find it helpful to receive

11    recommended books that they may want to read, but the real

12    value of this invention is to Barnes & Noble itself.  The

13    patented technology allows Barnes & Noble to promote and market

14    its products directly to the consumer on a device and in an

15    application that is designed for the consumer to purchase the

16    products.  And that's where the value lies here.  It is an

17    invention that puts Barnes & Noble's products in front of their

18    customers for the purpose of them purchasing it, in order to

19    generate revenue for the company.

20             Now, in addition to some of the other aspects of the

21    invention that I've just discussed, the invention also

22    eliminates the need for customers to search for desired

23    content.  By desired content, I mean e-books to read the Nook,

24    that is, on the Internet using a web browser.  This invention

25    makes it more likely that a customer's going to be connected

1    with a book that they'll want to read, a product that they want

2    to buy, and it makes it less likely that that particular

3    customer is going to be distracted in their web browsing from

4    making a purchase, or worse yet, be directed to a competitor of

5    Barnes & Noble to make the purchase elsewhere, which takes us

6    back to the issue of compensatory damages, which in the case of

7    patent infringement is governed by 35 U.S.C. 284.

8            The statute says that the Court shall award no less

9    than a reasonable royalty, together with interest and costs, as

10   fixed by the Court.  And the third paragraph of the statute

11   also says that the Court may receive expert testimony, as it's

12   going to do in these proceedings, to assist with the

13   determination of what royalty would be reasonable under these

14   circumstances.

15           Now, the parties' experts are in agreement about some

16   pretty basic things.  First, they agree that they're in

17   agreement regarding the analysis that needs to be done to

18   determine a reasonable royalty.  They've both adopted the

19   Georgia Pacific analysis in the hypothetical negotiation.

20           THE COURT:  Let me just interrupt for a moment.  This

21   is for both sides.  The federal patent bar association recently

22   released proposed new jury instructions, and what caught my eye

23   were the instructions on damages.  They take the position that

24   while the Georgia Pacific factors were useful at the time in

25   1970 or '71 when Judge Tenney of this court first raised them

1    as sort of a laundry list of things that one might look at, and

2    although it's of course the case that they have been widely

3    adopted by the courts of the United States, in fact over time

4    they've become increasingly less useful and that really only

5    one or two factors should be looked at.  Now, this is, of

6    course, just a proposal from the federal bar, federal patent

7    bar association, but I thought it was a helpful one.  So

8    between now and when we finish tomorrow, you may want to take a

9    look at those proposed instructions.

10             Go ahead.

11             MR. CABRAL:  Thank you, your Honor.

12             In addition to the analysis to determine the

13   reasonable royalties, the parties are also in agreement

14   regarding the basic construct of the hypothetical negotiation.

15   They agree that the two participants are Philips and Barnes &

16   Noble.  They also -- the experts, that is -- are in agreement

17   regarding the time frame of a hypothetical negotiation, which

18   in this case is November 2009.  The reason for that is this

19   patent issued in November 2009, and it also happens to coincide

20   with the time period that Barnes & Noble actually entered the

21   market for e-readers and e-books, which is also at the same

22   time.

23             The parties are also in agreement regarding the basic

24   assumptions that are required under the law; namely, they're in

25   agreement regarding the fact that the parties are all willing

1   participants who want to enter into a deal, and that both

2   parties in the negotiation have assumed that the '703 patent is

3   valid and infringed.

4          Where the parties' experts disagree is the outcome of

5   this negotiation, as well as how certain information should be

6   factored into the overall analysis of the Georgia Pacific

7   factors.

8          Now, we're going to hear evidence that Barnes & Noble

9   needed to enter the market at this time frame, the e-reader

10  market, to effectively compete with its competitors.  One of

11  those competitors was Amazon, who had been in the market for

12  e-readers for about two years before the date of the

13  hypothetical negotiation.  You're also going to hear evidence

14  that Barnes & Noble expected the infringing feature that's

15  patented by the '703 patent to increase its revenue.  What

16  you're not going to hear is any credible evidence that there

17  was an acceptable, noninfringing alternative to the technology

18  patented by the '703 patent.

19         Plaintiff is going to offer the testimony of David

20  Yurkerwich.  Mr. Yurkerwich is an expert with decades of

21  experience in the field of patent licensing and portfolio

22  management.

23         It's worth noting at this point that this Court has

24  previously acknowledged the limited nature of the evidence

25  available in a particular case to determine a reasonable

 1  royalty, using this hypothetical negotiation approach.  But I

 2  also think it's important to note that the parties are in

 3  agreement that the best available evidence in this case is the

 4  2011 license and settlement agreement involving Amazon.  That

 5  happens to be the only real-world license involving the '703

 6  patent, and it's a fairly complicated agreement.  There's a lot

 7  going on in that agreement.  There are licenses.  There are

 8  cross-licenses.  There are options for license, covenants not

 9  to sue, releases.  There is a lot to unpack from that

10  agreement.  And the Amazon agreement is also something that

11  involves lump sum payments as opposed to a per-unit royalty,

12  which both sides are seeking to calculate here.  It's also an

13  agreement that's directed to a patent portfolio as opposed to

14  the '703 patent alone, and for these reasons, the parties need

15  to make certain adjustments to that agreement.

16          THE COURT:  Let me take the liberty of interrupting

17  you again.  One of the motions *in limine*, which I denied

18  because in a bench trial we'll just deal with it when the

19  witnesses take the stand, but this was related to the fact that

20  Mr. Yurkewich continues to rely on something that's called the

21  Intertrust pitch, which was included at the prior trial.  What

22  about that?

23          MR. CABRAL:  I think there are several responses to

24  that, your Honor.  I think the Intertrust pitch was the subject

25  of a motion *in limine* filed by Barnes & Noble challenging its

1    admissibility under Rule 403.  The basis of the motion was that

2    the document, and in particular plaintiff's prior expert's

3    reliance on that document in a 90-cent-per-unit rate that

4    appears in that document, would confuse the jury.  And the

5    Court granted that motion without much explanation, saying that

6    the motion is granted.  Obviously because this is a bench

7    trial, there is no risk of jury confusion, so the basis for

8    inadmissibility before no longer applies here.  That would be

9    the first response.

10          The second response would be that if the document is

11   offered into evidence and the Court rejects it, for whatever

12   reason --

13          THE COURT:  I brought this on myself by interrupting

14   you, but you're of course quite right to say it's a 403 issue

15   that no longer is relevant, and because it's a bench trial,

16   he'll testify and be cross-examined and by I'll make a

17   determination; I'm not going to exclude anything in advance,

18   but my recollection is that this is really just a marketing

19   pitch, and that makes me wonder why it could be of any

20   evidentiary value.

21          MR. CABRAL:  That's certainly how Barnes & Noble has

22   characterized the document.  They haven't cited it in their

23   motion.  They didn't cite any evidence to support that it was

24   simply a pitch.  It was in our view an internal revenue

25   forecast.

1          THE COURT:  I see.  I will wait to hear the evidence

2     and see what is brought out on examination of the witness.

3          MR. CABRAL:  The final point I'll make about that,

4     your Honor, is that Mr. Yurkerwich is relying on that document

5     for the narrow purpose of determining the settlement discount

6     factors in the Amazon agreement and not as direct evidence of

7     the applicable per-unit rate that should result from a

8     hypothetical negotiation.  It's a completely different use of

9     the document in this case than it was in the last case.

10         THE COURT:  All right.

11         MR. CABRAL:  Where I left off, your Honor, I think I

12    was just getting to the adjustments that need to be made to the

13    Amazon agreement.

14         Mr. Yurkerwich, as part of his analysis, considered

15    the total amount of consideration exchanged in the agreement,

16    and what that means is that he considered the consideration

17    that was provided by Amazon, together with the consideration

18    that was received by Amazon, and assumed that they had equal

19    value.  And from that point, he then adjusted the effective

20    rate from the Amazon agreement in order to, one, account for

21    the differences between the real-world settlement negotiations

22    that led to that agreement, and the negotiations under the

23    hypothetical rule, which involve assumptions regarding validity

24    and infringement.  He also apportioned the value of the '703

25    patents against the rest of the value of the portfolio in order

G6nWadr1                          Opening - Mr. Cabral

1    to arrive at a rate that reflects a good faith effort to arrive

2    at the truth in terms of what the proper measure of damages

3    should be in this case.

4            In addition to the Amazon agreement, Mr. Yurkerwich

5    also considered the other best available evidence, which we

6    will frankly represent is not perfect, but it's all that we

7    have.  And that evidence includes, for example, an offer made

8    from Adrea to Barnes & Noble that Mr. Yurkerwich then adjusted

9    down and factored into his analysis.  The result of all of this

10   is a per-unit rate of approximately 20 cents, a little bit more

11   than that, and a total amount of royalties due of slightly over

12   $1 million; it would be $1,059,265.  To put that per-unit rate

13   in perspective if you take the average sale price of a Nook

14   device and assume it is one or $200, you are looking at a

15   per-unit rate that is approximately .1 or .2 percent of the

16   sale price.

17           Defendants for their part will offer the testimony of

18   Mr. Barnes.  I would ask that the Court keep in mind when

19   Mr. Barnes testifies that he has no personal knowledge about

20   how the infringing feature works on the Nook devices, what the

21   technology does on the Nook devices, or why Barnes & Noble even

22   uses it.  He's going to tell you that himself.  He's also going

23   to tell you that Amazon paid nothing for the option to license

24   the Philips and Sony portfolios and that the value of the

25   underlying license to the '703 patent is reflected solely in

1    the price paid to exercise the option.  And Mr. Yurkerwich will

2    explain why that's an assumption that is fundamental error in

3    Mr. Barnes's analysis.

4           And finally, you're going to hear Mr. Barnes's

5    rationale for why a per-unit rate of 2 cents per unit applies.

6    This is the same rate that he calculated mechanically from the

7    Amazon agreement, and he made no adjustments to account for the

8    differences of that real-world settlement negotiation where

9    compromises were made, and the outcome of a hypothetical

10   negotiation between willing parties, assuming validity and

11   infringement.

12          That brings me to the last part of the presentation

13   here, your Honor.  When we talked about 35 U.S.C. 284

14   previously, we skipped over the second paragraph, which relates

15   to the enhancement of damages.

16          MR. EDERER:  Your Honor, may I just interpose an

17   objection here?  First of all, we had an agreement with counsel

18   to exchange any slides that we were going to be using, and we

19   did not receive any of the slides we've been looking at for the

20   last few minutes.

21          THE COURT:  No.  That objection is clearly waived.

22   You waited until he went through umpteen slides before you

23   raised it.  Denied.

24          MR. EDERER:  Secondly, with respect to the question of

25   enhanced damages, this is an issue that came up in connection

1    with the pretrial consent order, and we don't think that this

2    trial should have anything to do with the question of enhanced

3    damages.  Your Honor has ordered several times that the issues

4    at this trial are limited to the allocation or attribution of

5    the jury's $1.3 million damages award to the '703 patent alone,

6    and we don't believe that issues relating to enhanced damages

7    should be taken up here until the right time, the appropriate

8    time, after the allocation is determined, and this is all in

9    the context, as you'll see in a moment, with respect to the new

10   Halo case, which counsel is about to get into.  We are not

11   prepared to address that issue.  We don't think it's part of

12   what the Court has indicated in several orders that it was

13   going to be hearing, and so we object to that.  And by the way,

14   the jury has already decided on the issue of willfulness.  That

15   was a determination that the jury made, and so essentially what

16   counsel is asking the Court to do is reassess not only the

17   issue of what the allocation of the numbers should be but the

18   jury's prior finding of no willfulness.

19            THE COURT:  When in your view should this issue be

20   addressed?

21            MR. EDERER:  I believe the issue should be addressed

22   after what we do here today and tomorrow, is to allocate and

23   calculate the amount of damages that are attributable to the

24   '703 patent.

25            THE COURT:  Let's assume that that allocation is made

 1   in due course but probably quite promptly, then what is

 2   required other than briefing?

 3          MR. EDERER:  I don't believe there's anything required

 4   other than briefing, your Honor.

 5          THE COURT:  OK.  I don't mind giving you some more

 6   time, but I think between today and tomorrow, which is what

 7   we've scheduled for it, I don't want to leave it hanging, this

 8   case has gone on long enough.

 9          MR. EDERER:  The point I want to make, your Honor, is

10   to the extent there's going to be evidence that plaintiff will

11   purport to introduce to address the issue of willfulness, that

12   issue has been decided.  Perhaps the only issue we have here is

13   whether and to what extent the Halo case may have anything to

14   do with it.

15          THE COURT:  That's how I see the issue, but let me

16   hear from plaintiff's counsel.

17          Why do you think that's an open issue other than the

18   legal issue that arguably is impacted by Halo?

19          MR. CABRAL:  At the original trial, the Court put

20   forth jury instructions on the issue of willfulness.  That

21   involved the Seagate test that was administered by the Federal

22   Circuit and also applied the clear and convincing evidence

23   standard to prove willfulness in getting enhanced damages under

24   284.  The Halo case says not only does that Seagate test no

25   longer apply, it says that the clear and convincing evidence

1    standard, which is an enhanced burden of persuasion, no longer

2    applies either.  The result of the Halo case gives this Court

3    pure discretion based on the factual evidence that we're

4    seeking to admit, and we have submitted the depositions in the

5    prior case to enhance damages if the Court feels that this case

6    is an egregious one that goes beyond an ordinary patent

7    infringement case, which is now the new standard.  But it's an

8    issue that's completely within the Court's discretion.

9              THE COURT:  I know that.  That's a fair point, but my

10   point is, strangely enough, neither I nor counsel anticipated

11   one way or the other what the Supreme Court of the United

12   States would determine ten days ago, so that was not supposed

13   to be part of this trial.  That's the point.  I think there may

14   well be issues that need to be briefed, but I don't see

15   spending any time in the next two days on this issue.  And I'm

16   also cognizant that both sides were very anxious to have this

17   case go forward on this schedule because you've lined up your

18   witnesses accordingly.

19             MR. CABRAL:  Yes, your Honor.

20             THE COURT:  I think we'll take up Halo at the end of

21   tomorrow and schedule whatever seems appropriate then for the

22   future.

23             MR. CABRAL:  Your Honor, we don't intend to take up

24   any time over the next two days on this issue specifically.

25   The experts will not be addressing this.

1            THE COURT:  OK.  Good.

2            MR. CABRAL:  All of the evidence is factual and that

3    will have been submitted as part of deposition designations and

4    trial testimony, etc.  It would just be an issue that we would

5    ask the Court to take up on the posttrial briefing, and the

6    Court has already indicated it will.

7            THE COURT:  That's fine.

8            MR. CABRAL:  And, your Honor, among that evidence that

9    has been submitted through depositions, and this is the final

10   slide of the presentation, is the evidence in this case that

11   has shown that the parties engaged in extensive presuit

12   licensing discussions, starting in 2010.  Barnes & Noble

13   actually received notice of the '703 patent together with the

14   claim chart on March 29, 2012, which is the starting point for

15   the damages analysis in this case.  That claim chart mapped

16   their infringement of the claims of the '703 patent, and then

17   most notably, at the 30(b)(6) deposition of Barnes & Noble,

18   their corporate representative testified that they have made no

19   effort or attempts to design around or avoid infringement of

20   the '703 patent, and that was admitted into evidence as well

21   during the last trial.  So after you've heard all of the

22   evidence and as part of posttrial briefing and submissions,

23   we'll ask that your Honor exercise your discretion for enhanced

24   damages in the case.

25            THE COURT:  Very good.  Let me hear from defense

1    counsel.

2              MR. EDERER:  Thank you, your Honor.  As I said before,

3    I'm Louis Ederer from Arnold & Porter, and I represent the

4    Barnes & Noble defendants in this case.

5              Before I start my opening remarks, I just want to

6    address briefly an issue that your Honor raised with respect to

7    the Intertrust document.  Mr. Cabral indicated that one of the

8    key reasons, if not the only reason, why the Court should not

9    again exclude the Intertrust document, and as you recall, your

10   Honor, you did indicate at the April 27, 2016, pretrial

11   conference that you would maintain the same rulings that you

12   made with respect to documents that were excluded at the first

13   trial, and Mr. Cabral indicates that the reason why you should

14   revisit that exclusion that you made previously is because we

15   only objected to that Intertrust document on the basis that it

16   was prejudicial to the jury, which by the way, may well explain

17   why plaintiff decided to go with a bench trial in this case as

18   opposed to a jury trial.

19             But beyond that, your Honor, if you go back and read

20   the *in limine* motions that we filed in the first trial, we very

21   clearly focused primarily on the question of whether the

22   reliability of that document, since it was very heavily relied

23   upon by the plaintiff's former damages expert, Magee, in

24   support of his "50 cents, no matter what" licensing royalty

25   rate calculation, and so if you go back and read the briefing

G6nWadr1                    Opening – Mr. Ederer

1   with respect to the Intertrust document in particular, our

2   argument with respect to jury prejudice was in one paragraph at

3   the end of the discussion.  The entire discussion was about the

4   reliability of that document, which as we demonstrated to your

5   Honor, was a document that was prepared by someone who worked

6   for Intertrust, who was not an expert, who had never done

7   anything like this before, had no background in the e-reader

8   industry, and yet Magee was relying on it very heavily to

9   support his 50 cents royalty rate.  So I submit to you, your

10  Honor, that for the same reason that that document was excluded

11  previously it should be excluded again here.

12          THE COURT:  The way I'm going to deal with all the

13  motions *in limine*, and that includes this one, is when a

14  witness testifies, whose testimony has been challenged in whole

15  or in part, I'm going to let him testify, I'm going to let him

16  be cross-examined on the very issues that form the basis of the

17  motions *in limine*, and then I will make a determination as part

18  of my determination overall in the case.  It doesn't seem to me

19  to be a prudent use of my time to make a separate

20  determination, but I hear your point, and you are right to

21  remind me that I did indicate that the same basic rulings that

22  occurred at the trial would occur here, but that was in the

23  context, you'll recall, of when we thought this was going to be

24  a jury trial.  It was subsequent to that that the parties told

25  me they were going to agree to a bench trial, and a good

 1  example is anything that was excluded on 403 grounds previously

 2  might well be admissible now in a bench trial because the same

 3  balancing is not required.  So there is that nuance to my prior

 4  determination because of the change to the bench trial, but

 5  that doesn't mean that you won't have a full opportunity to

 6  bring out what you think is the complete irrelevance or even

 7  prejudice of this particular item and the witness's reliance on

 8  it.

 9          MR. EDERER:  Thank you, your Honor.  I just thought it

10  was important to respond to what Mr. Cabral said.

11          THE COURT:  Yes, absolutely.  Let's go ahead.

12          MR. EDERER:  Your Honor, we're here today, as you

13  know, because at the first trial in this case, the jury found

14  two Adrea patents, the '501 and the '703, to be infringed and

15  made a single damage award of $1.33 million for the two

16  patents.  Now that the Court has invalidated the '501 patent,

17  at this trial Court will determine what the damages are or

18  would have been for the '703 patent alone.  And as Mr. Cabral

19  pointed out, the feature of the Barnes & Noble Nook device that

20  was found to have infringed the '703 patent is what Barnes &

21  Noble calls the shop feature, and I will come back to that in a

22  little bit.

23          The Court will be asked to determine how much money

24  Barnes & Noble should have to pay Adrea for infringing just the

25  '703 patent, which as the Court is aware, Barnes & Noble was

1   found not to have infringed willfully or intentionally, as I

2   just mentioned previously.  So let's talk briefly about how you

3   calculate damages in this type of case, and putting the

4   proposed jury instructions aside, as the Court is aware --

5           THE COURT:  Yes.  I'm sorry to spring that on you at

6   the last minute.

7           MR. EDERER:  We will take a look at it for sure, your

8   Honor.

9           As the Court's aware, the way you calculate damages,

10  or the accepted method up until now, in a patent infringement

11  case is to try to determine what royalty rate Barnes & Noble

12  would have agreed to pay the owner of this patent back in 2009

13  before Barnes & Noble started selling Nooks, which at the time

14  was not Adrea but the electronics company Philips, and it's the

15  Georgia Pacific hypothetical license negotiation between the

16  licensor, Philips, and the licensee, the party that needs a

17  license to use the feature, which in this case of course was

18  Barnes & Noble.  So what we need to do is put ourselves at that

19  hypothetical negotiation table back in 2009, before any Nook

20  products had ever been sold, before the Nook had ever even been

21  introduced, and try to figure out what royalty Barnes & Noble

22  would have been willing to pay for each Nook device that was

23  going to be sold, how many cents per unit, and what royalty

24  rate Philips would have been willing to accept for a license to

25  the '703 patent, which by the way, just issued in November

1   2009, the patent itself, so it coincides with the introduction

2   of the Nook, which by the way, may also address the issue of

3   willfulness, but we'll put that aside for now.

4          Barnes & Noble damages expert Ned Barnes has quite a

5   different view about how much Barnes & Noble would be willing,

6   or would have been willing, to pay Philips back in 2009 than

7   Adrea's expert Mr. Yurkerwich.  The Court heard Mr. Barnes's

8   testimony on this point at the first trial, and his opinion

9   hasn't changed.  Now, plaintiff's new damages expert says that

10  Barnes & Noble would have been willing to pay 20 cents a unit

11  for the right to use the shop feature.  Mr. Barnes says, No, an

12  appropriate royalty rate is 2 cents a unit at most.  And even

13  that 2-cents number is conservative; it could be lower, as I'll

14  explain to you.  And we'll take you through his calculations

15  and show you how he arrives at that 2-cents number.  I will

16  also show you all the things Yurkerwich did wrong in

17  calculating his 20-cents number and how he made some simple

18  adjustments to Yurkewich's calculation to correct some of his

19  numerical inputs, that even if he used some of his much larger

20  numbers as a starting point, you still come right back to

21  Mr. Barnes's 2-cents number.

22         Mr. Cabral had mentioned this, and I'll agree with him

23  on one thing.  While there's a sharp difference between the

24  findings of the two damages experts, they do agree on one

25  thing, and that is that even though Mr. Barnes was attacked at

1    the first trial for focusing on the 2011 Amazon agreement as a

2    starting point for calculating a hypothetical royalty rate, in

3    fact there was a Daubert motion filed against him where

4    plaintiff argued that he shouldn't be allowed to use the Amazon

5    agreement as a basis for calculating this royalty rate.  Now

6    both experts are zeroing in on the Amazon agreement.  As it is,

7    it is the one and only agreement in history in which anyone

8    ever paid anything to license the '703 patent.  So let me pause

9    there for a moment.

10         Adrea has existed from 2010 to 2016, and its sole

11   business is to license patents.  It has never succeeded in

12   licensing the '703 patent, or any Philips patent for that

13   matter, to anyone outside of the litigation context, and it's

14   important to remember another key thing that you'll hear from

15   Mr. Barnes.  The '703 patent was not even in suit in the Amazon

16   litigation, nor was Philips even a party to that case.

17         Anyway, Adrea, Amazon, and Discovery Communications

18   settled their patent infringement litigation back in 2011, and

19   as part of the settlement, Amazon agreed to pay Adrea $10

20   million for a license to the two Discovery patents they were

21   fighting about, as well as hundreds of other Discovery e-reader

22   patents.  Amazon also agreed to issue a cross-license to

23   Discovery -- not to Adrea, but to Discovery -- for the six

24   Amazon patents it had accused Discovery of infringing, and

25   Discovery paid no money to Amazon for that cross-license.

1    Nothing.  You can read the agreement, and you won't see

2    anything in that agreement that indicates that anything was

3    paid for the cross-license, and the cross-license wasn't even

4    issued to Adrea.  Adrea, by its own admission, received no

5    value from it.  And of course, the '703 patent that we're here

6    to talk about today was not a part of either of those two

7    licenses, the main license or the cross-license.

8              And then Adrea said, OK, Amazon, maybe we can make a

9    little bit more money down the road out this settlement, so

10   what if we also give you an option, which you can exercise or

11   not, to license a bunch of other e-reader patents, these

12   Philips and Sony patents over here, that we now own but which

13   we haven't accused you of infringing.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1              MR. EDERER:  379 patents and patent applications in

2      all, only one of which was the '703.  And we'll license all of

3      those patents to you for the price of 2½ million, so if you

4      give us 2½ million any time in the next two years, you'll get a

5      license for these 379 Philips and Sony patents as well.  And so

6      two years later Amazon decided to pay the 2.5 million for a

7      license to the 379 Philips and Sony patents, but there was

8      nothing special about it.  The '703 was one of them, but it

9      wasn't even one of the patents that Amazon and Adrea were

10     fighting about.

11             Now Adrea is taking the position that you can't

12     separate the $2½ million that Amazon paid for a license to the

13     Sony and Philips portfolios from the $10 million that Amazon

14     paid for a license to the Discovery portfolio; you have to look

15     at the value of the Amazon agreement as one single amount,

16     including the cross-license that Amazon issued for Discovery

17     for which no money changed hands at all.  And why are they

18     doing that?  Well, as I'll discuss in a moment, if Adrea's

19     expert, Mr. Yurkerwich, used the 2½ million Amazon paid to

20     license the Philips and Sony patents as the starting point for

21     his calculation, as did Mr. Barnes, his royalty rate would be

22     nine times lower than 20 cents, somewhere pretty close to

23     Mr. Barnes' 2 cents.  So he has to get that starting number up

24     much higher.  So he lumps the $2½ million that Amazon paid for

25     a license to the Sony and Philips patents with the $10 million

Amazon paid for a license for the Discovery patents, and then he assigns a completely fabricated value of $10 million for the cross-license from Amazon to Discovery, and there we are at 22.5 million as your starting point.

But Mr. Barnes said no, the right way to figure out what royalty Amazon paid to Adrea for a license to the '703 patent is to start with the $2½ million that Amazon paid for a license for all 379 Sony and Philips patents, the only component of the Amazon agreement that included the '703, and then you figure out a royalty rate for all the patents in that license, which, as Barnes will explain, was approximately 2 cents for all of those patents, and then divide that up across all the patents, 379. But as Barnes will also explain, to be conservative, he attributed the entire value of the $2½ million license to the '703 alone. If he spread it out across all the other patents, his royalty rate could have been even lower than 2 cents. And he will take you through his calculation and it will make complete sense as to why he concludes that Amazon paid Adrea, would have paid Adrea no more than 2 cents a unit to license the '703 patent.

And then Barnes will tell you that if there were any doubt about whether he should be using the $2½ million number as his starting point as opposed to Yurkerwich's 22½ million, Adrea itself confirmed, in contemporaneous documents and in its own president's testimony, at the first trial, that Amazon paid

1   just 2½ million for a license for the Sony and Philips

2   portfolios.

3           Now let's talk briefly about what you're going to hear

4   from Mr. Yurkerwich.  In order to get to his 20 cents rate,

5   Mr. Yurkerwich goes through a complicated and, frankly, bizarre

6   series of adjustments that are totally unsupported by evidence

7   or reliable methodology, all supposedly within the context of

8   the Amazon agreement, to inflate that 2 cents number up to 18

9   cents.  But even that's not good enough for him.  So he takes

10  the 18 cents number and he averages it with the 22 cents number

11  that he calculates using a different data point, a 2012 offer

12  that Adrea made to Barnes & Noble to license all of its

13  e-reader patents for 50 cents a unit, an offer, by the way,

14  which Barnes & Noble didn't respond to, much less accept, which

15  may lead you to ask, why is Yurkerwich even using that data

16  point in the first place?  I'll tell you why:  Because by

17  averaging 18 cents from the Amazon settlement with 22 cents

18  from the 2012 offer from Adrea to Barnes & Noble, he cuts

19  through, he comes to his final royalty number of 20 cents a

20  unit, which, not coincidentally, pushes his total damages

21  amount over $1 million.

22          Now in the interest of time, I'm not going to take you

23  through all the gymnastics that Mr. Yurkerwich does in

24  calculating his 18 cents and 22 cents royalty numbers, although

25  it's up there on the screen for your Honor, if you want to look

1    at it.  I'll let Barnes explain it to you, and you'll hear

2    about it in Yurkerwich's cross.  But I just want to touch on a

3    few highlights.

4           First, in addition to using 22½ million instead of 2½

5    million as the starting point for his calculation, which gets

6    him to an opening royalty rate of 17.4 cents for every patent

7    in the Adrea portfolio, Yurkerwich does these adjustments to

8    figure out a rate for the '703 alone.  And after he makes these

9    adjustments, he gets to a number for the '703 alone of 18.4

10   cents.  So a penny more for a license to the '703 patent alone

11   than for a license to every one of the 680 patents in the

12   entire portfolio.

13          And how does he do that?  Well, here's where we get

14   into the Intertrust documents.  His first adjustment is to

15   multiply his starting point rate by almost two and a half times

16   to account for litigation risk.  Yurkerwich's theory is that

17   rather than going to trial, Adrea settled its litigation with

18   Amazon in order to avoid the risk of losing.  And so it took a

19   settlement amount, his $22½ million value for the Amazon

20   agreement, that was two and a half times lower than what it

21   expected to recover in damages against Amazon, which he says is

22   53.6 million.  Where did he get the 53.6 million from?  He got

23   it from the Intertrust document, a document which was not only

24   excluded at the first trial but which has nothing to do with

25   any damages amount that Adrea expected to recover in the Amazon

1    case.  Anyway, he takes that 53.6 million, divides it by 22½

2    million, and here you go, we have a multiplier of 2.38 times

3    for litigation risk.

4              Then the next adjustment Yurkerwich makes is for the

5    portion of the value of the Adrea portfolio, hundreds of

6    patents, the portion he attributes to the '703 alone, what he

7    calls his share adjustment.  And even though the '703 patent

8    wasn't even in litigation in the Amazon case, Yurkerwich says

9    it was worth 25 percent of the value of the entire Adrea

10   portfolio.  Based on what?  Based on his experience.  And he

11   reaches this conclusion even though there's no evidence that

12   anyone from Amazon or Adrea even thought about the '703 patent

13   in settling that case.

14             But that doesn't even do it for Yurkerwich.  He needs

15   to get that royalty number even higher, so he goes on to make

16   another adjustment, his term adjustment, saying that the value

17   of the '703 which he already put at 25 percent of the entire

18   portfolio should be doubled to 50 percent of the entire

19   portfolio.  And by the way, he has no explanation for why his

20   term adjustment wasn't included as part of his share

21   adjustment.  As the Court is aware, when you value a patent,

22   one of the things you look at is its remaining terms.  So this

23   is just double-counting on Yurkerwich's part.

24             And then finally, as I said before, after making all

25   these adjustments to the royalty rate for the '703, Yurkerwich

1    is still only at 18 cents so he does his other calculation,

2    using the 2012 offer sheet that Adrea made to Barnes & Noble

3    for all 680 patents in the portfolio for a royalty of 50 cents

4    a unit, and he does all the same adjustments using that 50-cent

5    number and he comes up with an alternative royalty number, for

6    the '703 alone, of 22 cents, and then he averages that with his

7    18 cents and that gets him to 20.  And he does that in spite of

8    the fact that in response to Adrea's 50 cents offer, Barnes &

9    Noble offered nothing in return, which is apparently of no

10   meaning to Mr. Yurkerwich.

11         And by the way, as part of -- this is important.  As

12   part of his calculation based on this offer sheet, Yurkerwich

13   takes no litigation risk adjustment.  Why not?  Because he says

14   the '703 patent wasn't in litigation in that transaction.  But

15   it wasn't in litigation in the Amazon case either.

16         So these are only some of the adjustments Yurkerwich

17   makes to back into his 20 cents number, and there are others

18   that you'll hear about.  So what we're going to do, though, is

19   have Mr. Barnes, after he gives you his own analysis, he's

20   going to take you through Yurkerwich's adjustments, and he will

21   explain to you that even if you accept Yurkerwich's adjustments

22   in concept -- and in one example, even if you use his $22½

23   million number as a starting point, if Mr. Yurkerwich had used

24   the right numbers or numerical inputs in doing his calculation,

25   then guess what?  His royalty rate would have come out to the

1    same 2 cents that Barnes calculates.  And after Barnes puts in

2    his 2 cents -- no pun intended -- you'll understand why, no

3    matter how you look at these numbers, 2 cents is the maximum

4    royalty to be awarded here and the total damages award is

5    $104,640.

6           And your Honor, I apologize, but if I could just talk

7    briefly about the -- I didn't know that Mr. Cabral was going to

8    spend so much time on the shop feature in his opening.  If I

9    could just do two minutes on the shop feature.

10           THE COURT:  Okay.

11           MR. EDERER:  Now the Nook feature that was found to

12    have infringed the '703 is the shop feature.  And we think it's

13    relevant to the circumstances surrounding the hypothetical

14    negotiation to discuss what exactly the shop feature is.  From

15    listening to Mr. Cabral, you'd think the shop is the most

16    important feature on the whole Nook device.  As the evidence

17    has and will show, however, this shop feature had nothing

18    whatsoever to do with the operation of the Nook device as an

19    e-reader.  You could remove shop from the Nook entirely and the

20    device would still work perfectly.  You could still read books

21    on the device with no problem.  And as far as this issue about

22    whether it was a driver of sales, Barnes & Noble marketing vice

23    president, Mr. Hilt, testified at the first trial, and we've

24    designated his testimony again, shop was never a driver of

25    sales for Barnes & Noble -- not for the Nook devices, not for

G6n1adr2                       Opening - Mr. Ederer

1    content.  It was just not an important feature at all.  And you

2    will hear no credible evidence at this trial to the contrary.

3           And one more thing about the shop feature.  It goes

4    back to the question of what the '703 patent covers.  We keep

5    hearing about how the '703 patent covers content,

6    recommendations, personalized recommendations, all these things

7    that help people shop.  What the '703 patent covers, your

8    Honor, is none of those things.  It covers being able to get

9    that information in a certain way.  It's the pathway to get

10   that information.  And the '703 patent says that the pathway to

11   get that information is without accessing a web browser, that

12   it's a home network that has a direct dedicated link to the

13   information, to the URL.  And what's excluded, or not covered

14   by the patent, is a situation where you get the same

15   information in another way, which is by accessing a web

16   browser.  And what you'll hear is that there's a web browser on

17   many of the Nook devices, a general web browser, that would

18   also allow you to go to barnesandnoble.com for shopping, just

19   like the shop app took you there.  So Barnes & Noble could have

20   implemented the shop feature on this web browser.  So all this

21   talk about no alternative design-around, it's just not the

22   case.

23          And this all goes directly to the question of how

24   motivated Barnes & Noble would have been to pay for a license

25   at that hypothetical negotiation table.  And your Honor should

G6n1adr2

1    not lose sight of this as you consider the evidence and make

2    your decision as to how much Barnes & Noble should have to pay

3    in damages, which, again, is no more than $104,640.

4              Thank you for your attention, your Honor.

5              THE COURT:  All right.  Thank you, and thank both of

6    you for those helpful opening statements.

7              I should mention, with respect to the deposition

8    designations that you've sent me, there again, because it's not

9    a jury trial, I'll just read them through, and as I go through,

10   I'll mark whether the objection is sustained or overruled, and

11   then I'll furnish that to you in due course so you can see the

12   rulings as well.  But I don't want it to delay moving forward

13   with the trial.  And I'm hopeful to read those -- I won't

14   guarantee you, but I'll try to read them this weekend.  If I

15   have trouble falling asleep for any reason on Friday night,

16   I'll read them then.

17             So anyway, yes?

18             MS. SHIN:  With respect to the designations, there are

19   corresponding exhibits that are sprinkled throughout the

20   designations that we would like to offer and get them on the

21   record, if that's okay.  However you wanted to do that.

22             THE COURT:  Sure.  Why don't you find a time.  Let's

23   not do it now, but find a time sometime in the next two days to

24   do that.

25             MR. EDERER:  Your Honor, if I may just hand up the

G6n1adr2

```
1    chart that was --
2              THE COURT:  Sure, absolutely.
3              All right.  Now as I think my law clerk may have
4    indicated to you, we're going to have, at various times over
5    the next two days, various breaks so I can take other matters.
6    I have two short matters that I have to take now.  I hope
7    they'll take no more than 20 minutes, so why don't you plan to
8    be back in 20 minutes.  It may take a little longer, but
9    hopefully not much.  We'll see you then.
10             (Recess)
11             (In open court)
12             THE COURT:  Plaintiff should call their first witness.
13             MR. EDERER:  Your Honor, if I may, before we proceed?
14             THE COURT:  Yes.
15             MR. EDERER:  I don't want to waive my right to object
16   to any slides.  We did receive some slides that are going to be
17   used, I understand, for this coming presentation, witness
18   presentation.  There is one slide that we do object to in part.
19             THE COURT:  By number, or which one is that?
20             MR. EDERER:  Page 7.  And in particular, the reference
21   on that page to an option price and a strike price.
22             THE COURT:  All right.  So when that slide is offered,
23   that's the time to make the objection.
24             MR. EDERER:  Okay.
25             THE COURT:  All right.  Please call your first
```

G6n1adr2

1    witness.

2            MR. CABRAL:  And your Honor, if I may raise one point

3    before we do.  I apologize.  With respect to the admission of

4    exhibits that have already been entered into evidence in the

5    prior trial, is it your preference for us to notify you when a

6    document has been admitted or would you prefer us to offer the

7    evidence anew for admission?

8            THE COURT:  I think you should offer it, but if you

9    want to do that in some, you know, global sense, like at a

10   break, by just listing all the exhibits that the parties agree

11   should be received, that's fine.  But I think we should have

12   something on the record when it's offered, in case there is any

13   objection.

14           MR. CABRAL:  And there are not many exhibits to deal

15   with.  There's only a handful.  We may be able to deal with it

16   one on one, if that's easier for Court.

17           THE COURT:  Okay.  All right.

18           MR. CABRAL:  With that, your Honor, plaintiff calls

19   David Yurkerwich.

20           Your Honor, we have copies of the witness binders and

21   demonstratives.

22           THE COURT:  Yes.  Please hand them up.

23    DAVID E. YURKERWICH,

24        called as a witness by the Plaintiff,

25        having been duly sworn, testified as follows:

1   DIRECT EXAMINATION

2   BY MR. CABRAL:

3   Q.  Good morning, sir.  Can you please introduce yourself.

4   A.  My name is David Yurkerwich.

5   Q.  And how are you currently employed?

6   A.  I'm a senior consultant with Charles River Associates based

7   here in New York City.

8   Q.  Can you briefly address your educational degrees and

9   certifications.

10  A.  Yes.  I received a bachelor of science degree in business

11  administration from Villanova University in 1974, and following

12  graduation, I joined an accounting firm, Arthur Andersen, and

13  became a certified public accountant.  In the years that

14  followed, I became a certified valuation analyst and also

15  became accredited in business valuation.

16  Q.  Where are you from originally?

17  A.  New York; Long Island.

18  Q.  Have you testified as an expert in a patent case before?

19  A.  Yes, I have.

20  Q.  How many times?

21  A.  About 50 times, trials and depositions.

22  Q.  And were you testifying as a damages expert in those cases?

23  A.  Yes, I was.

24  Q.  Are you an expert witness full time?

25  A.  No, I'm not.

G6n1adr2                          Yurkerwich - Direct

1    Q.   What else do you do for employment?

2    A.   A large part of my professional life now is devoted to

3    helping clients and individuals, companies and individuals with

4    the development and management and licensing of their

5    intellectual property.

6    Q.   And how much of your time is consumed by those activities?

7    A.   I would estimate, in the current time, 75 percent or more.

8    It's increased over time.

9    Q.   Do you have any experience negotiating patent licenses?

10   A.   Yes.  I've been negotiating patent licenses since the early

11   '90s in a variety of contexts.

12   Q.   And can you briefly describe that experience for the Court.

13   A.   It really includes helping understand the value of a

14   patented invention in the marketplace and assessing what

15   advantages it might provide and targeting potential companies

16   that might have an interest in using that technology and then

17   actually going out and engaging in conversations, discussions,

18   negotiations with those potential users of the technology and

19   then negotiating agreements, helping them negotiate agreements

20   at acceptable compensation levels.

21   Q.   Do you have any other patent-related experience?

22   A.   I do.  Another part of what I do is I help smaller

23   companies and inventors analyze the potential for their

24   inventions in the marketplace and then I actually assist them

25   in helping find a partner to bring new technologies to the

1    market, which sometimes involves licensing or a direct sale of

2    their technology, and it's usually patented technology.

3    Q.   How many years of experience do you have with patent

4    licensing transactions?

5    A.   Over 20 years.

6    Q.   And how many years of experience do you have evaluating

7    damages in patent cases?

8    A.   Over 30 years.

9    Q.   Did you provide any opinions in this case?

10   A.   I have.

11   Q.   And can you briefly summarize the opinions that you've

12   provided.

13   A.   Yes.  I was asked to evaluate the damages arising from the

14   infringement of what's known as the '703 patent, and in that

15   regard I analyzed the reasonable royalty that would result from

16   a hypothetical negotiation between the relevant parties to

17   arrive at a per-unit amount, which I then applied to the number

18   of infringing units to calculate the damages.

19           MR. CABRAL:  Your Honor, if I may approach with a

20   binder for the witness.

21           THE COURT:  Yes.

22           MR. CABRAL:  Thank you.

23   Q.   Mr. Yurkerwich, if I could direct your attention to the

24   document labeled JTX 003.  Do you have that?

25   A.   I do.

1   Q.  Have you seen this document before?

2   A.  I have.

3   Q.  Is this the patent 7,620,703, the subject of your opinions

4   in this case?

5   A.  It is.

6           MR. CABRAL:  And your Honor, perhaps this is an

7   example of an evidentiary issue for admission.  This is the

8   patent in suit that was previously admitted in the prior trial.

9           THE COURT:  Yes.  You want to offer it?

10          MR. CABRAL:  Yes, your Honor.

11          THE COURT:  All right.  Any objection?

12          MR. EDERER:  No objection, your Honor.

13          THE COURT:  Received.

14          (Joint Exhibit 003 received in evidence)

15  Q.  Mr. Yurkerwich, are you familiar with the hypothetical

16  negotiation approach for estimating a reasonable royalty?

17  A.  Yes, I am.

18  Q.  And did you consider the construct of a hypothetical

19  negotiation in this case?

20  A.  Yes, I did.

21  Q.  In your view, who would have participated in the

22  hypothetical negotiation?

23  A.  In this matter, the parties would have been Philips as the

24  patent owner and Barnes & Noble as the infringer.

25  Q.  And when would the hypothetical negotiation have taken

G6n1adr2                        Yurkerwich - Direct

1    place?

2    A.  It would have occurred in November 2009.

3    Q.  And why did you select that time frame as the date for the

4    hypothetical negotiations?

5    A.  Really two reasons.  First, the '703 patent was granted in

6    November of 2009, and at that time, around that time, maybe

7    late October, early November, Barnes & Noble began selling the

8    infringing device.

9    Q.  Can you briefly describe the market for e-readers and

10   electronic books technology in November 2009.

11   A.  Yes.  The first e-readers actually came to market in

12   earlier -- in approximately 2004, and in fact, I believe Sony

13   was one of the first entrants into the market.  And another

14   company called iRex came into the market in 2005, and iRex was

15   actually a spinoff from Philips, the patent holder of the '703.

16   And then 2007, '8, Amazon came to the market with its Kindle

17   device, and by 2010, the market had reached over 2 billion in

18   sales.  So it was -- 2009, when Barnes & Noble entered, it was

19   a rapidly expanding market.

20           MR. EDERER:  Move to strike that prior answer.

21   There's no foundation for his testimony.

22           THE COURT:  Hang on.  Do you want to inquire into the

23   foundation for that.

24           MR. CABRAL:  Sure, your Honor.

25   BY MR. CABRAL:

1    Q.  Mr. Yurkerwich, as part of your analysis in this case, did

2    you consider or analyze the state of the market at the time of

3    the hypothetical negotiation, the market being for the market

4    for e-readers or electronic devices?

5    A.  I did, and I wrote about it in my expert report.

6              MR. CABRAL:  Your Honor, I'm happy to pursue and lay

7    more of a foundation, if you'd like.

8              THE COURT:  Well, I think I will receive it for now

9    subject to striking depending on what emerges later by way of a

10   foundation, or not, as the case may be.

11   BY MR. CABRAL:

12   Q.  The last question I'll ask on this issue is, can you

13   explain what you did as part of your analysis in this case to

14   analyze the state of the market for e-readers at the time of

15   the hypothetical negotiation in November 2009.

16   A.  Yes, I did.  I reviewed the available evidence that's been

17   produced in this matter and conducted my own research to

18   identify the market and the participants, and there were -- was

19   evidence concerning the size of the market over time.

20   Q.  What evidence are you referring to?

21   A.  IDC data and other market research.  I'd have to go back to

22   my report and look.

23   Q.  Mr. Yurkerwich, did you consider any transactions involving

24   the '703 patent when forming your opinions in this case?

25   A.  I did.

G6n1adr2                          Yurkerwich - Direct

1    Q.  And what transactions involving the '703 patent did you

2    consider?

3    A.   There were several transactions.  The first one is the

4    actual sale of the '703 patent to Adrea.  And the next event

5    that comes to mind is there was an offer -- I guess this is an

6    offer, not a transaction.  There was an offer on the part of

7    Adrea to license the '703 patent together with a portfolio of

8    the e-reader patents to Amazon.  And then there was a

9    settlement and license agreement arising from litigation

10   between Amazon, Discovery, and Adrea.  And then following that,

11   there was an offer that I reviewed from Adrea to Barnes & Noble

12   for a license to Adrea's e-reader portfolio, which included the

13   '703 patent.

14   Q.  Did you consider any other information beyond the prior

15   transactions involving the '703 patent as part of your

16   analysis?

17   A.  Yes, I did.

18   Q.  What did you consider?

19   A.   Well, I considered significant evidence that has been

20   produced in this matter, including documentation from Barnes &

21   Noble concerning the importance of the patented feature to its

22   launch and growth of sales in the Nook and content market.  So

23   there was a number of documents that I identified in that

24   regard.

25             MR. EDERER:  Objection, your Honor.  No foundation and

1    hearsay.  I don't know what he's talking about, but whatever

2    he's talking about is not in evidence.

3            THE COURT:  Well, of course an expert is not limited

4    to what's in evidence, as you know.  It just has to be

5    admissible, not admitted.  But let me take a look at the

6    question and the answer again.

7            Well, no.  I think for immediate purposes, it will be

8    received subject to cross examination.  The problem with it, of

9    course, is that it's hopelessly conclusory and vague, so we

10   ought to get into the meat of things and forget about this sort

11   of general introductory stuff.

12           MR. CABRAL:  That was my very next question, your

13   Honor.

14           THE COURT:  Very good.

15   BY MR. CABRAL:

16   Q.  Did you prepare any materials to assist you with your

17   testimony here today?

18   A.  I did.

19           MR. CABRAL:  And your Honor, with your permission,

20   we'd like to use the slides prepared by Mr. Yurkerwich to

21   assist his testimony.

22           THE COURT:  Yes.

23   Q.  Mr. Yurkerwich, on the screen, you'll see the first page of

24   a slide deck.  Did you prepare these slides?

25   A.  I did.

1          MR. CABRAL:  If we can turn to Slide No. 2.

2   Q.  I'd like to direct your attention to the heading

3   Licensing/Transactions Involving the '703 Patent.  Did you

4   consider any of these past transactions involving the '703

5   patent as more significant than others for purposes of forming

6   your opinions in this case?

7   A.  Yes, I did.

8          THE COURT:  Hang on.

9          Go ahead.

10  Q.  Can you please explain.

11  A.  Yes.  These are the four transactions/offers that I

12  mentioned a few minutes ago, and amongst them, the Amazon

13  license and settlement is perhaps the most significant of

14  these, given the fact that it's an actual event that occurred

15  and involved a negotiation and an agreement on a payment for

16  the Adrea patent portfolio, which includes the '703 patent, so

17  it's the more substantial of the four data points.

18  Q.  And why did you consider only these transactions relating

19  to the '703 patent?

20  A.  Because I believe these are the only transactions that are

21  available concerning the '703 patent.

22  Q.  Did you consider other information as part of your

23  *Georgia-Pacific* -- or your analysis of the *Georgia-Pacific*

24  factors in this case?

25  A.  I did.  While I of course considered all of the

1    *Georgia-Pacific* factors, and here I've grouped the factors into

2    other categories that you see listed -- relative advantages,

3    apportionment between the patent and other inputs, and relative

4    position of the parties, so I've actually -- there's -- those

5    headings represent multiple factors which I think I will

6    discuss a little bit later.

7    Q.  And in general terms, how does that information compare in

8    terms of significance to the Amazon license and settlement

9    agreement that you considered in your analysis?

10   A.  Well, I think amongst those factors are other important

11   data points that are relevant or would have been relevant to a

12   hypothetical negotiation.  The Amazon settlement, of course,

13   provides a quantification, when properly analyzed, as a data

14   point as well, and the Adrea offer to Barnes & Noble also

15   provides a relevant data point.

16             MR. CABRAL:  If you could turn to Slide 3.

17   Q.  Mr. Yurkerwich, can you briefly explain what's shown here.

18   A.  This is a timeline, obviously, of some of the more

19   significant events related to my analysis and that have some

20   relevance to the hypothetical negotiation in November 2009.

21   Q.  And which events on this timeline were significant for

22   purposes of your damages analysis in this case?

23   A.  Well, of course, the November 2009 data point is when

24   Barnes & Noble first began selling the infringing product, and

25   at that time, that very month, Intertrust was evaluating an

1       investment into the e-reader market, and then of course there

2       were the subsequent settlement and license agreement in

3       November 2011, which I believe is very important, and then

4       there was an offer made by Adrea to Barnes & Noble in May of

5       2012.

6               MR. EDERER:  Your Honor, may I just note my objection.

7       I don't wish to stand up every time the Intertrust document is

8       mentioned, but it was just mentioned here, and I would like to

9       note my objection to any testimony about the Intertrust

10      document.

11              THE COURT:  Yes.  So I will rule on that after cross

12      examination.  But you will have a continuing objection to it.

13              MR. EDERER:  Thank you.

14      BY MR. CABRAL:

15      Q.  Why did you consider events that took place after the date

16      of the hypothetical negotiation in 2009?

17      A.  Well, here -- and this is often the case -- they helped

18      clarify or enlighten with information that should be considered

19      during the hypothetical negotiation that wasn't really known at

20      the time, so it provides some guidance and clarification to

21      help interpret how the parties would have behaved during the

22      negotiation.

23      Q.  And briefly, how did these subsequent events affect your

24      opinion regarding the outcome of a hypothetical negotiation in

25      2009?

1    A.  Well, I think they're integral to helping me reach my

2    conclusion, particularly this agreement entered into with

3    Amazon which included the '703 patent.

4           MR. CABRAL:  Can you turn to slide 4, please.

5    Q.  Mr. Yurkerwich, can you explain briefly what is shown on

6    this slide.

7    A.  Yes.  This is a summary of the formation of Adrea, which is

8    one of the data points I mentioned, and it was in connection

9    with the formation of Adrea that Discovery, Sony, and Philips

10   contributed e-reader patents to Adrea, and of course Philips

11   contributed the '703 patent, together with others, and

12   Intertrust was the fourth partner to found this entity.

13   Q.  Can you explain how, if at all, the formation of Adrea

14   factored into your reasonable royalty analysis in this case.

15   A.  Well, it sets the stage for understanding the belief on

16   these four parties that this portfolio, the e-reader patents,

17   had substantial value, and of course it included the '703

18   patent, and in fact, they capitalized the company at a book

19   value of 20 million, the sum of the fives here, and Intertrust

20   of course did not contribute patents but agreed to contribute

21   5 million of cash and services to the entity, setting a

22   cornerstone for the four-way equal partnership, if you will,

23   and starting the company with a book value of $20 million,

24   which, you know, they certainly expected to make more than

25   $20 million from the venture.

1           MR. EDERER:  Objection, your Honor.  No foundation,

2     certainly for the last comment that he made, but for the entire

3     answer, as far as I'm concerned.

4           THE COURT:  Well, on all foundational objections,

5     which need to be made and preserved for the record, I'm going

6     to treat that, again, as something that the Court will rule on

7     after hearing cross examination, rather than take the time to

8     develop a foundation now.

9     BY MR. CABRAL:

10    Q.  And Mr. Yurkerwich, what did you mean by book value?

11    A.  Well, this is the, in effect, accounting value established

12    for the company at the time that it was set up.

13    Q.  Does the $5 million book value represent the market value

14    of each of the patent portfolios transferred to Adrea, in your

15    view?

16          MR. EDERER:  Objection, your Honor.

17          THE COURT:  Ground?

18          MR. EDERER:  Well, again, I would have to state

19    foundation.  He's asking for his view without any indication

20    whatsoever as to what he knows about any of this, what

21    investigation he conducted.  He's giving expert testimony based

22    on --

23          THE COURT:  All right.  So if it's a foundational

24    objection, just say objection, foundation, although there were

25    other grounds for which that question might have been objected

G6n1adr2                    Yurkerwich – Direct

1    to, such as leading, but I want to be able to know what the

2    nature of your objection is.  If it's just foundation, it will

3    be preserved in the way I've previously indicated to lay it for

4    cross examination.

5              Go ahead.

6              (Continued on next page)

1           MR. CABRAL:  Your Honor, I think there's a question

2    pending.  Shall I repeat it?

3           THE COURT:  The question is --

4           MR. CABRAL:  I can rephrase it and make it less

5    leading.

6           THE COURT:  Yes, go ahead.

7           MR. CABRAL:  OK.

8    Q.  Mr. Yurkerwich, how does the $5 million book value compare

9    to the market value of the patent that was transferred to

10   Adrea, in your view?

11   A.  Well, based on my review of the expectation of the parties,

12   they were planning to generate a lot more revenue than $20

13   million from this entity, and the formation documents, of

14   course, confirm that Intertrust was committing to put 5 million

15   into the entity for a 25 percent share.

16   Q.  Before we move on, what is an accounting book value?

17   A.  It's required when you form an entity to put on the books,

18   on a cost basis, the assets that are being acquired, and here

19   the parties agreed on, that each of the portfolios would be put

20   on the books on a cost basis of $5 million.

21          MR. EDERER:  Your Honor, may I move to strike the

22   testimony with respect to book value, the difference between

23   book value and market value?  There's nothing in

24   Mr. Yurkerwich's report that addresses this issue of book

25   value.

1          THE COURT:  Counsel, what about that?

2          MR. CABRAL:  Your Honor, Mr. Yurkerwich addresses not

3     only in the transaction using very similar data and information

4     in his expert report, paragraphs 9 and 10, but also addresses

5     in his expert report how this played into his analysis.

6          THE COURT:  I don't think I have his expert report.

7          MR. CABRAL:  If you give me one moment, your Honor.

8          Your Honor, may I approach?

9          THE COURT:  Yes.  Just tell me where in this report is

10    the reference to book value.

11         MR. CABRAL:  The reference I just gave, your Honor, I

12    apologize, about book value is not in the citation I just gave

13    you.  But the reference I just gave you was in paragraphs 9 and

14    10, addressing this transaction.  And the word "value" is used

15    but not book value necessarily, except for the fact that it's

16    in the chart in paragraph 10 in the same presentation of

17    information.

18         THE COURT:  The governing document is his expert

19    report.

20         Did you refer to this in your expert report?

21         THE WITNESS:  I believe this table is in my report.

22         THE COURT:  Where is the table in the report?

23         MR. CABRAL:  It's paragraph 10, your Honor.

24         THE COURT:  Paragraph 10, all right.

25         OK.  What about that, counsel?

 1             MR. EDERER:  Your Honor, what I'm looking at is the

 2   footnote, footnote 16, which is part of paragraph 10, where it

 3   says, "I understand the members believe that the fair value of

 4   the venture is seen as the contribution value."  Here we're

 5   talking about market value and book value.  I just don't see

 6   the connection between what he's talking about in footnote 16

 7   and what he just testified to.

 8             THE COURT:  If your objection was that this exceeded

 9   his expert report, this very chart, as I now see, is in his

10   expert report.  If you think that there is an inconsistency

11   between the way he labels it in the chart at paragraph 10 and

12   the way he describes how he reached that figure in footnote 16

13   to paragraph 10, that's appropriate ground for

14   cross-examination, but I don't think that's a ground for an

15   objection on the grounds that it's not included in his report.

16   Overruled.

17             MR. CABRAL:  Thank you, your Honor.

18             If we could turn to slide 5.

19   Q.  Mr. Yurkerwich, can you please explain what is shown here?

20   A.  Here I'm presenting the stages of the Amazon litigation,

21   which is ultimately resolved with a settlement and license

22   agreement, which of course includes the initiation of the suit

23   in 2009 by Amazon -- by Discovery against Amazon and then

24   followed a few months later by a suit initiated by Amazon

25   against Discovery for four of its patents, and then in 2010

G6nWadr3                         Yurkerwich - Direct

Discovery sold its e-book patents to Adrea, which included the

'703 patent, and then shortly after that, Amazon sued Discovery

again on two additional patents.  So this is the events that I

call the Amazon litigation.

Q.  And did you review the circumstances surrounding the

litigations between Amazon and Discovery as part of your

analysis in this case?

A.  Yes, I did.

Q.  How many total patents did Discovery assert against Amazon

in litigation?

A.  Two.

Q.  How many total patents did Amazon assert against discovery

in litigation?

A.  Six.

Q.  And what was the result or outcome of these litigated

disputes between Discovery and Amazon?

A.  They resulted in ultimately a settlement and license

agreement, which included cash compensation as well as licenses

from Adrea to Amazon and from Amazon to Discovery.

            MR. CABRAL:  If you could turn to slide 6.

Q.  Mr. Yurkerwich, can you briefly summarize what is shown

here on slide 6?

            MR. EDERER:  Your Honor, here's where I attempted

earlier to interpose an objection with respect to the slides.

This is the slide that I was referring to.

1          THE COURT:  OK.  Go ahead.

2          MR. EDERER:  In particular, the reference on the slide

3     to a strike price of $2-1/2 million.

4          THE COURT:  Yes.

5          MR. EDERER:  This concept of strike price has entered

6     this case only in the last 30 days since Mr. Barnes, our

7     expert, was deposed.  There's no reference to the concept of a

8     strike price anywhere in Mr. Yurkerwich's report, and what is

9     going on here is that Adrea is attempting to attack Mr. Barnes

10    on the basis that there's some difference in the value of the

11    option price at the time the parties entered into the Amazon

12    agreement versus the value of the exercise of that option at a

13    later time, strike price.  That's what they call it.  But the

14    concept appears nowhere in Mr. Yurkerwich's report, and it came

15    up for the first time at Mr. Barnes's deposition when he was

16    questioned about this notion of an option price and a strike

17    price.  So we did not have an opportunity to inquire of

18    Mr. Yurkerwich as to anything that he may have to testify about

19    relating to this notion of an option price and a strike price,

20    and therefore I interpose my objection to the slide and to the

21    testimony that I think we're about to hear.

22          THE COURT:  Counsel.

23          MR. CABRAL:  Your Honor, strike price is essentially

24    shorthand for the price used to exercise the option that's in

25    the agreement.  If that terminology is more amenable to defense

1    counsel, we're happy to use that term, but there's no

2    difference between Mr. Yurkerwich's opinions regarding the

3    price to exercise the option and what he is referring to as the

4    strike price here.  There's no fundamental distinction between

5    the two.

6              THE COURT:  Again, point me to the place or places in

7    his report, since he apparently doesn't use the term "strike

8    price" but uses the term that you think is the equivalent for

9    your purposes.

10             MR. CABRAL:  Just give me one moment, your Honor.

11   This is beginning on page 16 of Mr. Yurkerwich's expert report,

12   going into page 17.  This is part of Mr. Yurkerwich's

13   consideration of license factors 1, 2, 3, 4, and 7, but this is

14   primarily in the discussion of factor 1 relating to his

15   discussion of the Amazon agreement.  You'll see, for example,

16   in paragraph 52, under the subparagraph (a)(3) he's referring

17   to the $2.5 million paid by Amazon at the date they exercised

18   their option.  This is the same exact concept as the strike

19   price that's referred to here on slide 6.

20             THE COURT:  I'm sorry.  This is paragraph 52?

21             MR. CABRAL:  Exactly, your Honor.  This is paragraph

22   52, where Mr. Yurkerwich is considering the consideration

23   provided by Amazon on the one hand and then received by Amazon

24   on the other, much in the way that maps the presentation on

25   this slide.  Included in that consideration, as you'll see laid

1    out here in the bullet points, is the cash payment of $2.5

2    million.

3              THE COURT:  I see, yes.

4              MR. CABRAL:  It's a semantic difference.

5              THE COURT:  You're right.  I think the concept is

6    here, so I will just assume that's what's being referred to in

7    the chart.  The chart is not in evidence; it was simply a

8    demonstrative that you were using.  But to the extent that he's

9    simply using a different term to refer to the $2.5 million paid

10   by Amazon at the date they exercised their option, that is the

11   wording that he uses in the report.

12             MR. CABRAL:  And, your Honor, with your permission.

13             THE COURT:  Go ahead.

14             MR. EDERER:  Your Honor, if I may say, that is not

15   what's going on here.  What's going on here is that you're

16   about to hear the testimony about how plaintiff is taking the

17   position that the value of that option at the time it was

18   granted, in 2011, is somehow different than the value of the

19   option at the time it was exercised in 2013, and they're trying

20   to draw a distinction between option price and strike price as

21   it pertains to financial markets, where in the sale of

22   securities that's what happens.  So we're not talking about

23   semantics here.  We're talking about something substantive.

24             THE COURT:  I'm looking at paragraph 52 of his report,

25   and he says, "Consideration for the Amazon agreement included

1    the following," and then he lists three things, the third of

2    which is, "cash payments from Amazon to Adrea eventually

3    totaling $12.5 million, which included  $2.5 million paid by

4    Amazon at the date they exercised their option."

5          Now, let me ask plaintiff's counsel where thereafter

6    does he say how he made use of that 2.5 million in reaching his

7    conclusion?

8          MR. CABRAL:  This is part of his analysis to add up

9    the consideration provided on both sides of the agreement,

10   which he then determines to have, at least on the value of the

11   Amazon provided, which would be equal to the other side of the

12   transaction, a value of a total of $22-1/2 million, so this is

13   just one component of his larger analysis.

14         THE COURT:  No, I understand that.  I'm just asking

15   where is that, if anywhere?  I'm looking, for example, at page

16   20, paragraph 61:  "To compute the effect of royalty rate, I

17   added the value of the license to Discovery of $10 million to

18   the payments made to Adrea of 12.5 million to arrive at a total

19   compensation of 22.5 million."  There's a footnote then,

20   footnote 74, that says, "As previously noted, 2.5 million of

21   the consideration that Amazon paid to Adrea was paid later when

22   Amazon exercised the option to obtain the license to the Sony

23   and Philips patents.  Since Amazon elected to exercise the

24   option, it follows that the value of the license on the date it

25   was exercised was greater than 2.5 million, a fact which

1    suggests that pooling the 2.5 million with the $10 million may

2    understate the value."

3            If that's all he's saying here, it seems to me clearly

4    in his report.  Again, I'm not quite sure, maybe we'll have to

5    hear later testimony to know if it goes beyond that, but at

6    least that part is in his report.

7            MR. EDERER:  OK, your Honor.  I'll stand on my

8    objection for now.

9            THE COURT:  You're welcome to stand on it, sit on it,

10   whatever you'd like, but the objection for now is overruled

11   subject to hearing further testimony.

12           Go ahead.

13   Q.  Mr. Yurkerwich, without using the term "strike price," can

14   you summarize what is shown here on slide 6, briefly?

15   A.  Yes.  As you see, I looked at what Amazon received in the

16   settlement and essentially what they gave or provided with the

17   background that what they received was equal to what they

18   provided, or should have been.  Of course, what they received

19   was the license to Discovery portfolio and an option to license

20   the Sony and Philips portfolios.  They also received a covenant

21   not to sue for two years, and they received an option price of

22   2-1/2 million.  What they gave, they gave 10 million in cash

23   and then they also gave a license to the six Amazon patents

24   that were in two lawsuits against Discovery, which I have

25   valued at 10 million, based on a detailed analysis.  And then

1    ultimately they did pay the 2-1/2 million.

2    Q.  Where are the terms of the Amazon settlement memorialized?

3    A.  In the settlement and license agreement.

4    Q.  If you can direct your attention to the document labeled

5    JTX32 in your binder.

6    A.  I have it.

7    Q.  Have you seen this document before?

8    A.  Yes, I have.

9    Q.  Is this the Amazon agreement you're referring to?

10   A.  It is.

11   Q.  And did you consider the terms of this Amazon agreement as

12   part of the analysis in this case?

13   A.  I did.

14        MR. CABRAL:  Your Honor, this document was previously

15   admitted into evidence in the prior trial, and we offer it here

16   as well.

17        THE COURT:  Any objection?

18        MR. EDERER:  No, your Honor.

19        THE COURT:  Received.

20        (Joint Trial Exhibit 32 received in evidence)

21   BY MR. CABRAL:

22   Q.  Specifically, Mr. Yurkerwich, if we can go back to slide 6,

23   what consideration was received by Amazon under the terms of

24   the settlement agreement?

25   A.  Well, essentially the items that I just testified to are in

1    the agreement.  They received a license to the Discovery

2    portfolio, an option to license the Sony and Philips portfolio,

3    a covenant not to sue on the patents and those portfolios for a

4    two-year period, and then the ability to get a license for

5    2-1/2 million.

6    Q.  What do you mean by option in this context?

7    A.  In this context, the licensor, Adrea, gave Amazon the right

8    to license the Sony and Philips portfolios at a future point in

9    time, so they, they gave them the right.

10   Q.  And how does the $2.5 million number relate to that option

11   right?

12   A.  Well, it's the amount that they would have to pay if they

13   exercised the option.  It's a separate amount, if you will.

14   Q.  In your view, does that $2.5 million value represent the

15   value of the license itself?

16   A.  No, it does not.

17   Q.  Why not?

18   A.  Because they had the unilateral right to exercise the

19   option at that price, and that was given before it was

20   exercised.

21   Q.  What consideration was provided by Amazon specifically

22   under the terms of the 2011 license and settlement agreement?

23   A.  Well, they provided the 10 million in cash and, as I said,

24   a license to the six patents that they had asserted in two

25   lawsuits, which I had estimated to be worth 10 million, and

1    then they ultimately paid the 2-1/2 exercise price.

2               MR. CABRAL:  If we could turn to slide 7.

3    Q.  Mr. Yurkerwich, were you able to determine what price, if

4    any, Amazon paid to receive the option?

5    A.  No.  No, I was not.

6    Q.  Why not?

7               MR. EDERER:  Your Honor, I'd just renew my objection

8    with respect to slide 7, if necessary.  Same objection as with

9    respect to slide 6.

10              THE COURT:  Yes.  Overruled.  I think it's now clear

11   to me from that footnote that while the terminology is slightly

12   different, the whole concept that he's using here was fully

13   revealed in the expert report.  Overruled.

14              MR. CABRAL:  Thank you, your Honor.  I'll rephrase the

15   question, or repeat the question.

16   Q.  Why were you not able to determine what price Amazon paid

17   to receive the option?

18   A.  Because it was not set out separately in the agreement.  It

19   was bundled with the other consideration that they gave.  So it

20   was an element of the agreement that had value, but it was not

21   separately priced, if you will.

22   Q.  In your view, what relationship exists, if any, between the

23   amount paid to receive an option and the amount paid to

24   exercise an option?

25              MR. EDERER:  Objection, your Honor.  I think this goes

1    beyond what was in that footnote.

2              THE COURT:  I can't quite tell.  Let me hear his

3    answer.

4              You may answer the question.

5    A.  Well, the amount paid for an option is really inverse to

6    the ultimate exercise price of the option.  So in other words,

7    if you, in this case if you paid 5 million to have an option to

8    pay 2-1/2, and instead wanted to pay 5, then the value that you

9    would have paid to get it would be less.  So the amount you pay

10   for the option is, the more you pay for the option the less the

11   price of the strike price of the option -- sorry to use the

12   strike price, but the exercise price, I guess, maybe would be a

13   better term.  The less you pay for the option, then the more

14   you get for the exercise price.

15             THE COURT:  I agree that's not in his report, so the

16   last question and answer will be stricken.

17   BY MR. CABRAL:

18   Q.  Mr. Yurkerwich, would it be correct in your view to assume

19   that the option was given to Amazon for free?

20   A.  No.

21   Q.  Why not?

22             MR. EDERER:  Objection, your Honor.  Circling around

23   to the same place, or attempting to.

24             THE COURT:  Yes, I agree.  The point he makes in the

25   footnote is a different one.  I'll read it again.  Footnote 74:

1   "As previously noted 2.5 million of the consideration that

2   Amazon paid to Adrea was paid later when Amazon exercised the

3   option to obtain a license to Sony and Philips's patents."  Let

4   me stop there; we've already read the rest of the footnote.  So

5   he's assuming for that purpose that the original consideration

6   included at least 2.5 million, but he doesn't put a higher or

7   lower value on it or describe the effect that he's now

8   describing.

9        Then the footnote goes on, "Since Amazon elected to

10  exercise the option, it follows that the value of the license

11  at the date it was exercised was greater than 2.5 million, a

12  fact that suggests that pooling the 2.5 million with the $10

13  million may understate the value."  So that point as an

14  abstract point, and it can be made, but the only substantive

15  point he's making there is that 2.5 should be included and that

16  it's, if anything, an underestimate, and that's as far as it

17  goes.

18       MR. CABRAL:  Your Honor, I think the distinction in

19  the footnote is between the $2.5 million paid to exercise the

20  option, and you see in that language you just read, contrasting

21  that price to exercise against the true value of the option.

22       THE COURT:  Yes, but he doesn't say why.  He doesn't

23  explain any of what he just explained now.  He just gives it as

24  an overall conclusion that if they paid $2.5 million when they

25  exercised the license, it follows that using the 2.5 as part of

1    the value of the license is, if anything, an underestimate.

2    That point I allow, nothing more.

3           MR. CABRAL:   OK.   This is my last question on the

4    issue anyway, your Honor.   And not to belabor the point, I

5    think this is one of the key disagreements between the experts

6    in the case, and all we're trying to do with this questioning

7    is establish the difference between the value of an option and

8    whatever price it's designed to exercise later on.

9           THE COURT:   He's still bound by his report.   If

10   defense counsel, of course, questions him about that, he opens

11   that door, and he may answer then with everything he just said.

12   So we'll see if defense counsel chooses to do that, but for now

13   we leave it limited to the report.

14          MR. CABRAL:   Thank you, your Honor.   We'll reserve any

15   further questions for appropriate redirect or cross on Barnes &

16   Noble's expert.

17          Turn to slide 8.

18   Q.  Mr. Yurkerwich, what is shown here on slide 8, briefly?

19   A.  This is a summary of the consideration provided and

20   received for the Amazon settlement.

21   Q.  And did you draw any conclusions regarding the value of the

22   consideration provided by Amazon against the value of

23   consideration received by Amazon?

24   A.  Well, I believe that they were in balance, that is, the

25   total of what was provided should be more or less equal to what

1    was received.

2    Q.  Why did you assume the consideration provided by Amazon was

3    equal to the consideration received by Amazon under the terms

4    of the agreement?

5    A.  Because I assumed that they were acting in a rational

6    business manner and would not give up more than they received.

7    Q.  What was the total value of the consideration provided by

8    Amazon?

9    A.  I've estimated that to be 22-1/2 million at the time of the

10   agreement.

11   Q.  How did you arrive at that total?

12   A.  It is the sum of the 10 million cash paid at execution of

13   the agreement, the value of the license that it gave to

14   Discovery for the Amazon patents, which I valued at 10 million,

15   and the 2-1/2 million that was ultimately paid for the option.

16   Q.  If I can direct your attention to the acronym NPV at the

17   bottom of the slide, do you see that?

18   A.  Yes.

19   Q.  What does that mean?

20   A.  That's abbreviation for net present value, so the 22-1/2

21   million was the value at the time the agreement was executed.

22   Q.  And there's also reference to undiscounted future value.

23   Do you see that?

24   A.  Yes.

25   Q.  Would you describe the difference between net present value

1   and undiscounted future value?

2   A.  Yes.  As I'll explain perhaps later, one of the parts of

3   this analysis is to arrive at a per-unit royalty rate, and in

4   order to that I needed to look at what future payments would

5   have been made by Amazon -- and by that I mean future royalty

6   payments -- would have been made by Amazon and how many units

7   those payments would cover.  So there's a projection of

8   royalties that, when discounted, equals 22-1/2 million.  And of

9   course, that projection is the 32.9 million in undiscounted

10  future royalty payments.

11  Q.  Briefly, what was the purpose of the discounting exercise

12  you just described?

13  A.  It was to allow me to compute a per-unit royalty.

14          MR. CABRAL:  If we could turn to slide 9.

15  Q.  Mr. Yurkerwich, what value did you place on the license to

16  Discovery of the six Amazon patents that were asserted against

17  Discovery in litigation?

18  A.  I estimated that to be $10 million.

19  Q.  And can you briefly explain how you valued the license from

20  Amazon to Discovery of those six patents at $10 million?

21  A.  Yes.  I made a projection of what portion of Discovery's

22  revenue would have been subject to royalty payments over the

23  period of time that the Amazon patents would have been in use

24  and in force.

25  Q.  Why did you follow this approach to estimate the value of

1   the license to Discovery?

2   A.   In order to arrive at its net present value at the time of

3   the Amazon settlement and license agreement, because it was

4   part of the consideration that Amazon gave in connection with

5   the deal.

6   Q.   Can you explain how you estimated Discovery's online sales?

7   A.   Yes, by referencing Discovery financial documents and

8   investment analysts' reports that documented Discovery's online

9   sales, both in the past and what they might have been in the

10  future.

11  Q.   What was your estimate of those sales?

12  A.   In total 400 million over this period of 2003 to 2018.

13  Q.   And what information did you rely on to reach that

14  estimate?

15  A.   As I said, documents produced by Discovery and other

16  information from the analysts' reports.

17  Q.   Did you attempt to determine the royalty rate that should

18  be applied against the Discovery's online sales?

19  A.   I did.

20  Q.   What royalty rate did you apply in your calculations?

21  A.   I applied a rate of 3 percent.

22  Q.   Can you explain how you arrived at a rate of 3 percent?

23  A.   Well, I searched the record for potential data points and

24  also the public domain, and within the public domain, I was

25  able to identify six licenses in the category of collecting

1    consumer information for business analytics and marketing,

2    which was the most analogous subject area available in terms of

3    publicly available licenses.  And those licenses had rates

4    ranging from 3-1/2 to 10 percent.

5    Q.  Why in your view was information relating to business

6    analytics and marketing the most analogous subject area in

7    terms of publicly available licenses?

8    A.  And it's also collecting consumer data as part of that.

9    Well, it seemed to me related to online selling and

10   technologies related to generating online selling, based on

11   consumer preferences, for example, and those same licenses have

12   some relationship to the '703 patent as well.

13   Q.  What relationship, if any, did the publicly available

14   licenses you researched have to the patents that were asserted

15   by Amazon against Discovery?

16          MR. EDERER:  Your Honor, I'd like to interpose an

17   objection.  I think what I just heard Mr. Yurkerwich say is

18   that these agreements that he's found from some public source

19   somewhere, which he was talking about them being related in

20   some way, shape, or form to the Amazon patents that were being

21   asserted against Discovery, also related to the '703 patent in

22   some fashion.  A, there's nothing in his report about that.  B,

23   there's no foundation for that, no indicated foundation for

24   that statement.

25          THE COURT:  Well, let's see where in his report he

1    deals with it.  Maybe plaintiff's counsel can direct us.

2              MR. CABRAL:  Yes, your Honor.  I can probably head

3    this one off.  While Mr. Yurkerwich's discussion of these

4    license agreements that he's raised related primarily to his

5    valuation of the Discovery license that Discovery received from

6    Amazon, there is also some relation, although albeit less

7    probative and less direct, to the '703 patent that is mentioned

8    in his report, albeit very briefly.  On page 27, in paragraph

9    (a)(2), this is certainly not a central point of the analysis

10   and doesn't relate to the valuation of the Discovery

11   cross-license, but it is mentioned in his report with respect

12   to '703 only in this regard.

13             THE COURT:  Page 27 deals with factor 8 under Georgia

14   Pacific.  I'm sorry.  Well, there is factor 8 there, but the

15   paragraph you've just identified deals with factor 13, "the

16   portion of the profit or of the selling price that may be

17   customary in the particular business or in comparable

18   businesses to allow for the use of the invention or analogous

19   inventions."  And he then says in paragraph 82, "I have

20   identified six licenses in the business intelligence and

21   marketing analytics space, which indicates percentages of

22   selling price ranging from 3.5 percent to 10 percent."

23             Your point is that although he doesn't refer

24   specifically to what the context of those words is, generally

25   he's covering your situation, the situation that was just

1    challenged.

2            MR. CABRAL:  As I understand defense counsel's

3    objection, it was only with respect to the tail end of

4    Mr. Yurkerwich's last answer in suggesting that these licenses

5    bear any relationship to the '703 patent, and pointing this out

6    was one effort, and perhaps this is among the Georgia Pacific

7    factors that your proposed instructions suggest eliminating,

8    but this is a very minor part of Mr. Yurkerwich's analysis, but

9    it does relate those license agreements back to the '703 patent

10   only as, I think the terminology is analogous types of

11   inventions.  So it's a looser standard.  It's not comparable,

12   it's just analogous.

13           MR. EDERER:  Your Honor, I'm mystified at this point

14   because if you look at paragraph 28 of Mr. Yurkerwich's report,

15   he said he conducted a royalty rate search to find royalty

16   rates that could be comparable to the patent in suit using

17   royalty source intellectual property database.  I believe

18   that's the research he's talking about now.  At his deposition,

19   he clarified the reference to the patent in suit was an error

20   and that what he was talking about was the research that he did

21   with respect to the comparability of the research that he did

22   to the Amazon patents, not to the patent in suit.  So I

23   understood following that testimony that we weren't talking

24   about comparability with respect to the '703 patent anymore.

25           MR. CABRAL:  Your Honor, if I may, we're not talking

G6nWadr3                    Yurkerwich - Direct

 1   about comparability.  There is no doubt that Mr. Yurkerwich

 2   relied on these publicly available license agreements.  The

 3   lion's share of his analysis relates to his valuation of the

 4   Discovery license by Amazon.  As we point out the only

 5   reference to these licenses and associating them with the

 6   patent in suit is in the paragraph we just discussed in factor

 7   13 of the <u>Georgia Pacific</u> analysis, which just relates to

 8   analogous types of technologies, not comparable by any stretch,

 9   which I believe is a different factor altogether.

10             THE COURT:  I agree with both sides that this is of

11   incredibly trivial relevance, so I'm glad we're spending so

12   much time on it.  For now, though, I think I'm going to allow

13   it.  I'll think about it some more, but for now the objection

14   is overruled.

15             MR. CABRAL:  Thank you, your Honor.

16   Q.  With respect to your valuation of the license received by

17   Discovery to the six Amazon patents, did you account for the

18   difference between present and future value of money?

19   A.  Yes, I did.

20   Q.  And why did you do that?

21   A.  Again, to arrive at the consideration at the time that the

22   deal, the Amazon settlement and license was negotiated.

23   Q.  And how did you go about that exercise?

24   A.  Well, I applied a discount rate of 15 percent to the

25   royalties that would have been paid by Discovery to Amazon over

1   the time period of the license.

2   Q.  And where did you get that 15 percent?

3   A.  That is based on a publication called Ibbotson that

4   presents cost of capital rates, and in particular, this is what

5   they call a nonstore retailer rate, 15 percent.

6   Q.  And what was the present value of the future royalties

7   given up by Amazon under the terms of this license and

8   agreement?

9   A.  $10 million.

10  Q.  What was the future value of the royalties given up by

11  Amazon to Discovery in terms of this license, in your view?

12  A.  $10 million.

13          MR. CABRAL:  Turn to slide 10.

14  Q.  Mr. Yurkerwich, could you briefly address what is shown

15  here?

16  A.  This is the overall calculation of the per-unit rate

17  implied in the Amazon settlement agreement, including all of

18  the considerations, consideration that was given.

19  Q.  And did you, as part of your analysis in this case, convert

20  the lump sum payment in the Amazon agreement to a per-unit

21  royalty?

22  A.  Yes, I did.

23  Q.  And why did you do that?

24  A.  In order to arrive at an overall per-unit amount as the

25  starting point for analyzing the value of the '703 patent.  So

1  the '703 patent was part of this lump sum deal, and in order to

2  arrive at a rate for the '703 patent, I first developed an

3  overall implied rate for the license itself.

4  Q.  So following through this process, can you remind us where

5  that $32.9 million in payments came from?

6  A.  Yes.  So the 32.9 million are, is the total value of

7  royalties that would have been paid annually by Amazon for use

8  of the Adrea patent portfolio.  And that 32.9 million paid over

9  time is equivalent to 22.5 million at the time of settlement.

10 Q.  As part of your analysis, did you estimate the total number

11 of Kindle sales sold by Amazon?

12 A.  Yes.

13 Q.  Can you explain how you did that?

14 A.  Yes.  I started by looking at the actual sales and then

15 referencing both IBC data and analysts' reports, I made a

16 projection of future Kindle sales through 2018.

17         THE COURT:  Let me ask you a different question.  I'm

18 looking at your report.  Do you have a copy of your report in

19 front of you?

20         THE WITNESS:  I don't, your Honor.

21         THE COURT:  Would someone hand him a copy.  Go ahead.

22 We'll give you one.

23         THE WITNESS:  Thank you.

24         THE COURT:  One major section of your report, which is

25 designated by Roman numeral VI, beginning on page 12, is

1    entitled importance of the patent in suit, and it continues to

2    the top of page 15.  It begins at paragraph 35, "The shop

3    feature enabled by the patented technology on accused devices

4    are important features of the accused Nook devices.  The shop

5    feature is the gateway to sales of B&N content, an important

6    convenience feature that effortlessly connects users to content

7    of interest to the users," etc.

8              Is any of that within your area of expertise?

9              THE WITNESS:  Well, not -- certainly not as a

10   technologist, but I believe it's within my area of expertise to

11   understand how an invention creates value in the market or

12   determine how an invention creates value in the market, and if

13   you just look at the paragraphs that follow -- that 35, you're

14   right, is a, more of a, more of my words, but the paragraphs

15   that follow, 36 through 44, are references to Barnes & Noble

16   documents that support what I summarize in 35.  And I don't

17   mean to speak too much, but essentially, what I learned in 36

18   to 44 I summarized in 35.  And 36 is what I referred to

19   earlier.

20             THE COURT:  I guess my question is this.  Are you

21   attempting to put a monetary number on the value that the

22   patented item contributes to the defendants' product?

23             THE WITNESS:  I would say that the process that I used

24   primarily is focused on the Amazon settlement agreement, and

25   then adjusting that agreement and ultimately apportioning the

1    value in the agreement down to the '703.  And I'll explain how

2    I did that, hopefully, later, but certainly this evidence here

3    is an indication perhaps of the relative importance of the '703

4    patent to the other patents that were included in the Amazon

5    license.  I don't know -- is that helpful?

6           THE COURT:  It's helpful, but I'm not sure it falls

7    within your area of expertise, is my point.  If one had an

8    automobile with ten different patented components and one were

9    trying to figure out the value of a particular component to the

10   overall invention, or the overall automobile, as a function

11   therefor of, in effect, what part of the price of the

12   automobile could be attributed to this patented invention, you

13   could go about it by looking at comparable negotiations and

14   things like that, and all of that would be within your area of

15   expertise, but I don't know that you could independently be

16   expressing what is essentially an engineering opinion about, in

17   my hypothetical, Oh, yes, the vehicle won't even run without

18   this particular invention, or something like that, which would

19   be highly relevant, but it would have to come from an engineer.

20   So you're not expressing an opinion from an engineering

21   standpoint as to the value of this particular patented

22   component.

23          THE WITNESS:  No, I'm not, your Honor.  If I may, it's

24   engineering, but it's also the market response, or the impact,

25   what's the impact of having the feature on the business.  I

1    mean, and that's -- unfortunately, there's not data in the

2    record.

3           THE COURT:  That would be great, if you had a

4    situation where there was a market for a particular invention

5    and they added a new component and that was the infringing

6    component and they would know exactly.  Then we wouldn't be

7    dealing with a hypothetical negotiation.  We would be dealing

8    with profits, presumably, because there it would be an easy

9    thing to figure out.

10          THE WITNESS:  That's true, and in this negotiation,

11   it's really dealing with, Well, how important was this feature

12   to Barnes & Noble in assessing how much value to apportion from

13   another data point to the feature.

14          THE COURT:  OK.  We're going to break for lunch and

15   we'll resume at 2:00.

16          (Luncheon recess)

17

18

19

20

21

22

23

24

25

G6n1adr4                        Yurkerwich – Direct

                            AFTERNOON SESSION

1                                2:15 p.m.

2

3    BY MR. CABRAL:

4    Q.  Mr. Yurkerwich, what information did you rely on to

5    estimate Amazon's Kindle sales through 2018?

6    A.  I referenced documents from Amazon and industry data and

7    analyst reports.

8    Q.  And why didn't you attempt to estimate Amazon sales after

9    2018?

10   A.  I had to select a time period to calculate the value and I

11   used 2018 because it represented the average expiration date of

12   the patents that were being licensed in the Adrea portfolio.

13   Q.  What does the per-unit royalty rate of 17.4 cents per

14   Kindle device represent?

15   A.  It represents a allocation of the total value of 22½

16   million to all of the Kindle units that would have been covered

17   by the settlement, or that were covered by the settlement and

18   license agreement.  Estimated Kindle units, I should say.

19   Q.  And why did you determine the effect of rate paid by Amazon

20   for the entire portfolio as part of your analysis?

21   A.  Well, it was an important starting point in order to derive

22   a per-unit reasonable royalty for the '703 patent, because the

23   '703 patent was included in the overall Amazon settlement and

24   license agreement.

25   Q.  And what did you do with the 17.4 effective per-unit rate

G6n1adr4                              Yurkerwich – Direct

1   per Kindle device?

2   A.   I then made certain adjustments to that rate to arrive at a

3   '703 rate.

4            MR. CABRAL:   If we can turn to the next slide.

5   Q.   What adjustments did you make to the effective per-unit

6   rate in the Amazon agreement?

7   A.   I made four, four adjustments.   The first was to reduce it

8   to the US portion of the value associated with the Amazon

9   settlement; the second was to increase it from a settlement

10  rate to a hypothetical negotiation rate; and the third step was

11  to derive the share of the transaction, or settlement, that was

12  related to the '703 patent; and the fourth was to adjust that

13  because the '703 patent had a much longer patent life than the

14  average of the other members of the portfolio that were

15  licensed.

16  Q.   Let's start with the first adjustment.   Why did you adjust

17  for the US portion of the Amazon settlement value?

18  A.   Because the Amazon settlement included both foreign and US

19  patents and included worldwide revenues of Amazon, and of

20  course here, I'm deriving a rate for the '703 patent just for

21  the United States.

22  Q.   Turning to your second adjustment, why did you adjust for a

23  settlement or a litigation risk discount reflected in the

24  Amazon agreement?

25  A.   Because the Amazon negotiation to arrive at this agreement

1   was before the case was resolved.  In other words, there were

2   certain patents that were -- had been asserted in litigation

3   and there hadn't been a finding of validity or infringement

4   with respect to those patents or any of the patents in the

5   portfolio that was being licensed, whereas in this matter, this

6   hypothetical negotiation, the '703 patent has been found valid

7   and infringed and therefore, the negotiating positions of the

8   parties and the hypothetical negotiation here are different

9   than the positions of the parties in the Amazon settlement

10  negotiation.

11  Q.  Turning to the third adjustment, why did you adjust for the

12  share of the '703 patent in the license portfolio?

13  A.  Well, the '703 patent was one of many patents in the

14  portfolio that was licensed, so it was necessary to isolate its

15  value relative to the rest of the patents in the portfolio.

16  Q.  And finally, with respect to the fourth and final

17  adjustment, why did you adjust for the life of the '703 patent?

18  A.  Again, as I said earlier, the '703 patent had a much longer

19  life.  Its -- I believe its expiration date is 2026 and the

20  average life of the rest of the portfolio was much shorter.

21       MR. CABRAL:  If we could turn to the next slide.

22  Q.  Mr. Yurkerwich, can you explain what is shown here.

23  A.  Yes.  This is the first adjustment that I made, that is to

24  allocate the value to just the US portion of the settlement.

25  Q.  And how did you determine the percentage of the licensed

G6n1adr4                    Yurkerwich - Direct

1    Adrea portfolio that was attributable to foreign patent

2    families?

3    A.   I analyzed the portfolio that was licensed and determined

4    which patent families were exclusively US or exclusively

5    foreign or had both US and foreign counterparts, which you can

6    see in the lower left-hand corner of this slide, the

7    distribution of the families is presented there.

8    Q.   And where did you find the information regarding the patent

9    families and the origins?

10   A.   These were in an exhibit to the Amazon settlement

11   agreement.

12   Q.   How did you determine Amazon's foreign sales as part of

13   your analysis in this first adjustment?

14   A.   Here I referred to Amazon documents that revealed its level

15   of foreign e-reader and e-book sales to determine an estimate

16   of the percentage of Amazon's business that was outside the

17   United States.

18   Q.   And how did you account for the difference in value between

19   foreign patents and US patents in licensing negotiations?

20   A.   Well, first I determined what regions the foreign patents

21   were in, which you can see in this box North America, Europe

22   and Asia, 27 percent, 20 percent, and 53 percent.  And then I

23   assigned a value to each of those regions relative to the US.

24         MR. EDERER:  Objection, your Honor.  Move to strike.

25   I don't hear any source or foundation for that last answer.

1          THE COURT:  Well, in line with the earlier rulings,

2     I'll defer until after I hear cross.

3     Q.  Why, in your view, was it necessary to account for regional

4     differences in your analysis?

5     A.  Because patents -- during negotiations of global patent

6     licenses, patents outside the United States are given less

7     value relative to the US patents.  That's largely because the

8     other jurisdictions have less opportunity for patents to be

9     enforced, and I know from my own negotiations and from

10    reviewing many other negotiations that in the modeling of the

11    ultimate settlements, the patents that are outside the United

12    States are valued less than the patents in the United States,

13    and this type of calculation is one that I've observed in other

14    licensing transactions and one that I've used in my own

15    negotiations.

16    Q.  And where did you obtain the values that you used as part

17    of your analysis with respect to the value of foreign patents

18    in light of this negotiation?

19    A.  Those percentages are based on observing them in other

20    negotiations and ones that I use in my own negotiations and

21    it's -- you can see that, you know, Europe is viewed more

22    positively than Asia.  In fact, the Asia percentage of

23    50 percent is higher than it has been in the past.  But it's

24    just an indication that these jurisdictions are viewed

25    differently.  And this is a -- this is a changing relationship

G6n1adr4                          Yurkerwich - Direct

1    as the Chinese court system has developed, and of course the

2    European system is in -- in the midst of a change itself.

3              MR. EDERER:  Same objection, your Honor.

4              THE COURT:  Same ruling.

5    Q.  With respect to the percentages under the word Share in

6    your slide, what is the source of that information?

7    A.  The share percentages are derived from Exhibit B.

8    Q.  How did you arrive at --

9    A.  Oh, and exhibit -- I'm not sure.  It might be A.  But it's

10   one of the exhibits to the Amazon agreement.  I'm sorry.

11   Q.  And how did you arrive at 11 percent foreign share of the

12   portfolio?

13   A.  As depicted on the chart, it represents the multiplication

14   of the three data inputs, the foreign family percentage applied

15   to the level of foreign sales, and then discounted for the

16   relative value of the foreign patents compared to US patents.

17             MR. CABRAL:  If we can turn to the next slide.

18   Q.  Can you explain what is shown here.

19   A.  Yes.  This slide converts the 17.4 cents from a global

20   per-unit value to a US per-unit value by applying 89 percent,

21   which is the inverse of the 11 that I derived in the previous

22   slide, so 89 percent times 17.4 cents equals 15.4 cents.

23   Q.  And what does the result of this calculation shown on slide

24   13 represent?

25   A.  It represents the US portion of the settlement value on a

1    per-unit basis.

2              MR. CABRAL:  If we could turn to the next slide, 14.

3    Q.  What is the purpose of adjusting for a settlement discount

4    in the context of your analysis of the Amazon agreement?

5    A.  Yes.  This is expanding on what I described earlier that in

6    actual -- what I call here real-world license negotiations,

7    parties discount the amount that they might be seeking based on

8    the uncertainty of the future, which may be during litigation

9    or even prelitigation.  So in the real world, license

10   negotiations involve a degree of compromise, and obviously

11   they're completed without a judicial ruling, whereas here, in

12   this hypothetical negotiation, we have a ruling on validity and

13   infringement and therefore, in order to convert this settlement

14   per-unit amount to an amount that would be used on a

15   hypothetical negotiation, it's necessary to make an adjustment.

16   Q.  Does a patent need to be in active litigation in order to

17   adjust for litigation risk, in your view?

18   A.  No, it does not.

19   Q.  Why not?

20   A.  Because even without the threat of litigation, the sub --

21   the many variables in estimating a lump sum are debated, and I

22   know this from my own experience.  I prepare similar models to

23   negotiate lump sums, and all of the inputs are debated by the

24   parties, and there is uncertainty, and that uncertainty is

25   negotiated, and of course part of the uncertainty is which

1    patents are going to be found infringed and be valid.

2    Q.  Is an adjustment for litigation risk and uncertainty an

3    accepted methodology in your field?

4    A.  It is.

5    Q.  And how do you know that?

6    A.  I testified at least twice before in two different federal

7    courts where I've applied a litigation multiple to recognize

8    the difference between a settlement value and a hypothetical

9    negotiation value.

10   Q.  How does a patent owner's bargaining position in real-world

11   licensing negotiations compare to the bargaining position in

12   the hypothetical negotiation?

13   A.  Well, in a hypothetical negotiation the patent owner is in

14   a much stronger position because there is an assumption of

15   validity and infringement that's not present in a nonlitigation

16   or prelitigation environment.

17   Q.  And how does that difference in bargaining strength affect

18   the rates negotiated in a hypothetical negotiation as compared

19   to the rates negotiated in real-world licensing discussions?

20   A.  Well, the hypothetical rates would be higher.

21           MR. CABRAL:  If we could turn to the next slide, 15.

22   Q.  Can you explain how you determined the settlement discount

23   reflected in the Amazon license and settlement agreement.

24   A.  Yes.  I started with the settlement value which I

25   previously testified to of 22½ million, and then I searched for

1    evidence in the record of what the expected value might have

2    been for the Amazon settlement; that is, what was the possible

3    exposure of Amazon and the possible royalties that could have

4    been received by Adrea.  And I found a couple of data points.

5    This particular chart focuses on one of the data points, and

6    that is an estimate of the potential value of royalties for the

7    portfolio that -- the e-reader portfolio that was being

8    organized by Intertrust and ultimately became known as Adrea.

9              MR. EDERER:  Your Honor, renewing my objection with

10   respect to the use of the Intertrust document, and

11   Mr. Yurkerwich just indicated that he looked in the record, and

12   that document was not in the record and is not in the record in

13   the first trial and certainly not in the record here yet

14   either.  Not to mention all the other problems that we have

15   with it.

16             THE COURT:  So let's pause here for a moment.

17             So what's your understanding of what this document

18   was?

19             THE WITNESS:  It's a planning document.  It's called

20   E-Reader Market Venture is the title of the document, and it

21   represents an analysis of the e-reader market and the potential

22   royalties that could be generated from an e-reader portfolio of

23   patents.

24             THE COURT:  So this is someone's internal document,

25   never shared with the outside world?

1          THE WITNESS:  Well, I guess it depends on the

2    definition of outside world.  It was certainly shared with

3    Sony, Philips, and Discovery.

4          THE COURT:  Well, at the time it was generated it was

5    generated for internal planning purposes, yes?

6          THE WITNESS:  Planning, and I would say organizing the

7    portfolio participants.

8          THE COURT:  And do we have a copy of that?

9          MR. CABRAL:  We do, your Honor.  I believe it's in the

10   witness binder.

11         THE COURT:  What's the number?

12         MR. CABRAL:  It is PTX 166, your Honor.

13         THE COURT:  All right.  So I'm looking at this

14   document not yet received in evidence and it's a 2009 document.

15   Who is Intertrust Technologies?

16         THE WITNESS:  Intertrust is the fourth member of the

17   Adrea consortium and Intertrust is a technology company that

18   started in the digital rights management space many years ago

19   and has developed many products and licensed, for example,

20   Microsoft and Apple and others, so it's a -- it's a technology

21   development and licensing company.

22         THE COURT:  So this is their internal analysis, yes?

23   Intertrust's internal analysis of the business case for forming

24   a joint venture with Discovery, Sony, and Intertrust for the

25   purpose of licensing e-book technology patents, yes?

1          THE WITNESS:  It is, and if I could just make one

2     small addition, Intertrust is and was owned by Sony and

3     Philips, and this document was presented to the board, of which

4     Philips is a member, so Philips was aware of the document, and

5     on -- if you page back a couple of pages where it talks about

6     the general assumptions per model -- it's Bates 141114 -- it

7     indicates that additional patents will be contributed to the

8     venture, so Philips, you know, was certainly aware of this and

9     of course a year later became part of Adrea.

10          MR. EDERER:  Your Honor, there is absolutely no

11     evidence in the record in this case that Philips was ever made

12     aware of this document at the time that it was prepared.  Not a

13     shred.  There's never been any testimony, there are no

14     documents to that effect.  That is total conjecture on

15     Mr. Yurkerwich's part.

16          THE COURT:  So what's your basis for saying that

17     Philips was aware of it?

18          THE WITNESS:  Because I discussed it with Intertrust,

19     the CEO, and he told me that this document was presented to the

20     board of directors, which includes a Philips member.

21          THE COURT:  Did you --

22          THE WITNESS:  In fact, I know the Philips member.

23          THE COURT:  Excuse me.  Excuse me.

24          THE WITNESS:  Sorry.

25          THE COURT:  Did you reference that conversation in

G6n1adr4                      Yurkerwich – Direct

1    your expert report?

2               THE WITNESS:  I don't believe so, your Honor.

3               THE COURT:  Were you asked about it at your

4    deposition?

5               THE WITNESS:  I believe I said at my deposition that

6    Philips was on the board and would have seen the document, yes.

7               THE COURT:  Well, but you're now saying that you

8    personally had a conversation with the CEO at Philips --

9               THE WITNESS:  Of Intertrust.

10              THE COURT:  I'm sorry.  -- the CEO of Intertrust, who

11   told you that he had presented it to Philips?

12              THE WITNESS:  Had presented this document to the

13   board.

14              THE COURT:  So putting aside the double hearsay

15   problem, did you reference that at your deposition, that

16   conversation?

17              THE WITNESS:  I don't recall, your Honor.  I know I

18   referenced the fact that Philips was on the board and this was

19   presented to the board.  But I did discuss this document

20   with -- with Mr. Shalom.

21              MR. CABRAL:  Shamoon.

22              THE WITNESS:  Shamoon.

23              THE COURT:  And what is it that you think this

24   contributes to your analysis here?

25              THE WITNESS:  Yes, sir.  It's really I guess page 3,

1    or after the cover, the revenue opportunity summary.

2              THE COURT:  Okay.

3              THE WITNESS:  So here we have an NPV, net present

4    value, of revenue -- of the revenue opportunity of 67 million.

5    You see, assuming a 33 percent discount rate, an eight-year

6    licensing horizon.  So there's -- obviously you can tell from

7    the charts there's a model, similar to the one -- ones that I

8    prepared, analyzing the Amazon deal, that they prepared in

9    2009, looking at this market.  So it's in the right time frame

10   for sure.

11             THE COURT:  So let me ask plaintiff's counsel, are you

12   offering this?

13             MR. CABRAL:  Your Honor, I think it's a good point,

14   because I'm not sure that admission into evidence is essential.

15   We can deal with the offering in a second, but I think Rule

16   '703 --

17             THE COURT:  Allows the witness to reference evidence

18   that would be admissible even if it isn't actually admitted.

19   So if you want to put it to the test --

20             MR. CABRAL:  Well, actually, your Honor, I think the

21   exact language --

22             THE COURT:  Given the hypothetical, a real-world test

23   of the hypothesis that it would be admissible would be to move

24   to admit it.

25             MR. CABRAL:  Well, I think the precise language of

1  Rule '703 says that the document need not be admissible for an

2  expert to rely on it, so long as the facts and information are

3  such that would be typically relied on by an expert in the

4  field.

5           THE COURT:  Well, that's true.  I think that's more

6  referencing things like treatises and stuff like that, but

7  let's take a look at it just so we're all on the same page.

8           Rule 703.  An expert may base an opinion on facts or

9  data in the case that the expert has been made aware of or

10  personally observed.  If experts in a particular field would

11  reasonably rely on those kinds of facts or data in forming an

12  opinion on the subject, they need not be admissible for the

13  opinion to be admitted.  But if the facts or data would

14  otherwise be inadmissible, the proponent of the opinion may

15  disclose them to the jury only if their probative value in

16  helping the jury evaluate the opinion substantially outweighs

17  their prejudicial effect.

18           So I haven't heard yet any testimony regarding whether

19  experts in the field would reasonably rely on these kinds of

20  internal projections for this purpose, but assuming that you

21  can elicit such testimony, we would still have the question of

22  the probative value versus prejudicial effect.

23           Now that's really all formed and this whole rule is

24  formed in the background of the jury issue, but in a bench

25  trial we can take a more direct approach.  So if you don't want

1    to offer this, then I will not consider it or his testimony

2    with respect to it.  If you do want to offer it and you succeed

3    in getting it admitted, then I will consider his testimony with

4    respect to it.  Would you like to offer it?

5              MR. CABRAL:  I would like to offer it, your Honor, but

6    I would also like the opportunity to ask some underlying

7    questions before I make the offer, if that's --

8              THE COURT:  Well, that's fine.  I'm going to give you

9    plenty of opportunity.  But now that you have offered it

10   subject to connection, let me hear any voir dire from defense

11   counsel.

12             MR. EDERER:  Just give me one moment, your Honor.

13             THE COURT:  Yes.

14   VOIR DIRE EXAMINATION

15   BY MR. EDERER:

16   Q.  So Mr. Yurkerwich, the Intertrust document that we're

17   referring to here, you're utilizing that document as a proxy,

18   are you not, for purposes of discounting a settlement rate with

19   respect to the Amazon agreement, correct?

20   A.  No.  I'm using it for the purpose of estimating the amount

21   by which the agreement was discounted.

22   Q.  Right.  So what you're saying is, you have a value of

23   $22.5 million for the entire Amazon settlement agreement

24   consisting of the license with respect to Discovery patents,

25   the license with respect to the Adrea -- the Philips and Sony

1    patents, and the cross-license with respect to the Amazon

2    patent, correct?

3    A.   Yes.

4    Q.   And the discount that you're taking is the difference

5    between the 22.5 million and a number that is based upon the

6    $67 million figure that is in this Intertrust document,

7    correct?

8    A.   Again, I just need to correct your statement because you

9    said the discount that I'm taking.  It's the discount that I'm

10   computing.

11   Q.   Okay.

12   A.   And it's one example of that discount.

13   Q.   But the way you're computing it is you're taking -- you

14   have a denominator of 22.5 and you have a numerator of 53.6,

15   and from that you get a 2.38 multiplier, is that right?

16   A.   Yes.

17   Q.   And the 53.6 number is calculated by taking 80 percent of

18   the $67 million number that's in this Intertrust document,

19   correct?

20   A.   Yes.

21   Q.   And basically what you're measuring here is the discount

22   that Adrea agreed to take to settle the Amazon case from what

23   it expected to recover in damages in that case, correct?

24   A.   Well, from what it expected to recover in royalties from

25   the largest participant in the market.

1    Q.   Yes.  But what you were doing is you're discounting for

2    litigation risk, correct?

3    A.   That certainly is part of it because it was in litigation,

4    yes.

5    Q.   And you say in paragraph 66 of your report that you

6    confirmed with the lead negotiator for Adrea that they

7    discounted their expected damage recovery by more than

8    50 percent, given the risks associated with going to trial.

9    You said that, right?

10   A.   Yes.

11   Q.   And then you go on to talk about this very Intertrust

12   document, which says that, and you go on to say that that

13   forecast indicated an opportunity with a net present value of

14   approximately 67 percent, right?

15   A.   67 million.

16   Q.   67 million.  And then you took 80 percent of that

17   67 million representing what you say is Amazon's share of the

18   e-reader market to get to the $53.6 million number, correct?

19   A.   Yes.

20   Q.   And then you go on to say that settlement value, that

21   22.5 million, therefore only achieves 42 percent of Adrea's

22   goal.  You're talking about Adrea's damages goal in the Amazon

23   case, are you not?

24   A.   I am using this to help adjust the settlement to what their

25   expectation was with respect to Amazon.

1    Q.  Mr. Yurkerwich, do you know who actually prepared this

2    Intertrust document?

3    A.  I know that a number of people participated in its

4    preparation; at least three.

5    Q.  And one of them was a Mr. Manente, correct?

6    A.  Mr. Manente did some of the underlying analysis.

7    Q.  And Mr. Manente had no experience whatsoever in the

8    e-reader field when he put this document together, correct?

9    A.  I -- I don't know the answer to that question.

10   Q.  And at the time that Mr. Manente put this document

11   together, Adrea didn't even own any of the patents that it

12   later acquired, and as a result of having acquired those

13   patents, it became a party to the Amazon litigation, is that

14   right?

15   A.  Yes.

16   Q.  So at the time that Mr. Manente, or whoever put this

17   document together, created the document, they created the

18   document without regard to what they may have or may not have

19   achieved at trial in the Amazon case, correct?

20   A.  No.  I guess I don't agree with that, because it's a very

21   detailed analysis of the market.  It's based on substantive

22   research and data and it represents, even with -- it includes a

23   discount for some of the uncertainties of a program, so it's

24   a -- in my view, it's a pretty robust analysis of the potential

25   on which the parties made their decision to form the joint

1    venture.

2    Q.  And was it created with respect in any way to the Amazon

3    litigation?

4    A.  Well, I think the Amazon litigation was ongoing.  I don't

5    think it was created for the Amazon litigation, but certainly

6    there was knowledge of the Amazon litigation and Amazon was

7    clearly the largest player in this market.

8    Q.  And does it purport to reflect what Adrea would have or

9    would have liked to achieve by way of damages in the Amazon

10   litigation?

11   A.  It -- it purports to reflect the market, which included the

12   Amazon litigation.

13   Q.  Are you saying that this document demonstrates, in some

14   way, shape, or form, what Adrea expected to recover in damages

15   in the Amazon litigation but instead took a discount to settle

16   that case?  Is that what you're using this document for?

17   A.  I'm using it as an estimate of what they believed the

18   revenue opportunity from Amazon would be, not necessarily with

19   a fully litigated outcome.

20   Q.  And this document refers to projected revenues both for

21   e-content licensing and e-book device licensing, correct?

22   A.  It -- the way the estimate was put together, it has a -- a

23   two-factor input, looking at both devices and content.

24   Q.  And so of the $67 million in forecasted revenue over an

25   eight-year period that was created before Adrea even acquired

1    any of these patents, it showed $37 million in forecasted

2    revenue for e-reader device royalties and $30 million for

3    e-book transaction royalties, correct?

4    A.   The way this chart was put together, or this model, instead

5    of -- it could have just looked at device, it could have just

6    looked at content.  At this point they valued it using both

7    data inputs, but it's not -- it's not intended -- it wasn't

8    intended to isolate the opportunity with respect to Amazon, for

9    example, to one or the other; really both.

10   Q.   But you're purporting to use this document as a basis for

11   coming up with a settlement discount that Adrea agreed to take

12   in the Amazon litigation from 53.6 million down to 22.5 million

13   in order to come to a multiplier of 2.38, correct?

14   A.   That is correct.

15   Q.   Okay.  And of that 53.6 million, that's 80 percent of

16   67 million, right?

17   A.   Yes, it is.

18   Q.   Okay.  And so you're including in your discount both the

19   37 million that's reflected on here for e-reader device

20   royalties and the 30 million that's reflected on here for

21   e-book transaction royalties, correct?

22   A.   Well, as I said, the way it was put together, it had a

23   two-component piece, and in the Amazon ultimate deal, they had

24   a license for both.

25   Q.   Well, no.  In the Amazon deal where you're creating a

1    per-unit royalty rate based upon the Amazon settlement, you're

2    only calculating that per-unit rate based upon the projected

3    sale of Amazon devices, isn't that correct?

4    A.  That is correct.

5    Q.  But in your discount, you're including both projected

6    device royalties and projected e-book royalties.  Aren't you

7    overstating by $30 million what that discount opportunity would

8    be?

9    A.  No, I don't believe I am.  I believe that the royalty could

10   be derived from one of the other or both, and this is a model

11   of the potential in an e-reader market broadly, without trying

12   to pinpoint what the royalty base might ultimately be.

13   Q.  But the fact of the matter is that when this document was

14   created, it was created without reference to the Amazon

15   litigation; it has nothing to do with the damages that Adrea

16   expected to recover in that litigation, does it?

17   A.  I don't agree with that, no.

18   Q.  So in 2009, before Adrea acquired any of these patents and

19   became a party to the Amazon litigation, it's your testimony

20   that this document was created in order to forecast Adrea's

21   expected damage recovery in the Amazon case, is that your

22   testimony?

23   A.  I didn't say that.  I said this expected revenue includes

24   the hoped-for Amazon settlement and license.  That's what it

25   was for.

1   Q.  This document reflects Adrea's hope for settlement in the

2   Amazon case, is that your testimony?

3   A.  Yes.

4   Q.  And where does it say that in this document?

5   A.  It discusses later in the document that -- the difficulties

6   of litigation and -- and it includes a 33 percent discount rate

7   for the various risks of implementing a program like this, and

8   clearly Amazon was a -- well, the dominant player at that time,

9   as I testified to earlier.

10  Q.  And have you ever used before, Mr. Yurkerwich, a document

11  to support a litigation risk discount that was created with

12  respect to a time frame where the party involved wasn't

13  involved in that litigation?

14  A.  Absolutely.  Do it all the time.

15  Q.  You do it all the time.

16  A.  And I've seen it done by others.

17  Q.  Now are you aware, sir, that Mr. Manente has testified, or

18  had indicated in a document, that this forecast was not a

19  valuation per se?

20          MR. CABRAL:  To be clear, your Honor, Mr. Manente --

21          THE COURT:  Sustained.

22          MR. CABRAL:  Thank you.

23          MR. EDERER:  Well, I think that's about all I have,

24  your Honor.  I think that I would argue that it's pretty clear

25  that this document was not created in any way whatsoever for

1   the purpose of supporting a litigation risk discount in a

2   litigation to which Adrea, which was not even formed yet, was

3   not a party to that litigation.  There's no reference here

4   whatsoever.  And by the way, there is absolutely no reference

5   to Philips in this document.  Mr. Yurkerwich testified, based

6   upon a conversation that he had with Mr. Shamoon that he didn't

7   disclose in his report, that this was somehow shown to the

8   board of Philips.  There is zero reference to Philips in here.

9           THE COURT:  I am going to exclude his testimony

10  regarding the allegation that this was shown to Philips, but I

11  don't think that is the end of the issue on its admissibility.

12          This was very helpful.  I'm going to think about it

13  for a little bit more, but at least for now, I'm going to allow

14  the testimony to continue and to receive this contingently, and

15  I'll think about it over the next hour or so and make a final

16  ruling either at the end of the day or first thing tomorrow.

17          So let's go back to plaintiff's counsel.

18          MR. CABRAL:  Your Honor, one final point before I

19  continue the examination.  On the issue you and I had discussed

20  regarding Rule 703 --

21          THE COURT:  Yes.

22          MR. CABRAL:  -- and whether experts in this field

23  would rely on this type of facts and data --

24          THE COURT:  Yes.

25          MR. CABRAL:  -- in our opposition papers we had cited

1    to a case called *France Telecom v. Marvell Semiconductor,* and

2    in that case -- this is a Northern California case -- an expert

3    in that case was permitted to testify based on his analysis of

4    a licensing forecast, or revenue forecast, which is what we

5    contend this is.  So on the Rule 703 issue, it doesn't relate

6    to admissibility so much as Mr. Yurkerwich's ability to testify

7    about this facts and information.  We think that case would be

8    pertinent in this situation.

9            THE COURT:  Yes, that is at least part of the reason

10   for my tentative ruling.  This may or may not be entitled to

11   the weight that the witness is giving it, but it doesn't seem

12   to me to be the sort of thing that would not be appropriate for

13   an expert to consider on the issues that he is considering it

14   for.  But I will think about it a little bit more.  But at

15   least that's the basis for my tentative ruling that it will be

16   received.

17           MR. CABRAL:  Thank you, your Honor.  And you will see,

18   as the examination continues in a moment, the information

19   relevant to this particular issue, there is only one other data

20   point, which we'll get to in a second, which may not have these

21   problems, but we'll proceed accordingly and see how it goes.

22           THE COURT:  Okay.

23   BY MR. CABRAL:

24   Q.  Mr. Yurkerwich, if you could direct your attention to PTX

25   166.

1          THE COURT:  By the way, I've said all this earlier,

2     but I just want the record to be clear, I think Rule 703, in

3     reading it, refreshes my memory that an important reason why I

4     excluded this at trial was the possible confusion by the jury

5     outweighed its probative effect, characterized as a 403

6     objection but it's really a 703 objection as well, and

7     therefore, when I indicated, when it appeared that today's

8     proceeding would still be a jury trial, that I would adhere to

9     the previous rulings made on evidentiary matters, it was

10     against that context, but as I indicated earlier today, since

11     it's now a bench trial, that 403 analysis really drops out of

12     the picture and similarly that aspect of Rule 703, because

13     while a jury could be confused, the law in its wisdom says that

14     judges can never be confused.  So --

15          MR. EDERER:  Your Honor, if I may.  I apologize, but

16     two things.  One, in the case that Mr. Cabral just cited, the

17     *France Telecom* case, it does talk about experts being allowed

18     to use forecasts in their work, but it doesn't say anything in

19     that case about litigation risk or the use of forecasts to use

20     litigation risk for purposes of calculating settlement

21     discounts.  Number one.

22          And number two, I'm looking at our motion *in limine*

23     that we filed at the first trial with respect to this document,

24     which, as I think I mentioned earlier, focuses mainly on the

25     expert aspect of it and not the jury aspect of it.  But we do

G6n1adr4                       Yurkerwich – Direct

1    cite a case in our brief, *Leese v. Lockheed Martin*, 2014 WL

2    1092406 (D.N.J. 2014), in which we indicate that forecasts of

3    this nature by a nonexpert, which Mr. Manente is or was a

4    nonexpert, cannot be considered anything on which a testifying

5    expert can rely.  So we do have that cite in our brief as well.

6              (Continued on next page)

1              THE COURT:  OK.  As I say, this is a tentative ruling,

2      and I haven't made a final ruling.  Maybe I'll have a look at

3      that case you just cited, but I don't understand why a forecast

4      made by people familiar with business could not be relied on by

5      an expert.  The business people make determinations all the

6      time without hiring experts to give them the basis for making

7      that determination.  To take sort of a common-sense type

8      example, supposing a great big company said:  We're thinking

9      about raising our prices for our widgets by a dollar.  Do you

10     think that's a good idea or a bad idea?  And its internal

11     business people talked about how sales are going and what

12     happened the last time they raised prices and what their

13     competition was like, and all things like that; none of them

14     being experts, just being everyday business people who have to

15     make everyday business decisions, and later on that became

16     relevant to determining some damages issue in some case.  I

17     don't see why an expert couldn't rely on that or why he would

18     not rely on that.  These are the people in the field, so to

19     speak, who are making business decisions that they're asking

20     their own employers to rely on in making an investment of

21     money.

22              So if I read this correctly, and all of this is said

23     tentatively, because I haven't really focused on this that

24     much, but this is an internal Intertrust document.  I'm going

25     to assume it's never shown to anybody other than Intertrust,

1    and I agree that the evidence of that is beyond the scope of

2    the witness's report, but its objective is to analyze the

3    business case for performing a joint venture between Intertrust

4    and certain other companies for the purpose of licensing e-book

5    technology patents.

6            Now, no one who is putting this together is just going

7    to be engaging in a waste of time or a roll of dice or an

8    astrological analysis; they're going to be making assumptions

9    based, as this clearly is, on things like what they know about

10   the marketplace, the sort of things reflected in the various

11   charts that are shown throughout this exhibit, some of which

12   come from identified sources like the Forrester Report of

13   E-reader and E-book Market Rate for Growth, or the various

14   other sources, but some of which are just an analysis of

15   factors and giving pros and cons.  Is it entitled to a great

16   deal of weight?  I'm very skeptical about that, but is it

17   inadmissible because no expert reasonably would rely on this?

18   That I'm more skeptical about.

19           Anyway, let's continue.  We can have this discussion

20   further later.

21           MR. CABRAL:  Thank you, your Honor.  Just a few more

22   questions on this topic and then I'll move on.

23   Q.  If you can turn to the page ending with 112 in PTX166, and

24   you may have addressed this already.  First of all, is this the

25   information you relied on for purposes of forming your opinion

1   regarding the settlement discount in the case?

2   A.  Yes, this particular settlement discount calculation.  Yes.

3   Q.  How would you describe the information that's shown here on

4   this third page of PTX166 ending with 112?

5   A.  It's a summary page of detailed forecasts.  It actually

6   arises from a detailed model, the output of which is presented

7   in various charts.

8          THE COURT:  I didn't quite understand the response you

9   gave to defense counsel a minute ago when he tried to say that

10  you should not have relied on the combination of the two

11  figures on page 3, one of which deals with device royalties and

12  one of which deals with transaction royalties.  I'm not quite

13  sure I understood your answer to that.

14         THE WITNESS:  Yes.  And it might help me clarify that

15  if you look at the next page.

16         THE COURT:  OK.

17         THE WITNESS:  So in any licensing program, there are

18  different inputs that can be used to negotiate: a lump sum

19  payment.  In this case they at the time said, Well, we could

20  perhaps have a device rate, which you can see is equivalent to

21  90 cents per device, and then they said, Well, we could also

22  perhaps have a 10-cent-per-e-book rate.  So at the time they

23  weren't sure.  Of course, they didn't have the portfolio in

24  hand, and they weren't sure how it would go, what the best

25  combination or single rate might be, and ultimately, the Amazon

1    agreement was concluded, which provided Amazon with rights to

2    both the devices and the content, so both.

3            For purposes of this proceeding, I and the opposing

4    expert have focused on a device rate for the agreement, so we

5    haven't put it into two buckets, we put it into one.  And what

6    I'm saying is the value that they expected to derive from these

7    two buckets is the combined value or the 67 million.  It

8    happened in this model that they put it into two buckets, but

9    ultimately it was a lump sum of money, and for purposes of

10   parsing it, we're both parsing it on a device rate only.

11           THE COURT:  All right.  Go ahead.

12           MR. CABRAL:  If we can turn back to page 3.

13   Q.  Can you explain why you considered this information shown

14   here on page 3 of PTX166 as part of your analysis to adjust for

15   litigation risk?

16   A.  Well, yes.  I knew that, of course, the Amazon settlement

17   was just that, settlement, and was different than the

18   hypothetical negotiation, and I had to search for a metric

19   specific to this situation that might inform us as to the level

20   of discount that was taken in connection with settling the case

21   before any patent was found valid and infringed.  And this

22   document is one of only two documents that I found that gave

23   some guidance on what that level of that discount might have

24   been.

25   Q.  Just two last questions on this topic.  In your view, would

1    this information shown here on slide 3 of PTX166 be the type of

2    information relied on by experts in your field?

3    A.  Yes.

4    Q.  And why do you say that?

5    A.  Because in the patent licensing business, at the heart of

6    it is projecting the level of use and the potential royalties

7    in any particular field.  And it's particularly needed if

8    you're going to negotiate a lump sum payment, so it's

9    absolutely necessary to have those metrics in place.

10            MR. CABRAL:  If we could go back to slide 15.

11   Q.  Mr. Yurkerwich, what was the result of your analysis for

12   determining the discount reflected in the Amazon agreement

13   based on your consideration of the Intertrust analysis?

14   A.  Yes.  As you can see on the slide, it indicated to me that

15   the settlement -- well, that the settlement would need to be

16   increased by 2.38 percent -- 2.38 times, excuse me, in order to

17   come back to the expectation for Amazon, for licensing Amazon.

18            MR. CABRAL:  Your Honor, I'm about to move on.  We

19   will conditionally offer PTX166, subject to your rulings to

20   follow on this issue.

21            THE COURT:  OK.

22            MR. EDERER:  Your Honor, if I may just put one more

23   thing on the table with respect to this issue?

24            THE COURT:  Sure.

25            MR. EDERER:  I'm looking at your decision at the prior

1    trial explaining your exclusion of this document, because what

2    happened was that even though you had excluded it prior to

3    trial, there were some questions that were being put to the

4    plaintiff's then expert about this document and the information

5    contained in this document, to which I objected and you said an

6    expert can refer to two things:  "He can refer to matters that

7    are in evidence or could be admitted into evidence and can

8    refer to treatises and other things that are generally regarded

9    in the area."  And then you go on to say, Mr. Cox indicated to

10   you that you're offering this as information that Professor

11   Magee considered, even though the document had already been

12   excluded, and you said, "He considered it for its truth,

13   otherwise it would be irrelevant."  And there was some argument

14   by Mr. Cox, and then you say, "He is still considering it for

15   its truth, he is just discounting it.  I don't see how it's

16   admissible.  You'd better move on."

17            THE COURT:  I think you're right to bring that to my

18   attention, but I think I was misremembering 703 when I said

19   that.  In fact, one interesting thing that's come up today, and

20   I want to go back and see if 703's been amended sometime over

21   the last 20 years when I've been on the bench because its

22   wording is a little bit different than I recollected.  But I

23   was operating under the assumption, when I said those things

24   that you just quoted, as early as earlier this afternoon, that

25   for an expert to consider something beyond treatises and stuff

1    like that, it had to be something that at least could be

2    admissible into evidence even if it wasn't in fact admitted.

3    But plaintiff's counsel has drawn my attention to the language

4    of 703, which is really different, so I think that the comments

5    you just raised, which are consistent with what my thought

6    process was at the time, have to be reconsidered in light of

7    the wording of 703 that plaintiff's counsel has brought my

8    attention to.

9    Q.  Mr. Yurkerwich, apart from the Intertrust analysis, did you

10   consider any other information as part of your adjustment for a

11   settlement discount that should be applied to the Amazon

12   agreement?

13   A.  Yes.  I also considered an offer that was made by Adrea to

14   Amazon.

15   Q.  If we could direct your attention to DTX069 in your binder.

16          MR. EDERER:  Your Honor, may I interpose an objection

17   here?  This document was also excluded at the prior trial.

18   This is a proposal that was made by Adrea to Amazon to settle

19   the Amazon case for $50 million and other consideration.

20          THE COURT:  And was not accepted?

21          MR. EDERER:  Not only was it not accepted, but it was

22   objected to not by us but by counsel for the defendants.

23          THE COURT:  So why should I receive it here?

24          MR. CABRAL:  I'll be happy to address that, your

25   Honor.  This is a defense exhibit that was offered at the prior

1    trial with a fact witness for an entirely different purpose.

2    In that case, defense counsel was using this document in a way

3    that we believe is improper under Rule 408.  We don't think

4    that we are offering, and I haven't made an offer, of this

5    document into evidence yet, but if we did, the argument would

6    be when we do make the offer that we are not using this in a

7    manner that's prohibited under 408, which prohibits the use of

8    an offer to prove or disprove the validity or amount of a

9    disputed claim.  We're not offering this document here in the

10   way that --

11             THE COURT:  So what's the relevance?

12             MR. CABRAL:  The relevance here is to, again, account

13   for the litigation risk adjustment by comparing the settlement

14   amount to an amount that was made as part of that litigation.

15   It's merely to compare and determine the amount of risk that's

16   reflected in a settlement agreement that came after this offer,

17   not to challenge or establish the amount of the claim in

18   question.  With respect to 408, we think we are not using in a

19   manner prohibited by 408, which was our objection, and we'll

20   concede that.  This was a defense exhibit.  It was on their

21   original exhibit list, and they tried to use it affirmatively

22   at trial.

23             THE COURT:  I don't care about whose exhibit list it

24   was on, but I think your point is right.  If something was

25   excluded at the prior trial on ground X and it's now being

G6nWadr5                        Yurkerwich - Direct

1    offered for a totally different reason, then it may or may not

2    be admissible, but the prior ruling doesn't control then.  So

3    why don't you go ahead, and when you offer it I'll hear further

4    from defense counsel.

5              MR. CABRAL:  Thank you, your Honor.

6    Q.  Mr. Yurkerwich, is this document shown here as DTX069 a

7    document you considered as part of your analysis of litigation

8    risk adjustment?

9    A.  Yes, it is.

10   Q.  And have you seen it?  I take it you have seen this

11   document before?

12   A.  Yes, I have.

13   Q.  What did the settlement offer of Adrea to Amazon consist

14   of?

15   A.  It proposed a settlement of all litigation in exchange for

16   a payment of $50 million, and it also included an offer of a

17   strategic partnership to Amazon whereby they would obtain a 20

18   percent ownership of Adrea if Adrea -- I'm sorry, if Amazon

19   transferred certain patents to Adrea.

20   Q.  How did this offer compare to the actual settlement that

21   was negotiated with Amazon?

22   A.  Well, the ultimate settlement, of course, was valued by me

23   at $22-1/2 million and did not include Amazon obtaining a 20

24   percent ownership of Adrea or transferring any patents to

25   Adrea.

1          MR. CABRAL:  If we could go back to the slides and go

2     to slide 16.

3     Q.  What conclusions did you reach regarding the settlement

4     discount to be applied in this case based on your analysis of

5     this offer from Adrea to Amazon?

6     A.  Well, looking at this particular offer implies a settlement

7     discount -- well, it implies that the 22-1/2 million was 2.2

8     times less than the 50 million offer.

9          MR. CABRAL:  Your Honor, at this time we offer DTX69

10    into evidence, subject to our prior discussion.

11         THE COURT:  All right.  I'll hear from defense

12    counsel.

13         MR. EDERER:  Your Honor, this is a document that was

14    presented to Amazon by Adrea as an opening proposal to make a

15    settlement.  There's no indication that this document was taken

16    seriously by Amazon.  There's no testimony about the response

17    that Amazon gave, and yet Mr. Yurkerwich is presenting this as

18    a basis for demonstrating that there was a $27-1/2 million

19    litigation risk discount taken on the basis of this document.

20    This document doesn't demonstrate that.

21         THE COURT:  Hold on.  Let me ask the witness.

22         Do you know what response was made to this document?

23         THE WITNESS:  Well, there were -- not specifically to

24    this document, no, your Honor, I don't.  I know there --

25         THE COURT:  Was this early on in the settlement

1    discussion?

2            THE WITNESS:  No.  This, this was certainly after the

3    formation of Adrea.  Probably a year before the settlement.

4            THE COURT:  Many times in a settlement discussion, as

5    anyone who's ever had the opportunity to participate in those

6    discussions knows, a party may make an offer that is wildly at

7    odds with what any reasonable person would come up with just as

8    a negotiating tactic:  We don't want to start off too low; we

9    don't want to start off too defensive.  We'll start off with

10   something really off the charts, but then they'll come back and

11   we'll get more serious consideration.

12           I don't know whether this is that or not.  I mean, how

13   can I know, given the very limited information we have about

14   this?

15           MR. EDERER:  Your Honor, maybe I can assist in this

16   particular regard, because I actually did ask this question of

17   Mr. Yurkerwich at his deposition:

18   "Q.  What was Amazon's response to Adrea's demand for $50

19   million?"  Mr. Cabral objected, and then Mr. Yurkerwich

20   answered:

21   "A.  I don't know the exact response, but I do know that they

22   were proposing essentially a walkaway," meaning they offered

23   this much money in response to the $50 million demand.

24           THE COURT:  Right.  But of course, a walkaway itself

25   is also a negotiating tactic.

G6nWadr5                        Yurkerwich - Direct

1              MR. EDERER:  OK.  But what then?

2              THE COURT:  That's his point, but I think the witness

3      wanted to say something about that.

4              THE WITNESS:  What I wanted to say is that here this

5      includes dismissing the claims against Discovery that Amazon

6      had.  That was part of this offer, if you will.  And the point

7      that I wanted to make was this 50 million is not that

8      inconsistent with the 53 million we just saw a minute ago from

9      the earlier planning document, and that 53 million in the

10     earlier planning document had a 33 percent discount NRA, so

11     Intertrust was already discounting, anticipating that they were

12     going to have to settle some.  I'm just saying it's -- and you

13     see it comes out to 2.2, which I found comforting that it

14     wasn't that far off the 2.38, so in some ways they're in line

15     with each other, but unfortunately these are the only two data

16     points that I have.

17             MR. CABRAL:  And, your Honor, if I may just briefly on

18     this issue, the Federal Circuit has weighed in on the value of

19     settlement offers like this one in a context of reasonable

20     royalty analysis.  Typically that analysis is to use those

21     settlement offers as a basis to determine the rate.  And that's

22     not what we're doing here.  We're using this particular offer

23     in order to adjust for the settlement discount that's reflected

24     in the Amazon agreement, which I think is a fundamentally

25     different exercise than using an offer as probative evidence of

1    what a hypothetical negotiation would be.

2            The case I'm relying on, your Honor, is a case called

3    Whitserve v. Computer Packages, which is a Federal Circuit

4    case, and in it the Federal Circuit acknowledges that

5    settlement offers have value for determining reasonable

6    royalty, and that's more directly towards the result of a

7    hypothetical negotiation as opposed to how we're using it

8    indirectly here to determine a settlement discount to be

9    adjusted for as part of Amazon.

10           THE COURT:  I come out on this one pretty much how I'm

11   tentatively coming out on the other exhibit, but I think I know

12   enough about this one I can make my final ruling right now.  I

13   think I would not have admitted it before the jury, because I

14   think there is too much of a potential for confusion, but this

15   is a good example, I think, of where a judge is in a different

16   position from a jury.  Every judge is very familiar with

17   settlement negotiations and what goes on and all the background

18   to that in a way that jurors are mostly not familiar, so I

19   don't think the potential for confusion is present here.

20   Whether it has much probative value I remain skeptical, when I

21   think of all the things people do say in settlement

22   discussions.  But Rule 401, the most basic rule of all, says

23   that evidence is relevant if it has any tendency to make a fact

24   more or less probable than it would be without the evidence,

25   and given both that very low threshold and the absence of

1    better evidence, because you can't get blood out of a stone,

2    the witness could only rely on what little bit of data that was

3    available, I'm going to receive this in evidence.

4              (Defendants' Exhibit 69 received in evidence)

5              MR. CABRAL:  If we could turn to slide 17.

6    Q.  Mr. Yurkerwich, can you explain what is shown here?

7    A.  Yes, this is applying the litigation risk adjustment of

8    2.38 from the Intertrust planning document to the U.S. share of

9    the settlement rate, and so that's applying 2.38 times 15.4

10   cents to arrive at 36.7 cents.

11   Q.  What does this part of the calculation represent?

12   A.  It represents a rate that would apply to a hypothetical

13   negotiation where you have a valid and infringed patent in the

14   United States.

15   Q.  Without asking you to do a calculation on the spot in your

16   head, had you used the risk adjustment of 2.2 in your analysis,

17   how would that affect the calculation shown here?

18   A.  It would be approximately 32 cents -- maybe 33, excuse me.

19   Q.  Mr. Yurkerwich, did you also adjust for a share of the

20   settlement patent in the license portfolio?

21   A.  Yes, we did.

22   Q.  Can you explain the purpose of that adjustment?

23   A.  In this situation, I had to take this portfolio rate and

24   convert it into a '703 rate, so I had to apportion the

25   settlement in the '703 patent.

1          MR. CABRAL:  If we could turn to the next slide, slide

2     18.

3          THE COURT:  Sometime in the next few minutes we'll

4     take our midafternoon break, but find an appropriate spot.

5          MR. CABRAL:  Yes, your Honor.  I'll just ask a few

6     more questions.

7          THE COURT:  Go ahead.

8     Q.  How did you adjust for the value of the '703 patent alone?

9     A.  Well, I considered the entire portfolio and I considered

10    the activity with respect to the portfolio over its history,

11    and what I've presented here is three patent families that had

12    been asserted in litigation, in fact, the only three families

13    that were asserted in litigation, of course the '703 patent and

14    then the '851 and the '690/'501, which are in the same family.

15    So these are the only three families that have been litigated

16    to date.

17    Q.  Why did you focus on patent families that had been

18    litigated?

19    A.  Because it's the best evidence of where the value in the

20    portfolio lies.  Clearly if there were other patents litigation

21    worthy, they would have been asserted, and these are the three

22    families, the only three families that were asserted, and

23    therefore are likely to be the ones believed to have the most

24    value.

25    Q.  And what value did you assign in your analysis to the

1    patent families that had been litigated?

2    A.  I ended up assigning 25 percent to each of the litigated

3    families because I provided a fourth category, which you can

4    see on the chart, for the rest of the portfolio, assigning it a

5    25 percent weight.

6    Q.  And why did you assign weight to the rest of the portfolio

7    that had not been asserted in litigation?

8    A.  It's an element of conservatism.  I would have expected

9    that there might be another family that would have been

10   litigated or asserted, so this provides for the possibility

11   that there was or is another one, and it gives it the same

12   weight as the three that were litigated.

13   Q.  And what does the rest of the portfolio consist of?

14   A.  Well, it really consists of the Sony portfolio, as well as

15   any other Philips patents or Discovery patents that might be as

16   valuable as these three other ones.

17           MR. CABRAL:  Your Honor, with that, I think this is a

18   good breaking point.

19           THE COURT:  All right.  Again, I have two matters I

20   have to take care of, one down in chambers, one here in the

21   courtroom, so we will reconvene at 4:15.  And we will go today

22   until 5:30 and then conclude for today.  I'll see you at 4:15.

23           (Recess)

24

25

```
 1              (In open court)

 2              THE COURT:  Okay.  How much longer, by the way, do you

 3    have on direct?

 4              MR. CABRAL:  Without interruption, probably 15, 20

 5    minutes.

 6              THE COURT:  You expect to go without interruption?

 7    What kind of madman are you?

 8              MR. CABRAL:  With interruption, 25, perhaps.

 9              THE COURT:  Anyway, go ahead.

10              MR. CABRAL:  Thank you, your Honor.

11              If we could bring up slide 19.

12    BY MR. CABRAL:

13    Q.  Mr. Yurkerwich, can you explain what is shown here on slide

14    19.

15    A.  Yes.  This is the continuing calculation of my royalty for

16    the '703 patent, and here I'm actually adding the 25 percent

17    share that I've estimated for the '703 patent and multiplying

18    that by the previous portfolio rate of 36.7 to arrive at a '703

19    rate of 9.2 cents.

20    Q.  And I think you may have just hinted at it, but what does

21    the result of this calculation represent?

22    A.  It represents the '703 share of the Amazon settlement

23    adjusted down to the US and adjusted for the litigation risk.

24    Q.  Was your final adjustment to the Amazon settlement

25    agreement relating to the life of the '703 patent?
```

1    A.  Yes, it is.

2              MR. CABRAL:  If we could turn to the next slide.

3    Q.  Mr. Yurkerwich, can you briefly explain what is shown here.

4    A.  Yes.  This is a discussion of the background of why I

5    needed to increase the previous value of 9.2 cents to account

6    for the longer patent life of the '703 patent compared to the

7    rest of the portfolio.

8              MR. EDERER:  Your Honor, if I may, I apologize, but I

9    would like to interpose an objection to this slide and the

10   testimony that may be forthcoming with respect to this chart,

11   the illustrative example.  This illustrative example appears

12   nowhere in Mr. Yurkerwich's report, and if it had, I might well

13   have asked him some questions about it at his deposition.

14             MR. CABRAL:  Your Honor, I don't plan on asking any

15   substantive questions about the example presented here.  It's

16   merely represented as an illustration to help illustrate the

17   concept of why the adjustment is necessary, converting from a

18   lump sum to a per unit rate, but I'm happy to go along with the

19   examination, and obviously this demonstrative is not being

20   offered as evidence.

21             THE COURT:  All right.  That's fine.

22   BY MR. CABRAL:

23   Q.  Mr. Yurkerwich, why did you adjust for the life of the '703

24   patent?

25   A.  Because the Amazon settlement was for a portfolio of

1    patents that had varying lives and it was a lump sum, so what

2    I've done is disaggregate the lump sum into a per-patent

3    amount, and within that lump sum are patents with different

4    lives that would account for different shares of the lump sum

5    based on their different lives, because they would generate

6    royalties for different periods of time.

7    Q.  And how do you respond to the criticism that adjusting for

8    the life of the '703 patent is duplicative because a running

9    royalty accrues value over time as more sales are made?

10   A.  Well, it's really looking at the equation backwards, if you

11   will, because here, we're breaking apart a lump sum into its

12   individual patent components all at different lives, to arrive

13   at a per-unit rate, then that per-unit rate would be applied to

14   the different patents over different periods of time.

15          MR. CABRAL:  If we could turn to the next slide, 21.

16   Q.  Can you explain how you adjusted for the life of the '703

17   patent as part of your analysis in this case.

18   A.  Yes, I can.  Here you'll notice I have the portfolio

19   presented in four different categories.  That is the '851

20   patent being the 25 percent of the portfolio value, the 69501

21   patent family another 25 percent of the value, and then the

22   rest of the portfolio 25 percent, then of course the '703,

23   25 percent.  And I presented the average patent life for each

24   of these categories.  So you can see for '851 it's 4.9 years,

25   for the 69501 family it's 8.9 years, and the rest of the

portfolio has an average of 13.4, while the '703 patent had an

average life of 18.2.  So it demonstrates that in fact the '703

patent has a much longer life.  And part of what this slide is

demonstrated to show is the calculation that I made comparing

that '703 patent life of 18.2 years to the average life of the

rest of the portfolio.

Q.  And what do you consider to be the relevant life for

purposes of this adjustment?

A.  The relevant life is from the time period covered by the

patents included in the Amazon settlement.

Q.  And what was that time period?

A.  It's from 2008 through 2026.

Q.  And why did you determine that the relevant period began in

2008?

A.  Because that is the date that Amazon owed royalties,

starting from that date.

Q.  Why did you not compare the life of the '703 patent against

the average life of all other patents in the portfolio?

A.  Well, I did it based on the relative importance of the

patents that gave value in the settlement, so I grouped them

into the four categories that you see here and compared the

'703 patent to the other three categories, so you can see I

averaged the other three categories to arrive at a 9.1-year

average for these other three categories, weighting them 1/3

each, and then I compared that 9.1 years to the 18.2 years

G6n1adr6                          Yurkerwich - Direct

1    associated with the '703 patent and observed that the '703

2    patent was twice as long.

3              MR. CABRAL:  If we could turn to the next slide, slide

4    22.

5    Q.   Can you explain what's shown here.

6    A.   Here I applied this fourth and final adjustment to the

7    previous value of 9.2 cents, so I applied the two times for the

8    difference in the life between the '703 patent and the rest of

9    the portfolio to arrive at a per-unit rate of 18.4 cents.

10   Q.   And what does the result of this calculation represent?

11   A.   This would represent the apportioned and adjusted value of

12   the '703 patent from the Amazon settlement and license.

13   Q.   Now in addition to the Amazon license and settlement

14   agreement, you also considered an offer made by Adrea to Barnes

15   & Noble in 2012, correct?

16   A.   That's correct.

17             MR. CABRAL:  If we could turn to slide 23.

18   Q.   Can you explain what is shown here.

19   A.   Here, the offer made by Adrea to Barnes & Noble in 2012 was

20   an offer of 50 cents per unit, and I've considered that offer

21   and made adjustments to it consistent with the adjustments that

22   I made to the Amazon settlement, with one -- with one

23   exception.

24   Q.   And why did you consider this offer to Barnes & Noble as

25   part of your analysis in this case?

A.   This is to Barnes & Noble, and of course this negotiation

involves Barnes & Noble so -- and it was -- was made, and it's

a data point that helped me explore what an equivalent value

for the '703 patent might be based on this offer.

Q.   Did Barnes & Noble ever respond to this offer?

A.   I don't believe they did, no.

Q.   So why did you consider it part of your reasonable royalty

analysis in this case?

A.   Well, again, it was a data point that I felt I needed to

consider and -- and compare to the results of my other

analysis.  It was one of the few data points available

concerning the negotiations between these parties, and here, of

course, this is with Adrea, not Philips, but essentially Adrea

standing in the shoes of Philips.

Q.   Did you make any adjustments to this offer to Barnes &

Noble?

A.   I did.

Q.   And what adjustments did you make?

A.   You can see on the slide I made an adjustment for the US

portion and I then applied the same 25 percent adjustment that

I applied to the Amazon settlement to isolate the value to the

'703 patent, and then I adjusted it for the relatively longer

term of the '703 patent, again, by a factor of two.  So the

math is essentially 50 cents times the 89 percent times the

25 percent, and times 2, to arrive at 22.1 cents.

1   Q.  And why did you make these adjustments?

2   A.  Again, to develop an estimate based on this offer of the

3   value of the '703 patent.

4   Q.  Did you adjust the offer to Barnes & Noble to account for

5   litigation risk?

6   A.  I did not, and that's the one adjustment of the four that I

7   did not -- that I did not make here.

8   Q.  And why did you not adjust for litigation risk with respect

9   to this offer?

10  A.  Well, this was an offer and not a negotiation and it didn't

11  seem appropriate to increase it.

12  Q.  What was the end result of your analysis of the Adrea offer

13  to Barnes & Noble?

14  A.  A estimate of 22.1 cents for the '703 patent.

15  Q.  If you could please direct your attention to the Exhibit

16  JTX 31 in your binder.

17          MR. EDERER:  Your Honor, I'm going to object to the

18  prior testimony with respect to JTX 31, which hasn't been

19  offered and which is a settlement communication pursuant to

20  F.R.E. 408.  It's not a joint exhibit at this time.  It's

21  objected to.  It's a communication between Adrea and Barnes &

22  Noble, and it was labeled F.R.E. 408 by Adrea, and it involves

23  negotiations that took place prior to the institution of this

24  litigation.

25          MR. CABRAL:  Your Honor, this document was previously

1    admitted into evidence on October 7th of 2014.  It was

2    admitted as a joint exhibit at the prior trial.  While

3    Mr. Ederer is correct that Adrea did label the document as

4    Federal Rule of Evidence 408, we are obviously waiving that

5    objection in terms of offering it here for this proceeding as

6    well.

7              THE COURT:  Well, what's the purpose of offering this?

8              MR. CABRAL:  Your Honor, I think based on our prior

9    conversation, I don't necessarily think this document needs to

10   go into evidence, so long as Mr. Yurkerwich can provide his

11   opinions regarding this offer in the context --

12             THE COURT:  But that's a different issue.

13             MR. CABRAL:  Okay.

14             THE COURT:  So here, you're offering what occurred in

15   this settlement as reflected in the settlement document for its

16   truth, yes?  Not for some purpose other than to show what the

17   parties were settling about.

18             MR. CABRAL:  Exactly.  I think, if you mean by truth,

19   I think the distinction that existed before with Federal Rule

20   408 does not exist here.

21             THE COURT:  That's my point.

22             MR. CABRAL:  Yes.

23             THE COURT:  So this would normally be covered by 408,

24   and testimony about it would be covered by 408.  However, both

25   parties jointly offered it at the prior trial?

1            MR. CABRAL:  That's correct, your Honor.

2            THE COURT:  So why doesn't that waive the 408

3     objection?

4            MR. EDERER:  Well, your Honor, I think it goes back to

5     the question that you addressed earlier, which is the extent to

6     which a document was either objected to or not objected to for

7     a different purpose than --

8            THE COURT:  No.  The whole point of 408 is to protect

9     the confidentiality of settlement discussions.  If this

10    document was, on the consent of both parties, introduced at the

11    prior trial, the confidentiality of it has long since been

12    waived.  408 is a dead letter, as far as this document is

13    concerned.  So I don't see that objection.

14           MR. EDERER:  Yes.  The other objection that we've made

15    with respect to this document, your Honor, is under 403.  This

16    offer was not accepted, and it would be prejudicial to include

17    it in the record in this case.

18           THE COURT:  403 has almost no relevance in a bench

19    trial.  Overruled.  The document is received.

20           (Joint Exhibit 31 received in evidence)

21           MR. CABRAL:  Thank you, your Honor.  You anticipated

22    my offer into evidence.

23           THE COURT:  Well, it was silently but effectively

24    made.

25           MR. CABRAL:  Thank you.

G6n1adr6                          Yurkerwich – Direct

1    BY MR. CABRAL:

2    Q.  Is this document, JTX 31, Mr. Yurkerwich, is this the offer

3    you considered as part of your analysis?

4    A.  It is.

5    Q.  Are you familiar with the *Georgia-Pacific* factors for

6    estimating a reasonable royalty?

7    A.  I am.

8    Q.  Did you consider these factors in your analysis?

9    A.  I did.

10   Q.  Which factors did you consider?

11   A.  I considered all of them; all 15.

12   Q.  Did you give all 15 factors equal weight in your analysis?

13   A.  No, I did not.

14   Q.  Why not?

15   A.  Because they have different degrees of relevance and

16   importance to this particular matter.

17          THE COURT:  Let me call to your attention -- and this

18   came after your report, but I had raised it with counsel

19   earlier today.  So the Federal Patent Bar Association, which

20   has been of immense help to courts in helping frame jury

21   instructions and much else, has recently proposed doing away

22   with the *Georgia-Pacific*.  That doesn't mean this Court has the

23   power to do so, because it may be that case law requires me to

24   consider them all.  But in their proposed new jury instruction,

25   which is instruction 6.7, reasonable royalty – relevant

factors, they list just three, and it's really just two, but

you'll see why they break it into three.  The first is the

value that the claimed invention contributes to the accused

product; (2) the value that factors other than the claim

invention contribute to the accused product.  Let me pause

there to say I don't really see how you can compute 1 without

computing 2, so those are one factor.  And the last one is,

comparable license agreements such as those covering the use of

the claimed invention or similar technology.

         So let me ask you, other than those factors, were

there any *Georgia-Pacific* factors that you thought were

particularly important in this case?

         THE WITNESS:  Well, I think some of the

*Georgia-Pacific* factors obviously fall into those categories.

         THE COURT:  That's the whole point of the commentary,

which you don't have.  It points out, *Georgia-Pacific* suffers,

among many other things, from having overlapping factors.  But

other than genuinely separate factors under *Georgia-Pacific*

that -- I know in your report you considered all of them, but

as you sit here now, other than those two, are there any that

you thought are particularly important to your opinions in this

case?

         THE WITNESS:  Well, I think obviously the -- other

than those two, the comparable licenses and the value that the

invention contributes to the product --

1          THE COURT:  Right.

2          THE WITNESS:  Well, I think that is the heart of it.

3    There are some words in the factors that expand upon those

4    concepts, but -- and you'll see, you may have seen already,

5    I've already grouped the factors into some categories.

6          THE COURT:  I see you grouped factors 1, 2, 3, 4, and

7    7 as licensing factors, and I'm sure there are other groupings.

8    I'm just skimming through this at the moment.  But yes, I see

9    that.

10         THE WITNESS:  And you'll see the testimony -- the

11   slides organize them in the same way I did in the report.  And

12   it's really to kind of get to the heart of it and -- and, you

13   know, not focus on a factor that is not material to deriving

14   the results of a negotiation.  Now of course what you just --

15   tried to include the hypothetical negotiation, so I guess I

16   would say that should be certainly considered as part of the

17   analysis.

18         THE COURT:  But all the *Georgia-Pacific* factors are

19   designed to get at factors that would be considered in a

20   hypothetical negotiation.  I mean, I think that's in the

21   statute itself, if I recall correctly, but maybe that's a good

22   way to put the question.  Other than those two factors, the

23   value that the claimed invention contributes to the accused

24   product and comparable license agreements, what other factors

25   did you consider important?  I'm not asking you to go through

1    all your factors here because counsel's welcome to do that in

2    the two or three minutes left of his direct examination, but

3    what other factors, if any, would you want to bring to my

4    attention that you thought would be important in this

5    hypothetical negotiation?

6            THE WITNESS:  Well, I think the -- I would just say

7    that some of the words in some of the other factors, like the

8    popularity, the effect of the patented specialty in promoting

9    sales of other products, for example, that -- and that runs to

10   value, so maybe that's already embraced by one of these

11   categories, but I still find the words useful in terms of

12   helping us think about the details.

13           THE COURT:  Okay.  All right.

14           Okay.  Well, go ahead then, counsel.

15           MR. CABRAL:  Your Honor, the next few slides I had was

16   about to go through that same exercise and identify which

17   factors are significant.  I can skip over that in the interest

18   of time.

19           THE COURT:  But remember, his report is not in

20   evidence, so I don't want to deprive you of the opportunity of

21   covering anything you want to cover.  I was just trying to sort

22   of move things along a little bit.

23           MR. CABRAL:  Yes.  You'll see it's not a mechanical

24   step-by-step analysis, so --

25           THE COURT:  Very good.

1              MR. CABRAL:  If we could turn to the next slide.

2    BY MR. CABRAL:

3    Q.  Mr. Yurkerwich, of the *Georgia-Pacific* factors shown

4    here -- 1, 2, 3, 4, and 7 -- which factors, if any, did you

5    consider to be significant for purposes of your analysis?

6    A.  Well, the most significant factor, of course, is the Amazon

7    license, which is a license that includes the '703 patent, that

8    I've performed an exhaustive analysis to develop a per-unit

9    rate for the '703 patent from that license; and I also did

10   observe Barnes & Noble's licensing practices in a number of

11   other agreements, which give witness to them paying running

12   royalties on the Nook device; and the other factors obviously

13   are normally implied in this type of situation, where it's a

14   nonexclusive license for the United States.  So I think that's

15   kind of the heart of this group of factors.

16             MR. CABRAL:  If we could turn to the next slide.

17             MR. EDERER:  Your Honor, I'm just going to object to

18   the extent that Mr. Yurkerwich is referring to, in factor 2,

19   license and settlement agreements entered into by Barnes &

20   Noble.  First of all, he hasn't indicated what license and

21   settlement agreements he's referring to, but in addition, in

22   his report, I believe, when he addresses this issue, he

23   indicates that those agreements that I believe he's referring

24   to were not comparable to the agreement in this case, and

25   there's case law that supports the proposition that if

1    agreements of this nature are not comparable, then they're not

2    to be included in the *Georgia-Pacific* analysis.

3              THE COURT:  Well, I think that's appropriate for cross

4    examination but not for exclusion.

5              Go ahead.

6              MR. CABRAL:  Thank you, your Honor.

7    BY MR. CABRAL:

8    Q.  Mr. Yurkerwich, of the *Georgia-Pacific* factors shown

9    here -- 9, 10, and 11 -- which factors, if any, did you

10   consider significant for purposes of your damages analysis in

11   this case?

12   A.  Well, I would say that this group of factors addresses the

13   relative importance of the invention to the marketplace, and

14   what I tried to do here is show that -- and I wrote about this

15   in my report, based on some other Barnes & Noble documents that

16   discussed how they were using the invention to help customers

17   buy content, essentially, and they believed that this was an

18   important feature of the device.

19             MR. CABRAL:  If you could turn to the next slide,

20   slide 26.

21   A.  And here you have another group of factors, albeit somewhat

22   similar, but I would say that the profitability, success, and

23   popularity is relevant in that some of the documents from

24   Barnes & Noble indicated that this shopping feature was a

25   primary revenue driver, which obviously is an indication of its

1    importance.

2        And then I just --

3        MR. EDERER:  Your Honor, I'm just going to object

4    again -- I believe I objected before -- about the testimony

5    with respect to these documents, Barnes & Noble documents that

6    Mr. Yurkerwich seems to be referring to, and he's telling us

7    what he concluded from those documents and what they

8    purportedly say.  A, they're not in evidence and they haven't

9    been offered; B, I don't believe they say what Mr. Yurkerwich

10   says they say.

11       THE COURT:  So they don't have to be offered in

12   evidence.  We just went through that.  And if they don't say

13   what he says they say, that's, of course, fair game for cross

14   examination.  He's saying they do say that.  So that sounds

15   like cross examination to me.

16       Go ahead, counsel.

17       MR. CABRAL:  Thank you, your Honor.

18   BY MR. CABRAL:

19   Q.  Mr. Yurkerwich, I believe you addressed the substance of my

20   next question, but among the factors shown here -- 6, 8, 12,

21   and 13 -- which *Georgia-Pacific* factors did you consider to be

22   significant for analysis in this case?

23   A.  The -- I guess 6, 8, and 12, and essentially these are the

24   factors that deal with the importance and effect of the feature

25   on the success of the product in terms of generating sales and

1    profits.  And I just might comment on factor 13, where I again

2    refer to these six licenses that are identified in the public

3    domain that had the royalty rates of 3½ to 10 percent.  They

4    are -- there's a *Georgia-Pacific* factor for analogous

5    inventions, and these are licenses of analogous inventions.

6    How much weight it should be given, you know, that's a

7    different question, but that's what I found.

8           MR. CABRAL:  If we can turn to slide 27.

9    A.  And here --

10   Q.  Mr. Yurkerwich --

11   A.  Sorry.

12   Q.  -- hold on one second.  Why don't I start by asking for you

13   to explain what's shown here on slide 27.

14   A.  Well, here, I am concluding with, of course, factor 15, and

15   I also include factor 5 here, which is the commercial

16   relationship between the parties, and that's part of this

17   negotiation, revealing that Philips and Barnes & Noble were not

18   direct competitors in this negotiation, so, you know, that fact

19   provides some incentive on the part of Philips to want to

20   license its technology to Barnes & Noble to get it in use in

21   the marketplace.

22   Q.  What information did you consider regarding the relative

23   bargaining positions of Philips and Barnes & Noble at the

24   hypothetical negotiation?

25   A.  Well, you can see what I've summarized here.  On the Barnes

G6n1adr6                          Yurkerwich - Direct

1      & Noble side, I did observe that they were paying running

2      royalties for other patented technologies in the range of 5 to

3      60 cents per device, and there was an expectation, as I said a

4      minute ago, that -- that the shopping would be an integral

5      component and a primary revenue driver.

6           And another important point, which perhaps should be

7      included in that list of items that you mentioned, your Honor,

8      the availability of noninfringing alternatives, and --

9      acceptable amount of noninfringing alternatives, I should say.

10     And here, Barnes & Noble's technical expert advanced a

11     noninfringing alternative in a report.  However, he did not

12     address the acceptability of the alternative, and as far as I

13     know, there is no evidence in the record about the

14     acceptability of a noninfringing alternative that he proposed.

15     Q.  How did the existence or nonexistence of a noninfringing

16     alternative affect your analysis?

17     A.  Well, clearly the nonexistence provides an incentive or a

18     reason why Barnes & Noble would be willing to pay a royalty in

19     an amount equivalent to the implied rate in the Amazon

20     agreement, and in fact, as far as I know, the feature is

21     continued -- continues to be present in the devices.

22     Q.  Why did you consider other rates paid by Barnes & Noble

23     relating to technologies used on those devices?

24     A.  It's an indication that they were in a position where they

25     were using multiple technologies owned by others and elected to

G6n1adr6                          Yurkerwich - Direct

1    pay a running royalty, so it establishes the notion that they

2    would be willing to pay a running royalty.

3    Q.  Where did you obtain this information?

4    A.  From documents produced by Barnes & Noble.

5    Q.  If you could --

6           MR. EDERER:  Objection, your Honor.  Same objection.

7    It goes to the issue of comparability.

8           THE COURT:  Same ruling.

9           MR. EDERER:  And admissibility, actually, as well.

10          THE COURT:  Still same ruling.

11   Q.  If you could turn in your binder to Exhibit PTX 200, and

12   specifically Exhibit A.

13       Is this the information you considered regarding royalty

14   rates paid by Barnes & Noble for the Nook devices?

15   A.  Yes.

16          MR. CABRAL:  Your Honor, this document, PTX 200, was

17   admitted into evidence at the last trial, on October 17th.

18   We offer it here again for admission.

19          MR. EDERER:  Objection, your Honor.  The issue is,

20   once again, comparability, and right in Mr. Yurkerwich's

21   report, he indicates that these agreements do not appear

22   comparable to the patent in suit.

23          THE COURT:  Where are you talking about?

24          MR. EDERER:  Paragraph 72.

25          THE COURT:  Okay.  Hang on.

1              MR. EDERER:  And also 71.

2              THE COURT:  All right.  So 72 lists a bunch of

3      settlement agreements between Barnes & Noble and various other

4      parties, and says, "Given that the above agreements all are

5      based on lump sum payments and do not appear to be comparable

6      to the patent in suit, they provide little guidance for the

7      negotiation of royalty in this matter."

8              However, 71 lists a different group of license

9      agreements and there the statement is, "While the above

10     agreements are not comparable to the patent in suit, they do

11     provide evidence of Barnes & Noble's willingness to pay running

12     royalties for technologies important to their products."

13             But what's being offered here is beyond that, is it

14     not?

15             MR. CABRAL:  Your Honor, what's being offered here,

16     among what you just read, is only that first table of running

17     royalties, and in accordance with Mr. Yurkerwich's testimony,

18     he's relying on this solely to establish that Barnes & Noble

19     has been willing to pay a running royalty with respect to

20     technologies associated with the Nook device.  That's the only

21     reason he's using it.

22             THE COURT:  All right.  So that seems to be consistent

23     with his report, so what's the objection?

24             MR. EDERER:  The objection is that the suggestion here

25     is that these -- well, it goes to the question of admissibility

1    here.  The *LaserDynamics* case indicates very clearly that if

2    you're talking about agreements that are not comparable -- I

3    mean, it very clearly states right in the report that they're

4    not comparable, then they're not to be used for any purpose.

5    It's not --

6              THE COURT:  I don't understand that at all.  I mean,

7    that may be what that case said, but I don't understand why

8    that should be so.  If, for example, a question in a case was

9    whether a given company was willing to enter into licensing

10   agreements of any kind whatsoever and you were then able to

11   produce 500 licensing agreements, none of which were comparable

12   to the particular item in suit, they would still be admissible

13   to show that this was not a company that had decided they would

14   never ever do a licensing agreement.

15             So here, as I understand it, all that's being offered

16   is, this shows that Barnes & Noble is willing, unlike some

17   companies, to pay what's called a running royalty.  And the

18   fact that these may not be comparable may or may not be good

19   fodder for cross examination, but I don't see how it precludes

20   admissibility for that limited purpose.  Overruled.

21             MR. CABRAL:  Thank you, your Honor.  And I'm on my

22   last page so I'll wrap up here.

23   BY MR. CABRAL:

24   Q.  Mr. Yurkerwich, did you consider Barnes & Noble's

25   expectations regarding the use of the patented invention at the

G6n1adr6                    Yurkerwich - Direct

1    time of the hypothetical negotiation?

2    A.  Yes, I did.

3    Q.  And what specifically did you consider?

4    A.  That at the time of the hypothetical negotiation, they

5    viewed the shop feature as an important feature to the product

6    to help drive revenue.

7    Q.  And how did that factor into your analysis?

8    A.  It would support obviously a higher royalty rate within the

9    context of other data points.

10   Q.  If we could turn to --

11          MR. EDERER:  Your Honor, once again, this is, based

12   upon the same marketing documents that we haven't seen, pure

13   hearsay.  He's offering this for the truth of what these

14   documents say.  It's not just a question of reliance at this

15   point.

16          THE COURT:  Well, I'll reserve on that until I hear

17   cross examination.

18          MR. CABRAL:  If we could turn to the final slide, 28.

19   BY MR. CABRAL:

20   Q.  Mr. Yurkerwich, can you explain what's shown on this slide.

21   A.  In this slide I bring together two data points, that is,

22   the per-unit rate from the Amazon settlement of 18.4 cents and

23   then the per-unit rate derived from the offer, Adrea offer to

24   Barnes & Noble of 22.1 cents, and on this particular chart and

25   in my report, I computed an average of those two data points.

1    I also considered the *Georgia-Pacific* factors in concluding

2    that approximately 20 cents or 20.2 cents would be the result

3    of a hypothetical negotiation between Philips and Barnes &

4    Noble in November of 2009.

5    Q.  Why did you take the average of the two numbers?

6    A.  Well, I reflected on the two numbers themselves and I

7    placed more weight on the 18.4 result, which would suggest that

8    I shouldn't have taken a simple average.  However, an important

9    element of the Amazon settlement is that it was Amazon, and

10   Amazon was a much bigger player in the market than Barnes &

11   Noble, and they were the first company to take a license to the

12   portfolio, which included the '703 patent, so undoubtedly

13   that -- the value of that settlement included some volume

14   considerations and first licensee considerations, so therefore,

15   I think it's reasonable to take the simple average of these two

16   data points.

17   Q.  In your opinion --

18              MR. EDERER:  I move to strike that last answer.  I

19   don't believe anything that Mr. Yurkerwich just said as his

20   explanation of taking the average is in his report.  He just

21   indicates in his report, I averaged the two and I come out to

22   20 cents.

23              THE COURT:  Well, something that is implicit in some

24   of these objections I think goes beyond the requirements of

25   Rule 26.  For example, you previously objected, and plaintiff's

1    counsel acquiesced in your objection, to an illustration that

2    was in one of the slides but was not in the report, but I'm not

3    aware that every illustration needs to be in an expert report

4    to be admissible at testimony at trial.  So let's take a look

5    at the relevant portion of Rule 26.

6            So Rule 26(a)(2)(B) requires an expert report to

7    contain: (i) a complete statement of all opinions the witness

8    will express and the basis and reasons for them; (ii) the facts

9    or data considered by the witness in forming them; (iii) any

10   exhibits that will be used to summarize or support them; (iv)

11   the witness' qualifications, including a list of all

12   publications offered in the previous ten years; (v) a list of

13   all other cases in which, during the previous four years, the

14   witness testified as an expert at trial or by deposition; and

15   (vi) a statement of the compensation to be paid for the study

16   and testimony in the case.

17           Now the one that's at issue here on the objection just

18   raised is the first one, a complete statement of all opinions

19   the witness will express and the basis and reasons for them.

20   So he clearly expressed the opinion that the reasonable

21   royalties owed by Barnes & Noble would be $1,059,265, that this

22   was a function of multiplying the units between 2012 and 2014

23   by the per-unit average rate of .202 dollars, a little over 20

24   cents.  He's clearly disclosed that that was the average

25   between the per-unit rate that was set forth in the Amazon

 1    settlement and the per-unit rate that he had calculated for

 2    reasons he had given that was based on the offer to Barnes &

 3    Noble.  So the only thing, if you're right about his report,

 4    that he didn't disclose was why he chose to average those two

 5    figures.  I think that is a level of minutiae that, while

 6    ideally might have been disclosed in his report, the failure to

 7    disclose it doesn't fail to meet the requirements of

 8    Rule 26(a)(2)(B)(i).  But did you question him about that at

 9    his deposition?

10            MR. EDERER:  I will answer that question in one

11    moment, your Honor.

12            THE COURT:  Okay.

13            MR. EDERER:  I asked him some questions about

14    averaging in the context of another issue that I was pursuing

15    that had nothing to do with what he just said.

16            THE COURT:  You see, I think the two have to be read

17    in tandem.  You saw from his report that he averaged these two.

18    You saw how he computed each of the two.  And so I think it was

19    reasonably incumbent on you, if you felt that you were

20    mystified as to why he averaged them, to ask that at his

21    deposition.  I don't think that that is excluded by his failure

22    to give it in the report.  So the objection is overruled.

23            MR. CABRAL:  Thank you, your Honor.  Just four final

24    questions.

25    BY MR. CABRAL:

1   Q.  Mr. Yurkerwich, in your opinion what would have been the

2   result of the hypothetical negotiation in this case?

3   A.  A per-unit rate of 20.2 cents.

4   Q.  How did you determine the number of units of infringing

5   units sold?

6   A.  That was based on records produced by Barnes & Noble, and I

7   believe the quantities were actually stipulated to.

8   Q.  And what is the quantity, just for the record?

9   A.  5,232,016.

10  Q.  Why did you focus your opinions on the period from

11  March 29, 2012 through June 30, 2014?

12  A.  I believe March 29, 2012 is the date established by the

13  Court as the date when damages would begin, and only -- data

14  has only been produced through June 30, 2014, so we don't know

15  the number of units after that date at this point in time.

16  Q.  And in your opinion what are the total royalties owed by

17  Barnes & Noble for its infringement of the '703 patent?

18  A.  Well, for this particular period of time, $1,059,265.

19          MR. CABRAL:  No further questions, your Honor.

20          THE COURT:  Okay.  Cross examination.

21          MR. EDERER:  Your Honor, we also have a binder that we

22  may be showing some documents to the witness from, so may we

23  present it to you?

24          THE COURT:  Sure.  Thank you.

25          MR. EDERER:  Apologies, your Honor.  I'm told by my

1    team that only I have such a binder at this point.

2              THE COURT:  I will feel deprived, but I'll muddle

3    through somehow.

4              MR. EDERER:  But we will obviously present you and the

5    witness with the documents we would like you to focus on.

6              THE COURT:  Yes.  That's fine.

7    CROSS EXAMINATION

8    BY MR. EDERER:

9    Q.  Mr. Yurkerwich, there's one thing I wanted to go over that

10   you testified to earlier with respect to the timetable that you

11   were discussing.

12       I believe you testified that the '703 patent was issued in

13   November of 2009, is that right?

14   A.  Yes.

15   Q.  Was it November 17th?

16   A.  I didn't memorize the exact date.  I can tell you.

17       It is November 17th.

18   Q.  Well, I guess you must have a copy of the patent there with

19   you, so I'm not going to burden you with another copy of the

20   patent at this point.

21   A.  November 17th.

22   Q.  Okay.  And I believe you also testified that it was your

23   understanding that Barnes & Noble commenced sales of Nook

24   devices containing the accused shop feature in late October of

25   2009, is that right?

G6n1adr6                          Yurkerwich – Cross

1    A.  Yes.

2    Q.  So there was a period of time where Barnes & Noble, to your

3    understand, was selling Nooks containing the accused feature

4    prior to the time that the patent issued?

5    A.  I think there was a short period of time, yes.

6    Q.  Do you know how short?

7    A.  As far as I know, weeks, no more than a month.

8    Q.  Now you testified that in calculating a reasonable royalty,

9    you looked at various transactions that involve the '703

10   patent, is that right?

11   A.  Yes.

12              (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Q.   Generally, the reason you're looking at transactions

2    involving the '703 patent is that these are indicators to you

3    of what others may have determined to be economic value of that

4    patent, is that right?

5    A.   That's fair.

6    Q.   Now, I believe you testified that the first transaction

7    that you looked at involving the '703 patent related to the

8    formation of Adrea in 2010.  Is that right?

9    A.   Yes.

10   Q.   And if I could just show you, now I do have a document that

11   I want to present to you.  So showing you what was previously

12   marked as DTX128, do you recognize that document,

13   Mr. Yurkerwich?

14   A.   Yes, I do.

15   Q.   And is that the formation and framework agreement pursuant

16   to which Adrea was formed in August of 2010, to your

17   understanding?

18   A.   Well, this is actually the amended and restated limited

19   liability company operating agreement.

20   Q.   My apologies.  You're absolutely right.  I'm talking about

21   the amended and restated operating agreement.  Do you recognize

22   that document as one of the agreements that the various

23   stakeholders in Adrea entered into around the time that the

24   company was formed?

25   A.   Yes, in August 2010.

```
 1    Q.  I'll refer you to page 10 of that document.  I believe you

 2    were testifying earlier about the contributions of the various

 3    members of Adrea.  Do you recall that?

 4              THE COURT:  Are you offering this?

 5              MR. EDERER:  Oh, yes, your Honor, I offer it.

 6              THE COURT:  Any objection?

 7              MR. CABRAL:  Just on relevance ground, your Honor.

 8              THE COURT:  Overruled.  Received.

 9              MR. EDERER:  It's Exhibit 128, your Honor.

10              THE COURT:  Yes, Defendants' Exhibit 128.

11              (Defendants' Exhibit 128 received in evidence)

12    BY MR. EDERER:

13    Q.  Looking at page 10 of the agreement, Mr. Yurkerwich, are

14    you there?

15    A.  Yes.

16    Q.  And on this page, there's a listing of the various

17    contributions of the members of Adrea?

18    A.  Yes.

19    Q.  And do you recall testifying earlier about some of the

20    contributions by way of patent assets that various members

21    contributed to the company?

22    A.  Yes.

23    Q.  And you see in particular in paragraph 5.1(a)(2) the

24    contribution by the Philips sub, do you see that?

25    A.  Yes.
```

G6nWadr7                          Yurkerwich - Cross

1    Q.  And the contribution by the Philips sub was of various

2    patents that were valued at $5 million.  Do you see that?

3         MR. CABRAL:  Objection, your Honor.  I believe that

4    mischaracterizes the document, your Honor.

5         THE COURT:  OK.

6         MR. EDERER:  I can refer specifically to the language.

7         THE COURT:  All right.  Go ahead.

8    Q.  See the sentence that says, "Solely for purposes of

9    establishing an initial capital account under this agreement,

10   the members acknowledge and agree that the value of Philips sub

11   patents shall be treated as $5 million."  Do you see that?

12   A.  I do.

13   Q.  And there's a similar reference in here to the patents

14   being contributed by Sony, is that right?  That would be the

15   contribution by the SCA-IPLA in paragraph 5.1(a)(3).

16   A.  Yes.

17   Q.  I believe you testified those were just simply contribution

18   values or book values, if you will, for the patent assets being

19   contributed by the various members.  Is that right?

20   A.  Correct.

21   Q.  Are you aware that this same $5 million valuation was used

22   in Adrea financial statements subsequent to the formation of

23   the company?

24   A.  Yes, it should be.  It's a book value.  It was recorded on

25   the books, and as it indicates here, solely for purposes of

1   establishing an initial capital account.

2   Q.  Are you aware, sir, that that valuation was used on the

3   balance sheet of Adrea going forward from the formation of the

4   company?

5   A.  Yes, that's normal accounting.

6           THE COURT:  Let me make sure I understand what you

7   mean by that.  Are you saying this is an artificial value?

8           THE WITNESS:  No, your Honor, I'm not.  I'm saying

9   that when the parties set up this partnership, they agreed that

10  their open capital accounts would each be 5 million, and three

11  of the parties contributed patents to get that opening capital

12  account.  And one of the parties was obligated to contribute

13  money, being Intertrust.

14          THE COURT:  So they had to contribute patents that

15  were worth $5 million.

16          THE WITNESS:  That at least, that were, I suppose,

17  were at least worth $5 million.  It doesn't mean that they were

18  worth only $5 million.  I think that's the point.  And that's

19  why they say solely for the purpose, members acknowledge and

20  agree that the values are 5 million.

21          THE COURT:  I understand that, but if they're being

22  carried elsewhere on their books as actual value, then they

23  would have to be worth 5 million, not 30 million, right?

24          THE WITNESS:  Well, no, because you don't increase the

25  value of an asset until it's been realized, so the parties were

1    comfortable that, with a basis of 5 million, and their

2    expectation, of course, was that it would grow.  But for

3    starting the capital accounts, they decided, because Intertrust

4    was going to contribute 5 million, that they would each have a

5    $5 million capital account in exchange for contributing the

6    patents.

7             THE COURT:  Supposing you had a patent that any

8    objective, reasonable observer would say is worth 2 cents.

9    Could you nevertheless agree for these purposes that it's worth

10   5 million?

11            THE WITNESS:  Well, I don't think the other members

12   would have agreed to that.

13            THE COURT:  That may be, but what I'm a little unclear

14   on is whether this is an artificial entry or not.

15            THE WITNESS:  Yeah, I hear you.  So there is other

16   documentation, for example, in Philips's files, where the

17   Philips accounting people looked at what their cost basis was

18   in the patents, because they would have to pick out the gain;

19   they're going to have to report 5 million.  So I think the

20   parties said, Well, this is a reasonable number for moving

21   these patents into a new entity, and we can't really write it

22   up because it hasn't been realized.

23            THE COURT:  OK.

24            Go ahead, counsel.

25   BY MR. EDERER:

1    Q.  Do you know whether that valuation, that $5 million

2    valuation, has ever been changed in any Adrea balance sheets or

3    financial statements that have been issued since 2010?

4    A.  The answer is I'm not sure.  At some point, it would have

5    to reflect some diminution in value as a transaction as

6    completed, so I don't know the answer to that.

7    Q.  What if an actual valuation was conducted and it was

8    determined that the value was greater?  Would you then expect

9    that the financial statements would reflect that greater value?

10   A.  No, you're not --

11               MR. CABRAL:  Objection, your Honor.  Calls for a

12   hypothetical.

13               THE COURT:  Calls for what?

14               MR. CABRAL:  A hypothetical.

15               THE COURT:  My understanding is that it's been the law

16   of the Anglo-American legal system since at least 1492 that you

17   could ask hypotheticals to an expert.

18               MR. CABRAL:  Fair enough, your Honor, or assumes facts

19   not in evidence as an alternative objection.

20               THE COURT:  Well, that's a different objection. I do

21   think this is perhaps not the most major line of

22   cross-examination, but I will allow it to be completed since

23   we're going to have to break for the day very shortly anyway.

24               MR. EDERER:  I only have a few more questions, your

25   Honor.

1              THE COURT:  Go ahead.

2     BY MR. EDERER:

3     Q.  Mr. Yurkerwich, can I show you what's been marked as

4     Exhibit DTX290 for identification, which is the August 31,

5     2013, balance sheet for Adrea?  Do you have that document?

6     A.  I do.

7     Q.  Have you seen it before?

8     A.  Actually, I believe I have, yes.

9              MR. EDERER:  Your Honor, I move the admission of

10    DTX290.

11             MR. CABRAL:  Your Honor, we object to this document on

12    relevance grounds and hearsay grounds, depending on how

13    Mr. Ederer intends to use the document.

14             THE COURT:  The relevance ground is overruled.  We'll

15    see if the hearsay problem can be overcome.

16             MR. CABRAL:  Thank you, your Honor.

17    Q.  Mr. Yurkerwich, this document is headed Adrea LLC balance

18    sheet, dated August 31, 2013.  Do you see that?

19    A.  Yes.

20    Q.  And it shows what the balance sheet --

21             THE COURT:  Wait.  The hearsay problem arises.

22             Have you ever seen this before?

23             THE WITNESS:  Yes.

24             THE COURT:  OK.  And you saw it in the connection of

25    looking at Adrea's business records, yes?

1            THE WITNESS:  Yes.

2            THE COURT:  OK.  Received.

3            (Defendants' Exhibit 290 received in evidence)

4    BY MR. EDERER:

5    Q.  Mr. Yurkerwich, you see there's a section of the balance

6    sheet called assets and under that heading there is a label

7    intellectual property, and among other things it lists Philips

8    Electronics North America patents and then the value of those

9    assets for the years ending December 31, 2011, December 31,

10   2012, and August 31, 2013, all at $5 million.  Do you see that?

11           MR. CABRAL:  Objection, your Honor.  Again, it

12   mischaracterizes the document as stating the value of the

13   assets.

14           THE COURT:  I see what it is.  The document speaks for

15   itself, so I take that as for what it says.

16           Go on.

17   Q.  Do you see the words "contribution value" on that document,

18   Mr. Yurkerwich?

19   A.  What page are you on?  Where are you?

20   Q.  The one and only, the first page of the document that was

21   just handed to you.

22   A.  OK.

23   Q.  Under the heading of assets, intellectual property, Philips

24   Electronics North America patents, and it lists a value of

25   those patents at $5 million in each of three periods of time.

G6nWadr7                      Yurkerwich - Cross

1   A.  I don't see the words "contribution value."

2   Q.  So is it still your understanding nevertheless that this

3   balance sheet is not intended to reflect what the parties

4   believed to be the actual value of these various patent assets

5   and intellectual property assets?

6   A.  No, it is not intended to be.  It's an accounting record

7   and has to comply with generally accepted accounting principles

8   that don't allow you to write up the value of an asset until

9   that value's been realized.  And on the second page, you can

10  see the revenue coming in to the company of 10 million from the

11  Amazon settlement.

12  Q.  So would that indicate to you that some value with respect

13  to those assets has now been realized?

14  A.  Yes, it does.

15  Q.  Can you explain then why the asset value still has not been

16  written up?

17          THE COURT:  I'm going to interrupt because we are

18  running out of time.  I see the discrepancy that you're

19  pointing to.  We can argue about whether it's a real

20  discrepancy or not under generally accepted accounting

21  principles, but I'm not clear about what the relevance of this

22  is.  Do you want to explain that to me?

23          MR. EDERER:  In this case, we have heard a lot of

24  testimony about the value of these various patent assets and in

25  particular the '703.  I think that the value of the patent

assets as reflected on Adrea's own balance sheet over a period

of time, and which by the way, your Honor may recall were

actually reported to the IRS in those numbers, is directly

relevant to the value that is being ascribed to the '703 patent

and other patents in this case.

          THE COURT:  OK.  That frames the issue.

          What about that?

          THE WITNESS:  Well, the -- as I said, GAAP does not

provide for writing up assets until the value is realized.

          THE COURT:  He's saying that some of that value is

realized with this settlement.

          THE WITNESS:  Correct, and then it flows into the

balance sheet, with the cash comes into the company.  You don't

increase the value of the asset.  In fact, accounting rules

require you to write off the asset over a period of time, and

that's the amortization line.  You can see each year, like 2011

it was 2,187,000 and then the next year 3,910,000, the next

year 5,088,000.  Accounting, you put these assets on the books

and you have to write them off over a period of time.  And then

the revenue, the value comes into the company and then creates

income, which is on the second page in the upper right-hand

corner, the $10 million coming in from Amazon.  So this is just

normal accounting.  There's no opportunity or requirement to

quote/unquote write up the assets to their market value.

          THE COURT:  OK.

1                Anything else on that subject?

2                MR. EDERER:  One more thing, your Honor.

3     Q.  I believe you indicated in your report or you may have

4     testified that there were 39 patent families that were

5     contributed by Philips to Adrea.  Is that right?

6     A.  I'm sorry.  I don't remember the exact number, but there

7     were multiple families contributed by Philips.

8                MR. EDERER:  Give me one moment, your Honor?

9                THE COURT:  Yes.

10    Q.  Paragraph 50, do you have the report before you?

11    A.  Yes, I do.

12    Q.  We're looking at paragraph 50 of the report.

13    A.  Yes, there you go.  '703 patent together with 39 other

14    families.

15    Q.  Well, it's 38 other families --

16    A.  38.

17    Q.  -- so 38 plus one equals 39.  Is that one thing we can

18    agree on?

19    A.  Yes, sir.

20    Q.  So whatever value is being reflected on this balance sheet

21    with respect to the Philips patents, whether it's contribution

22    value, an actual value, or some other value, you divide $5

23    million by 39, would you get about $131,000 per patent?

24    A.  That's your math, but it's certainly not an appropriate

25    calculation.

1    Q.  And by the way, the Philips patents included, in addition

2    to the '703, a number of patents that relate to electrophoretic

3    display technology.  Are you aware of that?

4    A.  Yes.

5    Q.  And electrophoretic display technology is pretty important

6    technology for e-readers, isn't it?

7              MR. CABRAL:  Objection, your Honor.  Foundation.

8              THE COURT:  I'm sorry.  I didn't hear what the

9    objection was.

10             MR. CABRAL:  I apologize.  Foundation, your Honor.

11             MR. EDERER:  I'm asking if he knows.

12             THE COURT:  Yes.  Overruled.

13   A.  The technology in the Philips patents was used by iRex in

14   its e-reader.

15   Q.  Right, so iRex was a Philips spin-off, I believe you

16   testified.  Is that correct?

17   A.  That's correct.

18   Q.  And iRex, we can cover some of this another time, but iRex

19   had a license agreement with Philips, did it not, from 2005?

20   A.  It did.

21   Q.  And it was a license with respect to various Philips

22   e-reader-related patents?

23   A.  Correct.

24   Q.  And it did not include the '703, correct, because the '703

25   wasn't even issued at that point?

1    A.   That's correct.

2    Q.   And it mainly included licenses to have used

3    electrophoretic display technology, correct?

4    A.   Yes.

5    Q.   And that's technology that's core to e-readers because the

6    display is how you read books, isn't it?

7    A.   It was core to the iRex e-reader.  I don't know that it was

8    core to any other e-reader.

9           MR. EDERER:  I'm finished with this line, your Honor.

10          THE COURT:  OK.  Very good.  Tomorrow again we'll have

11   a number of interruptions, but am I right we only have this

12   witness and one other witness?

13          MR. EDERER:  That's right, your Honor.

14          THE COURT:  So we will finish.

15          MS. SHIN:  To the extent you're going to look at

16   designations tonight, I wanted to offer the document.

17          THE COURT:  Yes.  Don't worry about it.

18          Very good.  Why don't we start at 9:30 tomorrow and

19   we'll see if we can get a little more done.

20          MR. EDERER:  Thank you, your Honor.

21          (Adjourned to June 24, 2016, at 9:30 a.m.)

22

23

24

25

```
 1                      INDEX OF EXAMINATION

 2    Examination of:                          Page

 3    DAVID E. YURKERWICH

 4    Direct By Mr. Cabral . . . . . . . . . . . . .35

 5    Cross By Mr. Ederer  . . . . . . . . . . . . 144

 6                      DEFENDANT EXHIBITS

 7    Exhibit No.                              Received

 8     69    . . . . . . . . . . . . . . . . . . 115

 9     128   . . . . . . . . . . . . . . . . . . 147

10     290   . . . . . . . . . . . . . . . . . . 153

11                        JOINT EXHIBITS

12    Exhibit No.                              Received

13     003                                        38

14     32                                          58

15     31                                         126

16

17

18

19

20

21

22

23

24

25
```